```
 1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
 2


 3      * * * * * * * * * * * * * * * * * * *
        *STUDENTS for FAIR ADMISSIONS, INC.,   *
 4              Plaintiff               *  CIVIL ACTION
                    vs.                 *  No. 14-14176-ADB
 5                                      *
        *PRESIDENT and FELLOWS OF HARVARD      *
 6       COLLEGE,  et al.                *
                Defendants              *
 7      * * * * * * * * * * * * * * * * * * *


 8


 9


10          BEFORE THE HONORABLE ALLISON D. BURROUGHS
                 UNITED STATES DISTRICT JUDGE
11                    STATUS CONFERENCE
                      April 30, 2015
12


13


14


15


16


17


18


19


20                            Courtroom No. 4
                              1 Courthouse Way
21                            Boston, Massachusetts 02210


22
                        JAMES P. GIBBONS, RPR/RMR
23                       Official Court Reporter
                      1 Courthouse Way, Suite 7205
24                     Boston, Massachusetts  02210
                          jmsgibbons@yahoo.com
25
```

```
1    APPEARANCES:

2

3         BURNS & LEVINSON, LLP, (By Paul M. Sanford, Esq.,
     and Benjamin C. Caldwell, Esq.) One Citizens Plaza,
     Suite 1100, Providence, Rhode Island  02903, on behalf
4    of Plaintiff

5         CONSOVOY McCARTHY, PLLC, (By William S. Consovoy,
     Esq.) 3033 Wilson Blvd. Suite 700, Arlington, Virginia
6    22201, on behalf of Plaintiff

7         WILMER CUTLER PICKERING HALE and DORR, LLP,
     (By Seth P. Waxman, Esq.) 1875 Pennsylvania Avenue, NW,
8    Washington, D.C.  20006, on behalf of Defendants

9         WILMER CUTLER PICKERING HALE and DORR, LLP,
     (By Felicia H. Ellsworth, Esq.) 60 State Street, Boston,
10   Massachusetts 02109, on behalf of Defendants

11        HARVARD OFFICE OF THE GENERAL COUNSEL, (By Ara
     Gershengorn, Esq.), Smith Campus Center, Suite 980, 1350
12   Massachusetts Avenue, Cambridge, Massachusetts  02138,
     on behalf of Defendants
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                      P R O C E E D I N G S
2              THE CLERK:  This is Civil Action No. 14-14176
3    Students for Fair Admissions versus President and Fellows of
4    Harvard College.
5          Will counsel identify themselves for the record.
6              MR. SANFORD:  Good afternoon, your Honor.  Paul
7    Sanford for plaintiffs, Students for Fair Admissions.
8              MR. CONSOVOY:  Good afternoon, your Honor.  Will
9    Consovoy for plaintiffs.
10             MR. CALDWELL:  And Benjamin Caldwell, your Honor,
11   for the plaintiffs.
12             MR. WAXMAN:  Good afternoon, your Honor.  Seth
13   Waxman for the defendants.  My partner, Felicia Ellsworth,
14   is to my right.  And Ara Gershengorn, who's in the
15   university's General Counsel's Office, is to my left.
16             THE COURT:  Ms. Gershengorn I know.
17             MS. GERSHENGORN:  Good afternoon, your Honor.
18             THE COURT:  It's nice to see a familiar face out
19   there.
20         So it is my hope to get as much done as we can today.
21   I have every confidence that the collective brain power at
22   those tables exceeds mine, so I am happy for whatever
23   guidance and suggestions you have about how we can move this
24   along as efficiently as possible.  It is the sort of case
25   that I suspect will ultimately be decided above my pay
```

1    level, but we will do everything we can to get it decided

2    with as good and accurate a record as we can as quickly as

3    we reasonably can.

4         Let me run through my list, and then I am happy to have

5    you all run through your list.

6         Filed this morning was a motion to intervene.  I have

7    not read it yet, other than to sort of skim it.

8         Does anyone expect to weigh in on that?

9              MR. SANFORD:  We plan to file our response to that

10   within 14 days, your Honor.

11             THE COURT:  Okay.  So I'll put that aside until --

12   you too?

13             MR. WAXMAN:  We will do the same thing.

14             THE COURT:  That's fine.  I'll put that aside for

15   now.

16        The initial disclosures, it looks like, have been made,

17   correct?

18             MR. WAXMAN:  Yes, your Honor, both sides.

19             THE COURT:  Good.  I'm happy to hear that.

20        You've generally agreed to a discovery schedule on

21   expert testimony, summary judgment motions, although the

22   parties seem to have a dispute on how long a period leading

23   up to that that should be.  I think that Harvard is asking

24   for 8 months and you all are asking for 15?

25             MR. SANFORD:  Yes, your Honor.  That's really the

1    fundamental issue for today.

2        THE COURT:  Okay.

3        And then you all would like -- in part, this turns on

4    the fact that you would like all the applications to Harvard

5    over the last four years, and you all would rather do

6    representative samplings of those applications.  Have you

7    given any thought as to how that representative sampling

8    would be done?

9        MR. WAXMAN:  We have, your Honor, and I think for

10   the purposes of talking about the admissions files, we need

11   to distinguish between data, that is, the raw data sets of

12   quantifiable information about the applications.  We have --

13   Harvard has a full set of the data for the period that they

14   want to cover for -- on quantifiable information, and we

15   don't see any reason why there has to be some statistical

16   sample of that.  We can simply provide them the data set

17   with certain personal identification factors, like name and

18   address, redacted because they're irrelevant for purposes of

19   the analysis.

