**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:14-cv-14176-ADB |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | |
| Defendant. | ***REQUEST FOR*** *** ORAL ARGUMENT*** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION TO COMPEL PRODUCTION**

Plaintiff Students for Fair Admissions, Inc. ("SFFA") hereby respectfully submits this motion to compel production of material responsive to certain Requests for Production of Documents that SFFA served on Defendant, the President and Fellows of Harvard College ("Harvard"), on May 12, 2015.[1]

**PRELIMINARY STATEMENT**

This lawsuit alleges that Harvard's use of race in its admissions process violates Title VI of the Civil Rights Act of 1964. *See* Compl. (Dkt No. 1) ¶¶ 1-9.  Harvard concedes that it considers race in admissions decisions, *see* Answer (Dkt No. 17) ¶ 147, so the case turns on whether the way in which Harvard uses race satisfies strict scrutiny.

---

[1] Counsel for the parties have conferred and attempted in good faith to resolve the issues set forth herein, including by telephone on June 23 and email correspondence.  As a result of Harvard designating portions of Exhibit B to the Strawbridge Declaration as either "Confidential" or "Highly Confidential – Attorneys' Eyes Only," sections of this memorandum which reference that designated material have been redacted pursuant to the Stipulated Protective Order.  An unredacted version of this memorandum will be delivered to the Court in a sealed envelope along with SFFA's Motion to File Under Seal.

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 2 of 21

Plaintiff has requested three categories of relevant information and documents that Harvard has unreasonably refused to produce.[2]  *First*, SFFA seeks a preliminary sample of application files from the last four admissions cycles at Harvard.  SFFA's need for this information is obvious.  Harvard uses a ████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████

Harvard concedes that race is a factor in determining which applicants advance through that process, but denies that it uses race in a way that violates Title VI.  SFFA therefore must analyze application files to discover whether: (1) Harvard's ████████████████████ ████████████████████████████; and (2) Harvard's selection of candidates for advancement in its admissions process is consistent with its claim that race is not an unlawfully significant factor in that process.  Unsurprisingly, the only way to examine a process that claims to review and evaluate application files individually is to review and evaluate application files individually.

With that in mind, and in a good-faith effort to mitigate the potential burden of producing the roughly 148,000 application files Harvard received during the last four admission cycles, SFFA accepted Harvard's offer to produce a "*statistically significant sample of redacted applications*" needed "*to evaluate SFFA's claims.*" Joint Statement of April 23, 2015 (Dkt. No. 26), at 13 (emphasis added).  By definition, a statistically

---

[2] Harvard has yet to produce a single document in this case, notwithstanding SFFA's repeated invitations to begin the mutual exchange of documents.  The parties also continue to negotiate other discovery disputes, which are not yet ripe at this time and which SFFA hopes to resolve without needing to resort to further motion practice.

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 3 of 21

significant sample is one that is large enough to ensure that reliable conclusions can be drawn about the total population of application files from which the sample is drawn.

In a further effort to minimize Harvard's burden of production, SFFA proposed a preliminary random sampling of application files, which would permit SFFA and its expert to determine how many total files are needed to draw statistically reliable conclusions. SFFA thus requested that Harvard produce 400 complete application files from each of the four largest racial categories (i.e. White, African-American, Asian, Hispanic-American) from each of the past four admissions cycles, split evenly between admitted and rejected applicants. That initial sample totals only 6,400 application files— merely four percent of the total applications Harvard received over the last four years. In short, SFFA agreed to Harvard's proposal to use statistically significant sampling *and* SFFA has proposed a two-step process that allows Harvard to produce, at the outset, the smallest sample possible consistent with accepted standards for expert analysis.

Harvard, in a complete about-face, has now reneged on its promise to produce a "statistically significant sample" of files. Instead, Harvard now agrees to produce only 160 *total* files—roughly *one-tenth of one percent* (0.1%) of the same four-year applicant pool—half of which Harvard wants to hand pick rather than select randomly.[3] This proposal is statistically worthless and contrary to the principles of sampling that the First Circuit and other courts routinely apply. SFFA simply cannot perform any meaningful analysis based on 160 non-randomly selected files. SFFA respectfully asks this Court to order Harvard to produce the preliminary sample it has requested.

