IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br><br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> Defendant. | Civil Action No. 1:14-cv-14176-ADB |

**PLAINTIFF'S OPPOSITION TO MOTION TO STAY**

Plaintiff Students for Fair Admissions, Inc. ("SFFA") respectfully requests that the Court deny the Motion for Stay filed by Defendant President and Fellows of Harvard College ("Harvard").

**I.  Introduction**

Harvard's request for a stay pending a decision in *Fisher v. University of Texas at Austin*, No. 14-981 ("*Fisher II*"), is baseless. Harvard grossly exaggerates the overlap between *Fisher II* and this case. But the Court need not resolve that dispute. Where a stay would harm the non-moving party, as here, it must be denied absent a clear case of hardship. Harvard cannot meet that standard. Whatever the Supreme Court says in *Fisher II*, Harvard will still have to prove that its use of race in admissions satisfies strict scrutiny. There is no reason to delay discovery that is inevitable. Any marginal impact *Fisher II* might have on the legal standard can be accommodated under the existing summary-judgment schedule. Harvard's motion should be denied.

1

## II. Legal Standard

Although "[f]ederal courts have the inherent power to stay an action … this inherent power … must be balanced against the federal courts' 'strict duty to exercise the jurisdiction that is conferred upon them by Congress.'" *Goldhammer v. Dunkin' Donuts, Inc.*, 59 F. Supp. 2d 248, 251 (D. Mass. 1999) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996)). "Only in rare circumstances" then "will a litigant in one cause be compelled to stand aside" while another proceeds—even if the other case will "settle[] the rule of law that will define the rights of both." *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). Therefore, a stay "is rarely appropriate" when the parallel litigation "will not dispose of the entire case." *Chavous v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 201 F.R.D. 1, 3 (D.D.C. 2001) (citations and quotations omitted); *see also Consol. Edison Co. of New York v. United States*, 30 F. Supp. 2d 385, 389 (S.D.N.Y. 1998) ("A stay is as much a refusal to exercise federal jurisdiction as a dismissal. When a district court decides to dismiss or stay, it presumably concludes that the parallel litigation will be an adequate vehicle for the complete resolution of the issues between the parties.") (citation omitted)).

"The proponent of a stay" therefore "bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708 (1997). In deciding whether to grant a stay, this Court considers the: "(1) potential prejudice to the non-moving party; (2) hardship and inequity to the moving party without a stay; and, (3) judicial economy." *Alves v. Prospect Mortgage, LLC*, 2013 WL 5755465, at *2 (D. Mass. Oct. 22, 2013) (citations and quotations omitted). But these are not co-equal factors. The proponent "must make out a clear case of hardship or inequity in being required to go forward, *if there is even a fair possibility that the stay for which he prays will work damage to some one else.*" *Landis*,

299 U.S. at 255 (emphasis added). Further, a stay is especially difficult to secure in cases where the plaintiff has "alleged … continuing harm and sought … injunctive or declaratory relief." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005). Such cases are distinguishable from those where only damages are at issue. *Id*.

### III. A Stay Is Unjustified Even Accepting Harvard's Conception of the Overlap Between This Case and *Fisher II*.

Harvard argues that a stay is appropriate because *Fisher II* raises issues that "bear directly on this case." Memorandum in Support of Harvard's Motion for Stay ("Mot.") at 1. That is a gross overstatement of the relationship between the two cases. *See infra* at 11-15. But the Court need not resolve the dispute over *Fisher II*'s potential impact on the legal issues raised in this case to deny Harvard's stay motion. As explained below, the motion is meritless even assuming that *Fisher II* will "clarify the law" and "affect the standards that inform this litigation." Mot. at 2.

*First*, there is far more than a "fair chance" that granting Harvard's motion will harm SFFA—it is a certainty. SFFA has brought this suit on behalf of its members who allege a direct and concrete injury as a result of Harvard's admissions policies. *See* Complaint ¶¶ 15-28. Those members include applicants Harvard has rejected, high school students who plan to apply to Harvard in the coming months and years, and the parents of both rejected and future applicants. *See id.* These members will have their equal-protection rights prejudiced if resolution of this case is delayed by a year. This is especially true for those SFFA members who will be applying either for transfer or undergraduate admission in the 2016-2017 cycle—the first admissions cycle in which a judgment in SFFA's favor likely would take effect. For some of these applicants, then, a

3

one-year delay means losing forever the "opportunity to compete for admission on an equal basis." *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003).

