1            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2
      * * * * * * * * * * * * * *
3     STUDENTS FOR FAIR             *
      ADMISSIONS, INC.,             *
4            Plaintiff,             *
                                    *
5             vs.                   *      CIVIL ACTION
                                    *      No. 14-14176-ADB
6     PRESIDENT AND FELLOWS OF      *
      HARVARD COLLEGE, et al,       *
7            Defendants.            *
      * * * * * * * * * * * * * *
8
              BEFORE THE HONORABLE ALLISON D. BURROUGHS
9                UNITED STATES DISTRICT JUDGE
                    **STATUS CONFERENCE**
10
      A P P E A R A N C E S
11

12            CONSOVOY McCARTHY PARK PLLC
              Ten Post Office Square, 8th Floor
13            Boston, Massachusetts 02109
              for the plaintiff
14            By: Patrick Strawbridge, Esq.

15

16
              CONSOVOY McCARTHY PARK PLLC
17            3 Columbus Circle, 15th Floor
              New York, New York 10024
18            for the plaintiff
              By: Michael H. Park, Esq.
19

20

21
                              Courtroom No. 17
22                            John J. Moakley Courthouse
                              1 Courthouse Way
23                            Boston, Massachusetts 02210
                              January 28, 2016
24                            10:00 a.m.

25

1    **APPEARANCES CONTINUED**

2

3              BURNS & LEVINSON LLP
               One Citizens Plaza, Suite 1100
4              Providence, Rhode Island 02903
               for the plaintiff
5              By:  Benjamin C. Caldwell, Esq.

6

7              WILMER CUTLER PICKERING HALE and DORR LLP
               1875 Pennsylvania Avenue, NW
8              Washington, D.C. 20006
               for the defendants
9              By: Seth P. Waxman, Esq.

10

11             WILMER CUTLER PICKERING HALE and DORR LLP (Bos)
               60 State Street
               Boston, Massachusetts 02109
12             for the defendants
               By: Felicia H. Ellsworth, Esq.

13

14

15   ALSO PRESENT:  Ara Gershengorn, Esq., Harvard Office of
                     General Counsel

16

17

18

19

20

21

22                   CAROL LYNN SCOTT, CSR, RMR
                       Official Court Reporter
23                  One Courthouse Way, Suite 7204
                     Boston, Massachusetts 02210
24                       (617) 330-1377

25

1                      <u>P R O C E E D I N G S</u>

2              **THE CLERK:**  All rise.

3              **THE COURT:**  Hi, Everyone.

4              **VOICES:**  Good morning, Your Honor.

5              **THE CLERK:**  Court is in session.  Please be

6     seated.

7          This is civil action 14-14176, *Students for Fair*

8     *Admissions versus President and Fellows of Harvard College*.

9          Will counsel identify themselves for the record.

10             **MR. STRAWBRIDGE:**  Yes, on behalf of the

11    plaintiff Students for Fair Admissions, Patrick Strawbridge,

12    Consovoy McCarthy Park.  I'm here with my colleague Michael

13    Park and my co-counsel Benjamin Caldwell.

14             **MS. ELLSWORTH:**  Good morning, Your Honor.  On

15    behalf of defendant Harvard Felicia Ellsworth.  I'm here

16    with my partner Seth Waxman and Ara Gershengorn from

17    Harvard's Office of University Counsel.

18             **THE COURT:**  So the intervenors are not

19    represented here today, the aspirational intervenors?

20             **MR. WAXMAN:**  Probably preparing their cert

21    petition.

22             **THE COURT:**  All that fighting and then they

23    choose not to show up.

24          All right.  So we were here initially as sort of a

25    conference to follow up on the Court of Appeals' opinion on

1     the motion to intervene and I had both of your, you both

2     submitted sort of memos at my request and your suggestions

3     about what we could do while *Fisher* was still pending.  And

4     then in the meantime on the 27th I got a letter from SFFA

5     and later that same day the letter from Harvard.

6           So I take Harvard's point that they would have

7     liked more time to respond to this.  On the other hand, I am

8     a big proponent of sort of letters rather than motion

9     practice where we can try to resolve some of these issues

10    short of taking the time and the money to do this in a

11    motion.

12          The way this one is teed up, I mean, it is just

13    hard to see what is going on with all the redactions in the

14    attachment.  I can't, I mean, I take the general point but I

15    don't really know what we are talking about so --

16                **MR. CALDWELL:**  If I may, Your Honor?

17                **THE COURT:**  Yes.

