# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> Defendant. | Civil Action No. 1:14-cv-14176-ADB |

**DECLARATION OF EDWARD BLUM**

Edward Blum, pursuant to 28 U.S.C. § 1746, declares the following:

1. I am the President of Students for Fair Admissions, Inc. ("SFFA").

2. SFFA is a nonprofit association with thousands of members, including students, parents, and other supporters.

3. SFFA's purpose is to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and other lawful means.

4. In addition to this lawsuit against Harvard, SFFA has also brought a lawsuit against the University of North Carolina-Chapel Hill, alleging that the university has been violating the Fourteenth Amendment and federal civil rights laws through discriminatory admissions policies. That litigation is ongoing in the U.S. District Court for the Middle District of North Carolina.

5. SFFA also has been leading the charge against other universities engaged in similar discriminatory admissions practices. For example, in March of 2015, the New

Republic reported that Yale Law School was destroying its student admissions evaluation records to avoid being forced to hand over these documents to students who request them. Recognizing the serious legal concerns, SFFA sent a letter to Yale objecting to its destruction of these important documents. SFFA sent similar letters to other schools cautioning them against taking similar steps. In these letters, SFFA explained that destruction of student files "suggests resistance to enforcement of the Fourteenth Amendment and federal civil rights law sadly reminiscent of behavior the Supreme Court intervened to stamp out decades ago" and warned that such resistance "will only heighten the need for further judicial intervention."

6.  In my capacity as President of SFFA, I communicate with people who are interested in joining SFFA as members. Many potential members of SFFA have expressed concerns to me about their identity being disclosed if they were to join SFFA.

7.  Among the concerns that potential and current SFFA members have expressed is the fear that they will be retaliated against for being associated with SFFA. I understand that this concern is based on the fact that there are many people who are hostile to SFFA and to those who support its mission.

8.  Numerous articles, Internet blog posts, and social media campaigns have described SFFA as a racist, manipulative organization. For example, one website has characterized this lawsuit as an "example of the Asian American racial identity being exploited by mainstream politics to serve as a wedge for the purposes of advancing a conservative agenda: one that seeks to reinforce anti-Blackness and to marginalize people of colour through selective perpetuation of the Model Minority Myth." "#IAmNotYourWedge: Lawsuits Against Harvard & UNC Assert Anti-Asian

2

Discrimination in Admissions," Reappropriate.com (Nov. 19, 2014), http://goo.gl/tvGsDX.

9. Potential and current members have also expressed concerns to me that Harvard could retaliate against them by denying admission to them or to their family members if Harvard knew that they support SFFA.

10. I have explained to supporters of SFFA that the membership list is not available to the public or media and that we value members' confidentiality. This confidentiality policy is posted on SFFA's website because I know that anonymity is important to many members and prospective members. Many SFFA members have told me that they joined SFFA based on the understanding that their identity and involvement would remain confidential.

11. I have given five speeches to Asian-American groups during the last 18 months in New York, New Jersey, Northern and Southern California, and Houston. I estimate that over one thousand people have attended these talks. The most common questions I have been asked concern the anonymity of SFFA members and the fear of retribution if individuals are identified as members. Many SFFA members are first- and second-generation Asian Americans, who are particularly sensitive to such exposure and potential retribution in light of their experiences in their countries of origin.

12. Based on my experiences interacting with prospective and current SFFA members, I believe that fewer people would join SFFA if it were known that SFFA might be compelled by court order to disclose its members' identities. It is also likely that many current members would limit their participation or withdraw their membership entirely under such circumstances.

13.     I have tried to explain to people raising these concerns that there is a Court order in place that is intended to protect certain confidential information disclosed in the litigation from being revealed to the public. Not everyone understands the distinction between disclosure pursuant to the protective order and public disclosure. And because I cannot guarantee that their identities will never become public as part of the case, the existence of a protective order has not been sufficient to fully resolve their concerns.

14.     I have interacted with SFFA members who have expressed interest in participating as standing members for purposes of this litigation. Several parents and students have told me that they would like to be involved as standing members because they believe that Harvard's admissions process is unfair, but they are uncomfortable doing so because of fear that their identities could be disclosed and that they could suffer retaliation by Harvard and hostility from the public.

15.     Some members of SFFA have expressed fear that if they were to volunteer as standing members, then Harvard would retaliate against them or their family members by denying them admission, either to the undergraduate program or possibly later to graduate school.

16.     Some members have also expressed fear that they would become subject to hostility, such as the treatment experienced by Abigail Fisher, the lead plaintiff in *Fisher v. University of Texas at Austin*, No. 08-CV-263 (W.D. Tex.).

17.     In my capacity as President and a Board Member of SFFA, I have had discussions with SFFA's board members regarding matters relating to SFFA, such as strategy, fundraising, and operations. If these confidential communications were subject to disclosure, it would discourage openness and hinder our ability to communicate freely.

18. Similarly, if communications with SFFA members, potential members, and donors had to be disclosed in litigation—even if only to Harvard's lawyers—then I think that most people involved with SFFA, including myself, would be less willing to have candid and personal communications about issues that are central to SFFA's mission and operations.

19. Disclosure of internal communications would impede SFFA's ability to function because it would be difficult for individuals to communicate freely knowing that their discussions might later scrutinized by people outside of SFFA, including Harvard and its lawyers.

20. Disclosure of information about SFFA's donors would also threaten SFFA's ability to raise funds. In addition to membership dues, SFFA receives financial contributions from hundreds of outside donors. Some of these donors are willing to contribute to SFFA on the condition that they will remain confidential due to concerns about negative publicity or other consequences if their identities and contributions were publicized.

21. I fear that the disclosure of information concerning SFFA's donors to Harvard would cause some of them to withdraw their contributions and discourage other potential donors from making contributions, which could endanger SFFA's survival or force SFFA to cut back its activities.

22. I have also suffered immense personal hostility as a result of my involvement with SFFA and my advocacy efforts generally. I routinely receive hate mail and threats. I frequently receive vile text messages. Those messages have called me a "racist bigot" and an "asshole," and they have maligned my Jewish heritage in derogatory

5

terms. I have also been the target of numerous highly critical news publications and Internet postings impugning my character. *See, e.g.*, B. Clark, "Meet the Suspected White Supremacists Who are Financing Abigail Fisher," Melanoid Nation (Dec. 14, 2015), http://goo.gl/d7U3G5. Finally, I have also received two death threats concerning my advocacy activities.

23. In light of the foregoing, I believe that many SFFA members, prospective members, and donors would likely curtail their involvement in SFFA and their communications with me if information were disclosed concerning their identities, our communications, or SFFA's operations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, April 28, 2016.

_____
Edward Blum