# EXHIBIT A

**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OPEN SOURCE YOGA UNITY,

    Plaintiff,

    v.

BIKRAM CHOUDHURY,

    Defendant.

_____/

No. C 03-3182 PJH

**ORDER DENYING DEFENDANT'S MOTION FOR JUDGEMENT ON THE PLEADINGS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT OR ADJUDICATION RE STANDING**

On April 14, 2004, a hearing was held on the motion of defendant Bikram Choudhury ("Choudhury") for judgment on the pleadings, or in the alternative, for summary judgment or adjudication regarding standing and other jurisdictional issues. Plaintiff Open Source Yoga Unity ("OSYU") appeared through its counsel Elizabeth Rader, and Choudhury appeared through his counsel Robert Ungar. Having read the papers and carefully considered the relevant legal authority and oral argument, the court hereby rules as follows.

**BACKGROUND**

Choudhury has compiled a yoga routine known as "Bikram's Basic Yoga System," or "Bikram Yoga," one of the more popular forms of hot yoga. Bikram Yoga is a combination of a specific sequence of yoga postures, breathing exercises, temperature and a dialogue compiled by Choudhury. Choudhury holds various copyrights and trademarks related to Bikram Yoga, and has licensed many of his former students to teach Bikram Yoga.

Some yoga instructors have varied the Bikram Yoga routine. Consequently, in 2002 Choudhury began to send cease and desist letters to yoga instructors, demanding they stop exploiting his copyrighted and trademarked intellectual property. On February 5, 2003,

1  Choudhury posted text on his corporate website that announced the registration of his Bikram
2  Yoga copyright and detailed the legal consequences for those who might violate his copyright.
3    In summer of 2002, Vanessa Calder ("Calder"), started an informal group called Hot
4  Yoga Alliance ("HYA") to communicate with like minded people and build a mailing list. On
5  February 24, 2003, OSYU was incorporated as a California nonprofit Mutual Benefit
6  Corporation, and on March 21, 2003, Calder sent an email to the HYA email list announcing
7  the formation of OSYU. This email explained the purpose of OSYU and invited recipients to
8  join in an open conference call, which was held on March 25, 2003. In sum, the email
9  explained that OSYU was created to help enlist "the courts" in protecting "our" rights to
10 practice and teach yoga in a "free marketplace." The email continued, "we will seek to . . .
11 define what, if any, rights or exclusivity . . . Choudhury may assert or enforce regarding Bikram
12 Yoga, Hot Yoga," or any other yoga.
13   Beginning in late March 2003, OSYU began to hold "strategy conference calls" about
14 once a month. Participating in these calls were Calder; the McCauleys, Calder's parents and
15 owners of yoga studios, who had received a cease and desist letter from Choudhury; Jimmy
16 Barkan ("Barkan"); Kimberly Clark ("Clark"); Brandon Hartsell ("Hartsell") and "several other"
17 yoga studio owners.
18   On or about April 6, 2003, OSYU sent out a mailing to approximately 200 yoga
19 teachers and studios. The recipients included HYA mailing list members and other yoga
20 studios specifically targeted by Calder. The mailing included a formal letter from OSYU's
21 attorney and incorporator, James Harrison ("Harrison"), describing OSYU and its purpose.
22 The letter re-stated the purposes of OSYU spelled out in Calder's Mach 21 email, and stated
23 specifically that "OSYU was formed to provide a common voice, and the pooling of resources,
24 to oppose the litigious position . . . Choudhury is taking against the Yoga community." The
25 letter listed OSYU's postal and web address. Included in the mailing was a flyer "welcoming"
26 OSYU.
27   On April 8, 2003, Calder sent an email to the HYA email list announcing the launch of
28

2

1  OSYU's website. This email also encouraged recipients to support "our community" by
2  donating to the OSYU legal fund. Finally, the email encouraged recipients to "spread the
3  word" about OSYU. A second email from Calder on April 8, 2003, informed the HYA email list
4  that they had been transferred to the OSYU mailing list.

5       On June 13, 2003, Choudhury settled pending litigation with the Morrisons, yoga studio
6  owners who had received one of Choudhury's cease and desist letters. Choudhury's website
7  advertised the settlement as a significant legal victory and espoused that the "imposters" who
8  exploit Bikram Yoga "must and will be stopped." In response, OSYU held a June meeting
9  where it was decided that OSYU would file the current declaratory relief action.

