<pre>
 1                   UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2

 3   * * * * * * * * * * * * * *
     STUDENTS FOR FAIR          *
 4   ADMISSIONS, INC.,          *
              Plaintiff,        *
 5                              *
                  vs.           *        CIVIL ACTION
 6                              *        No. 14-14176-ADB
     PRESIDENT AND FELLOWS OF   *
 7   HARVARD COLLEGE, et al,    *
              Defendants.       *
 8   * * * * * * * * * * * * * *

 9          BEFORE THE HONORABLE ALLISON D. BURROUGHS
                UNITED STATES DISTRICT JUDGE
10                   STATUS CONFERENCE

11   A P P E A R A N C E S

12

13           CONSOVOY McCARTHY PARK PLLC
             Ten Post Office Square, 8th Floor
14           Boston, Massachusetts 02109
             for the plaintiff
15           By: Patrick Strawbridge, Esq.

16

17           CONSOVOY McCARTHY PARK PLLC
             3 Columbus Circle, 15th Floor
18           New York, New York 10024
             for the plaintiff
19           By: Michael H. Park, Esq.

20

21
                                Courtroom No. 17
22                              John J. Moakley Courthouse
                                1 Courthouse Way
23                              Boston, Massachusetts 02210
                                July 20, 2016
24                              3:15 p.m.

25
</pre>

1    **APPEARANCES CONTINUED**

2

3

                CONSOVOY McCARTHY PARK PLLC
4               3033 Wilson Boulevard, Suite 700
                Arlington, Virginia 22201
5               for the plaintiff
                By: William S. Consovoy, Esq.

6
                BURNS & LEVINSON LLP
7               One Citizens Plaza, Suite 1100
                Providence, Rhode Island 02903
8               for the plaintiff
                By:  Paul M. Sanford, Esq.

9

10              WILMER CUTLER PICKERING HALE and DORR LLP (Bos)
                60 State Street
11              Boston, Massachusetts 02109
                for the defendants
12              By: Felicia H. Ellsworth, Esq.
                    William F. Lee, Esq.

13

14              WILMER CUTLER PICKERING HALE and DORR LLP
                1875 Pennsylvania Avenue, NW
15              Washington, D.C. 20006
                for the defendant
16              By: Seth P. Waxman, Esq.

17              LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
                294 Washington Street, Suite 443
18              Boston, Massachusetts 02108
                for the intervenor defendant
19              By: Matthew M. Cregor, Esq.

20

21

22

23                    CAROL LYNN SCOTT, CSR, RMR
                        Official Court Reporter
24                   One Courthouse Way, Suite 7204
                     Boston, Massachusetts 02210
25                        (617) 330-1377

1              <u>P R O C E E D I N G S</u>

2              **THE CLERK:**  This is civil action 14-14176,

3    *Students for Fair Admissions versus President and Fellows of*

4    *Harvard College, et al.*  Will counsel identify themselves

5    for the record.

6              **MR. CONSOVOY:**  Good afternoon, Your Honor.

7    Will Consovoy for Students for Fair Admissions along with

8    Patrick Strawbridge, Paul Sanford and Michael Park.

9              **MS. ELLSWORTH:**  Good afternoon, Your Honor.

10   Felicia Ellsworth for Harvard, with Seth Waxman and Bill Lee

11   who has newly appeared and two individuals from General

12   Counsel (indicating).

13              **THE COURT:**  Mr. Lee, welcome aboard.

14              **MR. LEE:**  Thank you, Your Honor.

15              **MR. CREGOR:**  Good afternoon, Your Honor.  Matt

16   Cregor on behalf of the student intervenor.

17              **THE COURT:**  All right.  You guys are going to

18   have to help me out here because this jury verdict threw off

19   my whole afternoon so I have read all your letters but I

20   read them when they came in so that three and four are very

21   fresh in my mind.  One and two are less fresh in my mind but

22   I have read them so you all are going to have to help me out

23   here.

24              There is an agreed upon discovery schedule;

25   correct?

1          **MR. CONSOVOY:**  Correct.

2          **THE COURT:**  11 months?

3          **MR. CONSOVOY:**  Yes.

4          **THE COURT:**  Harvard thinks they could do it in

5     9.  They're willing to give you 11.

6          **MR. CONSOVOY:**  We're happy with the 11, Your

7     Honor.

8          **THE COURT:**  Okay.  I am, since I didn't have

9     time, I would normally parse through this and ratchet you

10    right back to where I think you should be but because I've

11    been sort of just a little bit flat out I'm going to give

12    you the 11 that you agreed to.  You can benefit from my

13    schedule the last couple months, so the schedule is fine.

14          And then, I can't -- I know your motion for

15    reconsideration is still pending but I can't get to that

16    today, I'm just not prepared to do it, but I will get to

17    that in the next couple of weeks.

18          And you are looking for much more expansive

19    discovery than Harvard is willing to agree to; correct?

20          **MR. CONSOVOY:**  Correct, Your Honor.

21          **THE COURT:**  Okay.  You want, you're willing to

22    agree to sort of the higher ups and you want more of the

23    individual admissions officers with the third-party people;

24    do I have that generally right?

25          **MR. STRAWBRIDGE:**  Yes.  To the extent that

1    we're talking about custodians, we think it's certainly

2    important to have some of the high-level admissions officers

3    included.  We've identified some selective people outside

4    the Admissions Office who we have reason to believe are

5    going to have relevant information.  You know, obviously the

6    parties are pretty far apart on the number of custodians.

7    We've attempted to pare our list once.  We've gotten no

8    response from the other side.  You know, it may well be that

9    there is a place to meet in the middle here but

10   unfortunately we have been unable to get there without some

11   help from the Court.

12           **THE COURT:**  So you want something like four

13   and you were offering something like ten; do I have that

14   right?

15           **MS. ELLSWORTH:**  Your Honor, we've offered 11.

16   There are three individuals not in the Admissions Office:

17   The President, the Dean of the College, and the Dean of the

18   Faculty of Arts and Science and then the remaining eight are

19   admissions officers.  And it includes the Dean of Admissions

20   and the director as well as several what I would call more

21   like blind (ph.) admissions officers but certainly not every

22   member of the 40 plus member staff.  And we haven't produced

23   any documents from any of them yet so I'm not sure how we

24   then know it's insufficient, or excuse me, that SFFA says

25   they know is insufficient but that's what our offer has

1   been.

