IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:14-cv-14176-ADB |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | |
| Defendant. | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS ON COUNTS IV AND VI**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

ARGUMENT ................................................................................................................... 8

I.    The Court Should Not Resolve the Arguments in Harvard's Motion Until the
      Close of All Discovery ......................................................................................... 8

II.   The Court Should Not Grant Judgment on Count IV Unless Harvard Concedes
      That It Does Not Use Race in the Manner *Bakke* Described. ............................ 11

III.  The Court Should Not Grant Judgment on Count VI Now Because Doing So
      Would Not Affect Discovery. .............................................................................. 13

CONCLUSION ............................................................................................................... 17

# TABLE OF AUTHORITIES

**CASES**

*Anchor v. Hartford Pub. Sch. Dist.*,
   No. 1:14-cv-796, 2015 WL 12591752 (W.D. Mich. Jan. 13, 2015)...........................................9

*Barrett v. L.F.P., Inc.*,
   No. 85-cv-6495, 1986 WL 7698 (N.D. Ill. June 27, 1986).......................................................9

*Brown v. Bd. of Educ. of Topeka*,
   349 U.S. 294 (1955)...........................................................................................................15

*Brown v. Plata*,
   563 U.S. 493 (2011)...........................................................................................................15

*City of Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989)..............................................................................................................7

*Dysart v. Remington Rand*,
   31 F. Supp. 296 (D. Conn. 1939).........................................................................................9

*Fisher v. Univ. of Texas at Austin* (*Fisher I*),
   133 S. Ct. 2411 (2013).................................................................................................4, 5, 7

*Fisher v. Univ. of Tex. at Austin* (*Fisher II*),
   136 S. Ct. 2198 (2016).........................................................................................4, 5, 6, 14

*Grajales v. P.R. Ports Auth.*,
   682 F.3d 40 (1st Cir. 2012)...................................................................................................9

*Gratz v. Bollinger*,
   539 U.S. 244 (2003)..............................................................................................................7

*Griffin v. Cty. Sch. Bd. of Prince Edward Cty.*,
   377 U.S. 218 (1964)...........................................................................................................15

*Grutter v. Bollinger*,
   539 U.S. 306 (2003).........................................................................................3, 7, 12, 14

*Hernandez v. Colegio y Noviciado Santa Maria del Camino, Inc.*,
   59 F. Supp. 3d 333 (D.P.R. 2014).......................................................................................10

*Jacobs v. Tenney*,
   No. 70-cv-3793, 1971 WL 307 (S.D.N.Y. Dec. 3, 1971)...................................................10

*Kelly v. United States*,
   809 F. Supp. 2d 429 (E.D.N.C. 2011)..................................................................................8

*Miller v. Johnson,*
  515 U.S. 900 (1995) ................................................................................................... 7

*Motown Record Corp. v. George A. Hormel & Co.,*
  657 F. Supp. 1236 (C.D. Cal. 1987) ..................................................................... 9, 10

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
  551 U.S. 701 (2007) ................................................................................................... 7

*Parniani v. Cardinal Health, Inc.,*
  No. 06-cv-2514, 2007 WL 2219373 (D. Minn. June 29, 2007) ................................ 9

*Picker Int'l, Inc. v. Mayo Found.,*
  6 F. Supp. 2d 685 (N.D. Ohio 1998) ..................................................................... 9, 10

*Regents of the University of California v. Bakke,*
  438 U.S. 265 (1978) ........................................................................................... *passim*

*Rodriguez v. California Highway Patrol,*
  89 F. Supp. 2d 1131 (N.D. Cal. 2000) ..................................................................... 16

*Schuette v. BAMN,*
  134 S. Ct. 1623 (2014) ..................................................................................... 5, 7, 11

*Serna v. Portales Mun. Sch.,*
  499 F.2d 1147 (10th Cir. 1974) .............................................................................. 14

*Shaw v. Reno,*
  509 U.S. 630 (1993) ............................................................................................ 7, 15

*Sinclair Ref. Co. v. Jenkins Petroleum Process Co.,*
  289 U.S. 689 (1933) .................................................................................................. 16

*Stark v. Hartt Transp. Sys., Inc.,*
  No. 2:12-cv-195, 2013 WL 358266 (D. Me. Jan. 28, 2013) .................................... 16

*Swann v. Charlotte-Mecklenburg Bd. of Ed.,*
  402 U.S. 1 (1971) ............................................................................................... 14, 15

*U.S. ex rel. Heineman-Guta v. Guidant Corp.,*
  718 F.3d 28 (1st Cir. 2013) ....................................................................................... 9

**OTHER AUTHORITIES**

Abram Chayes, *The Role of the Judge in Public Law Litigation*,
 89 Harv. L. Rev. 1281 (1976) ................................................................ 15

