

3033 Wilson Boulevard
Suite 700
Arlington, VA 22201
703.243.9423
www.consovoymccarthy.com

March 30, 2018

**VIA ECF**

Hon. Allison D. Burroughs
U.S. District Court, District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, MA 02210

Re:   *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
      No. 1:14-cv-14176-ADB

Dear Judge Burroughs,

Pursuant to this Court's March 14, 2018 order, Plaintiff Students for Fair Admissions, Inc. ("SFFA") submits this letter to address the treatment of confidential materials in SFFA's forthcoming motion for summary judgment. The parties have met and conferred but have been unable to resolve the dispute.

"Documents submitted to a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 121 (2d Cir. 2006). A party seeking to seal such records must provide "the most compelling reasons," *In re Providence Journal Co.*, 293 F.3d 1, 10 (1st Cir. 2002), and "must ensure that any sealing is narrowly tailored to shield as little from public view as possible," *Bradford & Bigelow, Inc. v. Richardson*, 109 F. Supp. 3d 445, 449 (D. Mass. 2015).

Harvard cannot provide such "compelling reasons"—indeed, it has not even tried. In response to SFFA's repeated requests during the two-week meet-and-confer process, Harvard refused to identify a single document or category of documents that it believes should be sealed. Instead, it has generally maintained that its documents contain "volumes of sensitive personal and business information" that must be withheld from public view. That is insufficient under controlling First Circuit law.

Harvard's refusal to identify particular documents appears to be deliberate—it knows that examination of any specific material produced in this case would reveal no basis to satisfy the high bar for withholding documents. As Harvard knows, the public interest in this civil rights case is paramount. SFFA alleges that Harvard—a premier university that accepts hundreds of millions of dollars in federal funding—is discriminating against Asian Americans and otherwise egregiously violating Title VI of the Civil Rights Act. The public has a profoundly important interest in observing and understanding how the Court resolves this case.

Moreover, the operation of Harvard's admissions process is simply not the type of information that belongs under seal. This case does not involve anything like "national security, the formula for Coca Cola, or embarrassing details of private life." *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 533 (1st Cir. 1993). And even if it ***could*** be worthy of such protection, Harvard has disseminated detailed information about its admissions process for decades, and countless articles and books are dedicated to the subject. As Harvard proudly admits on its website, "there is no formula for gaining admission to Harvard."

Even if certain records were eligible for impoundment, the importance to Harvard in keeping them secret could not outweigh the strong presumption of access in this case. The simplest way to think about this issue is to picture what this case will look like on appeal. If Harvard is correct, then the appellate briefs will be mostly redacted and oral argument will be held in closed courtrooms. Moreover, if Harvard's argument were correct, then the briefing in *Gratz*, *Grutter*, and *Fisher* would have been sealed, the Supreme Court would have held oral argument in secret, the transcripts would have been withheld from the public, and the opinions would have been littered with redactions. That is unimaginable.

No doubt recognizing the uphill battle it faces, Harvard has proposed that the Court should issue a blanket sealing order over the entire summary judgment record, and then the parties should determine later (through a "reasonable schedule") whether any of it was properly sealed. That is not how this works. Blanket sealing orders are "rarely, if ever, appropriate." *Landmark Am. Ins. Co. v. Magoo's II, Inc.*, 2007 WL 3023265, at *1 (D. Conn. Oct. 12, 2007). The Court disfavors motions to seal. Indeed, they are granted only after the Court engages in "a careful document-by-document review of the particular portions of the document that a party wishes to be kept under seal and after considering whether the requested order is no broader than necessary to serve the interests that require protection." *Id*.

That is why the Court made clear (and Harvard conceded) at the outset of this case that the protective order would not dictate what would be sealed at summary judgment or trial. That is why SFFA reached out to Harvard to discuss which types of documents, if any, it believed should be filed under seal. And that is presumably why the Court scheduled a hearing for April 10 to discuss these issues. Harvard cannot override the Court's obligations by making broad generalizations about its interests and refusing to identify any documents it believes must be filed under seal. Harvard's proposal has the process exactly backwards.

SFFA's proposal for dealing with the summary judgment record is workable and comports with the right of access the public enjoys under the common law and the First Amendment. SFFA will redact the summary judgment record to ensure that the identity of any Harvard applicant or student (present or former) will not be disclosed. This is appropriate and does not impede the public's right of access. Moreover, this will likely implicate few, if any, documents that SFFA will file with its motion. This suit is not about the treatment of individual students. It is about whether Harvard has engaged in a pattern of discrimination. Given the importance of student

privacy and the irrelevancy of individual student identities to this dispute, the Court is within its authority to authorize these ***limited*** redactions. *See, e.g.*, *Sahrle v. Greece Cent. School Dist.*, No. 10-cv-6631, 2015 WL 4872410, at *2 (W.D.N.Y. Aug. 13, 2015).[1]

Beyond that, there is no justification for redacting ***any*** other information. This is a landmark civil rights issue for which the public's right of access is at an apex. Harvard's position should be seen for what it is—an effort to shield its actions from public review and a request that this Court rule on a record not available to the public. This unwarranted stance should be rejected.

