**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

STUDENTS FOR FAIR ADMISSIONS, INC.,

Plaintiff,

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION),

Defendant.

Civil Action No. 1:14-cv-14176-ADB

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff Students for Fair Admissions submits the following statement of material facts as to which there is no genuine dispute for purposes of its Motion for Summary Judgment.

## TABLE OF CONTENTS

I. Parties and Key Individuals ..... 1

A. Plaintiff SFFA ..... 1

B. Defendant Harvard ..... 2

II. History of Harvard's Admissions Process ..... 5

A. The Creation of a Holistic Admissions Process to Discriminate Against Jews ..... 5

B. Harvard's Defense of Its Use of Race in Its Holistic Admissions System ..... 10

III. Harvard's Admissions Process ..... 13

A. Applying to Harvard ..... 13

B. Recruitment and Likely Letters ..... 13

C. Dockets ..... 14

D. Reading Procedures and Training ..... 15

E. Reading Applications and Assigning Numerical Ratings ..... 16

1. The Summary Sheet ..... 16

2. Scoring the Applications ..... 17

3. Evaluation from the Docket Chair ..... 21

F. Creating Target Numbers for the Subcommittees and the Full Committee ..... 22

G. Subcommittee Meetings ..... 24

H. Monitoring the Demographic Composition of the Class Through One-Pagers ..... 25

I. Full Committee Meetings ..... 26

1. Making Final Admissions Decisions ..... 26

2. Preventing Fluctuations from Year-to-Year and Fine-Tuning the Class ..... 27

J. Recruiting Admitted Students ..... 29

K. Waitlist ..... 29

L. Z-List ..... 30

IV. "Tips" in the Admissions Process ..... 30

A. The Role of "Tips" in the Admissions Process ..... 30

B. The Use of Race as a "Tip" in the Admissions Process ..... 31

1. Harvard's Reasons for Using Race in the Admissions Process ..... 31

2. Recording Race Through the Applications ..... 34

3. Harvard's Recruiting Efforts Vary by Race ..... 36

4. Reading Procedures and Training Regarding the Use of Race ..... 38

5. Harvard's Use of Race When Reading Applications and Assigning Numerical Ratings ..... 41

6. Reporting Early Action Admission Rates by Race during January ABAFAOILSS Meetings ........ 41

7. Creating Targets Based on Yield Rates by Race ........ 43

8. The Use of Race at Subcommittee Meetings ........ 45

9. Monitoring the Racial Makeup of the Class ........ 45

10. The Use of Race During Full Committee Meetings ........ 47

11. Use of Race in Recruiting Admitted Students. ........ 51

12. Reporting Admissions Decisions by Race at May ABAFAOILLS Meetings ........ 52

13. Race as a Factor in Waitlist Admissions. ........ 53

14. Racial Disparities on the Z-List ........ 53

C. The Use of Legacy Status in the Admissions Process ........ 54

D. The Use of Donations in the Admissions Process ........ 54

E. The Use of Staff and Faculty Preferences in the Admissions Process ........ 57

F. The Use of Athletic Ability in the Admissions Process ........ 57

V. Harvard's Knowledge of Its Discrimination Against Asian Americans ........ 58

A. Harvard's Knowledge of Complaints That Its Admissions Process Discriminates Against Asian Americans. ........ 58

1. Allegations of Asian-American Discrimination Made to the Office of Civil Rights ........ 58

2. Allegations of Asian-American Discrimination Made by Harvard Alumni Interviewers and Others ........ 61

B. Harvard's Internal Investigation Responding to Allegations of Discrimination Against Asian Americans. ........ 66

1. The Unz and Brooks Articles ........ 66

2. Harvard's Response to the Unz Article ........ 69

3. OIR's Findings of Bias Against Asian Americans ........ 72

4. The February 2013 OIR Report ........ 74

5. The "Admissions Part II" Report ........ 82

C. Harvard's Investigation into Tips for Low-Income Applicants ........ 91

1. OIR's Investigation into Tips for Low-Income Applicants ........ 91

2. OIR Sends Favorable Results to Dean Fitzsimmons ........ 92

3. OIR Warns of Preliminary Results Showing Discrimination Against Asian Americans ........ 94

4. The May 1, 2013 Memorandum ........ 95

5. The May 30, 2013 Report ........ 101

D. OIR Presents the Asian-American Bias Portion of the February 2013 Report to Senior Leaders ........ 103

E. Dean Khurana Receives the February 2013 Report and the May 1, 2013 Memorandum .... 104
F. The Testimony of Dean Fitzsimmons, Driver-Linn, Bever, and Dean Khurana .... 105
G. The Testimony of Mark Hansen. .... 109
H. Dean Fitzsimmons' Belief That He Acted "Vigilantly" .... 110
VI. Statistical Evidence of Asian Discrimination, Racial Preferences, and Racial Floors .... 111
A. The Collection and Analysis of Harvard's Admissions Data, Files, and Materials .... 111
1. SFFA's Econometrics Expert .... 111
2. Harvard's Admissions Data and Files .... 113
3. The Creation of Datasets for Analysis .... 113
B. Statistical Evidence of Bias Against Asian Americans by Harvard's Admissions Office .... 116
1. Descriptive Analysis of Bias Against Asian-American Applicants .... 116
2. Logistic Regression Analysis Confirms Bias Against Asian Americans .... 131
3. Regression Analysis Confirms Racial Bias in Both the Personal and Overall Ratings .... 132
4. Logistic Regression Analysis Confirms a Significant Penalty Against Asian Americans in Admissions Decisions .... 135
5. The Significant Increase in the Admission of Asian Americans If Harvard Treated Them Like White Applicants .... 137
C. Additional Statistical Evidence of Bias Against Asian Americans .... 139
1. Evidence of Bias in the Written Evaluations of Asian Americans .... 139
2. Evidence of Discrimination in Summary Sheets and Application Files .... 141
3. Stability in Asian-American Admissions Numbers .... 144
4. Stuyvesant High School: A Case Study in Bias .... 145
D. Harvard's Artificial Floor for African-American Admit Rates .... 151
E. Statistical Evidence Confirms That Harvard Awards Large Racial Preferences for African-American and Hispanic Applicants. .... 156
F. The Failure of Harvard's Expert to Rebut the Statistical Evidence .... 158
1. Professor Card's Unreliable Modeling Choices .... 159
2. The Finding of an Asian-American Penalty Through Small Modifications to Professor Card's Own Models .... 166
3. Professor Card Fails to Rebut the Statistical Evidence of a Floor on Single-Race African Americans .... 167
4. Professor Card's Finding of Substantial Racial Preferences .... 168
VII. The Availability of Race-Neutral Alternatives .... 168
A. Harvard's Failure to Conduct a Good-Faith Examination of the Availability of Race-Neutral Alternatives .... 168

1. Harvard Did Not Consider Race-Neutral Alternatives Until It Was Threatened with Litigation ..... 168

2. The Creation of the Ryan Committee After the Threat of Litigation ..... 171

3. The Abandonment of the Ryan Committee After the Initiation of Litigation ..... 172

4. The Creation of the Smith Committee at the Close of Discovery ..... 173

B. The Existence of Workable Race-Neutral Alternatives ..... 177

1. SFFA's Expert ..... 177

2. Harvard's Failure Even to Consider Race-Neutral Alternatives ..... 178

3. Harvard's Admissions Preferences Disproportionately Favor White and Wealthy Applicants. ..... 178

4. The Size of Preferences and Penalties in Admissions Decisions ..... 180

5. Simulations of Race-Neutral Admissions Policies ..... 181

6. Harvard's Rejection of These Race-Neutral Alternatives ..... 184

7. The Potential to Create Even Greater Racial and Socioeconomic Diversity ..... 187

# I. Parties and Key Individuals

## A. Plaintiff SFFA

1. Students for Fair Admissions, Inc. ("SFFA") is an Internal Revenue Code Section 501(c)(3) organization whose mission is "to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means." Ex. 193, SFFA-Harvard 0000059.[1]

2. SFFA is a voluntary membership association comprised of more than 21,000 people. SFFA's members include applicants and prospective applicants to institutions of higher education, along with their parents, and other individuals who share SFFA's mission. Ex. 234, SFFA Rog Resp. 9-12 (Aug. 4, 2017); *see, e.g.*, Ex. 194, SFFA-Harvard 0001939-40; Ex. 195, SFFA-Harvard 0001941-42; Ex. 196, SFFA-Harvard 0001953-54; Ex. 197, SFFA-Harvard 0001995-96; Ex. 198, SFFA-Harvard 0001997-98; Ex. 199, SFFA-Harvard 0001999-2000; Ex. 254, SFFA-Harvard 0001943-44; Ex. 255, SFFA-Harvard 0001945-46; Ex. 256, SFFA-Harvard 0001949-50; Ex. 258, SFFA-Harvard 0001955-56; Ex. 259, SFFA-Harvard 0001957-58; Ex. 260, SFFA-Harvard 0001959-60; Ex. 261, SFFA-Harvard 0001961-62.

3. SFFA has members who have applied to Harvard, were denied admission to Harvard through a system that employs race and/or ethnicity as a factor, and who would be ready and able to apply to transfer to Harvard if it were to cease its discriminatory practices. *See, e.g.,* Ex. 195, SFFA-Harvard 0001941-42; Ex. 197, SFFA-Harvard 0001995-96; Ex. 199, SFFA-Harvard 0001999-2000; Ex. 254, SFFA-Harvard 0001943-44; Ex. 255, SFFA-Harvard 0001945-46; Ex. 256, SFFA-Harvard 0001949-50; Ex. 258, SFFA-Harvard 0001955-56.

---

[1] Unless stated otherwise, all exhibit references are to the Declaration of Michael Connolly.

**B. Defendant Harvard**

4. Harvard College is a liberal arts college located in Cambridge, Massachusetts. Founded in 1636, it is the oldest institution of higher learning in the United States. Ex. 92, HARV00017147.

5. The President and Fellows of Harvard College (Harvard Corporation) ("Harvard") exercises fiduciary responsibility over Harvard College. Ex. 8, Faust 65:3-19.

6. The Office of Admissions and Financial Aid ("Admissions Office") is tasked with making admissions decisions to Harvard College. The Admissions Office employs approximately 40 admissions officers. Under the guidance of the office's leadership, these individuals handle the bulk of the day-to-day operations of recruiting students, reviewing applications, and determining which students to admit or deny. Ex. 31, HARV00001730-37; Ex. 34, HARV00003496-500.

7. The Office of Alumni Affairs and Development ("Development Office") is the chief fundraising office of Harvard. Individuals in the Development Office work with the Admissions Office when the children of donors or potential donors apply to Harvard. Ex. 9, Fitzsimmons 268:15-270:9.

8. The Office of Institutional Research ("OIR") is Harvard's internal research office. OIR's responsibilities include collecting, synthesizing, and analyzing Harvard's institutional data and producing reports to assist Harvard's leaders in their decisionmaking. OIR regularly performs analyses of admissions policies and practices. Ex. 8, Faust 69:16-70:8; Ex. 201, Hansen Ex. 1; Ex. 153, HARV00068151-174.

9. Harvard receives federal financial assistance and is covered by Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq*. Ex. 233, Harvard RFA #1.

**C. Key Harvard Administration Officials**

10. The President of Harvard is Drew G. Faust. President Faust is responsible for all aspects of the college's policies and operations, including admissions and financial aid. President Faust

has served in this role since 2007. She will be stepping down as president on June 30, 2018. Ex. 8, Faust 10:2-18; Ex. 215.

11.     The Dean of the Faculty of Arts and Sciences is Michael D. Smith. Dean Smith is responsible for providing oversight of the admissions and financial aid processes. Dean Smith has been the Dean of the Faculty of Arts and Sciences since 2007, and reports to the President. Dean Smith will be stepping down as Dean as soon as his successor is appointed. Ex. 22, Smith 10:11-13, 12:1-13:5, 14:10-11; Ex. 8, Faust 64:4-6; Ex. 23, Smith(2nd) 6:4-12.

12.     The Dean of Harvard College is Rakesh Khurana. Dean Khurana is responsible for the undergraduate education and residential experience of Harvard College students. Dean Khurana was appointed in July 2014. He reports to Dean Smith. Ex. 13, Khurana 11:4-24; 49:18-23.

13.     The Dean of Admissions and Financial Aid is William Fitzsimmons. Dean Fitzsimmons is responsible for the management and operation of the Admissions Office. Dean Fitzsimmons has served as the Dean of Admissions and Financial Aid since 1986. He reports to Dean Smith. Ex. 9, Fitzsimmons 33:23-34:21; Ex. 8, Faust 63:17-64:3.

14.     The Director of Admissions for Harvard College is Marlyn McGrath. Director McGrath is responsible for overseeing all aspects of the admissions process. She has served as Director of Admissions since 1987. She reports to Dean Fitzsimmons. Ex. 16, McGrath 9:2-8; 64:15-20.

15.     The Director of Financial Aid at Harvard College is Sally Donahue. Director Donahue is responsible for running the financial aid program and ensuring that financial aid awards are made in accordance with institutional and federal guidelines. Director Donahue has served as Director of Financial Aid since 2000. She reports to Dean Fitzsimmons. Director Donahue has announced that she will soon retire. Ex. 6, Donahue 15:2-16:15, 26:21-22; Ex. 23, Smith(2nd) 9:5-12.

16.     From 2007 through 2015, Elizabeth Yong was employed by the Admissions Office as the Special Projects Administrator for Admissions Policy, Operations, and Research. Ms. Yong was

responsible for maintaining Harvard's admissions databases and producing statistical reports and analyses when requested by Dean Fitzsimmons and others in the Admissions Office. Ms. Yong reported to Dean Fitzsimmons. Ex. 26, Yong 38:5-39:11; Ex. 16, McGrath 66:7-18.

17. The Director of the Office of Institutional Research is Erin Driver-Linn. Ms. Driver-Linn directs OIR in producing internal and external data reports and other research that informs Harvard's decision-making. Before joining OIR, Ms. Driver-Linn was Associate Director for Research at the Derek Bok Center for Teaching and Learning. She also taught in the Harvard Department of Psychology, where she received her PhD in experimental social psychology. Ms. Driver-Linn has approximately twenty years of experience performing statistical analysis. She has served as Associate Provost for Institutional Research since 2008. Ex.7, Driver-Linn 52:6-54:16, 68:14-70:2.

18. From 2008 through August 2014, the Assistant Director of OIR was Erica Bever. Ms. Bever graduated from Wellesley College in 2002 and then served for four years as a research analyst for McKinsey & Company. Ms. Bever then received a Master's in Higher Education from Harvard University before joining OIR. Ms. Bever reported to Ms. Driver-Linn. Ex. 2, Bever 22:2-23:12, 25:23-26:17, 28:22-29:24.

19. In August 2014, Ms. Bever became the Director of Research for Admissions and Financial Aid at Harvard. In this role, Ms. Bever is responsible for conducting statistical analysis of various aspects of Harvard's admissions process. She reports to Dean Fitzsimmons. Ms. Bever also serves as a senior admissions officer. Ex. 2, Bever 62:4-11, 64:25-65:4, 69:22-70:3,75:11-13.

20. Mark Hansen served as a Research Analyst at the Office of Institutional Research from July 2011 through July 2013. Mr. Hansen graduated from Boston University with a degree in pure and applied mathematics. He then received a Master's in Education from Harvard University. Mr. Hansen reported to Ms. Bever. [redacted]

[REDACTED] Ex. 10, Hansen 29:22-30:10, 40:2-8, 60:3-16.

## II. History of Harvard's Admissions Process

### A. The Creation of a Holistic Admissions Process to Discriminate Against Jews

21. Until the 1920s, Harvard selected its students by admitting applicants who passed a required examination. The size of the freshman class was dictated solely by the number of applicants who passed the exam. Ex. 239 at 1; Ex. 237 at 9-11.

22. In the early 1920s, however, Harvard's leaders, including President Abbott Lawrence Lowell, became increasingly alarmed by the growing number of Jewish students who were passing the required examinations and enrolling at Harvard. Ex. 240 at 1-3.

23. According to President Lowell, "the Hebrew question is a knotty one, and a source of much anxiety…. The summer hotel that is ruined by admitting Jews meets its fate, not because the Jews it admits are of bad character, but because they drive away the Gentiles, and then after the Gentiles have left, they leave also. This happened to a friend of mine with a school in New York, who thought, on principle, that he ought to admit Jews, but who discovered in a few years that he had no school at all…. In all these cases it is not because Jews of bad character have come; but the result follows from the coming in large numbers of Jews of any kind, save those few who mingle readily with the rest of the undergraduate body." Ex. 240 at 1.

24. To address this "problem," President Lowell preferred "to state frankly that we thought we could do the most good by not admitting more than a certain proportion of men in a group that did not intermingle with the rest, and give our reasons for it to the public. This would cause at once some protest, but would be recognized by reasonable people as the wise and generous thing." Ex. 240 at 2.

25.     President Lowell acknowledged, however, that a set quota on Jews would trigger opposition and resistance. Harvard's faculty and governing boards thus "would prefer to make a rule whose motive was less obvious on its face, by giving to the Committee on Admission authority to refuse admittance to persons who possess qualities described with more or less distinctness and believed to be characteristic of the Jews." Ex. 240 at 2.

26.     President Lowell wrote multiple letters in 1922 advocating for the adoption of a more flexible, subjective system—one that would allow Harvard to "reduce the number of Jews by talking about other qualifications than those of admission examinations." Ex. 242 at 1; *see* Ex. 241 at 1-2.

27.     By the spring of 1922, the proportion of Jewish students at Harvard had reached 21.5 percent. President Lowell warned that unless immediate measures were taken to limit the number of Jews, "the danger would seem to be imminent." Ex. 244, No. 24.1; Ex. 241, No. 19 at 1.

28.     In 1922, Harvard began asking applicants to identify their "race or color" and "religious preference." That year, Harvard also adopted a system for identifying which students were Jews. Those who were suspected of being Jewish were identified as "J.1," "J.2," or "J.3," depending on Harvard's determination of how likely they were to be Jewish. Ex. 243, Ex. 244.

29.     In 1925, President Lowell received an estimate of the number of Jews at Harvard based on the school's three classifications of Jews: "In accordance with your request, we have made a rough estimate of the number of Jews among the new students regularly admitted this year to the Freshman Class…. It appears that of a total of 881 new Freshmen … there are 239 men who come under the classification of Jews (*i.e.*, J.1 and J.2). This gives a percentage of 27.1 as compared with 21.5%, in 1922, the last time such an estimate was made. In addition to the above, there were 38 men, or 4.3% of the total, whom we place in the J.3 category." Ex. 244.

30.     President Lowell was also receiving letters from alumni castigating the school for being overrun by Jewish students. Among these letters was one from an alum who had attended a recent

Harvard-Yale football game and who complained vehemently about the number of Jews at Harvard: "Naturally, after twenty-five years, one expects to find many changes but to find that one's University had become so Hebrewized was a fearful shock. There were Jews to the right of me, Jews to the left of me, in fact they were so obviously everywhere that instead of leaving the Yard with pleasant memories of the past I left with a feeling of utter disgust of the present and grave doubts about the future of my Alma Mater." Ex. 245 at 1.

31.     The alum then recommended using the school's admissions program discretely to limit the number of Jewish students enrolling at Harvard: "The Jew is undoubtedly of high mental order, desires the best education he can get CHEAPEST, and is more persistent than other races in his endeavors to get what he wants. It is self evident, therefore, that by raising the standard of marks he can't be eliminated from Harvard, whereas by the same process of raising the standard 'White' boys ARE eliminated. And is this to go on? Why the Psychology Test if not to bar those not wanted? Are the Overseers so lacking in genius that they can't devise a way to bring Harvard back to the position it always held as a 'white man's' college?" Ex. 245 at 3.

32.     President Lowell responded that he had "foreseen the peril of having too large of a number of an alien race and three years ago I tried to prevent it," but that "[n]ot one of the alumni ventured to defend the policy publicly." President Lowell was "glad to see from your letter, as I have from many other signs, that the alumni are beginning to appreciate that I was not wholly wrong three years ago in trying to limit the proportion of Jews." Ex. 246 at 1.

33.     In November 1925, President Lowell continued to urge the adoption of policies to limit the number of Jews at Harvard: "A few years ago many of us thought the proportion of Jews in Harvard College was reaching a dangerous point. It was then 21.7%. In the present Freshman class it is 27.1%, so far as we can ascertain. The measures adopted at the time of the previous inquiry to remedy the situation have produced no effect." Ex. 247 at 1.

34.     According to President Lowell, Harvard needed to adopt an admissions system that focused on a student's "character" rather than academic achievement alone. "To prevent a dangerous increase in the proportion of Jews, I know at present only one way which is at the same time straightforward and effective, and that is a selection by a personal estimate of character on the part of the Admissions authorities, based upon the probable value to the candidate, to the College and to the community of his admission." Ex. 247.

35.     The chairman of the committee overseeing admissions was initially opposed to President Lowell's proposal, stating that "[e]verything in my education and bringing up makes me shrink from a proposal to begin a racial discrimination at Harvard—there's no use my pretending this isn't the case." Ex. 248 at 1. Nevertheless, in the end, the chairman agreed with President Lowell's notion of "a sound and discerning 'discrimination' among individuals," and the chairman expressed confidence that "such a discrimination would inevitably eliminate most of the Jewish element which is making trouble." Ex. 249 at 1.

36.     In January 1926, at President Lowell's urging, Harvard made three fundamental changes to its admissions policy. First, Harvard limited its incoming class to 1,000 students.  Second, Harvard eliminated a rule that had required it to admit students who were in the top seventh of their graduating class. Third, Harvard resolved to place "greater emphasis on selection based on character and fitness, and the promise of the greatest usefulness in the future as result of a Harvard education." Ex. 237.

37.     Shortly thereafter, Harvard issued a public statement on its policy: "The whole record does include evidences of the candidate's character, personality, and promise …. Race is a part of the record. It is by no means the whole record and no man will be kept out on grounds of race…. [I]f there should result in fact any substantial change in the proportion of groups in the College following application of [this] test, this will be due, not to race discrimination or any quota system, but to the

failure of particular individuals to possess as individuals those evidence of character, personality and promise which weighed with other evidences render them more fit than other individuals to receive all that Harvard has to offer. Of course there will be criticisms. It will be said that Harvard is discriminating on grounds of race. That will not be true." Ex. 250 at 2-3; *see also* Ex. 251 at 1.

38.     By the 1940s, President Lowell's "character and fitness" criteria remained one of the five pillars of Harvard's admissions policy, which included "(1) academic promise; (2) personal qualities of character, all-round effectiveness, stability, and purpose; (3) health and participation in athletic activities; (4) geographical distribution; and (5) Harvard parentage." In particular, Harvard stressed that the "personal qualities of character" criterion was of "major importance" in its admissions decisions. Ex. 238 at 1-2.

39.     The basic tenets of Lowell's "holistic" admissions policy continue today. Harvard continues to stress today that an applicant's "personal qualities," including an applicant's "strength of character," are "factors in our decision-making that are as significant as academic ability." Ex. 83, HARV00015816, HARV00015824-25.

40.     In November 2015, Harvard issued a report in which it acknowledged that "[u]nder the presidency of Abbott Lawrence Lowell (1909-1933), the Harvard administration restricted the numbers of Jewish students" admitted to Harvard. Ex. 62, HARV00007944, HARV00007950.

41.     Dean Khurana recognizes that "one of the reasons" Harvard adopted its holistic admissions process was to "discriminate[] against people who identified as Jewish." Ex. 13, Khurana 124:14-127:2.

42.     President Faust, however, testified: "I'm a historian. I would not rely on the interpretation of a single historian unchallenged. I have not done that historical work myself, and therefore I would not presume to make judgment about its accuracy." Faust claimed to "not know"

that Harvard had researched those allegations and had admitted to them during her presidency. Ex. 8, Faust 30:6-31:17.

43.     When it came to "mismatch" research, *i.e.*, studies showing that minority students "were being admitted to institutions for which they were not qualified and that this was a disservice to them," President Faust called the work "entirely discredited" even though she had not researched it. Ex. 8, Faust 291:14-293:24.

44.     Dean Fitzsimmons acknowledged that he read "carefully" a book documenting the history of Harvard historical treatment of Jews in admissions but nevertheless claimed to lack "any independent corroboration" of Harvard's treatment of Jewish students. Ex. 9, Fitzsimmons 409:11-410:22.

45.     Dean Fitzsimmons continues to maintain that it is "impossible to abuse" Harvard's "admissions process." *Id.*

46.     President Abbott Lawrence Lowell is still held in high honor by Harvard. Lowell House, one of the twelve undergraduate houses at Harvard University, bears his family name. A bust of President Lowell sits in Lowell Courtyard and his portrait hangs for all students to see in the Lowell Dining Hall. Ex. 54, HARV00005346, HARV00005357, HARV0005368-69; Ex. 218.

**B.      Harvard's Defense of Its Use of Race in Its Holistic Admissions System**

47.     In 1978, Harvard submitted an *amicus* brief to the U.S. Supreme Court that included a copy of the "Harvard College Admissions Program" ("Harvard Plan") as an Appendix. According to the Harvard Plan, "[t]he belief that diversity adds an essential ingredient to the educational process has long been a tenet of Harvard College admissions …. In recent years Harvard College has expanded the concept of diversity to include students from disadvantaged economic, racial and ethnic groups." Ex. 150, HARV00066632, HARV00066679.

48.     The Harvard Plan continued: "In practice, this new definition of diversity has meant that race has been a factor in some admission decisions." Ex. 150, HARV00066632, 66679. "The Admissions Committee, with only a few places left to fill, might find itself forced to choose between" Student A, "the child of a successful black physician in an academic community with promise of superior academic performance," Student B, "a black who grew up in an inner-city ghetto of semi-literate parents whose academic achievement was lower but who had demonstrated energy and leadership as well as an apparently abiding interest in black power," or Student C, "a white student with extraordinary artistic talent." A student's race might be one of the "individual qualities" that makes the difference. Ex. 150, HARV00066632, HARV00066680-81.

49.     Harvard did not inform the Supreme Court that the Harvard Plan was created for the specific purpose of discriminating against Jewish applicants, which has been called "one of the most shameful episodes in the history of American higher education in general, and of Harvard college in particular." Ex. 262 at 385.

50.     By endorsing the Harvard Plan, Justice Powell's controlling opinion thus "legitimated an admissions process that is inherently capable of gross abuse and that … has in fact been deliberately manipulated for the specific purpose of perpetuating religious and ethnic discrimination in college admissions." *Id.*

51.     In 2003, Harvard submitted an *amicus* brief to the U.S. Supreme Court in *Grutter v. Bollinger*. In this brief, Harvard told the Court that it "considers an academically qualified student's race or ethnicity as one among many factors in a carefully designed, competitive admissions process that views each applicant as an individual and weighs the capacity of each to contribute to the class as a whole." Ex. 148, HARV00066521, HARV00066528.

52.     In 2012, Harvard, along with other Ivy League schools, submitted an *amicus* brief to the U.S. Supreme Court in *Fisher v. University of Texas at Austin*. In this brief, Harvard told the Court

that it has "long used admissions policies similar to the Harvard plan that Justice Powell approved in [*Bakke*] and the University of Michigan Law School plan upheld in *Grutter*." In particular, Harvard "consider[s] all aspects of an applicant's background and experience, including in some circumstances the applicant's racial or ethnic background." Ex. 98, HARV00018900, HARV00018907.

53. According to the brief, it was "exceptionally important" that the petitioner was not asking the Court to abandon *Grutter*'s holding that race can "be used as a factor in admissions decisions to obtain a 'critical mass' of otherwise underrepresented minority students for educational reasons." Although the "admissions policies of [the *amici* schools] vary somewhat," each was "firmly committed to individualized, holistic review of the type long approved of by this Court." Ex. 98, HARV00018900, HARV00018913.

54. In 2015, Harvard submitted its own *amicus* brief to the U.S. Supreme Court in *Fisher II*. In this brief, Harvard told the Court that it should "reaffirm its previous decisions recognizing the constitutionality of holistic admissions processes that consider each applicant as an individual and as a whole.... In Harvard's judgment, based on its decades of experience with holistic admissions, these admissions policies best enable the university to admit an exceptional class of students that is diverse across many different dimensions, including race and ethnicity. Admissions processes that treat students in a flexible, nonmechanical manner and that permit applicants to choose how to present themselves respects the dignity and autonomy of each applicant, while also permitting Harvard to admit exceptional classes each year." The brief made no mention of whether Harvard was pursuing "critical mass" of underrepresented minority students. Ex. 149, HARV00066599, HARV00066607-08.

## III. Harvard's Admissions Process

### A. Applying to Harvard

55. To apply to Harvard, a student must submit an application (either the Common Application or the Universal Application), an application fee (or fee waiver request), a "secondary school report" (which includes a guidance counselor report and the student's transcript), two teacher evaluations, and the student's standardized test scores (*e.g.*, SAT, ACT). Ex. 91, HARV00016971-72.

56. Students can apply to Harvard in the "early action" cycle (applications due November 1) or the "regular decision" cycle (applications due January 1). Ex. 83, HARV00015830.

57. As a general matter, a student's application goes through a three-step process. First, it is reviewed and evaluated by one or two admissions officers. Second, a tentative admissions decision (*e.g.*, admit, deny, or waitlist) is given by a small group of admissions officers during a "subcommittee" meeting. Third, a final admissions decision is given by the entire Admissions Office during a "full committee" meeting. Ex. 16, McGrath 158:1-160:12, 177:9-19, 182:19-184:22; Ex. 83, HARV00015831-32.

58. This process is generally the same whether the student applies early action or regular decision. Ex. 16, McGrath 208:14-20.

59. The Admissions Office sends admissions decisions to early action students by mid-December and to regular decision students by late March. Ex. 83, HARV00015830.

### B. Recruitment and Likely Letters

60. Despite receiving tens of thousands of applications each year, Harvard believes it must invest "time, effort, and resources to recruit talented students." Ex. 83, HARV00015828-29.

61. Harvard encourages students to apply to Harvard by mailing and emailing recruitment materials to certain college-bound students, by sending admissions officers to various cities

throughout the country to talk about Harvard, and by arranging for on-campus visits and tours for visiting students. Ex. 83, HARV00015828-29.

62. Harvard also sends "likely letters" to certain students who have applied to Harvard. A likely letter is a letter that Harvard sends early in the admissions cycle to its most desired applicants—students who are "very, very strong candidates"—to let them know that they are likely to be admitted to Harvard. Ex. 6, Donahue 215:12-216:16; Ex. 14, Looby 86:4-24.

63. Harvard sends likely letters to its most desired students because it believes such letters may "convince [the] applicant to attend Harvard rather than another university." Ex. 234, Harvard ROG 13.

### C. Dockets

64. Every admissions officer is assigned to one or more specific geographic areas known as "dockets." Each admissions officer is responsible for reading and evaluating the applications from his or her docket; making tentative admissions decisions about those applicants in "subcommittee meetings"; and then leading the discussion about whether to admit or deny those applicants in "full committee meetings." Ex. 16, McGrath 182:19-184:22, 224:21-225:14; Ex. 83, HARV00015831-32.

65. Harvard divides the world into 20 dockets (there are 18 domestic dockets and two international dockets). Ex. 83, HARV00015831-32; Ex. 30, HARV00001484-85.

66. Within the United States, dockets are apportioned to capture roughly the same share of applicants but vary widely in geographic size. For example, the B Docket covers Alaska, Arizona, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming; the D docket covers Texas; and the T docket covers New York City. Ex. 30, HARV00001484-1485; Ex. 16, McGrath 224:21-225:14.

67. Each docket is staffed by four to eight individuals from the Admissions Office, with one of those individuals (typically someone senior in the office) designated as the chair of the docket.

For example, Dean Fitzsimmons chairs P Docket (greater Boston and surrounding areas); Director McGrath chairs B Docket (Alaska, Arizona, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming) and T Docket (New York City); Director Donahue chairs C Docket (Greater Los Angeles, Guam, and Hawaii); and Senior Admissions Officer [REDACTED] chairs I Docket (Delaware, District of Columbia, Maryland, and Virginia). Ex. 16, McGrath 182:19-184:22, 227:12-13; Ex. 30, HARV0001484-1485; Ex. 34, HARV0003496-500.

**D. Reading Procedures and Training**

68. The written guidelines for how admissions officers should review files are contained in a document known as the "Reading Procedures." The Reading Procedures are distributed to the admissions officers each year. Ex. 234, Harvard ROG 9; Ex. 29, HARV00001439; Ex. 14, Looby 28:2-14.

69. The Reading Procedures set forth, among other things, criteria for assigning numerical ratings to each application. Ex. 29, HARV00001443-44.

70. Harvard also conducts an in-person orientation and training process for all newly hired admissions officers. During the multi-week orientation, new admissions officers are trained on how to read and score application files, participate in "mock committee" discussions of the prior year's cases, and simulate preparing for and presenting cases at subcommittee meetings. New admissions officers also are provided with sample application files based on real cases from prior years for training and discussion. New admissions officers also meet again in the early winter to discuss the Reading Procedures. Ex. 234, Harvard ROG 9.

71. Once this orientation is concluded, new admissions officers are normally required to share approximately the first 50 to 100 application files that they read with a more senior admissions officer, who provides feedback on the ratings assigned by the new admissions officer. The work of

new admissions officers is monitored closely by more senior admissions officers during their first few years of employment. Ex. 234, Harvard ROG 9.

### E. Reading Applications and Assigning Numerical Ratings

#### 1. The Summary Sheet

72. Admissions officers are responsible for evaluating and scoring applications within their dockets. Except for the chair of the docket, every admissions officer in the docket serves as a "first reader," meaning that this admissions officer is the first person to evaluate and score applications. Ex. 83, HARV00015831-32; Ex. 234, Harvard ROG 9.

73. All applications within each docket are distributed among the first readers. Each first reader reviews and evaluates the applications he or she receives. For example, for the class of 2018, Harvard received 1,087 applications from Texas (the T Docket). These applications were distributed among the three first readers ([redacted], and Roger Banks) for initial review and evaluation. Ex. 16, McGrath 224:21-225:14; Ex. 39, HARV00004098; Ex. 29, HARV00001484-85; Ex. 34, HARV00003496-3500.

74. First readers receive a "summary sheet" with each application they review. A summary sheet is a short document (2-3 pages) that is prepopulated with information from the student's application, including high school, citizenship, test scores, GPA, class rank, profile ratings, and race. The summary sheet also contains three blank sections to be filled in by the first reader: "Ratings," "Notes," and "Reader Comments." *See, e.g.*, Ex. 236, HARV00072453.

75. The Ratings section contains 14 boxes representing 14 ratings for which the applicant can receive numerical scores. The ratings include: overall, academic, extracurricular, athletic, personal, teacher recommendation (up to four possible), a school support recommendation, two staff ratings (overall and personal), and two alumni ratings (overall and personal). *See, e.g., id.*

76. The Notes section is a space for the first reader to briefly summarize the application or any other pertinent information. Ex. 14, Looby 94:14-95:8.

77. The Reader Comments section is a space for the first reader to provide a lengthier assessment of the quality of the application. Ex. 14, Looby 95:9-16.

78. The summary sheet also includes each student's "academic index" score. The academic index is an objective measurement of the applicant's academic qualifications. It is calculated based on the applicant's SAT score (or ACT score converted to an SAT score), SAT2 subject tests, and high school grades or class rank. Declaration of Peter Arcidiacono, Exhibit A ("Arcidiacono Rep.") at 22 n.29.

**2. Scoring the Applications**

79. First readers score applications in various categories on a scale of 1 to 6 (with 1 being the highest). Admissions officers also can assign a plus or a minus for scores with a 2 or 3 to indicate strength. For example, a "2+" is better than a "2," which is better than a "2-." Ex. 29, HARV00001443-44; Ex. 16, McGrath 159:6-160:12.

80. The "academic" score represents the admissions officer's assessment of the student's academic performance as reflected in the student's grades, test scores, and other typical measures of academic achievement, such as winning nationally recognized competitions or awards. Ex. 16, McGrath 166:18-23, 168:16-169:3; Ex. 29, HARV00001443.

81. Under the Reading Procedures, a student who has [REDACTED] should receive an academic rating of "1"; an [REDACTED] should receive a "2"; a [REDACTED] should receive a "3"; a student with [REDACTED] should receive a "4"; a student with [REDACTED]

[redacted] should receive a "5"; and a student with [redacted] should receive a "6." Ex. 29, HARV00001443.

82. The "extracurricular" score represents the admissions officer's assessment of the student's extracurricular activities, community employment, and family commitments. Ex. 16, McGrath 163:3-15; Ex. 29, HARV00001443.

83. Under the Reading Procedures, a student who has [redacted] and [redacted] should receive an extracurricular rating of "1"; a student with [redacted] should receive a "2"; a student with [redacted] should receive a "3"; a student with [redacted] should receive a "4"; a student with [redacted] should receive a "5"; and a student with [redacted] should receive a "6." Ex. 29, HARV00001443.

84. The "athletic" score represents the admission officer's assessment of the student's athletic accomplishments. Ex. 16, McGrath 160:13-161:11; Ex. 29, HARV00001443-44.

85. Under the Reading Procedures, a student who is [redacted] should receive an athletic rating of "1"; a student with [redacted] should receive a "2"; a student with [redacted] should receive a "3"; a student with [redacted] should receive a "4"; a student with [redacted] should receive a "5"; and a student with a [redacted] should receive a "6." Ex. 29, HARV00001443-44.

86. The "personal" score represents the admission's officer assessment of the student's "personal qualities and character." Ex. 9, Fitzsimmons 239:2-7.

87. Harvard's Reading Procedures provide only limited instructions as to how to score the "personal" rating. Ex. 29, HARV00001444.

88. Under the Reading Procedures, a student who has [REDACTED] personal qualities should receive a personal rating of "1"; a student who has [REDACTED] personal qualities should receive a "2"; a student who has [REDACTED] personal qualities should receive a "3"; a student who has [REDACTED] personal qualities should receive a "4"; and a student who has [REDACTED] should receive a "5." Ex. 29, HARV00001444.

89. Because the guidelines for the "personal" rating are [REDACTED] Ex. 16, McGrath 171:9-22.

90. In practice, first readers determine the "personal" score by examining a variety of "subjective" factors, Ex. 5, Cheng 72:16-19; Ex. 6, Donahue 158:13-159:13, including whether the student has a "positive personality" and "others like to be around him or her," Ex. 14, Looby 50:2-51:10, has "character traits" such as "likability … helpfulness, courage, [and] kindness," Ex. 17, McGrath2 359:16-360:9, is "humor[ous]," an "attractive person to be with," and "widely respected," Ex. 16, McGrath 164:11-165:2, 171:9-22, is a "good person," Ex. 20, Ray 21:15-22:3, and has good "human qualities," Ex. 24, Walsh 60:3-20. First readers then "sort of add it all up and get a feeling." Ex. 24, Walsh 60:21-61:6.

91. In addition to these four categories, first readers assign "school support" scores, which represent the first reader's assessment of the applicant's guidance counselor report and teacher recommendations. Although the rating is assigned by the reader, it is intended to accurately convey the strength of the counselor or teacher's recommendations; readers do not second-guess the

counselor's or teacher's judgments. Ex. 9, Fitzsimmons 239:2-17; Ex. 6, Donahue 191:15-192:9; Ex. 29, HARV00001444.

92. If an applicant interviews with a Harvard alum, the alum will rate the applicant in four categories: academic, extracurricular, personal, and overall. Only the alumni interviewer's "overall" and "personal" scores are recorded on the applicant's summary sheet. Ex. 6, Donahue 193:22-194:15.

93. A guide for assigning alumni interview scores (along with other information about the admissions process) is contained in an Interviewer Handbook, which alumni interviewers receive from Harvard. The criteria for alumni assigning numerical scores are similar to the criteria for scoring by admissions officers. Ex. 35, HARV00003516; Ex. 29, HARV00001443-44; Ex. 83, HARV00015849-50.

94. The Admissions Office does not interview every applicant. The Admissions Office prioritizes obtaining an alumni interview with the most competitive candidates. Although it is not a requirement for admission, in practice, those who do not interview are rarely admitted. Arcidiacono Rep. 16; Ex. 16, McGrath 56:8-20; Ex. 11, Howrigan 261:261:7-20.

95. If an applicant is interviewed by an admissions officer (a "staff interview"), that admissions officer will rate the applicant in four categories: academic, extracurricular, personal, and overall. The criteria for assigning these scores are similar to the criteria for assigning scores by admissions officers when reading an application. Only the "overall" and "personal" ratings from the staff interview are recorded on the applicant's summary sheet. Ex. 28, HARV00000008; Ex. 6, Donahue 194:16-195:9; Ex. 29, HARV00001443-44; Ex. 172, HARV00076469.

96. [REDACTED] Declaration of Peter Arcidiacono, Exhibit B ("Arcidiacono Rebuttal Rep.") 6-7.

97. Finally, first readers assign applicants an "overall" score, which represents an overall assessment of the student. Ex. 9, Fitzsimmons 249:6-250:4; Ex. 16, McGrath 172:5-173:15; Ex. 29, HARV00001442-43.

98. Under the Reading Procedures, a student who is [REDACTED] and [REDACTED] should receive a "1" in the overall rating; a student who has [REDACTED] should receive a "2"; a student who is a [REDACTED] should receive a "3"; a student who is [REDACTED] should receive a "4"; and a student who is [REDACTED] should receive a "5." Ex. 29, HARV00001443.

99. The "overall" score is not a formulaic compilation of the scores in the other ratings. Instead, Harvard instructs first readers to assign the s▮ore by "stepping back and taking all the factors into account and then assigning that overall rating." Ex. 9, Fitzsimmons 249:6-250:4; Ex. 16, McGrath 172:11-173:15.

**3. Evaluation from the Docket Chair**

100. If an application receives a 1 or a 2 in the overall rating, [REDACTED] Ex. 16, McGrath 173:16-24, 174:1-176:4; Ex. 29, HARV00001451.

101. If the application receives an overall score of 3 or lower, [REDACTED] Ex. 16, McGrath 175:15-176:12; Ex. 29, HARV00001450-51.

102. [REDACTED] Ex. 20, Ray 34:2-11.

**F. Creating Target Numbers for the Subcommittees and the Full Committee**

103. Every January, after the close of the regular decision application deadline, the Admissions Office creates a total "target number," which represents the total number of students that Harvard intends to admit that admissions cycle. Ex. 16, McGrath 211:12-213:9; *see, e.g.*, Ex. 39, HARV00004098-4104.

104. The Admissions Office creates this "target number" to ensure it does not over-enroll its freshman class. Harvard has a strict limit on the number of students it can enroll (typically around 1,662 students each year), which is based on the total number of beds available for the incoming freshman class. Ex. 9, Fitzsimmons 283:11-13, 335:9-19.

105. If too many students accept Harvard's offer of admission (*i.e.*, the yield rate is too high), Harvard will face "real logistical problems" because it must house and educate every student who accepts Harvard's offer of admission. In Dean Fitzsimmons' 22-year tenure, Harvard has over-enrolled its incoming class only once. Ex. 9, Fitzsimmons 335:9-19; Ex. 16, McGrath 211:16-213:2.

106. The Admissions Office calculates the total target number based on two factors: (1) the number of students Harvard wants to enroll in the Fall, and (2) the Admissions Office's predicted yield rate (*i.e.*, the percentage of applicants who will accept Harvard's offer of admission). For example, in January 2013, the Admissions Office wanted to enroll 1,664 students for the upcoming class, and it believed, based on its applicant pool and prior yield rates, that 84% of admitted students would accept Harvard's offer of admission. The Admissions Office thus set a total "target number" of 1,981 admits (1,981 admits x 84% yield = 1,664 matriculants). Ex. 69, HARV00010476-77; Ex. 16, McGrath 211:16-213:2; Ex. 9, Fitzsimmons 281:4-284:4; Ex. 2, Bever 189:14-190:12.

107. The Admissions Office sets its yield rate by (1) predicting the characteristics of the class it will admit in March and then (2) comparing its predicted class to the prior year's class. For example, Harvard knows that applicants who live far away from Boston are less likely to matriculate than those who live closer to Boston. Thus, if Harvard anticipates admitting more applicants who live far away from Boston than the year before, the Admissions Office will likely lower its predicted yield rate, as fewer students are likely to accept Harvard's offer. Ex. 16, McGrath 211:16-213:2.

108. According to Director McGrath, to create the total target number, "we look at the various categories of aspects of candidates and try to imagine what's the difference between [the prior year's] pool and those characteristics that would … be reflected in the yield, and this year's about-to-be-admitted group, what we think is happening with it.… [T]he number we are shooting for is determined well before we have a final class in mind. But we know what the pool looks like, and we know roughly where it might head." Ex. 16, McGrath 212:5-13.

109. In addition, "[w]e want most of all not to overcrowd the freshman class so we choose a number that, under any realistic yield scenario, could not overcrowd us. If you were expecting, for example, a yield of 80 percent, you would determine your target number as if you might have 82 1/2 percent yield, let's say. So that you would not be overcrowded." Ex. 16, McGrath 212:20-213:2; *e.g.*, Ex. 69, HARV00010476-77.

110. The Admissions Office also creates target numbers for each subcommittee, which represents the number of students that each subcommittee can tentatively admit. Ex. 5, Cheng 43:6-46:5, 48:1-12, 150:1-152:3; Ex. 6, Donahue 250:3-251:12.

111. The Admissions Office creates subcommittee target numbers by multiplying the current year's total target number by the percentage of the prior year's class that was admitted from each docket. For example, in January 2013, the Admissions Office calculated subcommittee target numbers of ██ admits for B Docket (Alaska, Arizona, Colorado, Idaho, Montana, Nevada, New

Mexico, Oregon, Utah, Washington, and Wyoming); ███ admits for D Docket (Texas); and ███ admits for T Docket (New York City). These numbers were calculated by taking the total target number for 2014 (1,981 admits) and multiplying it by the percentage of the prior class that came from those dockets (███ for B Docket ; ███ for D Docket; and ███ for T Docket). Ex. 9, Fitzsimmons 281:4-282:19; Ex. 69, HARV00010476-77; Ex. 30, HARV00001485.

112. The docket chair receives the subcommittee target number before the start of subcommittee meetings. This number is a "hard target," meaning that the subcommittee cannot tentatively admit a number higher than the target number. Ex. 5, Cheng 150:1-152:3; Ex. 6, Donahue 250:3-251:12.

**G. Subcommittee Meetings**

113. After the applications are reviewed and evaluated, admissions officers hold "subcommittee" meetings to further evaluate the applications within their dockets. Ex. 16, McGrath 183:1-184:22.

114. The purpose of each subcommittee is to assign tentative designations (*e.g.*, admit, deny, or waitlist) to every student within their docket and to tentatively admit a number of students equal to the subcommittee's target number. For example, from January 22-25, 2013, Christine Mascolo, Kaitlin Howrigan, and Roger Banks (first readers for T Docket), along with Director McGrath (chair of T Docket), met to review every applicant in the T Docket (New York City) who applied in the regular decision cycle with the goal of tentatively admitting ███ (the subcommittee target number for that docket). Ex. 16, McGrath 184:4-22; Ex. 69, HARV00010477; Ex. 30, HARV00001485.

115. The subcommittee chair brings a written "docket" to each subcommittee meeting. The "docket" is a hard-copy document that lists relevant information for every student who applied from that geographic docket, including the student's name, high school, race, intended major, citizenship, test scores, class rank, profile ratings, whether the student's parents went to Harvard or Radcliffe,

whether the student's parents are faculty or staff at Harvard. *See, e.g.*, Ex. 141, HARV00057292; Ex. 16, McGrath 180:10-181:7, 184:11-185:10.

116.    Subcommittees typically discuss only applicants who received a second evaluation from the docket chair. Applicants who did not receive a second evaluation or who are not competitive typically are not discussed by the subcommittee and are presumptively denied admission. It is the responsibility of the first reader to lead the discussion on the applications he or she reviewed and evaluated. Ex. 20, Ray 34:2-11, 38:3-6; Ex. 11, Howrigan 44:20-46:11.

117.    The subcommittee chair often writes down comments on the written docket to reflect the subcommittee's discussion of the applicant. Ex. 9, Fitzsimmons 289:2-290:9; Ex. 16, McGrath 184:8-22.

118.    Subcommittee chairs record tentative admissions decisions on the written docket (by making a notation, such as "R" for reject or "A" for admit, next to the student's name) and in an electronic database. Ex. 11, Howrigan 51:6-22; *see, e.g.*, Ex. 141, HARV00057292.

119.    Subcommittee meetings end when the subcommittee has tentatively admitted its "target number" of students. Ex. 5, Cheng 45:5-46:5.

### H.    Monitoring the Demographic Composition of the Class Through One-Pagers

120.    Throughout the admissions process, Dean Fitzsimmons, Director McGrath, and Director Donahue regularly receive and review "one-pagers" prepared by a senior Admissions Office employee (e.g., Elizabeth Yong) who reports directly to Dean Fitzsimmons. *See, e.g.*, HARV00004925; Ex. 9, Fitzsimmons 311:12-17; Ex. 11, Howrigan 148:3-152:24; Ex. 26, Yong 21:4-10, 140:18-141:4.

121.    A one-pager is a document that compares select statistics for the current year to similar statistics from the prior year. Statistics include applicants and admits by: (1) gender; (2) location; (3) anticipated major; (4) legacy status; (5) disadvantaged status; (6) recruited athlete; (7) citizenship status;

(8) race, as measured under three different methodologies; and (9) the overall total. *See, e.g.*, Ex. 48, HARV00004925.

122. Because Harvard's electronic database is updated daily to reflect the tentative decisions of the full committee and the subcommittees, a one-pager allows Dean Fitzsimmons and Director McGrath to know exactly how the tentatively admitted class compares to the prior year's admitted class. Ex. 26, Yong 125:6-127:9.

123. Dean Fitzsimmons and Director McGrath receive one-pagers at critical points throughout the admissions cycle, including after the close of the early-action and regular-decision deadlines and before, during, and after full committee meetings. In the admissions cycle for the class of 2018, more than a dozen one-pagers were prepared for Dean Fitzsimmons during the admissions process. Ex. 26, Yong 19:12-23:11; Ex. 11, Howrigan 148:3-152:24; Ex. 9, Fitzsimmons 311:12-17. These one-pagers were not disseminated to the entire Admissions Office. Ex. 9, Fitzsimmons 315:5-11.

**I. Full Committee Meetings**

**1. Making Final Admissions Decisions**

124. After the subcommittees have met, the entire Admissions Office (approximately 40 people, including Dean Fitzsimmons and Director McGrath) assembles for "full committee" meetings in order to make final admissions decisions. Ex. 1, Banks 113:3-21.

125. Over a series of days (approximately one week during the early action cycle and two weeks during the regular decision cycle), the full committee meets to discuss and assign near-final admissions decisions to each application (*e.g.*, admit, deny, or waitlist). Ex. 16, McGrath 218:22-219:13; Ex. 31, HARV00001733-34.

126. The full committee typically discusses applicants by docket (and within the docket by high school). The full committee typically discusses only those applicants who are competitive.

Applicants who receive low ratings and those who were not tentatively admitted by the subcommittees typically will not be discussed at full committee. Applicants who the full committee unanimously supports also are typically granted admission without receiving a formal vote. Ex. 6, Donahue 237:20-240:12; Ex. 16, McGrath 217:10-218:3.

127. Members of the full committee often write comments or notations on the docket that reflect the discussion of the applicant or the parts of the application that the full committee found important. Ex. 6, Donahue 205:7-12.

128. When there is disagreement among the members of the full committee, a vote will be taken on the applicant. Although the decision of the majority controls, the views of Dean Fitzsimmons and Director McGrath are given special weight by members of the full committee. Ex. 6, Donahue 239:19-240:2; Ex. 151, HARV00066685.

129. The full committee's admissions decisions are recorded on the written docket and in the electronic database as each decision is made. Ex. 11, Howrigan 60:16-21.

**2.** [REDACTED]

130. Dean Fitzsimmons and Director McGrath review a one-pager before the full-committee process begins because they [REDACTED] Ex. 16, McGrath 194:11-195:13.

131. On the first day of full committee meetings, [REDACTED] Ex. 16, McGrath 194:11-195:13; Ex. 11, Howrigan 90:11-93:9; Ex. 6, Donahue 233:3-20.

132. Fitzsimmons and McGrath continue to review one-pagers throughout the full-committee process [REDACTED] Ex. 16, McGrath 200:15-17, 202:7-11; Ex. 11, Howrigan 90:11-93:2.

133. [REDACTED] Ex. 16, McGrath 201:3-202:06.

134. A few days before the end of full committee meetings, the Admissions Office pauses so that Dean Fitzsimmons and Director McGrath can review the pool of admits and determine how many applicants need to be "lopped" from the admitted class—*i.e.*, have their designation changed from "admit" to "waitlist" or "deny." Fitzsimmons then instructs admissions officers to meet again as a subcommittee and identify a certain number of students to "lop" from the admitted class. Ex. 68, HARV00010472, HARV00010475.

135. For example, on March 13, 2013, Dean Fitzsimmons [REDACTED] Ex. 68, HARV00010472, HARV00010475.

136. Admissions officers identify applicants they propose to lop on a preprinted form that requires five pieces of information about each applicant: name, legacy status, race/ethnicity, recruited athlete status, and whether they qualify for financial aid. Ex. 221, HARV00001812; Ex. 9, Fitzsimmons 318:16-22.

137. After potential "lops" have been identified, the full committee meets again to finalize the admitted class. The full-committee process ends once the Admissions Office has lopped enough admits to hit its total target number of admits. Ex. 68, HARV00010472.

### J. Recruiting Admitted Students

138. After admissions decisions are made, Harvard undertakes certain recruiting efforts to encourage admitted students to attend Harvard. Ex. 83, HARV00015840-41.

139. Harvard's most prominent recruiting effort is its Visitas Program. Visitas is a weekend in which admitted students can visit the campus and learn about Harvard. Ex. 9, Fitzsimmons 43:11-45:9.

140. Admitted students have until May 1 to accept their spots in the entering class. Ex. 83, HARV00015834.

### K. Waitlist

141. If there are spaces available in the entering class after the May 1 deadline, the full committee will meet to fill the remaining spots with applicants from the waitlist. Ex. 83, HARV00015834.

142. The full committee gives preference to those waitlisted applicants who have reached out to Harvard (personally or through others) and advocated to be admitted off the waitlist. Ex. 11, Howrigan 68:17-69:10.

143. The full committee also considers whether similar individuals with similar traits (*e.g.*, skilled piano players) have already been admitted and accepted Harvard's offer of admission. Ex. 14, Looby 213:2-214:20, 215:14-216:8.

144. Harvard typically admits between 40 and 60 students off the waitlist each year, but this number has ranged from no students to as many as 100. Ex. 9, Fitzsimmons 284:5-11.

**L. Z-List**

145. Each year, certain applicants (typically 50 to 60 each year) are offered admission through the "Z-List." Declaration of Richard Kahlenberg, Exhibit A ("Kahlenberg Rep.") 35; Ex. 17, McGrath2 405:8-407:7.

146. The Z-List (also known as "deferred admissions") refers to Harvard's practice of "offer[ing] applicants admission to Harvard College for a subsequent class, rather than the class for which they originally applied." Ex. 234, Harvard ROG 15.

147. According to Director McGrath, [REDACTED] Ex. 16, McGrath 405:8-407:7; *e.g.*, Ex. 137, HARV00032454.

148. Academically, Z-list admitted students perform far worse than other admitted students. For example, the academic indexes of Z-List admits are about as close to the academic indexes of *rejected* applicants as they are to the academic indexes of other admits. Kahlenberg Rep. 35-36.

149. Harvard does not acknowledge the existence of the Z-List on its admissions website or in its Interviewer Handbook. Ex. 83, HARV00015816.

**IV. "Tips" in the Admissions Process**

**A. The Role of "Tips" in the Admissions Process**

150. Per Harvard's website: "In our admissions process, we give careful, individual attention to each applicant. We seek to identify students who will be the best educators of one another and their professors—individuals who will inspire those around them during their College years and beyond." Ex. 213 (https://college.harvard.edu/admissions/application-process/what-we-look).

151. The website then identifies 36 "questions [that] will be on our minds" as "we read and discuss your application." These questions include, among others: Do you have initiative? Are you a self-starter? What motivates you? What is the quality of your activities? Do you appear to have a genuine commitment or leadership role? *Id.*

152. Absent from these 36 questions are five inquiries that actually play an enormous role in admissions decisions: (1) What is your race? (2) Did your parents attend Harvard or Radcliffe? (3) Did anyone related to you donate money or assets to Harvard? (4) Is your parent a staff or faculty member at Harvard? And (5) Are you an athlete being recruited by Harvard? Ex. 190, HARV00097325-26; Ex. 83, HARV00015825-26.

153. These five factors—which Harvard refers to as "tips"—affect the decisionmaking of the Admissions Office throughout the admissions process. Ex. 83, HARV00015825-26; Ex. 190, HARV00097325-26.

154. Despite the importance of these "tips," the Reading Procedures contain no discussion as to how admissions officers should use them in their decisionmaking. Ex. 29, HARV00001443-44.

## B. The Use of Race as a "Tip" in the Admissions Process

### 1. Harvard's Reasons for Using Race in the Admissions Process

#### a. Harvard's Claimed Interest in Diversity

155. Harvard claims that it takes an applicant's race into account when deciding whether to admit him or her because it wants "racial diversity on campus." Ex. 234, Harvard ROG 19; Ex. 190, HARV00097317.

156. Harvard claims that racial diversity is "essential to the University's mission," which is to "educate its students to be engaged citizens and citizen leaders in an increasingly complex society." Ex. 234, Harvard ROG 19.

**b. The Non-Pursuit of Critical Mass**

157. Harvard does not seek to achieve an interest in racial diversity by enrolling a "critical mass" of underrepresented minorities. Ex. 9, Fitzsimmons 153:10-154:13; Ex. 13, Khurana 128:5-129:21; Ex. 22, Smith 56:6-16; Ex. 6, Donahue 183:18-185:13; Ex. 16, McGrath 239:7-240:5, 247:23-248:5; Ex. 8, Faust 24:17-25:12.

158. As Director McGrath testified, "[i]t's not a term of general use in our deliberations .... It's not, to my knowledge, anybody's specific goal, a critical mass per se." Ex. 16, McGrath 239:15-240:5.

159. The leaders of the Admissions Office and Harvard College do not know what "critical mass" means in the context of pursuing Harvard's claimed interest in diversity. Ex. 6, Donahue 183:18-185:13; Ex. 16, McGrath 239:7-240:5, 247:23-248:5; Ex. 13, Khurana 128:5-129:21; Ex. 9, Fitzsimmons 153:10-154:13; Ex. 8, Faust 24:17-25:12.

160. As President Faust testified, critical mass is "not a concept" she had "studied." Ex. 8, Faust 25:3-3-11.

161. The leaders of the Admissions Office and of Harvard College have never heard the term "critical mass" used in the Admissions Office or in reference to Harvard's admissions process. Ex. 6, Donahue 183:18-185:13; Ex. 13, Khurana 128:5-129:21; Ex. 16, McGrath 239:7-240:5, 247:23-248:5; Ex. 9, Fitzsimmons 153:10-154:13; Ex. 8, Faust 25:3-12.

162. The leaders of the Admissions Office and of Harvard College do not have their own definition of "critical mass." Ex. 9, Fitzsimmons 153:10-154:13; Ex. 8, Faust 25:3-12.

163. The leaders of the Admissions Office and of Harvard College are not aware of any analysis Harvard has done with respect to how it might obtain "critical mass." Ex. 6, Donahue 184:4-185:13; Ex. 9, Fitzsimmons 153:10-154:13; Ex. 8, Faust 24:17-25:12.

164. The leaders of the Admissions Office and of Harvard College cannot "provide any range or quantification of what level of racial diversity is sufficient to achieve Harvard's education goals." Ex. 9, Fitzsimmons 154:8-13; Ex. 13, Khurana 72:13-18.

### c. The Use of Race for More than the Last Few Places

165. Harvard does not pursue an interest in racial diversity by using race merely as a factor in deciding who will fill the final few seats in a particular class. Ex. 16, McGrath 263:17-264:12.

166. In making its admission decisions, Harvard instead takes into account the race of every applicant who provides that information. Ex. 9, Fitzsimmons 154:14-24.

167. According to President Faust, it "would be impossible" to evaluate applicants without race "because a holistic consideration of a student would require taking race into account." Ex. 8, Faust 52:6-18.

[redacted]

168. [redacted] Ex. 16, McGrath 248:12-249:2.

169. According to McGrath, [redacted] Ex. 16, McGrath 240:6-19.

170. The Admissions Office [redacted] Ex. 16, McGrath 269:11-270:4.

171. The Admissions Office [redacted] Ex. 16, McGrath 199:10-22.

172. That is why early in the process, before most applications have been reviewed or evaluated, the Admissions Office "know[s] what the pool looks like, and [it] know[s] roughly where it might head." Ex. 16, McGrath 212:5-13.

**2. Recording Race Through the Applications**

173. Both the Common Application and the Universal Application ask students to identify their race through similar questions. Ex. 16, McGrath 127:6-21; Ex. 203, McGrath Ex. 2; Ex. 204, McGrath Ex. 3.

174. For example, the Common Application asks students to answer two questions. First, "are you Hispanic/Latino?" Second, "[r]egardless of your answer to the prior question, please indicate how you identify yourself. (Check one or more and describe your background): (1) "American Indian or Alaska Native (including all Original Peoples of the Americas)"; (2) "Asian (including Indian subcontinent and Philippines)"; (3) "Black or African American (including Africa and Caribbean)"; (4) "Native Hawaiian or Other Pacific Islander (Original People)"; and (5) "White (including Middle Eastern)." Ex. 204, McGrath Ex. 3.

175. Although these questions are optional, most applicants answer them. If a student does not answer these questions, Harvard identifies the student's race as "unknown." HARV00032523.

176. Harvard has three methodologies for categorizing applicants by race: an "old methodology," a "new methodology," and the federal Integrated Postsecondary Education Data System (IPEDS). Ex. 26, Yong 133:10-138:16.

177. The "old methodology" reflects how Harvard tracked race before the Common Application switched to its current two-part question on ethnicity. Ex. 26, Yong 134:7-134:22.

178. Both the "new methodology" and the IPEDS methodology reflect the Common Application's two-part question on race, but they differ in how students of multiple races and ethnicities are recorded. Ex. 26, Yong 134:7-136:2.

179.    The "new methodology" counts every box that is checked by the Common Application. Thus, if a student checks Asian, African American, Hispanic, and Native American, Harvard counts that student four times (one for each category). Ex. 26, Yong 135:2-136:6.

180.    The IPEDS system, by contrast, requires each student to be counted only once and it has a hierarchy categorizing each student. Under IPEDS, if a student marks Hispanic on Question 1, that student is counted as Hispanic, regardless of his answer to Question 2. If a student marks "not Hispanic" to Question 1 and selects only one race in Question 2 (*e.g.*, white), the student is counted as that race. If the student marks "not Hispanic" to Question 1 and selects two or more races in Question 2, the student is counted as "multiracial." Arcidiacono Rebuttal Rep. 54; Ex. 26, Yong 135:2-136:6.

181.    Harvard reports its admissions statistics in press releases under the "new methodology" instead of IPEDS. This allows Harvard to claim a higher number of minorities. Ex. 26, Yong 135:24-136:6, 137:15-138:4.

182.    Harvard does not, however, publicly report the number of applications received and the resulting admission rate for each racial category under any of its methods. According to Director McGrath, that is because publicly releasing admissions rates by race is "never very helpful for us." Ex. 16, McGrath 258:10-259:4.

183.    The Admissions Office has expressed frustration with statistics calculated under IPEDS (which must be publicly reported to the federal government) because, in its view, the methodology "underreports" African Americans (since IPEDS counts an individual as African American only if the individual marks "Not Hispanic" and "Black or African American"). Ex. 133, HARV00030510-11.

184.    If a student does not identify his or her race, the Admissions Office has alternative ways to determine the student's race through other information the Common Application requires,

including the student's last name, citizenship status, birthplace, language proficiency, country of birth of the student's parents, and the parents' last names and former last names. Ex. 204, McGrath Ex. 3.

185. The Admissions Office can also do outside research through social media to determine an applicant's race, which it has done in at least one instance. Ex. 20, Ray 31:16-32:10.

### 3. Harvard's Recruiting Efforts Vary by Race

#### a. Higher Performance Standards for Recruiting Asian Americans

186. At the beginning of each admissions cycle, the Admissions Office purchases the contact information of certain high school students (approximately 100,000 each year) who have taken the PSAT, the SAT, the ACT, or AP exams. Ex. 16, McGrath 10:14-12:20, 14:8-16:18; Ex. 26, Yong 267:15-24.

187. The Admissions Office sends these students letters and promotional materials (electronically and through the mail) encouraging them to visit and to apply to Harvard. HARV00015828; Ex. 20, Ray 109:23-110:19.

188. Harvard engages in these recruitment efforts because these mailings are a "critical opportunity to 'consciously shape the make-up of our student body,'" as Harvard's research shows that "students who qualify for this search are about twice as likely to be admitted as other applicants." Ex. 83, HARV00015828.

189. When setting the search parameters, the [REDACTED] Ex. 9, Fitzsimmons 60:6-25, 76:2-77:25.

190. For example, [REDACTED]



Ex. 113, HARV00023564; *see* Ex. 26, Yong 262:5-276:1; *see also* Ex. 58, HARV00007766; Ex. 9, Fitzsimmons 68:1-73:20.

191. Thus,

Ex. 113, HARV00023564.

192.

Ex. 113, HARV00023564.

193.

Ex. 9, Fitzsimmons 333:23-334:3.

**b. The Different Racial Standards for Receiving a Likely Letter**

194. The Admissions Office uses "likely letters" as a recruiting tool to encourage "very, very strong candidates" to attend Harvard. Ex. 6, Donahue 215:4-216:16.

195. Most likely letters (roughly 73%) are sent to recruited athletes. The remainder go to non-recruited-athlete applicants who Harvard has placed a priority on admitting. Declaration of Peter Arcidiacono ("Arcidiacono Dec.") ¶ 11; Ex. 234, Harvard ROG 13.

196. Among non-athlete applicants, Asian-American students are four times less likely to receive a likely letter than African-American applicants, more than three times less likely to receive a likely letter than Hispanic applicants, and two times less likely to receive a likely letter than white applicants:

| Applicant Race | Percentage of Non-Athlete Applicants Receiving a Likely Letter (Classes of 2014-2019) |
|---|---|
| African American | .48% |
| Hispanic | .38% |
| White | .24% |
| Asian American | .12% |

Arcidiacono Dec. ¶ 12 & Table 1.

197. The Admissions Office almost always admits students who have received likely letters. Arcidiacono Dec. ¶ 11.

### 4. Reading Procedures and Training Regarding the Use of Race.

198. The Reading Procedures contain no instructions for admissions officers on how they should use race in the admissions process. Ex. 29, HARV00001443-1444.

199. Admissions officers do not receive particular instructions each year as to how they should use race in the admissions process. Ex. 9, Fitzsimmons 236:2-237:2.

200. Admissions officers have in the past received oral training in which the use of race was discussed. For example, in the fall of 2013 and the fall of 2014, admissions officers attended training sessions led by Senior Admissions Officer [redacted] and Admissions Officer [redacted] in which

the topic was "casework" and "diversity." Ex. 65, HARV00010317; Ex. 64, HARV00010032-33; Ex. 20, Ray 125:5-13.

201. The diversity training covered three broad topics: (1) "looking at testing data and percentile breakdowns by race to provide context for casework, etc."; (2) "drawing from census data to look at demographic trends and breakdown in populations (specifically Hispanic and Native) to see what is happening demographically and geographically"; and (3) providing a "breakdown of the cultural communities and involvements on campus, and provide some personal and anecdotal examples of how students may 'translate' on campus from the kinds of questions we may or may not ask in committee." Ex. 50, HARV00004943.

202. In these sessions, Admissions Officers [redacted] and [redacted] Ex. 129, HARV00028373; Ex. 20, Ray 125:5-126:13.

203. One of the purposes of the training was to "provide statistics & data to give context to the demographics & experiences of the students we may see in our pool." Ex. 77, HARV00013369; Ex. 20, Ray 71:15-72:12.

204. During this training, admissions officers learned that [redacted] Ex. 125, HARV00028374; Ex. 18, Ortiz 153:3-24; Ex. 20, Ray 131:20-133:2.

205. [redacted] Ex. 18, Ortiz 70:7-71:13, 78:9-80:15, 161:7-20; Ex. 2, Bever 346:18-348:7; Ex. 20, Ray 69:12-76:4.

206. Thus, admissions officers were told that one year there were 49,008 Asian-American students scoring above 700 on the Math section of the SAT and only 2,101 African-American students with similar scores. Ex. 77, HARV00013376; Ex. 20, Ray 73:20-76:23.

207. As Erica Bever wrote to [REDACTED] and [REDACTED] the following year, [REDACTED] Ex. 119, HARV00024974.

208. Admissions officers also were told that they may [REDACTED] Ex. 125, HARV00028380; Ex. 20, Ray 146:8-148:16.

209. Admissions officers also were told that "[r]egardless of economic background, Black students' experiences are impacted by racial bias, both explicit and implicit." No such instruction was given with respect to Asian-American applicants. Ex. 77, HARV00013416; Ex. 20, Ray 103:9-104:13.

210. Admissions officers also were told that there may be students applying who [REDACTED] Ex. 125, HARV00028382.

211. For the 2014 training session, [REDACTED] Ex. 205, Ortiz Ex. 5; Ex. 206, Ortiz Ex. 6.

212. Ms. Bever created a [REDACTED] Ex. 2, Bever 347:18-348:7.

#### 5. Harvard's Use of Race When Reading Applications and Assigning Numerical Ratings

213. The Reading Procedures contain no instructions for first readers as to whether or how they should use race when assigning numerical scores in the four profile ratings (academic, extracurricular, athletic, and personal), the "overall" rating, or any other rating. Ex. 29, HARV00001443-44; Ex. 14, Looby 45:19-49:15.

214. It is Harvard policy that first readers are "not supposed to" take a student's race into account when assigning scores in the academic, extracurricular, athletic, or personal ratings. Ex. 16, McGrath 165:3-14.

215. However, admissions officers receive no training on whether, for example, they should take a student's race into account when assigning a score for the personal rating. Ex. 14, Looby 45:19-49:15; Ex. 2, Bever 22:2-6.

216. At least one admissions officer [REDACTED] admits to taking race into account when calculating all four profile ratings (academic, extracurricular, athletic, and personal). Ex. 14, Looby 39:17-44:9; 50:2-52:7.

217. First readers are permitted to take a student's race into account when assigning a numerical score in the overall rating. Ex. 9, Fitzsimmons 253:13-254:3; *see, e.g.*, Ex. 20, Ray 28:1-21; Ex. 18, Ortiz 22:5-22:12; Ex. 11, Howrigan 33:4-36:24.

218. An applicant's race also can be a factor in whether a first reader deems the application worthy of a second evaluation. Ex. 20, Ray 34:24-35:10; Ex. 11, Howrigan 37:24-38:13.

#### 6. Reporting Early Action Admission Rates by Race during January ABAFAOILSS Meetings

219. Every January, before subcommittee meetings begin (and before Dean Fitzsimmons has set the total target number and subcommittee target numbers), a representative from Harvard (known as an "Institutional Liaison") attends a conference of the Association of Black Admissions

and Financial Aid Officers of the Ivy League and Sister Schools ("ABAFAOILSS"). Ex. 82, HARV00014772-14777.

220.    ABAFAOILSS conferences are attended by representatives from Harvard and 15 other schools, including Barnard, Brown, Bryn Mawr, Columbia, Cornell, Dartmouth, MIT, Mount Holyoke, Princeton, Smith, Stanford, the University of Pennsylvania, Vassar, Wellesley, and Yale. *Id.*

221.    At each ABAFOILSS conference, the Institutional Liaisons from each school attend a "Round Robin" meeting. The purpose of the Round Robin meetings is for schools to share with one another their non-public admissions numbers by race from the current admissions cycle. Ex. 1, Banks 153:9-154:19.

222.    Institutional Liaisons are not permitted to attend Round Robin meetings unless they are willing to share their school's admissions statistics. Ex. 15, Lopez 69:17-21.

223.    At the Round Robin meetings, Institutional Liaisons from the 16 schools sit around a large table and take turns reading aloud their school's admissions numbers by race. Each Institutional Liaison reads three categories of information for each racial group: the number of applications the school received, the number of admitted students to date, and the number of matriculated students to date. Ex. 222, ABAFAOILLSS08-15; Ex. 82, HARV00014774-77; Ex. 1, Banks 154:8-19, 167:8-23; Ex. 5, Cheng 49:24-53:4, 54:2-60:1.

224.    Institutional Liaisons provide these statistics in seven racial categories: Black, Asian, Native American, Latino, Multi-Racial, Other, and Total. Ex. 222, ABAFAOILLSS08-15; Ex. 82, HARV00014774-14777.

225.    Through the Round Robin meetings, Institutional Liaisons receive admissions data months before it is ever publicly reported. They also receive admissions data that is never publicly reported: the application numbers and overall admission rate for each racial category. Ex. 16, McGrath 258:10-259:4.

226. As each college's admissions statistics are read aloud, Institutional Liaisons record the statistics by hand on a preprinted form. Ex. 1, Banks 153:11-157:11.

227. It typically takes about 30 minutes for the Institutional Liaisons to read and record admissions numbers. There is no commentary during this 30 minutes. After these numbers are read, there will typically be another 30 minutes of discussion, and then the meeting will end. Ex. 15, Lopez 72:2-76:3.

228. Admissions Officers from Harvard that have attended these Round Robin meetings include [REDACTED] Before each ABAFAOILLS conference, these admissions officers would prepare for the Round Robin meeting by obtaining a one-pager, which contains the up-to-date admissions statistics needed for the meeting. Ex. 1, Banks 170:3-172:23; Ex. 20, Ray 191:3-192:9.

229. Dean Fitzsimmons receives the admissions statistics from the Round Robin meetings. Dean Fitzsimmons finds them "useful" for understanding what is happening at Harvard's peer schools. Ex. 9, Fitzsimmons 452:10-453:24; Ex. 1, Banks 156:24-157:14, 170:3-22; Ex. 15, Lopez 50:21-51:3.

**7. Creating Targets Based on Yield Rates by Race**

230. [REDACTED] Ex. 16, McGrath 211:16-212:13; Ex. 9, Fitzsimmons 279:17-282:19.

231. Harvard also knows that different races have historically different yield rates. For example, the yield rates for the Class of 2014 through the Class of 2017 was as follows:



| | | | | |
|---|---|---|---|---|
| | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

Ex. 32, HARV00001860; Ex. 16, McGrath 213:3-215:9.

232. [redacted] Ex. 9, Fitzsimmons 326:14-333:2, 339:3-11.

233. [redacted] Ex. 16, McGrath 213:21-214:8.

234. [redacted] Ex. 16, McGrath 213:3-215:9.

235. [redacted] Ex. 81, HARV00014684; Ex. 39, HARV0004098-104.

### 8. The Use of Race at Subcommittee Meetings

236. Admissions officers take an applicant's race into account when deciding whether to tentatively admit that applicant. Ex. 11, Howrigan 50:15-51:5; Ex. 25, Weaver 261:15-262:5; Ex. 9, Fitzsimmons 287:25-288:8; Ex. 16, McGrath 185:6-23.

237. When reviewing applicants in subcommittee meetings, the race of every student (if available) is displayed prominently on the student's summary sheet, [REDACTED] Ex. 20, Ray 38:3-18.

238. Admissions officers often underline an applicant's race on the written docket and make comments about the applicant's race/ethnicity. Ex. 11, Howrigan 195:10-196:10, 200:4-16, 201:8-202:10, 205:4-14; *see, e.g.*, Ex. 141, HARV00056250, HARV00057292.

### 9. Monitoring the Racial Makeup of the Class

239. The one-pagers Dean Fitzsimmons and Director McGrath receive throughout the admissions process identify admissions statistics (current and prior-year applicants and admits by race) through Harvard's three methodologies: "old methodology," "new methodology," and IPEDS. Ex. 26, Yong 138:12-16.

240. For example, on March 2, 2014, the day before the first day of full committee meetings, Dean Fitzsimmons received the following admissions statistics:



Ex. 90, HARV00016806-07.

241. Thus, on March 2, 2014, Dean Fitzsimmons knew, for example, [REDACTED] *Id.*

242. Dean Fitzsimmons also knew that [REDACTED] *Id.*

243. For the 2013-2014 admissions cycle, Dean Fitzsimmons received one-pagers containing up-to-date admissions statistics by race on the following days:

| Date | Event | Bates Number |
|---|---|---|
| November 5, 2013 | Four days after the early action application deadline | Ex. 103, HARV00022117 |
| November 24, 2013 | The day before the beginning of early action full committee meetings | Ex. 44, HARV00004232 |
| November 26, 2013 | The second day of early action full committee meetings | Ex. 97, HARV00018646 |
| December 2, 2013 | The third day of early action full committee meetings | Ex. 101, HARV00021281 |
| December 5, 2013 | The day before the end of early action full committee meetings | Ex. 59, HARV00007772 |
| December 6, 2013 | The last day of early action full committee meetings | Ex. 43, HARV00004225 |
| December 10, 2013 | Four days after the conclusion of full committee meetings | Ex. 40, HARV00004202 |
| December 13, 2013 | The day of the announcement of early action admission decisions | Ex. 42, HARV00004224 |
| January 2, 2014 | The day after the regular decision application deadline | Ex. 33, HARV00001887 |

| | | |
|---|---|---|
| January 13, 2014 | The day before the creation of the 2014 [redacted] [redacted] | Ex. 41, HARV00004221 |
| March 2, 2014 | The day before the beginning of regular decision full committee meetings | Ex. 90, HARV00016806 |
| March 14, 2014 | The final day of "rerun" full committee meetings | Ex. 47, HARV00004313 |
| March 17, 2014 | The first day of the lopping process (third to last day before the end of full committee meetings) | Ex. 89, HARV00016782 |
| March 18, 2014 | The day before the end of regular decision full committee meetings | Ex. 70, HARV00010499 |
| May 21, 2014 | During the waitlist review process | Ex. 45, HARV00004268 |
| June 27, 2014 | Near the end of the waitlist review process | Ex. 36, HARV00003593 |
| *Based on the 2013-2014 admissions calendar. Ex. 135, HARV00031933; Ex. 39, HARV0004098. | | |

244. On certain days during full-committee meeting, one-pagers contain additional pages of information. For example, on December 2, 2013, Dean Fitzsimmons, Director McGrath, and Director Donahue received an additional one-pager that included admissions statistics by race and gender (*e.g.*, the number of female Hispanic applicants and male Hispanic applicants). Ex. 101, HARV00021284.

245. Similarly, on other days during full-committee meetings (March 2, 2014, March 17, 2014, and March 18, 2014), Dean Fitzsimmons, Director McGrath, and Director Donahue received an additional one-pager that included admissions statistics by race for non-legacy, non-athlete applicants ("NLNA applicants"). Ex. 223, HARV00016809; Ex. 89, HARV00016784; Ex. 70, HARV00010499.

**10. The Use of Race During Full Committee Meetings**

246. [redacted] Ex. 16, McGrath 194:11-16; Ex. 11, Howrigan 90:11-93:18; Ex.

9, Fitzsimmons 311:18-312:7; *compare* Ex. 93, HARV00018154 *with* Ex. 44, HARV0004232; Ex. 11, Howrigan: 223:12-20; HARV00031933.

247. Ex. 16, McGrath 194:11-198:7, 200:6-203:9.

248. Ex. 11, Howrigan 61:9-63:1; Ex. 14, Looby 32:20-34:16; Ex. 20, Ray 46:23-47:8.

249. Ex. 16, McGrath 196:7-198:7.

250. When members of the full committee are voting on each applicant, the student's race is a factor that they consider when deciding whether to admit the applicant to Harvard. Ex. 11, Howrigan 39:2-40:2; Ex. 6, Donahue 60:6-14.

251. Ex. 16, McGrath 157:10-24.

252. Ex. 16, McGrath 200:6-17; Ex. 11, Howrigan 90:11-93:18; *compare* Ex.

93, HARV00018155 *with* Ex. 59, HARV00007772; *compare* Ex. 93, HARV00018156 *with* Ex. 43, HARV00004225; Ex. 11, Howrigan: 223:12-20; Ex. 135, HARV00031933.

253. Ex. 16, McGrath 199:10-200:17, 201:3-12, 248:18-249:2.

254. Ex. 16, McGrath 248:18-249:2.

255. Ex. 16, McGrath 199:17-201:3-12

256. Ex. 16, McGrath 198:22-199:9, 214:21-215:9; Ex. 14, Looby 216:18-220:21.

257. Ex. 68, HARV00010473; Ex. 147, HARV00066372; Ex. 146, HARV00066245; Ex. 152, HARV00067540-41; Ex. 14, Looby 216:18-220:21.

258. [redacted] Ex. 16, McGrath 199:10-16.

259. [redacted] For example, on March 19, 2013, the last day of the full committee meetings, Dean Fitzsimmons asked Elizabeth Yong to send him "a one pager and his ethnic stats" because the full committee needed to remove 28 students from the list of tentatively admitted students. Ex. 102, HARV00021585; Ex. 9, Fitzsimmons 319:20-323:8; Ex. 26, Yong 156:11-157:21; Ex. 68, HARV00010469; Ex. 96, HARV00018624.

260. Fitzsimmons requested these "ethnic stats" because they [redacted] Ex. 9, Fitzsimmons 319:20-323:8, 334:4-335:19; 340:16-25.

261. Similarly, according to Harvard's April 2018 report on race-neutral alternatives, if the Admissions Office did not consider race in the admissions process there would be a "significant decline" in the admission of African-American and Hispanic admits. Ex. 190, HARV00097317.

262. The Interviewer Handbook likewise states that a student's race is a factor that can "tip" the applicant into the class. Ex. 83, HARV00015825-26.

263. Dean Fitzsimmons, however, claims that a student's race can never be a "decisive factor" in any admissions decision. Fitzsimmons claims that it would be "impossible" to determine whether a student's race was the factor that pushed a candidate over the edge into the admitted pool. Ex. 9, Fitzsimmons 157:2-157:22.

264. Other admissions officers likewise claim that a student's race is never decisive in their decision to vote to grant or deny admission to Harvard. Instead, they claim that "race is one of many

factors that we consider in our whole-person review process but is not a determining factor." Ex. 20, Ray 149:18-150:18; Ex. 18, Ortiz 57:18-58:2; Ex. 11, Howrigan 169:6-172:21.

### 11. Use of Race in Recruiting Admitted Students.

265. Every minority student admitted to Harvard is subsequently recruited by the Undergraduate Minority Recruitment Program ("UMRP"). Ex. 20, Ray 203:16-206:4.

266. The UMRP is divided into five divisions by race: African American, Asian American, Latino or Hispanic, Mexican American, and Native American. Each division hires current Harvard students whose race correlates with the student's division. Ex. 1, Banks 18:11-19:11.

267. Each division is responsible for recruiting the admitted students within that racial group. Thus, African-American Harvard students recruit African-American admits, Hispanic Harvard students recruit Hispanic admits, Asian-American Harvard students recruit Asian-American admits, and so forth. Ex. 20, Ray 203:16-206:4.

268. Admitted students are generally "assigned students of the same ethnic background to recruit" them because Harvard believes it will make them feel more "comfortable." Ex. 9, Fitzsimmons 80:14-24; Ex. 18, Ortiz 139:5-15.

269. Minority admits typically receive a call from a current Harvard student who works at UMRP and is a member of the same race as the admitted student. The Harvard student invites the minority admit to attend Visitas (a weekend in which admits can visit the campus) and then asks if he or she would like to stay in a Harvard dormitory with a member of his or her own race. Ex. 1, Banks 73:5-20; Ex. 20, Ray 213:6-216:23; Ex. 9, Fitzsimmons 80:14-24.

270. A white Harvard admissions officer, [redacted], is in charge of arranging for housing at Visitas for white high school students. Ex. 20, Ray 208:7-209:17; Ex. 1, Banks 27:16-28:6.

271. As a consequence of these efforts, most admits attending Visitas stay with current Harvard students of the same race. Ex. 20, Ray 2[redacted]5:23-206:18.

272.     Harvard is diligent about enforcing these race-based housing assignments. For example, in April 2013, the UMRP changed the room assignment of a Nigerian admit who was going to stay with an Asian-American Harvard student because "we don't want to match a prefrosh who explicitly asked for an af-am [African-American] host with an Asian student." Ex. 126, HARV00028629; Ex. 127, HARV00028633.

273.     According to Harvard's own expert, Dr. Ruth Simmons, "[s]egregated housing is the antithesis of what we [should] do in the academy" because college should "be an opportunity to learn something about life and the people of the world." Ex. 21, Simmons 137:15-138:23.

274.     Although the UMRP nominally recruits all minorities, Harvard places a special emphasis on the recruitment of African Americans and Hispanics. For example, the UMRP has established a "phone-a-thon" in which African-American alumni call African-American admitted students and Hispanic alumni call Hispanic students. There is no similar phone-a-thon for Asian-American admitted students.  Ex. 18, Ortiz 141:1-142:22.

275.     Similarly, Harvard has both a Mexican division and a Hispanic division because Mexican students are a "very distinct self-identified cultural unit, different from other Hispanic students." Harvard does not have a separate division for Asian students, even though the "Asian" category encompasses many distinct ethnicities, including Korean, Japanese, Chinese, Indian, and Vietnamese students. Ex. 1, Banks 18:11-19:11.

### 12.     Reporting Admissions Decisions by Race at May ABAFAOILLS Meetings

276.     In early May of every year, after the deadline for admitted students to accept their offer of admission but before the full committee meets to admit students off the waitlist, the Admissions Office sends an Institutional Liaison to the May ABAFAOILLS meeting. Ex. 222, ABAFAOILLSS08-15; Ex. 135, HARV00031933.

277. Like the January ABAFAOILSS conference, the Institutional Liaisons from Harvard and 15 of its peer schools attend a Round Robin meeting in order to share with one another non-public admissions numbers by race from the current admissions cycle. Ex. 1, Banks 153:11-154:14.

278. Like the January Round Robin, admissions officers share three categories of information for each racial group: the number of applications the school received, the number of admits to date, and the number of matriculants to date. Ex. 222, ABAFAOILLSS08-15.

279. Harvard's Institutional Liaison writes these statistics down and share them with Dean Fitzsimmons. Ex. 1, Banks 153:11-157:11, 170:3-22; Ex. 15, Lopez 50:21-51:3.

**13. Race as a Factor in Waitlist Admissions.**

280. Dean Fitzsimmons determines how many students should be admitted off the waitlist based on the number of students who accept Harvard's offer of admission by the May 1 deadline. Ex. 9, Fitzsimmons 283:20-284:4.

281. Dean Fitzsimmons continues to monitor one-pagers during the waitlist process. *See, e.g.*, Ex. 45, HARV00004268

282. The full committee uses the same criteria from regular decision to determine whether someone should get in off the waitlist. Ex. 18, Ortiz 186:14-19; Ex. 20, Ray 62:12-22.

283. Admissions officers have the authority to change an applicant's status from "waitlist" to "deny" and vice versa—without going through the full committee—by using a "change slip." Admissions officers take a student's race into account when deciding whether to change an applicant's status through a change slip. Ex. 11, Howrigan 242:14-244:5, 248:4-249:1.

**14. Racial Disparities on the Z-List**

284. The full committee places significantly more white students on the Z-List—the method by which the Admissions Office admits an applicant on the condition that the applicant takes a year off before enrolling—than any other racial group. Kahlenberg Rep. 35-36.

285. For the Classes of 2014-2019, 70% of Z-list students were white, 14% were Asian, 4% were Hispanic, and just 2% black. Kahlenberg Rep. 36.

**C. The Use of Legacy Status in the Admissions Process**

286. Whether an applicant's parents attended Harvard is a factor that admissions officers consider when determining a student's "overall" score. Ex. 9, Fitzsimmons 258:14-259:16; Ex. 20, Ray 29:18-30:19; Ex. 16, McGrath 206:7-24.

287. Legacy applicants often have an advantage procedurally, as they may receive special attention from alumni during the interview process, HARV00016009-16010, and have their application read personally by Dean Fitzsimmons, Ex. 14, Looby 210:10-211:1; Ex. 75, HARV00011752; Ex. 6, Donahue 217:11-219:13.

288. Harvard gives preferences to legacies because it fears wealthy alumni may stop donating money and other assets to Harvard if their children no longer receive preferences. Ex. 190, HARV00097326; Ex. 65, HARV00006025; Ex. 9, Fitzsimmons 191:2-193:12.

289. Admissions officers give a "lineage tip" to legacy students despite the fact that whether one of the student's parents went to Harvard does nothing to enrich the academic experience of students at Harvard. Ex. 6, Donahue 125:17-127:1.

290. For the Classes of 2014-2019, 46.5% of students on the Z-List were legacies (compared to less than 3% of the applicant pool as a whole). Arcidiacono Rep., Appendix A, Table A.2; Kahlenberg Rep. 36.

**D. The Use of Donations in the Admissions Process**

291. Harvard gives preferences to applicants whose relatives have donated money or assets to Harvard (or who have the potential to do so). Ex. 1, Banks 211:21-213:17; Ex. 22, Smith 251:8-252:14; HARV00097326; Ex. 23, Smith2 146:17-147:21; Ex. 16, McGrath 206:7-207:6

292. According to Dean Smith, Harvard gives donors and potential donors admissions preferences because "[f]rom my experience being dean and talking to individuals [who] donate to the institution ... [w]hat they want to know is does the university take my involvement in the community seriously" and are "the activities that I do ... being noticed?" Giving the children of these individuals admissions preferences "is one of the ways that we are able to explicitly say to them, look, we know you're a member of our community and we know that you are participating in our community and helping out." This lets donors know that they are "doing something with [their] ... money [that] matters greatly." Ex. 23, Smith2 146:17-147:21; Ex. 21, Simmons 143:2-145:4; Ex. 190, HARV00097326.

293. According to Senior Admissions Officer Roger Banks, a donation from a relative can be a "substantial consideration" in the Admissions Office's decision to admit an applicant. Ex. 1, Banks 211:21-214:9.

294. Dean Fitzsimmons tracks applicants who are of interest to a donor or potential donor through the "Dean's Interest List." Ex. 9, Fitzsimmons 264:14-266:2; *see, e.g.*, Ex. 74, HARV00011624.

295. The Dean's Interest List is a list that identifies the applicants who have been brought to Dean Fitzsimmons' attention because of their connections or importance to Harvard. Ex. 9, Fitzsimmons 264:14-268:22.

296. The Dean's Interest List [REDACTED] Ex. 9, Fitzsimmons 267:23-270:9; Ex. 74, HARV00011624.

297. [REDACTED] the Dean's Interest List [REDACTED] Ex. 9, Fitzsimmons 277:14-278:7.

298. [REDACTED] his Dean's Interest List. [REDACTED]

[redacted] Ex. 9, Fitzsimmons 265:4-23; Ex. 14, Looby 207:2-11; Ex. 8, Faust 77:19-78:16.

299. [redacted] Ex. 224, HARV00004890; Ex. 9, Fitzsimmons 273:21-276:24; *see also* Ex. 38, HARV00004008.

300. In another example, [redacted] Ex. 71, HARV00010543.

301. The children of donors or potential donors often get special advantages, including staff interviews. Ex. 24, Walsh 14:16-15:19.

302. For the Classes of 2014-2019, 58.8% of Z-List students were on the Dean's/Director's Interest List. Kahlenberg Rep. 35.

303. By contrast, just 1.2% of students on the Z-List were disadvantaged, and 1.8% of students on the Z-List were first generation. Kahlenberg Rep. 35.

304. The Admissions Office claims that it almost never places a disadvantaged student on the Z-List because "the Z-list is a forced gap year," and Harvard has "concerns of lower income,

under-resourced students not knowing what to do for a year, for a year off from traditional schooling." Ex. 5, Cheng 141:2-142:4; Kahlenberg Rep. 34-36.

**E. The Use of Staff and Faculty Preferences in the Admissions Process**

305. Harvard awards preferences to the children of Harvard faculty and staff because it fears that withholding such preferences would put it at a competitive disadvantage to other colleges and universities. In particular, Harvard fears that professors it is recruiting will decline an offer to teach at Harvard and instead go to a college or university that will award preferences to their children. Ex. 190, HARV00097326; Ex. 23, Smith2 145:6-146:15.

306. According to Dean Smith, potential faculty members want assurances that their children will be given admissions preferences: "[T]hey want to know what kind of community they're entering into. Is this a community that we talk about a whole person review of applicants? Will my son or daughter, when they are being considered by the admissions office, know whether or not I am a member of this community[?] …. [T]hat matters to the individuals coming in. If we tell them no ... they will look at this and say, well, this other institution cares that I'm a member of the community." Ex. 23, Smith2 145:6-146:15

**F. The Use of Athletic Ability in the Admissions Process**

307. Harvard gives preferences to recruited athletes because "[a]thletic performance at a high level requires discipline, resilience, and teamwork that benefits students for the rest of their lives and prepares them for active engagement with their peers." Ex. 190, HARV00097325.

308. Harvard also believes that its "ability to field athletic teams contributes to the deep connection Harvard students and alumni form with the institution and that foster a sense of community on campus." Ex. 190, HARV00097325.

309. Recruited athletes (those applicants with an athletic rating of 1) have by far the highest admissions rates and preferences of any group applying to Harvard. Arcidiacono Rep. 24; Arcidiacono

Rebuttal Rep., App. A3. The admit rate for recruited athletes is 86%; the rate for non-recruited athletes is 6%. Arcidiacono Rep., App. A, p.3.

310.    Illustrating how strong the preference is for recruited athletes, the probability of getting admitted with an academic rating of 4 is minuscule for non-athletes (.076%) and nearly a thousand times greater for athletes (70.46%). Arcidiacono Rebuttal Rep., App. A, p.3.

311.    The athletic rating has little impact on admissions outside of recruited athletes. Arcidiacono Rep. 5 n.5, 24 n.31; Arcidiacono Rebuttal Rep. 31.

## V.    Harvard's Knowledge of Its Discrimination Against Asian Americans

### A.    Harvard's Knowledge of Complaints That Its Admissions Process Discriminates Against Asian Americans.

#### 1.    Allegations of Asian-American Discrimination Made to the Office of Civil Rights

312.    Harvard has long been dogged by claims that it discriminates against Asian Americans in its admissions process. In the 1980s, the admission rate for Asian Americans was below that for all other racial groups, including whites. Multiple reports and student groups claimed that Harvard was limiting the number of Asian Americans it admitted based on Asian-American stereotypes. Ex. 117, HARV00023650-51.

313.    In response to these allegations, in January 1988, the Dean of Admissions and Financial Aid, William Fitzsimmons—who holds the same position today—acknowledged that Asian Americans had been admitted at a 3.7 percent lower rate than whites over the prior 10 years, but provided an explanation: "While Asian-Americans are slightly stronger than whites on academic criteria, they are slightly less strong on extracurricular criteria. In addition, there are very few Asian-Americans in our applicant pool who are alumni/ae children or prospective varsity athletes. When all these factors are taken into account, the difference in admissions rates for the two groups disappears." Ex. 105, HARV00023143.

314.     Later that year, the U.S. Department of Education, Office of Civil Rights ("OCR")
initiated a compliance review to determine whether Harvard was complying with Title VI of the Civil
Rights Act of 1964. Ex. 117, HARV00023650-51.

315.     In 1990, Thomas Hibino, the Regional Director of OCR, wrote a letter to Harvard
President Derek Bok closing the investigation. According to Mr. Hibino, "I am pleased to inform you
that [OCR] has completed its review of Harvard University's undergraduate admissions program" and
has "concluded that Harvard has not violated Title VI with respect to the admission of Asian
American applicants to the undergraduate program." Ex. 116, HARV00023643.

316.     According to Mr. Hibino, although "Asian American applicants have been admitted
at a significantly lower rate than white applicants, ... we determined that the primary cause of the
disparity was the preference given to children of alumni and recruited athletes, which adversely
affected Asian Americans." Ex. 116, HARV00023643.

317.     Mr. Hibino closed by asking President Bok to thank his "staff, particularly Dean
William R. Fitzsimmons" for their "courtesy and cooperation" throughout the investigation. Ex. 116,
HARV00023649.

318.     The OCR report was roundly criticized. According to Alan Dershowitz, for example,
Harvard's rationale was just pretext for intentional discrimination: "Asian Americans clearly get a big
whack—not a tip—in the direction against them. Harvard wants a student body that possesses a
certain racial balance…. I think the report was sloppy. I have absolutely no faith in the Harvard system
of admissions." Ex. 219.

319.     Mr. Hibino, who remained OCR's chief regulator of the Boston region for more than
two decades following the investigation, stayed friends with Dean Fitzsimmons throughout that time.
Ex. 26, Yong 245:7-20; Ex. 9, Fitzsimmons 362:22-363:7.

320.     Dean Fitzsimmons and Mr. Hibino worked cooperatively together whenever OCR was required to investigate Harvard. For example, on January 11, 2012, OCR sent President Faust a letter informing her that OCR had received a complaint from Indian-American parents alleging that Harvard was discriminating "on the basis of national origin (Indian American/Asian American)" by "limit[ing] the number of Asian American students admitted to the University" and by "appl[ying] different (i.e., higher) standards to the Student's application as compared to applications submitted by White applicants." OCR asked Harvard to provide certain data and other information related to its admissions process. Ex. 87, HARV00016645.

321.     The next day, on January 12, 2012, Mr. Hibino sent Dean Fitzsimmons an email saying, "I just wanted to let you know we finally sent you guys something on that complaint we talked about before. This shouldn't be a big deal, but let's talk sometime." Ex. 94 at 38 (FOIA).

322.     On February 2, 2012, the same day that Harvard submitted its response to OCR, Dean Fitzsimmons and Mr. Hibino met for lunch at the Ruth's Chris steakhouse in Boston. HARV00018452; Ex. 94 at 37 (FOIA).

323.     Thirteen days later, on February 15, 2012, OCR closed the investigation, informing Harvard that the parents of the Indian-American applicant had withdrawn their complaint. Ex. 86, HARV00016639.

324.     Later that year, Mr. Hibino emailed Dean Fitzsimmons to confirm lunch plans and joked: "The complainant who wants us to investigate Asian American admissions at Harvard again (we said no) sent a FOIA request for various things including stuff from the original case and I found the attached (which we didn't send.) This smoking gun, which I purportedly returned to you, is really hilarious if I do say so myself! I did it for the amusement of our team and of course, you guys are the only others who can appreciate the humor." Harvard informed SFFA that it was unable to locate the "smoking gun" document sent by Hibino. Ex. 49, HARV00004938.

### 2. Allegations of Asian-American Discrimination Made by Harvard Alumni Interviewers and Others

325. Harvard alumni have directly raised concerns of bias against Asian Americans with Harvard. In 2014, [redacted], a long-time alumni interviewer, wrote that "my feelings towards Harvard have been slowly changing over the years. I've been interviewing for the college for almost 10 years now, and in those ten years, none of the Asian American students I've interviewed has been accepted (or even wait-listed). I'm 0 for about 20. This is the case despite the fact that their resumes are unbelievable and often superior to those of the non-Asian students I've interviewed who are admitted. I've also attended interviewer meetings where Asian candidates are summarily dismissed as 'typical' or 'not doing anything anyone else isn't doing' while white or other minority candidates with similar resumes are lauded." Ex. 130, HARV00029909.

326. [redacted] continued: "Asian American percentage at the college hasn't moved in 20 years. If anything it's gone down, even though the % of Asian legacy candidates should be going up as AA alumni start having kids. Remember when they used to claim that Asians didn't have the 'legacy tip' and that was why they weren't admitted at the expected percentages? Well, it's 2014 and they're still not getting in. In short, I'm starting to feel like Harvard still isn't interested in Asian students, that the bar is higher for Asians than any other ethnicity and that Asian legacy candidates are not receiving the same consideration that white legacy candidates get." Ex. 130, HARV00029909.

327. Alumni interviewers from [redacted] echo these concerns. In 2013, a group of [redacted] alumni interviewers had an email discussion concerning discrimination against Asian-American applicants. According to [redacted] one of those alumni interviewers, "[s]tudents of Asian and Indian backgrounds have a much harder time getting in [to Harvard] because there are so many from those groups with great records applying, whereas students of other groups get a very big assist from their particular race in getting in …. [O]ther minority groups are almost completely ignored and so

receive relatively little help even though they come from very modest means and face a lot of discrimination." Ex. 73, HARV00011118.

328. [REDACTED] another Harvard alumni interviewer from [REDACTED] responded that [REDACTED] comments "are undeniably true and they certainly are not inconsistent with my comments and opinions, past and present. Your and my children and those of many of the other interviewers if and when they are admitted, have indeed overcome a formidable but unspoken hurdle, the unwritten 'Asian Quota' that exists but is ever vehemently denied by all the Ivy League Schools." Ex. 73, HARV00011118.

329. This email exchange was then forwarded to Dean Fitzsimmons. He responded to the email (addressing other concerns the [REDACTED] alumni interviewers had raised), but he never addressed their concerns about Asian-American discrimination. Ex. 124, HARV00026671.

330. According to Lee Cheng, an SFFA member who has been a Harvard alumni interviewer for mor[REDACTED] high levels of Academic and Extracurricular Activities achievements, and favored and admitted other applicants, particularly Hispanic or African-American candidates, who have had on average lower, and sometimes much lower, academic and extracurricular qualifications." Mr. Cheng has "personally never seen an Asian American candidate admitted with Academic qualifications that are typical for the African American or Hispanic candidates I have seen admitted." Ex. 217 at 3 (Declaration of Lee Cheng).

331. Similarly, on several occasions, the Admissions Office "made clear to alumni/ae interviewers, including [Mr. Cheng], that certain African-American or Hispanic candidates were of special interest to Harvard, and that we should make every effort to recruit and convince those candidates to matriculate to Harvard." Mr. Cheng recalls "[n]o such directive, instruction or guidance … ever [being] given for any Asian-American candidate." *Id.*

332. On the few occasions that Harvard officials have even responded to these concerns over discrimination against Asian Americans, they have dismissed them out of hand. For example, at [redacted] Ex. 129, HARV00029873.

333. Similarly, around 2010, [redacted], an employee at the Office of Institutional Research ("OIR"), told his supervisor, Erin Driver-Linn, that the admissions process was biased against "his people." [redacted] drew that conclusion after reviewing and analyzing Harvard's admissions data by race. Ms. Driver-Linn told no one and took no further steps to investigate [redacted] allegation. Ex. 7, Driver-Linn 211:7-212:24, 333:24-338:16.

334. [redacted]

[redacted] Ex. 104, HARV00022625.

335. Similarly, in April 2014, a junior in high school in [redacted] New York, wrote President Faust to express deep concern about media reports of discrimination against Asian Americans, and to seek assurances that Harvard—a university she had "always admired"—was not discriminating against Asian Americans. Ex. 131, HARV00029930.

336. Upon receiving the letter, Harvard officials (inaccurately) questioned whether she "really [was] a high school student" because the letter was so well-written. Harvard decided to send the student a "generic response ... saying that the President's Office is not involved in admissions, and [she] should contact the Admissions Office." Director McGrath, in turn, promised to "give our own dumb answer if she contacts us." Ex. 118, HARV00024781.

337. Similarly, in February 2013, an alumni interviewer from [redacted] Ex. 76, HARV00013119.

338. Similarly, in January 2014, the Utah alumni chapter notified Harvard that they had "met this morning to discuss and rank the Utah applicants who applied regular action for the Class of 2018, as well as the early action applicants who were deferred." The committee then identified the students who received their highest ranking. Ex. 136, HARV00032339.

339. Director McGrath, who is the chair of Docket B (which contains Utah), forwarded the email to her [redacted]

[redacted] Ex. 136, HARV00032339.

340. A few months later, Harvard admitted nine students from Utah. Only two were Asian American. Ex. 17, McGrath 400:19-401:21; Arcidiacono Dec. ¶ 13.

341. Harvard has also received letters urging the school to limit the number of Asian Americans admitted to Harvard. In 2012, President Faust received a letter from an alum urging Harvard to adopt "informal quotas." Such quotas "would include foreign students and the country of their origin. For example, I would limit the number of Japanese students to a certain percentage or number. I think it is also important to have a quota based on religious affiliation and skin color. None of this, of course, has to go beyond the confines of the dean's office. The last time I was in Cambridge it seemed to me that there were a large number of oriental students, for example. I think they probably should be limited to 5%.... I would appreciate hearing what you might think of my comments." Ex. 132, HARV00029944.

342. Director McGrath responded to the alum (with a carbon copy to President Faust): "President Faust has asked me to respond to your April 4 letter, in which you offer many thoughtful observations about Harvard College students and the results of the admissions process.... All of us at Harvard appreciate your thoughtful letter, as well as your loyalty over the years." The letter did not take issue with the alum's comments about limiting the number of "oriental students" at Harvard or establishing informal quotas. Ex. 132, HARV00029940-42; Ex. 17, McGrath 381:20-383:25.

343. President Faust was comfortable with Director McGrath sending this "polite and respectful response" because "[t]his is a letter from a 90-year-old alum who's given some kind of support to scholarships. He graduated with the class of 1942. He probably went off and fought in World War II. His letter is preposterous, but there's just no reason to tell him his letter is preposterous." Ex. 8, Faust 238:15-242:12.

344. When directly asked, President Faust refused to say whether a letter saying the same thing about African Americans would have deserved a similar "polite and respectful" response. Nor would she speculate as to how Asian-American students would react to the letter, because "Asian-American students have not seen these letters…. [T]hese are matters of personal correspondence that are not matters of public scrutiny." Ex. 8, Faust 238:15-242:12. Director McGrath similarly testified that she has "no regret[s]" about her response. Ex. 17, McGrath 381:20-383:25

345. Harvard's reaction to claims of discrimination against Asian Americans contrasts starkly with how it responds to complaints from other minority groups. When Native Americans raised concerns about their representation on campus, they were taken seriously, as were the concerns that Latinos and Latinas raised about their representation on campus. Ex. 8, Faust 83:1-89:5.

346. When African Americans raised concerns about the campus environment, Harvard's responded at the highest levels; President Faust even wrote an editorial. Ex. 67, HARV00010368-69.

347. When asked whether "concerns that Harvard's admissions process disadvantages Asian-Americans need to be addressed," President Faust replied simply, "No, I don't." Ex. 8, Faust 277:23-278:3.

## B. Harvard's Internal Investigation Responding to Allegations of Discrimination Against Asian Americans.

### 1. The Unz and Brooks Articles

348. On November 28, 2012, Ron Unz, a Harvard alumnus, published a lengthy magazine article in the *American Conservative* entitled "The Myth of American Meritocracy" ("Unz Article"). Ex. 88, HARV00016675.

349. The Unz Article describes the historical origin of Harvard's admissions process, when the college "transformed [its] admissions process from a simple objective test of academic merit into a complex and holistic" system that allowed Harvard to "sharply curtail the rapidly growing numbers

of Jewish students." Examining Harvard's admissions system today, Unz concluded that Asian Americans are the "new Jews." Ex. 88, HARV00016677.

350.    In the article, Unz described "the considerable anecdotal evidence that many Asians perceive their chances of elite admission as being drastically reduced by their racial origins" and argued that statistical evidence confirmed these fears, as Asian-American enrollment at Harvard had stagnated or declined in the past two decades despite a sharp rise in applications. Unz concluded that the statistical evidence showed "an anti-Asian admissions bias" at Harvard. Ex. 88, HARV00016678.

351.    Following publication of the Unz Article, Harvard leaders received numerous inquiries from the press and alumni asking for a response. Ex. 9, Fitzsimmons 374:11-375:10.

352.    On the day the Unz Article was published, for example, Director McGrath was forwarded an email from an alumni interviewer seeking a response from Harvard about the validity of the allegations. McGrath dismissed Unz's claims as "a hodgepodge of old-chestnut arguments." Ex. 138, HARV00032477.

353.    In mid-December 2012, Harvard agreed to provide its views in an upcoming *New York Times* symposium called "Room for Debate," which featured seven opinions about whether there was an "Asian quota in the Ivy League." Harvard's article was drafted by Jeff Neal, the Director of Communications, with assistance from Dean Fitzsimmons and the Office of General Counsel. Ex. 232, Harvard Privilege Log at 1; Ex. 217.

354.    On December 19, 2012, Mr. Neal's article was published in the *New York Times*. The three-paragraph article stated generally that Harvard's holistic admissions process was "highly individualized and holistic" and the college did "not use quotas of any kind." The article did not address any of Unz's statistics or specific claims about Harvard's admissions process. Ex. 217.

355.    Harvard received additional inquiries about the Unz Article following the "Room for Debate" publications. On December 20, 2012, in response to another email about the Unz Article,

McGrath explained, "I have been telling people that [his] set of views is nothing new…. I often mention too that we have had opportunities to show the OCR [Office of Civil Rights], the courts and others how our process works and that the OCR has found us in compliance with the law and with general principles of fairness. Fitz may have more specific talking points to offer but I have found the pretty simple response seems to shut up anyone not already loaded for bear." Ex. 225, HARV00035209.

356.     Five days later, on December 24, 2012, David Brooks published an opinion piece in the *New York Times* in which he summarized and discussed Unz's claims about Harvard ("Brooks Article"). Brooks lauded the Unz Article, describing it as one of "the best magazine essays of the year." Ex. 107, HARV00023314.

357.     The Brooks Article dialed up the pressure on Harvard to respond more substantively to claims of Asian-American discrimination. On December 27, 2012, for example, Dean Fitzsimmons received an email (the sender's name has been redacted) urging him to "bring[] the issue of accuracy and fact checking to [the] attention of [the] NYTimes public editor/ombudsman" because "[t]hese egregious errors really call for that." HARV00023318. Another email that day implored Fitzsimmons to issue a "formal reply directly from Harvard." Fitzsimmons promised that Harvard would soon issue "an institutional response" to the Unz Article, but "[g]iven the sensitivity of the issues, it will probably take some time to complete the deliberations, and I will keep you posted." Ex. 109, HARV00023320.

358.     In the weeks that followed, Dean Fitzsimmons, according to Elizabeth Yong, was "on a tear about this Asian American thing." Ex. 78, HARV00014509.

359.     Dean Fitzsimmons discussed the Unz Article with the entire Admissions Office. Ex. 52, HARV00005071.

360.     Dean Fitzsimmons attended multiple meetings to discuss the "Asian American issue." Ex. 63, HARV00009110; Ex. 128, HARV00029858; Ex. 142, HARV00065444.

361.     Dean Fitzsimmons ultimately promised that Harvard was looking into these issues and a decision on a response to the Unz Article would be forthcoming. Ex. 111, HARV00023432.

### 2.     Harvard's Response to the Unz Article

#### a.     Harvard's OIR Investigation into Asian-American Discrimination

362.     In early 2013, Harvard officials conducted an investigation into Unz's allegations that Harvard was discriminating against Asian Americans in the admissions process. This investigation was not done at the request of counsel. Ex. 7, Driver-Linn 93:17-95:11, 105:14-106:24.

363.     This investigation was led by the Director of the Office of Institutional Research, Erin Driver-Linn, with the assistance of two other individuals from OIR, Erica Bever and Mark Hansen, both of whom had extensive experience performing analysis of Harvard's admissions data. Ex. 7, Driver-Linn 234:7-21.

364.     OIR also worked with Elizabeth Yong in the Admissions Office in order to collect the admissions data they needed. Ex. 202, Hansen Ex. 6.

365.     OIR held multiple meetings with Dean Fitzsimmons to present its findings as to whether Harvard's admissions process disadvantaged Asian Americans. Ex. 10, Hansen 13:16-14:16, 103:16-18.

#### b.     Harvard's Investigation into Asian-American Discrimination at the Direction of Harvard's General Counsel

366.     In late December 2012 and early January 2013, dozens of emails were exchanged among senior leadership at Harvard concerning Unz's allegations that Harvard was discriminating against Asian Americans. Participants in these conversations included President Drew Faust, Provost Alan Garbar, Dean Smith, Dean Fitzsimmons, Erin Driver-Linn, Robert Iuliano (Harvard's General Counsel), Christine Heenan (the Vice President of Public Affairs and Communications), and Elizabeth Yong. Ex. 232, Harvard Privilege Log 1-5; Ex. 235, Supplemental Privilege Log 1-10.

367. At the direction of Mr. Iuliano, Harvard officials conducted an investigation into Unz's allegations that Harvard was discriminating against Asian Americans in the admissions process. *Id.*

368. Between December 29, 2012 and February 12, 2013, individuals from OIR exchanged over 100 emails among themselves and with individuals in the Admissions Office (including Dean Fitzsimmons) in which they were "gathering information," "requesting information," "providing information," or "discussing [a] request [for] information" for the purpose of obtaining legal advice from Mr. Iuliano "regarding [a] response to allegations of discrimination" against Asian Americans by Harvard. *Id.*

369. A repeated topic of conversation among individuals at OIR, Harvard leadership, as well as the Office of General Counsel, was a document entitled "Facts About Asian American Admissions at Harvard." This document purported to be "talking points" refuting the allegations of discrimination raised in the Unz Article. It provided various statistics about the percentage of Asian Americans in Harvard's applicant pool each year, the percentage of Asian Americans Harvard admitted each year, and the percentage of Asian Americans who matriculated to Harvard each year. Ex. 168, HARV00076081.

370. Harvard refused to produce emails and documents discussing these issues on grounds of attorney-client privilege. Individuals from OIR and the Admissions Office similarly refused to answer questions about these issues on grounds of attorney-client privilege. Ex. 232, Harvard Privilege Log 1-5; Ex. 235, Supplemental Privilege Log 1-10; *e.g.,* Ex. 7, Driver-Linn 93:17-94:18.

**c. Harvard's Draft Statements Responding to the Unz Article**

371. By early 2013, the pressure from alumni on Fitzsimmons to issue a formal response to the Unz Article on behalf of Harvard had not relented. For example, on January 20, 2013, an alum wrote Fitzsimmons asking: "Have I missed a printed response from Harvard to the errors and negative spin of [the Unz and Brooks] Articles? If not, what other steps did Harvard take to correct the errors

and seek retractions? E.g. was the public editor of the NYTimes ever advised? Were the authors? Uncorrected, the impression is damaging to Harvard." Ex. 111, HARV00023432.

372. Fitzsimmons responded: "There have been a number of meetings already to consider how Harvard should respond. Both the researchers and the public affairs staff are hard at work doing a variety of analyses. Our office has been involved in the deliberations and we have provided data that will help to frame the decision. Obviously[,] we stand ready to help in any way we can." Ex. 111, HARV00023432.

373. The alum responded: "Too many bureaucrats, too many lawyers, too much delay[,] too bad. By now, the NYTimes as the paper of record has created erroneous and damaging history." Ex. 111, HARV00023432; *see also* Ex. 85, HARV00016628-29; Ex. 110, HARV00023430; Ex. 140, HARV00035478.

374. [REDACTED] Ex. 187, HARV00077882; *see also* Ex. 61, HARV00007877.

375. In mid-January 2013, Fitzsimmons drafted articles responding to Unz's allegations and solicited input and revisions from McGrath, Donahue, Elizabeth Yong, and [REDACTED] (the Director of International Admissions). Ex. 78, HARV00014509; Ex. 143, HARV00065449; Ex. 142, HARV00065444.

376. Despite all of this work, Harvard never published a formal response to the Unz Article. Ex. 226, HARV00008301.

### 3.   OIR's Findings of Bias Against Asian Americans

#### a.   Harvard's Regular Reliance on the Conclusions of OIR

377.     Harvard's Office of Institutional Research has two primary functions: (1) to "collect, synthesize and analyze institutional data to fulfill mandatory reporting requirements"; and (2) to "support University decision-making (in the offices of the President and Provost, and beyond as possible)." Ex. 153, HARV00068152; Ex. 201, Hansen Ex. 1; Ex. 7, Driver-Linn 36:24-37:7.

378.     As to the first category, OIR regularly gathers institutional data from the various departments within Harvard, organizes and analyzes the data, and then produces data and reports to various State and Federal agencies and private organizations. For example, OIR produces admissions and enrollment statistics to the U.S. Department of Education annually and to the New England Association of Schools and Colleges, which is the organization that accredits Harvard as a post-secondary educational institution. Ex. 7, Driver-Linn 37:8-41:14.

379.     As to the second category, OIR provides statistical analysis of institutional data to support various leaders and departments within Harvard University in their decisionmaking. For example, OIR has performed statistical analysis concerning Harvard's finances, faculty salaries, and administrative staff growth. Ex. 153, HARV00068159-73.

380.     OIR has an annual budget of approximately $1 million and typically employs about ten individuals. Ex. 7, Driver-Linn 51:13-52:5; Ex. 153, HARV00068154.

381.     For Harvard College, in particular, OIR's work generally involves three categories: (1) admissions and financial aid; (2) student achievement; and (3) student outcomes. "This work is typically done at the request of President Faust or for particular leadership audiences at the College and FAS [Faculty of Arts and Sciences], such as for Dean Fitzsimmons." Ex. 184, HARV00077521.

382.     Importantly, OIR has "supported decision-making around admissions and financial aid at least since … 2007," and, "[o]n all of these policy questions, [OIR] collaborated closely with

Dean Bill Fitzsimmons and Director of Financial Aid Sally Donahue to understand the climate and nuances of the data, but brought an external perspective to these questions around access and affordability." Ex. 184, HARV00077521.

383. Harvard leaders regularly rely on OIR's analysis when making important decisions relating to admissions policies. For example, Harvard reinstated early action (which it had ended in 2007) based in part on OIR's conclusions that the elimination of early action had caused Harvard to see a "decline in yield among [Harvard's] most desirable students, including talented low income and underrepresented minority students." OIR's report, which was labeled "Preliminary Draft," was sent to President Faust and Dean Smith and then ultimately to the members of the Harvard Corporation. Ex. 184, HARV00077565, HARV00077562, HARV00077582, HARV00077586; Ex. 10, Hansen 55:16-56:7; Ex. 8, Faust 68:10-70:8; Ex. 201, Hansen Ex. 1.

384. Similarly, Harvard increased the amount it required certain students (those whose families had incomes between $150,000 and $180,000) to pay in tuition based in part on OIR's analysis of the effect of potential changes to financial aid. OIR's report, analyzed the effect of different student-contribution requirements on yield rates, on the academic and athletic quality of the admitted class, and on Harvard's savings via decreased aid grants. OIR's report, which was labeled "Preliminary Draft," was sent to Clayton Spencer, the Vice President for Policy at Harvard, and then ultimately to the members of the Harvard Corporation. Ex. 184, HARV00077599, 77645, 77648, 77656; Ex. 10, Hansen 55:16-56:7; Ex. 2, Bever 70:4-72:18; Ex. 8, Faust 68:10-70:8; Ex. 201, Hansen Ex. 1.

385. In late 2012, before it began its work examining bias against Asian Americans in admissions, OIR was working on two admissions-related projects: (1) analyzing the effect of Harvard's return to early action on admissions and the student body; and (2) examining the differences (if any) among male and female applicants to Harvard. Ex. 153, HARV00068157.

### b.    OIR's Collection of Admissions Data

386.    To analyze the effect of Harvard's admissions process on Asian Americans, OIR worked with Elizabeth Yong in the Admissions Office to obtain all "variables that are important in making admissions decisions." Ex. 202, Hansen Ex. 6.

387.    OIR's goal was to "gather all data that could be relevant to [its] analysis into whether Asians [were] disadvantaged in the admissions process." Ex. 10, Hansen 180:3-9.

388.    OIR ultimately collected nearly 100 fields of data about every applicant who applied to Harvard over a ten-year period (Class of 2007 through Class of 2016). These fields included, among others, name, address, high school, citizenship, race, whether the student sought a fee waiver, class rank, legacy status, whether the student's mother and father went to college, whether the student's mother and father went to graduate school, the student's academic index, academic rating, extracurricular rating, athletic rating, personal rating, guidance counselor rating, teacher ratings, alumni interview rating, overall rating, gender, SAT I scores, SAT II scores, ACT scores, GPA, anticipated concentration (major), and whether the student was a recruited athlete. Ex. 202, Hansen Ex. 6.

### 4.    The February 2013 OIR Report

### a.    The Report's Findings

389.    In February 2013, OIR produced a report entitled "Admissions and Financial Aid at Harvard College" ("February 2013 Report"). Ex. 134, HARV00031687.

390.    The February 2013 Report combined the three admissions-related projects OIR had been investigating over the previous few months into one report. The report's three sections addressed the following questions: "(1) What is the effect on our applicant pool and yield of reintroducing early action? (2) Is the shift in the gender balance at Harvard College due to increased interest and recruitment for SEAS [the School of Engineering and Applied Sciences]? And (3) Does the admissions process disadvantage Asians?" Ex. 134, HARV00031689.

**(1) The Report's Findings on the Return of Early Action**

391. In the section on early action admissions, the report provided detailed analysis of the applicant pool and yield rates of the class (broken down by race) before and after the elimination of early action and after the return of early action. Ex. 134, HARV00031692-701.

392. The report found that Harvard's decision to eliminate early action (starting with the Class of 2011) caused "yield rates for the most highly rated Hispanic, Black and White students [to] decline[]." By contrast, the yield rates for the most highly rated Asian-American students increased after the elimination of early action. Ex. 134, HARV00031694. The report defined "highly rated" students as those students with a 1 or a 2 on the academic and extracurricular rating. Ex. 134, HARV00031694.

393. The report also concluded that the current applicant pool (Class of 2016) was "more diverse than old early action pools" because there were more African-American, Hispanic, and International applicants. The report made this conclusion despite the fact that there were significantly fewer Asian-American applicants in the new early applicant pool than in the old early applicant pool. Ex. 134, HARV31697, HARV00031701.

394. The report also plotted out the "URM" (i.e., "underrepresented minorities") share of each class. The report defined URM students as Native Americans, Hispanics, and African Americans. Ex. 134, HARV00031700.

**(2) The Report's Findings on Gender and Admissions**

395. In the section on gender balance, the report investigated why [REDACTED] Ex. 134, HARV00031703-16.

396. [REDACTED]



[redacted] Ex. 134, HARV00031706, HARV00031716.

397. [redacted] Ex. 134, HARV00031706, HARV00031716.

398. [redacted] Ex. 134, HARV00031716.

**(3) The Report's Findings on Asian-American Bias**

399. In the section on Asian Americans, the report analyzed whether Harvard's admissions process was "bias[ed] against Asians." Ex. 134, HARV00031724.

400. To examine potential bias against Asians, the report "fit[ted] a series of basic logistic regression models" using a pooled sample of ten years of admissions data (Class of 2007 through Class of 2016). This allowed OIR to "generate fitted probabilities of admissions" based on various admissions ratings and applicant characteristics. Ex. 134, HARV00031718.

401. Through the report, OIR analyzed the possibility of Asian-American bias by creating four models. Each model projected the racial characteristics of the "admitted student pool" under hypothetical admissions systems that took certain factors into account. The report then compared each model to the actual admitted class at Harvard over the ten-year period. Ex. 134, HARV00031720.

402. The report contained the following table and chart:



| | Academics Only | Legacy and Athlete | Extracurricular and Personal | Demographics | |
|---|---|---|---|---|---|
| | **Model 1** | **Model 2** | **Model 3** | **Model 4** | **Actual** |
| Asian | 43.04% | 31.40% | 25.99% | 17.97% | 18.66% |
| African American | 0.67% | 1.83% | 2.36% | 11.12% | 10.46% |
| International | 7.27% | 5.86% | 7.39% | 7.68% | 8.90% |
| Hispanic | 2.42% | 2.62% | 4.07% | 9.83% | 9.46% |
| Native American | 0.21% | 0.32% | 0.41% | 1.21% | 1.23% |
| Unknown | 8.02% | 9.93% | 9.14% | 8.11% | 8.09% |
| White | 38.37% | 48.03% | 50.63% | 44.08% | 43.21% |

Ex. 134, HARV00031720.

403. In Model 1, OIR showed the racial makeup of Harvard's admitted class if the Admissions Office admitted students based only on two factors: (1) the student's academic index (*i.e.*, a numeric score Harvard creates based on the student's test scores and grades) and (2) the student's academic rating. Ex. 134, HARV00031719-20.

404. In an earlier draft of the report, OIR referred to Model 1 as "Unz's Proposal." Ex. 154, HARV00069096, HARV00069097.

405. According to the table and chart, if Harvard's admissions process were like Model 1, the percentage of Asian Americans in the class would more than double to 43 percent. Ex. 134, HARV00031720.

406. In Model 2, OIR predicted Harvard's admitted class if the Admissions Office admitted students based on four factors: (1) the student's academic index, (2) the student's academic rating, (3)

whether the student was a legacy (one of the student's parents went to Harvard or Radcliffe), and (4) whether the student was a recruited athlete. Ex. 134, HARV00031719-20.

407.     In an earlier draft of the report, OIR referred to Model 2's legacy and athlete factors as "[f]actors we will continue to consider no matter what (still need a football team, etc)." Ex. 154, HARV00069096-97.

408.     According to the chart, if Harvard's admissions process were like Model 2, the percentage of Asian-American students would fall by nearly 12 percent and the percentage of white students to rise by nearly 10 percent. The projected class, however, would still remain nearly 13 percentage points above the actual Asian-American share of the class.  Ex. 134, HARV00031720.

409.     As OIR summarized in an earlier draft, "[l]egacy and athlete seems to benefit white students most, though also benefits hispanic and black students." Ex. 154, HARV00069096, HARV00069100.

410.     In Model 3, OIR predicted Harvard's admitted class if the Admissions Office admitted students based on six factors: (1) the student's academic index, (2) the student's academic rating, (3) whether the student was a legacy, (4) whether the student was a recruited athlete, (5) the student's personal rating, and (6) the student's extracurricular rating. Ex. 134, HARV00031719-20.

411.     In an earlier version of the report, OIR referred to Model 3's personal rating and extracurricular rating as "[s]quishier measures, that may be more open to subjectivity." Ex. 154, HARV00069096-97.

412.     If Harvard's admissions process were like Model 3, the percentage of Asian-American students would fall by more than 5 percent and the percentage of white students would rise by more than 2 percent. The projected class, however, would still remain more than 7 percentage points above the actual Asian-American share of the class. Ex. 134, HARV00031720.

413.    As OIR summarized in an earlier draft, extracurricular and personal ratings "seem[] to benefit white students most, though also benefit[] hispanic and black students." The prior draft also found that "the majority of the change in admit rates and class composition comes from [the] personal ratings." Ex. 154, HARV00069096, HARV00069100.

414.    Finally, in Model 4, OIR predicted Harvard's admitted class if the Admissions Office admitted students based on eight factors: (1) the student's academic index, (2) the student's academic rating, (3) whether the student was a legacy, (4) whether the student was a recruited athlete, (5) the student's personal rating, (6) the student's extracurricular rating, (7) the student's gender, and (8) the student's race/ethnicity. Ex. 134, HARV00031719-20.

415.    In an earlier version of the February 2013 Report, OIR referred to Model 4's gender and race factors as "demographic factors." Ex. 154, HARV00069096-97.

416.    If Harvard's admissions process were like Model 4, the share of Asian-American students would fall by more than 8 percentage points, representing a 32 percent decrease in their share of the overall class. This would represent the largest drop of any racial group, including white students, which would fall approximately 6.5 percentage points, representing a 13 percent decrease in their share of the overall class. Ex. 134, HARV00031720.

417.    The addition of gender and race also caused the share of African Americans in the overall class to rise by nearly 9 percentage points (representing a 400% increase in their share of the class) and the share of Hispanics to rise by nearly 6 percentage points (representing a 140% increase in their share of the class). Ex. 134, HARV00031720.

418.    As OIR concluded in an earlier draft, the "[b]iggest change to … class composition for black and hispanic students comes from consideration of demographics." Ex. 154, HARV00069096, Ex. 154, HARV00069100.

419.    In the February 2013 Report, OIR also found that the same pattern could be expressed in changes in the admission rates of each racial category. According to the report, the admit rates of Asian Americans progressively declined as factors were added to each of the four models:



| | Academics Only | Legacy and Athlete | Extracurricular and Personal | Demographics | |
|---|---|---|---|---|---|
| | **Model 1** | **Model 2** | **Model 3** | **Model 4** | **Actual** |
| Asian | 17.35% | 12.66% | 10.48% | 7.24% | 7.63% |
| African American | 0.75% | 2.07% | 2.67% | 12.59% | 12.00% |
| International | 5.13% | 4.14% | 5.22% | 5.42% | 6.37% |
| Hispanic | 2.34% | 2.53% | 3.94% | 9.51% | 9.27% |
| Native American | 1.97% | 2.98% | 3.81% | 11.17% | 11.43% |
| Unknown | 9.45% | 11.70% | 10.77% | 9.56% | 9.67% |
| White | 9.43% | 11.81% | 12.45% | 10.84% | 10.77% |

Ex. 134, HARV00031720-21.

420.    Thus, under Model 1, the Asian-American admit rate would be by far the highest of any racial group (nearly twice as high as the white admit rate). Yet it falls steadily with each successive model. By Model 4 (which is closest to the actual admissions process), the Asian-American admit rate is the lowest of all the racial groups. Ex. 134, HARV00031720-21.

421.    OIR concluded that "once we account for ratings and demographic factors, we can closely predict what the admitted class will look like." Ex. 134, HARV00031722.

422. For proof of the accuracy of its modeling, OIR noted that the projected admitted class under Model 4 and the projected admit rates under Model 4 were nearly identical to the actual admitted class and actual admit rates. Ex. 134, HARV00031728.

423. OIR further concluded that "[w]ith current data, we explain a significant amount of the variation in admission, but further details (especially around the personal rating) may provide further insight." Ex. 134, HARV00031722.

424. OIR then raised various "next steps" they could take, including whether "this work [should] be shared with additional audiences (e.g. President Faust, Dean Smith, Dean Hammonds)." Ex. 134, HARV00031723.

425. Last, OIR asked whether it should acquire "more data to elaborate our understanding of the role of the personal essay and other factors" in order to address the question of whether there was "bias against Asians." Ex. 134, HARV00031724.

**b. Dean Fitzsimmons' Response to the February 2013 Report**

426. In late February 2013, OIR met with Dean Fitzsimmons and presented the findings from the February 2013 Report. Director Donahue and Elizabeth Yong may also have been at this meeting. Ex. 7, Driver-Linn 161:18-162:9, 191:2-11; Ex. 10, Hansen 100:15-100:23; Ex. 144, HARV00065693; Ex. 167, HARV00075072.

427. After OIR presented their findings of Asian-American bias, Dean Fitzsimmons sat silently, "pausing and reflecting" on what he had just heard. Ex. 7, Driver-Linn 193:14-195:12.

428. Following this presentation, Dean Fitzsimmons did not request any additional work from OIR into whether Asian-American applicants were being disadvantaged in response to the February 2013 Report. Ex. 9, Fitzsimmons 442:25-445:7; Ex. 7, Driver-Linn 193:14-195:12, 210:14-211:13, 326:13-327:9.

429. Dean Fitzsimmons did not share or discuss the February 2013 Report with anyone else in the Admissions Office or any senior leaders outside the Admissions Office. Indeed, there is no evidence in the record that Fitzsimmons shared the February 2013 Report with anyone at all. Ex. 9, Fitzsimmons 442:25-445:7.

430. Dean Fitzsimmons took no steps (*e.g.*, bias training) to ensure that individuals in the Admissions Office were treating Asian Americans fairly. Ex. 2, Bever 268:19-269:11.

431. Dean Fitzsimmons made no changes to Harvard's admissions policy or practices in response to the February 2013 Report. Ex. 9, Fitzsimmons 83:8-84:19.

### 5. The "Admissions Part II" Report

#### a. The Report's Findings

432. In early 2013, OIR issued a second report entitled "Admissions Part II." This report was a second "iteration" into OIR's investigation into whether Harvard's admissions process was biased against Asian Americans. Ex. 145, HARV00065741-57; Ex. 10, Hansen 104:2-105:7, 105:16-109:12.

433. The report specifically focused on whether Harvard was favoring white applicants over Asian-American applicants. To that end, OIR analyzed differences between white and Asian-American applicants in admission rates, test scores, and profile ratings. It also included logistic models measuring how certain factors in the admissions process affected the probability of admission to Harvard. Ex. 145, HARV00065741-57.

434. As shown in the report's first chart, on page 3, OIR found that Asian-American admit rates were lower than white admit rates every year over a ten-year period (Class of 2007 through Class of 2016). Ex. 145, HARV00065743.

435. On page 4, OIR analyzed only admit rates for "non-legacy, non-athlete" ("NLNA") applicants. The report looked at "non-legacy, non-athlete" applicants because Dean Fitzsimmons had

told OIR that being a legacy and being a recruited athlete are "preference[s] that typically benefit[] White students." OIR found that the difference in admit rates between White NLNA applicants and Asian-American NLNA applicants was smaller than the difference in admit rates between all White applicants and all Asian-American applicants. Ex. 10, Hansen 114:7-115:19; Ex. 2, Bever 160:20-162:4; Ex. 145, HARV00065744.

436. On page 5, OIR analyzed whether White NLNA applicants performed better in factors that affected the admissions process than Asian-American NLNA applicants, including test scores, admissions officer ratings, teacher ratings, guidance counselor ratings, and alumni ratings. The report found sizable differences between White NLNA applicants and Asian-American NLNA applicants in the performance of factors affecting the admissions process. Ex. 145, HARV00065745.

437. The report included the following chart:

Ex. 145, HARV00065745.

438. According to the chart, Asian-American NLNA applicants performed significantly better (as measured in standard deviations) than White NLNA applicants in the SAT II, the SAT I, the alumni overall rating (Alumni Rating 2), and the academic rating; they performed slightly better than White NLNA applicants in the extracurricular rating; and they performed about the same as White NLNA applicants in the alumni personal rating (Alumni Rating 1), the teacher ratings, and the guidance counselor rating. Ex. 145, HARV00065745.

439. Strikingly, White NLNA applicants performed significantly better than Asian-American applicants in only one category: the personal rating. Ex. 145, HARV00065745.

440. OIR provided no explanation for why White NLNA applicants' "personal qualities" were rated higher than those of Asian-American applicants. Ex. 145, HARV00065745; Ex. 10, Hansen 110:20-113:20; Ex. 9, Fitzsimmons 404:4-405:10.

441. On page 6, OIR analyzed whether White NLNA applicants were being admitted at higher rates than similarly qualified Asian-American NLNA applicants. Examining admit rates by academic index for White and Asian-American NLNA applicants, OIR found wide gaps between the two racial groups. Ex. 145, HARV00065746.

442. The report included the following chart:



Ex. 145, HARV00065746.

443.    According to the chart, White NLNA applicants were admitted at a higher rate than Asian-American applicants with the same academic index at every level of academic index. Ex. 145, HARV00065746; Ex. 10, Hansen 116:7-12.

444.    On page 7, OIR performed a similar analysis into whether White NLNA applicants were being admitted at higher rates than similarly qualified Asian-American NLNA applicants. Examining admit rates by SAT I scores for White and Asian-American NLNA applicants, the report similarly found wide gaps between the two racial groups. Ex. 145, HARV00065746.

445.    The report contained the following chart:



Ex. 145, HARV00065746

446.    According to the chart, White NLNA applicants were consistently admitted at a higher rate than Asian-American NLNA applicants with the same SAT I scores. Ex. 145, HARV00065747.

447.    On page 8, OIR conducted an "odds ratios for main effect logistic model." This type of model allows statisticians to determine the odds that an outcome will occur given a particular condition, compared to the odds of the outcome occurring in the absence of that condition. An odds ratio greater than 1 is a "positive association" and an odds ratio less than 1 is a "negative association." Ex. 145, HARV00065748; Ex. 2, Bever 177:16-23.

448.    The report contained the following chart:



Ex. 145, HARV00065748.

449.    Thus, according to OIR, the strongest "positive associations" with being admitted to Harvard were having a high personal rating, being African American, being a legacy, or being Native American. Ex. 145, HARV00065748.

450.    Importantly, the chart showed that there was a "negative association" between being admitted to Harvard and being Asian American. Put differently, an applicant who was Asian American was less likely to be admitted to Harvard than an applicant who was not Asian American. Ex. 145, HARV00065748.

451.    OIR provided no explanation as to why Asian Americans were the only racial group who had this negative association. Ex. 145, HARV00065748.

452. Similarly, on page 9, OIR conducted a "logit coefficients for main effect logistic model." This type of model allows statisticians to determine the strength of an association between a particular condition and a particular outcome, compared to the odds of the outcome occurring in the absence of that condition. A logit coefficient greater than 0 is a "positive association" and a logit coefficient less than 0 is a "negative association." Ex. 145, HARV00065749; Ex. 2, Bever 179:5-25; Ex. 10, Hansen 118:15-120:17.

453. The report contained the following chart:

Ex. 145, HARV00065749.

454.    Thus, according to OIR, the top four factors associated with being admitted to Harvard were (1) having a high personal rating; (2) being African American; (3) being a legacy; and (4) being Native American. Ex. 145, HARV00065749; Ex. 10, Hansen 118:15-120:17.

455.    By contrast, OIR found that being Asian American was negatively associated with the chance of being admitted to Harvard. Ex. 145, HARV00065749; Ex. 10, Hansen 118:15-120:17.

456.    OIR provided no explanation for why being Asian American was negatively associated with being admitted to Harvard. Ex. 145, HARV00065749.

457.    On pages 10, 11, and 12, OIR reproduced the modelling analysis from the February 2013 Report it previously shared with Dean Fitzsimmons that showed the large negative effect of various admissions factors on the Asian-American admitted pool and Asian-American admit rates. Ex. 145, HARV00065750-52.

458.    Referencing these four models, OIR noted that the "[p]ersonal rating is important in models of the admissions process and drive some of the demographic differences we see." Ex. 145, HARV00065742.

459.    On page 13, the report had a section for "Conclusions." OIR left the space blank. Ex. 145, HARV00065753.

460.    On page 14, the report had a section for "Possible Explanations." OIR left the space blank. Ex. 145, HARV00065754.

461.    On page 15, OIR attempted to understand how different inputs affected the academic index, the academic rating, and the personal rating. Ex. 145, HARV00065755.

462.    OIR found that the academic index and academic rating were fairly objective. SAT Scores and GPA accounted for 98% of the variation in the academic index and 70% of the variation in the academic rating. Ex. 145, HARV00065755.

463. By contrast, OIR found that the personal rating was extremely subjective. The alumni interview ratings, teacher ratings, and guidance counselor ratings accounted for only 20% of the variation in the personal rating scores. OIR provided no explanation for what factors were accounting for the other 80 percent of variation in the personal rating. Ex. 145, HARV00065755; Ex. 10, Hansen 123:8-124:8.

464. On page 16, OIR examined admit rates by geographic region (*e.g.*, Texas, California, the Northwest, New York) for White and Asian-American NLNA applicants and concluded that the "differences in admit rates by region [were] not explained by athletes and legacies." Ex. 145, HARV00065756.

465. Finally, on page 17, in a section titled "Other Possibilities," OIR hypothesized various factors that might explain the stark differences between White and Asian-American applicants, including whether the Admissions Office was considering yield rates by race when admitting students and whether preferences for the children of faculty and staff might alter the analysis. Ex. 145, HARV00065757.

**b. Dean Fitzsimmons' Response to the Admissions Part II Report**

466. Dean Fitzsimmons participated in multiple meetings in which OIR presented its findings as to whether Harvard's admissions process disadvantaged Asian Americans. Ex. 10, Hansen 13:16-15:6; 103:6-18.

467. At some point, Dean Fitzsimmons received and reviewed the Admissions Part II Report. Ex. 9, Fitzsimmons 391:19-393:25, 415:19-25.

468. Dean Fitzsimmons did not request any additional work from OIR into whether Asian-American applicants were being disadvantaged after being presented with the Admissions Part II Report. Ex. 9, Fitzsimmons 401:7-402:16, 415:5-8, 442:25-445:7.

469.     Dean Fitzsimmons did not share or discuss the Admissions Part II Report with anyone else in the Admissions Office or any senior leaders outside the Admissions Office. Indeed, there is no evidence in the record that Fitzsimmons shared Admissions Part II Report with anyone at all. Ex. 9, Fitzsimmons 401:7-402:16, 415:5-8, 442:25-445:7.

470.     Dean Fitzsimmons took no steps (*e.g.*, bias training) to ensure that individuals in the Admissions Office were treating Asian Americans fairly in response to the Admissions Part II Report. Ex. 2, Bever 268:19-269:11.

471.     Dean Fitzsimmons made no changes to Harvard's admissions policy or practices in response to the Admissions Part II Report. Ex. 9, Fitzsimmons 83:8-84:19.

### C.     Harvard's Investigation into Tips for Low-Income Applicants

#### 1.     OIR's Investigation into Tips for Low-Income Applicants

472.     In December 2012, Professors Caroline Hoxby and Christopher Avery released a study entitled "The Missing 'One-Offs': The Hidden Supply of High-Achieving Low Income Students." Hoxby and Avery argued, among other things, that "the vast majority of very high-achieving students who are low-income do not apply to any selective college or university." Ex. 72, HARV00010596.

473.     Over the following months, elite schools like Harvard came under fire for failing to recruit and admit low-income students. Ex. 122, HARV00026550, Ex. 51, HARV00004981, Ex. 72, HARV00010595.

474.     In April 2013, in response to this negative press, Dean Fitzsimmons asked OIR to investigate whether Harvard's admissions process was providing a "tip" to low-income applicants. Ex. 166, HARV00075060; Ex. 7, Driver-Linn 239:23-240:21; Ex. 156, HARV00069732.

475.     OIR's investigation was led by Erin Driver-Linn, the Director of OIR, with the assistance of Erica Bever and Mark Hansen. Ex. 7, Driver-Linn 234:7-21.

476. OIR's analysis utilized the same dataset it had created earlier in the year to analyze potential bias against Asian Americans in the admissions process. Ex. 7, Driver-Linn 232:10-233:16.

**2. OIR Sends Favorable Results to Dean Fitzsimmons**

477. On April 22, 2013, Ms. Bever sent Dean Fitzsimmons a report in which OIR used descriptive and regression analysis to conclude that the Admissions Office was providing an admissions tip to low-income students ("April 22, 2013 Report"). Ex. 164, HARV00075053.

478. The report contained the following chart, entitled "Admit Rates by Income and SAT Score, Class of 2009-2016":

Ex. 165, HARV00075058.

479. According to chart, "at every [SAT I] score level, lower income students have higher admit rates" than all other students. HARV00075058. For example, the admit rate for low-income applicants with perfect SAT I scores was approximately 6-7 percentage points higher than all other applicants with perfect SAT scores. Ex. 165, HARV00075058.

480.    Ex. 165, OIR also created "logistic regression models" that controlled for the various factors important to the admissions process, including "academic index, academic rating, athlete, legacy, extracurricular rating, personal rating, ethnicity, and gender." Ex. 165, HARV00075059.

481.    The report contained the following chart, entitled "Predicted and Actual Admit Rates by Income, Classes of 2009-2016":



Ex. 165, HARV00075059.

482.    According to the chart, "low income students are admitted at higher rates than predicted," and "higher income students are admitted at a lower rate" than predicted. For example, OIR predicted an admit rate of 6 percent for applicants whose income level was below $40,000, but the actual admit rate for these applicants was 11 percent. Ex. 165, HARV00075059.

**3. OIR Warns of Preliminary Results Showing Discrimination Against Asian Americans**

483. [REDACTED] Ex. 163, HARV00075052.

484. OIR, however, had not yet shared its full analysis with Dean Fitzsimmons. In late April, Ms. Driver-Linn, Ms. Bever, and Mr. Hansen exchanged drafts of a memorandum containing more detailed analysis of their conclusions. *See, e.g.,* Ex. 156, HARV00069734.

485. One of these drafts contained stark warnings about why OIR should not share these results publicly—doing so would highlight bias against Asian Americans. According to the draft, "[w]hile we find that low income students clearly receive a 'tip' in the admissions process, our model also shows that the tip for [legacy, athletes, etc.] is larger. On the flip side, we see a negative effect for Asian applicants." Ex. 156, HARV00069734.

486. OIR's warning continued: "These realities have also received intense scrutiny from critics like Bowen, or more recently, Unz, as we have discussed at length. To draw attention to the positive benefit that low income students receive, may also draw attention to the more controversial findings around Asians, or the expected results around legacies and athletes." Ex. 156, HARV00069734.

487. [REDACTED] Ex. 163, HARV00075052.

488.

Ex. 163, HARV00075051.

489.

Ex. 163, HARV00075051.

490. Ex. 163, HARV00075051.

491. Ex. 227, HARV00075471.

**4. The May 1, 2013 Memorandum**

**a. The Memorandum's Findings**

492. On May 1, 2013, Erica Bever emailed Dean Fitzsimmons (copying Ms. Driver Linn and Mr. Hansen) a memorandum entitled "Harvard College Admissions and Low Income Students" ("May 1, 2013 Memorandum"). Ex. 112, HARV00023547-48.

493. In the cover email, Ms. Bever stated, "Attached is a memo describing our recent analysis of low income admissions…. At your suggestion, we reviewed a small sample of literature to put this in context and realized our approach was consistent with what others have done…. We thought, based on our conversation last week, that it would also make sense to share this with Jeff

Neal and Christine Heenan, Nina Collins [Dean Smith's assistant], and Sally Donahue. Does that make sense? Are there others you would like to include in this conversation?" Ex. 112, HARV00023547.

494.     In the memorandum, which was labeled "Confidential Draft," and addressed to Dean Fitzsimmons, OIR noted the recent criticism "about the rate of admission for low income students at elite institutions and in particular for Harvard College" and explained that "at your request, we undertook an analysis to determine if the chance of admission [to Harvard] is any different for low income students, holding all other admissions characteristics constant." Ex. 112, HARV00023548.

495.     To conduct its analysis, OIR relied on eight years of admissions data from the Class of 2009 through the Class of 2016. Ex. 112, HARV00023548.

496.     First, OIR compared the admit rate of low-income applicants to all other applicants with similar SAT I scores in order "to see if there [was] any evidence of a preference for low-income applicants." OIR found that low-income applicants were "admitted at a higher rate than applicants with similar SAT scores from families with higher incomes." OIR reproduced the chart from OIR's April 22, 2013 Report entitled "Admit Rates by Income and SAT Score, Class of 2009-2016." Ex. 112, HARV00023548-23549; Ex. 112, HARV00023553.

497.     Second, OIR analyzed whether the higher admit rates for low-income applicants were being caused by other factors. To do so, OIR implemented a "logistic regression model," which would "predict the probability of admission, controlling for demographic characteristics and a variety of metrics used to asses[s] qualification for admission." The admissions factors OIR considered included academic index, academic rating, extracurricular rating, personal rating, athletic rating, legacy status, gender, and race. Ex. 112, HARV00023549.

498.     OIR acknowledged that there were some limitations to its approach, as a "wider set of variables might result in a better fitting model." Nevertheless, OIR found that "[i]n spite of these

limitations, the logistic regression model results [were] consistent with [its] descriptive analysis." Ex. 112, HARV00023549.

499.  Through its logistic regression model, OIR concluded that "applicants with incomes below $120K [were] admitted at higher rates than OIR would predict based on other admissions factors." OIR reproduced the chart from the April 22, 2013 Report entitled "Predicted and Actual Admit Rates by Income, Classes of 2009-2016." Ex. 112, HARV00023554.

500.  Finally, after determining that low-income applicants do receive a "tip" in the admissions process, OIR created a second logistic regression model in order to understand "the size of the admissions advantage conferred to low-income applicants relative to other groups of applicants, the so-called 'thumb on the scale.'" Ex. 112, HARV00023549.

501.  To understand the size of the low-income tip, OIR produced a table that identified the size of the coefficients (from largest to smallest) associated with being admitted to Harvard. Ex. 112, HARV00023549.

502.  The table showed the following:

**Table: Logistic Regression Predicting Admission from Classes 2009 through 2016**

| Variable | Coefficient Estimate | P-value |
|---|---|---|
| Athletic rating of 1 | 6.33 | 0.00 |
| Personal Rating 1 or 2 | 2.41 | 0.00 |
| Legacy | 2.40 | 0.00 |
| African American | 2.37 | 0.00 |
| Native American | 1.73 | 0.00 |
| Extracurricular 1 or 2 | 1.58 | 0.00 |
| Academic 1 or 2 | 1.31 | 0.00 |
| Standardized Academic Index | 1.29 | 0.00 |
| Hispanic | 1.27 | 0.00 |

| | | |
|---|---|---|
| CSS self-reported income less than or equal to $60K | 0.98 | 0.00 |
| International | 0.24 | 0.00 |
| Asian | -0.37 | 0.00 |
| Constant | -6.23 | 0.00 |
| Unknown/Other | -0.03 | 0.41 |
| Female | 0.00 | 0.87 |
| *N=192,359; Pseudo R2 = 0.45 | | |

Ex. 112, HARV00023549-50.

503.    As the memorandum explained, "[t]he variable with the largest effects on the probability of admission are athletic rating, personal rating, and legacy status. Compared to athletes and legacies, the size of the advantage for low income students is relatively small." Ex. 112, HARV00023549.

504.    Importantly, the table made clear that being Asian American was negatively associated with likelihood of being admitted to Harvard. Ex. 112, HARV00023550; Ex. 2, Bever 319:12-320:18.

505.    OIR provided no explanation for why being Asian American was negatively associated with the likelihood of being admitted to Harvard. Ex. 112, HARV00023549.

506.    OIR included a fourth chart in order to understand "the relative sizes of the admissions advantage conferred on different groups." This chart focused on "students with high academic ratings (1 or 2) and examine[d] the differences between athletes and non-athletes, legacy students and others, Asian students and all other students, and low income students and all other students." Ex. 112, HARV00023550.

507.    The chart showed the following:



Ex. 112, HARV00023555.

508. According to OIR, "an athlete that is also an academic 1 or 2 has an admit rate of 83% compared against 16% for non-athletes with an academic 1 or 2. Fifty-five percent of legacies who are academic 1s and 2s are admitted compared with 15% of all other academic 1 and 2s," and "low income applicants with an academic 1 or 2 have an admit rate of 24% compared against 15% for all other applicants." Ex. 112, HARV00023550.

509. By contrast, "Asian applicants with an academic 1 or 2 are admitted 12% of the time compared against an admit rate of 18% for non-Asian applicants." In other words, OIR concluded, "Asian high achievers have lower rates of admission." Ex. 112, HARV00023550, HARV00023555.

510. OIR provided no explanation for why Asians with an academic 1 or 2 were admitted at a lower rate than others. Ex. 112, HARV00023550; Ex. 10, Hansen 136:11-137:24.

511. OIR concluded with a warning about the dangers of sharing these results with the public: "We imagine that sharing any analysis of admission weights will draw attention to the variety of factors that compete with one another in the admissions decision. To state the obvious, with only

~2,200 spaces for admitted students per year, implicit tradeoffs are made between athletes and non-athletes, legacy admits and those without affiliation, low income and other students. We know that many are interested in the analysis of the relative tradeoffs. While we find that low income students clearly receive a 'tip' in the admissions process, our descriptive analysis and regression models also shows that the tip for legacies and athletes is larger and that there are demographic groups that have negative effects." Ex. 112, HARV00023550.

512. As OIR's table made clear, only one "demographic group" had "negative effects"—Asian Americans. Ex. 112, HARV00023550.

**b. Dean Fitzsimmons' Response to the May 1, 2013 Memorandum**

513. Dean Fitzsimmons shared OIR's findings about the tips given to low-income applicants with the rest of the Admissions Office. Fitzsimmons shared this part of the report "so that they would be equipped better when they're doing their many public presentations for questions about how interested Harvard is about attracting students from all economic backgrounds." Dean Fitzsimmons believed this was a "very important message" that was "critical to deliver in an America that is really quite divided by economic background issues." Ex. 9, Fitzsimmons 423:14-424:20.

514. Dean Fitzsimmons did not, however, share or discuss the May 1, 2013 Memorandum's findings about bias against Asian Americans with anyone else in the Admissions Office or any senior leaders outside the Admissions Office. Indeed, there is no evidence in the record that Fitzsimmons shared these findings with anyone at all. Ex. 9, Fitzsimmons 425:1-428:20

515. Dean Fitzsimmons did not request any additional work from OIR into whether Asian-American applicants were being disadvantaged in response to the May 1, 2013 Memorandum. Ex. 9, Fitzsimmons 425:1-428:20.

516.     Dean Fitzsimmons took no steps (*e.g.*, bias training) to ensure that individuals in the Admissions Office were treating Asian Americans fairly after seeing the May 1, 2013 Memorandum. Ex. 2, Bever 268:19-269:11.

517.     Dean Fitzsimmons made no changes to Harvard's admissions policy or practices in response to the May 1, 2013 Memorandum. Ex. 9, Fitzsimmons 83:8-84:19.

### 5.     The May 30, 2013 Report

#### a.     The Report's Findings

518.     After sending the May 1, 2013 Memorandum to Dean Fitzsimmons, OIR conducted additional analysis into whether the Admissions Office provided a tip to low-income applicants. On June 3, 2013, Erica Bever sent Dean Fitzsimmons (copying Erin Driver-Linn and Mark Hansen) a report entitled "Demographics of Harvard College Applicants," which was dated May 30, 2013 ("May 30, 2013 Report"). Ex. 161, HARV00074898; Ex. 157, HARV00069760-67.

519.     The May 30, 2013 Report, which was eight pages and labeled "Preliminary Draft," contained various analyses of the effect of being low income on different racial groups. The report also included a table similar to the table from the May 1, 2013 Memorandum, which identified coefficients for logistic regression modeling that predicted the probability of admissions for the Classes of 2009 through 2016. Ex. 157, HARV00069766.

520.     On the last page of the report, OIR provided a table that included "interaction terms." Statisticians use "interaction terms" to show how a factor may operate differently depending on which factor it interacts with. Interaction terms are often included when there is evidence that preferences operate differently for particular groups of applicants. Arcidiacono Rebuttal Rep. 4.

521.     The May 30, 2013 Report contained the following table:

***Coefficients for Logistic Regression Modeling Predicting Probability of Admissions, Classes of 2009-2016 (Includes Interaction Terms for All Race/Ethnicity and Low Income)***

| Variable | Coefficient | p-value |
|---|---|---|
| Athlete | 6.335 | 0.000 |
| African American | 2.509 | 0.000 |
| Personal 1 or 2 | 2.410 | 0.000 |
| Legacy | 2.403 | 0.000 |
| Native American | 1.787 | 0.000 |
| Extracurricular 1 or 2 | 1.586 | 0.000 |
| Academic 1 or 2 | 1.314 | 0.000 |
| Academic Index | 1.284 | 0.000 |
| Hispanic | 1.232 | 0.000 |
| **Low Income** | **0.998** | **0.000** |
| International | 0.249 | 0.000 |
| **Asian and Low Income** | **0.184** | **0.013** |
| Hispanic and Low Income | 0.126 | 0.160 |
| Female | -0.004 | 0.847 |
| Ethnicity Unknown | -0.016 | 0.707 |
| Ethnicity Unknown and Low Income | -0.136 | 0.263 |
| Native American and Low Income | -0.236 | 0.318 |
| **Asian** | **-0.418** | **0.000** |
| African American and Low Income | -0.490 | 0.000 |
| International and Low Income | -0.496 | 0.055 |
| Constant Term | -6.239 | 0.000 |

Ex. 157, HARV00069767 (emphasis in original).

522. By interacting race and low-income status, OIR showed (1) a positive association between being low income and being admitted; (2) a positive association between being Asian American and low income; and (3) a negative association between being Asian American and being admitted. The size of the negative association for being Asian American indicated that low-income Asian-Americans were ultimately admitted at a lower rate than similarly situated white applicants. *Id.*; Ex. 2, Bever 273:12-274:16.

523. The chart also showed a positive association between being African American and being admitted, but a negative association between being African American and low income—meaning that they received a smaller advantage for being low income than white applicants. Ex. 2, Bever 278:18-280:25.

524. The report provided no explanation for why being Asian American was negatively associated with being admitted to Harvard. Ex. 157, HARV00069767.

#### b. Dean Fitzsimmons' Response to the May 30, 2013 Report

525. Dean Fitzsimmons did not request any additional work from OIR into whether Asian-American applicants were being disadvantaged in response to the May 30, 2013 Memorandum. Ex. 9, Fitzsimmons 442:25-445:7.

526. Dean Fitzsimmons did not share or discuss the May 30, 2013 Memorandum with anyone else in the Admissions Office or any senior leaders outside the Admissions Office. Ex. 9, Fitzsimmons 442:25-445:7. Indeed, there is no evidence in the record that Fitzsimmons shared the May 30, 2013 Memorandum with anyone at all.

527. Dean Fitzsimmons took no steps (*e.g.*, bias training) to ensure that individuals in the Admissions Office were treating Asian Americans fairly in response to the May 30, 2013 Memorandum. Ex. 2, Bever 268:19-269:11.

528. Dean Fitzsimmons made no changes to Harvard's admissions policy or practices in response to the May 30, 2013 Memorandum. Ex. 9, Fitzsimmons 83:8-84:19.

### D. OIR Presents the Asian-American Bias Portion of the February 2013 Report to Senior Leaders

529. According to Erin Driver-Linn's calendar, a meeting was held on September 9, 2013 concerning "Fisher v. University of Texas Discussion." Ex. 186, HARV00077840.

530. According to the calendar invitation, Mr. Iuliano was the organizer of the meeting, and the attendees were Dean Fitzsimmons, Director McGrath, Director Donahue, Senior Admissions Officer Roger Banks, Erin Driver-Linn, and Erica Bever. Also invited were two individuals from the Office of General Counsel, Matthew Fox and Elizabeth Seaman, and one individual from the Office of Provost, Karen Pearce. Ex. 186, HARV00077840.

531.     The next day, September 10, 2013, another meeting was scheduled for October 8, 2013 with the same individuals. The subject matter was "Fisher v. University of Texas Discussion #2." Ex. 185, HARV00077839.

532.     In Harvard's files is a report dated October 8, 2013—the same day as the scheduled meeting to discuss *Fisher v. Texas*—that is entitled "Modeling Admissions to Harvard College: Preliminary Analysis" ("October 8, 2013 Report"). Ex. 155, HARV00069113.

533.     The October 8, 2013 Report contains five pages from the February 2013 Report that addressed Asian-American bias in Harvard's admissions process. Ex. 155, HARV00069114-18.

534.     The October 8, 2013 Report contains a new page at the end (page 7) that identifies two "potential next steps." These potential steps were (1) "identify additional factors that might be alternatives to race in admissions," such as socioeconomic status, geography, and others, and (2) "test these factors in predicting admissions and compare the results to actual admitted classes." Ex. 155, HARV00069119.

535.     What happened at these two meetings or whether any of these "potential next steps" were taken remains a secret because Harvard has instructed witnesses not to answer questions on these topics on the grounds of attorney-client privilege. Ex. 7, Driver-Linn 286:12-288:24.

536.     Harvard made no changes to its admissions policy or practices in response to these meetings or the October 8, 2013 Report. Ex. 9, Fitzsimmons 83:8-84:19.

### E.     Dean Khurana Receives the February 2013 Report and the May 1, 2013 Memorandum

537.     Rakesh Khurana became Dean of Harvard College on July 1, 2014. In preparation of him taking office, in May 2013, Ms. Driver-Linn sent Khurana a memorandum "highlight[ing] the Harvard College-related work the Office of Institutional Research has done since my tenure began in the office." Ex. 184, HARV00077521-23; Ex. 13, Khurana 11:4-6.

538. Included with the memorandum were the "significant projects our office has undertaken related to Harvard College." Absent from this attachment were "a handful of other projects." Among those absent were the February 2013 Report, the Admissions Part II Report, the May 1, 2013 Memorandum, and the May 30, 2013 Report. Ex. 184, HARV00077521-23.

539. Ten days after Dean Khurana took office, on July 11, 2014, Erin Driver-Linn, Erica Bever, and two other individuals from OIR met with Khurana to discuss "additional OIR analysis on Harvard College Students." OIR provided Khurana with three reports: (1) the six pages from the February 2013 Report discussing Asian-American bias in the admissions process; (2) the May 1, 2013 Memorandum; and (3) an OIR report on athletes. Ex. 162, HARV00074976-77.

540. Dean Khurana expressed no concern that Asian Americans were being disadvantaged in the process. Ex. 13, Khurana 252:23-258:6; Ex. 7, Driver-Linn 324:18-325:23.

541. Dean Khurana took no steps to find out why OIR prepared these reports. Ex. 13, Khurana 252:23-258:6.

542. Dean Khurana took no steps to determine how the analysis could be done more "appropriately." Ex. 13, Khurana 252:23-258:6.

543. Dean Khurana did not ask for any further investigation into discrimination against Asian-American applicants. Ex. 13, Khurana 256:15-258:24.

### F. The Testimony of Dean Fitzsimmons, Driver-Linn, Bever, and Dean Khurana

544. Despite numerous emails and drafts documenting her involvement, Erica Bever recalled very little about her involvement in OIR's work uncovering bias against Asian-American applicants. For example, Bever was asked: "Sitting here today, do you recall any analysis that you performed in response to the claims made in the Ron Unz article?" She answered: "I do not." She was asked: "do you recall, during your time at OIR, engaging in any analysis with respect to how race is used in the admissions process at Harvard?" Bever answered: "No." Then, Bever was asked: "Did you

ever meet with Rakesh Khurana during your time at OIR?" She answered: "I cannot recall." Bever 83:5-84:24. When asked: "Do you remember talking about this with Dean Fitzsimmons at any point in time, this analysis?" She said: "I do not." Ex. 2, Bever 119:18-21.

545.    Bever acknowledged she "remembered a lot of other reports that [she] did during this time period," and she "remembered other occasions when [she] met with Dean Fitzsimmons to talk about issues relating to admissions." Bever nevertheless had "a complete blank on this particular topic." It was put to her this way: "But you're telling us, sitting here today, under the penalty of perjury, that you don't have any recollection whatsoever of any discussions about this apart from one time when Mark Hansen showed you some slides in your office?" Bever answered: "That is correct." Ex. 2, Bever 219:4-221:10.

546.    Ultimately, Bever was asked: "can you explain why you remember all of those details about this analysis of financial aid from the middle of your tenure at OIR, but you have absolutely no recollection of the work that was done with respect to analyzing the effect of being Asian in the admissions process for more than a year in drafts that you shared and distributed throughout OIR?" Bever answered: "I cannot." Ex. 2, Bever 354:5-14.

547.    Despite numerous emails and drafts documenting her involvement, Ms. Driver-Linn had significant gaps in her memory about OIR's work uncovering bias against Asian-American applicants. For instance, she was asked: "do you remember reviewing articles, gathering information about race-conscious admissions in early 2013?" Driver-Linn answered: "I don't." She was then asked: "Do you remember OIR being asked to investigate whether the admissions offices statistics could refute or support the claim that Asian-Americans were disadvantaged by Harvard's admissions process?" Driver-Linn answered: "No." Driver-Linn also was asked: "Was OIR asked to do some sort of investigation into whether or not Asian-Americans were disadvantaged by Harvard's admissions process?" She again responded: "I don't know." Ex. 7, Driver-Linn 83:21-87:23. Finally, Driver-Linn

was asked: "Did Dean Fitzsimmons ask OIR to investigate whether or not the difference in admission rates between Asian and white applicants could be explained by legacy and athlete status?" She answered: "I'm not sure." Ex. 7, Driver-Linn 108:17-23.

548.    Despite numerous emails and drafts documenting his involvement, Dean Fitzsimmons had significant gaps in his memory about OIR's work uncovering bias against Asian-American applicants. Fitzsimmons, for example, was asked: "At some point did you ask the Office of Institutional Research to begin investigating whether Asian Americans -- whether the admissions process at Harvard was biased against Asian Americans." He answered: "I don't recall making that specific request. Q. You say you don't remember? Are you testifying under oath that you didn't ask them to do that? MS. ELLSWORTH: Objection. A. I don't have a recollection of making that specific request." Ex. 9, Fitzsimmons 385:2-15. He was then asked: "Do you remember making a request to [OIR] about—a general request to them about Asian American admissions?" Fitzsimmons replied: "I don't remember whether we made a specific request to them for such information." "So just to make sure I understand, is your testimony that you didn't make a request to OIR after Mr. Unz's article to look into Asian American discrimination, or is it simply that you don't remember making a request? MS. ELLSWORTH: Objection. A. I don't remember making a specific request to them about Asian American admissions at that time." Ex. 9, Fitzsimmons 387:4-21.

549.    When questioned about OIR's first report, Fitzsimmons answered: "Some of this information is familiar, but we have lots of interactions with different parts of Harvard." Fitzsimmons 393:14-18. Fitzsimmons was then asked: "Do you remember where you were the first time you saw this document?" He responded: "Not specifically. Q. The only memory you have about this document is a vague recollection of seeing it sometime?" Fitzsimmons answered: "That's the only thing I can say with any certainty." Ex. 9, Fitzsimmons 394:19-395:4.

550.     Fitzsimmons was asked: "Q. Do you remember speaking with Ms. Bever about it in 2013? A. No. Q. Do you remember speaking to Ms. Driver-Linn about it in 2013? A. Not specifically. Q. Generally. A. I don't remember specifically with whom I talked." Ex. 9, Fitzsimmons 394:10-18. Fitzsimmons was then asked: "Do you know why OIR was looking into the differences between Asian and white applicants with respect to athletes and legacies?" His answer: "I don't know specifically what their motivation was." Ex. 9, Fitzsimmons 395:18-23.

551.     On other matters, Fitzsimmons's recollection was better. He remembered important details about OIR's study of Harvard's early action. Ex. 9, Fitzsimmons 386:10-24. He likewise remembered the key aspects of OIR's work involving low-income applicants. Ex. 9, Fitzsimmons 415:9-12. But when asked simply to recall with whom he may have discussed OIR's findings on discrimination against Asian Americans, Fitzsimmons could not. "We have many meetings with many people, so I don't remember specifically who was in this meeting, which was five, six years ago." Ex. 9, Fitzsimmons 403:16-19.

552.     Although Dean Khurana remembers reading OIR's work on bias against Asian Americans, he does not recall discussing the reports with OIR. Ex. 13, Khurana 252:23-255:21.

553.     The recollections of Bever, Driver-Linn, Fitzsimmons, and Khurana are stronger when it comes to why the OIR reports should not be relied upon. Bever now claims that the OIR reports "oversimplified" the admissions process because OIR lacked statistics on other factors the Admissions Office considers. Ex. 2, Bever 134:24-136:11.

554.     Similarly, Driver-Linn now claims that OIR was too "reductive" in trying to "to quantify what's a very complicated set of things." Ex. 7, Driver-Linn 192:18-193:8.

555.     Similarly, Dean Fitzsimmons remembers "how incomplete the analysis was" because there was admissions data that OIR had not included in its analysis. Ex. 9, Fitzsimmons 392:8-393:25.

556. Dean Khurana similarly remembers thinking that OIR's analysis was not "done appropriately" because there are "a lot of limitations to doing what are called fitted models like this." Ex. 13, Khurana 252:23-253:20.

557. Despite these beliefs, none of these individuals ever raised any concern that OIR was improperly oversimplifying a complex process or that OIR's reports were flawed in any way. Ex. 2, Bever 138:11-17; Ex. 7, Driver-Linn 199:18-200:25, 290:14-291:23, 296:24-297:15; Ex. 10, Hansen 164:23-165:5.

558. Other Harvard officials claim that OIR's reports were merely "preliminary." For example, Faust testified: "So I would say this is an exercise. I would not give it more credibility than being an exercise until I had someone—they say it's preliminary, for discussion." Ex. 8, Faust 184:19-22.

559. Harvard's expert likewise emphasized that "OIR understood that its models were 'basic' and 'preliminary.'" Ex. 252, Card Report ("Card Rep.") 66.

560. To this day, Harvard is not aware of any statistical errors with any of OIR's reports. Ex. 7, Driver-Linn 125:23-126:7, 1286-25, 129:11-14, 138:15-139:19, 294:22-296:11.

**G. The Testimony of Mark Hansen.**

561. Mark Hansen (who is no longer employed by Harvard) recalls working on and discussing OIR's investigation into bias against Asian Americans. Ex. 10, Hansen 11:9-16:22.

562. Hansen remembers OIR performing further analysis in order to "incorporate additional data analysis not originally available" when the project began. Ex. 10, Hansen 18:12-18. He also recalls OIR performing "multiple iterations" of research. Hansen 105:4-9. In particular, Hansen recalls OIR analyzing white applicants against Asian-American applicants to gain "descriptive depth for [OIR's] future progression analysis." Ex. 10, Hansen 107:23-108:5.

563. Hansen recalls showing the results of OIR's study of bias against Asian Americans to Dean Fitzsimmons and others. Ex. 10, Hansen 100:15-23.

564. Hansen believes that OIR's reports are "evidence that Asians are disadvantaged in the admissions process at Harvard." Ex. 10, Hansen 129:5-22, 139:7-11, 151:8-12.

565. Finally, when he was asked: "Do you have any explanation other than intentional discrimination for your conclusions regarding the negative association between Asians and the Harvard admissions process?" Hansen responded: "I don't." Ex. 10, Hansen 182:14-21.

**H. Dean Fitzsimmons' Belief That He Acted "Vigilantly"**

566. According to Dean Fitzsimmons, Harvard "review[s] each application with great care" and "would always be vigilant about any suggestion of discrimination against any person." Ex. 9, Fitzsimmons 442:25-443:13.

567. In response to that statement, Fitzsimmons was asked: "Do you think that your testimony about how you reacted to these reports and the follow-up that did or did not happen is consistent with your statement just now that you would always be vigilant about allegations of discrimination?" He answered: "Yes." Ex. 9, Fitzsimmons 443:14-23.

568. Fitzsimmons was then asked: "do you think it was consistent with the exercise of vigilance not to send any of this information to anyone else in the admissions office?" He responded: "It was not my report." Ex. 9, Fitzsimmons 443:24-444:5.

569. Fitzsimmons was then asked: "Do you think it was consistent with the exercise of vigilance not to discuss the information in these reports about the effect of being Asian in the admissions process with anyone else in the admissions office?" He answered: "Yes." Ex. 9, Fitzsimmons 444:6-15.

570. Fitzsimmons was then asked: "Do you think it was consistent with vigilance for any allegation of discrimination against Asian Americans not to ask the Office of Institutional Research to do further work on these reports?" He answered: "Yes." Ex. 9, Fitzsimmons 444:16-22.

571. Fitzsimmons was then asked: "Do you have any view as to what a non-vigilant response would look like?" He answered: "No." Ex. 9, Fitzsimmons 444:23-445:2

572. Finally, Fitzsimmons was asked: "Can you explain how it would be any different than what your response was?" His response: "I would not be in a position to make an evaluation." Ex. 9, Fitzsimmons 445:3-7.

## VI. Statistical Evidence of Asian Discrimination, Racial Preferences, and Racial Floors

### A. The Collection and Analysis of Harvard's Admissions Data, Files, and Materials

#### 1. SFFA's Econometrics Expert

573. SFFA retained Professor Peter Arcidiacono to review and analyze the data and information produced by Harvard and to answer several questions about Harvard's admissions process, using accepted econometric and statistical methods and techniques. Arcidiacono Rep. 1.

574. Arcidiacono is a Professor in the Department of Economics at Duke University. He joined the Duke faculty as an Assistant Professor in 1999, was promoted to Associate Professor (with tenure) in 2006, and became a Full Professor in 2010. Arcidiacono Rep. 11.

575. His fields of study are labor economics, applied econometrics, and applied microeconomics. His work involves the quantitative analysis of economic data through the application of mathematics and statistical methods in order to draw reliable inferences that give empirical context to economic relations. Arcidiacono Rep. 11.

576. Professor Arcidiacono has published dozens of papers in peer-reviewed academic and economics journals, and has given presentations across the country and around the world on topics in applied economics and econometrics. He regularly employs statistical methods and conducts

statistical analyses in accordance with generally accepted practices in his field. Arcidiacono Rep. 11-12.

577.    A number of Professor Arcidiacono's papers relate directly to the impact of race on college admissions. He has published two survey papers on racial preferences in higher education, including one in the *Journal of Economic Literature*, widely regarded as the top journal for works synthesizing the literature on a particular topic. And he has published more than ten papers that address race and college admissions and college performance. Arcidiacono Rep. 11 & Appendix E.

578.    Professor Arcidiacono has served as an editor or associate editor for several economics journals, including serving as editor for the *Journal of Labor Economics*, the top field journal in labor economics; a coeditor at *Economic Inquiry and Quantitative Economics*; an associate editor for the *Journal of Applied Econometrics*; and a foreign editor for *The Review of Economic Studies*, one of the top five general-interest journals in economics, and one of the two top-five economics journals that publishes pieces on econometrics. Arcidiacono Rep. 11.

579.    Professor Arcidiacono was retained in this case to offer opinions on three key questions: (1) Are Harvard's admissions decisions biased against Asian-American applicants in the scoring and/or selection of applicants for admission? (2) Does Harvard set floors or ceilings on the admission of any racial/ethnic groups in making admissions decisions? (3) What role does an applicant's race/ethnicity play in admissions decisions made by Harvard? Arcidiacono Rep. 1.

580.    Separately, Professor Arcidiacono provided statistical modeling at the direction of SFFA's other expert, Richard Kahlenberg, to support Mr. Kahlenberg's opinions about the availability of race-neutral alternatives to Harvard's admissions process. Kahlenberg Rep. 45.

### 2.      Harvard's Admissions Data and Files

581.    Harvard maintains an electronic database that records numerous variables of data regarding the demographic background, educational achievements, extracurricular activities, and other information about each individual who applies to Harvard. Arcidiacono Rep. 12-13.

582.    In this litigation, Harvard produced hundreds of variables of data on each applicant over a six-year period (for the admissions cycles between the Class of 2014 and the Class of 2019). These variables include, among many others, gender, race, high school, city, state, GPA, test scores, academic rating, athlete rating, extracurricular rating, personal rating, overall rating, alumni interviewer ratings, counselor ratings, teacher ratings, and whether the applicant received a waiver of the application fee, is a first-generation college student, is economically disadvantaged, is a recruited athlete, is a child of Harvard alumni, is a child of Harvard faculty or staff, or is on the Dean's/Director's Interest List. Arcidiacono Rep. 12-13.

583.    Harvard also produced aggregate information on the number of applicants, admits, and matriculants for the admissions cycles between the Class of 2000 and the Class of 2017. Arcidiacono Rep. 13.

584.    Harvard produced 480 application files and 640 summary sheets from the admissions cycles for the Class of 2018 and the Class of 2019. Arcidiacono Rep. 13-14.

585.    SFFA requested, but did not receive, data regarding the zip code in which each applicant lived. Harvard also did not produce any family income or wealth data from its financial aid database. Kahlenberg Rep. 18.

### 3.      The Creation of Datasets for Analysis

586.    Using the applicant data produced by Harvard, Professor Arcidiacono constructed a dataset that permitted him to use logistic regression analysis to determine how various factors—

including race/ethnicity—affect the scoring of applications and admissions decisions. Arcidiacono Rep. 21-23.

587. Harvard's admissions data reveal several applicant categories that are strongly associated with admission, including (1) recruited athletes; (2) legacy students (*i.e.*, the children of Harvard alumni); (3) the children of Harvard faculty and staff; and (4) students on the Dean and Director's Interest List. Arcidiacono Rep. 21-22.

588. Arcidiacono Table A.2R shows the number of applicants and admit rate by preferred group:

**Table A.2R**
**Applicants and Admit Rate by Preferred Group**

| | Number of Applicants | Admit Rate |
|---|---|---|
| Not Athlete | 165,353 | 0.060 |
| Athlete | 1374 | 0.860 |
| | | |
| Not Legacy | 162,083 | 0.059 |
| Legacy | 4644 | 0.336 |
| | | |
| Not Child of Faculty or Staff | 166,406 | 0.066 |
| Child of Faculty or Staff | 321 | 0.467 |
| | | |
| Not Dean and Director's Interest List | 164,226 | 0.061 |
| Dean and Director's Interest List | 2501 | 0.422 |

Arcidiacono Rebuttal Rep., Table A.2R.

589. As a whole, applicants from these preferred groups comprise less than 5% of the overall applicant pool, but nearly one-third of the admitted class. Arcidiacono Rebuttal Rep., Table A.4R, A.5R

590. As those numbers suggest, falling within one of these categories dramatically increases one's chance of admission. As Table A.2R shows, (1) 86% of recruited athletes were admitted, an admission rate *fourteen* times higher than that of the applicants who were not recruited athletes (6%); (2) 42% of those on the Dean and Director's Interest List were admitted, an admission rate nearly seven times higher than that of the remaining pool; (3) 47% of the children of Harvard faculty and

staff were admitted, more than seven times higher than the rate of those who were not the children of Harvard faculty and staff; and (4) 34% of legacy students were admitted, an admission rate nearly six times higher than that of non-legacies. Arcidiacono Rebuttal Rep., Table A.2R; Arcidiacono Rep. 21-22.

591.   Given the substantial advantage in admissions rates for these groups, Professor Arcidiacono focused his analysis on two datasets: a "baseline" dataset and an "expanded" dataset. Arcidiacono Rep. 22; Arcidiacono Rebuttal Rep., Appendix A, p.3.

592.   Arcidiacono's baseline dataset includes applicants who are not athletes, legacies, children of Harvard employees (faculty or staff), or designated on the Dean or Director's Interest Lists. Because each of these characteristics is associated with preferential treatment by Harvard and thus an increased chance of admission, excluding them from the baseline dataset allows a comparison of similarly situated candidates and thus better analysis of the role that racial preferences are playing in the admissions process. Arcidiacono Rep. 22; Arcidiacono Rebuttal Rep. 69, Appendix A, p.3. Excluding them allows for the effect of race to be tested on the bulk of the applicant pool (more than 95% of applicants and more than two-thirds of admits) that do not fall into one of these categories, *i.e.*, the similarly-situated applicants. Arcidiacono Rep., Appendix A, Tables A.4 & A.5.

593.   The expanded dataset includes all domestic first-year applicants with complete applications and data except for recruited athletes. Arcidiacono Rep. 22; Arcidiacono Rebuttal Rep., Appendix A, p.3. Arcidiacono excludes athletes from the expanded dataset because their extraordinary admission rate demonstrates that the admissions process for this group is very different. For example, the probability of getting admitted with an academic rating of 4 is minuscule for non-athletes (0.076%) and nearly a thousand times greater for athletes (70.46%). Similarly, while 1 in every 7 admitted athletes have an academic rating of 4 or worse, only 1 in every 600 admitted non-athletes have an academic rating of 4 or worse. Arcidiacono Rebuttal Rep., Appendix A, p.3 n.1.

## B. Statistical Evidence of Bias Against Asian Americans by Harvard's Admissions Office

### 1. Descriptive Analysis of Bias Against Asian-American Applicants

594. In his expert reports, Professor Arcidiacono begins with a descriptive analysis of bias against Asian Americans in the admissions process. Arcidiacono Rep. 24-27, 31-53; Arcidiacono Rebuttal Rep. 11-16.

#### a. Bias in the Scoring of Asian Applicants

##### (1) The Strength of Asian Americans in Academics and the Academic Rating

595. In terms of academic performance, Asian-American applicants are significantly stronger than all other racial groups in both the baseline and expanded samples. Asian-American applicants have (1) the highest test scores; (2) the highest high school GPAs; (3) more AP exams; and (4) higher scores on those AP exams than any other racial group, including whites. Arcidiacono Rep. 33.

596. Asian-American applicants also are rated higher in the academic rating assigned by Harvard than all other racial groups. Arcidiacono Table 4.1R shows the percentage distribution of the academic ratings for the baseline dataset:

**Table 4.1R**
**Application rating summary statistics by race, baseline sample**

| | White | | | African American | | | Hispanic | | | Asian American | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Reject | Admit | Total | Reject | Admit | Total | Reject | Admit | Total | Reject | Admit | Total |
| Academic rating | | | | | | | | | | | | |
| <3- | 10.39 | 0.04 | 9.88 | 54.91 | 0.08 | 50.75 | 37.77 | 0.00 | 35.44 | 8.42 | 0.00 | 7.99 |
| =3-, 3, or 3+ | 46.56 | 11.19 | 44.83 | 40.02 | 40.52 | 40.06 | 48.68 | 34.60 | 47.81 | 33.22 | 5.60 | 31.80 |
| >3+ | 43.05 | 88.77 | 45.29 | 5.07 | 59.39 | 9.19 | 13.55 | 65.40 | 16.74 | 58.36 | 94.40 | 60.21 |

Arcidiacono Rebuttal Rep., Appendix C, Table 4.1R.

597. As Table 4.1R shows, 60.21% of Asian-American applicants had academic ratings better than 3+, compared with just 45.29% of white applicants. Arcidiacono Rebuttal Rep., Appendix C, Table 4.1R. Nearly identical rates are found in the expanded sample. Arcidiacono Rebuttal Rep., App. D, Table B.4.1R.

### (2) The Strength of Asian Americans in Non-Academic Categories

598. Harvard's data also show Asian-American applicants excel in more than academics. They also perform well in non-academic categories. Arcidiacono Rep. 37; Arcidiacono Rebuttal Rep., Appendix C, Table 4.1R.

599. Arcidiacono Table 4.1R shows the distribution of various component ratings that Harvard admissions officers and alumni assign to applicants during the evaluation process for the baseline dataset:

**Table 4.1R**
**Application rating summary statistics by race, baseline sample**

| | White | | | African American | | | Hispanic | | | Asian American | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Reject | Admit | Total | Reject | Admit | Total | Reject | Admit | Total | Reject | Admit | Total |
| Extracurricular rating | | | | | | | | | | | | |
| <3- | 3.74 | 0.71 | 3.59 | 8.02 | 0.76 | 7.47 | 5.98 | 1.26 | 5.69 | 2.02 | 0.19 | 1.93 |
| =3-, 3, or 3+ | 74.39 | 26.18 | 72.03 | 79.40 | 47.22 | 76.96 | 79.79 | 42.10 | 77.46 | 72.43 | 21.53 | 69.82 |
| >3+ | 21.87 | 73.11 | 24.38 | 12.58 | 52.02 | 15.57 | 14.23 | 56.64 | 16.85 | 25.54 | 78.28 | 28.25 |
| Teacher 1 rating | | | | | | | | | | | | |
| <3- | 0.57 | 0.00 | 0.54 | 1.11 | 0.00 | 1.02 | 0.90 | 0.00 | 0.84 | 0.51 | 0.00 | 0.48 |
| =3-, 3, or 3+ | 70.57 | 22.60 | 68.16 | 83.60 | 40.44 | 79.97 | 78.61 | 36.50 | 75.80 | 70.39 | 25.35 | 68.03 |
| >3+ | 28.86 | 77.40 | 31.31 | 15.28 | 59.56 | 19.01 | 20.49 | 63.50 | 23.35 | 29.10 | 74.65 | 31.49 |
| Teacher 2 rating | | | | | | | | | | | | |
| <3- | 0.48 | 0.00 | 0.45 | 0.80 | 0.00 | 0.72 | 0.82 | 0.00 | 0.76 | 0.51 | 0.05 | 0.48 |
| =3-, 3, or 3+ | 69.24 | 22.97 | 66.57 | 82.42 | 41.76 | 78.23 | 77.56 | 33.05 | 74.05 | 69.99 | 24.59 | 67.36 |
| >3+ | 30.28 | 77.03 | 32.98 | 16.78 | 58.24 | 21.06 | 21.61 | 66.95 | 25.20 | 29.50 | 75.36 | 32.16 |
| School counselor rating | | | | | | | | | | | | |
| <3- | 0.63 | 0.00 | 0.60 | 1.99 | 0.00 | 1.82 | 1.28 | 0.00 | 1.20 | 0.64 | 0.00 | 0.61 |
| =3-, 3, or 3+ | 75.44 | 23.25 | 72.78 | 86.42 | 41.73 | 82.65 | 83.59 | 40.73 | 80.74 | 75.85 | 26.30 | 73.22 |
| >3+ | 23.93 | 76.75 | 26.62 | 11.60 | 58.27 | 15.54 | 15.13 | 59.27 | 18.07 | 23.51 | 73.70 | 26.17 |
| Alumni Personal rating | | | | | | | | | | | | |
| <3- | 7.40 | 0.51 | 6.98 | 10.55 | 1.12 | 9.62 | 10.24 | 0.28 | 9.41 | 8.26 | 0.34 | 7.77 |
| =3-, 3, or 3+ | 31.43 | 5.89 | 29.89 | 35.82 | 9.13 | 33.19 | 35.55 | 6.54 | 33.11 | 31.55 | 6.38 | 29.98 |
| >3+ | 61.17 | 93.60 | 63.13 | 53.62 | 89.75 | 57.19 | 54.21 | 93.19 | 57.48 | 60.19 | 93.28 | 62.25 |
| Alumni Overall rating | | | | | | | | | | | | |
| <3- | 18.60 | 0.84 | 17.52 | 41.29 | 2.25 | 37.34 | 34.14 | 1.84 | 31.37 | 16.90 | 0.44 | 15.87 |
| =3-, 3, or 3+ | 37.47 | 10.45 | 35.83 | 35.45 | 22.39 | 34.13 | 36.81 | 16.41 | 35.06 | 34.70 | 7.57 | 32.99 |
| >3+ | 43.92 | 88.71 | 46.65 | 23.26 | 75.37 | 28.53 | 29.05 | 81.75 | 33.57 | 48.39 | 91.99 | 51.14 |

Arcidiacono Rebuttal Rep., Appendix C, Table 4.1R.

600. As Table 4.1R shows, Asian-American applicants have higher extracurricular ratings than any other racial group. Approximately 28% of Asian-American applicants have an extracurricular rating better than a 3+, compared to 24% of white applicants. A similar margin applies to the expanded sample. Arcidiacono Rebuttal Rep., Appendix D, Table B.4.1R.

601. These results are not a simple byproduct of academic strength. At every decile of the academic index, Asian-American applicants to Harvard outperform their peers from other races in

attaining high extracurricular ratings. Arcidiacono Table 5.4R shows the share of each racial/ethnic group that receives a 2 or better on the extracurricular rating by decile of the academic index:

**Table 5.4R**

**Share Receiving a Two or Higher on the Extracurricular Ratings by Race/Ethnicity and Academic Index Decile, Baseline Sample**

| | Extracurricular Rating | | | | |
|---|---|---|---|---|---|
| Academic Index Decile | Whites | African American | Hispanic | Asian American | Total |
| 1 | 11.41% | 9.02% | 9.27% | 12.97% | 10.09% |
| 2 | 16.35% | 13.75% | 12.73% | 15.99% | 14.75% |
| 3 | 20.14% | 18.86% | 15.86% | 18.57% | 18.92% |
| 4 | 22.02% | 23.27% | 18.74% | 21.59% | 21.61% |
| 5 | 23.83% | 22.85% | 20.65% | 23.67% | 23.61% |
| 6 | 25.08% | 26.38% | 23.31% | 25.51% | 25.36% |
| 7 | 26.64% | 27.42% | 27.61% | 28.34% | 27.39% |
| 8 | 27.31% | 27.91% | 24.63% | 29.78% | 28.11% |
| 9 | 30.45% | 32.65% | 28.94% | 34.92% | 32.76% |
| 10 | 33.04% | 38.64% | 29.21% | 37.98% | 35.96% |
| | | | | | |
| Average | 24.38% | 15.56% | 16.84% | 28.27% | 23.73% |

Arcidiacono Rebuttal Rep., Appendix C, Table 5.4R.

602. As Table 5.4R shows, Asian-American applicants who are not in the top decile of the academic index still receive extracurricular ratings that are just as strong or stronger than their peers of other races. This demonstrates that Asian-American applicants' strength on this rating is not a function of their academic achievements; even Asian Americans in lower academic deciles receive higher extracurricular ratings than their peers. *Id.*

603. Although Harvard's database does not record an extracurricular rating from the alumni interview, it does include an overall rating. Asian Americans receive higher overall ratings from alumni interviewers than their counterparts. More than 51% of Asian Americans in the baseline sample received an overall rating of a 1 or 2, compared to 46.7% of white applicants. Arcidiacono Rebuttal Rep., Appendix C, Table 4.1R. The same pattern holds in the expanded sample. Arcidiacono Rebuttal Rep., Appendix D, Table B.4.1R.

604. Asian-American applicants also received relatively strong scores for the recommendation submitted by their teachers and guidance counselors, compared to their peers of other races. As Table 4.1R shows, Asian Americans received a 1 or a 2 on each of these three ratings

at nearly identical rates to white applicants (and at a higher rate than African-American and Hispanic applicants). Arcidiacono Rebuttal Rep., Appendix C, Table 4.1R. The same pattern holds in the expanded sample. Arcidiacono Rebuttal Rep., Appendix D, Table B.4.1R.

605. Professor Arcidiacono thus concluded that "Asian-American applicants as a whole are stronger on many objective measures than any other racial/ethnic group including test scores, academic achievement, and extracurricular activities." Arcidiacono Rep. 2; Arcidiacono Rebuttal Rep. 1.

#### (3) Bias in Harvard's Assignment of Lower Personal Rating Scores to Asian Americans

606. Despite their superiority in the measurables for academic and extracurricular achievement, Asian-American applicants have the lowest scores of the four major racial groups on Harvard's personal rating—the most subjective of all the ratings. Arcidiacono Rep. 37.

607. Unlike the academic and extracurricular ratings, which correspond to objective credentials like test scores, grades, and AP exams (academic rating) or types of activities, number of activities, and number of hours per week on the activities (extracurricular rating), the personal rating is difficult to measure directly and is based on vague scoring criteria about one's "personal qualities." Arcidiacono Rep. 37-38 (citing HARV00000803-04).

608. Harvard's data capture two different personal ratings: one assigned by the admissions staff in Cambridge, and the other assigned by the alumni interviewers. Arcidiacono Table 4.1R shows the distribution of the personal ratings assigned to applicants in the baseline dataset by Harvard admissions officers and alumni interviewers:

**Table 4.1R**
**Application rating summary statistics by race, baseline sample**

| | White | | | African American | | | Hispanic | | | Asian American | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Reject | Admit | Total | Reject | Admit | Total | Reject | Admit | Total | Reject | Admit | Total |
| Personal rating | | | | | | | | | | | | |
| <3- | 0.45 | 0.00 | 0.43 | 0.50 | 0.00 | 0.47 | 0.51 | 0.00 | 0.48 | 0.51 | 0.00 | 0.48 |
| =3-, 3, or 3+ | 81.49 | 16.24 | 78.30 | 85.02 | 25.61 | 80.52 | 84.70 | 22.13 | 80.85 | 84.86 | 26.74 | 81.88 |
| >3+ | 18.06 | 83.76 | 21.27 | 14.47 | 74.39 | 19.01 | 14.79 | 77.87 | 18.68 | 14.63 | 73.26 | 17.64 |
| Alumni Personal rating | | | | | | | | | | | | |
| <3- | 7.40 | 0.51 | 6.98 | 10.55 | 1.12 | 9.62 | 10.24 | 0.28 | 9.41 | 8.26 | 0.34 | 7.77 |
| =3-, 3, or 3+ | 31.43 | 5.89 | 29.89 | 35.82 | 9.13 | 33.19 | 35.55 | 6.54 | 33.11 | 31.55 | 6.38 | 29.98 |
| >3+ | 61.17 | 93.60 | 63.13 | 53.62 | 89.75 | 57.19 | 54.21 | 93.19 | 57.48 | 60.19 | 93.28 | 62.25 |

Arcidiacono Rebuttal Rep., Appendix C, Table 4.1R.

609. As Table 4.1R shows, Asian-American applicants have the lowest share of applicants receiving better than a 3+ on the personal rating from Harvard admissions officers. Only 17.6% of Asian-American applicants received better than a 3+ on the personal rating, compared to 21.3% of white applicants. Arcidiacono Rebuttal Rep., Appendix C, Table 4.1R. The same is true of the expanded sample, where whites have the highest share of 1s and 2s on the personal rating (22.6%) and Asian Americans have the lowest (18.0%). Arcidiacono Rebuttal Rep., Appendix D, Table B.4.1R.

610. The low scores Asian-American applicants receive from Harvard's admissions officers on the personal rating differ significantly from the personal ratings assigned by alumni interviewers (who actually meet the applicants in person). Alumni interviewers score Asian-American applicants higher on the personal rating than African-American and Hispanic applicants and roughly comparable to white applicants. Arcidiacono Rep. 37; Arcidiacono Rebuttal Rep. 13-14; Arcidiacono Rebuttal Rep., Appendix C, Table 4.1R and Appendix D, Table B.4.1R.

611. Asian Americans' ratings on the personal score are not a product of their academic achievements. Regardless of their academic decile, Asian Americans are assigned lower personal scores by Harvard than their peers of other races. Arcidiacono Table 5.6R shows the share of applicants receiving a 2 or better for Harvard's personal rating and a 2 or better for the personal rating of the alumni interviewer by academic index decile and race/ethnicity:

**Table 5.6R**

**Share Receiving a Two or Higher on the Personal Rating and Alumni Interview Personal Rating by Race/Ethnicity and Academic Index Decile, Baseline Sample**

| | Personal | | | | | | Alumni Personal | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Academic Index Decile | Whites | African American | Hispanic | Asian American | Total | | Whites | African American | Hispanic | Asian American | Total |
| 1 | 8.11% | 9.49% | 8.48% | 8.01% | 8.81% | | 26.33% | 30.96% | 26.29% | 28.13% | 28.25% |
| 2 | 12.58% | 15.75% | 13.16% | 12.91% | 13.57% | | 33.72% | 39.83% | 33.42% | 32.03% | 34.89% |
| 3 | 16.25% | 23.35% | 17.77% | 13.46% | 17.16% | | 39.77% | 46.84% | 38.59% | 36.35% | 40.06% |
| 4 | 18.62% | 28.95% | 20.39% | 14.24% | 18.91% | | 44.27% | 55.56% | 43.86% | 40.66% | 44.64% |
| 5 | 20.40% | 33.89% | 25.60% | 15.69% | 20.56% | | 48.43% | 59.98% | 50.32% | 44.24% | 48.28% |
| 6 | 22.72% | 35.04% | 28.41% | 16.46% | 21.69% | | 51.84% | 62.20% | 54.50% | 46.96% | 51.18% |
| 7 | 22.59% | 40.00% | 30.03% | 18.11% | 22.01% | | 54.08% | 69.89% | 56.90% | 51.93% | 54.07% |
| 8 | 26.10% | 39.57% | 32.20% | 17.93% | 23.20% | | 58.20% | 67.48% | 62.44% | 53.78% | 56.77% |
| 9 | 28.23% | 40.31% | 30.24% | 20.87% | 24.74% | | 62.20% | 70.92% | 62.89% | 57.46% | 60.18% |
| 10 | 29.62% | 46.97% | 34.21% | 22.20% | 25.46% | | 64.98% | 73.48% | 71.05% | 63.61% | 64.49% |
| | | | | | | | | | | | |
| Average | 21.29% | 19.01% | 18.69% | 17.65% | 19.52% | | 49.79% | 42.79% | 41.25% | 50.21% | 48.09% |

Arcidiacono Rebuttal Rep., Appendix C, Table 5.6R.

612. Similar patterns are reflected in the expanded sample. Arcidiacono Rebuttal Rep., Appendix D, Table B.5.6R.

613. As Table 5.6R shows, within every academic decile, Harvard's admissions staff gives lower personal scores to Asian Americans than to every other race. In light of their strength in the extracurricular category, this demonstrates that the penalty Asian Americans face in the personal score is not a function of a one-dimensional focus on academics by those applicants. *Id.*

614. The difference in the personal ratings Harvard assigns is substantial. In the top three (most competitive) deciles, white applicants are given a personal rating of 1 or 2 at a substantially greater rate than Asian-American applicants, with the advantage of white applicants on the baseline sample ranging from 7-9 points. Hispanic and African-American applicants receive even greater advantages. Arcidiacono Rebuttal Rep., Appendix C, Table 5.6R.

615. Within the top decile, Asian-American applicants are given a personal rating of 2 or better 22% of the time. White applicants, on the other hand, receive a personal rating of 2 or better more than 22% of the time in each of the top *five deciles*; Hispanic applicants receive this score in each of the top six deciles; and African-American applicants receive this score in each of the top eight deciles. Arcidiacono Rebuttal Rep. 14; Arcidiacono Rebuttal Rep., Appendix C, Table 5.6R.

616. The personal ratings given by alumni interviewers "do not show this pattern." Arcidiacono Rep. 5. White applicants' advantage in the top decile is only 1.3 percentage points, and across the board the spread between white and Asian-American applicants is less than half of that in the admissions officers' ranking. Arcidiacono Rebuttal Rep., Appendix C, Table 5.6R, and Appendix D, Table B.5.6R.

**(4) The Inconsistency between Harvard's Personal Rating Scores and the Testimony that Asian Americans Are Not Lacking in Personal Qualities.**

617. The low personal ratings that Harvard's admissions officers consistently assign to Asian-American applicants are inconsistent with the testimony of virtually every witness in this case, who uniformly rejected the idea that Asian-American applicants as a whole are lacking in "outstanding personal qualities" compared to other applicants of other races. For example, Dean Fitzsimmons—who has read files every year for more than 30 years—denied that Asian-American applicants were, on average, lacking in personal qualities:

> Q. What about personal qualities? In your experience, do you think Asian Americans have fewer attractive personal qualities than white students?
> MS. ELLSWORTH: Objection.
> A. That wouldn't be my impression.
> Q. We're talking about things like leadership. Is that a personal quality?
> A. One of many.
> Q. Friendliness? Outgoing natures?
> MS. ELLSWORTH: Objection.
> A. Again, one of many, many variables.
> Q. And so you have no reason to believe that there's any reason why Asian Americans have those qualities, you know, to a lesser degree than white applicants, do you?
> MS. ELLSWORTH: Objection.
> A. No.

Ex. 9, Fitzsimmons 347:10-348:2.

618. Director McGrath likewise was asked, "In your experience, do Asian Americans as a group lack attractive personal characteristics compared to other applicants?" She responded "No, I don't think so." Ex. 17, McGrath 359:6-11.

619. Financial Aid Director Sarah Donahue likewise testified that in her experience, Asian Americans did not have the kind of characteristics that lead to lower personal ratings in any disproportionate way. Ex. 6, Donahue 166:1-7.

620. One of Harvard's own experts, Dr. Ruth Simmons, former President of Brown University, described concerns that Asian Americans weren't as well-rounded because of their cultural focus on academics as "balderdash," and testified that, in her experience, Asian-American students were not any less personable than other groups. Ex. 21, Simmons 129:17-131:11.

621. Other Harvard officials also testified that they had no reason to believe Asian-American applicants would have less attractive personal qualities than applicants of other races. Ex. 22, Smith 188:15-189:1; Ex. 26, Yong: 232:20-235:1; Ex. 10, Hansen 110:20-111:11.

622. Officials from elite high schools with large Asian-American populations confirm that Asian Americans are no less personable than other racial groups. For example, Michael Contompasis, the interim headmaster of Boston Latin School agreed that the Asian-American students at his school have "diverse interests, personalities, and strengths." Ex. 4, Contompasis 41:17-42:13.

623. Fabio Zuluaga, testifying on behalf of Thomas Jefferson High School in Arlington, Virginia, likewise testified that the Asian-American students there, in his experience, were no less well-rounded than white students, and did not exhibit any lesser leadership qualities. Ex. 27, Zuluaga 81:2-20.

**(5) The Bias Against Asian Americans in the Overall Rating**

624. Bias against Asian-American applicants is also reflected in the overall rating assigned by Harvard's admissions officers. Arcidiacono Rep. 50-52. Harvard has conceded that this variable is explicitly affected by race. Ex. 20, Ray 27:4-28:21; Ex. 11, Howrigan 35:13-36:6; Card Rep. 10, 26, 51 n.87, 63-64.

625. Arcidiacono Table 5.7R shows the shares of each racial group receiving an overall rating from the final reader of a 2 or better and an overall rating of the alumni interviewer of a 2 or better by race/ethnicity and academic index:

**Table 5.7R**
**Share Receving a Two or Higher on Overall Rating and Alumni Interviewer Overall Rating by Race/Ethnicity and Academic Index Decile, Baseline Sample**

| | Final Reader Overall Rating | | | | | | Alumni Interviewer Overall Rating | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Academic Index Decile | Whites | African American | Hispanic | Asian American | Total | | Whites | African American | Hispanic | Asian American | Total |
| 1 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | | 7.26% | 7.31% | 7.14% | 7.35% | 7.34% |
| 2 | 0.18% | 0.47% | 0.08% | 0.15% | 0.22% | | 13.35% | 14.89% | 11.82% | 12.22% | 13.37% |
| 3 | 0.26% | 2.05% | 0.68% | 0.23% | 0.63% | | 19.38% | 23.88% | 19.07% | 17.51% | 19.86% |
| 4 | 0.69% | 7.16% | 2.15% | 0.40% | 1.54% | | 26.23% | 33.46% | 24.84% | 23.11% | 26.12% |
| 5 | 1.57% | 15.50% | 4.54% | 1.34% | 2.71% | | 32.68% | 43.48% | 35.08% | 29.71% | 32.87% |
| 6 | 2.95% | 23.82% | 8.82% | 1.80% | 4.05% | | 38.07% | 51.38% | 39.65% | 36.08% | 38.34% |
| 7 | 4.15% | 30.79% | 12.01% | 3.11% | 5.22% | | 42.62% | 56.18% | 44.89% | 42.37% | 43.30% |
| 8 | 7.63% | 37.42% | 15.61% | 4.61% | 7.39% | | 49.26% | 59.20% | 50.98% | 46.95% | 48.50% |
| 9 | 10.97% | 45.41% | 19.67% | 7.59% | 10.12% | | 56.69% | 61.22% | 59.18% | 54.16% | 55.91% |
| 10 | 15.64% | 46.97% | 27.37% | 12.93% | 14.70% | | 63.13% | 66.67% | 64.47% | 63.10% | 63.28% |
| | | | | | | | | | | | |
| Average | 4.44% | 5.29% | 3.88% | 4.85% | 4.60% | | 36.50% | 20.82% | 23.64% | 40.91% | 34.59% |

Arcidiacono Rebuttal Rep., Appendix C, Table 5.7R.

626. As Table 5.7R shows, Asian-American applicants receive overall ratings lower than white applicants in every decile. Indeed, Asian-American applicants receive overall ratings similar to white applicants that are one decile lower. The same pattern can be observed in the expanded sample. Arcidiacono Rebuttal Rep., Appendix D, Table B.5.6.R.

627. More dramatically, African Americans are significantly more likely to be given a two in the overall rating than Asian Americans in the same academic index decile. For example, African Americans are more than 17 times more likely to be given a two than Asian Americans in the fourth decile, more than 13 times more likely to be given that rating in the sixth decile, more than 8 times more likely to be given that rating in the eighth decile, and more than 3 times more likely to be given that rating in the top decile. Similar disparities are present in the expanded sample. Arcidiacono Rebuttal Rep., Appendix C, Table 5.7R, and Appendix D, Table B.5.6.R.

628. By contrast, as Table 5.7R shows, Asian Americans do not see similar disparities for the overall rating by the alumni interviewer. For example, Asian-American applicants receive overall ratings by the alumni interviewer virtually identical to those of white applicants in the top (most competitive) decile. And, as noted above, the same is true of the ratings assigned based on the recommendations of teachers and guidance counselors. Arcidiacono Rebuttal Rep., Appendix C, Table 4.1R, and Appendix D, Table B.4.1R.

**b. The Bias Against Asian Americans in the Admission of Applicants**

**(1) The Consistently Low Admit Rates of Asian Americans**

629. Harvard has produced aggregate data for a 20-year period from the Class of 2000 through the Class of 2019 containing information by year and race on the number of applicants, admits, and matriculants. Ex. 139, HARV00032509-24.

630. Arcidiacono Figure 1.1 presents the raw admit rates for each racial group as well as the total admit rate for all applicants for the 20 years from the Class of 2000 through the Class of 2019:

Arcidiacono Rep. 25; Ex. 139, HARV00032509-24.

631. As Figure 1.1 shows, the Asian-American admit rate is below the total admit rate *every year* from the Class of 2000 through the Class of 2019. In addition, the Asian-American admit rate is the only one of the four major racial groups to consistently be below the average for the class. Arcidiacono Rep. 24-25; Ex. 139, HARV00032509-24.

632. Asian-American applicants had the lowest admit rate despite the fact that that they had higher test scores than all other racial groups during this time period. Arcidiacono Figure 1.2 presents the SAT scores for each racial group for admits and applicants for the 18 years from the Class of 2000 through the Class of 2017:

Arcidiacono Rep. 26; Ex. 139, HARV00032509-24.

633. As Figure 1.2 shows, Asian-American applicants had higher test scores than all other racial groups every year from the Class of 2000 through the Class of 2017. Arcidiacono Rep. 26.

**(2) The Lower Asian-American Admit Rates for Applicants within the Same Academic Index Deciles**

634. Arcidiacono Table 5.1R shows the number and fraction of each of the four major racial groups in each decile of the academic index for the baseline dataset:

**Table 5.1R**
**Number and Share of Applicants by Race/Ethnicity and Academic Index Decile, Baseline Sample**

| Academic Index Decile | Number of Applicants in Each Decile: Whites | African American | Hispanic | Asian American | Total | Share of Applicants in each Decile: Whites | African American | Hispanic | Asian American | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2,822 | 5,921 | 3,583 | 1,511 | 14,593 | 4.91 | 37.95 | 19.98 | 3.75 | 10.25 |
| 2 | 4,404 | 3,600 | 3,755 | 2,045 | 14,658 | 7.67 | 23.08 | 20.94 | 5.07 | 10.3 |
| 3 | 6,073 | 2,291 | 2,926 | 2,644 | 15,014 | 10.57 | 14.68 | 16.32 | 6.56 | 10.55 |
| 4 | 6,359 | 1,285 | 2,182 | 3,020 | 13,865 | 11.07 | 8.24 | 12.17 | 7.49 | 9.74 |
| 5 | 7,658 | 897 | 1,719 | 3,874 | 15,426 | 13.33 | 5.75 | 9.59 | 9.61 | 10.84 |
| 6 | 5,924 | 508 | 1,077 | 3,614 | 12,110 | 10.31 | 3.26 | 6.01 | 8.97 | 8.51 |
| 7 | 7,053 | 445 | 949 | 4,527 | 14,145 | 12.28 | 2.85 | 5.29 | 11.23 | 9.94 |
| 8 | 6,478 | 326 | 820 | 5,316 | 14,253 | 11.28 | 2.09 | 4.57 | 13.19 | 10.01 |
| 9 | 5,717 | 196 | 539 | 6,532 | 14,303 | 9.95 | 1.26 | 3.01 | 16.21 | 10.05 |
| 10 | 4,963 | 132 | 380 | 7,225 | 13,989 | 8.64 | 0.85 | 2.12 | 17.92 | 9.83 |
| Total | 57,451 | 15,601 | 17,930 | 40,308 | 142,356 | | | | | |

Arcidiacono Rebuttal Rep., Appendix C, Table 5.1R.

635. As Table 5.1R shows, 17.9% of Asian-American applicants in the baseline dataset are in the top decile of the academic index—more than double the share of white applicants in the top decile (8.6%) and 21 times the share of African-American applicants in the top decile (0.85%). Arcidiacono Rebuttal Rep., Appendix C, Table 5.1R.

636. Similarly, although Asian Americans are only 28% of the applicant pool in the baseline dataset, they represent more than half of those in the top academic index decile (7,225 out of 13,989). Arcidiacono Rebuttal Rep., Appendix C, Table 5.1R.

637. Indeed, if Harvard admitted students based only on the academic index, Asian-American applicants would comprise over 50% of the admitted class. Arcidiacono Rep. 42-43, 77.

638. Arcidiacono Table 5.2R shows the admit rates by race/ethnicity and academic index decile for the baseline dataset:

**Table 5.2R**
**Admit Rates by Race/Ethnicity and Academic Index Decile, Baseline Sample**

| Academic Index Decile | Whites | African American | Hispanic | Asian American | Total |
|---|---|---|---|---|---|
| 1 | 0.00% | 0.03% | 0.00% | 0.00% | 0.01% |
| 2 | 0.39% | 1.03% | 0.32% | 0.20% | 0.53% |
| 3 | 0.56% | 5.19% | 1.95% | 0.64% | 1.65% |
| 4 | 1.82% | 12.76% | 5.50% | 0.86% | 3.29% |
| 5 | 2.57% | 22.41% | 9.13% | 1.86% | 4.40% |
| 6 | 4.20% | 29.72% | 13.65% | 2.49% | 5.64% |
| 7 | 4.79% | 41.12% | 17.28% | 3.98% | 6.61% |
| 8 | 7.53% | 44.48% | 22.93% | 5.12% | 8.22% |
| 9 | 10.77% | 54.59% | 26.16% | 7.55% | 10.40% |
| 10 | 15.27% | 56.06% | 31.32% | 12.69% | 14.58% |
| Average | 4.90% | 7.58% | 6.16% | 5.14% | 5.46% |

Arcidiacono Rebuttal Rep., Appendix C, Table 5.2R.

639. As Table 5.2R shows, candidates from the higher academic index deciles are more likely to be admitted. The same is true in the expanded sample. Arcidiacono Rebuttal Rep., Appendix D, Table B.5.2.R.

640. Table 5.2R also shows that, notwithstanding that academic indexes are highly correlated with admission, there are massive disparities in the admit rates of different racial groups within the same academic index deciles. Within every decile, Asian-American admit rates lag behind the admit rates for other racial groups (with the sole exception being that white applicants in the eighth decile having a slightly lower admit rate). Arcidiacono Rebuttal Rep., Appendix C, Table 5.2R.

641. For applicants in the top half of academic indexes, Asian-American admit rates in any decile are roughly equivalent to white admit rates for one decile lower. For example, Asian Americans in the ninth decile have similar admit rates to whites in the eighth decile (7.55% v. 7.53%). Arcidiacono Rebuttal Rep., Appendix C, Table 5.2R.

#### (3) The Substantial Increase in Asian-American Admit Rates Under an Academics-Only Admissions System

642. If Harvard's admissions process were based on academics alone, the Asian-American admit rate would increase substantially. Arcidiacono Table 5.3R represents what the shares of the

different racial groups within the baseline dataset would be if a random lottery were conducted conditional on being in different academic index deciles:

**Table 5.3R**

**Share of admits of each race/ethnicity if equally drawn from different academic index deciles**

| | Whites | African American | Hispanic | Asian American |
|---|---|---|---|---|
| Actual Share of Admitted Class | 37.61 | 15.81 | 14.90 | 24.86 |
| Randomly sampling from: | | | | |
| Top 9 deciles | 42.76 | 7.58 | 11.23 | 30.37 |
| Top 8 deciles | 44.41 | 5.38 | 9.36 | 32.49 |
| Top 7 deciles | 45.01 | 3.86 | 7.82 | 34.77 |
| Top 6 deciles | 44.87 | 2.97 | 6.51 | 36.91 |
| Top 5 deciles | 43.80 | 2.34 | 5.47 | 39.56 |
| Top 4 deciles | 42.71 | 1.94 | 4.74 | 41.63 |
| Top 3 deciles | 40.33 | 1.54 | 4.09 | 44.83 |
| Top 2 deciles | 37.75 | 1.16 | 3.25 | 48.63 |
| Top decile | 35.48 | 0.94 | 2.72 | 51.65 |

Arcidiacono Rebuttal Rep., Appendix C, Table 5.3R.

643.    As Table 5.3R shows, randomly drawing from all those in the top nine academic index deciles would increase the share of Asian-American admits from 24.9% to 30.4% in the baseline dataset, a jump of more than 22%. More dramatically, randomly drawing from the top academic index decile (in the baseline dataset) would cause Asian-American admits to *more than double*—resulting in more than 51% of the admitted class being Asian American. Arcidiacono Rep. 42-45; Arcidiacono Rebuttal Rep. 14.

644.    Even if the number of admits from all other groups besides whites and Asian Americans were held fixed, and only the admits for whites and Asian Americans were randomly drawn from the top decile, the share of the class that was Asian American would still substantially increase, resulting in an Asian-American admitted share of 36.5%, a 47% increase. This occurs because Asian-American applicants dominate white applicants in their respective shares of the top academic decile. Arcidiacono Rep. 42-45; Arcidiacono Rebuttal Rep. 14, and Appendix C, Table 5.1R.

### (4) The Low Admit Rates of Asian Americans with the Same Overall Ratings

645. Among those applicants with the *same* overall rating, Asian-American applicants are less likely to be admitted than any other racial group. Arcidiacono Table 4.2 shows the share of each racial group that received a particular overall rating and, conditional on that rating, the probability of being admitted for the baseline and expanded dataset:

**Table 4.2R**
**Admission shares by race and overall rating, baseline sample**

| | White | | African American | | Hispanic | | Asian American | |
|---|---|---|---|---|---|---|---|---|
| | Admit | Pop. | Admit | Pop. | Admit | Pop. | Admit | Pop. |
| Score | Share | Share | Share | Share | Share | Share | Share | Share |
| *Panel 1: Baseline Sample* | | | | | | | | |
| <3 | 0.02 | 42.62 | 0.02 | 65.07 | 0.01 | 57.43 | 0.01 | 37.82 |
| 3 | 1.94 | 39.52 | 5.75 | 21.41 | 4.06 | 28.78 | 1.79 | 42.77 |
| 3+ | 8.89 | 13.42 | 22.50 | 8.23 | 19.14 | 9.92 | 7.96 | 14.58 |
| 2 | 65.48 | 4.39 | 84.63 | 5.23 | 79.48 | 3.85 | 65.51 | 4.76 |
| 1 | 100.00 | 0.04 | 100.00 | 0.05 | 100.00 | 0.03 | 100.00 | 0.08 |
| | | | | | | | | |
| *Panel 2: Expanded Sample* | | | | | | | | |
| <3 | 0.10 | 40.93 | 0.02 | 64.65 | 0.02 | 56.70 | 0.01 | 37.48 |
| 3 | 2.94 | 39.60 | 6.01 | 21.49 | 4.35 | 28.98 | 2.05 | 42.63 |
| 3+ | 11.32 | 13.91 | 23.15 | 8.31 | 20.41 | 10.16 | 8.64 | 14.69 |
| 2 | 71.34 | 5.51 | 84.82 | 5.49 | 80.64 | 4.12 | 67.65 | 5.12 |
| 1 | 100.00 | 0.06 | 100.00 | 0.06 | 100.00 | 0.04 | 100.00 | 0.08 |

Arcidiacono Rebuttal Rep., Appendix C, Table 4.2R.

646. As Table 4.2R shows, in both the baseline and expanded samples, those who have an overall score of 3- or worse are almost always rejected. By contrast, those who receive an overall rating of a 1 are always accepted. Admit rates for white applicants are higher than Asian-American admit rates in every category except one. For example, for applicants receiving an overall rating of 2+, 2, or 2- in the expanded dataset, the white admit rate is more than 3.5 percentage points higher than the Asian-American admit rate (71.34% v. 67.65%). Arcidiacono Rebuttal Rep., Appendix C, Table 4.2R.

647. In addition, among the four racial groups, Asian Americans have the lowest fraction of applications in the bottom category (worse than a 3 in the overall rating) for both datasets. This

indicates that Asian-American applicants are stronger overall than the other racial groups. Yet the share of Asian-American applicants who receive a 2 or better in the overall rating is lower than that of both white and African-American applicants. Arcidiacono Rebuttal Rep., Appendix C, Table 4.2R; Arcidiacono Rep. 39-40.

### 2.     Logistic Regression Analysis Confirms Bias Against Asian Americans

648.     Although Harvard deploys a "holistic" admissions process, statistical analysis can reliably quantify the role various factors play in the admissions decisions. Each admission decision provides a data point about how Harvard's process ranks applicants with particular attributes, many of which can be observed in the data produced by Harvard. By estimating a model of how Harvard makes admissions decisions, one can calculate an applicant's probability of admission based on observed characteristics. Arcidiacono Rep. 18.

649.     The Harvard database provides a set of observed characteristics that is more robust than what is typically available. Many peer-reviewed studies in excellent journals have been published analyzing discrimination with much less data of much lower quality. Arcidiacono Rep. 19.

650.     To evaluate whether Harvard is imposing a penalty against Asian-American applicants and granting preferences for other groups, Professor Arcidiacono used two types of logistic regression models commonly employed by econometricians to measure the effect of certain factors on a dependent variable. To determine the effect of various factors on Harvard's ratings for applicants, he used an ordered logit model. This type of analysis is typically used by econometricians when the outcome variable is non-binary (such as a rating on a multi-point scale). Arcidiacono Rep. 18-21.

651.     To determine the effect of various factors on the admissions decisions themselves, he used a logit model. This type of analysis is typically used by econometricians when the outcome variable is binary such as whether an applicant was admitted. Arcidiacono Rep. 18-19.

652.    In logistic regression models, characteristics relevant to the admissions decision are entered for each applicant. These relevant characteristics are referred to as controls; the results generated take into account (or "control for") each of these characteristics. Additionally, the marginal impact of each characteristic can be estimated in a way that controls for the impact of the other characteristics. Arcidiacono Rep. 17-19.

653.    The models Professor Arcidiacono estimated in this case include hundreds of variables. Arcidiacono Rep. 15 & n.15.

654.    In preparing his models, Professor Arcidiacono reported results for both the baseline and expanded samples, to demonstrate how results differ when one compares applicants who are similarly situated (i.e., do not receive a tip for one of the special categories that dramatically improve one's admission prospects). Arcidiacono Rep. 2, 22.

655.    Professor Arcidiacono generally pooled the data from six years, to avoid small sample sizes and provide the most complete assessment of Harvard's admissions process. He controls, however, for each applicant's admissions cycle and interacts that term with other key variables Harvard tracks. Interacting the control for which year it is with other control variables increases the flexibility of the model by allowing the other control variables to have effects that can differ by year. Arcidiacono Rebuttal Rep. 34-35, 69-70.

### 3.    Regression Analysis Confirms Racial Bias in Both the Personal and Overall Ratings

656.    Professor Arcidiacono's regression analysis shows that Asian-American applicants receive a significant penalty in the personal rating and African-American and Hispanic applicants receive a significant preference in the personal rating. Arcidiacono Rep. 53-61.

657.    Arcidiacono Table 6.1R shows how the probability of receiving a 2 or better on the personal rating would change for each race/ethnicity if they were treated like each of the other races/ethnicities:

**Table 6.1R**

**Probability of Receiving a 2 or Higher on Personal Rating for own race/ethnicity and counterfactual race/ethnicity, preferred model**

| Race/Ethnicity | Own Race | if White | if African American | if Hispanic | if Asian American |
|---|---|---|---|---|---|
| *Panel 1: Baseline sample* | | | | | |
| White | 0.214 | | 0.283 | 0.245 | 0.176 |
| African American | 0.193 | 0.152 | | 0.174 | 0.126 |
| Hispanic | 0.192 | 0.168 | 0.217 | | 0.138 |
| Asian American | 0.178 | 0.216 | 0.283 | 0.247 | |
| *Panel 2: Expanded sample* | | | | | |
| White | 0.227 | | 0.299 | 0.257 | 0.190 |
| African American | 0.197 | 0.155 | | 0.177 | 0.129 |
| Hispanic | 0.196 | 0.172 | 0.223 | | 0.143 |
| Asian American | 0.181 | 0.219 | 0.286 | 0.250 | |

Arcidiacono Rebuttal Rep., Appendix C, Table 6.1R; Arcidiacono Rebuttal Rep. 5.

658. As Table 6.1R shows, if Asian-American applicants were treated like white applicants (that is, holding fixed the rest of their characteristics and just changing their race), the probability of Asian Americans receiving a 2 or better on the personal rating would increase by nearly four percentage points, reflecting a 21% increased chance of receiving a 2 or better. And had Asian Americans been treated like African Americans, the probability of Asian Americans receiving a 2 or better on their personal rating would increase by more than 10 percentage points, reflecting more than a 58% increased chance of receiving a 2 or better. Arcidiacono Rebuttal Rep., Appendix C, Table 6.1R.

659. This tracks with the results for the overall rating, which Harvard concedes is affected by race. Arcidiacono Table 6.2R shows how the probability of receiving different overall ratings would change if an applicant were treated as each of the four major racial groups:

**Table 6.2R**

**Probability of receiving each overall rating for own race/ethnicity and counterfactual race/ethnicity, preferred model, baseline sample**

|  | Score | Own Race | if White | if African American | if Hispanic | if Asian American |
|---|---|---|---|---|---|---|
| White | <3 | 0.425 |  | 0.265 | 0.310 | 0.434 |
|  | 3 | 0.392 |  | 0.346 | 0.396 | 0.397 |
|  | 3+ | 0.136 |  | 0.206 | 0.190 | 0.125 |
|  | >3+ | 0.047 |  | 0.183 | 0.105 | 0.043 |
| African American | <3 | 0.649 | 0.750 |  | 0.678 | 0.755 |
|  | 3 | 0.210 | 0.188 |  | 0.218 | 0.188 |
|  | 3+ | 0.087 | 0.049 |  | 0.074 | 0.045 |
|  | >3+ | 0.054 | 0.013 |  | 0.030 | 0.012 |
| Hispanic | <3 | 0.565 | 0.658 | 0.526 |  | 0.664 |
|  | 3 | 0.289 | 0.254 | 0.274 |  | 0.255 |
|  | 3+ | 0.103 | 0.069 | 0.122 |  | 0.063 |
|  | >3+ | 0.043 | 0.019 | 0.079 |  | 0.017 |
| Asian American | <3 | 0.375 | 0.366 | 0.221 | 0.259 |  |
|  | 3 | 0.425 | 0.418 | 0.338 | 0.400 |  |
|  | 3+ | 0.148 | 0.161 | 0.231 | 0.219 |  |
|  | >3+ | 0.052 | 0.056 | 0.210 | 0.122 |  |

Arcidiacono Rebuttal Rep., Appendix C, Table 6.2R.

660.    As Table 6.2R shows, had Asian-American applicants been treated like white applicants, their probability of receiving a 2- or better on Harvard's overall rating would increase from 5.2% to 5.6% (representing more than an 8% increase in the chance of receiving such a score). Arcidiacono Rebuttal Rep., Appendix C, Table 6.2R.

661.    The impact would be even greater if Asian-American applicants were treated like African-American or Hispanic applicants. If treated like Hispanic applicants, the probability of Asian Americans receiving a 2- or better would rise from 5.2% to 12.2% (representing a 134% increased chance). And had Asian Americans been treated like African Americans, their probability of receiving a 2- or better on the overall rating would increase from 5.2% to 21.0% (representing a 285% increased chance). Arcidiacono Rebuttal Rep., Appendix C, Table 6.2R.

662.    Receiving a 2 or better on Harvard's overall rating is especially important for an applicant's chances of admission. As Arcidiacono Table 4.2R illustrates, the probability of admission to Harvard (for all racial groups) increases by over 50% when an applicant's overall rating moves from

3+ to 2. Put another way, moving from a 3+ to a 2 means that the applicant changes from being a likely reject to being a likely admit. Arcidiacono Rep. 59; Arcidiacono Rebuttal Rep., Appendix C, Table 4.2R.

663.   Because there is overwhelming evidence that both the personal rating and the overall rating assigned by Harvard are affected by the race of the applicant, Professor Arcidiacono's preferred model (Model 5) excludes the personal rating when controlling for the effect of race. Arcidiacono Rep. 63.

### 4.   Logistic Regression Analysis Confirms a Significant Penalty Against Asian Americans in Admissions Decisions

664.   Arcidiacono Table 7.1R shows the probability of admission for an Asian-American applicant with characteristics implying a 25% chance of being admitted if the applicant were treated as each of the other races/ethnicities. It provides these probabilities for each combination of gender and disadvantage status, both for the preferred model (Model 5) as well as a model that includes the personal rating (Model 6):

**Table 7.1R**
**Probability of admission for an Asian American if treated like other races/ethnicities when base probability is 0.25**

| | | Probability of admission | | | |
|---|---|---|---|---|---|
| | | Baseline sample | | Expanded Sample | |
| | Counterfactual group | Preferred Model | +Personal | Preferred Model | +Personal |
| Asian/male/no disadvantage | Black | 0.958 | 0.957 | 0.947 | 0.944 |
| | Hispanic | 0.790 | 0.779 | 0.768 | 0.754 |
| | White | 0.347 | 0.317 | 0.330 | 0.301 |
| Asian/female/no disadvantage | Black | 0.943 | 0.944 | 0.931 | 0.927 |
| | Hispanic | 0.771 | 0.761 | 0.751 | 0.734 |
| | White | 0.297 | 0.275 | 0.293 | 0.261 |
| Asian/male/disadvantaged | Black | 0.805 | 0.805 | 0.759 | 0.759 |
| | Hispanic | 0.646 | 0.629 | 0.604 | 0.596 |
| | White | 0.315 | 0.286 | 0.296 | 0.271 |
| Asian/female/disadvantaged | Black | 0.748 | 0.756 | 0.703 | 0.702 |
| | Hispanic | 0.620 | 0.605 | 0.581 | 0.571 |
| | White | 0.268 | 0.247 | 0.261 | 0.234 |
| Asian/male/no disadvantage | White legacy | | | 0.807 | 0.816 |
| | White double legacy | | | 0.893 | 0.903 |

Arcidiacono Rebuttal Rep., Appendix C, Table 7.1R.

665.   As Table 7.1R shows, if an Asian-American applicant who is not disadvantaged and has a 25% probability of admission were treated like a white applicant, the probability of admission

would increase to 29.7% (for female applicants) and 34.7% (for male applicants). These jumps equate to a 19% and 39% increases in the probability of admission, respectively. Arcidiacono Rebuttal Rep., Appendix C, Table 7.1R.

666. These disparities exist even under a model that includes the personal rating, despite the fact that this control penalizes Asian-American applicants and favors African-American and Hispanic applicants. Even with these measures, the same hypothetical Asian-American applicant would see his admissions probability increase to 31.7% if he were treated like a white applicant. This represents a 27% increase in his probability of admission. Arcidiacono Rebuttal Rep., Appendix C Table 7.1R.

667. Arcidiacono Table 7.2R shows what would happen to the overall Asian-American admission rate if Asian-American applicants were treated like each of the other races/ethnicities for both the baseline and expanded dataset and considering the preferred model as well as the model with the personal rating:

**Table 7.2R**
**Average Probability of admission for Asian American applicants if treated like other races/ethnicities**

| | Probability of admission | | | |
|---|---|---|---|---|
| | Baseline sample | | Expanded Sample | |
| | Preferred Model | +Personal | Preferred Model | +Personal |
| Data | | | | |
| Model | 0.052 | 0.052 | 0.052 | 0.052 |
| White Preferences | 0.062 | 0.057 | 0.061 | 0.057 |
| African American Preferences | 0.271 | 0.243 | 0.267 | 0.238 |
| Hispanic Preferences | 0.152 | 0.135 | 0.150 | 0.133 |

Arcidiacono Rebuttal Rep., Appendix C, Table 7.2R.

668. In the baseline dataset, as Table 7.2R shows, the admission rate for Asian-American applicants would increase overall by a full percentage point if they were treated like whites in the preferred model. This represents a 19% increase in the admissions rate. *Id.*

669. Adding the personal rating reduces this rate increase by half, indicating that the penalty on the personal rating accounts for about 50% of the discrimination in favor of whites over Asians.

Arcidiacono Rep. 67. But it also means that even taking "Harvard's scoring of applicants at face value, Harvard imposes a penalty against Asian Americans as compared to whites" that "has a significant effect on an Asian-American applicant's probability of admission." Arcidiacono Rep. 4.

#### 5. The Significant Increase in the Admission of Asian Americans If Harvard Treated Them Like White Applicants

670. Using his models, Professor Arcidiacono was able to determine what Harvard's admissions results would have been during the period in question if it had treated Asian-American applicants identically to their white counterparts. Specifically, he removed the Asian-American penalty from the model (by adjusting the negative coefficient for Asian-Americans to zero) and then assumed that Harvard admitted the same number of overall students from the dataset (by solving for a new constant term so the total admits would match the data). Arcidiacono Rep. 6-7, 73; Arcidiacono Rebuttal Rep., Appendix C, Table 8.1R.

671. Arcidiacono Table 8.1R shows the predicted year-by-year changes in admissions levels after removing penalties against Asian-American applicants for Arcidiacono's preferred model (Model 5) in the baseline dataset:

**Table 8.1R**
**Admissions levels and shares by race/ethnicity under different admissions policies, baseline sample**

| | | Preferred Model | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| *Panel 1: Changes in Admissions Levels* | | | | | | | | |
| Asian | Model | 369 | 356 | 346 | 315 | 300 | 327 | 2013 |
| American | No Asian-American penalty | 421 | 405 | 390 | 350 | 355 | 354 | 2274 |
| | | | | | | | | |
| African | Model | 198 | 219 | 178 | 180 | 195 | 193 | 1163 |
| American | No Asian-American penalty | 190 | 211 | 172 | 175 | 185 | 188 | 1121 |
| | | | | | | | | |
| Hispanic | Model | 189 | 215 | 182 | 194 | 217 | 191 | 1188 |
| | No Asian-American penalty | 180 | 206 | 174 | 187 | 205 | 185 | 1137 |
| | | | | | | | | |
| White | Model | 572 | 526 | 460 | 401 | 390 | 355 | 2704 |
| | No Asian-American penalty | 538 | 497 | 436 | 383 | 362 | 342 | 2557 |

*The entirety of Table 8.1R is in Appendix C of the Arcidiacono Rebuttal Report.

672. As Table 8.1R shows, removing the Asian-American penalty in admissions and simply treating them identically to white applicants would increase Asian-American admits in all years. The

model predicts 261 more Asian-American admits over this six-year period, more than a 13% increase and an average of 44 additional students in each class. Arcidiacono Rebuttal Rep., Appendix C, Table 8.1R; Arcidiacono Rep. 73.

673. Again, Professor Arcidiacono calculated the difference that including the personal rating would make. Even including that rating—which incorporates a penalty against Asian-Americans—Table 8.1R shows that there would have been 141 additional admits (a 7% increase) if Harvard had treated Asian-American applicants the same as whites. Arcidiacono Rebuttal Rep., Appendix C, Table 8.1R

674. Arcidiacono Table 8.1R also shows the predicted year-by-year changes in admission shares from removing the Asian penalty (here, for the preferred model in the baseline dataset):

**Table 8.1R**
**Admissions levels and shares by race/ethnicity under different admissions policies, baseline sample**

| | | Preferred Model | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
| *Panel 2: Changes in Admission Shares* | | | | | | | | |
| Asian | Model | 0.271 | 0.264 | 0.272 | 0.265 | 0.256 | 0.284 | 0.269 |
| American | No Asian-American penalty | 0.309 | 0.300 | 0.306 | 0.295 | 0.302 | 0.307 | 0.303 |
| | | | | | | | | |
| African | Model | 0.145 | 0.163 | 0.140 | 0.151 | 0.166 | 0.168 | 0.155 |
| American | No Asian-American penalty | 0.140 | 0.157 | 0.135 | 0.147 | 0.158 | 0.163 | 0.150 |
| | | | | | | | | |
| Hispanic | Model | 0.139 | 0.160 | 0.143 | 0.163 | 0.185 | 0.166 | 0.158 |
| | No Asian-American penalty | 0.132 | 0.153 | 0.137 | 0.157 | 0.174 | 0.161 | 0.152 |
| | | | | | | | | |
| White | Model | 0.420 | 0.390 | 0.362 | 0.337 | 0.332 | 0.308 | 0.361 |
| | No Asian-American penalty | 0.395 | 0.369 | 0.343 | 0.322 | 0.308 | 0.297 | 0.341 |

Arcidiacono Rebuttal Rep., Appendix C, Table 8.1R.

675. Removing the penalty against Asian-American applicants would increase their share of the admitted class by at least 2.3 percentage points in all years, with the largest change in 2018 of 4.6 percentage points. In every year, the share of admitted students from the baseline dataset would be about 30%. Not surprisingly, white applicants would bear the brunt of removing the Asian-American penalty; their share of the class would decline from 36% to 34% over the six-year period. The Hispanic share would drop by less than one percentage point (from 15.8% to 15.2%), and the African-American share would drop by one-half of one percentage point (from 15.5% to 15.2%).

Arcidiacono Rebuttal Rep., Appendix C, Table 8.1R. If they had been treated like white applicants--that is, if the penalty against Asian Americans had been removed—an average of approximately 44 more Asian Americans per year would have been admitted to Harvard over the six-year period the experts analyzed. Arcidiacono Rebuttal Rep., Appendix C, Table 8.2R.

676. In light of his extensive descriptive and logistic regression analysis, Professor Arcidiacono concluded that "Asian-American applicants suffer a statistically significant penalty relative to white applicants in two of the ratings Harvard's admissions officers assign to each file (the personal and overall rating)." Arcidiacono Rep. 2.

677. Professor Arcidiacono also concluded, based on his descriptive and logistic regression analysis, that "Asian-American applicants also suffer a statistically significant penalty relative to white applicants in the admissions decisions themselves, even aside from the penalty in the personal and overall ratings." Arcidiacono Rep. 3.

**C. Additional Statistical Evidence of Bias Against Asian Americans**

**1. Evidence of Bias in the Written Evaluations of Asian Americans**

678. As Professor Arcidiacono notes, "Harvard readers use the label 'Standard Strong' to characterize an application that had strong qualities but not strong enough to merit admission." Arcidiacono Rep., Appendix C, p.3.

679. Admissions officers use the phrase "standard strong" to refer to an applicant who is "very well qualified academically and likely has a good deal of extracurricular involvement as well but isn't distinguished in Harvard's incredibly, incredibly competitive applicant pool." Ex. 25, Weaver 229:8-18; *see also* Ex. 9, Fitzsimmons 260:19-261:12.

680. Professor Arcidiacono concluded that "a review of these summary sheets reveals that Harvard applies the label 'Standard Strong' disproportionately to Asian-American applicants. Further,

the Asian-American applicants who are labeled this way are substantially more qualified academically than 'Standard Strong" applicants from other racial groups." Arcidiacono Rep., Appendix C, p.3.

681.    In this litigation, Harvard was ordered to randomly select 10% of the domestic summary sheets of applicants for the Class of 2018; to search those summary sheets for particular keywords, including the phrase "standard strong"; and to produce to SFFA the summary sheets that included those terms. Harvard ultimately produced 256 summary sheets that included the phrase "standard strong" for domestic applicants who were either white, African American, Hispanic, or Asian American. Arcidiacono Rep., Appendix C, p.3.

682.    Arcidiacono Table C.1R shows the rate of being labeled "standard strong" by race/ethnicity for domestic applicants as well as the characteristics of applicants with this label:

**Table C.1R**
**Difference in characteristics for those labeled Standard Strong by race/ethnicity**

|  | White | African American | Hispanic | Asian American |
|---|---|---|---|---|
| Share Standard Strong | 0.120** | 0.010* | 0.036* | 0.151 |
| Academic Index | 227.04* | 206.40* | 220.86* | 230.56 |
| SAT Math | 749.84* | 625.00* | 733.64* | 769.50 |
| SAT Verbal | 758.06 | 615* | 685.45* | 758.67 |
| Share Academic 2 or better | 0.500* | 0.333 | 0.417** | 0.684 |
| Share Extracurricular 2 or better | 0.159 | 0.000 | 0.083 | 0.175 |
| Share Personal 2 or better | 0.087 | 0.000 | 0.083 | 0.096 |
| Number labeled Standard Strong | 127 | 3 | 12 | 114 |

*,** indicates statistically different from Asian American at the 95% and 90% level respectively

Arcidiacono Rebuttal Rep., Appendix D, Table C.1R.

683.    As Table C.1R shows, Harvard applies the label "standard strong" disproportionately to Asian-American applicants. "The 'Standard Strong' designation," in particular, "is applied 25% more often to Asian-American applicants than white applicants" (15.1% of Asian-American applicants receive a "standard strong" label versus 12.0% of white applicants). Very few African-American and Hispanic students were labeled "standard strong." Arcidiacono Rep., Appendix C, p.3.

684.    "This evidence serves to underscore how the operation of racial/ethnic preferences penalties work to the detriment of Asian-American applicants." Arcidiacono Rep., Appendix C, pp. 3-4.

685.    Table C.1R also shows that Asian-American applicants labeled "standard strong" are more competitive than "standard strong" applicants of all other racial/ethnic groups on several dimensions. Arcidiacono Rep., Appendix C, p.3.

686.    Asian Americans designated as standard strong in this sample had higher Academic Indexes and SAT scores, and they constituted the largest share of those ranked 2 or higher on the academic, extracurricular, and personal ratings. Arcidiacono Rep., Appendix C, p.3. In sum, "standard strong" means something different for Asian Americans than other racial groups.

### 2.    Evidence of Discrimination in Summary Sheets and Application Files

687.    In the tiny sample of summary sheets and application files that SFFA was permitted to review (many of which were selected by Harvard based on its own discretion), Harvard officials repeatedly describe Asian-American applicants as smart and hardworking yet uninteresting and indistinguishable from other Asian-American applicants. Arcidiacono Rep., Appendix C, p.1.

688.    For example, one Asian-American applicant was described as "busy and bright" but the "case will look like many others without late info." HARV00076506. Another Asian-American applicant was similarly described as "very busy … but doesn't go extra mile, thus she looks like many w/ this profile." Ex. 176, HARV00076691; *see also* Ex. 171, HARV00076335 (Asian-American applicant was "bright & busy but a bit difficult to see what would hold him in during a lop").

689.    Still another Asian-American applicant was seen as "[s]o very bright but lacking a DE [distinguishing excellence]." Ex. 178, HARV00076934; *see also* Ex. 180, HARV00077072 (Asian-American applicant was a "[h]ard worker and detail oriented but would she relax and have any fun? Ultimately, standard strong"); Ex. 181, HARV00077154 (Asian-American applicant has "a lot of

power in the testing, no doubt, but beyond that the case drops off. EC's are largely academic in nature and PQ's seem elusive.").

690. Even when the Asian-American applicant has [redacted] the reviewer [redacted] Ex. 182, HARV00077297. Ultimately, one reviewer was candid about Harvard's attitude when reviewing an Asian-American applicant: he will "need to fight it out with many similar to him." Ex. 175, HARV00076339-40.

691. In none of these cases did the Admissions Office view the applicant's Asian-American heritage as a "tip" or positive factor. *Id.*

692. By contrast, admissions officers frequently highlight other races/ethnicities as a positive factor and a reason to admit an applicant. *See, e.g.,* Ex. 172, HARV00076469-70 (underlining an applicant's race ("Hispanic") and noting: "not a conclusive folder yet there are multiple pieces that put her well in the running," including being "from [a] bi-cultural home along with NHRP [National Hispanic Recognition Program] status"); Ex. 174, HARV00076529 (underlining an applicant's race ("African American") and noting: "There is a lot to like here, high scores, Af Am [African American], HFAI potential but there are also pauses…."); Ex. 228, HARV00076246 (noting that "there is much to like" including the fact that the applicant is "NHRP"); HARV0077346 (underlining an applicant's race ("Mexican-American"), and noting: "She'd really throw herself into this place, I think, and we'd really notice her as a member of the Latina community"); Ex. 179, HARV00077069-70 (underlining an applicant's race ("Mexican-American"), circling "NHRP," and noting that the applicant is a "real 'choice,' though the Hispanic background might help some"); Ex. 177, HARV00076821-22 (underlining an applicant's race ("Hispanic American"), and referring to the applicant as a "very bright

NHRP'er"); Ex. 170, HARV00076275 (underlining an applicant's race ("Hispanic American"), and referring to the applicant as an "exceptionally bright NHRP'er"); Ex. 229, HARV00076841 (underlining an applicant's race ("Mexican American") and saying the applicant "presents as a super interesting Mex-Amer candidate" but then "you look at the scores and transcript, and the case falls apart. It's too bad.").

693. More evidence of discrimination is seen by comparing applicants of different races who attended the same high school. [redacted]

Arcidiacono Rep., Appendix C, p.6; Ex. 188, HARV00092081.

694. [redacted] Arcidiacono Rep., Appendix C, p.6.

695. [redacted]

Arcidiacono Rep., Appendix C, p.6; Ex. 230, HARV00094536.

696. [redacted]

Arcidiacono Rep., Appendix C, p.6.

697. [redacted] Ex. 188, HARV00092081; Arcidiacono Rep., Appendix C, p.6.

698. [redacted]

Arcidiacono Rep., Appendix C, p.6.

### 3. Stability in Asian-American Admissions Numbers

699. Given the Admissions Office's extensive efforts at racial balancing, it is unsurprising that the racial makeup of Harvard's class from year-to-year varies little. For example, for the Classes of 2014 through 2017, the percentage of the admitted pool of racial groups was remarkably stable:

| Percentage of the Admitted Class by Race | | | | |
|---|---|---|---|---|
| | Class of 2014 | Class of 2015 | Class of 2016 | Class of 2017 |
| Asian American | 18% | 18% | 21% | 20% |
| African American | 11% | 12% | 10% | 11% |
| Hispanic American | 10% | 12% | 11% | 12% |
| Native American | 3% | 2% | 2% | 2% |
| White | 48% | 50% | 52% | 53% |

Ex. 139, HARV00032522-23.

700. Asian-American admits, in particular, have remained remarkably stable. For example, for the 10-year period ending in the Class of 2018, the percent of each admitted class that was Asian American was as follows:

| Class | Percent of the Overall Class that is Asian American |
|---|---|
| 2018 | 20% |
| 2017 | 20% |
| 2016 | 21% |
| 2015 | 18% |
| 2014 | 18% |
| 2013 | 18% |
| 2012 | 19% |
| 2011 | 20% |
| 2010 | 18% |
| 2009 | 18% |

Ex. 231, HARV00023177.

701. Some years, these numbers are particularly close. For example, for 5 of the 7 years between the Class of 2009 and the Class of 2015, the percent of the overall class that was Asian American each year was within tenths of a percentage point of one another and, in some cases (2009-2010), a mere 0.003% from one year to the next:

| Class | Percent of the Overall Class that is Asian American |
|---|---|
| 2015 | 17.595% |
| 2014 | 17.868% |
| 2013 | 17.471% |
| 2012 | 19.080% |
| 2011 | 19.497% |
| 2010 | 17.647% |
| 2009 | 17.649% |

*Id.*

### 4. Stuyvesant High School: A Case Study in Bias

702. Stuyvesant High School is the top-ranked public high school in New York City and is consistently ranked as one of the best high schools in the country. Ex. 210 (Stuyvesant Profile); Ex. 19, Pedrick 29:14-31:10.

703.     Admission to Stuyvesant is open to students residing in all five boroughs of New York City and is determined solely on the basis of the students' scores on the NYC Department of Education's Specialized High Schools Admission Test (SHSAT). On average, more than 29,000 8th and 9th grade students take the test each year. Fewer than 4% of the students who take the SHSAT qualify for admission to Stuyvesant. Ex. 210 at 1 (Stuyvesant Profile); Ex. 19, Pedrick 45:16-21.

704.     Because students are admitted to Stuyvesant "simply through a test," the school does not take a student's race into account when admitting students. Ex. 19, Pedrick 45:16-21.

705.     In 2017, Stuyvesant's student body was 72% Asian American. Ex. 19, Pedrick 32:12-33:8.

706.     Casey Pedrick is the Assistant Principal at Stuyvesant High School. She has been at the school since September 2011. Before she became Assistant Principal, she served as Stuyvesant's Director of College Counseling. After she became Assistant Principal, she continued to provide college counseling to Stuyvesant students because she loved working with the students and parents and found the work rewarding. Ex. 19, Pedrick 13:16-15:9, 18:13-21:2.

707.     According to Ms. Pedrick, the educational experience of Stuyvesant students does not suffer because the student body is predominantly Asian American. The Asian-American students at Stuyvesant are well-rounded and "very different people." Ex. 19, Pedrick 38:5-8. Asian-American students differ greatly in how they help their community, what their hobbies are, and where they live geographically. Reflecting the diversity within the Asian-American community, there are 50 languages spoken in the homes of Stuyvesant students. Ex. 19, Pedrick 37:2-40:25.

708.     Asian-American students at Stuyvesant have long known that they are held to a higher standard than students of other races when it comes to undergraduate admissions. For example, in February 2013, the editorial staff of the Stuyvesant Spectator, the school newspaper, wrote an editorial entitled, "It's Time for a New Legacy." According to the students, "After four years of working hard

in one of the best schools in New York City, it's hard to imagine anything other than a college acceptance at the end of the line. But even our top artists, mathematicians, writers, athletes, and scientists fall prey to what seems like an unreasonable amount of rejections and deferrals. Obviously, this devastates star students, but many are suffering due to something completely out of their control—race. The majority of the Stuyvesant population is Asian American, and Asian Americans are considered to be the least desirable racial group at many universities, many of which enforce an unspoken 'Asian quota.' As a result, even the most qualified Asian American Stuyvesant students are receiving rejection letters simply because of their ethnicity." Ex. 209, Pedrick Ex. 14.

709.    Similarly, in April 2014, one student wrote an article for the Stuyvesant Spectator entitled "Ivy Day is Asian Discrimination Day; And Whites Reap the Benefits." He wrote: "At 5PM on Thursday, March 27, my Facebook newsfeed exploded. It was Ivy Day and America's top universities had released their long-awaited decisions. Within minutes, my screen sparkled with fancy college names, gleeful classmates, and hundreds of hearty congratulations to each accepted student…. But soon an eerie pattern emerged in the college acceptance statuses. Whites were being accepted in disproportionate numbers compared to their Asian peers." Using Stuyclodpedia, a webpage on which Stuyvesant students post their college decisions, the student calculated that "[t]hough 67% of students identified as East/Southeast Asian, these students represented only 48% of students admitted to the Ivy League. By contrast, the 20% of seniors who identified as Caucasian/Middle Eastern represented 32% of admitted students." Ex. 208, Pedrick Ex. 13.

710.    The student continued, "Asian students are not faceless. They are the hardworking and ambitious students who I have spent the past four years going to school with—and they deserve fair treatment…. If colleges can tolerate huge white populations (45% of Harvard undergraduates were white in 2011), then they should also feel comfortable with large Asian ones." The student concluded, "Ivy Day should be re-named Asian Discrimination Day—a day to remember that the

fight for civil rights has not yet been won and that we must continue striving for racial equality in America." Ex. 208, Pedrick Ex. 13.

711.   Similarly, in June 2014, one student wrote a paper entitled "Quantifying the Asian Penalty in College Admissions" in which the student used internal Stuyvesant's admissions data for the Class of 2007 "to model the level of Asian discrimination at Stuyvesant." Ex. 200 at SHS 000005-08. The student wrote: "Students, academics, and teachers … suspect that college practice overt discrimination against Asian students—systemically disadvantaging them over peers of all races. Though widely accepted to be true, such claims have seldom been empirically tested and never been quantified from the perspective of an applicant. … Using multivariate regression, we provide compelling evidence that the Asian penalty not only exists, but is highly significant. Holding SAT scores, GPA, gender, socio-economic status, and rigor of curriculum constant, we find that, on average, an Asian student will be admitted to a school that is 8.4 rankings lower than the school to which s/he would have been admitted had s/he not been Asian." Ex. 200 at SHS 000006, Pedrick Ex. 11.

712.   Before her deposition, Ms. Pedrick had heard allegations of discrimination against Asian Americans, but had never before seen statistics proving it. Ex. 19, Pedrick 83:25-84:10.

713.   In July 2017, during her deposition, SFFA showed Ms. Pedrick Harvard's admissions statistics for Stuyvesant, including the number of applicants and admits and the admit rates over a six-year period (Class of 2014 through Class of 2019):



Arcidiacono Dec. ¶ 14 & Table 2.

714.    As the Stuyvesant statistics show, Asian-American applicants had a substantially lower admit rate over the six-year period than all other racial groups. In particular, the Asian-American admit rates were substantially lower than the white admit rates. For example, in 2014, 55 white Stuyvesant students and 113 Asian-American Stuyvesant students applied to Harvard. Despite the fact that more than twice as many Asian-American Stuyvesant students applied as white Stuyvesant students, Harvard admitted the *same number* of white and Asian-American students. Arcidiacono Dec. Table 2.

715. The disparity is even worse in 2017. In that year, more than twice as many Asian-American students than white Stuyvesant students applied (65 v. 32), yet Harvard admitted *more* white students than Asian-American students (7 v. 6). Arcidiacono Dec. Table 2.

716. After presenting these statistics to Ms. Pedrick, SFFA and Ms. Pedrick had the following exchange:

Q. Have you ever seen statistics like this before?
A. No.
Q. What's your first reaction to them?
A. My first reaction is that, mathematically, it looks like there's discrimination.
Q. … So I would like to look at the white and Asian numbers from 2014…. [W]hites were admitted 7 out of 55 in 2014, and Asians were admitted 7 out of 113 in 2014. Now, we talked about race being a feather for underrepresented minorities. … [D]o you have any reason to believe that race would be a feather for white students?
A. No, I don't have a reason to believe that.
Q. … [T]heir chance of admission were more than double, right? …. [T]he Asian admit rate was 6.19 and the white admit rate was 12.73.
Do you think something like – do you think discrepancies that big could –
Sorry.
(Witness crying.)
Q. I'm sorry this is upsetting you. Do you want to take a break?
A. (Witness shakes her head no.)
Q. You want to keep going?
Can you tell me why this is so upsetting to you?
A. Because these numbers make it seem like there's discrimination, and I love these kids and I know how hard they work. So these just look like numbers to all of you guys, but I see their faces.
Q. And they're not just Asians to you, right? They're whites or –
A. They're kids.
Q. Of course. Of course.
A. I refer to them as my kids
Ms. Tsai. Why don't we take a break. She's crying. Let's take a minute to let her compose herself.
Q. I offered her.
A. You did. You did.
Q. …. So you would like to take a ten-minute break?
….
A. I would not like to. I want to plug ahead
….
Q. If someone said, "This must be [because] the Asian kids are less well-rounded than the white kids," what would you say?
A. I would hypothesize that's not true.
Q. If someone were to say, "It must be because the white kids are varsity athletes and the Asian kids are not"?

A. I would hypothesize that's not true.
Q. If someone were to say, "It's because the white kids are legacies and the Asian kids are not"?
A. That's more probable, in my experience. So many of my Asian students are first generation.
....
Q. Is it fair to say it's hard to explain discrepancies this large based on legacy?
A. Yes.
Q. Do you think the white kids are more socioeconomically disadvantaged than the Asian kids and they got a bump for that?
A. No.
Q. How about more musical?
A. No.
Q. I'm running out of categories. Any other thing on these lists of things colleges look for that the white kids as a group have that the Asian kids might be missing?
A. Nothing I can think of.
Q. So that's why you're so upset, am I right, because it's hard to think of anything other than discrimination that could account for this?
A. That's my initial feeling.

Ex. 19, Pedrick 96:23-101:24 (objections omitted).

### D. Harvard's Artificial Floor for African-American Admit Rates

717. Professor Arcidiacono found strong statistical evidence that "Harvard maintained a floor on the admission rate for single-race African Americans in the classes of 2017, 2018, and 2019. In each of these years, the admit rate for single-race African Americans … was virtually identical to the admit rate of all other domestic applicants." Arcidiacono Rebuttal Rep. 54.

718. Arcidiacono Table 6.1N reports admits and admit rates for single-race African-American applicants and all other domestic applicants:

**Table 6.1N**
**Admissions and admit rates for single-race African Americans and all other domestic applicants**

| Year | Single-race admits | All other domestic admits | Single-race admit rate | All other domestic admit rate | Difference |
|---|---|---|---|---|---|
| 2017 | 172 | 1,665 | 0.06399 | 0.06424 | -0.00025 |
| 2018 | 177 | 1,657 | 0.06585 | 0.06521 | 0.00064 |
| 2019 | 176 | 1,677 | 0.06059 | 0.06084 | -0.00025 |

Arcidiacono Rebuttal Rep. 54.

719.    As Table 6.1N shows, the African-American and non-African-American admit rates are almost identical during these three years. In both the Class of 2017 and the Class of 2019, the difference in the two admit rates is 0.00025—less than three hundredths of a percentage point. The maximum difference (in 2018) is 0.00064—less than seven hundredths of a percent. Arcidiacono Rebuttal Rep. 54.

720.    It is extremely unlikely that the admit rates for African-American applicants could come this close to exactly mirroring the admit rates for non-African-American applicants over three consecutive admissions cycles by mere happenstance (as opposed to direct manipulation). Professor Arcidiacono's statistical modeling indicates that the "chance of this match occurring in three consecutive years (without direct manipulation) is less than *two-tenths of one percent*—making it a near certainty that Harvard was purposely setting a floor on the admission rate of those applicants." Arcidiacono Rebuttal Rep. 9.

721.    Put differently, it can be said with 99.8% confidence that Harvard has manipulated its admission process to ensure that the African-American admissions rate tracks the overall admissions rate. Arcidiacono Rep. 29-30.

722.    The floor also can be observed by analyzing the day-by-day changes in admissions decisions. For each of the three years in which the floor exists, the admit rates for single-race African Americans begin below that of other domestic applicants, then rise until they approximate or exceed the admit rates for all other domestic applicants in mid-March through the end of the admissions cycle. Arcidiacono Rep. 30; Arcidiacono Rebuttal Rep., Appendix D, Tables B.1.2R-B.1.7R.

723.    Evidence produced in this case establishes that Harvard was concerned about the way in which admitted single-race African Americans were being reported in 2013, the year when the statistical evidence of the floor first appears. Arcidiacono Rebuttal Rep. 57-58.

724. The percentage of each admitted class that is single-race African American is reported publicly due to federal reporting requirements. These numbers are reported to the federal government through the IPEDS methodology. Ex. 9, Fitzsimmons 93:13-99:19; Ex. 26, Yong 133:10-139:24.

725. Second, unlike Harvard's other methodologies, IPEDS counts an individual as African American *only* if the individual marks "Not Hispanic" and "Black or African American only." If the individual marks, for example, Hispanic and African American, the individual is counted as Hispanic. And if the individual marks White and African American, the individual is reported as "two or more races." *Id.*

726. Third, in early 2013—the time frame when the floor can be observed in the statistics—Dean Fitzsimmons and other Harvard officials were expressing internal concern about the effect of the IPEDS methodology on the public perception of the number of minorities admitted to Harvard. Between January and March 2013, Dean Fitzsimmons was drafting and editing (with, assistance from Director McGrath, Director Donahue, and Jeff Neal in public relations) a document entitled "Addendum on the Collection and Reporting of Data on Race and Ethnicity." Ex. 133, HARV00030509; Ex. 114, HARV00023588; Ex. 123, HARV00026562; Ex. 115, HARV00023613.

727. In the article, Dean Fitzsimmons argues that "[t]he IPEDS reporting system leads to significantly underreported percentages for all ethnicities except Hispanic Americans" and that "[t]he method used by Harvard and many peer institutions gives a more complete report of the way many students, especially those of mixed heritage, actually view their racial and ethnic identities." Ex. 133, HARV00030510-11. For example, "for the class of 2016 (which entered Harvard in the fall of 2012), IPEDS reports that 18.7 percent were Asian American, 6.7 [percent were] Black or African American, and 11.1 percent [were] Hispanic American." HARV00030511. These statistics, however, were "misleading" because they did "not reflect the variety of ways in which our students may have self-identified." *Id.* Properly counted, Dean Fitzsimmons argued, Harvard actually enrolled a class that was

"22.4 percent Asian American, 9.3 percent Black or African American and 9.3 percent Hispanic…. In short, self-identified Asian Americans and African Americans make up a significantly greater portion of Harvard College's class of 2016 than reported by the federal government." *Id.*

728.    As Jeff Neal explained on March 21, 2013—two days after the regular decision admissions for the Class of 2017 were made—the "ethnicity statistics" in the article were included in order to "more directly satisfy some of the folks who have expressed concerns, while still not breaking into jail." Ex. 115, HARV00023613.

729.    Finally, before January 12, 2013, the one-pagers that Dean Fitzsimmons received did not contain IPEDS statistics. Starting on January 12, 2013, however, Dean Fitzsimmons began receiving one-pagers that contained admissions statistics by racial groups under the IPEDS methodology. *See, e.g.*, Arcidiacono Rep. 57-58; Ex. 100, HARV00019910.

730.    Dean Fitzsimmons received one-pagers with IPEDS admissions statistics for the rest of the 2013 admissions cycle and going forward after that. Arcidiacono Rep. 58.

731.    The IPEDS data was also reported differently in the admissions database information that Harvard produced in this matter for the admissions cycles for the classes of 2017-2019—the precise three years in which statistical evidence suggests a floor. Arcidiacono Rep. 30.

732.    Finally, there is evidence that Harvard loosened its standards for admitting single-race African Americans beginning in the 2017 admissions cycle—exactly when the floor is observed. Statistical evidence indicates that prior to that cycle, single-race African Americans admitted to Harvard on average had similar academic indexes to those of multi-racial African Americans. Arcidiacono Rebuttal Rep. 59-61; Arcidiacono Errata.

733.    As shown in the figure below, starting in the 2017 admissions cycle, single-race African-American admits had significantly lower academic indexes than multi-racial African-American admits. In each case the difference is negative, and more negative than any of the differences in the

pre-2017 cycles. These differences show that Harvard was admitting single-race African Americans with significantly lower academic indexes than their multi-race counterparts beginning in the post-2016 period. This is striking because it is precisely what would be expected if Harvard began imposing a floor on single-race African-American admit rates after 2016.

**Mean academic index for admitted single-race and multi-race African Americans by class**

| | Single-Race | Multi-Race | Difference | |
|---|---|---|---|---|
| 2014 | 0.169 | 0.183 | -0.014 | |
| 2015 | 0.180 | 0.103 | 0.077 | |
| 2016 | 0.259 | 0.280 | -0.021 | |
| Average Dif. | | | 0.014 | |
| 2017 | 0.192 | 0.291 | -0.098 | |
| 2018 | 0.290 | 0.354 | -0.064 | |
| 2019 | 0.199 | 0.388 | -0.189 | * |
| Average Dif. | | | -0.117 | * |
| Double Dif. | | | -0.131 | ** |

*,**=statistically significant at the 95% and 90% level respectively. Academic Index is in standard deviation units. Difference refers to the single-race academic index minus the multi-race academic index.

Arcidiacono Rebuttal Rep. 59-61; Declaration of Peter Arcidiacono, Exhibit C ("Arcidiacono Errata") 1.

734. As shown in the figure below, examining the admit rates of single-race and multi-race African Americans in the different admission cycles further confirms that Harvard changed its practices in 2017. In particular, the average admit rate for multi-race African Americans is 50% higher than the single-race African American admit rate in the pre-2017 period, but only 26% higher in the post-2016 period. This additional statistical evidence further confirms that Harvard changed its admissions practices in 2017 in a manner consistent with the existence of a floor on admission rates of single-race African Americans such that it was equivalent to the admission rates for all other domestic applicants.

**Admit rates for single-race and multi-race African Americans by class**

| | Single-Race | Multi-Race | Difference | | Ratio |
|---|---|---|---|---|---|
| 2014 | 0.0744 | 0.1144 | -0.0400 | * | 1.5707 |
| 2015 | 0.0652 | 0.0903 | -0.0251 | * | 1.3759 |
| 2016 | 0.0556 | 0.0880 | -0.0325 | * | 1.5454 |
| Average Dif./Ratio | | | -0.0325 | * | 1.4973 |
| | | | | | |
| 2017 | 0.0640 | 0.0812 | -0.0172 | * | 1.2439 |
| 2018 | 0.0658 | 0.0795 | -0.0136 | * | 1.2157 |
| 2019 | 0.0606 | 0.0785 | -0.0179 | * | 1.3120 |
| Average Dif./Ratio | | | -0.0163 | * | 1.2572 |
| Double Dif. | | | 0.0163 | ** | |

*,**=statistically significant at the 95% and 90% level respectively. Difference refers to the single-race admit rate minus the multi-race admit rate. Ratio refers to the multi-race admit rate divided by the single-race admit rate.

Arcidiacono Rebuttal Rep. 59-61; Arcidiacono Errata 1.

### E. Statistical Evidence Confirms That Harvard Awards Large Racial Preferences for African-American and Hispanic Applicants.

735. Professor Arcidiacono also was able to use logistic regression analysis to measure the size of the preferences given to students of different races. Arcidiacono Rep. 1-2, 7-8

736. Analyzing Harvard's data over six years, he found the magnitude of preferences for African Americans and Hispanics to be especially large. A white applicant with an admission probability of 2.25% would see their chance of admission quadruple—to 9.54%—if they were treated like an African-American applicant in the baseline dataset. If treated like a Hispanic applicant, the admission probability would more than double. Arcidiacono Rebuttal Rep. 70-71 & Table 8.1N.

737. Professor Arcidiacono found that "[a]n Asian-American applicant who was male, who was not disadvantaged, and whose characteristics result in a 25% chance of admission would have more than a 36% chance of admission if treated as a white applicant; more than a 75% chance of admission if treated as a Hispanic applicant; and more than a 95% chance of admission if treated as an African-American applicant (with all other characteristics unchanged)." Arcidiacono Rep. 7; *see also* Arcidiacono Rep. 3, 65 & Table 7.1; Arcidiacono Rebuttal Rep. 1, 17-18. Similarly, if an Asian-

American applicant who is not disadvantaged and has a 25% probability of admission were treated like a Hispanic applicant in the baseline dataset, the probability of admission would increase to 77.1% if the applicant were female and 79% if the applicant were male. And if treated like an African-American applicant, the probability of admission would increase to 94.3% if the applicant were female and 95.8% if the applicant were male. Similar results are observed in the expanded sample. Arcidiacono Rebuttal Rep., Appendix C, Table 7.1R.

738.     Even including the personal rating, if the hypothetical Asian-American applicant were treated like a Hispanic applicant, the increase would be more than 52 percentage points to 77.9%. And if the applicant were treated like an African-American applicant, the increase would be more than 70 percentage points to 95.7%. Arcidiacono Rebuttal Rep., Appendix C, Table 7.1R.

739.     The overall Asian-American admit rate would increase by much more if Asian-American applicants were treated like African Americans or Hispanics. The results from the preferred model show Asian-American admit rates increasing *over five-fold* if they were treated like African Americans (from 5.2% to 27.1%) and increasing nearly *three-fold* (from 5.2% to 15.2%) if they were treated like Hispanics. Arcidiacono Rebuttal Rep. 6; Arcidiacono Rebuttal Rep., Appendix C, Table 7.2R.

740.     Elimination of the preferences would have a substantial effect on Asian-American enrollment at Harvard. Removing preferences for African Americans and Hispanics (but keeping the penalty against Asian Americans) results in even larger gains with 537 more Asian-American admits over a six-year period, an increase of 27%. And removing all racial preferences and penalties—treating everyone as though they were white—would raise the number of Asian Americans by 799, a 40% increase. Arcidiacono Rebuttal Rep. 8, Arcidiacono Rebuttal Rep., Appendix C, Table 8.1R.

741.     There is also statistical evidence that Harvard's racial preferences operate differently with respect to advantaged and disadvantaged applicants. Harvard admits more than twice as many

non-disadvantaged African-American applicants than disadvantaged African Americans. Arcidiacono Rep. 8.

742. In fact, for African Americans there is no added benefit from being disadvantaged. Hispanics still see a boost for being disadvantaged but it is much smaller than the boost that white applicants receive for being disadvantaged. Arcidiacono Rep. 64.

743. Put another way, removing racial preferences would substantially increase the share of African Americans who are disadvantaged; they would go from 29% of the African-American admits to approximately 50%. Arcidiacono Rebuttal Rep. 9.

**F. The Failure of Harvard's Expert to Rebut the Statistical Evidence**

744. Harvard produced two reports from an econometrics expert of its own, David Card, a labor economics professor from the University of California-Berkeley. Ex. 252, Ex. 253.

745. Unlike Professor Arcidiacono, Professor Card has very limited experience in analyzing the effect of race in education. He has written only one paper that, by his own admission, only "indirectly" reflects on the use of race in college admissions. And before this case, he had never built a multivariate logistic regression model to estimate the effects of factors on college admissions decisions. Ex. 3, Card 27:13-30:10.

746. Professor Card does not dispute any of Professor Arcidiacono's descriptive analysis. Arcidiacono Rebuttal Rep. 12-16. He agrees that Asian Americans have strong qualifications across every category except the personal rating, and he does not dispute that Professor Arcidiacono's findings comport with the OIR findings. Arcidiacono Rebuttal Rep. 2.

747. Professor Card agrees with Professor Arcidiacono's decision to use regression analysis because "multivariate regression analysis is a widely accepted and common statistical technique in both academia and litigation." Card Rep. 47. Professor Card also agreed that a logistic regression model like Professor Arcidiacono's "is appropriate where, as here, the outcome of interest—in this case

admission to Harvard—is binary, taking values of either zero (not admitted) or one (admitted)." Card Rep. 47.

748. Professor Card disagrees, however, with Professor Arcidiacono's specific "modeling decisions." Card Rep. 47. Employing different modeling choices, Professor Card contends that the evidence of a penalty against Asian-American applicants is not compelling and that the effect of race on admissions is smaller than Professor Arcidiacono reports. Arcidiacono Rebuttal Rep. 2; Card Rep. 47.

749. Professor Card's modeling choices are inconsistent with standard econometric practices and thus improperly understate the effect of race in the admissions process generally and on Asian-American applicants specifically. Professor Card makes several fundamental errors. Arcidiacono Rebuttal Rep. 2-10.

**1. Professor Card's Unreliable Modeling Choices**

**a. Inclusion of Applicants Who Receive Non-Racial Preferences**

750. Unlike Professor Arcidiacono, Professor Card includes in each of his various models applicants to whom Harvard extends preferences so large that race does not matter in their admission: recruited athletes, legacies, those who are on the Dean's and Director's List, and children of faculty and staff. Professor Card includes these applicants (whom he calls "ALDC applicants") in his model because he believes "there is no penalty against Asian-American applicants unless Harvard imposes a penalty on *every* Asian-American applicant." Arcidiacono Rebuttal Rep. 3; Card Rep. 63:16-64:11.

751. But the claim here is not that Harvard, for example, "penalizes recruited athletes who are Asian-American because of their race." Arcidiacono Rebuttal Rep. 19. Rather, the claim "is that the effects of Harvard's use of race occur outside these special categories." Arcidiacono Rebuttal Rep. 19.

752.     Professor Card includes "special recruiting categories in his models" to "obscure the extent to which race is affecting admissions decisions for those not fortunate enough to belong to one of these groups." Arcidiacono Rebuttal Rep. 19.

753.     Because of the significant advantage that each of these categories confers on applicants, it is important to analyze the effect of race on an applicant pool without these special categories of applicants (the baseline dataset). Excluding these applicants allows for the effect of race to be tested on the bulk of the similarly situated applicant pool that did not fall into one of these categories. Arcidiacono Rebuttal Rep. 3.

754.     Indeed, focusing on the pool who are not legacies or athletes allows Professor Arcidiacono to conclude that "Harvard's preferences for those groups cannot explain the unequal treatment of Asian-American applicants." Arcidiacono Rep. 8.

755.     By including such ALDC applicants in his model, Professor Card obscures the extent to which race is affecting admissions decisions. Because there is no reason to believe that race would change Harvard's decision to admit a recruited athlete or a donor's child, including such applicants has the practical effect of making racial penalties and preferences appear to be less significant than they actually are. Arcidiacono Rebuttal Rep. 3, 17.

756.     Indeed, in his initial report Professor Card insisted on including in his model a large number of applicants who had no chance of admission. This had a similar effect: by diluting the model with applicants for whom race plainly played no role, it masked the effect that race played within the competitive pool. Arcidiacono Rebuttal Rep. 17-18.

757.     Indeed, Professor Card's original model included more than 29,000 "perfect predictions" for rejection—meaning that these applicants has zero probability of admission. Ex. 3, Card 53:11-56:24.

758. In response to Professor Arcidiacono's criticisms, Professor Card adjusted his model, reducing the number of those perfect predictions by about 80%. Ex. 3, Card 53:11-56:25.

**b. Inclusion of the Personal Rating Despite Evidence That It Is Affected by Racial Preferences**

759. Professor Card includes Harvard's personal rating in his models—notwithstanding the clear finding yielded by Professor Arcidiacono's analysis (and that of the Office of Institutional Research) that this rating shows strong evidence of racial bias. Arcidiacono Rebuttal Rep. 25-27.

760. Professor Card agrees that Asian-American applicants receive lower personal ratings, on average, than white applicants. Ex. 3, Card 277:19-25.

761. Professor Card ignores other indicators of racial penalties and preferences in the personal rating, such as the substantial preferences given to African-American and Hispanic applicants. Arcidiacono Rebuttal Rep. 22. Instead, he assumes that Asian-American applicants as a group are weaker on unobserved personal qualities. Arcidiacono Rebuttal Rep. 5. Professor Card finds that white applicants are more likely to be multi-dimensional than their Asian-American counterparts and hence are more attractive candidates. Card Rep. 35.

762. Specifically, Professor Card claims that the personal rating is a function of "individualized 'unobservable' factors that cannot be quantified by a statistical model." Card Rep. 10.

763. Professor Card contends "it is clear from the documents and testimony in this case that Harvard is using other information such as recommendation letters and the applicants' personal essays to form its assessments of each candidate's non-academic strengths. This information is 'missing data' that cannot be observed in the admissions database." Card Rep. 33; 17 n.12; Ex. 253, Card Rebuttal Report ("Card Rebuttal") 5.

764. "For example," Card says, "testimony in the record indicates that the applicant's essay is an important consideration in the personal rating, but there is no quantifiable measure of the essay

in the data I analyze. This means that the disparity Professor Arcidiacono labels 'bias' may very well be explained by factors other than race that the model does not include." Card Rep. 9.

765.     Professor Card believes the gap in personal ratings is explained by these unobservable characteristics, or "unobservables," although he could not say why Asian Americans would have characteristics unobserved in the data that would lead to lower personal ratings. "[T]hat's not really what's relevant for my statistical model. And I—my interpretation of how someone might answer that would be they might be thinking, well, as a whole, they are the same, but when I'm assigning the personal rating, what's relevant is I have got some of these characteristics that I can see, and some that I can't. There is a deficit on some of the ones that I can't see. So that could contribute to a negative coefficient for Asians in that assignment." Ex. 3, Card 289:2-19. There "must be some ... unobserved characteristics" that drive the differences in personal ratings between white and Asian-American applicants. Ex. 3, Card 289:19-290:4. This discrepancy is all the more alarming because, absent a logical reason, it is expected that unobserved characteristics will move in the same direction as observed characteristics. Arcidiacono Rep. 68, 77. That is, because Asian Americans have stronger academic and extracurricular qualifications than any other racial group, they would be expected to have stronger personal ratings too. But "Asian-American applicants have observed characteristics associated with higher personal ratings yet receive a penalty in their personal ratings, and African-American and Hispanic applicants have observed characteristics associated with lower personal ratings yet receive a preference in their personal ratings." Arcidiacono Rebuttal Rep. 27.

766.     When asked "why do you think that's the case," Professor Card said: "I don't know exactly." Ex. 3, Card 285:14-16. When asked, "[d]o you think that Asian Americans on average have less attractive personal qualities than white applicants in Harvard's application pool," Professor Card conceded that "I have no way of knowing that." Ex. 3, Card 282:18-283:3.

767. When asked if he had "any reason to believe that Asian Americans are not as effervescent as whites in Harvard's applicant pool," Professor Card replied that "I have no way of knowing that." Ex. 3, Card 283:5-11.

768. Professor Card's "understanding is that the readers look for something they call personal qualities. And I don't exactly know what those are but they—they talk about that in some of the materials I've seen. And so I think that what would probably believe to be true is that they see slightly fewer personal qualities conditional on academic qualities." Ex. 3, Card 284:24-285:10.

769. Professor Card conceded that he could not rule out racial bias as a reason for the disparity in the personal score. Ex. 3, Card 272:3-8.

770. When asked what reason other than racial bias "could there be for why the white applicants in Harvard's pool receive higher personal ratings than the Asian American applicants," Professor Card answered, "I don't really—I haven't really given that any thought directly." Ex. 3, Card 285:18-286:2.

771. Professor Card ultimately declined to create any models of his own to test for racial bias in the personal rating. Ex. 3, Card 47:11-20, 216:6-14.

772. Rather, he was satisfied to take Harvard at its word: "I was able to ask Dean Fitzsimmons directly in a telephone conversation if race was involved in the personal rating, for example, and he said no." When asked if he "d[id] anything to verify [Fitzsimmons'] testimony," Card responded: "No." Ex. 3, Card 47:11-15.

**c. Inclusion of the "Parental Occupation" Variable**

773. Professor Card's results also are heavily influenced by his inclusion of "parental occupation" (*i.e.*, the occupations of an applicant's parents) as a control variable.

774.     Professor Card had to write extensive code to group the variety of parental occupations in Harvard's database into 23 different categories for his model. Taking into account both parents' occupations, this adds 44 new variables to the model. Ex. 3, Card 310:10-312-14.

775.     The data in some of these categories vary wildly from year-to-year. For example, no mother or father is listed as self-employed in 2014, but more than 900 mothers and more than 2,100 fathers are listed as self-employed in each of the other years. Similar discrepancies are seen in the low-skilled category. And in the unemployed category, Professor Card lists 10 or fewer unemployed mothers and fathers in 2018 and 2019, but more than 2,200 unemployed mothers and 1,300 unemployed fathers in other years. Arcidiacono Rebuttal Rep. 32, Table 3.2N; Ex. 3, Card 315:15-25.

776.     These kinds of variations and inconsistencies in the data "raise doubts about the reliability of the field and its usefulness as a control. If there is little reason to trust the accuracy of a factor, incorporating it into a model will not inform the resulting estimates. Professor Card nowhere offers an explanation for why these data would vary so wildly across these years." Arcidiacono Rebuttal Rep. 32-33.

777.     Nor does Professor Card "provide a particularly compelling explanation for how parental occupation categories influence admissions decisions." Arcidiacono Rebuttal Rep. 33.

778.     Professor Card states that parental occupation might be a factor in considering "socioeconomic status." Ex. 3, Card 123:20-124:7.

779.     But the model (used by *both* experts) "already accounts for any applicants that Harvard identified as disadvantaged." Arcidiacono Rebuttal Rep. 33. There is "no reason why the parental occupation [Dr. Card] uses would increase our understanding about the admissions process at Harvard—let alone serve as a firm basis for opining that there is no significant discrimination against Asian-American applicants in Harvard's admissions process." *Id.*

**d. Exclusion of Interaction Terms**

780. Unlike Professor Arcidiacono, Professor Card refuses to interact income status with race in his model. An interaction term allows the effects of a particular factor to vary with another distinct factor. Arcidiacono Rebuttal Rep. 4, 19-22.

781. "In the context of racial discrimination, interaction terms are especially helpful (and often necessary) in revealing where certain factors operate differently for subgroups within a particular racial or ethnic group." Arcidiacono Rebuttal Rep. 4.

782. "Professor Card rightly recognizes that interaction terms should be included in a model when there is evidence that racial preferences operate differently for particular groups of applicants; yet nonetheless he removes interaction terms for variables that satisfy this condition." Arcidiacono Rebuttal Rep. 4.

783. Professor Card refuses in his model to interact race with disadvantaged status—even though the data show that Harvard treats disadvantaged students differently by race. Arcidiacono Rebuttal Rep. 45, 19-22.

784. Indeed, OIR independently concluded that disadvantaged African Americans receive a significantly lower preference than advantaged African Americans. Professor Card ignores this finding. Ex. 157, HARV00069767.

785. Harvard gives a preference to disadvantaged applicants. But the preference Harvard gives African-American and Hispanic applicants for disadvantaged status is much smaller than that given to Asian-American and white applicants (Hispanic applicants receive a modest preference for disadvantaged status, and African-American applicants receive no preference for disadvantaged status). Arcidiacono Rep. 74-75; Arcidiacono Rebuttal Rep. 5, 19-22.

786. The interaction term Professor Arcidiacono included for race and disadvantage allows one to capture those distinctions. Without it, the size of the preference Harvard gives to disadvantaged

Asian-American and white applicants is muted by the inclusion of African-American and Hispanic applicants. Since Asian-American applicants are more likely to be disadvantaged than white applicants, the practical implication of this is an understatement of the Asian-American penalty. Arcidiacono Rebuttal Rep. 5, 19-22.

### 2. The Finding of an Asian-American Penalty Through Small Modifications to Professor Card's Own Models

787. Professor Card's updated model (in which he adopts a change in the classification of extracurricular activities in response to criticisms from Professor Arcidiacono) show significant penalties against Asian-American applicants once minor corrective adjustments are made to remedy his various errors. Arcidiacono Rebuttal Rep. 7-8, 39-40 & Table 4.2N; Card Rebuttal 57-58; Ex. 3, Card 57:2-20.

**Table 4.2N: Small corrective adjustments to Professor Card's yearly model show penalties against Asian-American applicants**

| | | Card Yearly | | Card yearly with Corrected Extracurriculars | | Card Pooled | |
|---|---|---|---|---|---|---|---|
| (1) | No Specials | -0.18% | | -0.24% | | -0.22% | |
| (2) | Interact disadvantaged | -0.29% | | -0.36% | * | -0.32% | * |
| (3) | White & Asian Apps | -0.37% | | -0.47% | * | -0.34% | * |
| (4) | Exclude disadvantaged | -0.29% | | -0.37% | * | -0.35% | * |
| (5) | No personal rating | -0.56% | * | -0.62% | * | -0.65% | * |
| (6) | No parental occupations | -0.39% | * | -0.47% | * | -0.37% | * |
| (7) | Interact disadvantaged, no parent: occupations, no personal rating | -0.90% | * | -0.98% | * | -0.95% | * |

*=statistically different from zero at the 95% level. Marginal effects are calculated without perfect predictions.

Arcidiacono Rebuttal Rep. 39, Table 4.2N.

788. Removing ALDC applicants from Professor Card's updated model and then implementing *any one* of the following changes—without other adjustments—results in a statistically significant penalty against Asian-American applicants: (1) recognizing that the personal quality measure includes racial preference and therefore should not be included in the model; (2) recognizing that the parental occupation variables are unreliable and removing them from the analysis; or (3)

recognizing the fact that preferences for disadvantages status vary with race and therefore interacting race with disadvantaged status. Arcidiacono Rebuttal Rep. 7, 39 & Table 4.2N.

789.     Professor Card does not dispute that making these changes reveals a statistically significant evidence of an Asian penalty. Ex. 3, Card 180:15-183:10.

790.     Thus, "Professor Card has demonstrated that it is possible to mask the true effects of race in Harvard's admission process by changing the scope of the analysis in incorrect ways and choosing inappropriate combinations of control variables." Arcidiacono Rebuttal Rep. 10.

### 3.     Professor Card Fails to Rebut the Statistical Evidence of a Floor on Single-Race African Americans

791.     In his initial report, Professor Card did not challenge the calculations of Professor Arcidiacono, in which Professor Arcidiacono concluded the chance of the admissions rate of single-race African-Americans matching the overall admissions rate in three consecutive years was less than two-tenths of one percent. Arcidiacono Rebuttal Rep. 54-55.

792.     In his final report, Professor Card purported to find that the possibility of any racial group being that close for any three-year period "was about 17%." Card Rebuttal 80.

793.     At his deposition, Professor Card conceded that his alternative calculation "assumes that each of those outcomes is independent with one another," even though (as he concedes) this is not "exactly true." Ex. 3, Card 370:25-371:6.

794.     Indeed, a look at any of the one-pagers shows that Harvard's racial categories under the various methodologies are not independent of one another. For example, the African-American admission number and rate is the same under both the old and new methodologies. The Hispanic numbers are the same under the IPEDS and new methodologies. Ex. 90, HARV00016806.

795.     Professor Card testified that he did not see any one-pagers that reported the IPEDS method before January 2013, the time in which Professor Arcidiacono observed statistical evidence that a floor was instituted. Ex. 3, Card 378:15-379:7.

796. Professor Card testified that he agreed the way in which the IPEDS data were recorded in the admissions database before the 2017 admissions cycle was different. Ex. 3, Card 379:12-380:6.

#### 4. Professor Card's Finding of Substantial Racial Preferences

797. Even Professor Card's analysis confirms Professor Arcidiacono's finding that race plays a "significant role in admissions decisions at Harvard." Arcidiacono Rebuttal Rep. 8; *see also* Arcidiacono Rep. 7-8.

798. Without making any adjustments to Professor Card's approach, his models show that racial preferences are responsible for *tripling* the number of African-American admits and *doubling* the number of Hispanic admits. Arcidiacono Rebuttal Rep. 8, 46-47 & Table 5.1N.

799. Professor Card did not challenge these calculations in his rebuttal report or at his deposition. Ex. 3, Card 320:18-321:7. Professor Card thus has not denied that, without making any adjustments to his (flawed) approach, his models show that racial preferences are responsible for tripling the number of African-American admits and doubling the number of Hispanic admits.

## VII. The Availability of Race-Neutral Alternatives

### A. Harvard's Failure to Conduct a Good-Faith Examination of the Availability of Race-Neutral Alternatives

#### 1. Harvard Did Not Consider Race-Neutral Alternatives Until It Was Threatened with Litigation

800. Harvard has long been aware of Supreme Court precedent instructing universities to give "serious, good faith consideration of workable race-neutral alternatives" to race-based admissions processes. *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003).

801. In July 2013, in the wake of the Supreme Court's decision in *Fisher v. University of Texas*, 570 U.S. 297 (2013), James E. Ryan, the Dean of Harvard's Graduate School of Education, and Thomas Kane, a professor at the Graduate School of Education, wrote an article in the *Chronicle of Higher Education* urging colleges to engage in a good-faith effort to examine the availability of race-

neutral alternatives. Dean Ryan wrote the piece with the hope that it would "encourage some colleges and universities to conduct research into the effects of race-neutral alternatives on their admissions policies." Ex. 56, HARV00007310.

802.    A few weeks before it was published, Dean Ryan sent a draft of the article to President Faust because he believed she would be interested in seeing it. President Faust forwarded the article to Robert Iuliano. Dean Ryan and Professor Kane also sent the article to Dean Fitzsimmons to get his feedback given his "long-standing commitment to diversity in admissions and deep familiarity with the trade-offs involved." Ex. 56, HARV00007310-11; Ex. 60, HARV00007799.

803.    In Dean Ryan's article, entitled "Heeding the Court's Warning in Fisher," he explained that the Supreme Court's decision in *Fisher v. Texas* means that "[n]o longer may lower courts simply defer to the good faith decisions of universities regarding the necessity of explicitly considering race in admissions decisions rather than some proxy for race. Universities instead must attempt to prove, and lower courts must determine, what counts as a 'workable' race-neutral alternative. This is much harder than it might seem." Ex. 56, HARV00007311.

804.    According to Dean Ryan, "in order to determine whether a race-neutral alternative is 'workable,' one obviously has to know the ultimate goal of the affirmative action plan—and know how much racial diversity is 'enough.'" Universities "must be prepared to articulate the rationale for [their] choices. What is the overall goal of their admissions policy? How much diversity, roughly speaking, are universities seeking to achieve and along what dimensions? Why? Perhaps all universities have already answered these questions, but we suspect some have not, and to the extent the *Fisher* decision prompts this sort of internal review, that is all to the good." Ex. 56, HARV00007312.

805.    Dean Ryan ended the article with a warning: "Because the University of Texas admission policy was not overturned, it would be tempting to interpret the *Fisher* decision as a return to the status quo ante. That would be a mistake. Few institutions are currently prepared to answer the

questions that courts will soon be asking. If they fail to prepare convincing answers, they will lose. And, having been put on notice, responsibility for that loss will be with our university leaders, not the courts." Ex. 56, HARV00007313.

806.    Despite this warning, Harvard took no steps before April 2014 to undertake a "serious, good faith consideration of workable race-neutral alternatives" to its race-based admissions processes. Ex. 16, McGrath 255:13-256:5.

807.    In June 2015, Director McGrath was asked: "Has the admissions office ever discussed the possibility of going to a race-blind admissions system?" She answered: "I don't recall ever a discussion on the admissions committee about that." She was then asked: "Do you have a view as to whether or not a race-blind admissions process would be beneficial or detrimental to diversity on campus?" Her response: "A. As the director of admissions? Q. Yes. A. I don't know whether it would. I can't—I don't have a hunch on that." *Id.*

808.    Before April 2014, Harvard had never conducted a study into whether it could achieve the educational benefits of diversity without using racial classifications in admissions. Ex. 9, Fitzsimmons 168:6-23, 179:12-181:24; Ex. 8, Faust 47:14-48:19; Ex. 13, Khurana 103:14-21; Ex. 6, Donahue 70:17-71:1.

809.    Before April 2014, Harvard had never established a committee charged with analyzing the availability of race-neutral alternatives to its race-based admissions process. Ex. 9, Fitzsimmons 214:10-215:3.

810.    Before April 2014, Harvard had never had any "formal discussion" into whether it could achieve the educational benefits of diversity without using racial classifications. Ex. 9, Fitzsimmons 173:15-174:8; Ex. 1, Banks 87:7-88:24; Ex. 5, Cheng 39:20-40:12.

811.    Before April 2014, Harvard had never examined whether the race-neutral admissions policies used by other colleges could succeed at Harvard. Ex. 8, Faust 50:18-51:7.

812. Before April 2014, Harvard had never analyzed whether it could achieve racial diversity by curtailing or ending the tip it gives to legacy applicants, even though Harvard has long known that "as a whole, the legacy applicant pool is, on average, less ethnically diverse than the non-legacy applicant pool." Ex. 9, Fitzsimmons 188:16-190:5.

**2. The Creation of the Ryan Committee After the Threat of Litigation**

813. On April 7, 2014, the website Harvard Not Fair (www.harvardnotfair.org) was launched in order to find students who had been denied admission to Harvard on account of their race. Ex. 53, HARV00005215.

814. The following day, April 8, 2014, General Counsel Robert Iuliano scheduled a meeting with Dean Fitzsimmons, Director McGrath, and Elizabeth Yong to discuss "Fisher and the possibility of a lawsuit against Harvard." This meeting occurred on April 24, 2014. Ex. 121, HARV00026390.

815. In the weeks that followed, Harvard created two new committees focused on admissions and diversity. First, Harvard created the "One Harvard College Working Group," which was charged with "examin[ing] and suggest[ing] changes in our programs and institutions that will better equip our students to engage constructively in the life of the College, their academic interests, and vocational pursuits." Ex. 66, HARV00010356-58; Ex. 62, HARV00007944, HARV00007952.

816. Second, Harvard created the "Ryan Committee," which was charged with, among other things, examining "[w]hat alternatives—including alternatives that preclude any consideration of an applicant's race—there [are] to the current [admissions process], and would those alternatives as effectively achieve the educational benefits of diversity[.]" Ex. 57, HARV0007347-48; Ex. 160, HARV00072346.

817. The Ryan Committee was chaired by Dean Ryan, who is "[a] leading expert on law and education, [and] has written extensively about the ways in which law structures educational opportunity. His articles and essays address such topics as school desegregation, school finance, school

choice, standards and testing, pre-K, and the intersection of special education and neuroscience." In addition, Dean Ryan served as a law clerk to Chief Justice William Rehnquist, has authored articles on constitutional law and theory, and has argued before the United States Supreme Court. Ex. 160, HARV00072346; Ex. 214.

818. The Ryan Committee included more than two dozen individuals from across Harvard University, including the schools of education, business, economics, divinity, and law. Ex. 159, HARV00072345.

819. The Ryan Committee met approximately three times between June 2014 and December 2014. Ex. 9, Fitzsimmons 214:10-11.

820. Harvard has withheld documents related to the Ryan Committee on the basis of attorney-client privilege. Ex. 232, Priv. Log 31-33; *e.g.*, Ex. 120, HARV00026381.

821. Harvard has instructed witnesses not to answer questions related to the Ryan Committee on the basis of attorney-client privilege. Ex. 9, Fitzsimmons 224:15-225:3.

**3. The Abandonment of the Ryan Committee After the Initiation of Litigation**

822. On November 17, 2014, SFFA filed a lawsuit in federal court alleging, among other things, that "Harvard is using race in admissions decisions when race-neutral alternatives can achieve diversity." In addition, SFFA alleged that "[t]here is no evidence that Harvard studied all of the available race-neutral alternatives and had a strong basis in evidence that none would work about as well as a race-based approach *before* turning to racial preferences." Doc. 1 at 5, 113.

823. On December 10, 2014, shortly after SFFA's lawsuit was filed, the Ryan Committee met for the last time "to discuss the future of the committee." Dean Ryan thanked the committee members for their service and he informed them that the committee was being disbanded. Ex. 23, Smith2 171:7-18; Ex. 159, HARV00072344; Ex. 158, HARV00072342.

824.    The Ryan Committee produced no written work product and reached no conclusions as to whether Harvard could achieve the educational benefits of diversity without using racial classifications in admissions. Ex. 9, Fitzsimmons 226:6-9.

825.    Two and a half years after the filing of this lawsuit, Harvard's leaders still had not otherwise considered the availability of race-neutral alternatives to its race-based admissions process. For example, in June 2017, Director Donahue could recall no discussions with anyone in the Admissions Office about what Harvard's admitted class would look like if Harvard stopped using race as a factor in its admissions process. Ex. 6, Donahue 270:16-271:5.

### 4.    The Creation of the Smith Committee at the Close of Discovery

826.    In June 2017, at the close of discovery and two and a half years after the Ryan Committee was disbanded, Harvard formed a new committee chaired by Dean Michael Smith ("Smith Committee") to study the availability of race-neutral alternatives to its race-based admissions process. Ex. 23, Smith2 15:22-18:2.

827.    The Smith Committee was comprised of three individuals: Dean Smith, Dean Khurana, and Dean Fitzsimmons. Ex. 190, HARV00097310-12.

828.    Shortly before he was chosen to lead the committee, Dean Smith testified that race was part of an applicant's "lived experience," and he could think of no "circumstance in which Harvard would not want to use race as a factor in the holistic admissions process." Ex. 22, Smith 43:22-44:15, 62:3-14.

829.    Shortly before he was chosen to join the Smith Committee, Dean Khurana testified that "one's race or ethnicity can influence one's experience" and he would not abandon Harvard's use of race in admissions even if Harvard could "produce[] a student body that was identical to the student body today, so the exact same admitted class came in without using race." Ex. 13, Khurana 63:7-11, 91:16-92:11.

830.     Shortly after he was chosen to join the Smith Committee, Dean Fitzsimmons testified that race was "essential" to understanding an applicant and he could envision no scenario in which "we could achieve our goal of having a diverse class and an effective educational experience without using race." Ex. 9, Fitzsimmons 143:18-21, 178:21-179:11.

831.     The Smith Committee met seven times between August 2017 and April 2018. The Smith Committee often met in a conference room of the Office of General Counsel. Ex. 23, Smith2 37:15-25; Ex. 190, HARV00097312.

832.     Attorneys from the Office of General Counsel and from Harvard's litigation counsel, the law firm Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), attended almost every meeting of the Smith Committee. Ex. 23, Smith2 83:15-21.

833.     Attorneys from WilmerHale drafted agendas for meetings of the Smith Committee. HARV00097370; Ex. 23, Smith2 68:9-15.

834.     The Smith Committee did not create meeting minutes documenting their work. Ex. 23, Smith2 47:10-11.

835.     The members of the Smith Committee knew that any notes they took could be produced to SFFA through discovery. Aside from a few notes documenting a call the committee had with Dean Ryan, none of the three members of the Smith Committee took notes during the meetings. Ex. 23, Smith2 73:9-15; 171:7-18.

836.     Attorneys from WilmerHale took notes during the meetings of the Smith Committee. Harvard has not produced those notes on grounds of attorney-client privilege. Ex. 23, Smith2 48:13-49:10.

837.     Most of the Smith Committee meetings involved discussions—among Dean Smith, Dean Khurana, Dean Fitzsimmons, attorneys from the Office of General Counsel, and attorneys from WilmerHale—about the expert reports produced in this litigation. Ex. 211, Smith2 Ex. 9.

838.    The Smith Committee did not collect any admissions data or other data outside of what Harvard produced in this litigation. Ex. 23, Smith2 62:25-63:19.

839.    The Smith Committee did not gather testimony about the availability of race-neutral alternatives to Harvard's race-based admissions process. Ex. 23, Smith2 62:14-24.

840.    The Smith Committee did not analyze whether Harvard's admissions policy was helping students achieve academically. Ex. 23, Smith2 60:13-61:2.

841.    The Smith Committee did not run its own simulations of possible race-neutral alternatives. Ex. 23, Smith2 62:3-13.

842.    No member of the Smith Committee ever had a disagreement with another member about the committee's work. Ex. 23, Smith2 57:11-59:7.

843.    In late March 2018, Dean Smith asked Harvard's counsel to produce a draft of the Committee's findings. Ex. 23, Smith2 66:9-67:10.

844.    Shortly thereafter, Dean Smith, Dean Khurana, and Dean Fitzsimmons received a draft of the committee's report on the availability of race-neutral alternatives. This draft was a "collaborative effort among counsel." The bulk of the drafting, however, was done by Ara Gershengorn from the Office of General Counsel and Andrew Dulberg from WilmerHale. Ex. 23, Smith2 68:16-70:22, 189:23-190:4.

845.    Relying heavily on the report of Harvard's expert, David Card, the report concluded that "at present, no workable race-neutral admissions practices could promote Harvard's diversity-related educational objectives as well as Harvard's current whole-person race-conscious admissions program while also maintaining the standards of excellence that Harvard seeks in its student body." The report made three primary points in support of its conclusion that there are no workable race-neutral alternatives available to Harvard: (1) African-American enrollment would drop from 14% to 6%; (2) transitioning to socioeconomic preferences would make "the proportion of admitted students

with the highest academic ratings ... drop from 76% to 66%"; and, (3) Harvard "could not significantly increase its financial aid budget" in order to attract more minority applicants "without detracting from other commitments." Ex. 190, HARV00097317, HARV00097320, HARV00097323, HARV00097327.

846.     The report also defended Harvard's practice of awarding preferences to the children of alumni, donors and potential donors, and faculty and staff. According to the report, the benefits Harvard obtains from awarding these preferences outweighs the racial-diversity benefits from the elimination of such preferences. Ex. 190, HARV00097325-26.

847.     On April 6, 2018, the Smith Committee held its last meeting. At the meeting was Dean Smith, Dean Khurana, Dean Fitzsimmons, attorneys from the Office of General Counsel (Bob Iuliano and Ara Gershengorn), and an attorney from WilmerHale (Andrew Dulberg). Ex. 23, Smith2 185:13-24.

848.     At the meeting, Mr. Dulberg edited the committee's report to reflect final changes. WilmerHale attorneys drafted an additional paragraph to the report and then sent it to Dean Smith, Dean Khurana, and Dean Fitzsimmons for their final approval. Ex. 192, HARV00097710; Ex. 23, Smith2 173:13-174:12.

849.     The Smith Committee's final report differs sharply from other Harvard committees, including the Standing Committee on Schools, College and Continuing Education, which is a visiting committee that is charged with reviewing the ongoing performance and activities of the college. Dean Smith has "never had a report that they haven't given a recommendation in." Ex. 22, Smith 94:7-97:11.

850.     The Smith Committee, by contrast, fully endorsed Harvard's current admissions policy and made no recommendations of any changes (large or small) that should be made to Harvard's admissions process. Ex. 23, Smith2 94:7-97:11; Ex. 190, HARV00097310, HARV00097327-28.

**B. The Existence of Workable Race-Neutral Alternatives**

**1. SFFA's Expert**

851. SFFA expert, Richard Kahlenberg, is a senior fellow at The Century Foundation, a non-profit, non-partisan research organization. Mr. Kahlenberg is a graduate of Harvard College and Harvard Law School, and he is the author or editor of sixteen books, including five that relate to the subject of race-neutral alternatives in university admissions. In particular, he is the author of *The Remedy: Class, Race, and Affirmative Action*, which was described by Harvard University's William Julius Wilson in the *New York Times* as "by far the most comprehensive and thoughtful argument thus far for … affirmative action based on class." The book was named one of the best books of the year by the *Washington Post*. Kahlenberg Rep. 1.

852. Mr. Kahlenberg has been called "arguably the nation's chief proponent of class-based affirmative action in higher education" and has been identified as "perhaps the most prominent self-described progressive with doubts about the current version of affirmative action." According to William G. Bowen, the former president of Princeton University, Mr. Kahlenberg deserves "more credit than anyone else for arguing vigorously and relentlessly for stronger efforts to address disparities by socioeconomic status." Kahlenberg Rep. 1-2.

853. Mr. Kahlenberg was retained by SFFA in his personal capacity to provide an opinion on the availability and feasibility of race-neutral alternatives to Harvard's use of race as a factor in undergraduate admissions. In particular, he was asked to examine whether Harvard could implement workable race-neutral alternatives that would produce the educational benefits of diversity. Kahlenberg Rep. 3.

854. In forming his opinions, he drew upon his extensive knowledge of the history and study of race-neutral alternatives, examined substantial portions of the voluminous evidence produced

by Harvard, and reviewed the admissions data, analysis, and conclusions from SFFA's other expert witness, Professor Peter Arcidiacono. Kahlenberg Rep. 3.

**2. Harvard's Failure Even to Consider Race-Neutral Alternatives**

855. In the years before this lawsuit was filed, "think tanks and the academic community have been examining in earnest the use of race-neutral strategies to promote racial, ethnic, and socioeconomic diversity on campuses." In 2012, Mr. Kahlenberg and a colleague "examined ten leading universities where racial preferences had been banned and found that seven of the ten … had used race-neutral alternatives to meet or exceed the racial diversity levels they had obtained in the past using racial preferences." Moreover, "race-neutral approaches also produce much higher levels of socioeconomic diversity than do race-based admissions." Kahlenberg Rep. 6, 9-10.

856. Following a decision by the Supreme Court in 2013 that emphasized the need for further consideration of race-neutral alternatives, there were additional resources published and circulated to examine "the use of race-neutral strategies to promote racial, ethnic, and socioeconomic diversity on campuses." Kahlenberg Rep. 10.

857. Despite the clear instructions by the Supreme Court in 2013 that colleges must give serious, good-faith consideration to race-neutral alternatives, which was "widely discussed in the academic community," "it appears that Harvard—one of the nation's great research universities—conducted no investigation to see whether race-neutral strategies could yield the educational benefits of diversity" until three years after this lawsuit was filed. Kahlenberg Rep. 15-17.

**3. Harvard's Admissions Preferences Disproportionately Favor White and Wealthy Applicants.**

858. According to data produced by Harvard in this matter, Harvard has admitted the following numbers and shares of applicants and admits by race/ethnicity for various categories of preferences—legacy, Dean's/Director's List, Harvard faculty/staff, early action, and the Z-List—from the Class of 2014 through the Class of 2019:

| | Domestic Applicants, 2014-2019 | | | | Domestic Admits, 2014-2019 | | | |
|---|---|---|---|---|---|---|---|---|
| | Non-Legacy | | Legacy | | Non-Legacy | | Legacy | |
| **Race** | Total | Share | Total | Share | Total | Share | Total | Share |
| White | 66,329 | 0.40 | 3,499 | 0.69 | 3,961 | 0.41 | 1,093 | 0.70 |
| Black | 20,305 | 0.12 | 256 | 0.05 | 1,341 | 0.14 | 67 | 0.04 |
| Hispanic | 21,151 | 0.13 | 280 | 0.06 | 1,210 | 0.13 | 92 | 0.06 |
| Asian | 43,872 | 0.26 | 517 | 0.10 | 2,302 | 0.24 | 164 | 0.11 |

| | Domestic Applicants, 2014-2019 | | | | Domestic Admits, 2014-2019 | | | |
|---|---|---|---|---|---|---|---|---|
| | Non-Dean/Director | | Dean/Director | | Non-Dean/Director | | Dean/Director | |
| Race | Total | Share | Total | Share | Total | Share | Total | Share |
| White | 67,921 | 0.40 | 1,907 | 0.69 | 4,339 | 0.43 | 715 | 0.68 |
| Black | 20,463 | 0.12 | 98 | 0.04 | 1,379 | 0.14 | 29 | 0.03 |
| Hispanic | 21,280 | 0.13 | 151 | 0.05 | 1,241 | 0.12 | 61 | 0.06 |
| Asian | 44,059 | 0.26 | 330 | 0.12 | 2,331 | 0.23 | 135 | 0.13 |

| | Domestic Applicants, 2014-2019 | | | | Domestic Admits, 2014-2019 | | | |
|---|---|---|---|---|---|---|---|---|
| | Non-Faculty/Staff | | Faculty/Staff | | Non-Faculty/Staff | | Faculty/Staff | |
| Race | Total | Share | Total | Share | Total | Share | Total | Share |
| White | 69,642 | 0.41 | 186 | 0.54 | 4,973 | 0.45 | 81 | 0.54 |
| Black | 20,551 | 0.12 | 10 | 0.03 | 1,406 | 0.13 | 2 | 0.01 |
| Hispanic | 21,412 | 0.12 | 19 | 0.05 | 1,294 | 0.12 | 8 | 0.05 |
| Asian | 44,303 | 0.26 | 86 | 0.25 | 2,427 | 0.22 | 39 | 0.26 |

| | Domestic Applicants, 2016-2019 | | | | Domestic Admits, 2016-2019 | | | |
|---|---|---|---|---|---|---|---|---|
| | Regular Applicant | | Early Applicant | | Regular Applicant | | Early Applicant | |
| Race | Total | Share | Total | Share | Total | Share | Total | Share |
| White | 38,545 | 0.38 | 7,387 | 0.44 | 1,350 | 0.39 | 1,787 | 0.48 |
| Black | 12,145 | 0.12 | 1,839 | 0.11 | 536 | 0.15 | 380 | 0.10 |
| Hispanic | 12,973 | 0.13 | 1,808 | 0.11 | 523 | 0.15 | 344 | 0.09 |
| Asian | 25,516 | 0.25 | 4,234 | 0.25 | 759 | 0.22 | 856 | 0.23 |

| | Domestic Admits, 2014-2019 | | | |
|---|---|---|---|---|
| | Non Z-List | | Z-List | |
| Race | Total | Share | Total | Share |
| White | 69,575 | 0.41 | 253 | 0.70 |
| Black | 20,554 | 0.12 | 7 | 0.02 |
| Hispanic | 21,415 | 0.12 | 16 | 0.04 |
| Asian | 44,338 | 0.26 | 51 | 0.14 |

Arcidiacono Dec. ¶ 15 & Table 3.

859. As Table 3 shows, white applicants disproportionally benefit from the categories of legacy (70% of domestic legacy admits are white), Dean's/Director's Interest List (68% of the domestic admits are white), Harvard faculty/staff (54% of the domestic admits are white), and early action (48% of the domestic admits are white). By comparison, the African-American and Hispanic representation in these groups is miniscule. White admits also are more represented than admits of other races/ethnicities on the Z-List (70%). Arcidiacono Dec. Table 3; Kahlenberg Rep. 35.

860. Arcidiacono Table 4 provides the number and share of applicants and admits by race/ethnicity for additional factors—being socioeconomically "disadvantaged" and being first-generation college—from the Class of 2014 through the Class of 2019:

| | Domestic Applicants, 2014-2019 | | | | Domestic Admits, 2014-2019 | | | |
|---|---|---|---|---|---|---|---|---|
| | Non-Disadvantaged | | Disadvantaged | | Non-Disadvantaged | | Disadvantaged | |
| Race | Total | Share | Total | Share | Total | Share | Total | Share |
| White | 65,535 | 0.44 | 4,293 | 0.20 | 4,608 | 0.50 | 446 | 0.24 |
| Black | 14,690 | 0.10 | 5,871 | 0.28 | 1,041 | 0.11 | 367 | 0.20 |
| Hispanic | 16,331 | 0.11 | 5,100 | 0.24 | 872 | 0.09 | 430 | 0.23 |
| Asian | 39,585 | 0.27 | 4,804 | 0.23 | 1,993 | 0.21 | 473 | 0.26 |

| | Domestic Applicants, 2014-2019 | | | | Domestic Admits, 2014-2019 | | | |
|---|---|---|---|---|---|---|---|---|
| | Non-First Generation | | First Generation | | Non-First Generation | | First Generation | |
| Race | Total | Share | Total | Share | Total | Share | Total | Share |
| White | 66,401 | 0.43 | 3,427 | 0.18 | 4,875 | 0.47 | 179 | 0.23 |
| Black | 17,051 | 0.11 | 3,510 | 0.18 | 1,301 | 0.13 | 107 | 0.14 |
| Hispanic | 16,397 | 0.11 | 5,034 | 0.27 | 1,071 | 0.10 | 231 | 0.30 |
| Asian | 40,608 | 0.27 | 3,781 | 0.20 | 2,256 | 0.22 | 210 | 0.27 |

Arcidiacono Dec. ¶ 16 & Table 4.

861. As Table 4 shows, Hispanic and African-American applicants are disproportionately disadvantaged and first-generation college. *Id.*

862. Asian-American applicants have the lowest share of athletes and legacies, and they are negatively affected by preferences for athletes and legacies. Arcidiacono Rep. 3, 34 & Table 3.2; Arcidiacono Rebuttal Report, Appendix C, Table 8.2R.

863. But the negative effects of these preferences on Asian-American admit rates is smaller than the penalty Asian Americans face as a result of being treated differently than white applicants who are not legacies or athletes. Arcidiacono Rep. 3.

### 4. The Size of Preferences and Penalties in Admissions Decisions

864. As Professor Arcidiacono found, certain factors—such as being African American, being on the Dean's/Director's List, being a legacy, and being the child of Harvard faculty and staff—are more positively associated with admission than being disadvantaged. Indeed, according to Professor Arcidiacono, being Asian American is negatively correlated with admission to Harvard and first-generation status has very little, if any, positive effect. Arcidiacono Rebuttal Rep. B.7.2R.

865. OIR reached similar findings, determining that being a recruited athlete, having a higher personal rating, being a legacy, and being African American are more positively associated with

admission to Harvard than being low-income or being Asian American. Ex. 112, HARV00023549-23550.

### 5. Simulations of Race-Neutral Admissions Policies

866. Drawing on numerous prior studies, both Mr. Kahlenberg (with Professor Arcidiacono's assistance) and Professor Card designed a number of "simulations" of race-neutral admissions policies to demonstrate the likely results of adopting race-neutral strategies at Harvard. Kahlenberg 45; Card Rep. 103-04.

867. Professor Card agreed that both he and Mr. Kahlenberg took similar approaches in their simulations to generate hypothetical classes under alternative admissions scenarios, and that their methodology was "pretty standard in the literature and was used by several of the other papers in the area." Ex. 3, Card 99:11-18; Card Rep. 104, 152.

#### d. Card Simulation 4x

868. To create "Card Simulation 4x," Professor Card made two modifications to the way Harvard makes its admissions decisions. First, he turned off preferences for race, legacy, recruited athlete, whether an applicant is the child of Harvard faculty or staff, and whether an applicant is on the Dean's/Director's Interest List. Second, he provided an equally weighted preference to students with each of the following four socioeconomic factors: tagged economically "disadvantaged"; eligible for fee waiver; first-generation college; and from neighborhoods with a median income below $65,000. Card Rep. 105-106; Declaration of Richard Kahlenberg, Exhibit B ("Kahlenberg Rebuttal Rep.") 22-23.

#### e. Kahlenberg Simulations 6 & 7

869. To create Kahlenberg Simulation 6, Kahlenberg designed (and Professor Arcidiacono implemented) five adjustments to Card Simulation 4x. Kahlenberg Rebuttal Rep. 29-32.

870.     First, Kahlenberg added a fifth variable (attending a high school whose student body is, as a whole, socioeconomically disadvantaged) to Card's definition of socioeconomic disadvantage. Kahlenberg did this because attending a disadvantaged high school constitutes an additional obstacle for students, such that students who overcome that hurdle deserve special consideration. Leaving this factor out also unfairly penalizes African-American and Hispanic students because, on average, they are more likely to attend high poverty schools. Kahlenberg Rebuttal Rep. 30.

871.     Second, Kahlenberg created a more sophisticated definition of disadvantaged neighborhood and high school socioeconomic status by providing equal weight to three factors: parental income, parental education, and percentage of families speaking a language other than English at home. Kahlenberg created this single composite measure of neighborhood and high school socioeconomic status because they are all associated with academic outcomes in the academic literature and have been employed in other contexts to denote socioeconomic disadvantage. Kahlenberg Rebuttal Rep. 30-31.

872.     Third, Kahlenberg provided a preference to those in the most disadvantaged third of neighborhood Census tracts (and high schools) in the data set. This measurement more accurately captures the most economically disadvantaged neighborhoods and thus does not unfairly penalize African-American and Hispanic students who, on average, live in more economically disadvantaged neighborhoods than whites of the same income. Kahlenberg Rebuttal Rep. 31-32.

873.     Professor Card agreed these were slight adjustments to the SES model. Ex. 3, Card 147:5-7.

874.     Fourth, Kahlenberg reinstated the athletic preference because a realistic race-neutral alternative would not eliminate athletic preferences. Kahlenberg Rebuttal Rep. 32.

875.     Simulations 6 and 7 are the same in all these respects. The only difference is that in Simulation 6, Professor Arcidiacono turned off the preference for early admission, whereas in

Simulation 7, that preference was left on. As explained in more detail below, Simulations 6 and 7 yield results that are very similar and demonstrate that both are workable race-neutral alternatives. Kahlenberg Rebuttal Rep. 32.

**f. Three Successful Race-Neutral Alternatives**

876. Under Card Simulation 4x, Kahlenberg Simulation 6, and Kahlenberg Simulation 7, Harvard's Class of 2019 would have the following characteristics:

| | Results of Race-Neutral Alternatives for the Class of 2019 | | | |
|---|---|---|---|---|
| | Status Quo | Card Simulation 4x | Kahlenberg Simulation 6 | Kahlenberg Simulation 7 |
| **Race** | | | | |
| White | 0.4 | 0.35 | 0.32 | 0.33 |
| African American | 0.14 | 0.10 | 0.10 | 0.10 |
| Hispanic | 0.14 | 0.17 | 0.20 | 0.19 |
| Asian | 0.24 | 0.30 | 0.31 | 0.31 |
| **Socioeconomic Status** | | | | |
| Disadvantaged | 0.18 | 0.52 | 0.52 | 0.49 |
| First Generation | 0.07 | 0.25 | 0.25 | 0.24 |
| **Academic Readiness** | | | | |
| Avg. Comp SAT | 2244 | 2189 | 2173 | 2180 |
| Avg. Comp ACT | 33 | 33 | 32 | 33 |
| Avg. Academic Index | 228 | 225 | 225 | 225 |
| Avg. Converted GPA | 77 | 77 | 77 | 77 |
| **Geographic Diversity** | | | | |
| Rural | 0.04 | 0.05 | 0.05 | 0.05 |
| Northeast | 0.41 | 0.36 | 0.37 | 0.38 |
| Midwest | 0.12 | 0.13 | 0.10 | 0.10 |
| South | 0.23 | 0.24 | 0.23 | 0.23 |
| West | 0.24 | 0.27 | 0.30 | 0.29 |

Kahlenberg Rebuttal Rep. 33; *id.*, Appendix A; Card Rep. 108-113; Card Rebuttal Ex. 26;

877. Under all three simulations, socioeconomic diversity would increase substantially. For example, under all three simulations, the number of first-generation college students would more than *triple*. Similarly, under all three simulations, the number of disadvantaged students admitted to Harvard would more than *double*. Kahlenberg Rebuttal Rep. 33, Appendix A; Card Rep. 113; Card Rebuttal Ex. 26.

878. Looking at socioeconomic status outcomes is relevant to race-neutral alternatives analysis because the objective of the exercise is to identify the educational benefits of diversity, benefits

that Harvard acknowledges flow from socioeconomic diversity. Kahlenberg Rebuttal Rep. 24-25. Declaration of Richard Kahlenberg, Exhibit C ("Kahlenberg Supp. Rep.") 2.

879. These benefits are especially important to consider given Harvard's lack of socioeconomic diversity. Harvard has 23 times as many high-income students as low-income students. Kahlenberg Rep. 20-23. Even though more than two-thirds of American high school students would qualify as "disadvantaged" under Harvard's terminology only 17.4% qualified as such in the admitted class of 2019. Kahlenberg Rep. 49.

880. Second, under all three simulations, the combined total of non-white (African-American, Hispanic, and Asian) admits would *increase* as compared to the status quo. Although African-American admits would fall by 4 percentage points in all three simulations, the percentage of Hispanic admits would rise between 3 and 6 percentage points depending on the simulation. Kahlenberg Rebuttal Rep. 33, Appendix A; Card Rep. 108; Card Rebuttal Ex. 26.

881. Third, under all three simulations, the academic readiness of students remains comparable. Under all three simulations, the average GPA, average ACT, and academic index remain virtually the same, while SAT scores fall slightly (by 55 to 71 points out of 2400). Kahlenberg Rebuttal Rep. 33, Appendix A; Card Rep. 111; Card Rebuttal Ex. 26.

882. Fourth, geographic diversity increases under all three simulations, with increases in admissions from those in the West and those living in rural areas. Kahlenberg Rebuttal Rep., Appendix A; Card Rep. 111; Card Rebuttal Ex. 26.

**6. Harvard's Rejection of These Race-Neutral Alternatives**

883. Professor Card criticizes these simulations of race-neutral alternatives because (1) the share of African-American admits falls from 14% in the status quo to 10%; (2) the simulations result in a class with "slightly lower average SAT and ACT scores"; and (3) the simulations "reduce the

fraction of the admitted class with academic, personal, and extracurricular ratings of 1 or 2." Card Rebuttal 94-95.

884.     Professor Card's reliance on the decline in African-American admits is not based upon any institutional view Harvard communicated to him. He testified that he was given no "understanding of what difference would be acceptable to Harvard" and that he has no personal view as to what declines would be acceptable. Ex. 3, Card 152:6-23. He does, however, acknowledge that Mr. Kahlenberg's simulations would result in a 10% share of African-American admits. Card Rebuttal 94. The Smith Committee claimed the African-American admit share would drop to 6%, but such a decline would occur only if Harvard refused to employ race-neutral alternatives. With them, African-American enrollment remains strong. Kahlenberg Supp. Rep. 1.

885.     Harvard witnesses denied that there was any minimum number of any racial group that was necessary to achieve their diversity interests. For example, President Faust was asked whether Harvard's "admissions policy is ... concerned with the overall representation of particular groups," and she was emphatic that it is not, Ex. 8, Faust 90:11-92:1, and Dean Smith testified that Harvard is "not looking for any particular number," Ex. 23, Smith2 126:7-25. According to President Faust, there is no "particular designated level" of representation of a racial group necessary to obtain the benefits of diversity. Ex. 8, Faust 90:11-92:1, 107:21-108:2; 195:23-196:13; Ex. 11, Howrigan 174:12-175:21.

886.     Moreover, a 10% share of African-American admits is "greater than the representation found at Harvard throughout most of the affirmative-action era." Kahlenberg Rep 50. Indeed, "Harvard has prided itself for decades on providing the educational benefits of diversity, boasting that 'diversity is the hallmark of the Harvard experience.' Yet in the classes graduating in the 1970s and early 1980s, Harvard's African-American representation ranged from 7-8%, which seemed to satisfy Harvard's claimed interest." Kahlenberg Rep. 49-50. Even accounting for yield rates, historical

experience undermines Professor Card's criticism of African-American representation in Mr. Kahlenberg's simulations. Kahlenberg Rep. 49-50.

887.    Had Harvard given SFFA access to data about the wealth of applicants, the African-American representation would likely have increased. While African Americans typically have incomes that are 70% of white incomes, African-American wealth is just 10% of white wealth. Kahlenberg Rep. 18.

888.    The average SAT scores in all three of these simulations are still in the 98th percentile of all SAT takers and represents a single percentile point difference from the status quo (2244 at the 99th percentile). Kahlenberg Rebuttal Rep. 33, Appendix A; Card Rep. 111; Card Rebuttal Ex. 26.

889.    Harvard has denied that maximizing SAT scores is a top priority. Ex. 23, Smith 149:7-13.

890.    Third, the decline in students with the highest academic, extracurricular, and personal ratings is minor, amounting to a few dozen students (at most) in each rating category. For example, in the class of 2019, there were only 87 applicants with academic 1s, 61 applicants with extracurricular 1s, and 8 applicants with personal 1s. And Harvard already rejects numerous students with these ratings each year. Indeed, Harvard rejected 46% of the academic 1s, 44% of the extracurricular 1s, and 25% of the personal 1s in the class of 2019. Arcidiacono Dec. ¶ 17 & Table 5. Kahlenberg Rebuttal Rep. 34; Kahlenberg Supp. Rep.  2-3; Card Rep. 28, 111, Ex.4; Card Rebuttal Ex. 26.

891.    Moreover, the minor differences in Harvard's ratings that results from the substantial increases in socioeconomic diversity must be considered in light of the obstacles overcome by those additional socioeconomically disadvantaged admits. Kahlenberg Supp. Rep. 3.

892.    Harvard itself has made this very point, having explained that "excellence can be found in all quarters of society, and students who excel or show promise of excelling despite limited access to educational and other resources often show the kind of determination and resilience that makes

them likely to benefit greatly from what Harvard has to offer students—and show that they will in turn have much to offer Harvard." Ex. 190, HARV00097322.

893. To the extent these minor differences detract from the class, they pale in comparison to the benefits in diversity obtained from the simulations, including an increase in Hispanic and Asian admits, an increase in geographic diversity, and a large increase in socioeconomic diversity. Kahlenberg Rebuttal Rep. 24-26; Kahlenberg Supp. Rep. 2-3.

894. The Smith Committee, likewise, criticized simulations that deprived Harvard of the ability to give preferences to legacies, the children of donors, the children of Harvard faculty and staff, those who apply early action, and those who are admitted through the Z-List—preferences that overwhelmingly benefit wealthy and white students. Ex. 190, HARV00097310, HARV00097324-97326; Kahlenberg Rep. 31-36; Kahlenberg Rebuttal Rep. 10-13.

#### 7. The Potential to Create Even Greater Racial and Socioeconomic Diversity

895. Mr. Kahlenberg identified a number of other practices that Harvard could adopt to increase racial diversity. Kahlenberg Rep. 23-25, 29-31, 39-42, 47-48.

896. For example, Harvard could increase its financial aid commitment. Harvard's endowment is $37.1 billion—the largest in the nation, exceeding the GDP of more than half the countries in the world. Indeed, Harvard has proclaimed that its $37 billion endowment means it can be need-blind in admissions. Numerous witnesses—including Harvard's Dean of Admissions and Harvard's Director of Financial Aid—testified that "there is no economic restraint on the number of students Harvard can admit through its financial aid initiative." Kahlenberg Rep. 29-31; Kahlenberg Rebuttal Rep. 9-10.

897. Harvard could increase its recruiting efforts among less wealthy and white bases. Harvard "recruits disproportionately from areas that have few high-achieving, low-income students. For example, the Midwest and Mountain states produce 21.2% of high-achieving low-income

students, which is six times as many as exist in New England (3.5%). Yet in the class of 2021 Harvard enrolled more students from New England (16.5%) than in all of the Midwest and Mountain states combined (13.4%)." Harvard also "relies heavily on a relatively small number of 'feeder' schools to fill a significant part of its class. For the classes of 2007-2016, 20.3% of the matriculates … came from schools that represent just 0.6% of American high schools." Kahlenberg Rep. 39-40; Kahlenberg Rebuttal Rep. 15-17.

898.    Harvard could take into account more specific information about family wealth and income. "Because Harvard has adopted 'need-blind' admissions, it has placed a firewall between the admissions and financial aid offices that prevents admissions officers from knowing the family income or wealth of applicants," which "creates an enormous barrier to implementing a central race-neutral strategy used at numerous other colleges[.]" RK 23-25; Kahlenberg Rebuttal Rep. 6.

899.    Harvard could take more transfers, especially from community colleges. "The majority of Black and Hispanic undergraduate students in this country study at [community] colleges," and "Harvard has for years lagged in this arena." By comparison, "Amherst College, a highly competitive institution, enrolls between 12 and 15 community college transfer students annually." If Harvard "adopted a similarly scaled program, it would include between 44 and 55 community college transfer students per year. This rate would translate into about 300 community college transfers over a six-year period, rather than the two actually admitted." Kahlenberg Rep. 41-42; Kahlenberg Rebuttal Rep. 17-18.

900.    Harvard could take into account other information, such as zip code or single-parent family status, to increase its recruitment of socioeconomically disadvantaged students. As with wealth and family income, Harvard has such data but did not produce them to SFFA. Kahlenberg Rep. 47-48; Kahlenberg Rebuttal Rep. 35.

Dated: June 15, 2018

Respectfully submitted,

*/s/ William S. Consovoy*

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
703.243.9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com

Patrick Strawbridge BBO #678274
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
617.227.0548
patrick@consovoymccarthy.com

Michael H. Park
CONSOVOY MCCARTHY PARK PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
212.247.8006
park@consovoymccarthy.com

Adam K. Mortara
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
312.494.4400
adam.mortara@bartlit-beck.com

John M. Hughes
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
303.592.3100
john.hughes@bartlit-beck.com

Paul M. Sanford BBO #566318
BURNS & LEVINSON LLP
One Citizens Plaza, Suite 1100
Providence, RI 02903
617.345.3000
psanford@burnslev.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ William S. Consovoy
William S. Consovoy