# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS
# BOSTON DIVISION

STUDENTS FOR FAIR ADMISSIONS, INC.,

                Plaintiff,

  v.

PRESIDENT AND FELLOWS OF HARVARD
COLLEGE (HARVARD CORPORATION),

                Defendant.

Civil Action No. 1:14-cv-14176-ADB

**Motion to File Under Seal Granted
June 14, 2018 [Dkt. 411]**

# MEMORANDUM IN SUPPORT OF DEFENDANT'S
# MOTION FOR SUMMARY JUDGMENT ON ALL REMAINING COUNTS

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS .................................................................................................3

    A.    The Harvard College Admissions Process.................................................3

    B.    Harvard's Efforts To Admit A Diverse Student Body...............................7

    C.    This Lawsuit.................................................................................................10

STANDARD OF REVIEW ...............................................................................................11

ARGUMENT ......................................................................................................................11

I.    SFFA LACKS STANDING TO BRING THIS ACTION .............................................11

II.    HARVARD'S CONSIDERATION OF RACE ALONG WITH MANY OTHER FACTORS IN ADMISSIONS DECISIONS IS NARROWLY TAILORED TO ACHIEVE A COMPELLING INTEREST .................................................................................................................16

    A.    Harvard Has A Compelling Interest In A Diverse Student Body.........................18

    B.    Harvard's Consideration Of Race Is Narrowly Tailored .......................................18

        1.    Harvard Does Not Engage In Racial Balancing Or Use Quotas...............18

        2.    Harvard Considers Race Flexibly, Along With Many Other Factors........21

        3.    There Are No Workable Race-Neutral Alternatives That Would Allow Harvard To Achieve Its Compelling Interest In Diversity While Maintaining Its Standards Of Excellence ....................................................25

            a)    Harvard Employs Many Race-Neutral Practices To Pursue Diversity....................................................................................26

            b)    Eliminating Race-Conscious Admissions Would Cause A Substantial, Unacceptable Decline In Minority Enrollment .........27

            c)    No Race-Neutral Alternatives Would Sufficiently Promote Diversity Without Imperiling Other Fundamental Institutional Objectives, Including Academic Excellence .................................29

                i)    Potential New Practices ...................................................29

                ii)    Eliminating Various Existing Practices ............................32

III.    Harvard Does Not Discriminate Against Asian-American Applicants ................35

    A.    Fact Discovery Has Yielded No Documentary Or Testimonial Evidence Of Discrimination ................................................................................37

    B.    Expert Discovery Has Yielded No Legally Sufficient Evidence Of Discrimination ........................................................................................38

CONCLUSION ..................................................................................................................45

CERTIFICATE OF SERVICE .........................................................................................47

## TABLE OF AUTHORITIES

### Cases

*AARP v. EEOC*,
   267 F. Supp. 3d 14 (D.D.C. 2017) ...........................................................................................12

*Allen v. Wright*,
   468 U.S. 737 (1984) ...................................................................................................................15

*American Postal Workers Union v. Frank*,
   968 F.2d 1373 (1st Cir. 1992) ...................................................................................................13

*Blunt v. Lower Merion School District*,
   767 F.3d 247 (3d Cir. 2014) ................................................................................36, 37, 39, 44

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corporation*,
   509 U.S. 209 (1993) ..........................................................................................37, 41, 44

*Camel Hair and Cashmere Institite of America, Inc. v. Associated Dry Goods*
   *Corporation*, 799 F.2d 6 (1st Cir. 1986) ...............................................................................12

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ...........................................................................................................13, 14

*Clapper v. Amnesty International USA*,
   568 U.S. 398 (2013) ...........................................................................................................14, 15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ...................................................................................................................41

*Electronic Privacy Information Center v. Presidential Advisory Commission on*
   *Election Integrity*, 266 F. Supp. 3d 297 (D.D.C. 2017) .........................................................12

*Fisher v. Univeristy of Texas at Austin*,
   570 U.S. 297 (2013) .........................................................................................................*passim*

*Fisher v. University of Texas at Austin*,
   136 S. Ct. 2198 (2016) .................................................................................................... *passim*

*Gonzalez v. El Dia, Inc.*,
   304 F.3d 63 (1st Cir. 2002) .......................................................................................................37

*Goodman v. Bowdoin College*,
   380 F.3d 33 (1st Cir. 2004) .......................................................................................................35

*Gratz v. Bollinger*,
   539 U.S. 244 (2003) ...................................................................................................................22

*Grutter v. Bollinger*,
   539 U.S. 306 (2003) ..................................................................................... *passim*

*Hazelwood School District v. United States*,
   433 U.S. 299 (1977) .............................................................................................36

*Hunt v. Washington State Apple Advertising Commission*,
   432 U.S. 333 (1977) .............................................................................................12

*Keyishian v. The Board of Regents of the University of the State of New York*,
   385 U.S. 589 (1967) .............................................................................................16

*LeBlanc v. Great American Insurance Company*,
   6 F.3d 836 (1st Cir. 1993) ...............................................................................37, 41

*Lovelace v. Southeastern Massachusetts University*,
   793 F.2d 419 (1st Cir. 1986) ...............................................................................16

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .......................................................................................11, 15

*Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corporation*,
   475 U.S. 574 (1986) .............................................................................................41

*McGuire v. Reilly*,
   386 F.3d 45 (1st Cir. 2004) .................................................................................36

*Perry v. Roy*,
   782 F.3d 73 (1st Cir. 2015) .................................................................................11

*Pina v. The Children's Place*,
   740 F.3d 785 (1st Cir. 2014) ...............................................................................11

*Price v. General Motors Corporation*,
   931 F.2d 162 (1st Cir. 1991) ...............................................................................41

*Regents of the University of California v. Bakke*,
   438 U.S. 265 (1978) ..................................................................................... *passim*

*Spath v. National Collegiate Athletic Association*,
   728 F.2d 25 (1st Cir. 1984) .................................................................................36

*Sweezy v. State of New Hampshire by Wyman*,
   354 U.S. 234 (1957) .............................................................................................16

*Valley Forge Christian College v. Americans United for Separation of Church
   and State, Inc.*, 454 U.S. 464 (1982) ..................................................................11

*Villanueva v. Wellesley College*,
930 F.2d 124 (1st Cir. 1991)................................................................................................16

### Docketed Cases

*Regents of the University of California v. Bakke*,
No. 76-811 (U.S.)................................................................................................................7

### Statutes

Civil Rights Act of 1964, tit. VI, 42 U.S.C. § 2000d...................................................................10

# INTRODUCTION

This case is the latest salvo by ideological opponents of the consideration of race in university admissions.  Having failed to persuade the Supreme Court to invalidate the admissions program at the University of Texas at Austin, they have now trained their sights on Harvard, a private university, which has long sought to assemble an extraordinary and diverse class of undergraduates by conducting a wide-ranging review of each applicant's background and experience.  In that whole-person evaluation, the Harvard College Admissions Office considers applicants' academic performance and potential, extracurricular commitments and talent, athletic abilities, personal qualities, and many other factors, including applicants' socioeconomic background and self-identified race or ethnicity.  By undertaking that detailed review, the Admissions Committee learns who each applicant is as a person and seeks to identify students who would both benefit most from Harvard's educational resources and contribute most to Harvard's community of learning.

Harvard seeks excellence from its students, but it does not define excellence through a narrow focus on grades and test scores.  Rather, Harvard's admissions process is designed to identify engaged and creative students who will take their place as the leaders of the next generation and who will be equipped to deal with a complex, diverse world.  Harvard believes that achievement, purpose, and promise are found in all quarters, and seeks in its undergraduate program to make the most of this critical moment in students' lives when they have a unique opportunity to interact with people who have different interests and backgrounds—in attending classes, sharing meals, playing sports, living together, performing together, and much more. Harvard has long believed that, "[t]hrough a diverse living environment, where students live with people who are studying different topics, who come from different walks of life and have

evolving identities, intellectual transformation is deepened and conditions for social transformation are created."  Ex. 68.[1]

As the Supreme Court recognized in *Grutter v. Bollinger*, 539 U.S. 306, 335 (2003), and *Regents of the University of California v. Bakke*, 438 U.S. 265, 316-317 (1978),[2] Harvard's admissions process is a model for university admissions programs that aim to achieve a class that is excellent in many ways, including through its diversity.  The exhaustive discovery SFFA has conducted in this case demonstrates without doubt that Harvard does not use quotas or engage in racial balancing and that race is but one of many factors that Harvard considers in evaluating how its students will learn from one another.  Harvard also uses many race-neutral means to pursue diversity—including extensive recruiting and one of the most generous financial aid policies in the country—and it has carefully studied other potential race-neutral measures, ultimately concluding that the consideration of race remains necessary to attain an exceptional class that is racially diverse.

Nor does Harvard discriminate against applicants of any race, including Asian Americans.  Nothing in the record suggests any effort by Harvard to limit the number of Asian-American students, which fluctuates considerably from year to year.  Indeed, the percentage of self-identified Asian-American students in the admitted class has grown by 29% in the last decade to nearly 23% of admitted students.  Statement of Material Facts ("SMF") ¶ 113.[3]

---

[1]  "Ex." citations refer to exhibits to the Declaration of Felicia H. Ellsworth in Support of Defendant's Motion for Summary Judgment.

[2]  Unless otherwise noted, all references to the *Bakke* decision are to Justice Powell's opinion, the reasoning of which the Court adopted in *Grutter*, 539 U.S. at 325.

[3]  Over the last two decades, the number of applicants to Harvard College has increased dramatically.  SMF ¶¶ 3, 109.  During this period, the share of Asian-American applicants has remained relatively stable, while the shares of African-American and Hispanic applicants have increased substantially.  SMF ¶¶ 110-112.

SFFA's statistical arguments are deeply flawed, resting on a contrived model of the Harvard admissions process that excludes numerous applicants as well as several of the most important factors that Harvard considers.  Although SFFA purports to be an organization dedicated to vindicating the interest of Asian-American applicants, it is nothing of the sort—it is merely a vehicle to litigate the ideological preferences of its founder Edward Blum, and does not have standing to bring this lawsuit.

Harvard recognizes, and agrees with this Court's previously expressed view, that this case could be efficiently resolved at trial, and Harvard was prepared to forgo moving for summary judgment and to proceed directly to trial.  Nonetheless, given the Court's willingness to entertain summary judgment motions and the state of the record, the Court should enter summary judgment for Harvard on all remaining claims.  No reasonable fact-finder could conclude that Harvard engages in racial balancing, considers race other than as one factor among many, could continue to achieve its educational goals without considering race, or intentionally discriminates against Asian Americans.  Harvard remains fully prepared to make its case at trial, but it should be unnecessary for Harvard to do so, for it is clear as a matter of law that SFFA cannot prevail.

