# EXHIBIT 28

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> *Defendant*. | Civil Action No. 1:14-cv-14176 |

**REBUTTAL REPORT OF RUTH SIMMONS, Ph.D.**

March 15, 2018

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| **I.** | **INTRODUCTION** ................................................................................................................... 1 |
| **II.** | **KAHLENBERG'S SUPPORT FOR ELIMINATING ADMISSIONS POLICIES REGARDING CHILDREN OF ALUMNI, DONORS, AND FACULTY AND STAFF IGNORES IMPORTANT UNIVERSITY GOALS AND INTERESTS** ............................................. 3 |
| **III.** | **KAHLENBERG'S SUGGESTION TO ELIMINATE EARLY ACTION OVERLOOKS THE NEGATIVE CONSEQUENCES FOR COMPETITIVE UNIVERSITIES LIKE HARVARD AND THE OUTREACH EFFORTS MADE TO ATTRACT A BROADER POOL OF EARLY APPLICANTS** ........................................................................................................ 10 |
| **IV.** | **CONCLUSION** ................................................................................................................... 13 |

**I. INTRODUCTION**

1. I have been retained by President and Fellows of Harvard College ("Harvard") to provide an expert opinion in this matter.  In my opening expert report, I stated my opinion that attainment of a diverse (including a racially diverse) student body contributes various significant benefits to students, the campus environment, and society.  I also set forth my opinion, based on my decades of experience as a professor, administrator and university president of institutions of higher education across the country, that certain admissions practices used by Harvard and many other colleges and universities criticized for allegedly hindering efforts to attain a diverse student body serve important and legitimate goals, and that eliminating such practices would entail significant costs for Harvard.  My opinions were also based on my review of the materials cited in my report, including Harvard's internal reports analyzing the benefits of diversity and various descriptions of Harvard's admissions process.

2. I have reviewed the rebuttal expert report submitted by Richard Kahlenberg, Students for Fair Admissions, Inc.'s ("SFFA") proffered expert witness, which, among other things, contends that my conclusions regarding the use of admissions policies regarding children of alumni, faculty and staff, and donors are unsubstantiated, and that the elimination of early action would not have substantial costs.

3. As I explain below, Mr. Kahlenberg's rebuttal report does not change the opinions and conclusions reflected in my expert report.

4. My opinions and conclusions are based on my decades of experience as a professor and leader at several institutions of higher education, and my review of the materials cited herein (Exhibit A) and in my initial report.  In my leadership roles at Princeton University, Smith College, Brown University, Spelman College, and Prairie View A&M University, I had regular contacts with the deans of admissions and others with direct oversight of admissions regarding the

1

admissions process. I have formed an understanding of Harvard College's current admissions approach, which considers each applicant as an individual, through review of Harvard's statements regarding its admissions process,[1] and interactions with other leaders of Ivy League institutions during my presidency at Brown University.

5. In my leadership roles at institutions, including Brown University and Smith College, I had a role in those institutions' admissions strategies and processes. I was involved in discussions with senior leaders, admissions staff, and the Boards of Trustees regarding admissions policies and practices, and participated in the formulation of policies intended to admit strong classes of students. For example, at Smith College, the Board of Trustees was interested in improving the admissions process and attracting stronger classes, and I devised strategies to accomplish this objective, including hiring admissions employees to effect those changes. As President of Brown, I interacted with the admissions office, both to keep abreast of admissions updates and to provide my view of the university's strategic goals. Additionally, like presidents of most universities, I have been involved in recruiting prospective students by talking to high school teachers, counselors, alumni, and prospective students across the country.

6. In my experience as both a leader of different universities and a member of several university Boards of Trustees, the admissions season and policy developments are subjects on which university presidents report to their Boards of Trustees.

7. At Brown University and Princeton University, remaining apprised of the admissions process was a core function of leadership to ensure that we admitted and educated a cohort of students who demonstrate excellence and are diverse across many dimensions, including academic interest, geography, whether students are the first in their family to attend college, race and

---

[1] *See* Simmons Report, Exhibit B.

