# EXHIBIT 41



HU 36.11.5

# THE PRESIDENT'S REPORT

## 1993–1995

### HARVARD UNIVERSITY

HARVARD UNIVERSITY
JAN 1 8 1999
ARCHIVES

CONFIDENTIAL

HARV00030365

Democracy does not seek equality through the discouragement or obliteration of individual diversities. It does not aim at a general average of gifts and powers in humanity. The prairie is not its social ideal. Its conception of social and political equality does not involve a dead level of human gifts, powers, or attainments. On the contrary, democratic society enjoys and actively promotes an immense diversity among its members, and in particular, it increases many fold and with happiest results the difference between the human individual in youth and the same individual in his prime and in old age. A despotic government gives one individual—the ruler—or a few individuals—the ruling family or set—the opportunity of great personal growth and enlargement. Democratic society gives multitudes that precious opportunity.

—Charles William Eliot (1909)


A college would be a dreary place if it were composed of only one type of individual. A liberal education is possible, it seems to me, only in an atmosphere of tolerance engendered by the presence of many [individuals] of many minds.

—James Bryant Conant (1938)

CONFIDENTIAL

HARV00030366

# DIVERSITY AND LEARNING

## *I*
## *Introduction*

I have the honor to submit this report to the members of
the Board of Overseers.

DURING THE PAST TWO YEARS, we have seen a steady
growth in controversy concerning issues of student diver-
sity, university admissions, and affirmative action. Amid
this national discussion and debate, specific proposals have been
advanced in some quarters to eliminate factors such as race, ethnic-
ity, and gender from consideration in university admissions.
Although major policy changes have not yet taken effect, some are
scheduled to go forward in at least one major university system in
the near future, and others are under active consideration. The cli-
mate is one of uncertainty and ferment.

As we look ahead, I believe we need to examine not only cur-
rent ideas and recommendations, but also the relevant past. We
need to remind ourselves that student diversity has, for more than
a century, been valued for its capacity to contribute powerfully to
the process of learning and to the creation of an effective educa-
tional environment. It has also been seen as vital to the education
of citizens—and the development of leaders—in heterogeneous
democratic societies such as our own. These overarching values

1

CONFIDENTIAL

HARV00030367

*Harvard University*

have for many decades influenced our approach to admissions, and have provided the rationale for our basic policies.

In the pages that follow, I discuss the emergence of student diversity as an important idea in American higher education, especially as it relates to learning that takes place beyond the classroom and the formal curriculum. I draw largely on the experience of Harvard University, but also on a broader context. I consider why many thinkers, from the mid-nineteenth century to our own time, have placed such a strong emphasis on diversity—and how they have defined the concept. Finally, I indicate why the goal of diversity remains so important to the actual quality and breadth of education for all our students, and why our existing policies continue to offer the most effective and promising pathway to the future.

CONFIDENTIAL

HARV00030368

## II
### Early Ideas of Diversity:
### Nineteenth Century Beginnings

#### 1.

THE WORD *diversity* has been overused in recent years, often to the point of cliché. That is unfortunate, because the term has an important history, and it has no adequate synonym in our language. The word and the idea began to appear in discussions of education at least as early as the mid-nineteenth century. Over the past century and a half the significance of diversity to the process of education has been increasingly recognized. Without at least some reference to this historical development, we cannot fully understand our contemporary notions of diversity— nor can we adequately evaluate the arguments that are shaping the current national debate on affirmative action.

We need to understand how some of the major English and American educators of the nineteenth and early twentieth centuries defined diversity and viewed its contribution to learning. It is also important to see how the concept of diversity affected their ideas about the purposes and structure of educational institutions. We will not find complete answers to such questions, nor should we look for unanimity. But there is enough testimony on the record to be of real use.

Many nineteenth century educators tended to think of diversity in terms of ideas—differences in opinions and views in all the areas of life where actual proof was impossible to achieve. Many would have subscribed to the argument that John Milton had made in the *Areopagitica* when opposing the censorship of books: "Where there is much desire to learn, there of necessity will be much arguing, much writing, many opinions; for opinion in good men is but

3

CONFIDENTIAL

HARV00030369

*Harvard University*

knowledge in the making." The clash of different opinions was often seen to be positive: "that which purifies us is triall, and triall is by what is contrary."

An important variation on this theme emerged in the work of major thinkers during the 1840s and 1850s. John Stuart Mill stressed the value of bringing "human beings in contact with persons dissimilar to themselves, and with modes of thought and action unlike those with which they are familiar."[1] The word *diversity* was very much a part of his lexicon. Many passages in *On Liberty* concern the "causes which make diversity of opinion advantageous, and will continue to do so."[2] It was not enough, moreover, for a person to read about or "be taught" the opinions of others on a given subject:

> That is not the way to do justice to the arguments, or bring them into real contact with his own mind. He must be able to hear them from persons who actually believe them; who defend them in earnest, and do their very utmost for them. He must know them in their most plausible and persuasive form; he must feel the whole force of the difficulty which the true view of the subject has to encounter and dispose of . . . .[3]

For Mill, opinions and ideas were not disembodied abstractions: they were living things that should be encountered in the presence of "persons who actually believe them," and who could argue for them forcefully, based on their own experience and convictions. Diversity, in other words, was most fully realized when it was made visible and present through actual associations among human beings in all their variety.

John Newman's view was less combative than Mill's, but it shared some significant features. Newman envisioned colleges where "a multitude" of students would "come together and freely mix with each other." Under such circumstances,

> they are sure to learn one from another, even if there be no one to teach them; the conversation of all is a series of lectures to each, and they gain for themselves new ideas and views, fresh matter of thought, and distinct principles for judging and acting, day by day.[4]

Newman's university was to be like "the world on a small field": students would "come from very different places, and with widely different notions." Because of such differences, there would be "much to adjust," new "inter-relations to be defined," and rules and

4

CONFIDENTIAL

HARV00030370

*The President's Report 1993–1995*

norms to be established, so that a college could in time become unified in spirit, with "one tone and one character."[5] Through a process of association and mutual education, unity would eventually emerge from difference.

Mill may have stressed the friction of human contact, while Newman emphasized reconciliation and wholeness. Yet both regarded direct association among dissimilar people as essential to learning. Both take us beyond any simple concept of diversity defined in purely intellectual or abstract terms. Mill emphasized not only different ideas and opinions, but also different "modes of thought and action." Newman specifically mentioned geographical diversity: students would come from "very different places," bringing their "widely different notions," creating a small-scale version of the world outside. For both Mill and Newman, these forms of diversity are not mere extras; they are integral to true learning at a profound level. They are not dispensable. They shape some of the fundamental ways in which knowledge itself is generated, tested, and transformed into understanding.

## 2.

THE NATION STOOD on the verge of the Civil War when Harvard president C.C. Felton presented his report for the academic year 1859-60. In the midst of this national turmoil, he and others saw a need for colleges and universities to provide an education based on experience with different kinds of people, in the hope of overcoming regional, cultural, and other barriers. One way for Harvard to help achieve this hope, in Felton's view, was to become a truly national institution. "Students from every State and Territory in the Union—without a single exception or secession— will resort to our University," Felton wrote, "no difference whatever being made between the citizens of Massachusetts and the citizens of the remotest part of the country, or of foreign lands." Gathering students together in this way, "from different and distant States[,] must tend powerfully to remove prejudices, by bringing them into friendly relations . . . ," Felton reasoned. "Such influences are especially needed in the present disastrous condition of public affairs."[6]

5

HARV00030371

*Harvard University*

For Felton, a national university could aspire to have a nation-wide influence, helping to "remove prejudices" and to reduce the possibility of misunderstanding, conflict, and even war. Geography—or place of residence—thus became, from an early date, a critical component in Harvard's concept of diversity. And this factor had, of course, no inherent relation to individual merit or achievement. The fact that a student came from Carolina or Connecticut indicated nothing about his abilities or accomplishments. The rationale was quite different, and very straightforward: students from many parts of the country (or the world) were likely to have a variety of basic assumptions, experiences, regional or cultural perspectives, and even prejudices. Felton concluded that if he could bring together—in a single institution—young people from different backgrounds who would be educated in association with one another, and who would eventually become leaders in different parts of the nation, then that process could make a difference to the creation of unity throughout the country as a whole.

To some extent, the process was already under way. Henry Adams, class of 1858, graduated not long before Felton's report was submitted. Most of Adams's classmates (about one hundred in all) were from New England, but "chance insisted on enlarging [his] education by tossing a trio of Virginians" into the mix. One of the trio was "Roony" Lee, son of Robert E. Lee. Adams and the Virginians

> knew well how thin an edge of friendship separated them in 1856 from mortal enmity. . . . For the first time Adams's education brought him in contact with new types and taught him their values. He saw the New England type measure itself with another, and he was part of the process.[7]

As events turned out, despite their friendship neither Adams nor Lee was able to reach across the gap between them. Lee "had changed little from the Virginian of a century before; but Adams was himself a good deal nearer the type of his great-grandfather" than to many of his contemporaries—and he was "little more fit than the Virginians to deal with a future America."[8] Both Lee and Adams were constrained by differences in heritage, history, temperament, and culture that were in the end too vast to overcome.

The point, however, is not whether this particular experiment in education was or was not a full success. The point is that Adams—and, from a different perspective, Felton—recognized the impor-

6

CONFIDENTIAL

HARV00030372

*The President's Report 1993–1995*

tance of the attempt, and saw that this "lesson in education was vital to these young men."[9] It produced an awareness of what might, under different circumstances, have proved possible. It also altered Adams's consciousness, and forced him to confront and assess a type of person he had never before known. It drove him to reach new conclusions about himself and his own limitations, and even led to some understanding (vastly oversimplified) of representative southerners and the South. Chance had "enlarged" his education, almost in spite of himself. Harvard, meanwhile, had begun a modest experiment in diversity that rested on principles and experiences not very different from those described by Mill and Newman. That experiment would continue—and grow in complexity and comprehensiveness—well into the future.

<div align="center">3.</div>

Dıversıty became a more explicit goal—and the word itself was more frequently used—during the last decades of the nineteenth century and the early decades of the twentieth. In the political and educational dialogue of the day, diversity was defined more precisely (as well as expansively); it was sometimes championed; and it was in some places realized more fully than before. It also became a subject of increasing controversy.

Many events contributed to this development. Struggles between differing religions, and between religion and science (particularly the ideas of Darwin), intensified. The movement for women's rights created greater tensions, even as it gathered strength. The social position of black Americans, following the Civil War and Reconstruction, was anything but resolved. Perhaps most significant, successive waves of "new immigrants" had been arriving since the mid-1800s, and this process accelerated in the 1870s and 1880s. Those who came in the last decades of the century were generally poorer, less well-educated, and more culturally heterogeneous than most previous groups. Many were escaping from poverty and continued famine in Ireland, from anti-Semitism and persecution in Russia and Eastern Europe, or from terrible economic and social conditions in southern Italy. There were Catholics, Jews, and mem-

<div align="center">7</div>

CONFIDENTIAL

HARV00030373

*Harvard University*

bers of the Eastern Orthodox Church; there were Irish, Poles, Hispanics, Greeks, Ukrainians, Armenians, Chinese, and others. They came, moreover, in very great numbers. By the 1890s, for example, the recent immigrant population of Boston (first and second generation combined) accounted for more than two-thirds of the residential community. Social services—to the extent they existed—were saturated. School systems were strained, and often became flash points for religious and other forms of tension.

As we know, this continuous influx of different peoples gave rise to considerable anxieties and fears on the part of the settled population. To some, established institutions and traditions appeared to be under siege, particularly since the newest immigrants were themselves so varied in terms of language and culture. To be sure, some people welcomed the great influx as another infusion of strength into American society. But historians of the period have documented the equally strong movements to curtail immigration, and to limit the opportunities available in education and employment. In Boston and its environs, many civic, political, and religious groups sprang into existence during the 1880s and 1890s: the Massachusetts Society for Promoting Good Citizenship, the Citizens Association, the Citizens Club of Boston, and—more pointed and assertive in its goals—the Immigration Restriction League of Boston (founded in 1894 with the help of three young Harvard graduates from the class of 1889).

This was also a moment when purportedly scientific studies of race proliferated. A steady flow of articles and books set out to define the "races" of mankind, and to assess their relative superiority. There were also the well-known attempts to demonstrate that the origins of democratic or republican laws and institutions lay in the assemblies of ancient Teutonic or Anglo-Saxon tribes. In a quite different sphere, parochial school systems began to develop more rapidly at this time, as did the movement by Episcopalians and other Protestants to found church-related boarding schools, especially in New England. As a result, secondary and even elementary schools functioned somewhat less effectively as potential "melting pots." Instead, religious and social groups began to establish separate institutions to educate their children in accord with their particular cultural and religious traditions.

8

CONFIDENTIAL

HARV00030374

*The President's Report 1993–1995*

In short, the increased diversity of the population produced a variety of responses. New England, Boston, and Harvard constituted one of the main arenas in which conflicting attitudes and forces encountered one another. Meanwhile, Harvard's president, Charles William Eliot, played an important role in defining an expanded conception of diversity in relation to learning.

### 4.

CHARLES ELIOT'S PRESIDENCY at Harvard spanned forty years, from 1869 to 1909. More than anyone else, he was responsible for transforming Harvard College into Harvard University. Most of his contributions have been well-documented, but his ideas about diversity have received less attention. Yet diversity was central to Eliot's approach to education. He wrote about it and theorized about it. More than any other leading educator of his time, he stressed the value of cultivating the diverse talents of every individual, while also emphasizing how diversity among individuals and groups can be a major stimulus to learning. He expanded the definition of diversity, in terms of the criteria and considerations to be taken into account. Finally, he regarded diversity as so powerful and far-reaching in its effects—capable of shaping life-long attitudes and habits—that he came to view it as indispensable to the healthy functioning of a democratic society.

Scarcely anyone during his time expressed more confidence than Eliot in the potential of all human talent to flourish, given the freedom and opportunity to do so. It was in society's interest "to make the most of every useful gift or faculty which any member may fortunately possess; and it is one of the main advantages of fluent and mobile democratic society that it is more likely . . . to secure the fruition of individual capacities."[10] A democracy "does not seek equality through the discouragement or obliteration of individual diversities. . . . [It] actively promotes an immense diversity among its members . . . ."[11]

A chief task for colleges and universities, therefore, was to create an atmosphere that would be stimulating in the variety and quality of academic and other offerings or activities. Eliot's com-

9

CONFIDENTIAL

HARV00030375

mitment to the "elective system" was predicated on the conviction that a diversity of interests and talents among students required a corresponding variety of fields of inquiry and opportunities to foster individual development. Flexibility and choice, not prescription, were the keys to serious learning and growth. In the selection of courses (and extracurricular activities), the university should allow its students, "in the main, to govern themselves":

> It must have a large body of students, else many of its numerous courses of highly specialized instruction will find no hearers, and the students themselves will not feel that very wholesome influence which comes from observation of and contact with larger numbers . . . from different nations, States, schools, families, sects, parties, and conditions of life.[12]

For Eliot (as for Mill, Newman, and Felton), direct contact among a heterogeneous (and now also large) group of students was vital to the process of education. And Eliot's list of the "categories" or considerations that contribute to diversity is more detailed than we have seen before. He wanted people from various "nations, States, schools, families, sects, parties, and conditions of life." Some of these categories are by now familiar, but others (such as nations, families, sects, and conditions of life) tend to expand the definition of diversity to include characteristics and types of people (not simply opinions or ideas) that resist easy or strict definition.

In a number of articles and reports, Eliot discussed his views in greater detail. He wanted, as he said, a university "of broad democratic resort." Harvard's students should be children of the "rich and poor," the "educated and uneducated." There was also a need for "diversity in religion."[13] Indeed, Eliot could say with some satisfaction (after three decades in office) that the Harvard of 1900 had "for a generation past" been free from any religious restrictions in admissions and faculty appointments, and was now open to students and faculty of "every religious communion, from the Roman Catholic to the Jew and the Japanese Buddhist." The goal was to foster not only greater knowledge, but actual "respect for each other's religious inheritances."[14] This could be achieved only if students and faculty from different sects or denominations were brought directly together in an institution where they could associate freely and learn about one another:

10

CONFIDENTIAL

HARV00030376

*The President's Report 1993–1995*

> The influence of an educated Roman Catholic in an American community is diminished, not increased, if his education has deprived him of all knowledge of his Protestant contemporaries and of the Protestant mode of thought and feeling. Precisely in the same way the influence . . . of the members of the Episcopalian body is diminished, not increased, by their habit of resorting to schools and colleges under the exclusive control of their own religious communion.[15]

For Eliot, Americans would ideally retain many of their differences, and resist becoming "the same." But if they were to lead productive lives as citizens and leaders in a democracy, then they needed to understand the "modes of thought and feeling" of their contemporaries, encountering one another and studying with one another on a daily basis.

Beyond matters of religion, Eliot's Harvard now intended to attract—even more aggressively—students "from a large area, from North and South, from East and West." There would be "Democrats and Republicans, free-traders and protectionists, spoilsmen and reformers, Prohibitionists and high-license advocates."[16] The goal was to create a more open and even disputatious university community where (as in John Stuart Mill) the zeal and zest of argument and debate would be audible and tangible. In addition (as in Newman and Felton), the gains in terms of tolerance, mutual understanding, and camaraderie would be profound and long-lasting. At a university,

> there is . . . a continual ferment and agitation on all questions of public interest. This collision of views is wholesome and profitable; it promotes thought on great themes, converts passion into resolution, cultivates forbearance and mutual respect, and teaches . . . candor, moral courage, and independence of thought on whatever side these noble qualities may be displayed.[17]

Discussion and debate are not purely intellectual processes. They involve emotion and conviction as well as reason and argument. They convert "passion into resolution," and teach candor and moral courage. Education and learning are in this sense human and moral processes concerned ultimately with values and effective action. They are most fully tested when individuals engage others whose ideas, passions, experiences, and beliefs differ from their own.

There are, of course, alternative conceptions of education and learning, with their own important emphases and rewards. Eliot's

11

CONFIDENTIAL

HARV00030377

*Harvard University*

conception, however, was fashioned explicitly to serve the purposes and needs of a democratic society that was intrinsically diverse, and committed to freedom and equality of opportunity. It was a society that could not function effectively without a considerable level of mutual "forbearance" and tolerance—if not respect and understanding—among its infinitely varied citizenry. Consequently, the university should resemble that larger society in many essential features. Indeed, Eliot never tired of insisting that "the whole organization of college life is intensely democratic" in its determination to minimize "social inequalities," to maximize individual choice and opportunity, and to demonstrate "the intimate dependence of each human individual on a multitude of other individuals, not in infancy alone, but at every moment of life—a dependence which increases with civilization and with the development of urban life."[18]

Diversity, therefore, was central to Eliot's conception of education for citizenship in a democratic society. Moreover, the fruits of diversity would extend well beyond the university through the continuing association of individuals during their lifetimes. In this sense, Eliot expanded on Felton's hopes concerning the power of a truly national institution. "A university of national resort exerts a unifying influence" far and wide, argued Eliot, because of "the mutual knowledge" that students gain from one another, and "hold through life."

> Every year hundreds . . . go out from each of the great American universities and scatter through the whole country. In their several places of residence they ordinarily rise to places of trust and influence; and they remain united for life, however separated by distance; united by common associations, and by bonds of friendship and mutual respect. . . .
>
>   Do you ask, Are all these aims of the higher education anywhere attained? Nowhere, as yet. But they surely will be as our republic grows in wealth, wisdom, and true worth.[19]

Once again, Eliot powerfully forges the links between diversity, student learning, and the role of higher education in a heterogeneous democratic society.

12

CONFIDENTIAL

HARV00030378

## III
### Diversity and Race:
### Some Turn-of-the-Century Dilemmas

#### 1.

IT IS DIFFICULT TO DISCUSS the issue of diversity in late nineteenth century America without at least touching upon the complicated set of questions related to race, nationality, religion, and ethnicity. The body of scholarly literature on this broad topic is now substantial and impressive, but it is not so definitive that it yields ready generalizations or relatively uncontested truths. Let me offer just a few observations here.

