# EXHIBIT 42



**HARVARD GRADUATE SCHOOL OF EDUCATION**

**CONFIDENTIAL BRIEFING FOR JIM RYAN**

| | |
|---|---|
| From: | Suzannah Lutz • 617-495-3401 (work) |
| Meeting/Event: | Student Diversity Committee |
| Date/Time: | Thursday, June 26, 2014<br>1:45pm—3:00pm |
| Location: | Mass Hall, Perkins Room |
| Contact: | Ranna Farzan<br>ranna_farzan@harvard.edu<br>617-495-4778 |

You are scheduled for a meeting of the Student Diversity Committee.

**Attachments:**
- Correspondence
- Agenda
- Charge to the Committee
- Summary of the Supreme Court's *Fisher* decision

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                        HARV00072365

**Lutz, Suzannah**

| | |
|---|---|
| **From:** | Shack, Monica S |
| **Sent:** | Friday, June 13, 2014 11:57 AM |
| **To:** | Lutz, Suzannah |
| **Subject:** | FW: Ryan Committee |
| **Attachments:** | committee charge.pdf; OGC Fisher Client Advisory.PDF; Agenda June 26 2014.PDF |

**From:** Farzan, Ranna L
**Sent:** Friday, June 13, 2014 11:13 AM
**To:** Ryan, James E.; Avery, Christopher; Banaji, Mahzarin R.; Byrne, Patricia M.; Canfield, Michael Ross; Carrasco, David; Chetty, Nadarajan; Dingman, Thomas A.; Ely, Robin J.; Fallon, Richard; Fitzsimmons, William R.; Forsyth, Ann; Hammonds, Evelynn M.; Jha, Ashish; Katz, Lawrence F.; Kennedy, Randall; Leopold, Deirdre C.; Mayer, Robert J.; Soban, Jessica Lynn; Warikoo, Natasha Kumar; Driver-Linn, Erin; Gershengorn, Ara B; Goodheart, Marc; Iuliano, Robert
**Cc:** Kim_Bremner@dfci.harvard.edu; Dial, Christopher M; Higbe, Charlene; Jilek, Tiffany Lee; Kearney, Susan; Lamond, Margaret; Martin, Torey E.; Murphy, Jean; Pacholok, Olesia; Rom, Suzanne; Shack, Monica S
**Subject:** Re: Ryan Committee

Dear Committee members,

Thank you for your responses. I am writing to let you know that our first meeting will be <u>June 26, 2014, 1:00pm-2:30pm</u> in the Perkins Room at Massachusetts Hall.

In advance of the meeting, we thought it would be helpful to send the meeting agenda and some very limited introductory information. Therefore, attached here, please find a copy of the charge to the Committee and a brief summary of the Supreme Court's *Fisher* decision. We will be setting up a shared site with additional reading information for anyone who would like to access it and will provide more information about that going forward.

Please let me know if you have any questions.

Best,
Ranna

**From:** Farzan, Ranna L
**Sent:** Wednesday, June 11, 2014 3:13 PM
**To:** Ryan, James E.; Avery, Christopher; Banaji, Mahzarin R.; Byrne, Patricia M.; Canfield, Michael Ross; Carrasco, David; Chetty, Nadarajan; Dingman, Thomas A.; Ely, Robin J.; Fallon, Richard; Fitzsimmons, William R.; Forsyth, Ann; Hammonds, Evelynn M.; Jha, Ashish; Katz, Lawrence F.; Kennedy, Randall; Leopold, Deirdre C.; Mayer, Robert J.; Soban, Jessica Lynn; Warikoo, Natasha Kumar; Driver-Linn, Erin; Gershengorn, Ara B; Goodheart, Marc; Iuliano, Robert
**Cc:** Jilek, Tiffany Lee; Kearney, Susan; Murphy, Jean; 'Pacholok, Olesia'; Shack, Monica S
**Subject:** Ryan Committee

Dear committee members,

On behalf of President Faust and Dean Ryan, thank you again for agreeing to serve on the committee. I will be working with Dean Ryan on scheduling and other logistical issues, so please do not hesitate to be in touch if there's anything I can do as the committee's work gets underway.

1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    HARV00072366

Dean Ryan is hoping to schedule the first meeting as soon as possible, as early as next week. Set forth below are two options (the meeting will be 90 minutes at Massachusetts Hall). We recognize the short notice and difficulties of finding a common time, so we'll select whichever date works for the most people. Please let me know of your availability as soon as possible.

>   Monday, June 16: 11-12:30pm
>   Thursday, June 26: 1:00pm-2:30pm

Thank you for your flexibility in scheduling this meeting. If you have an assistant or scheduler, please let me know so that I can copy him or her going forward.

