# EXHIBIT 98

```
 1                UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
 2                      BOSTON DIVISION

 3
     --------------------------------x
 4
     STUDENTS FOR FAIR ADMISSIONS, INC.,
 5
                      Plaintiff,
 6                                         Civil Action No.
     vs.                                   1:14-cv-14176
 7
     PRESIDENT AND FELLOWS OF HARVARD
 8   COLLEGE (HARVARD CORPORATION); and
     THE HONORABLE AND REVEREND THE
 9   BOARD OF OVERSEERS,

10                    Defendants.

11   --------------------------------x

12              - HIGHLY CONFIDENTIAL -

13

14           DEPOSITION OF MARLYN ELIZABETH

15       McGRATH, a witness called by the Plaintiff,

16       taken pursuant to the applicable provisions of

17       the Federal Rules of Civil Procedure, before

18       James A. Scally, RMR, CRR, a Notary Public in

19       and for the Commonwealth of Massachusetts, at

20       the offices of WilmerHale, 60 State Street,

21       Boston, Massachusetts, on Thursday, June 18,

22       2015, commencing at 9:00 a.m.

23

24
```

1   those complaints?

2       A.   Oh, I can.

3       Q.   Okay.  What can you tell me about the ones you

4   remember?

5       A.   They get sent -- they're typically -- the ones I'm

6   describing typically are addressed to the president.  You

7   know, typically it's "My grandniece didn't get in" or a

8   particular person was not admitted, "and, by the way, you

9   know, she fell victim to such-and-such a policy."

10           We are not unfamiliar in our office with

11  complaints about decisions, which can be couched in, you

12  know -- in many different terms.  And those that get to the

13  president are like those.

14      Q.   And when we're talking about these three or four a

15  month sometimes clustered around the admissions process --

16      A.   Right.  Right.

17      Q.   -- your answer is it's three or four a month that

18  specifically raise the issue of Harvard's use of race in

19  the admissions process?

20      A.   Yes.

21      Q.   Do you remember if any of those complaints have

22  included complaints by Asian-Americans who felt they were

23  discriminated in the admissions process?

24      A.   You know, I don't remember whether it was by

```
 1   Asian-Americans themselves to the president's office.
 2   We -- in our -- I'm not certain that the ones that I've
 3   seen from the president have come from Asian-Americans.
 4       Q.   What about complaints received directly by someone
 5   in your office?
 6       A.   Yes.
 7       Q.   How often do you recall seeing those types of
 8   complaints?
 9       A.   How often do I recall seeing them.
10       Q.   Or being made aware of them.
11                MR. WOLFSON:  Objection.
12                Go ahead.
13       A.   This year, which is the year I can remember the
14   best, probably four or five.
15       Q.   Were those four or five complaints before or after
16   the filing of this litigation?
17       A.    In this process, so mostly -- I mean in this
18   cycle.  So since.
19       Q.   Since the filing of this litigation.
20       A.   Uh-huh.
21       Q.   Is there anything specific you remember about
22   those complaints?
23       A.   I actually don't remember anything specific, and I
24   don't remember where they came from.  We do answer all our
```

1   mail, and people regularly complain about not being

2   admitted.  And they, as I said a minute ago, have various

3   arguments to make about that.  And so it's hard for me to

4   remember or distinguish one from another.

5       Q.   What kind of a response do you give -- answer do

6   you give when you receive those types of complaints?

7       A.   We explain that the process is holistic and

8   complex, and we have many fine applicants, and we have a

9   committee process that can choose only a few.

10      Q.   Is there standard language that's used to respond

11  to any of those types of complaints?

12      A.   We do guide our staff in standard language,

13  various versions of which seem -- whichever one seems most

14  appropriate to what's being asked for.

15      Q.   So is there -- is there a sample letter or

16  language that's maintained electronically?

17      A.   Yes.  We have sample letters that we have shared

18  with them.

19      Q.   Do you recall receiving any of those complaints

20  from other faculty members?

