# EXHIBIT 102

Highly Confidential - For Attorneys' Eyes Only                    1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MASSACHUSETTS

 3                  BOSTON DIVISION

 4    -------------------------------x

 5    STUDENTS FOR FAIR ADMISSIONS,

 6    INC.,

 7              Plaintiff,

 8                              Civil Action No.

 9    vs.                       1:14-cv-14176

10    PRESIDENT AND FELLOWS OF HARVARD

11    COLLEGE (HARVARD CORPORATION);

12    and THE HONORABLE AND REVEREND ^

13    THE BOARD OF OVERSEERS,

14              Defendants.

15    -------------------------------x

16

17     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19            DEPOSITION OF GRACE CHENG

20               Friday, April 7, 2017

21               Boston, Massachusetts

22

23    BY:  DEBORAH ROTH, CSR/RPR

24    JOB NO.:  72659
```

09:32:16  1    daily, probably daily with Ms. McGrath.  I'm

09:32:20  2    asking the same type of questions for those

09:32:22  3    that reported to you after 2012.  What was

09:32:25  4    the extent of your communication with those

09:32:28  5    who reported to you?

09:32:29  6              MS. ELLSWORTH:  Objection.

09:32:29  7        A. Probably daily communication.

09:32:48  8        Q. About what?

09:32:51  9              MS. ELLSWORTH:  Objection.

09:32:51 10        A. Whatever issues they wanted to talk

09:32:56 11    about.

09:32:59 12        Q. Okay.  What were your duties as the

09:33:01 13    associate director of admissions?

09:33:03 14        A. I was responsible for training new

09:33:18 15    admissions officers and onboarding new

09:33:26 16    officers.

09:33:27 17        Q. Are those separate things, training

09:33:30 18    and onboarding?

09:33:31 19        A. Yes.

09:33:35 20        Q. Okay.  Can you explain what each of

09:33:36 21    those is?

09:33:37 22        A. Onboarding is literally the logistical

09:33:49 23    arrangements to welcome a new staff member.

09:33:59 24    Training was only for people who were going

09:34:04  1    to read admissions files.

09:34:09  2        Q. Okay.  Let's focus on the 2012 to 2015

09:34:16  3    time period.  How many people reported to

09:34:19  4    you?

09:34:19  5        A. Between six and nine.

09:34:38  6        Q. Okay.  And you were responsible for

09:34:42  7    training all of them; is that right?

09:34:44  8              MS. ELLSWORTH:  Objection.

09:34:45  9        A. Only in reading procedures.

09:34:51  10       Q. Okay.  And so what did the training in

09:34:55  11   reading procedures of application files

09:34:58  12   entail?

09:34:59  13       A. Using old real admissions cases to

09:35:22  14   acclimate readers as to what an application

09:35:24  15   looked like, the different sections of a

09:35:33  16   file, and how to evaluate each file.

09:35:43  17       Q. Is there training about the use of

09:35:48  18   race in an application file?

09:35:49  19             MS. ELLSWORTH:  Objection.

09:35:49  20       A. No.

09:35:56  21       Q. Is there any discussion about an

09:35:59  22   applicant's race in the training of new

09:36:04  23   readers?

09:36:04  24             MS. ELLSWORTH:  Objection.

09:36:05  1        A. Yes.

09:36:22  2        Q. Can you tell me what is discussed

09:36:26  3    about race in the training of new readers?

09:36:29  4            MS. ELLSWORTH:  Objection.

09:36:29  5        A. It is one data point that is

09:36:46  6    self-reported by the applicant that a reader

09:36:59  7    may receive and is part of a holistic

09:37:10  8    evaluation.

09:37:11  9        Q. Is that documented anywhere?

09:37:21 10        A. Yes.

09:37:25 11        Q. Where?

09:37:26 12        A. The reading procedures document.

09:37:35 13        Q. Did you draft that?

09:37:36 14        A. No.

09:37:37 15        Q. Who drafted that document?

09:37:38 16        A. I don't know.

09:37:44 17        Q. Did you make any changes to the

09:37:45 18    procedures while you were associate director

09:37:49 19    of admissions?

09:37:50 20            MS. ELLSWORTH:  Objection.

09:37:51 21        A. I believe so.

09:37:53 22        Q. Do you recall anything specific about

09:37:57 23    those changes?

09:37:58 24        A. Changing dates.

10:14:23  1      A. Probably.

