# EXHIBIT 105

```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 2                     BOSTON DIVISION

 3
     --------------------------------x
 4
     STUDENTS FOR FAIR ADMISSIONS,
 5   INC.,

 6          Plaintiff,
                                          Civil Action No.
 7   vs.                                  1:14-cv-14176

 8   PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE (HARVARD CORPORATION);
 9   and THE HONORABLE AND REVEREND
     THE BOARD OF OVERSEERS,
10
            Defendants.
11
     --------------------------------x
12
         - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY -
13

14               DEPOSITION OF ROGER BANKS, a

15         witness called by the Plaintiff, taken

16         pursuant to the applicable provisions of

17         the Federal Rules of Civil Procedure,

18         before James A. Scally, RMR, CRR, a

19         Notary Public in and for the Commonwealth

20         of Massachusetts, at the offices of

21         WilmerHale, 60 State Street, Boston,

22         Massachusetts, on Thursday, May 4, 2017,

23         commencing at 9:00 a.m.

24
```

```
 1    coordinators for each of those five groups; is that
 2    right?
 3         A.   Right.
 4         Q.   And how are those student coordinators
 5    chosen?
 6              MS. ELLSWORTH:  Objection.
 7         A.   They were -- they were chosen through a
 8    selection process.  Applicants had to submit essays,
 9    respond to a series of written questions about why
10    they wanted to hold the position, their backgrounds.
11    They were interviewed personally by myself and other
12    student -- current student coordinators and selected
13    as a -- you know, by our group.
14         Q.   And what were you looking for when you were
15    interviewing and selecting student coordinators?
16              MS. ELLSWORTH:  Objection.
17         A.   I think we were looking for a combination of
18    things.  One salient feature was interest in
19    promoting our mission, the ability to do that in real
20    terms, and also to gather other students into the
21    fold, because, you know, ten students couldn't do
22    this alone.  You needed allies; you needed people to
23    go out and do the trips, et cetera.  We were looking
24    for students who were reasonably well connected to
```

```
 1   the various ethnic communities on campus.
 2   Personality, intellect, writing ability, public
 3   speaking skills, ability to get along with others as
 4   a team.
 5      Q.   Okay.  Were there any efforts made to measure
 6   the success of the program?
 7            MS. ELLSWORTH:  Objection.
 8      Q.   Let me ask it differently.
 9      A.   Yeah.
10      Q.   How would you assess -- how would you go
11   about accessing -- strike that.
12           How would you go about assessing the
13   successfulness of the UMRP?
14            MS. ELLSWORTH:  Objection.
15      A.   It was a very hard thing to measure,
16   actually.  Because we obviously looked at the number
17   of students who decided to matriculate in any given
18   year and took some degree of comfort and perhaps some
19   degree of credit in -- in those figures.  But we also
20   recognize that we've lost -- we lose students to
21   other schools and wonder whether or not, you know, we
22   had achieved the depth of our -- of our goals and
23   mission.  We listened closely to student feedback
24   during the admissions process and post matriculation.
```

```
 1      Q.   Okay.  Did subcommittees present to the full
 2   committee a certain number of applicants that was
 3   provided to them by the dean?
 4               MS. ELLSWORTH:  Objection.
 5      Q.   Let me rephrase.
 6           Did each docket have a target number of
 7   applicants to present to the full committee?
 8               MS. ELLSWORTH:  Objection.
 9      A.   You have to try -- I just want to be sure I
10   understand the question.
11      Q.   Sure.  At the subcommittee level, was there a
12   total target number of applications that the
13   subcommittee would present to the full committee?
14               MS. ELLSWORTH:  Objection.
15      A.   For the purposes of lopping?
16      Q.   Correct.
17      A.   Yes.
18      Q.   And how were those target numbers arrived at?
19      A.   I do not know.
20      Q.   How did you learn of them?
21      A.   From the dean.
22      Q.   Okay.  So the dean would provide a target
23   number for each subcommittee for the lopping process?
24               MS. ELLSWORTH:  Objection.
```

```
 1      A.   He would provide that to the chair, and the
 2   chair would provide that to the committee members.
 3      Q.   Okay.  Was there any guidance along with a
 4   number that was provided, such as characteristics of
 5   students that the full committee needed more or fewer
 6   of, or was it just a number?
 7              MS. ELLSWORTH:  Objection.
 8      A.   It was a straight-up number.
 9      Q.   Okay.  During the lopping process, did you
10   ever have an understanding as to whether certain
11   racial groups needed to be lopped more than others?
