# EXHIBIT 115

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1                          Erica J. Bever

2                                   Volume I
                                    Pages 1 to 363
3                                   Exhibits 1 to 23

4               UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
5
        - - - - - - - - - - - - - - - -x
6                                       :
        STUDENTS FOR FAIR ADMISSIONS,   :
7       INC.,                           :
                        Plaintiff,      :
8                                       :   Civil Action
              vs.                       :   No.
9                                       :   1:14-cv-14176-ADB
        PRESIDENT AND FELLOWS OF        :
10      HARVARD COLLEGE (HARVARD        :
        CORPORATION),                   :
11                      Defendant.      :
        - - - - - - - - - - - - - - - -x
12
              DEPOSITION OF ERICA J. BEVER, a witness
13      called on behalf of the Plaintiff, taken pursuant to
        the Federal Rules of Civil Procedure, before
14      Alexander K. Loos, Registered Diplomate Reporter and
        Notary Public in and for the Commonwealth of
15      Massachusetts, at the Offices of WilmerHale, 60
        State Street, Boston, Massachusetts, on Thursday,
16      July 13, 2017, commencing at 9:00 a.m.

17      PRESENT:

18

19         HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

20

21

22

23

24      Reported By: Alexander K. Loos

25      Job No: 127040

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 80

1                    ERICA J. BEVER

2         MS. ELLSWORTH:  Objection.

3      A.   I don't know.

4      Q.   And who do you remember bringing it up?

5      A.   I don't recall.

6      Q.   Okay.  Do you remember whether it was the

7  topic of discussion between yourself and Dean

8  Fitzsimmons at that time?

9      A.   I do not.

10     Q.   Okay.  Do you remember whether it was the

11  topic of discussion between yourself and

12  Ms. Driver-Linn at that time?

13     A.   I do not.

14     Q.   Do you remember whether this was the topic

15  of discussion with Ms. Yong at that time?

16     A.   I do not.

17     Q.   Okay.  And when you say you don't remember,

18  you're saying you don't remember one way or the

19  other:  It may have been; it may not have been?

20         MS. ELLSWORTH:  Objection.

21     A.   It varies.

22     Q.   When you say "it varies," what do you mean?

23         MS. ELLSWORTH:  Objection.

24     A.   I would not have discussed it with

25  Elizabeth Yong.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 81

1                         ERICA J. BEVER

2       Q.    And why not?

3       A.    I did not work with her at that time.

4       Q.    Okay.  With respect to Dean Fitzsimmons or

5  Ms. Driver-Linn, can you say one way or the other

6  whether you discussed it with them at that time?

7       A.    I'm fairly certain I did not.

8       Q.    And why are you fairly certain you did not?

9       A.    I was on maternity leave.

10      Q.    From when to when?

11      A.    From October of 2012 through January of

12  2013.

13      Q.    Okay.  Do you recall having any discussions

14  with anybody about the article when you returned

15  from maternity leave?

16      A.    I do not.

17      Q.    And when I say "do you recall," I'm talking

18  about discussions at any time, not just when you

19  returned from maternity leave.  Now let me expand

20  the question to clarify.

21            Do you recall talking about the article or

22  it's claims about bias in the admissions process at

23  Harvard at any point during your time at OIR?

24            MS. ELLSWORTH:  Objection.

25            I'll remind the witness not to disclose the

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 82

1                    ERICA J. BEVER

2   contents of communications with counsel or taken at

3   the direction of counsel in responding to the

4   question.

5          If you can otherwise answer, you may do so.

6   A.   I do not recall.

7   Q.   Do you remember talking about this with

8   counsel or at the direction of counsel before the

9   fall of 2014?

10          MS. ELLSWORTH:  Objection.

11          I'll direct the witness not to answer the

12   question.

13          MR. STRAWBRIDGE:  I'm sorry.  The question

14   about timing, I just want to be clear about the

15   boundary of your instruction.

16          You're instructing her not to say whether

17   or not she discussed it with counsel at any point in

18   time before 2014?

19          MS. ELLSWORTH:  Can you repeat your

20   question?

21   BY MR. STRAWBRIDGE:

22   Q.   Did you have a discussion with counsel or

23   at the direction of counsel about the claims made in

24   Ron Unz's article before the fall of 2014?

25          MS. ELLSWORTH:  I'm instructing the witness

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 83

1                    ERICA J. BEVER

2    not to answer the question.

