EXHIBIT 118

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          Erin E. Driver-Linn

2       UNITED STATES DISTRICT COURT

3      FOR THE DISTRICT OF MASSACHUSETTS

4

5

6

7  ********************************

8  STUDENTS FOR FAIR ADMISSIONS, INC.,

9          Plaintiff

10  vs.              CA NO. 1:14-CV-14176

11  PRESIDENT AND FELLOWS OF

    HARVARD COLLEGE

12  (HARVARD CORPORATION),

13

           Defendant

14

    ********************************

15

16    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

17       DEPOSITION OF:  ERIN E. DRIVER-LINN

18            WILMERHALE

19          60 State Street

20        Boston, Massachusetts

21      July 27, 2017          9:03 a.m.

22        Darlene M. Coppola

23      Registered Merit Reporter

24      Certified Realtime Reporter

25  Job no. 127103

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 13

1                    Erin E. Driver-Linn

2    BY MR. STRAWBRIDGE:

3        Q.   Did you review that report to

4    prepare for this deposition?

5                    MS. ELLSWORTH:  Objection.

6        A.   I reviewed that work product to

7    prepare.

8    BY MR. STRAWBRIDGE:

9        Q.   What is the distinction you're

10   making in your mind between "report" and

11   "work product"?

12       A.   A report is more formal.

13       Q.   And what is formal about this work

14   product?

15                   MS. ELLSWORTH:  Objection.

16       A.   Work that the office of

17   institutional research does is iterative

18   and goes back and forth between internal

19   members of the team.

20            When it's in a PowerPoint format, it

21   does not mean it's formal.

22   BY MR. STRAWBRIDGE:

23       Q.   What in your mind makes a report

24   formal?

25       A.   Various things.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 44

1                     Erin E. Driver-Linn

2     Harvard use any outside entity to provide

3     statistical information?

4                     MS. ELLSWORTH:  Objection.

5        A.   I don't know.

6     BY MR. STRAWBRIDGE:

7        Q.   Do you remember any experience where

8     a consultant was hired to double-check

9     OIR's work?

10                    MS. ELLSWORTH:  Objection.

11       A.   No.

12    BY MR. STRAWBRIDGE:

13       Q.   OIR is the party that's responsible

14    at the college for preparing that

15    information and accurately and conveying it

16    to these various entities?

17                    MS. ELLSWORTH:  Objection.

18       A.   No.

19    BY MR. STRAWBRIDGE:

20       Q.   Who is?

21       A.   The office of institutional research

22    is, at the university level.

23            There's another office, the Harvard

24    College office of institutional research.

25       Q.   And which of the various groups that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 53

Erin E. Driver-Linn

1

2      A.   A doctoral degree in social

3  psychology, experience working on various

4  kinds of research projects.

5  BY MR. STRAWBRIDGE:

6      Q.   What was your undergraduate degree

7  in?

8      A.   Communications.

9      Q.   Where did you earn that from?

10     A.   University of Arkansas.

11     Q.   Do you have a master's degree?

12     A.   They give you a master's degree on

13  the way to the doctoral degree.

14     Q.   Is it also in -- I'm sorry.  Was it

15  at -- in social psychology?

16     A.   Uh-huh.

17     Q.   So you have a master's and a

18  doctorate in social psychology?

19              MS. ELLSWORTH:  Objection.

20  BY MR. STRAWBRIDGE:

21     Q.   Or does the doctorate trump the

22  master's?

23     A.   It does.

24     Q.   Did you have experience with

25  statistical analysis before you became

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 54

1          Erin E. Driver-Linn

2   director of institutional research?

3              MS. ELLSWORTH:  Objection.

4      A.   Yes.

5   BY MR. STRAWBRIDGE:

6      Q.   And what was your experience?

7      A.   I took classes in methods, and I

8   analyzed data from psychology experiments.

9      Q.   And was that the only statistical

10  training or experience that you had?

11             MS. ELLSWORTH:  Objection.

12     A.   Classes, experience; yes.

13  BY MR. STRAWBRIDGE:

14     Q.   How many years of experience do you

15  think you had in statistical analysis?

16     A.   Ten-ish.

17     Q.   Is an advanced degree in statistics

18  a requirement of working in the office of

19  institutional research?

