# EXHIBIT 124

Page 1

1

2    HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY

3       IN THE UNITED STATES DISTRICT COURT

4        FOR THE DISTRICT OF MASSACHUSETTS

5       Civil Action No:  1:14-cv-14176-ADB

     --------------------------X

6

     STUDENTS FOR FAIR ADMISSIONS,

7    INC.,

8                      Plaintiff,

9          v.

10   PRESIDENT AND FELLOWS OF

     HARVARD COLLEGE

11   (HARVARD CORPORATION),

12                     Defendant.

13   ---------------------------X

14           VIDEOTAPED DEPOSITION OF

15             DAVID CARD, Ph.D.

16             Washington, DC

17             April 27, 2018

18               9:07 AM

19

20

21   Reported by:

22   Karen Brynteson, RMR, CRR, FAPR

23   Job No. 139809

24

25

Highly Confidential Attorneys' Eyes Only

Page 45

                    D. Card

1    particular rating as your basis for

2    excluding it from the model?

3    A.    Yes.

4    Q.    Did you do anything else to

5    determine whether there were any other

6    variables in the admissions process

7    that -- in which race played a role and,

8    thus, should be excluded from your model?

9    A.    I don't understand the

10   question.

11   Q.    Did you see any other

12   deposition testimony that suggested

13   anything else should be excluded from

14   your model because race was considered as

15   part of assigning a particular rating or

16   other variable?

17   A.    I'm aware of the fact that in

18   the deposition testimony you and your

19   colleagues asked a number of admissions

20   officers and the Dean directly on some of

21   the other components of the ratings

22   system.

23   Q.    And if anyone had -- had

24   answered that -- that race influenced

Highly Confidential Attorneys' Eyes Only

D. Card

1

2  those other components, you would have

3  considered it appropriate to exclude them

4  from the model?

5          MS. ELLSWORTH:  Object to the

6      form.

7          THE WITNESS:  Well, Dean

8      Fitzsimmons stated very clearly

9      that race was used in part to

10     determine the overall rating, but

11     that that was not the case with the

12     other pro -- profile ratings.

13          And several other of the

14     admissions officers concurred with

15     that very strongly on direct

16     question.

17 BY MR. STRAWBRIDGE:

18     Q.   And you believed them?

19          MS. ELLSWORTH:  Object to the

20     form.

21          THE WITNESS:  I had no reason

22     not to believe them.

23 BY MR. STRAWBRIDGE:

24     Q.   You didn't see any other

25 evidence that made you think that you

Highly Confidential Attorneys' Eyes Only

```
 1                    D. Card
 2    should exclude any other variables based
 3    on the potential that race was affecting
 4    them?
 5        A.    I -- when I was finishing my
 6    -- in the process of trying to finish my
 7    rebuttal report, it was very clear that
 8    there were a number of disagreements
 9    between Professor Arcidiacono and me on a
10    couple of issues.
11              And so I -- I was able to ask
12    Dean Fitzsimmons directly in a telephone
13    conversation if race was involved in the
14    personal rating, for example, and he said
15    no.
16        Q.    Did you do anything to verify
17    his testimony?
18              MS. ELLSWORTH:  Object to the
19        form.
20              THE WITNESS:  No.
21    BY MR. STRAWBRIDGE:
22        Q.    You're familiar with what it
23    means to interact a variable in the
24    multivariate logit model?
25        A.    In general terms, yes.
```

Highly Confidential Attorneys' Eyes Only

1                    D. Card

2       Q.    And from that baseline, you

3   then do a number of simulations that

4   analyze the effect of various

5   race-neutral alternatives, correct?

6       A.    Correct.  I do the kind of

7   simulations that have been done in the

8   literature before and that Professor

9   Arcidiacono performs for Mr. Kahlenberg

10  as well, yeah.

11      Q.    And, in fact, your method

12  closely follows that used by Mr.

13  Kahlenberg, assisted by Professor

14  Arcidiacono.  Right?

15      A.    Right, but this is a method

16  that is pretty standard in the literature

17  and was used by several of the other

18  papers in the area.

19      Q.    There were two key

20  differences, I think, between your

21  approach with -- between your approach

22  and those of Mr. Kahlenberg's, at least

23  in your initial report?

24           MS. ELLSWORTH:  Object to the

25      form.

Highly Confidential Attorneys' Eyes Only

1                   D. Card

2          THE WITNESS:  There were a

3       number of differences, yeah.

4   BY MR. STRAWBRIDGE:

5          Q.    Let me ask you this:  Was one

6   of the big differences the broader

7   measure of socioeconomic disadvantage

8   that you deployed?

9          A.    Yes.

10         Q.    Another difference between the

11  two of you is, at least in one of his

12  simulations, Mr. Kahlenberg kept a

13  preference for athletes, correct?

