EXHIBIT 152

Nos. 02-241 & 02-516

**In the**
**Supreme Court of the United States**

---

BARBARA GRUTTER,
                                        PETITIONER,

*v.*

LEE BOLLINGER, ET AL.,
                                        RESPONDENTS.

---

JENNIFER GRATZ AND PATRICK HAMACHER,
                                        PETITIONERS,

*v.*

LEE BOLLINGER, ET AL.,
                                        RESPONDENTS.

---

On Writs Of Certiorari To
The United States Court Of Appeals
For The Sixth Circuit

**BRIEF OF HARVARD UNIVERSITY, BROWN
UNIVERSITY, THE UNIVERSITY OF CHICAGO,
DARTMOUTH COLLEGE, DUKE UNIVERSITY,
THE UNIVERSITY OF PENNSYLVANIA,
PRINCETON UNIVERSITY, AND YALE
UNIVERSITY AS AMICI CURIAE SUPPORTING
RESPONDENTS**

ROBERT W. IULIANO              LAURENCE H. TRIBE
HARVARD UNIVERSITY                *Counsel of Record*
Holyoke Center 980             JONATHAN S. MASSEY
1350 Massachusetts Ave.        1575 Massachusetts Ave.
Cambridge, MA 02138            Cambridge, MA 02138
(617) 495-1280                 (617) 495-4621

*Additional Counsel Listed Inside Cover*

HARV00066521

ii

BEVERLY LEDBETTER
BROWN UNIVERSITY
110 South Main Street
Providence, RI 02903
(401) 863-9900

ROBERT B. DONIN
DARTMOUTH COLLEGE
14 South Main Street
Suite 2C
Hanover, NH 03755
(603) 646-0101

WENDY S. WHITE
UNIVERSITY OF
PENNSYLVANIA
133 South 36th Street
Philadelphia, PA 19104
(215) 746-5200

DOROTHY K. ROBINSON
YALE UNIVERSITY
2 Whitney Avenue, 6th Floor
New Haven, CT 06510

BETH A. HARRIS
THE UNIVERSITY OF CHICAGO
5801 South Ellis Avenue
Chicago, IL 60637
(773) 702-7243

KATE S. HENDRICKS
DUKE UNIVERSITY
Office of University Counsel
North Pavilion Building
2400 Pratt Street, Suite 400
Durham, NC 27710
(919) 684-3955

PETER G. MCDONOUGH
LORRAINE SCIARRA
PRINCETON UNIVERSITY
Office of General Counsel
120 Alexander Street
Princeton, NJ 08544
(609) 258-2500

HARV00066522

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . .   iii

INTEREST OF AMICI . . . . . . . . . . . . . . . . . . . . . . . . .   1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . .   3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

I.   CONSIDERATION OF RACE AND ETHNICITY
     IN AN INDIVIDUALIZED ADMISSIONS
     PROCESS SERVES COMPELLING INTERESTS  . . . .   7

     A.  There Is a Broad Consensus On The Important
         Educational Benefits of Diversity.. . . . . . . . . . . . . .   7

     B.  Consideration of Race and Ethnicity Grows
         Naturally Out Of The Needs Of The Professions
         and Of American Business . . . . . . . . . . . . . . . . . . .   10

     C.  The Interests in Diversity and Inclusion That
         Support Well-Designed Programs of Race-Specific
         Affirmative Action in University Admissions
         Do Not Reflect Impermissible Stereotyping . . . . . . .   12

     D.  Advancing The Interests In Diversity and Inclusion
         Is Not Tantamount to Attempting to Remedy
         Societal Discrimination. . . . . . . . . . . . . . . . . . . . . .   14

II.  STRICT SCRUTINY IS SATISFIED BY
     PROPERLY DESIGNED UNIVERSITY
     ADMISSIONS POLICIES THAT CONSIDER
     RACE AND ETHNICITY . . . . . . . . . . . . . . . . . . . . . . .   15

     A.  The Distinctive Educational Role of Universities
         Must Be Accommodated in The Application
         Of Strict Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . .   15

HARV00066523

ii

B.  Explicit Consideration of Race and Ethnicity
    In an Individualized Admissions Process Is Fully
    Capable of Satisfying the Narrow Tailoring
    Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

    1.  Petitioners' Arguments Rest on a
        Misunderstanding of the Admissions Process
        At Selective Universities  . . . . . . . . . . . . . . . . . .  19

    2.  The Interest In Racial Diversity Cannot Be Served
        By Race-Neutral Reliance On Factors, Such
        As Economic Disadvantage, That Are
        Already Carefully Considered  . . . . . . . . . . . . .  22

    3.  The Interest in Racial Diversity Cannot Be
        Served By The Newer Alternatives Involving
        Non-Individualized Guaranteed Admissions . . .  23

C.  Consideration of Race Does Not Make
    An Admissions Plan A Quota . . . . . . . . . . . . . . . . .  26

D.  Race-Conscious Admissions Programs Are Not
    Open-Ended Commitments  . . . . . . . . . . . . . . . . . .  27

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

HARV00066524

iii

## TABLE OF AUTHORITIES

**Cases**                                                         **Page**

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995) . . . . . . . . . . . . . . . . . . . . . 6, 14, 15-17
*Batson v. Kentucky*, 476 U.S. 79 (1986) . . . . . . . . . . . . . . 26
*Board of Regents v. Southworth*, 529 U.S. 217 (2000) . . . . 15
*Brown v. Bd. of Education*, 347 U.S. 483 (1954) . . . . . . . . 28
*Burson v. Freeman*, 504 U.S. 191 (1992) . . . . . . . . . . . . . 28
*Bush v. Vera*, 517 U.S. 952 (1996) . . . . . . . . . . . . . . . . . . 18
*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
*Dickerson v. United States*, 530 U.S. 428 (2000) . . . . . . . . 8
*Easley v. Cromartie*, 532 U.S. 235 (2001) . . . . . . . . . . . . . 18
*Eldred v. Ashcroft*, 123 S. Ct. 769 (2003) . . . . . . . . . . . . . 28
*Georgia v. McCollum*, 505 U.S. 42 (1992) . . . . . . . . . . . . 26
*Hills v. Gautreaux*, 425 U.S. 284 (1976) . . . . . . . . . . . . . . 28
*Hunt v. Cromartie*, 526 U.S. 541 (1999) . . . . . . . . . . . . . . 18
*Hunter v. Underwood*, 471 U.S. 222 (1985) . . . . . . . . . . . 22
*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) . . . . . . 26
*Johnson v. Transportation Agency*, 480 U.S. 616 (1987) . . 17
*Keyishian v. Board of Regents*, 385 U.S. 589 (1967) . . . . . 12
*Metro Broadcasting, Inc. v. FCC*,
    497 U.S. 547 (1990) . . . . . . . . . . . . . . . . . . . . . . . . 4, 13, 15
*Mississippi Univ. for Women v. Hogan*,
    458 U.S. 718 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
*Planned Parenthood v. Casey*, 505 U.S. 833 (1992) . . . . . . . 8
*Regents of the University of California v. Bakke*,
    438 U.S. 265 (1978) . . . . . . . . . . . . . 1, 7, 8, 14, 16, 25-27
*Regents of the University of Michigan v. Ewing*,
    474 U.S. 214 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*Shaw v. Reno*, 509 U.S. 630 (1993) . . . . . . . . . . . . . . . . . . 22
*Swann v. Charlotte-Mecklenburg Bd. of Education*,
    402 U.S. 1 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

