# EXHIBIT 153

No. 11-345

IN THE

# Supreme Court of the United States

ABIGAIL NOEL FISHER,

*Petitioner,*

*v.*

UNIVERSITY OF TEXAS AT AUSTIN, *et al.,*

*Respondents.*

ON WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

BRIEF OF BROWN UNIVERSITY, UNIVERSITY OF
CHICAGO, COLUMBIA UNIVERSITY, CORNELL
UNIVERSITY, DARTMOUTH COLLEGE, DUKE UNI-
VERSITY, HARVARD UNIVERSITY, JOHNS HOP-
KINS UNIVERSITY, MASSACHUSETTS INSTITUTE
OF TECHNOLOGY, UNIVERSITY OF PENNSYL-
VANIA, PRINCETON UNIVERSITY, STANFORD
UNIVERSITY, VANDERBILT UNIVERSITY, AND
YALE UNIVERSITY
IN SUPPORT OF RESPONDENTS

SETH P. WAXMAN
 *Counsel of Record*
PAUL R.Q. WOLFSON
KELLY P. DUNBAR
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 663-6000
seth.waxman@wilmerhale.com

ADDITIONAL COUNSEL LISTED ON INSIDE COVER

HARV00018900

BEVERLY E. LEDBETTER
VICE PRESIDENT AND
 GENERAL COUNSEL
BROWN UNIVERSITY
110 South Main St.
Providence, RI 02912-1913

BETH A. HARRIS
UNIVERSITY OF CHICAGO
VICE PRESIDENT AND
 GENERAL COUNSEL
5801 S. Ellis Ave., Suite 619
Chicago, IL 60637

JANE E. BOOTH
GENERAL COUNSEL
COLUMBIA UNIVERSITY
535 West 116th St.
New York, NY 10027

JAMES J. MINGLE
UNIVERSITY COUNSEL
CORNELL UNIVERSITY
250 Myron Taylor Hall
Ithaca, NY 14853-4901

ROBERT B. DONIN
GENERAL COUNSEL
DARTMOUTH COLLEGE
63 South Main St.
Hanover, NH 03755

PAMELA J. BERNARD
VICE PRESIDENT AND
 GENERAL COUNSEL
DUKE UNIVERSITY
310 Blackwell St., 4th Floor
Box 104124
Durham, NC 27710

ROBERT W. IULIANO
VICE PRESIDENT AND
 GENERAL COUNSEL
HARVARD UNIVERSITY
Holyoke Center, Suite 980
1350 Massachusetts Ave.
Cambridge, MA 02138-3834

DEREK SAVAGE
INTERIM GENERAL COUNSEL
 AND DEPUTY GENERAL
 COUNSEL
JOHNS HOPKINS UNIVERSITY
113 Garland Hall
3400 N. Charles St.
Baltimore, MD 21218

R. GREGORY MORGAN
VICE PRESIDENT AND
 GENERAL COUNSEL
MASSACHUSETTS INSTITUTE
 OF TECHNOLOGY
77 Massachusetts Ave.
Cambridge, MA 02139-4307

WENDY S. WHITE
SENIOR VICE PRESIDENT
 & GENERAL COUNSEL
UNIVERSITY OF PENNSYLVANIA
133 South 36th St., Suite 300
Philadelphia, PA 19104-3246

PETER G. MCDONOUGH
GENERAL COUNSEL
PRINCETON UNIVERSITY
120 Alexander St., 2nd Fl.
Princeton, NJ 08540

DEBRA ZUMWALT
VICE PRESIDENT AND
 GENERAL COUNSEL
STANFORD UNIVERSITY
Bldg. 170, 3rd Fl., Main Quad
Stanford, CA 94305

DAVID WILLIAMS II
VICE CHANCELLOR FOR
 UNIVERSITY AFFAIRS
 AND ATHLETICS, GENERAL
 COUNSEL AND SECRETARY
 OF THE UNIVERSITY
VANDERBILT UNIVERSITY
2100 West End Ave., Suite 750
Nashville, TN 37203

DOROTHY K. ROBINSON
VICE PRESIDENT AND
 GENERAL COUNSEL
YALE UNIVERSITY
2 Whitney Ave., 6th Fl.
New Haven, CT 06510

HARV00018901

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...........................................iii

INTEREST OF AMICI CURIAE...................................1

SUMMARY OF ARGUMENT.......................................3

ARGUMENT.............................................................6

I.  THIS COURT SHOULD REAFFIRM *GRUT-TER*'S CORE HOLDINGS THAT DIVERSITY IS A COMPELLING INTEREST AND THAT UNIVERSITIES MAY PURSUE DIVERSITY WITHOUT RELYING UPON OSTENSIBLY RACE-NEUTRAL ALTERNATIVES THAT WOULD UNDERMINE OTHER IMPORTANT ASPECTS OF A UNIVERSITY'S MISSION ....................6

    A.  Diversity Remains A Compelling Educational Interest For Amici Institutions.........................................................6

    B.  Mechanistic, Ostensibly Race-Neutral Policies Are Not Constitutionally Required Alternatives For Achieving Diversity................................................14

II.  PETITIONER'S ARGUMENTS REGARDING THE APPLICATION OF STRICT SCRUTINY ARE DEEPLY FLAWED..............................................17

    A.  Petitioner's Reliance On *Parents Involved* Is Unavailing ...........................19

    B.  Petitioner Misapprehends The Educational Mission Of Universities And The Role And Benefits Of Diversity.......................22

(i)

HARV00018902

ii

**TABLE OF CONTENTS—Continued**

                                                              Page

C. This Court Has Not Applied And
   Should Not Apply A Strong-Basis-In-
   Evidence Standard To The Unique
   Context Of Higher Education ............................27

CONCLUSION ................................................................32

HARV00018903

iii

## TABLE OF AUTHORITIES

### CASES

Page(s)

*Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200 (1995) ............................................ 18

*Board of Regents of University of Wisconsin System* v. *Southworth*, 529 U.S. 217 (2000) ........... 30

*Brown* v. *Board of Education of Topeka*, 347 U.S. 483 (1954) .......................................... 24

*City of Richmond* v. *J.A. Croson Co.*, 488 U.S. 469 (1989) ................................... 27, 28

*Dickerson* v. *United States*, 530 U.S. 428 (2000) ........... 13

*Gratz* v. *Bollinger*, 539 U.S. 244 (2003) ........................... 7

*Grutter* v. *Bollinger*, 539 U.S. 306 (2003) .......... 1, *passim*

*Parents Involved in Community Schools* v. *Seattle School District No. 1*, 551 U.S. 701 (2007) ........................................... 4, *passim*

*Planned Parenthood of Southeastern Pennsylvania* v. *Casey*, 505 U.S. 833 (1992) ...................... 13

*Regents of University of California* v. *Bakke*, 438 U.S. 265 (1978) ................................ 1, 6, 7, 24, 29

*Regents of University of Michigan* v. *Ewing*, 474 U.S. 214 (1985) ............................... 14, 30

