# EXHIBIT 154

No. 14-981

IN THE
# Supreme Court of the United States

ABIGAIL NOEL FISHER,
*Petitioner,*
*v.*
UNIVERSITY OF TEXAS AT AUSTIN, *et al.*,
*Respondents.*

ON WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

## BRIEF FOR AMICUS CURIAE HARVARD UNIVERSITY IN SUPPORT OF RESPONDENTS

ROBERT W. IULIANO
SENIOR VICE PRESIDENT
AND GENERAL COUNSEL
ARA B. GERSHENGORN
MATTHEW T. FOX
OFFICE OF THE GENERAL
COUNSEL
HARVARD UNIVERSITY
Holyoke Center, Suite 980
1350 Massachusetts Ave.
Cambridge, MA 02138

FELICIA H. ELLSWORTH
ERIC F. FLETCHER
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109

SETH P. WAXMAN
*Counsel of Record*
PAUL R.Q. WOLFSON
KELLY P. DUNBAR
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
(202) 663-6000
seth.waxman@wilmerhale.com

DEBO P. ADEGBILE
ADRIEL I. CEPEDA DERIEUX
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..........................................iii

INTEREST OF AMICUS CURIAE..............................1

SUMMARY OF ARGUMENT........................................3

ARGUMENT......................................................................5

I.  THIS COURT SHOULD REAFFIRM THE
    EQUAL PROTECTION PRINCIPLES THAT
    HAVE GUIDED HARVARD'S ADMISSIONS
    POLICIES FOR DECADES..............................................5

    A.  Diversity In Higher Education Re-
        mains A Compelling—Indeed, Vital—
        Interest ................................................................5

        1.  This Court's precedents firmly es-
            tablish that diversity is a compel-
            ling interest................................................5

        2.  Achieving the substantial benefits
            of student-body diversity is more
            important now than ever ...........................7

    B.  This Court Should Reaffirm Its Nar-
        row-Tailoring Framework In Universi-
        ty Admissions ....................................................14

        1.  Individualized,  holistic  review
            should remain the touchstone of
            narrow-tailoring analysis...........................14

        2.  Narrow tailoring does not require
            the use of mechanistic race-neutral
            alternatives.................................................18

HARV00066600

ii

**TABLE OF CONTENTS—Continued**

Page

II. PETITIONER'S    ARGUMENTS    DISTORT
EQUAL PROTECTION JURISPRUDENCE AND
ARE UNPERSUASIVE.................................................21

    A. Petitioner's "Few Places Left To Fill"
Argument Is Meritless.....................................21

    B. Petitioner's Arguments About The
Type Of Evidence That May Be Con-
sidered In Defending Admissions Pro-
cesses Are Misplaced.......................................24

CONCLUSION .................................................................27

HARV00066601

iii

## TABLE OF AUTHORITIES

### CASES

Page(s)

*Bartlett* v. *Strickland*, 556 U.S. 1 (2009) .................. 13, 14

*Brown* v. *Board of Education*, 347 U.S. 483 (1954) .......................................................................... 9

*Fisher* v. *University of Texas at Austin*, 133 S. Ct. 2411 (2013) ................................................. *passim*

*Grutter* v. *Bollinger*, 539 U.S. 306 (2003) ............. *passim*

*J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127 (1994) ...................................................................... 17

*Keyishian* v. *Board of Regents*, 385 U.S. 589 (1967) ...................................................................... 27

*League of United Latin American Citizens* v. *Perry*, 548 U.S. 399 (2006) ........................................ 12

*Parents Involved in Community Schools* v. *Seattle School District No. 1*, 551 U.S. 701 (2007) ............................................... 10, 11, 12, 13, 14

*Regents of University of California* v. *Bakke*, 438 U.S. 265 (1978) .......................................... *passim*

*Regents of University of Michigan* v. *Ewing*, 474 U.S. 214 (1985) ............................................. 26

*Schuette* v. *Coalition to Defend Affirmative Action*, 134 S. Ct. 1623 (2014) .............................. 6, 19

*Sweezy* v. *New Hampshire*, 354 U.S. 234 (1957) ..... 14, 27

*Texas Department of Housing & Community Affairs* v. *Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015) ...................................... 13

HARV00066602

iv

## TABLE OF AUTHORITIES—Continued

Page(s)

### DOCKETED CASES

*Regents of the University of California.* v. *Bakke*, 438 U.S. 265, Brief of Columbia University, Harvard University, Stanford University, and the University of Pennsylvania as Amici Curiae (1978) (No. 76-811), 1977 WL 188007 ...........................1

*Students for Fair Admissions, Inc.* v. *President & Fellows of Harvard College (Harvard Corp.)*, No. 14-14176 (D. Mass.)................2

### STATUTES, RULES, AND REGULATIONS

Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.* ...........................................2

### OTHER AUTHORITIES

Bowman, Nicholas A., *College Diversity Experiences and Cognitive Development: A Meta-Analysis*, 80 Rev. Educ. Res. 4 (Mar. 2010)........................................................................8

Bowman, Nicholas A., *Promoting Participation in a Diverse Democracy: A Meta-Analysis of College Diversity Experiences and Civic Engagement*, 81 Rev. Educ. Res. 29 (Mar. 2011) ........................................................................8

Chang, Mitchell S., et al., *The Educational Benefits of Sustaining Cross-Racial Interaction Among Undergraduates*, 77 J. Higher Educ. 430 (2006) ...........................................8

HARV00066603

v

**TABLE OF AUTHORITIES—Continued**

Page(s)

Faust, Drew, President of Harvard University, *2015 Remarks at Morning Prayers* (Sept. 2, 2015), *available at* http://www.harvard.edu/president/speech/2015/2015-remarks-morning-prayers .......................................................................... 11

