**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**BOSTON DIVISION**

------------------------------------------------------------x
STUDENTS FOR FAIR ADMISSIONS, INC.,

                                        Plaintiff,

                - against -
                                                        Civil Action No. 1:14-cv-14176-ADB

PRESIDENT AND FELLOWS OF HARVARD
COLLEGE,

                                        Defendant.
------------------------------------------------------------x


**MEMORANDUM OF AMICUS CURIAE**
**NATIONAL ASSOCIATION OF SCHOLARS**
**IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Dennis J. Saffran
38-18 West Drive
Douglaston, NY 11363
718-428-7156
djsaffranlaw@gmail.com

Dwight Duncan
*Counsel of Record*
333 Faunce Corner Road
Dartmouth, MA 02747-1252
508-985-1124
dduncan@umassd.edu

July 30, 2018

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

IDENTITY AND INTEREST OF AMICUS CURIAE ................................................. 1

STANDARD OF REVIEW AND SUMMARY OF ARGUMENT ............................... 1

ARGUMENT .............................................................................................................. 3

A.   Statistical Evidence Establishes a Significant Possibility That Harvard's
     Admissions Policies are Motivated by Prejudice or Stereotype, Thus Entitling
     Plaintiff to Summary Judgment Under *Grutter* .................................................. 3

     1.   Studies by Both the Plaintiff and Harvard Itself Document This ........................ 4

     2.   Other Statistical Studies Also Support This Conclusion ......................... 7

B.   Historical Evidence That Harvard's "Holistic" Admissions Policies Were
     Instituted to Exclude Jews, and are Now Applied to Asians in the Same Way and
     for the Same Reasons, Buttresses the Conclusion That These Policies are
     Motivated by Prejudice or Stereotype ................................................................ 11

C.   Anecdotal Evidence of Biased and Stereotypical Views About Asian Students
     Reinforces This Conclusion .............................................................................. 16

CONCLUSION .......................................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................. 2

*City of Richmond v. J. A. Croson Co.*, 488 U. S. 493 (1989) ............................... 1, 3, 15

*Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 ("*Fisher I*") (2013) ....................... 1, 7

*Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411 (1st Cir. 2017) .................... 2

*Grutter v. Bollinger*, 539 U.S. 306 (2003) .......................................................... *passim*

*Nyquist v. Mauclet*, 432 U.S. 1, 17 (1977).................................................................. 3

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
      429 U.S. 252 (1977)................................................................................... 14, 15

*Wessmann v. Gittens*, 160 F.3d 790 (1st Cir. 1998) ..................................................... 7

## Statutes and Rules

Fed. R. Civ. P. 56(a) ................................................................................................... 2

## Other Authorities

Alan M. Dershowitz & Laura Hanft, *Affirmative Action and the Harvard College
      Diversity Discretion Model: Paradigm or Pretext?*, 1 Cardozo L. Rev. 379 (1979) ............ 12

Althea Nagai, Center for Equal Opportunity, *Too Many Asian Americans: Affirmative
      Discrimination in Elite College Admissions* (2018),
      http://www.ceousa.org/attachments/article/1209/AN.Too%20Many%20AsianAms.Fi
      nal.pdf ............................................................................................... 1, 6, 9

Colleen Walsh, *Faust Issues Clarion Call to Fight Racism*, The Harvard Gazette (Aug.
      30, 2017), https://news.harvard.edu/gazette/story/2017/08/harvard-president-issues-
      clarion-call-to-fight-racism/....................................................................... 19

Daniel Golden, *The Price of Admission: How America's Ruling Class Buys Its Way into
      Elite Colleges—and Who Gets Left Outside the Gates* (2006) ............................... 17

Dennis Saffran, *Fewer Asians Need Apply*, City J., Winter 2016 at 38, https://www.city-
      journal.org/html/fewer-asians-need-apply-14180.html ....................................... 16

Gustavo López *et al.*, Pew Research Center, *Key Facts About Asian Americans, a Diverse and Growing Population* (2017), http://www.pewresearch.org/fact-tank/2017/09/08/key-facts-about-asian-americans/ ................................................................... 6

Jerome Karabel, *The Chosen: The Hidden History of Admission and Exclusion at Harvard, Yale and Princeton* (2005) ................................................................... 12

National Center for Education Statistics, *Youth Indicators 2011* Table 2 (2012), https://nces.ed.gov/pubs2012/2012026/tables/table_02.asp ................................................ 6

Ron Unz, *The Myth of American Meritocracy: How corrupt are Ivy League admissions?*, The American Conservative, Dec. 2012, at 14, http://theamericanconservative.com/pdf/The%20Myth%20of%20American%20Meritocracy-Unz.pdf; http://www.theamericanconservative.com/articles/the-myth-of-american-meritocracy/ ........................................................................... 10, 11, 12, 15

Tania deLuzuriaga, *Report Issued on Inclusion, Belonging*, The Harvard Gazette (Mar. 27, 2018), https://news.harvard.edu/gazette/story/2018/03/harvard-issues-task-force-report-on-inclusion-belonging/ ................................................................. 19

Thomas Espenshade & Alexandra Radford, *No Longer Separate, Not Yet Equal: Race and Class in Elite College Admission and Campus Life* (2009) .................................. 8, 9

