## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT COURT OF MASSACHUSETTS
## BOSTON DIVISION

STUDENTS FOR FAIR ADMISSIONS, INC.,

         Plaintiff,

         v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION),

         Defendant.

Civil Action No. 1:14-cv-14176-ADB

**MEMORANDUM OF *AMICI CURIAE* IN SUPPORT OF DEFENDANT'S**

**MOTION FOR SUMMARY JUDGMENT ON REMAINING COUNTS II, III, V**

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

INTEREST OF AMICI ............................................................................................................. 3

ARGUMENT ............................................................................................................................ 7

    I.      Harvard Is Entitled to Consider Race in Admissions to Pursue the
           Benefits of a Racially Diverse Student Body Across Multiple
           Dimensions. ................................................................................................ 7

           A.      Diversity in Higher Education Remains Compelling—
                    Indeed, Vital—in Today's Society Largely Separated by
                    Race. .............................................................................................. 7

           B.      Diversity—and Racial Diversity in Particular—Prevents
                    Racial Isolation and Produces Distinct Educational
                    Benefits. ........................................................................................ 9

    II.     Harvard's Holistic Admissions Review Properly Views Race as
           One of Many Factors That Contextualizes an Applicant's Past
           Achievements and Future Potential. ........................................................ 16

           A.      Race and Racial Barriers Remain Factors in American Life
                    Which Cannot and Should Not Be Ignored in the
                    Admissions Process. .................................................................... 16

           B.      Harvard Flexibly Considers Race, Whereby Race is Not the
                    Predominant Factor in Admissions. ............................................. 20

    III.    Race-Conscious Admissions Policies Remain Necessary to
           Support the Type and Level of Demographic Representation which
           Will Produce Educational Benefits for All Students. ............................ 211

           A.      SFFA Admits Its "Race-Neutral" Alternatives Would
                    Reduce the Admission of African Americans at Harvard,
                    Preventing Harvard from Harnessing the Full Benefits of
                    Student Diversity. ........................................................................ 22

            B.      When Highly Selective Institutions Eliminate Holistic
                    Admissions Students of Color Are Negatively Impacted. .......... 25

               1.      Decreased Enrollment of Students of Color ................................ 25

                2.      Increased Racial Isolation ........................................................... 28

CONCLUSION ...................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases:**                                                                                                              **Page(s):**

*Fisher v. Univ. of Texas at Austin,*
    136 S. Ct. 2198 (2016) .................................................................................................. *passim*

*Fisher v. Univ. of Texas at Austin,*
    570 U.S. 297 (2013) ..........................................................................................................7, 9

*Gratz v. Bollinger,*
    539 U.S. 244 (2003) ..............................................................................................................9

*Grutter v. Bollinger,*
    539 U.S. 306 (2003) .................................................................................................. *passim*

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (207) ................................................................................................................2

*Regents of Univ. of California v. Bakke,*
    438 U.S. 265 (1978) .................................................................................................. *passim*

*Texas Dep't of Hous. & Cmty. Affairs,*
    135 S. Ct. 2507 (2015) ..........................................................................................................8

## Other Authorities

Amana Lewis, Mark Chesler, and Tyrone A. Forman, *The Impact of 'Colorblind'*
    *Ideologies on Students of Color: Intergroup Relations at a Predominantly*
    *White University,* 69 J. of Negro Educ. 74 (2000) ..................................................................15

Angel L. Harris and Marta Tienda, *Hispanics in higher education and the Texas*
    *top 10% law,* 4 Race and Social Problems 57 (2012) ...........................................................27

Angela Locks, Sylvia Hurtado, Nicholas Bowman, and Leticia Oseguera,
    *Extending Notions of Campus Climate and Diversity to Students' Transition to*
    *College,* 31 The Review of Higher Education 257 (2008). .......................................................9

Annie E. Casey Found., Race for Results: Building a Path to Opportunity for All
    Children, Kids Count Policy Report (2014),
    http://www.aecf.org/m/resourcedoc/AECF-RaceforResults-2014.pdf ...................................17

Anthony L. Antonio, Mitchell J. Chang, Kenji Hakuta, David A. Kenny, Shana Levin, Jeffrey F. Milem, *Effects of Racial Diversity on Complex Thinking in College Students*, 15 Psychological Science 507 (2004) ........................................14

Anthony L. Antonio, *The role of interracial interaction in the development of leadership skills and cultural knowledge and understanding*, 42 Research in Higher Education 593 (2001) ........................................................................12

Catherine Horn and Stella M. Flores, *Percent Plans in College Admissions: A Comparative Analysis of Three States' Experiences 42*, The Civil Rights Project at Harvard University (2003) ...................................................................26

Dalton Conley, *What Is the Difference Between Race and Ethnicity?*, Race: The Power of an Illusion, PBS (2003), https://www.pbs.org/race/000_About/002_04-experts-03-02.htm ..............................1

David Love, "Black and Brown Students Are Denied Access to Advanced Placement Courses, the New Jim Crow in Education," Atlanta Black Star (June 4, 2018), http://atlantablackstar.com/2018/06/04/black-and-brown-students-are-denied-access-to-advanced-placement-courses-the-new-jim-crow-in-education/ ..............................................................................................18

Eleni Karageorge, The Unexplainable, Growing Black-White Wage Gap, Bureau of Labor Statistics (Nov. 2017) ..................................................................17

Elise Boddie, *Commentary on Fisher: The Importance of Diversity Within Diversity*, SCOTUSBlog (Oct. 11, 2012), http://www.scotusblog.com/2012/10/commentary-on-fisher-the-importance-of-diversity-within-diversity/ .......................................................................23

Elizabeth Y. Sun, *Not Just "Asian*," Harvard Crimson (Aug. 9, 2017), https://www.thecrimson.com/article/2017/8/9/sun-not-just-asian/.......................29

Jay Rosner, *How the SAT Creates "Built-In Headwinds,"* Kidder and Rosner, 43 Santa Clara L. Rev. 131 (2002) .........................................................................18

Jeremy Ashkenas, Haeyoun Park, and Adam Pearce, *Even with Affirmative Action, Blacks and Hispanics Are More Underrepresented at Top Colleges Than 35 Years Ago*, N.Y. Times (Aug. 24, 2017), https://nyti.ms/2w0BE08 .......................17

Jerry Kang, *Negative Action Against Asian Americans: The Internal Instability of Dworkin's Defense of Affirmative Action*, 31 Harv. C.R.-C.L. L. Rev. 1 (1996).....................3

Jiali Luo and David Jamieson-Drake, *A Retrospective Assessment of the Educational Benefits of Interaction Across Racial Boundaries*, 50 J. of College Student Development 67 (2009).........................................................................11

Julie S. Chung and Alexander Z. Zhang, *Students for Fair Admissions and Harvard Both Got It Wrong*, Harvard Crimson (July 18, 2018), https://www.thecrimson.com/article/2018/7/18/chung-zhang-sffa-harvard-wrong/ ...................................................................................................29

Kristin Davies, Linda Tropp, Arthur Aron, Thomas Pettigrew, and Stephen Wright, *Cross-Group Friendships and Intergroup Attitudes,* 15 Personality and Social Psychology 332 (2011) ...........................................................................9

Lincoln Quillian, Devah Pager,, Ole Hexel,, and Arnfinn H. Midtbøen, "Meta-analysis of field experiments shows no change in racial discrimination in hiring over time," PNAS (Aug. 8, 2017), http://www.pnas.org/content/pnas/early/2017/09/11/1706255114.full.pdf ...........................16

Maria Cancian, *Race-Based Versus Class-Based Affirmative Action in College Admissions*, 17 J. of Policy Analysis and Management 94 (1998)...........................................25

Mariette Berndsen, Russell Spears, Joop van der Pligt, and Craig McGarty, *Illusory Correlation and Stereotype Formation: Making Sense of Group Differences and Cognitive Biases*, Stereotypes as Explanations (2002)................................15

Mario L. Barnes, Erwin Chemerinsky, and Angela Onwuachi-Willig, *Judging Opportunity Lost: Assessing the Viability of Race-Based Affirmative Action After Fisher v. University of Texas*, 62 UCLA L. Rev. 272 (2015)...................................19, 25

Mark E. Engberg and Sylvia Hurtado, *Developing Pluralistic Skills and Dispositions in College: Examining Racial/Ethnic Group Differences*, 82 J. Higher Educ. 416 (2011)........................................................................................13

Mark C. Long, *College Applications and the Effect of Affirmative Action*, 121 Journal of Econometrics 319 (2004)..........................................................................26

Mark C. Long and Marta Tienda, *Winners and Losers: Changes in Texas University Admissions post-Hopwood*, 30 Educational Evaluation and Policy Analysis 255 (2008)...........................................................................................27

Meike Bonefeld and Oliver Dickhäuser, "(Biased) Grading of Students' Performance: Students' Names, Performance Level, and Implicit Attitudes," Frontiers in Psychology (May 9, 2018), https://www.frontiersin.org/articles/10.3389/fpsyg.2018.00481/full#B46...........................18

Mitchell J. Chang, *Does Racial Diversity Matter?: The Educational Impact of a Racially Diverse Undergraduate Population*, 40 J. of College Student Development 377 (1999) ..............................................................................10

Mitchell J. Chang, M. Seltzer, and J. Kim, *Diversity of Opinions Among Entering College Students: Does Race Matter?*, Research paper presented at the National Academy of Education Annual Meeting, Toronto, Canada (2002) ..........................14

Mitchell J. Chang, Nida Denson, Victor Saenz, and Kimberly Misa, *The Educational Benefits of Sustaining Cross-Racial Interaction Among Undergraduates*, 77 J. of Higher Educ. 430 (2006) ..................................11

Nida Denson and Mitchell Chang, *Racial Diversity Matters: The Impact of Diversity-Related Student Engagement and Institutional Context*, 46 Amer. Educ. Research J. 322 (2009) ..................................11