20       And then the question, I think the dispute is, what

21   about the actual raw admission folders, which are

22   approximately 40 pages in length?  And as to that we are

23   suggesting discussing with them what some reasonable

24   representative sample would be, recognizing that everything

25   that's quantifiable out of that -- out of the -- you know,

the letters of recommendation, and the personal statements,

which are highly, highly, personal and sensitive, what

representative -- what would a representative sample be.

THE COURT:  When you're talking about information

that's quantifiable, you're talking about -- you are all

welcome to sit if you're more comfortable.

MR. WAXMAN:  This role reversal is very

uncomfortable for me.  I am used to standing when I talk to

a judge.

You can stand or sit.

THE COURT:  My law clerks told me this makes people

uncomfortable, but I digress.

On my very first day, I'm sharing a courtroom with

another judge, I sat down in her chair, and it turned out to

be a very slippery chair.

(Laughter.)

THE COURT:  So after the humiliation of my first

day, I've become somewhat reticent about sitting in other

people's chairs.

I did sit in one yesterday.  I fell into a hole, which

I sort of had to climb out of, because it was somebody

else's.  So now I'm just going to stand.

MR. WAXMAN:  Well, this isn't my own chair, either,

so I will stand also.

THE COURT:  Well, that is if you laughed, because

1    when I actually fell to the floor, nobody laughed, and I

2    realized that at this point in my life, no one is going to

3    laugh if in I fall to the ground, which is unfortunate.

4           MR. WAXMAN:  A very, very dear friend of mine was

5    sworn in on Friday to the District Court bench, and we had a

6    reception for him at which several retired judges spoke.

7    And one of the retired judges said, There are two things

8    that are going to change in your life now that you've become

9    a United States District Judge:  No. 1, no one is going to

10   laugh at you; and, No. 2, you will never know if any of your

11   jokes are funny.

12          THE COURT:  Randy's swearing in?

13          MR. WAXMAN:  Yes.

14          THE COURT:  We were in the same "baby judge

15   school."  He probably wouldn't have laughed when I hit the

16   ground either.

17          MR. WAXMAN:  I'm sure he wouldn't have.

18          THE COURT:  I know.

19       So in terms of the quantifiable information, you're

20   talking about GPA, test scores.  Are you quantifying things

21   like recommendation letters?  Do they get a number?  Is that

22   in those?  Like good ones get a "1"?

23          MR. WAXMAN:  There are --

24          THE COURT:  What else is in there?

25          MR. WAXMAN:  When folders are complete, the first

1    several steps in the admission's process are to have one,

2    two, or three individual readers of the file, and those

3    readers will put numerical scores on a scale of 1 to 5,

4    based on academic ability, personal characteristics,

5    athletic ability, I think are the major ones.  And that's

6    all in the database.

7              THE COURT:  For every applicant?

8              MR. WAXMAN:  For every applicant, admitted or not.

9              THE COURT:  And you're willing to grow a database

10   for everybody, and a representative sample for some?

11       Is there a way to correlate the data set with the

12   applications?

13             MR. WAXMAN:  Well, there is an absolute -- the data

14   set includes the name and the address and where the --

15             THE COURT:  And you're not going to redact that?

16             MR. WAXMAN:  We are going to redact that.  We're

17   proposing to redact that.

18             THE COURT:  So once you've redacted that, is there

19   a way for them to look at the application and find it in the

20   data set?

21             MR. WAXMAN:  We can certainly do that for them.  So

22   we can say, On this date on line 8,254 of the data set,

23   here's the folder, the full folder, for that applicant.

24             THE COURT:  Two questions:  Why is this not

25   sufficient, and I guess a corollary to that, What do you

1    hope to get out of the paper file that's not available in

2    that numerical file?

3            MR. CONSOVOY:  Your Honor, I think there's more

4    going on in the file than is being led on here.

5        For example, there are summary statements where there

6    are comments made by people in the Admissions Office about

7    the applicant, which are going to be central to this case.

8        Names may be central.  For example, if an Asian

9    applicant has a non-Asian name or doesn't identify their

10   race, are measures being taken to discover that, which

11   there's been reporting on publicly.

12           THE COURT:  Does the data set indicate ethnicity,

13   to the extent you have it?

14           MR. WAXMAN:  Yes, it does.

15           MR. CONSOVOY:  But if they -- the question is, When

16   they don't have it, what do they do to figure it out?  And

17   the name will be essential.

18       So on the common application, you're not required to

19   give your race.  You are, however, required to give your

20   parents' nation of origin.  And your name may not look

21   Asian, and, so we want to know -- we think it's central to

22   discovering whether there's invidious discrimination here,

23   trying to match up what type of effort was undertaken to

24   discover that person's race so they could then classify them

25   on a racial basis.

1          The summary sheets, the comments from the alumni

2     interviewers around the country who meet with these

3     individual students, there may be comments in the file about

4     that as well that won't be captured by the data set we're

5     talking about here.

6          And this is attempting to root out invidious

7     discrimination.  This is the kind of in-the-weeds, tough,

8     digging and rooting we have to do to root out that kind of

9     behavior.

10          And there is a statistical side of this case, there's

11     no question, and we're happy to speak with them and try to

12     work together collectively to figure out how to handle

13     aggregate data, individualized data, and redacting, if

14     necessary.  Although I think you see from our papers we

15     don't think, once the protective order's in place, there's

16     no basis for redacting at all under law, and we would want

17     to be heard on that issue.