---

[3] Because "statements in [a] 26(f) report constitute judicial admissions," *Carter v. Reiner, Reiner & Bendett, P.C.*, Civil No. 3:06CV00988(AWT), 2007 WL 2221432, *1 n.1. (D. Conn. July 30, 2007), this Court could compel production of the sample solely on the basis of Harvard's prior representation.

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 4 of 21

*Second*, SFFA requested the names of a small subset of the thousands of alumni interviewers that Harvard uses as a key part of its application process.  Alumni interviews are often the only face-to-face meeting Harvard's representatives ever have with an applicant.  Accordingly, alumni interviewers are uniquely positioned to discuss how race affects the admission of the applicants they interview.  SFFA limited its request to certain key geographic areas where there are disproportionate high numbers of  eminently qualified Asian-American applicants.  Harvard, however, refuses to provide the names of that subset of alumni interviewers for those geographic areas, despite their important role in the admissions process and the fact that information about alumni interviewers is readily available and, most importantly, clearly discoverable since they are eyewitnesses.  SFFA respectfully requests that this Court order Harvard to produce documents sufficient to identify these individuals.

*Third*, SFFA seeks information about Harvard's transfer student admissions process.  Harvard has refused to produce any documents about its transfer admissions, contending that it is irrelevant to this case.  But the Complaint alleges that Harvard improperly uses race in considering transfer students; it also contends that the transfer program could provide a race-neutral means for Harvard to achieve diversity.  And some of SFFA's members hope to apply for transfer to Harvard if SFFA prevails.  SFFA therefore respectfully requests that the Court compel Harvard to produce this information.

## ARGUMENT

### I.     Legal Standard.

Several principles govern the scope of permissible discovery in this case.  To begin, the Rules provide for broad discovery into any matter "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1), 34(a)(1).  "[A]

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 5 of 21

request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action." *Schuurman v. Town of N. Reading*, 139 F.R.D. 276, 277 (D. Mass. 1991) (quotation omitted).

Moreover, because this action alleges discrimination against Asian Americans in violation of Title VI, SFFA is entitled to particularly broad discovery. "The great weight of the policy in favor of discovery in civil rights actions supplements the normal presumption in favor of broad discovery." *Grenier v. Jonas*, No. 09-121, 2011 WL 1791093, at *2 (D. Vt. May 10, 2011) (quoting *Floyd v. City of New York*, 739 F. Supp. 2d 376, 381 n.21, 381-82 (S.D.N.Y. 2010)). Moreover, "determining the existence of a discriminatory purpose demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982); *see also Raza v. City of New York*, 998 F. Supp. 2d 70, 82 (E.D.N.Y. 2013) ("Limiting the scope of discovery is especially inappropriate when, as here, the central fact at issue, discriminatory intent, is difficult to establish.").

Finally, Harvard retains the burden to produce evidence that its use of race can withstand strict scrutiny. Because this Court (as well as the appellate courts) must give "close analysis to the evidence of how the process works in practice," there must be a complete record with evidence sufficient to understand Harvard's admissions decisions. *See Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411, 2421 (2013). Given the "searching review" that strict scrutiny requires, this Court should be especially skeptical of Harvard's attempts to thwart discovery into core aspects of its admissions process.

**II.     Harvard Should Produce the Preliminary, Randomly Selected Sample of Admissions Files SFFA Has Requested.**

Case 1:14-cv-14176-ADB    Document 65    Filed 07/16/15    Page 6 of 21

**A. Harvard's admissions process makes a review of application files an essential part of developing the record in this case.**

From the outset, the parties have recognized that any legal evaluation of SFFA's claims will require substantial discovery into Harvard's admissions process. To understand that process, and to tailor discovery accordingly, SFFA took the deposition of Marlyn E. McGrath, Harvard's Director of Admissions. In that deposition, SFFA learned several important facts. First, Harvard ███████████████████████████████ ███████████████████████████████ *See* Strawbridge Decl, Ex. B at 158:12-21. ███████████████████████████████████ ███████████████████████ *See id.* at 162:17-163:2.

Second, Harvard ██████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████ *See id.* at 158:22-160:5. ████ ████████████████████████████████████████████████ █████████████████████████████████████████ *See id.* at 161:14-24. █████████████████████████████████████████████ ███ *See id.* at 172:11-173:15. █████████████████████ ████████ *See id.* at 165:7-165:18.