Remarkably, Harvard gives the shortest of shrift to the potential harm to SFFA's members; in fact, Harvard nowhere even uses the words "harm" or "hardship," let alone bothers to analyze the impact of its request for a year-long pause in this litigation. Harvard would prefer to make the case about the attorneys, individuals, and non-profit organizations advocating on these applicants' behalf. *See* Mot. 3. It is disconcerting that Harvard believes the outcome of this stay request (and perhaps other aspects of this case) should be influenced by SFFA's litigation strategy, the decision of its President to support Ms. Fisher, or its choice of counsel. This litigation tactic is not new. *See, e.g.*, *NAACP v. Button*, 371 U.S. 415, 429 (1963); Mark Tushnet, *Some Legacies of Brown v. Board of Education*, 90 Va. L. Rev. 1694, 1701 (2004).

In reality, this case is about Harvard's discriminatory policies and the countless applicants these policies harm. SFFA's members are entitled to a judicial determination as to whether the process to which they have been (and soon will be) subjected "is fair and constitutional in every phase of implementation." *Grutter v. Bollinger*, 539 U.S. 306, 394 (2003) (Kennedy, J., dissenting). That some of them would be denied that right as a result of a stay is reason enough to deny Harvard's motion. *See Hines v. D'Artois*, 531 F.2d 726, 737 (5th Cir. 1976) ("We must always have great respect for a trial court's judicial discretion in the control of its docket, but we cannot abdicate our roles in monitoring that discretion to prevent the ossification of rights which attends inordinate delay. . . . If plaintiffs were not to be permitted forthwith to tell their story to the court, the tale might be stale indeed by the time it reached judicial ears."). After all, "it is well-

established that … a stay should not be for an indefinite period of time." *In re Lernout & Hauspie Securities Litig.*, 2003 WL 23341390, at *2 (D. Mass. June 12, 2003). For these applicants, the stay would not only be indefinite; it would operate as a dismissal.

But even those applicants who will "only" have vindication of their constitutional rights delayed will suffer harm sufficient to defeat Harvard's motion. Stays are disfavored in civil-rights cases, *see Costantino v. City of Atl. City*, 2015 WL 668161, at *3-8 (D.N.J. Feb. 17, 2015), as such delay materially impairs pursuit of claims Congress and the public consider "profoundly important," *see Kelly v. City of San Jose*, 114 F.R.D. 653, 660 (N.D. Cal. 1987). "While the stay is in effect, through no fault of the parties, relevant evidence could be lost or destroyed, memories could fade, and pertinent witnesses could move out of the jurisdiction." *I.K. ex rel. E.K. v. Sylvan Union Sch. Dist.*, 681 F. Supp. 2d 1179, 1193 (E.D. Cal. 2010) (citation omitted); *see New York v. Hill*, 528 U.S. 110, 117 (2000) ("Delay can lead to a less accurate outcome as witnesses become unavailable and memories fade."). Delay is a particular concern where, as here, many of the "relevant documents … are not computerized" given that it puts them at greater "risk of being lost or misplaced." *Costantino*, 2015 WL 668161, at *4. In sum, there is a certainty, not merely a "fair chance," that a stay will damage SFFA.[1]

*Second*, Harvard cannot make out a clear case of hardship or inequity it will suffer in the absence of a stay. Harvard claims that "*Fisher II* is likely to affect both fact and

---

[1] Most of Harvard's cases are distinguishable on this ground. In some, it appears that most or all of the non-moving parties agreed to the stay. *See In re Literary Works in Electronic Databases Copyright Litigation*, No. 21-90, 2001 WL 204212, at *3 (S.D.N.Y. Mar. 1, 2001); *Carter v. United States*, No. 06-225, 2007 WL 2439500, at *2 (D. Vt. Aug. 23, 2007). In others, the stay imposed minimal or no harm upon the non-moving party. *See Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 622 (S.D.N.Y. 2012); *Cent. Valley Chrysler-Jeep, Inc. v. Witherspoon*, No. 04-6663, 2007 WL 135688, at *14 (E.D. Cal. Jan. 16, 2007).