18                **MR. CALDWELL:**  An unredacted version of the

19    letter was submitted yesterday morning along with the motion

20    to impound.  It was --

21                **THE COURT:**  I don't think so.

22                **THE CLERK:**  I didn't get it but --

23                **THE COURT:**  I got the motion to impound but

24    there wasn't anything attached.

25                **MR. CALDWELL:**  There should have been a sealed

```
1    letter, a sealed envelope attached to that motion.  I can
2    check --
3              THE COURT:  Normally, I mean, normally when
4    somebody files a motion to impound and the thing is attached
5    I can look at the attachment and then once I grant the
6    motion it is to be refiled but I have, I generally can look
7    at the one that is attached to the motion to impound even
8    before the refiling.  But in this case there hasn't been one
9    refiled and there wasn't one attached.
10         Now, if you are saying that you sent it in a
11   separate envelope, those never come to me and Karen said she
12   didn't get that one either.  So it is fine --
13             MR. STRAWBRIDGE:  Your Honor, if it helps, I
14   have an unredacted version.
15             THE COURT:  That would be great.
16             MR. STRAWBRIDGE:  I'm happy to hand that up.
17         (Whereupon, the document was handed to the Court.)
18             THE COURT:  So where I would propose we start,
19   I am just sort of figuring out what we can do while Fisher
20   is still chugging along and I have my tentative thoughts on
21   it, tentative thoughts that I am sure are going to make
22   everybody equally unhappy, but I am going to throw them out
23   there and you can talk about what people think about it,
24   make your arguments and then I will go ahead and order what
25   I will.
```

1          I would like to get as much done as possible, as

2     you all probably know by now, I have been pretty consistent

3     in that, while at the same time not, keeping in mind that

4     *Fisher* is out there and not wanting anybody to do too much

5     of anything that *Fisher* might actually impact.  So my

6     thoughts, and it's fairly in line with Harvard's fallback

7     position, I would like to do the discovery on the standing

8     issues in a limited sort of way.  I would like Harvard to

9     respond to SFFA's Request for Productions 16, 18, 27 and 31.

10    And I would like to the extent possible all of the discovery

11    disputes and sort of foundational work to get done, Bates

12    ranges, custodian search terms, just sort of get, have the

13    parameters set so that when *Fisher* is decided we can jump

14    right back into this.

15          All right.  You know, as I say, I don't want to

16    jackpot *Fisher* but I don't really have any confidence that

17    *Fisher* is going to move this case either.  So I really want

18    us to tee it up to get going right after *Fisher* is decided.

19          And then SFFA had asked for regular discovery

20    conferences and I am happy to do that as well.

21          And, again, Harvard in their submission regarding

22    the scope of discovery was sort of more specific than SFFA's

23    was but I am guessing the only thing that SFFA is going to

24    have an issue with in what I just said is the standing

25    discovery.

1          **MR. STRAWBRIDGE:**  Would you like me to address

2     it, Your Honor?

3          **THE COURT:**  I am happy to have you talk about

4     it but I know you think it is unbalanced that you should

5     have to be providing information and they don't but in the

6     meantime they're -- and we will get to this -- but they are,

7     they're producing on their database and the production

8     burden has been on them so far.

9          And I really do view standing as just a threshold

10     jurisdictional issue that is going to have to get dealt with

11     and I don't see any reason not to deal with it now.

12          **MR. STRAWBRIDGE:**  So, if I may, Your Honor?

13          **THE COURT:**  You may.

14          **MR. STRAWBRIDGE:**  All right.  You know, SFFA's

15     proposal did not object to the notion of standing discovery

16     proceeding forward.  What we have a bigger problem with is

17     the notion that discovery somehow is going to be layered or

18     sequenced in a way that's going to basically permit Harvard

19     all discovery at once to file a dispositive motion on

20     standing while keeping really the meat of the case away from

21     Students for Fair Admissions.  In particular --

22          **THE COURT:**  Well, why should we get to the

23     meat of the case if there is no standing?

24          **MR. STRAWBRIDGE:**  Well, first of all, I'll say

25     this.  In almost every single case involving affirmative

1    action that has gone up to the Supreme Court starting with

2    *Bakke*, including *Parents Involved*, including *Gratz*,

3    including both rounds of *Fisher*, standing has been raised in

4    every point and it's routinely been rejected.  A 501(c)(3)

5    organization, SFFA, hundreds of members, I don't think that

6    standing, there is even a realistic chance that standing is

7    actually going to be put into issue in any way in this case.