10       This action was filed on July 9, 2003. Prior to that date, OSYU had the following
11  characteristics. In declarations and affidavits filed in support of OSYU, no less than eight
12  individuals, including Calder, McCauley, Barkan, Hartsell, Clark, Erin Thibeault, Darla Magee
13  and Ted Grand, claim to be members of OSYU since before July 9, 2003.[1] Prior to that date,
14  OSYU also had received donations from 16 different individuals and organizations, ranging in
15  value from $15.00 to $1,125.00. In addition to the purposes of OSYU as explained in its April
16  mailing, OSYU's specific legal purpose, stated in its Articles of Incorporation, was to
17  "communicate, and defend in any legal way possible, the idea that no form or style of Yoga is
18  proprietary as it can not be owned, transferred, franchised, trademarked or copyrighted."

19       OSYU's first and only director, Calder, was appointed/elected to the board of directors
20  by OSYU's incorporator on the following day, July 10, 2003. On July 11, 2003 OSYU filed a
21  Statement of Information for a Domestic Nonprofit Corporation with the California Secretary of
22  State, listing Calder as the CEO and Secretary of OSYU and Harrison as CFO and Agent for
23  Service of Process. OSYU amended its Articles of Incorporation on July 15, 2003, changing
24  its corporate form to a non-profit Public Benefit Corporation. OSYU adopted its first set of
25  Bylaws on July 29, 2003. On December 18, 2003, William McCauley replaced Harrison as
26  CFO.

---

[1]Choudhury's objections to these affidavits are overruled.

3

**ANALYSIS**

Choudhury moves for judgment on the pleadings or for summary judgment, alleging that OSYU lacks associational standing because of the inadequacy of OSYU's purported membership, and because the current action is not germane to the purposes of OSYU. Even if OSYU has standing, Choudhury argues that OSYU's declaratory relief action should be dismissed because i) OSYU members have unclean hands, ii) judgment in this action would not forestall duplicitous litigation, iii) the nature of relief sought by OSYU is inequitable to Choudhury, iv) OSYU has failed to join necessary and/or indispensable parties, and v) the affirmative claim of copyright misuse is not cognizable.[2]

A.  General Legal Standard

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies." Casey v. Lewis, 4 F.3d 1516, 1519 (9th Cir. 1993). Standing is an essential component of the case or controversy requirement. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). OSYU bears the burden of alleging facts demonstrating that it is a "proper party to invoke judicial resolution of the dispute." U.S. v. Hays, 515 U.S. 737, 743 (1995). Thus, OSYU must demonstrate the constitutional minimum of Article III standing. Because OSYU seeks declaratory and injunctive relief only, it must show a "very significant possibility of future harm." Id.

An association has standing to bring suit on behalf of its members when: i) its members would otherwise have standing to sue in their own right,[3] ii) the interests it seeks to protect are germane to the organization's purpose, and iii) neither the claim asserted nor the

---

[2] Choudhury improperly raises a number of legal arguments in his reply brief, which were not raised in his moving papers. The court will not entertain these claims, including Choudhury's "suggestion" for sanctions. Any desire for sanctions must be made known pursuant to the dictates of Civil Local Rule 7-8.

[3] In order to have standing, an individual must have first suffered an "injury-in-fact" to a legally protected interest that is both "concrete and particularized" and "actual or imminent;" second, there must be a causal connection between the injury and the conduct complained of; third, it must be "likely"–not merely "speculative"–that the injury will be "redressed by a favorable decision." San Diego County Gun Rights Committee v. Reno, 98 F.3d 1121, 1126 (9th Cir. 1996) (citing Lujan, 504 U.S. at 560-61).

4

relief requested requires the participation of individual members in the lawsuit. Individuals for Responsible Gov't, Inc. v. Washoe County, 110 F.3d 699, 702 (9th Cir. 1997) (quoting Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977). Associational standing is particularly appropriate where "the association is seeking to represent the interests which are central to the purpose of the organization" and "where the relief sought is some form of prospective remedy, such as declaratory judgment, which will inure to the benefit of the organization's membership." Rodriguez v. California Highway Patrol, 89 F. Supp. 2d 1131, 1135 (N.D. Cal. 2000) (quoting Peick v. Pension Benefit Guar. Corp., 724 F.2d 1247, 1259 (7th Cir. 1983). Absent both purpose and members, however, an association lacks any standing to sue. Individuals for Responsible Gov't, Inc., 110 F.3d at 702.

In response to a motion for summary judgment on the ground of lack of standing, the plaintiff must set forth, by affidavit or other evidence, specific facts that are to be taken as true for purposes of the motion. Lujan, 504 U.S. at 561. If the affidavits on the summary judgment motion do not go beyond the allegations of the complaint relative to establishing standing, the analysis of the question is no different than it would be at the pleading stage. See Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26 (1976).