2           **MR. STRAWBRIDGE:**  So a couple, just a couple

3   quick rejoinders from that.

4           We know for a fact that the first read on every

5   application that is done is done by a junior admission

6   officer.  All the Admissions Office, they've offered I think

7   what are more fairly characterized as senior admissions

8   officers.  Certainly people are much more forthcoming with

9   their colleagues than they are with their supervisors.  And

10  at the end of the day these are the people who do the first

11  read on the applications.  They have an integral role in it.

12          I'll just note that, you know, among the list of

13  people we want from outside the Admissions Office is the

14  Chief Diversity Officer as well as the Provost for Diversity

15  and Inclusion.  It's kind of hard to imagine in this kind of

16  case we wouldn't get them in as custodians.

17          And then the other data point that we offered up

18  which I think is reasonable is given UNC, which actually has

19  a smaller admissions office, there are 70 people in their

20  Admissions Office, there is fewer than that at UNC, we made

21  an opening offer of 24 custodians in the parallel litigation

22  which hasn't progressed beyond that point, but I think that

23  kind of shows a more realistic assessment of what would be

24  typical for a case like this.

25          **MS. ELLSWORTH:**  There are 40 admissions

1 officers.  There may well be staff members and other people

2 who don't perform reading functions but the number is 40

3 give or take one or two, not 70.

4   We don't think what UNC has or has not offered has

5 any bearing on what should happen in this litigation.  And I

6 also, I'm not sure that it's entirely true that none of the

7 folks who we offered do first reads at all.  Certainly at

8 prior points in their career they have.  I think, you know,

9 when you're talking about ESI searching, what we're talking

10 about is information that might bear on the workings of the

11 office as opposed to individual applicant decisions or

12 applicant information that's not going to be coming up in

13 searching email or other documents.  That's files alone or

14 in the database information that's already been produced so

15 I just don't see the need for it.

16   On the diversity officers point that

17 Mr. Strawbridge raised, again, the Dean of the college, Dean

18 Khurana, has oversight overall of that so what we're, we're

19 offering fairly senior level people but the right and the

20 important people who could speak to Harvard's approach to

21 diversity, the interest in diversity and from an ESI

22 perspective we're going to have the final versions in the

23 relevant we think communications on those topics.

24    **THE COURT:**  All right.  Well, I'm inclined to

25 give them some of the senior admissions people.  I guess I

```
 1    don't fully understand how the process works so I'm not sure

 2    how the Chief Diversity Officer and the Provost would have

 3    any -- do they have any role in the application process?

 4              MR. STRAWBRIDGE:  I mean, I don't think that

 5    we have enough information to say what role they have but

 6    they certainly have a role in fostering diversity-inclusive

 7    policies on the campus which is really what the admissions

 8    process is all about achieving so I think certainly Your

 9    Honor is well aware of the fact we have a mismatched claim,

10    that we have some other post admissions relevant data and

11    relevant information in this case.  And, you know, we're not

12    asking for everybody who works under that person but we

13    think that at least those two examples are prime people in

14    the case about diversity and inclusion and Harvard's alleged

15    interest thereof.

16              THE COURT:  I know what you meant, you say

17    Diversity Officer and then the Chief Diversity Officer and

18    that it's easy to sort of throw them in there but, I mean,

19    we are looking at the admissions process, not what happens

20    after the admissions process, at least as of this stage of

21    the game.

22              MR. STRAWBRIDGE:  Well, I guess I don't think

23    that those two things are necessarily seamless.  We don't, I

24    mean, we just, we don't have enough discovery yet to know

25    what extent.  It's hard for me to imagine that the Diversity
```

1    Officer doesn't have any interest in both how applicants get

2    admitted and what the student body looks like and what sort

3    of arrangements are made once they're there.  And the

4    point is --

5              **THE COURT:**  The arrangements that are made

6    once they're there I'm not concerned about but do the Chief

7    Diversity Officer and the Provost have any role in

8    admissions?

9              **MS. ELLSWORTH:**  No, Your Honor, no role in

10   admissions.

11        To the extent Your Honor is inclined to, if you

12   think the more junior admissions officers are relevant, I

13   guess what we would suggest is we think that 11 or

14   thereabouts is a good number for this case given the federal

15   rules on deposition limits, given the deposition limits that

16   are, at least provisionally have been put in place by the

17   Court for this case.

18        So if more junior officers are needed, I guess what

19   I would suggest is Your Honor can set a number from which

20   SFFA can choose who, within reason who these admission

21   officers should be rather than adding to the ones we've

22   already offered.

23              **THE COURT:**  I mean, I can go back and look at

24   your letters.  Honestly 11 seems skimpy to me in a case of

25   this size and magnitude.  On the other hand, 40 seems

1    excessive to me in any case regardless of its size or

2    magnitude so I guess I have two choices.  I can go back and

3    parse your letters more carefully than I have which I'm

4    happy to do or I can send you two back to the drawing board

5    or you eight back to the drawing board, however many you

6    are, and come up with another list.

7              I don't want to just pick a number arbitrarily so I

8    don't want to say that you want 10, you want 40, I would

9    rather parse through it a little bit more but I think that

10   the Admissions Office, they should get somebody sort of in

11   each strata so they can sort of figure out what's going on

12   at each level where the selections are being made that are

13   relevant to them.

14             So if you take the higher level people that I'm

15   sure they want, that 11 number doesn't leave very many

16   people actually in the Admissions Office and down in the

17   weeds in the process.

18             **MS. ELLSWORTH:**  We can certainly take that

19   guidance in terms of people in each strata and also the

20   guidance that even 11 seems not quite enough.  We disagree

21   with that but I understand your position.