Alan Dershowitz & Laura Hanft, *Affirmative Action and the Harvard College Diversity-
 Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379 (1979) ................................ 16

John Minor Wisdom, *Rethinking Injunctions*, 89 Yale L.J. 825 (1980) ...................................... 15

Owen M. Fiss, *The Civil Rights Injunction* (1978) ..................................................... 15

Sheldon Bernard Lyke, *Catch Twenty*-Wu? *The Oral Argument in* Fisher v. University
 of Texas *and the Obfuscation of Critical Mass*, 107 Nw. U. L. Rev. Colloquy 209 (2013).... 11

**RULES**

Fed. R. Civ. P. 12(c) .................................................................................. 8

Fed. R. Civ. P. 54(a) .................................................................................. 8

Fed. R. Civ. P. 54(b) .................................................................................. 8

Fed. R. Civ. P. 56(a) .................................................................................. 9

## INTRODUCTION

The Court should deny Harvard's motion for judgment on the pleadings ("Mot."). ***First***, the Court should not resolve Harvard's arguments in their current form or before discovery closes. The Federal Rules of Civil Procedure do not authorize a motion, like Harvard's, for *partial* judgment on the pleadings. Judgment on the pleadings is all or nothing. Harvard must challenge Counts IV and VI in a motion for partial summary judgment—which, per the Scheduling Order, is appropriate only after the discovery period closes. Even if the Federal Rules permitted Harvard's motion, however, the Court should delay consideration until after discovery closes and Harvard's arguments should be considered together with any other dispositive motions that the parties might file at that time.

***Second***, the Court should not grant judgment on Count IV—now or after discovery. Count IV alleges that Harvard is not using race in the manner approved by Justice Powell in *Bakke*—as a tie-breaker to compare students in a head-to-head fashion at the end of the admissions process. Compl. ¶¶ 466-76. Harvard's claim that *Bakke* is not so limited represents a revisionist interpretation intended to mask its bait and switch. Harvard also argues that *Grutter* allows it to use race more broadly. SFFA agrees. But because *Bakke* and *Grutter* endorsed different types of race-based admissions policies, SFFA must prove that Harvard uses neither policy. Unless Harvard is prepared to concede that it does not use a *Bakke*-style policy, the Court should not grant judgment on Count IV.

***Third***, the Court should not grant judgment on Count VI before discovery because it would have no effect on this case. Count VI alleges that no school should *ever* be allowed to use race as a factor in admissions. Compl. ¶¶ 489-505. SFFA agrees that this Court cannot overrule Supreme Court precedent. But granting judgment on Count VI will not narrow the scope of discovery; all of SFFA's discovery requests are (and will be) relevant to Counts I, II, III, and V,

1

as well as SFFA's request for an injunction against Harvard. Nor will it alter the scope of potential relief; the Court may still enjoin Harvard from using racial preferences as a remedy for violating Title VI.

### BACKGROUND

In several cases, the Supreme Court has considered the legality of race-based admissions in higher education. Each time, Harvard University was a focal point of the parties' arguments and the Justices' opinions. But Harvard's proximity to the litigation has apparently caused it to lose some perspective: its motion misrepresents the decisions of the Supreme Court and the role that Harvard played in them. It is important to set the record straight.

*Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), was the Court's first opportunity to address the legality of race-based admissions in higher education. The plaintiff in *Bakke* challenged the admissions policy of the UC-Davis School of Medicine. *Id.* at 269-70. Harvard—sensing that its own race-based admissions might be in jeopardy—joined an amicus brief supporting the medical school. *See* Amicus Br. of Columbia Univ. et al., *Bakke*, 438 U.S. 265 (No. 76-811), 1977 WL 188007. The brief appended a copy of Harvard's admissions policy to "illustrate the kind of significance [Harvard] attached to race." *Id.* at *3a. Notably, the policy asserted that race was a factor in only "some admissions decisions." *Id.* at *2a. In particular, when Harvard had "only a few places left to fill," *id.* at *3a, it would look back at the makeup of the class so far and use race to make comparative, head-to-head decisions about those remaining applicants. *See id.* at *3a-4a.

Justice Powell, who wrote the principal opinion in *Bakke*, relied heavily on Harvard's representations. He appended the Harvard Plan to his opinion, *see* 438 U.S. at 321-24 (Powell, J.), and he held it out as an example of a race-based admissions policy that could survive strict scrutiny, *see id.* at 316-19. Justice Powell repeated Harvard's refrains about using race only in a

2

head-to-head fashion to fill out the remaining seats in the class: "The applicant who loses out on the *last available seat* to *another candidate* receiving a 'plus' on the basis of ethnic background will not have been foreclosed from all consideration for that seat simply because he was not the right color or had the wrong surname. It would mean only that his combined qualifications, which may have included similar nonobjective factors, did not outweigh those of *the other applicant*." *Id.* at 318 (emphases added).