## PROCEDURAL HISTORY

On March 14, 2018, the Court issued an order directing the parties to "meet and confer regarding the treatment of confidential materials to narrow the areas of dispute" and to "file letter briefs on the outstanding issues by March 30, 2018." At Harvard's suggestion, SFFA reviewed the documents and information produced by Harvard on a category-by-category basis to determine which summary judgment documents (if any) should be filed under seal or redacted.

On March 16, SFFA informed Harvard that it would not file on the public docket any document that would "reveal the identity of any Harvard applicant or Harvard student." SFFA explained, however, that this would implicate few documents given that Harvard has produced nearly all such information in redacted form (such that SFFA does not even have access to it). SFFA also made clear that if "limited redactions are needed to ensure that Harvard applicants or Harvard students are not identified, SFFA will work collaboratively with Harvard in advance of summary judgment to ensure those redactions are made."

SFFA informed Harvard that it had identified seven categories of documents that might be used in its summary judgment filing: (1) tabulated admissions data (*e.g.*, documents summarizing historical admissions rates); (2) summaries and other compilations based on the database produced by Harvard (*e.g.*, aggregate information about the applicant and admitted pools of students to Harvard); (3) internal reports created by Harvard; (4) emails from or to Harvard admissions officers and other Harvard employees; (5) documents related to the admissions process; (6) deposition transcripts; and (7) the expert reports. SFFA concluded that given Harvard's heavy burden to prevent public access to documents filed in conjunction with a summary judgment motion, it was unlikely that any of these categories of documents could be sealed. If Harvard disagreed, SFFA requested that Harvard "specifically identify which category or categories of documents include material that Harvard will seek to have sealed and the legal basis for each request."

---

[1] Indeed, SFFA does not even have access to most of this information, as Harvard already has redacted all personally identifiable information of applicants, alumni, and donors, as well as information concerning the University's business that it deems irrelevant. Harvard also has withheld all personally identifiable information from the database it produced to SFFA.

SFFA did not hear back from Harvard until March 22—six days later. Harvard rejected SFFA's proposal, stating that SFFA's categories contain "volumes of sensitive personal and business information" and "information that can be used to ascertain the identities of Harvard applicants and students." Harvard promised to provide "a more reasonable approach next week," but did not identify any document it believed could properly be sealed or any supporting cases.

SFFA responded on the same day, reiterating that it would "work with Harvard to redact any document to ensure applicants and students are not individually identifiable." SFFA also emphasized that it was unaware of any document containing "sensitive business information" that could possibly satisfy the heavy burden for filing under seal at the summary judgment stage. Nevertheless, SFFA maintained that it was "open to being convinced otherwise," urged Harvard to identify the types of documents that it believed should be filed under seal, and noted its availability that week and over the weekend to discuss the issues.

Five days later, on March 27, Harvard proposed for the first time that the parties "file their summary judgment papers and supporting documents under seal" and then set a "reasonable schedule thereafter—with first priority given to the briefs themselves—for determining the parties' positions on which documents should (1) remain entirely sealed, (2) be redacted, or (3) be filed publicly." As to the substance of the documents, Harvard stated that it was "continuing to evaluate … whether we can agree to any of what you have proposed" and that it might be available for a meet and confer on Thursday, March 29. Once again, Harvard identified no document it believed could properly be sealed on a motion for summary judgment and no cases supporting its position.

On March 28, SFFA explained to Harvard that its proposal "to issue a blanket sealing order and then to determine later whether any documents were properly sealed is untenable and finds no support in the case law," that the proposal was not consistent with the Court's instructions, and that it was especially improper "given that Harvard has yet to identify a single document that could be properly filed under seal." The proposal also would "deny amici curiae access to the record and briefs and thus prevent them from participating in this case."

On March 29, the parties met and conferred by phone. Harvard maintained its position that all summary judgment briefs and record materials should be filed under seal first. Despite SFFA's requests, Harvard again declined to identify any document that it believed could meet the standard for being filed under seal.

## BACKGROUND LAW

There is a "longstanding tradition of public access to trials and pre-trial motions in our judicial system—a tradition that is protected both by the common law and the First Amendment." *Bradford & Bigelow*, 109 F. Supp. 3d at 447 (citing *Nixon v. Warner Comm'ns*, 435 U.S. 589, 597 (1978)). This tradition endures because "[p]ublic access to judicial records and documents allows citizenry to monitor the

functioning of our courts, thereby insuring quality, honesty and respect for our legal system." *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987) (citation omitted); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1070 (3d Cir. 1984) (explaining that access "enhances the quality and safeguards the integrity of the factfinding process. It fosters an appearance of fairness, and heightens public respect for the judicial process. It permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government"); *Lugosch*, 435 F.3d at 119 ("[P]rofessional and public monitoring is an essential feature of democratic control."). It also is "driven by administrative concerns," given that the court "expends considerable resources to process and maintain sealed documents." *Bradford & Bigelow, Inc.*, 109 F. Supp. 3d at 447 (citing *Dunkin Donuts v. Agawan Donuts*, No. 07-cv-11444, 2008 WL 427290, at *1 (D. Mass. Feb. 13, 2008)).