## STATEMENT OF FACTS

### A.    The Harvard College Admissions Process

Every year, approximately 40,000 students apply for the approximately 1,600 seats in Harvard's freshman class.[4]  The Harvard applicant pool is overwhelmingly strong on all dimensions, and outstanding grades and test scores are not unusual among Harvard applicants. Among the approximately 26,000 domestic applicants to the Class of 2019, for example,

---

[4]    More than 37,000 people applied to Harvard for admission to the Class of 2019, and 2,003 were offered admission.  SMF ¶¶ 1-2.  In the most recent admissions cycle, 42,749 people applied for admission to the Class of 2022, of whom 1,962 were offered admission.  SMF ¶¶ 3-4.

approximately 3,500 had perfect SAT math scores, approximately 2,700 had perfect SAT verbal scores, more than 8,000 had a perfect converted GPA, and nearly 1,000 earned a perfect composite score on the SAT or ACT.  SMF ¶¶ 5-9.

Given the extraordinary pool of applicants, many of whom have the ability to succeed academically at Harvard, the admissions process is designed to identify those students who manifest the qualities, academic and otherwise, that suggest they will become engaged participants and leaders in an increasingly diverse, complex society.  Harvard encourages students to submit information about any aspect of their background and experience that may bear on that question.  Application files contain a wealth of information beyond grades and test scores: information about the applicant's extracurricular and athletic participation, teacher recommendations, guidance counselor recommendations that frequently discuss much more than academic qualifications, the applicant's essays, an evaluation from a Harvard graduate in the applicant's community who interviewed the applicant, information reflecting the applicant's socioeconomic background, parental education and occupation, an expression of the applicant's likely academic and extracurricular interests at Harvard, any academic or artistic work the applicant has submitted, and much more.  SMF ¶¶ 13-15, 22.

Information about an applicant's race or ethnicity is included in the application if the applicant chooses to disclose it.  SMF ¶¶ 16, 18.[5]  If an applicant chooses to identify his or her

---

[5]    Applicants may disclose their race and ethnicity on the Common Application, Universal College Application, and Coalition Application, all of which Harvard accepts.  SMF ¶ 16. Applicants may also discuss their race or ethnicity in their personal statement or essay.  SMF ¶ 17.  Applicants are not required to disclose their race, and in applications to the Classes of 2014 through 2019, roughly 10,000 domestic applicants chose not to do so.  SMF ¶ 18.  Harvard does not change the applicant's self-reported race or ethnicity (or decision not to disclose that information) through other investigation or if the information is disclosed elsewhere in the application (for example, in a recommendation letter).  SMF ¶ 115-116.

race or ethnicity—singular or plural—it is considered as one factor among many that may inform an applicant's life experience and the contributions the applicant may make to a class that is diverse on many dimensions. SMF ¶ 117. Many other kinds of diversity and experience are considered as well—such as the applicants' socioeconomic background and circumstances, the academic interests applicants wish to pursue at Harvard, whether they have overcome hardship, intellectual passions, artistic or athletic ability, public service, and much more. SMF ¶¶ 27, 85.

The Harvard Admissions Office reviews these thousands of applications in a labor-intensive committee process over several months.[6] All applications are assigned to one of approximately twenty geographic dockets, which consider a roughly equal number of applications. SMF ¶¶ 36-37. A subcommittee of admissions officers is responsible for the initial evaluation of all candidates from a particular docket. SMF ¶¶ 38-39. Admissions officers develop a deep understanding of the high schools in their assigned regions, which allows them to assess the academic rigor (of the school as well as particular classes and teachers), grades, and school recommendations they receive. SMF ¶¶ 40, 42. The admissions officer responsible for an applicant's high school conducts the first review of an application and will pass the application to the subcommittee chair if further review is warranted. SMF ¶ 41, 67.

Admissions officers conduct the same whole-person evaluation for all applicants. SMF ¶¶ 25-27. The first reader reviews each application carefully, considering the applicant's achievements, talents, and personal qualities, and taking into account the context in which those achievements occurred and those talents were developed, to assess the applicant's potential to

---

[6]     Applicants may apply to Harvard through its non-binding Early Action program or for Regular Decision. SMF ¶ 11. Early Action applications are due in November and Regular Decision applications are due in January. *Id.* The subcommittee and full committee processes described here are the same for Early Action and Regular Decision, though there are far fewer applications for Early Action. SMF ¶ 12.

contribute to the Harvard community.  SMF ¶ 27.  Admissions officers seek, for example, to discern whether an applicant demonstrates outstanding and unusual intellectual ability, capacity for leadership, creative ability, or athletic ability.  SMF ¶ 28.  Admissions officers also look for individuals who have been able to transcend difficult circumstances by achieving academic, extracurricular, and personal distinction in the face of hardship.  SMF ¶¶ 133-134.

To facilitate the evaluation and comparison of applicants, the reader assigns numerical ratings to applicants on four dimensions: academic, extracurricular, athletic, and personal.  SMF ¶ 43.  Readers also assign numerical ratings to letters submitted by two teachers and a guidance counselor.  SMF ¶ 44.  The numerical ratings typically range from 1 to 4, with 1 being the best score.  SMF ¶¶ 46-47.  Admissions officers also assign applicants an overall rating, which takes into account the other ratings, but is not determined by any particular formula and may take into account information not reflected in any other ratings.  SMF ¶¶ 45, 64-65.

After the members of a subcommittee have completed their review of all applications from the docket, the subcommittee meets to discuss applications and decide whether applicants should be recommended for admission.  SMF ¶¶ 72-75.  An application that contains supplemental academic or extracurricular material may also be referred to a member of Harvard's faculty (typically one of the approximately 20 faculty members who sit on Harvard's Standing Committee on Admissions and Financial Aid) for review.  SMF ¶ 71.  The full Admissions Committee of roughly 40 members (and any members of the Standing Committee who wish to join) then meets to discuss applicants and reach final decisions.  SMF ¶¶ 76-78. During the full committee process, an admissions officer presents an applicant's file to the full committee and makes the case for the applicant's admission.  SMF ¶ 79.  Once the discussion is

complete, the full 40-person committee decides whether to admit the applicant, with each member having one equal vote.  SMF ¶¶ 80-81.

### B.    Harvard's Efforts To Admit A Diverse Student Body

Harvard has long understood that its students learn as much in their daily interactions with one another as they do in formal classroom settings, and that their time at Harvard is a unique opportunity to meet individuals from backgrounds far different from their own and to understand different perspectives and experiences.  To that end, Harvard strives to ensure that its students come from broadly diverse backgrounds—geographically, socioeconomically, and racially—and it may consider an applicant's self-identified race or ethnicity as one of many factors in its admissions process.

In 1977, Harvard and other peer universities submitted an amicus brief to the Supreme Court in *Bakke* that included "a description of the criteria applied in selecting students for admission to Harvard College."  Brief of Columbia Univ. et al., *Regents of the Univ. of Cal. v. Bakke*, No. 76-811, 1977 WL 188007 at *12 n.5 (June 7, 1977).  In explaining why those criteria might include an applicant's race, Harvard's description of its admissions plan emphasized that "[t]he quality of the educational experience of all the students in Harvard College depends in part on … differences in the background and outlook that students bring with them."  *Id.*  As Justice Powell noted in *Bakke*, Harvard's admissions process considered all manner of "qualities … likely to promote beneficial educational pluralism," including "exceptional personal talents, unique work or service experience, leadership potential, maturity, demonstrated compassion, a history of overcoming disadvantage, ability to communicate with the poor, or other qualifications deemed important."  438 U.S. at 317.  In Harvard's process, "race or ethnic background may be deemed a 'plus' in a particular applicant's file, yet it does not insulate the individual from comparison with all other candidates for the available seats."  *Id.*  Thus, the process "is flexible

enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant."  *Id.*

In 1996, Harvard University President Neil Rudenstine presented a lengthy report examining diversity in higher education that reaffirmed Harvard's commitment to both diversity and individualized admissions.  SMF ¶ 86.  As President Rudenstine explained, diversity is "the substance from which much human learning, understanding, and wisdom derive."  Ex. 41 at 53.  He concluded that Harvard's "commitment to excellence … means that we will seek out—in all corners of the nation, and indeed the world—a diversity of talented and promising students."  *Id.*  President Rudenstine explained that "little if anything can substitute for the experience of continued association with others who are different from ourselves, and who challenge us—even as we challenge them."  *Id.*

In 2014, shortly after the Supreme Court decided *Fisher I*, Harvard convened a university-wide committee chaired by James Ryan, Dean of the Graduate School of Education, to examine the educational benefits of diversity and to determine whether Harvard could obtain those benefits in all of its schools without considering race in admissions.  SMF ¶ 145.  That committee paused its work in late 2014, after this lawsuit was filed, as information and analyses would be produced in this litigation that would inform the evaluation of some of the questions the committee had been considering (with respect to Harvard College).  SMF ¶ 146.  Shortly thereafter, the committee's work with respect to Harvard College was taken up by two new committees.

First, in the spring of 2015 the Committee to Study the Importance of Student Body Diversity, chaired by Rakesh Khurana, Danoff Dean of Harvard College, considered once again the importance of a diverse student body to Harvard College's educational goals.  The

Committee's report, which was unanimously endorsed by Harvard's Faculty of Arts and Sciences in February 2016, "emphatically embrace[d] and reaffirm[ed] the University's long-held view that student body diversity—including racial diversity—is essential to our pedagogical objectives and institutional mission." Ex. 45 at 22; SMF ¶ 89.  The Committee explained that this diversity "enhances the education of all of our students, it prepares them to assume leadership roles in the increasingly pluralistic society into which they will graduate, and it is fundamental to the effective education of the men and women of Harvard College." Ex. 45 at 22; SMF ¶ 90.

Second, in 2017, Harvard convened a Committee to Study Race-Neutral Alternatives in Harvard College Admissions, chaired by Michael Smith, Edgerley Family Dean of the Faculty of Arts and Sciences, to consider, with the benefit of information generated in this litigation, "whether Harvard could achieve its diversity-related educational objectives through the application of race-neutral alternatives." Ex. 47 at 2-3; SMF ¶¶ 147, 151.  The Committee also included Dean Khurana and Dean of Admissions and Financial Aid William Fitzsimmons.  SMF ¶¶ 147, 149.[7]  The Committee reviewed social science literature, as well as all of the relevant reports submitted by both Harvard and SFFA's experts in this case, which collectively "detail the effects that abandoning consideration of race and certain other practices in admissions would have on the academic, demographic, and other characteristics of the Harvard College student body." Ex. 47 at 3; SMF ¶¶ 152-153.  Following months of work, the Committee issued a final

---

[7]     The members of the Committee were chosen because of their responsibilities with regard to Harvard College and their experience with regard to diversity.  Dean Smith is the Dean of the Faculty of Arts and Sciences, which is responsible for academics at Harvard College, and supervises the Admissions Office.  SMF ¶ 148.  Dean Khurana is the Dean of Harvard College, is responsible for issues of student life at the College, and has deep experience with diversity issues.  SMF ¶ 149.  Dean Fitzsimmons is responsible for the Admissions Office and has unparalleled experience in higher education admissions.  SMF ¶ 150.

report explaining its conclusion that, "at present, no workable race-neutral admissions practices could promote Harvard's diversity-related educational objectives as well as Harvard's current whole-person race-conscious admissions program while also maintaining the standards of excellence that Harvard seeks in its student body." Ex. 47 at 18; *see* SMF ¶ 154.