2

ethnicity, socioeconomic background, extracurricular interests and talents, and type of high school, among other types of diversity.  My understanding is that Harvard's admissions process, like those at Brown, Princeton, and many other competitive universities, takes a holistic review of individual applicants and considers many, many factors in evaluating students for admission.

8. Based on my experience as President of Smith College, Brown University, and Prairie View A&M University and as Provost of Spelman College, I found that while educational missions inform the nature of the admissions process and result in varying types of admissions pools and admissions cohorts, the importance of admissions from an institutional and leadership perspective never varies.

9. Accordingly, for over thirty years in higher education, admissions has been a central focus of my professional life, and that focus continues today.

## II. KAHLENBERG'S SUPPORT FOR ELIMINATING ADMISSIONS POLICIES REGARDING CHILDREN OF ALUMNI, DONORS, AND FACULTY AND STAFF IGNORES IMPORTANT UNIVERSITY GOALS AND INTERESTS

10. Mr. Kahlenberg's argument for eliminating consideration of an applicant's relationship to an alumnus in the admissions process ignores the various institutional goals that are served through such consideration.  As I explained, based on my own extensive experience at colleges and universities that have considered applicants' legacy status during the admissions process, including Smith College and Brown University, and my experience speaking with administrators and leaders of other universities, it is legitimate for universities like Harvard to consider, in their admissions processes, that an applicant is the child of an alumnus—provided, of course, that the applicant is otherwise qualified to attend the school.  Considering this factor advances several important goals and interests of universities.  Many excellent institutions, including Harvard, have found that there are many benefits that alumni and their children bring to the university community, such as passing on cherished institutional values and traditions from

3

generation to generation, instilling a sense of school spirit and helping to form broader and stronger alumni networks.[2] The enthusiasm of alumni networks aids recruitment efforts and strengthens fundraising results. It is no accident that institutions with large alumni participation enjoy improved standing over time, both academically and financially.[3] My own experience at Brown University, Princeton University, and Smith College bears out those conclusions. Those institutions, like other selective institutions with long histories, have survived over time because they have maintained their educational excellence while working tirelessly to garner the support needed to compete with other universities, raise their standing among their peers, and ensure that they will still be thriving over future decades and centuries. In my experience, the benefits that arise from cultivating strong relationships with alumni through the judicious consideration of applicants' family connections to the university not only enhance the quality of education and

---

[2] *E.g.*, Monyak, "Legacy Status Tips Admission Scales," The Hoya (Mar. 20, 2015), available at http://www.thehoya.com/legacy-status-tips-admission-scales/; Temple, "Lunch with Don Bishop," Notre Dame Magazine (Jan. 20, 2015), available at https://admissions.nd.edu/connect/news/lunch-with-don-bishop/; Kapur, "Legacy Still Factor in Admissions," The Stanford Daily (Apr. 4, 2008), available at https://stanforddailyarchive.com/cgi-bin/stanford?a=d&d=stanford20080404-01.2.7&srpos=1&e=-------en-20--1--txt-txIN-kapur+legacy------; Heinz, "Perspective: Better Fundraising through Family Freshmen? Legacy Admits Repay Loyalties," The Daily Pennsylvanian (Feb. 6, 2007), available at http://www.thedp.com/article/2007/02/perspective_better_fundraising_through_family_freshmen_legacy_admits_repay_loyalties; "Why Yale Favors Its Own," Yale Alumni Magazine (Nov./Dec. 2004), available at http://archives.yalealumnimagazine.com/issues/2004_11/q_a.html; Bourne, "Children of Alumni Enjoy Admissions Preference," The Middlebury Campus (Feb. 25, 2003), available at https://middleburycampus.com/2689/news/children-of-alumni-enjoy-admissions-preference/.

[3] For example, U.S. News & World Report's annual college rankings include factors that directly or indirectly are affected by alumni participation, such as the institution's alumni giving rate and the institution's academic reputation, which is based on a peer assessment survey and high school counselors' ratings. In my experience, an institution's academic reputation can improve over time based on the efforts of enthusiastic alumni who act as informal ambassadors in their communities for their alma mater or who become involved in the governance and direction of their schools through service on boards and committees. *See* "Best Colleges Ranking Criteria and Weight," U.S. News & World Report (Sept. 11, 2017), available at https://www.usnews.com/education/best-colleges/articles/ranking-criteria-and-weights.

social interactions for all students, but also help to ensure that the future of the institution will be secured and strengthened over time.