To begin with, in the late nineteenth century, the concepts of race, religion, and nationality were different from our own in several respects—and the idea of ethnicity, in its contemporary meaning, was scarcely developed at all. There was also considerable overlap among these categories. Although race was often defined in terms of skin color, it was even more widely viewed as a set of characteristics that could include a particular group's native language, geographical home, religion, national identity, temperament, certain physiognomic features, political and cultural traditions, and traditional occupations.

These categories and classifications shifted constantly, however, and they were obviously difficult to apply with rigor and consistency, although many writers tried persistently to do so. For example, the French or French-Canadians could be construed as one or more "races"; yet they could equally be identified as simply part of a larger Celtic racial group. The Italians were "Mediterraneans"; but the Greeks, their southeastern neighbors, were sometimes linked (mistakenly) to an obscure Germanic tribe—because some commentators found it difficult to believe that the great classical Greek civilization could possibly have been Mediterranean in its

13

CONFIDENTIAL

HARV00030379

*Harvard University*

origins. Finally, religion complicated the picture. Protestants and Catholics were manifestly religious—not racial or national—groups. But it proved difficult in the later nineteenth century to dissociate Protestantism completely from Anglo-Saxons (or from the Teutons, English, or Nordics), just as it was hard to disentangle Catholicism completely from the Irish and Italians.

In short, ideas of race, religion, and nationality interpenetrated one another. Composite types and stereotypes were not only common but also carried potential explosive power in the charged atmosphere that surrounded the immigration controversies of the time. Even the most superficial glance at the titles of many turn-of-the-century books and articles suggests why the situation was potentially volatile: *Are We Celts or Teutons?*; *The Growth of the French–Canadian Race in America*; *The Jewish Question*; *The Irish in American Life*; *The Races of the Danube*; *The Coming of the Italian*; *The Racial Problem in Immigration*; *The Causes of Race Superiority*; *The Races of Europe*; and *Immigration and Degradation*, to name just a few.

## 2.

SERIOUS TENSIONS—sparked by immigrant, religious, and national groupings—emerged in Boston (and elsewhere) as early as the 1830s and 1840s, and escalated over the next several decades. The Boston Irish (and other groups) took steps to preserve their own religious tradition, as well as to create their own self-help and cultural organizations. These very actions, however,

> provoked complaints that "instead of assimilating at once with the customs of the country of their adoption, our foreign population are too much in the habit of retaining their own national usages, of *associating too exclusively with each other*, and living in groups together. . . . " The inability of the native-born to understand the ideas of their new neighbors perpetuated this gap between them, rousing the vivid fear that the Irish were "a race that will never be infused into our own, but on the contrary will always remain distinct and hostile."[20]

The reference in this passage to the Irish "race" was by no means casual. The more that Teutons, Anglo-Saxons, and the "Gothic" Germanic peoples continued to press their conception of racial

14

CONFIDENTIAL

HARV00030380

*The President's Report 1993–1995*

superiority, the more the Irish and others felt the need to respond with racial pronouncements of their own—as well as with more assertive attempts (particularly by the Catholic Church) to maintain traditional values in the face of considerable suspicion and even hostility. Irish writers—such as John McElheran—declared that "the divine spark of genius radiates from the Celtic centre of the world" and shows "the natural tendency of the pure Celtic race, uncontaminated by Gothic bestiality."[21] Given this dynamic of claim and counterclaim, group definitions tended to become stronger, and potential conflict more likely. No single or simple cause triggered the many events that contributed to this situation. But once the process had been set in motion, conciliation was increasingly difficult to achieve. By the mid-1850s,

> the violent phase had passed, [but] the bitterness of conflict and antagonism remained. Out of it had grown a confirmed definition of racial particularism: the Irish were [regarded as] a different group, Celtic by origin, as distinguished from the "true" Americans, who were Anglo-Saxon, of course. Once aroused, hatred could not be turned off at the will of those who had provoked it.[22]

Through at least the 1870s, the Irish and Brahmins in Boston lived uneasily together—essentially at arm's length. The relative lack of immediate major threats or disruptions encouraged some leaders (on various sides) to declare that the major economic, social, and other problems facing immigrants were well on the way to being resolved. Consequently, activities on behalf of identifiable groups were said to be no longer necessary. This position was espoused, for example, by both Henry Cabot Lodge and Patrick Collins (an Irish politician and lawyer who had attended Harvard Law School in the early 1870s). Despite the grim conditions under which the Irish and other groups continued to live,

> there was a resolute effort to pretend that the genuine divisions in the city's life did not exist. Thus, in 1876, Collins . . . declared, "I . . . denounce any man or body of men who seek to perpetuate divisions of races or religions in our midst. . . . I know neither race, color nor creed. Let me say now that there are no Irish voters among us. There are Irish-born citizens like myself . . . [but] Americans we are and Americans we will remain."[23]

To Collins, the nation was to consist in the future of individuals who were all "Americans": hyphenated groups, such as Irish-

15

HARV00030381

*Harvard University*

Americans, were viewed as potential obstacles to further progress, representing interests and values that no longer required special recognition or attention. Historical comparisons are never exact, but some of the parallels between the 1870s and our own time are too obvious to ignore, whatever lessons we may choose to draw from them.

The main issue, of course, was not whether the ideal of a united nation was an appropriate vision for America's future: few people would have seriously questioned such a goal. The more immediate dilemma was whether the difficult social, religious, economic, and other realities of the time had been sufficiently resolved, so that the needs, interests, and even the identity of particular groups should fade—in effect—from national consciousness. One of our foremost social historians has suggested that the views expressed by Collins and others were at best premature: "Collins and Lodge were both inaccurate" in their assessment of the situation; more important, "they knew it, [and] they nevertheless felt the necessity of speaking as they did."[24]

As matters turned out, few of the deep-rooted problems facing Boston (and other cities) had been adequately confronted and addressed. When the next great wave of immigrants began to reach the nation's shores in the 1870s and 1880s, the scene was set for increased tension and conflict—as well as for intensified group identification and differentiation.

3.

CHARLES ELIOT SHARED with most of his contemporaries the assumption that there were a number of distinct races, each with its own identifiable characteristics. As has already been suggested, he also believed that the special talents, qualities, and interests of each race should be preserved, insofar as possible. His views on the subject were far from simple, but he held strongly to the idea that each group should be enabled to make its own unique contribution to the diversity of American society. In this sense, he tended to view races rather as he viewed individuals: they should develop freely along their own lines, following their own bent,

16

CONFIDENTIAL

HARV00030382

because that would lead to the full realization of their capacities. America had always "drawn to it multitudes from all parts of the habitable earth." For Eliot, therefore, the resulting "great diversity in the population of the United States as regards racial origin" was another important "illustration of the variety which may co-exist with freedom and security under democratic institutions."[25]

Eliot believed that, over time, differences among races that lived together in a single society would be qualified and diminished. But he insisted on maintaining differences, and he was no advocate of deliberate assimilation or amalgamation:

> In general, the ideal of a people made up from many different races and living under free institutions should be the perpetuation of racial diversity, and not the bringing about of a racial blend. The diversities of race need no more be extinguished under free institutions than the diversities between human individuals. Freedom should encourage diversity, not extinguish it.[26]

We may not agree with Eliot on the topic of assimilation—or on his conception of race. He himself had complicated attitudes. For instance, he was not in favor of interracial marriage, and his views seem to have been shaped as much by Anglo-Saxon attitudes and anxieties as by his desire to maintain the distinctive attributes of each separate group. Nevertheless, he identified race as a positive component of diversity, and defined racial diversity as an element that enhances—rather than diminishes—the vitality and strength of a democratic society.

Moreover, given that the new immigrant groups were closely identified with distinct "races," Eliot's affirmation of racial diversity was effectively an indication of his willingness to make room in higher education for at least some of the recent arrivals. In the 1890s, a decision to enroll even a modest number of university students from some of these groups was not uncontroversial. Indeed, when issues of race were at stake in the 1890s and earlier—especially in Boston and Cambridge—the "immigrant wave" was in some ways as complex an issue as the persistent and profound dilemma which W.E.B. Du Bois later identified as "the color line."

In spite of controversy, Eliot introduced several changes at Harvard. And given the ferment of the time, he could not press forward altogether quietly—even if he had wished to do so. Public discussion and articles (like those already cited) were necessary, as

CONFIDENTIAL

HARV00030383

*Harvard University*

was the creation of a university atmosphere that was more open in spirit. Additional financial aid was also needed to assist students from different backgrounds who lacked the means to attend a private college such as Harvard. Some explicit policy changes—especially in the sphere of religion—were also introduced. Compulsory chapel was abolished (after considerable struggle) and was replaced (with the help of the Reverend Phillips Brooks) by a system of voluntary observance, including services offered by ministers from a number of denominations. Since religion was often linked to "race"—as in the case of Jews, Buddhists, and Catholic groups—greater religious inclusiveness also implied greater racial diversity.

Over the course of a quarter-century and more, the results of these efforts were measurable and even striking. In 1870, at the beginning of Eliot's presidency, a survey showed that nearly 80 percent of the 563 undergraduates who responded were Unitarians, Episcopalians, and Congregationalists. Nearly 20 percent were members of other Protestant sects. There were seven Roman Catholics and three Jews.[27]

Certain demographic and economic factors help to explain some of these statistics, but it is also the case that there had been no serious earlier effort by Harvard to encourage the enrollment of individuals from groups that were still very much on the outside. Changing the attitude and policies of the university was a necessary prelude to changing its enrollment patterns. The situation altered steadily during the Eliot years, and it did so largely as a result of actions that were conscious and even conspicuous. By 1908, when Eliot was about to retire, 9 percent of the College's student body was Roman Catholic (compared to 1 percent in 1870); 7 percent was Jewish (compared to 1 percent earlier); and African-American students—who were absent from the student body in 1870—were at least starting to be enrolled, though still in very small numbers. Even in terms of these three categories, the aggregate number by 1909 accounted for about 17 percent of the student population, as contrasted to 2 percent at the beginning of Eliot's tenure.[28]

We should remember, in addition, that Eliot also undertook some significant (if hesitant) initiatives with respect to the educa-

18

CONFIDENTIAL

HARV00030384

*The President's Report 1993-1995*

tion of women. The explicit goal in this case had more to do with increasing educational opportunity for the members of a certain group than fostering interaction among different groups—although any greater inclusion of women in university life during the 1890s would have inevitably introduced a broader range of views and perspectives not otherwise present.

Eliot's views on the appropriate education for women—and on the role of women in society—fell short of full equality and were the subject of some intense criticism. Eliot was ambivalent about the entire subject, and it is not clear how far he would have proceeded without very substantial prodding. Early in his tenure, however, he collaborated on a report (with Professor Louis Agassiz and others) recommending the admission of women to the Harvard Medical School. The recommendation ultimately failed, but it represented an important first step. By 1879, Eliot and the Harvard faculty were working with Elizabeth Carey Agassiz to establish the "Harvard Annex," which was to become Radcliffe College. Women were to be educated separately, although taught by Harvard professors; by 1894, 22 Radcliffe women earned A.B. degrees, and three were awarded A.M.'s.

Eliot's efforts in the sphere of diversity were only part of his larger goals. Yet they were fully consistent with his basic approach to education. The results were uneven, and they were certainly not "linear": they came about as a result of struggle and disagreement, including changes in Eliot's own ideas over the course of the four decades of his presidency. What was remarkable about Eliot, in retrospect, is that he responded directly to so many of the conflicting educational issues of his era. He analyzed them with unusual clarity and tenacious logic. He was responsive to emerging challenges and changing circumstances. During his tenure, several important barriers were broken—not completely, but nonetheless significantly. Doors were opened that would be difficult to close entirely in later eras. Some of Eliot's changes "appalled" many people, but they also created a reputation for "diversity, tolerance, and pluralism" which "rested upon solid foundations."[29] From every point of view, diversity had helped to bring about significant advances in the nature, quality, and scope of undergraduate education at Harvard.

19

CONFIDENTIAL

HARV00030385

4.

THE DEVELOPMENTS just discussed provide some evidence of an increasing emphasis on diversity at Harvard. But were the benefits of diversity apparent to students themselves? On this point, the testimony is necessarily anecdotal and impressionistic—as well as sporadic. As early as the 1850s, the statements of Henry Adams, mentioned earlier, suggest that direct "contact with new types" of people had "for the first time taught [Adams] their values."[30]

Half a century later, John Reed, class of 1910, entered Harvard near the end of Eliot's presidency. He was the polar opposite of Adams in his political views, social background, and point of origin. He soon found himself immersed in the bewildering intricacy of Eliot's cosmopolitan college, with its different types, groups, clubs, and cliques. Reed's own recollection of his Harvard experience, written in 1917, is especially interesting, because it suggests some of the ways in which life in a diverse community can lead to pain, isolation, and separateness, as well as to intellectual exhilaration, greater self-knowledge, and moments of human reconciliation:

> I got to know many fellows to nod to, and a very few intimately; but most of my friends were whirled off and up into prominence, and came to see me no more. One of them said he'd room with me sophomore year—but he was tipped off that I wasn't "the right sort" and openly drew away from me. And I, too, hurt a boy who was my friend. He was a Jew, a shy, rather melancholy person. We were always together, we two outsiders. I became irritated and morbid about it—it seemed I would never be part of the rich splendor of college life with him around—so I drew away from him. . . . It hurt him very much, and it taught me better. Since then he has forgiven it, and done wonderful things for me, and we are friends.[31]

Real learning, in all its dimensions, rarely takes place altogether easily, without friction or pain. Indeed, the educational benefits of diversity are often first experienced as forms of temporary dislocation and disorientation—just as they can eventually lead to increased understanding and friendship. Genuine risks and difficulties are involved, and it would be foolish to pretend otherwise.

In John Reed's case, life at Harvard grew steadily better, and he gradually came to revel in the university. It was a place where strong individuals, as well as groups, coexisted in a milieu that was characteristic of Eliot's open and relatively unstructured institution:

CONFIDENTIAL

HARV00030386

*The President's Report 1993–1995*

> Harvard University under President Eliot was unique. . . . [A] man who came for a good time could get through and graduate . . . ; but on the other hand, anyone could find there anything he wanted from all the world's store of learning. . . .
>
> All sorts of strange characters, of every race and mind, poets, philosophers, cranks of every twist, were in our class. The very hugeness of it prevented any one man from knowing more than a few of his classmates, though I managed to make the acquaintance of about five hundred of them.[32]

If Reed was hyperbolic and ebullient, W.E.B. Du Bois was remarkably firm and determined. As a member of the class of 1890, he had a spectacularly successful undergraduate career. As an African-American, he too found himself outside the mainstream of college life: by his own testimony, his important relationships were with faculty rather than with classmates. But that did not prevent him from making a place for himself—or from being chosen (by his fellow students) as one of the six commencement orators at the time of graduation. If his years at Harvard were partly defined by his isolation, he did not doubt that the sheer opportunity to observe and learn from a "majority" institution was one of the most significant experiences of his life.

By 1933, Du Bois could look back on his Harvard time with both dispassion and appreciation. He was very clear, for example, about some of the specific forms of diversity—geographic, racial, and socioeconomic—that Eliot had introduced:

> Harvard had broadened its earlier ideals. It was no longer simply a place where rich and learned New England gave the accolade to the social élite. It had broken its shell and reached out to the West and to the South, to yellow students and to black. I had for the mere asking been granted a fellowship of $300 . . . .[33]

In addition, Du Bois remembered the university as a place where a broader and more inclusive vision of learning—and of society—was beginning to be publicly articulated:

> Men sought to make Harvard an expression of the United States, and to do this by means of leaders unshackled in thought and custom who were beating back bars of ignorance and particularism and prejudice. There were William James and Josiah Royce; Nathaniel Shaler and Charles Eliot Norton; George Santayana; Albert Bushnell Hart, and President Eliot himself. There were at least a dozen men—rebels against convention, unorthodox in religion, poor in money—who for a moment held in their hands the culture of the United States, typified it, expressed it, and pushed it a vast step forward.[34]

21

CONFIDENTIAL

HARV00030387

*Harvard University*

By 1933, the passage of time had almost certainly softened Du Bois's earlier ambivalence about Harvard, and altered the memory of some of his more difficult experiences. Nonetheless, William James, Josiah Royce, and other teachers made a lasting impression on him. They remained in his memory as examples not simply of scholars, but of individuals and leaders who demonstrated that "ignorance and particularism and prejudice" could be overcome—in the nation as well as in the university. These direct encounters between a brilliant young African-American and a cadre of progressive New England academics produced living proof for Du Bois that people of different races could meet and work on common terms, could respect one another, and could strengthen one another's commitment to the important moral as well as intellectual values essential to serious education.

22

CONFIDENTIAL

HARV00030388

# IV
## Some Twentieth Century Challenges:
## Structures, Admissions, and Tests

### 1.

I N THE TWENTIETH CENTURY there have been at least two major developments related to the conception of diversity in education, especially outside the classroom and the formal curriculum.

The first had to do with the creation of educational facilities and structures intended to help support the goals that I have been discussing. The second concerned the need to deal with a new problem: how to select students from a pool of highly qualified applicants that was much larger than the available number of places in each entering class. Let me turn first to the matter of facilities and structures.

From many points of view, the basic conception of a residential education has remained the strongest expression of an institution's commitment to educating the "whole person," rather than only the intellect. This idea was embodied in the foundation charters of many American colleges and universities: the purpose was to provide the community with "pious and learned" graduates who would become ministers, lawyers, public servants, and civic leaders in all walks of life. As a result, a young person's character, integrity, industriousness, and other attributes were important in admissions, as well as in the life of the college and the larger community.

The residential nature of a college also allowed the benefits of a diverse student body to be more fully realized. If a college provided proper facilities and assistance—while creating an open atmosphere of free inquiry and mutual respect—then it could more confidently take the step of bringing together many kinds of students

23

CONFIDENTIAL

HARV00030389

*Harvard University*

from different places. Initiatives of this kind were introduced in at least some colleges and universities by the mid- to late nineteenth century, and were developed much more systematically in the twentieth. New institutional structures enabled students to form close and more continuing associations with their peers, joining organizations and societies of every type. At Harvard, students began living in residential "Houses" that provided social and dining facilities, faculty "masters" and associates, and graduate student tutors. Participation in such units—and in associated extracurricular activities—was rightly seen as much more than a mere adjunct to education. It became part of the fabric of daily life in residential university communities, and one of the primary ways that students learned from one another.

President A. Lawrence Lowell was clearly very different from Eliot, and in some ways sought to limit Eliot's concept of diversity. For example, he called for quotas on the number of Jewish students admitted to Harvard. At the same time, he went further than Eliot in providing facilities that could sustain the more democratic ideals which had gradually been established at the university. In developing the residential House system during the late 1920s, Lowell specifically sought to diminish the tendency of students to form "cliques based upon similarity of origin and upon wealth."[35] The goal of the Houses was "to bring into contact a body of students with diverse interests" who would "provoke" one another to think freshly about many subjects.[36] Although intellectual diversity was one aim of the Houses, Lowell insisted that the new structures were not fundamentally academic, but "a social device for a moral purpose":

> So far as subjects of concentration, pecuniary means, and residence in different parts of the country are concerned, each House should be as nearly as possible a cross-section of the College.[37]

President James Conant later expanded on some of Lowell's themes. As early as 1936-37, he was asking whether there is "any surer way of finding the truth" than by having it debated by students "of differing opinions": "Have we not in each of our [Houses] a band of scholars who educate one another?" If our future lawyers, doctors, poets, teachers, scientists, and historians "all lunch and dine together day after day, then the most powerful of the forces making for a liberal education are set at work."[38]

24

CONFIDENTIAL

HARV00030390

*The President's Report 1993–1995*

Part of Conant's program involved a reenergizing of Harvard's academic life, especially in advanced learning and research. This initiative took many forms, but the conscious recruitment and enrollment of a more diverse student body was one of its important aspects. From one point of view, diversity meant a stress on intellectual values to Conant, and he recognized that his goals could be achieved only if there was a significant change in admissions, signaling new forms of openness at Harvard. Students from an even wider range of socioeconomic, geographic, and ethnic groups (requiring more outreach, and more financial aid) would be attracted to the university only if special steps were taken—and if the university made clear that the newcomers would indeed be welcome.