Best,
Ranna

Ranna L. Farzan
Executive Assistant to Robert Iuliano
Senior Vice President and General Counsel
Harvard University
Massachusetts Hall
Cambridge, MA 02138
617.495.4778
ranna_farzan@harvard.edu

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                HARV00072367

# Committee on Student Body Diversity

June 26, 2014
1:00pm [45] – 2:30pm [3:00]

Perkins Room, Massachusetts Hall

### AGENDA

1. Welcome/Introductions

2. Background on relevant legal principles (Bob Iuliano)

3. Review of the charge and defining the task of the Committee

4. Identifying data/information needed

5. Looking forward: rough timeline

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    HARV00072368

**Redacted:
Attorney-Client Privilege**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                        HARV00072369

Charge to the Committee

Harvard's admissions processes, including the individualized holistic review through which we evaluate applicants, have long been important features of our institution. They are the means by which we have created and maintained a vibrant academic community with students who are talented and diverse in their intellectual interests, backgrounds and experiences, socio-economic status, geography, race and ethnicity, perspectives, and aspirations. Appreciating that our institution may be the first place where many students are exposed to so many others whose backgrounds differ markedly from their own, Harvard seeks students who will broaden and challenge each other not only in our classrooms, but in laboratories and clinics, student organizations and activities, residences and dining halls, on the fields, and on the stage. As a result of their experiences here, we believe that our students leave Harvard better prepared, better educated, and better able to advance knowledge, promote understanding, and serve society.

Harvard has repeatedly expressed its belief that diversity of many kinds, including racial diversity, contributes to the achievement of our educational mission. In the Supreme Court's *Bakke* decision in 1978, Justice Powell's pivotal opinion concluded that the benefits to the educational process flowing from a diverse student body constitute a legally compelling interest sufficient to justify the consideration of race in admissions. Justice Powell specifically pointed to the Harvard College admissions process—then, as now, a highly individualized, holistic review of each application, with an applicant's race potentially considered as one factor among many – as an "illuminating example" of an admissions program that properly advances the compelling educational interest in student diversity. Since that time, the legal framework for evaluating diversity in the context of university admissions has received further attention from the Supreme Court – first, in the 2003 cases involving the University of Michigan (*Grutter* and *Gratz*) and in last year's case from the University of Texas at Austin (*Fisher*). In these decisions, the Court has continued to find that colleges and universities may permissibly consider race as part of an effort to create a diverse student body whose members contribute to one another's educational experience. The Court has asked, however, that universities have a "reasoned, principled explanation for the academic decision" about the educational benefits of diversity and that they evaluate "whether [they] could achieve sufficient diversity without using racial classifications."

As part of Harvard's ongoing efforts to consider these issues, and in view of the Supreme Court's precedent on race-conscious admissions in higher education, the committee is asked to consider the following questions:

- How does a diverse student body, including a racially diverse student body, contribute to Harvard's educational objectives and mission? What influence does the diversity of the student body, including racial diversity, have on how Harvard students learn in the classroom, in extracurricular activities, and in the range of informal interactions that are hallmarks of a principally residential campus? How, if at all, does the exposure of students to diversity while on campus influence their lives after graduation, including in their careers, as active and informed citizens and potential leaders, and in pursuing lives of meaning and of value to society?

1

**Redacted:
Attorney-Client Privilege**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00072370

- What are the strengths and limitations of the ways we consider diversity in our current admissions processes? What alternatives – including alternatives that preclude any consideration of an applicant's race – are there to the current approach, and would those alternatives as effectively achieve the educational benefits of diversity? Would these alternatives impair Harvard's ability to achieve other important academic, educational, and institutional interests and objectives? Are alternatives practically feasible?

In considering these questions, the committee should identify appropriate sources of information that might include qualitative information, anecdotal evidence, studies with measurable objectives, internal research, external research, recent scholarship, or historical information. The committee will also want to determine whose input to seek in considering these questions, including potential outreach to students, faculty, alumni, members of the administration, and others. The committee is asked to make findings regarding Harvard's current approaches to admissions in keeping with the questions outlined above. The committee also should consider any recommendations for changes to Harvard's admissions processes and other activities to better achieve our goals.

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
HARV00072371



**HARVARD UNIVERSITY**
OFFICE OF THE GENERAL COUNSEL

HOLYOKE CENTER, ROOM 980
1350 MASSACHUSETTS AVENUE
CAMBRIDGE, MASSACHUSETTS 02138-3834
(617) 495-1280   FAX: (617) 495-5079

June 26, 2013

Earlier this week, the United States Supreme Court announced its decision in *Fisher v. University of Texas*, a challenge to the University of Texas at Austin's (UT) consideration of race in its undergraduate admissions process. Justice Kennedy wrote the opinion for the Court, which was joined by all the other justices except for Justice Ginsburg (who dissented) and Justice Kagan (who did not participate). The Court did not decide whether the Texas plan passed constitutional muster and instead remanded the case to the lower courts for more work. The opinion is nonetheless worthy of note in at least two respects: its reaffirmation of the importance of student body diversity and its discussion of the means by which universities may seek to achieve that diversity.

*Legal Framework*

Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, government decisions that involve the consideration of race are subject to what the courts call "strict scrutiny": the goal being served must be "compelling" and the means "narrowly tailored" to serve that goal.