21               MR. WOLFSON:  Objection.

22      A.   I don't remember receiving complaints from faculty

23  members, except general complaints about "Can you tell me

24  why you didn't take Mary Smith, who I wrote you a letter

```
 1                    MR. STRAWBRIDGE:  This is a good

 2          stopping point for me.

 3                    MR. WOLFSON:  Sure.  Okay.

 4                    MR. STRAWBRIDGE:  We can take lunch

 5          right now.  Thank you so much.

 6                    THE WITNESS:  You're welcome.

 7                    (Recess:  12:35 p.m. to 1:17 p.m.)

 8   BY MR. STRAWBRIDGE:

 9      Q.   Okay.  Good afternoon --

10      A.   Good afternoon.

11      Q.   -- Ms. McGrath.

12           When an applicant fills out the Common Application

13   or the Universal College Application, they have the

14   opportunity to indicate their race or ethnic background?

15      A.   They do.

16      Q.   Okay.  And do you know what categories they are

17   presented to select?

18      A.   I always have to remind myself.  It's a drop-down

19   menu, as I understand it.

20      Q.   Let me make sure that's actually on the --

21                    MR. STRAWBRIDGE:  I'm going to ask

22          the court reporter to mark this as Exhibit

23          No. 2.  I ask the court reporter to mark

24          this as Exhibit 2 and this as Exhibit 3.
```

1                    (Exhibit 2, Universal College

2           Application five-year admissions

3           application, marked.)

4                    (Exhibit 3, The Common Application

5           first-year application, marked.)

6      Q.     Starting with Exhibit No. 2, Ms. McGrath, which is

7  the Universal College Application, I think if you turn to

8  the second page at the very top --

9      A.     Yes.

10     Q.     -- that's the section that includes ethnicity?

11     A.     Yes.

12     Q.     And it asks two questions; correct?

13     A.     Yes.

14     Q.     The first is whether you are Hispanic or Latino?

15     A.     Right.

16     Q.     And the second says, "How would you describe your

17  racial background?"  And then it lists "Asian," "Black or

18  African-American," "American Indian or Alaskan Native,"

19  "Native Hawaiian or Other Pacific islander" or "White"; is

20  that accurate?

21     A.     Yes.

22     Q.     And with respect to the Common Application, which

23  is Exhibit No. 3, under the "Demographics" section on page

24  1 --

1      A.   Yes.

2      Q.   -- the right column, it again -- well, not again,

3  but it also asks, "Are you Hispanic/Latino?"  And then it

4  says, "Regardless of your answer to the prior question,

5  please indicate how you identify yourself."  And, again, it

6  gives the option "American Indian or Alaskan Native,"

7  "Asian (including Indian subcontinent and Philippines),"

8  "Black or African-American (including Africa and

9  Caribbean)," "Native Hawaiian or Other Pacific Islander,

10  (Original Peoples)," or "White (including Middle Eastern)";

11  is that accurate?

12      A.   Yes.

13      Q.   When -- you mentioned earlier that when Harvard

14  receives information from standardized testing services, it

15  records information regarding ethnic identities of

16  potential targets, or it collects information, I suppose,

17  of ethnic identities and potential targets for recruitment;

18  correct?

19      A.   The testing agency?

20      Q.   The testing agency collects them and provides them

21  to Harvard?

22      A.   Yes.

23      Q.   And does Harvard enter that information into its

24  database?

```
 1        A.   Yes.

 2        Q.   Okay.  Does Harvard also enter into its database

 3   the indications that applicants make with respect to their

 4   race or ethnic identity under the questions we just

 5   reviewed --

 6        A.   Yes.

 7        Q.   -- on the common applications?

 8        A.   Yes.

 9        Q.   And do you know what -- are the categories that

10   are listed on the Common Application and the Universal

11   College Application the categories Harvard uses in its

12   database?

13        A.   These are, yes.

14        Q.   Okay.  Do you have -- are there any other race or

15   ethnic category, categories, that are not included on these

16   applications that Harvard tracks on its database?

17        A.   We sometimes see "Other."  And I think that in

18   some of our reporting, that may be "White," but I'm not

19   sure.  That's not a question I can answer with confidence.

20        Q.   Okay.  Do you know whether or not Harvard ever

21   receives conflicting information from the standardized test

22   services and the actual applications received about a

23   particular recruitment target's racial identification?

24        A.   I understand that we do.
```

1    Q.   And what does it do to resolve that conflict, if

2  anything?

3    A.   We don't really resolve the conflict.   The

4  question -- we don't really resolve the conflict.

5    Q.   Okay.   So what does it do when it gets either

6  conflicting or additional information?

7    A.   For the database for applications, the one that is

8  the -- the racial preference choice associated with that

9  candidate is whatever he or she indicates at the time that

10  she applied on the application, Universal or Common

11  Application.   I understand that we retain in our database

12  all information pertaining to ethnicity, but we don't

13  attempt to reconcile it.