10:14:26  2      Q. And at these roundtable discussions

10:14:29  3  you described, how were the numbers shared?

10:14:34  4  In other words, orally, or was there a piece

10:14:36  5  of paper that was -- or pieces of paper that

10:14:41  6  were passed around, or something else?

10:14:44  7          MS. ELLSWORTH:  Objection.

10:14:44  8      A. Orally.

10:14:52  9      Q. And what numbers were shared orally?

10:14:54  10          MS. ELLSWORTH:  Objection.

10:14:54  11     A. I don't remember.  I was not the

10:15:01  12  person who had the numbers.

10:15:03  13     Q. I'm not asking specifically what the

10:15:06  14  numbers were.  I'm asking what the

10:15:08  15  categories of the numbers that were

10:15:10  16  presented were?

10:15:11  17     A. Again, I don't remember the specifics,

10:15:20  18  and I don't know if that's how they do it

10:15:24  19  these days.

10:15:26  20     Q. When you attended -- you said you

10:15:30  21  attended twice, right?

10:15:31  22     A. Yes.

10:15:31  23     Q. In these meetings, you said numbers

10:15:37  24  were shared orally about admissions from the

10:15:40 1   early action process from each school; is

10:15:42 2   that right?

10:15:42 3       A. Yes.

10:15:43 4       Q. And were those numbers the admissions

10:15:49 5   -- the applicants who were admitted broken

10:15:51 6   down by race?

10:15:53 7             MS. ELLSWORTH:  Objection.

10:15:53 8       A. From what I recall, yes.

10:16:02 9       Q. Were there any other numbers that were

10:16:04 10  shared?

10:16:04 11      A. Overall numbers.

10:16:11 12      Q. Overall what?

10:16:12 13      A. Total number of applicants, admits.

10:16:22 14      Q. Okay.  What else was discussed at

10:16:28 15  these meetings?

10:16:31 16            MS. ELLSWORTH:  Objection.

10:16:32 17      A. Honestly, I don't remember.

10:16:35 18      Q. Well, let's start with the roundtable

10:16:42 19  meeting.

10:16:43 20            After the numbers were shared, was

10:16:45 21  there a discussion?

10:16:47 22      A. Not that I recall.

10:16:51 23      Q. So is it your memory that each

10:16:53 24  school's representative would share the

10:16:55 1    numbers by race, and then the overall

10:16:59 2    numbers, go around the table, and then the

10:17:02 3    meeting was over?

10:17:04 4              MS. ELLSWORTH:  Objection.

10:17:04 5        A. From what I remember, from the one

10:17:11 6    meeting I attended before 2009, yes.

10:17:15 7        Q. How about the other meeting?

10:17:16 8        A. I was not present for the roundtable

10:17:20 9    after 2012.

10:17:21 10       Q. Okay.  Did people take notes at these

10:17:25 11   meetings?

10:17:26 12             MS. ELLSWORTH:  Objection.

10:17:26 13       A. I don't remember.

10:17:28 14       Q. Do you remember people writing down

10:17:29 15   the numbers?

10:17:30 16             MS. ELLSWORTH:  Objection.

10:17:30 17       A. I don't remember.

10:17:34 18       Q. Do you have any understanding of why

10:17:35 19   the numbers were shared orally?

10:17:38 20       A. I do not know.

10:17:46 21       Q. Did you ever ask why the numbers were

10:17:47 22   not shared in writing?

10:17:48 23             MS. ELLSWORTH:  Objection.

10:17:49 24       A. No.

10:17:51  1        Q. What's your understanding -- it seems

10:17:53  2    unusual to me that people would go into a

10:17:55  3    room and share numbers orally, and then

10:17:58  4    leave that room.  What's your understanding

10:18:01  5    as to why that was the way the information

10:18:03  6    was transmitted?

10:18:04  7              MS. ELLSWORTH:  Objection.

10:18:05  8        A. I have no idea.

10:18:08  9        Q. And nothing about that strikes you as

10:18:10 10    unusual?

10:18:11 11              MS. ELLSWORTH:  Objection.

10:18:11 12        A. I don't know.  I was a junior

10:18:19 13    counselor at the time.

10:18:22 14        Q. What was the purpose of sharing those

10:18:25 15    numbers?

10:18:26 16              MS. ELLSWORTH:  Objection.

10:18:26 17        A. I don't know.

10:18:27 18        Q. What was your understanding of the

10:18:28 19    purpose?

10:18:29 20        A. To get some sort idea of what was

10:18:44 21    happening at peer institutions.