12              MS. ELLSWORTH:  Objection.
13      A.   No.
14      Q.   And let me be more pointed about it.  Did you
15   ever hear during the lopping process of having too
16   many Asians?
17              MS. ELLSWORTH:  Objection.
18      A.   No.
19      Q.   Do you ever recall a focus in the lopping
20   process of reducing the number of Asians?
21      A.   No.  Not in my experience.
22      Q.   Were you aware during the admission cycle of
23   the relative numbers of racial groups that had been
24   accepted?
```

```
 1                    MS. ELLSWORTH:  Objection.
 2       A.   I'm a little hazy on the question.  Could
 3  you --
 4       Q.   Sure.  As the admissions process went on, did
 5  you ever hear anyone discuss whether they were
 6  running ahead or behind of projected targets by
 7  racial group?
 8       A.   No.
 9       Q.   Do you know if the admissions process is
10  guided in any way to arrive at targets for admitted
11  students by racial group?
12                    MS. ELLSWORTH:  Objection.
13       A.   No.
14                    MR. PARK:  I'd like to mark as
15            Exhibit 7 a document Bates labeled HARV
16            32507 to 32524, which is an email from
17            Ms. McGrath dated April 15, 2014, with
18            an attachment.
19                    (Exhibit 7, 4/15/14 email chain
20            and attachment Bates stamped
21            HARV00032507 through 6871, marked.)
22       Q.   Please take a moment to review the document
23  and let me know when you've had a chance to do so.
24  (Pause.)
```

```
 1      A.   Right.
 2      Q.   Okay.  So typically, then, in a full
 3 committee meeting, the status was that the class was
 4 oversubscribed and the objective of the meeting was
 5 to reduce it to the -- to the target number; is that
 6 right?
 7            MS. ELLSWORTH:  Objection.
 8      A.   That -- yes.  That's an acceptable premise,
 9 yes.
10      Q.   Okay.  And so it sounds like the dean started
11 out by describing the objective of the meeting in
12 sort of general and specific quantitative terms?
13      A.   Right.
14            MS. ELLSWORTH:  Objection.
15      Q.   Was part of the dean's description of what
16 had to happen, did that ever include race?
17            MS. ELLSWORTH:  Objection.
18      A.   Yes.
19      Q.   And what do you recall the dean saying about
20 race?
21      A.   I recall a breakdown of admitted students by
22 race and ethnicity, academic background, geographic
23 background, area of concentration, various broad sort
24 of categories.
```

```
 1   to time might -- strike that.
 2           You testified earlier that you recalled at
 3   least one situation in which the dean mentioned a
 4   gender imbalance in his introductory remarks; is that
 5   right?
 6       A.  Yes.
 7       Q.  As the meeting progressed, how would the
 8   committee sort of stay apprised of where they were
 9   with respect to that imbalance?
10               MS. ELLSWORTH:  Objection.
11       A.  In all honesty, we did not stay apprised of
12   that.  Again, it was a background feature to be taken
13   into account, but with no explicit instructions from
14   the dean on how to vote.
15       Q.  So it wasn't something about which the dean
16   would periodically update the committee on where they
17   were?
18               MS. ELLSWORTH:  Objection.
19       A.  No, it was not.
20       Q.  Okay.  And the same question with respect to
21   racial categories.  Was there ever an update during
22   the meeting about where the application stood with
23   respect to race?
24       A.  Never.
```

Roger Banks - May 4, 2017    139
Highly Confidential - For Attorneys' Eyes Only

```
 1   counselor, a former full-time ABAFAOILSS member, who
 2   wanted to know about the status of one of her
 3   students.
 4       Q.  Okay.  Starting with the bottom email on the
 5   first page, do you see the abafaoilss@yahoogroups.com
 6   address?
 7       A.  Uh-huh.
 8       Q.  I take it that is the ABAFAOILSS listserv
 9   address?
10               MS. ELLSWORTH:  Objection.
11       A.  Honestly, I don't -- I -- I take that at face
12   value.  I don't know --
13       Q.  Okay.
14       A.  -- myself.
15       Q.  Do you know how it works?
16       A.  No, I don't.
17       Q.  Okay.  Do you know the difference between
18   this address and a Gmail groups or Google groups
19   ABAFAOILSS address?
20       A.  No, I don't.
21       Q.  In that bottom email, it says, quote, "I've
22   worked at Princeton and I feel very confident I know
23   how the 'likely' process works for athletes," end
24   quote.
```

1            Do you see that?
2       A.   I do.
3       Q.   What is that about?
4            MS. ELLSWORTH:  Objection.
5       A.   Recruited athletes are eligible to receive
6  tentative -- tentative decisions on their admission
7  files.  That's what this is about.