3        Q.    Are you going to follow that instruction?

4        A.    Yes.

5        Q.    Sitting here today, do you recall any

6    analysis that you performed in response to the

7    claims made in the Ron Unz article?

8        A.    I do not.

9        Q.    Did you review any such analysis in

10   preparation for your deposition?

11            MS. ELLSWORTH:  Objection.

12       A.    Yes.

13       Q.    Okay.  Do you have any -- and what did you

14   review?

15       A.    Presentations put together around the time.

16       Q.    And looking at those presentations doesn't

17   refresh your recollection about the work that you

18   may have done?

19            MS. ELLSWORTH:  Objection.

20       A.    It did not.

21       Q.    Based on your preparation for this

22   deposition, what analysis or presentations did you

23   do related to the Ron Unz article?

24            MS. ELLSWORTH:  Objection.

25       A.    I do not know.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 85

1                       ERICA J. BEVER

2       A.   I do.

3       Q.   And who is Michael Smith?

4       A.   He's the dean of the faculty of arts and

5  sciences.

6       Q.   And did you ever have occasion during your

7  time at OIR to meet with Michael Smith?

8       A.   I did.

9       Q.   Okay.  And what topics did you meet with

10  Michael Smith about?

11      A.   Financial aid.

12      Q.   And specifically what with respect to

13  financial aid?

14      A.   Financial aid policy.

15      Q.   What policy?

16      A.   The affordability initiative.

17      Q.   And when you say the for the affordability

18  initiative, what are you referring to?

19      A.   I am referring to the policy that reduced a

20  family's contribution to zero to ten percent of

21  their income for families up to 180 -- $180,000 in

22  2008.

23      Q.   Did you do a lot of work on that question?

24           MS. ELLSWORTH:  Objection.

25      A.   I did.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 86

                         ERICA J. BEVER

1

2      Q.    Okay.  And what was -- what was the scope

3  of your analysis?

4      A.    Could you clarify?

5      Q.    Yeah.  You said -- you said it was an

6  analysis of the family contribution being reduced

7  from zero to ten percent, or within that range?

8            What specifically were you analyzing?

9      A.    We looked at several -- many things.

10     Q.    Just give me an example.

11     A.    We looked at how much families were paying

12  across our income distribution.

13     Q.    Okay.  What else do you remember looking

14  at?

15     A.    The cost of attendance at Harvard and

16  peers.

17     Q.    Okay.  Anything else?

18     A.    Yield rates by income.

19     Q.    All right.

20            What else?

21     A.    The share of students on aid.

22     Q.    Do you remember anything else about that

23  analysis?

24     A.    Other institutions' financial aid policies.

25     Q.    Can when was this analysis performed?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 87

1                    ERICA J. BEVER

2     2008, you said?

3         A.   From June -- July 2007 through the

4     announcement in December of 2007.  And then

5     periodically annually every year since.

6         Q.   Can you explain why you remember all those

7     aspects of that analysis going back to 2007 but you

8     don't remember any of the analysis you did with

9     respect to the Ron Unz article and the claims it

10    makes about Asian discrimination at Harvard?

11            MS. ELLSWORTH:  Objection.

12        A.   The affordability initiative analysis was

13    significant, a significant work product for me.

14        Q.   And what made it a significant work

15    product?

16        A.   It took many months.  I have continued to

17    revise exhibits annually over the last 10 years, and

18    it went to the Harvard Corporation.

19        Q.   Do you know how many months you spent on

20    analysis of the claims that were made in the Unz

21    article?

22            MS. ELLSWORTH:  Objection.

23        A.   I do not.

24        Q.   Do you know whether that analysis was ever

25    provided to Michael Smith?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 88

1                      ERICA J. BEVER

2           MS. ELLSWORTH:  Objection.

3      A.   I do not.

4      Q.   Do know whether that analysis was ever

5  provided to Drew Faust?

6      A.   I do not.

7      Q.   Do you know whether that analysis was ever

8  provided to Rakesh Khurana?

9           MS. ELLSWORTH:  Objection.

10     A.   I do not.

11          MR. STRAWBRIDGE:  I'm going to ask the

12  reporter to mark that as Exhibit 2.