20             MS. ELLSWORTH:  Objection.

21     A.   Not to my knowledge.

22  BY MR. STRAWBRIDGE:

23     Q.   Are the people who work in the

24  office of institutional research expected

25  to have some familiarity or experience with

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 55

1          Erin E. Driver-Linn

2    respect to statistical analysis?

3               MS. ELLSWORTH:  Objection.

4       A.   Not all of them.

5    BY MR. STRAWBRIDGE:

6       Q.   Some of them?

7               MS. ELLSWORTH:  Objection.

8       A.   Yes.

9    BY MR. STRAWBRIDGE:

10      Q.   It's a big part of the office's

11   overall responsibility, correct?

12              MS. ELLSWORTH:  Objection.

13      A.   What do you mean by "big part"?

14   BY MR. STRAWBRIDGE:

15      Q.   Does the office of institutional

16   research handle a lot of data for the

17   university?

18      A.   What do you mean by "a lot"?

19      Q.   In your view, I believe you said

20   that the office of institutional research

21   had the responsibility for collecting,

22   summarizing and reporting institutional

23   data, correct?

24              MS. ELLSWORTH:  Objection.

25      A.   Correct.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 93

1                    Erin E. Driver-Linn

2    to look into the IPEDS statistics to see

3    whether or not the claims made in Ron Unz's

4    article were accurate --

5                    MS. ELLSWORTH:  Objection.

6        Q.   -- in early 2013?

7                    MS. ELLSWORTH:  My apologies.

8    Objection.

9        A.   I'm sorry.  Could you repeat the

10   question?

11                   MR. STRAWBRIDGE:  Go ahead.

12

13                   *(Question read.)

14

15       A.   No.

16   BY MR. STRAWBRIDGE:

17       Q.   *What, if anything, do you recall

18   doing in response to Ron Unz's article at

19   OIR?

20                   MS. ELLSWORTH:  Objection.

21            Again, I'll remind the witness not

22   to disclose the content of communications

23   with counsel or actions taken at the

24   direction of counsel in answering the

25   question.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 94

1                Erin E. Driver-Linn

2      A.   I'm sorry.  Could you repeat the

3  question?

4                MR. STRAWBRIDGE:  Go ahead.

5

6                *(Question read.)

7

8      A.   I can't answer that question.

9  BY MR. STRAWBRIDGE:

10     Q.   Why can't you answer that question?

11     A.   Because it relates to discussions

12  with counsel.

13     Q.   Is it your testimony that everything

14  that OIR did in response to Ron Unz's

15  article in 2013 was done at the direction

16  or upon the advice of counsel?

17                MS. ELLSWORTH:  Objection.

18     A.   No.

19  BY MR. STRAWBRIDGE:

20     Q.   Okay.  So what did you do that

21  wasn't done at the direction of counsel?

22                MS. ELLSWORTH:  Objection.

23     A.   Could you clarify "do"?

24  BY MR. STRAWBRIDGE:

25     Q.   No.  I'm sorry, I can't.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 95

                    Erin E. Driver-Linn

1

2           "Do" means to take action.

3           Like, what did OIR do with -- in

4    response to Ron Unz's article that wasn't

5    at the direction of counsel?

6               MS. ELLSWORTH:  Objection.

7           Just answer the question as best you

8    can if he won't clarify it.

9       A.   I can't remember what was done at

10   the direction of counsel and what was not

11   exactly.

12   BY MR. STRAWBRIDGE:

13      Q.   When you prepared for this

14   deposition, did you discuss what OIR --

15   what actions OIR took in response to the

16   Ron Unz article?

17               MS. ELLSWORTH:  Objection.

18           I will direct the witness not to

19   answer that question.

20   BY MR. STRAWBRIDGE:

21      Q.   Are you going to follow that

22   advice?

23      A.   I am.

24      Q.   As part of your preparation for this

25   article, did you review what actions OIR

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 131

                    Erin E. Driver-Linn

1
2   BY MR. STRAWBRIDGE:

3       Q.   Are you aware of OIR, in 2013,

4   constructing a logistic model to analyze

5   the way the admissions process works?

6                   MS. ELLSWORTH:  Objection.

7       A.   I'm aware in preparation for this

8   deposition that this model was done.