14         A.    Right.

15         Q.    Other than those two

16  differences, do you remember any other

17  differences in how you went about

18  generating your race-neutral simulations?

19         A.    Yes.  I'm -- I'm using my

20  model and Mr. Kahlenberg is -- is

21  basically using Arcidiacono's model.

22         Q.    Right.

23         A.    Well, actually not

24  Arcidiacono's model, as I recall, because

25  Arcidiacono's model was fed pooling

Highly Confidential Attorneys' Eyes Only

Page 101

                    D. Card

1   across multiple years.  And I think for

2   this simulation he refit his model just

3   on the last year, more in the way that I

4   would normally do.

5            So I believe for this analysis

6   he actually fit a separate model for

7   2019.

8        Q.   Because we had to generate a

9   class in this case for a specific year's

10  example?

11           MS. ELLSWORTH:  Object to the

12           form.

13           THE WITNESS:  Yes, and there's

14           a problem with his modeling

15           strategy of not fitting a model

16           year-to-year, which is it doesn't

17           work very well for fitting one

18           particular class.

19           And so the advantage of my

20           class of always fitting a model

21           year-by-year, you don't have to do

22           that whereas he had to reestimate

23           his model, so that's a difference.

24  BY MR. STRAWBRIDGE:

Highly Confidential Attorneys' Eyes Only

Page 146

1                    D. Card

2    your rebuttal report, go to paragraph

3    192.  I just have to find mine.

4         A.    Right.

5         Q.    Looking at paragraph 192 of

6    your rebuttal report.

7         A.    Yes.

8         Q.    You agree that simulations 6

9    and 7 are based upon your models?

10        A.    Yes.

11        Q.    The one adjustment that he

12   makes is -- well, he makes a few

13   adjustments.  He keeps the athletic

14   preference in both models, correct?

15        A.    Yes.

16        Q.    So that means putting them

17   back in, compared to your model, which

18   excluded them, right?

19        A.    Yes.

20        Q.    In number 6 he eliminates the

21   advantage associated with early action?

22             MS. ELLSWORTH:  Object to the

23        form.

24             THE WITNESS:  I believe that's

25        correct, yeah.

Page 147

1                    D. Card

2       BY MR. STRAWBRIDGE:

3            Q.    And, again, I'm just staying

4       in paragraph 192.

5            A.    He eliminates the preferences,

6       yeah, and he changes the -- the four SES

7       characteristics slightly.

8            Q.    Right.  And you determined

9       that these simulations, you know, as he

10      -- as he -- as he makes those

11      adjustments, are insufficient because the

12      race-neutral alternative "produces a

13      class that is different from the current

14      class in the dimensions I understand

15      Harvard cares about."

16              That's in paragraph 195,

17      correct?

18           A.    Yes, that's what I say, yes.

19           Q.    All right.  So looking at the

20      Exhibit 26 in your report.

21           A.    Okay.

22           Q.    Which differences in your view

23      render this as insufficient because it

24      produces a class that is different from

25      the current class in dimensions that you

Page 152

1              D. Card

2        Q.    It's 26 percent compared to

3    the 30 percent drop that you termed as

4    dramatic, correct?

5        A.    Right.

6        Q.    But, again, do you -- do you

7    have a -- do you have any understanding

8    of what difference would be acceptable to

9    Harvard, even if it were a decline in any

10   of these racial categories?

11            MS. ELLSWORTH:  Object to the

12       form.

13            THE WITNESS:  No.

14   BY MR. STRAWBRIDGE:

15       Q.    And you don't have a personal

16   understanding as to what you think is an

17   acceptable or not acceptable decline for

18   purposes of a race-neutral alternative?

19            MS. ELLSWORTH:  Object to the

20       form.

21            THE WITNESS:  No.

22   BY MR. STRAWBRIDGE:

23       Q.    Did the committee tell you

24   that an African American class that

25   represents 10 percent of the admitted

Highly Confidential Attorneys' Eyes Only

Page 153

1                    D. Card

2    pool is insufficient to meet its goals of

3    obtaining the educational benefits of

4    racial diversity?

5              MS. ELLSWORTH:  Object to the

6         form of the question.

7              THE WITNESS:  The committee --

8         the only information I received

9         from the committee was, I believe,

10        via counsel, which was a request

11        for more information on the

12        characteristics of the class under

13        alternative scenarios.

14   BY MR. STRAWBRIDGE:

15        Q.    And what information in

16   particular do you recall getting that

17   request about?

18        A.    About the fractions with the

19   profile ratings of 1 or 2, and I believe

20   concentration, in particular, but I can't

21   -- those ones stick in my mind.  I don't

22   remember whether they also asked about

23   geography at some point.