HARV00066525

iv

**Cases (continued)**                                    **Page**

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) . . . . . . . . 16
*United States v. Virginia*, 518 U.S. 515 (1996) . . . . . . . . . 17
*University of Pennsylvania v. EEOC*,
    493 U.S. 182 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 276 (1986) . . 7, 14


**Miscellaneous**                                        **Page**

ABA REPORT OF THE COMMITTEE ON DIVERSITY
    IN LEGAL EDUCATION (1998) . . . . . . . . . . . . . . . . . . . . . 10
AMA BOARD OF TRUSTEES REPORT, DIVERSITY IN
    MEDICAL EDUCATION (1999) . . . . . . . . . . . . . . . . . . . . . 10
*Appearance and Reality in the Sunshine State*,
    Harvard Civil Rights Project (Feb. 2003) . . . . . . . . . . . 23
Derek Bok, *The Uncertain Future of Race-Sensitive*
    *Admissions* (Jan. 2003) . . . . . . . . . . . . . . . . 10, 11, 23, 25
William G. Bowen & Derek Bok, THE SHAPE OF THE
    RIVER: LONG-TERM CONSEQUENCES OF CONSIDERING
    RACE IN COLLEGE AND UNIVERSITY ADMISSIONS
    (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 21
William G. Bowen & Sarah A. Levin, RECLAIMING
    THE GAME (forthcoming) . . . . . . . . . . . . . . . . . . . . . 21, 29
William G. Bowen & Neil L. Rudenstine,
    *Race-Sensitive Admissions: Back to Basics*,
    CHRONICLE OF HIGHER EDUCATION 87 (Feb. 7, 2003) . . 11
Richard A. Epstein, *A Rational Basis for Affirmative*
    *Action: A Shaky But Classical Liberal Defense*,
    100 MICH. L. REV. 2036 (2002) . . . . . . . . . . . . . . . . . . 11
Holman W. Jenkins, Jr., *Why the Michigan Case*
    *Matters to Business*, Wall Street Journal,
    Jan. 22, 2003, at A15 . . . . . . . . . . . . . . . . . . . . . . . . . . 11

HARV00066526

v

**Miscellaneous (continued)**                                    **Page**

John F. Kain and Daniel M. O'Brien, "Hopwood and the
   Top 10 Percent Law: How Have They Affected the
   College Enrollment Decisions of High School
   Graduates," presented at the National Bureau of
   Economic Research Meeting on Higher Education
   (Boston: Nov. 9, 2001; revised Dec. 2002) . . . . . . . . . 24

Thomas J. Kane, *Racial and Ethnic Preferences in
   College Admissions*, in THE BLACK-WHITE TEST
   SCORE GAP (Brookings, 1998) . . . . . . . . . . . . . . . . . . . 23

Glenn Loury, THE ANATOMY OF RACIAL
   INEQUALITY (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Percent Plans in College Admissions: A Comparative
   Analysis of Three State Experiences*,
   Harvard Civil Rights Project (Feb. 2003) . . . . . . . . . . . 23

Neil Rudenstine, THE PRESIDENT'S REPORT
   1993-1995: DIVERSITY AND LEARNING . . . . . . . . . . . . . 9

STATISTICAL ABSTRACT OF THE UNITED STATES 2001 . . . 23

Kathleen M. Sullivan, *The Supreme Court,
   1985 Term – Comment: Sins of Discrimination:
   Last Term's Affirmative Action Cases*,
   100 HARV. L. REV. 78 (1986) . . . . . . . . . . . . . . . . . . . . 14

HARV00066527

## INTEREST OF AMICI CURIAE

Harvard University, Brown University, the University of Chicago, Dartmouth College, Duke University, the University of Pennsylvania, Princeton University, and Yale University respectfully submit this brief amici curiae in support of respondents.[1]   For the last two-and-a-half decades, highly selective institutions have relied on the approval by five Justices of the favorable consideration of race and ethnicity in the admissions process in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978).  *See id.* at 320 (opinion of the Court per Powell, J.); *id.* at 328 (opinion of Brennan, J., joined by White, Marshall, and Blackmun, JJ., concurring in the judgment in part and dissenting in part) (joining in Part V-C of Justice Powell's opinion).  In *Bakke*, a number of private universities had filed a brief stressing the importance of admissions programs that treat "an applicant's membership in a minority racial group as a favorable factor in the consideration of his application." Brief of Columbia Univ. *et al.* as *Amici Curiae*, No. 76-811, at 4.   Under this model, amici and other highly selective educational institutions consider an academically qualified student's race or ethnicity as one among many factors in a carefully designed, competitive admissions process that views each applicant as an individual and weighs the capacity of each to contribute to the class as a whole.

The 25 years since *Bakke* have seen extensive efforts by amici and other selective universities to encourage minority applications and expand minority admissions.  The principle underlying *Bakke* has become the basis of well-settled reliance not only by amici, but also by students, alumni, high schools, and businesses.  To abandon *Bakke* now would trigger wrenching disruption.

---

[1] Pursuant to Rule 37.6, amici certify that no counsel for any party authored this brief in whole or in part.  No persons other than the amici curiae or their counsel made a monetary contribution to the preparation or submission of this brief.  Letters reflecting the parties' consent to the filing of this brief have been filed with the Clerk.

HARV00066528

2

Amici's experience during the quarter century since *Bakke* has confirmed the wisdom of that decision. Amici's admissions policies have served compelling pedagogical interests by contributing to a diverse and inclusive educational experience, teaching students to view issues from multiple perspectives, and helping to break down prejudices and stereotypical assumptions. The policies prepare students to work productively in a multiracial environment after they graduate, and the policies meet the demands of business and the professions by preparing a generation of public and private leaders for an increasingly pluralistic national and global economy.

To be sure, the admissions process must not be used to separate, subordinate, or stigmatize students, or to exclude any student from any place in an entering class on account of that student's race. But a prohibition on such illegitimate practices does not justify jettisoning the genius of federalism or replacing the benefits of competition, experimentation, and heterogeneity with the dead hand of a stifling uniformity. So long as they do not employ these illegitimate practices, different universities should be free to craft their own distinctive approaches. Such a course would be especially appropriate if there were any uncertainty or ambiguity about the best means for promoting racial diversity. It is vital that the Constitution be understood to protect – not to eviscerate – the capacity of universities thoughtfully to determine how to fulfill their profound responsibility: educating a diverse array of talented students to reason rigorously, to bridge differences both real and imagined, and to emerge as effective citizens and leaders in a multiracial society.

Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial "discrimination," the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits this Court might place on state university admissions criteria or procedures.

HARV00066529

3

Accordingly, amici urge this Court to interpret the Constitution and federal statutes to leave amici and other selective educational institutions with latitude to take race and ethnicity into account as positive factors in their individualized admissions processes.

## SUMMARY OF ARGUMENT

Academically selective universities have a compelling interest in ensuring that their student bodies incorporate the experiences and talents of the wide spectrum of racial and ethnic groups that make up our society. Amici should be free to compose a class that brings together many different kinds of students; that includes robust representation of students from different races and ethnicities; and that prepares graduates to work successfully in a diverse nation. Indeed, highly selective universities have long defined as one of their central missions the training of the nation's business, government, academic, and professional leaders. By creating a broadly diverse class, amici's admissions policies help to assure that their graduates are well prepared to succeed in an increasingly complex and multi-racial society. The policies also make certain that no racial or ethnic group is excluded from that vital process. Nor have amici been educating students to meet a merely imagined need. Every major profession in America has made known a desire for diversity within its ranks. Businesses demand that the graduates of highly selective universities both be diverse and be prepared to work with colleagues from different backgrounds.