*Ricci* v. *DeStefano*, 129 S. Ct. 2658 (2009) ..................... 28

*Shaw* v. *Reno*, 509 U.S. 630 (1993) ................................ 12

*Sweezy* v. *New Hampshire*, 354 U.S. 234 (1957) ........... 29

*University of Pennsylvania* v. *EEOC*, 493 U.S. 182 (1990) ................................................ 30

HARV00018904

iv

### TABLE OF AUTHORITIES—Continued

Page(s)

*Wygant* v. *Jackson Board of Education*, 476
U.S. 267 (1986) ..................................................27, 28

### OTHER AUTHORITIES

Byrne, J. Peter, *Academic Freedom: A "Special Concern of the First Amendment"*, 99
Yale L.J. 251 (1989) .................................................29

Dartmouth College, *Mission*, *available at*
http://www.dartmouth.edu/home/about/mis
sion.html (last visited Aug. 12, 2012).......................23

Harvard College, Office of Admissions, *A Brief
Profile of the Admitted Class of 2016*,
*available at* http://www.admissions.college.
harvard.edu/apply/statistics.html (last visited Aug. 12, 2012) .......................................................16

Harvard University, *Frequently Asked Questions*, *available at* http://www.harvard.edu/
faqs/mission-statement (last visited Aug.
12, 2012) ......................................................................23

Laycock, Douglas, *The Broader Case For Affirmative Action: Desegregation, Academic Excellence, and Future Leadership*,
78 Tul. L. Rev. 1767 (2004) ......................................25

Minow, Martha, *After* Brown*: What Would
Martin Luther King Say?*, 12 Lewis &
Clark L. Rev. 599 (2008) ...........................................17

Payton, John, *Post-*Grutter*: What Does Diversity Mean in Legal Education and Beyond?*, 35 Pepp. L. Rev. 569 (2008) .........................25

HARV00018905

v

### TABLE OF AUTHORITIES—Continued

Page(s)

Snyder, Thomas D., & Sally A. Dillow, *Digest of Education Statistics 2011* (June 2012), *available at* http://nces.ed.gov/pubs2012/ 2012001.pdf ..................................................... 15

Stanford University, *The Founding Grant with Amendments, Legislation, and Court Decrees, available at* https://ogc.stanford.edu/ sites/ogc.stanford.edu/files/Founding%20 Grant%20(equivalent%20to%20SU%20 Articles%20of%20Incorporation)_22124_1. pdf (last visited Aug. 12, 2012) ................................ 23

Tilghman, Shirley M., *2005 Opening Exercises Greeting and Address* (Sept. 2005), *available at* http://www.princeton.edu/president/ speeches/20050911 ...................................... 10

The Common Application, *2012-2013 First-Year Application, available at* https://www.commonapp.org/commonapp/ DownloadForms/2013/2013PacketFY_ download.pdf (last visited Aug. 12, 2012) ............... 12

Yale University, *University Mission Statement, available at* http://www.yale.edu/ about/mission.html (last visited Aug. 12, 2012) ...................................................... 23

HARV00018906

## INTEREST OF AMICI CURIAE[1]

Brown University, University of Chicago, Columbia University, Cornell University, Dartmouth College, Duke University, Harvard University, Johns Hopkins University, Massachusetts Institute of Technology, University of Pennsylvania, Princeton University, Stanford University, Vanderbilt University, and Yale University submit this brief as amici curiae in support of respondents. Amici have long used admissions policies similar to the Harvard Plan that Justice Powell approved in *Regents of University of California* v. *Bakke*, 438 U.S. 265 (1978), and the University of Michigan Law School plan this Court upheld in *Grutter* v. *Bollinger*, 539 U.S. 306 (2003). Amici accordingly have substantial experience with admissions policies that consider all aspects of an applicant's background and experience, including in some circumstances the applicant's racial or ethnic background.

Although Amici differ in many ways, they speak with one voice to the profound importance of a diverse student body—including racial diversity—for their educational missions. Amici seek to provide their students with the most rigorous, stimulating, and enriching educational environment, in which ideas are tested and debated from every perspective. They also seek to prepare active citizens and leaders in all fields of human endeavor. Although all Amici have highly selective admissions criteria designed to ensure that all of their

---

[1] Letters consenting to the filing of this brief have been filed with the Clerk of the Court. No counsel for a party authored this brief in whole or in part, and no person, other than amici or their counsel, made any monetary contribution to the preparation or submission of this brief.

HARV00018907

2

students (including minority students) will be prepared for demanding coursework and will graduate successfully, they all recognized long ago that admissions by purely numerical factors such as grade-point averages and standardized test scores would not effectively accomplish their broader educational missions.

Amici therefore examine all aspects of individual applicants to assess potential for both extraordinary achievement and contribution to the university's learning environment. This holistic review is necessary in light of Amici's missions and roles. Each includes undergraduate, graduate, and professional schools. All draw applicants from around the nation and the world. All emphasize collaborative research, teaching, and learning. And all are residentially based communities where learning takes place not just from faculty but also in the broad range of students' interactions with their peers, in the classroom, and in many other settings.

In Amici's experience, a diverse student body adds significantly to the rigor and depth of students' educational experience. Diversity encourages students to question their own assumptions, to test received truths, and to appreciate the spectacular complexity of the modern world. This larger understanding prepares Amici's graduates to be active and engaged citizens wrestling with the pressing challenges of the day, to pursue innovation in every field of discovery, and to expand humanity's learning and accomplishment.

Amici have relied on *Bakke* and *Grutter* in shaping admissions policies designed to achieve these goals. A decision questioning or repudiating the principles in those cases could significantly impair Amici's ability to achieve their educational missions. Although Amici are

HARV00018908

3

private institutions, they are cognizant that Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial "discrimination," and so their ongoing efforts to attain diverse student bodies could be compromised by new limits this Court might place on state university admissions procedures. Amici accordingly urge the Court to interpret the Constitution, consistent with *Bakke* and *Grutter*, to continue to allow educational institutions to structure admissions programs that take account of race and ethnicity as single factors within a highly individualized, holistic review process.

## SUMMARY OF ARGUMENT

This Court held in *Grutter* that diversity in higher education, of which race and ethnicity may be components, is a compelling government interest. This Court also held that the Constitution does not require a university to choose between academic selectivity and diversity, and thus does not require a university to use mechanistic, ostensibly race-neutral admissions plans as its means of obtaining a diverse student body. Petitioner here does not challenge either of those holdings, which remain of exceptional importance. Universities continue to have a compelling interest in ensuring that their student bodies reflect a robust diversity that enables them to offer a learning environment that enriches the educational experience for all students and also prepares them to be active, capable citizens and leaders in a complex and heterogeneous nation and world. A constitutional rule that universities may achieve such diversity only through the use of mechanistic policies would not only be unworkable for Amici institutions but would be fundamentally incompatible with Amici's educational missions. This Court accord-

HARV00018909

4

ingly should take pains not to disturb, indeed should emphatically reaffirm, those core holdings of *Grutter*.