Harvard College, *Mission, Vision and History*, *available at* https://college.harvard.edu/about/history .................................................................... 8

Hurtado, Sylvia & Linda DeAngelo, *Linking Diversity and Civic-Minded Practices with Student Outcomes*, Liberal Educ. (2012) ................. 8

Laycock, Douglas, *The Broader Case For Affirmative Action: Desegregation, Academic Excellence, and Future Leadership*, 78 Tul. L. Rev. 1767 (2004) .................. 10

Payton, John, *Post-Grutter: What Does Diversity Mean in Legal Education and Beyond?*, 35 Pepp. L. Rev. 569 (2008) ..................... 10

Rudenstine, Neil L., Harvard Univ., *The President's Report 1993-1995: Diversity and Learning* (1996)........................................ 8, 10, 15

HARV00066604

## INTEREST OF AMICUS CURIAE[1]

Harvard University is the oldest institution of higher education in the United States and has a longstanding commitment to maintaining a student body that is diverse in many ways, including (but certainly not limited to) racially and ethnically. Harvard's commitment to diversity was well recognized forty years ago, when Justice Powell cited with approval the "Harvard College Admissions Program" in his influential opinion in *Regents of the University of California* v. *Bakke*, 438 U.S. 265, 322 (1978). As Harvard explained in the amicus brief it filed in *Bakke*, "diversity makes the university a better learning environment" and to achieve diversity, it is "essential" that race be one of the numerous characteristics that the university "consider[s] in choosing a student body." Br. of Columbia University, Harvard University, Stanford University, and the University of Pennsylvania as Amici Curiae *13, *16, *Regents of Univ. of Cal.* v. *Bakke*, 438 U.S. 265 (1978) (No. 76-811), 1977 WL 188007.

Harvard's commitment to diversity, explained in the *Bakke* brief and continuing to this day, stems from its effort to create an educational environment that is rigorous, stimulating, and enriching. Harvard also works to prepare its students to be active and engaged citizens and leaders in all fields of human endeavor. In Harvard's experience and educational judgment, a diverse community of students adds significantly to the educational experience and future success of all of its graduates, from all backgrounds and races. A campus

---

[1] Letters consenting to the filing of this brief have been filed with the Clerk of the Court. No counsel for a party authored this brief in whole or in part, and no person, other than amicus or its counsel, made any monetary contribution to the preparation or submission of this brief.

HARV00066605

2

that is home to individuals with a deep and wide variety of academic interests, experiences, viewpoints, and talents enables students to challenge their own assumptions, to learn more deeply and broadly, to develop skills of collaboration and problem solving, and to begin to appreciate the spectacular complexity of the modern world. With the benefit of that diversity on campus, Harvard's alumni are better able to lead lives of meaning, contribution, and service after graduation.

Although Harvard is a private institution and therefore not directly subject to the Equal Protection Clause of the Fourteenth Amendment, Harvard does receive federal financial assistance and so is covered by Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.* Harvard has therefore looked to this Court's decisions concerning the use of race in higher education admissions at public universities—*Bakke*, *Grutter* v. *Bollinger*, 539 U.S. 306 (2003), and *Fisher* v. *University of Texas at Austin*, 133 S. Ct. 2411 (2013)—as a guide in shaping its admissions policies. Moreover, Harvard is currently defending a lawsuit brought under Title VI alleging that Harvard's undergraduate admissions policies are inconsistent with this Court's equal protection precedents.[2] Harvard therefore has a substantial educational and legal interest in ensuring that the Court adheres to the established framework for assessing the permissibility of race-conscious admissions established by *Bakke*, *Grutter*, and *Fisher*.

---

[2] *Students for Fair Admissions, Inc.* v. *President & Fellows of Harvard Coll. (Harvard Corp.)*, No. 1:14-cv-14176 (D. Mass.). The lawsuit against Harvard is backed by the same organization that is funding this litigation. The lawsuit against Harvard expressly seeks to overrule decisions holding that diversity is a compelling interest that can justify consideration of race in admissions, and to establish that race may never be considered in admissions.

HARV00066606

3

## SUMMARY OF ARGUMENT

This Court has long affirmed that universities may conclude, based on their academic judgment, that establishing and maintaining a diverse student body is essential to their educational mission and that the pursuit of such diversity is a compelling interest. Petitioner does not directly challenge that holding here, with good reason. It is more apparent now than ever that maintaining a diverse student body is essential to Harvard's goals of providing its students with the most robust educational experience possible on campus and preparing its graduates to thrive in a complex and stunningly diverse nation and world. These goals, moreover, are not held by Harvard alone, but are shared by many other universities that, like Harvard, have seen through decades of experience the transformative importance of student body diversity on the educational process. This Court should therefore reaffirm its longstanding deference to universities' academic judgment that diversity serves vital educational goals.

The Court should also reaffirm its previous decisions recognizing the constitutionality of holistic admissions processes that consider each applicant as an individual and as a whole. Harvard developed such policies long before they were embraced by Justice Powell in *Bakke* and reaffirmed by this Court in *Grutter*. In Harvard's judgment, based on its decades of experience with holistic admissions, these admissions policies best enable the university to admit an exceptional class of students that is diverse across many different dimensions, including race and ethnicity. Admissions processes that treat students in a flexible, nonmechanical manner and that permit applicants to choose how to present themselves respects the dignity and autonomy

HARV00066607

4

of each applicant, while also permitting Harvard to admit exceptional classes each year. Compelling Harvard to replace its time-tested holistic admissions policies with the mechanistic race-neutral alternatives that petitioner suggests would fundamentally compromise Harvard's ability to admit classes that are academically excellent, broadly diverse, extraordinarily talented, and filled with the potential to succeed and thrive after graduation.