Thomas J. Espenshade & Chang Y. Chung, *The Opportunity Cost of Admission Preferences at Elite Universities*, 86 Social Science Q. 293 (2005) ........................................ 9

## IDENTITY AND INTEREST OF AMICUS CURIAE

Amicus Curiae National Association of Scholars ("NAS") is an independent membership association of academics working to foster intellectual freedom and to sustain the tradition of reasoned scholarship and civil debate in America's colleges and universities.  NAS supports intellectual integrity in the curriculum, in the classroom, and across the campus.  As a group comprised of professors, graduate students, administrators, and trustees, NAS is intimately familiar with the concerns relevant to this case.  It is dedicated to the principle of individual merit and opposes race, sex, and other group preferences.  NAS joined an *amicus* brief to the United States Supreme Court supporting this position in *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 (2013).  More recently, NAS member Althea Nagai, Ph.D., published *Too Many Asian Americans: Affirmative Discrimination in Elite College Admissions* (Center for Equal Opportunity, 2018)[1], documenting discrimination by the defendant and other prestigious colleges and universities against Asian applicants.

## STANDARD OF REVIEW AND SUMMARY OF ARGUMENT

The Supreme Court has held, in two of its leading cases concerning racial preferences, that in applying the narrow tailoring test of the strict scrutiny requirement applicable to such a case, a reviewing court must be assured that "the means chosen 'fit' th[e] compelling goal so closely that **there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype**." *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (quoting *City of Richmond v. J. A. Croson Co.*, 488 U. S. 469, 493 (1989) (plurality opinion)) (emphasis added).  The rule that summary judgment is only appropriate when "there is no genuine dispute

---

[1] http://www. ceousa.org/attachments/article/1209/AN.Too%20Many%20AsianAms.Final.pdf

as to any material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017); Fed. R. Civ. P. 56(a), must be read together with this substantive rule defining what the material issue is in this case.  That issue is not whether the record establishes **conclusively** that Harvard's admission policies are motivated by prejudice or stereotyping, but whether it establishes that there is **little or no possibility** that they are.

The public record alone in this case, even without regard to the sealed evidence unavailable to NAS, leaves no genuine dispute that the plaintiff has more than met this standard.  This record is replete with evidence of a de facto Asian quota startlingly similar to the one that Harvard once imposed on Jews; of impermissible racial proportionality, or "balancing," in admissions; and of biased views about the personal characteristics of Asian applicants.  This evidence is corroborated by other statistical studies and anecdotal accounts strongly suggesting that admissions officials at Harvard and other elite colleges are consciously or unconsciously prejudiced against Asian applicants based on a stereotypical view of Asian students as uninteresting, uncreative and one-dimensional.  It is further corroborated by the indisputable historical evidence that the "holistic" admissions system which Harvard defends here was originally instituted to exclude Jewish students who were stereotyped in much the same way that Asian-Americans are today.

In light of all this, no reasonable observer could conclude that "there is little or no possibility" that "the means chosen" by Harvard to achieve its purported educational goal of racial diversity were in fact motivated at least in part by "prejudice or stereotype" about one racial group.  Therefore, under *Grutter* Harvard's admissions policies are not narrowly tailored to "closely fit" its goal, and plaintiff is entitled to judgment as a matter of law.

- 2 -

# ARGUMENT

**A.    Statistical Evidence Establishes a Significant Possibility That Harvard's Admissions Policies are Motivated by Prejudice or Stereotype, Thus Entitling Plaintiff to Summary Judgment Under *Grutter***

Both the publicly available evidence in this case, and other statistical studies of the admissions records of Harvard and similar colleges and universities vis-a-vis Asian-Americans, strongly suggests that Harvard either intentionally discriminates against Asian applicants and/or engages in prohibited racial balancing that disparately burdens Asian students.  Regardless of whether this evidence proves, at this stage, that Harvard has in fact discriminated against Asian-Americans, it clearly establishes beyond any genuine dispute that there is more than a small possibility that it has.  Thus, under the *Grutter* strict scrutiny standard requiring that there be "little or no possibility" that a policy disproportionately burdening and benefitting different racial groups was motivated by "illegitimate racial prejudice or stereotype," plaintiff is entitled to summary judgment.[2]

Further, as discussed in Sections B and C *infra*, this conclusion is buttressed by anecdotal evidence of prejudicial and stereotyped views of Asian-American students held by admissions officials and other administrators at Harvard and similar schools, and by the striking historical parallels between Harvard's treatment of Asians today and of Jews in the 1920's through the 1940's.

---

[2] The cases in which the Court articulated this standard, *Grutter* and *City of Richmond v. J. A. Croson Co.*, *supra*, of course involved challenges to racial preferences and set-asides by white plaintiffs, thus establishing that even in such cases strict scrutiny requires that there be no significant chance that the racial preference was motivated by prejudice towards or stereotyping about the white majority.  This rule should be applied even more stringently where, as here, and as is becoming increasingly common in our increasingly multi-racial society, the brunt of ostensibly benign racial favoritism falls on a group that is itself a racial minority that has historically faced discrimination.  *Cf, Nyquist v. Mauclet*, 432 U.S. 1, 17 (1977) (Rehnquist, J., dissenting) ("Orientals" an example of a "discrete and insular minority" subject to heightened protection under Court's equal protection jurisprudence).