Nida Denson and Shirley Zhang, *The Impact of Student Experiences with Diversity on Developing Graduate Attributes*, 35 Studies in Higher Educ. 529 (2010)..................................11

Nisha Gottfredson, Abigail T. Panter, Charles E. Daye, Walter F. Allen, and Linda F. Wightman, *The Effects of Educational Diversity in a National Sample of Law Students: Fitting Multilevel Latent Variable Models in Data with Categorical Indicators*, 44 Multivariate Behavioral Research 305 (2009) .......................9

OiYan A. Poon, *Do Asian Americans Benefit From Race-Blind College Admissions Policies?*, National Commission on Asian American and Pacific Islander Research in Education 3 (2017), https://files.eric.ed.gov/fulltext/ED573713.pdf ..................................27

Patricia Gurin, Eric L. Dey, Sylvia Hurtado, and Gerald Gurin, *Diversity and Higher Education: Theory and Impact on Educational Outcomes*, 72 Harv. Educ. Rev. 330 (2002) ..................................13

Patricia Odell, Kathleen Korgen, and Gabe Wang, *Cross-Racial Friendships and Social Distance between Racial Groups on a College Campus*, 29 Innovative Higher Educ. 291 (2005)..................................9

Paul Jargowsky, "Concentration of Poverty in the New Millennium: Changes in Prevalence, Composition, and Location of High Poverty Neighborhoods," Century Foundation and Rutgers Center for Urban Research and Education (Dec. 2013) ..................................17

Peter Salovey, Yale's Commitment to Equity and Inclusion (May 10, 2018), https://news.yale.edu/2018/05/10/yales-commitment-equity-and-inclusion; ..........................9

Raj Chetty, Nathaniel Hendren, Maggie R. Jones, and Sonya R. Porter, "Race and Economic Opportunity in the United States: An Intergenerational Perspective," Equality of Opportunity (Mar. 2018), http://www.equality-of-opportunity.org/assets/documents/race_paper.pdf..................................16

Rakesh Kochhar and Anthony Cilluffo, *Income Inequality in the U.S. Is Rising Most Rapidly Among Asians*, Pew Research Center (July 12, 2018), http://www.pewsocialtrends.org/2018/07/12/income-inequality-in-the-u-s-is-rising-most-rapidly-among-asians/ ........................................................29

Rebecca L. Stotzer and Emily Hossellman, *Hate Crimes on Campus: Racial/Ethnic Diversity and Campus Safety*, 27 J. Interpersonal Violence 644 (2012)........................................................14

Samuel D. Museus and Julie J. Park, *The Continuing Significance of Racism in the Lives of Asian American College Students*, 56 J. College Student Dev. 551 (2015)........................................................14

Samuel Museus, Uma Jayakumar, and Thomas Robinson, *Modeling Racial Differences in the Effects of Racial Representation on Two-Year College Student Success*, 13 College Student Retention 549 (2012) ........................15

Saul Geiser, "Norm-Referenced Tests and Race-Blind Admissions: The Case for Eliminating the SAT and ACT at the University of California," UC Berkley CSHE 15.17 (Dec. 2017) ........................................................18

Scott Page, *The Diversity Bonus: How Great Teams Pay Off in the Knowledge Economy* (New Jersey: Princeton Univ. Press 2017)........................15

Sean F. Reardon, Rachel Baker, and Daniel Kalsik, *Race, Income and Enrollment Patterns in Highly Selective Colleges 1982-2004*, Center for Education Policy Analysis, Stanford University (2012) ........................................................26

Sharon Fries-Britt and Kimberly Griffin, *The Black Box: How High-Achieving Blacks Resist Stereotypes About Black Americans*, 48 J. of College Student Development 509 (2007) ........................................................15

Thomas Pettigrew and Linda R. Tropp, *A Meta-Analytic Test of Intergroup Contact Theory*, 90 J. of Personality and Social Psychology 751 (2006)........................9

William G. Bowen and Derek Bok, *The Shape of the River: Long-Term Consequences of Considering Race in College and University Admissions* (1998)........................................................12

William C. Kidder, *How Workable are Class-Based and Race-Neutral Alternatives at Leading American Universities?*, 64 UCLA L. Rev. Disc. 100 (2016)........................................................25

William C. Kidder, Misshaping the River:  Proposition 209 and Lessons for the *Fisher* Case, 39 J. of College and Univ. Law 53 (2013), http://ssrn.com/abstract=2123653 ........................................................28

William C. Kidder, *Two Decades After the Affirmative Action Ban: Evaluating the University of California's Race-Neutral Efforts* (Oct. 2015), https://www.ets.org/Media/Research/pdf/kidder_paper.pdf.............................................27, 28

William C. Kidder, *Situating Asian Pacific Americans in the Law School Affirmative Action Debate: Empirical Facts About Thernstrom's Rhetorical Acts*, 7 Asian L.J. 29 (2000).........................................................................................................3

The Campaign for College Opportunity, *The State of Higher Education in California* (Sept. 2015), http://collegecampaign.org/wp-content/uploads/2015/09/2015-State-of-Higher-Education_AANHPI2.pdf ...................18, 30

Harvard University Presidential Task Force on Inclusions and Belonging, "Pursuing Excellence on a Foundation of Inclusion," http://inclusionandbelongingtaskforce.harvard.edu/files/inclusion/files/harvard_inclusion_belonging_task_force_final_report .......................................................................23

Leadership Conference Education Fund, "Justice on Trial: Racial Disparities in the American Criminal Justice System" (2000), http://archives.civilrights.org/publications/justice-on-trial/......................................................17

NYU CARE, *Asian Americans and the Benefits of Campus Diversity: What the Research Says* (2012).......................................................................................................13

U.S. Dep't of Educ. Off. for Civil Rights, "Data Snapshot: College and Career Readiness," Civil Rights Data Collection (Mar. 2014), https://www2.ed.gov/about/offices/list/ocr/docs/crdc-college-and-career-readiness-snapshot.pdf.............................................................................................................18

University of Michigan, Diversity, Equity, and Inclusion: Strategic Plan Progress Report (2017), https://diversity.umich.edu/wp-content/uploads/2017/11/Diversity_Equity_and_Inclusion_Year_One_Progress_Report.pdf..........................................................................................................................9

"I, Too, Am Harvard," Tumblr (Aug. 7, 2014), http://itooamharvard.tumblr.com/.....................28

## INTRODUCTION AND SUMMARY OF ARGUMENT

At the heart of this lawsuit is whether Harvard has the academic freedom to value racial diversity in ways in which our country has fallen short: bridging racial divides and instilling greater cross-cultural understanding among its talented student body of future leaders.  Plaintiffs' lawsuit uses Asian Americans as a cover to force every institution of higher education in the United States to ignore the reality of a society where certain ethno-racial minorities, Asian Americans among them, encounter structural racism and implicit bias because of their identity.[1]

Amici are a diverse group of Asian-American, Black, Latino, Native American, and Pacific Islander students who seek to protect Harvard's freedom to consider race in admissions to the full extent allowed by law ("*Students*").  As a racially diverse cohort of applicants, current students, and alumni, *Students*[2] stand in solidarity to support Harvard's use of holistic admissions program and right to consider race to the full extent allowed by law.  *Students* contend that Harvard needs to do more, not less, to ensure that underrepresented groups—Black, Latinos, Native Americans, Pacific Islanders, and various subgroups of Asian Americans (such as Vietnamese and Hmong)—enroll in greater numbers to fully harness the educational benefits of diversity.  While *Students* desire even greater diversity, there is no question that Harvard's race-conscious admissions policy is constitutional.

---

[1] *Students* use the term "ethno-racial" to recognize that an individual's identity arises out of both race and ethnicity, with the former generally referring to traits like skin color and the latter referring to shared customs, culture, and history.  *See, e.g.*, Dalton Conley, *What Is the Difference Between Race and Ethnicity?*, Race: The Power of an Illusion, PBS (2003), https://www.pbs.org/race/000_About/002_04-experts-03-02.htm.

[2] *Students* submit this 30-page brief along with their declarations in accordance with this Court's Order authorizing *Students'* participation in this lawsuit.  Memorandum and Order on Proposed Defendant-Intervenors' Motion to Intervene, Dkt. 52 at 23 (June 15, 2015).  Consistent with the Order, *Students* also intend to file a motion opposing SFFA's Motion For Summary Judgment and to participate in any oral argument relating to summary judgment motions.  If the case proceeds to trial, *Students* anticipate filing a motion for limited participation to develop a full record in defense of race-conscious admissions.

*Students'* brief provides the Court with information in three principal areas. *First*, *Students* affirm that ethno-racial diversity produces distinct benefits, including promoting interactions between students of different racial backgrounds that heighten cross-racial understanding, breaking down stereotypes, and enriching students' understanding of perspectives different than their own. *See Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) ("The[] benefits [of diversity] are substantial."). Increased enrollment of underrepresented groups also helps alleviate the ethno-racial isolation experienced by these students at Harvard. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 798 (2007) (Kennedy, J., concurring in part) ("[A] compelling interest exists in avoiding racial isolation[.]").

*Second*, *Students* explain how Harvard's current affirmative consideration of race complies with the parameters set forth by the Supreme Court: it is individualized and flexibly recognizes all forms of diversity and does not treat race as a predominant factor for any applicant. It serves to appreciate, and counterbalance, the pervasive inequities that persist across our society with regard to race, class, and the intersection between them.

*Third*, *Students* demonstrate that Harvard's interest in promoting greater representation of, and diversity within, students of color compels the continued consideration of race in Harvard's holistic, individualized admissions process, for at least two reasons. First, as SFFA's expert concedes, any "race-neutral" alternative would significantly reduce the admission of African Americans, to the detriment of both Black and non-Black students. Second, experience and prevailing research strongly suggest that when highly selective institutions stop considering race, all students of color—including Asian Americans—lose out and intra-racial group diversity declines.