18          THE COURT:  Again, this is very preliminary, and

19     I'm happy to discuss this, and I expect this discussion will

20     go on for some time today, if not beyond today.  But I am

21     very disinclined to give you all of those application files,

22     and I am disinclined to make them have to redact all of

23     those admissions files.

24          You make a good point on things like notes to the

25     files, which is something different than, for example,

1    personal essays, which I am disinclined to give you.

2        I understand you can make the argument that if somebody

3    writes an essay about their family's trip from China, that

4    could be instructive, but I'm willing to go with the idea

5    that, unless you can dissuade my otherwise, if someone's

6    written an essay about their family's trip from China to

7    America, that that's reflected in other places in their

8    application as well.

9        MR. CONSOVOY:  I think -- I guess I can make two

10   points, your Honor.  One is I think some of this is

11   premature.  We haven't submitted a document request yet.  We

12   haven't asked for every file yet.  We may not start by

13   asking for every file.  But there may come a time where if

14   some evidence is discovered in this case that might lead us

15   in that direction, we'd want the opportunity to pursue it in

16   this court.

17       Second, it is a bit unusual that Harvard, in their own

18   paper here, says their entire process is holistic, that

19   everyone is a measure of every aspect of the application,

20   and the essay is essential to it, but then when they say

21   Well, here's what counts for admission, but you don't get

22   to see the essays.  I don't see how they can take that

23   position.

24       THE COURT:  I guess what I don't understand is how

25   putting a case like this together you would use what's in

1   the essays.

2         MR. CONSOVOY:  So imagine there are two students at

3   a deposition and they say, We don't -- race is not the

4   deciding factor for admission, and we hand them one

5   application -- two applications in front of them and say,

6   Explain to me how Student A was not admitted, who's

7   Asian-American, and Student B, who is admitted, and is not

8   Asian-American, why they got in.

9       I promise you the essay will be central to the

10  deposition.

11        THE COURT:  I would rather sort out a way, if

12  you -- and, again, I'm just thinking aloud here.  I am

13  disinclined to give you every application.  So I would --

14  starting from the position of wanting to figure out a way to

15  give you enough to put your case together without having

16  Harvard run to a stop while they redact all these

17  applications.

18      So if you come up with two students who are exactly the

19  same and then you ask for the complete admissions file, and

20  one's Asian and one's not, or you don't know who's what, and

21  then you ask for the files on those, I think that's a

22  different situation than asking for everybody's file as a

23  broad survey matter.

24        MR. CONSOVOY:  Sure.

25        THE COURT:  And, again, I'm not inclined to resolve

1    this today, but I need to decide whether or not discovery at

2    8 months or 15 months, and sort of thinking through some of

3    these issues.

4         MR. CONSOVOY:  I completely understand.

5         I'm saying, I don't think it will be when two students

6    are the same.  It will be when two students are very

7    different, and one got in.  And, you know, in terms of SATs

8    and GPAs and schools they went to, and that's when the issue

9    is going to come up.

10        But, secondly, in terms of the schedule, we're happy to

11   pursue this in a way that doesn't ask the Court to rule on

12   this in the first round of discovery.  But we don't think

13   it's really the key factor anyway in whether it's an 8- or

14   15-month schedule.  The depositions, and there needs to be

15   many here, I think, are really what's driving it, and we

16   think eight is unrealistic.  It can't be --

17        MR. SANFORD:  May I make a suggestion, your Honor?

18        THE COURT:  Sure.

19        MR. SANFORD:  I think what the joint statement

20   discloses pretty clearly is there are going to be some

21   predicate fundamental discovery battles of the nature being

22   discussed this morning.  I would suggest to the Court that

23   if their plan to do a statistical sampling is what the Court

24   ultimately rules is allowed in discovery, that's going to

25   drive discovery in one direction.

1    What we don't know, as we stand here today, is which

2    direction.  But we do know, based on Harvard's admission,

3    that there are 5.6 million pages of documents which,

4    according to Harvard, would require 10 million redactions.

5    Now, we don't agree with that position, but that

6    position is what's driving the scope of discovery.

7    We have indicated to Harvard we are willing to work

8    with them on a protective order, on a confidentiality order,

9    and we will also work out FERPA privacy and confidentiality

10   issues with them, because 94 percent of these applicants are

11   not accepted to Harvard.  So that puts a large majority of

12   the FERPA into one basket, 94 percent of those.

13   Subsequent to the filing of that joint statement, we

14   have also now in the last 24 hours had the Lawyers'

15   Committee for Civil Rights file a motion to intervene.

16   We don't know, as we stand here today, if that

17   intervention motion will or will not be granted.  But if it

18   is granted, it will be yet another party in this case, which

19   will increase the number of admitted attorneys to about 11

20   or 12 from five different jurisdictions all seeking to

21   coordinate and mesh schedules for depositions under a

22   proposed eight-month plan.  I think everybody in the room

23   knows that's simply not workable.  Even Harvard knows that.

24   So what I would suggest, your Honor, is let's pick a

25   schedule that gives us a reasonable time period to conduct

1    the discovery at the rate we determine appropriate, in the

2    sequence we determine appropriate, mindful and sensitive to

3    the schedules of the Harvard admissions officers.

4         Our proposed schedule is more sensitive to their

5    schedules because it allows discovery beyond the next

6    admission cycle, rather than trying to expedite broad,

7    sweeping discovery in a short eight-month window with

8    attorneys from 11 different entries.