Third, ██████████████████████████████████████ █████████████████████████ *See id.* at 177:9-19. ██████████████████████████████████████ ████████████████████████████████████████ ██████████ *See id.* at 180:10-14. ████████████

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 7 of 21

█████████████████████████████████████████████ *See*

*id.* at 185:6-23. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ *See id.* at 190:6-19. ████████████████

████████████████████████████ *See id.* at 193:11-15; 194:11-198:7.

This process makes clear why review of application files is necessary. ███████

████████████████████████████████████████████ The

only way for SFFA's expert to test that claim is to review individual files to determine

whether, "compared with others similarly situated," certain applicants were "selectively

treated" on the basis of race. *See Marrero-Gutierrez v. Molina*, 491 F.3d 1, 9 (1st Cir.

2007) (citations and quotations omitted). Likewise, Harvard claims that while an

applicant's race is considered ██████████████████, it is done consistent with Title

VI—*viz.*, not to discriminate against a racial group or to engage in racial balancing, but

only as the Supreme Court has authorized. Here too, the way for SFFA's expert to test

this claim is to review a significant number of files to see whether race is being used

consistent with the "demanding burden of strict scrutiny articulated in *Grutter* and …

*Bakke.*" *Fisher*, 133 S. Ct. at 2415. In short, there is no other way to determine "how the

process works in practice." *Id.* at 2421.

That is why SFFA initially anticipated seeking the approximately 148,000

admission files from the past four cycles. Upon further reflection, however, SFFA never

made a formal request for all 148,000 application files. Rather, since in the Joint

Statement, Harvard proposed "producing a statistically significant sample of redacted

applications, which will be sufficient to evaluate SFFA's claims," *id.* at 13, SFFA agreed

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 8 of 21

to Harvard's offer.  SFFA currently seeks only a preliminary sample of 1,600 randomly selected application files for each of the last four admissions cycles, split evenly (*i.e.*, 400 each) among white, black, Asian-American, and Hispanic or Latino applicants for each year.  *See* Ex. C. to Strawbridge Decl. at 25 (Request No. 24).  This preliminary sample will permit a determination as to how many additional files might be needed to constitute a statistically significant sample size to provide a basis for an expert opinion.

Unfortunately, Harvard has reneged on its prior representations.  Instead of the statistically significant sample it promised to provide, Harvard now refuses to produce anything more than a *total* of 160 application files from only the most recent admissions cycle.  Ex. C at 26 (Response No. 24).  It insists that 80 of these 160 files must be hand-selected by Harvard, with the other half to be selected by SFFA.  *Id.*  In other words, Harvard is unwilling to engage in *any* process of random selection, without which statistical sampling is impossible, and it refuses to produce any files for any admissions cycle other than the Class of 2019.  Moreover, counsel for Harvard has made clear that this would not be a preliminary sample, but the *entirety* of its production of application files.  *See* Ex. C at 26.  Harvard thus apparently believes that a non-random sample of *one-tenth of one percent* of the relevant pool is all that SFFA is entitled to in this case (notwithstanding its prior representation that it would produce a statistically significant sample).  Harvard's offer is not a serious proposal. SFFA's motion should be granted.

### B. Statistical sampling is an appropriate way to analyze Harvard's admissions process while minimizing the burden of discovery.

There is nothing unusual about using statistical sampling to draw conclusions from a random sample of application files about the total population of files.  Statistical sampling has long been accepted by the courts in a variety of contexts to lessen the

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 9 of 21

burdens of discovery and to help the district courts manage cases without prejudicing either party.  The kinds of files SFFA needs here are routinely produced in civil rights litigation.  Discovery of a statistically significant sample of Harvard's application files is therefore entirely appropriate here.