expert discovery in this case." Mot. at 5. That is not only wrong, *see infra* at 7-11, it is beside the point. Harvard does not argue, for example, that *Fisher II* will make the discovery SFFA currently seeks inappropriate or duplicative. *See, e.g.*, *Wittman v. Aetna Health, Inc.*, 2014 WL 4772666, at *2 (D. Me. Sept. 24, 2014). Harvard mainly argues that the decision in *Fisher II* might "possibly … open the door to additional discovery"—*not* that *Fisher II* would render discovery currently being sought wasteful or irrelevant. Mot. at 5. There is no reason to "defer the immense burdens of discovery," Mot. at 1, when those same burdens (and perhaps new ones based on the inclusion of an additional admissions cycle) will be there waiting one year later. In any event, even the "possibility of duplicative discovery does not establish a clear case of hardship in the face of Plaintiff's objections to the stay." *Hunt Const. Grp., Inc. v. Brennan Beer Gorman/Architects, LLP*, 2009 WL 2424529, at *1 (D. Vt. Aug. 5, 2009). Harvard's argument as to the burdens of hypothetical additional discovery after *Fisher II* is even weaker.[2]

The only other argument Harvard offers as to the possibility of hardship is that *Fisher II* might "cause Harvard to change its admissions policies and practices" in a way that would "moot" SFFA's claims. Mot. at 6. Here too, even aside from Harvard's mischaracterization of *Fisher II*, the argument is disingenuous. SFFA has filed suit challenging "Harvard's *existing* admissions policies and practices." Mot. at 6. It is therefore true that this case would be over if Harvard is unable to defend its existing

---

[2] The potential burdens that the stay avoided in *Cardenas v. AmeriCredit Fin. Servs. Inc.*, No. 09-4978, 2011 WL 846070 (N.D. Cal. Mar. 8, 2011), the other case upon which Harvard relies, were markedly different. There, the district court stayed the case because the issue—the enforceability of an arbitration clause—could require the dismissal of the case from Court. *See id.* at *4. Harvard does not (and cannot) make such a claim here.

policies in the wake of *Fisher II*. But that would be because SFFA would be entitled to judgment as a matter of law (along with the accompanying declaratory and injunctive relief)—not because SFFA's claim would "become largely irrelevant." *Id.*; *see City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."). The idea that Harvard is entitled to a stay so it can wait and see if the Supreme Court's decision in *Fisher II* makes any defense of its admissions system impossible is absurd.

Harvard's argument is made even more galling by its conspicuous reservation of the option to argue later that *Fisher II* is not controlling with respect to it. Mot. 2 n.1. Harvard argues that its policies would not be impaired even if *Fisher II* outlaws racial preferences in admissions because, as a private institution, it is subject to Title VI, not the Fourteenth Amendment. The argument is not just legally indefensible, *see Gratz*, 539 U.S. at 275 n.23, but Harvard's intention to pursue it thoroughly discredits the stay request. Harvard cannot credibly seek a stay pending the outcome of a case while reserving the right not to be bound by the outcome. Indeed, Harvard cannot conceive of any outcome in *Fisher II* that would terminate these proceedings. This Court cannot accept Harvard's claim that *Fisher II* could change everything while *knowing* that Harvard will claim that *Fisher II* changed nothing as soon as the stay is lifted.

*Third*, a stay will not advance judicial economy. Harvard argues it would be inefficient to proceed because "*Fisher II* may affect the discovery that the parties seek from each other to establish their claims and defenses, the issues that the parties ask their testifying experts to address, and the parties' strategies in seeking and using all that

7

information." Mot. at 5. Harvard is wrong three times over: *Fisher II* will not impact fact discovery, it will not impact expert discovery, and any guidance the opinion provides as to the applicable legal standard can be addressed in the parties' summary-judgment briefing under the established schedule.