8         Secondly, we cite the First Circuit precedent in

9    our filing about the fact that standing is to be litigated

10   like any other issue and alongside the other issues.

11   Harvard did not file a 12(b)(1) motion which certainly would

12   have been their right if they wanted to front load this

13   issue.

14        We're in discovery so I have that perspective.  And

15   in particular I think our concern is with respect to

16   unilateral deposition testimony.  You know, if -- the

17   document discovery is going to be exchanged.  SFFA was

18   willing to exchange documents with Harvard going back to

19   last spring and Harvard wasn't willing to exchange any

20   documents.  Almost every document they've produced in this

21   case has been at the order of the Court.

22        So to the extent that, you know, when we get into

23   the questions as to SFFA's organizational documents, SFFA is

24   prepared to produce those but we really think that the case

25   needs to be set up in a way so that both parties are moving

1    forward.  It's not just simply some low hanging fruit from

2    Harvard's side and then everything that they need to file

3    dispositive motions to try to short circuit the case, that

4    is just going to delay the case.  That's our concern.

5         We have members who applied to Harvard, were

6    rejected, they're members of this organization.  They want a

7    fair chance to compete for admission at Harvard and they're

8    aging out of their window to transfer.

9         The case has been pending for more than a year.

10   It's been almost a year since the Answer was filed.  I guess

11   our view is that, you know, the meat of discovery is really

12   going to be how the admissions process works, what role race

13   is playing when they actually get into the meetings, when

14   the readers are doing their evaluations of the applications,

15   we haven't had one page of discovery on that information.

16   We think that discovery does need to move forward and it

17   goes a little bit beyond just the four or five RFPs that

18   Harvard has cherrypicked which are largely, I think "low

19   hanging fruit" is a fair characterization of these

20   documents.

21        There needs to be some real email discovery.  We

22   know there are daily reports regarding the makeup of the

23   class during the meeting process that needs to be produced.

24   I think that there is more discovery out there; but, again,

25   you know, the First Circuit says standing is to be litigated

1    along with any other issue.  We're happy to litigate that

2    but we don't think that the case should be sequenced and we

3    certainly don't think that the staging motion should take

4    priority over SFFA's --

5              **THE COURT:**  I am not going to sequence it.

6    What I am trying to do is do what we can do while *Fisher* is

7    pending.  I mean, I take the general principle but this case

8    is positioned a little bit differently because *Fisher* is out

9    there.  And it is not even just a First Circuit case, it's a

10   Supreme Court case, right.  So, I mean, I am just, I am

11   trying to get as much done as we possibly can while it's

12   pending.  And it is not because it is low lying fruit or

13   because I am sequencing it because I know the standing issue

14   is not going to be, or at least I don't have any reason to

15   think the standing issue is going to be impacted by *Fisher*.

16            If I allow discovery on the standing issue, what

17   are you all proposing to do?

18            **MS. ELLSWORTH:**  In terms of what discovery to

19   take, Your Honor?

20            **THE COURT:**  Yes.  Are you looking for just

21   documents and how many depositions and of who?

22            **MS. ELLSWORTH:**  So, I think how many

23   depositions will depend a little bit on what the documents

24   reveal about membership and decision making of the

25   membership and decision making of the Boards of Directors.

1    I think we had in our proposal indicated at one point that

2    two or three depositions might suffice.  I don't want to

3    bind us to that right now, although we certainly are willing

4    to be reasonable.  I know two depositions of Harvard

5    witnesses have gone forward already or one and a half really

6    of the directer McGrath and then another former admissions

7    officer.

8         So depending on how many decision makers are

9    implicated and certain of the members, the proposed, the

10   members of SFFA that are proposed applicants, we may need to

11   depose some of them, which we're willing to be reasonable

12   and come up with a proposal for what we would seek to submit

13   to the Court, if that would be useful.

14        **THE COURT:**  I can do it two ways.  I can give

15   you a limit of three depositions and then you come back or I

16   can take them at their word that they're going to be

17   reasonable and that you come back if you feel like they're

18   not being reasonable, or I can just set another status

19   conference for a month and we can have everybody talk about

20   how unreasonable everybody else is being here in a public

21   forum.

22        **MR. STRAWBRIDGE:**  Your Honor, I guess my view

23   is if the Court is really inclined to allow depositions on

24   their side and not on our side, we'd appreciate as much

25   clear guidance as we can.  Agreement unfortunately has been

1    difficult to come by in this case.