Generally, standing is determined by the facts that exist at the time the complaint is filed. Clark v. City of Lakewood, 259 F.3d 996, 1006 (9th Cir. 2001). Lack of standing is a jurisdictional defect (Bender v. Williamsport Area School Dist., 475 U.S. 534, 541 (1986)), and standing is a necessary element of federal court jurisdiction. Big Country Foods, Inc. v. Board of Educ. of Anchorage School Dist., 952 F.2d 1173, 1176 (9th Cir. 1992).

B.  Discussion

Choudhury advances several arguments attacking OSYU's associational standing based on the status of OSYU's purported members. Specifically relating to membership, Choudhury claims: i) OSYU had no members on the date OSYU filed its complaint, ii) OSYU is currently a "sham organization" that lacks indicia of a traditional membership organization, and iii) the individual members of OSYU would not have standing to prosecute this action in

5

their own right.

1) Legal Standard for Membership

The California Corporations Code defines "member" as "any person who, pursuant to a specific provision of a corporation's articles or bylaws, has the right to vote for the election of a director or directors or on a disposition of . . . the assets of a corporation or on a merger or on a dissolution. . . ." 'Member' also means any person who is designated in the articles or bylaws as a member and, "pursuant to a specific provision of a corporation's articles or bylaws, has the right to vote on changes to the articles or bylaws." Cal. Corp. Code § 5056. The Public Benefit Corporations Code § 5332, and the Nonprofit Religious Corporations Code recognize that those types of corporations may refer to associated persons as "members" even though the associated persons do not meet the definition of member in § 5056.

The cases interpreting associational standing take a broader view of what constitutes membership. In Hunt v. Washington State Apple Advertising Comm'n, the Supreme Court rejected the defendant's argument that the Washington State Apple Advertising Commission was precluded from establishing the requisites of associational standing because it had no "members" under state law. 432 U.S. 333, 342 (1977). Rather, the Supreme Court performed a functional analysis and found that the apple growers and dealers possessed "all the indicia of membership," and that "the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests." Id. at 344-45.

Moreover, the Ninth Circuit has held that an organization's form under state law does not affect its federal standing. Sierra Association for Environment v. Federal Energy Regulatory Commission, 744 F.2d 661, 662 (9th Cir. 1984) (holding that a suspended non-profit corporation had capacity to sue as an unincorporated association under Fed. R. Civ Proc. 17(b)(1), and any incapacity under California law was accordingly irrelevant). Thus, the "indicia of membership" test is the correct test to apply to determine whether a corporation,

6

despite its failure to meet state law requirements, has "members" whose interests it can represent in federal court. See Friends of the Earth, Inc. v. Chevron Chemical Co., 129 F.3d 826, 829 (5th Cir. 1997); Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 119 (3d Cir. 1997).

The Hunt "indicia of membership" test looks to whether the organization represents the purported members and provides the means by which the members express their collective views and protect their collective interests. Hunt, 432 U.S. at 344-45. Generally, the test looks to see if the organization in question is the "functional equivalent of a traditional membership organization," whereas the test specifically looks at whether an organization's purported 'members' elect the governing body of the organization, whether the members serve in the organization, and whether the members finance the organization's activities (including the costs of litigation). Id. Other circuits have looked at additional factors, including whether 'membership' is voluntary, whether there is an articulated and understandable membership structure and whether the lawsuit is within the organization's central purpose, and thus within the scope of reasons that individuals joined the organization. See Friends of the Earth, Inc., 129 F.3d at 829.

2) Membership in OSYU as of July 9, 2003

On July 9, 2003, OSYU's only legal vestiges were its initial Articles of Incorporation and its incorporator. OSYU had no legally appointed or elected directors, officers or members, as that term is defined in the California Corporations Code. Moreover, at the time the complaint was filed, OSYU was a Mutual Benefit Corporation, not a Public Benefit Corporation or Nonprofit Religious Corporations, so the 'member' definition exceptions in those codes are inapplicable to OSYU. However, because an organization's lack of legal form is not fatal to the standing inquiry (See Sierra Association for Environment, 744 F.2d at 662), the court applies the Hunt "indicia of membership" test, when evaluating this issue as of July 9, 2003.

First, OSYU's purported 'members' did not elect the governing body of the organization. In fact, there was no official governing body of OSYU on July 9. Even assuming

7

that Calder, by virtue of her organizational activities, qualifies as a "governing body," she was not elected to her role by the purported members. This factor weighs against OSYU.