22             **THE COURT:**  I mean, if I do go back and parse

23   through these and you want me to make these decisions, I'm

24   disinclined to order the Chief Diversity Officer, I'm

25   disinclined to order the Provost and I'm disinclined to

```
1     include alumni interviewers, sort of the third-parties that,

2     whatever you want to call it, third-party interview types of

3     people but I think they should get a representative sample

4     of what's going on in the Admissions Office and it's hard to

5     think they can do that with 11.

6              MR. STRAWBRIDGE:  Can I just say a couple

7     things in response?

8              THE COURT:  Sure.

9              MR. STRAWBRIDGE:  First of all, I just want to

10    make sure that we're clear.  I think what we're talking

11    about here is the custodians.  We haven't asked for any

12    third-party alumni interviewers as custodians in this case.

13    There is a separate issue with respect to identifying

14    potential witnesses.

15         But with respect to custodians, the other people

16    that we -- the alumni interviewers (ph.) are people who were

17    actually mentioned in a deposition as the people who

18    interfaced with the Admissions Office when there are

19    requests from alumni or from donors to have certain people

20    admitted.  That plays right into both some of the race

21    neutral alternatives available to Harvard and their

22    admissions process directly so I guess I don't agree that

23    those people have no role in the admissions process.

24         We do have evidence we'd be happy to submit in

25    support of that, if you'd like, but, you know, my only
```

1    concern about going back is we have been trying to negotiate

2    this for a while.  We've come down from our initial number.

3    I know that you think our number seems high.  It's a civil

4    rights case.  We think that the number is appropriate but

5    we've been willing to meet in the middle.  We've gotten no

6    movement out of them so I guess I'm a little worried that if

7    we, you know, that it's just going to be, we're just going

8    to be back here in another month and we're not making

9    progress.

10          **THE COURT:**  All right.  So, I mean, I'm happy

11    to, I mean, now that this trial has resolved itself, I'm

12    happy to take a deeper dive into the letters and just issue

13    an opinion and an order, both on the discovery issue and the

14    motion for reconsideration.

15          **MR. STRAWBRIDGE:**  I think we would be fine

16    with that.

17          **THE COURT:**  Okay.

18          **MS. ELLSWORTH:**  That's fine, Your Honor.

19          **THE COURT:**  Okay.  That's what I'll do then.

20       Anything else today?

21          **MR. WAXMAN:**  Congratulations on finishing your

22    trial.

23          **THE COURT:**  Have you been following this

24    trial?

25          **MR. WAXMAN:**  Yes.

1          **THE COURT:**  Really good, cutting edge kind of

2     and interesting, good lawyering all the way around which

3     made it nice.

4          **MR. CONSOVOY:**  A couple more, we have a couple

5     more points, Your Honor.

6          Quickly though, I think we are getting to stuff

7     inside the protective order and I think there may be people

8     in the room who are not covered by that protective order, I

9     just want to be careful about that.

10         **MS. ELLSWORTH:**  It's our protective order I

11    think, not yours.

12         **MR. CONSOVOY:**  Right, there are people in the

13    courtroom who are not covered by that protective order.

14         **MS. ELLSWORTH:**  What order, is it database?

15         (Whereupon, counsel conferred.)

16         **MR. CONSOVOY:**  Database, I want to talk a

17    little bit more about matriculating students and the

18    issue --

19         **MS. ELLSWORTH:**  So, Your Honor, if we're going

20    to talk about individual database fields, we have designated

21    those as "attorneys' eyes only" under the protective order.

22    We would ask that our folks here from our firm could stay

23    and there are others we'd ask might be excused or we can try

24    and talk at a high level of generality, whichever Your Honor

25    prefers.

1          **THE COURT:**  I'm fine either way.  I am happy

2     to -- I am not going to clear the courtroom.  We can go out

3     back and do this.

4          **MR. CONSOVOY:**  I can keep it high level.  I

5     just wanted to make sure we -- I didn't want to jeopardize

6     your interests as well.

7          **THE COURT:**  Who is here who is not covered by

8     the protective order?

9          (Pause in proceedings.)

10         **THE COURT:**  If we need to step out, we can.

11         **MR. CONSOVOY:**  Sure.  So a couple other

12    points.  I take it Your Honor is going to look at the

13    letters and all the issues because you covered only a couple

14    of them.

15         **THE COURT:**  Yes.

16         **MR. CONSOVOY:**  There are many issues but I

17    just want to, if I could briefly highlight some that we

18    think are more urgent than ours.

19         On the databases, Your Honor --

20         **THE COURT:**  Yes.

21         **MR. CONSOVOY:**  -we think that the number of

22    years is quite insufficient.  When I was here in one of the

23    earlier hearings, I raised a concern that I would be empty

24    handed at the podium in front of an appellate court because

25    we didn't have the record we needed.  And I think *Fisher II*

1    bears out my concern that, and I was told I was empty handed

2    there, that three terms of data was insufficient to prove

3    what needed to be proved in *Fisher* and in all candor was

4    held against us.

5         And so I just want to underline that point as Your

6    Honor goes back and reviews those letters that the Supreme

7    Court indicated, there have been eight years of data, it

8    would be inappropriate to have in a case just like this that

9    we're alleging, I just want to make sure we understand what

10   kind of claims, I know it has been a while since we got into

11   the merits of this.

12        We're alleging that Harvard is engaging in racial

13   balancing of the class over a four-year period.  You need

14   all four years in that period to prove that claim.  We're

15   asking for two full-year periods of data, data that Harvard

16   has, that it can easily produce, that it's not burdensome

17   and that they've already produced two years quite quickly

18   and that it is not privileged.

19        We have also said that we are willing to table any

20   request for application files while we review that data.  It

21   is our hope, we understand from, we're trying to listen as

22   well, that the Court is concerned about requiring Harvard to

23   produce application files.  We hear that.

24        This is the solution in the short term.  If we can

25   get those eight years, we think, and get the fields that we

1    need within them, they have redacted fields that are

2    essential to understanding the process.  Harvard can't be in

3    charge of this case deciding what fields are relevant and

4    what fields are not.

5           Our experts have to figure that out for themselves.

6    Things like -- I'm going to try to stay general here.  We've

7    identified those fields in our letters.  I won't tell you

8    what they are but they are central to determining how

9    applicants are compared head-to-head, how different schools

10   are compared, how different regions in the country are

11   compared.

12          If you review the deposition transcripts which

13   we've highlighted, this is essential to what they do.  I

14   think our general frustration in this case has been -- and

15   without getting into the very particular issues -- that we

16   have asked for information that is relevant, that is not

17   covered by any federal or state common law privilege, that

18   is not burdensome to produce or duplicative.  Harvard has

19   said no because of a general privacy concern and because

20   they don't think it's important enough for us to get.

21          That's just now how discovery works in a civil

22   rights case.