Of course, Justice Powell ultimately concluded in *Bakke* that the medical school's race-based admissions were unconstitutional. *Id.* at 320. It was not until *Grutter v. Bollinger*, 539 U.S. 306 (2003), that a majority of the Court upheld a university's race-based admissions. The plaintiff in *Grutter* challenged the admissions policy of the University of Michigan Law School. *Id.* at 311. The law school's policy was unlike the Harvard Plan that Justice Powell endorsed in *Bakke*: instead of using race in a comparative, head-to-head fashion to fill out the last part of the class, the law school considered the race of *every* applicant in order to achieve "a critical mass of underrepresented minority students." *Id.* at 318; *see also id.* at 389-92 (Kennedy, J., dissenting) (distinguishing the law school's policy in *Grutter* from the Harvard Plan in *Bakke*). In fact, Harvard filed an amicus brief in *Grutter* but never once suggested that the law school's policy was like its own. *Cf.* Amicus Br. of Harvard Univ. et al., *Grutter*, 539 U.S. 306 (No. 02-241), 2003 WL 399220, at *15 (emphasizing "the variety of ways in which our nation's institutions choose to compose their student bodies" and universities' "[d]ifferences over the optimal means for promoting racial diversity").

Ultimately, *Grutter* upheld Michigan's admissions policy. For the first time, a majority of the Court held that "student body diversity" was a compelling interest that could justify race-based admissions. 539 U.S. at 328-33. The Court also held that the law school's policy was

narrowly tailored to further that interest. *Id.* at 333-43. But *Grutter* applied a very lenient version of narrow tailoring, stating that "[w]e take the Law School *at its word* that it would 'like nothing better than to find a race-neutral admissions formula.'" *Id.* at 343 (emphasis added). This holding prompted a dissent from Justice Kennedy, who faulted the Court for "confus[ing] deference to a university's definition of its educational objective with deference to the implementation of this goal." *Id.* at 388 (Kennedy, J., dissenting).

Justice Kennedy's dissent eventually became the law in *Fisher v. University of Texas at Austin* (*Fisher I*), 133 S. Ct. 2411 (2013). The plaintiff in *Fisher* challenged the race-based admissions policy of the University of Texas ("UT"). *Id.* at 2415. UT's policy was identical to the policy approved in *Grutter*, with one major wrinkle: Texas law required the university to fill 75% of its freshman class with students who had graduated in the top ten percent of a Texas high school. *Fisher v. Univ. of Tex. at Austin* (*Fisher II*), 136 S. Ct. 2198, 2206 (2016). The plaintiff argued that UT, unlike Michigan Law School, could not satisfy strict scrutiny because the Top Ten Percent Plan was a race-neutral alternative that had already achieved substantial diversity on campus. *See* Pet'r's Br., *Fisher I*, 133 S. Ct. 2411 (No. 11-345), 2012 WL 1882759. The plaintiff did *not* contest that student body diversity is a compelling interest that can justify race-based admissions. *See Fisher I*, 133 S. Ct. at 2419 ("[T]he parties here do not ask the Court to revisit th[e] [compelling interest] aspect of *Grutter*'s holding."). Harvard joined an amicus brief on behalf of UT. *See* Amicus Br. of Brown Univ. et al., *Fisher I*, 133 S. Ct. 2411 (No. 11-345), 2012 WL 3527821. Now that *Grutter* had been decided, Harvard (conveniently) asserted for the first time that its race-based admissions policy was "similar to … the University of Michigan Law School plan." *Id.* at *1.

Seven Justices in *Fisher I* voted to vacate the decision of the Fifth Circuit, which had upheld UT's admissions policy. 133 S. Ct. at 2415. Echoing Justice Kennedy's dissent in *Grutter*, the Supreme Court clarified that the narrow-tailoring requirement does not apply any differently in the context of race-based admissions: "*Grutter* calls for deference to the University's conclusion … that a diverse student body would serve its educational goals. … [H]owever, there must still be a further judicial determination that the admissions process meets strict scrutiny in its implementation. … On this point, the University receives no deference." *Id.* at 2419-20. As the Court explained, the Fifth Circuit "confined the strict scrutiny inquiry in too narrow a way by deferring to the University's good faith in its use of racial classifications and affirming the grant of summary judgment on that basis." *Id.* at 2421; *see also id.* ("Strict scrutiny must not be strict in theory but feeble in fact."). The Court remanded the case so that the Fifth Circuit could apply the correct standard. *Id.* at 2422.