The common law and the First Amendment both apply here. The common law right of access applies to all "judicial records and documents." *Nixon*, 435 U.S. at 597; *see United States v. Kravetz*, 706 F.3d 47, 58-59 (1st Cir. 2013). The First Amendment right attaches "to particular judicial records such as documents filed in connection with summary judgment motion in civil cases." *Erichsen v. RBC Capital Markets, LLC*, 883 F. Supp. 2d 562, 574 (E.D.N.C. 2012); *see also Doe v. Pub. Citizen*, 749 F.3d 246, 267 (4th Cir. 2014) ("We have squarely held that the First Amendment right of access attaches to materials filed in connection with a summary judgment motion."); *Mangosoft, Inc. v. Oracle Corp.*, No. 02-cv-545, 2005 WL 2203171, at *2 (D.N.H. Sept. 9, 2005). Thus, "documents submitted to a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment." *Lugosch*, 435 F.3d at 121; *Bradford & Bigelow*, 109 F. Supp. 3d at 448.[2]

As a result, "only the most compelling reasons can justify non-disclosure" of these records. *In re Providence Journal Co.*, 293 F.3d 1, 9 (1st Cir. 2002) (quoting *Standard Fin. Mgmt.*, 830 F.2d at 410); *see, e.g.*, *Hilsinger Co. v. Eyeego, LLC*, No. 13-cv-10954, 2014 WL 5475032, at *1 (D. Mass. Oct. 29, 2014). For example, "the statement that 'this proprietary and confidential information, if publicly disclosed, would provide competitors of the Defendant and Defendant's vendors an unfair advantage' without more is not enough to override the common law and First Amendment rights of the public to review court documents." *Shamblin v. Obama for America*, No. 13-2428, 2014 WL 6065752, at *2 (M.D. Fla. 2014). Harvard, therefore, "must establish an overriding interest in sealing and must ensure that any sealing is narrowly tailored to shield as little from public view as possible." *Bradford & Bigelow*, 109 F. Supp. 3d

---

[2] Even if, as Harvard has suggested, Doc. 386 at 24-25, the presumption of access is stronger at trial than at summary judgment, the distinction is semantical here. The strongest possible presumption of access applies not only to trial documents, but also to those documents "that will be included in an appellate record." *Bradford & Bigelow*, 109 F. Supp. 3d at 448 (citing *Poliquin*, 989 F.2d at 533). The documents at issue will be part of the appellate record and play a central role in the appeal no matter which party ultimately prevails before this Court. In all events, then, "the public interest is strongest (and the burden to overcome it the highest) for [the] documents" in dispute. *Id.*

at 449. Harvard "must explain, on a document-by-document basis, why sealing is required and how their request satisfies the applicable legal standard." *Id*. at 447.[3]

**ARGUMENT**

**I.  Harvard Has Not Satisfied Its Burden To Withhold "Sensitive Business Information" Contained in Summary Judgment Filings from the Public Record.**

Despite repeated requests from SFFA to identify specific documents (or even categories of documents) that should be sealed, Harvard broadly asserts that there are "volumes of sensitive … business information" that should be withheld from the public. Given the high public interest in this case and the strong presumption of public access, Harvard cannot show "the most compelling reasons [necessary to] justify non-disclosure" of these records. *In re Providence Journal Co*., 293 F.3d at 9.

**A.  The public has a strong interest in this case.**

As explained above, the public has an important interest in "access to judicial records and documents" in ***all*** cases. *See Standard Fin. Mgmt.*, 830 F.2d at 410. But access to judicial records is especially vital where the case "involves issues important to the public." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 788 (3d Cir. 1994). This is one of those cases.

First, this is a civil rights case. "The public has a profoundly important interest in giving force to the federal civil rights law." *Floyd v. City of New York*, 739 F. Supp. 2d 376, 381 (S.D.N.Y. 2010). When "a lawsuit involves a matter of public concern such as civil rights," that is "a factor that will usually support disclosure." *Id*.; *see, e.g.*, *Price v. Equilon Enterprises LLC*, No. 11-1553, 2012 WL 12846100, at *1 (W.D. Wash. Nov. 20, 2012) ("This case involves allegations of gender- and sexual orientation-based discrimination at a lab of a prominent global company. The public has an interest and right to access the documents that bear on these allegations."); *Bullard v. Goodyear Tire & Rubber Co*., No. 09-4024, 2011 WL 5248085, at *2 (D. Kan. Apr. 12, 2011) ("The accusations found in the plaintiff's employment record, as well as the evidence surrounding these alleged events, are central issues in the pending summary judgment proceeding of this employment discrimination case. The public certainly is entitled to know why, how and on what basis the court decided the summary judgment motion.").