### C.     This Lawsuit

SFFA was created by activist Ed Blum for the specific purpose of suing Harvard and other universities to end the consideration of race in admissions. SMF ¶ 243; Ex. 2 at 166:13-19 ("I needed plaintiffs; I needed Asian plaintiffs … so I started … HarvardNotFair.org."). SFFA was incorporated in July 2014. SMF ¶ 240. The Board of Directors consisted of only three members: Mr. Blum; Abigail Fisher (the plaintiff in *Fisher v. University of Texas at Austin*, Mr. Blum's unsuccessful previous attempt to undo the consideration of race in admissions); and Richard Fisher (Abigail Fisher's father). SMF ¶ 241, *see* Ex. 83. They appointed themselves to serve as SFFA's President, Secretary, and Treasurer, respectively. SMF ¶ 242.

Four months later, led by the same Board of Directors, SFFA sued Harvard, alleging that Harvard's admissions practices violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. Dkt. 1. SFFA took extensive discovery in this case, including 24 depositions, and Harvard produced more than 97,000 pages of documents to SFFA, including 480 anonymized application files, along with detailed anonymized database information about more than 200,000 individual applicants.

The initial complaint had six counts, including one count that explicitly sought to prohibit the consideration of race in higher education admissions. Dkt. 1 at 101-119. After the Supreme Court reaffirmed the permissibility of race-conscious admissions in *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016), this Court granted judgment on the pleadings to Harvard on Counts IV and VI. Dkt. 325. The remaining counts in the complaint allege that Harvard's use of

race in admissions is not narrowly tailored because Harvard purportedly engages in racial balancing, uses race as more than a "plus" factor in admissions, and could achieve racial diversity through race-neutral policies.  Dkt. 1 at 104-109, 112-114.  SFFA also alleges that Harvard intentionally discriminates against Asian-American applicants.  Dkt. 1 at 101-104.

## STANDARD OF REVIEW

Summary judgment is appropriate where "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Pina v. Children's Place*, 740 F.3d 785, 795 (1st Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  On a motion for summary judgment, "[a]ll facts in the record, as well as all reasonable inferences to be drawn therefrom, are drawn in favor of the non-movant."  *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015).

## ARGUMENT

## I.      SFFA LACKS STANDING TO BRING THIS ACTION

SFFA is not a true membership organization that can sue on behalf of its members; it is a litigation vehicle designed to further the ideological objectives of its founder, Mr. Blum.  Harvard recognizes that the Court previously denied its motion to dismiss for lack of standing, Dkt. 324, but discovery has since established that SFFA's so-called "standing members" lack the required individual standing to sue Harvard and confirmed that this suit is nothing more than Mr. Blum's effort to "convert the judicial process into … a vehicle for the vindication of the value interests of concerned bystanders."  *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473 (1982); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) (lack of standing raised at summary judgment will defeat jurisdiction).

SFFA's claim to standing rests on its assertion of "associational" standing—the assertion that it sues "as the representative of its members."  *Camel Hair & Cashmere Inst. of Am. v. Associated Dry Goods Corp.*, 799 F.2d 6, 10 (1st Cir. 1986); *see Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977).  The Court previously concluded that *Hunt*'s "indicia of membership" requirement for associational standing does not apply to organizations that "formally have members," Dkt. 324 at 10, but it also recognized that "there may be situations … in which the adequacy of an organization's representativeness is so seriously in doubt that the Court should consider *Hunt*'s indicia-of-membership analysis or some other criteria to evaluate the issue of associational standing," *id.* at 15.[8]  Depositions of SFFA's members and recent financial filings make clear that this is such a case.

SFFA's "members" are completely disconnected from the organization.  SFFA amended its bylaws after Harvard made clear its intention to challenge SFFA's standing, and now purports to hold meetings for members and to allow its members to elect one (but only one) of SFFA's five directors.  But in depositions after this Court's order on standing, SFFA's so-called "standing members" confirmed that they have not attended any SFFA meetings and refused on counsel's instruction to testify about whether they have voted in any SFFA election.  SMF ¶¶ 249-250.  Although SFFA purports to have more than 20,000 "members," its most recent available tax filings reveal that only a tiny fraction of those "members" have paid dues.  SMF ¶¶ 253-254; Ex. 92 at 9 (2016 filing reporting $300 in dues); Ex. 91 at 9 (2015 filing reporting

---

[8]     Harvard maintains that the indicia-of-membership test should be applied to SFFA, and that SFFA fails that test.  *See Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 307 (D.D.C. 2017) (holding that organization failed indicia-of-membership test); *AARP v. EEOC*, 267 F. Supp. 3d 14, 23 (D.D.C. 2017) (applying indicia-of-membership test to AARP and concluding that it "is a close question").  Even if this Court disagrees, however, SFFA still lacks standing, as explained in the text.

$430 in dues).  Those tax filings also reveal that unidentified donors, by contrast, provided SFFA with nearly $2 million in 2015 and 2016.  SMF ¶ 255.  In reality, SFFA is Mr. Blum:  He raises SFFA's money and is solely responsible for its daily operations.  SMF ¶ 257.

In addition, discovery has revealed that SFFA's "standing members" lack the concrete stake in the outcome of this dispute required by Article III.  As this Court previously held, to establish standing, SFFA must identify individual members who can demonstrate (1) an "injury in fact" that is "concrete in both a qualitative and temporal sense, distinct and palpable as opposed to abstract, and actual or imminent as opposed to conjectural or hypothetical"; (2) causation "defined as a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant"; and (3) "redressability—a likelihood that the requested relief will redress the alleged injury."  Dkt. 324 at 4 (internal quotation marks omitted).  SFFA has not done so.

Many of SFFA's standing members can claim only past wrongs (the denial of admission). But since SFFA seeks only forward-looking relief, not damages for a purported past injury (Dkt. 1 at 119), the allegation of "past wrongs" to its members does not "amount to that real and immediate threat of injury necessary to make out a case or controversy."  *City of L.A. v. Lyons*, 461 U.S. 95, 103 (1983).  Where an organizational plaintiff seeks only "declaratory and injunctive relief" that "will not alleviate its members' injuries" and "no … member faces a realistic risk of future exposure" to injury, the organization lacks standing.  *American Postal Workers Union v. Frank*, 968 F.2d 1373, 1376-1377 (1st Cir. 1992); *see Lyons*, 461 U.S. at 109. SFFA must therefore show that an injunction will redress an imminent, prospective harm to an individual member.  It cannot do so.

When this suit was filed, SFFA predicated its standing on a single person, ███████.
SMF ¶ 258.  The complaint alleged that ████████ "was denied admission to Harvard's 2014
entering class."  Dkt. 1 ¶ 15.  But ████████ is not eligible to transfer to Harvard: █ has
completed more than two years of undergraduate study.  SMF ¶¶ 259-260.  Accordingly, ███
████ does not face any alleged prospect of injury, and the only relief SFFA seeks cannot redress
any past injury to ████  Four other "standing members" added by SFFA after it filed suit lack
standing for a similar reason: ████████████████████████████████ have
all completed two or more years of undergraduate study, and are therefore no longer eligible to
transfer to Harvard.  SMF ¶¶ 261-265.

████████████ and ████████ apparently remain eligible to apply for transfer
admission to Harvard, Ex. 40 at 1, but neither manifests any serious interest in doing so.  SMF
¶¶ 266, 267; Ex. 15 at 37:25-38:3 (████ Dep.) ("Q:  Do you intend to apply to transfer from
████████████ to any other college or university?  A:  I don't anticipate that at the moment,
no."); Ex. 19 at 44:5-9 (████████ Dep.) ("Q:  Under what circumstances would you be willing
to consider [transferring]?  A:  I mean … *this is highly speculative*.  You never know what the
circumstances are." (emphasis added)).[9]  As neither is actually considering a transfer application,
neither has alleged anything more than a "possible future injury" that is "not sufficient" to
establish the injury-in-fact required for Article III standing.  *Clapper v. Amnesty Int'l USA*, 568
U.S. 398, 409 (2013); *see Lyons*, 461 U.S. at 102-105.

---

[9]     While ████████████ went on to speculate that he "would apply to transfer to Harvard,"
██ conceded that █ would do so only "[i]f it was not a burden to transfer."  Ex. 19 at 44:13-19.

SFFA also identified a single "intended future applicant[] to Harvard" as a so-called "standing member."  Ex. 40 at 2.[10]  That individual, ███████████, would not apply to Harvard (if at all) for a year and a half, in the 2019-2020 admissions cycle.  SMF ¶ 268.  That allegation of "possible future injury" is too remote to confer standing.  *See Clapper*, 568 at 409; *Lujan*, 504 U.S. at 564 n.2 (to confer standing, future injury must be "imminen[t]," which means "*certainly impending*" (internal quotation marks omitted)).

Finally, SFFA asserts that it has standing on behalf of parents of rejected and prospective applicants to Harvard.  Ex. 40 at 2.  But SFFA's parent members have no independent basis for standing apart from that of their children.  Although courts have allowed parents to assert injuries suffered by their minor children, *see Allen v. Wright*, 468 U.S. 737, 756 (1984), parents have no special status that allows them to evade the core requirement that their children suffer a concrete injury, traceable to the defendant's conduct, that would be redressed by the relief sought, *see supra* p. 13.  SFFA has not alleged any facts that would differentiate the parent members from the students; the students allege either a past harm that cannot be redressed by this lawsuit or a future harm that is too speculative.  SMF ¶¶ 269-278.  Accordingly, the parents lack standing as well.[11]

The absence of any member with standing is not surprising; it follows from the reality that SFFA is a litigation vehicle for Mr. Blum, not a genuine membership organization controlled by members and designed to advance their cognizable interests.  In the absence of standing, the Court lacks jurisdiction, and this case should be dismissed.

---

[10]     SFFA previously identified a second intended future applicant as well, but ██ was recently admitted to the Harvard Class of 2022.  SFFA has since withdrawn its reliance on ██ as a "standing member."
[11]     The Court previously declined to determine whether prospective applicants or parents have standing to sue.  Dkt. 324 at 14.

## II.   HARVARD'S CONSIDERATION OF RACE ALONG WITH MANY OTHER FACTORS IN ADMISSIONS DECISIONS IS NARROWLY TAILORED TO ACHIEVE A COMPELLING INTEREST

Three of SFFA's remaining counts—Counts II, III, and V—claim that Harvard's consideration of race in admissions fails to comport with the Supreme Court's equal protection precedent.[12]  The Supreme Court has repeatedly held that "a university may institute a race-conscious admissions program as a means of obtaining 'the educational benefits that flow from student body diversity.'"  *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198, 2210 (2016) (*Fisher II*) (quoting *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 310 (2013) (*Fisher I*)); *see Grutter v. Bollinger*, 539 U.S. 306, 325 (2003) ("[S]tudent body diversity is a compelling state interest that can justify the use of race in university admissions."); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 311-312 (1978) ("[T]he attainment of a diverse student body … clearly is a constitutionally permissible goal for an institution of higher education.").