11. As I explained in my expert report, as long as the applicants admitted under policies considering children of alumni are themselves qualified to attend the college or university, and can be reasonably expected to make substantial contributions to the university community in their own right, it is not detrimental for universities to consider whether applicants are children of alumni. Based on my experience in the field of higher education, fostering loyalty and affection for the university among students, alumni, and future generations of prospective students is an important goal for many, if not all, colleges and universities, and considering whether applicants are children of alumni during the admissions process is one way many universities go about achieving this goal. During my tenure at Princeton University, Smith College, and Brown University, when we evaluated a well qualified legacy applicant for admission, we considered not only whether that applicant was individually capable of contributing significantly to the university community (as we do with all applicants), but also the degree to which that applicant's family had positive associations with the university. This dual consideration was aimed at ensuring both that any such student admitted was capable of succeeding *and* that the university's institutional goals were furthered.

12. Moreover, universities are capable of objectively evaluating the qualifications and expected contributions of applicants regardless of whether applicants have an affiliation with a school. In my experience, and based on my knowledge of competitive universities' treatment of legacy applicants, the majority of legacy applicants are rejected and not accepted, based on the strength of their applications. As selective universities, including Brown and Princeton, have recognized, there is generally little incentive to admit an applicant with a familial relationship to

the school who is otherwise not capable of succeeding there. Doing so affects the student's chances for a successful college experience.

13. In my experience, the existence of consideration for qualified legacy applicants does not prevent universities from considering and admitting other qualified applicants, such as students from low-income or minority backgrounds. Among a pool of applicants who are diverse in many ways, legacies are just one category of students that can contribute significantly to the learning environment; although no university would want a class exclusively of legacies, it is quite reasonable for those applicants to be considered within prudent limits.

14. Mr. Kahlenberg's reliance on a single study about consideration for children of alumni in admissions and alumni giving behavior[4] does not alter my conclusions based upon years of higher education experience. The study that Mr. Kahlenberg cites focuses solely on whether the existence of legacy admissions policies affects the level of alumni donations. It finds that "schools with legacy preferences, on average, have 35.7 percent higher alumni giving than non-legacy preference schools before controlling for [family] wealth."[5] The study also acknowledges that its models suggest that abolishing legacy preferences would have a "deleterious impact" on the finances of universities that currently consider legacy status in admissions."[6] In my opinion, such an outcome would be harmful for many private universities, whose financial resources affect their ability to sustain the excellence of their offerings and provide resources for low income students of all races to afford the costs of their education. In addition, studies, including those reviewed in the study that Mr. Kahlenberg cites, have found that alumni with familial ties to an institution are

---

[4] Kahlenberg Report at 32-33; Kahlenberg Rebuttal Report at 12.
[5] Coffman, O'Neil, & Starr, "An Empirical Analysis of Legacy Preferences on Alumni Giving at Top Universities," at 114.
[6] *Id.* at 115.

more likely to donate than other alumni.[7]  While these studies have tended to analyze the experience of an individual university or college, their findings comport with my own observations of alumni giving based on my experiences at Smith College and Brown University.

15. Moreover, neither Mr. Kahlenberg nor the study cited in his report addresses the relationship between universities having legacy admissions policies and the level of alumni engagement more broadly.  As I explained in my initial report and above, in my experience, universities value students who are the children of alumni for much more than whether they or their families have an ability to donate money.[8]

16. Mr. Kahlenberg also argues that there are excellent institutions that admit strong students and provide excellent educations without using legacy preferences, naming four publicly-funded universities.[9]  Although that is undoubtedly true, the decision by some universities to not consider whether applicants are children of alumni does not mean that it is the appropriate decision for all universities.  Based on my experience at both private and public universities, I can say that private universities are much more dependent on an active network of supporters, mostly alumni, to sustain their ability to provide excellent educations and services to their students, compared to public universities which receive government funding.