The Harvard National Scholarships were created as part of this process. Meanwhile, at a more local level, a broad range of urban commuter students were invited to join Conant's collegium. Many of these bright, adventurous, and non-establishment undergraduates earned the ambiguous label "meatballs." The distinguished journalist and chronicler Theodore H. White, class of 1938, was one such student, and he has left us a vivid description of life in President Conant's diversified institution:

> Conant was the first president to recognize that meatballs were Harvard men, too, and so he set apart a ground floor room at Dudley Hall where we could bring our lunches in brown paper bags and eat at a table, or lounge in easy chairs between classes. The master of this strange enclave of commuting Irish, Jewish, and Italian youngsters from Greater Boston was a young historian named Charles Duhig, whose argument was that the most revolutionary force in history was the middle class.[39]

Not only were the "meatballs" distinguished by their ethnic backgrounds; they also tended to come from low-income families and were frankly upwardly mobile:

> Most of us, largely Boston Latin School graduates, knew more about poverty than anyone from Beacon Hill or the fashionable East Side of New York. We hated poverty; and meant to have no share in it. . . . Harvard had the keys to the gates; what lay behind the gates I could not guess, but all that lay there was to be looted. . . . There were museums to be seen, libraries and poetry rooms of all kinds to tarry in—and stacks and stacks and stacks of books.[40]

If Conant created something of a new immigrant-urban stew in the College, he also expressed the hope that the Houses (which

25

CONFIDENTIAL

HARV00030391

*Harvard University*

charged extra room and board rates) would one day be affordable to all Harvard undergraduates. In addition, he proposed that similar House-like arrangements be created for graduate and professional school students. Finally, after the war—at a time when the double challenge of securing democracy and sustaining peace was very substantial—he urged that students should learn "not only *the facts about* life, but a worth-while *way* of life . . . . We must learn *how* to live together." It was important to remember that "centuries of academic history have shown that it is not primarily through the curriculum that a student learns a worth-while way of life":

> Tolerance, honesty, intellectual integrity, courage, friendliness are virtues not to be learned out of a printed volume but from the book of experience; and the content of this book for a youth is largely determined by the mode of his association with contemporaries. So, too, are those attitudes so essential for the survival of a modern democracy . . . .[41]

Here, Conant—like Eliot—stresses the clear linkage between certain values (such as tolerance) fostered in a residential college, and the civic virtues essential to citizenship and leadership in a democracy. Learning to live together was a central goal of university life; and although Conant's primary interests were academic and intellectual, he was unreserved in pointing out that "the development of the character and philosophy of life of an undergraduate is quite as much a product of his extracurricular activities as of his experience in the lecture hall, classroom, or library."[42]

Much "development of the character and philosophy of life" happens in unpredictable and spontaneous ways. But as Lowell, Conant, and many others have realized, colleges and universities can do much to shape their students' opportunities for personal growth by paying close attention to the structure and ambiance of life outside—as well as inside—the classroom. Norms and expectations must be articulated, fundamental institutional values must be stated clearly, and considerable guidance must be provided. During the course of the last century, many institutions have invested heavily in these extracurricular aspects of education, and have rightly emphasized their significance time and again.

26

CONFIDENTIAL

HARV00030392

2.

THE YEARS AFTER WORLD WAR II presented new challenges to Harvard and to higher education in general. During the presidency of Nathan M. Pusey in the 1950s and 1960s, questions about admissions were rather different. With the establishment of very high standards and an ever-growing number of exceptional applicants, how should the university select students in order to create the best educational environment possible, so that undergraduates and graduate students alike could learn as much as a residential institution might offer them? Granted that high academic capability and achievement were central considerations, what other characteristics and qualities should be taken into account—and how should they be evaluated and weighted? Now that the university could be far more selective than ever before, it became important to define the university's admissions criteria with greater clarity, and to describe the linkage between those criteria and the environment for learning.

The dilemma was created in part by the fact that many colleges and universities began to rely more heavily on aptitude tests (especially SATs), grade point averages (GPAs), and class-rank indices. When difficult choices are involved, one response is to search for "objective" criteria that can help in decision making, as well as in the explanation and justification of decisions. When the issue is such as to arouse strong feelings—and few things in life arouse stronger feelings in us than the hopes that we have for our children—the search for a way to base decisions on apparently objective information can become unusually intense. The increased use of standardized test scores and GPAs was neither surprising nor unnatural, even though it was an imperfect and inadequate substitute for informed, experienced judgment that relied on a wider variety of factors.

While Harvard placed a very high value on academic standards throughout this period (and while President Conant was indirectly involved in the establishment of the Educational Testing Service[43]), the university continued to strike a balance between numerical measures and more complex forms of assessment in admissions. The annual Harvard College admissions reports of the

27

CONFIDENTIAL

HARV00030393

*Harvard University*

late 1950s and the 1960s offer a helpful guide to the major issues and their resolution—a resolution that was fundamentally consistent with Harvard's past practice. The faculty was of course instrumental in the shaping and articulation of admissions policies and procedures at the university; the reports of the admissions committee, therefore, reflect significantly the views of the faculty, as well as other groups within the institution.

As early as 1961 the admissions committee reported that an analysis of the SAT scores for the past three incoming classes showed that the previous "pattern of steadily rising scores seems to have been broken":

> From this and other evidence it seems clear that in choosing among candidates who are academically qualified the Committee continues to give less weight to the so-called objective factors (rank in class and test scores) and more weight to other evidence, not only of intellectual promise but of other qualities and kinds of promise as well.[44]

Harvard had already begun a series of studies analyzing the "objective factors" of students at the time of admission, in relation to their academic performance in college. In 1963-64, a more explicit assessment of the situation was included in the admissions report:

> The high quality and variety of talents in recent candidate groups have led us to expect the distributions of scores to shift up and down . . . . Test scores and other objective criteria of academic performance are most relevant to our discussions only at the extremes of our academic range . . . .[45]

The debate about test scores, grades, and other "objective" indicators has intensified even further in the past quarter-century. This is not the place for an extended discussion of the many factors that bear on this complex issue, but I want to mention a few considerations that I believe are important.

- There is a broad consensus that standardized test scores can be valuable as one factor, among several, in helping to assess candidates for admission. Their greatest use is in providing some evidence about the likely academic performance of students, especially during their first two years (approximately) at college or university. In the United States, tests of this kind can offer comparative information difficult to gather in other ways, because we do not have a standard nationwide curriculum, with uniform national examinations in specific academic subjects.

28

HARV00030394

*The President's Report 1993–1995*

National curricula and examinations present their own problems, of course, and can lead to early (often narrow) forms of specialization. They do, however, facilitate certain kinds of assessment across school systems and regions in a country. Standardized aptitude tests—such as SATs—are different from uniform national exams in specific subjects, but they too can be helpful in making some forms of comparative evaluation possible.

The correlation between SAT scores and future academic performance, however, is far from exact. It is not uncommon for individuals to outperform (or underperform) what the tests "predict"—often by significant margins. In addition, the predictive power of the tests diminishes over time. After one or two years, SAT scores and similar indices used at the point of admission tend to be less informative about continued academic performance. For some students, the correlation can remain quite strong; for others, it weakens substantially.

- Standardized tests are designed to assess certain academic capacities and achievements, but they obviously do not attempt to evaluate many other critical qualities. They do not, for example, measure a student's ability to exercise good judgment in different situations, or to understand other human beings; nor do they assess qualities such as competitiveness, decisiveness, and cooperativeness—or creativity and imagination.

- In addition, the test scores of individuals fluctuate over time, and some of these changes are due to the quality of a student's educational opportunities and preparation. This point is crucial. We know, for example, that the SAT scores of students tend to increase with more (and better) schooling—as well as with more practice in test-taking. That is one reason why so many secondary school students take the SATs two or three (or more) times. Special courses, coaching, and pre-exam preparation books can also help to improve scores.

In other words, students who have had less consistent access to good education (and who lack the money to pay for extra "prepping") will frequently do less well on standardized tests. Opportunities, not just abilities, are a critical issue here. Individuals who have unusual drive, curiosity, and a strong

29

CONFIDENTIAL

HARV00030395

*Harvard University*

sense of purpose can compensate for lower test scores, and they regularly demonstrate that they can succeed admirably in a university—and in life—if they are given the chance. To curtail the admission of such students, mainly because they have somewhat lower SATs, would discount what we know about the real abilities of human beings and their exceptional capacity for continued growth and development.

- A final point: not only do the test scores of individuals vary over time, but so do the average scores of particular groups. During the course of decades, for example, selected subgroups within our population have performed better on standardized tests, depending upon their access to educational opportunities and (in the case of immigrants) on the amount of time they and their families have lived in the United States. More schooling, more time for acculturation, and increased access to higher education are clearly some of the important factors that have led to this phenomenon of rising scores.

Similarly, we know that the average test scores of African-Americans (and those of certain other minorities) are currently below the average "majority" scores. We also know, however, that African-American SAT averages have steadily risen since the mid-1970s, while the figures for white students have remained essentially level (dipping for several years, and then recovering). There is no single explanation that accounts for these trends, but some improved access to better primary and secondary schooling (especially in the private school sector) has almost certainly made a difference in the case of minority students. This change in the level of educational opportunity—however limited, and however precarious—has begun to show tangible results.

These general observations about standardized tests have led—at Harvard and many other institutions—to an admissions approach which takes relevant "objective" data into account, but is not driven primarily by them. Average scores among students admitted to Harvard remain very high, but they vary from year to year. In addition, the range of individual test scores within the student body continues to be broad. Consequently, as the admissions

30

CONFIDENTIAL

*The President's Report 1993–1995*

staff evaluates candidates, it looks carefully at letters of recommendation from teachers and others; at the actual quality of a student's academic work (not simply the grades); at evidence of character and commitment; at each student's written personal statement; and at assessments of the nature and quality of a student's contributions in specific extracurricular activities or employment situations. These and other factors—including those characteristics that can enable individual students to contribute something distinctive to the diversity of the student body—create the framework for admissions to Harvard College, and they provide a much sounder basis for informed decisions than reliance on any one or two indicators could conceivably supply.

Although the situation of the 1990s differs in some respects from the late 1950s and the 1960s, the fundamental approach to admissions does not. Passages from the detailed admissions committee report of 1964–65 can still stand as a reasonable summary of Harvard's basic approach to the use of SATs and similar indices:

> We pay attention to test scores and Predicted Rank List [PRL] but, helpful as they are, what they tell us . . . is quite limited, even in the intellectual area. For some school and college people this is a hard proposition to accept, but each of the studies we have done of the performance of students in Harvard College seems to support it . . . . Our crude approximation of personal strengths . . . correlates as well as test scores and PRL with completion of the A.B. degree and comes close to correlating as well with graduation with honors. In short, our research gives support to the common sense notion that effective intelligence depends as much on such personal characteristics as energy, imagination and ability to channel one's energies as it does on the qualities the aptitude and achievement tests measure.[46]

3.

IF THERE WERE broad conceptual shifts concerning diversity during the post–World War II period, they occurred in two areas. First, diversity was seen as comprising a somewhat wider range of attributes and factors. Second, there was a fuller appreciation of the effect that a diverse student body could have, not simply upon individuals, but upon an entire entering class of students, and on an institution as a whole.

31

CONFIDENTIAL

HARV00030397

*Harvard University*

The earliest postwar change in admissions—and in the nature of diversity—occurred with the GI Bill. Suddenly, colleges and universities were enriched by thousands of veterans who brought with them different talents and kinds of experience that added immensely to the quality of education. At about the same time (in 1946), Harvard provost Paul Buck called for "an extended organization for making contact with the 500 to 1,000 schools that now send us students, often only occasionally." Over the next two decades, Harvard College developed a greatly expanded national and international network of volunteers to assist the admissions staff.

As a result, it was soon possible to seek, actively and affirmatively, students in rural, urban, and suburban areas across the country. Candidates from regions throughout the nation were deliberately recruited, as were (for example) pianists, biologists, classicists, poets, football players, and student government leaders. More women enrolled through Radcliffe, and although the process was slow, Radcliffe and Harvard Colleges were on the way to becoming a fully coeducational enterprise. Meanwhile, the pool of African-American applicants expanded substantially during the 1960s, and the number of enrolled minority students increased over the next decades. Students from abroad also enrolled in greater numbers—as did those from low-income and middle-income families.

In other words, a greater degree of openness and inclusiveness, along many dimensions, was becoming part of the rhythm and life of the university. It did not simply happen; it was the result of purposeful efforts to reach out, in order to identify and attract the most promising, capable, and diverse group of students possible.

A second shift that took place during the 1950s and 1960s had to do with a sharpening sense of how diversity could contribute broadly to education within an entire university. Student diversity was seen as "stimulating to the Faculty" and "more relevant to liberal education."[47] Moreover, the composition of each entering class became, explicitly, a consideration in its own right. Every new class was viewed more and more as an ensemble, rather than a simple aggregation of individuals chosen one by one without any significant reference to the pattern produced by the whole.

In this regard, the admissions reports of this period return strongly to the theme that the "measure of a class" consists largely

32

CONFIDENTIAL

HARV00030398

in "how much its members are likely to learn from each other—the real beginning of learning, both intellectually and emotionally."[48] The range of undergraduate "interests, talents, backgrounds and career goals affects importantly the educational experience of our students," because "a diverse student body is an educational resource of coordinate importance with our faculty and our library, laboratory and housing arrangements."[49]

This conception of a diverse student body as an "educational resource"—comparable in importance to the faculty, library, or science laboratories—is the most direct expression of an idea that we have seen emerging over the course of more than a century. Cardinal Newman once suggested, perhaps more wittily than seriously, that a "University which had no professors or examinations at all," but merely brought together a group of students with different notions from different places, would be preferable to "a so-called University" that dispensed with the residential and tutorial aspects of college life and "gave its degrees to any person who passed an examination in a wide range of subjects."[50] The Harvard admissions statement quoted above may lack Newman's wit and some of his deliberate hyperbole, but it demonstrates the continuing emphasis on the value of what students themselves, in all their heterogeneity, can contribute to one another's education.

### 4.

As the pool of college applicants grew in the 1950s and 1960s (and later), more questions began to arise concerning fairness in admissions. In the eyes of some people, there was a growing sense that measurable credentials—especially test scores and GPAs—ought to be the essential determinants for admission. Others were concerned that an emphasis on numerical indices and narrowly defined "objective" criteria would screen out large numbers of candidates who were needed not only by the universities, but by the nation: exceptional human beings who were unusually capable students, and whose combined qualities would make them effective leaders both in college and in later life.

CONFIDENTIAL

HARV00030399

*Harvard University*

These different views about admissions represented long-standing tensions. They had begun to develop long before the postwar era, and were even evident in the differing approaches taken successively by Presidents Eliot (expansive on many fronts), Lowell (very restrictive on some fronts), and Conant (especially assertive on the academic front).

Despite these differences of emphasis, however, Harvard remained basically committed to enrolling a broad mix of students. One consequence of maintaining this approach in the postwar period, however, has been the plain fact that admissions decisions have become far more difficult to make—and to explain—in the face of huge increases in excellent applications. Disappointed applicants (with their families, teachers, and other supporters) have asked for detailed reasons, especially if their test scores and grades were, by most standards, high. The gap between institutional decisions (on the one hand) and candidate expectations (on the other) has grown, leading in many cases to misunderstanding and anger.

These reactions are understandable, but there is another set of important considerations that must be borne in mind. A college or university should be consistent and equitable in the way it makes admissions decisions. But the university also has guiding educational purposes that are ultimately the source of its admissions policies, and that create the framework for the development of admissions criteria. These criteria, as we have seen, have for many generations included considerations of diversity, primarily because of the ways in which diversity enhances the environment for learning. The beneficiaries of such an approach are the students actually chosen for admission—the students to whom an institution owes its primary responsibility, and for whom the composition of a diverse student body pays significant educational dividends. Given this fact, colleges and universities must be able to exercise their best judgment, applying a broad range of criteria and considerations, in making final admissions decisions. Only in this way can they take full advantage of the important values that diversity can and does provide.

34

CONFIDENTIAL

HARV00030400

# V
## *Civil Rights Legislation and the* Bakke *Case*

### 1.

ALTHOUGH DIVERSITY had become a significant goal in much of American higher education before World War II, substantial parts of our population still remained largely outside the doors of excellent educational institutions. Throughout much of this nation's history, and in all sectors of the country, many people had been excluded—or made to feel unwelcome—because of characteristics such as their religion, race, gender, and ethnicity. African-Americans provide the clearest example. But Jews, Latinos, Native Americans, and others also found, for a very long period, only limited ports of entry. And while women had access to outstanding single-sex colleges, they were denied admission to the many private colleges and universities that remained all male.

This situation began to change during the postwar period. But even those institutions of higher education that were committed in principle to diversity have had uneven records of accomplishment—Harvard included. In addition, a sizable proportion of colleges and universities in the United States had been founded to serve particular groups or constituencies. Some institutions were, for example, explicitly church-related. Others were intentionally local or regional in nature. Some were largely devoted to students of a particular race or ethnic group. Others emphasized a specific set of intellectual or cultural traditions—in science and technology, or the creative arts, or in "great books."

The Civil Rights Act of 1964 (and related initiatives) represented a major effort on the part of the federal government to promote equal opportunity for all Americans, in many occupations and spheres of life. This legislation followed—by a decade—the Supreme Court's landmark decision in *Brown v. Board of*

35

CONFIDENTIAL

HARV00030401

*Harvard University*

*Education*. In *Brown*, as we know, separate public schools designated by law for children of different races had been declared inherently "unequal." Under the 1964 Civil Rights Act, admissions (and other specific activities) in colleges and universities that received federal funding became subject to requirements of nondiscrimination. The legislative history of the Act reveals deep and passionate divisions in the Congress, and in the country. Proponents argued that government had a special responsibility to make certain that programs and activities supported by federal funds were free of discrimination. Opponents foresaw a future in which controversies about race or ethnicity—and later, about gender—would create continuing unrest, discontent, and litigation.

As in the case of any genuine dilemma, the real issues were beyond immediate resolution, and they contained the seeds of continuing disagreement. In higher education, a variety of programs related to affirmative action were designed during the late 1960s and 1970s. Some of these programs soon met with legal challenges. Perhaps the most conspicuous involved the University of California, in a case brought by Allan Bakke. In 1978, the Supreme Court in *Bakke* issued what remains its most significant statement concerning questions of race and admissions in higher education.

The Medical School of the University of California at Davis had a policy of reserving 16 of the 100 places in each class for members of certain minority groups. Candidates for these spaces were considered separately from others, and were held to a different standard of admissions. The process was largely but not exclusively quantitative in nature, with precise "benchmark" scores and "cutoff" points being used. Bakke contended that he was not admitted because of his race: that as a white student, he had been unfairly excluded from competing for one of the 16 places reserved for minorities, even though his test scores and other indices were stronger than those of students admitted under the special admissions program.

The *Bakke* case was especially significant because it dealt directly with the matter of quotas or set-asides in admissions, as well as with the question of whether race or ethnicity can be used as a factor in admissions decisions. The Court decided, in a 5-4 vote, that the admissions process at the Davis Medical School was unaccept-

36

CONFIDENTIAL

HARV00030402

*The President's Report 1993–1995*

able. The clear separation of 84 "regular" admissions places from 16 "special" places for minorities, together with the use of different numerical cutoff points for the two groups, was held to be unlawful. Allan Bakke prevailed, essentially because he was judged to have been denied the opportunity to compete fairly in a full field that included all applicants and all 100 spaces.

Several of the opinions, by different Justices of the Court,[51] restated the view that racial categories and preferences—even if "benign" in purpose—are problematic, given the broad and unqualified language of the equal protection clause of the Fourteenth Amendment. While the original initiative that led to the Amendment's adoption in 1868—and ultimately to the Civil Rights Act of 1964—was clearly intended to break systematic patterns of discrimination against African-Americans, the basic constitutional and legislative goals involved equal protection for *all* persons, whatever their race.