Until *Fisher*, the Court had twice previously considered how the Equal Protection Clause applies to race-conscious admissions programs at colleges and universities. The first was in its 1978 decision in *Regents of the Univ. of Calif. v. Bakke*. The Court was substantially divided, but Justice Powell wrote what the *Fisher* Court characterized as the "principal opinion." Applying strict scrutiny, Justice Powell found that the educational benefits of a diverse student body represented a compelling and constitutionally protected interest. Turning to the means by which colleges and universities could seek to achieve that diversity, Justice Powell made clear that racial quotas were impermissible, as were separate admissions tracks for minority and non-minority applicants. Citing to the Harvard College admissions process, however, he determined that the constitution permitted the consideration of race as one factor in an individualized review of each candidate.

In its 2003 Michigan cases, *Grutter v. Bollinger* and *Gratz v. Bollinger*, the Court affirmed what Justice Powell had written in *Bakke*: student body diversity is a compelling government interest permitting the consideration of race as part of a "highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment." Broad-brush, mechanistic approaches that treat all underrepresented minorities monolithically (in *Gratz*, a 20-point bonus in a system in which 100 points guaranteed admission) are impermissible, however, because they "ensure[] that the diversity contributions of applicants cannot be individually assessed."

*Fisher*

Since 2005, UT has followed a unique two-stage admissions process: first, under state law, Texas high school students who graduate in the top 10% of their class are guaranteed admission (the "Ten Percent Plan"), a guarantee that fills a large majority of its undergraduate student body. Second, the seats left open after that first stage are filled through a process that considers all aspects of each application, including the applicant's race. UT designed its second-stage review to mirror the approach previously approved by the Supreme Court in *Bakke* and *Grutter*: a holistic, individualized review of the entirety of each application in which race is one factor among many, not determinative on its own.

Abigail Fisher is a Caucasian woman who applied to the University of Texas at Austin in 2008. She was not admitted, either under the Top Ten Percent plan or under the individualized review process. She brought suit, alleging that but for the consideration of race in the individualized review process, she would have been admitted; that is, she claimed that her race was held against her, with the result that she was denied a place at UT that she would otherwise have been granted. Relying on the Supreme Court's prior decisions, the lower courts ruled that the admissions plan passed constitutional scrutiny and found in favor of the University of Texas.

Fisher sought and was granted review by the Supreme Court.

In resolving Fisher's claims, the Court left untouched the long-standing precedent that "'the attainment of a diverse student body ... is a constitutionally permissible goal for an institution of higher education.'" In doing so, the Court cited *Grutter*'s observation that a university's "educational judgment that such diversity is essential to its educational mission is one to which we defer."

These aspects of the Court's decision are of central importance to Harvard. As noted in the *amicus* brief we and other universities filed in *Fisher*:

> Decades of experience with admissions policies based on the Harvard Plan, *Bakke*, and *Grutter* have convinced [Harvard and other signatories to the brief] that the quality of their students' education is greatly enriched if the student body is diverse in many ways – including racial and ethnic diversity. Diversity encourages students to question their assumptions, to understand that wisdom and contributions to society may be found where not expected, and to gain an appreciation of the complexity of the modern world. In these ways, diversity bolsters the unique role of higher education in "preparing students for work and citizenship" and training "our Nation's leaders" for success in a heterogeneous society.

The Supreme Court, however, was concerned by the approach taken by the lower courts when examining the Texas plan for "narrow tailoring." Most centrally, the justices held that the good faith of a university does not determine whether an admissions plan meets the narrowly tailored standard. Although the courts can "take account of a university's experience and expertise in adopting or rejecting certain admissions processes," it is the responsibility of the courts, and not "university administrators, to ensure that '[t]he means chosen to accomplish the [government's] asserted purpose [are] specifically and narrowly framed to accomplish that purpose.'" In the Court's view, this was the central mistake made by the lower courts: rather than conducting their own independent examination, the district and appeals

2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00072373

courts "confined the strict scrutiny inquiry in too narrow a way by deferring to the University's good faith."

The Court therefore remanded the case to the lower court with instructions to re-evaluate whether the Texas plan meets the narrow tailoring requirements. The *Fisher* opinion offered at least two points of guidance concerning the substantive standards informing that review.

First, the Court repeated its instruction in *Bakke* and *Grutter* that a narrowly tailored admission plan must involve the individualized assessment of each candidate where race is one factor among many. "[I]t remains the University's obligation to demonstrate, and the Judiciary's obligation to determine, that admissions processes ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application."

Second, the Court returned to *Grutter*'s observation that "narrow tailoring does not require exhaustion of every conceivable race-neutral alternative." The *Fisher* Court understood this to mean that, for a plan to pass constitutional muster, the university must show that "no workable race-neutral alternatives would produce the educational benefits of diversity."

The Court's opinion leaves much work for the parties and the lower courts to do in assessing the validity of UT's admissions program. Much of that effort is likely to focus on facts specific to Texas, although the lower courts will likely need to interpret the narrowly tailored standards articulated by the Supreme Court in evaluating the school's admissions process. The OGC will be following those proceedings with care. We will also work directly with Harvard's schools to answer any questions they may have about *Fisher*.

Links to the Court's opinion in *Fisher* and Harvard's amicus brief follow:

Decision

Amicus Brief

3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                              HARV00072374