14    Q.   So the information that Harvard would use going

15  forward for its own reporting purposes would be the

16  information reported on the equivalent of Exhibits 2 and 3?

17    A.   Yes.

18    Q.   What does Harvard do if an applicant does not

19  indicate an ethnicity on either of these applications?

20           MR. WOLFSON:   Objection.

21           Go ahead.

22    A.   We don't necessarily do anything.

23    Q.   Does Harvard make any attempt to ascertain the

24  race of an applicant through other parts of its

1    application?

2        A.   We do not with that purpose in mind.

3        Q.   Okay.  But with any purpose in mind, does Harvard

4    make an attempt to identify the race of an applicant who is

5    not --

6        A.   We don't make an attempt to, no.

7        Q.   What is reported on the universal applications is

8    what Harvard maintains in its database, and there's never

9    an attempt to supplement or add additional information for

10   people who do not check the box?

11                   MR. WOLFSON:  Objection.

12                   Go ahead.

13       A.   What I would say to that is that we often learn

14   from other sources, in other places or from other sources

15   in the application, more about the family's background,

16   which may include ethnicity.  The student may write to us,

17   write an essay on the topic, and that may be information

18   that was lacking.

19       Q.   And if that -- if Harvard learns that information

20   from other materials that the student has submitted, does

21   it record that information in its database?

22       A.   Not -- we don't correct or change that designation

23   that the student gave us.

24       Q.   I understand.  But would there be an additional

1    A.   The reporter to the -- the registrar is, I

2  believe, the transmitter of -- of those data to the

3  government, and I'm not certain, but that's what I think is

4  true, that the reason I couldn't tell you for certain was

5  that if it's the registrar, I can't tell you what other

6  sources they may have.

7    Q.   Does your office provide its database to the

8  registrar's office?

9    A.   Yes.  We provide the -- we provide to the

10  registrar's office at the time that we're conveying the --

11  conveying the student to freshman status, we provide the

12  registrar's office and the freshman dean's office with the

13  data that we have concerning the applicants who are about

14  to enroll.

15    Q.   That would occur at the time that the applicant

16  has accepted Harvard's invitation to enroll?

17    A.   Yes.  After the applicant is accepted.

18    Q.   What does Harvard do -- strike that.

19         In a situation where the applicant does not self-

20  identify on one of the universal applications but Harvard

21  learns through other materials submitted of the applicant's

22  race or ethnic background, what does Harvard do with that

23  information?

24    A.   We -- we bear it in mind.  We do not change the

1   record as -- we do not change the student's designation.  I

2   guess you asked that before.

3        Q.   May it be noted in the summary sheets?

4        A.   It may well be.

5        Q.   Is that information important to Harvard's

6   analysis of applications?

7                  MR. WOLFSON:  Objection.

8        A.   And the answer is that it depends on the case.

9        Q.   Is there any training manual or written policy

10  regarding the use of an applicant's materials to identify

11  that applicant's race when the applicant has not self-

12  identified?

13       A.   Not to my knowledge.

14       Q.   Can you say with confidence that none of your

15  admissions officers have ever taken steps to identify the

16  race of an applicant who did not self-identify on one of

17  the universal applications?

18                  MR. WOLFSON:  Objection.

19       A.   And I cannot say that with confidence.

20       Q.   Are you aware of any occasion at all in which an

21  officer may have taken steps to identify the race of an

22  applicant who did not self-identify?

23       A.   Taken steps for that particular purpose, I'm not

24  aware of any such -- such steps.

1   turn up in the athletic column.  For many of the rest of

2   us, it would turn up in the extracurricular column.  Again,

3   it's a question of the judgment of the reader.

4          But generally speaking, that's -- athletic is

5   construed by the person reading it, and we have some

6   guidelines, again, about what would be a 3, what would be a

7   3 plus, perhaps, what would be a 2.  And we know what a 1

8   is and we know what a 4 is.

9       Q.   And then the last category was personal.

10      A.   Uh-huh.

11      Q.   Can you give me an example of what goes in the

12  personal column?