10:18:50 22        Q. And what would you do with that

10:18:52 23    information?

10:18:52 24              MS. ELLSWORTH:  Objection.

10:18:54  1        A. I don't remember.   I didn't have the

10:19:04  2    information.

10:19:04  3        Q. Was it Roger Banks who brought that

10:19:07  4    information to the meeting that you

10:19:09  5    attended?

10:19:09  6        A. If he attended, he was the Harvard

10:19:27  7    institutional representative.

10:19:28  8        Q. So do you recall Mr. Banks collecting

10:19:36  9    those numbers in advance of the ABAFAOILSS

10:19:39 10    meeting?

10:19:40 11        A. I do not know how he got the numbers.

10:19:43 12        Q. Okay.  Do you recall Mr. Banks writing

10:19:48 13    down the numbers from the other schools at

10:19:50 14    this meeting?

10:19:51 15            MS. ELLSWORTH:  Objection.

10:19:51 16        A. I don't remember.

10:19:52 17        Q. Do you recall any conversation with

10:19:54 18    Mr. Banks about what was shared at the

10:19:57 19    meeting?

10:19:57 20        A. I do not recall.

10:19:58 21        Q. What's your understanding as to why

10:20:06 22    schools who attended this meeting were

10:20:09 23    sharing those numbers?

10:20:12 24            MS. ELLSWORTH:  Objection.

10:20:12 1      A. I don't know.

10:20:16 2      Q. What's your understanding as to why

10:20:20 3   Mr. Banks would attend this meeting and

10:20:22 4   share those numbers?

10:20:23 5           MS. ELLSWORTH:  Objection.

10:20:23 6      A. I don't know.

10:20:31 7      Q. You don't know why this meeting took

10:20:37 8   place?

10:20:37 9           MS. ELLSWORTH:  Objection.

10:20:37 10      A. It's -- in my opinion, it's a

10:20:49 11   networking opportunity meeting.

10:20:50 12      Q. Well, I mean you can network by, you

10:20:57 13   know, having drinks with folks at these

10:20:59 14   conferences.  What you've described here in

10:21:02 15   this particular meeting does not sound like

10:21:04 16   a networking opportunity.  Am I missing

10:21:07 17   something?

10:21:07 18           MS. ELLSWORTH:  Objection.

10:21:12 19      A. I just don't know the reason why this

10:21:17 20   discussion happened or the roots of...

10:21:21 21      Q. Okay.  Is it your understanding that

10:21:26 22   this meeting took place at the ABAFAOILSS

10:21:29 23   conference every year?

10:21:31 24           MS. ELLSWORTH:  Objection.

10:21:31  1        A. To the best of my knowledge, yes.

10:21:37  2        Q. How about the second time you attended

10:21:40  3   when Harvard hosted.  Did you attend this

10:21:43  4   meeting?

10:21:43  5        A. No.

10:21:44  6        Q. Was there a similar meeting of

10:21:51  7   ABAFAOILSS after the regular admissions

10:21:53  8   process had concluded?

10:21:55  9             MS. ELLSWORTH:  Objection.

10:22:01 10        A. I do not believe so.

10:22:15 11        Q. Who organized these meetings?

10:22:20 12             MS. ELLSWORTH:  Objection.

10:22:20 13        A. There is a ABAFAOILSS executive board.

10:22:33 14        Q. And how would the ABAFAOILSS executive

10:22:36 15   board communicate with its members?

10:22:38 16        A. There is a Google group and mass

10:22:50 17   email.

10:22:50 18        Q. What is the Google group?

10:22:54 19             MS. ELLSWORTH:  Objection.

10:22:54 20        A. I actually don't know.

10:22:59 21        Q. But it's a Google address?

10:23:01 22        A. I believe so.

10:23:05 23        Q. Going back to the meeting at

10:23:13 24   Dartmouth, do you recall approximately how

10:44:13 1        Q. And "late breaking issues."  What does

10:44:21 2    that mean?

10:44:21 3        A. That is all encompassing of any new

10:44:37 4    information.

10:44:39 5        Q. "New" meaning after the application

10:44:42 6    was submitted?

10:44:43 7               MS. ELLSWORTH:  Objection.

10:44:46 8        Q. What does new mean?  What do you mean

10:44:49 9    by "new"?

10:44:50 10       A. Any information that we learn about

10:44:57 11   that we did not get from the application.

10:45:00 12       Q. And how would the admissions office

10:45:04 13   learn of such information?

10:45:05 14       A. That could be from a teacher, a

10:45:13 15   counselor, the interview report, as I