8       Q.   Okay.  So would recruited athletes get
9  "likely" letters --
10           MS. ELLSWORTH:  Objection.
11      Q.   -- from Harvard?
12      A.   Recruited athletes as well as non-recruited
13 athletes.
14      Q.   Okay.  And so what is a "likely" letter?
15      A.   A letter -- a "likely" letter essentially
16 suggests that the student is, as it were, likely to
17 be admitted to the college, but because of NCAA and
18 other kinds of regulations in the case of athletes,
19 we are not able to provide a final letter of
20 admission until the end of the admissions process
21 itself.  It's a tentative piece of information.
22      Q.   Who would the "likely" letter be from?
23           MS. ELLSWORTH:  Objection.
24      A.   I would be from the dean of admissions.

1    Q.  So for an applicant to receive a "likely"
2  letter, the entire file would have been reviewed by
3  the admissions office?
4    A.  The entire file would have been viewed and
5  vetted by the entire admissions committee.
6    Q.  And the applicant would have received an
7  admission decision, but it was tagged as likely due
8  to NCAA regulations?
9    A.  Yeah.
10         MS. ELLSWORTH:  Objection.
11   A.  Yes.
12   Q.  Okay.  In this email, back to the document,
13  it says that -- the author says, "I have a student
14  who is being promised admission even without a likely
15  and is wary of my advice to move on to other schools
16  who have guaranteed her a spot on their team.  It
17  would be great to hear from someone at Harvard to
18  confirm that this is not the case."
19         Do you see that?
20   A.  I do.
21   Q.  Do you remember what this was about?
22   A.  I don't.
23   Q.  Why would an athlete have the impression that
24  they were promised admission even without a "likely"?

```
 1   advocating for keeping it the way it has
 2   traditionally been done?
 3              MS. ELLSWORTH:  Objection.
 4       A.  I was advocating for a discussion of what I
 5   viewed as a practical dilemma.
 6       Q.  Okay.  Did you fill out these charts when you
 7   attended the round robin meetings?
 8       A.  I did.
 9       Q.  And what did you do with those charts?
10              MS. ELLSWORTH:  Objection.
11       A.  What did I do with the charts when I was --
12       Q.  After you filled them out, would you -- well,
13   what would you do with them after you filled them
14   out?
15              MS. ELLSWORTH:  Objection.
16       A.  I would tuck them back in my briefcase.
17       Q.  Okay.  And then what would happen to them
18   from there?
19       A.  My briefcase would go back to my office.
20       Q.  Okay.  And at any point, did you share the
21   contents of these charts with anyone else in your
22   office?
23              MS. ELLSWORTH:  Objection.
24       A.  I can recall sharing the data with the dean
```

```
 1  on a couple of occasions.
 2       Q.   A couple of occasions because it was sporadic
 3  or because that's just what you remember sitting
 4  here?
 5            MS. ELLSWORTH:  Objection.
 6       A.   Because it was sporadic.
 7       Q.   Okay.  What was the dean interested in about
 8  the chart?
 9            MS. ELLSWORTH:  Objection.
10       A.   I would describe his interest as being
11  comprehensive in nature.
12       Q.   Do you recall discussing anything in
13  particular about the chart with the dean?
14       A.   No, not really, no.
15       Q.   What did you do with the charts after
16  discussing them with the dean?
17            MS. ELLSWORTH:  Objection.
18       A.   They would return to my briefcase.
19       Q.   Do they exist somewhere today?
20            MS. ELLSWORTH:  Objection.
21       A.   Yes.
22       Q.   Where?
23       A.   In one of my many briefcases.
24       Q.   So you've kept the filled-in charts from your
```

```
 1   attendance at the round robin meetings?
 2       A.  Yes.
 3               MS. ELLSWORTH:  Objection.
 4       Q.  Okay.  Did you make copies of those charts
 5   and provide them to the dean or anyone else in the
 6   office?
 7       A.  No, never.
 8       Q.  What did you do with the information about
 9   other schools' admissions rates of minorities?
10               MS. ELLSWORTH:  Objection.
11       A.  I'm sorry.  I don't understand the question.
12       Q.  Why was this information useful to you?
13               MS. ELLSWORTH:  Objection.
14       A.  Well, it was useful in a suggestive way in
15   terms of background and other kinds of challenges
16   that other offices might be facing in their
17   admissions cycles.
18       Q.  Did other schools' numbers ever come up in
19   subcommittee or full committee meetings at Harvard?
20               MS. ELLSWORTH:  Objection.
21       A.  I'm sorry.  I don't quite -- if you could
22   be --
23       Q.  Sure.  I'll ask -- I'll ask it differently.
24           Do you recall discussing numbers from any
```

```
 1   other school from this chart in your meetings at
 2   Harvard, whether in subcommittee or in full
 3   committee?