13                (Document marked as Bever

14                Exhibit 2 for identification)

15          MS. ELLSWORTH:  Do you have another copy?

16          MR. CONNOLLY:  Yeah.  If you want it.

17  BY MR. STRAWBRIDGE:

18     Q.   If you can look at this document, it's

19  obviously voluminous, but the areas I specifically

20  want to direct you to are -- I think it's on Page 31

21  through Page 38.

22          Have you had a chance to review that?

23     A.   Yes.

24     Q.   Okay.  Is this your first time seeing this

25  document?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 121

ERICA J. BEVER

1

2    Q.    And when you say "personal qualities and

3    character," what are you referring to?

4    A.    A variety of things.

5    Q.    Such as?

6    A.    Again, concern for others.

7    Q.    What else?

8    A.    Qualities described by recommenders.

9    Q.    Anything else?

10         MS. ELLSWORTH:  Objection.

11   A.    The student's own application materials.

12   Q.    Like their academic application materials?

13         MS. ELLSWORTH:  Objection.

14   A.    I'm referring to their essay, how they

15   spend their time.

16   Q.    In your experience does -- is a student's

17   race sometimes factored into their personal --

18         MS. ELLSWORTH:  Objection.

19   Q.    -- into their personal score?

20         MS. ELLSWORTH:  Objection.

21   A.    No.

22   Q.    Do you think that's true with respect to

23   all readers?

24         MS. ELLSWORTH:  Objection.

25   A.    I cannot say what other readers do.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 134

                              ERICA J. BEVER

 1

 2        A.    It does not.

 3        Q.    "Framing from Drew," do you see that?

 4        A.    I do.

 5        Q.    Okay.  Do you know what that means?

 6        A.    I do not.

 7        Q.    Okay.  Do you know who wrote that?

 8        A.    I do not.

 9        Q.    Okay.  If I represent to you that this

10   document bears a file name that includes your

11   initials, do you have any reason to believe that's

12   inaccurate?

13              MS. ELLSWORTH:  Objection.

14        A.    I do not.

15        Q.    Okay.  So is it very possible that you, in

16   fact, did prepare this document?

17              MS. ELLSWORTH:  Objection.

18        A.    It is possible.

19        Q.    Did you have any other questions with the

20   report that we've looked at that have come to your

21   mind today?

22              MS. ELLSWORTH:  Objection.

23        A.    Could you clarify?

24        Q.    Yeah.  You said that you can ask questions

25   based on what you've seen today about this report,

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 135

1                    ERICA J. BEVER

2  correct?

3      A.   Yes.

4      Q.   And one of the questions that you raised

5  was whether or not data was misinterpreted or was

6  incomplete --

7           MS. ELLSWORTH:  Objection.

8      A.   Yes.

9      Q.   -- correct?

10          Do you have any other questions about that

11 analysis?

12     A.   Those are my most significant questions.

13     Q.   Okay.  And do you have any basis to believe

14 that data would have been incomplete?

15     A.   Yes.

16     Q.   And why is that?

17     A.   Because since I have moved to admissions

18 and financial aid, I have a better understanding of

19 admissions data.

20     Q.   And what in particular do you think you

21 have an understanding of now that you didn't know

22 then?

23     A.   The process.

24     Q.   And what in particular -- how in particular

25 does that affect the reliability of the data that

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 136

1                    ERICA J. BEVER

2   OIR would have used in 2013?

3       A.   We oversimplified the process.

4       Q.   And what do you mean by "oversimplified the

5   process"?

6       A.   So in that analysis we just reviewed only

7   four ratings were included.

8       Q.   And -- and why does that oversimplify the

9   process?

10      A.   There are many other factors we review in

11  admissions.

12      Q.   Such as?

13      A.   There are many factors in the admissions

14  process.

15      Q.   When you say only four ratings were

16  considered, what is your basis for saying only four

17  ratings are considered?

18           MS. ELLSWORTH:  Well, if you're going to

19  ask questions about the document --

20           MR. STRAWBRIDGE:  Feel free to look at it.

21           I want to know why she feels only four

22  ratings were used in this analysis since she doesn't

23  remember anything about it.

24           MS. ELLSWORTH:  Is that a question to the

25  witness?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 137

1                    ERICA J. BEVER

2          MR. STRAWBRIDGE:  Yes.

3      A.    I see academic rating, personal rating,

4   extracurricular rating and athlete.