9   BY MR. STRAWBRIDGE:

10      Q.   And who constructed this model?

11      A.   I don't know.  My best guess is Mark

12  Hansen.

13      Q.   And why is that your best guess?

14      A.   My sense is at the time Mark was

15  trying to learn about different forms of

16  modeling.

17      Q.   And was he trying to -- why was Mr.

18  Hansen modeling admissions criteria?

19                  MS. ELLSWORTH:  Objection.

20      A.   In the course of doing his work.

21  BY MR. STRAWBRIDGE:

22      Q.   Do you think this was the first time

23  he had ever done a logistic model?

24      A.   I don't think it was the first time

25  for any logistic model.  It may have been

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 132

1                    Erin E. Driver-Linn

2    the first time to do an Unz -- to look at

3    at odds ratios.

4         Q.   Why do you think that?

5         A.   My memory of Mark is he had a

6    mathematics background but did not have

7    much of a statistics background.

8         Q.   Can you say with any certainty

9    whether this is the first time he had ever

10   done an odds ratio?

11                   MS. ELLSWORTH:   Objection.

12        A.   I cannot.

13   BY MR. STRAWBRIDGE:

14        Q.   Do you -- are you aware of any --

15   are you aware of any analytical errors that

16   are reflected in this chart?

17        A.   Yes.

18        Q.   What's that analytical error?

19        A.   From my perspective, a model should

20   not be constructed with these kinds of

21   variables put together.

22        Q.   Why?

23        A.   One example is that it mixes

24   categorical variables with continuous

25   variables.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 142

1                  Erin E. Driver-Linn

2    individuals in OIR?

3         Q.    Why was this something that OIR was

4    spending their time doing?

5                       MS. ELLSWORTH:   Objection.

6         A.    I don't know exactly.

7    BY MR. STRAWBRIDGE:

8         Q.    Do you know generally?

9         A.    Generally, I believe it was to try

10   to approximate and understand the

11   independent variables that were used in

12   admissions decision-making.

13        Q.    And why was OIR trying to

14   approximate and understand those variables?

15                      MS. ELLSWORTH:   Objection.

16        A.    It's part of ongoing work related to

17   admissions and financial aid.

18   BY MR. STRAWBRIDGE:

19        Q.    And ongoing work at whose request?

20                      MS. ELLSWORTH:   Objection.

21        A.    There's another work product that

22   includes this model that has multiple

23   categories of work, and the answer to the

24   question is different depending on the

25   different categories of work.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 143

1                    Erin E. Driver-Linn

2    BY MR. STRAWBRIDGE:

3        Q.   I'm talking about this category of

4    work.

5        A.   This particular model, I do not

6    believe we were asked to work on.

7        Q.   You think this was just something

8    that you did on your own?

9        A.   I do.

10       Q.   Why do you think it's something you

11   did on your own?

12       A.   My best understanding is that Mark,

13   in particular, and others on the team

14   wanted to be able to understand whether

15   admissions could be quantified.

16       Q.   You think this was just a hobby

17   inquiry?

18                MS. ELLSWORTH:  Objection.

19       A.   That's not how I would characterize

20   it.

21   BY MR. STRAWBRIDGE:

22       Q.   Earlier you told me that some of

23   this work was being done to respond to

24   concerns that were raised in the popular

25   press, including Ron Unz's article.  Right?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 144

1                    Erin E. Driver-Linn

2       A.   I don't believe that's exactly the

3   way I said it.

4            I believe one reason why OIR was

5   doing work on admissions and financial aid

6   at this period of time was because of

7   questions that were raised in the popular

8   press, including Ron Unz's article.

9       Q.   Did you review Mark Hansen's

10  deposition testimony about the creation of

11  this document?

12      A.   Yes.

13      Q.   As part of your preparation for this

14  deposition?

15      A.   Yes.

16      Q.   Do you have any reason to believe

17  that his testimony was inaccurate with

18  respect to why he was creating this

19  document?

20      A.   Not the same as my memory.

21      Q.   Do you think that he's mistaken?

22      A.   I think he might be mistaken.

23      Q.   Are you saying under oath that you

24  think he got this wrong?