24        Q.    I should probably just

25   clarify.  This is my fault.  I was

Highly Confidential Attorneys' Eyes Only

Page 216

D. Card

1

2       A.    Yes.

3       Q.    And that is, in fact, what

4  this exhibit suggests, correct?

5       A.    Yes.

6       Q.    Okay.  Did you ever construct

7  a model of the personal rating in either

8  of your reports?

9       A.    No.

10      Q.    You referred several times to

11  Professor Arcidiacono's model, but you

12  did not do your own model of personal

13  rating, correct?

14      A.    Correct.

15      Q.    And is that because you felt

16  that there was not enough observables in

17  the data to estimate a reliable model of

18  the personal rating?

19      A.    I personally felt like we

20  could use the personal rating and the

21  academic rating and the extracurricular

22  rating as ratings.  We could include the

23  other variables, some of the other

24  variables that go into the determination

25  of those ratings, and that it would be

Highly Confidential Attorneys' Eyes Only

1              D. Card

2   preferable to do that than -- but -- so I

3   don't -- my -- I also believe that

4   Professor Arcidiacono's model of personal

5   rating has significant weaknesses.

6        Q.    And is -- and is one of those

7   weaknesses the -- the presumed role that

8   unobservables would play if they could be

9   incorporated into the data and the model?

10             MS. ELLSWORTH:  Object to the

11         form.

12             THE WITNESS:  Yes.  His -- his

13         model is relatively sparse.  It

14         doesn't include, in fact, some of

15         the variables that I would argue

16         should be included in the overall

17         admissions model.

18             And it also has a relatively

19         low explanatory power.

20   BY MR. STRAWBRIDGE:

21        Q.    When you say "relatively low,"

22   what do you mean?

23        A.    Well, there's a standard

24   measure of explanatory power, a pseudo

25   R-squared statistic.

Highly Confidential Attorneys' Eyes Only

Page 270

D. Card

1    is a standard problem in any kind of

2    statistical analysis that there is

3    unobservable components.  And one of the

4    reasons why statistical analysis of this

5    kind, an observational statistical

6    analysis can't prove a causality or

7    prove, definitively prove discrimination,

8    for example, is that we don't really know

9    what's the unobservable components that

10   are driving things.

11       Q.    Well, you cite some of them in

12   your report, correct?

13       A.    I cite some of the potential

14   factors, yes, but I don't -- I don't

15   think I would claim that -- well, I know

16   I would not claim that that's a

17   definitive list.

18       Q.    Right.  But -- but, for

19   example, you cite the personal essay as a

20   missing data in this analysis, right?

21       MS. ELLSWORTH:  Object to the

22       form.

23       THE WITNESS:  I give that as

24       an example of an input that I

Page 271

```
 1                    D. Card
 2        believe would be important in
 3        assigning the personal rating that
 4        is missing from Professor
 5        Arcidiacono's personal rating model
 6        and is also missing from our --
 7        from the database entirely.
 8             So there is not much we can do
 9        about that.
10   BY MR. STRAWBRIDGE:
11        Q.    And is it your assumption that
12     if we had that information, it would
13     close the gap in the personal rating
14     between Asians and whites?
15             MS. ELLSWORTH:  Object to the
16        form.
17             THE WITNESS:  I don't have
18        direct evidence on that.  What I do
19        know is that the personal rating
20        assigned to whites is higher than
21        the personal rating assigned to
22        Asians, conditional on the observed
23        factors.  And so one of the
24        conjectures would be that that
25        might be part of the story.
```

Highly Confidential Attorneys' Eyes Only

Page 282

1              D. Card

2   incentives of Harvard.

3           And I disagree with that type

4   of analysis -- that type of conclusion on

5   the basis of statistical evidence.

6           MR. STRAWBRIDGE:  Can we take

7      a short break?

8           MS. ELLSWORTH:  Okay.

9           THE VIDEO OPERATOR:  The time

10     is 3:13.  We are off the record.

11          (A recess was taken at

12   3:12ï¿½p.m., after which the deposition        39

13   resumed at 3:28 p.m.)

14          THE VIDEO OPERATOR:  The time

15     is 3:28.  We are back on the

16     record.

17   BY MR. STRAWBRIDGE:

18     Q.   Do you think that Asian

19   Americans on average have less attractive

20   personal qualities than white applicants

21   in Harvard's application pool?

22          MS. ELLSWORTH:  Objection.

23     Are you asking for a personal

24     opinion?

25          MR. STRAWBRIDGE:  No.

Highly Confidential Attorneys' Eyes Only

Page 283

1                    D. Card

2              THE WITNESS:  I have no way of

3         knowing that.

4     BY MR. STRAWBRIDGE:

5         Q.    Can you think of -- do you

6     have any reason to believe that Asian

7     Americans are not as effervescent as

8     whites in Harvard's applicant pool?