There is widespread agreement on these fundamental principles. Thus, even while opposing the particular programs in these cases, the United States recognizes that universities have an important – what it calls "paramount" (U.S. Grutter Br. 16) – interest in attracting students from a wide range of backgrounds, explicitly endorsing the "laudable goals of educational openness and diversity." U.S. Gratz Br. 16. The United States accepts that it is entirely legitimate for universities to concern themselves with "ensur[ing] that [they] are open to all individuals and that student bodies are educationally diverse and broadly

HARV00066530

4

representative of the public." *Id.* at 17.  In particular, the United States acknowledges that "universities may adopt admissions policies that seek to promote experiential, geographical, political, or economic diversity . . . ."  U.S. Grutter Br. 10.

The United States, to be sure, does not expressly include "racial diversity" within its general endorsement.  But that reticence cannot reflect any sound limitation on the reach of the "diversity" that is relevant in these cases.  It would be a strange, almost otherworldly, version of diversity that recognized the importance of all kinds of differences *except* racial ones.  Certainly, American businesses, the professions, and the remaining elements of our society consider racial diversity to be of central importance.  This Court should adhere to the principle of *Bakke*, which has been inextricably woven into the American social fabric over the past quarter century.

None of us favors a return to de facto segregation, or anything like it, in our leading universities.  The principal issue in this case is the *means* by which racial and ethnic diversity should be achieved.  This Court should respect the institutional competence and academic freedom of amici and of other highly selective universities, public and private, regarding the most appropriate means to achieve these agreed-upon ends.  Rather than imposing a unitary, top-down model of how to be race-conscious *enough* without being *too* race-conscious, the Court should preserve the flexibility of universities to pursue carefully calibrated admissions policies designed to promote student diversity and the vital educational benefits that flow from it.

It is instructive to contrast the minority broadcast licensing preferences at issue in *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547 (1990).  Those preferences necessarily depended for their success on the assumption that differences in the race of station owners would lead to differences in speech; otherwise, the programming at issue would have been unchanged.  But the purposes of amici's admissions policies are served whether the views held by individual minority students, or by minority

5

students on average, turn out to be very different or virtually indistinguishable from those of other students. The policies contemplate simply that being of a particular race, especially a race subject to historical and continuing prejudices, entails experiences that people of other races have not had and ought to understand better. These differences will vary from individual to individual, thus resulting in substantial differences within racial groups as well. Far from reflecting and perpetuating stereotypes, amici's admissions policies are consciously designed to dissolve them.

The critics of Michigan's admissions programs insist that mechanistic approaches – such as guaranteed admission for a specified percentile of high school graduates (as in California, Florida, and Texas) – or softer "race-neutral" proxies (like economic disadvantage) can be deliberately adjusted to replicate the racial and ethnic mix that explicit consideration of race in the admissions process would have achieved. According to the critics, the Constitution forbids overt consideration of race or ethnicity, even as part of a highly individualized admissions process. Instead, the university must be relegated to a purportedly "race-blind" approach – whose very aim, however, is to achieve the same diverse racial and ethnic mix.

Petitioners' proposed alternatives would be infeasible and ineffective. Although petitioners suggest that universities should consider factors like economic circumstances and personal hardships, the truth is that those factors are already taken into account in the typical selective admissions process. Petitioners' proposals for guaranteed admissions plans for the top GPA-achievers among the applicant pool are unworkable for relatively small private universities, which simply cannot promise to admit the top ten percent (or even the top one per cent) of graduating high school seniors. Nor could graduate schools, with fewer available spaces and even more selective criteria, feasibly operate under such formulas.

Petitioners' proposals would also compromise the quality of

HARV00066532

6

student populations at selective universities. Thus, even if a policy of guaranteed admission for students graduating in a specified percentile of their high school class succeeded in admitting a certain number of minority students, it would likely compel the admission of so many other, non-minority applicants as to eliminate available spaces in the college class for those with unusual backgrounds, experiences, and other talents to contribute. Such alternatives are therefore fundamentally incompatible with the commitment to consider each applicant on his or her individual merit, taking into account *all* factors, not just test scores or class rank, that would militate for or against admission to a selective university. Whatever strict scrutiny properly requires, it should not force universities to achieve one vital interest (racial diversity) to the exclusion of another (treatment of students as individuals) and thereby compromise the constitutional imperative of academic freedom.

Nor should strict scrutiny be distorted to require amici to adopt disingenuous admissions policies – policies that would seek to accomplish with a wink and a nod the very diversity that petitioners contend amici are forbidden to achieve directly. Far more consistent with our constitutional traditions is an application of strict scrutiny that honors candor and transparency, that respects individualized evaluation, that recognizes the institutional competence of our nation's many and diverse educational institutions in framing their own learning strategies, and that can, as this Court has put it, distinguish between a "No Trespassing sign" and a "welcome mat." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229 (1995). Such an application of strict scrutiny would regard the asserted ability of alternative methods to approximate the racial diversity that a sensibly designed program of race-based affirmative action can achieve not as proof that such a program should be struck down but as an inadvertent concession that the program is indeed constitutionally justified. Just as imitation is at times the sincerest form of flattery, so in this context petitioners' argument helps establish the breadth of the fundamental consensus that

HARV00066533

7

seeking a racially diverse student body, and attempting to graduate a class of future leaders able to operate effectively within a diverse and pluralistic society, represent neither "reverse discrimination" nor the patronizing use of race to perpetuate stereotypes of inferiority but simply educational measures within the competence and familiar domain of American universities.

Because petitioners' constitutional challenges to the admissions policies in both cases ignore these basic lessons and are deficient as a matter of law, the judgments of the court of appeals in No. 02-241 and of the district court in No. 02-516 should be affirmed.

## ARGUMENT

## I. CONSIDERATION OF RACE AND ETHNICITY IN AN INDIVIDUALIZED ADMISSIONS PROCESS SERVES COMPELLING INTERESTS.

### A. There Is a Broad Consensus On The Important Educational Benefits of Diversity.

It is appropriate to begin with the substantial common ground in this case: the United States acknowledges that "[e]nsuring that public institutions are open and available to all segments of American society, including people of all races and ethnicities, represents a *paramount government objective*." U.S. Grutter Br. 16 (emphasis added). Indeed, almost twenty-five years ago, this Court held that a university "has a substantial interest that legitimately may be served by a properly devised admissions program involving the competitive consideration of race and ethnic origin." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 320 (1978) (Part V-C, opinion of Powell, J.); *see id.* at 272 (Brennan, White, Marshall, Blackmun, J.J., joining Part V-C); *see also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 276, 286, 289 n.* (1986) (O'Connor, J., concurring in part and concurring in the judgment) (*Bakke* recognized the "compelling" nature of "a state interest in the promotion of racial diversity * * * in the context of higher education").

HARV00066534

8

Tellingly, the United States does not ask this Court to overturn *Bakke*. U.S. Grutter Br. 15 n.4. In fact, the United States maintains that "this case requires this Court to break no new ground." *Id.* at 12. The best way to achieve that objective is to adhere to the core principle of *Bakke.* Since that decision, universities across the country have operated on the well-founded belief that they are free to give favorable consideration to race and ethnicity as part of their individualized admissions programs. To reverse course now, after a quarter century of reliance – to repudiate the importance of seeking racial inclusiveness through a carefully designed program consistent with *Bakke* – would be to upset deeply grounded expectations in a way utterly contrary to the doctrine of *stare decisis. See Dickerson v. United States*, 530 U.S. 428, 442-44 (2000); *Planned Parenthood v. Casey*, 505 U.S. 833, 861-69 (1992).