The arguments petitioner does make in challenging the admissions policy of the University of Texas ("UT") would have this Court depart significantly from its settled equal protection jurisprudence. Amici write to emphasize three conspicuous errors in petitioner's understanding of strict scrutiny.

First, the decision in *Grutter*, not the various opinions in *Parents Involved in Community Schools* v. *Seattle School District No. 1*, 551 U.S. 701 (2007), supplies the appropriate framework for reviewing race-conscious university admissions policies. *Parents Involved* addressed student assignment policies markedly different from holistic review. The Court emphasized in *Parents Involved* that the policies at issue were structured such that race was effectively the entire classification; the policies employed race in a mechanistic, binary fashion; and the policies called for no individualized consideration of any other aspects of a student. Both the majority opinion and the concurring opinion of Justice Kennedy therefore drew a sharp distinction between the policies at issue in *Parents Involved* and those approved in *Grutter*.

Second, petitioner's understanding of the scope and nature of the educational benefits of diversity is deeply flawed. This Court recognized in *Grutter* that one aspect of the mission of many universities is training future citizens and leaders for a heterogeneous society, and that diversity is vital to that objective. Petitioner's claim (at 26) that diversity is exclusively an "inward-facing" concept misunderstands both precedent and the educational mission of many universities, including Amici. Petitioner's related contention—that any con-

HARV00018910

5

sideration by a university of demographics in assessing diversity amounts to racial balancing—is equally misplaced. When a university considers which applicants will best contribute to a vibrant learning environment intended to prepare citizens and leaders for a heterogeneous society in which race remains a salient social factor, the university need not ignore the communities from which its students come and into which its students will graduate, whether it be a single state, the nation, or the world.

Third, contrary to petitioner's contention, this Court has never applied a strong-basis-in-evidence standard to race-conscious university admissions, and it should not do so now. This Court has applied that standard in the public contracting and employment contexts, where race was the predominant consideration in measures ostensibly taken to remedy historical discrimination or to avoid claims of discrimination. Those settings have nothing to do with the consideration of race and ethnicity as single aspects of individualized review in higher education. The application of such a standard to higher education would seriously impair a university's ability to use its educational judgment and experience, developed over decades, in deciding which students to admit. Educational judgment and experience are fundamental components of a university's academic freedom, protected by the First Amendment. Petitioner's proposed standard, moreover, could have a particularly significant impact on Amici: Given the large number of qualified applicants to whom each institution must deny admission every year and the non-quantifiable aspects of individualized, holistic review, it would invite significant litigation and judicial intrusion into university admissions processes and decisions.

HARV00018911

6

## ARGUMENT

I. THIS COURT SHOULD REAFFIRM *GRUTTER*'S CORE
HOLDINGS THAT DIVERSITY IS A COMPELLING INTER-
EST AND THAT UNIVERSITIES MAY PURSUE DIVERSITY
WITHOUT RELYING UPON OSTENSIBLY RACE-NEUTRAL
ALTERNATIVES THAT WOULD UNDERMINE OTHER IM-
PORTANT ASPECTS OF A UNIVERSITY'S MISSION

### A. Diversity Remains A Compelling Educational Interest For Amici Institutions

Justice Powell recognized in *Regents of University
of California* v. *Bakke*, 438 U.S. 265 (1978), and this
Court held unequivocally in *Grutter* v. *Bollinger*, 539
U.S. 306, 328 (2003), that universities "ha[ve] a compel-
ling interest in attaining a diverse student body." The
Court in *Grutter* further underscored that the educa-
tional benefits of diversity are "substantial" and "not
theoretical but real." *Id.* at 330. These are points to
which Amici can attest without qualification. Decades
of experience with admissions policies based on the
Harvard Plan, *Bakke*, and *Grutter* have convinced them
that the quality of their students' education is greatly
enriched if the student body is diverse in many ways—
including racial and ethnic diversity. Diversity encour-
ages students to question their assumptions, to under-
stand that wisdom and contributions to society may be
found where not expected, and to gain an appreciation
of the complexity of the modern world. In these ways,
diversity bolsters the unique role of higher education in
"preparing students for work and citizenship" and
training "our Nation's leaders" for success in a hetero-
geneous society. *Id.* at 331, 332; *see Parents Involved
in Community Schools* v. *Seattle School District No. 1*,
551 U.S. 701, 783 (2007) ("Diversity … is a compelling
educational goal that a school district may pursue.")

HARV00018912

7

(Kennedy, J., concurring in part and concurring in the judgment).

Petitioner does not ask this Court to abandon *Grutter*'s holding on this score. *See, e.g.*, Pet. Br. 26 ("*Grutter* ... permits race to be used as a factor in admissions decisions to obtain a 'critical mass' of otherwise under-represented minority students for educational reasons."); JA74a. That acknowledgment is exceptionally important to Amici. The admissions policies of Amici vary somewhat, but each is firmly committed to individualized, holistic review of the type long approved of by this Court.[2] In deciding which students to admit, Amici consider all aspects of their applicants both as individuals and also in relation to other potential members of the incoming class. That review is intended to produce a student body that is talented and diverse in many ways, including in intellectual interests, geography, socio-economic status, background and experience (including race and ethnicity), perspective, and areas of accomplishment.

1. In pursuing an academically excellent and broadly diverse student body, Amici do not place dispositive weight on objective numerical measures such as

---

[2] *See Grutter*, 539 U.S. at 337 (upholding admissions policy because the Law School "engages in a highly individualized, holistic review of each applicant's file"); *Gratz* v. *Bollinger*, 539 U.S. 244, 271 (2003) (identifying constitutional vice in undergraduate admissions as the absence of "individualized consideration"); *id.* at 276 (O'Connor, J., concurring) (flaw in undergraduate admissions was a lack of "meaningful individualized review of applicants"); *Bakke*, 438 U.S. at 315 (Powell, J.) ("The diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.").

HARV00018913

8

GPA and SAT scores. Certainly, Amici seek students who have the potential to succeed at demanding coursework, but each institution's applicant pool includes many more academically strong candidates than the institution could hope to admit, and even the highest GPA or SAT scores by no means guarantee admission.[3] Thus, in addition to seeking students who are qualified, each institution also looks to compose a student body that is exceptional, complementary, and diverse in many ways. In service of this goal, each institution seeks, and invites applicants to submit, any relevant information about their experiences, accomplishments, and background to understand how the applicant might contribute to the vibrancy of the student body. The individualized, holistic review processes employed by Amici are not ways of ranking candidates from "strong" to "weak" but instead means to assemble an exceptional undergraduate community that exposes

---

[3] Amici's focus on factors beyond objective qualifications reflects both their educational philosophy and the strength of their applicant pools. For example, in the most recent admissions year, one Amicus could have filled more than two full matriculating classes from students ranked first in their high schools. In fact, however, only 12 percent of those applicants were admitted, comprising slightly more than 21 percent of the total number of admitted applicants. For that school, more than eight matriculating classes could have been filled by students in the top ten percent of their high schools. Another Amicus recently admitted only six percent of applicants in the top ten percent of their high school classes and declined to admit nearly two thirds of applicants with perfect SAT scores. And a third Amicus institution has admitted, over the last three admission cycles, fewer than half of applicants with perfect SAT scores. That same institution received applications from 2,272 valedictorians for the class of 2016, but admitted only 294 of those applicants.