Many of the specific arguments made by petitioner are unique to the admissions policy of the University of Texas at Austin ("UT"). UT ably responds to those arguments, and Harvard addresses them only to emphasize two errors in petitioner's understanding of strict scrutiny. First, petitioner's insistence that a university's consideration of race or ethnicity, as part of a holistic admissions process, must be restricted to the last "few places to fill" in an admissions class misreads *Bakke*, ignores *Grutter*, and advocates an unworkable, counterintuitive rule. Second, petitioner's suggestion that the constitutionality of race-conscious admissions turns on the precise rationales and evidence a university had in mind at the time such admissions policies were first adopted misunderstands the nature of universities' admissions processes. Although Harvard's desire to achieve a diverse class has been unwavering, Harvard's admissions policies have not been static. And *Grutter* forecloses the suggestion that a university may not rely on evidence acquired and experience gained after the adoption of such policies in defending race-conscious admissions policies.

HARV00066608

5

## ARGUMENT

I. THIS COURT SHOULD REAFFIRM THE EQUAL PROTEC-
TION PRINCIPLES THAT HAVE GUIDED HARVARD'S
ADMISSIONS POLICIES FOR DECADES

### A. Diversity In Higher Education Remains A Compelling—Indeed, Vital—Interest

#### 1. This Court's precedents firmly establish that diversity is a compelling interest

This Court has long recognized student-body diversity as a compelling interest that justifies race-conscious admissions in higher education. Informed by the Harvard College admissions program that largely remains in place today, Justice Powell's opinion in *Regents of the University of California* v. *Bakke* recognized that a university may consider race in admissions to further the "attainment of a diverse student body." 438 U.S. 265, 311-312 (1978). Justice Powell understood what institutions of higher education had learned from experience, namely that diversity improves students' educational experience; it fosters that "atmosphere of 'speculation, experiment and creation'—so essential to the quality of higher education—[that] is widely believed to be promoted by a diverse student body." *Id.* at 312-313. Justice Powell's seminal opinion also recognized that diversity benefits students—and the Nation—long after graduation. The "'nation's future depends upon leaders trained through wide exposure' to the ideas and mores of students as diverse as the Nation of many peoples." *Id.* Diversity, as he explained, is therefore of "paramount importance" to the mission of many institutions of higher education. *Id* at 313.

In *Grutter* v. *Bollinger*, this Court "endorse[d] Justice Powell's view that student body diversity is a compelling state interest that can justify the use of race in

HARV00066609

6

university admissions." 539 U.S. 306, 322 (2003); *see id.* at 387-388 (Kennedy, J., dissenting) ("Our precedents provide a basis for the Court's acceptance of a university's considered judgment that racial diversity among students can further its educational task."). In doing so, this Court found that the educational benefits of diversity are "substantial" and "not theoretical but real." *Id.* at 330. Diversity not only deepens and indeed transforms the education that students from all races and backgrounds receive during their time on campus but also contributes to the broader and essential goal of "preparing students for work and citizenship" and training "our Nation's leaders" for success in a heterogeneous society. *Id.* at 331, 332.[3]

The Court's prior decision in this case already reaffirmed those precedents, and there is no reason to revisit them now. *See Fisher* v. *University of Texas at Austin*, 133 S. Ct. 2411, 2419 (2013). "In *Fisher*, the Court did not disturb the principle that consideration of race in admissions is permissible, provided that certain conditions are met." *Schuette* v. *Coalition to Defend Affirmative Action*, 134 S. Ct. 1623, 1630 (2014) (plurality). In fact, *Fisher* acknowledged *Grutter*'s central holding that "a university's educational judgment that diversity is essential to its educational mission is one to which we defer." *Fisher*, 133 S. Ct. at 2419 (quoting *Grutter*, 539 U.S. at 328). Public and private universities across the country, including Harvard, have for

---

[3] *Grutter* involved a state university subject to the Equal Protection Clause. This Court has never been directly presented with a case involving the consideration of race in admissions by a private university covered by Title VI, and has therefore not directly addressed whether different considerations and criteria might be appropriate in that context. Because UT is also a state university, this case does not present that question.

HARV00066610

7

decades acted in accordance with the holdings of *Bakke*, *Grutter*, and more recently *Fisher*—that achieving student-body diversity is a compelling interest universities may pursue—in structuring admissions processes and in furthering a core aspect of their educational mission.

2. **Achieving the substantial benefits of student-body diversity is more important now than ever**

As in *Fisher*, petitioner has not expressly asked this Court to overrule *Bakke* or *Grutter*. Nevertheless, this Court should use this opportunity to reaffirm that diversity in higher education remains a compelling interest. The benefits of student-body diversity, including racial and ethnic diversity, are substantial and concrete. Indeed, it is Harvard's educational judgment, *see Fisher*, 133 S. Ct. at 2419, that the need for student-body diversity is even more compelling today than it was at the time of *Bakke* and *Grutter*.

Decades of experience have convinced Harvard that the quality of education, inside the classroom and out, of all of its students is greatly enriched if the student body is diverse racially and ethnically as well as in many other ways. Most directly, diversity greatly enriches the academic experience on Harvard's campus. As Harvard College's mission statement explains: "Beginning in the classroom with exposure to new ideas, new ways of understanding, and new ways of knowing, students embark on a journey of intellectual transformation. Through a diverse living environment, where students live with people who are studying different topics, who come from different walks of life and have evolving identities, intellectual transformation is deepened and

HARV00066611

8

conditions for social transformation are created."  Harvard College, *Mission, Vision and History*.[4]

Student-body diversity enables students to gain a fuller appreciation of the complexity of the modern world.  Students who learn and actively participate in a diverse community must reevaluate received truths, test their own beliefs and biases, and learn to communicate compellingly across differences.  As explained at the conclusion of Harvard's 1996 comprehensive review of diversity's importance to the institution's mission, "[e]ducation and learning are … most fully tested when individuals engage others whose ideas, passions, experiences, and beliefs differ from their own."  Rudenstine, Harvard Univ., *The President's Report 1993-1995: Diversity and Learning* 11 (1996).  These experiences amplify what students learn in the classroom and foster the personal and intellectual transformation at the heart of Harvard College's liberal arts education.[5]

---

[4] *Available at* https://college.harvard.edu/about/history.