### 1.      Studies by Both the Plaintiff and Harvard Itself Document This

As plaintiff recounts in detail in its memorandum in support of its motion, both its expert consultant, Professor Peter Arcidiacono of Duke University, and, notably, Harvard's own internal investigation, document clear statistical patterns of discrimination against Asian applicants.

Asian-Americans consistently receive the lowest "personal rating"[3] of any racial group from admissions officials in Cambridge, who have not met them, even though the local alumni interviewers who actually do interact with them face-to-face rank them similarly to whites and somewhat higher than African-Americans and Hispanics.  Pl's Mem at 7-9, 30; Pl's Statement of Undisputed Material Facts ("Pl's SMF") ¶¶ 606-616 & Tables 4.1R and 5.6R.  A similar discrepancy is found in the "overall rating" of applicants, which is not merely a formulaic compilation of the personal rating and the more objective academic rankings, but rather is itself a purely subjective measure.  Pl's SMF ¶ 99.  Among the most academically competitive applicants, Asians receive significantly lower overall ratings from admissions officials than do whites, African-Americans and Hispanics, but alumni interviewers rank them similarly to those in other racial groups,  Pl's Mem. at 9; Pl's SMF ¶¶ 624-628 & Table 5.7R.

This discrimination is reflected in the admission rates for those in different racial groups.  Analyzing Harvard's own data obtained in discovery, Professor Arcidiacono found that the Asian-American admission rate was below the total admission rate, and below the admission

---

[3] As discussed by the plaintiff, the personal rating is a completely subjective and vague measure variously described by different Harvard officials as potentially including such impressions as whether a student has good "human qualities," a "positive personality," and character traits such as "likability," "helpfulness," "courage" and "kindness," and is generally an "attractive person to be with," "widely respected" and a "good person" who "others like to be around."  Pl's Mem. at 7-8; Pl's SMF ¶ 90.

rates for whites and African-Americans, for every year from the Class of 2000 through the Class of 2019, and was below the Hispanic admission rate for eighteen of those twenty years – even though Asians had higher SAT scores than applicants from any other group in each of those years. Pl's SMF ¶¶ 629-633 & Figures 1.1 and 1.2; *see also id.* ¶¶ 638-640 & Table 5.2R (admission rates by race and academic index decile). Harvard's own internal investigation, by its Office of Institutional Research ("OIR"), similarly found that the admission rate for Asians was significantly below that for every other group for the ten years from the Class of 2007 through the Class of 2016. *Id.* ¶¶ 400, 419. Even more strikingly, OIR found that if admissions had been based solely on academic ratings the Asian admission rate would have more than doubled, from less than 8% to more than 17%, and would have been far higher than that of any other racial group. *Id.* ¶ 419.[4]

Given the clear statistical disparity in acceptance rates, it is not surprising that while Asian-Americans make up some 28% of the applicants to Harvard (*see id.* ¶ 634 Table 5.1R) – and over 50% of the applicants with the top academic records (*id.*) – they account for only about 19% of those admitted, *id.* ¶¶ 402, 699-701. By contrast, Professor Arcidiacono found that they would comprise over 50% of admitted students if admission were based on academic accomplishments alone, *id.* ¶ 637. And Harvard's OIR investigation essentially confirmed this finding, determining that Asians would represent 43% of admissions under an "academics only" model.

---

[4] The admission figures for all groups were somewhat lower in Professor Arcidiacono's data than in the OIR data. That is because Prof. Arcidiacono used detailed admissions data disclosed by Harvard for the Classes of 2014 through 2019, Pl's SMF ¶ 582, while OIR analyzed data for the classes of 2007 through 2016, *id.* ¶ 400, and the admissions rates for all groups have declined as applications have increased. This decline is reflected in Prof. Arcidiacono's chart cited above, *id.* ¶ 630 Figure 1.1, which is based on aggregate data disclosed by Harvard for the Classes of 2000 through 2019 (*see id.* ¶ 630). In any event, whether one focuses on the Class 2014-Class 2019 data, the Class 2007-Class 2016 data, or the Class 2000-Class 2019 aggregate data, they all show one consistent pattern of apparent discrimination against Asian-American applicants.

Pl's Mem. at 11-12; Pl's SMF ¶ 402.  Moreover, OIR found that even adding to this model preferences for recruited athletes, "legacy" preferences for the children of alumni, extracurricular activity ratings – and even the biased personal rating – Asians should still constitute 26% rather than 19% of admitted students.  *Id.* ¶¶ 402, 406-413.  Thus there is an extremely strong inference of an institutional bias against Asian applicants that is even greater than the bias reflected in the personal rating scores.

This inference is further supported by the striking consistency over time of the Asian-American share of students admitted to Harvard, even while the Asian proportion of the high school age applicant pool was growing substantially.  Data obtained from Harvard in discovery shows that the Asian share of the Classes of 2009 through 2018 has remained constantly in the 18% to 21% range.  *Id.* ¶¶ 699-701.  This stagnancy has occurred at the same time that the Asian population was experiencing "the fastest growth rate of any major racial or ethnic group" in the country.  Gustavo López *et al.*, Pew Research Center, *Key Facts About Asian Americans, a Diverse and Growing Population* (2017), http://www.pewresearch.org/fact-tank/2017/09/08/key-facts-about-asian-americans/.