*Students* would oppose any admissions system that intentionally seeks to negatively suppress any racial group. But, as *Students* will explain in their brief to be filed in August, this type of suppressive "negative action" is conceptually distinct from an affirmative race-conscious admissions program that flexibly considers race to better contextualize an applicant's prior achievements and potential contributions.[3] There is simply no causal link in the record between Harvard's individualized consideration of race to promote diversity and any bias against Asian-American students.

Accordingly, *Students* believe the record clearly supports summary judgment on Counts II, III, and V[4] in favor of Harvard's individualized consideration of race in a manner that promotes greater representation of, and diversity within, students of color admitted to one of our nation's most elite training grounds for educational opportunities and future leadership.

### INTEREST OF AMICI

*Students* are a racially and ethnically diverse group that includes prospective students, current students, and alumni of Harvard, all of whom are intimately impacted by Harvard's race-conscious policies. *Students* vary along numerous various dimensions: representing no less than 8 different ethnicities, 8 different class years, and 13 different academic concentrations. But *Students* share a common interest in defending Harvard's freedom to narrowly consider race for the purpose of achieving greater levels of diversity on Harvard's campus.

Amici Sarah Cole, Fadhal Moore, Arjini Kumari Nawal, Itzel Libertad Vasquez-Rodriguez, and Keyanna Wigglesworth were all students at Harvard when this action was filed

---

[3] *See* William C. Kidder, *Situating Asian Pacific Americans in the Law School Affirmative Action Debate: Empirical Facts About Thernstrom's Rhetorical Acts*, 7 Asian L.J. 29, 33, 60 (2000); Jerry Kang, *Negative Action Against Asian Americans: The Internal Instability of Dworkin's Defense of Affirmative Action*, 31 Harv. C.R.-C.L. L. Rev. 1, 3-4 (1996).

[4] *Students* are not addressing Count I in this brief but may do so in subsequent briefs.

in 2014.[5]   Now graduates, these *Students* identify with ethno-racial subgroups that have historically been underrepresented and marginalized at Harvard.  While diverse in their racial backgrounds and academic interests, they all believe ethno-racial diversity significantly impacted their learning inside and outside of the classroom.  Based on their experiences, they all desire a greater presence of underrepresented groups on campus.   Three graduate amici submitted supplemental declarations to inform the arguments raised at summary judgment.[6]  Itzel Libertad Vasquez-Rodriguez, who identifies as an indigenous Mexican-American or "Xicana," believes that her ethno-racial identity "shaped my perspective and made me the critical thinker I am today."  (Itzel Libertad Vasquez-Rodriguez Supp. Decl. at ¶ 5.)  Reflecting on her time at Harvard, Vasquez-Rodriguez found that significant representation of people of color "was critical to persist and excel at Harvard despite racial hostilities on campus that were both overt and subtle."  (*Id.* at ¶ 21.)  Sarah Cole, who identifies as a Black American, is critical of the plaintiffs' efforts to eliminate race from holistic admissions, noting, "to try to not see my race is to try to not see me at all."  (Sarah Cole Supp. Decl. at ¶ 6.)  Cole desires a more racially diverse Harvard "that not only sharpens folks' critical thinking, but also develops their capacity for empathy and regard for others by making its campus a space where the 'others' are allowed to safely exist and learn and teach."  (*Id.* at ¶ 11.)  Fadhal Moore, who identifies as African-American, views the presence of same-race peers as critical to his success at Harvard, noting how his peers, "who feel more like family than anything at this point, ended up actually helping

---

[5] Sarah Cole Decl., Dkt. 31, Ex. 1.10; Fadhal Moore Decl., Dkt. 31, Ex. 1.11; Arjini Kumari Nawal Decl., Dkt. 31, Ex. 1.12; Itzel Libertad Vasquez-Rodriguez Decl., Dkt. 31, Ex. 1.13; Keyanna Wigglesworth Decl., Dkt. 31, Ex. 1.14.
[6] Sarah Cole Supp. Decl.; Itzel Libertad Vasquez-Rodriguez Supp. Decl.; Fadhal Moore Supp. Decl.

me learn many of the cultural cues necessary to navigate a white world with which I and many of my peers were so unfamiliar."  (Fadhal Moore Supp. Decl. at ¶ 5.)

Amici Y.Z., D.L., T.D., J.L., A.Z., A.A., and S.C. are all of Asian heritage but differ in terms of their ethnicities, their families' income, their SAT scores, and their families' immigration histories.  They are all current students at Harvard, and they all attest that they benefit from Harvard's racial diversity.  Y.Z., who identifies as Chinese American, immigrated from China when Y.Z. was four, grew up in an upper-middle class suburb, and appreciates how Harvard's racial diversity has provided meaningful opportunities to "confront my own prejudices and privilege."  (Y.Z. Decl. at ¶ 6.)  D.L., who identifies as Chinese American, spoke about the dangers of essentializing Asian Americans as "model minorities" while interviewing for Harvard and believes Harvard's admissions office favorably viewed his sensitivity to race and discrimination.  (D.L. Decl. at ¶ 5.)  T.D., who identifies as Vietnamese American, moved to the United States at age eight, lived in a working-class neighborhood, graduated as the valedictorian of his high school, and was admitted to Harvard in spite of relatively low SAT scores.  (T.D. Decl.)  J.L. was born in Korea, grew up in Texas, and felt stereotyped by peers as "a hard working Asian."  (J.L. Decl. at ¶ 3.)  J.L. freely discussed his "intersecting identities" in his Harvard application essay "with a heavy emphasis on his Korean identity."  (*Id.* at ¶ 5.)  At Harvard, J.L. is engaged in research on racism, prejudice, and intersectionality.  A.Z., who identifies as Chinese American, was routinely "teased for being Asian" while growing up in a predominately white suburb but now at Harvard "interact[s] with a much more diverse group of peers" and "feel[s] much more comfortable interacting with and working with people of different backgrounds."  (A.Z. Decl. at ¶¶ 4, 7.)  A.A., who identifies as Chinese American and queer, believes Harvard admitted them despite grades that were "not the best" because their application

5

reflected their passion as a person "and part of that includes [A.A.'s] ethnic and racial identity." (A.A. Decl. at ¶¶ 8-9.)  A.A. observes that Harvard's campus is "very diverse in some ways" but "still has a long way to go when it comes to diversity." (*Id.* at ¶¶ 13, 16.)  S.C., who identifies as Chinese American, grew up in a one-room San Francisco apartment and, to this day, serves as her parents' "translators." (S.C. Decl. at ¶¶ 3, 5.)  S.C. ignored advice that her "Asian immigrant story" was overdone and her SAT scores too low for Harvard and wrote about growing up in an immigrant family and her passion for social justice. (*Id.* at ¶ 5.)  S.C. believes she benefited from race-conscious admissions because it "allowed the College to look at me as a whole person and view my qualifications in the context of both my class and race." (*Id.* at ¶ 6.)

Amici S.N., M.E., and M.A. plan to apply to Harvard and identify with historically marginalized minority groups (African American, Native American, and Pacific Islander, respectively).  S.N. lives in a community that has experienced racially-motivated hate crimes. (S.N. Decl. at ¶ 5.)  S.N. has exemplary qualifications and intends to apply to Harvard, in part, because S.N. wishes to attend a college that values diversity. (*Id.* at ¶ 13.)  M.E. has cultivated strong ties to Native culture, dancing competitively at powwows and joining the Native American Club at a previous school. (M.E. Decl. at ¶¶ 10-11.)  M.E. intends to apply to Harvard, but intends to select a college that has an active Native American community. (*Id.* at ¶¶ 12, 14.)  M.A. reflects that their "Pacific Islander and biracial identity" has already caused them to "see that race is constructed and I can bring that important perspective to the college campus or dorm room." (M.A. Decl., Dkt. 230, Ex. 2 at ¶ 10.)  Attending a diverse college is important for M.A. because M.A. "would feel very isolated" without such diversity. (*Id.* at ¶ 9.)  S.N., M.E., and M.A. are concerned that the relief sought by SFFA may limit access for such

underrepresented groups and result in an educational environment that is even less diverse and not as welcoming.

From their various vantage points, *Students* are well-qualified and uniquely positioned to deepen the Court's understanding of: (i) the benefits that currently flow to *Students* based on Harvard's pursuit of diversity across various dimensions (ii) Harvard's current racial climate and the negative impact of reducing the representation of already underrepresented groups (iii) how race and ethnicity shaped the *Students*' experiences before, during, and after college and, consequently, how it shaped their application materials and should be considered to appreciate their accomplishments and potential contributions to Harvard's campus community and beyond.

## ARGUMENT

### I. Harvard Is Entitled to Consider Race in Admissions to Pursue the Benefits of a Racially Diverse Student Body Across Multiple Dimensions.

#### A. Diversity in Higher Education Remains Compelling—Indeed, Vital—in Today's Society Largely Separated by Race.

The Supreme Court has long recognized student body diversity as a compelling interest that justifies race-conscious admissions in higher education. *See, e.g.*, *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198, 2210-11 (2016) ("*Fisher II*"). This interest stems from diversity's numerous benefits within the academic environment and, more broadly, for our national progress and welfare. As recently as 2016, the Supreme Court reaffirmed that a diverse student body "'promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races.'" *Id.* at 2210 (quoting *Grutter*, 539 U.S. at 330). It also facilitates "enhanced classroom dialogue and the lessening of racial isolation. . ." *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 308 (2013) ("*Fisher I*"). These benefits extend beyond the college campus by contributing to the broader goal of "preparing students for work and citizenship" in our extraordinarily diverse society. *Grutter*, 539 U.S. at 331. As Justice

Powell reflected nearly forty years ago in *Bakke*, nothing less than "the nation's future depends upon leaders trained through wide exposure to the ideas and mores of students as diverse as this Nation of many peoples." *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 313 (1978) ("*Bakke*") (internal quotation omitted).