9         And if the intervenor is allowed into this case, what

10   they did not say in their papers to the Court, but what they

11   have said to us in writing, is that they intend to

12   participate in fact discovery, oral argument, briefing, and

13   expert discovery.  So right away that could add an

14   additional two to four experts, approximately, to the case.

15        THE COURT:  When you guys address their motion to

16   intervene, is there -- can you also think about whether

17   there is some way to let them participate short of

18   intervention, sort of an *amicus* kind of role?

19        MR. SANFORD:  We will address that in our response

20   within 14 days, your Honor, because, quite frankly, I'm not

21   really sure which side of the case the proposed intervenor

22   is on.  On the one hand they say they want to be a defendant

23   in support of Harvard's policies, to the extent they agree

24   with Harvard's policies, but they don't want them to do the

25   legacy admissions.

1      So that's going to require us to work through issues on

2  our end, but I think it's clear that the landscape in this

3  case is fraught with potential for discovery disputes that

4  counsel are not able to work through at some point in the

5  future.

6      So, for example, I would suggest if we were to go with

7  an eight-month discovery schedule, all we're doing is

8  setting ourselves up for motions for extension, and a delay

9  in the production of quantitative data, as well as

10  underlying files, to the extent they are discoverable.

11      If we have a 15-month cycle, as I have suggested is a

12  practical reality, given the potential number of

13  depositions, which even Harvard concedes is certainly going

14  to be more than ten -- Harvard has conceded in the joint

15  statement that they would like to limit it to ten for their

16  own employees, but non-parties and experts don't count

17  against the deposition limit of ten.

18      We also are suggesting from the outset, in an effort to

19  be forthright, that we believe this is the type of case

20  which is going to require more than the presumptive limit of

21  25 interrogatories and 25 requests for admissions.  In fact,

22  this case, from a statistical standpoint, might cry out for

23  a significant number of requests for admissions if Harvard

24  is unwilling to stipulate to a lot of the data.

25      So in coming up with the 8 and 15 months, I think each

1  side made a good-faith effort, but I would suggest that 15

2  months reflects the practical realities of these discovery

3  disputes that are going to play out over the next, probably,

4  two to six months, which means depositions probably won't

5  even begin for five or six months.  And I don't think it

6  would be appropriate to give Harvard the opportunity to jam

7  the plaintiff on discovery by delaying production of

8  documents, saying it's going to take them a long time to

9  redact documents, and thereby depriving our experts of the

10  opportunity to review these documents until the end of the

11  discovery cycle.

12      So 15 months gives us what we need to proceed at a

13  reasonable pace, mindful of the number of attorneys, and it

14  gives Harvard some sensitivity and flexibility on their

15  admissions officers' schedule.

16          THE COURT:  I'm not going to give you 15 months,

17  but I am going to give you more than eight.

18      I think that the longer the discovery schedule is, the

19  more time there is to have discovery disputes, and I think

20  that while whole buildings can be built in a year, you can

21  get a case ready for trial, summary judgment, or something

22  close to that.  If it turns out that we had need extensions,

23  we will talk about it as it comes, but I am not going to set

24  a 15-month schedule because it is my experience that things

25  expand to fill the time allotted, and I would rather hold

1    you on a tighter schedule than trying to keep you guessing

2    about whether or not I'm going to grant your continuances or

3    not.

4          MR. WAXMAN:  Just a couple of things I thought I

5    might respond to.

6          THE COURT:  Focus on 10 or 12 months and which you

7    would prefer.

8          MR. WAXMAN:  Ten.

9          THE COURT:  Twelve?

10          MR. SANFORD:  Twelve.

11          MR. WAXMAN:  I do -- just a couple of things.

12       First of all, you know, in terms of counsel's

13    speculation about, Gee, we don't know how they really figure

14    out what the race is, I mean, the discovery period is open.

15    They can -- I don't have to tell them how to practice law.

16    They notice a 30(b)(6) deposition and identify some topics.

17

18       And they're talking about being jammed at the end of

19    the discovery period on the basis of the depositions.  I do

20    want to come to the limits on the specific discovery

21    applications and suggest why, as a going-in matter, the

22    presumptive limits in the local rules ought to apply absent

23    a showing that it shouldn't.  I mean, we are talking here in

24    terms of depositions about essentially -- Harvard is a large

25    place, no question.  It's not as large as the University of

1  Michigan, but it's a large place.  It has an Admissions

2  Office of 40 people.  So this is -- for these purposes,

3  let's say there's some discrimination suit that's brought

4  against, you know, the IBM R&D unit.  It's got 40 people in

5  it.  In a case like that, in the ordinary run-of-the-mill

6  case like that, no judge would stand for the proposition

7  that there are 40 people here, and, therefore, we need 40

8  depositions.

9       And I think it should be incumbent upon them, once we

10 see what the requests are, for them to come forward to us.

11 Maybe we will agree.  If not, we can submit it to your Honor

12 or to the magistrate.  They want X number of more

13 depositions.  We don't think that's necessary.  Here's who

14 they want.  And a judge or magistrate judge will do what

15 they're paid to do and rule on that.

16      And the same thing for the request for admissions.  And

17 I would suggest, as a going-in matter, a discovery cutoff.

18 I do think that it's important to hold the parties' feet to

19 the fire.  They say lively, Well, we should go beyond even

20 the next admission cycle.  This is to be litigation that is

21 focused on an Admissions Office that works very hard,

22 particularly in certain times of the year, and extending

23 this longer is not, frankly, helpful to us.