First, the use of a sample to draw statistically valid conclusions about a greater population has long been accepted by the federal courts.  As the First Circuit has noted, "sampling of similar claims and extrapolation from the sample is a recognized method of proof." *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 18 n.19 (1st Cir. 2005). Courts have substantial experience with sampling and extrapolation in a variety of contexts, including discovery of the class members of large class actions,[4] monitoring compliance with an existing injunctive order,[5] review of mortgage loan files in securities litigation,[6] and determination of the number of instances of alleged fraud.[7]

Nor is there any doubt that Harvard's application files are properly subject to discovery.  Because of the necessity of such files to test the ordinary defenses made to allegations of discrimination, *see supra* at 7, courts routinely require defendants to produce records containing evaluations or qualifications of individuals who compete with or are in a comparable position as the alleged victim of discrimination.  *See, e.g.*,

---

[4] *Morangelli v. Chemed Corp.*, No. 10-00876, 2011 WL 7475, at *1 (E.D.N.Y. 2011); *Seabron v. Am. Family Mut. Ins. Co.*, 862 F. Supp. 2d 1149, 1166 (D. Colo. 2012), *order clarified on reconsideration* (June 26, 2012).

[5] *Hickenlooper v. Montez*, No. 92–cv–00870–CMA, 2014 WL 4413221, at *3 n.4 (D. Colo. Sept. 8, 2014).

[6] *Massachusetts Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 989 F. Supp. 2d 165 (D. Mass. 2013) (Saris, C.J.); *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, No. 11-6188 DLC, 2012 WL 6000885, at *1 (S.D.N.Y. Dec. 3, 2012).

[7] *U.S. ex rel. Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259, 261 (D. Mass. 2009).

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 10 of 21

*Weahkee v. Norton*, 621 F.2d 1080, 1082 (10th Cir. 1980) (holding that plaintiff was entitled to files of employees who were hired and promoted over him because "[t]he qualifications and job performance of these employees in comparison with the plaintiff's qualifications and performance is at the heart of this controversy" and that this is "the sort of information that EEOC seeks, and we have allowed, in investigating and litigating discrimination claims"); *Diaz-Garcia v. Surillo-Ruiz*, 45 F. Supp. 3d 163, 166-67 (D. P.R. 2014) (permitting discovery of other employee files because they may provide evidence that employees were hired for political reasons or that grounds for plaintiffs' dismissal were pretextual).  Indeed, Harvard itself previously has been ordered to produce similar records in a sex discrimination case.  *Jackson v. Harvard University*, 111 F.R.D. 472, 476 (D. Mass. 1986) (ordering production of ten years' worth of faculty tenure evaluations because "plaintiff is entitled to an opportunity to show that others with similar qualifications achieved the rank or position or that women at Harvard Business School are evaluated by a stricter standard than their male colleagues, or that the evaluations of plaintiff when compared with those of men who were granted tenure, reveal a covert bias against women faculty").

Given the large number of application files at issue here—approximately 148,000—extrapolation from a sample is a reasonable way to limit the burden on Harvard while permitting a statistically defensible analysis of the extent to which race is playing a factor in Harvard's allegedly "holistic" process.  Once the sample is produced, this analysis can be done by assigning values to Harvard's criteria for scoring applicants and then determining, through regression analysis, the extent to which race, rather than the

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 11 of 21

other criteria,   appears to be influencing the admissions process.   *See* Ex. A to Strawbridge Decl. ¶ 28.

None of this should be a point of controversy for purposes of this motion. After all, it was *Harvard's* position before this Court on April 23 that statistically significant sampling was an appropriate method of conducting discovery on application files.  The only question for this Court is which of the parties' sampling proposals hews closer to basic statistical principles and thus promises to provide worthwhile analytical results.

### C. The sample must be of sufficient size such that reliable conclusions can be drawn regarding Harvard's admissions decisions.

The sheer difference in the relative size of the proposed samples—6,400 versus 160—weighs heavily in favor of SFFA's proposal.  SFFA's preliminary sample is crafted to provide a strong basis for reviewing the application files and determining how many more files would be necessary for a statistically reliable analysis.   The preliminary sample must be large enough to analyze the effect of race on various aspects of Harvard's admissions process, *see* Ex. A ¶ 30, and to support inferences about the entire pool with the requisite degree of statistical confidence, *see id.* ¶ 31.