As an initial matter, whatever impact Harvard (incorrectly) believes *Fisher II* will have on the legal standard, it will not affect fact discovery. The point of discovery is to build a comprehensive record. *See United States v. 23.76 Acres of Land*, 32 F.R.D. 593, 596 (D. Md. 1963) ("It is the rare law suit in which there are not at least two versions of a single transaction or occurrence. The purpose of discovery is to permit each party to learn of the other party's version."). *Fisher II* will not alter the facts of this case. It will not alter Harvard's reasons for having *chosen* to consider race in admissions decisions. It will not alter how Harvard has *used and currently uses* race in its admissions process. And it will not alter Harvard's reasons for having *determined* that there are no workable race-neutral alternatives to using race.

But even if *Fisher II* refines the applicable legal standard in some way that impacts the kind of facts that might be admissible on summary judgment or at trial, it still would not impact the scope of fact discovery. "The Federal Rules of Civil Procedure contemplate open and generous discovery." *McCarron v. J.P. Morgan Sec., Inc.*, 2008 WL 2066940, at *2 (D. Mass. May 14, 2008) (citations omitted); *see also* Fed. R. Civ. P. 26(b)(1) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."). In short, "relevancy is broadly construed at the discovery stage of litigation and a request for discovery should be considered relevant if there is any possibility that the information

8

sought may be relevant to the subject matter of the action." *Gagne v. Reddy*, 104 F.R.D. 454, 456 (D. Mass. 1984). Harvard cannot credibly contend that *Fisher II* will so fundamentally alter the legal standard as to make otherwise irrelevant facts relevant or vice versa.

Indeed, Harvard barely tries to do so. Harvard offers *no* argument as to how *Fisher II* will impact any discovery it plans to take of SFFA. As for SFFA's discovery requests, all Harvard will say is that *Fisher II* may clarify the legal standard on "qualitative" diversity, which, in turn, could shape discovery on that issue. Mot. at 5. But Harvard has never claimed to pursue the "diversity within diversity" interest that the University of Texas at Austin ("UT") belatedly advanced in *Fisher II*. *See infra* at 14-15. Even if Harvard had done so, it would not affect the scope of fact discovery. SFFA has already propounded discovery (and will continue to do so through additional document requests, interrogatories, and deposition testimony) seeking evidence as to how Harvard defines diversity. If Harvard claims an interest in qualitative diversity, all facts concerning it will come to light in due course. SFFA does not need the benefit of *Fisher II* to investigate this issue in full.

Beyond this feeble example, Harvard offers only vague generalities about how *Fisher II*'s clarification of the legal standard "will affect the type of evidence SFFA seeks and the evidence that Harvard may wish to present" in support of its program. Mot. at 5. Such generalities fall far short. *See, e.g.*, *Honeywell Int'l, Inc.*, 20 F. Supp. 3d at 132 (rejecting argument "broadly assert[ing]" a "substantial overlap in legal and factual issues between this case and the related cases" as "speculation … unaccompanied by reasoning, analysis, or supporting authority"). SFFA is not concerned with proceeding at the same

time as *Fisher II*. Nor does it anticipate seeking any additional discovery based on its outcome. And if Harvard has evidence that it "may wish to present" in defense of its program, it would be well advised to timely produce it in response to SFFA's discovery requests to which such evidence is surely responsive. At base, Harvard "can give the court no assurances or even convincing arguments that a stay will achieve the ends of judicial economy which would be its justification." *Dow Chem. Co. v. Composite Container Corp.*, 1984 WL 1245, at *1 (D. Mass. Apr. 10, 1984).

*Fisher II* likewise will not affect expert discovery. Harvard offers nothing specific on this point—not even the vague generalities it throws out in support of its argument concerning fact discovery. If Harvard is suggesting that the same issues that purportedly support staying fact discovery support staying expert discovery, the argument is equally meritless. An expert's job is to provide "testimony concern[ing] scientific, technical, or other specialized knowledge" that "will assist the trier of fact in understanding or determining a fact in issue." *Correa v. Cruisers, a Div. of KCS Int'l, Inc.*, 298 F.3d 13, 24 (1st Cir. 2002). "Expert testimony that consists of legal conclusions" therefore "cannot properly assist the trier of fact." *Nieves-Villanueva v. Soto-Rivera,* 133 F.3d 92, 100 (1st Cir. 1997) (quotation omitted). Here, the parties' experts will testify about how Harvard's admission system works, to what extent (and in what way) race is a factor in admissions, and the ability (or inability) of race-neutral alternatives to achieve diversity in the student body. Experts will *not* be testifying as to the relevant legal standard, however it may be shaped by *Fisher II* (if at all). *Fisher II* thus has no more bearing on expert discovery than it will on fact discovery—which is precisely none.