2         I do just want to make an additional point, and

3    maybe Your Honor's mind is made up, but, you know, I have

4    yet to hear from that side of the table -- and we've been

5    through this several times now -- any articulated way in

6    which the actual scope of the fact discovery of how Harvard

7    uses race is going to be changed by *Fisher*.  There is a lot

8    of speculation as to how the legal standard might shift but

9    the way that Harvard actually applies race, the way that it

10   actually takes it into account, and the way it affects

11   individuals or groups of people in the admissions process is

12   just a question of fact and I don't think there is any

13   reason to sort of forestall discovery into that process.

14        **THE COURT:**  If the Supreme Court, for example,

15   says race cannot be considered in any way, shape or form,

16   right, that's one case; and if they leave things generally

17   sort of status quo saying that it can be considered under,

18   you know, certain limited circumstances, that is a different

19   case.

20        And I am concerned about letting discovery go

21   forward premised on this case being one of those two things,

22   and I don't know which it would be, and I am sure there is

23   many permutations of it in between so --

24        **MR. STRAWBRIDGE:**  I appreciate the concern --

25        **THE COURT:**  -- if they say that race is not

1    being considered at all ever, they're going to have to

2    change their admissions process.

3            **MR. STRAWBRIDGE:**  In the unlikely event that

4    they say that race cannot be considered at all, then we may

5    be entitled to judgment at that point.

6            I think, if you read the transcript, I think that

7    far and away the most reasonable expectation is going to be

8    a statement about the University of Texas's program and how

9    the University of Texas's program fits within existing

10   precedent.  I mean, any case could always alter

11   fundamentally the scope of the law but I think that has to

12   be balanced against the harms to the student members of this

13   organization whose window to transfer is closing.

14           **THE COURT:**  It is only another few months.

15   And I am willing to concede right out there that all those

16   people in the Supreme Court, at least most of them, are a

17   lot smarter than I am.  I am just not willing to guess about

18   what they're going to do.  I really don't know what they are

19   going to do.

20           So, but I do want to use this time, so I am going

21   to let standing discovery go forward.  She says she is going

22   to be reasonable.  I'll limit you to three depositions.  If

23   you need more, come back and ask.  If you feel like their

24   three are unreasonable, you come back and let me know.  But

25   let's just get, let's get it done while we can.

1          And, you know, I take your point on the RFPs that

2     we've talked about, 16, 18, 27 and 31, being low-lying

3     fruit.  Those are the ones that they sort of suggested.

4     They made sense to me.  If you have other ones that you

5     think are, that should be included in that group for

6     whatever reason, you can also send me a letter and they can

7     respond and we can review that.  I would like to have that

8     be a larger group but, you know, what I didn't do was parse

9     through the discovery RFP by RFP trying to figure out which

10    ones could get done and which ones couldn't.  So if you have

11    suggestions about ones you'd like me to add to that list,

12    I'm happy to do that.  I think as sort of a bright line,

13    what I am trying to stay away from is the individual

14    applications at this point.  So if you have sort of generic,

15    you know, batches of documents, policies, protocols, you

16    know, the same sorts of things that are in these RFPs, I'm

17    certainly willing to add them to the list.

18          **MR. STRAWBRIDGE:**  If I may ask, Your Honor, do

19    you have a view with respect to some of the third-party

20    discovery in this case?  That was one of the issues that we

21    had raised.

22          **THE COURT:**  I am, I -- I thought I had already

23    ordered this but I may not have.

24          In terms of, say, like the alumni interviewers, is

25    that one of the categories you were thinking about?

1          **MR. STRAWBRIDGE:**  That's one but there are a

2    number of others.

3          **THE COURT:**  Which other categories?

4          **MR. STRAWBRIDGE:**  Well, there is certainly

5    potential third-party discovery at the high school level

6    with respect to people who are intimately involved in their

7    students' applications to the Ivy League schools and Harvard

8    in particular.  There is also discovery among trade groups,

9    higher education trade groups that, you know, there is some

10   indication that they would have highly relevant information

11   with respect to Harvard's policies as well as general

12   policies and understanding.  There are witnesses to the harm

13   who look at everyday students whose hopes to apply to these

14   schools are crushed and are sometimes told explicitly that

15   their race is a factor in their decision making and so that

16   is all fair ground for third-party discovery.

17         **THE COURT:**  So sort of consistent with my view

18   that I am not going to get into individual applicants, I am

19   willing to do generalized discovery so, for example, on the

20   alumni interviewers, if I haven't ordered it already, and I

21   thought that I had, sort of the general guidelines of their

22   alumni interviewing program but not the specific individual

23   alumni interviewers.  And that's why I am not going to allow

24   high school trade group or witnesses to the harm.  I am

25   interested in the broader sort of structural policy program

1    protocol discovery and not getting into individual

2    applications or situations.