Second, as of July 9, OSYU's purported members did "serve in the organization." At the beginning stages of a fledgling organization, that organization's activities will necessarily be limited in scope. Calder, the McCauleys, Barkan, Clark, Hartsell and several other yoga studio owners participated in regular conference calls, discussing OSYU's initial strategy and activities, including the filing of the current action. Additionally, Calder drafted and distributed OSYU related information to those interested in OSYU. The court finds that OSYU's purported members did "serve" in and with the organization by fashioning OSYU's strategy and disseminating its message. This factor weighs in favor of OSYU.

Third, OSYU's purported members did help to finance OSYU prior to July 9, 2003. Sixteen different individuals and organizations donated to OSYU prior to the date this law suit was filed. This factor weighs in favor of OSYU.

The additional factors examined by other circuits also tip in favor of OSYU. Membership in OSYU is voluntary, a factor which supports OSYU's position. However, as of July 9, there was no understandable or articulated membership structure. Membership in OSYU simply seemed to be determined by desire to affiliate with like-minded people. This factor weighs against OSYU. Finally, this lawsuit, which seeks to clarify Choudhury's yoga-related intellectual property rights, is clearly within the organization's central purpose. This factor weighs in favor of OSYU.

The court finds that on balance on July 9, 2003, OSYU did represent its members and did provide the means by which they could express their collective views and protect their collective interests. At least four of the Hunt related factors weigh in favor of OSYU, therefore OSYU passes the "indicia of membership" test to establish associational standing. Moreover, since the filing of this lawsuit, OSYU has established an articulated membership structure. Thus, the court finds that Choudhury's argument that OSYU currently lacks "indicia of membership," and is a sham organization to be without merit.

     3)     Standing of Individual Members of OSYU

Choudhury argues that OSYU's members would not otherwise have standing to sue in their own right, and that therefore, OSYU has no standing.

On July 9, 2003, each of OSYU's purported members had reason to fear an imminent "injury-in-fact" to a concrete and particularized legally protected interest. Based on Choudhury's statements on his website regarding the Morrison settlement, his practice of sending cease and desist letters threatening litigation, and his history of pursuing litigation, each of the yoga practitioners identified in OSYU's opposition brief had real reason to fear that Choudhury might seek to continue his litigation strategy in protecting his copyrights and trademarks. Furthermore, even if a member felt no actual threat that Choudhury would sue, each member had reason to believe their right to practice and teach yoga might be taken away by precedent established by Choudhury's potentially victorious legal actions.

The fact that some members of OSYU do not believe they are currently infringing Choudhury's trademark is irrelevant. Although the McCauleys claim that they are not infringing Choudhury's intellectual property rights, this belief alone would not prevent Choudhury from seeking legal action against the McCauleys. The McCauleys belief that they are not engaged in present activities which could constitute copyright or trademark infringement simply has no relevance as to whether they are actually infringing Choudhury's copyrights or trademarks. Finally, the members' injury, namely the inability to teach and perform Bikram yoga or variations thereof without a license from Choudhury, would indeed be redressed by a favorable decision in the current action.

     4)     Whether this Lawsuit is Germane to OSYU's Purpose

In his moving papers, Choudhury argues that OSYU cannot demonstrate that this lawsuit is germane to OSYU's purpose. Choudhury refashions this argument in his reply brief, claiming instead that OSYU's purpose is not analogous enough to other traditional membership associations such that OSYU has standing to bring suit on behalf of its members.

Courts have generally found the germaneness test to be undemanding, and the Ninth

9

1 Circuit thus characterizes the germaneness requirement as mandating mere pertinence
2 between litigation subject and organizational purpose. See Presidio Golf Club v. National
3 Park Service, 155 F.3d 1153, 1159 (9th Cir. 1998) (citations omitted).
4     As of the date of this lawsuit, OSYU's stated purpose in its Articles of Incorporation was
5 to "communicate, and defend in any legal way possible, the idea that no form or style of Yoga
6 is proprietary as it can not be owned, transferred, franchised, trademarked or copyrighted."
7 Furthermore, the evidence shows that OSYU was formed to provide a common voice to
8 oppose the "litigious position Choudhury is taking against the Yoga community." This lawsuit
9 is directly related to OSYU's purpose, which is to seek legal clarification of intellectual
10 property rights (Choudhury's copyrights and trademarks in particular) as they relate to yoga.

11     5)     Other Arguments

12     In addition to the issue of standing, Choudhury advances various other arguments in
13 support of his motion. Choudhury argues that OSYU members have unclean hands, that a
14 judgment favorable to OSYU would not forestall duplicitous litigation, that the nature of relief
15 sought by OSYU is inequitable, that necessary parties are not before the court pursuant to
16 Federal Rule of Civil Procedure 19, and that the affirmative claim of copyright misuse is not
17 cognizable.