23                 **THE COURT:**  Okay.  I am going to go back to

24   these letters but just so you understand where I am coming

25   from, I limited discovery significantly while *Fisher* was

1    pending because it wasn't clear to me what would be

2    relevant, how much of your case would be left, how, what

3    they would do in response to *Fisher*.  And, you know, *Fisher*

4    came out where it came out.  Your case lives on.  They can

5    have some reason to be emboldened (ph.) but now we are going

6    to have real discovery, like we are going to get to this and

7    it is going to get done.

8             I am, I remain concerned about the applicant files

9    and if I can balance it out, I will.  As I sit here, I am

10   happy to hear you on it.  Eight years doesn't sound crazy to

11   me, especially where it limits the applicant files which is

12   what I am really concerned about, but we are going to do

13   sort of fulsome discovery at this point.

14            Now we know what the parameters are.  We know what

15   the legal standard is more or less.  To the extent it

16   clarified it, it clarified it.  And it is going to be a lot

17   less limited than it has been, now that you know what the

18   parameters are and we won't, we're not so much at risk of

19   having to do it and then do it again.  So, I mean, it's

20   going to be broader than it's been.  And eight years -- I'm

21   happy to hear you on it but eight years doesn't sound crazy

22   to me.

23            **MR. WAXMAN:**  Before you rule --

24            **THE COURT:**  I'm not ruling today.

25            **MR. WAXMAN:**  -- it is a serious misreading of

1    *Fisher* to say three years in any case, and this is a case in

2    which two years has produced 70,000, records of 70,000

3    applicants.  If their empirical people, who I am sure have

4    been hard at work on this, have not been able to come up

5    with statistically significant trends that they can talk

6    about out of the sample of 70,000, that's simply because

7    they aren't there.

8            Now, I understand the argument that more years is

9    better and we're talking about data.  We're not just talking

10   about data.  The two years that we produced, and I believe

11   possibly the year before and the following year, are

12   essentially using, the same data is being colleted under the

13   same conventions.

14           As you go back farther and farther, we haven't

15   looked at this except to know that different data was

16   collected using different criteria and there will be

17   significant work to sort of harmonize it so that year

18   after -- year against year can be evaluated.

19           I think it's important to understand this is not a

20   damages case.  This is a case asking for prospective

21   injunctive relief.  They have some -- we still don't have

22   any meaningful discovery into the standing of this case but

23   they've identified, quote, "members" in the classes for the

24   years in which we've produced.  They don't have anybody who

25   has a claim or has made a claim with respect to, you know,

1   all of these prior years.  And if the argument is we need a

2   whole admission cycle, that is four years, I think it's

3   important to understand here that there is no dispute that

4   Harvard is assembling classes among an extremely large

5   number of highly qualified applicants class by class.  They

6   have two full classes and they can evaluate the extent to

7   which the decisions that are made over an admission cycle

8   reflect intentional discrimination.  Even if there were an

9   argument for somehow including a four-year range --

10          **THE COURT:**  Let me ask you this:

11          So if they -- one of their claims is that there is

12   an impermissible quota system.  And let's just say there is

13   some class of people, I don't care, we can talk about any

14   one you want, Asian Americans or, you know, whoever else,

15   and the percentage of them in those two classes is the same,

16   which I think is what they allege in their Complaint, right?

17   That the percentage is the same year after year?

18          **MR. WAXMAN:**  That's what they allege.  It's

19   not what they can prove but --

20          **THE COURT:**  But how do you prove or disprove

21   that by the statistics of two years?

22          **MR. WAXMAN:**  Those numbers are publicly

23   available.  They have them just as we have them.  Harvard

24   publishes every single year.  They don't need a database of

25   hundreds of thousands of other applicant files on a huge

1    number of variables to know what the percentage of Asian

2    Americans, African Americans, Hispanic Americans, Pacific

3    Islanders, White Anglos, Jews have been accepted every year.

4         **THE COURT:**  But is it not relevant, I mean, if

5    you have -- and I'm just making it up, I'm Jewish so I'll

6    say that, I'll use Jewish.  If you have ten percent Jewish

7    people every year, isn't that relevant to the significance

8    of that number how many Jewish applicants you had?  And

9    isn't that what changes year over year?

10        Because if it is ten percent out of the exact same

11   number, that means one thing, but if it's always ten percent

12   and the number of applications fluctuates, does that not

13   mean something else?

14        **MR. WAXMAN:**  Sure, if there were wild

15   fluctuations in applications and the same percentage were

16   accepted every year, that would be a data point to argue

17   that what was going on was, in fact, ethnic or racial

18   balancing.

19        **THE COURT:**  How are they supposed to know that

20   with only seeing two years?

21        **MR. WAXMAN:**  Yeah, I mean, we can do this very

22   simply without transferring hundreds of thousands -- data

23   from hundreds of thousands of files.  Simply, we can simply

24   aggregate for them the number of Asian American applicants,

25   the number of Jewish applicants, all the self-reporting data

1   going back eight years if that's the issue.

2          The question is whether we have to turn over for

3   years and years before any plaintiff ever had any claim in

4   this case or any member of a plaintiff had any claims in

5   this case in order to show them that, yes, in, you know, in

6   2012 we had X number of Jewish applicants who self-reported

7   as Jewish and Y number of Jewish matriculants, that can be

8   done.  That's not the whole database.

9          I think if there is any argument for more than

10  70,000, the data from 70,000 files, it certainly wouldn't be

11  for more than four years.  That's an entire college

12  experience.  I don't think there is an argument for more

13  than two years but I don't understand how we immediately

14  devolved to eight years.

15          **MR. CONSOVOY:**  The Supreme Court said in

16  *Fisher* eight years was the right number.  Your Honor can

17  read the opinion.  They weren't guessing.  They said we

18  would like to have the last eight years to evaluate the

19  current system.  That is direct -- and they said that three

20  years was essentially woefully insufficient.

21          So, I don't need to re-read the opinion for Your

22  Honor but it's there.

23          Second, this kind of argument is exactly what I

24  have been talking about.  Harvard has been trying to

25  litigate the merits of the case on the first day of

discovery.  All we're looking for are databases with information in them that is likely to lead to discoverable evidence.