Strangely, Harvard describes *Fisher I* as *affirming* the use of racial preferences. *See* Mot. at 2, 5, 10. But Harvard has it backwards: the Court *reversed* the decision of the Fifth Circuit and *narrowed* its precedent. *Fisher I* did not endorse *Grutter*'s holding that student body diversity is a compelling governmental interest; it merely assumed that point because the plaintiff did not challenge it. *Fisher I*, 133 S. Ct. at 2419; *see Schuette v. BAMN*, 134 S. Ct. 1623, 1630 (2014) (plurality) ("[T]he principle that the consideration of race in admissions is permissible … [was] not challenged [in *Fisher I*]."); *Fisher II*, 136 S. Ct. at 2208 ("*Fisher I* … t[ook] no position on the constitutionality of [UT's] admissions program …."). And *Fisher I* did not endorse *Grutter*'s application of narrow tailoring; the decision all but overruled it. *Fisher II*, 136 S. Ct. at 2209 (describing leniency of strict-scrutiny review in "the years before *Fisher I* clarified the stringency of the strict-scrutiny burden for a school that employs race-conscious review").

5

To be sure, the Supreme Court eventually ruled in UT's favor in *Fisher II*. But Harvard's assertion that *Fisher II* "strongly reaffirmed" the use of race-based admissions in higher education, Mot. at 4, drastically overreads that decision. The Court explained that the question presented in *Fisher II* was "narrow," 136 S. Ct. at 2210, and that the unique facts and procedural history of the case could "limit its value for prospective guidance." *Id.* at 2209. For one, UT's admissions policy was "*sui generis*" due to the presence of the Top Ten Percent Plan. *Id.* at 2208. Because the Top Ten Percent Plan was required by state law, UT lacked control over its admissions process—unlike most other universities (including Harvard). *Id.* at 2208-09. For another, the Court had to decide *Fisher II* on "a record ... almost devoid of information" because UT did not keep track of the students admitted under the Top Ten Percent Plan. *Id.* at 2209. For that reason, remand would have been futile because the data it needed did not exist. *See id.* Most tellingly, the Court would not even say that UT's admissions policy is *currently* constitutional. Because the plaintiff could only challenge the policy as it existed "when her application was rejected in 2008," the Court could not evaluate "the constitutionality of the University's current admissions policy." *Id.* The Court reminded Texas that its decision in *Fisher II* "does not necessarily mean the University may rely on [its] same policy without refinement." *Id.* at 2215. As the Court explained, universities have an "ongoing obligation to engage in constant deliberation and continued reflection regarding [their] admissions policies." *Id.*; *see also id.* at 2209-10; *id.* at 2214-15.

Harvard agrees, or at least it used to before *Fisher II* was decided. Harvard argued in its *Fisher II* amicus brief that the Court's decision would have little effect on its own admissions policy due to the "unique" facts of the case. Amicus Br. for Harvard Univ., *Fisher II*, 136 S. Ct.

6

2198 (No. 14-981), 2015 WL 6735848, at *4. Harvard's brief was prophetic: *Fisher II* has little to say about the legality of Harvard's race-based admissions.

Harvard's motion now contends that race-based admissions have been approved by "nearly forty years of consistent Supreme Court precedent." Mot. at 10. But Harvard's reading of the precedent omits quite a bit. The Supreme Court has struck down more race-based admissions policies than it has upheld. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007); *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Bakke*, 438 U.S. at 320 (Powell, J.). The Court has put a 25-year expiration date on all race-based admissions, *see Grutter*, 539 U.S. at 343, and it has held that schools are free to *prohibit* race-based admissions, *see BAMN*, 134 S. Ct. at 1638.

None of this is surprising: race-based admissions are strongly disfavored. The use of race in admissions, like in other contexts, is "odious to a free people," "pernicious," "highly suspect," and "presumptively unconstitutional." *Fisher I*, 133 S. Ct. at 2418; *Parents Involved*, 551 U.S. at 720; *Grutter*, 539 U.S. at 326; *Miller v. Johnson*, 515 U.S. 900, 927 (1995). There are no "benign" uses of race in admissions. *Fisher I*, 133 S. Ct. at 2417; *Parents Involved*, 551 U.S. at 741-42; *Bakke*, 438 U.S. at 289-99 (Powell, J.). "[E]ven in the pursuit of remedial objectives, an explicit policy of assignment by race may serve to stimulate our society's latent race consciousness, suggesting the utility and propriety of basing decisions on a factor that ideally bears no relationship to an individual's worth or needs." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (alteration in original). Harvard thus is wrong to suggest that the Supreme Court has blindly endorsed race-based admissions. Federal law "forbids the use even of narrowly drawn racial classifications except as a last resort." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 519 (1989) (Kennedy, J., concurring in part and concurring in the judgment).

## ARGUMENT

SFFA has three main objections to Harvard's motion for judgment on the pleadings. First, the Court should deny Harvard's motion as procedurally improper and require Harvard to re-raise its arguments in a motion for summary judgment at the end of discovery. Second, the Court should not grant judgment on Count IV, even after discovery, unless Harvard is prepared to concede that it does not now use (and has never used) a race-based admissions policy like the one endorsed in *Bakke*. Third, the Court should not grant judgment on Count VI now because it would have no effect on the discovery or relief SFFA may obtain in this litigation through its remaining counts.