Second, this is a civil rights case about the use of racial preferences in college admissions. These cases generate enormous public interest. *See, e.g.*, Supreme Court Docket, *Fisher v. University of Texas*, No. 11-345 (S. Ct.) (98 amicus briefs); Supreme Court Docket, *Fisher v. University of Texas*, No. 14-981 (92 amicus briefs); Supreme

---

[3] Thus, if the Court agrees with Harvard's position, it will have to independently review each document to decide what (if any) redactions to permit. That will be a significant undertaking given that Harvard's position implicates nearly every relevant document. *See infra* at 12-13.

Court Docket, *Grutter v. Bollinger*, No. 02-241 (98 amicus briefs). This case (in which SFFA alleges, *inter alia*, that Harvard—one of the oldest, wealthiest, and most prestigious universities in the world—is discriminating against Asian Americans) is no exception. *See, e.g.*, Jeannie Suk Gerson, *The Uncomfortable Truth About Affirmative Action and Asian-Americans*, The New Yorker (Aug. 10, 2017); Anemona Hartocollis & Stephanie Sau, *Affirmative Action Battle Has a New Focus: Asian-Americans*, N.Y. Times (Aug. 3, 2017); Nicole Hong, *Lawsuit Accusing Harvard of Anti-Asian Bias Revives Scrutiny of Affirmative Action*, Wall St. J. (Aug. 3, 2017). The public's interest in these cases is one of the reasons why "minority admissions schemes" must be "transparent and protective of individual review." *Grutter v. Bollinger*, 539 U.S. 306, 394 (2003) (Kennedy, J., dissenting). It is the only way to ensure that "[p]rospective students, the courts, and the public" can be confident that university admissions policies are "fair and constitutional in every phase of implementation." *Id.*

Third, Harvard annually receives more than half a *billion* dollars from the federal government. Harvard Univ., 2017 Fiscal Report 6, https://goo.gl/hjsmbx. Quite naturally, "the public's interest in the judicial record is especially acute where—as here—the government has subsidized the good or service underlying the litigation from the public fisc." *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 712 (7th Cir. 2015). The public has a right to know, after all, whether the substantial money that Harvard receives from them is being used for illegal purposes. Accordingly, "a party that is subsidized by the public fisc and that seeks to seal portions of the record must satisfy a higher burden than a party that receives no government subsidy must satisfy in order to achieve the same result." *Id.* at 712-13.

### B. Harvard cannot overcome the strong presumption of public access that applies to this case.

Harvard argues that information about the process through which it admits its students is highly confidential business information. That is incorrect. First, Harvard's information is not a trade secret or anything like one. Even if it were, Harvard has so extensively disclosed the information as to forfeit any protection to which it might otherwise have been entitled. Second, even if the information were a trade secret, the public's interest in disclosure here outweighs Harvard's interest in confidentiality. If Harvard is correct, then nearly every relevant document in this case will have to be sealed. The Court "cannot hold a fair hearing on the summary judgment motion while the key documents are still under seal." *California ex rel. Lockyer v. Safeway, Inc.*, 355 F. Supp. 2d 1111, 1126 (C.D. Cal. 2005).

#### 1. Harvard's admissions process is not a trade secret or confidential business information.

The information that Harvard seeks to keep from the public is not protectable. Although Harvard was unwilling to explain the basis for its position during the meet-and-confer process ordered by the Court, it appears from previous correspondence between the parties that Harvard wants to seal what it refers to as "trade secret and/or commercially sensitive information" and "confidential business information

and practices." The documents Harvard is referring to are those that could reveal: "how readers or other evaluators determine and assign different ratings and scores; the meaning of specific numerical scores or when specific scores are assigned to particular types of applicants; how Harvard calculates the academic index score; how Harvard classifies the race of applicants; the names and meanings of specific codes or labels assigned to applicants by readers, and how readers assign them; and details about how Harvard retains applicant records and information." In other words, Harvard appears to believe that the manner in which it conducts its undergraduate admission process—*i.e.*, the very subject of this litigation—should be kept secret.

That argument fails under controlling precedent. To qualify for protection under the common law and the First Amendment, the information must be akin to a trade secret. "'Simply showing that the information would harm the company's reputation is not sufficient to overcome the strong common law presumption in favor of public access to court proceedings and records .... Indeed, common sense tells us that the greater the motivation a corporation has to shield its operations, the greater the public's need to know. In such cases, a court should not seal records unless public access would reveal legitimate trade secrets, a recognized exception to the right of public access to judicial records.'" *In re Gitto Global Corp.*, No. 05-cv-10334, 2005 WL 1027348, at *10 (D. Mass. May 2, 2005) (quoting *Brown & Williamson Tobacco Co. v. FTC*, 710 F.2d 1179-80 (6th Cir. 1983)).[4]

In other words, the fact that the business information is kept confidential is insufficient. As the Third Circuit has explained, "documents do not contain trade secrets merely because they are confidential." *Littlejohn*, 851 F.2d at 685. "A trade secret," under the Restatement, "consist[s] of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Harvard Apparatus, Inc. v. Cowen*, 130 F. Supp. 2d 161, 174 (D. Mass. 2001) (citations omitted). Many courts apply this definition in deciding whether to impound judicial documents. *See, e.g.*, *Apple Inc. v. Samsung Electronics Co.*, 727 F.3d 1214, 1221 (Fed. Cir. 2013); *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313 n.13 (11th Cir. 2001). It is the definition under Massachusetts law as well. *See Take It Away, Inc. v. Home Depot, Inc.*, 374 F. App'x 47, 50 (1st Cir. 2010).