---

[12]      The Supreme Court's decisions on race-conscious admissions were issued in the context of suits against public universities governed by the Equal Protection Clause of the Fourteenth Amendment.  But this case involves a private university, which has a weighty academic freedom interest, protected by the First Amendment, in choosing its students, and in determining how they are educated (including through the judgment about the educational benefits following from a diverse student body).  The Supreme Court has not yet examined whether, in light of that constitutional interest, its precedents limiting the consideration of race in pursuit of a diverse student body apply to private universities subject to Title VI in the exact same manner as they apply to public universities.  There are good reasons to think they do not, for although academic freedom "does not embrace the freedom to discriminate," courts "are hesitant to intrude upon academic freedom" in such core areas as the selection of students and faculty.  *Villanueva v. Wellesley College*, 930 F.2d 124, 129 (1st Cir. 1991); *see also Lovelace v. Southeastern Mass. Univ.*, 793 F.2d 419, 426 (1st Cir. 1986) (declining "to constrict the university in defining and performing its educational mission").  Even in its cases involving public universities, the Supreme Court has recognized "[t]he freedom of a university to make its own judgments as to education,'" which "'includes the selection of its student body.'"  *Grutter*, 539 U.S. at 329 (quoting *Bakke*, 438 U.S. at 312); *see also Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967); *Sweezy v. New Hampshire*, 354 U.S. 234, 262-263 (1957) (Frankfurter, J., concurring).  As the discussion in the text demonstrates, however, Harvard is entitled to summary judgment even if the Court's equal protection precedents are fully applicable here, for its consideration of race comports fully with those decisions.

As the Supreme Court has interpreted the Equal Protection Clause, a university's consideration of race in admissions must be "narrowly tailored." *Grutter*, 539 U.S. at 334. It must not "'insulat[e] the individual from comparison with all other candidates for the available seats,'" must consider race "only as a 'plus' in a particular applicant's file," and must be "'flexible enough to consider all pertinent elements of diversity in light of the pertinent qualifications of each applicant.'" *Id.* at 334 (quoting *Bakke*, 438 U.S. at 315, 317). And the university must show that abandoning consideration of race, and instead undertaking only race-neutral efforts to achieve diversity, "would not promote its interest in the educational benefits of diversity 'about as well and at tolerable administrative expense.'" *Fisher II*, 136 S. Ct. at 2208 (quoting *Fisher I*, 570 U.S. at 312). Narrow tailoring does not, however, "'require a university to choose between maintaining a reputation for excellence [and] fulfilling a commitment to provide educational opportunities to members of all racial groups.'" *Fisher II*, 136 S. Ct. at 2208 (quoting *Grutter*, 539 U.S. at 339).

As the extensive record in this case makes clear, there can be no genuine dispute that Harvard's admissions program satisfies those requirements. Harvard has long emphasized the importance of student body diversity, including racial diversity, to its pedagogical mission. And Harvard's admissions program remains, as in *Bakke*, the model of whole-person review that considers the entirety of every applicant's file, subjects every applicant to the same rigorous review as all others, treats race or ethnicity as but one of many factors that might bear on the perspective the applicant might bring to Harvard, and employs no quotas. Harvard has also recently reexamined whether it remains necessary to consider race, and has concluded that Harvard must continue to consider race as one factor among many in order to meet its fundamental educational objectives.

### A.      Harvard Has A Compelling Interest In A Diverse Student Body

The Supreme Court has made clear that "the decision to pursue the educational benefits that flow from student body diversity is, in substantial measure, an academic judgment." *Fisher II*, 136 S. Ct. at 2208 (internal quotation marks omitted). "Once … a university gives a reasoned, principled explanation for its decision" to pursue the educational benefits of diversity, "deference must be given to the University's conclusion, based on its experience and expertise, that a diverse student body would serve its educational goals." *Id.* (internal quotation marks omitted).

Harvard has made a principled, reasoned explanation for its "decision to pursue 'the educational benefits that flow from student body diversity" after determining that those benefits are "integral to its mission." *Fisher I*, 570 U.S. at 310.  In particular, Harvard reexamined the importance of student body diversity in 2015, and it concluded that diversity serves Harvard's curricular goal of exposing students to "'new ideas, new ways of understanding, and new ways of knowing,'" Ex. 45 at 7, and "prepares [its students] to assume leadership roles in the increasingly pluralistic society into which they will graduate," *id.* at 22; *see also* SMF ¶¶ 87-88. Those conclusions were endorsed by the full Faculty of Arts and Sciences.  SMF ¶ 91.

Those academic judgments are entitled to deference, *see Fisher II*, 136 S. Ct. at 2208, and SFFA has not attempted to controvert Harvard's determination that a diverse student body is essential to its mission.  The only question, therefore, is whether Harvard's consideration of race in admissions is narrowly tailored to its diversity-related educational objectives.  The record makes clear that it is.

### B.      Harvard's Consideration Of Race Is Narrowly Tailored

#### 1.      Harvard Does Not Engage In Racial Balancing Or Use Quotas

Count II of the Complaint alleges that Harvard engages in "racial balancing."  Dkt. 1 ¶¶ 444-455.  Specifically, the Complaint contends that the racial composition of Harvard's

admitted classes remained "remarkabl[y] stab[le]" over time, *id.* ¶ 449, and SFFA has speculated that such stability could only be the result of Harvard's determination to freeze the representation of various racial groups, *id.* ¶¶ 451-452.  But SFFA has marshalled no evidence to support its allegation, and none exists.  Indeed, it appears that SFFA has abandoned its claim that Harvard engages in racial balancing:  SFFA's expert reports notably fail to adopt or support any of the relevant statistical allegations averred in SFFA's complaint.  *E.g.*, *id.* ¶¶ 449-450.

The extensive record compiled in this case would not permit a reasonable fact-finder to conclude that Harvard pursues quotas, seeks proportional racial representation, or engages in racial balancing.  In particular, no evidence suggests that Harvard seeks to limit the representation of any racial group on campus.[13]  SMF ¶ 93.  To the contrary, unrebutted expert statistical analysis by Harvard's expert, Dr. David Card, establishes that the premise of SFFA's allegation is wrong:  The racial breakdown of Harvard's admitted class of students fluctuates

---

[13]   Although reports prepared for the Dean and Director of the Admissions Office summarize a variety of demographic information about admitted applicants (including information about geography, gender, intended concentration, and race) for the current and prior years, those reports hardly suggest that Harvard was targeting a particular composition of the admitted class.  They were provided to the leadership of the Admissions Office periodically during the admissions cycle, *see* Ex. 26 at 311:12-17 (Fitzsimmons Dep.)—a far cry from *Grutter*, where the Supreme Court upheld the University of Michigan Law School's consideration of race even though data were distributed to the entire admissions committee on a daily basis, 539 U.S. at 336.  No testimony or documents suggest that the 40-person committee "give[s] race more or less weight based on the information contained in those reports."  *Id.*

The same is true of the "target" numbers for each docket subcommittee.  Those numbers, determined on the basis of the prior year's share of admitted applicants from each geographic docket, serve simply as a "rough … starting point" for each subcommittee to use in determining how many applicants to recommend for consideration by the full committee.  Ex. 26 at 279:17-281:3.  They reflect the fact that, in the Admissions Committee's experience, there will tend to be, "from one year to the next, … roughly the same number and … roughly the same quality [of applicants] from an area."  *Id.*

Moreover, as the Supreme Court has explained, "'[s]ome attention to numbers,' without more, does not transform a flexible admissions system into a rigid quota."  *Id.* (quoting *Bakke*, 438 U.S. at 323).

considerably from year to year.  SMF ¶¶ 94-97; Ex. 31 at 58 (SFFA's expert does not dispute Dr. Card's analysis that "shows changes in the fraction of admitted students by race/ethnicity over time").

If there were any substance at all to SFFA's claim that Harvard targets a particular racial composition of the admitted class, SFFA's expert, Dr. Peter Arcidiacono, undoubtedly would have presented statistical evidence to that effect.  Yet such evidence is glaringly absent from Dr. Arcidiacono's reports.  Instead, Dr. Arcidiacono makes only an obscure claim not reflected in SFFA's complaint: that, for a single three-year period, using one of three methodologies Harvard has employed to ascertain the racial composition of its classes for statistical purposes, the admission rate for African-American applicants matched the overall admissions rate for all other domestic applicants.[14]  Ex. 31 at 27-30; Ex. 35 at 58; SMF ¶ 98.  He has no documentary or testimonial support for the inference he then draws that this reflects intentional racial balancing. Neither he nor SFFA identified any evidence that anyone at Harvard took steps to manipulate admissions rates.  Ex. 37 ¶ 153.  And SFFA was unable to identify any reason Harvard would have manipulated the rate of admission in this particular way.  Indeed, when Harvard reports the racial composition of the class to the Harvard community, it does not even use the methodology employed in Dr. Arcidiacono's observation.  SMF ¶ 108.

And even Dr. Arcidiacono's limited assertion wilted under scrutiny.  His first report claimed that Harvard began to use the IPEDS methodology to report admissions by racial group for the Class of 2017 and alleged that the matching of admissions rates thus coincided with the

---

[14]     Harvard has used three methodologies to reflect students' self-reported race or ethnicity. The federal government requires Harvard to use the Integrated Postsecondary Education Data System ("IPEDS") methodology for statistical reporting to the federal government.  SMF ¶ 99-100.  Harvard has at various points used two other methods of reporting race, which it refers to as the "New Methodology" and the "Old Methodology."  SMF ¶¶ 101-103.

first use of IPEDS.  Ex. 31 at 27-30; Ex. 27 at 240.  But Dr. Arcidiacono has since admitted that

Harvard began recording and reporting IPEDS data three years earlier, for the Class of 2014.

SMF ¶ 104; Ex. 27 at 243:3-14.  And he conceded that, the Classes of 2014 through 2016, the

IPEDS admissions rates for African-American applicants and the admissions rates for all other

domestic applicants varied "significantly."  Ex. 27 at 244:25-245:10; SMF ¶ 105.  What is more,

as Dr. Card's report explains, there are *many* different ways to compare admission rates across

racial groups when searching for evidence of an alleged quota.  Over any six-year period, there

are at least 92 opportunities to find the pattern SFFA identifies.  SMF ¶ 106.  Dr. Card shows

that finding such a pattern in one of those many possible comparisons of admission rates is

unremarkable and not statistically meaningful.  SMF ¶ 107.

SFFA has not identified any direct evidence or any serious argument that could support

its farfetched statistical claim, and the record evidence clearly contradicts it.  Harvard is therefore

entitled to summary judgment on Count II.[15]

## 2.    Harvard Considers Race Flexibly, Along With Many Other Factors

Count III of the Complaint alleges that Harvard uses race as more than a "plus factor" in

its admissions decisions.  Dkt. 1, at 107.  The Supreme Court has held that universities may

"consider race or ethnicity … flexibly as a 'plus' factor in the context of individualized

consideration of each and every applicant."  *Grutter*, 539 U.S. at 334.  As noted above, the Court

specifically endorsed "Harvard's flexible use of race" described in Justice Powell's *Bakke*

opinion as the model for how universities should consider race in admissions.  *Id.* at 335; *Bakke*,

438 U.S. at 323.  The Court has thus approved admissions policies (including Harvard's own)

that involve "highly individualized, holistic review of each applicant's file, giving serious

---

[15]    If the Court does not grant summary judgment to Harvard on Count II, any further
litigation of this Count should be limited to the claim discussed in SFFA's expert reports.

consideration to all the ways an applicant might contribute to a diverse educational environment." *Grutter*, 539 U.S. at 337; *see Fisher II*, 136 S. Ct. at 2205-2206.