17. Nor is it illegitimate to give some consideration in admissions to the likelihood that an applicant or his family will lend financial support to the university.  Based on my experience at

---

[7] *See* Coffman, O'Neil, & Starr at 103-106; Holmes, "Prestige, Charitable Deductions and Other Determinants of Alumni Giving: Evidence from a Highly Selective Liberal Arts College," 28 Economics of Education Review, 18-20 (2009) (finding that Middlebury College alumni with close alumni relatives are more likely to donate than those without family connections); Edmonson, "Explaining the Alumni Relationship and Giving Tendencies of Multigeneration Alumni Legacy Families at Marquette University," College of Professional Studies Professional Projects (2011) (finding that legacy alumni give more than non-legacy alumni).
[8] Simmons Report at 20-21.
[9] Kahlenberg Rebuttal Report at 12.  Mr. Kahlenberg names two publicly-funded universities in England and two public universities in California.

institutions of varying sizes and missions, I have observed that all colleges and universities have financial and budgetary considerations that affect the breadth and scope of educational and on-campus services provided to all students, from the availability of research funding and the budget for hiring faculty and administrators, to the construction and renovation budget for classrooms and dormitories, to the amount of financial aid that can be offered to other students. Tuition alone cannot cover an institution's entire annual operating budget. In order to thrive, universities, particularly private ones, depend on other sources of revenue, especially donations. So long as applicants are qualified academically and otherwise to attend the university, and will bring to the campus the same willingness to engage broadly that universities expect of all students, there are pragmatic reasons for universities to give consideration to the likelihood that an applicant and his family will support the institution. Beyond that, in my own experience at Princeton, Brown, and Smith, and based on discussions I have had with other university administrators and leaders, I have found that influential individuals assist universities in a variety of other ways—by offering advice, serving on boards, expanding the network of donors, and so on. Moreover, during my presidencies of Brown University and Smith College, I found that there were very few donor relationships that were important enough to justify consideration of that relationship in the application process. Based on that experience and my knowledge of competitive peer institutions like Harvard, I believe the number of applicants who could benefit from an admissions consideration based on the financial support of non-alumni family members for the institution is very small.

18. Mr. Kahlenberg contends that the absence of an empirical study supporting admissions consideration of children of faculty or staff must necessarily mean such consideration and the interests it serves are invalid.[10] However, he does not cite any studies disproving the existence of

---

[10] Kahlenberg Rebuttal Report at 13.

the various benefits that arise from such consideration. Based on my own experience at Smith College and Brown University, my interactions with professors over my career, and my interactions with administrators and leaders of other universities, I can say that for many faculty and staff who have children or plan to have children, the fact that their children may have an opportunity to attend an institution can be a deciding factor in whether they choose to work or remain at a particular university, even a highly regarded university like Harvard. For example, during my time at Brown, I was involved in situations where I tried to recruit a new professor or faculty member to the school. Inevitably, if that individual had a child near college age, the individual would ask whether their child would be able to go to Brown. If we did not see a possibility of admitting their child based on a preview of their qualifications, the recruit often chose to go to a different institution. Beyond faculty and staff recruitment and retention, faculty and staff devote their professional and personal time to contributing to the campus community, and often raise their children among the community, instilling in them the values that universities seek among prospective students. Giving consideration to these children, provided that they are as qualified and broadly engaged as other strong applicants, strengthens the relationship between a university and its faculty and staff by bolstering morale and retention, and strengthens the student community more broadly—children of faculty and staff often consider the university a second home, their parents are integral parts of the institution, and together their continued affection for the university helps to shape all students' educational and social experiences. My experience at Brown University also made clear that selective universities have no incentive to admit the child of a faculty or staff member if that child was not, on his or her own merits, deserving of admission. Moreover, as I explained in my initial report, elimination of such an admissions consideration would entail greater costs than benefits, given that the number of children of faculty or staff admitted in an admissions cycle is virtually negligible compared to the larger pool of applicants.