In his pivotal opinion in *Bakke*, Justice Powell concluded that "racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination."[52] But while any use of racial or ethnic categories requires special care and scrutiny, the categories are not in all circumstances excluded from conscious consideration, according to a majority of the Court. Under the *Bakke* ruling, it was judged permissible to take race explicitly into account as one factor in making university admissions decisions, provided that the institution can show that the practice is necessary to promote a substantial interest.[53]

This particular aspect of Justice Powell's opinion was, of course, extraordinarily significant, and it remains so. The California Superior Court, and the Supreme Court of California (both of which had previously decided in favor of Bakke), had specifically declared racial considerations to be impermissible in admissions decisions. By contrast, Justice Powell stated clearly that conscious consideration of race or ethnicity in decision making is not intrinsically unconstitutional, even though its use must be strictly circumscribed:

> In enjoining petitioner [the University of California] from ever considering the race of any applicant, . . . the courts below failed to recognize that the State has a substantial interest that may legitimately be served by a properly

37

CONFIDENTIAL

HARV00030403

*Harvard University*

devised admissions program involving the competitive consideration of race and ethnic origin.[54]

In addressing the question of what constitutes a sufficiently substantial interest, Justice Powell was unpersuaded by several arguments that the University of California had advanced.[55] The rationale that Justice Powell found persuasive was based directly on educational grounds: the presence of minority students contributed—along with the presence and contributions of other students—to diversity, and therefore to the total educational environment of an institution, as well as to the education of all its members. In short, some consideration of racial and ethnic characteristics was judged to be appropriate, because "the interest of diversity is compelling in the context of a university's admissions program."[56]

This conclusion was grounded in part on considerations of academic freedom. Justice Powell relied on the long-standing definition of academic freedom used by Justice Frankfurter in *Sweezy v. New Hampshire:*

> "It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail 'the four essential freedoms' of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study."[57]

While none of these freedoms can be judged to be absolute, they have "long . . . been viewed as a special concern of the First Amendment"[58]—and the specific capacity to decide "who may be admitted to study" was obviously of direct relevance in *Bakke.* Justice Powell also quoted from another earlier opinion of the Supreme Court, *Keyishian v. Board of Regents:*

> "Our Nation is deeply committed to safeguarding academic freedom which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment. . . . The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of an authoritative selection."[59]

In his discussion of these issues, Justice Powell not only mentioned the "robust exchange of ideas," but also emphasized the

38

CONFIDENTIAL

HARV00030404

broader concept of student exposure to the "mores"—the customs, habits, and outlooks—of fellow students who are "as diverse as this Nation of many peoples."[60] While the educational benefits of such exposure may appear to be most striking during a student's university years, their long-term significance was held to be equally valuable: "The Nation's future depends upon leaders trained" in this way,[61] and the results of such training can have a lasting effect on individuals, and therefore on the society of which they are a part.

In the course of Justice Powell's exposition, one can hear echoes of Mill's insistence on "robust" exchanges, or Eliot's commitment to educating future leaders of a heterogeneous democratic society. Indeed, Justice Powell's pivotal opinion in *Bakke* has its roots in a long tradition of thought concerning the nature of learning and education. That tradition preceded, by more than a century, the advent of affirmative action programs and the passage of the Civil Rights Act of 1964. It is a tradition that is still vital, and still crucial to our nation's future.

### 2.

IF IT IS PERMISSIBLE to take race and ethnicity into account as one factor in an admissions process, but generally not permissible to "set aside" places (or to use a set of differently defined standards) exclusively for members of a particular ethnic or racial group (or groups), how can one design and administer an appropriate process? In *Bakke*, the Justices devoted considerable attention to this issue.

Justice Powell drew extensively on Harvard College's policy statement on admissions, which he quoted at length in his opinion and added in full as an appendix. This policy, shaped by Harvard's faculty and admissions committee, carried the strong endorsement of President Derek Bok, whose constant efforts in behalf of diversity and affirmative action helped to determine Harvard's goals and extend its progress throughout the 1970s and 1980s. Two passages from the Harvard statement are particularly pertinent. The first concerns the way in which different criteria can be weighed simultaneously in making admissions decisions; the second concerns the

39

CONFIDENTIAL

HARV00030405

*Harvard University*

question of so-called "critical mass," including the issue of quotas as contrasted to approximate (and flexible) goals:

> When the Committee on Admissions reviews the large middle group of applicants who are 'admissible' and deemed capable of doing good work in their courses, the race of an applicant may tip the balance in his favor just as geographic origin or a life spent on a farm may tip the balance in other candidates' cases. . . .[62]
>
> In Harvard College admissions the Committee has not set target-quotas for the number of blacks, or of musicians, football players, physicists or Californians to be admitted in a given year. At the same time the Committee is aware that if Harvard College is to provide a truly heterog[e]neous environment that reflects the rich diversity of the United States, it cannot be provided without some attention to numbers. It would not make sense, for example, to have 10 or 20 students out of 1,100 whose homes are west of the Mississippi. Comparably, 10 or 20 black students could not begin to bring to their classmates and to each other the variety of points of view, backgrounds and experiences of blacks in the United States. . . . Consequently, when making its decisions, the Committee on Admissions is aware that there is some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted. But that awareness does not mean that the Committee sets a minimum number of blacks or of people from west of the Mississippi who are to be admitted.[63]

Distinctions between the Harvard College program and the University of California at Davis program were discussed in some detail in *Bakke*. Justice Blackmun wrote that, while he saw the advantages of the Harvard program, he was not convinced that the difference between the two was "very profound or constitutionally significant." Justice Blackmun concluded that the Harvard program was "better formulated than Davis' two-track system," but he added:

> The cynical, of course, may say that under a program such as Harvard's one may accomplish covertly what Davis concedes it does openly. I need not go that far, for despite its two-track aspect, the Davis program, for me, is within constitutional bounds, though perhaps barely so.[64]

In his pivotal opinion, however, Justice Powell insisted on the fundamental difference between a two-track process involving set-asides and a unitary process that judged all candidates by the same set of criteria, applied in a way that considered each applicant as an individual with a complex set of talents, interests, characteristics, qualities, and achievements:

40

CONFIDENTIAL

HARV00030406

*The President's Report 1993–1995*

In such an admissions program, race or ethnic background may be deemed a "plus" in a particular applicant's file, yet it does not insulate the individual from comparison with all other candidates for the available seats. The file of a particular black applicant may be examined for his potential contribution to diversity without the factor of race being decisive when compared, for example, with that of an applicant identified as an Italian-American if the latter is thought to exhibit qualities more likely to promote beneficial educational pluralism. Such qualities could include exceptional personal talents, unique work or service experience, leadership potential, maturity, demonstrated compassion, [or] a history of overcoming disadvantage. . . . Indeed, the weight attributed to a particular quality may vary from year to year depending upon the "mix" both of the student body and the applicants for the incoming class.

This kind of program treats each applicant as an individual in the admissions process.[65]

### 3.

Finally, it is important to note that in his decisive opinion in *Bakke*, Justice Powell took into account the contribution of diversity to education at the graduate as well as the undergraduate level. While acknowledging differences in the specific educational purposes to be served (and in the admissions selection criteria) at the two different levels, he concluded that there was sufficient similarity between the two to warrant similar approaches: "Even at the graduate level, our tradition and experience lend support to the view that the contribution of diversity is substantial."[66] Law schools, for example, were seen not only as academic institutions, but as "the proving ground for legal learning and practice"—places that "cannot be effective in isolation from the individuals and institutions with which the law interacts. Few students and no one who has practiced law would choose to study in an academic vacuum . . . . "[67]

A similar perspective was relevant to medicine. "Physicians serve a heterogeneous population," wrote Justice Powell, and

an otherwise qualified medical student with a particular background— whether it be ethnic, geographic, culturally advantaged or disadvantaged— may bring to a professional school of medicine experiences, outlooks, and ideas that enrich the training of its student body and better equip its graduates to render with understanding their vital service to humanity.[68]

41

CONFIDENTIAL

HARV00030407

*Harvard University*

This important issue—of graduate and professional school admissions—deserves some additional discussion, even though it cannot receive adequate attention in the present context. Generalizing about admissions criteria across very different disciplines is obviously difficult, because programs vary widely in the nature of the required preparation. A Ph.D. program in statistics or plasma fusion, for instance, will undoubtedly have technical requirements for admission that would ordinarily not have clear parallels in a program such as English literature or European history. Similarly, medicine differs from law in the nature and extent of preparation normally required—just as there are substantial variations in the kinds of specialization usually expected in fields as diverse as government, divinity, and business administration.

Nonetheless, if we want a society in which our physicians, teachers, architects, public servants, and other professionals possess a developed sense of vocation and calling; if we want them to be able to gain some genuine understanding of the variety of human beings with whom they will work, and whom they will serve; if we want them to think imaginatively and to act effectively in relation to the needs and values of their communities, then we shall have to take diversity into account as one among many significant factors in graduate and professional school admissions and education.

We need to remember, for instance, that many Ph.D. students in physics or sociology—like master's degree candidates in public health or education—will one day carry responsibilities that affect people from many different backgrounds. The Ph.D. student who becomes a teacher of science, art, or economics at an undergraduate college—no less than the general practitioner of medicine, or the inner-city minister—must be prepared to understand and work with many individuals, over decades, who will have a multiplicity of opinions, cultural perspectives, and convictions about life. Relevant academic training and expertise are indispensable to such practitioners. But such training and expertise can take one only so far in many of the situations that are now the substance of everyday professional life, and the realities of our time require forms of education that are broad in their human dimensions, as well as powerful in their intellectual content.

42

CONFIDENTIAL

HARV00030408

*The President's Report 1993–1995*

President Conant was once asked how he would measure the quality of Harvard's undergraduate program. Conant, as we have noted, was hardly averse to reliance on tests, and he was unambiguous in his concern for high academic standards. But he replied that he would "reject all informational tests" that might be given to "recent graduates as indicative of the effectiveness of our general education. Whether a liberal education has been a success or failure should be measured by the student's breadth of vision fifteen or twenty years after graduation."[69]

Graduate and professional education—like undergraduate education—plays a central role in helping to expand (or to constrain) an individual's "breadth of vision." Indeed, student diversity must be taken consciously into account at the graduate school level, because education at that level so strongly affects a student's conception of professional vocation, as well as the capacity to work with a variety of fellow professionals. The need to sustain rigorous academic standards in graduate and professional programs is clear. The more difficult and genuine challenge, in many respects, is to ensure that other significant values—ethical, professional, and civic—also receive the serious attention that they so clearly deserve.

CONFIDENTIAL

HARV00030409

# VI
## *Possible Future Directions*

A S WE MOVE FURTHER in the post-*Bakke* era, there are various policy alternatives concerning student diversity and admissions.

We can continue with admissions policies that take many individual qualities and factors into careful account (including a person's ethnicity, race, or gender). These policies have served us extremely well for a very long time, and have enhanced the educational mission of our universities.

Alternatively, institutions may choose on their own to take less account of race, ethnicity, and gender in admissions; or they may find themselves prohibited from doing so by legislative or other actions (at either the state or federal level). The Board of Regents of the University of California has recently endorsed a complex series of prohibitions along these lines, although the precise interpretation of the recommendations remains unclear. More generally, there has obviously been widespread debate about—and some expressed opposition to—affirmative action programs during the past two years, not only in California but throughout the nation.

My own view—as suggested throughout these pages—is that the main question to be addressed in this context is not so much affirmative action in itself, but the broader matter of diversity as it relates to the quality, breadth, and texture of student learning. The primary purpose of diversity in university admissions, moreover, is not the achievement of abstract goals, or an attempt to compensate for patterns of past societal discrimination. It represents now, as it has since the mid-nineteenth century, positive educational values that are fundamental to the basic mission of colleges and universities. It is also, as I have emphasized, extremely important to the development of important civic virtues—and of future leaders—vital to the health and effective functioning of our democracy.

44

CONFIDENTIAL

HARV00030410

*The President's Report 1993–1995*

The most constructive and well-conceived admissions programs are those that view affirmative action in relation to the educational benefits of diversity. They may take various characteristics such as race, ethnicity, or gender into account as potential "plus" factors (among many others) when evaluating candidates, but they do not assign such characteristics an overriding value. Nor do they aim to achieve specific numerical targets, either through the use of set-asides or quotas. They involve energetic efforts in outreach, but not mandated outcomes. Programs of this kind, when they are carefully designed and implemented, preserve an institution's capacity—with considerable flexibility—to make its own determinations in admissions. This capacity and flexibility have been critical in the past, and will continue to be so in the future.

With these general considerations in mind, let me comment briefly on some of the main arguments that have recently been advanced by thoughtful critics of affirmative action in university admissions:

*One such argument suggests that affirmative action programs in admissions were important during an interim stage as a step toward greater equality of opportunity and the creation of a "level playing field," but that we have now reached a point where discrimination has been so significantly reduced that African-Americans (or other historically underrepresented groups) no longer face serious obstacles of this kind.*

There have clearly been increased opportunities for members of historically underrepresented groups in colleges and universities during the past quarter century. Positive steps of this kind, however, are very recent, and are far from secure. Twenty-five to thirty years of improved access to higher education is a very brief time span. It is scarcely one generation—barely long enough for graduates of the late 1960s to have had children who are now reaching college age.

To understand more precisely what has been achieved, it is helpful to consider some of the data concerning (for example) African-Americans in higher education programs during the past two to three decades. While the focus must remain on the broad concept of diversity as it relates to learning—as distinct from any narrowly quantitative search for "equal outcomes"—such data are useful in assessing the extent of actual progress in achieving diversity, along one important dimension, during an era when

45

CONFIDENTIAL

HARV00030411

*Harvard University*

intensified efforts have been made to enhance opportunities for historically underrepresented groups in both undergraduate and graduate education.

- In 1964, only 4 percent of African-Americans 25 years or older had completed at least four years of college, compared to 10 percent of whites in the same age group. By 1993, the figures had risen to 12 percent for African-Americans and 23 percent for whites—indicating a significant advance by both groups, but also a persistent gap.[70]

- In 1975, African-Americans received about 1,000 (3.8 percent) of the roughly 26,000 doctoral degrees awarded by American universities to U.S. citizens of known race or ethnicity. After periods of modest increase and decline in that percentage, African-Americans received about 1,100 (4.2 percent) of the roughly 26,000 such degrees awarded in 1993.

  If attention is confined to doctorates in the basic arts and sciences disciplines (excluding business, communications, education, and certain other fields), the percentages are smaller—roughly 2 percent in 1975 and 3 percent in 1993. Indeed, in 1993 a total of roughly 600 doctorates were awarded to African-Americans (or black permanent residents) in the basic arts and sciences nationwide. That figure includes, for example, 8 doctorates in mathematics, 9 in physics and astronomy, 31 in chemistry, 74 in the biological sciences, 20 in economics, 29 in sociology, 19 in history, and 15 in music.[71]

- In the field of law, blacks received 5.7 percent of first-professional degrees awarded by American universities in 1992-93, compared to 4.0 percent in 1976-77. In medicine, the comparable figure was 5.9 percent in 1992-93, up from 5.3 percent in 1976-77. In business, blacks received 5.3 percent of the master's degrees awarded in 1991-92, up from 3.8 percent in 1976-77.[72]

However we interpret these statistics—and there are many considerations that must be taken into account—two main conclusions seem to me to be clear.

First, since the advent of affirmative action programs at colleges and universities in the late 1960s and 1970s, there has been

CONFIDENTIAL

HARV00030412

*The President's Report 1993–1995*

marked improvement in the participation of African-Americans (as well as other historically underpresented minorities) in higher education. Particularly at the undergraduate level, but also (far more selectively) at some advanced levels, there have been genuine gains.

Second, in spite of these gains, the figures show that we are still very much "in process." There is substantial unrealized potential in each of the different degree programs and fields of study just cited. In addition, the gaps in certain areas are startling, and they highlight critical shortages that are exceptionally troubling from a national point of view. The doctoral situation in the arts and sciences shows only glacial change—from a very low baseline—over time. The situation is a matter of major concern, and it illustrates the need for continued and focused attention in the years ahead. While the data for professional education are more encouraging, they are at best mixed. The overall numbers are not robust, and the representation of African-Americans in some fields is clearly very modest.

As we think about the long run, we need to remember that the number of degrees awarded at the doctoral and professional school level are likely to grow only if the numbers at the undergraduate level continue to increase. Progress in advanced education depends directly on the gains achieved at previous stages. This is a classic "pipeline" problem, where the linkages in the entire system are crucial, and where a weakening or breakdown at any juncture along the way has major implications for the possibilities at every successive phase.

Hence, we cannot expect to find—in two or three decades—noticeably more African-Americans (or members of other underrepresented groups) in Ph.D. programs or in professional schools unless access to excellent undergraduate education remains very strong—and indeed expands. The nation's ability to achieve diversity at advanced levels in education will depend ultimately on continued progress at earlier levels. So will our ability to assure a reasonable presence of historically underrepresented groups in the major professions—including a strong presence on the faculties of our colleges and universities. We need no precise numerical conception of diversity in order to reach the intuitive conclusion that

47

CONFIDENTIAL

HARV00030413

*Harvard University*

approximately 600 African-American doctoral graduates, in all arts and sciences fields, is clearly inadequate. Far from having reached a point where we can feel confident about the gains that have been made since the 1960s, we are still very much in the process of creating the conditions necessary for continuous long-range sustainability. The achievements to date are real, but they are also too recent, too fragile, and too incomplete for any relaxation of effort. At times in our past, there has been a temptation to believe we had moved past the point where continued attention to the particular problems and available opportunities of different racial or ethnic groups was necessary to make further progress in economic and educational areas—but the judgment proved premature.[73] At this moment in our history, we should be mindful of the progress that has been made; but we should not mistake that progress for the full realization of a durable success.

*A second argument sometimes advanced concerning affirmative action programs in higher education suggests that, however well-intentioned they may be, they are focused on the wrong target; our attention and resources should instead be devoted to solving more basic social and economic difficulties, by investing in children's health, improved schools, better housing, and school-to-work transitional programs.*

Large-scale social investments intended to solve social and economic (and educational) problems might well make a significant difference. But I do not see evidence that such investments, on a major scale, are likely to be forthcoming, at least not in the near future. Even if they were to be developed, we would need to monitor them over a considerable span of years in order to make certain that they were having a real impact, and that they would be continued.

The question, therefore, is not whether appropriate forms of affirmative action in higher education represent an adequate response to the large-scale social problems that have been identified. Few, if any, people would make such a claim. Instead, the question is whether programs that are well-designed and administered can be helpful as one part of a more general approach. Moreover, to appreciate the full contribution of these programs, we should remember that they have several far-reaching effects beyond any results that can be measured simply in terms of admissions decisions or their ability to contribute to diversity and learning.

48

CONFIDENTIAL

HARV00030414

*The President's Report 1993–1995*

They stimulate, for example, outreach efforts on a national scale, and therefore play a key role in the identification of talented candidates, as well as in the formation of expanded pools of applicants from underrepresented groups. Teachers, guidance counselors, and alumni volunteers (among others) are all part of this process. They make clear to young students that increased educational opportunities do in fact exist—in hundreds of institutions, not just a few. This signal is itself catalyzing, and has become a powerful source of motivation for thousands of students who previously saw far less reason for hope.

As we evaluate the effects of affirmative action in higher education, therefore, we should not underestimate the role it plays in creating an entire cycle of activity involving outreach, advice, and professional guidance. It has helped to foster aspiration and to strengthen the conviction that young people who have talent and determination can in fact find opportunities in higher education, and can then go on to make their way successfully in our society.

*A third argument made against affirmative action programs in university admissions is that such programs run the risk of stigmatizing and thus injuring the very people they are designed to assist and protect.*

The concern about stigmatization is serious and troubling. Some of the Justices in *Bakke* considered this issue, but clearly did not give it decisive weight. I would place greater importance on this point if I were more convinced about two matters.