13      A.   Yes.  That can have various elements.  If the

14  student in writing about himself or herself presents a very

15  appealing personal picture, and that can mean -- appealing

16  can be a wide variety of appeal, you know, a sensitive

17  writer, a person with humor, a person who seems very

18  outward directed, and that's appealing, and if that or some

19  other attractive personal elements are echoed or

20  supplemented, reinforced by the other materials in the

21  folder, typically the SSR, the secondary school report, the

22  counselor letter, who may give us -- which may give us a

23  good deal of information or may not about the candidate's

24  personal style, personal affect, relationships to other

```
 1   people, that could help, and so can the teacher letters.

 2   And when we have an interview, that can help us too.

 3       Q.    Would a person's race or ethnic identity be

 4   included in one of the appealing factors that would weigh

 5   into the personal category?

 6       A.    That should not be part of it.

 7       Q.    Does race or ethnic background play into any of

 8   these categorical areas?

 9       A.    Does it play into any of them?

10       Q.    Yes.  I mean is it considered in assessing the

11   score in any of these areas?

12       A.    I don't -- it's not supposed to.  It is supposed

13   to be what each of those aspects would be compared to other

14   applicants in general whom you've read.

15       Q.    You say it's not supposed to.  Are you aware of

16   occasions when it has been included in one of these

17   categories?

18       A.    No.

19       Q.    We discussed -- strike that.

20             On the personal category, is the essay a large

21   driver of where that score is going to come from?

22       A.    Well, it could be.  It may be, but only if it

23   echoes or reinforces things that we have from other

24   credible sources.
```

1    Q.    Would overcoming difficulty socioeconomic

2   circumstances be something that could be accounted for in

3   the personal category?

4    A.    Yes.   Yes, it could be.

5    Q.    Would navigating a new culture be something that

6   could be accounted for in the personal category?

7    A.    Yes.

8    Q.    If someone's ethnic identity played a factor into

9   their development as a person because of where they grew up

10  or where they moved to or something like that, could that

11  play into the personal category?

12   A.    Yes.

13   Q.    If someone's status as an immigrant to this

14  country or the children of the immigrants, could that play

15  into the personal category?

16   A.    Yes, if it was a successful managing of that

17  circumstance.

18   Q.    These categories, we talked a little bit about

19  athletics, but let's just start with academic.   What

20  influences the numeric score that's given to a person on

21  their academic profile?

22   A.    The basic ones are grades, test scores, and

23  teacher reports.

24   Q.    Are there cutoffs to determine who is a 4 and who

1   conversion chart -- the equivalent number in ACT's.

2       Q.   Some take the SAT's, or is it ACT only?

3       A.   We take both, you know, which is why we have this

4   conversion chart.  And they're, you know, as you know,

5   scaled differently, which makes it harder for people.

6       Q.   And the scale changes from time to time as well.

7       A.   Yes, and we've got the scale changing.

8            And then 2 academic would be someone who would

9   have scores in the, you know, 680 to high 700's to, you

10  know, one or two in the 800 region.  For many members of

11  the staff, a 2 plus academic -- remember I told you the 2

12  pluses are better than 2's -- would be someone who had, you

13  know, a bunch of 800s and straight A scores but no evidence

14  of the next one I'll tell you about, which is the 1

15  academic.

16      Q.   And what would that be?

17      A.   And a 1 academic is someone who we have good

18  reason to believe, based on, say, awards won, the awards

19  that we're familiar with, which are a fair number of

20  awards, and/or, along with good scores.  The scores can be,

21  you know, somewhere in the 700s, excellent grades, and some

22  real academic distinction attested somewhere elsewhere of

23  the kind that we can really trust, might be a 1 academic.

24  And they -- in addition to that, for many of these people

1    as an overlap, a 1 academic would be someone who our

2    faculty said is truly unusual.  So that would be a 1 in the

3    first column, the academic column.

4        Q.   Let's talk about the 1 through 4 scale for extra-

5    curricular activities.  What are the guidelines the office

6    uses for those?

7        A.   So for extracurricular activities, it's pretty

8    rare, I think, to use -- empirically to see a 1

9    extracurricular, but that's someone who would be, you know,

10   the national debate champion.  Someone might think that was

11   worthy of calling it a 1 extracurricular.

12           In making judgments in the extracurricular column,

13   we always have some -- or pay some attention to the time

14   that the student reports spending on something.  So if a

15   student was a one-shot in winning some -- you know, having

16   some great activity and then only spent two hours a week on

17   it, we might decide that it's not quite as high to rate.

18   And these are subjective, as everything in the folder is

19   kind of a subjective reading of one person, because someone

20   else might not agree with that.  So I'm giving you a sense

21   of how I might -- might think of something.  Other people

22   might do it a little differently.