10:45:18 16   indicate here.

10:45:25 17       Q. And what is an "IV report" or "4

10:45:28 18   report"?

10:45:29 19       A. Interview.

10:45:32 20       Q. For No. 3 do you see where it says

10:45:35 21   "standard strong"?

10:45:36 22       A. Yes.

10:45:37 23       Q. What does that phrase mean?

10:45:39 24               MS. ELLSWORTH:  Objection.

10:45:39  1       A. That is an office-specific adjective.

10:46:15  2   It is the average student who applies to

10:46:18  3   Harvard with qualities that make the student

10:46:40  4   an appropriate applicant to the school.  We

10:46:44  5   just can't admit everyone qualified to be

10:46:48  6   there.

10:46:50  7       Q. Does that mean that the majority of

10:46:55  8   standard strong designated applicants were

10:46:57  9   rejected?

10:46:58 10            MS. ELLSWORTH:  Objection.

10:47:07 11       A. I would say the majority of standard

10:47:09 12   strong applicants were not admitted.

10:47:20 13       Q. So I'm trying to understand why you

10:47:22 14   answered the question differently than I

10:47:24 15   asked it.

10:47:25 16            Does that mean that the remainder

10:47:27 17   were waitlisted?  I'm trying to get an

10:47:32 18   understanding of what "standard strong"

10:47:34 19   typically means?

10:47:34 20            MS. ELLSWORTH:  Objection.

10:47:34 21       A. I was answering that there's other

10:47:39 22   admissions decisions than just rejection.

10:47:42 23       Q. Okay.  And what's your understanding

10:47:50 24   about the typical admissions result for a

13:24:29  1    guess based on your experience looking at

13:24:34  2    these numbers what it might mean?

13:24:35  3              MS. ELLSWORTH:  Objection.

13:24:36  4        A. No.  I have no idea.

13:24:40  5        Q. Do you ever recall hearing the notion

13:24:43  6    of saving a space while you were in the

13:24:52  7    admissions office at Harvard?

13:24:53  8        A. No.

13:25:02  9        Q. We talked a minute ago about PR admits

13:25:06 10    being previous admits.  Was this also

13:25:11 11    referred to as the Z list?

13:25:13 12              MS. ELLSWORTH:  Objection.

13:25:14 13        A. They're not the same.

13:25:21 14        Q. What's the Z list?

13:25:23 15        A. Zs are students who are offered

13:25:38 16    admission, but are asked to matriculate the

13:25:45 17    following fall.

13:25:49 18        Q. Why might somebody be offered

13:25:53 19    admission for the following fall?

13:25:55 20              MS. ELLSWORTH:  Objection.

13:25:55 21        A. There are a multitude of reasons.

13:25:59 22        Q. Do you recall a few common ones?

13:26:05 23              MS. ELLSWORTH:  Objection.

13:26:05 24        A. These are students that Harvard would

13:26:13  1   love to admit, and we just didn't have space

13:26:16  2   for them.

13:26:21  3        Q. Did they -- strike that.

13:26:26  4             Did Z list students -- strike that.

13:26:32  5             When were students designated as Z

13:26:34  6   list applicants?

13:26:38  7             MS. ELLSWORTH:  Objection.

13:26:38  8        A. From my recollection, during the final

13:26:59  9   days of full committee.

13:27:02 10        Q. So is it fair to say that the class

13:27:05 11   had sort of been filled out, and there are

13:27:08 12   other students that are qualified, but there

13:27:10 13   wasn't space for, so they were offered

13:27:12 14   admission for the following year?  That's

13:27:14 15   what you're referring to as "the Z list"?

13:27:17 16             MS. ELLSWORTH:  Objection.

13:27:17 17        Q. Is that a fair characterization?

13:27:19 18        A. To clarify, there's really no point in

13:27:39 19   time when the committee deems the class

13:27:44 20   admitted as full.  The committee admitted as

13:27:53 21   it saw fit, and then there would be a

13:28:02 22   realization that given a predicted yield

13:28:06 23   percentage for the entire class, too many

13:28:10 24   students may have been preliminarily

13:28:13 1    admitted.  So students would have to be

13:28:22 2    rediscussed to be taken out of the class.

13:28:30 3        Q. What factors would go into putting a

13:28:34 4    student on the Z list?

13:28:38 5            MS. ELLSWORTH:  Objection.