 4              MS. ELLSWORTH:  Objection.
 5       A.  No, never.  In my experience, never.
 6       Q.  Do you recall the dean ever mentioning
 7   numbers that he learned from this chart in meetings
 8   with the office?
 9              MS. ELLSWORTH:  Objection.
10       A.  No, not in my experience, no.
11       Q.  Okay.  Did the dean ever use these numbers to
12   benchmark Harvard's progress with respect to
13   admittance and enrollment of minority groups?
14              MS. ELLSWORTH:  Objection.
15       A.  I'm sorry.  Could you -- could you --
16       Q.  Yeah, sure.  Well, you know, you had
17   mentioned sometimes you discussed the contents of
18   these charts after the ABAFAOILSS meetings with the
19   dean.  I'm wondering what in particular the dean was
20   interested in about these numbers?
21              MS. ELLSWORTH:  Objection.
22       A.  I don't know.  He'd be your best witness on
23   that.
24       Q.  Do you recall discussing any specifics of
```

1  strategies, hosting programs, pre-application events,
2  post-application events, those sorts of things.
3      Q.  Do you recall sharing anything in your
4  capacity as the institutional liaison for Harvard?
5          MS. ELLSWORTH:  Objection.
6      A.  I'm sorry.  Could you --
7      Q.  You mentioned some of the types of topics
8  that the attendees at this meeting covered after the
9  numbers had been reported.
10     A.  Uh-huh.
11     Q.  And I'm asking whether you recall
12  specifically whether you, as the institutional
13  liaison for Harvard, shared anything in particular
14  about Harvard's challenges or efforts or programs or
15  anything in particular.
16         MS. ELLSWORTH:  Objection.
17     A.  Not that I can recall offhand, no.
18     Q.  Did institutional liaisons who did not report
19  leave prior to the reporting?  Do you ever remember
20  that happening?
21     A.  Yes.
22     Q.  Were there any institutions that typically
23  didn't have somebody reporting?
24         MS. ELLSWORTH:  Objection.

Roger Banks - May 4, 2017                                              163
Highly Confidential - For Attorneys' Eyes Only



```
 1   at a lower rate than other ethnic groups?
 2             MS. ELLSWORTH:  Objection.
 3             Just the same warning.
 4        A.   No.
 5        Q.   Okay.  Do you believe that Asians are
 6   disadvantaged in Harvard's admissions process?
 7             MS. ELLSWORTH:  Objection.
 8        A.   No.
 9        Q.   Why not?
10        A.   Objection.
11             MS. ELLSWORTH:  Objection.
12        A.   I think that Asian-Americans are given every
13   opportunity to present their best credentials in the
14   admissions process.
15        Q.   I guess I'm asking something a little bit
16   different from their opportunity to present their
17   credentials, but whether in the process the results
18   disadvantage them in any way.
19        A.   I'm sorry.  The results?
20        Q.   Are they disadvantaged in the process as
21   evidenced by the results of the admissions process?
22             MS. ELLSWORTH:  Objection.
23        A.   I don't think so, no.
24        Q.   Have you ever heard of complaints from alumni
```

```
 1  COMMONWEALTH OF MASSACHUSETTS                    SUFFOLK, SS.

 2

 3              I, JAMES A. SCALLY, RMR, CRR, a
    Certified Shorthand Reporter and Notary Public duly
 4  commissioned and qualified in and for the
    Commonwealth of Massachusetts, do hereby certify that
 5  there came before me on the 4th day of May, 2017, at
    9:00 a.m., the person hereinbefore named, ROGER
 6  BANKS, who provided satisfactory evidence of
    identification as prescribed by Executive Order 455
 7  (03-13) issued by the Governor of the Commonwealth of
    Massachusetts, was by me duly sworn to testify to the
 8  truth and nothing but the truth of his knowledge
    concerning the matters in controversy in this cause;
 9  that he was thereupon examined upon his oath, and his
    examination reduced to typewriting under my
10  direction; and that this is a true record of the
    testimony given by the witness to the best of my
11  ability.
                I further certify that I am neither
12  attorney or counsel for, nor related to or employed
    by, any of the parties to the action in which this
13  deposition is taken, and further, that I am not a
    relative or employee of any attorney or counsel
14  employed by the parties hereto or financially
    interested in the action.
15

16
         My Commission Expires:  April 8, 2022
17

18

19
                            _____
20                          James A. Scally, RMR, CRR
                            CSR/Notary Public
21

22

23

24
```