5      Q.    Okay.  And what other ratings do you think

6   are missing from that analysis?

7      A.    Many.

8      Q.    Like what?

9      A.    The interview ratings.

10     Q.    You mean ratings from the alumni

11  interviewers and --

12     A.    And staff interviews.

13     Q.    And staff interviews.

14         What other ratings?

15     A.    Teacher reports.

16     Q.    Oh, you mean like the ratings from teachers

17  or guidance counselors?

18     A.    No.

19     Q.    What do you mean by -- what do you mean by

20  teacher reports?

21     A.    The recommendation letters of teachers and

22  guidance counselors.

23     Q.    And are those recommendations ever -- ever

24  distilled to a rating?

25     A.    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 138

1                    ERICA J. BEVER

2    Q.   Okay.  And how is that process done?

3    A.   By the reader, and the chair if the file is

4    passed.

5    Q.   Okay.  And was that information that would

6    have been available to OIR at the time that this

7    these reports were prepared?

8    A.   I do not recall.

9    Q.   You don't know whether it was or not?

10   A.   I do not recall.

11   Q.   But you think that a more complete analysis

12   would have taken those ratings into account?

13   A.   I do.

14   Q.   And you think -- and that leads to you

15   question the conclusions in here even though you

16   don't remember having those questions at the time?

17   A.   That is correct.

18        MR. STRAWBRIDGE:  Okay.  Can I have

19   Exhibit 24, please.

20        MR. CONNOLLY:  Not 45?

21        MR. STRAWBRIDGE:  Not 45.

22            (Document marked as Bever

23             Exhibit 3 for identification)

24        THE WITNESS:  Thank you.

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 143

1                    ERICA J. BEVER

2          MS. ELLSWORTH:  Objection.

3     A.   I am not.

4     Q.   Okay.  And are you in a position today to

5  identify any information strengths or weaknesses

6  about the methodology that was used to create this

7  document?

8          MS. ELLSWORTH:  Objection.

9     A.   Yes.

10    Q.   And what -- what conclusions can you

11 provide on that?

12    A.   Again, it seems to inaccurately reflect the

13 process.

14    Q.   Okay.  When we looked at the prior exhibit,

15 you said it inaccurately reflects the process

16 largely because you were concerned it excluded

17 various ratings that are available in the admissions

18 database; is that correct?

19         MS. ELLSWORTH:  Objection.

20    A.   That is correct.

21    Q.   So let me direct your attention here to

22 Page 5.

23         Would you agree with me that Page 5 has a

24 slide entitled "Difference in Average Test Scores

25 and Rating for White and Asian Applicants"?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 156

 1                    ERICA J. BEVER
 2    other questions did you have about Exhibit 2 other
 3    than the exclusion of these additional ratings.
 4         A.   Yeah.
 5         Q.   So what is it?  What are the other concerns
 6    that you have?
 7              MS. ELLSWORTH:  Objection.
 8              If you want to review the exhibit in trying
 9    to answer the question, go ahead.
10         A.   It's the same, isn't it?
11              Could you restate your question?
12         Q.   Yeah.  My question was -- my question is,
13    is what other questions have you formed today about
14    the conclusions or the methodology employed in
15    Exhibit 2 besides --
16         A.   And this is Exhibit 2, correct?
17         Q.   Correct.
18         A.   Okay.  Sorry.
19              MS. ELLSWORTH:  Objection.
20         A.   So again this does not reflect the process
21    by which we do admissions.
22         Q.   And why doesn't it reflect that?
23         A.   Because we review many factors, some of
24    which can be data and some of which are not.
25         Q.   Do you believe that Harvard's admissions

HIGHLY CONFIDENTIAL -   ATTORNEYS EYES ONLY

Page 219

 1                    ERICA J. BEVER

 2          MS. ELLSWORTH:  Objection.

 3     A.   Yes, it is.

 4     Q.   But you're telling us, sitting here today,

 5  under the penalty of perjury, that you don't have

 6  any recollection whatsoever of any discussions about

 7  this apart from one time when Mark Hansen showed you

 8  some slides in your office?

 9          MS. ELLSWORTH:  Objection.

10     A.   That is correct.

11     Q.   How many OIR projects of 6 to 12 pages did

12  you do in a given year?