25                    MS. ELLSWORTH:   Objection.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 145

Erin E. Driver-Linn

1

2     A.    I would not say he got this wrong.

3  My best recollection is that Mark worked on

4  this and brought it forward after he had

5  been working on it to others in the team.

6  BY MR. STRAWBRIDGE:

7     Q.    So is it your testimony under oath

8  that this document was created entirely at

9  the instigation of people within OIR with

10 no questions or input from anyone outside

11 the office of institutional research?

12             MS. ELLSWORTH:   Objection.

13    A.    It's my best understanding that no

14 person outside of OIR asked us to do this

15 modeling work.

16 BY MR. STRAWBRIDGE:

17    Q.    And are you positive that's true?

18             MS. ELLSWORTH:   Objection.

19    A.    I can't be perfectly certain.

20 BY MR. STRAWBRIDGE:

21    Q.    Are you certain -- can you say with

22 any certainty under oath today that this

23 model and work was not being done because

24 of questions from somebody outside of the

25 office of institutional research about

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 157

1                    Erin E. Driver-Linn

2        Q.   And what discussions are you

3   referring to in particular?

4                  MS. ELLSWORTH:  Objection.

5             I'll remind the witness not to

6   disclose the contents of any communications

7   with counsel or actions taken at the

8   direction of counsel in answering the

9   question.

10       A.   I'm sorry.  Could you repeat the

11  question?

12  BY MR. STRAWBRIDGE:

13       Q.   What discussions are you referring

14  to, the Unz discussions?

15       A.   I can't answer that question.

16       Q.   Based on the instruction that your

17  attorney gave you?

18       A.   Yes.

19       Q.   The instruction was not to refer to

20  the content of the discussions.

21            But is it your testimony that the

22  discussions that are referred to here are

23  discussions where counsel for Harvard was

24  present?

25                  MS. ELLSWORTH:  Objection.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 158

Erin E. Driver-Linn

1

2    A.   I'm sorry.  Could you repeat the

3    question?

4    BY MR. STRAWBRIDGE:

5    Q.   Are the Unz discussions that you're

6    referring to here discussions where a

7    lawyer for Harvard was present?

8    A.   That's my best recollection.

9    Q.   Are you aware of any discussions

10   that took place regarding the Ron Unz

11   article with Dean Fitzsimmons or Sally

12   Donahue where counsel was not present?

13   A.   I don't recall.

14   Q.   You don't know whether there were

15   such discussions or not?

16          MS. ELLSWORTH:  Objection.

17   A.   I don't know.

18   BY MR. STRAWBRIDGE:

19   Q.   Your next sentence says, you think

20   "It would be helpful to find a time to

21   review with you the threads of the work we

22   are doing to ensure that we are aligned."

23          Did I read that correctly?

24   A.   You did.

25   Q.   What did you mean by "ensure that we

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 165

1                    Erin E. Driver-Linn

2     includes analysis as to whether or not

3     there is bias in the admissions process

4     against Asian-Americans at Harvard?

5                    MS. ELLSWORTH:  Objection.

6          A.   I'm sorry.  Could you repeat the

7     question?

8     BY MR. STRAWBRIDGE:

9          Q.   Do you agree that that -- that this

10    report, particularly on page -- on the

11    pages that you just looked at, 30 to 39,

12    includes analysis as to whether there is

13    bias against Asians in college admissions

14    at Harvard?

15                   MS. ELLSWORTH:  Objection.

16         A.   No.

17    BY MR. STRAWBRIDGE:

18         Q.   Let me direct you to Page 3 of this

19    report.

20              Have you had a chance to look at

21    this page?

22         A.   Yes.

23         Q.   So this is a slide entitled "Recent

24    Admissions in Financial Aid, Questions

25    Raised."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 166

1                    Erin E. Driver-Linn

2          Correct?

3     A.    Correct.

4     Q.    Question No. 3 on here is "Is there

5  bias against Asians in college admissions?"

6     A.    Correct.

7     Q.    And that's the part of the report

8  that's referring to the analysis that takes

9  place on Pages 30 through 39, correct?

10     A.    I do believe that Question 3 on Page

11  3 is the same work that is later referenced

12  as evaluating factors that play a role in

13  Harvard College admission.

14     Q.    You agree that it's referring to

15  Pages 30 to 39 of this document?

16              MS. ELLSWORTH:   Objection.

17     A.    I would say referring to 30 to 36.

18  BY MR. STRAWBRIDGE:

19     Q.    Fair to -- go ahead.

20     A.    (Witness reviews document.)

21          And 38 -- 38 also references, I

22  think, that.