9              MS. ELLSWORTH:  Objection.

10             THE WITNESS:  I have no way of

11        knowing that.

12    BY MR. STRAWBRIDGE:

13        Q.    So it could be true?

14             MS. ELLSWORTH:  Objection.

15             THE WITNESS:  May or may not

16        be true.

17    BY MR. STRAWBRIDGE:

18        Q.    It is one possible explanation

19    for the difference in their personal

20    ratings?

21             MS. ELLSWORTH:  Object to the

22        form.

23             THE WITNESS:  Well, if -- if

24        effervescence was, indeed, a

25        significant determinative personal

Page 284

                    D. Card

1            rating conditional on the other

2            factors then -- and you could

3            measure effervescence and you found

4            that, I guess I would -- then I

5            would say, well, you found that and

6            I would agree with it, but no one

7            has done that exercise so I don't

8            really know what to say.

9    BY MR. STRAWBRIDGE:

10       Q.    Well, someone's assigned

11   personal ratings to all of the

12   applicants?

13       A.    They are, yes.

14       Q.    Right.  So I am just asking,

15   do you -- do you think that an

16   explanation for the gap in the personal

17   ratings between Asian Americans and white

18   applicants is a lack of effervescence in

19   the Asian American pool?

20            MS. ELLSWORTH:  Object to the

21            form.

22            THE WITNESS:  I think the --

23            my understanding is that the

24            readers look for something they

Page 285

1              D. Card

2          call personal qualities.  And I

3          don't exactly know what those are,

4          but they -- they talk about that in

5          some of the materials I've seen.

6              And so I think that what I

7          would probably believe to be true

8          is that they see slightly fewer

9          personal qualities conditional on

10         academic qualities.  Again, this is

11         all conditional on academic

12         qualities.

13    BY MR. STRAWBRIDGE:

14         Q.   And why do you think that's

15    the case?

16         A.   I don't know exactly.

17         Q.   Well, you can't rule out the

18    fact that it is racial bias.  What other

19    explanation could there be for why the

20    white applicants in Harvard's pool

21    receive higher personal ratings than the

22    Asian American applicants?

23             MS. ELLSWORTH:  Objection.

24             THE WITNESS:  I don't really

25         -- I haven't really given that any

Highly Confidential Attorneys' Eyes Only

1           D. Card

2      thought directly.

3 BY MR. STRAWBRIDGE:

4      Q.    Isn't that the entire question

5 that we need to answer when we decide

6 whether the personal ratings should be

7 included in the model?

8           MS. ELLSWORTH:  Object to the

9      form.

10           THE WITNESS:  No, not at all,

11      because we see a difference between

12      Asian applicants and white

13      applicants in their extracurricular

14      rating and their academic rating,

15      statistically significant positive

16      gap.

17           I don't think that -- and, in

18      fact, I would never conclude that

19      that means that there is positive

20      racial bias in favor of Asian

21      applicants.  So the presence of a

22      significant coefficient doesn't say

23      that there is a racial animus

24      against whites in the assignment of

25      academic credentials.

Highly Confidential Attorneys' Eyes Only

Page 287

1                    D. Card

2       BY MR. STRAWBRIDGE:

3            Q.    But there are other ways to

4       check that, right?  We can look at

5       academic index, right?

6            A.    Well, this is from Professor

7       Arcidiacono's model, which controls for,

8       among other things, academic index

9       variables and all the components of that.

10      So even conditional on all those things,

11      what his model shows is that Asian

12      Americans receive a statistically higher

13      academic rating.

14                 And I conclude, and he

15      concludes, he agrees with me, that that's

16      the most likely explanation for that is

17      unobserved characteristics of the

18      candidate.  And I don't have an

19      explanation for what those are either.

20                 But I'm -- as is very standard

21      in the, you know, statistical analysis

22      and attempts to make inferences from

23      observational data of this type, I don't

24      really think that I can speculate exactly

25      what the differences are.

Highly Confidential Attorneys' Eyes Only

                      D. Card

1          Q.    Do you think that -- well, did

2     you review the depositions in this case?

3          A.    I reviewed the ones that are

4     described in the -- in my appendix.

5          Q.    Did you see any testimony from

6     any Harvard admissions officer that the

7     Asian Americans were lacking in the

8     personal qualities that they evaluated in

9     assigning a personal rating as a group?

10              MS. ELLSWORTH:  Object to the

11              form.

12              THE WITNESS:  I didn't

13              specifically look at that, but I'm

14              not aware of that one way or the

15              other.

16    BY MR. STRAWBRIDGE:

17         Q.    You'd assume that to be true,

18    right?

19         A.    No, not necessarily because my

20    interpretation of the -- of that would be

21    are they different conditional on -- so

22    there is two questions you could ask.