Amici's experience in the two-and-a-half decades since 1978 confirms the wisdom of *Bakke*'s premise. Selective universities across the country have built their communities mindful of the pedagogical value of multiracial diversity in educational programs. Students are both recipients and providers of the learning that takes place at universities, and amici thus have a vital interest in what students bring to the task of educating each other. In a recent survey, for example, 69 percent of Harvard Law School students and 73.5 percent of Michigan Law School students reported that having "students of different races and ethnicities" was a "clearly positive element of their educational experience."[2] Diversity helps students confront perspectives other than their own and thus to think more rigorously and imaginatively; it helps students learn to relate better to people from different backgrounds; it helps students become better citizens. The educational benefits of student diversity include

---

[2] Gary Orfield and Dean Whitla, DIVERSITY IN LEGAL EDUCATION 16 (1999). *See also* Richard J. Light, MAKING THE MOST OF COLLEGE 9-10, 129, 132-35 (2001).

HARV00066535

9

the discovery that there is a broad range of viewpoint and experience *within* any given minority community – as well as learning that certain imagined differences at times turn out to be only skin deep.

It is surely fitting for universities to undertake to prepare their students to live and work in a global economy within a multiracial world. The challenges of contemporary life demand that students acquire not just traditional forms of knowledge regarding science and the arts, but also techniques of bridging differences in perspective and in personal experience. Amici have concluded, as a matter of reasoned educational judgment, that their admissions policies are well adapted to such learning. This Court has no reason to distrust that judgment or to impose a set of uniform rules on the university admissions processes of the fifty states and of countless private institutions.

Amici have adopted admissions programs seeking racial and ethnic diversity as a natural part of a long and expanding policy of inclusion. Harvard, for example, has been pursuing the idea of student diversity for a period that dates to the nineteenth century. *See* Neil Rudenstine, THE PRESIDENT'S REPORT 1993-1995: DIVERSITY AND LEARNING 3-13. In its early stages, the concept of diversity was rooted primarily in geography. Thus, George Washington's will bequeathed funds for a national university so that "the youth of fortune and talents from all parts" might, "by associating with each other," be "enabled to free themselves in a proper degree" from "local prejudices and habitual jealousies."[3]

Ultimately, amici embraced a broader vision of diversity. Thus, President Charles Eliot declared that students need to "feel that very wholesome influence which comes from observation of and contact with larger numbers . . . from different nations, States, schools, families, sects, parties, and conditions of life."

---

[3] Available at http://gwpapers.virginia.edu/will/text.html.

10

THE PRESIDENT'S REPORT 1993-1995 at 10.  As Eliot saw it, Harvard students should be children of the "rich and poor," the "educated and uneducated," rather than representing just one segment of American society. *Id.*  Throughout the twentieth century, therefore, the University increasingly accepted students from public, rather than private, schools, and became increasingly, and then fully, coeducational.  It also undertook to expand the enrollment of students from different ethnic groups, primarily of European origin, that had previously been represented at Harvard, if at all, in only small numbers. *Id.* at 24-25.

It is against this historical backdrop that selective universities ultimately developed their admissions policies with respect to African-Americans and other minority groups that have been subject to targeted exclusion from many of the benefits of American life.  Far from adopting a theory for the convenience of the moment, amici simply recognized, as they had in the past, that students from these minority groups would bring valuable new experiences to the university community.

### B. Consideration of Race and Ethnicity Grows Naturally Out Of The Needs Of The Professions and Of American Business.

Amici have a special interest in this pair of cases stemming from their distinctive responsibility, since colonial times, to educate leaders in all walks of life.  As the United States has explained, "[a] university degree opens the doors to the finest jobs and top professional schools, and a professional degree, in turn, makes it possible to practice law, medicine and other professions." U.S. Grutter Br. 16.  Highly selective academic institutions are keenly aware of a responsibility to train not only doctors, lawyers, and accountants, but also corporate, government, social, and academic leaders.

Every major profession in this country has sought greater

HARV00066537

11

diversity within its ranks.[4]  Businesses have demanded more
minority managers and executives, as well as non-minorities who
can work well with colleagues from diverse backgrounds.
Leading corporations, business groups, professional
organizations, and executives have repeatedly called for
consideration of race and ethnicity in university admissions.[5]  In
adopting their admissions policies, universities are responding to
"the clearly articulated needs of business and the professions for
a healthier mix of well-educated leaders and practitioners from
varied racial and ethnic backgrounds. . . . [B]usinesses depend
heavily on their ability to recruit broadly trained individuals from
many racial backgrounds who are able to perform at the highest
level in settings that are themselves increasingly diverse."[6]

Commentators across the political spectrum have recognized
and applauded the fact that "[t]he level of affirmative action in
the United States in the private sector on grounds of race goes far
beyond what is needed to keep firms out of hot water. It
represents a sustained and consistent effort to change the
dominant practices in the United States." Richard A. Epstein, *A
Rational Basis for Affirmative Action: A Shaky But Classical
Liberal Defense*, 100 MICH. L. REV. 2036, 2053 (2002).  That is
why there is broad support in the business community for
consideration of race in university admissions.  Holman W.
Jenkins, Jr., *Why the Michigan Case Matters to Business,* Wall
Street Journal, Jan. 22, 2003, at A15 (noting the "dozens of
companies" filing briefs in support of Michigan in this case).

Empirical data have confirmed the value of amici's

---

[4] *See* ABA REPORT OF THE COMMITTEE ON DIVERSITY IN LEGAL EDUCATION
7-8 (1998); AMA BOARD OF TRUSTEES REPORT, DIVERSITY IN MEDICAL
EDUCATION 2,4 (1999); Derek Bok, *The Uncertain Future of Race-Sensitive
Admissions* 4-8 (Jan. 2003) (available at www.nacua.org/documents).

[5] Derek Bok, *The Uncertain Future of Race-Sensitive Admissions* 8-10.

[6] William G. Bowen & Neil L. Rudenstine, *Race-Sensitive Admissions:
Back to Basics*, CHRONICLE OF HIGHER EDUCATION 87 (Feb. 7, 2003).

HARV00066538

12

admissions programs in serving this interest.  In a study of 45,000 students who matriculated in 1976 and 1989, Derek Bok, former president of Harvard, and William G. Bowen, former president of Princeton, have shown that minority students admitted under these programs were highly successful in completing rigorous academic programs, securing good jobs, and contributing to community life.[7]

As this Court has noted, "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'" *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (D.D.C. 1943)).  Amici's admissions programs are well adapted to achieving this paramount interest.

### C. The Interests in Diversity and Inclusion That Support Well-Designed Programs of Race-Specific Affirmative Action in University Admissions Do Not Reflect Impermissible Stereotyping.

The interests asserted by amici do not rest on a stereotypical assumption that all members of the same race have had the same or similar experiences, much less that they have the same fixed set of perceptions or beliefs.  The interest in ensuring that minorities are not excluded from the professions and positions of future leadership does not hinge at all on any prediction that they

---

[7] The study found that approximately 90 percent of all graduates in 1976 were involved in such civic activities as community service, youth organizations, or cultural and arts activities.  The rate of participation for black men is even higher, and black men and women are more likely to serve in a leadership position.  *See* THE SHAPE OF THE RIVER: LONG-TERM CONSEQUENCES OF CONSIDERING RACE IN COLLEGE AND UNIVERSITY ADMISSIONS 6-11 (2000).  These professionals "are the backbone of the emergent black . . . middle class . . . . [T]hey can serve as strong threads in a fabric that binds their own community together and binds those communities into the larger social fabric as well."  *Id.* at 116.