HARV00018914

9

students to differences of many kinds: backgrounds, ideas, experiences, talents, and aspirations.

Amici's admissions policies are based on the principle that, in a free society, inquiry proceeds best when views and goals must withstand examination from the widest possible range of perspectives. And Amici's experiences bear this out: A student body that is diverse in many dimensions, including racial and ethnic background, produces enormous educational benefits. Such diversity significantly improves the rigor and quality of students' educational experiences by leading them to examine and confront themselves and their tenets from many different points of view. It also prepares them for life, work, and leadership in a nation and world that are constantly becoming more complex.

This diversity benefits society as well, for it fosters the development of citizens and leaders who are creative, collaborative, and able to navigate deftly in dynamic, diverse environments. Indeed, the university plays a unique and critical role in this respect, for in our society a university educational experience may offer one of the few opportunities for individuals to live and interact on a daily basis with peers from markedly different backgrounds, experiences, and perspectives. As one university president has explained:

> Princeton also offers you a once-in-a-lifetime opportunity to connect with men and women whose lives have differed dramatically from your own; who view the world from a different vantage point. Never again will you live with a group of peers that was expressly assembled to expand your horizons and open your eyes to the fascinating richness of the human condition. … The reason [the Admission Office] took such

HARV00018915

10

care in selecting all of you—weighing your
many talents, your academic and extracurricu-
lar interests, your diverse histories—was to in-
crease the likelihood that your entire educa-
tional experience, inside and outside the class-
room, is as mind-expanding as possible.  When
you graduate you will enter a world that is now
truly global in perspective, and in which suc-
cess will require that you have a cosmopolitan
attitude.  You must be equipped to live and
work in not one culture, but in many cultures.

Shirley M. Tilghman, *2005 Opening Exercises Greeting
and Address* (Sept. 2005), *available at* http://www.
princeton.edu/president/speeches/20050911.[4]

Like this Court, Amici look forward to the day
when race does not matter.  *See Grutter*, 439 U.S. at 343
(anticipating that "25 years from now, the use of racial
preferences will no longer be necessary to further the
interest" in diversity); *id.* at 346 (Ginsburg, J., concur-
ring) ("one may hope, but not firmly forecast, that over
the next generation's span, progress toward nondis-
crimination and genuinely equal opportunity will make
it safe to sunset affirmative action").  But for now, "the
reality is that" "race [does] matter[]."  *Parents In-
volved*, 551 U.S. at 787 (Kennedy, J., concurring in part

---

[4] For Amici, diversity is meant to benefit the student body
both inside and outside the classroom.  Because Amici are all resi-
dential institutions, each strives to create a learning environment
in which education occurs both within the classroom and through
myriad other student interactions—in residences and dining halls,
in performance, artistic, athletic, and recreational spaces, in stu-
dent organizations and activities, and throughout the campus.  In-
deed, Amici aim to create an environment in which students learn
as much from each other outside as within the classroom.

HARV00018916

11

and concurring in the judgment); *accord Grutter*, 539 U.S. at 332-333. To say that race continues to matter is to acknowledge forthrightly that, for many reasons—including the frustrating persistence of segregated schools and communities—race continues to shape the backgrounds, perspectives, and experiences of many in our society, including Amici's students. *See, e.g., Parents Involved*, 551 U.S. at 798 (Kennedy, J., concurring in part and concurring in the judgment) ("Due to a variety of factors ... neighborhoods in our communities do not reflect the diversity of our Nation as a whole.").

For many students, a university may be the first place in which they are exposed to others whose backgrounds are markedly different from their own. Through that exposure, students are encouraged to question their own assumptions and biases and to appreciate the complexity of our society and the world. In Amici's judgment, such exposure will hasten the arrival of the day when race no longer matters.

2. Abandoning *Grutter*'s compelling-interest holding would significantly impair the ability of Amici to fulfill their educational missions. It would also call into question Amici's ability to use individualized, holistic admissions at all. The structure of that review requires that Amici obtain and review copious information regarding the characteristics, life experiences, accomplishments, and talents of each applicant, to assess both the applicant's academic potential and the contribution that the applicant may make to the class as a whole. Such an application process should allow—indeed encourage—applicants to provide any information about themselves, including their background, that the appli-

HARV00018917

12

cant thinks relevant.[5]  If an applicant thinks his or her race or ethnicity is relevant to a holistic evaluation—which would hardly be surprising given that race remains a salient social factor—it is difficult to see how a university could blind itself to that factor while also gaining insight into each applicant and building a class that is more than the sum of its parts.

Nor is it at all apparent why universities should, at this point in our nation's evolving understanding of race, be forced to will ignorance with respect to race. As this Court has recognized, race continues to influence our experiences.  *See Parents Involved*, 551 U.S. at 787 (Kennedy, J., concurring in part and concurring in the judgment); *accord Grutter*, 539 U.S. at 332-333. In view of that reality, as well as the history and purposes of the Equal Protection Clause, it would be extraordinary to conclude at this time that race is the single characteristic that universities may not consider in composing a student body that is diverse and excellent in many dimensions, not just academically. *Cf. Shaw* v. *Reno*, 509 U.S. 630, 679 (1993) (Stevens, J., dissenting) ("If it is permissible to draw boundaries to provide adequate representation for rural voters, for union members, for Hasidic Jews, for Polish Americans, or for Republicans, it necessarily follows that it is permissible to do to the same thing for members of the very minor-

---

[5] *See, e.g.*, The Common Application, *2012-2013 First-Year Application* (calling for an essay on, among other things, an "experience that illustrates what you would bring to the diversity in a college community" and inviting applicants to "attach a separate sheet if [applicant] wish[es] to provide details of circumstances or qualifications not reflected in the application"), *available at* https://www.commonapp.org/commonapp/DownloadForms/2013/2013PacketFY_download.pdf (last visited Aug. 12, 2012).

HARV00018918

13

ity group whose history in the United States gave birth to the Equal Protection Clause.").