[5] Since *Grutter*, scholarship has continued to demonstrate what universities have long understood:  Diversity promotes learning, reduces prejudice, and increases civic engagement.  *See, e.g.*, Hurtado & DeAngelo, *Linking Diversity and Civic-Minded Practices with Student Outcomes*, Liberal Educ., 19 (2012) ("Students who reported exposure to diverse opinions, cultures, and values" developed skills to "work cooperatively with diverse people, discuss and negotiate controversial issues, and engage in perspective taking"); Bowman, *Promoting Participation in a Diverse Democracy: A Meta-Analysis of College Diversity Experiences and Civic Engagement*, 81 Rev. Educ. Res. 29, 46 (Mar. 2011) ("[O]verall results indicate that college diversity experiences are related to increased civic engagement."); Bowman, *College Diversity Experiences and Cognitive Development: A Meta-Analysis*, 80 Rev. Educ. Res. 4, 20 (Mar. 2010) ("[T]he meta-analysis showed that college diversity experiences are significantly and positively related to cognitive development."); Chang et al., *The Educational*

HARV00066612

9

These benefits of diversity on campus also materially advance Harvard's educational mission of preparing citizens and leaders for work and life in a diverse society. The world and the nation into which Harvard's students graduate demand that those students be open and exposed to a broad array of perspectives. Whatever their field of endeavor, Harvard's graduates will have to contend with a society that is increasingly complex and influenced by developments that may originate far from their homes. To fulfill their civic and other responsibilities, Harvard's graduates cannot be blind either to the challenges facing our increasingly pluralistic country or to the unresolved racial divisions that stubbornly persist despite decades of substantial efforts to resolve them. Of course, each student will emerge from his or her time at the university with a distinct perspective, but a diverse student body will ensure that students have been exposed to people from backgrounds, circumstances, and points of view very different from their own. Through this, Harvard is meeting an equally fundamental aspect of its educational mission, which is to ensure that its students graduate with the skills and experience to navigate successfully the world that awaits them.

Thus, not only does diversity powerfully transform a student's educational experience, but the benefits also reach beyond the walls of our campus—they go to the heart of our democracy. Institutions of higher education play a central role in fostering democratic practices and traditions. *Cf. Brown* v. *Board of Educ.*, 347 U.S.

---

*Benefits of Sustaining Cross-Racial Interaction Among Undergraduates*, 77 J. Higher Educ. 430, 449 (2006) ("[T]he effects of students' frequency of cross-racial interaction on ... Openness to Diversity, Cognitive Development, [and] Self-confidence ... are significant and uniformly positive.").

HARV00066613

10

483, 493 (1954) (education is "required in the performance of our most basic public responsibilities" and "very foundation of good citizenship"). Student-body diversity is crucial to exposing students to different viewpoints, backgrounds, and perspectives, thus equipping students with the capacity to be effective, thoughtful, and engaged citizens and leaders in an increasingly diverse nation and world. *See* Rudenstine, *President's Report* at 1 ("[S]tudent diversity has … been valued for its capacity to contribute powerfully to the process of learning and to the creation of an effective educational environment. It has also been seen as vital to the education of citizens—and the development of leaders—in heterogeneous democratic societies such as our own."). This Court has recognized as much. *See Grutter*, 539 U.S. at 331-332; *Bakke*, 438 U.S. at 313; *see also* Laycock, *The Broader Case For Affirmative Action: Desegregation, Academic Excellence, and Future Leadership*, 78 Tul. L. Rev. 1767, 1772-1773 (2004) (noting *Grutter*'s discussion of the relationship between diversity and democracy); Payton, *Post-Grutter: What Does Diversity Mean in Legal Education and Beyond?*, 35 Pepp. L. Rev. 569, 581-582 (2008) (similar).

The need for leaders and citizens equipped to work and live in an increasingly interconnected and heterogeneous nation and world is more pressing today than ever. Our nation's "strength comes from people of different races, creeds, and cultures" united in commitment to "freedom of all." *Parents Involved in Cmty. Sch.* v. *Seattle Sch. Dist. No. 1*, 551 U.S. 701, 782 (2007) (Kennedy, J., concurring in part and concurring in judgment). But our shared experience, underscored by recent events, makes clear that the constitutional ideal of "openness and opportunity" where the "promise of liberty and equality" is accessible to all, regardless of

HARV00066614

11

race, is not easily achieved or assured. *Id.* at 787. Preconceptions and assumptions—whether subconscious or open—must be identified and examined before they can be effectively addressed.

Decades ago, Harvard, like many other colleges and universities, realized that there were many talented students from diverse racial, ethnic, and cultural backgrounds who were not applying to college and especially not to the nation's top universities. Given the central role that higher education has played in clearing the path to leadership in our society, it was evident then, as it is now, that our nation would be poorer if these students were not included more robustly in our colleges and universities. Consideration of race as one of many factors in university admissions ensures that strong leadership from all segments of society is a reality.

Universities play a unique role in helping to bridge the divides that threaten to prevent the Nation from achieving its highest democratic ideals. As Harvard's President recently explained, "for many if not most of those arriving at Harvard for the first time, [Harvard] is the most varied community in which they have ever lived—perhaps ever will live." Faust, President of Harvard University, *2015 Remarks at Morning Prayers* (Sept. 2, 2015).[6] Through daily interactions in classrooms, residential halls, and extracurricular activities with those of different backgrounds and viewpoints, students are encouraged to think critically, to approach, consider, and reconsider real-world problems in different ways, and to better appreciate the complexity of our society and the world. In Harvard's experience, this exposure to students of different backgrounds

---

[6] *Available at* http://www.harvard.edu/president/speech/2015/2015-remarks-morning-prayers.