Indeed, according to Census data, during almost the exact same period between the selection of the Class of 2009 and the selection of the Class of 2018, when Asian admissions remained essentially flat, the Asian high school age cohort (14-to-17-year-old) grew by 27% even though the total national 14-to-17-year-old cohort actually declined by 0.5%.  National Center for Education Statistics, *Youth Indicators 2011* Table 2 (2012), https://nces.ed.gov/pubs2012/2012026/tables/table_02.asp.[5]  *See also* Nagai, *supra*, at 6-7 Figures 1 & 2 (expo-

---

[5] The Census data are for the period 2005 to 2015.  The Classes of 2009 and 2018 were admitted in 2005 and 2014 respectively.

nential growth of Asian population and Asian undergraduate population). It is hard to believe that this flatlining of the admission rate of the most academically talented group in Harvard's applicant pool, at the same time that its share of that pool was vastly expanding both absolutely and relative to other groups, does not reflect intentional discrimination.

At the very least it reflects an attempt at "outright racial balancing," which the Supreme Court has declared to be "patently unconstitutional." *Fisher v. Univ. of Texas at Austin*, *supra*, 570 U.S. at 311 ("*Fisher I*") (quoting *Grutter*, 539 U.S. at 330). The percentages of other racial minority groups in Harvard's admitted classes have also remained remarkably constant from year to year, with African-Americans and Hispanics each accounting for between 10% and 12% of the Classes of 2014 through 2017. Pl's SMF ¶ 699. These percentages track almost exactly their proportion of total applicants during this timeframe (African-Americans 11.0%, Hispanics 12.6%). *See id.* ¶ 634 Table 5.1R. The First Circuit rejected just such "a scheme of proportional representation" based on the racial breakdown of the applicant pool in *Wessmann v. Gittens*, 160 F.3d 790, 798 (1st Cir. 1998), deeming it "less a means of attaining diversity in any constitutionally relevant sense and more a means for racial balancing." *Id.* Harvard's apparently similar scheme, though tacit rather than explicit as in *Wessmann*, must be rejected here as well.

### 2.    Other Statistical Studies Also Support This Conclusion

Various scholarly studies of the role of race in the admissions process at Harvard and other elite colleges have reached the same finding as did Professor Arcidiacono and Harvard's own research office – *viz.*, that Asian-Americans are admitted at significantly lower rates than are other racial groups. These corroborating studies reinforce the conclusion that there is more than a "little possibility" that this is motivated by prejudice or stereotyping.

In one of the most well-known studies, two Princeton researchers found that, controlling

for other variables such as academic credentials, Asian students applying to highly selective private colleges faced odds three times as high as similar whites, six times as high as similar Hispanics, and sixteen times as high as similar African-Americans.  Thomas Espenshade & Alexandra Radford, *No Longer Separate, Not Yet Equal: Race and Class in Elite College Admission and Campus Life* 84-85 (2009).  Asians need SAT scores 140 points higher than whites, 270 points higher than Hispanics and some 450 points higher than blacks (out of 1600 points) to be admitted to these schools.  *Id.* at 92-93.  In other words, an Asian applicant with an SAT score of 1500 has only the same chance of being accepted as a white student with a 1360, a Latino with a 1230 or an African-American with a 1050.  Among candidates in the highest 1400-1600 SAT range, 77% of blacks, 48% of Hispanics, and 40% of whites but only 30% of Asians are admitted.  *Id.* at 81.

The Espenshade-Radford book is often cited for its statistics on the rather startling gaps between the admissions odds of Asian and white students on the one hand and of similarly situated African-American and Hispanic students on the other.  However, the more important disparity for present purposes is the still sizeable one **between** Asians and whites.  As seen, Asian-American applicants are at a significant disadvantage compared to white as well as to other minority applicants.  The clear import is that race-conscious admissions policies such as those used at all of these selective institutions are not benign to all racial minorities but actually privilege whites over Asians.  Another study by Professor Espenshade confronted this question directly and reached the staggering conclusion that racial preferences for blacks and Latinos at elite colleges come almost entirely at the expense of Asian-Americans rather than whites.  He and a colleague found that if affirmative action were eliminated "[n]early four out of every five places . . . not taken by African-American and Hispanic students would be filled by Asians."

Thomas J. Espenshade & Chang Y. Chung, *The Opportunity Cost of Admission Preferences at Elite Universities*, 86 Social Science Q. 293, 298 (2005).