That an ethno-racially diverse group of students have joined together as *Students* to champion Harvard's right to consider race in admissions reflects the profound and continuing impact of race and ethnicity on a student's life.  This is not an issue we as a country have resolved:  "Much progress remains to be made in our Nation's continuing struggle against racial isolation." *Texas Dep't of Hous. & Cmty. Affairs*, 135 S. Ct. 2507, 2525 (2015).  A holistic admissions policy that considers race, like Harvard's, effectuates such progress by ensuring the "path to leadership [is] visibly open to talented and qualified individuals of every race and ethnicity" and by training "our Nation's leaders" to engage successfully with today's increasingly diverse citizenry and challenges.  *Grutter*, 539 U.S. at 331-32.

Harvard agrees that "the need for student-body diversity is even more compelling today than it was at the time of *Bakke* and *Grutter*."[7]  Student body diversity is "integral" to Harvard's mission because diversity exposes students to "new ideas, new ways of understanding, and new ways of knowing,"[8] and "prepares [Harvard students] to assume leadership roles in the increasingly pluralistic society."[9]  Moreover, Harvard has concluded that a reduction in African-American and Hispanic students risks exacerbating "ongoing feelings of isolation and alienation

---

[7] Brief for Harvard University as Amicus Curiae Supporting Respondents at 7, *Fisher II*, 136 S. Ct. 2198 (2016).
[8] Report of the Committee to Study the Importance of Student Body Diversity, Dkt. 419, Ex. 45 at 8.
[9] *Id.* at 23.

among racial minorities in [its] community."[10]   *Students'* experiences confirm this conclusion and that Harvard has a principled and legitimate goal of pursuing diversity within its student body.

### B.     Diversity—and Racial Diversity in Particular—Prevents Racial Isolation and Produces Distinct Educational Benefits.

The benefits of ethno-racial diversity recognized by the Supreme Court[11] have long been confirmed by colleges[12] and empirical research.[13]  These benefits accrue at the individual level (for minority and non-minority students), the institutional level, and the societal level.

On the individual and institutional level, numerous studies confirm that greater ethnic diversity provides vital support for underrepresented minorities, including: reducing tokenism and isolation,[14] promoting a sense of belonging,[15] and furthering overall student well-being and

---

[10] Report of The Committee to Study Race-Neutral Alternatives, Dkt. 419, Ex. 47 at 9.

[11] *See, e.g.*, *Bakke*, 438 U.S. at 315-19 (Powell, J., announcing the judgment of the Court); *Grutter*, 539 U.S. at 325; *Gratz v. Bollinger*, 539 U.S. 244, 275-76 (2003); *Fisher I*, 570 U.S. at 309; *Fisher II*, 136 S. Ct. at 2210.

[12] *See, e.g.*, The President's Report 1993-1995, Dkt. 419, Ex. 41; Peter Salovey, Yale's Commitment to Equity and Inclusion (May 10, 2018), https://news.yale.edu/2018/05/10/yales-commitment-equity-and-inclusion; University of Michigan, Diversity, Equity, and Inclusion: Strategic Plan Progress Report 2-7 (2017), https://diversity.umich.edu/wp-content/uploads/2017/11/Diversity_Equity_and_Inclusion_Year_One_Progress_Report.pdf.

[13] *See, e.g.*, Kristin Davies, Linda Tropp, Arthur Aron, Thomas Pettigrew, and Stephen Wright, *Cross-Group Friendships and Intergroup Attitudes*, 15 Personality and Social Psychology 332, 345 (2011); Nisha Gottfredson, Abigail T. Panter, Charles E. Daye, Walter F. Allen, and Linda F. Wightman, *The Effects of Educational Diversity in a National Sample of Law Students: Fitting Multilevel Latent Variable Models in Data with Categorical Indicators*, 44 Multivariate Behavioral Research 305, 326 (2009); Thomas Pettigrew and Linda R. Tropp, *A Meta-Analytic Test of Intergroup Contact Theory*, 90 J. of Personality and Social Psychology 751, 766 (2006); Angela Locks, Sylvia Hurtado, Nicholas Bowman, and Leticia Oseguera, *Extending Notions of Campus Climate and Diversity to Students' Transition to College*, 31 The Review of Higher Education 257, 279 (2008).

[14] *See* Patricia Odell, Kathleen Korgen, and Gabe Wang, *Cross-Racial Friendships and Social Distance between Racial Groups on a College Campus*, 29 Innovative Higher Educ. 291, 303 (2005).

[15] *See* Locks et al., *supra* note 13, at 277.

retention.[16]  *Students'* experiences demonstrate this firsthand.  As Sarah Cole, a Black American graduate of Harvard (class of 2016), reflected:

> I dream of a Harvard experience where I wasn't the only slave-descendant black person in my philosophy class, or volunteer program (serving black and brown kids), or teacher preparation program… It is not sustainable to expect individual students of color to be the lone workers helping to make their peers (and superiors) grow less biased.

(Sarah Cole Supp. Decl. at ¶ 10.)  Itzel Libertad Vasquez-Rodriguez, an indigenous Mexican-American graduate of Harvard (class of 2017), similarly reflected:

> I often felt incredibly isolated at Harvard… I felt more comfortable and confident sharing my opinions in spaces with higher levels of underrepresented students of color…[This] lowered the likelihood that I would be viewed as a "token" for my race.

(Itzel Libertad Vasquez-Rodriguez Supp. Decl. at ¶ 4.)

Greater racial representation combined with a holistic appreciation of difference also promotes increased diversity within a given racial category (intraracial diversity),[17] which in turn can reduce isolation for students who identify with less-represented sub-groups or those with intersectional identities.  For example, A.A., who identifies as Chinese American and queer (class of 2019), emphasized that she valued the diversity within Harvard's Asian-American community:

> [At Harvard] I met other queer Asian Americans. I felt understood, like I didn't have [to] explain myself or filter myself to be accepted. It was a great experience for me . . . .  Harvard has several activist-oriented Asian American organizations on campus

---

[16] *See* Mitchell J. Chang, *Does Racial Diversity Matter?: The Educational Impact of a Racially Diverse Undergraduate Population*, 40 J. of College Student Development 377, 391 (1999).

[17] *Grutter*, 539 U.S. at 319-20 (noting testimony that when a university's student body includes sufficient numbers of minority students "racial stereotypes lose their force because nonminority students learn there is no 'minority viewpoint' but rather a variety of viewpoints among minority students.").

> that have provided me with community and opportunities to grow . . . . [T]he people in these organizations, such as the Harvard Queer Asian American and Pacific Islander Alliance, understand me . . . because they also understand what it is to be caught in liminal spaces of identity.

(A.A. Decl. at ¶¶ 11, 13, 14.)

Beyond the benefits flowing to minority students, studies confirm racial and ethnic diversity enhances learning for all students. Such shared benefits include: reduced prejudice;[18] improved cross-cultural understanding, comfort, and engagement;[19] enhanced problem-solving and academic abilities;[20] and a developed capacity for teamwork and leadership.[21] *Students'* experiences bear this out. For example, Y.Z., a Chinese American rising senior at Harvard (class of 2019), reflected on how Harvard's racial diversity helped her overcome previously held prejudices, explaining:

> Coming from my suburb, Harvard seemed incredibly diverse to me. . . . I made many African American friends during my first year who shared perspectives with me I had previously not been exposed to. . . . I had many conversations about race and class with my friends that forced me to confront my own prejudices and privilege.

(Y.Z. Decl. at ¶ 6.) Fadhal Moore, an African-American graduate of Harvard (class of 2015), explained how having same-race peers at Harvard exposed him to a more diverse array of friends

---

[18] *See* Kristin Davies et al., *supra* note 13, at 345; Nisha Gottfredson et al., *supra* note 13, at 326.

[19] *See* Mitchell J. Chang, Nida Denson, Victor Saenz, and Kimberly Misa, *The Educational Benefits of Sustaining Cross-Racial Interaction Among Undergraduates*, 77 J. of Higher Educ. 430, 430-55 (2006); Nida Denson and Mitchell Chang, *Racial Diversity Matters: The Impact of Diversity-Related Student Engagement and Institutional Context*, 46 Amer. Educ. Research J. 322, 343 (2009); Nida Denson and Shirley Zhang, *The Impact of Student Experiences with Diversity on Developing Graduate Attributes*, 35 Studies in Higher Educ. 529, 540 (2010).

[20] *See* Chang et al., *supra* note 19; Jiali Luo and David Jamieson-Drake, *A Retrospective Assessment of the Educational Benefits of Interaction Across Racial Boundaries*, 50 J. of College Student Development 67, 82 (2009).

[21] *See* Chang et al., *supra* note 19; Luo and Jamieson-Drake, *supra* note 20, at 67.

and opportunities on campus: "It was other black students who opened doors to other non-black spaces that I ended up loving be they academic, political, musical, or for public service." (Fadhal Moore Supp. Decl. at ¶ 5.)  D.L., a Chinese American rising junior (class of 2020), also reflected on how Harvard's racial diversity has increased his cross-cultural understanding and engagement, sharing:

> I am very involved in the hip hop dance team, through which I've had the opportunity to learn more about the place of hip hop dance in black culture and become friends with many brilliant students of diverse minority racial backgrounds. Overall, the diversity at Harvard that is made possible by its affirmative action program contributes tremendously to the school and to my personal experience.

(D.L. Decl. at ¶ 6.)

The benefits of racial diversity in higher education also extend to society at large. Studies have shown that greater racial diversity is associated with increased civic engagement[22] and increased preparation for leadership in a diverse, global economy.[23]  Consistent with this research, *Students* affirm that Harvard's racial diversity has buttressed their commitment to public service and has better prepared them to perform such service.  For example, J.L., a Korean American rising senior (class of 2019), shared:

> Since coming to Harvard, I have been very involved in the Phillips Brooks House Association (PBHA), the nation's largest student-run public service non-profit that serves more than 10,000 individuals in and around the greater Boston area. PBHA is a hub for diverse student organizing on campus and has challenged me to develop a deeper commitment to social justice.