24           THE COURT:  Is there --

25           MR. WAXMAN:  I also just wanted to say I continue

1   to be perplexed by counsel's repeated reference to the

2   number of jurisdictions that counsel of record in this case

3   are in.  I don't see how that counts one way or the other.

4   I think, by their tally, we represent three of those

5   jurisdictions, because I work in D.C., my partner works in

6   New York, and Harvard is here.  We will meet whatever

7   discovery -- you know, whatever deadlines are necessary.

8   It's not that hard, frankly, to get here from New York or

9   Boston.

10          THE COURT:  It may be helpful, but I don't

11  generally adjust my schedules based upon whether or not

12  there's out-of-town lawyers or not.  I view that to be a

13  choice of the parties about out-of-town.  You can

14  participate by phone, if that's easier.  But otherwise my

15  schedules are the same for in-town or out-of-town lawyers.

16  I will make reasonable accommodations by not trying to

17  schedule things early in the morning or late in the

18  afternoon so that you can get in or out to where you're

19  going, but that's sort of where I draw the line on that.

20          Does it make a difference -- I'm not a fan of

21  bifurcation, but I'm just trying to think this through.  Is

22  it helpful if you bifurcate liability and remedy?  I find in

23  most cases there's enough spillover between liability and

24  remedy that it turns out not to be worth it, and there's all

25  sorts of disputes about which side of the line in

1    particular, but in this case would bifurcating remedy make a

2    difference to anyone?

3           MR. SANFORD:  Bifurcation is not appropriate in

4    this case.  In fact, if this were bifurcated, as Harvard has

5    proposed along the outlines of liability and remedy, what

6    you're going to do is create a built-in dispute at

7    depositions over whether that's a permissible question or

8    not.

9        Let's --

10          THE COURT:  I wouldn't do it unless there was

11    agreement between the parties that it made sense.

12        Mr. Waxman, you raised the issue of standing.

13          MR. WAXMAN:  Yes, your Honor.

14          THE COURT:  And also, I think, subject matter

15    jurisdiction.  I don't know if you mean those to be the same

16    thing?  Can you flesh those out for me?

17          MR. WAXMAN:  Well, we haven't moved to dismiss, as

18    your Honor has undoubtedly noticed --

19          THE COURT:  Right.

20          MR. WAXMAN:  -- because we think we do need to take

21    some discovery in order to ascertain whether we have

22    dispositive motions in this case.  And, you know, our

23    initial round of discovery, which we will serve very

24    promptly, will go to the nature of individual standing in

25    this case.

1          I do want to note that unlike all the other cases in

2     this line; i.e., <u>Bakke</u>, <u>Grutter</u>, <u>Bollinger</u>, <u>Hopwood</u>, there

3     are named individuals as parties.

4          In this case, not only do we not have a named

5     individual as a party, we don't have an individual named as

6     a complainant in the case.  So it's sort of hard to make an

7     *a priori* decision about whether we have a motion to dismiss

8     either under 12(b)(1) or 12(b)(6), and we would purport to

9     take discovery on this.  What we have is a plaintiff that

10    was created for the avowed and exclusive reason of suing

11    Harvard, and on its face that doesn't appear like it should

12    establish standing, but it seems pointless to us to burden

13    the Court with a dispositive motion before we have the real

14    facts.

15          MR. CONSOVOY:  Your Honor, may I respond briefly?

16          We're happy to have discovery on this issue.  It's what

17    we expected, and we are happy to share with him about our

18    organization, which has sued not only Harvard but North

19    Carolina as well, and may be bringing other cases as well,

20    no different than the ACLU and NAACP or any other litigating

21    organization.  Harvard just happens to be one of the first.

22          Mr. Waxman left out a case called <u>Parents Involved</u> from

23    the Supreme Court, which involved an organizational

24    plaintiff, just like ours, who had students as members of

25    the organization.  This is a very typical way litigation

1     proceeds.  But we're happy to have discovery.  I think

2     they'll find it's a regular organization that meets all the

3     qualifications, and I doubt you will entertain a motion on

4     this, but we don't see an issue here.

5          THE COURT:  In terms of a protective order, I'm

6     happy to basically sign whatever protective order you want.

7          Probably a personal peccadillo, but I'd make sure on

8     the protective order you've thought through the in-court

9     issues, trial, motion practices, etc.  I have my own

10    standard language that I add if you don't think to add it

11    yourself, but mine is pretty broad-based, giving me

12    basically complete discretion to do whatever I want during a

13    hearing or trial.  So if that's fine with you, I'll add the

14    language, but if you want to parse it a little more finely

15    than that, add your own language.

16         So I think what I'll do is wait for your briefing on

17    the motion to intervene.

18         We will set a schedule, probably setting discovery at

19    somewhere between 10 or 12 months, maybe 11, and I think

20    we'll have you in every few months, at least by telephone,

21    to make sure we stay on track.

22         Is there anything else we can accomplish today?

23         MR. SANFORD:  One housekeeping detail, if I may,

24    your Honor.

25         As I alluded to earlier, in our joint statement Harvard

1    had proposed that the ten-deposition limit should be the

2    presumptive limit for party depositions, but that

3    depositions of non-party witnesses, including experts, need

4    not count towards the ten-deposition limit.

5         I understood Mr. Waxman to be saying something

6    completely different in court today.  So I would like to

7    just confirm that we are, in fact, honoring Harvard's

8    representation in the joint statement.

9         THE COURT:  I thought that made sense.  I didn't

10   think I heard you say anything inconsistent with that today,

11   but you can clarify.