There is no dispute that "[s]tatistical evidence drawn from an extremely small universe has little probative value." *White v. Vathally*, 570 F. Supp. 1431, 1435 (D. Mass. 1983), *aff'd*, 732 F.2d 1037 (1st Cir. 1984) (quotation omitted); *Schmid v. Frosch*, 680 F.2d 248, 250 (D.C. Cir. 1982) ("[S]mall samples provide a less reliable basis for making an inference about the treatment of two groups than do larger samples of decisions."); *United States v. City of New York*, 637 F. Supp. 2d 77, 95 (E.D.N.Y. 2009) ("Courts have sometimes declined to rely on statistical significance analysis when a sample size was too small.") (collecting cases).

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 12 of 21

SFFA's proposal of a preliminary sample totaling four percent of Harvard's approximately 148,000 application files during the last four years is well below the mainstream sample range granted by courts in comparable circumstances.[8] *See, e.g.*, *Hickenlooper*, 2014 WL 4413221, at *3 n.4 (ordering 10% sample for discovery of compliance with ADA); *Seabron*, 862 F. Supp. 2d at 1166, *order clarified on reconsideration* (June 26, 2012) (ordering 25% sample for discovery of class plaintiffs); *Perez–Benites v. Candy Brand, LLC*, No. 07-1048, 2010 U.S. Dist. LEXIS 115590, at *5- 6 (W.D. Ark. Oct. 27, 2010) (limiting discovery of class plaintiffs to 20% sample); *Katt v. New York City Police Dep't*, No. 95-8283, 1997 WL 394593, at *3 (S.D.N.Y. July 14, 1997) (ordering production of random sample of 19% of files regarding sexual harassment complaints); *Skibo v. City of New York*, 109 F.R.D. 58 (E.D.N.Y.1985) (ordering production of a random sample exceeding 10% of files containing complaints against police officers).

The clear weight of authority favoring a statistically significant sample holds true even in recent cases involving thousands of files. For example, in mortgage-related litigation initiated by the Federal Housing Finance Agency, the district court approved a methodology employing a sample of 50,000 mortgage loan files out of a population of 1.1 million mortgages—an overall percentage of 4.5 percent. *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, No. 11-6188, 2012 WL 6000885, at *1 (S.D.N.Y. Dec. 3, 2012); *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 2015 WL 2183875, at *38 n.76 (S.D.N.Y. May 11, 2015); *see also Massachusetts Mut. Life Ins. Co.*, 989 F. Supp.

---

[8] Although Harvard claims that less than four years is an appropriate time frame, and proposes only producing application files from one admissions cycle, Ex. C at 26, SFFA's Complaint specifically alleges that Harvard engages in racial balancing over a four-year period, adjusting the numbers by race each year to maintain its preferred racial distribution. Compl. ¶¶ 300-304.

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 13 of 21

2d at 167-68 (approving methodology based upon sample of discovery into 9,900 mortgage loan files for population of 278,609 loans, or 3.6 percent). These cases support the reasonableness and scientific basis for SFFA's proposal here. The preliminary sample SFFA has requested will yield an ultimate request for files that falls within this accepted range. Indeed, it is possible that the sample may be all the files SFFA requires to analyze Harvard's admissions process. In all events, however, there is no legal or statistical basis for Harvard's proposal to provide 0.1 percent of application files.

> ### D. The sample must be random to avoid selection bias and stratified to ensure that SFFA's expert can competently examine the effect of race on the admissions process.

An equally glaring flaw in Harvard's proposal is its refusal to generate the sample using random selection. Instead, Harvard proposes to choose (and, no doubt, to cherry-pick) 80 files and to let SFFA pick 80 additional files. Given a pool of approximately 37,000 files for each admission year, Harvard's process is deliberately designed to yield *unrepresentative* results. It also is the antithesis of sound statistical practice. As Dr. Arcidiacono explains, "a biased sample is not representative of the entire population and the inferences drawn from such a sample cannot reliably characterize for the entire population." Ex. A at ¶ 22. Random sampling "eliminates these problems by ensuring that each member of the population has an equal chance of being selected for the sample; this ensures that the sample is representative of the whole population." *Id.* at ¶ 23.