Finally, even if *Fisher II* "affect[s] the legal standards in this case," Mot. at 7, the parties can address it in their summary judgment briefs. Harvard correctly observes that *Fisher II* will be issued "likely no later than June 2016." *Id*. at 1. Summary judgment briefing in this case is schedule to commence on October 13, 2016. Thus, judicial economy will not be served by staying this case to address any impact *Fisher II* has on the prevailing legal standard. Indeed, given the additional witnesses, statistical data, admissions files, and other documents that will become relevant through the addition of another admissions cycle, a stay will only *disserve* judicial economy. For all of these reasons, Harvard's stay motion should be denied.

**IV.    Harvard Badly Misapprehends the Legal Question at Issue in *Fisher II* and Its Impact on This Litigation.**

The above argument firmly establishes that the Court should deny the stay request even accepting Harvard's argument regarding the overlap between *Fisher II* and this case. But Harvard's argument is, in truth, built on sand. Harvard's motion is premised on the proposition that a stay is justified until *Fisher II* "clarifies the applicable legal framework and standards and provides material guidance regarding the law in this area that will shape the analysis of this case before the Court." Mot. 1; *see also id*. 2 ("*Fisher II* presents the Supreme Court with an opportunity to clarify the law" and "will almost certainly affect the standards that inform this litigation"). Even a cursory review of the Supreme Court's decision in *Fisher I* and the certiorari pleadings in *Fisher II* flatly disproves this assertion.

*Fisher I* clarified the applicable law. In that decision, the Supreme Court held that the Fifth Circuit "did not apply the correct standard of strict scrutiny" and set forth the proper legal framework. *Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411, 2415 (2013).

11

In particular, the Court walked through the strict-scrutiny requirements established in the "decisions that directly address the question of considering racial minority status as a positive or favorable factor in a university's admissions process" and explained that "additional guidance may be found in the Court's broader equal protection jurisprudence which applies in this context." *Id*. at 2417-18. The Court held that the Fifth Circuit's deferential review of UT's reasons for reinstating racial classifications was in conflict with this "controlling standard" and remanded the matter "so that the admissions process [could] be considered and judged under a correct analysis." *Id*. at 2421.

On remand, the Fifth Circuit purported to apply "the ordered exacting scrutiny" and again upheld UT's use of race in its admissions system. *Fisher v. Univ. of Texas at Austin*, 758 F.3d 633, 637 (5th Cir. 2014). Ms. Fisher, in turn, sought certiorari on the ground that the Fifth Circuit erred in concluding that UT's use of racial preferences could withstand "the demanding scrutiny that *Fisher I* mandates." Petition for Certiorari, *Fisher v. Univ. of Texas at Austin* (U.S. Feb. 10, 2015) (No. 14-981) ("*Fisher II* Pet.") at 2. Thus, Ms. Fisher is not "now asking the Supreme Court to clarify" the "standard set forth in *Fisher I*." Mot. at 3. Far from it, her position is that the "Court's decision in *Fisher I* could not have been more clear. On remand, the Fifth Circuit was to review the record under the traditional and demanding constraints of strict scrutiny." *Fisher II* Pet. at 14. Ms. Fisher thus argued that the Court should grant certiorari a second time not because of doubt as to the applicable legal standard, but because the Fifth Circuit "contravened" that clear standard "in multiple ways." *Id*. at 15.

In reality, then, Harvard's stay request is not premised on the need for guidance as to the governing legal framework. *Fisher I* settled that issue, and it is not up for review in

12

*Fisher II*. Harvard seeks a stay on the theory that the *application* of strict scrutiny in *Fisher II* will resolve issues "closely related to those in this case." Mot. at 3. Even as to that, however, Harvard's argument misses the mark. There is almost no overlap between the case-specific issues raised in *Fisher I* and those raised here. Moreover, any minimal overlap that does exist provides an insufficient basis to grant a stay given that the established schedule will allow those issues to be addressed fully in the parties' summary judgment briefs.