3          Ms. Ellsworth.

4          MS. ELLSWORTH:  I was just going to clarify,

5    Your Honor.  You have ordered the general policies and

6    procedures about the alumni program.  That's included in the

7    production that we made and are making on a rolling basis.

8          THE COURT:  That is what I thought.  So, I

9    mean, that is where I stand on sort of as a bright line as I

10   can give you now.  I am not -- I am holding back, trying to

11   hold back on anything that involves individual applications,

12   individual interviewer, an individual high school guidance

13   counselor.  I'm trying to keep this on a broader level until

14   *Fisher* is decided.

15         MR. STRAWBRIDGE:  And then let me just, maybe

16   this is the application of sort of your more general

17   approach, but does Your Honor have a view on email

18   discovery, for example, for both parties?  You said

19   something that we can negotiate or start production on --

20         THE COURT:  Yes, can you be a little more

21   specific about --

22         MR. STRAWBRIDGE:  Sure.  I mean, the parties

23   obviously have, especially with respect to Harvard's

24   admission policies, a lot of their responses to our RFPs

25   basically say that they're going to produce, you know, ESI

 1    so -- and we know that there are particular documents and

 2    reports that were circulated via email that are going to be

 3    relevant to the case.  So I guess the question is, you know,

 4    we would obviously appreciate the opportunity to at least

 5    start negotiating custodians and the scope of ESI but I

 6    think some of that is going to be a big chunk of the

 7    relevant document discovery.

 8             So if email is on or off for both sides, that's

 9    fine, but I think we want --

10             THE COURT:  Certainly negotiating the scope is

11    on and what -- let me hear what you have to say, you're

12    standing up.

13             MS. ELLSWORTH:  Sorry.

14             THE COURT:  No, that's fine.

15             MS. ELLSWORTH:  I just wanted to be heard

16    briefly.

17             THE COURT:  That is as polite a way of letting

18    me know that you want to be heard.

19             MS. ELLSWORTH:  Certainly our position is, I

20    mean, ESI means a variety of different things.  There are

21    lots of electronic documents that have been produced and

22    will be produced responsive to the RFPs that we've

23    identified and Your Honor has indicated will order

24    production on.

25             I think specific individual email would be, follow

1    on what I guess we are viewing as on the sort of should be

2    pending *Fisher II* side of the line so that's going to relate

3    to individual applicants or the actual, you know,

4    application process if it goes to -- I fail to see what

5    email discovery could relate to some of the more general

6    structural policies.

7              THE COURT:  If there is a weekly report that

8    is -- and I have no idea.  I am just -- if there is a weekly

9    report that circulates every Monday that says right now we

10   have this many people in, we have this many people out,

11   there is statistical information we have this many spots

12   left, if there is statistical information that isn't, that

13   doesn't focus on individual applications or name individual

14   applicants, that is the kind of information that I would

15   like exchanged now.

16        But, you know, I am in a little bit of a difficult

17   position here because I don't really know what the documents

18   look like but I'm trying to make clear that a statistical or

19   objective report that doesn't name individual students, that

20   is the sort of thing I would like to be having exchanged

21   now.

22             MS. ELLSWORTH:  There is not to my knowledge a

23   weekly report that comes around on a regular, you know, on

24   sort of a scheduled basis.  There certainly are reports that

25   are discussed in the Admissions Office and used that have

1   some statistical information that don't fall into the

2   categories that we had offered or proposed as sort of our

3   fallback position to produce here.

4          So there is not, you know, we can investigate

5   whether there is something that is, in fact, a regular

6   circulation.  My knowledge of the facts of the documents is

7   that there is not something that is quite so regular.  I'm

8   not saying this report doesn't exist.  It's just not

9   something that goes around every Monday morning as Your

10  Honor suggested.

11         **MR. STRAWBRIDGE:**  Just, Your Honor, briefly,

12  there is a daily report during the meeting process.  I'm

13  going to try to respect the protective order but we know the

14  daily report, at least when the actual admissions meetings

15  are convened, that was the subject of testimony already in

16  this case and that's the kind of thing we're talking about.