18     a)     Whether OSYU Members Have Unclean Hands

19     Choudhury argues that OSYU's members, by virtue of their contracts with Choudhury,
20 have "unclean hands" and would be subject to that defense if they were bringing this suit in
21 their individual capacity. Choudhury asks the court to exercise its discretion to decline to
22 entertain OSYU's action for declaratory relief.
23     The court declines Choudhury's request. The contractual obligations between
24 Choudhury and individuals who happen to be members of OSYU are not material to this
25 copyright and trademark claim for declaratory relief. Resolution of this suit in favor of OSYU
26 would not impact Choudhury's ability to bring common law breach of contract claims against
27 certain individuals.

28

        b)      Whether Judgment in this Action Would Forestall Duplicitous Litigation

Choudhury again asks the court to exercise its discretion to decline to entertain OSYU's action for declaratory relief because this suit will encourage and permit duplicitous litigation.

Choudhury's argument is, again, unpersuasive. Choudhury's main argument is that a final ruling in this case will have limited geographic impact. Choudhury's geographical limitation argument presupposes that no court would be an appropriate forum for OSYU to bring its claim, as each court's ruling would be of limited geographical impact. OSYU's legal claims are not limited by geography, but even if they were there is no basis for providing Choudhury with immunity from lawsuits against him which may be filed in other jurisdictions.

        c)      Whether the Nature of Relief Sought by OSYU is Inequitable

Choudhury claims, without relying on any legal authority, that the "asymmetrical nature of relief" available to each party renders this action "unfair." Given Choudhury's aggressive tactics of protecting his copyrights, including cease and desist letters and litigation, Choudhury's claim of inequity is unpersuasive. See <u>Societe de Conditionnement en Aluminium v. Hunter Engineering Co., Inc</u>., 655 F.2d 938, 943 (9th Cir. 1981) (reasoning that "the Declaratory Judgment Act was designed to relieve potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure or never. The Act permits parties so situated to forestall the accrual of potential damages by suing for a declaratory judgment, once the adverse positions have crystallized and the conflict of interests is real and immediate.").

        d)      Whether Necessary Parties are Before the Court Pursuant to Rule 19

Choudhury next argues that not all necessary parties are before the court as required by Rule 19. Choudhury claims that Bikram Certified Teachers, who benefit from their licensing arrangement with Choudhury and would be threatened by a ruling favorable to OSYU, have a "financial/contractual" interest in this litigation.

Rule 19 protects the legal "interests" of non-parties that will be impaired by the litigation

11

1 "as a practical matter." Rule 19(a)(2)(i); American Greyhound Racing, Inc. v. Hull, 305 F.3d 1015, 1023 (9th Cir. 2002). Where precedent in copyright cases is lacking, it is appropriate to look for guidance in patent law "because of the historic kinship between patent law and copyright law." Sony Corp. of America v. Universal City Studios, 464 U.S. 417 (1984); Harris v. Emus Records Corp., 734 F.2d 1329, 1333 (9th Cir. 1984). It is well settled in patent law that a non-exclusive licensee "has only a personal and not a property interest in the patent." See In re CFLC, Inc., 89 F.3d 673, 679 (9th Cir. 1996). Furthermore, the Seventh Circuit has specifically held that for purposes of joinder in a suit for copyright infringement, a licensing agent is neither the legal nor the beneficial owner of the copyright and has no interest in the copyright. Bourne Co. v. Hunter Country Club, Inc., 990 F.2d 934, 937 (7th Cir. 1993).

The court finds that Choudhury's non-exclusive licensees have no legal interest in intellectual property owned by him, and therefore are not necessary parties under Rule 19.

### e) Whether Copyright Misuse is a Cognizable Claim

Choudhury argues in a footnote that the affirmative claim of copyright misuse is not cognizable. The court is not persuaded by Choudhury's footnote.

In accordance with the foregoing, the court finds that Choudhury's motion for judgment on the pleadings, or in the alternative, for summary judgment or adjudication regarding standing and other jurisdictional issues must be DENIED. All other motions by the parties currently pending before the court, including the remainder of Choudhury's evidentiary objections, are rendered moot.

This order fully adjudicates the matter listed at No. 26 on the clerk's docket for this case.

**IT IS SO ORDERED.**

Dated: April 19, 2004

_____/s/_____
PHYLLIS J. HAMILTON
United States District Judge

12