This is a Title VI claim.  If this were a Title VII claim for a pattern and practice of racial discrimination, that would similarly be for prospective relief; but, of course, when you're evaluating the pattern and practice you have to look backwards to evaluate what the current policy is.  And Your Honor hit it exactly on the head in terms of needing more, it's actually much more than Your Honor said but you said it right.  We don't know how many applied. That is conveniently the one field that Harvard doesn't make publicly available.  They tell you everything about their applicants but they won't tell you how many from each racial group applied.  That has always been interesting to us.  But it's the information behind that that's equally important. We don't just have the quota claim.  That is one of our claims.  It's, you know, one of our main claims but we also have a claim that under Grubb (ph.) race is more than a non-predominant factor in admissions.

Now, you have to do a head-to-head -- and Your Honor brought this point up in a previous status conference. Head-to-head comparisons are going to be very important over time.  Are people of similar qualifications being treated dissimilarly?  We need to know.  And I'm not talking about

1    what's actually in the database now.  Do people go to the

2    same high schools?  They've withheld extracurriculars.

3    They've withheld aspects of a person's application that they

4    deem essential to the admissions decision.  So this is, and

5    I'll leave -- I won't belabor it but this is my point:

6         Harvard wants to be in charge of what we get to

7    see.  If they haven't, if they don't know what their systems

8    look like over the past year of this stay, then they haven't

9    been looking.  How could they not know at this point -- I,

10   mean, Your Honor asked us to all be diligent and be ready --

11   not know how they kept their data and whether it would be

12   easily -- we've been asking for a year.  We've been asking

13   for multiple years for a long time now.

14        All we're asking for are databases to avoid getting

15   files.  This is a, I think just straightforward.  It's eight

16   years, it's two cycles of experience.

17        And the last point is it's not just that it's ten,

18   ten, ten every year.  Our claim is that if it bumps up one

19   year, they bump it down the next, right, so that over a

20   four-year period the Jewish number would average out to ten

21   and so you need to see those bumps, right, and you need to

22   see them over multiple cycles.

23        At summary judgment if they want to argue that

24   it's, you know, not good evidence, not strong evidence,

25   that's what summary judgment is for.  That's what a trial is

1    for.  Discovery goes beyond the bare essential claims and

2    says what's out there.  I think this is straightforward.

3              **MR. WAXMAN:**  So this is an odd case in that

4    the discovery in this case is, I mean, I understand Your

5    Honor is considering our reconsideration motion but even if

6    it were warranted, it is unbelievably lopsided.  We're

7    talking about discovery of an institution that is, A,

8    nonprofit, and, B, imbued with protection of the First

9    Amendment.  I mean, other than the *Fisher* case it's hard to

10   recall an opinion that the Supreme Court has in which the

11   Supreme Court has adjudicated what goes on in universities

12   without hearing about the First Amendment and the extent to

13   which the First Amendment protects.

14             Secondly, with respect to the database fields,

15   we're happy to come in and talk with Your Honor about what

16   fields, particularly what fields, what it is that we're not

17   producing, but we are concerned as, Your Honor knows, with

18   the privacy of people who apply to Harvard and who attend

19   Harvard and who did not choose to be part of this lawsuit.

20   And the things that we have, the fields that we haven't

21   produced are fields that we believe would either implicate a

22   FERPA notification but more importantly would permit the

23   identification of a student, a student who had the following

24   extracurriculars and went to this high school.

25             **THE COURT:**  So, I mean, we've been around

1    this, we've been around this before, but let me ask you this

2    so I understand.

3            So we get to summary judgment or trial, wherever

4    we're going on this, and they say these few applicants are

5    equal and this one that's selected wasn't.  And then you get

6    to that and say no, this guy was captain of his football

7    team.  How are they supposed to guard against that if you're

8    not giving them, if you're not giving them information that

9    they need to differentiate?

10           **MR. WAXMAN:**  Well, look, obviously we are not

11   going to be -- we are going to be constrained in the same

12   way that they are.

13           If we're talking about applicant, applicant files,

14   I don't know how they're going to be able to say this guy is

15   the same as this guy based on a database record.

16           **THE COURT:**  But something like --

17           **MR. WAXMAN:**  If all we produce is the data --

18           **THE COURT:**  Something like being captain --

19           **MR. WAXMAN:**  Excuse me?

20           **THE COURT:**  Something like being captain of

21   the football team, let's say that you're like, let's just

22   say that you're an African American captain of the football

23   team in a predominantly white area.  That tells you

24   something important about that candidate, it says a lot of

25   important things about that candidate.  How are they

1    supposed to know that if you're not kind of giving them what

2    makes that kid unique?

3            **MR. WAXMAN:**   There is going to be, I mean,

4    they are getting deposition testimony from -- I mean,

5    they've already deposed the Director of Admissions.  They

6    undoubtedly will depose the Dean of Admissions and others

7    within the Admissions Office about how this works and how

8    these individual considerations work.

9            If you're asking about a head-to-head between

10   candidate X and candidate Y, that's an argument which I

11   think requires a disclosure.  On those terms you'd have to

12   have an admissions officer say, yeah, I looked at this file

13   and I looked at this file and here's why I think the

14   committee of 40 voted this way in this case and voted this

15   way in another case.

16           We're not talking about -- we're not talking here

17   about the number of electronic, the data -- the size of the

18   database and the fields that are identified.  I fully

19   understand, and maybe it would be easier for us to argue

20   about the case if we had, if we didn't have the privacy

21   constraints that we're operating under.  But we understand

22   that this is a balance and we have to live by whatever it is

23   that the Court rules just as the other side does.

24           You know, I've heard from Mr. Consovoy a number of

25   times about this is not how discovery works.  They made

1    their allegations.  They're going to put on their case and

2    we have to defend against it and we can't haul out at trial

3    something that we have refused to produce to them, and Your

4    Honor has upheld, as a way of defending the case.

5              THE COURT:  If I ordered you to produce the

6    database in a way that, you know, arguably like, like, let's

7    just say that you give a certain zip code, there's only one

8    high school in that zip code and there's only one football

9    captain, if that.  Arguably you've put out enough data to

10   figure out who this kid is.

11             If I ordered you to produce a database that have

12   these three pieces of information, does that trigger your

13   FERPA obligations do you think?

14             MS. ELLSWORTH:  I think we would take the

15   position that a FERPA notice with that combination would

16   require FERPA.

17             MR. CONSOVOY:  Your Honor, it might implicate

18   that one isolated, it's just a notice.  We're not talking

19   about -- it's just a notice that has to go out to comply

20   with FERPA.  If Harvard wants to make a privacy argument --

21             THE COURT:  It is not just a notice.  It's not

22   just a notice.