## I.   The Court Should Not Resolve the Arguments in Harvard's Motion Until the Close of All Discovery.

The Court should defer resolution of the arguments in Harvard's motion until discovery is concluded and motions for summary judgment are due. First, Harvard's motion challenges only Counts IV and VI, but there is no such thing as a motion for *partial* judgment on the pleadings. Harvard's motion is really a motion for partial summary judgment, but such a motion is premature under the Court's amended scheduling order. *See* Doc. 180. Second, even if Harvard's motion was procedurally proper, the Court should exercise its discretion to defer consideration of the motion until discovery is completed.

The Federal Rules of Civil Procedure do not permit a motion for *partial* judgment on the pleadings. Rule 12(c) provides that any party can "move for *judgment* on the pleadings." Fed. R. Civ. P. 12(c) (emphasis added). The word "judgment" means an "order from which an appeal lies," Fed. R. Civ. P. 54(a), so an order that "adjudicates fewer than all the claims" ordinarily is not a "judgment," Fed. R. Civ. P. 54(b). The purpose of Rule 12(c), accordingly, is to "gain[] a *final* judgment on the merits," not to "serve[] as a pruning device to eliminate objectionable

matter from an opponent's pleadings." *Kelly v. United States*, 809 F. Supp. 2d 429, 433 n.2 (E.D.N.C. 2011) (emphasis added).

Indeed, when the Federal Rules want to depart from this general definition of judgment, they do so expressly. For example, Rule 56(a) allows for "partial summary judgment" on "each claim or defense." Fed. R. Civ. P. 56(a). However, "there is no comparable provision in Rule 12(c) for a partial judgment on the pleadings." *Barrett v. L.F.P., Inc.*, No. 85-cv-6495, 1986 WL 7698, at *2 (N.D. Ill. June 27, 1986). The difference is significant. *See U.S. ex rel. Heineman-Guta v. Guidant Corp.*, 718 F.3d 28, 35 (1st Cir. 2013) ("[W]hen Congress includes language in one section of a statute but omits it in another, 'it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"). Accordingly, many courts have declined to consider so-called motions for partial judgment on the pleadings. *See, e.g.*, *Motown Record Corp. v. George A. Hormel & Co.*, 657 F. Supp. 1236, 1237-38 (C.D. Cal. 1987); *Barrett*, 1986 WL 7698, at *2; *Picker Int'l, Inc. v. Mayo Found.*, 6 F. Supp. 2d 685, 688 (N.D. Ohio 1998); *Dysart v. Remington Rand*, 31 F. Supp. 296, 297 (D. Conn. 1939).

Even if a motion for partial judgment on the pleadings were allowed, as some courts have held, this Court should not consider Harvard's motion until the close of all discovery. As SFFA has explained, *see* Doc. 189, district courts have "broad discretion" to defer resolution of motions for judgment on the pleadings, *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 46 (1st Cir. 2012); *see Anchor v. Hartford Pub. Sch. Dist.*, No. 1:14-cv-796, 2015 WL 12591752, at *1 (W.D. Mich. Jan. 13, 2015) ("[T]he Court may choose to defer consideration of [Rule 12(c)] motions until the parties have an opportunity for plenary discovery."). That is the appropriate course here. Harvard's challenge to Count IV involves complicated questions about Supreme Court precedent and Harvard's various litigating positions, *see infra* at 11-12, and Harvard's

challenges to Counts IV and VI will not affect discovery or otherwise streamline this case, *see infra* at 13-16. For the sake of accuracy and efficiency, this Court should resolve Harvard's motion together with any other dispositive motions following the close of discovery. *See, e.g., Parniani v. Cardinal Health, Inc.*, No. 06-cv-2514, 2007 WL 2219373, at *2 (D. Minn. June 29, 2007) (R&R) ("To ensure that the dispositive motions are handled in an efficient and consistent manner, all motions will be examined together ...."), *adopted in relevant part*, 2007 WL 2219368 (D. Minn. July 27, 2007).