Harvard cannot show that the manner in which it conducts admissions is akin to a trade secret. There is nothing special about the factors Harvard claims to use in making admissions decisions. There is no unique element; no special formula. That is why Harvard openly proclaims that "[t]here is no formula for gaining admission to

---

[4] To the extent that the Freedom of Information Act imposes a lower standard for protecting business information, it is irrelevant here. *See Brown & Williamson Tobacco Corp.*, 710 F.2d at 1177 ("It is clear that [FOIA] was not intended to restrict the federal courts—either by mandating disclosure or by requiring non-disclosure—under the § 552 exemptions."); *see, e.g.*, *Long*, 2011 WL 2490950, at *2 ("Fairbank is correct that FOIA standards are inapposite."). This is not a FOIA dispute and, in any event, the right of access here is partially grounded in the Constitution.

Harvard." *What Admissions Criteria Do You Use*, Harvard College, https://college.harvard.edu/what-admissions-criteria-do-you-use.

True, different universities presumably weigh different factors differently. And, at least in theory, Harvard may not want others to know which attributes it values most. *But see infra* at 10-11. That does not make the information proprietary, however. If it did, the record in most Title VII cases would need to be sealed. Every employer has slightly different criteria for hiring and promotion. If those variations were proprietary, then the federal courts would be brimming with impounded documents. But SFFA has been unable to locate any case in which this kind of decisional criteria—admissions, hiring, promotion, tenure, and the like—has been sealed as a trade secret. Indeed, none of this information was sealed in analogous cases. *See, e.g.*, *Gratz v. Bollinger*, 539 U.S. 244, 255-57 (2003); *Grutter*, 539 U.S. at 315-16; *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 305-07 (2013). Harvard even submitted a copy of its admissions plan in *Regents of University of California v. Bakke*, 438 U.S. 265, 321 (1978) (Appendix to opinion of Powell, J.).

But even if the Court deems "confidential business information"—as opposed to trade secrets—eligible for impoundment, Harvard's request still fails. "[I]mplicit in the notion of 'confidential business information' is something beyond the mere fact that the particular datum has not previously been made available to the public." *Salomon Smith Barney, Inc. v. HBO & Co.*, No. 98-721, 2001 WL 225040, at *3 (S.D.N.Y. Mar. 7, 2001). Harvard cannot meet this test. Harvard, of course, is a nonprofit—not a business—and thus does not speak of its admissions process in commercial terms. Regardless, Harvard appears concerned that **applicants** will learn more about its admissions system. But "confidential business information" is impounded to prevent competitive harm. *See Nixon*, 435 U.S. at 598; *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 166 (3d Cir. 1993); *Apple Inc.*, 727 F.3d at 1221. Applicants do not compete with Harvard—they compete with each other. Nor do other universities compete with Harvard at the admissions stage. Some compete with Harvard for **admitted** students. But they do not compete with Harvard in selecting students for admission, at least if they are being honest about admissions criteria being set in accordance with their academic mission and unique institutional values.

At most, then, disclosing these records will give Harvard's "customers" some additional information about the "product" Harvard sells. That is not competitive information. But even if it were, giving applicants access to truthful information about the details of Harvard's admissions system will cause Harvard no more competitive **harm** than informing consumers about the quality of an article of commerce they may purchase—which is to say none. The disclosure here simply is not sought to "gain unfair commercial advantage." *FTC v. AbbVie Prods.*, 713 F.3d 54, 62 (11th Cir. 2013).[5]

---

[5] During the discovery process, the Court raised the concern that certain information might give "Mr. Blum's kid or his neighbor's kids or everybody he knew … an advantage in the admissions process." Hearing Tr. at 25 (Sept. 6, 2016). Even if there were such special information, *but see infra* 10-11, no competitive advantage could be gained from public access to the summary judgment filings because **everyone** (not just those connected to Mr. Blum) would have access to them. In any event, the

Regardless, Harvard has not kept information about its admissions process confidential. Far from it, Harvard has made public all of the key details about its admissions system. Much of it was disclosed in the Department of Education's 1990 report on Harvard's admissions process. Further, the information has been repeatedly disclosed through the press (often by Harvard itself). Examples include:

- Stephen M. Marks, *"Stairway to Harvard,"* Harvard Crimson (July 7, 2006) (describing, *inter alia*, that "[b]oth readers score the applicant using a 1-to-6 scale on academics, extracurriculars, athletics, personal qualities, and an overall composite rating; the subcommittee and committee refer to these scores in their deliberations.").

- Malcolm Gladwell, *Getting In: The Social Logic of Ivy League Admissions*, The New Yorker (Oct. 10, 2005) ("By the nineteen-sixties … [Harvard] began by lumping all applicants into one of twenty-two dockets, according to their geographical origin. There was one docket for Exeter and Andover, another for the eight Rocky Mountain states. Information from interviews, references, and student essays was then used to grade each applicant on a scale of 1 to 6, along four dimensions: personal, academic, extracurricular, and athletic.").