By contrast, the Supreme Court held unconstitutional the undergraduate admissions policy of the University of Michigan ("Michigan") in *Gratz v. Bollinger*, 539 U.S. 244 (2003). There, Michigan used a 150-point rating system for applicants and automatically applied a 20-point enhancement to members of underrepresented ethnic and minority groups. *Id.* at 255. Admissions decisions were almost entirely based on the applicant's score. *Id.* The Court held that this automatic enhancement "does not provide … individualized consideration" and instead "has the effect of making the factor of race … decisive for virtually every minimally qualified underrepresented minority applicant." *Id.* at 271-272 (internal quotation marks omitted). Similarly, in *Bakke*, the Court invalidated an admissions program that reserved 16 of 100 places in a medical school class for members of certain minority groups because that quota denied all other applicants "the chance to compete … for the special admissions seats." 438 U.S. at 319.

The record in this case conclusively establishes that, unlike in *Gratz* and *Bakke*, race is not applied mechanically and does not overwhelm other considerations. Instead, as in *Grutter* and *Fisher II*, Harvard's consideration of all factors in an applicant's file, including race, is highly flexible. SMF ¶ 117. Witness after witness, with no witness to the contrary, attested to the flexible nature of Harvard's evaluation of application files.[16] Training documents similarly

---

[16]    *See* Ex. 26 at 158:24-159:7 ("[I]f you're looking for a particular formula, there are no formulas of any sort … because people are multidimensional."); Ex. 1 at 231:15-232:1 ("[E]ach applicant is really considered as an individual, including … many factors, family background, which will include whatever we know of race, whatever else we know about family circumstance and education, whatever we can know about the nature of the school and the kind of community the student grew up in.  Those context features, those features of the student's setting are always important to us in imagining how well he's achieved in the circumstances that he started with to us as a candidate."); Ex. 6 at 91:5-8 ("There are many, many factors that are used in combination to advocate for a student [to be admitted], not any one alone guarantees anything."); Ex. 12 at

emphasize to admissions officers and alumni interviewers that they should consider every aspect of an applicant's background and experience and should not give undue weight to any one factor. SMF ¶¶ 31-32.

Admissions officers testified that an applicant's self-identified race may be one of many factors that affects the overall rating—not mechanically, but where the application file indicated a reason that race might be one relevant consideration illuminating the qualities that the applicant might bring to Harvard.  SMF ¶ 119-120.  As one admissions officer explained, the consideration of race in the overall rating "depends on the individual case," and may be done "to reflect the strength of the case and to provide a slight tip for some students."  Ex. 13 at 28:14-21.  Harvard assigns no point value to race, nor does it have a rating cutoff for admissions decisions.  And, regardless of any individual reader's scoring of a particular application, admissions decisions are made by the 40-member Admissions Committee.  SMF ¶¶ 76-81; *see supra* p. 6.

The flexibility of Harvard's individualized consideration of applicant files is confirmed by Dr. Card's statistical analysis, which establishes that "to be admitted to Harvard, applicants must have *multiple* areas of strength, and race is not a determinative factor."  Ex. 37 ¶ 136; SMF ¶ 121.  Because other factors are far more important than race, it is not possible to offer any meaningful prediction of whether an applicant will be admitted based solely on his or her race. SMF ¶ 122; Ex. 33 at Card Ex. 27.  Instead, an applicant's academic rating, extracurricular

---

60:23-24 ("[W]e view each file individually based on achievement and areas of excellence."); Ex. 13 at 42:24-43:2 ("[W]e consider race as a factor among many that we are looking at in the whole-person review process."); Ex. 14 at 54:11-14 ("Every student would be reviewed on a variety of factors  The impact that any individual characteristic would have would vary by student and depend on the student."); Ex. 3 at 239:13-14 ("Race was just one factor of many factors that were considered in an applicant's folder."); *see also* Ex. 4 at 12:3-7 ("Harvard has a holistic admissions policy where we look at the variety of attributes of every applicant, life experience, education, activities, the whole range of who an individual is.").

rating, personal rating, teacher/alumni ratings, intended concentration, and intended career explain more of the variability in admissions decisions than race.  SMF ¶¶ 123-124.

SFFA's expert concedes that race does not affect the admissions decision for most applicants, but he contends that race is determinative for many "competitive" applicants.  Ex. 35 at 49-51; SMF ¶ 125.  But even assuming race has a meaningful effect on the likelihood of admission for certain candidates, that does not mean that race is anything more than a permissible "plus factor" in the Harvard admissions process.  In *Grutter*, the Court noted that "the same could be said of the Harvard plan discussed approvingly by Justice Powell in *Bakke*, and indeed of any plan that uses race as one of many factors."  539 U.S. at 339.  The Court explained that what matters is not whether an applicant's race might be an important consideration in any particular number of cases, but whether the admissions program "remain[s] flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application."  *Id.* at 337; *see also Fisher I*, 570 U.S. at 309.  A university must ensure that "all factors that may contribute to student body diversity are meaningfully considered alongside race in admissions decisions."  *Grutter*, 539 U.S. at 337.  That is precisely what Harvard does.  *See supra* pp. 4-6.

Where, as here, the vast majority of applicants are highly qualified and the admissions process attempts to discern factors that make out the exceptional case, *any* consideration present in the application file could determine the outcome.  Thus, as Dr. Card has shown (and Dr. Arcidiacono conceded), race is by no means the factor that influences the outcome more often, or in a more pronounced way, than many others.  SMF ¶¶ 121-125.  Indeed, Dr. Arcidiacono admitted that numerous other factors in admissions decisions at Harvard were "determinative" by

his understanding, including a high academic, extracurricular, or personal rating.  Ex. 27 at
279:21-280:4; SMF ¶ 125.

Without any statistical or direct evidence to support its claim that Harvard uses race as
more than a plus factor, SFFA cannot prevail on Count III at trial.

> **3.      There Are No Workable Race-Neutral Alternatives That Would
> Allow Harvard To Achieve Its Compelling Interest In Diversity While
> Maintaining Its Standards Of Excellence**

Count V of the Complaint alleges that Harvard cannot lawfully continue to consider race
in admissions because "there are a host of race-neutral alternatives that if implemented can
achieve student body diversity" at Harvard.  Dkt. 1 ¶ 484.  In *Grutter*, the Supreme Court
required "serious, good faith consideration of workable race-neutral alternatives that will achieve
the diversity the university seeks."  539 U.S. at 339.  But the Court also made clear that narrow
tailoring does not "require a university to choose between maintaining a reputation for
excellence or fulfilling a commitment to provide educational opportunities to members of all
racial groups."  *Id.*

Aided by the information in the Complaint, published social science literature, and expert
testimony in this case, a committee of three senior University officials with responsibility for
academics, undergraduate student life, and admissions (the "Committee") met throughout 2017
and early 2018 to examine the extensive efforts Harvard already undertakes to attract and admit a
diverse student body, as well as numerous possible alternatives to considering race in
admissions.  SMF ¶¶ 147-154.  The Committee's unanimous conclusion was that, "at present, no
workable race-neutral alternatives could promote Harvard's diversity-related educational
objectives as well as Harvard's current whole-person race-conscious admissions program while
also maintaining the standards of excellence that Harvard seeks in its student body."  Ex. 47 at

18; SMF ¶ 212.[17]  The record fully supports those conclusions and establishes that "it is

'necessary' for [Harvard] to use race to achieve the educational benefits of diversity" because the

"available, workable race-neutral alternatives do not suffice" to promote Harvard's diversity-

related educational objectives and to maintain Harvard's standards of excellence, *Fisher I*, 570

U.S. at 312.

a)   **Harvard Employs Many Race-Neutral Practices To Pursue Diversity**

Harvard's efforts to promote diversity go far beyond its consideration of race in the

admissions process, and Harvard has reexamined and expanded those efforts over the years.

*First*, Harvard has a financial aid policy that is among the most generous (if not the most

generous) in the country, "designed to ensure that students from all socioeconomic strata can

attend Harvard, promoting both economic and racial diversity."  Ex. 47 at 6; *see* SMF ¶¶ 135-

141.

*Second*, Harvard makes considerable efforts to recruit promising candidates from a

variety of backgrounds to apply to Harvard and matriculate if admitted.  SMF ¶¶ 127-132.  For

example, the Undergraduate Minority Recruitment Program engages in extensive outreach to

minority applicants, including Asian-American, African-American, Hispanic, and Native

American applicants.  SMF ¶¶ 131-132.  Harvard also recruits students from families with

limited economic resources or who will be the first in their family to attend college.  SMF

¶¶ 127-130.

*Third*, once students apply, Harvard's admissions officers pay close attention to

applicants' socioeconomic backgrounds and flag an application if the applicant appears to be

---

[17]     The Committee also recommended that Harvard reexamine the availability of race-
neutral alternatives five years from now.  SMF ¶ 155.  *Cf. Fisher II*, 136 S. Ct. at 2209-2210
(universities should periodically reexamine their race-conscious admissions policies).

disadvantaged or is eligible for aid under the Harvard Financial Aid Initiative.  SMF ¶ 134.  By doing so, the Admissions Office ensures that such applicants "are not disadvantaged in the application process because of their lack of resources and opportunities" and seeks "to recognize the particular achievement of students who have excelled when coming from a modest background."  Ex. 47 at 5; *see* SMF ¶ 134.

*Fourth*, once applicants from diverse backgrounds have been admitted, Harvard encourages them to matriculate, including by inviting them to visit the campus and meet current Harvard students from a variety of backgrounds.  SMF ¶¶ 142, 144.  Harvard makes financial assistance available so that economic considerations will not prevent interested students from attending.  SMF ¶ 143.

All of these initiatives are important to Harvard's pursuit of a diverse and excellent student body, but Harvard's experience—as well as the experts' analyses in this case—has shown that they are insufficient to achieve Harvard's diversity-related educational objectives without considering race.  As Dr. Card's analysis shows and the Committee recognized, eliminating consideration of race in admissions would have a dramatic and detrimental effect on diversity at Harvard—an effect that no combination of race-neutral measures could mitigate while maintaining Harvard's standards of excellence.

### b)   Eliminating Race-Conscious Admissions Would Cause A Substantial, Unacceptable Decline In Minority Enrollment

Dr. Card's analysis establishes that, even if Harvard maintained all of its existing race-neutral efforts to achieve diversity, eliminating the consideration of race "would reduce the population of students who self-identify as African-American, Hispanic, or 'Other' … by nearly

50%."[18]  Ex. 47 at 8; *see* SMF ¶ 156.  For example, Dr. Card's simulations show that if Harvard

had not considered race, the proportion of African-American students in the Class of 2019 would

have dropped from 14% to 6%, and the proportion of Hispanic or Other students would have

dropped from 14% to 9%.  SMF ¶ 156.