9

### III. KAHLENBERG'S SUGGESTION TO ELIMINATE EARLY ACTION OVERLOOKS THE NEGATIVE CONSEQUENCES FOR COMPETITIVE UNIVERSITIES LIKE HARVARD AND THE OUTREACH EFFORTS MADE TO ATTRACT A BROADER POOL OF EARLY APPLICANTS

19. Mr. Kahlenberg dismisses, without providing any evidence to the contrary, my opinion that universities risk losing well-qualified students to competitor institutions by eliminating early admissions.[11] I continue to believe, based on my experience, that eliminating early action admissions would have substantial costs for competitive and selective universities like Harvard.

20. During my presidency at Brown University, we assessed whether Brown should eliminate early admissions, cognizant that other competitive universities had decided to do so or were considering such a move. After hearing from enrolled students, applicants, and their families, we ultimately concluded that the potential costs of losing out on the ability to compete for some of this country's most talented students outweighed any potential benefits of elimination. Early action can serve to strengthen the recruitment of the most talented students who are the most sought-after candidates. When strong applicants are able to demonstrate their interest to particular selective universities by applying early, and can in turn receive early commitments from those universities, they have less incentive to apply to competitor universities and are more likely to matriculate to the school in which they showed early interest. For example, I recall that during Brown's assessment of whether to eliminate early admissions, we heard from many students who desired to be able to show their interest in Brown as their first-choice school through applying early. The lack of an early action admissions cycle puts universities at a disadvantage against their peer competitors who do have early admissions in competing for the same, well qualified applicants, as competitive universities have recognized in deciding to reinstate early admissions

---

[11] Kahlenberg Rebuttal Report at 20.

programs.[12] Moreover, universities like Harvard that seek to increase enrollment of talented students from lower income and/or minority backgrounds may be at a competitive disadvantage without an early admissions program, as these students may decide to apply early elsewhere and no longer be available during the regular admissions cycle.[13] These experiences of universities that have eliminated and then reinstated early admissions programs are consistent with the considerations Brown University weighed in deliberating whether to eliminate, and ultimately deciding to keep, early admissions.

21. Mr. Kahlenberg argues that I have "ignore[d] the principle [sic] issue [] that many low-income and minority students are at a disadvantage because they lack counselors telling them to apply early."[14] I do not dispute that some students need more support in navigating the college application process, and some have criticized early admissions programs for the reason Mr. Kahlenberg observes. While it is no doubt true that some students from low income backgrounds, including some very capable minority students, do not have the benefit of strong college advising resources, many with their sights on universities like Harvard have been focused on applying for some time and, consistent with the experience of the schools that reinstated early options after

---

[12] *See* Lewin, "Harvard and Princeton Restore Early Admission," N.Y. Times (Feb. 24, 2011), available at http://www.nytimes.com/2011/02/25/education/25admissions.html; "Princeton to reinstate early admission program" (Feb. 24, 2011), https://www.princeton.edu/news/2011/02/24/princeton-reinstate-early-admission-program; Steinberg, "University of Virginia Explains Its Return to Early-Admissions Arena," N.Y. Times (Nov. 23, 2010), available at https://thechoice.blogs.nytimes.com/2010/11/23/virginia/.

[13] *E.g.*, Lewin (According to Harvard's Dean of Faculty of Arts and Sciences, "'We looked carefully at trends in Harvard admissions these past years and saw that many highly talented students, including some of the best-prepared low-income and underrepresented minority students, were choosing programs with an early-action option, and therefore were missing out on the opportunity to consider Harvard.'"); "Princeton to reinstate…" (According to Princeton's President, "'By reinstating an early program, we hope we can … provide opportunities for early application for students who know that Princeton is their first choice, while at the same time sustaining and even enhancing the progress we have made in recent years in diversifying our applicant pool….'").

[14] Kahlenberg Rebuttal Report at 20.

11

suspending them, want early application options.[15]  Indeed, that was my own experience at Brown University, based on feedback I heard from students, applicants, and their families.