First, I would find the argument more compelling if there were a strong consensus, especially among those who have been assisted by affirmative action programs, that the difficulties resulting from stigmatization were sufficiently clear and substantial as to outweigh the increased opportunities and protections. I know of no calculus that can resolve such an issue at the present time. Although opinion is to some extent divided, my own observation suggests that the greater weight of informed views—particularly views from members of underrepresented groups—remains substantially in favor of well-designed and carefully administered affirmative action initiatives in admissions, because of their demonstrated positive effects.

Second, I would see greater force in the argument concerning stigmatization if the most injurious and long-lasting forms of racial

49

CONFIDENTIAL

HARV00030415

stigma appeared to result from affirmative action—particularly affirmative action in higher education—rather than from other causes. The difficulty, unfortunately, is that racial stigmatization is clearly the inheritance of discriminatory attitudes and behavior that reach far back into history. These attitudes were powerfully reinforced by the destructive racial theories and renewed legalized discrimination that developed in the late nineteenth and early twentieth centuries, during the Reconstruction period and afterward. Some significant progress in racial and ethnic relations has clearly been made since World War II. But discrimination and stigmatization remained very visibly operative during the turbulent years preceding (and following) the 1964 Civil Rights Act, and they continue to be persistent today. It seems doubtful that a phenomenon of such force and durability would be seriously mitigated because affirmative action programs—created as recently as the late 1960s and 1970s—were eliminated. Very little if any evidence, based on the experience of the past, would lead us to expect a result of this kind.

*According to a fourth argument, affirmative action programs in university admissions can create unfairness, particularly when students with high test scores (or grades) are denied admission in favor of students with less impressive "objective" records.*

The potential for unfairness exists, and needs to be taken scrupulously into account. That, of course, was the main reason for the Supreme Court's insistence in *Bakke* that any use of racial or ethnic categories must be subject to exacting judicial scrutiny. At the same time, at least two other considerations are important to bear in mind.

First, as I suggested earlier, any definition of qualifications or merit that does not give considerable weight to a wide range of human qualities and capacities will not serve the goal of fairness to individual candidates (quite apart from groups) in admissions. Nor will it serve the fundamental purposes of education. The more narrow and numerical the definition of qualifications, the more likely we are to pass over (or discount) applicants—of many different kinds—who possess exceptional talents, attributes, and evidence of promise that are not well measured by standardized tests.

CONFIDENTIAL

HARV00030416

*The President's Report 1993–1995*

Second (and also mentioned earlier), a college or university is responsible first and foremost to the applicants it chooses to admit, and it must attempt to create the best possible educational environment for them. One major consideration in the creation of that environment is the composition of an entering class—and entire student body. Admissions decisions are not isolated, atomistic events. They focus on individuals, but each decision is made in the context of others, where the pattern of the whole is also taken into account. This pattern contributes significantly to student diversity—and diversity, as we have seen, is strongly linked to the quality of learning.

The way to proceed in the future is not to introduce absolute prohibitions on the consideration of race (or other factors) in admissions, but to treat such characteristics with the same care and scrupulousness that we have historically given to so many aspects of diversity. That is what we are doing now. That is what we have done in the past—well before the advent of affirmative action programs in the late 1960s.

51

CONFIDENTIAL

HARV00030417

*Harvard University*

## VII
## *Admissions: The 1990s and Beyond*

### 1.

To SUSTAIN OUR POLICIES in the future will require the same kind of care that we have traditionally devoted to them. In the present situation, it is important not only to take stock, but also to describe briefly the general principles that should continue to guide Harvard's practice in the years ahead.

It should be recognized at the outset that there is—regrettably—no ideal, friction-free way to arrive at decisions regarding admissions, and no effective way to explain such decisions to the thousands of individuals who are affected by them.

This situation is a direct outgrowth of the post-World War II boom in higher education, and in our collective national expectations concerning full access to educational opportunities. During the past half-century, there have been far more applicants than anyone would once have imagined possible. Even if the total number of places in our higher educational system were equal to the number of potential students, a good number of individual colleges and universities would still remain oversubscribed, and would have to turn away many qualified applicants. Therefore, with or without consideration of race, ethnicity, gender, geographic location, income level, or various other factors, there will be thousands of disappointed candidates.

When such a large proportion of applicants are barely distinguishable on statistical grounds, SAT scores and GPAs are clearly of only limited value. Admissions processes, therefore, must remain essentially human. They must depend on informed judgment rather than numerical indices. And they will be subject to all the inevitable pressures and possible misconceptions that any exceptionally competitive selection process involves.

In order to sustain a balanced, consistent, and highly attentive process, long-established basic principles continue to offer the best guidance.

52

CONFIDENTIAL

HARV00030418

*The President's Report 1993–1995*

- Our commitment to excellence means that we will continue to admit students as individuals, based on their merits: on what they have achieved academically, and what they seem to promise to achieve; on their character, and their energy and curiosity and determination; on their willingness to engage in discussion and debate, as well as their willingness to entertain the idea that tolerance, understanding, and mutual respect are goals worthy of persons who have been truly educated.

In assessing individual merit, we will—as we have in the past—take a number of criteria into account. Grades, test scores, and class rank will be given appropriate consideration in admissions, but they will be viewed in the context of each applicant's full set of capabilities, qualities, and potential for future growth and effectiveness.

- Our commitment to excellence also means that we will seek out—in all corners of the nation, and indeed the world—a diversity of talented and promising students.

Such diversity is not an end in itself, or a pleasant but dispensable accessory. It is the substance from which much human learning, understanding, and wisdom derive. It offers one of the most powerful ways of creating the intellectual energy and robustness that lead to greater knowledge, as well as the tolerance and mutual respect that are so essential to the maintenance of our civic society.

In our world today, it is not enough for us and our students to acknowledge, in an abstract sense, that other kinds of people, with other modes of thought and feeling and action, exist somewhere—unseen, unheard, unvisited, and unknown. We must, in addition, extend ourselves in order to have direct contact with some substantial portion of that larger universe. There must be opportunities to hear different views directly—face to face—from people who believe them and embody them. Much can be learned from reading, from travel, and from formal academic study. But little if anything can substitute for the experience of continued association with others who are different from ourselves, and who challenge us—even as we challenge them.

53

CONFIDENTIAL

HARV00030419

*Harvard University*

- In selecting those students who will be offered places, the whole must be seen to be genuinely greater than the sum of the parts.

When an individual student is admitted, the decision is rarely if ever the result of a circumscribed choice between two—or three, or a very few—applicants who are viewed as being in direct competition for a single place. The proper analogy is not a race between a few individuals, where one wins and the others lose. Once a standard of high quality has been assured, there are still many more candidates than there are spaces available. At that point, the question is how to admit not only individuals, but also an entire entering class of students who—in their collective variety—are likely to have a strong capacity to teach and to learn from one another.

Such a process of selection involves the conscious consideration of different forms of diversity. In this process—as I stated earlier—quotas or set-asides in admissions are not acceptable. By the same token, efforts to prohibit, categorically and absolutely, the consideration of particular characteristics or criteria are no less arbitrary than to accord such factors a completely sheltered, insulated form of protection or status.

## 2.

In closing, I want to emphasize that we need not—and should not—romanticize the idea of diversity in order to reach a sensible and realistic assessment of its positive value. Mill, Felton, Eliot, and others were anything but sentimental in their outlook, and the complex circumstances of our own historical moment demand nothing less. Mill understood only too well that unfettered discussion and argument—stimulated by diversity—can sometimes inflame situations rather than resolve them:

> The tendency of all opinions to become sectarian is not cured by the freest discussion, but is often heightened and exacerbated thereby . . . . But it is not on the impassioned partisan, it is on the calmer and more disinterested bystander, that this collision of opinions works its salutary effect . . . . There is always hope when people are forced to listen to both sides . . . .[74]

54

CONFIDENTIAL

HARV00030420

*The President's Report 1993–1995*

For Mill, diversity—and the clash of freely expressed opinions—could be divisive, and he expected no immediate solutions; but he saw that the long-term dangers and risks of insulating or isolating individuals and groups from one another are likely to be greater than the risks of creating opportunities for direct exchange and contact. In the end there are no guarantees. There is only the hope that is created when people "listen to both sides"—or indeed to many sides.

This was precisely President Felton's conclusion, long ago, when Harvard made more conscious efforts to enroll different kinds of students, from different regions of the nation. It seemed clear to Felton that, so long as there were serious regional and other differences straining the fabric of the nation, education should attempt to reduce the hazards of separation and division, rather than reinforcing or perpetuating them. The gains in mutual understanding and tolerance—even in the midst of argument and intermittent tension—would ultimately outweigh the dangers that could so easily result from sustained isolation and lack of even rudimentary understanding.

This perspective surely provides the basis for a response to those of us—and I include myself—who are seriously concerned about fragmentation, sectarianism, and incidents of tension or conflict between groups in our contemporary society. The present situation in the United States is particularly difficult in many respects. At the same time, we need to remember that—from its earliest origins—this nation's experiment in diversity has always been complex, and has involved significant strain as well as episodes of violence. Indeed, by most measures, our contemporary predicament is not more severe, and in some respects is less so, than that which existed throughout much of the nineteenth and early twentieth centuries. In this regard, we should bear in mind the memory of the disruptive and often violent incidents that took place in the decades leading to the Civil War; the terrible War itself; the difficult and divisive history of the Reconstruction; and so much of the turbulence that marked the era of the "new immigrants":

> Outside, the mob battered down the prison gates and spread out into the prison. They hunted through the corridors and corners and found six of the acquitted men in a small courtyard used for exercise. There, men dressed in

55

CONFIDENTIAL

HARV00030421

*Harvard University*

frock coats and derby hats from close range of 20 feet pumped over a hundred rifle shots and gunshot blasts into the six men, tearing their bodies apart while others cheered.[75]

The year was 1891. The acquitted men, so far as we know, were in fact innocent, but feelings and suspicion ran so high that respectable citizens refused to accept the verdict of a court, and administered their own form of justice. One prisoner, still half-alive after the shootings, was dragged several blocks and then, with great deliberation and applause, was hanged from a lamppost.

This incident might well have been described—at the time—in any one of several ways: as an incident involving "foreigners," immigrants, or members of different "racial" groups. But the foreign or racial groups were not white and black. They were Irish and Italians who had settled in the South. As it happened, the victims were southern "Mediterranean" Italians, and the episode was not unique. Three more Italians were lynched in Louisiana in 1896, and five similar lynchings took place in 1899. If the Italians suffered, however, the Irish were also afflicted, as were Jews and other groups. African-Americans, as we know, experienced the most frequent and persistent violence, as well as systematic legal and other forms of discrimination.

All the new immigrant groups and "races" were to some extent at risk. And the risks—as well as the strong sense of group identity—did not disappear as quickly or easily as many of us may now wish to believe. It took the better part of a century, after the 1840s, before some of the new immigrant groups were substantially integrated, and even then many doors remained largely closed—certainly to Jews, but also to large portions of the Irish, Italian, and other populations.

As we know, as late as the early 1960s, many private colleges and universities (not to mention private clubs and other organizations) still retained effective quotas with respect to Jews. Nor were there substantial numbers of Catholics in many of these institutions—quite apart from African-Americans, Asian-Americans, Native Americans, Hispanic-Americans, and other minorities. Women, moreover, were often entirely excluded. In certain cases, this situation was the reflection of expressed individual and group preferences. But few people doubt that there were strong de facto

56

CONFIDENTIAL

HARV00030422

restrictions in effect—and indeed, in the case of African-Americans, legal restrictions.

Attitudes, habits, and prejudices fade slowly, and perhaps never as completely as we might hope. Moreover, if the better part of a century was required before many "white" groups were able to enter fully into the life of the nation—groups who had experienced neither slavery nor systematic legal discrimination—how much time should be estimated for a similar process to take place with respect to African-Americans, for whom official segregation in many aspects of daily life continued to exist into the 1960s? How soon should we expect forms of group identification—and some patterns of self-separation—to vanish?

The extent of our nation's success in dealing with diversity can be measured only in the full light of our entire history. Without such a long-term view, as well as an informed awareness of what can be achieved in a heterogeneous society (and at what speed), we will almost certainly undervalue all that has been accomplished so far, and we will be tempted to overdramatize the shock effect of periodic incidents: incidents that can easily be interpreted as evidence of crisis or failure, when in fact they are often no more than signs of the inescapable if unsettling stresses which exist in a large and complex democratic society such as ours.

As we try to assess the progress that has been made to date, particularly on our college and university campuses, we ought to ask whether there are ways to evaluate—more systematically—the degree of success that has so far been realized. Are there concrete lessons that can be learned from the experience of the past quarter-century? Are there certain kinds of institutional arrangements, norms, and stated expectations that enhance the experience of diversity and learning for students and others—and are there some that affect it more negatively?

Clearly, we have much more institutional knowledge and experience now than even a decade ago, and far more than we had in 1970. We also have a growing body of alumni (still relatively young) who have graduated since the late 1960s, when Harvard and many other institutions became gradually more inclusive.

Universities—and individual scholars—are now in a position to begin to draw on this cumulative knowledge in an effort to evalu-

CONFIDENTIAL

HARV00030423

*Harvard University*

ate our recent history, and to see which measures have been relatively effective, which have been less fruitful, and which remain uncertain. We will not find definitive answers, but neither should we simply draw blanks. Studies of this kind would not only be useful in themselves, but would help to make clear that our institutions are still very much in the midst of a national experiment in diversity, and that we are committed to learning from it in order to ensure its success.

Meanwhile, as I look at the present situation on many of our campuses, I believe that the achieved level of tolerance and respect—among thousands and thousands of students—is extraordinary. How many of us would have predicted, in 1950 or 1960, that so great a number of talented and dissimilar students would be studying together and learning from one another after so brief a passage of time? No similar transformation has ever before taken place in the long history of higher education, either in this country or elsewhere.

This is not a moment for national self-congratulation. But neither is it a moment to underestimate the substantial human and institutional achievements—in terms of education and diversity—of the past few decades. These achievements have their roots, as we have seen, in ideas and actions that reach back more than a century in our history. The record is impressive. The progress, however imperfect, is inspiring. That progress must be sustained and strengthened. To change course now would be to turn aside from many decades of difficult but steady hope and fulfillment, in order to follow pathways far less bright, and far less full of promise.

58

CONFIDENTIAL

HARV00030424

*Notes*

## II
### EARLY IDEAS OF DIVERSITY:
### NINETEENTH CENTURY BEGINNINGS

1. *Principles of Political Economy* (1848), bk. III, ch. XVII, sec. 5.
2. *On Liberty* (1859), pt. II.
3. Ibid.
4. *The Idea of a University* (1852), discourse VI, sec. 9.
5. Ibid.
6. Report of the President to the Board of Overseers 1859-60, 6.
7. *The Education of Henry Adams* (1907), ch. IV.
8. Ibid.
9. Ibid.
10. "The Function of Education in Democratic Society," in *Educational Reform* (New York: Century Co., 1901), 408.
11. "The Contemporary American Conception of Equality Among Men as a Social and Political Ideal" (oration delivered at University of Missouri, June 2, 1909), 17.
12. "Liberty in Education," in *Educational Reform*, 146-47.
13. "The Contemporary American Conception of Equality," 17.
14. "The Aims of the Higher Education," in *Educational Reform*, 237.
15. Ibid., 238.
16. Ibid., 239.
17. Ibid.
18. "The Function of Education in Democratic Society," in *Educational Reform*, 414.
19. "The Aims of the Higher Education," in *Educational Reform*, 240-41, 249.

## III
### DIVERSITY AND RACE:
### SOME TURN-OF-THE-CENTURY DILEMMAS

20. Oscar Handlin, *Boston's Immigrants*, rev. ed. (Cambridge, Mass.: Harvard University Press, 1959), 185 (quoting the *Boston American*, Oct. 21, 1837, and Mayor Theodore Lyman of Boston).
21. Ibid., 144-45.
22. Ibid., 206.

59

CONFIDENTIAL

HARV00030425

23. Ibid., 226.
24. Ibid.
25. "The Contemporary American Conception of Equality," 19.
26. Ibid., 22.
27. Stephan Thernstrom, "Poor but Hopefull Scholars," in *Glimpses of the Harvard Past* (Cambridge, Mass.: Harvard University Press, 1986), 126.
28. Ibid., 127.
29. Ibid., 126, 128.
30. *The Education of Henry Adams,* ch. IV.
31. "College Is Like the World," in *The Harvard Book,* rev. ed. William Bentinck-Smith (Cambridge, Mass.: Harvard University Press, 1986), 284.
32. Ibid., 284-85.
33. "The Field and Function of the Private Negro College" (1933) in *The Education of Black People,* ed. Herbert Aptheker (Amherst, Mass.: University of Massachusetts Press, 1973), 89.
34. Ibid.

## IV
## SOME TWENTIETH CENTURY CHALLENGES: STRUCTURES, ADMISSIONS, AND TESTS

35. Report of the President to the Board of Overseers 1927-28, 10.
36. Ibid., 13.
37. Ibid., 14.
38. Report of the President to the Board of Overseers 1936-37, 19.
39. "Harvard Lies at the End of the Subway," in *The Harvard Book* (1986), 294-95.
40. Ibid., 295.
41. Report of the President to the Board of Overseers 1950-51, 15.
42. Ibid.
43. Nicholas Lemann, "The Structure of Success in America," *Atlantic Monthly,* Aug. 1995, and "The Great Sorting," *Atlantic Monthly,* Sept. 1995.
44. Faculty of Arts and Sciences Admission and Scholarship Committee Report [hereinafter Admission Committee Report] 1960-61, Official Register of Harvard University, vol. LIX, no. 26, 197.
45. Admission Committee Report 1963-64, Official Register of Harvard University, vol. LXII, no. 27, 91.
46. Admission Committee Report 1964-65, Official Register of Harvard University, vol. LXIII, no. 29, 102.
47. Admission Committee Report 1966-67, Official Register of Harvard University, vol. LXV, no. 25, 114.
48. Admission Committee Report 1963-64, 92.
49. Admission Committee Report 1964-65, 100-01.
50. *Idea of a University,* discourse VI, sec. 9.



CONFIDENTIAL

HARV00030426

*The President's Report 1993–1995*

V

CIVIL RIGHTS LEGISLATION AND THE *BAKKE* CASE

51. No single opinion represented the views of a majority of the Court, although brief passages of Justice Powell's pivotal opinion stated the judgment of the Court on the key issues in dispute.

52. Regents of the University of California v. Bakke, 438 U.S. 265, 291 (1978) (opinion of Powell, J.); see also ibid., 356-62 (opinion of Brennan, J., et al.).

53. Ibid., 320 (opinion of Powell, J.); see also ibid., 356-62 (opinion of Brennan, J., et al.).

54. Ibid., 320; see also ibid., 355-56 (opinion of Brennan, J., et al.).

55. An attempt, for instance, to compensate for previous general "societal discrimination" against minorities was judged by Justice Powell not to be an adequate reason for giving special consideration to minority candidates in admissions, because there had been no determination that the University of California at Davis had itself engaged in discriminatory practices requiring remedial effort. Ibid., 307-10. Four Justices of the Court—those who along with Justice Powell formed the majority concluding that race could be used as a "plus factor" in university admissions—took a different view of the "societal discrimination" issue. Ibid., 362 (opinion of Brennan, J., et al.) ("remedying the effects of past societal discrimination is . . . sufficiently important to justify the use of race-conscious admissions programs where there is a sound basis for concluding that minority underrepresentation is substantial and chronic, and that the handicap of past discrimination is impeding access of minorities" to the university).

56. Ibid., 314.

57. Ibid., 312 (quoting 354 U.S. 234, 263 (1957) (concurring in result)).

58. Ibid., 312.

59. Ibid., 312 (quoting 385 U.S. 589, 603 (1967)).

60. Ibid., 313.

61. Ibid., 312 (quoting Keyishian v. Board of Regents, 385 U.S. 589, 603 (1967)).

62. Ibid., 316.

63. Ibid., 323-24.

64. Ibid., 406.

65. Ibid., 317-18.

66. Ibid., 313.

67. Ibid., 314 (quoting Sweatt v. Painter, 339 U.S. 629, 634 (1950)).

68. Ibid., 314.

69. Report of the President to the Board of Overseers 1935-36, 10.

61

CONFIDENTIAL

HARV00030427

*Harvard University*

## VI

### POSSIBLE FUTURE DIRECTIONS

70. U.S. Department of Commerce, Bureau of the Census, *Educational Attainment in the United States: March 1993 and 1992*, table 18.