23           But, anyway, to answer your question, so a 2 would

24   be someone who had really -- you know, who was the student

```
 1   20 hours a week taking care of his little sister.  Then
 2   you're going to give him a kind of credit, which is the way
 3   we think about it, saying, you know, we can't expect or we
 4   couldn't expect; we're happy to see this other activity.
 5   So that's a flag in a way to other readers that that reader
 6   who assigned that was going through and thinking of that as
 7   a kind of value judgment, but different, and putting it in
 8   that folder.
 9       Q.   And then are there guidelines with respect to the
10   allocation of the 1 through 4 standard in the personal
11   category?
12       A.   Yes.  They're not terribly helpful.  I think
13   "unusual appeal" is I think the phrase we use in their
14   reading instructions.  And, you know, again, readers will
15   construe that in different ways.  And 2 is -- and I'm not
16   going to get the words for that one right; it's something
17   like "very appealing," you know, a very attractive person
18   to be with and have in your school community and widely
19   respected.  And 3 means, you know, just fine.  I mean we
20   have better language than this.  I don't know what it is.
21   But there are some guidelines for it, yes.  4 has a
22   meaning.
23       Q.   4 has what, I'm sorry?
24       A.   4 is a kind of negative.
```

1    Q.   I think I need to step back a little bit because

2  what do you mean by a folder being ready to be presented to

3  committee?

4    A.   We are now -- the part I'm describing to you now

5  is the reading process.  You wanted me to take you through

6  the phases, so I should have labeled this the reading

7  phase.

8    Q.   That's fine.

9    A.   This is the reading phase.

10    Q.   So the reading phase -- I guess I'm not -- I

11  apologize.  I'm not quite understanding --

12    A.   There's no reason why you should.

13    Q.   -- the last answer, which is were you just saying

14  that in some cases, after one reading, a strong file might

15  go directly to the docket head and not get a second reader?

16    A.   Yes.

17    Q.   Okay.

18    A.   In fact, typically, and there's an anachronism of

19  language here, the first reader is the first reader, like

20  it's first and it's first.  So those words mean the same

21  thing.  The proper first reader title is the same thing as

22  ordinarily the first reader.

23       The person who will read the folder second, being

24  in practice the second reader of the folder, is still

1  called the third reader, because we used to routinely send

2  any case that was going -- that looked strong to the first

3  reader on to a second reader to make sure that actual

4  second reader thought so too, the second reader on the

5  docket of the same subcommittee, and only then would it go

6  to the chairman of the docket, who is known, of course, as

7  the third reader.

8          We now typically don't put every case through that

9  second reader.  But the chairman would be -- if a case is

10 going to be presented in committee, it will be sent to the

11 chair to read.

12     Q.   So what determines whether or not a file gets a

13 second reader or not?  I mean is it --

14     A.   The judgment of the first reader.

15     Q.   Okay.  If -- if the first reader's overall

16 assessment is 1, do those cases ever get a second reader,

17 or do they generally go straight to the docket head?

18     A.   They should go straight to the docket head, unless

19 there was a reason to send it to the second reader, who you

20 knew had a special interest in that kind of mathematical

21 problem that this person says he saw.

22     Q.   The general rule in that case would be an overall

23 assessment of 1 can go straight to the third reader --

24     A.   Yes.

1    Q.    -- which would be the --

2    A.    That would normally be true.

3    Q.    And what about an assessment of 2?

4    A.    Normally go to the third, to the chairman.

5    Q.    Okay.  What about an assessment of 3, an overall

6    assessment of 3?

7    A.    One of two things would be likely to happen,

8    either to go, by the judgment of the first reader, to the

9    chairman anyway, or it might be not expected to be

10   presented in committee.  It could be later, but it might

11   not be one of the cases that you send on believing that it

12   was absolutely going to seem competitive enough.

13   Q.    So I guess that maybe leads me to a different

14   question, which is:  At some point, is someone's

15   application, essentially the process stops for that

16   application because it's evident that they're unlikely to

17   gain admission?