13:28:38 6        A. The same factors that are used to

13:28:44 7    consider a student for admission would be

13:28:49 8    used to advocate for putting a student on the

13:28:57 9    Z list rather than reject or waitlist.

13:29:02 10       Q. I think you said that Z list

13:29:04 11   candidates were qualified, but it was more a

13:29:08 12   question of timing.

13:29:10 13           So I'm getting -- I'm asking what

13:29:11 14   factors would go to the timing component of

13:29:15 15   it as opposed to the qualifications?

13:29:18 16           MS. ELLSWORTH:  Objection.

13:29:18 17       Q. You can answer if you understand what

13:29:21 18   I'm asking you.

13:29:22 19       A. I want to clarify that the timing

13:29:32 20   aspect could have applied to many, many more

13:29:40 21   students who unfortunately needed to be taken

13:29:44 22   out of the preliminary list of admits.

13:29:49 23           So students could have ended up on

13:29:52 24   the waitlist or rejected or on the Z list,

13:30:01  1    and it would all depend on the first reader

13:30:09  2    or the subcommittee to advocate.

13:30:13  3        Q. Well, presumably somebody who got

13:30:16  4    admitted would be stronger than somebody who

13:30:18  5    got waitlisted who would be stronger than

13:30:20  6    somebody who got rejected; is that fair?

13:30:23  7            MS. ELLSWORTH:   Objection.

13:30:23  8        A. Let me clarify that.

13:30:29  9            A student could have been

13:30:31 10    preliminarily admitted, and based on the

13:30:38 11    final number of admitted students Harvard

13:30:42 12    wanted to give an offer of admission to, the

13:30:46 13    committee had to move students out of the

13:30:51 14    admit category to waitlist, for example.

13:30:57 15        Q. What factors would the committee

13:31:03 16    consider in making the decision to move

13:31:05 17    students in the way that you just described?

13:31:07 18        A. So this would encompass the holistic

13:31:13 19    discussion all over again.  Many, many

13:31:19 20    factors would be presented, and the committee

13:31:26 21    would have to make a subjective decision

13:31:28 22    where the student would ultimately land.

13:31:34 23        Q. Well, the committee wouldn't

13:31:38 24    reconsider every student in deciding who to

Grace Cheng - April 7, 2017
Highly Confidential - For Attorneys' Eyes Only

186

15:01:11  1
15:01:13  2
15:01:16  3
15:01:19  4
15:01:24  5
15:01:25  6
15:01:28  7
15:01:30  8
15:01:30  9
15:01:46 10
15:01:50 11
15:01:55 12
15:01:59 13
15:02:04 14
15:02:06 15
15:02:08 16
15:02:21 17
15:02:22 18
15:02:54 19
15:03:06 20
15:03:08 21
15:03:10 22
15:03:10 23
15:03:18 24



Grace Cheng - April 7, 2017                                    **187**
Highly Confidential - For Attorneys' Eyes Only



15:20:37  1            MS. ELLSWORTH:  Objection.

15:20:37  2       A. Not that I recall.

15:20:38  3       Q. Geographical imbalance?

15:20:40  4       A. Not that I remember.

15:20:51  5       Q. How about too few of a particular

15:20:53  6  group?  I think my question was phrased as

15:20:55  7  too many.  I guess I'm asking the flip side

15:20:58  8  of that.  Were you ever given guidance in

15:21:00  9  terms of a group being too underrepresented?

15:21:07 10       A. Not that I remember.

15:21:18 11       Q. Did you know the numbers by race of

15:21:25 12  the preliminarily admitted class before the

15:21:28 13  lopping process began?

15:21:29 14       A. No.

15:21:36 15       Q. Do you know if that information was

15:21:38 16  tracked during the admissions process?

15:21:40 17            MS. ELLSWORTH:  Objection.

15:21:41 18       A. I don't know.

15:21:42 19       Q. Okay.  Then let's go back to -- with

15:21:57 20  the lopping process.  The first reader would

15:22:00 21  consider holistically people who are

15:22:04 22  vulnerable, and then would the subcommittees

15:22:08 23  prepare a list of recommendations for

15:22:13 24  lopping?

15:22:13  1      A. Yes.

15:22:16  2      Q. And then what happened next?

15:22:18  3              MS. ELLSWORTH:   Objection.

15:22:18  4      A. What happened to the lists?

15:22:26  5      Q. Right.   So the subcommittees could

15:22:30  6  come back and come up with a lop list.