13     A.   Many.

14     Q.   Like how many?

15     A.   Many.

16     Q.   Thousands?

17     A.   Possibly.

18     Q.   You think you did thousands of these types

19  of reports in one year?

20          MS. ELLSWORTH:  Objection.

21     A.   Probably not in one year.

22     Q.   Hundreds?

23     A.   Possibly.

24     Q.   You think you did hundreds of these types

25  of reports in one year?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 220

                      ERICA J. BEVER

 1

 2      A.   Yes.

 3      Q.   Okay.  Do you think when we ask Mark Hansen

 4   he's going to say that he doesn't remember any of

 5   this stuff, either?

 6           MS. ELLSWORTH:  Objection.

 7      A.   I don't know.

 8      Q.   Do you think...

 9           Do you have any reason as to why you

10   wouldn't remember the particular reports we've been

11   looking at?

12           MS. ELLSWORTH:  Objection.

13      A.   I do not.

14      Q.   Do you think they just didn't take up very

15   much of your time?

16      A.   I don't remember.

17      Q.   I mean, you remembered a lot of other

18   reports that you did during this time period,

19   correct?

20      A.   Correct.

21      Q.   And you've agreed that the -- the

22   allegations of racial discrimination are something

23   that people at Harvard would take pretty seriously,

24   correct?

25           MS. ELLSWORTH:  Objection.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 276

                          ERICA J. BEVER

1

2      Q.    And Hispanic American and low income,

3   correct?

4      A.    Yes.

5      Q.    And, in fact, what is the coefficient of

6   being African American and low income in the Harvard

7   admissions process?

8           MS. ELLSWORTH:  Objection.

9      A.    This does not represent the Harvard

10  admissions process.

11     Q.    All right.

12          What does this represent?

13     A.    This is a model --

14     Q.    Okay.

15     A.    -- of an admissions outcome using a limited

16  data set.

17     Q.    What was that data set in particular?

18     A.    The variables shown.

19     Q.    Well, it's also data drawn from the

20  admissions database for seven years, correct?

21     A.    That is correct.

22          This model doesn't even control for year.

23     Q.    Do you remember having -- well, strike

24  that.

25          Is it your testimony that this model is

HIGHLY CONFIDENTIAL -   ATTORNEYS EYES ONLY

Page 280

1                       ERICA J. BEVER

2    white student who is not low income and all other

3    things being constant.  So these are constants as --

4    or these are variables that, for everything --

5    holding all other things to their zero, more or

6    less.

7        Q.   So with respect to African-American and low

8    income, your testimony is that's compared to a white

9    student who's low income?

10       A.   No.  That's compared to the constant

11   student who is -- I'm not sure what the admitted

12   group in this category is; it looks like white; I

13   don't see a coefficient for white -- and other

14   things, non-athlete, a non-personal 1 or 2.  A

15   non-extracurricular 1 or 2.

16       Q.   Okay.  So does that mean that the

17   coefficient for African American low income would be

18   compared to a white student who does not have high

19   academic extracurricular or personal scores?

20            MS. ELLSWORTH:  Objection.

21       A.   Again, the way to do that comparison is not

22   shown on this chart.

23       Q.   Okay.  But it's something that you're

24   familiar with?

25       A.   It's something I can do statistically.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 362

1

2     COMMONWEALTH OF MASSACHUSETTS)

3     SUFFOLK, SS.                  )

4         I, Alexander K. Loos, RDR and Notary Public in

5     and for the Commonwealth of Massachusetts, do hereby

6     certify that there came before me on the 13th day of

7     July, 2017, at 9:00 a.m., the person hereinbefore

8     named, who was by me duly sworn to testify to the

9     truth and nothing but the truth of her knowledge

10    touching and concerning the matters in controversy

11    in this cause; that she was thereupon examined upon

12    her oath, and her examination reduced to typewriting

13    under my direction; and that the deposition is a

14    true record of the testimony given by the witness.

15    I further certify that I am neither attorney or

16    counsel for, nor related to or employed by, any

17    attorney or counsel employed by the parties hereto

18    or financially interested in the action.

19

20        Under Federal Rule 30:

21            ___ Reading and Signing was requested

22            ___ Reading and Signing was waived

23            _X_ Reading and Signing was not requested

24

25