23     Q.    Do you remember reviewing this

24  document when it was sent around by

25  Miss Bever?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 191

Erin E. Driver-Linn

1

2    Q.   So you -- so Harvard's testimony,

3    through you as their 30(b)(6) witness, is

4    that you do not know what type of report --

5    which version of this report was shared

6    with Dean Fitzsimmons?

7                MS. ELLSWORTH:  Objection.

8    A.   It's my best understanding from

9    reading the materials that there was a

10   meeting and there was a version of this

11   work, but I don't know what version.

12   BY MR. STRAWBRIDGE:

13   Q.   Do you have any basis to believe

14   that the version that was presented at the

15   meeting with Dean Fitzsimmons is different

16   than this one?

17                MS. ELLSWORTH:  Objection.

18                Which exhibit are you referring to

19   when you say "this one"?

20                MR. STRAWBRIDGE:  Exhibit 8.

21   A.   (Witness reviews document.)

22                I don't have any reason to -- I

23   don't know.

24   BY MR. STRAWBRIDGE:

25   Q.   What do you remember about the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 192

1                Erin E. Driver-Linn

2  meeting with Dean Fitzsimmons on

3  February 25th?

4                MS. ELLSWORTH:  Objection.

5     A.   In preparation for today and looking

6  at these documents and trying to think back

7  and jog my memory, I have a vague memory of

8  my reactions to Dean Fitzsimmons seeing

9  this work.

10  BY MR. STRAWBRIDGE:

11     Q.   What were your reactions to him

12  seeing this work?

13     A.   I remembered wondering to myself if

14  the team had gone too far.

15     Q.   And why do you think that?

16     A.   Why do I recall that?  Why do I

17  think that?  What --

18     Q.   Why did you have a reaction thinking

19  the team had gone too far?

20                MS. ELLSWORTH:  Objection.

21     A.   Reconstructing my memory now, my

22  best understanding of that vague sense was

23  that I had enormous respect for Dean

24  Fitzsimmons and the -- to try to quantify

25  what's a very complicated set of things, I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 193

1                    Erin E. Driver-Linn

2    felt like it might have gone too far.

3    BY MR. STRAWBRIDGE:

4        Q.    And what do you mean by "gone too

5    far"?

6        A.    Being reductive, trying to take

7    complex things and reduce them to overly

8    simplistic.

9        Q.    Did you decide -- well, strike that.

10            Why did you have this reaction?

11                MS. ELLSWORTH:   Objection.

12       A.    I don't know.   It's a vague memory.

13   BY MR. STRAWBRIDGE:

14       Q.    Do you remember Dean Fitzsimmons

15   saying something in particular about

16   Pages 30 through 39 of this report?

17       A.    I don't.

18       Q.    Do you remember feeling like the

19   suggestion that Asian -- that the

20   admissions process disadvantages

21   Asian-Americans was troubling to him?

22                MS. ELLSWORTH:   Objection.

23       A.    Could you repeat the question?

24   BY MR. STRAWBRIDGE:

25       Q.    Do you remember whether he had a

Page 194

1                    Erin E. Driver-Linn

2    reaction that suggested that Pages 30 to 39

3    of this report presented information that

4    was troubling to him?

5                    MS. ELLSWORTH:  Objection.

6        A.   I do not.

7    BY MR. STRAWBRIDGE:

8        Q.   Do you remember him disagreeing with

9    the analysis that appears on Pages 30 to

10   39?

11                   MS. ELLSWORTH:  Objection.

12       A.   I do not.

13   BY MR. STRAWBRIDGE:

14       Q.   Do you remember him saying, we

15   should look into this further?

16       A.   I do not.

17       Q.   Or anything like that at all?

18                   MS. ELLSWORTH:  Objection.

19       A.   I do not.

20   BY MR. STRAWBRIDGE:

21       Q.   Do you remember him having any

22   visible reaction to the information that

23   appears on Pages 30 to 39 of this version

24   of the report?