23              More or less the kind of

24    questions we were discussing before the

Highly Confidential Attorneys' Eyes Only

1            D. Card

2   break, one question would be:  Do Asian

3   Americans as a whole have higher or lower

4   or the same personal qualities as, say,

5   white Americans?

6            But that's not really what's

7   relevant for my statistical model.  And I

8   -- my interpretation of how someone might

9   answer that would be they might be

10  thinking, well, as a whole, they are the

11  same, but when I'm assigning the personal

12  rating, what's relevant is I have got

13  some of these characteristics that I can

14  see, and some that I can't.  There is a

15  deficit on some of the ones that I can't

16  see.

17           So that could contribute to a

18  negative coefficient for Asians in that

19  assignment, just as there must be some or

20  there -- my interpretation is there must

21  be some unobserved characteristics of the

22  academic credentials of Asian Americans,

23  conditional on this broad set of other

24  academic qualities that we can observe in

25  the data and that Professor Arcidiacono

Highly Confidential Attorneys' Eyes Only

Page 290

1                       D. Card

2    puts into his model that leads the --

3    leads the admissions people to give them

4    a higher assignment.

5    BY MR. STRAWBRIDGE:

6         Q.    So you would not accept the

7    testimony from Harvard's admissions

8    officers that they don't see any

9    difference between the Asian American

10   applicants with respect to their personal

11   qualities and the white applicants?

12             MS. ELLSWORTH:  Objection.

13             THE WITNESS:  I would have to

14        see how the question was asked, and

15        I would have to think about

16        whether, if they are asking that

17        about the overall characteristics,

18        not conditional on their other

19        characteristics that are, say,

20        included in these models, I would

21        have to think about that.

22             Because I think several of

23        these documents are really focusing

24        on the difference between the

25        unconditional, in other words, the

Highly Confidential Attorneys' Eyes Only

Page 309

1                           D. Card

2               Nevertheless, there is a

3           significant positive, so there must

4           be, according to Professor

5           Arcidiacono's argument, there must

6           be unobserved factors there.

7    BY MR. STRAWBRIDGE:

8           Q.    But I asked you about the

9    personal characteristics.  What do you

10   think they are in the personal

11   characteristics, not the academics, the

12   personal?

13                MS. ELLSWORTH:  Object to the

14           form.  I believe he already --

15                THE WITNESS:  I have no idea.

16           I believe I have stated that

17           clearly.

18   BY MR. STRAWBRIDGE:

19           Q.    Inclusion of parental

20   occupation is important to your model?

21           A.    I believe it should be

22   included in the analysis of admissions,

23   yes.

24           Q.    How many variables did you --

25   did that add to your model?

Highly Confidential Attorneys' Eyes Only

Page 310

D. Card

1

2     A.    Let me look at my -- the

3     appendix -- you don't have tabs on

4     appendices here, so I am having a little

5     bit of trouble finding the right tabs.

6     Q.    If I told you it was 46, does

7     that number sound more or less correct?

8     A.    46 per year?

9     Q.    46 parental occupations.

10    A.    It seems to show in my

11    Exhibit 28 of my -- of my rebuttal report

12    that there is 28 categories -- 23

13    categories, excuse me.

14    Q.    23 categories for fathers,

15    right?

16    A.    Yes.

17    Q.    And 23 categories for mothers?

18    A.    Yes.

19    Q.    So that's 46, right?

20    A.    Correct.  And then there is

21    one omitted for each.

22    Q.    So 47?

23    A.    44.

24    Q.    48?

25    A.    44.

Highly Confidential Attorneys' Eyes Only

Page 311

                    D. Card

1

2       Q.    44, I'm sorry.  Thank you.

3    It's a long day.

4           When you use the occupations

5    in your model, are they the same

6    occupations that are listed on Harvard's

7    summary sheets?

8       A.    Not necessarily, to the best

9    of my knowledge.

10      Q.    In fact, did you have to use a

11   code to translate the parental

12   occupations into different categories?

13          MS. ELLSWORTH:  Object to the

14      form.

15          THE WITNESS:  As I explain, I

16      think fairly clearly in Appendix B

17      of my rebuttal report, there's a

18      procedure that I developed to

19      classify the different categories

20      that are used in the -- first of

21      all, there is two occupation

22      categories that are used, and one

23      of those is more prevalent in one

24      year; then the other one is more

25      prevalent in later years, but small

Page 312

1                       D. Card

2          fractions of the data in later

3          years continue to be coded in the

4          -- in the first method, as far as I

5          can tell.

6               So I make a table or an

7          algorithm to construct them all

8          into a coherent set of categories.

9   BY MR. STRAWBRIDGE:

10         Q.    Did you use -- and that

11   algorithm involves more than 100 lines of

12   code that you had to write?