HARV00066539

13

will have particular views or philosophies, let alone that such views are monolithic.

Nor do the pedagogical benefits of diversity depend on stereotypical assumptions. Instead, those benefits rest upon a quite different expectation: that minority students will have had formative experiences that they would not have had as identically situated students of a different race. In the context of higher education, recognition of this real-world difference should be no more impermissible than recognition that gender plays a role, one that differs from individual to individual, in how young men and women grow up.

What those experiences are, and how each student has reacted to them, is part of what amici hope students will explore. Both minority and non-minority students will have the opportunity to reconsider preconceptions and prejudices in the course of obtaining a university education in a diverse environment. Indeed, one of the valuable lessons for non-minorities to discover is that members of a minority group do not all share the same views and opinions; far from it. Thus, amici's admissions policies are central elements in their strategy for *breaking down* racial and ethnic stereotypes. Openness to differing life experiences and perspectives, and the capacity to rethink what has been previously thought, are critical objectives of educational diversity in the first place.

The assumptions underlying the FCC station-ownership program in *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547 (1990), were very different. As devised, that program depended for its very existence on a conclusive presumption that minority station owners would make different broadcast programming choices from those that nonminority owners would make. *See id.* at 566-71. The FCC program also assumed that the views of minority owners about desirable programming would remain static – that is, remain distinctly "minority" views – during the entire period of ownership. Indeed, the FCC's presumption about minority tendencies was so rigid that it expected minority station

HARV00066540

14

owners, by reason of their race alone, to resist the market forces that had shaped broadcast programming up to that point. *See id.* at 626 (O'Connor, J., dissenting). Nothing approaching that sort of presumption is present in amici's admissions programs.

**D.  Advancing The Interests In Diversity and Inclusion Is Not Tantamount to Attempting to Remedy Societal Discrimination.**

Petitioners seek to equate the promotion of educational diversity with the pursuit of remedies for "societal discrimination," Grutter Br. 40; Gratz Br. 33, a mission this Court has described as too "amorphous" to support a number of race-based measures. *See Adarand Constructors*, 515 U.S. at 220; *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 497-99 (1989) (plurality opinion); *Wygant*, 476 U.S. at 267 (plurality opinion). That the two goals are distinct is shown by the fact that Justice Powell rejected the interest in remedying societal discrimination in both *Bakke* and *Wygant*, but said in *Bakke* that he found educational diversity to be a compelling justification for considering race in university admissions. *See* 438 U.S. at 314. It has been suggested that the remedial interest is backward-looking and may at times even be punitive, while the educational diversity interest is forward-looking and inclusive. *See* Kathleen M. Sullivan, *The Supreme Court, 1985 Term – Comment: Sins of Discrimination: Last Term's Affirmative Action Cases*, 100 HARV. L. REV. 78 (1986).  And, most importantly, the educational diversity interest is contextually limited by its link to the teaching mission of the university in a way that an interest in remedying societal discrimination could never be.[8]

---

[8] The same distinction was evident in *Wygant*. *See* 476 U.S. at 276-77 (plurality opinion); *id.* at 288 (O'Connor, J., concurring in part and concurring in the judgment).  Importantly, the Court in *Wygant* did not rule out all consideration of race for educational purposes: to the contrary, in her separate opinion, Justice O'Connor expressly distinguished the asserted "remedial" role model justification from the (unasserted) justification in having a racially diverse faculty. *See id.* at 289 & n.* (O'Connor, J., concurring in part and

HARV00066541

15

## II.  STRICT SCRUTINY IS SATISFIED BY PROPERLY DESIGNED UNIVERSITY ADMISSIONS POLICIES THAT CONSIDER RACE AND ETHNICITY.

Strict scrutiny is, of course, a two-part test. Having established a compelling reason for consideration of race in decisionmaking as part of carefully calibrated procedures, an institution must also demonstrate that its use of race is "narrowly tailored" to the identified interest. *See Adarand Constructors*, 515 U.S. at 227; *see also Metro Broadcasting*, 497 U.S. at 617 (O'Connor, J., dissenting). This test is met by properly designed university policies that take race and ethnicity into account as part of the individualized and competitive admissions process.

### A.  The Distinctive Educational Role of Universities Must Be Accommodated in The Application of Strict Scrutiny.

In addressing a university's choice of a specific admissions process, this Court should accord significant respect to the variety of ways in which our nation's institutions choose to compose their student bodies. Differences over the optimal means for promoting racial diversity suggest that the proper course is to allow each university to pursue its own admissions policy within constitutional constraints that are not so tight as to suffocate all possibilities for variation.

The judicially recognized and constitutionally grounded tradition of academic freedom, and the deeply ingrained practice of deference to educators' judgments on educational matters, combine to make it especially appropriate to defer to amici's well supported assessment that individualized consideration of race and ethnicity in the admissions process is essential for selective universities to perform their broad educational function. *See Board of Regents v. Southworth*, 529 U.S. 217, 233 (2000); *University of Pennsylvania v. EEOC*, 493 U.S. 182, 199 (1990)

---

concurring in judgment).

HARV00066542

16

(noting "importance of avoiding second-guessing of legitimate academic judgments"); *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 226 n.12, 227 (1985) ("Academic freedom thrives on . . . autonomous decisionmaking by the academy itself").

This Court has previously acknowledged "the vital role in a democracy that is played by those who guide and train our youth." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Academic freedom can and should be accorded a role in supporting a degree of judicial deference, particularly with respect to questions regarding the precise fit of the interests in diversity with the universities' other choices about their mission and the availability of alternative means to serve those interests. *See Bakke*, 438 U.S. at 314 (opinion of Powell, J.). Although strict scrutiny is properly demanding, it should not be applied so as to deprive university officials of responsibly exercised discretion to define what the university shall be, "what may be taught, how it shall be taught, and who may be admitted to study." *Id.* at 312 (opinion of Powell, J.) (quoting *Sweezy*, 354 U.S. at 263 (Frankfurter, J., concurring in result).

Nor have this Court's decisions created a paradigm of "strict scrutiny" so rigid as to rule out careful consideration of context. To be sure, this Court has at times spoken as though literally all decisions that consider an individual's race – even for such laudatory purposes as combatting or offsetting the lingering effects of discrimination against racial minorities – are to be equated with the constitutional anathema of racial segregation. In reality if not always in rhetoric, however, the Court has been far more nuanced in its understanding of the many and varied uses of race, making clear that strict scrutiny does not mean that all race-conscious measures are nearly certain to be doomed. "The point of carefully examining the interest asserted by the government in support of a racial classification, and the evidence offered to show that the classification is needed, is precisely to distinguish legitimate from illegitimate uses of race in

HARV00066543

government decisionmaking." *Adarand Constructors*, 515 U.S. at 227.