Finally, the societal reliance interests on *Bakke* and *Grutter* counsel against any precipitous abandonment of diversity as a compelling interest. *Cf. Planned Parenthood of Se. Penn.* v. *Casey*, 505 U.S. 833, 861-869 (1992). In the 34 years since *Bakke* and the nine years since *Grutter*, Amici and other selective universities have undertaken a wide range of measures to encourage minority applications and to expand minority admissions. The principle that diversity is a compelling interest, announced in *Bakke*, widely followed in practice, and affirmed in *Grutter*, has provided the framework and foundation for these efforts. The reliance interests of universities, applicants, students, high schools, businesses, and other social actors and institutions on this Court's jurisprudence are substantial. Absent some "special justification"—which is not present here—principles of *stare decisis* require continued adherence to *Grutter*. *See Dickerson* v. *United States*, 530 U.S. 428, 443 (2000) ("even in constitutional cases, [*stare decisis*] carries such persuasive force that we have always required a departure from precedent to be supported by some special justification" (internal quotation marks omitted)).[6]

---

[6] Forbidding race-consciousness in individualized, holistic admissions processes would have many wrenching effects on Amici, including a potential wave of litigation by disappointed applicants. Because admissions officials would doubtless be aware of the race of at least some successful applicants, some applicants not admitted might sue, claiming that race improperly influenced admissions decisions and was responsible for the fact that other students were admitted rather than them. Unlike in other contexts in which allegations of discrimination might be raised, universities

HARV00018919

14

### B. Mechanistic, Ostensibly Race-Neutral Policies Are Not Constitutionally Required Alternatives For Achieving Diversity

In addition to holding that diversity is a compelling interest, this Court in *Grutter* firmly rejected the view that universities must choose between maintaining "excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups." 539 U.S. at 339. The Court declined to hold, as the Solicitor General pressed, that universities must first try mechanistic measures—such as the Texas 10% Plan, which itself depends upon the existence of segregated schools—before it may adopt race-conscious admissions policies. The Court was clear that strategies that "require a dramatic sacrifice of diversity, the academic quality of all admitted students, or both" are not constitutionally required. *Id.* at 340.

Petitioner is not challenging that aspect of *Grutter*. *See* Pet. Br. 35 n.9 ("unlike in *Grutter*, Petitioners [sic] are not attempting to force a percentage plan upon Respondents"). She therefore is not advocating a rule

---

would often not be able to point to specific, objective distinctions between one applicant and another because numerical scores are not determinative of Amici's admissions decisions: All such decisions are to some extent subjective and involve nuanced judgments about the applicant and composition of an entire class. Litigation over the merits of specific admissions decisions would inevitably draw courts into the second-guessing of core educational judgments. *See Regents of Univ. of Mich.* v. *Ewing*, 474 U.S. 214, 226 (1985) (courts are not well-equipped "to evaluate ... academic decisions that are made daily by faculty members of public educational institutions—decisions that require an expert evaluation of cumulative information and are not readily adapted to the procedural tools of judicial ... decisionmaking" (internal quotation marks and brackets omitted)).

HARV00018920

15

that universities must first attempt mechanistic, race-neutral alternatives in pursuing a diverse student body. This concession is crucial to Amici: Mechanistic admissions plans, whether based on guaranteed admissions or other "objective" numerical criteria, would be at war with the educational missions of Amici and unworkable.

As this Court explained in *Grutter*, guaranteed admissions plans are not desirable race-neutral alternatives for many universities because they "preclude the university from conducting the individualized assessments necessary to assemble a student body that is not just racially diverse, but diverse along all the qualities valued by the university." 539 U.S. at 340. For Amici, the assumption embodied in mechanistic alternatives— *i.e.*, that objective numerical measures are the only or even the best measure of an applicant's potential—is profoundly misplaced. As we have explained, Amici rely on individualized, holistic review designed to assess the qualifications of the whole applicant, as well as how the applicant would contribute to fulfilling the educational missions of the institution.

Mechanistic proposals like the Texas 10% Plan are also completely impracticable. Amici receive applications from far more applicants qualified by objective measures than they could hope to admit. *See supra* n.3. Beyond that, Amici have nationally and internationally based student bodies at the undergraduate and graduate level. In the United States alone, there are more than 24,000 public secondary schools and more than 2,700 private secondary schools in addition to more than 14,000 combined elementary and secondary schools. *See* Snyder & Dillow, *Digest of Education Statistics 2011* tbl. 5 (June 2012), *available at* http://nces.ed.gov/pubs2012/2012001.pdf. Were each Amicus to guarantee admission to just the top student

HARV00018921

16

at each of the nation's secondary schools, that would require admitting many more than 20,000 students. Even if only 20 percent of those students matriculated, a class of 4,000-plus students would easily exceed any one of Amici institution's educational resources.[7] Apart from that basic math problem, guaranteed admissions policies would raise profound difficulties with respect to international students and at the graduate level. *See Grutter*, 539 U.S. at 340 (noting the United States did not "explain how [percentage] plans could work for graduate and professional schools"). Again, however, even if these plans were somehow workable for Amici (they are not), Amici would never voluntarily choose to structure their admissions policies in such a mechanistic fashion and with such a focus on a few quantitative measures.

Amici do extensively consider a wide range of race-neutral factors in seeking to compose broadly diverse and excellent student bodies. For example, Amici consider whether the applicant is the first in the family to attend college, whether he or she comes from a disadvantaged background, and whether languages other than English are spoken in the home. Amici also engage in substantial outreach and recruiting efforts aimed at increasing the size and diversity of the applicant pool. Furthermore, Amici have adopted financial aid policies designed to enable a wide variety of admitted students from all backgrounds to attend. These ef-

---

[7] For the class of 2016, for example, Harvard admitted 2,032 students. *See* Harvard College, Office of Admissions, *A Brief Profile of the Admitted Class of 2016, available at* http://www.admissions.college.harvard.edu/apply/statistics.html (last visited Aug. 12, 2012).

HARV00018922

17

forts have played an important role in contributing to the diversity, including racial and ethnic, of the student bodies of Amici institutions. But racial and ethnic diversity are a distinct kind of difference in background, and reliance on such race-neutral measures alone cannot substitute for individualized, holistic review that takes account of race and ethnicity of the type approved of by *Grutter*. *See, e.g.*, Minow, *After* Brown: *What Would Martin Luther King Say?*, 12 Lewis & Clark L. Rev. 599, 636 n.192 (2008) (collecting studies showing that reliance on socioeconomic status as an admissions factor alone cannot produce racial diversity).

For these reasons, the Court should reaffirm, and in no way retreat from, the principle of *Grutter*, that the Constitution does not require the use of mechanistic, race-neutral policies before race-conscious admissions approaches may be used.

## II. PETITIONER'S ARGUMENTS REGARDING THE APPLICATION OF STRICT SCRUTINY ARE DEEPLY FLAWED

Petitioner argues that UT's consideration of race in admissions does not satisfy strict scrutiny. UT ably defends the specifics of its admissions system in its brief. Amici write to emphasize that petitioner's arguments amount to a backdoor effort to drain *Grutter* of meaning and would significantly unsettle this Court's equal protection jurisprudence, on which Amici and many other universities have relied. Specifically, petitioner's apparent view that *Parents Involved*, rather than *Grutter*, governs this case is fundamentally misplaced; petitioner's understanding of the scope and nature of the educational benefits of diversity is unfounded; and petitioner's call for a strict-basis-in-evidence standard to review the use of holistic, individualized admissions

HARV00018923

18

processes in higher education finds no support in this Court's precedent and would have highly detrimental implications.