HARV00066615

12

helps to promote cross-racial understanding and to combat the racial divisions that still trouble society and prevent the achievement of the full promises of liberty and equality. *See Fisher*, 133 S. Ct. at 2418.

The diversity that Harvard strives to achieve is multifaceted. Harvard seeks to admit students of varied backgrounds, socioeconomic circumstances, talents, interests, viewpoints, ambitions, and skills. One aspect of the broad diversity that Harvard seeks is ensuring that each admitted class is diverse within, among, and across racial and ethnic groups—a dimension of diversity that helps to dispel stereotypes and to undermine preconceived notions that members of racial groups think and act alike. *See Grutter*, 539 U.S. at 333 (noting that the University of Michigan Law School sought to "diminish[] the force" of stereotypes "that minority students always (or even consistently) express some characteristic minority viewpoint on any issue" (internal quotation marks omitted)); *League of United Latin Am. Citizens* v. *Perry*, 548 U.S. 399, 434 (2006) ("We do a disservice ... by failing to account for the differences between people of the same race."). That broad view of diversity—in which "race or ethnic origin is but a single though important element" considered along with a "far broader array of qualifications and characteristics"—is precisely the type of comprehensive diversity that this Court has recognized as a compelling interest for decades. *Bakke*, 438 U.S. at 315; *see Grutter*, 539 U.S. at 309-310; *see also* UT Br. 32-33.

Race and ethnicity remain important components of the all-encompassing diversity that Harvard seeks each year through its admission process. That is because the unfortunate "reality is that" "race [continues to] matter." *Parents Involved*, 551 U.S. at 787 (Kennedy, J. concurring in part and concurring in the judg-

HARV00066616

13

ment).   To say that race continues to matter is to acknowledge, forthrightly, that in our society race and ethnicity continue to shape the backgrounds, perspectives, and experiences of many, including Harvard's students.  "Just as growing up in a particular region or having particular professional experience is likely to affect an individual's views, so too is one's own, unique experience of being a racial minority in a society, like our own, in which race unfortunately still matters." *Grutter*, 539 U.S. at 333.

Indeed, to say that race and ethnicity are the *only* aspects of a student's background that a university may *not* consider would be willfully blind to the continuing relevance of race in our society.   Universities should not be compelled to ignore that students of different races and ethnic backgrounds often grow up separated and apart from one another, not exposed to others' experiences, perspectives, and values.  *See Parents Involved*, 551 U.S. at 798 (Kennedy, J., concurring in part and concurring in judgment) (noting the persistence of segregated schools); *Texas Dep't of Hous. and Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2515 (2015) (explaining that "vestiges" of de jure segregation by race "remain today, intertwined with the country's economic and social life"); *see also Bartlett* v. *Strickland*, 556 U.S. 1, 25 (2009) (plurality opinion) ("[R]acial discrimination ... [is] not ancient history.").  For those reasons, race and ethnicity remain salient social facts that influence the experiences and lives of Harvard's students.   And they remain important aspects of the expansive student-body diversity that Harvard seeks each year to attain.  Indeed, to compel universities to suppress or ignore information submitted by applicants who wish to describe their race or ethnicity as an important aspect of their background

HARV00066617

14

and experience would arbitrarily deprive universities of the ability to assess each individual as a whole and would represent a significant intrusion into the academic freedom of universities that this Court has long recognized. *E.g. Grutter*, 539 U.S. at 328-329; *Sweezy* v. *New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in the result).

In short, as many of our country's leading institutions of higher education have repeatedly argued to the Court, and as Harvard restates now, student-body diversity dramatically improves the depth and breadth of our students' academic experiences. It also helps to advance the nation's unfinished project of "uniting" "differing races, creeds, and cultures … in commitment to the freedom of all." *Parents Involved*, 551 U.S. at 782 (Kennedy, J., concurring in part and concurring in judgment); *see also Strickland*, 556 U.S. at 25 (plurality opinion) ("Much remains to be done to ensure that citizens of all races have equal opportunity to share and participate in our democratic processes and traditions."). At this time in our nation's history, this Court should reaffirm, not turn away from, its recognition of the role that diversity in higher education plays in helping our country achieve reconciliation, unity, and equal opportunity for all.

**B. This Court Should Reaffirm Its Narrow-Tailoring Framework In University Admissions**

**1. Individualized, holistic review should remain the touchstone of narrow-tailoring analysis**

Just as universities were reassured in *Bakke*, *Grutter*, and *Fisher* that student-body diversity is a permissible (indeed compelling) objective under the Equal Protection Clause, so too have they been guided by

HARV00066618

15

those decisions in understanding *how* they may consider race and ethnicity in their admissions. *See, e.g.*, Rudenstine, *President's Report* at 35-43 (*Bakke* "devoted considerable attention" to the issue of "how can [a university] design and administer an appropriate process" that "account[s]" for "race and ethnicity ... as one factor in an admissions process"). In *Grutter*, this Court identified the "hallmarks of a narrowly tailored [admissions] plan." 539 U.S. at 334. Those characteristics are that an "admissions program cannot use a quota system," *id.*; it "'may consider race or ethnicity only as a "plus" in a particular applicant's file, without insulating the individual from comparison with all other candidates for the available seats'"; and it must be "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant." *Id*; *see also id.* at 392-393 (Kennedy, J., concurring) ("There is no constitutional objection to the goal of considering race as one modest factor among many others to achieve diversity, but an educational institution must ensure, through sufficient procedures, that each applicant receives individual consideration and that race does not become a predominant factor in the admissions decisionmaking.").