While the Espenshade studies were published in 2005 and 2009 they relied on data from the 1980's and 1990's. *Id.* at 293; Espenshade & Radford, *supra*, at 10. Research incorporating more recent statistics reaches the same results however. As noted earlier, NAS member Althea Nagai recently published *Too Many Asian Americans: Affirmative Discrimination in Elite College Admissions*, *supra*, examining admission of Asian applicants to Harvard and other prestigious institutions. Nagai analyzed data from the National Center for Education Statistics ("NCES") on admissions to Harvard, the California Institute of Technology ("Caltech") and the Massachusetts Institute of Technology ("MIT") for the period from 1980 through 2016. *See* Nagai, *supra*, at 8-9 & n.15. She found that the Asian percentage of the student body at Harvard actually reached its high point 25 years ago, in 1993, at 21%, then declined and, as reflected in Harvard's own figures noted in Section A(1) above, has essentially stagnated over the last ten to fifteen years. *Id.* at 13 & Figure 5.[6]

In an exhaustive 2012 study of the same NCES data, author Ron Unz looked at the racial composition of Ivy League and other elite schools since 1980 and found a similar pattern. Ron Unz, *The Myth of American Meritocracy: How corrupt are Ivy League admissions?*, The Amer-

---

[6] One notable finding of Nagai's offers an extreme variant of Prof. Espenshade's findings that racial preferences come almost entirely at the expense of Asians and thus benefit whites compared to them. Nagai compared the racial composition of Caltech and MIT, two extremely similar elite institutions, neither of which provides legacy preferences or recruits athletes. However, MIT does take race into account in admissions decisions, while Caltech is the only top school that rejects the use of racial preferences and instead selects students based almost entirely on academic merit. Thus one can get a fairly good idea of the racial impact of preferences by comparing the populations of the two schools. Strikingly, this comparison suggests that such preferences come **entirely** at the expense of Asian-Americans, who are 43% of the student body at Caltech but only 26% at MIT. Equally striking, the racial group that benefits the most is not African-Americans or Hispanics but **whites**, whose numbers actually **increase** from 29% at Caltech to 35% at MIT. *Id.* at 10 Table 1.

ican Conservative, Dec. 2012, at 14.[7]  Asian enrollment at Harvard increased from about four

percent to ten percent during the early and mid-1980's.  *Id.* at 17-18 & App. C.[8]  It then spiked

after the Department of Education Office for Civil Rights ("OCR") began an investigation in

1988 into an earlier complaint of discrimination against Asians by Harvard, peaking at 21% in

1993 as noted by Nagai.  *Id.* at 18 & App. C.  However, beginning in 1994, the first year in

which all students were admitted after the close of the investigation in October, 1990, "the Asian

numbers went into reverse, generally stagnating or declining during the two decades which

followed."  *Id.* at 18; *see id.* App. C.  Unz found that the striking consistency in the Asian

numbers from year to year, reflected in the Harvard figures above for the classes of 2009 through

2018 (*see supra* p. 6), actually dates to this point in the mid-1990's:  "Even more surprising has

been the sheer constancy of these percentages, with almost every year from 1995–2011 showing

an Asian enrollment within a single point of the 16.5 percent average."  *Id.* at 18; *see id.* App. C.

Moreover, Unz pointed out that these figures actually understate the decline in Asian

representation at Harvard, as they do not take into account that, as noted above, Asians have

been the fastest-growing racial group in the United States.  The Asian share of the college-age

(18-21 year-old) cohort quadrupled from 1.3% to 5.1% between 1976 and 2011.  *Id.* at 18-19 &.

App. B.  Factoring this in, Unz calculated that "the percentage of college-age Asian-Americans

attending Harvard . . . has . . . dropped by over 50 percent" since peaking in 1993.  *Id.* at 19.

Unz found strikingly similar patterns at other Ivy League schools. Not only were the

---

[7]    http://theamericanconservative.com/pdf/The%20Myth%20of%20American%20Meritocracy-Unz.pdf
(pdf of print ed.); http://www.theamericanconservative.com/articles/the-myth-of-american-meritocracy/
(html)

[8] The Appendices are available online at http://www.theamericanconservative.com/articles/meritocracy-
appendices/

Asian admission numbers remarkably stable from year to year, but from college to college as well.  After the closing of the OCR Harvard investigation "Asian enrollments across all those universities rapidly converged to the same level of approximately 16 percent, and remained roughly static thereafter."  *Id.* at 18.  This convergence (and its striking contrast with the pattern at Caltech which, as noted above, does not take race into account in admission, as well as with the ballooning of the Asian college-age population) is starkly depicted in Unz's chart below.



*Id.* at 18.  This apparent conscious parallelism in Ivy League Asian admissions further supports the strong inference that there is more than a "little possibility" that it is motivated by prejudice or stereotyping.

**B.**   **Historical Evidence That Harvard's "Holistic" Admissions Policies Were Instituted to Exclude Jews, and are Now Applied to Asians in the Same Way and for the Same Reasons, Buttresses the Conclusion That These Policies are Motivated by Prejudice or Stereotype**

There is indisputable historical evidence that the "holistic" admissions system which Harvard defends here was originally instituted to exclude Jewish students who were stereotyped

in much the same way that Asian-Americans are today.  And there are uncanny parallels between the imposition of a de facto Jewish quota under this system in the 1920's and the Asian admission experience since the 1990's.  This historical background further bolsters the conclusion from the statistical record of a significant possibility that Harvard's policies are motivated by prejudice or stereotype,

> As Unz summarizes this history:

>> During the 1920s, the established Northeastern Anglo-Saxon elites who then dominated the Ivy League wished to sharply curtail the rapidly growing numbers of Jewish students, but their initial attempts to impose simple numerical quotas provoked enormous controversy and faculty opposition.  Therefore, the approach subsequently taken by Harvard President A. Lawrence Lowell and his peers was to transform the admissions process from a simple objective test of academic merit into a complex and holistic consideration of all aspects of each individual applicant; the resulting opacity permitted the admission or rejection of any given applicant, allowing the ethnicity of the student body to be shaped as desired.  As a consequence, university leaders could honestly deny the existence of any racial or religious quotas, while still managing to reduce Jewish enrollment to a much lower level, and thereafter hold it almost constant during the decades which followed.  For example, the Jewish portion of Harvard's entering class dropped from nearly 30 percent in 1925 to 15 percent the following year and remained roughly static until the period of the Second World War.