---

[22] William G. Bowen and Derek Bok, *The Shape of the River: Long-Term Consequences of Considering Race in College and University Admissions* (1998).
[23] Anthony Lising Antonio, "The role of interracial interaction in the development of leadership skills and cultural knowledge and understanding," 42 Research in Higher Education 593 (2001).

(J.L. Decl. at ¶ 7.)  Itzel Libertad Vasquez-Rodriguez, a Harvard graduate (class of 2017) who identifies as indigenous Mexican-American, reflected on how Harvard's diversity better prepared her to pursue social justice work in Peru after graduation.  Itzel explained:

> [Harvard's ethno-racial diversity] has given me the confidence and grace to work cooperatively with diverse groups of people. It also gave me the tools to promote equitable participation. By making sure that every voice in a room is heard, I'm able to strengthen discussions, problem-solve, and support solution-oriented efforts. . . .   [T]he ethno-racial diversity at Harvard was fundamental in preparing me to advance positive change in my current and future professional endeavors.

(Itzel Libertad Vasquez-Rodriguez Supp. Decl. at ¶¶ 24-25).

As these statements underscore, the benefits of racial diversity on campus flow to students of all backgrounds, including Asian-American students.  Declarants Y.Z., D.L., T.D., J.L., A.Z., A.A., and S.C. identify with Asian-American ancestry; they all emphatically contest SFFA's implication that Harvard's pursuit of racial diversity discriminates against Asian Americans.[24]   Rather, these Asian-American *Students* attest that they benefit directly from Harvard's goal of promoting racial diversity through productive cross-racial interactions with peers.[25]  *Students'* sentiments are corroborated by field research.  Studies have demonstrated that interactions with a diverse student body, both in and out of the classroom, lead to positive learning and civic outcomes for Asian-American students.[26]  Furthermore, research has indicated

---

[24] Y.Z. Decl. at ¶¶ 7-8; D.L. Decl. at ¶ 8; T.D. Decl. at ¶ 8; J.L. Decl. at ¶ 6; A.Z. Decl. at ¶ 12; A.A. Decl. at ¶ 22; S.C. Decl. at ¶ 7.

[25] Y.Z. Decl. at ¶¶ 7-8; D.L. Decl. at ¶ 8; T.D. Decl. at ¶¶ 8-9; J.L. Decl. at ¶¶ 6-8; A.Z. Decl. at ¶ 10; A.A. Decl. at ¶ 23; S.C. Decl. at ¶¶ 7-8.

[26] *See* NYU CARE, *Asian Americans and the Benefits of Campus Diversity: What the Research Says* (2012); Patricia Gurin, Eric L. Dey, Sylvia Hurtado, and Gerald Gurin, *Diversity and Higher Education: Theory and Impact on Educational Outcomes*, 72 Harv. Educ. Rev. 330, 351-353, 354 tbl. 3 (2002); Mark E. Engberg and Sylvia Hurtado, *Developing Pluralistic Skills and Dispositions in College: Examining Racial/Ethnic Group Differences*, 82 J. Higher Educ. 416, 434 (2011) (observing that while "the effects of intergroup learning on the pluralistic measure

that racially diverse campuses benefit Asian Americans by reducing racial prejudices targeting Asian-American students and other students of color.  A recent empirical study reported that Asian American and Pacific Islander ("AAPI") students experienced direct racial hostility in the forms of racial bullying, racial slurs, and racial profiling.[27]  The study also indicated Asian Americans experience indirect intimidation as a result of witnessing racist acts directed towards other students of color.[28]  Studies show increased racial diversity serves to address this type of intimidation: universities that reach the highest levels of diversity have fewer incidents of racial hostility.[29]

Further, research has demonstrated that, as compared to socioeconomic or geographic diversity, racial diversity contributes to small-group discussions in unique ways which enhances students' reasoning.[30]  Research suggests that when a topic concerning racial inequality is addressed in a course, there will likely be greater variation in opinions and perspectives when the students are more racially diverse than if they were more socioeconomically diverse.[31]  As *Student* Itzel Libertad Vasquez-Rodriguez, who identifies as indigenous Mexican-American and low-income, has explained:

were significant for all other groups," Asian-American students "seem to demonstrate the strongest benefit").

[27] *See* Samuel D. Museus and Julie J. Park, *The Continuing Significance of Racism in the Lives of Asian American College Students*, 56 J. College Student Dev. 551, 553, 557-58 (2015).

[28] *Id.*

[29] *See, e.g.*, Rebecca L. Stotzer and Emily Hossellman, *Hate Crimes on Campus: Racial/Ethnic Diversity and Campus Safety*, 27 J. Interpersonal Violence 644, 654-55 (2012).

[30] *See* Anthony L. Antonio, Mitchell J. Chang, Kenji Hakuta, David A. Kenny, Shana Levin, Jeffrey F. Milem, *Effects of Racial Diversity on Complex Thinking in College Students*, 15 Psychological Science 507, 507-10 (2004).

[31] *See* Mitchell J. Chang, M. Seltzer, and J. Kim, *Diversity of Opinions Among Entering College Students: Does Race Matter?*, Research paper presented at the National Academy of Education Annual Meeting, Toronto, Canada (2002).

> [T]he experiences of people of color based on their appearance and
> ethno-race is distinct from their experiences based on class. . . .  As
> a student of color, I often felt isolated and tokenized because of the
> color of my skin, my name, and my features. Greater
> socioeconomic diversity would not—on its own—have helped me
> feel less singled out based on my ethno-racial identity.

(Itzel Libertad Vasquez-Rodriguez Supp. Decl. at ¶ 22.)

In sum, *Students'* testimony highlights at least three ways that attending to demographic representation across the student body is necessary (though not sufficient) to harness the full benefits of diversity.  First, greater numeric representation lessens the vulnerability felt by marginalized minorities,[32] thereby increasing their likelihood to participate rather than choose disengagement.[33]  Second, such representation increases the likelihood that students will have more frequent and more meaningful encounters across race that are crucial to overcoming pre-existing biases.[34]  Third, it allows for increasing differences *within* a particular racial group, which reduces prejudice and prevents the solidification of stereotypes by increasing exposure to the variety of intra-racial identities.[35]

---

[32] *See, e.g.*, Amana Lewis, Mark Chesler, and Tyrone A. Forman, *The Impact of 'Colorblind' Ideologies on Students of Color: Intergroup Relations at a Predominantly White University*, 69 J. of Negro Educ. 74, 82-84 (2000); Sharon Fries-Britt and Kimberly Griffin, *The Black Box: How High-Achieving Blacks Resist Stereotypes About Black Americans*, 48 J. of College Student Development 509, 514 (2007).

[33] *See, e.g.*, Samuel Museus, Uma Jayakumar, and Thomas Robinson, *Modeling Racial Differences in the Effects of Racial Representation on Two-Year College Student Success*, 13 College Student Retention 549, 566 (2012).

[34] *See* Mariette Berndsen, Russell Spears, Joop van der Pligt, and Craig McGarty, *Illusory Correlation and Stereotype Formation: Making Sense of Group Differences and Cognitive Biases*, Stereotypes as Explanations (2002).

[35] *See* Scott Page, *The Diversity Bonus: How Great Teams Pay Off in the Knowledge Economy* (New Jersey: Princeton Univ. Press 2017); *see also Grutter*, 539 U.S. at 319-20.

## II.   Harvard's Holistic Admissions Review Properly Views Race as One of Many Factors That Contextualizes an Applicant's Past Achievements and Future Potential.

Race-conscious policies such as Harvard's are designed to effectively achieve diversity by comprehensively evaluating applicants individually and holistically.   Harvard's race-conscious admissions process appropriately considers race as one of many factors that may shed light on an applicant's past achievements and future potential.   *See Bakke*, 438 U.S. at 316-18.

### A.   Race and Racial Barriers Remain Factors in American Life Which Cannot and Should Not Be Ignored in the Admissions Process.

*Grutter* recognized that present-day inequities provide a compelling justification for considering race because "[b]y virtue of our Nation's struggle with racial inequality, [underrepresented] students are both likely to have experiences of particular importance to the . . . [s]chool's mission, and less likely to be admitted in meaningful numbers on criteria that ignore those experiences."   539 U.S. at 338.   It cannot be disputed that race continues to impact individuals' opportunities and outcomes irrespective of their socioeconomic status.[36]

Several studies have revealed how race independently shapes our experiences and worldviews.   For example, a recent study found that in ninety-nine percent of America, Black boys fare worse than white boys raised in the same neighborhood whose parents earn similar incomes.[37]   In the workplace, employers are less likely to hire African-American and Latino job applicants than applicants of other races with comparable qualifications and education levels.[38]

---

[36] *See, e.g.*, Raj Chetty, Nathaniel Hendren, Maggie R. Jones, and Sonya R. Porter, "Race and Economic Opportunity in the United States: An Intergenerational Perspective," Equality of Opportunity (Mar. 2018), http://www.equality-of-opportunity.org/assets/documents/race_paper.pdf.

[37] *See id.* at 6.

[38] Lincoln Quillian, Devah Pager,, Ole Hexel,, and Arnfinn H. Midtbøen, "Meta-analysis of field experiments shows no change in racial discrimination in hiring over time," PNAS (Aug. 8, 2017) at 2, http://www.pnas.org/content/pnas/early/2017/09/11/1706255114.full.pdf.