12        MR. WAXMAN:  We are happy -- what I believe we said

13   in the joint statement is we are certainly willing to

14   accommodate their requests.  If your Honor, you know,

15   prefers it to limit -- to apply the ten-deposition limit to

16   Harvard employees and officers, if your Honor says, Look, on

17   a notional basis we should simply apply the presumptive

18   limits of Local Rule 26, then that's fine with us, too.  But

19   otherwise we're prepared to live with ten Harvard

20   depositions.

21        THE COURT:  I think that makes sense, just given

22   the nature of the case.  But if you want, I can hold off on

23   that.  You can get started with discovery and see where we

24   sort of end up -- how many depositions you want to take, how

25   many you want to take -- and then revisit it.

1          It actually sounded like a reasonable position to me.

2          MR. SANFORD:  I must be must misunderstanding,

3    because I am hearing two different proposals, one in court

4    today and one in the papers in the joint statement.

5          On page 17 of the joint statement, Harvard specifically

6    stated, quote, "Harvard proposes that the ten (10)

7    deposition limit should be the presumptive limit for party

8    depositions, absent agreement of the parties or order of the

9    Court, but that depositions of non-party witnesses,

10   (including expert witnesses) need not count towards Local

11   Rule 26.1's ten (10) deposition limit," end quote.

12         That, I think, makes more sense at this stage of the

13   proceeding.  And if, as we get further into discovery, we

14   find that we need to exceed the ten-deposition limit for

15   Harvard, we will come back to your Honor and request

16   permission, if Harvard was unwilling to stipulate to that.

17         THE COURT:  That's what I read, and that's what I

18   thought he said today.

19         Are you saying something different today?

20         MR. WAXMAN:  No.  We are prepared to either live

21   with the presumptive limit in the rule or to extend the

22   presumptive limit to ten Harvard.

23         We are, frankly, quite concerned by, you know, with

24   certain aspects of their initial disclosures and in the

25   joint statement where they reference, for example, well,

 1   there are regional interviewers.  There are 15,000 alumni

 2   who conduct interviews.  These are not Harvard employees.

 3          THE COURT:  All those people are not being deposed.

 4       (Laughter.)

 5          MR. WAXMAN:  Okay.

 6          THE COURT:  So let's start with -- we'll start with

 7   a ten-deposition limit for Harvard people.  Depositions of

 8   experts and non-parties don't count toward that ten, but if

 9   anybody feels anybody is trying to depose excessive numbers

10   of people outside of ten, come back, okay?

11       I'm going to have you in regularly because, well, two

12   reasons.  First of all, I don't want this to sort of get out

13   of hand; but, second of all, I really -- I don't want

14   discovery disputes to hold this up.  So if you have -- you

15   know, you're at a deposition and you have a discovery

16   dispute, pick up the phone.  If you have something that you

17   can handle in a page or two, fax it over.  If you need a

18   five- or ten-page motion, send it over.  We will keep things

19   moving.  I am not referring the discovery disputes to the

20   magistrate.  We'll chug through them.  And we'll do it

21   quickly, because I am a big believer in "Justice delayed is

22   justice denied" and in keeping these things moving.  I will

23   do my part of it, but you guys -- I'm not going to be happy

24   about people walking out of depositions or recessing them

25   because there's a dispute.  Just pick up the phone and call,

1    and we'll deal with it that way.

2         Anything else?

3              MR. SANFORD:  One other housekeeping detail, if I

4    may, your Honor.

5         Mr. Waxman brought up the subject of initial

6    disclosures, and I'm glad he did, because we had some issues

7    with Harvard's initial disclosures.

8         What we have, your Honor, are basically a listing of

9    six or seven names, which is fine, but then we have at least

10   two, if not three, very broad, catch-all categories with not

11   a single name of a Harvard employee identified.

12             THE COURT:  Give me an example.

13             MR. SANFORD:  "Representatives from the Office of

14   Admissions."  Not a single name listed.  They're Harvard

15   employees.  If they plan to reply on them for claim or

16   defense, it should be disclosed.

17        "A representative from the Office and Institutional

18   Research.

19        "Information pertaining to admissions statistics."

20        Not a single name.  Yet they're proposing to give us a

21   statistical sampling?  I think we are entitled to more

22   detail.

23             THE COURT:  Can you give him a name?

24             MR. WAXMAN:  Well, in our -- first of all, they

25   have exactly the same categories in their list without names

1    attached.

2         What we have done is we have specifically identified

3    the Dean of Admissions, the Director of Admissions, and two

4    employees in the Admissions Office.  So as to comply with

5    the spirit of initial disclosures, we have also said that

6    there may be other people in the Admissions Office -- I have

7    not interviewed all of them -- who may also independently

8    have admissible evidence that we would use in our case.

9         When they serve us with their discovery, whether it's a

10   30(b)(6) deposition or an interrogatory, we can provide

11   that.  We are under no obligation for purposes of fronting

12   who the Rule 26(a)(1)(A)(i) disclosures are of

13   identifying -- we've identified the particular people that

14   we know for sure have information that we will use in our

15   case, as the rule requires.  And we have, in order to

16   provide as much information as possible, on April 30, before

17   discovery requests, have also pointed out that we have

18   custodians of statistical information, and we have other

19   people in the Admissions Office that we may call.

20           THE COURT:  When you talk about this statistics

21   file that has the numerical statistics for every

22   application, how is that put together?  Is someone

23   responsible for that?

24           MR. WAXMAN:  Yes.

25           THE COURT:  Do they have that name?

1          MR. WAXMAN:  Yes, they do.  It's Elizabeth Yong.

2          MR. SANFORD:  Elizabeth Yong or another

3     representative from the Admissions Office.  She is a former

4     admissions officer, according to their initial disclosures.