Common sense dictates that a selectively chosen sample is unlikely to reflect the larger population. "Probability sampling methods, in contrast, ideally are suited to avoid selection bias. . . . [and] leaves no room for selection bias." Reference Manual on Scientific Evidence, *Federal Judicial Center* at 100 (2d ed. 2000); *see also United States v. Skodnek*, 933 F. Supp. 1108, 1118 (D. Mass. 1996) (crediting affidavit from a Harvard

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 14 of 21

statistics professor describing "the rationale for random sampling as a method of objectively choosing a sample that is representative of the population"). Indeed, courts often reject non-random sampling because of concerns about selection bias. *See, e.g., In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 984 F. Supp. 2d 1021, 1040 (C.D. Cal. 2013) (rejecting admissibility of expert report because "[w]ithout a random sample . . . there is no reliable way to draw conclusions about the relationship between Plaintiffs' certificates and Countrywide RMBS as a whole"); *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019-20 (5th Cir. 1997) (rejecting selective sampling and holding that "the sample must be a randomly selected one of sufficient size so as to achieve statistical significance to the desired level of confidence in the result obtained").

In addition to random selection, SFFA proposes a sample stratified by the race of the applicant, meaning that the sample includes equal numbers of applicants from each of the four largest racial categories. Ex. C at 25. Harvard's proposal, by contrast, is not stratified in any way. *Id.* at 26. Under its proposal, Harvard could hand-pick 80 Hispanic students, and therefore massively distort the representative nature of the 160-file sample Stratified random sampling, in contrast, would ensure that the sample includes "[a] sufficient number of both rejected and accepted applicants is necessary to draw any meaningful conclusions." Ex. A. at ¶ 25. As a result, it ensures fewer files are needed than would be the case with simple random sampling. *Id.* at ¶ 35. The stratified sample will then permit SFFA's expert "to discern differences or relationships between subgroups within" the applicant pool. *Id.* at ¶ 26. Stratified sampling permits analysis of the effect of practices or process across characteristics such as. *Id.*; *see also* Reference Manual on Scientific Evidence, at 100 n.52 (discussing the advantage of "[m]ore

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 15 of 21

complicated methods, such as stratified sampling and cluster sampling"); *Massachusetts Mut. Life Ins. Co.*, 989 F. Supp. 2d at 175 ("Stratification increases the precision.").

### E. Requiring the production of this preliminary sample does not impose an undue burden on Harvard.

SFFA's request for a preliminary sample imposes no undue burden on Harvard. To the contrary, SFFA's proposal *limits* the number of files that Harvard will need to produce, both at the outset and by the end of discovery. Ex. A at ¶ 35. Although Harvard would prefer to produce fewer documents, it cannot meet its burden by "'rely[ing] on a mere assertion that compliance would be burdensome and onerous without showing the manner and extent of the burden and the injurious consequences of insisting upon compliance.'" *In re New England Compounding Pharmacy, Inc. Products Liab. Litig.*, No. 13-2419, 2013 WL 6058483, at *6 (D. Mass. Nov. 13, 2013) (quotation omitted)).

Harvard also has invoked its obligations under the Family Educational Rights and Privacy Act ("FERPA") and may argue that those obligations somehow increase its burden to justify denying a statistically sound sample to SFFA. This is a red herring. As a threshold matter, a large percentage of the produced files will be for students who never enrolled at Harvard and as to whom FERPA imposes little or no obligations on Harvard. *See* 20 U.S.C. § 1232g(a)(6) (excluding from the definition of "student" persons who do not attend the institution). Moreover, SFFA already has agreed to permit Harvard to redact a substantial amount of personally identifiable information from the applications it does produce. *See* Protective Order (Dkt. No. 55) ¶¶ 2(a), 14.

Furthermore, FERPA permits the disclosure of such information with proper notice. There is no substantial burden to Harvard's providing notice to a few thousand individuals (at most); ███████████████████████████████████

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 16 of 21

███████████████████████ *See* Ex. B at 16:7-18.  Although Harvard may prefer

to redact files instead of giving notice, that voluntary choice cannot create a burden

justifying resistance to a reasonable, statistically sound sampling approach.

> **F.  Harvard cannot rely on individualized review of applications to defend against conclusions SFFA's expert may draw from statistics if it does not produce a statistically significant sample of those files.**

Finally, it is important to understand the ramifications for this case if SFFA is not

permitted to examine a statistically significant sample of files from each admissions cycle

during the relevant period.  As the Court explained at the initial scheduling conference, it

is vital that the parties build as "good and accurate a record" as possible.  Transcript of

April 30, 2015, Status Conference at 4.  Allowing Harvard to thwart discovery on these

files would be tantamount to an order denying SFFA the right to conduct discovery on

issues that go to the heart of this case—issues that will be essential to this Court's

resolution of SFFA's claims and the multiple levels of appellate review likely to follow.