Foremost, almost all of SFFA's claims have *no* overlap with *Fisher II*. SFFA alleges that Harvard has engaged in a campaign of invidious discrimination against Asian-American applications. *See* Comp. ¶¶ 428-42. Such racial discrimination has been unlawful for more than a century. *See Yick Wo v. Hopkins*, 118 U.S. 356 (1886). SFFA also alleges that Harvard has engaged in racial balancing. *See* Compl. ¶¶ 433-55. Racial balancing likewise "is patently unconstitutional." *Grutter*, 539 U.S. at 330. Furthermore, SFFA alleges that Harvard is using race neither as a "plus" factor in accordance with *Grutter*, *see* Compl. ¶¶ 456-65, nor to fill the "last few places" in the freshman class in accordance with *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978), *see* Compl. ¶¶ 466-76. *Fisher II* raises none of these issues.

Harvard's attempts to establish even minimal overlap between *Fisher II* and this litigation are thus unsustainable. First, Harvard argues that both cases raise the question whether "a university's decision to consider race in admissions must be measured against the reasons that the university expressed at the time of making that decision." Mot. at 3. In fact, neither case raises that issue. It is settled law that a university's reasons for employing racial classifications must be "genuine, not hypothesized or invented post hoc

13

in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996). The issue in *Fisher II* is not the validity of this legal rule, but whether UT adhered to it or instead invented post hoc rationales for its use of race. *See Fisher II* Pet. at 15-16.[3] That issue is not raised in this litigation—at least not yet.

Second, Harvard argues that Ms. Fisher's challenge to UT's "assertion of a 'qualitative' interest in diversity" tracks SFFA's claim that "'Harvard is not pursuing the critical-mass interest found permissible in *Grutter*.'" Mot. at 4 (quoting Compl. ¶ 427). But the two arguments have nothing to do with each other. Ms. Fisher challenges UT's argument that it has not yet achieved "critical mass" because the minorities admitted via Texas's race-neutral Top 10% Law "are inherently limited in their ability to contribute to the University's vision of a diverse student body." *Fisher II* Pet. at 21 (citation and quotations omitted). That issue is not raised here: Harvard does not admit *any* minorities through race-neutral means and, unlike UT, Harvard has not (yet) argued that race-neutral alternatives are unworkable because they would admit the *kind* of minority applicants that lack "unique talents and higher test scores … required to enrich the diversity of the student body." *Id*. at 12 (citations and quotations omitted).

Third, Harvard claims that both Ms. Fisher and SFFA are arguing that universities may "consider race … only for a small subset of applicants." Mot. at 4. That is not true. Under *Grutter*, a university may use race as a comprehensive element of its admissions process in order to enroll a critical mass of underrepresented minorities. *See* 537 U.S. at

---

[3] Harvard also notes that SFFA challenges its failure to consider race-neutral alternatives before using racial preferences. Mot. at 3-4. That too is a settled principle. *See Fisher*, 133 S. Ct. at 2420 ("But strict scrutiny imposes on the university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice.").

343. The issue in *Fisher II* is that UT seeks to defend its interest in intra-racial diversity not under *Grutter*, but under *Bakke*, which, again, allows the use of race in comparing applicants only when there are "'a few places left to fill'" in the freshman class. *Id.* at 27 (quoting *Bakke*, 438 U.S. at 324). That issue has little or nothing to do with this case. Harvard has not asserted an intra-racial diversity interest and has already acknowledged in discovery that its admissions system is intended to employ racial classifications in the manner *Grutter* allows—not the way *Bakke* envisions.