17         **THE COURT:**  I mean, I don't have it in front

18  of me so just to try to give you some guidance.  To the

19  extent that that says we reviewed, you know, Tommy, Sue and

20  Mary, Tommy is in, Mary is out, Sue we're going to defer, I

21  am not going to require them to exchange that sort of

22  information now.  But if there is a more general report

23  about we reviewed this many applicants, that leaves this

24  many spots, this is what the current statistical breakdown

25  is or not, by that I mean if they're, you know, I think

1    there is a difference if they're looking at any racial or

2    ethnic or bugle-playing composition of the class week to

3    week versus if they get, like, 80 percent of the class and

4    then look to see where they're deficient.  And then -- I

5    think there is a difference in that and I think they are

6    entitled to know which model it is.

7           And if there is a way to do that now, the reports

8    that don't discuss individual student applications and why

9    this one is in and this one is out, I would be inclined to

10   let that sort of report go over now.  But if it includes

11   individual student information, I would be inclined to hold

12   it off until after *Fisher*.

13           **MR. STRAWBRIDGE:**  That's some suitable

14   guidance.  We're happy to submit a letter in very short

15   order with respect to some additional RFPs that we think

16   should be fair game but I think I understand the parameters

17   of the Court's guidance.

18           **MS. ELLSWORTH:**  I understand what Your Honor

19   is saying.  I'm not sure that there is a document that

20   exists in that way but I understand your guidance and we

21   can --

22           **THE COURT:**  If there is not, there is not,

23   right.  I really am not privy to the documents.  I am just

24   trying to -- I am happy to resolve, you know, this RFP by

25   RFP, document by document, but I feel like if I give you

1    some general guidance about how I am going to come down on

2    these things, you guys are all excellent lawyers and surely

3    you, you know, hopefully you can resolve some of these

4    things without coming back here every other day, although it

5    is always a pleasure to see you.

6                    **MS. ELLSWORTH:**  Thank you, Your Honor.

7                    **THE COURT:**  If you saw what the rest of my day

8    looked like, you would know that I am being completely

9    honest.

10                   (Laughter.)

11                   **MR. STRAWBRIDGE:**  We appreciate that, Your

12   Honor.

13                   **THE COURT:**  So that is what I am inclined to

14   do.  If either one of you have more things you can add to

15   the pot, I am happy to consider those, but for the moment --

16   and we will get an order out to try to give you some

17   guidance -- but standing discovery and, if need be, motion

18   practice, the four RFPs we talked about and whatever you can

19   get done in terms of negotiating the parameters of discovery

20   so we can hit the ground running when *Fisher* is decided.  I

21   will schedule regular conferences.  How often are you

22   thinking or --

23                   **MR. STRAWBRIDGE:**  I mean, I would suggest that

24   they should -- monthly seems appropriate.  If the parties

25   can agree that there is no need for a particular conference,

1   we're happy to notify the Court and move them.

2           THE COURT:  So we will schedule them monthly

3   and then if you decide it is not necessary, just let us

4   know.  Karen, you can start looking ahead for a month.

5           And then, so these two letters which, again, are a

6   little, I guess I could take a second to look at this.

7           (Pause in proceedings.)

8           THE COURT:  So there is 296 fields that

9   Harvard has not turned over; is that right?

10          MS. ELLSWORTH:  There is 296 fields that are

11  identified by SFFA in their letter.  You know, we would like

12  an opportunity to respond more fully.  To the extent Your

13  Honor is interested in adjudicating this by letter, we're

14  happy to submit a letter response in some shorter period of

15  time than the 14-day motion period.  But these are -- I

16  don't think we -- Harvard certainly doesn't want to discuss

17  these in a public setting hearing.  We'd have to ask that

18  the courtroom be closed if we're going to have a, sort of a

19  field-by-field discussion of this.

20          But I think it probably would be more productive to

21  have some equivalent of briefing on the fields and the basis

22  for withholding certain fields.

23          THE COURT:  So why don't we go ahead and do

24  that.  We will have another status in a month.  If we can

25  decide it on the papers, we will.  If I want to hear from

 1    you, we will do it in a month.

 2          But I, you know, I guess -- and, again, I thought I

 3    could look at this quickly but I can't, it is not in a

 4    format that I can look at it really quickly and know what we

 5    are talking about.

 6          So if you are talking about fields that, for

 7    example, take out the names of the recommenders for a

 8    particular student or, you know, that sort of information, I

 9    am going to let them hold that back for now.  You know, I am

10    going to let them hold back information that specifically --

11    I want the statistical information to go over but I want

12    the, if you are talking about like names of people and how

13    they regard recommendations from one person over another,

14    you know, that kind of stuff I am going to let them hold

15    back but --

16          **MR. STRAWBRIDGE:**  Just briefly, Your Honor.