23             MR. CONSOVOY:  I believe it's just a notice.

24             THE COURT:  The other person gets an

25   opportunity to object.  It's a process.

1              **MR. CONSOVOY:**  Sure.  UNC sent out notice to

2     all the people.  There has been -- nobody has weighed in.

3     If that came up, then we'd actually have, but then we'd

4     actually have a real issue; right?  We don't have a real

5     issue right now.  We have Harvard saying, remarkably, that

6     extracurriculars are going to be withheld in determining

7     whether their admission decisions are legitimate.

8              The deposition itself, the deposition itself

9     identified all of the characteristics essential to the case.

10    We would prefer to be able to litigate our own case the way

11    we'd like to.  We believe the information is relevant to the

12    admission decision.  I promise you Harvard will not say

13    contrary to that.  It's in the database they've already

14    given us.  We just want the field to be not disclosed.

15             We have a protective order in place.  It was, Your

16    Honor noted, heavily negotiated.  It was negotiated for this

17    purpose, so that the parties could freely produce the data

18    that was necessary to resolve the case.  We simply need the

19    data.  We cannot litigate our case without it.

20             **MR. WAXMAN:**  Well, it's true that the FERPA

21    notice permits objections and there could be litigation

22    about that but the privacy interest here that FERPA is aimed

23    at protecting, and, frankly, it's an institutional concern

24    (ph.) at Harvard is, yes, so everybody now knows that, you

25    know, I could apply to Harvard, I can apply to Yale, I could

 1    apply to Stanford, I could apply to Duke, but if I apply to

 2    Harvard, you know what?  There is information from my file

 3    that is likely to be produced or could be produced or has

 4    been ordered to be produced in other years that would allow

 5    me to be identified.  It's a competitive concern for Harvard

 6    that the notice goes out that, yes, these personally

 7    identifying features in the files will be disclosed.  If it

 8    weren't for that concern, we would be very happy to produce

 9    all of these files insofar as there are data -- these

10    database fields insofar as they bear on determinations.

11          There is no question that the high school that an

12    applicant went to is a factor that the Admissions Office

13    considers in an effort to achieve the broadest form of

14    diversity possible.  There is no question about that.

15          The question is where you draw the line in order to

16    protect the privacy of individual people who never wanted to

17    be part of this lawsuit, the vast majority of whom aren't

18    even at Harvard, against the interests in finding out

19    everything possible that might possibly be relevant to what

20    the plaintiffs think they want to show.

21          **THE COURT:**  Well, so I don't really buy the

22    idea that this would put Harvard at a competitive

23    disadvantage.  I am somewhat concerned about people's --

24    about not so much just generally identifying it, you know,

25    some kid applied to Harvard but more than that, the personal

1    stuff in their application.

2         So, I mean, let's just say, I mean, what is the

3    exact privacy interest sort of implicated here in the

4    database?  You get who applied and you get sort of objective

5    data, right, in the database?

6         **MS. ELLSWORTH:**  Yes, there are certain -- some

7    of the fields that are in question have the narrative

8    entries so they're going to be, it's going to be descriptive

9    self-entered information about an individual's

10   extracurricular or honors, other biographical type

11   information.  There is some other fields at issue that

12   relate to, sort of a rating or something that an Admissions

13   Officer has provided, some of which doesn't relate to the

14   admissions process at all.  The extracurriculars, things

15   like that, are taken into account in the admissions

16   decision.  Lots of extracurricular information has already

17   been produced in fields we're talking about here that were

18   raised in SFFA's letter, they are the narrative fields that

19   say "captain of X" as opposed to football or however many

20   hours per week were spent on football, just to use that as

21   an example.

22         So it's not that no extracurricular information has

23   been produced and no honors information has been produced.

24   The vast majority of the information that bears on the

25   admissions decision has been produced.  It's these fields

1    that have the more narrative descriptions of what somebody

2    did or the role that they played which we think, you know,

3    has poured over into the personally identifiable limit and

4    then we get into just serious privacy concerns.

5              **THE COURT:**  I don't think just, I don't think

6    just identifying somebody raises a very high privacy concern

7    but to be able to link somebody's identity with some

8    personal background information seems to me a bigger

9    intrusion.

10             **MR. STRAWBRIDGE:**  I just want to remind Your

11   Honor that the protective order in this case already

12   relieves them of any obligation to produce actual names and

13   addresses, anything like that.

14        We also agreed that to the extent the narrative

15   field included that actual information, that they could

16   redact data on a field-by-field basis.

17             **THE COURT:**  But what they're saying is that if

18   you put together some of those fields in a small school in a

19   small town in a rural state or whatever, that you could

20   figure out who these people are.

21             **MR. STRAWBRIDGE:**  So that's true, although if

22   you recall, the protective order actually has a provision

23   that they insisted on that we agreed to that actually

24   prohibits us from doing that upon, you know, pain of

25   contempt of this Court.  We actually agreed that we weren't

1    going to try to do that gumshoe work.  We're not trying to

2    identify anybody.  We're trying to understand what is the

3    predominant factor in the admissions decision.

4            And I don't understand, if the narrative field says

5    that you're the captain versus just a player, if the

6    narrative field says that you were the leader of your

7    extracurricular club as opposed to just a member, that the

8    narrative field says that you did this or you achieved this

9    accomplishment, how can that not be a factor that is

10   relevant to the admissions decision in trying to weigh as to

11   whether --

12           **THE COURT:**  It's clearly relevant to the

13   admissions process and I'm trying to sort out whether the

14   privacy intrusion outweighs the relevance.  And what I'm

15   telling you is they have just been able to identify the

16   person sort of doesn't unduly distress me but are there

17   things beyond that that should?

18           **MS. ELLSWORTH:**  Well, I guess I'm not sure

19   what it is that would be concerning to Your Honor.  There is

20   a whole wealth of information about marital status, parents'

21   marital status, financial, socioeconomic status, whether

22   someone is disadvantaged or eligible for financial aid,

23   things like that that may spill more over into the types of

24   information that is more than just identifying who the

25   person is by very personal facts about themselves or their

1   family or their background.