Better still, the Court should deny Harvard's motion for partial judgment on the pleadings and require it to re-raise these arguments in a motion for summary judgment. *See, e.g., Hernandez v. Colegio y Noviciado Santa Maria del Camino, Inc.*, 59 F. Supp. 3d 333, 334-35 (D.P.R. 2014). The procedures of Rule 56 are better developed and more familiar than the procedures of Rule 12(c). *See Jacobs v. Tenney*, No. 70-cv-3793, 1971 WL 307, at *1 (S.D.N.Y. Dec. 3, 1971) ("[U]sual procedure suggests such a motion [for judgment on the pleadings] in a complicated litigation ... should be deferred for determination after the completion of discovery, and then treated as a motion for summary judgment."). Those well-defined procedures would allow this Court to avoid the difficult question of whether the Federal Rules permit a motion for partial judgment on the pleadings. *See, e.g., Motown Record*, 657 F. Supp. at 1237-38 ("Rather than decide the propriety of a 'partial' judgment on the pleadings, this Court will consider defendants' motion as a motion for partial summary judgment pursuant to [Rule 56]."); *Picker Int'l*, 6 F. Supp. 2d at 688 (Because "it is not clear whether a Rule 12(c) motion should be granted when it would not dispose of the entire case," "the Court will proceed under Rule 56 rather than Rule 12(c)."). There is no reason—or legal basis—for considering Harvard's arguments now.

II.     **The Court Should Not Grant Judgment on Count IV Unless Harvard Concedes That It Does Not Use Race in the Manner *Bakke* Described.**

Harvard contends that Count IV fails because "[t]he Supreme Court has never held that a university may use race *only* to 'fill the last few places' in its entering class." Mot. at 7 (emphasis added). That is not SFFA's argument. The Supreme Court has approved *two* types of race-based admissions policies: a *Bakke*-style policy, which uses race in a head-to-head fashion to fill the last few seats in the class, and a *Grutter*-style policy, which uses race to evaluate every candidate to achieve a critical mass of underrepresented minorities. To prevail, SFFA must prove that Harvard is pursuing neither policy. SFFA included Count IV to guard against a claim by Harvard that it has a *Bakke*-style admissions policy.

SFFA was right to do so. The Harvard Plan that *Bakke* endorsed was not the same as the admissions policy that *Grutter* endorsed. Harvard's amicus brief in *Bakke* described its admissions policy in terms of head-to-head comparisons between individual students when the university had "only a few places left to fill." Amicus Br. of Columbia Univ. et al., *supra*, at *3a. Harvard now argues that this language was merely an "*example*." Mot. at 8. Even so, the point of that "example" was to "illustrate the kind of significance [Harvard] attached to race." Amicus Br. of Columbia Univ. et al., *supra*, at *3a. More importantly, Justice Powell understood the Harvard Plan to operate this way. *See BAMN*, 134 S. Ct. at 1633 ("[W]e must understand [a Supreme Court opinion] as [the opinion] understood itself."). Justice Powell described the Harvard Plan in the same terms as Harvard did—a policy that used race to make head-to-head comparisons to fill the last few seats. *See Bakke*, 438 U.S. at 318 (Powell, J.); Sheldon Bernard Lyke, *Catch Twenty-Wu? The Oral Argument in* Fisher v. University of Texas *and the Obfuscation of Critical Mass*, 107 Nw. U. L. Rev. Colloquy 209, 222 (2013) ("Justice Powell specifically addressed and

approved considerations of race (as well as other factors) in the final stages of admissions as articulated in the Harvard Plan.").

Unsurprisingly, Harvard did not argue that it had a *Grutter*-style policy until *after* the Supreme Court decided *Grutter* in favor of Michigan Law School. *See supra* at 3-4. When the law was in flux and Harvard feared Title VI liability, it described its admissions policy in narrower terms. *See supra* at 2-3.[1] That narrow description of the Harvard Plan—as a policy that used race in a comparative, head-to-head fashion at the end of the admissions process—was the one that *Bakke* endorsed. Post-*Grutter*, though, Harvard has aligned itself with the "critical mass" rationale that *Grutter* endorsed. *See supra* at 4. SFFA thus correctly anticipated that this issue would need to be resolved. Compl. ¶ 471 ("[T]o the extent that Harvard ever used race in th[e] way [described in *Bakke*], … it clearly is no longer using race in this fashion."); *id.* ¶ 473 ("[S]tatistical evidence demonstrates that Harvard is not using race merely to fill the last few places in the entering freshman class."). The bottom line is that Harvard can resolve this issue by informing the Court whether it is using race only to fill the last few seats or whether its "review of *all* applicants ... takes race ... into account throughout the admissions process." Mot. at 10. This should not be a difficult question for Harvard to answer.

Yet Harvard's position remains opaque. The motion appears to argue that its admissions policy is the one approved in *Grutter*, not the one approved in *Bakke*, but never comes out and

---

[1]      Harvard "reserves the right to argue that Title VI does not incorporate wholesale the case law of the Equal Protection Clause." Mot. at 2 n.2. But there is nothing to reserve. Title VI prohibits "racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." *Grutter*, 539 U.S. at 343. If the issue is open, however, SFFA reserves the right to argue that Title VI is *more* restrictive than the Equal Protection Clause. *See Bakke*, 438 U.S. at 415-18 (Stevens, J., concurring in the judgment in part and dissenting in part) (Title VI is "colorblind" and "has independent force, with language and emphasis in addition to that found in the Constitution. ... Race cannot be the basis of excluding anyone from participation in a federally funded program.").

says so. *See* Mot. at 7-10. 