- Dan Rosenheck, *Keys to the Kingdom,* Boston Magazine (Nov. 2005) (revealing "admissions officers start by assessing each applicant in four areas (academics, extracurriculars, personal qualities, and athletics) on a scale of one (best) to six (worst). Those who pass this initial threshold move forward to a second and sometimes third reader for further appraisal.").

- William R. Fitzsimmons, *Guidance Office: Answers from Harvard's Dean, Part 1*, N.Y. Times (Sept. 10, 2009), https://goo.gl/SxAWze (describing in great detail Harvard's admissions process in a four-part Q&A with Dean Fitzsimmons).

- On Harvard Time, *Harvard Admissions Dean Interview*, https://goo.gl/4G1fXn (video interview with Dean Fitzsimmons revealing, *inter alia*, that Harvard looks for applicants who have a "distinguishing excellence").

- David Dent, *Conversations on Admitting: One-on-One with Harvard Admissions Officer*, HuffPost (Dec. 16, 2017) (Harvard admissions officer revealing that "we're looking for what we call a distinguishing excellence going through this process").

- Elizabeth Heaton, *What Kind of Hook Do I Need to Get Accepted to an Ivy League College?*, HuffPost (Apr. 10, 2017) (revealing that "a distinguishing excellence, or DE, represents significant achievement in a particular field").

- Ishan Puri, *How to Get Accepted by Harvard*, Synocate (Jan. 11, 2016) (explaining that Harvard divides "high schools ... geographically to a specific

---

Court was discussing what label certain documents could be given under the protective order during discovery—not what documents could be sealed at summary judgment or trial. *See infra* 14-15. The notion, for example, that Mr. Blum—the President of the entity that has brought this litigation—could be excluded from attending the trial is absurd.

admissions officer responsible for certain regions," "each person will make comments and assessments before they send to someone else," after "the first admissions officer reads your application, he/she will send your application to more senior people," and that "admissions officers then meet at the regional level, make initial recommendations (around 4-12 people), and then meet with the full committee (including the dean and all 40 admissions officers) to discuss these cases").

- *Ivy League Admissions Are a Sham: Confessions of a Harvard Gatekeeper*, Gawker (Mar. 18, 2015) (quoting from the Harvard Interviewer Handbook).

- Princeton Review, *The Truth About Harvard: A Behind-the-Scenes Look at Admissions and Life on Campus* 14-24 (2004) (describing "how the admissions office reads your file," how admissions officers are assigned by "dockets," how offers are made through early decision, regular decision, waitlist, and the Z-List, how Harvard "decide[s] whom to accept," how Harvard awards "special preference" to legacies, recruited athletes, and minorities, and how Harvard uses teacher and guidance counselor recommendations and alumni interviews); *see id*. at 210-212 (identifying additional public sources detailing Harvard's admissions process).

Obviously, it is not "confidential business information" if Harvard has already publicly revealed the substance of it. *See, e.g.*, *Sam's Riverside, Inc. v. Intercon Sol'ns, Inc.*, 790 F. Supp. 2d 965, 971 n.2 (S.D. Iowa 2011) ("[T]he Court concludes that it is not necessary to seal this opinion, as it contains no information that the Court deems to be confidential. Indeed, some of the documents that the parties filed under seal do not appear to be confidential in any way."). Nor is it commercially sensitive if Harvard is so willing to discuss it in the press when it suits its interests. Seeking impoundment here is about impeding public scrutiny of Harvard's admissions process—not about protecting Harvard from unfair competition.

### 2. The interest in public access outweighs any marginal interest in confidentiality Harvard might possess.

But even if information about Harvard's admissions process were eligible for impoundment, that would not mean that the records in dispute necessarily should be sealed. That is just the beginning of the inquiry. The issue is "whether the need for secrecy **outweighs the presumption of access that normally attaches to such documents.**" *Leucadia, Inc.*, 998 F.2d at 166 (emphasis added). The Court still "must carefully balance the competing interests that are at stake in the particular case." *Hansen v. Rhode Island's Only 24 Hour Truck & Auto Plaza, Inc.*, 863 F. Supp. 2d 122, 123 (D. Mass. 2012) (citation omitted). In so doing, the Court must consider "the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Lugosch*, 435 F.3d at 121. The need for access here outweighs Harvard's interest in secrecy.

This information goes to the heart of the case. A key issue in dispute is whether Harvard is manipulating its admissions system in ways that violate Title VI. That issue

has been the subject of extensive document production, internal communications and reports, dozens of depositions, and the expert reports. It would be impossible for the public to understand whether Harvard's admissions system—especially the pivotal internal mechanisms used to sort and advance applicants through the process—is being manipulated if they are prevented from knowing how the system is supposed to work in the first place. How can the public know, for example, whether Asian Americans are discriminated against by not being deemed as having a "distinguishing excellence" if they do not know what Harvard claims to be the neutral criteria for achieving that status in the application process?