The Committee members concluded, in the exercise of their academic and institutional

judgment, that such a result would not allow Harvard to achieve its educational objectives.

Although the Committee made clear that Harvard has in mind no "specific number of students of

any given racial or ethnic background who must be on campus in order for Harvard's diversity-

related educational objectives to be satisfied," Ex. 47 at 8; *see* SMF ¶ 158; Ex. 7 at 57:7-22, it

recognized that the sort of dramatic decline projected by the simulations "would prevent Harvard

from achieving its diversity-related educational objectives" because it would mean that "students

… will have diminished opportunities to engage with and learn from classmates who come from

widely different backgrounds and circumstances."  SMF ¶ 159.  A "significant reduction in the

number of African-American and Hispanic students on campus would inhibit the ability of

Harvard's students and faculty to glean the benefits of a diverse student body and significantly

undermine [its] educational mission and broader institutional objectives."  SMF ¶ 160.

The Committee's conclusion is consistent with Harvard's institutional recognition that,

while it "has made progress in supporting historically underserved groups," there is "much more

work to do" for the campus to "become a truly inclusive community."  Ex. 69; *see* SMF ¶¶ 161-

162.  The Committee expressed concern that "[t]he issues of diversity and inclusion that Harvard

faces today—including … ongoing feelings of isolation and alienation among racial minorities in

---

[18]      In Dr. Card's report, the "Other" racial or ethnic background refers to applicants who
self-identified as Native American, Hawaiian, or Pacific Islander in their applications to Harvard.
Ex. 33 ¶ 23 n.5.

Harvard's community—would only be exacerbated by a significant decline in African-American and Hispanic enrollment."  SMF ¶ 163.

c)    **No Race-Neutral Alternatives Would Sufficiently Promote Diversity Without Imperiling Other Fundamental Institutional Objectives, Including Academic Excellence**

The Committee carefully considered whether, if Harvard were to eliminate consideration of race, it could nonetheless attain its diversity-related educational objectives—without unduly compromising other essential institutional objectives—by altering its admissions practices in certain ways.  The Committee examined a wide array of practices suggested by the Complaint, social science literature, and the reports of SFFA's proffered expert on race-neutral alternatives, Richard Kahlenberg.  Following a careful consideration of the likely effects of the various alternatives, the Committee concluded that the proposals would entail an unacceptable sacrifice of Harvard's educational mission.

i)    **Potential New Practices**

*Increased Preference For Modest Socioeconomic Background.*  The Committee extensively considered the suggestion that, in lieu of considering race, Harvard should give a significantly increased advantage to students who come from modest socioeconomic circumstances—an alternative heavily favored by SFFA's expert.

The evidence conclusively demonstrates, however, that increasing the already-extensive efforts Harvard undertakes to recruit, admit, and enroll students from modest socioeconomic backgrounds cannot substitute for considering race if Harvard is to maintain its commitment to diversity as well as other institutional imperatives.  Harvard would have to place much greater weight on socioeconomic circumstances to admit a class that is comparable in diversity to its current classes without considering race.  SMF ¶¶ 187-188.  But if it did so, then consideration of socioeconomic circumstances would outweigh almost every consideration in the admissions

process; for many applicants, the boost would be "larger than that given to candidates with the most exceptional academic, extracurricular, personal, and athletic ratings." Ex. 33 ¶ 239; *see* Ex. 47 at 13-14; SMF ¶ 187.

Placing such overwhelming weight on socioeconomic circumstances would have a profoundly negative impact on other important characteristics of the incoming class. Most centrally, the proportion of admitted students receiving the highest academic ratings (1 or 2) would drop substantially, as would the fraction with top extracurricular and personal ratings. SMF ¶¶ 188-189. In the Committee's judgment, that would pose an unacceptable risk of significant decline in the exceptional quality of Harvard's classes. SMF ¶ 190. "Harvard does not seek diversity to the exclusion of all its other objectives," Ex. 47 at 14, especially the excellence of its class—and the Supreme Court has repeatedly emphasized that the law "does not force universities to choose between a diverse student body and a reputation for academic excellence," *Fisher II*, 136 S. Ct. at 2213; *see Grutter*, 539 U.S. at 339.

*Increased Recruiting.* SFFA has suggested that Harvard could increase efforts to recruit socioeconomically disadvantaged students and could establish partnerships with schools and organizations that serve applicants of modest means. But Harvard's current recruitment efforts are so extensive that any gain from increased efforts would be minimal. SMF ¶¶ 167-169.[19]

*Increased Financial Aid.* The Committee also concluded that increasing financial aid would not materially increase diversity. Harvard is already more affordable, especially to lower-income applicants, than many public institutions. SMF ¶ 172. And there is no evidence that

---

[19]   Indeed, although SFFA's expert blithely accused Harvard of "fail[ing] to recruit high-achieving, low-income students, including thousands who are African American and Hispanic," Ex. 32 at 40, his deposition revealed that he had made no effort to understand the breadth of Harvard's current recruiting efforts, *see* Ex. 30 at 66:6-83:16.

further expansion would increase diversity; the most recent expansion of financial aid did not do so, and most African-American and Hispanic households are already eligible for zero parental contribution under Harvard's financial aid program.  SMF ¶¶ 173-174.

*Place-Based Preferences.*  The Committee rejected using place-based preferences, akin to the State of Texas' "top 10% plan" addressed in *Fisher II*, 136 S. Ct. at 2205.  The Committee concluded that such a practice would be inimical to Harvard's goal of admitting exceptional students wherever they can be found.  SMF ¶ 178.  Excellence across the many dimensions Harvard seeks is not equally distributed by geography, and it may well be that the second or third student from one community would contribute more to Harvard's educational environment than the top student from another.  *Id.*  A mechanical scheme of geographic distribution would drastically and unacceptably restrict Harvard's ability to admit excellent candidates wherever they are found.  *Id.*; *see, e.g.*, *Grutter*, 539 U.S. at 340 (percentage plans "may preclude the university from conducting the individualized assessments necessary to assemble a student body that is not just racially diverse, but diverse along all the qualities valued by the university").[20]

*Transfer Students.*  The Committee also rejected the idea that Harvard might significantly increase the number of transfer students it accepts as upperclassmen.  The only way to do so would be to build new housing or to reduce the size of the freshman class.  SMF ¶¶ 181-183. The Committee concluded that it is not possible for the College to build new housing at present, and that "[t]here is no good reason to admit fewer freshmen for the purpose of reserving spots for future transfer students," particularly when "Harvard already rejects thousands of incredibly

---

[20]     Mr. Kahlenberg's proposal, which focused on "neighborhood clusters" as defined by the College Board, Ex. 32 at 48, is also not race-neutral, because several of the College Board's neighborhood clusters explicitly incorporate race in their definitions.  For example, neighborhood cluster 54 is "[p]redominantly Hispanic"; cluster 56 is "[p]redominantly Hispanic and African-American"; and cluster 58 is "largely Asian."  Ex. 84 at 2-4.

talented students who could thrive at the College, including many racially diverse applicants." SMF ¶¶ 182-183.  Moreover, the pool of transfer applicants is less racially diverse than the pool of freshman applicants, and transfer applicants on average have lower academic ratings than do freshman applicants.  SMF ¶ 184.

### ii)       Eliminating Various Existing Practices

*Eliminating Early Action.*  The Committee also considered whether eliminating Early Action would increase diversity, and concluded on the basis of Harvard's historical experience that it would not.  Harvard had previously eliminated its Early Action program for four admissions cycles, covering the Classes of 2012 through 2015, in the hope that the change "would encourage an even greater number of diverse students to apply and matriculate."  Ex. 47 at 6; *see* SMF ¶¶ 192-193.  Unfortunately, the change did not produce the desired results.  The share of African-American, Hispanic, and Other students at Harvard did not rise, and the yield rate for such students in fact declined, as many of the most promising students opted to attend universities that offered them early admission.  SMF ¶ 194.  Harvard reinstated a non-binding Early Action program for the Class of 2016, and yields then increased.  SMF ¶ 195. There is no reason to think that the results from eliminating Early Action now would be any less inimical to Harvard's diversity-related educational objectives than they were before.  SMF ¶ 196.

*Practices That Foster Connection to Harvard.*  The Committee also considered a group of practices that foster connections between Harvard and its alumni, staff, and others, but are alleged (by SFFA or others) to detract from racial diversity—such as the consideration of whether an applicant's parent attended Harvard College or Radcliffe, the consideration of whether an applicant's parent is employed by Harvard, and the practice of deferred admission.[21]

---

[21]     The Committee also considered whether Harvard should eliminate consideration for athletic recruits.  SFFA's Complaint does not allege that Harvard could achieve diversity by

The Committee noted that if Harvard eliminated those practices, and also eliminated race-conscious admissions, then (according to Dr. Card's analysis) the number of African American, Hispanic, and Other students would decrease by half from current levels.  SMF ¶ 198.

The Committee also explained that the practices in question serve valuable institutional interests.  For example, considering whether an applicant's parent attended Harvard College or Radcliffe as an undergraduate "helps to cement strong bonds between the university and its alumni."  Ex. 47 at 16; *see* SMF ¶ 202.  Harvard depends on its alumni's willingness to volunteer for a variety of activities, such as interviewing applicants, and also depends on its alumni for financial support, which is "essential to Harvard's position as an institution of higher learning" and "helps make [possible] the financial aid policies" that do much to ensure a diverse student body.  Ex. 47 at 17; *see* SMF ¶¶ 202-203.  As Dr. Ruth Simmons, Harvard's higher-education expert—who has served as president of three universities—explained, "[t]here would be substantial costs if Harvard were to stop considering whether applicants are the children of alumni."  Ex. 34 ¶ 55.  Similarly, Harvard has good reason to consider whether an applicant's parent is a member of the faculty or an employee.  "Eliminating that consideration would place Harvard at a significant competitive disadvantage in recruiting personnel."  Ex. 47 at 17; *see* SMF ¶ 204.

*Eliminating Consideration Of Test Scores.*  Finally, Harvard considered whether it should eliminate consideration of standardized test scores.  The Committee recognized that such scores

---

eliminating consideration for athletic recruits, and SFFA's expert "specifically rejected" that proposition, Ex. 36 at 11, but the Committee considered that possibility as part of its "serious, good faith consideration of workable race-neutral alternatives," *Grutter*, 539 U.S. at 339, and rejected it.  Among other reasons, Harvard seeks excellence in multiple dimensions, athletics among them, and the Committee noted that Harvard athletes are often among the most dedicated and supportive alumni.  SMF ¶¶ 200-201.

"are imperfect measures of academic excellence and aptitude."[22]  Ex. 47 at 18; *see* SMF ¶ 207. Harvard nonetheless continues to believe that, when considered appropriately, as one factor among many—and particularly "in light of an applicant's background and ability to prepare"— standardized test scores "provide useful information" to the Admissions Committee.  Ex. 47 at 18; *see* SMF ¶¶ 207-208.