22. Moreover, as my report noted, universities can ameliorate this issue by publicizing their admissions policies, including their early admissions policies, to schools and students, so that applicants understand that they have the option of applying early.[16]  This is particularly so in current circumstances in which the internet and websites are a key source of admissions information.[17]

23. My understanding is that Harvard engages in extensive outreach to low-income and minority students to encourage them to apply to Harvard through programs such as the Underrepresented Minority Recruitment Program,[18] the Harvard First Generation Program,[19] the Harvard Financial Aid Initiative,[20] and the Harvard College Connection.[21]  Other universities with early admissions programs have also increased their efforts to educate lower-income and minority students about applying early, such as connecting directly with high school students through social media and visits by current enrolled students, and have credited these enhanced efforts with

---

[15] *Supra* note 12.
[16] See Simmons Report at 23.
[17] *E.g.*, Richter, "The Role of the Internet in Students' College Selection Process and Admissions Recruitment Strategies: A Review of the Literature," 4 Journal of Student Affairs at N.Y.U., 2008, available at https://steinhardt.nyu.edu/scmsAdmin/uploads/001/352/JoSA2008_RichterOnline.pdf.
[18] Available at https://college.harvard.edu/admissions/hear-our-students/multicultural-diversity.
[19] Available at https://college.harvard.edu/admissions/hear-our-students/first-generation-students.
[20] Available at https://college.harvard.edu/admissions/hear-our-students/economic-diversity.
[21] Available at https://college.harvard.edu/admissions/hear-our-students/harvard-college-connection.  The Harvard admissions office has recently credited the Harvard College Connection with helping to increase the number of students who applied for early admission.  *See* "977 Admitted to Class of 2019 under Early Action," The Harvard Gazette (Dec. 12, 2014), available at https://news.harvard.edu/gazette/story/2014/12/977-admitted-to-class-of-2019-under-early-action/ ("Harvard College Connection (HCC), a new initiative announced in October 2013, appears to have played a major role in this year's early results.  Bolstered by Harvard's enhanced website and video capabilities along with a new social media program and traditional outreach, HCC was cited by many students in their applications.").

bringing greater socioeconomic and racial diversity to the early admissions applicant pool.[22] This is consistent with my own experience at Brown University, and these outreach efforts, in my opinion, should help increase the number of lower-income and minority applicants who choose to apply early.

## IV. CONCLUSION

24. For the reasons stated in my initial report and above, Mr. Kahlenberg's rebuttal report does not change my opinions and conclusions regarding the necessity of keeping certain admissions policies in order to effectuate institutional goals.

---

[22] *E.g.*, Trustman, "Penn received a record-breaking number of Early Decision applicants for the Class of 2022," The Daily Pennsylvanian (Nov. 15, 2017), available at http://www.thedp.com/article/2017/11/penn-ed-applicant-pool-record-high; Victor, "Early applications show increased diversity," Yale Daily News (Nov. 19, 2015), available at https://yaledailynews.com/blog/2015/11/19/129216/; Wang, "U. accepts 15.4 percent of early action applicants," The Daily Princetonian (Dec. 15, 2016), available at http://www.dailyprincetonian.com/article/2016/12/u-offers-admission-to-15-4-percent.

13

3/15/18

Date:

_Ruth J. Simmons_

Ruth Simmons

# EXHIBIT A

**Rebuttal Report of Dr. Ruth Simmons**
**List of Materials Considered**

1. Expert Report of Richard D. Kahlenberg, *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College (Harvard Corporation)*, October 16, 2017.

2. Rebuttal Expert Report of Richard D. Kahlenberg, *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College (Harvard Corporation)*, January 30, 2018.

3. Multicultural Diversity. *Harvard College Admissions & Financial Aid*. Retrieved from: https://college.harvard.edu/admissions/hear-our-students/multicultural-diversity.

4. First Generation Students. *Harvard College Admissions & Financial Aid*. Retrieved from: https://college.harvard.edu/admissions/hear-our-students/first-generation-students.

5. Economic Diversity. *Harvard College Admissions & Financial Aid*. Retrieved from: https://college.harvard.edu/admissions/hear-our-students/economic-diversity.

6. Harvard College Connection. *Harvard College Admissions & Financial Aid*. Retrieved from: https://college.harvard.edu/admissions/hear-our-students/harvard-college-connection.