71. National Research Council, *Summary Report 1990: Doctorate Recipients from United States Universities*, tables S-1 and S-2; National Research Council, *Summary Report 1993: Doctorate Recipients from United States Universities*, tables A-2 and B-2.

72. U.S. Department of Education, National Center for Education Statistics, *Digest of Education Statistics 1995*, tables 266 and 261; *Digest of Education Statistics 1980*, tables 112 and 111. Degrees awarded to nonresident aliens are not included.

73. For example, see above, part III.2, pp. 14-16.

## VII

### ADMISSIONS: THE 1990s AND BEYOND

74. *On Liberty*, pt. II.

75. Jerre Mangione and Ben Morreale, *La Storia: Five Centuries of the Italian American Experience* (New York: Harper-Collins, 1992), 209.

CONFIDENTIAL

HARV00030428



CONFIDENTIAL

HARV00030429

It is my sad duty to conclude this report with a list of those among the active and retired ranks of the University who died during the calendar years 1993 and 1994. They include Paul Codman Cabot, Treasurer of Harvard College from 1948 to 1965, who died on September 1, 1994, at the age of 95; Albert Lindsay Nickerson, Overseer from 1959 to 1965 and Fellow of Harvard College from 1965 to 1975, who died on August 7, 1994, at the age of 83; and four other former Overseers: R. Ammi Cutter, Overseer from 1966 to 1972 who died on November 28, 1993, at the age of 91; Arthur Theodore Lyman, Overseer from 1979 to 1985, who died on July 1, 1993, at the age of 73; Lewis Thomas, Overseer from 1976 to 1982, who died on December 3, 1993, at the age of 80; and Jerome B. Wiesner, Overseer from 1987 to 1993, who died on October 21, 1994, at the age of 79. Harvard was honored by the distinguished service of these former members of its governing boards, and by that of the men and women named in the pages that follow.

CONFIDENTIAL

# Necrology

JAMES LUTHER ADAMS, Edward Mallinckrodt, Jr. Professor of Divinity, *Emeritus,* died on July 26, 1994, at the age of 92. An expert on social ethics and a leading Unitarian scholar, Professor Adams began teaching at Harvard Divinity School in 1956. He lectured on religious issues in law, economics, and civic affairs, and was co-director of a Harvard Business School seminar on religion and public-policy decision making. He was keenly interested in issues lying at the intersection of religion, public policy, and social responsibility. Born in Ritzville, Washington, he earned his bachelor's degree from the University of Minnesota in 1924, his master's degree from Harvard in 1930, and his doctorate from the University of Chicago in 1947. He taught at Meadville Theological School in Chicago for 20 years before joining the Harvard faculty. After retiring from Harvard in 1968, Professor Adams began four years as Distinguished Professor of Social Ethics at Andover Newton Theological School. An authority on the philosopher and theologian Paul Tillich, he was the author of *Paul Tillich's Philosophy of Culture, Science, and Religion.* His many other writings include *An Examined Faith: Social Context and Religious Commitment.* He was editor of the *Journal of Liberal Religion, Faith and Freedom, The Christian Register,* and the *Journal of Liberal Ministry.* He served as president of the American Society for Christian Ethics, president of the Society for the Scientific Study of Religion, and chairman of the Massachusetts Civil Liberties Union's committee on church and state. After his ordination to the Unitarian ministry, he was a minister at churches in Massachusetts from 1927 to 1935.

HENRY FREEMAN ALLEN, Henry Willard Williams Clinical Professor of Ophthalmology, *Emeritus,* died on December 23, 1993, at the age of 77. Born in Boston, he graduated from Harvard College in 1939 and from Harvard Medical School in 1943. A sixth-generation surgeon, he was a descendant of the Warren family, whose members helped found the Medical School and the Massachusetts General Hospital. Following service in World War II as a captain in the Army Medical Corps in Germany, Dr. Allen did his residency in ophthalmology at the Massachusetts Eye and Ear Infirmary. He was chief of ophthalmology there from 1968 to 1973. President of the Channing Home from 1956 to 1962, Dr. Allen helped to establish the Channing Laboratory, the William Ellery Channing Professorship, and the Harriet Ryan Albee Professorship at the Medical School. He volunteered his surgical services at the Binder-Schweitzer Hospital in Pucalpa, Peru, as well as in Haiti, Saudi Arabia, and the Sioux Indian Nation in South Dakota. He was a trustee of the Episcopal Divinity School in Cambridge, the Perkins School for the Blind in Watertown, and the Massachusetts Eye and Ear

65

CONFIDENTIAL

HARV00030431

*Harvard University*

Infirmary. For 25 years Dr. Allen directed the Lancaster course in ophthalmology at Colby College, which drew faculty from across the United States to teach medical residents from all over the world. His Harvard appointments included Assistant Clinical Professor of Ophthalmology (1957), Associate Clinical Professor of Ophthalmology (1965), Clinical Professor (1968) and the Williams Clinical Professorship of Ophthalmology (1970).

Henry B. Arthur, George M. Moffett Professor of Agriculture and Business, *Emeritus*, died May 16, 1993, at the age of 89. Born in Gloversville, New York, he graduated from Union College in 1926. He received master's and doctoral degrees in economics from Harvard in 1931 and 1935, and began a long career as an economist in industry and government. He served as chief of the Marshall Plan Program Review in Paris, and was a member of the Wage Stabilization Board during the Korean War. He joined the Harvard Business School faculty in 1960 to become the first Moffett Professor of Agriculture and Business. Professor Arthur analyzed management and training programs in India and Central America, and lectured throughout the world. After his retirement in 1970 he wrote on business ethics and developed the first course on the subject at Harvard's Extension School, where he taught from 1984 to 1990. The Henry B. Arthur Fund for Business Ethics was established at the Business School in 1987, and the school awarded him its Distinguished Service Award in 1992.

William Bentinck-Smith, Honorary Curator of Type Specimens and Letter Design in the Harvard College Library, died on January 19, 1993, three days before his 79th birthday. Mr. Bentinck-Smith served as an administrative officer for more than forty years under Harvard presidents Conant, Pusey, and Bok, and was later an active member of the University Library Visiting Committee. After graduating from Harvard College in 1937, he earned his M.S. in journalism from Columbia University in 1938 and became a reporter for the *Boston Globe*. In 1940 he was named managing editor of the *Harvard Alumni Bulletin* (now *Harvard Magazine*). After three years of decorated service in the Navy during World War II, he returned to the *Bulletin* as its editor. From 1954 to 1971 he served as assistant to President Nathan M. Pusey, and from 1957 to 1964 was also editor of *Harvard Today*. He subsequently became an associate in the Office of the Secretary to the University, working with the governing boards. An authority on Harvard history, Mr. Bentinck-Smith was also the Library's resident expert on type design. Among his historical works are *Building a Great Library: The Coolidge Years* (1976) and *Harvard University History of Named Chairs* (Vol. I, 1991). He was editor of *The Harvard Book* (1953, revised 1982), an anthology of writings about the College and its history, and of *More Lives of Harvard Scholars* (1986), a collection of memorial minutes. His interest in typography was sparked by his friendship with Philip Hofer (1898–1984), founder and curator of the College Library's Department of Printing and Graphic Arts. Mr. Bentinck-Smith gave much of his time to volunteer activities at Harvard and elsewhere. He served as secretary of his College class, secretary of the Charity of Edward Hopkins, a director of the Associated Harvard Alumni, and president of the Signet Associates. In 1987 he was awarded the Harvard Medal for his services to the University.

CONFIDENTIAL

HARV00030432

*The President's Report 1993–1995*

AMICO BIGNAMI, Professor of Pathology (Neuropathology), died on August 5, 1994, at the age of 64. A Harvard Medical School professor since 1976, Dr. Bignami was internationally known for his contributions to the understanding of brain and spinal cord degeneration and regeneration. For fourteen years he was associate chief of staff for research and development at the Brockton/West Roxbury Veterans Administration Medical Center. Born in Montreux, Switzerland, he graduated from Italy's Instituto M. Massimo and earned his medical degree at the University of Rome. He came to the United States in 1969 and served as Associate Professor of Pathology at Stanford University. The author of more than 200 scientific papers, he was noted for his explication of the pathological mechanisms involved in diseases of the central nervous system, including Jakob-Creutzfeldt disease.

WALTER FRANCIS BOGNER, Professor of Architecture, *Emeritus,* died on June 16, 1993, at the age of 93. Born in Providence and educated in Europe, he studied architecture in Austria and at Harvard. In 1925 he won the Rotch Traveling Fellowship in architecture and spent two years traveling and studying in Europe as a visiting fellow at the American Academy in Rome. He began teaching at the Harvard Graduate School of Design in 1927, became a full professor in 1946, and retired in 1966. Professor Bogner used his Third Year Design studios to develop research programs on postwar problems of housing and school facilities. He wrote urban design manuals, several books on school design, and master planning studies for Boston, Milwaukee, and San Francisco. In 1951 he served as consultant to the German Ministry of Housing for the rebuilding of eleven German cities under the Marshall Plan. Throughout his career he maintained a private practice in Cambridge, designing schools, hospitals, and private homes in New England. His interest in civic improvement led to the Back Bay Center Project for Boston in 1953. Professor Bogner was a fellow of the American Institute of Architects, a member of the Boston Society of Architects, and a founder of the AIA teacher training program through the Association of the Collegiate Schools of Architecture.

UWE KLAUS BRINKMANN, Associate Professor of International Health-Epidemiology in the Faculty of Public Health, died June 19, 1993, while in Fortaleza, Brazil, on field research. He was 52. Born in Hamburg, Germany, he earned a medical degree at the University of Berlin in 1966. He went on to take a degree in tropical public health from the London School of Hygiene and Tropical Medicine in 1970 and a doctorate in epidemiology and tropical medicine from the University of Hamburg in 1981. Dr. Brinkmann attained world stature as a teacher in epidemiology at the Institute of Tropical Medicine in Hamburg from 1974 to 1982, and at the Institute for Tropical Hygiene at Heidelberg. He did much research in developing countries, and served residencies in Togo, Ghana, Ethiopia, Liberia, Burkina Faso, Guatemala, Mali, and Thailand. During the 1980s he taught postgraduate courses throughout Europe. He published nearly one hundred scientific papers on tropical diseases, and was an expert on the impact of malaria on Africa and the transmission of the AIDS virus in Thailand. In 1990 he joined the Harvard School of Public Health faculty in the departments of Epidemiology,

67

CONFIDENTIAL

HARV00030433

*Harvard University*

Population and International Health, and Tropical Public Health. He led an inter-disciplinary group studying the emergence of new infectious diseases as a result of changes in the global environment, human settlement, and human behavior.

DOUGLAS WALLACE BRYANT, Professor of Bibliography and Librarian, *Emeritus*, and former Director of the University Library, died on June 12, 1994, at the age of 80. Professor Bryant's pioneering work in computerization and resource sharing helped transform library management. Born in Boston, he earned his bachelor's degree from Stanford University and his master's degree in library science from the University of Michigan. He joined Harvard's library staff in 1952, after serving as director of U.S. Information Service libraries at the American Embassy in London. He became University Librarian in 1964 and was appointed director of the library system in 1972. He was named Professor of Bibliography that same year. As direc-tor of Harvard's library system he oversaw the establishment of ten new library buildings, including the Countway Library of Medicine and Pusey Library. Under his leadership the Harvard collections grew from 7.25 million to 10 million vol-umes. He was instrumental in establishing the National Union Catalog of all publi-cations produced in the United States, and in creating a computer-based catalog of works to be made freely available to scholars. This later became a national consor-tium called the Research Libraries Group. He was honored in 1973 with the estab-lishment of the Douglas W. Bryant Fellowship program, awarded annually to promote scholarly research by Harvard library staff. After retiring from Harvard in 1979, Professor Bryant became executive director of the American Trust for the British Library; from 1990 to 1994 he served as its president. Over the course of his career he had many significant professional associations with UNESCO, the International Federation of Library Associations, the Center for Research Libraries, the Ford Foundation, and the London School of Economics.

FRANK MORTON CARPENTER, Fisher Professor of Natural History, *Emeritus*, and Alexander Agassiz Professor of Zoology, Emeritus, died on January 18, 1994, at the age of 91. A renowned specialist in the evolution of insects, he performed studies of the structures of living and fossil insects that helped reconstruct the past 250 mil-lion years of insect life. His life's work, titled *Superclass Hexapoda*, was published by the Geological Society of America in 1992. It is regarded as the first comprehensive work of its kind, covering all the known history of fossil insects. He was also a co-author of *The Classification of Insects*, published in 1954. Born in Boston, he began his affiliation with Harvard at the age of sixteen, when he joined the Cambridge Entomological Club. He graduated from Harvard College in 1926 and remained at the University to earn his master's and doctoral degrees. He held appointments at Harvard for more than 45 years, becoming Agassiz Professor of Zoology in 1945 and Fisher Professor of Natural History in 1969. He served as curator of fossil insects in the Museum of Comparative Zoology from 1936 until his retirement in 1973, and was chairman of the biology department in the 1950s. He also served as acting associate dean of the Graduate School of Arts and Sciences, as acting direc-tor of the University Extension program, and as president of the Harvard chapter of Phi Beta Kappa. For nearly 30 years he was managing editor of the entomological

68

CONFIDENTIAL

HARV00030434

*The President's Report 1993–1995*

journal *Psyche.* In 1993 Professor Carpenter received the Thomas Say Award from the Entomological Society of America in recognition of his lifelong contributions to the study of insects. He was awarded the Paleontological Society Medal in 1975, and was an honorary fellow of the Royal Entomological Society.

HOLLIS BURNLEY CHENERY, Thomas D. Cabot Professor of Economics, *Emeritus,* died on September 1, 1994, at the age of 76. An expert on international economics, he served as vice president for development policy at the World Bank between terms as Professor of Economics at Harvard. He was Professor of Economics from 1965 to 1972 and Cabot Professor from 1982 to 1988. During his tenure at Harvard he was associated with the Harvard Development Advisory Service, which later became the Harvard Institute for International Development. Born in Richmond, Virginia, he earned a bachelor's degree in mathematics from the University of Arizona in 1939 and a second bachelor's degree in engineering from the University of Oklahoma in 1942. He worked as an engineer for gas and oil companies before entering the Air Force in 1942 and rising to the rank of captain. After World War II he earned a master's degree in economics from the University of Virginia and a Ph.D. in economics from Harvard. From 1949 to 1953 he worked as an economist with the U.S. Economic Cooperation Administration, directing economic analysis programs in Paris, Rome, and Ankara. He was a professor of economics at Stanford University from 1952 to 1961, and served as co-director of Stanford's Research Center for Economic Growth. He was a Guggenheim Fellow in 1961. In that year he joined the United States Agency for International Development, where he rose to become an assistant administrator. He was the author or co-author of several publications, including *Structural Change and Development Policy; Patterns of Development, 1950-1970;* and *Arabian Oil: America's Stake in the Middle East.*

DAVID GLENDENNING COGAN, Henry Willard Williams Professor of Ophthalmology, *Emeritus,* died September 9, 1993, at the age of 85. Born in Fall River, Massachusetts, Dr. Cogan graduated from Dartmouth College in 1929 and earned his medical degree at Harvard Medical School. He completed his residency in ophthalmology at the Massachusetts Eye and Ear Infirmary, where he later became director of the ophthalmic laboratories and director of the eye pathology department. Dr. Cogan's first appointment at Harvard Medical School began in 1935; from 1943 to 1973 he was director of its Howe Laboratory of Ophthalmology. He became Professor of Ophthalmology in 1955, and from 1962 to 1968 he chaired the Department of Ophthalmology. Dr. Cogan was widely recognized as one of the world's leading clinical ophthalmologists and educators. His textbook *Neurology and the Visual System* was published in 1966; it remains an important reference work for ophthalmologists and neurologists. His studies of atomic bomb victims in Hiroshima and Nagasaki led to significant findings on cataract development and radiation damage to the eyes. Dr. Cogan retired from Harvard in 1974 and joined the National Eye Institute in Bethesda, Maryland, where he was chief of neuro-ophthalmology from 1974 to 1985 and senior medical officer from 1985 until his death. He was a founder of the American Ophthalmic History Society and the recipient of many professional awards, including the

69

CONFIDENTIAL

HARV00030435

*Harvard University*

Procter Medal of the Association for Research in Vision, the Howe Medal of the American Ophthalmological Society, and the Gonin Medal of the International Council of Ophthalmology.

OLIVER COPE, Professor of Surgery, *Emeritus,* died on April 30, 1994, at the age of 91. A Massachusetts General Hospital physician for more than 60 years, Dr. Cope was the first chief of staff of the Shriners Burns Institute. His wide range of expertise covered endocrinology, treatments for burn victims, diseases of the breast, and psychosomatic illness. Born in Germantown, Pennsylvania, he graduated from Harvard College in 1923 and from Harvard Medical School in 1928. He began his thirty-nine-year affiliation with Harvard Medical School in 1930 as an Assistant in Surgery, was appointed Professor of Surgery in 1963 and assumed emeritus status in 1969. After the bombing of Pearl Harbor in 1941, Dr. Cope helped develop the use of petroleum jelly wraps and intravenous fluids for burn management, which became the method of treatment used by the U.S. military. At the end of the war he turned his attention to the treatment of burned children. In the 1940s Dr. Cope questioned the routine prescription of radical mastectomies and advocated lumpectomies combined with radiation and drug therapy. After retiring in 1969, he devoted his time to improving the physical and emotional care of women with breast cancer. Dr. Cope urged medical educators to place more emphasis on the behavioral sciences and on the mental and emotional aspects of illness. He was the author of several books, including *Management of the Coconut Grove Burns at the Massachusetts General Hospital; The Breast;* and *Man, Mind and Medicine: The Doctor's Education.*

BERNARD DAVID DAVIS, Adele Lehman Professor of Bacteriology and Immunology, *Emeritus,* died on January 14, 1994, at the age of 78. Dr. Davis was one of the first scientists to suggest that penicillin could be used to isolate bacterial mutants. His groundbreaking research was fundamental in advancing the study of genetics. Born in Franklin, Massachusetts, he graduated from Harvard College in 1936 and from the Medical School in 1940. From 1942 to 1954 he worked for the U.S. Public Health Service, where he headed a tuberculosis research lab. He came to Harvard Medical School in 1957 to head the department of bacteriology and immunology, and was appointed to the Lehman Professorship of Bacteria and Immunology in 1962. In the 1970s he published essays in scientific journals and in the lay press on the relations between science and society. Through op-ed pieces in *The Wall Street Journal* and *The New York Times* he defended the value of scientific research. His many awards include the 1989 Hoechst-Roussel Award for his research on antibiotics, and the 1989 Selman A. Waksman Award in Microbiology from the National Academy of Sciences for his technique in isolating bacterial mutants. He was the author of *Storm Over Biology* and a textbook on microbiology, and was a member of the National Academy of Science and the American Academy of Arts and Sciences.