18   A.    It's funny.  It actually doesn't stop, because

19   throughout the process, and throughout the committee

20   process, which is the next element of the, next chapter of

21   this, we have something called a docket, which is a

22   physical docket, which actually lists all of the applicants

23   and, in annotated form, which we all know how to read,

24   quite a lot of information about that student.

```
 1  people are expected to take vacation?
 2       A.   They would be expected not to take vacation.  You
 3  never know.
 4       Q.   But family emergency, sickness, that might excuse
 5  someone?
 6       A.   We are prepared to deal with that, of course, and
 7  we'll find a way to work with that.
 8            And then immediately after the conclusion of the
 9  final subcommittee meeting, we begin the process of full
10  committee to consider the strong cases.
11       Q.   So tell me how the full committee meeting works.
12                 MR. WOLFSON:  Objection.
13                 Go ahead.
14       A.   Those cases that have been recommended for
15  admission are all discussed as long as -- as well as any
16  other cases that people in that full committee, large
17  committee of perhaps 40 people, want to raise and hear
18  about.  And through a series of votes, decisions are made
19  with all of those possible candidates in mind.
20       Q.   Let me just step back to the subcommittee meeting.
21  Is there a vote -- is there a majority vote requirement to
22  admit someone to full committee, or is there somewhat of a
23  threshold?
24       A.   Yes.  Well, majority vote, but if the number is
```

 1    way -- like if it's everybody, if we loved all of these

 2    candidates and there are 500 of them and so on and were

 3    early action, the chairman will go back and say, "We're

 4    going to have to take some of these people out who are less

 5    strong.  So let's have a series of votes."  And there are

 6    various ways to do that.  But the typical vehicle is

 7    majority vote, and then you may have to reduce the list by

 8    majority vote.

 9        Q.   Is there a list -- is there a percentage or a

10    cutoff of the number of applications that are supposed to

11    come out of subcommittee?

12        A.   The only real cutoff number in any of this is for

13    next year 1664, for this year 1662, which is the number of

14    beds in the freshman class.  So everything we do is

15    organized with that notion in mind.  So at each stage of

16    the -- of the phase -- of the -- of the process, we have in

17    mind a number of people to admit.  And in early action, we

18    do not have a fixed number of people to admit, and it's an

19    a nonbinding number, but the dockets have a rough idea of

20    how many people they should be recommending to the full

21    committee.

22        Q.   And the idea is it's going to be suitably winnowed

23    at each step until it gets to full committee?

24        A.   Yes.

```
 1   five years?
 2        A.   It's a higher percentage.  It's about, you know,
 3   25 percent.  I may have this wrong.  I'd have to check it,
 4   because it has varied from year to year, depending on the
 5   size of the pool and the strength of the pool.
 6        Q.   You think it's in the overall nature of about 25
 7   percent?
 8        A.   Actually, I think it's in the overall nature of
 9   something like 20 percent or 18 percent.  I don't remember
10   last year, actually.
11        Q.   As with the subcommittee, is there a docket, a
12   physical docket, prepared for the full committee meeting?
13        A.   Yes.
14        Q.   Does it contain all the same information?
15        A.   Yes.
16        Q.   Okay.  And how are -- how are the candidates
17   presented at the full committee meetings?
18        A.   In a way that's very similar to the presentation
19   at subcommittee.  We use screens that you can see things,
20   and you can also do this on your computer now.  We -- the
21   area person who's in charge of presenting these cases
22   determines, you know, which ones to talk about.  Other
23   people can raise questions.  And the chairman of the whole
24   thing, Dean Fitzsimmons, who runs that process of the
```





1      A.   If it was -- seemed to be very underrepresented

2  compared to, let's say, recent years and so on, that would

3  be mentioned or given some attention.

4      Q.   What about overrepresentation?

5      A.   Overrepresentation is in our system not a notion.

6  It's underrepresentation.

7      Q.   What is -- what is the definition of

8  underrepresentation?

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Marlyn Elizabeth McGrath - June 18, 2015
Highly Confidential

200



Marlyn Elizabeth McGrath - June 18, 2015
Highly Confidential

201



1           Another example would be field of concentration.

2     If there are, you know, no engineers in the class and we

3     are used to having early action more engineers than that,

4     we would say the same kind of thing, which is "If there are

5     some strong ones, please let's look at those again and see

6     if they look any better or not."

7          Q.    The information available to the dean or director

8     regarding the race or ethnicity of the various pools at

9     this point in the process, is that made available in the

10    form of a document?

11         A.    Yes.

12         Q.    Okay.  And who prepares that document?

13         A.    The database administrator, Elizabeth Yong.

14         Q.    And that would be given to you and to Mr.

15    Fitzsimmons?

16         A.    Yes.

17         Q.    How is that typically given to you?

18         A.    In a document.

19         Q.    It would be an email or physical copy or --

20         A.    It's given by, you know, security-protected

21    document, and I -- Elizabeth often hands me a printout for

22    the committee.