15:22:32  7  Would they go back into a full committee or

15:22:34  8  something else?

15:22:36  9              MS. ELLSWORTH:   Objection.

15:22:36  10     A. They would go back into full

15:22:41  11  committee.

15:22:41  12     Q. And then how would the process proceed

15:22:44  13  from there?

15:22:44  14     A. When I was there -- and things may

15:22:50  15  have changed since then -- we would proceed

15:22:56  16  alphabetically docket by docket and look at

15:23:04  17  each docket's identified names to come out of

15:23:08  18  the class.

15:23:10  19     Q. Okay.   Then after that process, did

15:23:19  20  the full committee have some type of -- what

15:23:27  21  was the committee's -- strike that.

15:23:29  22              After that process, what was the

15:23:31  23  committee's information about groups by race

15:23:35  24  of the prospectively admitted class at that

15:23:38  1    point?

15:23:39  2              MS. ELLSWORTH:  Objection.

15:23:39  3        A. From what I remember, we were never

15:23:49  4    told the breakdown.

15:23:51  5        Q. So when did you learn the breakdown of

15:24:00  6    an admitted class by race?

15:24:02  7        A. Usually in the press release to the

15:24:05  8    public once the class was admitted.

15:24:10  9        Q. So is it your testimony that from the

15:24:17 10    beginning of the process until the press

15:24:19 11    release, the full committee did not have in

15:24:25 12    front of it the numbers of the prospectively

15:24:29 13    admitted class by race?

15:24:30 14              MS. ELLSWORTH:  Objection.

15:24:31 15        A. From what I recall, yes.

15:24:37 16        Q. How were the lop lists maintained in

15:24:42 17    terms of documentation?

15:24:50 18              MS. ELLSWORTH:  Objection.

15:24:50 19        A. Again, from what I remember, when I

15:25:01 20    was there, Dean Fitzsimmons kept a copy from

15:25:06 21    each docket and each docket chair had a copy.

15:25:11 22        Q. Okay.  And what did that copy look

15:25:14 23    like?

15:25:16 24              MS. ELLSWORTH:  Objection.

16:44:37  1    charge of the search.

16:44:41  2        Q. Do you know how the search was

16:44:44  3    tailored to target underrepresented

16:44:48  4    minorities?

16:44:49  5            MS. ELLSWORTH:  Objection.

16:44:49  6        A. Colleges are able to ask for names by

16:45:08  7    self-reported minority affiliation.

16:45:12  8        Q. Did you have any involvement in

16:45:15  9    identifying the parameters for requesting

16:45:19 10    names?

16:45:20 11        A. Not that I recall.

16:45:27 12        Q. I want to switch to athletics for a

16:45:31 13    little bit.  What does it mean to be an

16:45:34 14    athletic liaison?

16:45:38 15        A. That is the person on the admissions

16:45:41 16    committee who is responsible for interacting

16:45:46 17    with the coach or coaches to know who is

16:45:55 18    applying each year.

16:45:58 19        Q. Okay.  And is the admissions process

16:46:01 20    different for athletes than for nonathletes?

16:46:05 21            MS. ELLSWORTH:  Objection.

16:46:05 22        A. No.  The process of holistic admission

16:46:17 23    is the same.

16:46:18 24        Q. How is an applicant's athletic

```
 1   CERTIFICATE

 2   COMMONWEALTH OF MASSACHUSETTS )

 3   COUNTY OF SUFFOLK                )

 4      I, Deborah Roth, a Registered Professional

 5   Reporter and Notary Public duly commissioned

 6   and qualified in and for the Commonwealth of

 7   Massachusetts, do hereby certify:  That

 8   Grace Cheng, the witness whose deposition is

 9   hereinbefore set forth, was duly identified

10   and sworn by me, and that the foregoing

11   transcript is a true record of the testimony

12   given by such witness to the best of my

13   ability.

14      I further certify that I am not related

15   to any of the parties in this matter by

16   blood or marriage, and that I am in no way

17   interested in the outcome of this matter.

18      IN WITNESS WHEREOF, I have hereunto set

19   my hand and affixed my notarial seal this

20   10th day of April 2017.

21   _____

22   Deborah Roth, CSR:  14700-S, RPR:  34250

23   My Commission Expires:  December 31, 2021

24
```