25                   MS. ELLSWORTH:  Objection.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          Erin E. Driver-Linn

2     A.   My vague memory is only that he was

3   more thoughtful.

4   BY MR. STRAWBRIDGE:

5     Q.   What does that mean?

6     A.   Pausing and reflecting.

7     Q.   And that's --

8     A.   Not verbally.

9          My vague memory is of a pause and

10   then my thinking to myself, has the team

11   gone too far, have I gone too far, has the

12   team gone too far.

13     Q.   Do you think you were presenting

14   information that Dean Fitzsimmons didn't

15   want to know?

16               MS. ELLSWORTH:  Objection.

17     A.   That is not my sense.

18   BY MR. STRAWBRIDGE:

19     Q.   Then why did you think you had gone

20   too far?

21     A.   Reducing what's a very complicated

22   thing into, you know, a quant model.

23     Q.   Isn't that what the office of

24   institutional research does?

25               MS. ELLSWORTH:  Objection.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 196

                    Erin E. Driver-Linn

1

2    A.   It's not how I would characterize

3  what the office of institutional research

4  does.

5         I am referencing, again, my earlier

6  point about exploratory, preliminary,

7  limited.

8         I believe all complicated analyses

9  are iterative, exploratory, preliminary,

10 and limited.

11 BY MR. STRAWBRIDGE:

12   Q.   Did you have that concern about your

13 analysis of the results of the

14 reintroduction of early action that was

15 presented as part of the same report?

16   A.   I don't know.

17   Q.   Did you feel like that part was too

18 reductive and you had overly simplified a

19 complicated process?

20            MS. ELLSWORTH:  Objection.

21   A.   I just want to clarify that I don't

22 have specific memories of what I thought

23 then.  This is a vague -- a vague memory.

24         I don't remember having a memory

25 related to the return of the early action

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 198

1                    Erin E. Driver-Linn
2    page -- well, strike that -- with respect
3    to the charts that appear on Page 40
4    through 41 of this report?
5        A.    Not that I recall.
6        Q.    In your vague and hazy recollection
7    of your internal dialogue, are you sure
8    that you had that feeling with respect to
9    Pages 30 through 39 and that analysis and
10   not other parts of this report?
11                   MS. ELLSWORTH:  Objection.
12       A.    No.
13   BY MR. STRAWBRIDGE:
14       Q.    So it's possible that you didn't
15   have that reaction with respect to the
16   analysis of bias against Asian-Americans in
17   the admissions process?
18                   MS. ELLSWORTH:  Objection.
19       A.    That's not how I would characterize
20   the modeling work --
21   BY MR. STRAWBRIDGE:
22       Q.    You agree that that's how it's
23   characterized on --
24                   MS. ELLSWORTH:  Can you let
25   the witness finish her answer, please.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 219

1                    Erin E. Driver-Linn

2      A.    I think I was aware at that time

3   that further work was being done.

4   BY MR. STRAWBRIDGE:

5      Q.    Do you know whether that included

6   further work on modeling the factors that

7   influence admissions decisions at

8   Harvard?

9                    MS. ELLSWORTH:   Objection.

10     A.    I can't recall.

11  BY MR. STRAWBRIDGE:

12     Q.    And do you remember any discussion

13  at all following the February 25th meeting

14  about what the next steps should be with

15  respect to the work that had gone into

16  Pages 30 to 39 of that presentation?

17                    MS. ELLSWORTH:   Objection.

18     A.    The question -- the question was,

19  can I recall any discussion of next steps?

20  BY MR. STRAWBRIDGE:

21     Q.    Right.

22     A.    No, I can't recall.

23     Q.    Do you know if there was discussion

24  as to whether that information should be

25  presented to Michael Smith, for example?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 220

1                     Erin E. Driver-Linn

2        A.    Not that I recall.

3        Q.    Do you recall if there was any

4    discussion about whether it should be

5    presented to Dean Hammonds?

6        A.    Not that I recall.

7        Q.    Can you say whether or not there was

8    any discussion about further work to

9    analyze the extent to which Asian-Americans

10   were affected by Harvard's admissions

11   process?

12                    MS. ELLSWORTH:   Objection.

13            I'll remind the witness not to

14   disclose any actions taken at the direction

15   of counsel or communications with counsel.

16            You may otherwise answer the

17   question.