13         A.    That the staff at Cornerstone

14   wrote under my direction, yeah.

15         Q.    And you agree that at least on

16   one occasion, the code in your data does

17   not actually match what the summary

18   sheets that were produced by Harvard?

19               MS. ELLSWORTH:  Object to the

20          form.

21               THE WITNESS:  My understanding

22          is that that's true, yes.

23   BY MR. STRAWBRIDGE:

24         Q.    Led you to in at least in one

25   instance to report unskilled laborer as a

Highly Confidential Attorneys' Eyes Only

Page 313

1                    D. Card

2    skilled tradesperson?

3         A.    It led me to put them in the

4    same bucket in the classification system,

5    but, as I say in this appendix,

6    recategorizing labor into that group into

7    the low skilled mix, essentially no

8    difference to any of my conclusions.

9         Q.    Well, that's assuming that

10   they are all -- that they are all -- that

11   all the data is correct, right?

12        A.    Well, this is -- first of all,

13   it is not entirely clear who is filling

14   out the forms for the common application,

15   the universal application.  Oftentimes,

16   in fact, if you look on the -- on the

17   Internet, there is questions about how to

18   fill out the common application form.

19             So I am not necessarily

20   claiming, and nor is it necessary for my

21   analysis, that occupations are reported

22   exactly the way that some expert in

23   occupation coding would assign them on an

24   individual basis, but even with an expert

25   assigning occupation codes, there are

Page 314

D. Card

1    known to be some slippage in assignment

2    of complicated variable like occupation.

3         Some people fit into

4    occupations which are between the lines.

5    I have done in the course of my career

6    studies of the effect of -- this is a

7    problem that arises in lots of variables

8    measured in economic analyses.  We call

9    it misclassification error.

10         It means that different

11    algorithms, slightly different algorithms

12    or slightly different people who are

13    doing the assignment would reach slightly

14    different conclusions.

15         And my view is based on my

16    professional work in the past, looking at

17    this kind of problem, that that does not

18    in any way invalidate the use of the

19    occupation codes.  In fact, the fact that

20    there may be some slippage in the

21    assignment of the -- of an occupation

22    code, if anything, would give the

23    measured occupation codes that I have a

24    little bit less statistical power and

1                         D. Card

2    prevent them from performing a stronger

3    role as they would in the model, if I had

4    some measures that did not have that

5    misclassification error.

6        Q.    We discussed this earlier, but

7    I just want to make sure I understand.

8    When you were deciding to put the

9    parental occupations in, did you test for

10   statistical significance?

11       A.    I'm not entirely sure of

12   whether, at what stage of the analysis

13   that kind of exercise would have been

14   done, so I can't say for sure.

15       Q.    You don't dispute that some of

16   the parental occupation categories vary

17   substantially from year to year?

18           MS. ELLSWORTH:  Object to the

19           form.

20           THE WITNESS:  I don't dispute

21           that, for example, the category

22           unemployed disappears in some

23           years, and so one of the reasons --

24           or is much less frequent in some

25           years.

Highly Confidential Attorneys' Eyes Only

Page 316

1              D. Card

2          And so one of the reasons why

3      I fit a model, a year-by-year model

4      is to allow the coefficients

5      assigned to the occupation

6      variables to change from year to

7      year, just like many of the other

8      characteristics change from year to

9      year in the mean or prevalence in

10     the sample.

11         For example, the disadvantaged

12     flag variable, which is assigned by

13     Harvard readers, and would seem to

14     be not subject to some of these

15     same issues, nevertheless, the

16     fraction of students that have that

17     code changes substantially between

18     2018 and 2019.

19  BY MR. STRAWBRIDGE:

20     Q.    And do you understand why that

21  is?

22     A.    No.

23     Q.    Did you read Sally Donohue's

24  deposition?

25     A.    No.

Highly Confidential Attorneys' Eyes Only

Page 317

1                        D. Card

2        Q.    And do you know whether or not

3     there is any testimony that gave a

4     specific reason as to why the

5     disadvantaged flight changed on that

6     level in 2019?

7                MS. ELLSWORTH:  Object to the

8           form.

9                THE WITNESS:  No.

10    BY MR. STRAWBRIDGE:

11       Q.    Do you have any explanation as

12    to why there would be no unemployed

13    people in the Harvard data pool for some

14    of the years?

15               MS. ELLSWORTH:  Object to the

16          form.

17               THE WITNESS:  My guess is

18          because the questions that were

19          employed in the common application

20          and universal application did not

21          collect it in that way.  That

22          category wasn't available.

23    BY MR. STRAWBRIDGE:

24       Q.    You don't think that, like,

25    the number of unemployed people

Highly Confidential Attorneys' Eyes Only

1                    D. Card

2    oscillated that way?