Thus, in *Adarand Constructors*, this Court distinguished between uses of race that literally segregate people into different physical locations or applicant pools on the basis of their race (a "No Trespassing" sign) and uses of race that serve principally to broaden and diversify the set of those who are invited in by rounding out a multi-variabled assessment of individuals (a "welcome mat"). 515 U.S. at 229. In this pair of cases, giving favorable consideration to minority race and ethnicity in individualized admissions processes that *exclude no one from any place in an entering class on account of race* is the proverbial "welcome mat" that does not use race in a segregative or constitutionally offensive way.[9]

In this regard, there is an instructive parallel between legislative redistricting and university admissions. Each activity is part of a process for the formation of groups in the operation of a pluralistic system – whether for lawmaking or for the composition of a diverse student class. Moreover, just as there is usually no way for those drawing legislative district lines to avoid knowing the race and party affiliation of the residents of the voting districts that will be created, so too there is often no way for amici to avoid learning the race and ethnicity of their applicants as part of the individualized admissions processes on

---

[9] The members of this Court have drawn similar distinctions in other contexts, recognizing that use of sometimes problematic classifications does not invariably trigger a uniformly heightened level of constitutional alarm. *See, e.g., United States v. Virginia*, 518 U.S. 515, 533-34 (1996) ("Sex classifications may be used . . . to advance full development of the talent and capacities of our Nation's people."); *Johnson v. Transportation Agency*, 480 U.S. 616, 656 (1987) (O'Connor, J., concurring in the judgment) (gender may be used as a "'plus' factor" in affirmative action plan); *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 728 (1982) ("In limited circumstances, a gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened.").

HARV00066544

18

which amici rely. Through alumni interviews, application essays, and campus visits, amici gain a keen appreciation for the talents and backgrounds of their prospective students. To demand that amici close their eyes to the race and ethnicity of those students – alone among their many relevant characteristics – is as unrealistic as it is unjustified.

There are basic differences, of course, between forming a new legislative district and forming an entering college or law school class. Yet the two processes have enough in common that it is notable that this Court has not merely *upheld* redistricting that takes conscious and deliberate account of race but has actually concluded that "[s]trict scrutiny does not apply" invariably to such redistricting. *Bush v. Vera*, 517 U.S. 952, 958 (1996); *see also Easley v. Cromartie*, 532 U.S. 235, 241 (2001); *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999). In view of this approach to redistricting, it would be surprising to conclude at the same time that, whenever a university class is formed with consciousness of race, strict scrutiny not only *applies* but proves *fatal*. That no such conclusion does follow, and that the contrasts in legal doctrine are not so surprisingly stark after all, is entailed by what is special about universities as places that educate their students, and expect their students to educate each other, to take their place in a multiracial world. This mission enables universities' individualized and competitive consideration of race to satisfy strict scrutiny, while similar uses of race by most other institutions would presumably fail to pass that test.

**B. Explicit Consideration of Race and Ethnicity in an Individualized Admissions Process Is Fully Capable of Satisfying the Narrow Tailoring Requirement.**

The arguments raised by petitioners and their amici are beset by intractable contradictions. On the one hand, they complain that university admissions policies have impermissible collateral effects on those displaced by supposedly less qualified minorities. On the other, they contend that supposedly race-

HARV00066545

19

neutral alternatives can advance the same compelling interests in producing equally diverse and racially inclusive student populations. But if petitioners are correct that the alternatives will result in essentially the same levels of minority enrollments, then the impact on displaced non-minorities will, at minimum, be the same (and may even be worse, given the imprecise and overbroad nature of petitioners' alternatives). And if petitioners are not correct, as amici's experience strongly suggests, then their alternatives will not suffice. Either way, petitioners' arguments fail.

Moreover, petitioners' mechanistic, by-the-numbers proposals would threaten the ability of selective universities to ensure *non*-racial diversity in their student bodies – whether in terms of musical talents, unusual personal experiences, or other kinds of contributions. These proposals are anti-meritocratic and utterly contrary to amici's individualized admissions philosophies. Under petitioners' approach, the composition of an entering class will be changed for the worse, to the detriment of every student and the educational objectives of amici.

### 1. *Petitioners' Arguments Rest on a Misunderstanding of the Admissions Process at Selective Universities.*

An understanding of amici's admissions programs makes clear why petitioners' arguments are fundamentally misguided. The purpose of a university admissions process is not simply to identify the students who, if admitted, would be likeliest to earn the highest grade-point averages. Quite apart from the impossibility of reliably making that prediction, pursuit of so narrow a goal would be unlikely to yield a student body that any sensible university would wish to enroll. While amici continue to place the highest priority on academic rigor, they have always sought to enroll a broad cross-section of students who can bring a critical mix of experiences and perspectives into the university community and who can leave it well prepared to serve as future leaders of our society.

The factors considered in amici's individualized admissions

HARV00066546

20

programs are extraordinarily varied, wide-ranging, and notoriously difficult to quantify. Although petitioners and the United States sometimes give the impression that university admissions officers consider just test scores, class rank, and race, little could be more misleading. At Harvard College, for example, every application is read individually by at least one admissions officer and often two or more. All applicants are further considered, and any who are serious contenders for admission are discussed by a multi-member admissions subcommittee.[10] Candidates are reviewed and discussed yet again by the entire admissions committee, consisting of approximately 30 members, often supplemented by faculty members in relevant departments. All this review and discussion is necessary precisely because the admissions process seeks to form a class that is diverse along multiple dimensions, of which race is but one – a class that is more than the sum of its individual student parts.

Admission factors begin, of course, with the core academic criteria, including not just grades and test scores but teacher recommendations and state, regional, national, and international awards. In some cases, those criteria will be all but decisive, either positively (very rarely) or negatively (more often). In the vast majority of cases, however, they are not themselves decisive, and the process continues. Admissions officials give special attention to, among others, applicants from economically and/or culturally disadvantaged backgrounds, those with unusual athletic ability, those with special artistic talents, those who would be the first in their families to attend any college, those whose parents are alumni or alumnae, and those who have overcome various identifiable hardships. The committee also extends favorable consideration to applicants who write

---

[10] Well before they begin reviewing applications, amici engage in extensive recruiting efforts to encourage talented students, including those from minority backgrounds, to apply.

21

exceptionally well, to applicants who show a special dedication to public service, and to those who demonstrate unusual promise in a wide variety of fields.

These factors have a common feature: they provide evidence that particular students – all of whom have academic records very similar to many other highly capable students – are likely to add something distinctive to the university and, post-graduation, to the larger society. The decisions about whom to admit are typically made not head-to-head but sequentially, with an eye to the composition of the overall class. Each factor becomes part of the case for a particular applicant, just as other factors increase the chances for competing applicants. No one factor, including race, is dispositive, as empirical data make clear.[11]

By the same token, the individualized admissions process means that simply eliminating the consideration of minority race and ethnicity would not significantly increase any given non-minority student's odds of gaining admission to an academically selective university. Data from a representative sample of selective colleges and universities demonstrate that the admissions rate for white students would rise by less than two percentage points, from roughly 25 percent to 26.5 percent.[12]

---

[11] Analysis of data from leading private research universities for the undergraduate class entering in 1999 indicates that, among male minority applicants with combined SAT scores in the 1200-1299 range (within the top 10 percent of minority test-takers and the top 20 percent of all test-takers), the probability of admission was only about 35 percent. In other words, roughly two in three of these minority candidates were denied admission. At the very top of the SAT range (1400+), nearly two out of five were rejected. Indeed, the data show that recruited athletes at many selective colleges are far more likely to be admitted at a given SAT level than are minority candidates. *See* William G. Bowen & Sarah A. Levin, RECLAIMING THE GAME (forthcoming).

[12] Bowen and Bok, THE SHAPE OF THE RIVER 26, 36.