Before proceeding, Amici wish to underscore a crucial threshold point. No Amicus employs race or ethnicity as a *classification* in its admissions policies; no seats in the class are reserved to applicants of any race or ethnic background, nor are applicants of any race or background limited to a certain number of places. Rather, Amici's admissions policies, by considering myriad factors including race and ethnicity, are designed to foster excellence through the admission of a class diverse in multiple dimensions.

In this way, Amici's policies are influenced by the Harvard Plan approved by Justice Powell in *Bakke* and this Court in *Grutter*. Many universities have adopted or reaffirmed such policies in the wake of *Grutter*. In light of this commitment to individualized, holistic review, Amici consider race and ethnicity with extraordinary care and in the most limited fashion necessary to contribute meaningfully to the diversity of their student body. Imposing judicial constraints on such review beyond those set forth in *Grutter* therefore would risk depriving Amici of the ability to compose academically excellent and diverse student bodies that remain vital to achieving Amici's educational missions. *See Grutter*, 539 U.S. at 326-327 ("Although all governmental uses of race are subject to strict scrutiny, not all are invalidated by it."); *Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200, 237 (1995) ("dispel[ling] the notion that strict scrutiny is strict in theory, but fatal in fact" (internal quotation marks omitted)).

HARV00018924

19

### A. Petitioner's Reliance On *Parents Involved* Is Unavailing

At nearly every step of petitioner's argument, she places heavy, if not exclusive, reliance on *Parents Involved*. That reliance is wholly misplaced. This Court has been clear that "[c]ontext matters when reviewing race-based governmental action under the Equal Protection Clause," *Grutter*, 539 U.S. 327, and the differences between *Parents Involved* and this case are stark. In view of the important guidance provided in *Grutter* with respect to structuring narrowly tailored admissions policies—guidance on which Amici and others have heavily relied—this Court should reject any suggestion that *Parents Involved*, rather than *Grutter*, governs review of individualized, holistic admissions processes in the context of higher education.

1. In applying narrow tailoring in *Grutter*, this Court identified the "hallmarks of a narrowly tailored [admissions] plan." 539 U.S. at 334. Those hallmarks are that an "admissions program cannot use a quota system"; an admissions program "may consider race or ethnicity only as a plus in a particular applicant's file, without insulating the individual from comparison with all other candidates for the available seats"; and an admissions program must be "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant." *Id.* (internal quotation marks and brackets omitted). The Court found that the program at issue in *Grutter* satisfied those requirements because, among other things, the law school "engage[d] in a highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment." *Id.* at 337.

HARV00018925

20

There is a wide gulf between that form of review and the assignment policies at issue in *Parents Involved*. Under the latter, race was a binary factor: One plan "classifie[d] children as white or nonwhite," while the other classified children "as black or 'other.'" 551 U.S. at 710; *see id.* at 723 ("Even when it comes to race, the plans here employ only a limited notion of diversity[.]"). For each plan, moreover, race was effectively the entire classification at issue, and it was applied in a "crude" fashion that failed to give consideration to any other characteristics of students. *See id.* at 789 (Kennedy, J., concurring in part and concurring in the judgment). What is more, the assignment plans were challenged by parents of children "denied assignment to particular schools … *solely* because of their race." *Id.* at 710-711 (emphasis added).

The plans at issue in *Parents Involved* bear no meaningful resemblance to the individualized, holistic review used by Amici and endorsed in *Grutter*. Justice Kennedy, for example, expressly distinguished *Gratz* and *Grutter* on the ground that, unlike the challenged policies before the Court in *Parents Involved*, those cases addressed a "system where race was not the entire classification." 551 U.S. at 792-793. Justice Kennedy further contrasted the assignment plans at issue with *Grutter*-like plans that would give "nuanced, individual evaluation of school needs and student characteristics that might include race as a component." *Id.* at 790. And the majority opinion drew precisely the same distinction in comparing *Grutter* with the policies at issue. *See id.* at 722 ("The entire gist of the analysis in *Grutter* was that the admissions program at issue there focused on each applicant as an individual, and not simply as a member of a particular racial group."); *id.* at 723 ("under each plan[,] when race comes into play, it

HARV00018926

21

is decisive by itself" and "not simply one factor weighed with others in reaching a decision, as in *Grutter*").

In short, both the majority opinion and Justice Kennedy's concurring opinion in *Parents Involved* took pains to emphasize a distinction between policies in which race (applied as a black/white binary distinction) is effectively the entire classification and those in which race and ethnicity are but single factors as part of individualized, holistic review. The Court in *Parents Involved* was clear that the plans before it were "not governed by *Grutter*," 551 U.S. at 725, and the inverse is true here: *Grutter*, and not *Parents Involved*, continues to supply the appropriate benchmarks for assessing the constitutionality of admissions policies of universities, such as Amici, that are structured on *Grutter* and the Harvard Plan.

2.  This basic distinction disposes of petitioner's argument (at 38-41) that the use of race is unconstitutional when it has an insubstantial effect on actual admissions decisions.  To be sure, Justice Kennedy in *Parents Involved* observed that "it is noteworthy that the number of students whose assignment depends on express racial classifications is limited."  551 U.S. at 790.  Those "small number of assignments affected," he reasoned, "suggest[ed] that the schools could have achieved their stated ends through different means," including "facially race-neutral means ... or, if necessary, a more nuanced, individual evaluation of school needs and student characteristics that might include race as a component."  *Id*.  The upshot of Justice Kennedy's analysis, as the Fifth Circuit noted below, was that a state actor, when faced with a racial classification that has little effect in practice, should instead use race-neutral measures or *Grutter*-like policies that evaluate,

HARV00018927

22

in an individualized, holistic manner, a number of factors, including race and ethnicity. *See* Pet. App. 70a.

Contrary to petitioner's insistence, nothing in this Court's precedents suggests that where race and ethnicity play only a small role (or are single factors among many) in influencing decisions in a *Grutter*-like admissions system, the use of race and ethnicity becomes unconstitutional. Such a result would defy common sense: That race and ethnicity, when considered among a multitude of other factors, might have diminishing significance in effecting outcomes should be taken as welcome evidence that a program is carefully crafted to avoid overreliance on race and ethnicity while also achieving a diverse and academically excellent student body.

### B. Petitioner Misapprehends The Educational Mission Of Universities And The Role And Benefits Of Diversity

In challenging UT's decision to reinstate a limited use of race in admissions after *Grutter*, petitioner argues (at 26) that "*Grutter* ... endorses an inward-facing concept of diversity focused on enhancing the university experience—not an outward-facing concept of diversity focused on achieving a level of minority enrollment that is in proportion to the general population." To be clear, Amici (apparently like UT[8]) do not seek to

---

[8] *See* JA131a ("UT Austin has not established a goal, target, or other quantitative objective for the admission and/or enrollment of under-represented minority students for any of the incoming classes admitted in 2003 through 2008."); Pet. App. 44a ("UT has never established a specific number, percentage, or range of minority enrollment that would constitute 'critical mass'" and "there is no indication that UT's *Grutter*-like plan is a quota by another name").