Harvard's use of a holistic admissions process predated *Bakke*, and Harvard has continued to structure its admissions process consistent with the guidance set forth in *Bakke* and *Grutter*. In that process, every applicant is considered individually and as a whole throughout the admissions process; no formulas or cut-offs are applied to rule any applicant in or out. Harvard has committed extraordinary resources to a labor-intensive admissions process that aims to consider every dimension of the perspective each individual applicant might bring to campus, including the applicant's race or ethnicity.

HARV00066619

16

In any given year, Harvard receives applications from many more academically qualified candidates than it could ever admit. Harvard does not assign dispositive weight to any one objective criterion, such as grade point average or SAT score. Rather, Harvard seeks students possessing excellent academic credentials and exceptional individual qualities to enhance its student body. Harvard not only allows but encourages applicants to submit any information about themselves that they find relevant. It reviews copious information about every applicant, and considers each application with extraordinary care. In so doing, Harvard aims to gain a full understanding of how each prospective student could benefit from a Harvard education, and how other students, the faculty, and indeed the university itself could benefit in turn from that student's participation in the Harvard community.

Consistent with this Court's acknowledgment that race is "'one element in a range of factors that a university may consider'" in the service of attaining a diverse student body, Harvard's admissions process is "individualized" and race is considered in a "flexible, nonmechanical way." *Grutter*, 539 U.S. at 324, 334. In fact, race and ethnicity are considered in much the same way that Harvard considers many other personal attributes and accomplishments, such as academic or athletic achievement, work experience, geographic origin, or socioeconomic background. Harvard never compels applicants to claim membership in any racial or ethnic group. But neither does the University discourage candidates from offering *any* information, including about their racial or ethnic background, if they believe it is relevant to understanding their accomplishments or experiences. An individual's race or ethnicity, if self-identified, is but a piece of a larger mosaic, and is con-

HARV00066620

17

sidered only to understand the applicant as a complete and distinct individual. At no point is an applicant treated "simply" as a "component[] of a racial ... class." *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 153 (1994) (Kennedy, J., concurring) (internal quotation marks omitted).

By encouraging applicants to provide any information about themselves that they deem relevant, the Harvard admissions process also appropriately recognizes every applicant's sense of dignity and self-worth. If an applicant believes that his or her race or ethnicity is relevant to a holistic evaluation—as do many applicants—it is difficult to see why a university should be compelled to ignore that fact. Of course, each university may and must decide for itself what characteristics it looks for in students; the right to do so has long been understood as a central aspect of academic freedom. *See Bakke*, 438 U.S. at 312. But if a university deems it important to consider the student as a whole, as Harvard does, then forbidding consideration of information that a student provides concerning race and ethnicity would countermand the educational judgment of the university and demean the worth of the individual applicant. An admissions process that required disregard of a characteristic that the applicant herself deems important and that, in fact, remains a salient social fact would seriously burden a university's capacity to evaluate and understand that applicant as a whole, just as would a rule forbidding the university from considering the applicant's family circumstances, test scores, or preferred field of study.

HARV00066621

18

### 2. Narrow tailoring does not require the use of mechanistic race-neutral alternatives

Petitioner does not directly take issue with the key narrow-tailoring principles established by *Bakke* and *Grutter*, discussed above. At various times, petitioner observes that universities have an obligation to consider "non-racial alternative[s]." Pet. Br. 48; *see id.* at 22-23, 24, 38, 47. But she overlooks that this Court in *Grutter* made clear that narrow tailoring does *not* "require a university to choose between maintaining a reputation for excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups." 539 U.S. 339. Although *Fisher* held that courts need not defer to universities in their choice of race-conscious admissions as a *means* to accomplish diversity, *see* 133 S. Ct. at 2420, the Court sounded no retreat from the proposition that universities may, as part of the definition of their institutional mission, seek a student body that is *both* diverse *and* academically exceptional. Indeed, for Harvard, achieving the latter requires the former. Harvard recognizes that there is enormous talent in all communities, and that many academically talented students might not consider Harvard were it not racially and ethnically diverse. The excellence of the education Harvard offers would be diminished in the absence of such a diverse student body. A university's insistence on seeking students that will excel is not merely a question of means and methods; it is fundamental to the mission of many universities, and the Court should not limit the ability of universities to achieve meaningful diversity without sacrificing other vital aspects of a university's mission.

The Court should also reject any call by petitioner to force all universities to pursue student-body diversity in the same rigid manner, regardless of differences

HARV00066622

19

between and among universities. Different universities may have different conceptions of diversity and how diversity advances the unique educational mission of each institution. Although demanding, narrow tailoring should not be used to standardize the admissions processes of colleges and universities in a way that overrides the "experience and expertise" of university officials "in adopting or rejecting certain admissions processes," *Fisher*, 133 S. Ct. at 2420, or that creates a mandate of uniformity that stifles competition and experimentation among universities.[7]

None of this means that universities may ignore race-neutral measures in shaping admissions policies. Indeed, Harvard has not just considered, but actively employs, many race-neutral means to achieve a broadly diverse and exceptional student body. For example, Harvard considers whether the applicant is the first in the family to attend university, whether he or she comes from a disadvantaged background, and whether languages other than English are spoken in the home. Harvard also engages in extensive outreach and recruiting efforts aimed at increasing the size and diversity of the applicant pool, visiting more than 150 cities, suburbs, and small towns across the country each year.

---

[7] This Court also has never held—and it should not to do so now—that a university must actually experiment with a variety of race-neutral alternatives before it adopts race-conscious admissions. It is enough for universities to give serious consideration to such measures in light of a university's mission and educational objectives as well as available evidence regarding the effectiveness of race-neutral alternatives. *See, e.g., Schuette*, 134 S. Ct. at 1678-1682 (discussing empirical analyses showing diversity declines in California and Michigan after bans on race-conscious admissions despite use of race-neutral measures).