*Id.* at 16 (footnotes omitted).

The anti-Semitism that gave rise to Harvard's holistic system is eye-popping, and worth recounting at some length.  Professor Alan Dershowitz has termed the origin of the holistic plan "one of the most shameful episodes in the history of American higher education in general, and of Harvard College in particular."  Alan M. Dershowitz & Laura Hanft, *Affirmative Action and the Harvard College Diversity Discretion Model: Paradigm or Pretext?*, 1 Cardozo L. Rev. 379, 385 (1979).  The following discussion draws heavily on this article and on Berkeley Professor Jerome Karabel's 2005 book, *The Chosen: The Hidden History of Admission and Exclusion at Harvard, Yale and Princeton* 1-109 to set out this history.  *See also* Pl's SMF ¶¶ 21-46.

- 12 -

Prior to the early 1920's admission to Harvard and other Ivy League schools was based almost entirely on grades and an entrance examination. Essays and personal interviews were not required, and there was relatively little consideration of extracurricular activities or of the kind of subjective "character" traits included in today's amorphous "personal rating" (*see supra* p. 4 & n. 3). While the admission criteria were objective, until about the turn of the century they were not particularly demanding, in keeping with the Ivy League reputation as a place for the social rather than the intellectual elite. Beginning in the 1890's, however, Harvard began to make its requirements more academically rigorous, just as increasing numbers of Jewish immigrants whose culture emphasized academics were arriving in America, and Jews began to comprise a growing share of the student population. Harvard was already 7 percent Jewish by 1900, a figure which increased to 10% in 1909, 15% in 1914 and 21.5% in 1922.

This trend did not sit well with many of Harvard's officials and alumni. As early as 1907 the dean of financial aid expressed his preference for "sons of families that have been American for generations" rather than the "increasing class [of] foreigners, and especially the Russian Jews." Some twenty years later, as Jewish enrollment reached its peak, a member of the Class of 1901 wrote to President Lowell after attending the Harvard-Yale game that "to find that one's University had become so Hebrewized was a fearful shock. There were Jews to the right of me, Jews to the left of me." Bemoaning that "[t]he Jew is undoubtedly of high mental order" and that therefore raising academic standards only increases their number, the anguished alum beseeched Lowell to "devise a way to bring Harvard back to the position it always held as a 'white man's' college."

These concerns found a sympathetic ear in Lowell, who responded that he "had foreseen the peril of having too large of a number of an alien race and had tried to prevent it." Indeed he

had.  Lowell first warned of the "Jewish problem" in a 1920 letter expressing fear that the rising

tide of Jews would "ruin the college" and suggesting a 15% cap on their enrollment.  In 1922 he

formally proposed such a quota to the faculty, which rejected it but instead adopted a geographic

diversity plan in an attempt to limit the enrollment of students from Jewish areas.

The geographic diversity effort did not work and the Jewish numbers continued to

increase, reaching 27.6% in 1925.  At that point Lowell, rather than renewing the battle for an

express Jewish quota, proposed the imposition of a de facto one by the institution of highly

discretionary admissions criteria emphasizing subjective measures of "aptitude and character"

rather than exam scores.  "To prevent a dangerous increase in the proportion of Jews," he wrote

to the Admissions Committee, "I know at present only one way which is at the same time

straightforward and effective, and that is a selection by a personal estimate of character."  Lowell

was quite candid that "a very large proportion of the less desirable, upon this basis, are . . . the

Jews."  The faculty not only adopted the new holistic admissions plan but made the process even

more subjective, directing the admissions committee to personally interview as many applicants

as possible to gather additional information on "character and fitness."

The Supreme Court has ruled that the "historical background" of a challenged action is an

important consideration in a civil rights case, even when examining a policy such as a zoning

code that is racially "neutral on its face," and that the "administrative history may be highly rele-

vant, **especially where there are contemporary statements by members of the decision-

making body**" indicating invidious intent.  *Village of Arlington Heights v. Metropolitan Housing

Development Corp.*, 429 U.S. 252, 267, 266, 268 (1977) (emphasis added).  The present case

involves not a facially neutral policy like the zoning ordinance in *Arlington Heights*, but an

expressly race conscious one, and thus the substantive standard is that articulated in *Grutter* and

*City of Richmond v. J. A. Croson Co.*, *supra*: that to survive strict scrutiny there must be "little or no possibility" that the policy was motivated by prejudice or stereotyping.  Here the contemporary statements of President Lowell and other Harvard officials in devising and instituting the holistic admissions policy provide damning proof that it was.