Low-income Black and Latino families are also more likely to live in neighborhoods with concentrated poverty as compared to poor-whites.[39]

Racial inequities cut across multiple sectors—from education,[40] to our economy, to our criminal justice system and beyond.  Children of color are more likely to be affected by exposure to high levels of poverty and violence at a young age, the effects of "toxic stress," and inadequate housing and transportation.[41]  Entering the classroom, students of color are thus more likely to attend schools that lack adequate funding, which means larger schools, larger class sizes, less challenging curriculums, and less qualified teachers.[42]  Black workers are also paid less than their white counterparts in comparable jobs, and the wage gap is only growing.[43]  In the criminal justice system, people of color are targeted by racially discriminatory laws and enforcement systems.[44]  There are also tremendous *intraracial* disparities, particularly within the AAPI community.  Many Southeast-Asian, Native-Hawaiian, and Pacific-Islander subgroups suffer from school segregation,[45] inadequate preparation for college,[46] and other barriers to higher education.[47]

---

[39] Paul Jargowsky, "Concentration of Poverty in the New Millennium: Changes in Prevalence, Composition, and Location of High Poverty Neighborhoods," Century Foundation and Rutgers Center for Urban Research and Education 5 (Dec. 2013).

[40] Jeremy Ashkenas, Haeyoun Park, and Adam Pearce, *Even with Affirmative Action, Blacks and Hispanics Are More Underrepresented at Top Colleges Than 35 Years Ago*, N.Y. Times (Aug. 24, 2017), https://nyti.ms/2w0BE08.

[41] Annie E. Casey Found., Race for Results: Building a Path to Opportunity for All Children, Kids Count Policy Report 3 (2014), http://www.aecf.org/m/resourcedoc/AECF-RaceforResults-2014.pdf.

[42] *See id.* at 4.

[43] Eleni Karageorge, The Unexplainable, Growing Black-White Wage Gap, Bureau of Labor Statistics (Nov. 2017) (finding that the wage gap also grew for Black women).

[44] Leadership Conference Education Fund, "Justice on Trial: Racial Disparities in the American Criminal Justice System" (2000), http://archives.civilrights.org/publications/justice-on-trial/.

[45] *See, e.g.*, Robert T. Teranishi, Southeast Asians, School Segregation and Postsecondary Outcomes, Comm'n on Asian Am. Research in Higher Educ. 3 (2004) (describing residential

In light of these race-based inequities, it is perhaps unsurprising that the "academic criteria" that SFFA vociferously promotes are laden with their own set of biases. The academic index score is influenced by standardized test scores (such as the SATs), rigorous, SAT2 subject tests, grades, and class rank. (SFFA Statement of Facts, Dkt. 414 at 22.) Far from being "objective" indicators of merit, these measurements favor certain groups over other, more marginalized communities. Numerous studies show that the SATs are skewed to favor wealthier students and disfavor underrepresented minority groups.[48] The criteria for curricular "rigor" are equally flawed: Black and Latino children consistently have less access to AP courses and other higher-level courses,[49] and even scholastic grades themselves are subject to implicit bias against students of color.[50] In sum, there is nothing more "objective" about academic scoring as compared to the numerous other criteria Harvard considers when selecting students that are

---

isolation and ethnic enclaves among poor immigrant communities from Southeast Asia and the attendant educational inequities).

[46] *See, e.g.*, The Campaign for College Opportunity, *The State of Higher Education in California* 27-31 (Sept. 2015), http://collegecampaign.org/wp-content/uploads/2015/09/2015-State-of-Higher-Education_AANHPI2.pdf.

[47] *Id.* at 22-25 (Hmong and Cambodian children have the highest rates of poverty in California; more than two-thirds of Hmong, Samoan, Cambodian, and Vietnamese freshmen received need-based financial aid; large proportions of Vietnamese, Thai, Korean, Chinese, and Cambodian communities have limited English proficiency).

[48] *See, e.g.*, Saul Geiser, "Norm-Referenced Tests and Race-Blind Admissions: The Case for Eliminating the SAT and ACT at the University of California," UC Berkley CSHE 15.17 (Dec. 2017); Jay Rosner, *How the SAT Creates "Built-In Headwinds,"* Kidder and Rosner, 43 Santa Clara L. Rev. 131, 17 (2002).

[49] *See* U.S. Dep't of Educ. Off. for Civil Rights, "Data Snapshot: College and Career Readiness," Civil Rights Data Collection (Mar. 2014), https://www2.ed.gov/about/offices/list/ocr/docs/crdc-college-and-career-readiness-snapshot.pdf; David Love, "Black and Brown Students Are Denied Access to Advanced Placement Courses, the New Jim Crow in Education," Atlanta Black Star (June 4, 2018), http://atlantablackstar.com/2018/06/04/black-and-brown-students-are-denied-access-to-advanced-placement-courses-the-new-jim-crow-in-education/.

[50] Meike Bonefeld and Oliver Dickhäuser, "(Biased) Grading of Students' Performance: Students' Names, Performance Level, and Implicit Attitudes," Frontiers in Psychology (May 9, 2018), https://www.frontiersin.org/articles/10.3389/fpsyg.2018.00481/full#B46.

diverse across many dimensions.  Harvard's holistic, individualized review is consistent with *Grutter's* recognition that universities may need to consider race to counterbalance "criteria that ignore those experiences [of racial inequality]." 539 U.S. at 338.These types of disparities inform the admissions process in at least two meaningful ways.  First, such inequities may indicate that an applicant can offer a distinct perspective once on Harvard's campus.  As a Black American, Sarah Cole asserts, "I knew the crucial importance of my voice and perspective, and many of my classmates and professors did, as well."  (Sarah Cole Supp. Decl. at ¶ 10.)  As a low-income Chinese American, S.C. similarly testifies that her distinctive "humor, empathy, and humility," which was praised by Harvard's admissions officers, derive "largely from [her] Chinese heritage and low-income status."  (S.C. Decl. at ¶ 6.)

Second, such inequities shed light on the strengths of an applicant's accomplishments, as many minorities must overcome race-based hurdles.  As an example, an admissions officer reviewing T.D.'s application may view T.D.'s decision to enroll in a "humanities magnet program in high school to explore my linguistic capabilities" with even greater admiration after learning that T.D. (a Vietnamese immigrant) learned English in the United States, tried to overcome their accent, and endured racial slurs.  (T.D. Decl. at ¶ 4.)  Thus, the allegedly "color-blind" system SFFA proposes would effectively "end[] up conferring a preference for applicants for whom race does not matter, or more accurately, for those who do *not* suffer the traditional harms stepping from structural racism."[51]

---

[51]  Mario L. Barnes, Erwin Chemerinsky, and Angela Onwuachi-Willig, *Judging Opportunity Lost: Assessing the Viability of Race-Based Affirmative Action After Fisher v. University of Texas*, 62 UCLA L. Rev. 272, 294-95 (2015) (internal quotation marks omitted, emphasis added).

### B. Harvard Flexibly Considers Race, Whereby Race is Not the Predominant Factor in Admissions.

Harvard receives applications from many more academically qualified candidates than it could ever admit.[52]  Admitting candidates based solely on academic scores is neither practically realistic, nor would it be desirable.  Although academic qualifications, like grade point average and test scores, may be useful for threshold determinations about scholarly abilities, they are incomplete in revealing an applicant's professional potential or their ability to provide unique contributions to the educational environment.  It is only after considering whether "an individual is capable of thriving academically at Harvard" that the Committee considers whether the "person behind the scores" demonstrates collective qualities suggesting they will become engaged citizens and citizen-leaders in an increasingly diverse, complex society.[53]  Part of this assessment considers the applicant's contribution to the multifaceted diversity Harvard seeks across socioeconomic circumstances, talents, interests, viewpoints, ambitions, skills, and race.[54]

SFFA makes the bald assertion that race is a predominant factor in admissions for African-American and Hispanic applicants.  (SFFA Memorandum for Summary Judgment, Dkt. 413 at 46-47.)   But SFFA's claim vastly overstates the role race plays in decisions and effectively tries to overturn established Supreme Court precedent which allows race to play some role in applicant decisions.  *See Bakke*, 438 U.S. at 316; *Grutter*, 539 U.S. at 319.

Contrary to SFFA's claim, any "tip" that race may provide does *not* operate as a trigger for admission.  In fact, race explains far less about applicants' likelihood of admission than numerous other factors Harvard considers.  (Card Report, Dkt. 419, Ex. 33 at ¶¶ 178-81, 195.)

---

[52] Brief for Harvard University as Amicus Curiae Supporting Respondents at 16, *Fisher II*, 136 S. Ct. 2198 (2016).
[53] Interview Handbook 2013-2014, Dkt. 419, Ex. 54 at 13.
[54] *Id.* at 10-13.

Rather, to be admitted to Harvard, applicants must demonstrate multiple areas of strength.  (*Id.* at ¶¶ 56-57.)   Indeed, the vast majority of admitted students excel across multiple profile dimensions: 46% of admitted students, from applicants to the classes of 2014 through 2019, had profile ratings of 2 or better on at least three key dimensions.  (*Id.* at ¶ 59 (1 being the highest rating, followed by 2, etc.).)  Significantly, an applicant's race only factors into the "overall rating" assigned by admissions officers and is never the sole factor determining admission.  (*Id.* at ¶ 53.)

Moreover, SFFA ignores established Supreme Court precedent recognizing that, in a highly competitive admissions process, any attribute that is valued by the university—whether that be artistic ability, athletics, socioeconomic status, geographic origin, or race—may affect admissions outcomes but this does not render the policy unconstitutional.  *See Grutter*, 539 U.S. at 337-40; *Bakke*, 438 U.S. at 323.   In *Bakke*, Justice Powell approvingly discussed Harvard's race-conscious admissions policy knowing that when the admissions committee "reviews the large middle group of applicants who are 'admissible' and deemed capable of doing good work in their courses, the race of an applicant may tip the balance in his favor."  438 U.S. at 323.  The *Grutter* and *Fisher II* Courts similarly upheld race-conscious admissions plans where race may have played an outcome determinative role for a limited number of applicants.  *See Grutter*, 539 U.S. at 339; *Fisher II*, 136 S. Ct. at 2212.