5          So my concern, your Honor, is there are two broad,

6     sweeping categories, if not three, that you can drive a

7     truck through, and we have no clue who they plan to call to

8     rely on for claim or defense.

9          All I'm asking is some reciprocity to what we gave,

10    which was we identified 58 specific people with title,

11    address, and phone, in our initial disclosures, as is

12    required.  I would just like to see Harvard held to the same

13    standards under the rule.

14          THE COURT:  I'm sure he would be happy to give you

15    258 people, but I'm not sure how helpful you would find that

16    at the end of the day.

17          MR. WAXMAN:  The couple of categories that we've

18    identified without a name are replicated almost identically

19    in categorical designations without names, and they have

20    several more in theirs.  And it's April 30.  I mean, you

21    know, this is, without question, the most that is required

22    in order to fully allow the parties to practice law the way

23    they're supposed to.

24          THE COURT:  Is it true that Mr. Yong is no longer

25    at Harvard?

1          MR. WAXMAN:  She is at Harvard, but she is retiring

2    at some point, and her -- she will be replaced by somebody

3    who --

4          THE COURT:  Has she yet been replaced?

5          MR. WAXMAN:  No.

6       She is still an employee at Harvard, so far as I know,

7    and will be for several months.

8          THE COURT:  And still responsible?

9          MR. WAXMAN:  Still responsible.

10         THE COURT:  Great.

11         MR. SANFORD:  For that category, that may be

12   acceptable, at least we have a name, but for two other

13   categories --

14         THE COURT:  What's the next category?

15         MR. SANFORD:  The next category, according to them,

16   the name is "Representatives from the Office of Admissions,"

17   and the subject of discoverable information is quite broad.

18   They list "Information pertaining to Harvard's recruitment,

19   admissions policy and practices."

20      We couldn't take a deposition based on that --

21         THE COURT:  They gave you the name and the contact

22   information for the head of admission, correct?

23         MR. SANFORD:  Yes.

24      But this is a broad catch-all for the other 39

25   employees of the Admissions Office.  I'm just trying to

1    avoid getting ambushed down the road, and I would like to

2    have the opportunity to take the deposition of a known

3    individual.

4        The second category --

5            THE COURT:  I'm guessing what he's saying is that

6    you have the head of admissions and then you have everybody

7    else.

8            MR. WAXMAN:  You have more than the head of

9    admissions.

10       We've got Grace Cheng, admissions officer.

11       Sally Donahue, director of the financial aid part of

12   the admission office.

13       William Fitzsimmons, the Dean of Admissions.

14       Marlyn McGrath Lewis, the Director of Admissions.

15       Elizabeth Yong, the admissions officer who has

16   information regarding the database and other things.

17           THE COURT:  Is there someone who is responsible for

18   running the alumni interviewers?

19           MR. WAXMAN:  I don't think there is a person who's

20   responsible for running the alumni interviewers, but, I

21   mean, they will -- when they take a deposition, they will

22   understand how this process works.  But, you know, the

23   Harvard admissions process, the 37,000 applications are

24   divided into regional dockets.  Each regional docket has a

25   committee of admissions officers who work on it.  There are

1    alumni who reside all across the country, therefore --

2              THE COURT:  How many regions are there?

3              MR. WAXMAN:  I believe 20.

4              THE COURT:  Is there one admission officer

5    responsible for each of those 20 regions?

6              MR. WAXMAN:  No.  Each region has a subcommittee of

7    the admissions officers who consider in the first tranche --

8    who will read the applications from those files and who meet

9    as an initial subcommittee to discuss those applications.

10   And I'm not sure -- I believe that each admissions -- each

11   docket subcommittee has a chair, someone who will sort of

12   run the multi-day meetings that occur.  I am not sure there

13   is any title to it, and I am also not sure that one person

14   sticks with, you know, Northern New England every year.

15      But, you know, Ms. Lewis or Dean Fitzsimmons or the

16   other individuals named could easily provide that

17   information, as could a 30(b)(6) representative.

18              THE COURT:  That's fine.

19      What I want to make sure is that you're not missing --

20   like if there's regional chairs, that he could then figure

21   out who to talk to about each region, or if you have someone

22   that coordinates alumni, there's some broad categories that

23   you can give him so he doesn't have to depose 40 people to

24   find out who is responsible for what, I think that would be

25   helpful.

1           MR. WAXMAN:  Yup, and that's why, I mean, they can

2     choose to do it however they want, but I would think if they

3     identified five topics, that they'd want a 30(b)(6) witness

4     to testify about, that would be the most efficient way to do

5     it, or an interrogatory that simply says, you know, How are

6     these arranged and is there a regional --

7           THE COURT:  My point is is that sooner or later he

8     is going to get that information.

9           MR. WAXMAN:  Of course.

10          THE COURT:  To the extent you have that some place,

11    in a chart or whatever, that says this is the regional

12    committees, and this is the chair of that regional

13    committee, that might just expedite things a little bit.

14    We're not talking about information that he is not going to

15    be able to get, and I don't want to be here with him saying

16    he had to waste three of his ten deposition to get stuff

17    that you could have easily provided him with a couple of

18    charts.

19          MR. WAXMAN:  Your Honor, I am not in any way

20    fighting that instinct or that mandate from the Court.  I am

21    not suggesting, you know, we're going to make you use up

22    your ten deposition to get in the same zip code as this

23    basic information.