Yet the ramifications for Harvard will be equally severe and potentially fatal to its

ability to defend its admissions program.  SFFA has requested—and Harvard had agreed

to produce—statistical data concerning admissions decisions during the relevant period.

It is quite likely that this data will establish that Harvard's admissions policies have a

disproportionate racial effect sufficient to establish an inference of intentional

discrimination, *see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252,

266 (1977), and that Harvard is impermissibly using race in its admissions process in

other ways that cannot be defended under strict scrutiny, *see Fisher*, 133 S. Ct. at 2415.

Harvard will surely respond by arguing that these statistical disparities can be explained

on a case-by-case basis.  In particular, Harvard will likely defend its program as one that

16

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 17 of 21

is "holistic and complex" and which considers "many fine applicants" but "can choose only a few." *See* Ex. B. at 118:5-9.  It will be Harvard's position that the statistics do not tell the whole story because "each applicant is really considered as an individual" based on a complete review of his or her application file.  *Id*. at 231.  Indeed, Harvard has emphasized the "holistic nature" of its admissions process and the many, many factors that might influence its decisions.  *See* Answer ¶¶ 124, 147; Joint Statement, at 8; Strawbridge Decl., Ex. D, at 12-13 (Response to Interrogatory No. 4).

But if Harvard does not produce the statistically significant sample of admissions files in order to allow SFFA to examine and rebut those claims, it will *not* be permitted to make these arguments.  Harvard's ability to carry its burden will rise or fall on the statistics it produces.  Harvard cannot defend its program based on the individualized, holistic review of the entire application file and then conceal in discovery the very materials it claims to rely upon to advance that defense.  *See* Rule 37(c)(1) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."); *Cosme-Montalvo v. Trafon Grp., Inc.*, No. 11-2197, 2013 WL 1728577, at *3 (D.P.R. Apr. 22, 2013), *appeal dismissed* (Nov. 6, 2013) (prohibiting defendants' use at summary judgment of documents withheld in discovery).  Either SFFA must be provided the opportunity to review those materials and test Harvard's claims to see if Harvard's assertions regarding the use of race truly match up to its actual practices or Harvard may not rely on the allegedly individualized, holistic nature of its program in this case.

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 18 of 21

### III.   Harvard Should Produce the Requested Names and Contact Information for a Subset of Its Alumni Interviewers.

Harvard uses a network of its alumni to interview applicants to Harvard. *See, e.g.*, Complaint ¶ 175. There is no dispute that these interviews are an important part of the admissions process. Ms. McGrath testified that: ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. B at 56:8-57:5; 60:2-61:15; Ex. D at 13 (noting that "reports from alumni or admissions officer interviews" are a factor in admissions). Based on this undisputed evidence alone, alumni interviewers are certain to have relevant information.

In light of their substantial role in the admissions process, SFFA propounded a request to Harvard for documents sufficient to show the names of alumni interviewers it uses in specific geographic areas most likely to have a significant number of competitive Asian applicants. *See* Ex. C at 21-22 (Request No. 19). Although Harvard has not disputed the importance of the alumni interview for applicants, Harvard nonetheless refuses to provide to SFFA documents responsive to its request on the grounds of alleged burden, invasion of privacy, and lack of relevance. *See* Ex C at 22 (Response No. 19).

Harvard's blanket refusal to provide documents sufficient to show the names of the certain alumni interviewers that SFFA has requested is indefensible. Many of those individuals are likely to have relevant information about the admissions process, including the extent to which race drives admissions decision. Rule 26 specifically permits discovery into "the identity and location of persons who know of any discoverable matter." Fed. R. Civ. P. 26(b)(1); *Gerber v. Down E. Cmty. Hosp.*, 266

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 19 of 21

F.R.D. 29, 35 (D. Me. 2010) (noting that Rule 26(b)(1)'s "language clearly encompasses the identity of potential witnesses"). Harvard's effort to shield the names of these third-party witnesses on relevancy or privacy grounds is baseless and not made in good faith.