Fourth, Harvard suggests that both *Fisher II* (implicitly) and this case (explicitly) ask the Supreme Court to overrule equal-protection precedent authorizing the use of racial preferences in the educational setting. Mot. at 4. Harvard is half right. If this case reaches the Supreme Court, SFFA will seek, as one form of potential relief, a ruling that altogether prohibits racial preferences in admissions. *See* Compl. ¶¶ 489-505. But that issue was not before the Supreme Court in *Fisher I* and it is not within the question presented in *Fisher II*. *See Fisher*, 133 S. Ct. at 2421; *Schuette v. BAMN*, 134 S. Ct. 1623, 1630 (2014). The issue is thus irrelevant for purposes of Harvard's stay request. Whether the Supreme Court will overrule *Grutter* and *Bakke* if and when this case reaches it has nothing to do with *Fisher II*, is not the subject of fact or expert discovery in this litigation, and is not relief a district court could grant to SFFA in any event.

\* \* \*

Harvard's strategy is clear. It first requested a compressed discovery schedule that never would have allowed for the thorough and complete review of its admission system that strict scrutiny demands. Having been rebuffed by the Court, Harvard then turned to stalling tactics. It has invented excuse after excuse for failing to (or in some cases flatly

15

refusing to) produce *any* documents to date (*more than eight months* since this case was filed), notwithstanding their obvious relevance to this litigation and the ample time it has had to gather them. *See* Memorandum of Law in Support of Plaintiff's Motion to Compel Production (Doc. 65). Harvard also has reneged on a written promise to the Court that it would produce a statistically significant sample of application files, and it has tried to distract attention from its policies by seeking to make this case about those who have chosen to advocate on behalf of the applicants harmed by Harvard's policies instead of showing concern for these students' right to have their day in court. Now, faced with the imminent prospect of finally having to disclose information shedding light on its use of racial preferences, Harvard requests a one-year stay based on the flimsiest of reasons.

The Court must bring this to an end. Rather than welcoming the opportunity to defend its policies, Harvard seeks to delay or evade judicial review in a manner sadly reminiscent of the obstructive tactics once employed to continue racial discrimination against the underrepresented minorities Harvard now claims to champion. The Supreme Court is watching to see whether the difficulty of case-by-case review under strict scrutiny ultimately outweighs any marginal educational benefit of racial preferences. Harvard's behavior only lends further support to the conclusion that the costs of allowing racial preferences in admissions decisions—even in a limited way—far exceed the benefits. This case should proceed as scheduled and without further delay.[4]

---

[4] In the event the Court is inclined to grant Harvard's motion, SFFA respectfully requests that the Court issue a written explanation of its reason in order to aid the First Circuit and potentially the Supreme Court in reviewing that decision. *See Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004) (explaining in the context of reviewing a district court's resolution of a discretionary stay motion that "[t]here is no question that a trial judge can facilitate the appellate task by spelling out his rationale, and we encourage such elaboration").

## V. Conclusion

For the foregoing reasons, Plaintiff SFFA respectfully requests that the Court deny the Motion for Stay.

|  |  |
|---|---|
|  | Respectfully submitted,<br>/s/ William S. Consovoy |
|  | William S. Consovoy<br>Thomas R. McCarthy<br>J. Michael Connolly |
| Paul M. Sanford<br>BBO #566318<br>Benjamin C. Caldwell<br>BBO #67506<br>BURNS & LEVINSON LLP<br>One Citizens Plaza, Suite 1100 Providence, RI  02903<br>Tel: 617-345-3000<br>Fax: 617-345-3299<br>psanford@burnslev.com<br>bcaldwell@burnslev.com | CONSOVOY MCCARTHY PARK PLLC<br>3033 Wilson Boulevard<br>Suite 700<br>Arlington, Virginia 22201<br>Tel: 703.243.4923<br>Fax: 703.243.4923<br>will@consovoymccarthy.com<br>tom@consovoymccarthy.com<br>mike@consovoymccarthy.com |
|  | Patrick Strawbridge<br>BBO #678274<br>CONSOVOY MCCARTHY PARK PLLC<br>Ten Post Office Square<br>Boston, MA 02109<br>Tel: 617.227.0548<br>patrick@consovoymccarthy.com |
|  | *Counsel for Plaintiff Students for Fair Admissions, Inc.* |
| Dated: July 20, 2015 |  |

**CERTIFICATE OF SERVICE**

In accordance with Local Rule 5.2(b), I hereby certify that I filed the preceding document through the ECF system, and that this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

s/ Patrick Strawbridge_____