17    That's certainly one category.  There is another category

18    that actually has been the subject of public testimony in

19    this case already so I think it is okay to talk about that,

20    that is, there is some applicant-specific information.

21    You're right, one of the categories of information we're

22    seeking is information about potential third-party witnesses

23    so perhaps that falls within what Your Honor is talking

24    about.

25          We also have raised some issues specific to

1    applicants and, I mean, including things like what extra

2    curricular activities they participated in, what honors they

3    won.  The names and the street addresses are strictly out of

4    a database.  There is material that their expert actually

5    identified as being useful to SFFA that, you know, on that

6    level and obviously relevant to the admissions process.  We

7    don't have that at this point.

8         There is more that I could go into except for it's

9    covered by the court --

10        THE COURT:  I am cognizant of the request not

11   to discuss it here but to the extent you want to comment on

12   it, go ahead.

13        MS. ELLSWORTH:  We will file a more full

14   response but I would just note that the basis for

15   withholding certain of the fields that are not specific

16   individuals' names are that they do render the applicants

17   identifiable or could render the applicants identifiable so,

18   again, it's a privacy concern for the applicants and

19   students at Harvard.

20        THE COURT:  Like I said, if it says, you know,

21   No. one tennis player at Newton North High School, I am

22   going to hold off on that; but if it says tennis player, I

23   want that produced, okay.  Generally speaking off the top

24   unencumbered by any actual documents.

25        MS. ELLSWORTH:  We understand.  We'll provide

1    a letter that will hopefully educate Your Honor a little bit

2    more on whether that type of line drawing can be done from

3    the information.

4              THE COURT:  How many fields are there?  Like,

5    if you have an individual student applicant, they get a --

6    there is a database that is filled out with all the

7    information for that applicant, how many fields are there

8    for each applicant?

9              MS. ELLSWORTH:  In the entire database there

10   are about 1600 fields.  Not every applicant has every field

11   filled out.

12             THE COURT:  I don't know if I should be

13   starting to feel better or worse about the fact that I

14   didn't get into Harvard.

15             (Laughter.)

16             THE COURT:  If there is 1600 fields, I could

17   have been deficient in a lot of them.  If there is only 10,

18   I feel like I hopefully would have made the cut.

19             All right.  So --

20             (Laughter.)

21             THE COURT:  So why don't you go ahead and

22   brief that.  Let's have it -- how much time do you want?  I

23   know if it were a motion you would be entitled to your two

24   weeks.  Do you need the two weeks?

25             MS. ELLSWORTH:  We could certainly do it in

```
 1    one week, Your Honor.
 2                   THE COURT:  Why don't we do that.  We will
 3    take a look at it.  Karen, do you have the next date for
 4    them?
 5                   THE CLERK:  Thursday, February 25th, at eleven
 6    a.m.
 7                   THE COURT:  Is that school vacation week?
 8                   THE CLERK:  No, that is after.
 9                   MS. ELLSWORTH:  I had the same question so
10    that's fine.
11                   THE COURT:  Mr. Waxman, you look like you are
12    going to say something.
13                   MR. WAXMAN:  I don't have my electronics so I
14    have no idea about February 25th but I do believe that I
15    don't have an argument on that day, at least that I can
16    recall.
17                   THE COURT:  They don't let you bring your
18    electronics in?
19                   MR. WAXMAN:  They do but, maybe I wasn't
20    prepared.  I have it in my briefcase; but, in any event, I
21    think that date is fine.
22                   MR. STRAWBRIDGE:  Your Honor, if I may?
23                   THE COURT:  Of course.
24                   MR. STRAWBRIDGE:  That is fine, we're happy,
25    you know, to do this.
```

1              I'll note on all the issues that we raised in our

2     letter, we've raised those issues with Harvard going back to

3     December 15th.  I don't think that it was a surprise that we

4     were going to file something before the conference.  We

5     talked about it last week and let --

6              THE COURT:  I am not faulting you for the way

7     it was raised.

8              MR. STRAWBRIDGE:  The one issue, at least one

9     of the issues that we did raise that I don't think requires

10    further briefing, and really shouldn't, because we have a

11    relatively reasonable request for a modest expansion of the

12    protective order so that we're able to actually talk to our

13    client.

14             MS. ELLSWORTH:  We do want to brief that

15    issue, Your Honor.  We don't view it as a modest request in

16    light of the highly confidential nature of the information

17    here and the fact that the protective order was negotiated

18    by both parties so we do intend to address that in the brief

19    we file in one week.