2           **MR. CONSOVOY:**  Disadvantage is at the heart of

3   this case.  I mean, again, we filed a Complaint.  Harvard

4   answered.  In answering they're saying our allegations are

5   plausible.  Every -- and it's in our letter, Your Honor.

6   Everything we're asking for is directly tied to an

7   allegation that they answered saying it's plausible.

8           We argue in Count 6, Count 5 and Count 6, that

9   race-neutral alternatives, socioeconomic benefit as a

10  preference instead of race would eliminate the use of race.

11  Harvard is withholding who is socioeconomically

12  disadvantaged.  They answered the Complaint.  It's relevant.

13  I know how it is not relevant.

14          **MR. WAXMAN:**  Our argument is it's not relevant

15  and we think that we've produced fields that actually

16  disclose that.  I think, one of the problems we're having

17  here, Your Honor, is we know what the fields are that we

18  produced and they are arguing about names of certain other

19  fields that aren't being produced.  I don't want to offer up

20  Your Honor's time or tell you how to run your courtroom but

21  it might be worth simply having, you know, one lawyer from

22  each side come in and walk Your Honor through all of the

23  fields that have been produced for 70,000 files already and

24  understand what it is that we're not withholding and then

25  Your Honor can decide how the line is drawn.  I think we've

1   articulated what we think the right balance is and the

2   concern that we have.

3            **THE COURT:**  Well, so that's not a bad idea.

4   And just the way that my day unfolded, I am just not as

5   prepared for this conference as I ought to be so why don't

6   we recess this, unless there are other topics that you want

7   to discuss today, I will go through this, get further along

8   on the decision trail and then have somebody in to sort of

9   talk through whatever issues that remain.

10           **MR. CONSOVOY:**  That sounds great, Your Honor.

11       I have two really short ones.

12           **THE COURT:**  That's fine.  I'm not in any

13   hurry.

14           **MR. CONSOVOY:**  One is we respect Your Honor's

15   rulings about the, or leanings on the diversity officer but

16   it has raised one, the overall approach did raise one

17   concern.  I just want to be heard on that briefly.

18       We do have claims in this case that go to the

19   experience of matriculating students.  We have a claim and

20   it's in the Supreme Court's opinion on *Fisher*.  *Fisher II*

21   says, In reviewing these programs as to whether they reach

22   strict scrutiny, you have to weigh the benefits of them,

23   which Harvard counts, but also the costs.  We have alleged

24   that one of the costs of having these programs is what's

25   called a "mismatch effect."  It's in our Complaint.

1            I am not saying we're going to get everything we

2     want on matriculating students.  We're asking for a less, it

3     may be different than the custodian issue.  Emails, I

4     understand that, although I do think the Chief Diversity

5     Officer would probably -- communications have real insight

6     into the cost and benefits of using race as an admission

7     criteria.

8            But putting that aside, I just don't want the Court

9     to be under the impression that this is just about the

10    applications.  We can win this case if we can show that

11    their program isn't meeting their desired needs.  I would

12    think it would be relevant to the finder of fact not just

13    what the freshman class looks like but what the senior class

14    looks like.  How are these students doing when they get to

15    Harvard?  Are they succeeding in the majors they've chosen?

16    Are they failing out?  Are they having a positive -- is

17    cross-racial understanding, which is the premise of their

18    program, occurring at Harvard?  This was Justice Kennedy's

19    point.  This can't be a paper case.  This can't be

20    superficial.  These are deep, important issues.

21            I understand that there are going to be, that's why

22    they chose to use race in the admissions.  That comes with a

23    price.  The price is there is going to be some intrusion by

24    the Courts.

25            And I just want to let the Court know that the

 1    matriculating students are not part of our case.  They're

 2    indirectly relevant.

 3              MR. WAXMAN:  Look, the -- I think we will be

 4    arguing for however long Your Honor has this case about what

 5    *Fisher II* decided.  *Fisher II* was very, very clear on the

 6    point that it is the university and the university gets

 7    great deference in defining what success is and defining

 8    what an appropriately diverse class is.

 9              And in direct response to the points that my

10    friends here were making in *Fisher*, that if you simply

11    didn't take race into account, you would have, I don't know,

12    smarter students, more academically-prepared students.

13              The Supreme Court said, The University gets to

14    decide this.  And this so-called and quite odious mismatched

15    theory I think is over in light of *Fisher II*.

16              Now, Your Honor can decide that at an appropriate

17    time but --

18              THE COURT:  It may be over given the death of

19    Scalia.  That itself might have been but for the death now

20    but --

21              MR. WAXMAN:  Well, the author, the person who

22    wrote the book on the *Mismatched Theory*, Stuart Taylor, one

23    of the -- a friend of mine and one of the intellectual

24    pro-genders of the plaintiff's case has already published

25    something saying this litigation is over unless the next

1   President gets to support, gets to appoint two presidents

2   with extremely different views.  These theories, this is not

3   a one-off case, these theories are gone.

4        Now, I'm not saying that that's how Your Honor

5   should rule in this case; but the notion that a case about

6   race discrimination in admissions requires intrusive

7   discovery about matriculating students and how they're doing

8   so that they can make their own case about Harvard, how

9   Harvard should be defined in success is beyond the pale.

10        **MR. CONSOVOY:**  Harvard is making my initial

11  point every time Mr. Waxman stands up.  They want to

12  litigate our case for us.

13        We have a claim.  The claim has merit.  It was

14  answered.  Nothing in *Fisher II* forecloses it.  If it did,

15  we would have heard from them in their letter to the Court

16  about *Fisher II* that, there is nothing in there that says

17  that.  It says we must measure the costs and benefits of

18  these programs.

19        Deference is a summary judgment issue, Your Honor.

20  He makes my point.  Harvard wants to say we win summary

21  judgment today so don't give them the information that is

22  relevant to their claim.

23        We're asking for limited information.  I would

24  think -- I don't understand how it couldn't be relevant, I

25  am just hypothesizing this, it is not the case.  If all

1    minority students were having unsuccessful experiences at

2    Harvard, if they were dropping out of their majors, could

3    anybody say that that's not relevant to Harvard's compelling

4    government interest in the use of race?  Of course it's

5    relevant.  All we want is the data.  There will be plenty of

6    time later in the case -- they agreed to an 11-month

7    discovery for a reason.  There will be plenty of time to

8    litigate how far deference goes, how much, what is the line

9    between good faith and bad faith.  We are nowhere even near

10   that yet.  We have a long way to go here.  We just want some

11   basic data.