For whatever reason, though, Harvard will not unequivocally concede that race is not used only to fill the last few seats of an incoming class.

There is no reason for Harvard to be coy. If Harvard admits that it does not use race only in a comparative, head-to-head fashion to fill the last few seats—or if this Court understands Harvard to concede this important point—SFFA does not oppose judgment on Count IV after discovery is completed. Absent that, SFFA opposes granting judgment to Harvard on this Count.

## III. The Court Should Not Grant Judgment on Count VI Now Because Doing So Would Not Affect Discovery.

Harvard contends that Count VI fails because it seeks to overturn Supreme Court precedent. Mot. at 10-11. SFFA acknowledges that this Court cannot overrule decisions of the Supreme Court. SFFA included Count VI to preserve its arguments for further review. Because Harvard concedes that SFFA has done so, Mot. at 10 ("SFFA … may, at the appropriate time, ask the Supreme Court to overrule [its precedents]."), SFFA does not oppose entering judgment in Harvard's favor on Count VI after discovery is completed.

SFFA does disagree with Harvard, however, that the Court should do so *now*. Harvard is wrong that granting judgment on Count VI (or Count IV, for that matter) will "simplify discovery." Mot. at 1. With or without those counts, SFFA will be entitled to exactly the same discovery. Harvard cannot prevail unless it proves that it is not discriminating against Asian Americans (Count I), that it is not engaged in racial balancing (Count II), that it uses race as no more than a "plus" factor (Count III), and that it lacks a race-neutral means of achieving student

13

body diversity (Count V). Compl. ¶¶ 428-65, 477-88. In turn, Harvard must produce evidence about what its admissions policies are, how it uses race, why it uses race, whether its purposes for using race are compelling, whether race is necessary to accomplish those purposes, what race-neutral alternatives it considered, why it rejected any such alternatives, and other related issues. Granting judgment on Count VI will not alter discovery, as Harvard acknowledged earlier in this litigation. *See* 7/21/15 Status Conference, Doc. 84 at 11-12 ("Mr. Waxman: … Count I says that we're intentionally discriminating against Asian Americans. Count II says we're engaging in racial balancing. I don't think that the plaintiffs are prepared to dismiss Count III and Count IV and, frankly, all of the discovery in this case, I don't think it can be segregated. We're asking about – they're asking to examine the same documents, examine the same witnesses, respond to all the same contention interrogatories.").

Harvard nevertheless contends that disposing of Count VI will allow the parties to "focus their resources on … *Harvard's* specific admissions policies and practices." Mot. at 11. But that is a red herring. SFFA was never going to ask Harvard for discovery on the admissions policies of *other* universities. Harvard must prove that *its* race-based practices are legal, and litigating those issues will require substantial discovery into the history, purposes, procedures, and effects of Harvard policies. *See Fisher II*, 136 S. Ct. at 2209-10, 2214-15; *see also Grutter*, 539 U.S. at 348-49 (Scalia, J., concurring in part and dissenting in part) (describing various lines of discovery that are permissible under Supreme Court precedent).

Furthermore, although this Court must follow Supreme Court precedent on race-based admissions, those decisions do not limit the *relief* the Court can award if SFFA prevails on one of its claims. Federal courts have "broad" equitable powers under the Constitution and Title VI to remedy discrimination in education. *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1,

15 (1971); *Serna v. Portales Mun. Sch.*, 499 F.2d 1147, 1154 (10th Cir. 1974). One available tool is a structural injunction, which is "a means of initiating a relationship between a court and a social institution" where "the court will *direct* or *manage* the reconstruction of the social institution, in order to bring it into conformity with the [law]." Owen M. Fiss, *The Civil Rights Injunction* 36-37 (1978). Structural injunctions are appropriate when the defendant has engaged in "the systematic denial of important rights to a social group." *Id.* at 94. The injunction recognizes that, at some point, "[t]he [legal] wrong [i]s the institution itself, and it [i]s the institution that ha[s] to be changed for civil rights to be safeguarded." John Minor Wisdom, *Rethinking Injunctions*, 89 Yale L.J. 825, 827 (1980). The Supreme Court blessed the use of structural injunctions most prominently in the wake of *Brown v. Board of Education*, 347 U.S. 483 (1954), when recalcitrant States refused to desegregate their public schools. *See, e.g.*, *Swann*, 402 U.S. 1; *Griffin v. Cty. Sch. Bd. of Prince Edward Cty.*, 377 U.S. 218 (1964); *Brown v. Bd. of Educ. of Topeka*, 349 U.S. 294 (1955). But structural injunctions also have been used in many other cases covering a wide array of subjects. *See* Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv. L. Rev. 1281, 1284 (1976); *see, e.g.*, *Brown v. Plata*, 563 U.S. 493 (2011).