*Gratz* illustrates the point. There, it was important to the outcome that being an underrepresented minority was worth 20 out of 150 points in the University of Michigan's undergraduate admissions system. *See Gratz*, 539 U.S. at 255. In addition to constituting an important predicate fact, this information also placed the size of the preference in context both as a percentage of the overall score, *see id.* at 270 ("We find that the University's policy, which automatically distributes 20 points, or one-fifth of the points needed to guarantee admission, to every single 'underrepresented minority' applicant solely because of race, is not narrowly tailored to achieve the interest in educational diversity that respondents claim justifies their program."), and as an indicator of how much comparative value the university attributed to it, *see id*. at 278 (O'Connor, J., concurring) ("Most importantly for this case, an applicant automatically receives a 20-point bonus if he or she possesses any one of the following 'miscellaneous' factors: membership in an underrepresented minority group; attendance at a predominantly minority or disadvantaged high school; or recruitment for athletics."). There is no way the public could have understood the dispute if the facts—that Michigan used a point system, that being an underrepresented minority garnered certain points, that it was worth the same number of points as being a recruited athlete, or any combination of these facts—had been hidden.

The centrality of this information also creates practical problems. If Harvard's sweeping position were accepted, then SFFA anticipates that nearly every document it intends to introduce in support of summary judgment would need to be redacted or filed under seal. The expert reports would need to be substantially redacted, as would the documents Harvard produced in discovery that describe its admission process. But so too would the internal documents Harvard uses to sort, review, and advance applicants through its process. And that is just the beginning. The nature of Harvard's system was a topic of most of the depositions as well; thus, substantial portions of those transcripts would need to be redacted too. In all likelihood, almost the entire summary judgment record would need to be redacted to one degree or another. *See Young v. Liberty Mut. Grp. Inc*., No. 12-cv-2302, 2014 WL 6886018, at *2 (D. Ariz. Dec. 5, 2014) ("[B]ecause Plaintiff's case largely centers on her medical condition and various medical examiners' opinion of it, to allow all materials containing Plaintiff's medical information to be filed under seal would effectively seal the entire case, and, thus, would infringe too extensively on the public right to access court records") (citation omitted). It would not only be an administrative nightmare for the Court, but it would ignite collateral litigation over each document.

Worse still, this effort all would be for naught unless the Court is prepared to hold the trial in secret or, if summary judgment is granted, the Court believes that the First Circuit and the Supreme Court will adopt the same approach for the appellate briefing and arguments. That seems highly unlikely based on controlling law. It is unrealistic to think that the trial (if necessary) and appeals will be held in secret. One way or another, then, these documents will become public in the near future. There is no justification for delaying public access—especially given how central summary judgment is to the adjudicatory process. Broadly impounding documents that will be publicly disclosed months later is senseless.

Finally, even if the competing interests were at equipoise, the importance of this case must tip the balance in favor of disclosure. As noted, this is an important and closely watched civil rights case. The public has a right to know exactly what is going on at Harvard. Even if this were a commercial issue—as Harvard would like to portray it—the public would have a right to know if the product is defective or if a fraud is being perpetrated. *Cf. Cipollone v. Liggett Group, Inc.*, 113 F.R.D. 86, 87 (D.N.J. 1986) ("Discovery may well reveal that a product is defective and its continued use dangerous to the consuming public. The public disclosure of that information will certainly embarrass that party and cause it financial loss. It is inconceivable to this court that under such circumstances the public interest is not a vital factor to be considered in determining whether to further conceal that information and whether a court should be a party to that concealment."); *Pub. Citizen*, 749 F.3d at 271 ("We are not blind to the fact that a corporation's image or reputation may diminish by being embroiled in litigation … over the safety of one of its products. That is the nature of public litigation."). The public interest in disclosure is equally (if not more directly) implicated here. The Court's evaluation of whether Harvard invidiously discriminates against Asian-American applicants or whether it otherwise systematically violates Title VI cannot be shrouded in secrecy. Harvard's position should be rejected.

## II. Harvard's Request for a Blanket Sealing Order Is Improper.

No doubt recognizing the heavy burden it faces, Harvard attempts to end-run the appropriate process by proposing that the Court issue a blanket sealing order covering all summary judgment briefs and materials, and then determine **later** if the documents were properly sealed. This approach is untenable and finds no case law support.

To begin, courts roundly reject the type of blanket sealing order Harvard seeks here. "A blanket sealing order would rarely, if ever, be appropriate…. Until either party demonstrates the existence of extraordinary circumstances or a compelling need to seal from public view any particular portion of any specific document filed in this case," the Court cannot "depart from the governing strong presumption of open access." *Landmark Am. Ins. Co. v. Magoo's II, Inc.*, 2007 WL 3023265, at *1 (D. Conn. Oct. 12, 2007); *see Pub. Citizen*, 749 F.3d at 267, 270 (rejecting the "wholesale sealing of the parties' summary judgment motions and accompanying materials"). "Broad and general findings by the trial court … are not sufficient to justify closure." *Matter of New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987). The Court can grant a motion

to seal only after engaging in "a careful document-by-document review of the particular portions of the document that a party wishes to be kept under seal and after considering whether the requested order is no broader than necessary to serve the interests that require protection." *Landmark Am. Ins.*, 2007 WL 3023265, at *1.