*       *       *

Although Mr. Kahlenberg disagrees with the conclusions reached by the Smith Committee on numerous grounds, *see* Ex. 38, those factual disputes are immaterial and do not preclude summary judgment.  Mr. Kahlenberg did not identify additional practices that the Committee should have considered.  Ex. 30 at 225:10-14.  Nor did his approach to simulating the effects of various alternative practices meaningfully differ from the approach taken by Dr. Card and relied upon by the Committee.  Instead, Mr. Kahlenberg simply disagreed with the Committee on the ultimate question whether certain alternative practices could allow Harvard to achieve its educational objectives.[23]  That dispute is not legally material, because Mr. Kahlenberg's opinion is not the one that matters.  It is of course "for the courts, not for university administrators, to ensure that" the university's consideration of race is narrowly tailored to the interests it serves.  *Fisher I*, 570 U.S. at 311.  But the narrow-tailoring inquiry considers "a university's experience and expertise in adopting or rejecting certain admissions processes."  *Id.*; *see also Fisher II*, 136 S. Ct. at 2211 (referring to studies conducted by the University of Texas).

---

[22]     "Indeed, as part of its continuous effort to attract students from all economic backgrounds, Harvard recently announced that beginning with the Class of 2023, applicants would not be required to submit the essay portion of the SAT or ACT."  Ex. 47 at 18.

[23]     For example, he claimed that a drop from 76% to 66% in the proportion of admitted students receiving the highest academic ratings "would hardly seem to represent a threat to 'the standards of excellence that Harvard seeks in its student body,'" on the theory that the average SAT scores and grade-point averages of admitted students would remain roughly the same.  Ex. 38 at 2-3.

Indeed, it is difficult to see how the Court could decide whether Harvard would be able to achieve its educational objectives without considering race unless it gave appropriate weight to Harvard's account of its educational objectives and the student body characteristics that would or would not permit those objectives to be achieved.

The record establishes that Harvard could not achieve the diversity it seeks or the educational objectives that flow from that diversity without considering race unless it significantly compromised other essential institutional objectives, including academic excellence.  Neither Title VI nor Supreme Court precedent require universities to make such fundamental compromises as a condition for receiving federal funds.  The Court should therefore grant summary judgment to Harvard on Count V.

## III.   HARVARD DOES NOT DISCRIMINATE AGAINST ASIAN-AMERICAN APPLICANTS

The remaining count of the Complaint alleges that Harvard intentionally discriminates against Asian-American applicants, in violation of Title VI.  To prove that claim, SFFA must show that Harvard "discriminated on the basis of race, the discrimination was intentional, and the discrimination was a substantial or motivating factor for [Harvard's] actions." *Goodman v. Bowdoin Coll.*, 380 F.3d 33, 43 (1st Cir. 2004).  Even after drawing factual inferences in the light most favorable to SFFA, no reasonable fact-finder could conclude that SFFA meets that standard.  Accordingly, the Court should grant summary judgment to Harvard on Count I.

SFFA's discrimination case is entirely statistical.  Months of extensive discovery failed to produce documentary or testimonial support for SFFA's accusation that Harvard systematically seeks to limit the number of Asian Americans or discriminates against them.  To the contrary, the evidence shows that Harvard values the diversity that Asian-American students bring to its campus—like students of all other races—and that Harvard's Admissions Office seeks, as part of its diversity initiatives, to recruit and enroll strong Asian-American students, SMF ¶ 132.

Lacking direct support for its intentional discrimination claim, SFFA can make a prima facie case based on statistics only if it can show "gross disparities of the kind and degree sufficient to give rise to an inference that the non-uniform individualized analyses of [applicants] … reflect[s] a pattern or practice of discrimination." *Blunt v. Lower Merion School Dist.*, 767 F.3d 247, 299-300 (3d Cir. 2014); *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-308 (1977).  Courts are reluctant to find intentional discrimination on the basis of statistics alone. *McGuire v. Reilly*, 386 F.3d 45, 63 (1st Cir. 2004) ("The role that traditional pattern evidence (statistical studies and the like) can play in a traditional equal protection challenge is limited by the fact that courts have been loathe to infer intent from mere effect[.]"); *Spath v. NCAA*, 728 F.2d 25, 28 (1st Cir. 1984) ("[G]enerally courts must look to evidence other than statistical impact to support a finding of discriminatory purpose.").  SFFA has failed to show the "gross disparity" required to allow it to survive summary judgment on its claim of intentional discrimination based on statistics alone.

SFFA's statistical expert was able to arrive at his conclusions only by developing a model that fails in crucial respects to reflect the realities of Harvard's admissions process and excludes information that is central to the Admissions Office's evaluation of applicants.  SMF ¶¶ 224-239. Harvard's expert, Dr. Card, developed a much more robust and methodologically sound model— one that accounts for the full range of observable information considered in the admissions process—that shows no negative effect of Asian-American ethnicity.  SMF ¶¶ 216-220. Although a disagreement between experts is often a matter to be resolved at trial, "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict" and therefore cannot overcome a motion for summary judgment.

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *see also, e.g.*, *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848-849 (1st Cir. 1993) (affirming summary judgment against discrimination claim notwithstanding statistical evidence offered to support it). That is the case for Dr. Arcidiacono's statistical analysis.

### A.    Fact Discovery Has Yielded No Documentary Or Testimonial Evidence Of Discrimination

SFFA's extensive discovery into Harvard's admissions practices yielded no documentary or testimonial evidence to suggest, as SFFA contends, that Harvard systematically and intentionally disadvantages Asian Americans in the admissions process.  To the contrary, the documentary and testimonial evidence about Harvard's admissions process demonstrates that Harvard carefully considers every applicant individually, using the same thorough reading and committee procedures for all applicants.  Harvard does not, for example, employ special processes for certain ethnic groups and not others.[24]  Where, as here, "the same evaluation procedures are used for all [applicants] regardless of their race there simply is no discrimination."  *Blunt*, 767 F.3d at 300.[25]

---

[24]    *See, e.g.*, Ex. 26 at 108:21-23 ("We believe strongly that having people from every ethnic background in our undergraduate student body is absolutely central to our mission."); Ex. 1 at 277:22-278:1 ("Q.  … [A]re Asian-American applicants … assessed against other Asian-American applicants in the pool in any given year?  A.  No.  They are assessed individually."); Ex. 5 at 184:12-18 ("Q.  [D]o you have an opinion as to whether the admissions process at Harvard disadvantages Asian-Americans as a group?  A.  Yes. … I don't believe it does.").

[25]    SFFA will likely point to a handful of isolated comments to suggest that it has unearthed direct evidence of discrimination against Asian Americans.  Ex. 39 at 8-10.  Those do not manifest any discriminatory intent on the part of Harvard admissions officers, and in any event "stray workplace remarks … normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus."  *Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 69 (1st Cir. 2002).  That is particularly true in the context of Harvard's decision-making process, which relies on group deliberation by multi-member subcommittees and the full Admissions Committee of roughly 40 people (SMF ¶¶ 75-76, 81).  Moreover, the fact that SFFA could identify no more than a handful of allegedly questionable remarks, after Harvard produced more than 90,000 pages of documents from more than two dozen custodians, is itself compelling evidence that Harvard does not discriminate.

SFFA will point to documents prepared by individuals in Harvard's Office of Institutional Research, which in SFFA's view suggest that Asian-American applicants were disadvantaged in the admissions process. But the analysis in those documents was not designed to evaluate whether Harvard was intentionally discriminating and reached no such conclusion. SMF ¶ 214. And as the documents on their face and testimony about them consistently acknowledge, the analysis was incomplete, preliminary, and based on limited inputs. SMF ¶ 213. In particular, the documents make clear that the analysis did not control for much information that is central to the Harvard admissions process, which takes account of any available information that might bear on the qualities that a student would bring to Harvard.[26] SMF ¶ 215. Those gaps are critical because, as explained below, Dr. Card's model—which accounts for the full range of observable information considered in the whole-person Harvard admissions process—shows no negative effect of Asian-American ethnicity in the admissions process.[27]

**B.    Expert Discovery Has Yielded No Legally Sufficient Evidence Of Discrimination**

SFFA has failed to muster statistical evidence showing "gross disparities of the kind and degree sufficient to give rise to an inference that the non-uniform individualized analyses of

---

[26]    *See* Ex. 65 at 36 ("There are a variety of factors that quantitative data is likely to miss or ratings do not capture. We'd like to better understand: Exceptional talent (music, art, writing); The role of context cases[;] The role of personal statement/essay[;] Measures of socio-economic status (HFAI Flag, Low Income Flag)"); Ex. 66 at 17 (noting that model does not account for "Children [of] faculty/staff," "Search for socioeconomic diversity," "High school quality/opportunities open to student," and "[Geographic] Dockets").

[27]    The incomplete, preliminary nature of the analysis also explains why it was not shared more widely. Dean Fitzsimmons testified that "with a very, very incomplete model with a great deal of information missing … it's unclear what to do with it." Ex. 26 at 407:5-11. Similarly, Dean Khurana testified that he reviewed at least one of the analyses and concluded that he "didn't think that th[e] … analysis was done appropriately" because there are "a lot of limitations to doing … models like this." Ex. 8 at 253:16-20.

[applicants] … reflect[s] a pattern or practice of discrimination." *Blunt*, 767 F.3d at 299-300. Its intentional-discrimination claim therefore should not proceed to trial.

The parties' experts examined an extensive set of anonymized data from the Harvard Admissions Office about domestic applicants to the Classes of 2014 through 2019 (approximately 150,000 applicants).[28] SMF ¶¶ 216, 224. Dr. Card's analysis—which incorporated as much information as possible about the factors that inform Harvard's whole-person admissions process—found no negative effect of Asian-American ethnicity. SMF ¶ 219. Specifically, Dr. Card found that the average marginal effect of Asian-American ethnicity on applicants' likelihood of admission, across all six years for which admissions data were produced, was statistically indistinguishable from zero. SMF ¶ 219. In three of the six years, the estimated effect was slightly positive; in the others, it was slightly negative. SMF ¶ 220. Neither those effects nor the average effect across all six years was statistically significant. SMF ¶ 219. Those results alone demonstrate the absence of merit to SFFA's claim of intentional discrimination.