7. Monyak, Suzanne. (March 20, 2015). Legacy Status Tips Admission Scales. *The Hoya*. Retrieved from: http://www.thehoya.com/legacy-status-tips-admission-scales/.

8. Temple, Kerry. (January 20, 2015). Lunch with Don Bishop. *Notre Dame Magazine; University of Notre Dame Undergraduate Admissions*. Retrieved from: https://admissions.nd.edu/connect/news/lunch-with-don-bishop/.

9. Kapur, Salone. (April 4, 2008). Legacy Still Factor in Admissions. *The Stanford Daily*.

10. Heintz, Francesca. (February 6, 2007). Perspective: Better Fundraising through Family Freshmen?  Legacy Admits Repay Loyalties. *The Daily Pennsylvanian*. Retrieved from: http://www.thedp.com:8080/article/2007/02/perspective_better_fundraising_through_family_freshmen_legacy_admits_repay_loyalties.

11. Lassila, Kathrin. (November/December 2004). Why Yale Favors Its Own. *Yale Alumni Magazine*. Retrieved from: http://archives.yalealumnimagazine.com/issues/2004_11/q_a.html.

12. Bourne, Claire. (February 25, 2003). Children of Alumni Enjoy Admissions Preference. *The Middlebury Campus*. Retrieved from: https://middleburycampus.com/2689/news/children-of-alumni-enjoy-admissions-preference/.

13. Morse, Robert & Brooks, Eric. (September 11, 2017). Best Colleges Ranking Criteria and Weight. *U.S. News & World Report*. Retrieved from: https://www.usnews.com/education/best-colleges/articles/ranking-criteria-and-weights.

14. Lewin, Tamar. (February 24, 2011). Harvard and Princeton Restore Early Admission. *The New York Times*. Retrieved from: http://www.nytimes.com/2011/02/25/education/25admissions.html.

15. Staff. (February 24, 2011). Princeton to reinstate early admission program. *Princeton News*. Retrieved from: https://www.princeton.edu/news/2011/02/24/princeton-reinstate-early-admission-program.

16. Steinberg, Jacques. (November 23, 2010). University of Virginia Explains Its Return to Early-Admissions Arena. *The New York Times: The Choice Blog*. Retrieved from: https://thechoice.blogs.nytimes.com/2010/11/23/virginia/.

17. 977 Admitted to Class of 2019 under Early Action. (December 12, 2014). *The Harvard Gazette*. Retrieved from: https://news.harvard.edu/gazette/story/2014/12/977-admitted-to-class-of-2019-under-early-action/.

18. Trustman, Harry. (November 15, 2017). Penn received a record-breaking number of Early Decision applicants for the Class of 2022. *The Daily Pennsylvanian*. Retrieved from: http://www.thedp.com/article/2018/02/applicant-total-upenn-admissions-penn-class-2022-philadelphia.

19. Victor, Jon. (November 19, 2015). Early applications show increased diversity. *Yale Daily News*. Retrieved from: https://yaledailynews.com/blog/2015/11/19/129216/.

20. Wang, Katherine. (December 15, 2016). U. accepts 15.4 percent of early action applicants. *The Daily Princetonian*. Retrieved from: http://www.dailyprincetonian.com/article/2016/12/u-offers-admission-to-770-applicants.

21. Coffman, Chad, O'Neil, Tara & Starr, Brian. An Empirical Analysis of Legacy Preferences on Alumni Giving at Top Universities. *Affirmative Action for the Rich*.

22. Holmes, Jessica. (February 2009). Prestige, Charitable Deductions and Other Determinants of Alumni Giving: Evidence from a Highly Selective Liberal Arts College. *Economics of Education Review*. Volume 28, No. 1, pp. 18-28.

23. Edmonson, Lauren. (Spring 2011). Explaining the Alumni Relationship and Giving Tendencies of Multigeneration Alumni Legacy Families at Marquette University. *College of Professional Studies Professional Projects*.

24. Richter, Diana. (2008). The Role of the Internet in Students' College Selection Process and Admissions Recruitment Strategies: A Review of the Literature. *Journal of Student Affairs at New York University*. Volume IV.