RUSSELL GERARD DAVIS, Professor of Education, *Emeritus,* died April 30, 1993, at the age of 70. Born and raised in Hopkinton, Massachusetts, he graduated *cum laude* from Holy Cross in 1943. He also attended classes at Dartmouth College. He served as a Marine rifleman from 1942 to 1946 and fought in the Peleliu and Okinawa

70

CONFIDENTIAL

HARV00030436

*The President's Report 1993–1995*

campaigns. His experiences were the basis for his novel *Marine at War,* which deglamorizes war and the military. From 1946 to 1951, he taught at the Cranwell School in Lenox. He began graduate studies in linguistics at Harvard in 1951, but was called to service as a visiting expert for the Army in Okinawa, Japan, and Korea. He completed his master's degree in education at Harvard in 1953 and his doctorate in education in 1955. Between 1955 and 1957, he served as a diplomat in Ethiopia with the U.S. International Cooperation Administration. His experience led to the publication of two collections of children's stories, *Ten Thousand Desert Swords* and *The Lion's Whiskers,* and a romantic novel, *Strangers in Africa.* Between 1957 and 1960, he was an assistant professor of education at Boston College and director of the Office of Research. In 1962 he organized the Center for Studies in Education and Development at Harvard, and in 1967 was named Professor of Education and Development. He served on the Gardner Commission to Vietnam in 1968, and from 1968 to 1969 was director of the Peace Corps in East Asia and the Pacific regions. Professor Davis was also director of a $3 million project to improve education planning in developing nations from 1976 to 1980. His activities at Harvard were interdisciplinary: he joined the Center for Population Studies in the School of Public Health in 1969 and the Harvard Institute for International Development in 1974. Professor Davis retired in 1989. He was a fellow of the American Academy of Sciences and a member of several professional organizations.

CHARLES WILLIAM ELIOT II, former Charles Eliot Professor of Landscape Architecture and Professor of City and Regional Planning, died March 16, 1993, at the age of 93. Born in Cambridge, he was the grandson of Charles William Eliot, Harvard's president from 1869 to 1909. He attended the Browne and Nichols School and served in World War I in the American Red Cross Ambulance Service in Italy and in the U.S. Army Field Artillery. He graduated from Harvard College in 1920 and received a master's degree from the Harvard School of Landscape Architecture in 1923. After a year of additional study in Europe, he returned to Boston and drafted plans for Arlington, Bedford, Duxbury, and Yarmouth. He then went to Washington, D.C., to become city planner and director of the National Capital Park and Planning Commission. From 1933 to 1943 he was executive officer and director of the National Resources Planning Board in the executive office of the President. When the board was dissolved in 1943, he went to California as director of the Haynes Foundation. In the early 1950s he returned to Harvard, where he was appointed Charles Eliot Professor of Landscape Architecture. The chair is named for his uncle, a landscape artist who worked with Frederick Law Olmsted to develop the Boston park system. Professor Eliot retired from the School of Design in 1966 and became a planning consultant. He served on the boards of numerous organizations, including the National Parks Association, the National Symphony Orchestra, the American Society of Planning Officials, and the Metropolitan Area Planning Council.

KENDALL EMERSON, JR., Professor of Medicine, *Emeritus,* died April 20, 1993, at the age of 86. Born in Worcester, Dr. Emerson was a 1929 graduate of Yale University and 1933 graduate of Harvard Medical School. After an internship at

CONFIDENTIAL

HARV00030437

*Harvard University*

Presbyterian Hospital in New York City, he became a research fellow in the department of pharmacology at Johns Hopkins Medical School. Dr. Emerson did his residency in the metabolic study unit there. From 1939 until 1942 he worked at the Rockefeller Institute for Medical Research in New York City. As a lieutenant in the Navy he was stationed in the Pacific during World War II. In 1946 he joined the department of medicine at Peter Bent Brigham Hospital (now Brigham and Women's Hospital) as an associate in medicine. He became an assistant professor at the Medical School in 1949. He subsequently became Associate Clinical Professor and, in 1967, Clinical Professor of Medicine. From 1960 until 1967 he was a visiting physician to the Boston Lying-In Hospital, where he was chief of medicine from 1967 until his retirement from the Medical School in 1973. He was later appointed physician to the University Health Services at Harvard Law School. Dr. Emerson was a member of the Royal Society of Medicine, the American Society for Clinical Investigation, the Federation for Clinical Research, the American Diabetic Association, the American Clinical and Climatological Association, the Endocrine Society, and the American College of Physicians.

ERIK HOMBURGER ERIKSON, Professor of Human Development, *Emeritus,* died on May 12, 1994, at the age of 91. A psychoanalyst who profoundly reshaped views of human development, he was best known for his theory that each stage of life, from infancy and early childhood on, is associated with a specific psychological struggle that contributes to a major aspect of personality. Born in Frankfurt am Main, Germany, he graduated from the Vienna Psychoanalytic Institute in 1933 and emigrated to the United States the same year. He became a naturalized citizen in 1939. From 1933 to 1935 he taught and did research at Harvard Medical School. He then joined the faculty at Yale University's School of Medicine, and moved to the University of California at Berkeley in 1939. He returned to Massachusetts in 1951 to become associated with the Austen Riggs Center in Stockbridge. In 1960 he rejoined the Harvard faculty as Professor of Human Development. He retired in 1970, but was Godkin Lecturer at Harvard in 1972. He was the author of many books, including *Childhood and Society* (1950), the first of several books exploring the development of human personality and ways in which various societies deal with stages of the life cycle. Another book, *Gandhi's Truth,* won the National Book Award in philosophy and science, the Pulitzer Prize for general nonfiction, and the Melcher Award of the Unitarian Universalist Association. Professor Erikson was a trustee of Radcliffe College and a Fellow of the American Academy of Arts and Sciences; a member emeritus of the National Academy of Education; a life member of the American Psychoanalytic Association; an honorary member of Phi Beta Kappa; and a member of the Cambridge Science Club and the Signet Society.

HOWARD BARRACLOUGH FELL, Professor of Invertebrate Zoology, *Emeritus,* died on April 21, 1994, at the age of 76. He joined the Harvard faculty in 1964, became Professor of Invertebrate Zoology in 1965, and served as curator of invertebrate zoology at the Museum of Comparative Zoology. His research focused on evolution, general problems of marine biogeography, biology of deep-sea bottom faunae, and systematics, morphology and paleontology of the Echinodermata. Born in

72

HARV00030438

*The President's Report 1993–1995*

Lewes, England, he earned his bachelor's and master's degrees from the University of New Zealand, and his doctorate in zoology from the University of Edinburgh. He taught at the University of Victoria in New Zealand before coming to Harvard. His honors included the Hector Medal and Prize and the Hutton Medal.

FRANK BURT FREIDEL, JR., Charles Warren Professor of American History, *Emeritus,* died January 25, 1993, at the age of 76. Born in Brooklyn, New York, he received his bachelor's degree from the University of Southern California in 1937. He earned his master's degree in 1939 and his doctorate in 1942 from the University of Wisconsin. After teaching at several colleges he came to Harvard in 1955 as a full professor. He was appointed Charles Warren Professor of American History in 1972. In 1981 he retired from Harvard, and served as Bullitt Professor of History at the University of Washington in Seattle until 1986. Professor Freidel wrote twelve books and was co-author or editor of several more. Having come of age in the Depression, he was an admirer of President Franklin D. Roosevelt, about whom he published six books and was writing a seventh at the time of his death. The seventh book was to have been a short biography of Roosevelt for college use. Among his other works were *Splendid Little War,* a pictorial history of the Spanish-American War; *America in the Twentieth Century;* and the two-volume *A History of the United States.* Professor Freidel was a past president of the Organization of American Historians, and a member of the New England History Teachers' Association, the Massachusetts Historical Society, the Southern Historical Association, and the Colonial Society. He was a fellow of the American Academy of Arts and Sciences, and a member of the American Historical Association and the American Antiquarian Society.

DANIEL HERTZ FUNKENSTEIN, Professor of Psychiatry, *Emeritus,* died on January 28, 1994, at the age of 83. Born in Atlanta, he attended the University of Georgia and received his medical degree from Tulane University in 1934. He was briefly in private practice before volunteering as a flight surgeon in the Army Air Corps. His four years of service in World War II brought him decorations that included the Silver Star and Bronze Star. In 1946 he moved to Boston and retrained in psychiatry at the Massachusetts Mental Health Center, where he later served as director of education and research. He was also director of research for the Harvard University Health Services. He held appointments in the Harvard Medical School from 1946 until his retirement in 1976. He served on the school's admissions committee from 1952 until 1976, and contributed to the development of the combined M.D.-Ph.D. program for Harvard and MIT. After retiring, he was chief of staff at the Brockton Veterans' Administration Medical Center, where he had been a consultant for 30 years. Dr. Funkenstein was the author of numerous articles and two books in the areas of psychophysiology and medical education. He also had a private psychiatry practice, which included counseling students interested in medical careers. He was an active member of the American Psychiatric Association for more than two decades.

PARK SPEARIN GERALD, Professor of Pediatrics, *Emeritus,* died July 9, 1993, at the age of 72. Dr. Gerald was born in Omaha and graduated in 1943 from Iowa State

CONFIDENTIAL

HARV00030439

*Harvard University*

College. He took his medical degree from Creighton University School of Medicine, Omaha, in 1947. He received training in cytogenetics in the Galton Laboratory of London's University College, where he was an honorary research assistant. In 1959, after service in the Army Medical Corps, he became a clinical fellow and resident at Children's Hospital Medical Center. There he developed the clinical genetics unit, and served as its chief. He also taught pediatrics at Harvard Medical School. His research into genetic disturbances and birth defects led to the authorship of more than a hundred scientific papers and seats on the editorial boards of the *New England Journal of Medicine* and other leading medical journals. After his retirement in 1991, Dr. Gerald was active in the Boston Computer Society.

ERWIN NATHANIEL GRISWOLD, Langdell Professor of Law, *Emeritus,* died on November 19, 1994, at the age of 90. Dean of Harvard Law School for 21 years, Professor Griswold also served as solicitor general of the United States under two presidents. Born in East Cleveland, Ohio, he earned his bachelor's and master's degrees from Oberlin College before entering Harvard Law School, where he received his LL.B. in 1928 and a doctorate the next year. After graduating he served as special assistant to the attorney general in Washington. He returned to Harvard as an assistant professor in 1934, and became Professor of Law the following year. He was appointed to the Charles Stebbins Fairchild chair in law and became dean in 1946. Under his leadership the Law School developed its International Legal Studies Program and International Tax Program. He doubled the size of the faculty without appreciably increasing the size of the student body, and oversaw the enrollment of the first women students in 1950. Professor Griswold left Harvard to serve as solicitor general under Presidents Johnson and Nixon. He served on the U.S. Civil Rights Commission and was an expert witness for Thurgood Marshall in cases that laid the foundation for the Supreme Court's desegregation order in *Brown v. Board of Education.* In 1979 the Law School dedicated Griswold Hall in honor of his contributions. Professor Griswold held leadership positions in many organizations, and was a trustee of Oberlin College and the Harvard Law Review Association.

HARRIET LOUISE HARDY, Clinical Professor of Occupational Health in the Department of Preventive Medicine, *Emerita,* died October 13, 1993, at the age of 87. Born in Arlington, Dr. Hardy graduated from Wellesley College in 1928 and earned her medical degree at Cornell University Medical School in 1932. She began her medical career as physician at the Northfield School in western Massachusetts; in 1939 she became college physician at Radcliffe College. Throughout her career Dr. Hardy fought against diseases caused by occupational exposure to dangerous substances. In the 1940s she identified beryllium as the source of an often fatal respiratory illness contracted by workers in plants manufacturing fluorescent lamps. She also worked with the Atomic Energy Commission to study hazards of nuclear energy. Dr. Hardy established an occupational medicine clinic at Massachusetts General Hospital in 1947, and she was its director until her retirement in 1971. She also established the National Beryllium Registry, a unit that became a model for tracking occupational hazards and establishing guidelines for their control. She led the Occupational Medical Service at MIT for more than twenty years and was an

74

CONFIDENTIAL

HARV00030440

*The President's Report 1993–1995*

advisor on safety considerations relating to the institute's first nuclear reactor. In 1971 she was named clinical professor in the Harvard Medical School's Department of Medicine—the first woman appointed to a full professorship at the school. Dr. Hardy published her memoirs, *Challenging Man-Made Disease,* in 1983. Among her awards were the American Medical Women's Association's Medical Woman of the Year, the Award of Merit of the American Academy of Occupational Medicine, the Alice Hamilton Award of the New York Academy of Science, and awards from the American Public Health Association.

DWIGHT EMARY HARKEN, Clinical Professor of Surgery, *Emeritus,* died August 27, 1993, at the age of 83. Born in Osceola, Iowa, Dr. Harken earned his bachelor's and medical degrees at Harvard, trained at Bellevue Hospital in New York City, and then went to London on a New York Academy of Medicine fellowship. During World War II he remained in London, served with the Army Medical Corps, and did pioneering work in cardiac surgery. He is recognized as the first surgeon to have had repeated success in wartime heart surgery: he removed bullets and shrapnel from the hearts of about 130 wounded soldiers without a single fatality. Dr. Harken taught at Tufts University for two years and then came to Harvard, where he taught and practiced from 1948 to 1970. He was chief of thoracic surgery at Peter Bent Brigham Hospital, now Brigham and Women's Hospital, and held a parallel post at Mt. Auburn Hospital in Cambridge. In 1951 he opened the world's first intensive care unit at the Brigham; he later opened a second unit, which was named for him, at Mt. Auburn Hospital. In the 1960s Dr. Harken and his colleagues developed the first pacemaker, artificial valves, and other devices to help imperfect hearts function normally. Dr. Harken also addressed the emotional concerns of his patients and gathered four of his cardiac patients to form a support group. That effort grew into Mended Hearts, an international organization with tens of thousands of members. Dr. Harken also helped found Action on Smoking and Health, Heart House, and the American Board of Thoracic Surgery. He wrote or edited more than two hundred scientific articles and several books, and served on the boards of eight journals. Dr. Harken was a former president of the American College of Cardiology and the Association for the Advancement of Medical Instrumentation.

EINAR INGVALD HAUGEN, Victor S. Thomas Professor of Scandinavian and Linguistics, *Emeritus,* died on June 20, 1994, at the age of 88. He was born to Norwegian immigrant parents in Sioux City, Iowa. His interest in Scandinavian culture began in boyhood, during a two-year visit to his parents' home town of Opdal in central Norway. He earned his bachelor's degree from St. Olaf College and his master's and Ph.D. degrees from the University of Illinois. He taught Scandinavian languages at the University of Wisconsin for 29 years before joining the Harvard faculty in 1960. He retired in 1975. His work to promote the study and understanding of Scandinavian culture in the United States earned him the Order of St. Olaf, First Class, the highest honor bestowed by the Norwegian Government. He was also honored by Sweden, which named him a commander of the North Star. He lectured at various universities in the United States, Europe, and Japan, and was the author of many books, dictionaries, and biographies.

75

CONFIDENTIAL

HARV00030441

*Harvard University*

RICHARD JULIUS HERRNSTEIN, Edgar Pierce Professor of Psychology, died on September 13, 1994, at the age of 64. He was an experimental psychologist whose theories on the inheritance of intelligence and criminal behavior catalyzed a national debate. Born in New York City, he graduated from City College of New York in 1952 and earned his doctorate at Harvard in 1955. He conducted research at the Walter Reed Army Institute of Research and was a lecturer in psychology and a research associate at the University of Maryland before joining the Harvard faculty in 1958. Professor Herrnstein taught psychology for 36 years at Harvard. After serving as Associate Professor of Psychology and director of the Psychological Laboratories, he became chairman of the Department of Psychology, a position he held until 1971. He was appointed Professor of Psychology in 1967. He served on many departmental and University committees, including the Harvard-Radcliffe Admissions Committee, the Advisory Committee on Honorary Degrees, and the Committee on the Use of Human Subjects in Research. Professor Herrnstein's controversial article *I.Q.*, published in the September 1971 issue of *The Atlantic Monthly*, contended that I.Q. is largely inherited and cannot be significantly enhanced by social programs. His 1973 book *IQ and Meritocracy* spurred a debate on the merits of I.Q. testing. He was also co-author of *Crime and Human Nature* and of *The Bell Curve: Intelligence and Class Structure in American Life*, published shortly after his death. He was a Guggenheim Fellow, a Sloan Foundation Fellow, a Russell Sage Foundation Fellow, and a recipient of the Lewis P. and Linda L. Geyser Prize.

PETER HESS, Professor of Cellular and Molecular Physiology, died March 4, 1993, at the age of 41. Born in Switzerland in 1951, Dr. Hess earned his medical degree in 1979 from the University of Bern, Switzerland. A biophysicist, he was best known for his research on ion channels in nerve and cardiac muscle cells. He was appointed a faculty member at Harvard Medical School in 1986 and became a full professor in 1992. Dr. Hess was an active promoter of the School's M.D.-Ph.D. program, and he served on the program's admissions committee for six years. An accomplished violinist, he often performed at Medical School events.

THORKILD JACOBSEN, Professor of Assyriology, *Emeritus,* died on May 2, 1993, at the age of 88. Born and schooled in Denmark, he came to America in 1927 on a $1,000 fellowship offered by the University of Chicago. After completing his doctorate he directed the 1930 excavation of the 2,600-year-old Sennacherib aqueduct at Jerwan, Iraq, which was the world's oldest known aqueduct at the time. In 1950 he helped unearth Sumerian clay tablets and translate cuneiform compositions written 3,800 years earlier. His team also discovered a 6,000-year-old irrigation canal that paralleled the Euphrates River. He became professor of Assyriology at Harvard in 1962, and retired in 1974. He dedicated his life to deciphering poetry and religious writings composed in Sumerian, a 3,000-year-old Mesopotamian language with no known precursor or offspring. He compiled dictionaries, explicated ancient hymns, poems, and epics, and edited professional journals including *Sennacherib's Aqueduct at Jerwan, Sumerian Poetry in Translation, The Assyrian Dictionary of the Oriental Institute,* and *The Journal of Cuneiform Studies.* Professor Jacobsen was a member of the Royal Danish Academy of the Arts and Sciences, the American

76

CONFIDENTIAL

HARV00030442

*The President's Report 1993–1995*

Philosophical Society, and the American Academy of Arts and Sciences. He retired as president of the American Oriental Society only days before his death. His fifteen fellowships and dozen positions included a fellowship at the National Humanities Center and a visiting professorship at the University of London.

WILLIAM DOUGLAS KAPLAN, Professor of Radiology, died on March 30, 1994, at the age of 56. He was chief of oncologic nuclear medicine at the Dana-Farber Cancer Institute for more than 15 years and was credited with popularizing the use of nuclear medicine to trace the lymphatic system in preparation for radiation therapy. He was also widely known for his contributions to brain tumor imaging. Born in Washington, D.C., he graduated from the University of Maryland and the University of Maryland School of Medicine. After an internship in internal medicine and a residency in diagnostic radiology at Washington Hospital Center, he completed his training in nuclear medicine at Peter Bent Brigham and Children's Hospital in Boston. He began his twenty-three-year affiliation with Harvard Medical School in 1971 as a Clinical Fellow in Radiology and became Professor of Radiology in 1992. Deeply concerned about the education of nuclear medicine technologists, Dr. Kaplan worked with the training program at the Massachusetts College of Pharmacy and Allied Health Sciences. He bequeathed to the program his collection of nuclear medicine journals. He was a fellow of the American College of Nuclear Physicians and a member of many advisory boards and committees.

ROGER THOMSON KELLEHER, Professor of Psychobiology in the Department of Psychiatry, died on May 19, 1994, at the age of 67. He was a pharmacologist internationally recognized for basic scientific studies on drugs used to modify behavior. Born in New Haven, Connecticut, he was a 1950 graduate of the University of Connecticut. He received his Ph.D. in experimental psychology from New York University in 1955. At the Yerkes Laboratories of Primate Biology in Florida he developed a primate research program based on the behavioral principles advanced by the late B.F. Skinner. In 1957 he conducted research on chlorpromazine and other antischizophrenic drugs at Smith, Kline and French Laboratories. He joined the Department of Pharmacology at Harvard Medical School in 1961 and was appointed professor of psychobiology in 1972, when he also became chairman of the Department of Behavioral Biology at the New England Regional Primate Research Center. His research was concerned with systematic studies of the effects of drug abuse in primates, and the influence of behavioral activities on cardiovascular and other physiological functions. He was a fellow of the American Association for the Advancement of Science and a director of the Society for the Experimental Analysis of Behavior.