23         Q.    By security-protected document, that means it

24    would be in electronic format?

1    A.    Yes.

2    Q.    Once you have basically completed the full

3    committee process, and presumably that has included

4    settling on a number that is acceptable --

5    A.    Right.

6    Q.    -- in this given year for early --

7    A.    Right.

8    Q.    -- early action decision period?

9    A.    Right.

10              MR. WOLFSON:   Wait until he finishes

11        before you --

12   Q.    It's very hard.  I know.  I talk slow, and we all

13   see where I'm going.

14        But the -- is there anything else done with

15   respect to the early action process by the -- by the

16   committee at that point other than notify those who have

17   been accepted for early action?

18   A.    Yes, there is.

19   Q.    What's done at that point?

20   A.    The next step is to make lists of those candidates

21   who are about to be admitted who have submitted financial

22   aid applications and to make sure that, to the extent

23   possible, an -- a financial aid package, as it is called,

24   offer, with the various components, is constructed so that

1    Q.    Do you remember when that occurred?

2    A.    No, not recently, it has not occurred, to my

3    knowledge.

4    Q.    Can you describe how race is factored into the

5    admissions process?

6                    MR. WOLFSON:   Objection.

7    A.    Could you be a little more specific about what you

8    would like to know?

9    Q.    Well, we've talked a little bit about it, but I

10   guess I'm just trying to get from -- from sort of the

11   initial kind of highest-level perspective what -- to what

12   extent does Harvard consider race when it's making its

13   admissions decisions?

14   A.    The most important thing to say is that when an

15   applicant has applied, each applicant is really considered

16   as an individual, including -- whose candidacy will always

17   include, generally include, many factors, family

18   background, which will include whatever we know of race,

19   whatever else we know about family circumstances and

20   education, whatever we can know about the nature of the

21   school and the kind of community the student grew up in.

22   Those context features, those features of the student's

23   setting are always important to us in imagining how well

24   he's achieved in the circumstances that he started with to

1  us as a candidate.  And race or ethnicity is often -- I

2  mean is certainly part of our comprehension of that

3  candidate.

4      Q.  Besides the comprehension of an individual

5  candidate, to what extent, if any, does Harvard desire to

6  ensure that the overall makeup of a particular class

7  reflects a particular racial composition?

8      A.  We are not very interested -- we are not

9  interested in racial composition per se.  We are very

10  interested in, for each class, assembling a diverse group

11  of people along various ways you could measure that,

12  ethnicity being one, but also geography and -- things we've

13  talked about, geography, field of concentration.  We want

14  to make sure that in the final enrolling class that there's

15  a mix of -- a mix of people and a mix of experiences and,

16  we like to think, a mix of perspectives.

17      Q.  Is race a more or less important factor with

18  respect to diversity than geographic distribution?

19      A.  You know, I couldn't make a general statement

20  about that.  It really depends on the case.  In some -- for

21  some candidate, he may be a very rare example of a certain

22  kind of Alaskan candidate.  That context may be a feature

23  of the case that the area person will keep emphasizing and

24  the committee might keep responding to or not.  In another

```
 1    case, it may be ethnicity, especially if the ethnicity or
 2    the experience of ethnicity was unusual and salient in
 3    developing the person --
 4        Q.   So I understand that --
 5                 MR. WOLFSON:  Did you finish?
 6        A.   Or not was the last thing I was going to say.
 7                 MR. WOLFSON:  Okay.
 8        Q.   Thank you.  I'm sorry.
 9             So I understand that to be an analysis as to the
10    relative importance with respect to an individual decision,
11    but with respect to being concerned that you have a diverse
12    group as a whole, is ethnicity a more or less important
13    factor on a group basis than geographic diversity?
14        A.   I don't think one is more important than the other
15    to us in the college.
16        Q.   Is -- is the purpose of taking into account race
17    at Harvard to ensure a diverse student body?
18                 MR. WOLFSON:  Objection.
19                 Go ahead.
20        A.   That's one of the purposes.
21        Q.   And is -- did you just testify that diversity
22    extends beyond racial diversity?
23        A.   Yes.  We think so.
24        Q.   But racial diversity is included in one of the --
```

1    Q.   What about the concept of achieving a desired

2    number of racially diverse students?