18       A.    Can you repeat the question?

19   BY MR. STRAWBRIDGE:

20       Q.    Do you remember, following that

21   February 25th meeting, any discussion about

22   further steps to be taken in analyzing

23   whether Asian-Americans were disadvantaged

24   by Harvard's admissions process?

25       A.    I can't answer that question.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 221

1                    Erin E. Driver-Linn

2    BY MR. STRAWBRIDGE:

3        Q.   Can you answer -- is that because

4    your answer requires you to reveal

5    communications with counsel?

6        A.   Yes.

7        Q.   Did you have any such discussions

8    that did not include communications with

9    counsel?

10       A.   Not that I recall.

11       Q.   When are the discussions you're

12   thinking of?  When did they take place?

13                    MS. ELLSWORTH:  Objection.

14   It's a when question.  You can answer it as

15   a when.

16       A.   I believe prior to October 2013 and

17   then much later.

18   BY MR. STRAWBRIDGE:

19       Q.   Did -- he when you say "much later,"

20   what do you mean?

21       A.   Maybe in 2015.

22       Q.   After this lawsuit was filed?

23                    MS. ELLSWORTH:  Objection.

24   Answer if you know.

25       A.   I believe so.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 234

1          Erin E. Driver-Linn

2    that memo before -- as it was being

3    created?

4         A.   I don't have a specific memory of

5    reviewing drafts, but I believe, in

6    preparation for today, that I did review...

7         Q.   Was there any guidance in the office

8    as to who should take responsibility for

9    admissions issues among the OIR team?

10              MS. ELLSWORTH:   Objection.

11        A.   What do you mean by "guidance"?

12   BY MR. STRAWBRIDGE:

13        Q.   Is there any reason why this -- both

14   the February analysis and the May analysis

15   was done by Mr. Hansen and     Miss Bever

16   as opposed to other people in the office?

17        A.   In general, there's efficiency in

18   having people work in the same area,

19   because it's -- it takes a while to learn

20   the data, it takes a while to understand

21   what's going on.

22        Q.   And so, in your experience around

23   2013, 2014, was admissions analysis the

24   responsibility of Miss Bever and

25   Mr. Hansen?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 235

1                    Erin E. Driver-Linn

2                    MS. ELLSWORTH:  Objection.

3       A.   I wouldn't characterize it as the

4    responsibility of.

5    BY MR. STRAWBRIDGE:

6       Q.   Do you recall anybody else working

7    on admissions analysis in the OIR office at

8    that time?

9       A.   I don't recall.  I know in

10   preparation for today that someone

11   mentioned Alisa Lu may be being involved.

12            I think I'm remembering that

13   correctly.

14       Q.   And who is Miss Lu?

15       A.   She was a member of the OIR team.

16       Q.   And do you know who she reported to?

17       A.   I think she reported to Erica.

18       Q.   Do you know what she did, what

19   you're recalling?

20                    MS. ELLSWORTH:  Objection.

21       A.   I don't.

22   BY MR. STRAWBRIDGE:

23       Q.   I'm handing you a document that's

24   been labeled as Exhibit 13.

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 375

1       Erin E. Driver-Linn

2            CERTIFICATION

3        I, DARLENE M. COPPOLA, a Notary Public, do hereby

4    certify that ERIN E. DRIVER-LINN, after having

5    satisfactorily identifying herself, came before me on

6    the 27th day of July, 2017, in Boston, Massachusetts,

7    and was by me duly sworn to testify to the truth and

8    nothing but the truth as to her knowledge touching and

9    concerning the matters in controversy in this cause;

10   that she was thereupon examined upon her oath and said

11   examination reduced to writing by me; and that the

12   statement is a true record of the testimony given by

13   the witness, to the best of my knowledge and ability.

14        I further certify that I am not a relative or

15   employee of counsel/attorney for any of the parties,

16   nor a relative or employee of such parties, nor am I

17   financially interested in the outcome of the action.

18        WITNESS MY HAND THIS 9th day of August, 2017.

19

20

21   _____

22   DARLENE M. COPPOLA              My commission expires:

23   NOTARY PUBLIC              November 11, 2022

24   REGISTERED MERIT REPORTER

25   CERTIFIED REALTIME REPORTER