3        A.    I don't think it does, but as

4    I said, because I am putting a

5    year-by-year model, I don't think it

6    matters at all.

7        Q.    Did you ask any of these

8    questions of Dean Fitzsimmons when you

9    had your conversation with him?

10            MS. ELLSWORTH:  Object to the

11        form.

12            THE WITNESS:  As I recall, I

13        asked him if the committee uses

14        parental occupation information in

15        making their assessment.  And we

16        talked over, because he is a

17        sociologist and knew quite well

18        some of the underlying literature

19        on -- on occupation and the

20        importance of occupation in the

21        sociology literature, so we had a

22        bit of a talk about that.

23    BY MR. STRAWBRIDGE:

24        Q.    And what -- and what did he

25    specifically tell you?

Highly Confidential Attorneys' Eyes Only

Page 319

                        D. Card

1

2       A.     He said that occupation was a

3   very important part of the process, that

4   it is on the summary sheets.

5       Q.     Is that disclosed anywhere in

6   your report?

7       A.     My discussion with --

8       Q.     Yes.

9       A.     No.

10      Q.     Did you do anything to test

11  whether or not Harvard was treating

12  different occupations differently based

13  on race?

14          MS. ELLSWORTH:  Object to the

15      form.

16          THE WITNESS:  I show that or I

17      -- I can't remember where this is

18      reported, whether it is part of my

19      original report or not.  The

20      occupations vary by race.

21  BY MR. STRAWBRIDGE:

22      Q.     Did you interact race and the

23  occupation codes in your model?

24      A.     No.

25      Q.     Did you estimate separately

1                    D. Card

2    question?

3         A.    No.

4         Q.    Were you a percipient witness

5    in the admissions office in 2013?

6              MS. ELLSWORTH:  Object to the

7         form.

8              THE WITNESS:  No, but neither

9         was Professor Arcidiacono.  And he

10        seems to want to make that kind of

11        a conclusion.

12   BY MR. STRAWBRIDGE:

13        Q.    Let me ask you this:  You set

14   forth your alternative math in paragraph

15   161 of your rebuttal report, correct, on

16   probability?

17        A.    Let me check it.  Paragraph

18   121?

19        Q.    Yes.

20        A.    In my rebuttal report?

21              MS. ELLSWORTH:  Paragraph 161,

22        I think, is what --

23   BY MR. STRAWBRIDGE:

24        Q.    I'm sorry, it was 161.  I

25   misspoke.  I apologize.

Highly Confidential Attorneys' Eyes Only

```
 1                    D. Card
 2        A.    Oh.  Yes.
 3        Q.    So you conclude that the --
 4   that given the years that you just
 5   described and the different racial
 6   categories, that the actual probability
 7   of seeing a pattern over a three-year
 8   period is about 17 percent?
 9        A.    Assuming for the sake of
10   simplicity that there's a 0.2 chance that
11   the group's average rate matches the
12   average admission rate for other
13   applicants, so that would be the same
14   kind of calculation that he does, so
15   assume that number, then take the 92
16   combinations, that's what I did.
17        Q.    You earlier said you didn't
18   challenge that number, you hadn't
19   challenged that calculation?
20             MS. ELLSWORTH:  Object to the
21        form.
22             THE WITNESS:  That 0.2 is his
23        calculation, yes.
24   BY MR. STRAWBRIDGE:
25        Q.    The -- your calculation
```

Highly Confidential Attorneys' Eyes Only

Page 371

1                      D. Card

2       assumes that each of those outcomes is

3       independent with one another?

4           A.    Yes.

5           Q.    Is that true?

6           A.    It would not be exactly true.

7       It would be -- it might be approximately

8       true, depending on the race group you are

9       thinking of.

10          Q.    What makes something

11      "approximately true"?

12          A.    Well, the actual calculation

13      for the permutations, I didn't try and

14      do.  I tried to do a simplified

15      calculation.  That's what I have done

16      here.

17          Q.    For example, you would agree,

18      right, that the Hispanic methodology

19      between IPEDS and the new methodology

20      does not differ?

21              MS. ELLSWORTH:  Object to the

22          form.

23              THE WITNESS:  No, I would

24          disagree with that.

25      BY MR. STRAWBRIDGE:

Highly Confidential Attorneys' Eyes Only

Page 372

                    D. Card

1

2    Q.    Do you think the two things

3    differ?

4    A.    Yes, because under the new

5    methodology, individuals are allowed to

6    report multiple races.  And so someone

7    could be both Hispanic and African

8    American, for example.

9    Q.    Which outcomes do you think

10   are not independent of one another?

11   A.    Do you want me to go through

12   the permutation argument?