HARV00066548

22

2. *The Interest In Racial Diversity Cannot Be Served By Race-Neutral Reliance On Factors, Such As Economic Disadvantage, That Are Already Carefully Considered.*

Petitioners argue that race-conscious admissions decisions are unnecessary because suitable attention to race-neutral factors will do just as well. The United States urges (as one solution) that universities look to such factors as special economic hardship instead of race. *See* U.S. Grutter Br. 24-25. But the decisive fact is that all of the suggested race-neutral factors, and many more besides, already enter into admissions decisions.[13] Consideration of those factors alone does not achieve the distinctly *racial* diversity that amici seek in their student bodies. To accomplish that goal, admissions committees must give favorable consideration to minority race *in addition* to those other factors, not *instead* of them.

To "tweak" the race-neutral factors emphasized by petitioners – for example, by deliberately tilting individual admissions toward "hardship" students in the hope of thereby selecting a large enough increment of minority students to make up for the losses that would result from race-blind admissions – would be disingenuous at best. Such an approach would in truth be a race-based policy and not a race-neutral alternative at all. Indeed, such programs, if adopted to assure increased minority enrollment, would be based on race in a causal sense and would thus raise obvious constitutional questions of their own. *See Shaw v. Reno*, 509 U.S. 630, 643-44 (1993); *Hunter v. Underwood*, 471 U.S. 222, 228-33 (1985). And no one is well

---

[13] The United States cites, as possible factors, "a history of overcoming disadvantage, geographic origin, socioeconomic status, challenging living or family situations, reputation and location of high school, volunteer and work experiences, exceptional personal talents, leadership potential, communication skills, commitment and dedication to a particular cause, extracurricular activities, extraordinary expertise in a particular area, and individual outlook as reflected by essays." U.S. Grutter Br. 25. Amici already give significant favorable consideration to all of these factors.

HARV00066549

23

served, especially in a university setting animated by respect for truth, by preferring covert processes to those that are candid, open, and forthright.

In any event, such programs would interfere with or profoundly alter what a university is seeking to achieve, not merely serve the goal in an alternative way. A race-neutral preference for economically disadvantaged students, for example, would admit many more whites than non-whites, because of sheer demographic realities.[14] And, of course, the university interest in admitting minority students goes well beyond just admitting minority students from disadvantaged backgrounds.

### 3. *The Interest in Racial Diversity Cannot Be Served By The Newer Alternatives Involving Non-Individualized Guaranteed Admissions.*

There are related, and no less serious, problems with plans – like those in Florida, Texas, and California – that guarantee admission to students who graduate in a certain percentile of their class. Available research suggests that the impact of these plans on minority admissions is quite limited and due in significant part to lingering racial segregation in secondary schools – itself a deeply problematic state of affairs.[15]

---

[14] *See* Columbia Brief in *Bakke* at 19; *see also* STATISTICAL ABSTRACT OF THE UNITED STATES 2001, at 442-43, Tables 679, 682 (1999 figures: 21.9 million Whites below poverty line; 8.36 million Blacks; 1.16 million Asians and Pacific Islanders; 7.4 million Hispanics); Thomas J. Kane, *Racial and Ethnic Preferences in College Admissions*, in THE BLACK-WHITE TEST SCORE GAP 448 (Brookings, 1998).

[15] *See Appearance and Reality in the Sunshine State*, Harvard Civil Rights Project (Feb. 2003) (available at www.civilrightsproject.harvard.edu); *Percent Plans in College Admissions: A Comparative Analysis of Three State Experiences*, Harvard Civil Rights Project (Feb. 2003) (available at www.civilrightsproject.harvard.edu); Derek Bok, *The Uncertain Future of Race-Sensitive Admissions* at 34 (reporting that while the number of black applicants to the University of Texas (Austin) rose by more than 20 percent

HARV00066550

24

Moreover, these proposals would plainly be impractical for relatively small, academically selective universities. For example, even if a college were to guarantee admission only to valedictorians in high schools across the country, the program simply could not work: according to the U.S. Department of Education, there are well over 30,000 high schools in the United States. In 2002, almost 2,900 valedictorians applied to Harvard, but the number of applicants offered admission to the freshman class was only 2,066. Over 1,600 applicants scored a perfect 800 on their verbal SATs, and over 2,100 scored a perfect 800 on the math portion. Harvard College could not accept all applicants in either category and would not wish to do so.

Nor could guaranteed admissions plans feasibly operate at the graduate level, where the pools of applicants are very different and the entering classes much smaller. Applicants to graduate schools are competing for far fewer spaces, making the problems of guaranteeing admission slots all but insurmountable. Notably, while petitioners and the United States endorse these plans, they make no real effort to show how the experience of a handful of large States would be transferable to other, very different, public and private institutions.

Practicalities aside, the allocation of guaranteed places is incompatible with the long-standing policies and practices of any truly selective university. Guaranteed admission plans would deny admissions officers the critical capacity to consider each applicant as an individual on his or her overall merits in the context of the admitted group as a whole. For example, a black student with lower class standing from a rigorous urban school

---

between 1996 and 2001, the number of blacks admitted fell by more than 15 percent and that while the number of Hispanic applicants rose by 20 percent, the number admitted dropped by almost 12 percent); John F. Kain and Daniel M. O'Brien, "Hopwood and the Top 10 Percent Law: How Have They Affected the College Enrollment Decisions of High School Graduates," presented at the National Bureau of Economic Research Meeting on Higher Education (Boston: Nov. 9, 2001; revised Dec. 2002).

HARV00066551

25

may well be academically superior to black students who graduate at the top of smaller and less rigorous high schools. In Texas, for example, the average SAT scores of the top 10 percent of University of Texas students dropped from 1242 in 1996 to 1211 in 2000. The percentage of the class with scores under 1000 virtually doubled.[16] In principle, a sensibly selective admissions program should take the strongest students, including the strongest minority students, a result that can be achieved only by amici's genuinely individualized procedures.

A practice of awarding of guaranteed places would thus diminish the ability of selective universities to achieve excellence and non-racial forms of diversity. Even if a "top 10 percent" program succeeded in admitting a significant number of minority students, it would likely compel the admission of so many other "guaranteed" students that it left too few places for those with more unusual talents and experiences to contribute. Squeezing the admissions process into so Procrustean a bed would conflict with the basic approach of selective university admissions as amici understand and have long embraced it. Whatever strict scrutiny properly requires, it should not force public *or* private universities to serve one vital interest (racial diversity) at the expense of another (individualized selection of students) and in the process sacrifice the constitutional imperative of respecting academic freedom.

### C.  Consideration of Race Does Not Make An Admissions Plan A Quota.

Properly tailored admissions programs differ from quotas in the critical sense that they do not bar any slot to any individual based on his or her race but fully preserve "individual" consideration (*Bakke*, 438 U.S. at 319-20 (opinion of Powell, J.)), consistent with traditional principles of university admissions.   Although amici *consider* minority race and

---

[16] Derek Bok, *The Uncertain Future of Race-Sensitive Admissions*, at 35.