HARV00018928

23

attain levels of enrollment that conform to state, national, or international demographics. But petitioner's proposed distinction between the "inward" and "outward" benefits of diversity is inconsistent with the educational missions of Amici and precedent.

Amici's educational missions are broader than petitioner and her amici would acknowledge. Amici insist that students at their institutions will excel at demanding coursework, but their missions extend beyond that singular goal to developing active and engaged citizens equipped to handle the problems of a complex world and in training city, state, national, and international leaders in every field of endeavor, including the arts, government, science, and business.[9] In order to train

---

[9] *See, e.g.*, Harvard University, *Frequently Asked Questions* ("The Mission of Harvard College": "Education at Harvard should liberate students to explore, to create, to challenge, and to lead. The support the College provides to students is a foundation upon which self-reliance and habits of lifelong learning are built: Harvard expects that the scholarship and collegiality it fosters in its students will lead them in their later lives to advance knowledge, to promote understanding, and to serve society."), *available at* http://www.harvard.edu/faqs/mission-statement (last visited Aug. 12, 2012); Yale University, *University Mission Statement* ("Yale seeks to attract a diverse group of exceptionally talented men and women from across the nation and around the world and to educate them for leadership in scholarship, the professions, and society."), *available at* http://www.yale.edu/about/mission.html (last visited Aug. 12, 2012); Dartmouth College, *Mission* ("Dartmouth College educates the most promising students and prepares them for a lifetime of learning and of responsible leadership, through a faculty dedicated to teaching and the creation of knowledge."), *available at* http://www.dartmouth.edu/home/about/mission.html (last visited Aug. 12, 2012); Stanford University, *The Founding Grant with Amendments, Legislation, and Court Decrees*, at 24 (Stanford University's "chief object is the instruction of students with a view to producing leaders and educators in every field of

24

active citizens and leaders for participation in a diverse nation and world, Amici must be able to compose an appropriately diverse student body.

This Court has long embraced this facet of the educational mission of universities, and has recognized the role diversity plays in advancing it. In *Bakke*, for example, Justice Powell explained that "it is not too much to say that the nation's future depends upon leaders trained through wide exposure to the ideas and mores of students as diverse as this Nation of many peoples." 438 U.S. at 313 (internal quotation marks omitted). Similarly, in *Grutter*, this Court held that "[i]n order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity. All members of our heterogeneous society must have confidence in the openness and integrity of the educational institutions that provide this training." 539 U.S. at 332; *cf. Brown* v. *Board of Educ. of Topeka*, 347 U.S. 483, 493 (1954) (education is "required in the performance of our most basic public responsibilities" and "very foundation of good citizenship").

This understanding of the broad educational mission of universities reveals the basic error in petitioner's insistence (at 27) that any attention to demographics as *a* factor in assessing diversity is "'outright racial balancing.'" *Grutter* recognized that universities train leaders and citizens for a heterogeneous society,

---

science and industry"), *available at* https://ogc.stanford.edu/sites/ ogc.stanford.edu/files/Founding%20Grant%20(equivalent%20to% 20SU%20Articles%20of%20Incorporation)_22124_1.pdf (last visited Aug. 12, 2012).

HARV00018930

25

and that diversity is vital to that function.  It stands to reason that a university may pay some attention to the communities from which its students come and into which its students graduate in pursuing those goals.

In *Parents Involved*, by contrast, the challenged student assignment plans were "tied to each district's specific racial demographics, rather than to *any* pedagogic concept of the level of diversity needed to obtain the asserted educational benefits."  551 U.S. at 726 (plurality opinion) (emphasis added).  The plans set a range of enrollment "solely by reference to the demographics of the respective school districts."  *Id.* at 729 (plurality opinion).  And as explained above, the programs did not employ individualized, holistic review in order to achieve diversity.

Those considerations are not at issue here, where a university has a pedagogic concept of diversity in mind, and as part of its educational mission also pursues *Grutter*'s approved goal of creating a "path to leadership" and citizenship for a "heterogeneous society."  539 U.S. at 332.[10]  Indeed, as explained throughout this brief, producing the next generation of citizens and leaders is a core mission of Amici institutions.  In aiming for a

---

[10] *See* Laycock, *The Broader Case For Affirmative Action: Desegregation, Academic Excellence, and Future Leadership*, 78 Tul. L. Rev. 1767, 1773 (2004) (*Grutter* embraced a broad justification for diversity that included "bringing more minority young people into the most selective schools and into positions of leadership" to secure the "legitimacy of selective institutions of higher education and the legitimacy of the nation's leadership"); Payton, *Post-*Grutter: *What Does Diversity Mean in Legal Education and Beyond?*, 35 Pepp. L. Rev. 569, 581-582 (2008) (explaining the significance of *Grutter*'s discussion of the relationship between diversity and democracy).

HARV00018931

26

rich and robust concept of diversity consonant with those objectives, it would be illogical to exclude altogether any consideration of demographics, whether municipal, state, national, or international, depending upon the nature and mission of the institution.

As Texas's flagship educational institution, UT's mission is focused in part on training the next generation of leaders for Texas. *See* Resp. Br. 5. That may well affect the manner in which UT assesses the diversity necessary to fulfill its mission. *See* Pet. App. 50a ("The need for a state's leading educational institution to foster civic engagement and maintain visibly open paths to leadership … requires a degree of attention to the surrounding community."). But this aspect of a university's mission is not "racial balanc[ing], pure and simple." *Parents Involved*, 551 U.S. at 726 (plurality opinion). The essence of racial balancing is a goal that functions as a quota, seeking to secure a "specified percentage of a particular group merely because of its race or ethnic origin." *Grutter*, 539 U.S. at 329 (internal quotation marks omitted). Petitioner concedes that is not the goal of UT. *See supra* n.8. Nor, emphatically, is it the goal of these Amici. Amici do not employ quotas, and have no rigid baselines in mind with respect to diversity. Amici's educational objectives are to admit a student body that is diverse across myriad axes, that constitutes more than the sum of its parts, that excels academically, and that prepares a next generation of nationally and internationally engaged citizens and leaders who are equipped to succeed in a remarkably diverse world.

Petitioner largely ignores *Grutter*'s recognition of this paramount role of universities, which the Fifth Circuit found crucial to its analysis. *See* Pet. App. 50a-51a. Petitioner argues (at 29) only that "this Court has

HARV00018932

27

always rejected the use of race to advance the general welfare of society." The cases petitioner cites hold that remedying societal discrimination is not a compelling interest. *See, e.g., City of Richmond* v. *J.A. Croson Co.*, 488 U.S. 469, 499 (1989) ("amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota"); *Wygant* v. *Jackson Bd. of Educ.*, 476 U.S. 267, 276 (1986) (plurality opinion) ("Societal discrimination … is too amorphous a basis for imposing a racially classified remedy."). That is not even remotely the issue here. The compelling governmental interest in diversity in higher education is quite different from remedying generalized discrimination. The issue here is whether, in assessing diversity, a university may take into account the need (a) to foster conditions for providing the most stimulating learning environment possible and (b) to train effectively citizens and leaders for a heterogeneous society. Justice Powell's opinion in *Bakke* and the decision of this Court in *Grutter* answer that question affirmatively. A retreat now would be a substantial blow to the educational missions of Amici and many universities.