HARV00066623

20

In addition, Harvard has adopted expansive financial aid policies with the goal of enabling admitted students from all backgrounds to attend. Under Harvard's admissions policies, a candidate's financial need will never adversely affect his or her chances of admission. In fact, Harvard pays the total cost of attendance for students from families with annual incomes below $65,000, with no expected contribution from the student's family. More than half of Harvard students receive grant aid, and for those students, the average family pays less than $12,000 to attend; they also are not required to take out any loans. In these and other ways, Harvard strives to ensure that it receives applications from a wide range of applicants and that all admitted students, regardless of financial means, are able to attend.

Those efforts have played a critical role in contributing to Harvard's diversity. Harvard intends to continue to employ these and other measures to broaden the universe of individuals who consider, apply to, and enroll at Harvard. But, in Harvard's experience, reliance on these race-neutral measures cannot substitute for individualized, holistic review that takes account of race and ethnicity of the type approved by *Grutter*.

Harvard also recognized long ago that admissions by purely numerical factors such as grade point averages and standardized test scores would not effectively accomplish its educational mission. Given the breadth of talents and experiences that Harvard seeks from applicants, its admission process cannot be reduced to formulas. Rather, Harvard considers how each individual would contribute to and benefit from the admitted class a whole. Purportedly race-neutral measures that would require Harvard to abandon or limit individualized, holistic review would fundamentally com-

21

promise Harvard's ability to admit a class that is at once academically excellent, broadly diverse, and filled with great potential to equip citizens and leaders for democratic engagement.

## II. PETITIONER'S ARGUMENTS DISTORT EQUAL PROTECTION JURISPRUDENCE AND ARE UNPERSUASIVE

Having declined to ask this Court to overrule *Grutter*, petitioner offers several arguments tied to the unique interaction between UT's Top Ten Percent Plan and holistic review. *See* Pet. App. 51a (explaining that "UT Austin's admission program is a unique creature"). UT fully responds to those contentions in its brief. Two of petitioner's arguments have the potential for consequences well beyond this case. As explained below, those arguments should be rejected.

### A. Petitioner's "Few Places Left To Fill" Argument Is Meritless

Petitioner first seeks to rewrite this Court's precedents by restricting the consideration of race to a small subset of admissions decisions. Specifically, petitioner contends that Justice Powell's opinion in *Bakke* limited the use of race in admissions to "comparative decisions between qualified applicants when there were 'a few places left to fill'" (Pet. Br. 42 (quoting *Bakke*, 438 U.S. at 324) (appendix)), and that *Bakke* does not permit "across-the-board deployment of race in the application process" (Pet. Br. 23). This argument misreads *Bakke*, ignores *Grutter*, and would demand unworkable admissions processes.

*First*, petitioner seriously misreads Justice Powell's opinion in *Bakke*. Justice Powell endorsed a "flexible" admissions program that "consider[s] all pertinent elements of diversity in light of the particular qualifica-

HARV00066625

22

tions of *each applicant.*"  438 U.S. at 317 (emphasis added); *see also id.* at 318 ("This kind of program treats each applicant as an individual in the admissions process."").  What was unconstitutional, in Justice Powell's view, was an admissions system that "reserv[ed] … a specified number of seats in each class for individuals from the preferred ethnic groups." *Id.* at 315.  By contrast, "an admissions program where race or ethnic background is simply one element—to be weighed fairly against other elements—in the selection process" is permissible. *Id.* at 318.  Nothing in his opinion suggests that this holistic evaluation of applicants, including consideration of race, must be restricted to applicants for a few, set-aside admissions seats.

Instead, the "few places left to fill" formulation relied upon by petitioner is wrenched out of context from the Harvard Plan appended to Justice Powell's opinion. The Harvard Plan explained that only a small number of students would be admitted principally on the basis of "extraordinary" intellectual potential—"perhaps 150 or so out of an entering class of over 1,100." *Bakke*, 438 U.S. at 322.  All other applicants would be reviewed on the basis of a multitude of factors, including interests, talents, backgrounds, and race.  *Id.*  In attempting to explain "the kind of significance" attached to race, the Harvard Plan offered as an "illustrat[ion]" a decision, "with only a few places left to fill," between two minority candidates—one the child of a successful physician and the other from an inner city. *Id.* at 324.  That hypothetical example does not remotely indicate that all consideration of race was restricted to competition for the last "few places left to fill."  The rest of the Plan and Justice Powell's opinion foreclose any such strained reading.

HARV00066626

23

*Second*, this Court rejected petitioner's misreading in *Grutter*. There, this Court explained that "truly individualized consideration demands that race be used in a flexible, nonmechanical way." 539 U.S. at 334. As in Justice Powell's opinion, that principle forbids "quotas" and "separate admissions tracks," but permits universities to "consider race or ethnicity more flexibly as a 'plus' factor in the context of individualized consideration of each and every applicant." *Id.*; *see id.* at 335 (a permissible system treats "race as a 'plus' factor in any given case while still ensuring that each candidate competes with all other qualified applicants" (internal quotation marks and alterations omitted)). And, indeed, the University of Michigan Law School admissions process approved of in *Grutter* functioned in just that way. *Id.* at 337 ("[T]he Law School engages in a highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment.").