The impact of the holistic policy was immediate and drastic.  The percentage of Jews in Harvard's freshman class plummeted from over 27% in 1925 to just 15% in 1926, and remained virtually unchanged at about that level until the 1940's.  During this time Harvard buttressed this quota by reinforcing the holistic elements of its admissions system, for the first time requiring candidates to submit personal essays and descriptions of their extracurricular activities in an attempt to further emphasize "leadership" skills and "character."  Jewish numbers at Harvard did not begin to rebound until after World War II, but even as late as 1952 an Admissions Committee report expressed concern that the impression that Harvard was "dominated by Jews" might cause a loss of "students from upper-income, business backgrounds."

Comparing the experience of Jewish students of that era and Asian students over the last several decades under Harvard's holistic admissions plan, Unz observes that the Asian experience "exactly replicates the historical pattern . . . in which Jewish enrollment rose very rapidly, leading to imposition of an informal quota system, after which the number of Jews fell substantially, and thereafter remained roughly constant for decades."  Unz, *supra*, at 18.  This is starkly illustrated in the chart below comparing Harvard's Jewish enrollment for the period from 1908 to 1942 with its Asian enrollment for the corresponding period from 1976 to 2010:



Harvard Jewish Enrollment 1908–1942 and Asian Enrollment 1976–2010

During roughly equal 35-year periods, separated by about 70 years, the representation of Jews and Asians at Harvard climbed steadily, dropped sharply, and then essentially flatlined.

SOURCE: Ron Unz, "The Myth of American Meritocracy," *The American Conservative*, November 28, 2012, Appendixes C and D; Jerome Karabel, *The Chosen: The Hidden History of Admission and Exclusion at Harvard, Yale, and Princeton* (Houghton Mifflin Harcourt, 2005)

Dennis Saffran, *Fewer Asians Need Apply*, City J., Winter 2016 at 38, 43, https://www.city-journal.org/html/fewer-asians-need-apply-14180.html.

This stunning parallel and the consistently low "personal ratings" given to Asian-American applicants (*supra* p. 4) make clear that, just as it did with the Jews eighty years ago, Harvard now deems another upstart, achievement-oriented minority that has been too successful under the old academic standards to be deficient in the highly subjective and discretionary "personal estimate of character" favored by President Lowell.

**C.    Anecdotal Evidence of Biased and Stereotypical Views About Asian Students Reinforces This Conclusion**

This statistical and historical evidence that there is far more than a "little possibility" that

the holistic admissions policy is motivated by prejudice or stereotype is supported by anecdotal accounts strongly suggesting that officials at Harvard and other elite colleges are consciously or unconsciously biased against Asian applicants based on a stereotypical view of Asian students as uninteresting, uncreative and one-dimensional.

*Wall Street Journal* reporter Daniel Golden summarized this stereotypical view in his 2006 book, *The Price of Admission: How America's Ruling Class Buys Its Way into Elite Colleges—and Who Gets Left Outside the Gates*: "Asians are typecast in college admissions offices as quasi-robots programmed by their parents to ace math and science tests." *Id.* 201.  He chronicled example after example of this prejudiced thinking.  MIT's Dean of Admissions (engaging in the kind of racial stereotyping which, as Golden notes, would be unimaginable in the case of a black applicant) said of one rejected applicant with stellar credentials that he "looked like a thousand other Korean kids with the exact same profile," was "yet another textureless math grind" and "just wasn't . . . interesting." *Id.*  A former Vanderbilt administrator said that Asians are good students but don't provide a stimulating intellectual environment. *Id.*

Most notably, Golden described "stereotyping by Harvard admissions evaluators" unearthed in the earlier federal investigation (*see supra* p. 10).  Then as now "Harvard evaluators ranked Asian American candidates on average below whites in 'personal qualities'."  And, "[i]n comments written in applicants' files":

> Harvard admissions staff repeatedly described Asian Americans as "being quiet/shy, science/math oriented, and hard workers," ....One reader summed up an Asian applicant this way: "He's quiet and, of course, wants to be a doctor."  Another wrote that an applicant's "scores and application seem so typical of other Asian applications I've read: extraordinarily gifted in math with the opposite extreme in English."

*Id.* 202.

- 17 -

There are similar indications of prejudice on the part of Harvard officials in the present record, even as redacted.  Perhaps the most telling is the response of then President Drew Faust to a 2012 letter from an alumnus reminiscent of the 1920's "Jews to the right of me, Jews to the left of me" letter to President Lowell (*supra* p. 13).  Urging Faust to adopt "informal quotas" on Asians, the alum wrote: "The last time I was in Cambridge it seemed to me that there were a large number of oriental students. … I think they probably should be limited to 5%."  Pl's SMF ¶ 341.  Faust's office asked Director of Admissions Marlyn E. McGrath to respond "on behalf of the president" "[g]iven the nature of his suggestions."   Pl's Ex. 132, Doc. No. 421-132.  McGrath's response on Faust's behalf to this blatantly racist letter, though not as enthusiastic as Lowell's to the earlier letter, was nonetheless startlingly respectful for the present era.  She lauded his "many thoughtful observations about Harvard College students and the results of the admissions process," thanked him for his "efforts to help us continually to improve the quality of our student body," and reiterated in conclusion that "[a]ll of us at Harvard appreciate your thoughtful letter, as well as your loyalty over the years."  *Id.*; Pl's SMF ¶ 342.  McGrath offered only the most subtle and obscure hints of any disagreement with the tenor of the letter (noting, for example, that there were several international students on the squash team – a particular interest of his apparently).  Pl's Ex. 132.  But nowhere did she take issue with his proposal to establish quotas on "oriental students."  Pl's SMF ¶ 342.