### III.   Race-Conscious Admissions Policies Remain Necessary to Support the Type and Level of Demographic Representation which Will Produce Educational Benefits for All Students.

SFFA's own evidence reinforces the ongoing need for race-conscious admissions in order for Harvard to achieve the educational benefits of diversity.  SFFA's simulations of race-neutral admissions policies would significantly reduce Black students on campus, thereby impacting ethno-racial diversity at Harvard.  (Card Rebuttal Report, Dkt. 419, Ex. 37 at ¶¶ 192-93, 196-97.)

21

Consequently, SFFA's models do not offer an acceptable race-neutral alternative to its holistic admissions program.  Moreover, historical experience and prevailing research show that when highly selective institutions stop considering race, all students of color—including Asian Americans—lose out.

A.    **SFFA Admits Its "Race-Neutral" Alternatives Would Reduce the Admission of African Americans at Harvard, Preventing Harvard from Harnessing the Full Benefits of Student Diversity.**

Before considering race in admissions, Harvard must conduct a serious, good faith review of workable race-neutral alternatives.  *See Fisher II*, 136 S. Ct. at 2218; *Grutter*, 539 U.S. at 339. In doing so, however, Harvard is not required to exhaust every conceivable race-neutral alternative or "choose between maintaining a reputation for excellence [and] fulfilling a commitment to provide educational opportunities to members of all racial groups."  *Grutter*, 539 U.S. at 339.  Alternatives that negatively impact campus climate or would not produce the educational benefits of diversity may be ineffective or unworkable.  *See id.* at 340.  Harvard may therefore reject race-neutral alternatives which decrease overall diversity or the representation of specific racial groups.  *See id.* at 318-319 (recognizing that a critical mass of underrepresented students may be necessary to dispel stereotypes and reduce racial isolation).  It is undisputed that *all* of the race-neutral alternatives proposed by SFFA are projected to significantly reduce the number of African-American students admitted to Harvard by nearly 30% or more.  (Card Rebuttal Report, Ex. 37 at Ex. 6; *see also* SFFA Statement of Facts, at 190.)  While such decreases may be acceptable to SFFA, they are not to *Students.*  "There is little enough diversity as it is; without a conscious effort to maintain and grow a diverse student body, safe spaces and open dialogue will become harder to find."  (A.A Decl. at ¶ 21.)  Moreover, in *Fisher II*, the Supreme Court found similar differences—increasing the portion of Hispanic students from 11% to 16.9% and African-American students from 3.5% to 6.8%—had a "meaningful" effect on

diversity.  *Fisher II*, 136 S. Ct. at 2212.  Thus, Harvard may seek to enroll a sufficient number of underrepresented minorities to ensure that they are "represented . . . meaningful[ly]."  *See Grutter*, 539 U.S. at 316.

Holistic admissions policies rest on the premise that the consideration of individual qualifications, characteristics and experiences is necessary to admit not only the best applicants but to assemble the best mix of students.  There are important distinctions that may exist both within and between racial groups.  An institution may therefore be wary of race-neutral alternatives that cause a decline in any particular underrepresented minority group.[55]  Minorities are not fungible, and each group's representation independently affects the benefits of diversity and the conditions for meaningful participation and cross-racial interaction.[56]  While the lack of diversity at Harvard contributes to "uncomfortable experiences" in the classroom, ethno-racial diversity challenges students to think differently about issues.  (*See* A.A Decl. and Itzel Libertad Vasquez-Rodriguez Supp. Decl.)

Lumping different racial groups together is a tactic often used to argue that an institution has achieved "enough" diversity and should no longer be permitted to consider race.[57]  Indeed,

---

[55] Harvard has found that students of color and of diverse backgrounds are underrepresented in certain degree programs in patterns consistent with historical trends.  *See, e.g.*, Harvard University Presidential Task Force on Inclusions and Belonging, "Pursuing Excellence on a Foundation of Inclusion," http://inclusionandbelongingtaskforce.harvard.edu/files/inclusion/files/harvard_inclusion_belonging_task_force_final_report.

[56] Proponents of race-neutral alternatives often presuppose that all members of underrepresented groups are interchangeable or that different racial groups contribute to campus diversity in the same way.  But the courts have recognized that such stereotypes are antithetical to the goals of diversity:  allowing nonminority students to appreciate that "there is no 'minority viewpoint' but rather a variety of viewpoints among minority students."  *See Grutter*, 539 U.S. at 320.

[57] Elise Boddie, *Commentary on Fisher: The Importance of Diversity Within Diversity*, SCOTUSBlog (Oct. 11, 2012), http://www.scotusblog.com/2012/10/commentary-on-fisher-the-importance-of-diversity-within-diversity/.

this is what SFFA argues here.  By aggregating African-American, Hispanic, and students who self-identify as "other" in his simulations, Kahlenberg concludes that the "percentage of underrepresented minority students basically holds steady" because a rise in the percentage of Hispanic students counteracts the corresponding drop in the percentage of African Americans admitted to Harvard.[58]  (Kahlenberg Rebuttal Report, Dkt. 419, Ex. 36 at 26-27.)  This presumes that increasing the representation of one underrepresented minority group neutralizes a decline in another.  Consequently, SFFA contends that race-neutral alternatives "would make Harvard *more* racially diverse."  (SFFA Memorandum for Summary Judgment at 51 (emphasis added).)  This argument demonstrates SFFA's misunderstanding of ethno-racial diversity.

    *Students* assert that increasing the representation of one underrepresented group does *not* eliminate the effects of decreasing another group's representation.  *Students* also wholeheartedly reject SFFA's assumption that such socioeconomic or geographic diversity would counteract any drop in racial diversity or that these benefits are interchangeable.  (*Id.* at 50; Kahlenberg Rebuttal Report, Ex. 32 at 29.)  Socioeconomic diversity allows students to appreciate the benefits of their own privilege.  (*See* Y.Z. Decl.)  But it does not create the same appreciation of differences as racial diversity:  as one of the *Students* observed:  "I felt an affinity to other people in my neighborhood because of our shared experience with poverty, but I did not feel like people understood my racial and ethnic identity."  (T.D. Decl. at ¶ 3.)  Another *Student's* views echo this statement:  "I think racial diversity and socioeconomic diversity are both important.  But the

---

[58] In his race-neutral simulations, Kahlenberg analyzes the level of admitted African-American, Hispanic and "other" students collectively as "minority admitted shares."  Yet the Supreme Court analyzed the impact of diversity on different racial groups separately in *Fisher II*, noting that "27 percent [of undergraduate classes with at least five students] had only one African-American student" and "[t]welve percent of these classes had no Hispanic students."  136 S. Ct. at 2212.

experiences of people of color based on their appearance and ethno-race is distinct from their experiences based on class."  (Itzel Libertad Vasquez-Rodriguez Supp. Decl. at ¶ 22.)

**B. When Highly Selective Institutions Eliminate Holistic Admissions Students of Color Are Negatively Impacted.**

Both historical experience and prevailing research demonstrate that, when highly selective colleges such as Harvard eliminate the use of race in admissions, white students benefit while students of color tend to lose out because of a decline in enrollment numbers of students of color and because of escalating racial isolation.

### 1. *Decreased Enrollment of Students of Color*

Race-neutral policies often confer a benefit for white applicants who have not been subjected to the harms associated with structural racism, while disadvantaging underrepresented minorities.[59]  Proxies such as socioeconomic disadvantage or geographic diversity may not produce the meaningful levels of racial diversity on campus because not all disadvantaged youth are members of a racial or ethnic minority group and many underrepresented minorities live in concentrated areas.[60]  In addition, there is research suggesting that income-based admissions

---

[59] Mario L. Barnes et al., *supra* note 51, at 294-295.

[60] *See* Maria Cancian, *Race-Based Versus Class-Based Affirmative Action in College Admissions*, 17 J. of Policy Analysis and Management 94, 104 (1998).  Socioeconomic disadvantage can be defined a number of different ways but simulations found substantial if "far from perfect" overlap between disadvantaged groups.  Class-based preferences do not necessarily produce the same levels of racial diversity as race-based affirmative action.  While minorities are disproportionately disadvantaged, overall there are greater numbers of low-income whites than low-income minorities.  *See also* William Kidder, *How Workable are Class-Based and Race-Neutral Alternatives at Leading American Universities?*, 64 UCLA L. REV. DISC. 100, 111 (2016).

alone may actually *reduce* both racial and socio-economic diversity at some of the most selective colleges and universities.[61]

The impact of bans on affirmative action on underrepresented minority students is evident in the state systems that implemented percentage plans following such bans.[62]   In addition to concerns that the success of such programs depends on underlying segregation of the K-12 school system, research suggests that percentage plans have not effectively replicated the level of racial diversity that institutions may have achieved prior to such a ban.  This trend also is evident at the most highly selective institutions within those states that use percentage plans.[63]

Texas offers one example of a state that was required to eliminate race-based admissions. One researcher found that the end of affirmative action in Texas correlated with a decrease in the likelihood that minority students would request that their SAT scores be sent to in-state public colleges.[64]   Another study found that the Texas plan was ineffective in maintaining racial or ethnic diversity at three of the state's most competitive public institutions—UT Austin, Texas A&M and Texas Tech University—in spite of the fact that two of those schools engaged in other

---

[61] *See* Sean F. Reardon, Rachel Baker, and Daniel Kalsik, Race, Income and Enrollment Patterns in Highly Selective Colleges 1982-2004, at 2, Center for Education Policy Analysis, Stanford University (2012).

[62] Percentage plans are just one example of a race neutral alternative to holistic admissions. However, they offer the opportunity to evaluate application, admit and enrollment rates by racial group before and after a ban on race-conscious admissions.  While the mechanics of each plan vary, as do the student-age racial demographics, it is possible to make some general observations about the impact of such bans on underrepresented minorities.