24       I don't know that we actually have -- that Harvard

25    actually has a chart that shows it.  If Harvard actually has

1    a chart made up that shows it, that's fine.

2            THE COURT:  Well, I think it would be helpful, to

3    the extent that there is some sort of documentation within

4    the Admissions Office about who is responsible for what, if

5    he could get a copy of that, that might move this along.

6            MR. WAXMAN:  There may very well be an organization

7    chart for the Admissions Office, which, if there is, we're

8    obviously very happy to produce.

9            THE COURT:  I think that would save everybody some

10   time, and it's not information that they're not going to

11   have sooner rather than later, and maybe they'll get it

12   sooner.

13           MR. SANFORD:  I apprecaite Mr. Waxman's offer, your

14   Honor.  That would be very helpful.

15       The second category --

16           THE COURT:  I think we're on the third.

17           MR. SANFORD:  Truly the third, but it's outside the

18   Admissions Office.

19       They have identified a representative from the Office

20   of Institutional Research, and the subject of discoverable

21   information is information pertaining to admissions

22   statistics, which, in some ways, is the heart of this case.

23   But they don't name a witness.

24           THE COURT:  I thought that's what Ms. Yong did.

25           MR. WAXMAN:  No.  She is an employee of the

```
 1    Admissions Office.  Harvard also has an office that
 2    essentially does, you know, statistical and other
 3    institutional research on any topic that the university
 4    needs.  And we've indicated that there may be -- you know,
 5    we may call, or someone in that office may have access to a
 6    data set or data sets.  I don't think that exists
 7    independently of admissions, but --
 8          THE COURT:  So you're saying you don't know of
 9    anything that resides there that would be relevant to this
10    case, but that there may be information there, and, if there
11    is, you will make someone from that office available to
12    provide that information?
13          MR. WAXMAN:  Absolutely.
14          THE COURT:  Okay.
15          MR. WAXMAN:  And I will say, I don't think it would
16    be an appropriate use of the Court's time to go through
17    their unnamed categories and complain about the fact that
18    although we haven't served any discovery yet, they haven't
19    named somebody.  Who is it from the Princeton Board that's
20    going to do something?  Who it from unnamed outside
21    consultants that they've identified categorically?  It
22    doesn't seem to me that that's the point of a Rule 26(b)
23    conference.
24          THE COURT:  I'm not going to go through all of
25    them, but to the extent there are things I can quickly
```

```
 1    resolve here, I assure you it would be a good use of my
 2    time, rather than waiting for you to brief it, and you to
 3    brief it, and them to brief it, and then reading it all and
 4    then deciding the issue.
 5            MR. WAXMAN:  I mean, there's nothing -- we will
 6    serve our discovery requests, and to the extent we don't get
 7    the information we feel we're clearly entitled to, we will
 8    be here.
 9            THE COURT:  Call or fax away.
10            MR. WAXMAN:  We will call your Honor's offer and
11    either call you, write to you in letter, or send you a very
12    short brief.  But I think a lot of this stuff can be, if not
13    resolved, at least crystalized for purposes of decision.
14            THE COURT:  Is there anything else with the initial
15    disclosures that we can close out today?
16            MR. SANFORD:  I don't believe so, your Honor.  That
17    was very helpful.
18            THE COURT:  How about from your side, Mr. Waxman?
19            MR. WAXMAN:  I don't think so either.
20        I guess we will negotiate the terms of a protective
21    order, and if we have disputes about whether the protective
22    order is sufficiently protective, we will crystallize them
23    and bring them to your Honor.
24        We certainly are going to need, presumably in the same
25    vein as we will produce an organization chart for the
```

1   Admissions Office if we need it, the names of their

2   plaintiffs, that is, the people that they haven't named or

3   identified as to who are victimized by the alleged

4   practices.

5          THE COURT:  They are not in the complaint.  I am

6   sure there is good and sufficient reason for that, but

7   particularly the people that were not admitted to Harvard,

8   they're going to be entitled to that to go back to those

9   application files and be able to take a look at them.

10         MR. CONSOVOY:  We understand our disclosure

11  obligations, and as soon as a protective order is in place,

12  we're happy to give it.  We just want the protective order

13  first.

14         THE COURT:  Anything else I can help anyone with

15  today?

16     (Whereupon, counsel shake heads in the negative.)

17         THE COURT:  We'll put out a scheduling order.  We

18  will have you back in the not-too-distant future, and we

19  will try to get this moved along for you as clearly and

20  expeditiously as we can.

21         MR. SANFORD:  Your Honor, do you want us to deem

22  discovery now open --

23         THE COURT:  Yes.

24         MR. SANFORD:  -- or should we wait until the ruling

25  on the intervention?  Because if we start undertaking

1    discovery in advance of their participation, after they have

2    indicated they intend to participate, I don't want to cause

3    a problem down the road.

4         THE COURT:  My suggestion is is that you start

5    exchanging written discovery, and if you are both going to

6    respond in two weeks, you will have a ruling in three weeks,

7    and they can get caught up, but let's get it going.

8         MR. WAXMAN:  Thank you, your Honor.

9         THE COURT:  Thank you, all.

10         THE CLERK:  All rise.

11      (Proceedings adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## **C E R T I F I C A T E**

I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/James P. Gibbons                  May 19, 2015
James P. Gibbons


JAMES P. GIBBONS, CSR, RPR, RMR
Official Court Reporter
1 Courthouse Way, Suite 7205
Boston, Massachusetts 02210
jmsgibbons@yahoo.com