Finally, there is little burden on Harvard to respond to this request; Ms. McGrath testified that Harvard assigns one admissions officer oversight responsibilities for the alumni interviewers, which presumably includes access to their basic contact information. Ex. B. at 50:1-7; 52:16-18.  Counsel for Harvard has instead asserted an alleged burden on the interviewers themselves based on the scope of *future* third-party discovery that SFFA *may* serve.  But the rules do not permit prospective, speculative, and premature objections concerning third-party discovery as a basis to withhold readily available information of eyewitnesses within the party's possession.  SFFA therefore respectfully requests that the Court order Harvard to comply with SFFA's Document Request No. 19.

**IV.     Harvard Should Produce Information and Documents Relevant to the Use of Race in Its Transfer Student Admissions Process.**

Harvard has responded to numerous SFFA discovery requests by limiting its production of documents to the freshman admissions process. *See* Ex. C at 12 (Response No. 1), 14 (Response No. 4), 23 (Response No. 21), 29 (Response Nos. 29 and 30), 32 (Response No. 34), 33 (Response No. 36).  Harvard bases its categorical refusal to provide any discovery into its transfer admissions process on the bare assertion that "documents or information concerning individual transfer applicants . . . are irrelevant to this Action." *See, e.g.,* Ex. C at 7 (Objection to Instruction No. 3).  In doing so, Harvard seeks to exclude any discovery into the use of race in the admission of transfer students.

But Harvard admitted in its Answer that its "admissions office considers applicants for transfer admission in a holistic manner and that, as with applicants for

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 20 of 21

early or regular admission, it considers each applicant's background and personal characteristics, including—where relevant—the applicant's race or ethnicity as it bears on the holistic review." Answer ¶ 186.  Harvard's website likewise touts that its transfer applicants undergo the same "holistic" admissions process that applies to freshman applicants.  *See* Ex. E.  And counsel for Harvard has not articulated any difference in the ways in which race is used or considered for transfer students.

Moreover, SFFA's Complaint clearly establishes the specific relevance of the transfer admissions process to this action:

- SFFA has members who were denied admission to Harvard as freshmen but retain interest in applying for transfer if race will not be a factor in considering their application.  *See* Complaint ¶ 24.

- The recruitment and admissions of transfer students, particularly from community colleges, may be a race-neutral alternative to Harvard's race-based admissions process.  *Id.* ¶¶ 334-38.

- SFFA contends, among other things, that Harvard is engaged in ongoing racial balancing to preserve a specific composition of racial groups on campus.  *See, e.g., id.* ¶ 300.  The transfer admissions process is one way by which Harvard could achieve this goal, particularly as issues of mismatch, *see id.* ¶¶ 383-99, result in attrition among the students admitted to Harvard as freshmen.

Because the transfer admissions process is directly relevant to SFFA's claims, the Court should reject Harvard's categorical objection to producing materials regarding this process and order it to produce documents and information about transfer admissions.

## CONCLUSION

For the reasons given, SFFA respectfully requests that the Court: (a) order Harvard to comply with SFFA Request for Production Nos. 19 and 24; (b) order Harvard to produce documents regarding its transfer admissions process on the same terms it produces information regarding its freshman admission process in response to SFFA's discovery requests; and (c) grant such other and further relief as the Court sees fit.

Case 1:14-cv-14176-ADB   Document 65   Filed 07/16/15   Page 21 of 21

Respectfully submitted,

By: /s/ William S. Consovoy

————————————————————————————

Paul M. Sanford BBO #566318
Benjamin C. Caldwell BBO #67506
BURNS & LEVINSON LLP
One Citizens Plaza, Suite 1100
Providence, RI 02903
Tel: 617-345-3000
Fax: 617-345-3299
psanford@burnslev.com
bcaldwell@burnslev.com

Dated: July 16, 2015

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
Tel: 703-243-4923
Fax: 703.243.4923
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com

Patrick Strawbridge
BBO #678274
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
Tel: 617-227-0548
patrick@consovoymccarthy.com

*Counsel for Plaintiff Students for Fair Admissions, Inc.*

4820-7134-5189.1