20             THE COURT:  I will let them have a week.  I

21    mean, I am somewhat reluctant to jump into a protective

22    order that was negotiated between two parties.  And, you

23    know, you agreed that something is going to be sort of

24    attorneys' eyes only and then you want to give it to your

25    principal non-attorney participants, it does --

1          **MR. STRAWBRIDGE:**  Well, I think the scope

2     about the extent to which they're designating materials has

3     certainly caught us off guard.

4          **THE COURT:**  I think that is a valid point that

5     you raise.  I also, you know, I take from Ms. Ellsworth's

6     response that you're allowed to share the substance of the

7     documents, just not the actual document itself; is that --

8          **MR. STRAWBRIDGE:**  No, I don't think that's

9     true at all.  I think what she does is say we're not allowed

10    to reveal the existence of the information.

11         **THE COURT:**  Is that what you said in your

12    letter, that they could share the substance of the document?

13         **MS. ELLSWORTH:**  Yes, Your Honor.  The

14    protective order in paragraph five has a provision meant to

15    address the concern that SFFA is raising.  Perhaps an

16    interpretation of that provision is the subject of dispute

17    but it certainly, you know, as I said, was negotiated in the

18    protective order we contemplated.

19         Harvard has non-attorney clients as well that need

20    to be advised and, you know, proceeding under a protective

21    order which allows one to advise your client about strategic

22    legal decisions without revealing any protected information

23    so we think that should be sufficient.

24         **THE COURT:**  Why don't you put in your response

25    what it is you think they can, the extent to which the

```
1     protective order allows them to share information with their

2     clients and how and maybe we will have some more common

3     ground than we think.

4            They say you're designating 80 percent of your

5     documents; is that accurate?

6            MS. ELLSWORTH:  The percentage may well be

7     correct.  I mean, the fact of the matter is that what was

8     ordered to be produced is, does, in fact, we believe quite

9     squarely fall within the protective order's terms in terms

10    of either sensitive personal information or the type of

11    trade secret information about how Harvard conducts its

12    admission process, commercially sensitive information that

13    is not appropriate for members of the public and certainly

14    not for future applicants to Harvard to have, to be privy to

15    when other applicants are not.

16           So the scope of our designation has to do with the

17    nature of the discovery as to what they are seeking rather

18    than any over-designation on Harvard's part.

19           THE COURT:  We will see where we are in a

20    couple of weeks.

21           MR. STRAWBRIDGE:  And just one follow-up, Your

22    Honor.  We will certainly do it in a reasonable time and

23    space but if they're going to brief a full response, we'd

24    like a brief opportunity to submit a reply to respond to

25    whatever they --
```

1          **THE COURT:**  That is fine.  I mean, I would

2     like it to be fully briefed for me with a little bit of time

3     to think about it before we meet again.

4          **MR. STRAWBRIDGE:**  We can do it in a matter of

5     48 hours after theirs.

6          **THE COURT:**  That is fine.  I mean, I am always

7     inclined when I get these letters to sort of start working

8     through them without talking to the parties but by the time

9     you take your week and you take your two days we will be

10    close enough to the next status and I am happy to hold off

11    if you both would like to preserve the opportunity to be

12    heard on it orally.

13         **MS. ELLSWORTH:**  Thank you, Your Honor.

14         **THE COURT:**  I'm happy to do that.  And then,

15    so if we are not going to get to it until, for a month, if

16    you want to take a little longer than a week and you want to

17    take a little longer than 48 hours, you know, it is not a

18    firm deadline.  We should be ready to go in a month on it.

19         Okay.  Anything else?

20         **MS. ELLSWORTH:**  Nothing from Harvard, Your

21    Honor.

22         **THE COURT:**  Mr. Strawbridge?

23         **MR. STRAWBRIDGE:**  Not at this point.

24         **THE COURT:**  Okay.  Thanks everyone.

25         **VOICES:**  Thank you.

1

2          (WHEREUPON, the proceedings were recessed at 10:33

3      a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Carol Lynn Scott, Official Court Reporter for

the United States District Court for the District of

Massachusetts, do hereby certify that the foregoing pages

are a true and accurate transcription of my shorthand notes

taken in the aforementioned matter to the best of my skill

and ability.



            /S/CAROL LYNN SCOTT



        _____

                CAROL LYNN SCOTT
               Official Court Reporter
              John J. Moakley Courthouse
             1 Courthouse Way, Suite 7204
              Boston, Massachusetts 02210
                   (617) 330-1377



**DATE: February 3, 2016**