12        And all we're saying today is matriculating

13   information is relevant to the case.  That's it.

14        **MR. WAXMAN:**  The fact that we answered the

15   Complaint and denied it doesn't say anything.  And --

16        **THE COURT:**  I agree.

17        **MR. WAXMAN:**  And there may very well be at an

18   appropriate point in time in which we can identify for the

19   Court counts of the Complaint that are no longer viable in

20   light of *Fisher II.*

21        The point here is that the privacy interests of the

22   matriculating students are greatly implicated by this, a

23   case which challenges race discrimination in admissions.  We

24   have, we understand that we have two prongs that we have to

25   satisfy to carry our burden.  And the first one is to

1    explain what we are looking for in a student class and how

2    we go about getting it.

3          And the second is to demonstrate why there are no

4    appropriate and sufficient, quote, race-neutral alternatives

5    that get us there.  We understand that that, it is our

6    burden to -- since we have acknowledged that we engage in

7    race-conscious admissions, we have to prove those two things

8    to the Court.  And we will.

9          But inquiries into the records and successes and

10   performances and failures of matriculating students is

11   unbelievably intrusive and quite orthogonal to what the

12   legal theory in this Complaint should be or is.

13              **MR. CONSOVOY:**  It should be was, again, my

14   point.

15              **THE COURT:**  I get it, I get it.

16              **MR. CONSOVOY:**  My only point is if there was a

17   motion to dismiss it would have been filed, which means the

18   allegations are plausible and the discovery rulings as I

19   understand it are tied to whether the information is

20   relevant to a claim that has been entered.  That was my only

21   point.  And I don't think anybody disagrees that it is.

22   I've said my piece on that.

23          I just want to add, there is an issue we want to

24   raise for Your Honor.  It's not before you today.  It has to

25   do with Mr. Lee's appearance.  He is on the Board of Fellows

```
 1    for Harvard.
 2              THE COURT:  Yes.
 3              MR. CONSOVOY:  It has raised a concern about
 4    whether he may or may not be a potential witness in this
 5    case.  The parties are both in good faith working through
 6    this issue right now.  We're not putting it before the
 7    Court.  Everyone has -- we are working to get the
 8    information we need to evaluate the question.  We hope that
 9    it never has to come before the Court but we want to make
10    sure that you're aware of the concern and that the parties
11    are working through it.
12              THE COURT:  Okay.
13              MR. LEE:  And, Your Honor, I called
14    Mr. Consovoy the day I entered my appearance to explain to
15    him that I had acted as Senior Fellow but before I entered
16    my appearance I completely recused myself from all of my
17    fiduciary obligations having anything to do with this case.
18    I have actually given them information to prove that to
19    them.  And that once I did that and entered my appearance, I
20    am not participating in anything at the corporation level
21    that has to do with the case.  They're communicating with
22    Mr. Waxman and Ms. Ellsworth.  I'm just here to be one of
23    the foot soldiers at the trial.
24              MR. CONSOVOY:  I don't want to --
25              THE COURT:  An impressive foot soldier.
```

1          (Laughter.)

2                    **MR. LEE:**  Thank you.

3                    **MR. WAXMAN:**  We think so.

4                    **MR. CONSOVOY:**  We respect him.  We don't want

5     this to be an issue but I have a duty to my client and our

6     concern goes to things that were done before or earlier than

7     when that switch was made.

8                    **THE COURT:**  Okay.  That's fine.  If it comes

9     before me, I will deal with it.

10          You look like you want to speak back there.

11                    **MR. CREGOR:**  Thank you, Your Honor.  Matt

12    Cregor for the student intervenor.  Just a quick two

13    matters.

14          First, I'm very happy to be here in the role that

15    you granted us.  As intervenor we're monitoring discovery.

16    We ask that if matters come up for which we need

17    clarification that we have the opportunity to seek it.

18          For example, we wondered, Your Honor, if there is

19    some way to be generally informed of discovery such that

20    when the dispositive motion arises we have some sense of

21    what's leading up to it.  Just something to raise for you

22    now for consideration later.

23          And then, lastly, we received a great deal of

24    Interest from both current and prospective students at

25    Harvard about this case.  As the school year starts we would

1    wish to add some students to our group of Amici.  I just

2    wanted to flag it for the Court now.

3              THE COURT:  I mean, I'll let the parties speak

4    on that but I don't have any issue with you adding or

5    subtracting people as is appropriate.

6              MR. CONSOVOY:  On that issue, no.  On the

7    other we would have concerns.

8              MS. ELLSWORTH:  No concerns.

9              THE COURT:  Okay.  We will cross that bridge

10   when we get there.

11             MR. CREGOR:  Thank you very much, Your Honor.

12             THE COURT:  All right:  We'll get working on

13   this.  I'm sorry, I've been just a little bit -- I tried

14   that criminal case, it was eight weeks.  We tried it from

15   ten to four which has left just literally around the margins

16   so my bad on that but it just ended up being more consuming

17   than I anticipated.

18             MR. CONSOVOY:  Your Honor, one final

19   technicality.  Is the stay lifted?  Because there are things

20   we can start doing that we don't have to wait on your --

21             THE COURT:  Yes, the stay is lifted other than

22   the issues that you raised in here.  I mean, it's lifted as

23   to that too.  I just don't perceive any progress until I --

24             MR. CONSOVOY:  We may have additional

25   discovery to propound and things like that.

1          **THE COURT:**  That's fine.

2      Okay.  All right.  Thank you.

3          **VOICES:**  Thank you, Your Honor.

4          **THE CLERK:**  Court is adjourned.

5

6      (WHEREUPON, the proceedings were recessed at 4:00

7      p.m.)

C E R T I F I C A T E


        I, Carol Lynn Scott, Official Court Reporter for

the United States District Court for the District of

Massachusetts, do hereby certify that the foregoing pages

are a true and accurate transcription of my shorthand notes

taken in the aforementioned matter to the best of my skill

and ability.



                /S/CAROL LYNN SCOTT


        _____

                CAROL LYNN SCOTT
               Official Court Reporter
              John J. Moakley Courthouse
             1 Courthouse Way, Suite 7204
              Boston, Massachusetts 02210
                  (617) 330-1377



**DATE: August 3, 2016**