SFFA has alleged that Harvard is the paradigm case for a structural injunction. In the eyes of the law, the policies that Harvard allegedly uses to exclude Asian Americans are no different from the policies that the Jim Crow South used to keep black children out of public schools. *See Shaw*, 509 U.S. at 650-51 ("[E]qual protection analysis 'is not dependent on the race of those burdened or benefited by a particular classification.'"). Like the Jim Crow South, Harvard has a long history of racial discrimination, stretching back almost a century. Compl. ¶¶ 42-124. If SFFA prevails, Harvard cannot be trusted to operate any kind of race-based

admissions program given its history of using the moniker of "diversity" to mask its real agenda of pure racial balancing. *See generally* Alan Dershowitz & Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379 (1979). That is why SFFA seeks a permanent injunction "prohibiting Harvard from using race as a factor in future undergraduate admissions decisions" and "requiring Harvard to conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission." Compl. at 119.

This issue need not be resolved unless and until Harvard is found to have violated Title VI. But SFFA's request for a structural injunction confirms that removal of Count VI from the case will not alter the scope of permissible discovery. As the Supreme Court has explained, discovery with respect to the plaintiff's requested remedies "is as appropriate ... as it is for proof of other facts essential to his case." *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 693-94 (1933); *see also Rodriguez v. California Highway Patrol*, 89 F. Supp. 2d 1131, 1142 (N.D. Cal. 2000) ("Plaintiffs are entitled to discovery to attempt to establish an evidentiary basis for their claims for injunctive relief." (citing *Riggs v. City of Albuquerque*, 916 F.2d 582, 586-87 (10th Cir. 1990)); *Stark v. Hartt Transp. Sys., Inc.*, No. 2:12-cv-195, 2013 WL 358266, at *11 (D. Me. Jan. 28, 2013) (permitting discovery because it was relevant to "the appropriate scope of damages and other requested relief").

Contrary to Harvard's claim, then, whether *Harvard's* asserted interest in student body diversity is merely a "clever post facto justification for increasing the number of minority students in the student body," Compl. ¶ 497, whether the Court is capable of properly administering the requirement of strict scrutiny to ensure that *Harvard's* consideration of race complies with Title VI, *id*. ¶ 500, and whether *Harvard's* use of race-based admissions in the

16

wake of a judicial finding that *Harvard* has engaged in systematic discrimination against Asian Americans "impose[s] significant costs on the university community, society in general, and the very minority students these programs are purported to benefit," *id.* ¶ 501, remain "appropriate topics for litigation in this case." Mot. at 11. Accordingly, SFFA is entitled to pursue the same discovery with or without Counts IV and VI.[2]

## CONCLUSION

For these reasons, the Court should deny Harvard's motion for partial judgment on the pleadings.

Respectfully submitted,

*/s/ William S. Consovoy*

Paul M. Sanford BBO #566318
Benjamin C. Caldwell BBO #67506
BURNS & LEVINSON LLP
One Citizens Plaza, Suite 1100
Providence, RI  02903
Tel: 617-345-3000
Fax: 617-345-3299
psanford@burnslev.com
bcaldwell@burnslev.com

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard
Suite 700
Arlington, Virginia 22201
Tel: 703.243.4923
Fax: 703.243.4923
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com

---

[2]     The student-amici argue that Count VI fails for the additional reason that "the Supreme Court has repeatedly rejected the 'mismatch' theory." Doc. 199 at 6. But the mismatch issue is principally relevant to Count V. *See* Compl. ¶ 485. Notably, Harvard has not sought judgment on Count V. That is because the Supreme Court has squarely held that a university may not use racial preferences when it has "race-neutral alternatives that are both available and workable." *Fisher II*, 136 S. Ct. at 2208. In evaluating this issue, the Court must take into consideration both the benefits and costs of using race as a factor in admissions. Any mismatch effect would be one such cost and it is thus an appropriate subject for discovery. *See* Compl. ¶¶ 383-99. In any case, this Court cannot consider arguments that the parties have not raised. *See Lane v. First Nat. Bank of Boston*, 871 F.2d 166, 175 (1st Cir. 1989).

Patrick Strawbridge
BBO #678274
Consovoy McCarthy Park PLLC
Ten Post Office Square
Boston, MA 02109
Tel: 617.227.0548
patrick@consovoymccarthy.com

*Counsel for Plaintiff Students for Fair Admissions, Inc.*

Dated: October 21, 2016

## CERTIFICATE OF SERVICE

I hereby certify that this document will be sent by email to the registered participants as identified on the Notice of Electronic Filing.

/s/ William S. Consovoy
William S. Consovoy