Indeed, to date, Harvard has "cite[d] no case law and offer[ed] no argument warranting what would be, in essence, an anticipatory and wholesale sealing of an entire motion for summary judgment and all exhibits. Such a request is unduly broad and inconsistent with established case law and the local rules of this court." *Thomas v. Delmarva Power & Light Co.*, No. 15-cv-433, 2016 WL 9685172, at *2 (D. Md. Nov. 1, 2016); *see id*. at *1 n.1 (denying request that "plaintiff be required to file its response and exhibits under seal, to the extent they contain designated confidential information"); *Florence v. Cenlar Fed. Sav. & Loan*, No. 16-587, 2017 WL 1078637, at *1 (D. Nev. Mar. 20, 2017) ("[T]he parties acknowledge that some of the documents they have filed under seal are not confidential. This kind of blanket approach is incompatible with the applicable standards established by controlling Ninth Circuit authority."). Such a blanket order is especially improper here because Harvard, for good reason, has not identified **any** document that deserves to be sealed.

Nor does it matter at this stage that many of the documents Harvard wants to seal were (presumably) subject to the protective order for discovery purposes. While Harvard "might well consider many of those documents 'confidential,' and while a substantial number of them may fall within the scope of the pre-trial discovery protective order, those factors alone are not sufficient to warrant sealing the entire summary judgment record in this case." *Mangosoft*, 2005 WL 2203171, at *1; *see also Bradford & Bigelow*, 109 F. Supp. 3d at 448 ("The 'good cause' that justifies an umbrella protective order at the discovery stage (and allows such designations) is not sufficient to meet the heightened standard to seal filings about dispositive motions or trial …. Parties therefore may not rely solely on their designations under a discovery protective order to support sealing motions; they must show that each document they seek to seal should be sealed under the appropriate standard.") (citations omitted). That is why, in issuing the protective order, the Court made clear that it would not dictate the standard for redacting material at summary judgment or dictate what (if any) portions of the trial proceedings would be sealed. *See* Doc. 55 at 1; Hearing Tr. at 26-27 (Sept. 6, 2016) (Harvard counsel agreeing). The Court understood that "[t]he parties' ability to label information 'confidential' in the discovery process was never intended to transform litigation in a public forum into a proceeding where all trial related motions, some of them potentially dispositive, are shrouded in secrecy with intensive redactions and purported seal orders." *Gratz College v. Synergis Educ. Inc.*, No. 14-cv-06966, 2015 WL 9582743, at *2 (E.D. Pa. Dec. 30, 2015).

Nor does Harvard's proposal to "seal now, review later" comport with the common law or First Amendment. "[D]ocuments submitted to a court in support of or in opposition to a motion for summary judgment are judicial documents to which a presumption of **immediate public access** attaches under both the common law and the First Amendment." *Lugosch*, 435 F.3d at 126 (emphasis added). "Indeed, for the presumptive right to be suspended or nonexistent until after the judge has ruled on a

motion, would be to impair the important interest in contemporaneous review by the public of judicial performance." *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 101 F.R.D. 34, 43 (C.D. Cal. 1984). "The public's interest in monitoring the work of the courts is subverted when a court delays making a determination on a sealing request while allowing litigation to proceed to judgment in secret.... Because the public benefits attendant with open proceedings are compromised by delayed disclosure of documents, … the public and press generally have a contemporaneous right of access to court documents and proceedings when the right applies." *Pub. Citizen*, 749 F.3d at 272.

Harvard's proposal, in short, is "effectively a denial of any right to contemporaneous access—where '[e]ach passing day may constitute a separate and cognizable infringement of the First Amendment.'" *Lugosch*, 435 F.3d at 126 (quoting *Grove Fresh Distrib., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994)). Even in cases where the parties agree to such a process and in which commercially sensitive information is arguably at issue, courts have prioritized the importance of public access. *See, e.g.*, *Mangosoft*, 2005 WL 2203171, at *2. Not only would the public be denied contemporaneous access, but those individuals and groups seeking to participate in this case as *amici curiae* would effectively be prohibited from doing so, as they would lack access to the briefs and record materials.

\* \* \*

It is understandable that Harvard wants this case to be litigated in secret. The allegations against it are serious and the evidence produced in discovery is powerful. Yet that does not mean that the public should be kept in the dark. Quite the opposite. The public has a right to know whether Harvard—an educational institution receiving half a billion dollars a year from the federal government—is systematically violating Title VI of the Civil Rights Act. Harvard's broad and vague assertions that volumes of documents in the record contain "sensitive business information" cannot override the "presumption of *immediate public access* … under both the common law and the First Amendment." *Lugosch*, 435 F.3d at 126. Harvard's request for a blanket sealing order should be denied.

Respectfully submitted,

*/s/ William S. Consovoy*
William S. Consovoy

cc: ECF recipients