Dr. Card also found other evidence weighing against SFFA's allegation of intentional discrimination. If Harvard were engaged in systematic intentional discrimination, one would expect to find a negative effect of Asian-American ethnicity on the likelihood of admission not just for the applicant pool as a whole but for large subgroups of the pool—for example, applicants of a given gender or from a particular region. But Dr. Card found the opposite: The data show a *positive* (though statistically insignificant) association between Asian-American

---

[28]     Harvard produced hundreds of fields of data for each applicant in that time period, including profile scores assigned by Harvard admissions officers, alumni interview scores, test scores, grades, extracurricular activities and hours, family educational attainment, parental occupation, intended field of concentration, financial information, and demographic information.

ethnicity and the likelihood of admission for women applicants in four of six years (and overall), and a similar positive (though statistically insignificant) association for all applicants from California, which has the highest concentration of Asian-American applicants, in five of six years (and overall).  SMF ¶¶ 221-222.  Together, female Asian-American applicants and Asian-American applicants from California represent nearly two thirds (64%) of domestic Asian-American applicants over the six cycles for which data was produced.  SMF ¶ 223.  It would be odd, to say the least, for Harvard to limit its alleged discrimination to male applicants from States other than California.  Unsurprisingly, SFFA has no evidence of any such effort.[29]

SFFA's expert, Dr. Arcidiacono, was able to arrive at his conclusions only by excluding important information from his analysis and treating the remaining data in a manner seemingly designed to reach his desired result.  *See* Ex. 37 ¶ 31.  Generally, of course, methodological disputes between competing experts are resolved at trial.  But as discussed above, "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict" and therefore cannot overcome a motion for summary judgment.

---

[29]  Dr. Arcidiacono was apparently so eager to find discrimination against Asian Americans that he reached conclusions that can only be characterized as bizarre.  He concluded that "Harvard imposes a penalty on applicants" (regardless of their race) "from any docket with a high share of Asian-American applicants," and that this supposed "penalty is more than a third" of the alleged "direct penalty Harvard imposes on Asian-American applicants generally."  Ex. 35 at 78.  Evidently, Dr. Arcidiacono believes that Harvard systematically discriminated against *all* applicants from the three California dockets—33,000 applicants in the six years studied, 61% of whom were *not* Asian American—just for the purpose of discriminating against Asian Americans who live in California.  *See* Ex. 37 ¶ 121.  Not only is that theory nonsensical; it is belied by the fact that (as Dr. Arcidiacono acknowledged) there is a *positive* (though statistically insignificant) association between Asian-American ethnicity and the likelihood of admission for applicants from California.  *See* SMF ¶ 222; Ex. 27 at 284:25-285:11 (admitting that Dr. Card "found a positive, although statistically insignificant, effect of Asian-American ethnicity for Asian-American applicants from California" and that he "didn't do an analysis of [his] own" to rebut it).

*Brooke Grp.*, 509 U.S. at 242; *see also, e.g.*, *LeBlanc*, 6 F.3d at 848-849 (affirming summary judgment against discrimination claim notwithstanding statistical evidence offered to support it); *Price v. Gen. Motors Corp.*, 931 F.2d 162, 165 (1st Cir. 1991) (affirming grant of summary judgment notwithstanding competing expert evidence).  That is true even if the opinion is admissible (or its admissibility is not challenged) under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 & n.19 (1986) (expert report that was "implausible and inconsistent with record evidence" could not overcome summary judgment).  Indeed, *Daubert*—decided only a week after *Brooke Group*—reaffirmed courts' authority to resolve issues as a matter of law in the face of admissible expert testimony.  509 U.S. at 595-596.

Dr. Arcidiacono's analysis is so unmoored from the reality of Harvard's admissions process that, as a matter of law, it cannot justify a finding that Harvard intentionally discriminated against Asian-American candidates.  Indeed, it is undisputed that Dr. Arcidiacono excluded from his analysis numerous applicants and numerous factors that are relevant to the admissions process—information that was in his possession and informed Dr. Card's more comprehensive analysis.  Among the fatal defects in Dr. Arcidiacono's work are the following.

*First*, Dr. Arcidiacono performed all of his core analyses on a sample that excludes recruited athletes, applicants whose parent or parents attended Harvard or Radcliffe as an undergraduate, applicants whose names appeared on a "Dean's interest" or "Director's interest" list, and children of Harvard faculty and staff.  SMF ¶ 225.  Dr. Arcidiacono excluded those applicants on the conjecture that the Admissions Committee evaluates them under a separate process, but discovery showed the opposite.  SMF ¶ 228.  Indeed, when Dr. Arcidiacono was asked what he meant by suggesting that applicants in the excluded categories were subjected to

separate admissions processes, he explained that those applicants received "tips" in the admissions process—but that is true of applicants in many other categories, none of which he excluded.  *See* Ex. 27 at 90:12-104:8.

Because Dr. Arcidiacono makes no claim that "Harvard … discriminate[s] against Asian-American applicants who are in the special recruiting categories," Ex. 35 at 69; *see also* Ex. 27 at 83:5-84:9, 110:14-113:25, his analysis offers no support for SFFA's claim of systemic, intentional discrimination.  Dr. Arcidiacono's extraordinary theory, rather, is that Harvard "does not discriminate against Asian-Americans who happen to be athletes, legacies, faculty children, staff children, or on the dean's list, but they do as to all others."  Ex. 27 at 266:21-267:1.  SFFA has no explanation for why Harvard would pursue such a strange scheme—let alone any documentary or testimonial evidence that it does.

*Second*, Dr. Arcidiacono excluded an essential component of the Admissions Office's process of reviewing applicants—the personal rating.  SMF ¶ 230.  That is a serious flaw, because evaluation of applicants' personal characteristics is fundamental to the admissions process.  The personal rating reflects the wide range of information in the application that bears on applicants' personal qualities.  For example, it captures information in the applicant's personal essays and recommendation letters that may shed light on the applicant's character—information that is not otherwise observable, since the essays and supplemental recommendation letters receive no scores and the other recommendation letters receive only a unitary score that assesses the overall strength of the letter on all dimensions.  SMF ¶ 231.  Harvard has long given great weight to applicants' personal qualities, and those personal qualities can distinguish the few truly exceptional students who are admitted from the thousands of accomplished and talented students who apply but who cannot be offered admission.  SMF ¶ 232.

Dr. Arcidiacono excluded the personal rating from his preferred model on the theory that it is biased against Asian Americans. Ex. 27 at 157:22-158:10.  But as Dr. Card has explained, Dr. Arcidiacono's attempt to conduct statistical analysis of the personal rating fails to show that the rating is in fact biased.  Dr. Arcidiacono's analysis overlooks that the personal rating is difficult (if not impossible) to model statistically, because it reflects a wide range of important information that admissions officers take into account but that is not quantified in the available data—applicants' essays, their responses to short-answer questions, teachers' and guidance counselors' qualitative observations about applicants, alumni interviewers' comments, and much other information about applicants in the file. Ex. 37 ¶ 40.  Where so much relevant information is statistically unobservable, it is methodologically unsound to conclude that intentional discrimination is the cause of the perceived association between race and personal ratings.  *See* Ex. 33 ¶¶ 145-150; Ex. 37 ¶¶ 41-42; Ex. 29 at 268:24-269:21.

Indeed, Dr. Arcidiacono's rush to conclude that racial disparities in personal ratings must be attributable to invidious discrimination against Asian Americans—as opposed to aggregate differences in unobservable factors—starkly conflicts with his assessment of the academic and extracurricular ratings, which show an estimated *positive* and statistically significant effect of Asian-American ethnicity. Ex. 33 ¶ 149; Ex. 37 ¶¶ 42-43; Ex. 27 at 176:4-177:18.  In other words, the same modeling approach on which Dr. Arcidiacono relies to conclude there is bias *against* Asian-Americans in the personal rating finds bias *in favor* of Asian-Americans in academic and extracurricular ratings.  For those ratings, Dr. Arcidiacono attributes the discrepancy "to unobservable characteristics not reflected in the model"—yet he rejects, for no articulable reason, the proposition that the same explanation applies to the personal rating.  Ex. 27 at 176:4-177:18.  According to Dr. Arcidiacono, then, statistical variances that favor Asian

Americans should be dismissed as the result of "unobservable characteristics," but statistical variances that disfavor Asian Americans are attributed to alleged bias. *See* Ex. 37 ¶ 42.

*Third*, Dr. Arcidiacono erroneously conducted his analysis by pooling admissions data across all six admissions cycles together (Classes of 2014-2019), rather than analyzing each cycle independently and then computing average effects across all cycles. SMF ¶ 233. That choice is methodologically unsound because the Harvard admissions process is a year-by-year process in which applicants to a particular class compete against each other for limited spots in that class. Applicants seeking admission to the Class of 2014 did not compete against applicants for the Class of 2019 (or any other class). SMF ¶ 234. But Dr. Arcidiacono's analysis, absent any evidentiary support, assumes they did just that.[30]

Dr. Arcidiacono's unjustifiable omissions and methodological errors are essential to his conclusion that the data are consistent with discrimination. Once those methodological errors are corrected and the omitted data included, the statistical evidence shows no evidence of discrimination, let alone "gross disparities of the kind and degree sufficient to give rise to an inference that the non-uniform individualized analyses of [applicants] … reflect[s] a pattern or practice of discrimination," *Blunt*, 767 F.3d at 299-300. Ex. 37 ¶¶ 104-105 & Card Ex. 13; Ex. 27 at 114:8-116:7. Dr. Arcidiacono's report therefore cannot allow SFFA to overcome summary judgment, because it is "render[ed] … unreasonable" by "indisputable record facts" and is "not supported by sufficient facts to validate it in the eyes of the law," *Brooke Grp.*, 509 U.S. at 242.

---

[30]     Dr. Arcidiacono's erroneous choice to pool data across years also exacerbates the errors in some of his other methodological choices. For example, he omitted data about parental occupations and applicants' intended career—even though he acknowledged that information can be important to admissions decisions—because of the degree to which those data vary from year to year. Ex. 27 at 193:5-198:24, 214:15-217:4; Ex. 35 at 31-33, 62-63. But that concern would not exist if admissions were modeled year-by-year. Ex. 37 ¶ 111.

\*       \*       \*

After extensive fact and expert discovery, SFFA has come up with no legally sufficient evidence to support its speculation that Harvard has engaged in a years-long, intentional discounting of Asian Americans' applications.  The documents and testimony certainly do not support any such claim.  SFFA is left to offer only gerrymandered statistics to support its claims, but that evidence is far too flawed to support a finding of discrimination at trial.  Because there is no genuine dispute of material fact on this issue, summary judgment should be granted.

## CONCLUSION

The Court should grant summary judgment to Harvard on all remaining counts of the Complaint.

Respectfully submitted,

/s/ Seth P. Waxman
Seth P. Waxman (*pro hac vice*)
Paul R.Q. Wolfson (*pro hac vice*)
Daniel Winik (*pro hac vice*)
WILMER CUTLER PICKERING
     HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Tel: (202) 663-6800
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
paul.wolfson@wilmerhale.com
daniel.winik@wilmerhale.com

Debo P. Adegbile (*pro hac vice*)
WILMER CUTLER PICKERING
     HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 295-6717
Fax: (212) 230-8888
debo.adegbile@wilmerhale.com

William F. Lee (BBO #291960)
Felicia H. Ellsworth (BBO #665232)
Andrew S. Dulberg (BBO #675405)
Elizabeth Mooney (BBO #679522)
WILMER CUTLER PICKERING
     HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com

Dated:  June 15, 2018                    *Counsel for Defendant President and*
                                         *Fellows of Harvard College*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing, and

the sealed version of this document will be served on counsel for SFFA by email.

/s/ Seth P. Waxman
Seth P. Waxman