JOHN ARTHUR KIRKPATRICK, JR., Professor of Radiology, died on May 8, 1994, at the age of 68. Born in Waynesboro, Pennsylvania, he graduated from Franklin and Marshall College and earned his medical degree in 1949 from Temple University School of Medicine, where he began his radiology residency after service in the U.S. Navy. He completed his training at Children's Hospital in Boston and returned to Philadelphia, where he was director of the radiology program at St. Christopher's

77

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL

HARV00030443

Hospital and a professor of radiology at Temple University for the next 20 years. In 1974 he returned to Boston to become radiologist-in-chief at Children's Hospital and Professor of Radiology at Harvard Medical School. Fellows who trained with him established the Kirkpatrick Society in his honor in 1991. Children's Hospital and Harvard Medical School established the John A. Kirkpatrick Professorship in 1994. He was president of the American Roentgen Ray Society, the Society for Pediatric Radiology, and the International Skeletal Society, and was a member of the National Academy of Sciences and an honorary member of sixteen medical societies overseas. He was awarded gold medals from several organizations, including the American College of Radiology and the Society for Pediatric Radiology. He also received the Waldo E. Nelson Achievement Award from St. Christopher's Hospital for outstanding contributions to children's health care. He was the author of 108 scientific papers and 43 books and chapters on pediatrics and radiology.

HARVEY LEIBENSTEIN, Andelot Professor of Economics and Population, *Emeritus*, died on February 28, 1994, at the age of 71. Professor Leibenstein developed several original economic theories, including the concept of X-efficiency analysis. Born in Russia, raised and educated in Montreal, he earned degrees from Northwestern and Princeton Universities. He taught economics at Princeton and the University of California at Berkeley before joining the Harvard faculty in 1966 as a visiting professor of economics. He was appointed to the Andelot Professorship of Economics and Population in 1967. He was an active member of Harvard's Hillel community and an honorary associate of Leverett House. The author of nine books on economic theory, he was particularly interested in the economic development of low-income countries and organizational analysis. His 1987 book, *Inside the Firm: The Inefficiencies of Hierarchy*, challenged many established theories of organizational management. A Guggenheim Fellow, he was also a member of the Institute for Advanced Study, Princeton.

HARRY TUCHMAN LEVIN, Irving Babbitt Professor of Comparative Literature, *Emeritus*, died on May 29, 1994, at the age of 81. Professor Levin was considered a founder of comparative literature as a discipline and played a central role in the development of Harvard's department of comparative literature. Born in Minneapolis, Minnesota, in 1912, he graduated from Harvard College in 1933 and began his first teaching appointment at Harvard in 1939 as an instructor in English. He was an associate of Eliot House and Walter Channing Cabot Fellow in the Faculty of Arts and Sciences. Named to the Babbitt Professorship of Comparative Literature in 1960, he assumed emeritus status in 1983. He was a leading authority on Shakespeare and the author of many books, including *James Joyce: A Critical Introduction*. Published in 1941, it was considered the first major study on the works of Joyce. He received many honorary degrees, including degrees from Oxford University, the University of Paris-Sorbonne, and the University of St. Andrews.

HAROLD DAVID LEVINE, Clinical Professor of Medicine, *Emeritus*, died April 8, 1993, at the age of 85. He was a graduate of Brookline (Mass.) High School, a 1929 graduate of Harvard College, and a 1932 graduate of Harvard Medical

78

CONFIDENTIAL

HARV00030444

School, where he was elected to the Boylston Medical Society. He interned in pathology at Beth Israel Hospital, then completed an internship and assistant residency in medicine at Peter Bent Brigham Hospital (now Brigham and Women's Hospital). From 1934 until 1941 Dr. Levine was a general practitioner and surgeon in Bristol, New Hampshire. He served on the medical staff of Franklin Hospital in Franklin, New Hampshire, and the Margaret Pillsbury Hospital in Concord, New Hampshire. During World War II he served with the Army Medical Corps in Harvard units at Fort Dix, New Jersey, and in the South Pacific, New Guinea, and in the Philippines as chief of the Medical Service of the 35th General Hospital. In 1946 he began a cardiac consultation practice in Boston and headed the Electrocardiographic Laboratory at the Brigham. He worked at Brigham and Women's for many years and concluded his practice at Deaconess Hospital in 1989. His Harvard faculty appointments included Assistant Clinical Professor in 1958, Associate Clinical Professor in 1967, and Clinical Professor from 1973 until his retirement in 1974. He was president of the Massachusetts chapter of the American Heart Association.

JAMES JOSEPH LINGANE, Professor of Chemistry, *Emeritus,* died on March 14, 1994, at the age of 84. A specialist in analytical chemistry, he was appointed an instructor in chemistry at Harvard in 1941. He became Professor of Chemistry in 1952 and assumed emeritus status in 1976. He served as a member of the Board of Freshman Advisers from 1942 until 1972. Born in St. Paul, Minnesota, he received his doctorate from the University of Minnesota in 1938. His many awards included the Gordon Research Conference Award from the American Association for the Advancement of Science, and the Fisher Award from the American Chemistry Society. He was a member of the American Chemistry Society, and the American Academy of Arts and Sciences, and an honorary member of the British Society of Analytical Chemists.

LYNN HAROLD LOOMIS, Dwight Parker Robinson Professor of Mathematics, *Emeritus,* died on June 9, 1994, at the age of 79. Born in Afton, New York, he graduated from Rensselaer Polytechnic Institute in 1937, and earned his master's degree in 1938 and a Ph.D. in 1942, both from Harvard. He began teaching at Harvard in 1938 and joined the Society of Fellows as a Junior Fellow the following year. He was appointed Associate Professor of Mathematics with tenure in 1946, became Professor of Mathematics in 1956, and assumed emeritus status twenty-seven years later. His research, initially in function theory, turned to abstract analysis, and he published a number of articles on the subject, and the book, *Abstract Harmonic Analysis.* He was also the author of several texts on calculus. He was a member of the American Academy of Arts and Sciences.

JEAN MAYER, former Professor of Nutrition and Lecturer in the History of Public Health, died January 1, 1993, at the age of 72. One of the world's leading nutritionists, he left Harvard in 1976 to assume the presidency of Tufts University. He was born in Paris and educated at the University of Paris, where he earned two baccalaureate degrees, master's degrees in physics and biology, and a doctor of science degree.

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL

HARV00030445

*Harvard University*

After service in the French army in World War II, when he was fourteen times decorated, he emigrated to the United States. He received his Ph.D. from Yale University in 1948 and joined the Harvard faculty in 1950. He became an American citizen in 1957. He was appointed Professor of Nutrition in 1965, and in 1973 was named Master of Dudley House. As a researcher he was particularly noted for his pioneering studies of obesity and the regulation of hunger. A founder of the National Council on Hunger and Malnutrition, he was a consultant to agencies of the United Nations and to three U.S. presidents. In 1969 he organized the White House Conference on Food, Nutrition, and Health. For his efforts to improve American nutritional standards and alleviate world hunger, he received two presidential awards.

MARIAN WILKINS ROPES FIELDING, Associate Clinical Professor of Medicine, *Emerita,* died on December 24, 1994, at the age of 91. A specialist in the treatment of arthritis and lupus, she was born in Salem, Massachusetts, and graduated from Smith College. She earned a master's degree at MIT before graduating from Johns Hopkins Medical School in 1931. She began her sixty-year affiliation with Harvard Medical School in 1934 as a research fellow, was appointed Associate Clinical Professor of Medicine in 1962, and assumed emerita status in 1970. Dr. Ropes Fielding wrote two books on lupus, and articles published in medical journals. She was a member of the board of directors of the New England Home for the Deaf.

ROBERT OSHER SCHLAIFER, William Ziegler Professor of Business Administration, *Emeritus,* died on July 24, 1994, at the age of 79. An expert on decision analysis and managerial economics, Professor Schlaifer was a member of the Business School faculty from 1948 until his retirement in 1985. Born in Vermillion, South Dakota, he graduated from Amherst College and earned his doctorate in ancient history at Harvard. He was appointed an instructor in history in 1939; in 1943 he served as a physics instructor and physicist at Harvard's Underwater Sound Laboratory. He was the author of several books, including *Probability and Statistics for Business Decisions* and *Applied Statistical Decision Theories.* He had recently completed work on a computer program called AQD, which is designed to make statistical data analysis accessible to the non-expert.

NATHAN BILL TALBOT, Charles Wilder Professor of Pediatrics, *Emeritus,* died on June 7, 1994, at the age of 84. An authority on child development and the prevention of psychological and behavioral disorders in children, Dr. Talbot was chief of children's service at Massachusetts General Hospital for 15 years. Born in Boston, he graduated from Harvard College and Harvard Medical School. He specialized in pediatric endocrinology and developed Boston's first pediatric endocrinology clinic and laboratory at Children's Hospital. During World War II he was a member of the task force that developed optimal life-raft rations for the army and navy. He was appointed an assistant professor at the Medical School in 1945 and Professor of Pediatrics in 1962. Dr. Talbot wrote extensively on child development and strove to integrate the social, behavioral, and biological aspects of child health. He was the author of five books, including *Raising Children in Modern America.* He was the recipient of the Mead Johnson and Borden awards from the American Academy of Pediatrics.

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL

HARV00030446

*The President's Report 1993-1995*

KIRIL TARANOVSKY, Professor of Slavic Languages and Literatures, *Emeritus*, died January 18, 1993, at the age of 81. He was born in Yuriev, Russia (now Tartu, Estonia), and grew up in Tartu, St. Petersburg, and Kharkov. In the aftermath of the Bolshevik revolution and during the ensuing civil war, the Taranovsky family moved to Yugoslavia, where he graduated from high school and received a law degree from the University of Belgrade in 1933. He worked briefly translating Russian poetry into Serbo-Croatian and returned to the university to earn a degree in Slavic languages in 1936. After teaching at the University of Belgrade for more than two decades, he came to Harvard as a visiting lecturer in 1958. He taught at the University of California, Los Angeles, from 1959 to 1963 and then returned to Harvard as Professor of Slavic Languages and Literatures until his retirement in 1981. After retiring from Harvard, he taught at the University of Wisconsin and at the University of Belgrade, where he continued his work on the analysis of Russian poetry.

SAMUEL EDMUND THORNE, Charles Stebbins Fairchild Professor of Legal History, *Emeritus*, died on April 7, 1994, at the age of 86. An authority on English legal history and common law, Professor Thorne wrote the five-volume work *Bracton on the Laws and Customs of England* which serves as the basis for the continuing study of the relationship between sociopolitical history and the evolution of English common law in the twelfth century. Born in New York, he graduated from City College in 1927 and Harvard Law School in 1930. After teaching at Northwestern and Yale universities, he became a professor at Harvard Law School in 1956. He retired in 1978. He was awarded honorary degrees from Yale, Wesleyan, and Cambridge universities, and was a member of the American Historical Society, the American Society of Legal Historians, and the Guggenheim Foundation.

JOHN GORDON TORREY, Charles Bullard Professor of Forestry, *Emeritus*, and former Director of the Harvard Forest, died January 7, 1993, at the age of 71. Born in Philadelphia, he graduated from Williams College in 1942, and received a master's degree in 1947 and a Ph.D. in 1950, both from Harvard. He was a captain in the Army Medical Administration Corps during World War II, serving with the 317th Station Hospital in Europe from 1943 to 1946. He taught at the University of California, Berkeley, from 1949 to 1960 and came to Harvard as Professor of Botany in 1960. He was director of the Maria Moors Cabot Foundation for Botanical Research from 1966 to 1976, and director of the Harvard Forest in Petersham, Massachusetts, from 1984 to 1991. He held the Charles Bullard Professorship of Forestry from 1984 until his retirement in 1991. Professor Torrey studied and conducted research in England, Germany, Scotland, Australia, and the United States. He published widely, and was a member of, or adviser to, many scientific policy boards and agencies, serving on the editorial boards of several scientific journals.

DONALD THEODORE TRAUTMAN, Henry Shattuck Professor of Law, died September 18, 1993, at the age of 69. Born in Cleveland, Ohio, he earned his bachelor's degree in economics at Harvard College in 1946 and his law degree in 1951 from Harvard Law School, where he was case editor of the *Harvard Law Review*. After graduation he clerked for Supreme Court Justice Felix Frankfurter.

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL

HARV00030447

*Harvard University*

Appointed Assistant Professor of Law at Harvard Law School in 1953, he became Professor of Law in 1956. He was named Charles Stebbins Fairchild Professor of Law in 1980 and Shattuck Professor of Law in 1981. A specialist in accounting, choice of law, and admiralty law especially pertaining to issues of federal jurisdiction, Professor Trautman was co-author of two texts, *Materials on Accounting* (1959) and *Law of Multistate Problems* (1965). He held a Guggenheim Fellowship in 1969. He was a leader in the use of computers in legal education and served as faculty adviser to the Law School's Education Technology Department. He had been president, vice president, and editorial chairman of the Center for Computer Assisted Legal Instruction and was a member of the State Department's Advisory Committee on Private International Law.

JAMES ROLAND WARE, Associate Professor of Chinese, *Emeritus,* died February 27, 1993, at the age of 91. After receiving bachelor's and master's degrees from the University of Pennsylvania, he earned his Ph.D. from Harvard in 1932. Professor Ware joined the Harvard University faculty in 1936 as an assistant professor of Chinese. He was Associate Professor from 1939 until his retirement in 1968. For many years he taught literary Chinese and edited many texts used in language classes. He also translated the sayings of Confucius and Chuang Chou into English.

AMOS NIVEN WILDER, Hollis Professor of Divinity, *Emeritus,* died May 1, 1993, at the age of 97. Born in Madison, Wisconsin, he spent much of his boyhood in China, where his father was American consul in Hong Kong and Shanghai. After serving in World War I as an ambulance driver and artillery corporal, he took his bachelor's degree at Yale University in 1920. He was a Belgian-American Fellow at the University of Brussels and a divinity student at Mansfield College, Oxford; at Oxford he met Albert Schweitzer and served as his secretary. Wilder completed his bachelor's degree in divinity at Yale Divinity School in 1924, and received his Ph.D. in 1933. While finishing his dissertation, he taught at Hamilton College and then joined the faculty of Andover Newton Theological School. He taught at the Chicago Theological Seminary and the Federated Faculty of the University of Chicago from 1943 to 1954. Professor Wilder came to Harvard that year as Professor of New Testament Interpretation at the Divinity School. He was Hollis Professor of Divinity from 1956 until his retirement in 1963. His scholarly work reflected the literary interest he shared with his brother, the late Thornton Wilder. He advocated a literary approach to biblical studies, with an emphasis on comparative literature. Among his many publications are *Eschatology and Ethics in the Teaching of Jesus; The Spiritual Aspects of the New Poetry; Early Christian Rhetoric: The Language of the Gospel; The New Voice: Religion, Literature, Hermeneutics; The Bible and the Literary Critic;* and *Armageddon Revisited: A World War I Journal.* Professor Wilder was chairman of the Society for the Arts, Religion, and Contemporary Culture in Chicago.

DONALD WYMAN, Horticulturist, *Emeritus,* died September 6, 1993, at the age of 89. Born in Templeton, California, he graduated from Pennsylvania State University and earned his doctorate in ornamental horticulture from Cornell

82

CONFIDENTIAL

HARV00030448

*The President's Report 1993–1995*

University in 1935. He was appointed Horticulturist of the Arnold Arboretum in 1936, a position he held until his retirement in 1970. During his career he wrote approximately one hundred articles for horticultural magazines in the United States, Canada, and Great Britain; for 29 years he was editor of *Arnoldia*, the magazine of the Arnold Arboretum Mr. Wyman also wrote the reference work *Wyman's Gardening Encyclopedia*. He earned some of the most prestigious awards in his field, including the Liberty Hyde Bailey Medal (American Horticultural Society), the George Robert White Medal (Massachusetts Horticultural Society), and the Veitch Memorial Gold Medal (Royal Horticultural Society of London). He served as president, director, and trustee of the American Horticultural Society and trustee of the Massachusetts Horticultural Society.

ALONZO SMYTHE YERBY, Professor of Health Services Administration in the Faculty of Public Health, *Emeritus,* died on February 16, 1994, at the age of 72. A distinguished figure in public health at the state, federal, and international levels, Dr. Yerby was committed to community welfare. Born in Augusta, Georgia, he graduated from the University of Chicago and attended Meharry Medical College, receiving his M.D. in 1946. In 1948, he received a master's degree in public health from Harvard. He served as director of the Health Insurance Plan of Greater New York, as department commissioner for medical affairs for the New York State Department of Welfare, and as executive director of New York City's Department of Public Welfare. He joined the Harvard School of Public Health in 1966 as Professor and Chairman of the Department of Health Services Administration, and served as Associate Dean for Community Affairs from 1969 to 1974. After assuming emeritus status at Harvard in 1982, he became Professor of Preventive Medicine and Biometrics and director of the Division of Health Services Administration in the School of Medicine, Uniformed Services University of the Health Sciences in Maryland. In honor of Dr. Yerby's service, the School of Public Health established the Alonzo Yerby Public Health Award and Distinguished Lecture Series. In 1964 he received the City of New York Public Service Award for Professional Achievement.

LOUIS ZETZEL, Clinical Professor of Medicine, *Emeritus,* died on September 13, 1993, at the age of 84. Born in Chelsea, Dr. Zetzel graduated from Harvard College in 1929 and received his medical degree from Harvard Medical School in 1934. After completing his medical training with fellowships in New York and Philadelphia, he joined the staff at Beth Israel Hospital, where he was chief of gastroenterology from 1956 to 1968. During World War II he served in the Army Medical Corps. Dr. Zetzel was an expert on diseases of the digestive tract. From 1936 to 1975 he held appointments at the Harvard Medical School, where he sat for many years on the admissions committee. He became Clinical Professor of Medicine in 1967. On his 75th birthday, a visiting professorship in gastroenterology was established in his name at the Medical School. After retiring from Harvard in 1975, Dr. Zetzel continued in private practice; he continued to make house calls until his retirement in 1986.

83

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL

HARV00030449

*Harvard University*

Special mention is made of the following members of the Harvard community who served the University with dedication and distinction:

Glenn Ewing Behringer, former Associate Clinical Professor of Surgery, who died on March 10, 1994, at the age of 72; Doris Ruth Bennett, Clinical Instructor of Pediatrics, who died on April 22, 1994, at the age of 70; Paul Donham, former Associate Professor of Business Administration, who died on April 15, 1993, at the age of 78; Robin Michael Evans, Lecturer in Architecture, who died on February 19, 1993, at the age of 48; Kenneth William Haskins, former Senior Lecturer on Education, who died on December 13, 1994, at the age of 71; Ralph Lazzaro, former Director of Language Studies in the Divinity School and Lecturer on Church History, who died on September 10, 1994, at the age of 79; Abraham Pollen, former Assistant Clinical Professor of Ophthalmology, who died on June 28, 1994, at the age of 80; Hugo H. Montero, former Senior Lecturer on Romance Languages and Literatures, who died on September 17, 1994, at the age of 72; Eugene Rossitch, Jr., Assistant Professor of Surgery, who died on November 18, 1994, at the age of 35; Mark A. Saroyan, Assistant Professor of Government, who died on July 21, 1994 at the age of 34; Julius Silberger, Assistant Clinical Professor of Psychiatry, who died on October 31, 1994, at the age of 65; Vincent Solomita, former Assistant Professor of Design, who died on March 11, 1994, at the age of 73; Denise Jouasset Strieder, Associate Professor of Pediatrics, who died on October 17, 1994, at the age of 65; George Putnam Sturgis, former Assistant Clinical Professor of Medicine, who died on March 11, 1993, at the age of 87; Demetrius George Traggis, former Assistant Professor of Pediatrics at the Sidney Farber Cancer Center, who died on May 4, 1994, at the age of 77; and Rudolph William Vollman, Associate Clinical Professor of Surgery, who died on March 26, 1994, at the age of 59.

Neil L. Rudenstine
*President*

January 1996

Lists containing all resignations accepted during the academic years 1993-94 and 1994-95, all promotions, elections to established chairs, and all appointments without limit of time voted during the academic years 1993-94 and 1994-95, as well as lists of visiting professors and lecturers, are on deposit in the office of the Secretary to the University, and in the Archives.

84

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL

HARV00030450