3    A.   The concept of it is certainly familiar to me and

4    to my staff.  It's not, to my knowledge, anybody's specific

5    goal, a critical mass per se.

6    Q.   Does the admissions office have any predetermined

7    idea as to what would be sufficient to create a racially

8    diverse campus?

9    A.   You know, we are guided, I think, in our thinking

10   about a sufficiently diverse class as it shapes up, as I

11   said, by previous years.  If there's a dramatic change, not

12   corresponding to a dramatic change in the number of

13   applicants, we would want to -- we would raise the question

14   of whether we were giving good, careful consideration to

15   those candidates from that group that seemed to be doing

16   less well this year than they were last year.  It might not

17   change anything.  But we're not ever -- and I think we're

18   clear with our staff about this, we're not ever looking for

19   a particular number or percentage.

20   Q.   Other than attempting to ensure that there's not a

21   large disparity from a prior year's experience, has the

22   admissions office attempted to increase the relative

23   enrollment of particular ethnic groups over a period of

24   time?

1    Q.    And have you heard the opinion expressed there's

2  not enough Asian-Americans on campus?

3    A.    Yes.

4    Q.    And by anyone in the admissions office?

5    A.    It's often discussed in the admissions office that

6  we want to make sure that we can do better attracting, you

7  know, Vietnamese students or native Hawaiian students or

8  whatever.  That's not -- I don't mean often, but it

9  certainly happens from time to time.

10    Q.    What about Asian-American groups as a whole under

11  the --

12    A.    I think there's been some discussion of, you know,

13  are we doing well with Asian-Americans, are we attracting

14  good candidates.  I know our students have written about

15  that.  We have -- I told you that we had student

16  recruiters, and they recruit these various ethnic groups,

17  including, of course, American -- Asian-Americans, and

18  those particularly were attached to representing certain

19  groups I think always feel underrepresented.

20    Q.    Is the -- is the relative level of diversity that

21  Harvard wants to achieve analyzed over a four-year period

22  as well as year to year by your office?

23    A.    We don't analyze it, to my knowledge, as a group

24  of four years together.  Our general view of things is year

```
 1  by year, cohort by cohort.
 2      Q.   And your testimony is that Harvard does not have
 3  any specific category for individual racial groups on
 4  campus?  Specific -- sorry.  Your testimony is that it
 5  doesn't have any specific target or minimum level for
 6  racial groups on campus?
 7      A.   We do not.
 8      Q.   And it does not have a minimum level for
 9  individual racial groups on campus?
10      A.   No.  Not a specific number.
11      Q.   Are you able to testify to any degree of
12  specificity with what is a -- what is an inadequate
13  departure from the prior years with respect to any racial
14  group?
15      A.   An inadequate departure or inadequate number
16  compared --
17      Q.   Inadequate number compared to the prior years.
18      A.   I can't testify to that.  I could not be specific.
19      Q.   And how does Harvard measure whether or not it has
20  achieved its interest in sufficient racial diversity in a
21  given class?
22               MR. WOLFSON:  Objection.
23               Go ahead.
24      A.   You know, I don't believe I've ever heard -- that
```

1  COMMONWEALTH OF MASSACHUSETTS                    SUFFOLK, SS.

2

3          I, JAMES A. SCALLY, RMR, CRR, a Certified
   Shorthand Reporter and Notary Public duly commissioned and
4  qualified in and for the Commonwealth of Massachusetts, do
   hereby certify that there came before me on the 18th day of
5  June, 2015, at 9:00 a.m., the person hereinbefore named,
   MARLYN ELIZABETH McGRATH, who provided satisfactory
6  evidence of identification as prescribed by Executive Order
   455 (03-13) issued by the Governor of the Commonwealth of
7  Massachusetts, was by me duly sworn to testify to the truth
   and nothing but the truth of her knowledge concerning the
8  matters in controversy in this cause; that she was
   thereupon examined upon her oath, and her examination
9  reduced to typewriting under my direction; and that this is
   a true record of the testimony given by the witness to the
10 best of my ability.
           I further certify that I am neither
11 attorney or counsel for, nor related to or employed by, any
   of the parties to the action in which this deposition is
12 taken, and further, that I am not a relative or employee of
   any attorney or counsel employed by the parties hereto or
13 financially interested in the action.

14

15         My Commission Expires:  April 8, 2022

16

17

18                          _____
                            James A. Scally, RMR, CRR
19                          CSR/Notary Public

20

21

22

23

24