13   Q.    I am just asking which ones

14   you think -- you told me that you do not

15   think they are all independent of one

16   another.  So I am asking which ones.

17   A.    Well, the problem is that the

18   groups as a whole have to add up to the

19   total.  And so there's a little bit of

20   dependence between the total and the

21   averages.

22   Q.    Would that raise or lower the

23   number you put in your report?

24        MS. ELLSWORTH:  Object to the

25        form.

Highly Confidential Attorneys' Eyes Only

Page 373

1                    D. Card

2               THE WITNESS:  Off the top of

3          my head, I don't know.  I don't

4          believe it would change it much,

5          but I don't know.

6     BY MR. STRAWBRIDGE:

7          Q.    Does the definition of African

8     American differ between old methodology

9     and new methodology?

10         A.    Well, the old methodology was

11    based on applicants checking a single box

12    that were -- and a categorization based

13    on alphabetical order.  The new

14    methodology allows candidates to check

15    multiple boxes.

16         Q.    But if you were looking at the

17    admission rate of African Americans under

18    the old methodology or the new

19    methodology, just looking at African

20    Americans, you would see the exact same

21    admission rate, wouldn't you?

22              MS. ELLSWORTH:  Object to the

23         form.

24              THE WITNESS:  I don't think

25         so.  Because I think under the new

Highly Confidential Attorneys' Eyes Only

Page 377

1                    D. Card

2         Q.    Allowing people to choose --

3    this is a question of reporting, not

4    choice.  I am just saying people -- at

5    the end of the admissions process, do you

6    know how many people have checked all the

7    boxes, 500 people in the admissions

8    process checked African American, and

9    they all also checked Hispanic.

10        A.    Well, my understanding is that

11   the admission rates for African Americans

12   under these three different methodologies

13   in any given year are -- are slightly

14   different.

15        Q.    And that's essential to the

16   math that you have done here?

17              MS. ELLSWORTH:  Object to the

18         form.

19              THE WITNESS:  Not necessarily,

20         but it is part -- under the

21         assumption I am making here, that

22         would be -- I think that would be

23         built in, yes, sir.

24   BY MR. STRAWBRIDGE:

25        Q.    Have you seen in this case any

Highly Confidential Attorneys' Eyes Only

Page 378

1                    D. Card

2     one-pagers -- do you know what I mean by

3     a one-pager?

4          A.    I have a vague understanding

5     of what that is, yeah.

6          Q.    Have you seen any one-pagers

7     prepared by the admissions office during

8     the committee meeting process listing

9     IPED statistics before January 2013?

10               MS. ELLSWORTH:  Object to the

11          form.

12               THE WITNESS:  Repeat the

13          question again?

14    BY MR. STRAWBRIDGE:

15          Q.    Have you seen a one-pager

16    prepared by the admissions office during

17    the committee meeting process that lists

18    the IPED statistics prior to January

19    2013?

20               MS. ELLSWORTH:  Object to the

21          form.

22               THE WITNESS:  I have -- I have

23          only seen a couple of these forms,

24          and so I can't say I have done an

25          exhaustive search.  I was never

                    D. Card

1

2          searching for that.  But I don't

3          believe I would have seen that.

4              I believe the forms I looked

5          at are the ones that are referred

6          to in Professor Arcidiacono's

7          report.

8    BY MR. STRAWBRIDGE:

9          Q.    And you also referred to some

10     in some documents in your report, right?

11         A.    I did.

12         Q.    Have you -- did you see

13     Professor Arcidiacono's note that the

14     IPEDS' number was stored differently in

15     the admissions database as it was

16     produced to him before the 2017

17     admissions cycle versus after?

18         A.    I believe that there is a

19     different field that it is captured in,

20     that's right.

21         Q.    And your report doesn't

22     challenge the -- that statement in

23     Professor Arcidiacono's report?

24             MS. ELLSWORTH:  Objection to

25         form.

Highly Confidential Attorneys' Eyes Only

Page 384

1

2      DISTRICT OF COLUMBIA, to wit:

3

4              I, Karen K. Brynteson, the
       officer before whom the foregoing
5      deposition was taken, do hereby certify
       that the within-named witness
6      personally appeared before me at the
       time and place herein set out, and
7      after having been duly sworn by me,
       according to law, was examined by
8      counsel.

9

10             I further certify that the
       examination was recorded
11     stenographically by me and this
       transcript is a true record of the
12     proceedings.

13

14             I further certify that I am
       not of counsel to any of the parties,
15     nor an employee of counsel, nor related
       to any of the parties, nor in any way
16     interested in the outcome of this
       action.

17

18             As witness my hand and
       notarial seal this 9th day of May,
       2018.

19

20

21

       _____
22          KAREN K. BRYNTESON
23          Notary Public
24
       MY COMMISSION EXPIRES:  10-30-22
25