HARV00066552

ethnicity, the *impact* of that consideration always depends on the qualifications of all other applicants, including those who receive consideration for being, for instance, the first in their families to attend college or for having persevered in the face of illness or after losing a parent.  The consideration of race remains at all times within the bounds of the overall, individualized admissions process.[17]

The California-Davis policy in *Bakke* was quite different.  As Justice Powell made clear, *see* 438 U.S. at 315-19, the problem with the California-Davis minority admissions program was not that it sought to enroll an increased number of minority students, or even that it quantified its aspiration candidly, but that the goal of admitting a particular number of qualified minority students effectively became the tail that wagged the dog.  Because California-Davis established a prescribed floor for the number of qualified minority students to be admitted, the central admissions question became not how well a particular minority applicant matched up to the overall pool of medical school applicants, but whether he or she was qualified for one of the fixed number of slots set aside for minority applicants alone.  No matter how

---

[17] Even in those settings where "[w]e know that, like . . . gender," "race . . . matters," *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 148 (1994) (O'Connor, J., concurring) – where, to offer one suggestive instance, "there is substantial reason to believe" that "minority representation" in a "racially mixed" group "may help to overcome . . . racial bias" on the part of non-minority members of that group, *Georgia v. McCollum*, 505 U.S. 42, 68 (1992) (juries) (O'Connor, J., dissenting from holding that criminal defendants, like the state itself, may not peremptorily strike jurors on the basis of race) – state action to exclude someone altogether from a given position or opportunity on account of the individual's race or gender is ordinarily impermissible as an affront to the equal dignity of the excluded individual.  *See J.E.B.*, 511 U.S. at 142 & n.14 (majority opinion); *id.* at 153-54 (Kennedy, J., concurring); *Batson v. Kentucky*, 476 U.S. 79 (1986).  It is for this special situation that one should reserve the pejorative term, "quota."  But no such dignitary concern is properly triggered when minority race is simply given due consideration as one of many factors in a setting where the fact of the individual's race is no proxy but is itself an independently relevant variable.

HARV00066553

27

outstanding the competing applicants from those groups might have been in a given year, they still could not gain admission to any of the reserved seats unless the university first found an absence of qualified minority candidates to admit.

A properly individualized admissions program does not suffer from this "set-aside" defect. Nor does an individualized admissions process become a "quota" simply because the number of admitted minority students may not vary radically from year to year. Amici's admissions committees do not have fixed targets for any group of admitted students, and the percentages for different groups change over time. Thus, over the past four years at Harvard College, the number of admitted students whose fathers did not attend any college has ranged from 220 to 228 – or from a low of 10.6% of admitted students to a high of 11.0%, or a variation of approximately 3.8%. For the same academic years, the percentage of African-American students among the admitted applicants was as low as 8.76% and as high as 9.92% – approximately a 13% variation. That said, the makeup of any given class does tend to be relatively predictable, simply because the applicant pool tends to be relatively consistent. One would expect, for example, that the number of redheaded students in the entering class would be relatively constant from year to year – but that hardly demonstrates the existence of an "redhead quota."

### D. Race-Conscious Admissions Programs Are Not Open-Ended Commitments.

Petitioners contend that consideration of race and ethnicity will create an ever-expanding precedent that can have no temporal stopping point and that will lead to claims by other groups – whether social, religious, or ideological – for "fair" representation on our university campuses. That misconstrues amici's argument. Amici are not asserting that any group, including African Americans, has a "right" to proportionate representation either in academia or in the professions – only that action by universities to achieve substantial and meaningful

HARV00066554

28

inclusion, if carefully tailored, violates no right on the part of others and no constitutional or statutory commitment of our society. The decision of a university as to which minority groups deserve favorable consideration in an individualized admissions process designed to foster such diverse representation, and the weight of such consideration, are necessarily and appropriately decisions to be made as a matter of educational judgment, taking into account both the university's sense of its mission and its best estimate of the leadership needs it will address – not as a matter of conflicting "rights."

Petitioners and their amici object, finally, that race-conscious university admissions programs have no identifiable time limit. *See* U.S. Grutter Br. 32-34. We question whether this is a cognizable constitutional complaint. Although this Court has at times expressed concern about temporal indefiniteness, it has never held that measures necessary to reach an intended objective – that is, measures otherwise properly tailored to serve a compelling interest – were to be struck down simply because such measures lack a clear exit strategy or a definite "sunset" provision. *See, e.g., Burson v. Freeman*, 504 U.S. 191 (1992) (First Amendment context). The proper constitutional concern would thus seem to be whether the selected means outlast the interest they are designed to serve, not whether they go on "too long" in some abstract, undefined sense. *Cf. Eldred v. Ashcroft*, 123 S. Ct. 769 (2003) (20-year extension of copyright terms held permissible).

In any event, even if there must be an ultimate end to the consideration of race in university admissions, it is surely premature to declare that the end is upon us. We are not so far removed from the days when segregation by race in education, and race discrimination in all sorts of vital opportunities relevant to educational performance, were for many a matter of law. *Brown v. Bd. of Education*, 347 U.S. 483 (1954); *Swann v. Charlotte-Mecklenburg Bd. of Education*, 402 U.S. 1 (1971); *Hills v. Gautreaux*, 425 U.S. 284 (1976). However devoutly we

HARV00066555

might wish it were otherwise, the effects of that history cannot be expected to play themselves out within a single generation. *See* Glenn Loury, THE ANATOMY OF RACIAL INEQUALITY 4 (2002). Progress toward a goal does not mean that the goal has been reached.

But progress there has been. Amici have seen a sharp rise in the number of applications filed by minority students during the past few decades. At the same time, the overall credentials of minority applicants – including the raw numbers on which others place so much emphasis – have increased as well. This is so, in fact, both on an absolute basis and in comparison with other applicants.

Average SAT test scores for minority students rose roughly 130 points at a group of liberal arts colleges studied in 1976 and 1995, and approximately 150 points at a group of research universities.[18] Test scores for non-minority students rose as well, but by much smaller increments (about 30 points at the liberal arts colleges and 70 points at the research universities). If these trends continue, the interest in a racially diverse student body might gradually become decoupled from policies that give favorable consideration to minority race and ethnicity. But hoping that day will come sooner rather than later cannot be translated into a constitutional imperative that the nation's universities act as though that day has already arrived.

---

[18] William G. Bowen & Sarah A. Levin, RECLAIMING THE GAME (forthcoming).

HARV00066556

30

## CONCLUSION

This Court should affirm the judgments of the court of appeals in No. 02-241 and of the district court in No. 02-516.

Respectfully submitted.

ROBERT W. IULIANO
HARVARD UNIVERSITY
Holyoke Center 980
1350 Massachusetts Ave.
Cambridge, MA 02138
(617) 495-1280

LAURENCE H. TRIBE
*Counsel of Record*
JONATHAN S. MASSEY
1575 Massachusetts Ave.
Cambridge, MA 02138
(617) 495-4621

BEVERLY LEDBETTER
BROWN UNIVERSITY
110 South Main Street
Providence, RI 02903
(401) 863-9900

BETH A. HARRIS
THE UNIVERSITY OF CHICAGO
5801 South Ellis Avenue
Chicago, IL 60637
(773) 702-7243

ROBERT B. DONIN
DARTMOUTH COLLEGE
14 South Main Street
Suite 2C
Hanover, NH 03755
(603) 646-0101

KATE S. HENDRICKS
DUKE UNIVERSITY
Office of University Counsel
North Pavilion Building
2400 Pratt Street, Suite 400
Durham, NC 27710
(919) 684-3955

HARV00066557

31

WENDY S. WHITE
UNIVERSITY OF
PENNSYLVANIA
133 South 36th Street
Philadelphia, PA 19104
(215) 746-5200

PETER G. MCDONOUGH
LORRAINE SCIARRA
PRINCETON UNIVERSITY
Office of General Counsel
120 Alexander Street
Princeton, NJ 08544
(609) 258-2500

DOROTHY K. ROBINSON
YALE UNIVERSITY
2 Whitney Avenue, 6th Floor
New Haven, CT 06510

HARV00066558