### C. This Court Has Not Applied And Should Not Apply A Strong-Basis-In-Evidence Standard To The Unique Context Of Higher Education

Petitioner argues at length (at 31-37) that, under this Court's precedents, a strong-basis-in-evidence standard applies to university admissions programs, although she says little about the content of this standard. As a matter of precedent, petitioner's claim is wrong, as UT cogently explains (at 49). Amici write to emphasize why this Court should not, for the first time, apply such a standard to higher education.

HARV00018933

28

*First*, the reasons the Court has applied a strong-basis-in-evidence standard in other circumstances carry no force here. "Context matters when reviewing race-based governmental action under the Equal Protection Clause." *Grutter*, 539 U.S. at 327. The strong-basis-in-evidence standard has been used to identify when race may be used to remedy historical discrimination. *See Wygant*, 476 U.S. at 277-278; *Croson*, 488 U.S. at 498-499. Whether discrimination has occurred is an objective and measurable fact: For example, did the City of Richmond discriminate in the past in awarding government contracts? In that setting, it would make little sense simply to credit a good-faith judgment by the City that discrimination has occurred because the City would have no special claim to expertise regarding that fact.[11]

By contrast, the educational benefits of diversity and the degree of diversity necessary to obtain those benefits defy easy calculation. Judgments about educational benefits are necessarily at the core of the expertise of universities and inevitably implicate the First Amendment interests in a university's definition of its own educational mission, discussed further below. *See Grutter*, 539 U.S. at 328 ("The Law School's educational judgment that such diversity is essential to its educa-

---

[11] In *Ricci* v. *DeStefano*, 129 S. Ct. 2658 (2009), this Court applied this standard to determine whether a public employer's fear of disparate-impact liability was reasonable. In that setting, too, it arguably made little sense simply to credit the good-faith belief of the employer because the possibility of such liability lies squarely within the competence of the courts to evaluate—unlike the educational benefits to be obtained from particular admissions policies, an area in which the courts have no special expertise and have long deferred to universities' judgments.

HARV00018934

29

tional mission is one to which we defer."). In this crucial respect, higher education is far afield from government contracting and public employment, in which the state actors employing the racial classifications would have no reasonable claim to any special expertise as to whether historical discrimination has occurred.

*Second*, application of a strong-basis-in-evidence standard to universities' admissions decisions would threaten to undermine the First Amendment interests of universities, as well as the proper deference due university officials' educational judgments. This Court has long acknowledged the special role universities play in the First Amendment tradition. As Justice Powell explained, the First Amendment interests of a university includes the freedom " 'to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.' " *Bakke*, 438 U.S. at 312 (Powell, J.) (quoting *Sweezy* v. *New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in the result)). This Court reiterated in *Grutter* that, "given the important purposes of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." *Grutter*, 539 U.S. at 329.[12]

---

[12] *See also Parents Involved*, 551 U.S. at 792 (Kennedy, J., concurring in part and concurring in the judgment) ("precedent support[s] the proposition that First Amendment interests give universities particular latitude in defining diversity"); Byrne, *Academic Freedom: A "Special Concern of the First Amendment"*, 99 Yale L.J. 251, 311 (1989) ("[T]he Supreme Court's decisions concerning academic freedom have protected principally and expressly a First Amendment right of the university itself ... largely to be free from government interference in the performance of

HARV00018935

30

Although this "special niche" of universities has never meant and should not mean that they are immune from judicial review, a strong-basis-in-evidence standard could seriously impair universities' legitimate First Amendment interests. A constitutional rule that required decisions regarding diversity—for example, determinations about the value of diversity, the types of diversity necessary to advance a university's mission, and the contributions of various degrees of diversity to that mission—to be proven by surveys or data sets, and then second-guessed in court, would imperil the First Amendment interests of universities by cabining a university's ability to rely on the nuanced and expert judgments of its officials, faculty, and administrators in assessing such questions. *Cf. Regents of Univ. of Mich.* v. *Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision, … they should show great respect for the faculty's professional judgment."). And a standard that would afford no or little deference to the educational judgments of universities would be contrary to this Court's recognition of the need to limit intrusive judicial inquiry of university decisionmaking. *See University of Penn.* v. *EEOC*, 493 U.S. 182, 199 (1990) (noting the "importance of avoiding second-guessing of legitimate academic judgments"); *Ewing*, 474 U.S. at 226 n.12, 227 ("Academic freedom … thrives

---

core educational functions."); *cf. Board of Regents of Univ. of Wis. Sys.* v. *Southworth*, 529 U.S. 217, 232 (2000) ("It is not for the Court to say what is or is not germane to the ideas to be pursued in an institution of higher learning.").

HARV00018936

31

on autonomous decisionmaking by the academy itself[.]").[13]

*Third*, application of a strong-basis-in-evidence standard to *Grutter*-like admissions policies could have a particularly substantial impact on Amici. Amici receive applications from far more academically excellent students than they could hope to admit, and they rely exclusively on individualized, holistic review. *See supra* pp. 7-8. In light of that, a standard that demanded rigorous empirical evidence regarding individual admissions decisions or decisions regarding the composition of a student body as a whole could subject Amici to frequent litigation over whether the standard is satisfied. The predictable result would be intrusive discovery and judicial micro-management of admissions decisions and policies. *See supra* n.6 (explaining why a reversal of *Grutter* would have a similar effect). None of this is to say that universities need not carefully evaluate issues of diversity, but often the most probative evidence bearing on the issues will be the expert educational judgments of university officials, admissions officers, and faculty—judgments based on decades of experience with holistic, individualized race-conscious admissions policies. The Constitution should not be read to foreclose reliance on those judgments.

---

[13] This is not, as petitioner paints it (at 22), an argument for "unlimited deference to university administrators." Strict scrutiny is properly demanding, but it should be applied so as not to deprive university officials of the right to exercise responsibly their expert educational judgments. *See Grutter*, 539 U.S. at 328 (strict scrutiny "is no less strict for taking into account complex educational judgments in an area that lies primarily within the expertise of the university").

HARV00018937

32

In short, the framework adopted by this Court in *Grutter* supplies a workable and appropriate standard for reviewing race-conscious university admissions policies. There is no cause for replacing that framework with an ill-defined strong-basis-in-evidence standard that could interfere with the First Amendment interests of and educational judgments by universities and that would be sure to invite unnecessary litigation.

## CONCLUSION

The judgment of the court of appeals should be affirmed.

Respectfully submitted.

SETH P. WAXMAN
   *Counsel of Record*
PAUL R.Q. WOLFSON
KELLY P. DUNBAR
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 663-6000
seth.waxman@wilmerhale.com

AUGUST 2012

HARV00018938