*Finally*, petitioner's "few places left to fill" argument would demand an unworkable standard for courts to apply. Tellingly, petitioner does not suggest a principled standard by which a court could identify the constitutionally acceptable "last few places" in which race could be considered. Would race be off limits for 60% of admissions seats? 70%? Would the answer vary depending upon the size or mission of the university? Would the answer depend on how the university structured its admissions processes (*e.g.*, early decision, rolling admissions)? Even asking these questions makes clear that such an approach would unduly enmesh courts in university admissions decisions, would impair universities' freedom to define their own missions, and would do nothing effective in advancing the narrow-tailoring inquiry. Indeed, the result likely would be a

HARV00066627

24

stratified admissions processes involving "separate admissions tracks"—a non-race track for some seats, with race-based admission decisions for other seats—of the type that this Court has long disapproved. *See Grutter*, 539 U.S. at 334; *Bakke*, 438 U.S. at 315-316 (opinion of Powell, J.).

### B. Petitioner's Arguments About The Type Of Evidence That May Be Considered In Defending Admissions Processes Are Misplaced

Petitioner also attempts to narrow, artificially, the kind of evidence that may be considered in defense of holistic admissions processes. Petitioner's arguments are unfounded.

*First*, petitioner contends that the only rationales and evidence that a university may use to defend its admissions policies are those "contemporaneous" with its initial decision to adopt race-conscious admissions. Pet. Br. 31; *id.* at 33 (referring to "the settled contemporaneous-evidence requirement"). In petitioner's view, "a university must set forth its clearly-articulated reason at the time it makes the decision to use racial preferences" and may defend its admissions system only on that basis. Pet. Br. 21. That line of argument is wrong for many reasons.

Petitioner mistakenly assumes that universities' admissions processes are fixed from a single point in time at which they are adopted. But in reality, universities continually reexamine their admissions policies, processes, and priorities. They may not necessarily do so through the appointment of a blue-ribbon committee, as petitioner apparently thinks is required, but universities accumulate experience and develop judgments based on the operation of their policies, and those judgments are reflected in continual modifications, large and

HARV00066628

25

small, to the way they review applications and the classes they admit. The decisions about admissions policies are also contextual—for example, Harvard and other universities constantly consider which students will foster the most dynamic educational experience and will provide one another with the interactions and skills necessary to contribute and find meaning after graduation. Given this dynamic process, it would make little sense to insist that universities defend their current admissions processes only on the basis of rationales and evidence articulated at some distant point in the past (if such a point even could be identified).

Any such rule also would be inconsistent with *Grutter*. There, in assessing the constitutionality of the University of Michigan Law School's admission process (one adopted "[i]n 1992," 539 U.S. at 314), this Court canvassed an extensive factual record, including "numerous studies" on the benefits of diversity, all of which were issued after 1992, *id.* at 330, and it credited evidence and rationales for diversity supplied by amici, *id.* at 330-331 (citing briefs on the benefits of diversity for businesses and in military recruiting). That does not mean, of course, that a university may adopt race-conscious admissions for no reason at all. But there is no basis for requiring that initial justifications be set in stone for all time, or that constitutional review of universities' admissions policies be limited to "contemporaneous evidence" and not take account, for example, of evidence acquired in the course of using race-conscious admissions policies or new studies and insights.

*Second*, petitioner contends that the requisite "contemporaneous evidence" must include "empirical evidence" supporting a university's decision to pursue a diverse student body. Pet. Br. 31. If by empirical evidence petitioner means scientific studies, petitioner is

HARV00066629

26

wrong. Although there is a substantial body of empirical evidence to support the educational benefits of diversity, this Court has never held that such educational judgments must be supported by scientific studies. Quite the contrary; as the Court has made clear, "a university's 'educational judgment that ... diversity is essential to its educational mission is one to which we defer.'" *Fisher*, 133 S. Ct. at 2419. Judgments about diversity are integrally tied to a university's conception of its mission and its pedagogical judgment about the best conditions for teaching and learning on its campus.

The Court should turn aside petitioner's demand that scientific studies—and only such evidence—can justify a university's decision to pursue student-body diversity as a pedagogical objective. Evidence bearing on the value of diversity may take many forms, including detailed empirical analyses, as well as the expert educational judgment of university officials and faculty, reflecting their day-to-day experience, about the benefits of diversity and the role of diversity in accomplishing universities' missions, evidence that unfolds over the lifetimes of their graduates. Those are precisely the types of institution-specific educational judgments that courts are ill-equipped to second-guess and to which deference to the expertise of universities is appropriate.

Petitioner's position that universities' judgments on these questions should be discounted, or even ignored, unless backed by regression studies or statistical surveys would impose needless costs on universities and would drain of all meaning *Grutter*'s requirement of "defer[ence]" to such decisions. Indeed, such a rule would be deeply inconsistent with this Court's recognition that the judiciary is poorly suited "to evaluate the substance of ... academic decisions," *Regents of Univ. of Mich.* v. *Ewing*, 474 U.S. 214, 226 (1985), and would threaten a

HARV00066630

27

university's freedom "'to determine for itself on academic grounds ... who may be admitted to study,'" *Sweezy*, 354 U.S. at 263 (Frankfurter, J., concurring in the result); *see also Keyishian* v. *Board of Regents*, 385 U.S. 589, 603 (1967).

## CONCLUSION

The judgment of the court of appeals should be affirmed.

Respectfully submitted.

ROBERT W. IULIANO
SENIOR VICE PRESIDENT
    AND GENERAL COUNSEL
ARA B. GERSHENGORN
MATTHEW T. FOX
OFFICE OF THE GENERAL
    COUNSEL
HARVARD UNIVERSITY
Holyoke Center, Suite 980
1350 Massachusetts Ave.
Cambridge, MA  02138

FELICIA H. ELLSWORTH
ERIC F. FLETCHER
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109

NOVEMBER 2015

SETH P. WAXMAN
    *Counsel of Record*
PAUL R.Q. WOLFSON
KELLY P. DUNBAR
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC  20006
(202) 663-6000
seth.waxman@wilmerhale.com

DEBO P. ADEGBILE
ADRIEL I. CEPEDA DERIEUX
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007

HARV00066631