Even more startling was President Faust's defiant defense of this "polite and respectful" response at her deposition.  *Id.* ¶ 343.  Noting that the alum was 90 years old, had "probably … fought in World War II" and had "given some kind of support to scholarships," she unrepentantly stated that "there's just no reason to tell him his letter is preposterous."  *Id.*  She refused to say if she would have sent the same polite response to a letter calling for quotas on African-

- 18 -

American students, and when asked how Asian-American students might feel about the response she replied that "Asian-American students have not seen" it. *Id.* ¶ 344. (McGrath similarly testified that she had "no regrets" about the response, and first refused to "speculate" but then asserted that she "might have" sent the same response to a letter arguing that "that there were too many black students on campus." *Id.*; McGrath Dep. 381:5-13; 382:25-383:2 (Pl's Ex. 17, Doc. No. 421-17).

President Faust may well be correct that no purpose would have been served by a more confrontational response (*see also* McGrath Dep. 380:3-11 [would not have been "productive" or fruitful"]), and that the man's age, service and financial contributions should give him a pass. But amicus respectfully submits that it is inconceivable that Harvard, which has long trumpeted its commitment to confronting racism and providing a welcoming environment for students of color, *see e.g.*, Colleen Walsh, *Faust Issues Clarion Call to Fight Racism*, The Harvard Gazette (Aug. 30, 2017);[9] Tania deLuzuriaga, *Report Issued on Inclusion, Belonging*, The Harvard Gazette (Mar. 27, 2018),[10] would have sent a similar response to a letter calling for the imposition of quotas on black, Latino or other minority students, or would have responded so cavalierly to their potential feelings about such a letter. This patently unfair double standard provides further support for the inference that the holistic admissions policy which underrepresents Asian applicants is motivated by bias against them. *See also* Pl's Mem. at 21; Pl's SMF ¶¶ 345, 346 (recounting prompt responses by Faust and other Harvard officials to allegations of discrimination against other groups).

---

[9] https://news.harvard.edu/gazette/story/2017/08/harvard-president-issues-clarion-call-to-fight-racism/

[10] https://news.harvard.edu/gazette/story/2018/03/harvard-issues-task-force-report-on-inclusion-belonging/

In contrast to Harvard's polite and respectful personal response to the anti-Asian alumnus, when an Asian-American high school student sent Faust an "extraordinarily well-written" letter in 2014 expressing concern about media reports of discrimination against Asians by Harvard, a university she had "always admired," she received a "generic response ... saying that the President's Office is not involved in admissions, and [she] should contact the Admissions Office." In discussions between the President's office and the Admissions Office about this response, Admissions Director McGrath joked that "we are always happy to give our own dumb answer if she contacts us." Pl's SMF ¶¶ 335, 336; Pl's Ex. 118, Doc. No. 421-118.

Another example suggesting bias on the part of Harvard officials is their stonewalling reaction to Harvard's own OIR internal investigation documenting discrimination against Asian-Americans (*see supra* p. 5). As plaintiff recounts, when briefed on OIR's reports Dean of Admissions William Fitzsimmons and Dean of the College Rakesh Khurana sat silently, asked no questions, did not request any additional information or study, did not report the OIR findings to anyone or take any action on them, and did not express any concern about the unfairness to Asian-American applicants revealed in the reports. *See* Pl's Mem. at 15-16 and portions of Pl's SMF cited there. Dean Fitzsimmons nonetheless testified at his deposition that "we would always be vigilant about any suggestion of discrimination" but that he believed that his response to the OIR reports had been vigilant. Pl's SMF ¶¶ 566-572; Fitzsimmons Dep. 442:25-445:7, Pl's Ex. 9, Doc. No. 421-9. It is unimaginable that Harvard officials would have responded to findings of discrimination against any other racial minority group in this fashion.

Finally, Harvard's very posture in this litigation reflects stereotyping of Asian-Americans as it relies on an expert report purporting to find that they are less "likely to be multi-dimensional" than are whites. Pl's SMF ¶ 761; Card Rep. 35, Def's Ex. 33, Doc. No. 419-33. It is also

noteworthy in this regard that plaintiff's expert included the biased "personal rating" in his statistical models – merely taking Dean Fitzsimmons's word for it that race was not a factor in the personal rating scores.  Pl's SMF ¶¶ 759, 772.

## CONCLUSION

For the foregoing reasons, Amicus respectfully requests that the Court grant plaintiff's motion for summary judgment and deny defendant's motion for summary judgment.

Dated: July 30, 2018

Respectfully submitted,

Dennis J. Saffran
38-18 West Drive
Douglaston, NY 11363
718-428-7156
djsaffranlaw@gmail.com

/s/ Dwight Duncan_____
Dwight Duncan BBO #553845
*Counsel of Record*
333 Faunce Corner Road
Dartmouth, MA 02747-1252
508-985-1124
dduncan@umassd.edu

*Attorneys for Amicus Curiae*
  *National Association of Scholars*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants by August 3, 2018.


/s/ Dwight Duncan
Dwight Duncan BBO #553845