[63] *See* Catherine Horn and Stella M. Flores, Percent Plans in College Admissions: A Comparative Analysis of Three States' Experiences 42, The Civil Rights Project at Harvard University (2003).

[64] Data on where students send their SAT scores is often associated with where those students are choosing to apply.  M. Long found that the percentage plan in Texas was associated with fewer racial and ethnic minorities applying to public flagship institutions which would make it more difficult for those schools to admit and enroll a diverse class.  Mark C. Long, *College Applications and the Effect of Affirmative Action*, 121 Journal of Econometrics 319, 340 (2004).

measures designed to increase minority admissions.[65]   The first post-*Hopwood* class at the University of Texas enrolled a much smaller number of underrepresented minorities and the percentage of White students in that cohort increased immediately after the ban.  When viewed in light of the underlying demographic changes in the Texas student population, researchers have concluded that Hispanic students were more disadvantaged than White students at the state's top two institutions under the percentage plan.[66]

At the University of California ("UC"), the end of race-conscious admissions also reduced the likelihood that students of color were sending their SAT scores to in-state, public schools.  In the first year after Proposition 209 was implemented, there were "dramatic declines" of 55% in admission offers to African Americans at UC Berkley and UCLA, California's most selective public universities.[67]  Asian Americans also experienced a system-wide decline in their admit rate since Prop 209 was implemented, establishing that Asian Americans do not necessarily benefit under a race-neutral alternatives.[68]   Moreover, the reduced number of underrepresented minorities admitted were more likely to enroll elsewhere following the enactment of Prop. 209, and survey data from eight of its campuses confirmed that Black and Latino students felt that the ban on affirmative action and low levels of campus diversity contributed to racial isolation and feelings that those students were less respected by their

---

[65] *See* Mark Long and Marta Tienda, *Winners and Losers: Changes in Texas University Admissions post-Hopwood*, 30 Educational Evaluation and Policy Analysis 255, 255-80 (2008).
[66] Angel L. Harris and Marta Tienda, *Hispanics in higher education and the Texas top 10% law*, 4 Race and Social Problems 57, 57-67 (2012).
[67] William C. Kidder, *Two Decades After the Affirmative Action Ban:  Evaluating the University of California's Race-Neutral Efforts* (Oct. 2015), https://www.ets.org/Media/Research/pdf/kidder_paper.pdf.
[68] OiYan A. Poon, *Do Asian Americans Benefit From Race-Blind College Admissions Policies?*, National Commission on Asian American and Pacific Islander Research in Education 3 (2017), https://files.eric.ed.gov/fulltext/ED573713.pdf.

peers.[69]  Data on the freshman admit pools spanning over ten years shows that underrepresented minorities were more likely to reject an offer from the University of California after Prop. 209.[70] Despite significant investment in race-neutral alternatives over 20 years, the UC system has never returned to its previous levels of diversity.[71]

###### 2.   *Increased Racial Isolation*

Dramatic decreases in the number of African-American students on campus would surely undercut "meaningful representation" of minorities, leaving them vulnerable to "feel[ing] isolated or like a spokesperson for their race." *Grutter*, 539 U.S. at 318-19.  *Students* assert that such cuts would harm all who benefit from a racially diverse campus, especially Asian-American, Black, Latino, and Native American students.  There are courses in which there is an observable absence of Black students; decreasing the representation of Black students on campus would certainly impact the substantive discussion in those courses.  (*See* Sarah Cole Supp. Decl. at ¶¶ 8-10; Fadhal Moore Supp. Decl. at ¶¶ 5-6; A.A. Decl. at ¶ 21; J.L. Decl. at ¶ 8.)  Some student activities or groups still have a reputation for being elitist and white.  (D.L. Decl. at ¶ 7.) Recently, students of color launched a multimedia campaign to highlight, explore, and affirm the diverse experiences and voices of Black students at Harvard and combat tokenism, stereotypes and isolation.[72]  *Students* strongly believe that a reduction in the presence of Black students and any students of color would profoundly weaken their ability to have such concerns addressed on campus.  (T.D. Decl. at ¶ 10; J.L. Decl. at ¶ 8.)

---

[69] William C. Kidder, Misshaping the River:  Proposition 209 and Lessons for the *Fisher* Case, 39 J. of College and Univ. Law 53, 55 (2013), http://ssrn.com/abstract=2123653.
[70] *Id.*
[71] William C. Kidder, *supra* note 67.
[72] *See* "I, Too, Am Harvard," Tumblr (Aug. 7, 2014), http://itooamharvard.tumblr.com/.

Students from underrepresented Asian sub-groups may also experience a similar decline in enrollment and a concomitant increase in racial isolation (although it is more difficult to measure since disaggregated data do not exist).  There is a tendency to view all Asians as a monolithic entity, which has "erased the complexity of the Asian-American experience."[73] T.D. notes that, while there is a big presence of Chinese and Korean culture and community on campus, there is very little presence of Southeast Asian culture; the elimination of ethno-racial considerations in the admissions process would eliminate any opportunity to remedy the problems of isolation that Southeast Asian students like T.D. experience at Harvard.  (T.D. Decl. at ¶ 8.)

As *Students* can attest, the life experiences of Asian Americans and Pacific Islanders reflect a wide variety of unique experiences reflective of a broad range of comparative privilege and disadvantage that institutions should be permitted to consider when making an offer of admission.[74]  Generic references to "Asian American" students perpetuates the "model minority" myth and discounts the specific needs and challenges faced by distinct subgroups of Asian

---

[73] *See* Julie S. Chung and Alexander Z. Zhang, *Students for Fair Admissions and Harvard Both Got It Wrong*, Harvard Crimson (July 18, 2018), https://www.thecrimson.com/article/2018/7/18/chung-zhang-sffa-harvard-wrong/.  This is particularly stark, given that Asian Americans are the most economically unequal racial group in the United States.  *See also* Rakesh Kochhar and Anthony Cilluffo, *Income Inequality in the U.S. Is Rising Most Rapidly Among Asians*, Pew Research Center (July 12, 2018), http://www.pewsocialtrends.org/2018/07/12/income-inequality-in-the-u-s-is-rising-most-rapidly-among-asians/.

[74] Two recent Op-Eds by Harvard students, including one of the amici that we represent, have borne out this underrepresentation of particular sub-groups with the Asian-American label: "[East Asian and Indian] are essentially the only two areas of Asia that I see represented at Harvard.  It takes another person to remind me that the Philippines and Southeast Asian countries like Vietnam, Malaysia, Cambodia, and Thailand are also a part of this label."  Elizabeth Y. Sun, *Not Just "Asian,"* Harvard Crimson (Aug. 9, 2017), https://www.thecrimson.com/article/2017/8/9/sun-not-just-asian/; *see also* Julie S. Chung and Alexander Z. Zhang, *supra* note 73.

students.  As already noted, the monolithic treatment of underrepresented sub-groups erases their varied ethnic, cultural, linguistic, socioeconomic, political and religious backgrounds.  Research shows that many Southeast Asian students live in poverty.[75]  Other Asian students, including members of Thai, Vietnamese, Korean, Hmong and Cambodian communities, experience significant language barriers.[76]  Many Native Hawaiian and Pacific Islander students have low academic achievement, limited educational opportunities and require remediation in college.[77]

*Students* therefore believe that holistic admissions policies are necessary to allow Harvard to consider the unique educational inequities faced by underrepresented minorities.  To realize the educational benefits of diversity, it is essential that Harvard has the freedom to better comprehend and account for the differences in social and economic advantage and the variations in educational opportunities experienced by these students.

## CONCLUSION

*Students* represent a broad cross-section of Harvard's racially and ethnically minority students, prospective students, and alumni.  Their shared experience starkly shows that there continue to be race-based barriers to equal access and opportunity for all.  Breaking down these barriers requires an ongoing effort to promote diversity and inclusion across our shared social institutions, including elite academic universities such as Harvard.  Based on Harvard's current campus climate, race-conscious admissions practices remain necessary to promote such diversity and inclusion.  For the foregoing reasons, this Court should affirm through summary judgment that Harvard's limited, individualized consideration of race to promote diversity complies with our Constitution.

---

[75] *See* The Campaign for College Opportunity, *supra* note 46, at 22.
[76] *Id.* at 25.
[77] *Id.* at 27-31.

Respectfully Submitted,

/s/ Matthew Cregor
Matthew Cregor (BBO #673785)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
AND ECONOMIC JUSTICE
61 Batterymarch Street, 5th Floor
Boston, MA 02110
Tel: (617) 988-0609
mcregor@lawyerscom.org

/s/ Jon M. Greenbaum
Jon M. Greenbaum (*pro hac vice*)
Kristen Clarke
Brenda Shum
Genevieve Bonadies Torres
David Grau
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, DC 20005
Tel: (202) 662-8600
jgreenbaum@lawyerscommittee.org

/s/ Nicole K. Ochi
Nicole K. Ochi (*pro hac vice*)
ASIAN AMERICANS ADVANCING JUSTICE
1145 Wilshire Boulevards
Los Angeles, CA 90017
Tel: (213) 241-0211
nochi@advancingjustice-la.org

/s/ Lawrence Culleen
Lawrence Culleen (*pro hac vice*)
Nancy Perkins (*pro hac vice*)
Steven Mayer (*pro hac vice*)
Emma Dinan
Krithika Santhanam
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Tel: (202) 942-5477
Lawrence.Culleen@arnoldporter.com

Dated:  July 30, 2018                    COUNSEL FOR *AMICI CURIAE*

**<u>CERTIFICATE OF SERVICE</u>**

In accordance with Local Rule 5.2(b), I hereby certify that this document filed through the ECF system on July 30, 2018 will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Lawrence Culleen
Lawrence Culleen
