UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC.,<br><br>  Plaintiff,<br><br>  v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION),<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No.<br>)  1:14-cv-14176-ADB<br>)<br>)<br>)<br>)<br>)<br>) |

AMICUS BRIEF OF BROWN UNIVERSITY,
CASE WESTERN RESERVE UNIVERSITY,
COLUMBIA UNIVERSITY, CORNELL
UNIVERSITY, DARTMOUTH COLLEGE,
DUKE UNIVERSITY, EMORY UNIVERSITY, GEORGE
WASHINGTON UNIVERSITY, JOHNS HOPKINS UNIVERSITY,
MASSACHUSETTS INSTITUTE OF TECHNOLOGY,
PRINCETON UNIVERSITY, STANFORD UNIVERSITY,
UNIVERSITY OF PENNSYLVANIA, VANDERBILT
UNIVERSITY, WASHINGTON UNIVERSITY IN ST. LOUIS,
AND YALE UNIVERSITY IN SUPPORT OF DEFENDANTS

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

STATEMENT OF INTEREST AND INTRODUCTION .......................................................1

ARGUMENT ..........................................................................................................................2

I. Student Body Diversity Is Essential to Achieving the Educational Missions of *Amici*. ..........................................................................................................................2

II. Individualized, Holistic Evaluation of Applications, With Consideration of Race, Is Necessary to Achieve the Benefits of Diversity ...........................................6

    A. Holistic Review of Individual Applications Enables *Amici* to Consider How Each Individual Student Can Contribute to the Diversity of the Student Body. ............................................................................6

    B. Facially Race-Neutral Approaches to Admissions Do Not Provide *Amici* With A Meaningful Alternative For Obtaining Diversity ..................9

III. It Would Be An Extraordinary Intrusion To Mandate The Use Of One Particular Method Of Selection Here Or Prohibit All Consideration Of Race In The Admissions Process. .......................................................................................13

CONCLUSION .....................................................................................................................16

# TABLE OF AUTHORITIES

**CASES**

*Fisher v. University of Texas at Austin*, 570 U.S. 297 (2013) ................................6, 9, 13, 15

*Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016) ..............................3, 5, 9, 13

*Gratz v. Bollinger*, 539 U.S. 244 (2003) ...........................................................................15

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ..................................................2, 3, 5, 7, 8, 11, 12, 14

*Parents Involved in Community Schools v. Seattle School District Number 1*, 551 U.S. 701 (2007) ................................................................................................8, 12, 14

*Regents of University of California v. Bakke*, 438 U.S. 265 (1978) ................................3, 14,

*University of Pennsylvania v. EEOC*, 493 U.S. 182 (1990) ..................................................14

**OTHER AUTHORITIES**

Brief of the President and the Chancellors of the University of California as *Amici Curiae* in Support of Respondents, *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016) (No. 14-981), 2015 WL 6735847 ......................10

*Brown's Mission*, Brown University, https://www.brown.edu/about/mission (last visited July 25, 2018) ................................................................................3

Martha Minow, *After* Brown: *What Would Martin Luther King Say?*, 12 Lewis & Clark L. Rev. 599 (2008) ..........................................................................9

*Mission Statement*, Dartmouth College, https://home.dartmouth.edu/mission-statement (last visited July 25, 2018) ................................................................4

Adriane Kayoko Peralta, *A Market Analysis of Race-Conscious University Admissions for Students of Color*, 93 Denv. L. Rev. 173 (2015) ..................................10

Shirley M. Tilghman, President, Princeton University, *2005 Opening Exercises Greeting and Address* (Sept. 11, 2005), http://www.princeton.edu/president/ speeches/ 20050911 ..................................................................5

*What Yale Looks For*, Yale College Undergraduate Admissions, https://admissions.yale.edu/what-yale-looks-for (last visited July 25, 2018) ..............................7

## STATEMENT OF INTEREST AND INTRODUCTION

*Amici* Brown University, Case Western Reserve University, Columbia University, Cornell University, Dartmouth College, Duke University, Emory University, George Washington University, Johns Hopkins University, Massachusetts Institute of Technology, Princeton University, Stanford University, University of Pennsylvania, Vanderbilt University, Washington University in St. Louis, and Yale University are American institutions of higher education. *Amici* have longstanding admissions policies similar to those that the Supreme Court upheld in *Grutter v. Bollinger*, 539 U.S. 306 (2003). Accordingly, *Amici* have substantial experience with admissions policies that consider an applicant's background and experience, including the applicant's racial or ethnic background.

*Amici* speak with one voice to emphasize the profound importance of a diverse student body for their educational missions. The diversity that *Amici* seek in their admissions policies is nuanced and multifaceted, and it encompasses a diversity of perspectives, experiences, goals, backgrounds, races, ethnicities, and interests. *Amici* strive to enroll a diverse student body because in their experience *Amici* have found that doing so significantly deepens the students' educational experience. Diversity encourages students to question their own assumptions, to test received truths, and to appreciate the complexity of the modern world. This larger understanding prepares *Amici*'s graduates to pursue innovation in every field of discovery, to be active and engaged citizens equipped to wrestle with the great questions of the day, and to expand humanity's learning and accomplishment.

*Amici* rely on decades of experience in finding that individualized and holistic review of applications is the best means that universities can employ in pursuit of meaningful diversity. *Amici* consider race and ethnicity as one factor among many in order to better understand each applicant and the contributions he or she might make to the university environment. The plaintiffs here suggest that holistic review should be conducted without regard to race, but it is artificial to consider an applicant's experiences and perspectives while turning a blind eye to race. For many applicants their race has influenced, and will continue to influence, their experiences and perspectives.

A decision by this Court forbidding all consideration of race in the admissions process would compromise *Amici*'s efforts to attain diverse student bodies, and it would be inconsistent with the letter and spirit of the Supreme Court's jurisprudence, which has for decades upheld holistic admissions policies like *Amici*'s. In light of the momentous interests at stake, *Amici* urge the court to affirm the right of educational institutions to structure admissions programs that appropriately consider race and ethnicity within the context of an individualized and holistic review.

## ARGUMENT

### I. Student Body Diversity Is Essential to Achieving the Educational Missions of *Amici*.

Justice Powell recognized in *Regents of University of California v. Bakke*, 438 U.S. 265 (1978), and the Supreme Court held unequivocally in *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003), that universities "ha[ve] a compelling interest in attaining a diverse student body." In the Court's most recent statement on the subject, the Court credited the University of Texas' argument that a diverse student body "provid[es] an academic

2

environment that offers a robust exchange of ideas, exposure to differing cultures, preparation for the challenges of an increasingly diverse workforce, and acquisition of competencies required of future leaders." *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2211 (2016) (hereinafter *Fisher II*) (internal quotation marks omitted).

Decades of experience with admissions policies have convinced *Amici* that a diverse student body provides irreplaceable value to the quality of their students' education. *Amici* strive for the type of student body diversity that "encompasses a … broad[] array of qualifications and characteristics of which racial or ethnic origin is but a single though important element." *Bakke*, 438 U.S. at 315 (opinion of Powell, J.). Enrolling a diverse student body "promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races," while also "promot[ing] learning outcomes" and "better prepar[ing] students for an increasingly diverse workforce and society." *Grutter*, 539 U.S. at 330 (internal quotation marks and alterations omitted). The admissions policies of *Amici* vary somewhat, but they share a common commitment to the basic principle that student body diversity is one of those "intangible 'qualities which are incapable of objective measurement but which make for greatness.'" *Fisher II*, 136 S. Ct. at 2214 (quoting *Sweatt v. Painter*, 339 U.S. 629, 634 (1950)).

Essential to the educational missions of *Amici* is a commitment to "prepar[e] students for work and citizenship," a core component of which is "exposure to widely diverse people, cultures, ideas, and viewpoints." *Grutter*, 539 U.S. at 330, 331. *See, e.g.*, *Brown's Mission*, Brown University, https://www.brown.edu/about/mission (last visited July 25, 2018) ("The mission of Brown University is to serve the community, the nation,

3

and the world by discovering, communicating, and preserving knowledge and understanding in a spirit of free inquiry, and by educating and preparing students to discharge the offices of life with usefulness and reputation."); *Mission Statement*, Dartmouth College, https://home.dartmouth.edu/mission-statement (last visited July 25, 2018) ("Dartmouth College educates the most promising students and prepares them for a lifetime of learning and of responsible leadership, through a faculty dedicated to teaching and the creation of knowledge.").

Indeed, for *Amici*, diversity is meant to benefit the student body both inside and outside the classroom. Because *Amici* are all residential institutions, each strives to create a learning environment in which education occurs both within the classroom and through myriad other student interactions—in residences and dining halls, in performance, artistic, athletic, and recreational spaces, in student organizations and activities, and throughout the campus. *Amici* aim to create an environment in which students learn as much from one another outside as within the classroom. As one university president has explained:

> Princeton ... offers you a once-in-a-lifetime opportunity to connect with men and women whose lives have differed dramatically from your own; who view the world from a different vantage point. Never again will you live with a group of peers that was expressly assembled to expand your horizons and open your eyes to the fascinating richness of the human condition. ... The reason [the Admission Office] took such care in selecting all of you—weighing your many talents, your academic and extracurricular interests, your diverse histories—was to increase the likelihood that your entire educational experience, inside and outside the classroom, is as mind-expanding as possible. When you graduate you will enter a world that is now truly global in perspective, and in which success will require that you have a cosmopolitan

4

> attitude. You must be equipped to live and work in not one culture, but in many cultures.

Shirley M. Tilghman, President, Princeton University, *2005 Opening Exercises Greeting and Address* (Sept. 11, 2005), http://www.princeton.edu/president/speeches/20050911.

*Amici*'s admissions policies are based on the principle that, in a free society, inquiry proceeds best when views and goals must withstand examination from the widest possible range of perspectives. *Amici*'s experiences bear this out: a student body that is diverse in many dimensions, including racial and ethnic background, produces enormous educational benefits. Like the University of Texas and Harvard, *Amici* seek the type of diversity that "provid[es] an educational setting that fosters cross-racial understanding, provid[es] enlightened discussion and learning, [and] prepar[es] students to function in an increasingly diverse workforce and society." *Fisher II*, 136 S. Ct. at 2211 (quotation marks omitted). Such diversity significantly improves the quality of students' educational experiences by leading them to examine and confront themselves and their tenets from many different points of view. It also prepares them for life, work, and leadership in a nation and world that constantly are confronting new challenges. Indeed, as Justice O'Connor wrote in *Grutter*, "[i]n order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity." *Grutter*, 539 U.S. at 332.

In short, for many students, a university may be the first place in which they are exposed to others whose experiences, opinions, faiths, and backgrounds differ remarkably from their own. Through that exposure, students are encouraged to question

5

their own assumptions and biases and to appreciate the full texture of our society and the world.

II. Individualized, Holistic Evaluation of Applications, with Consideration of Race, Is Necessary to Achieve the Benefits of Diversity.

    A. Holistic Review of Individual Applications Enables *Amici* to Consider How Each Individual Student Can Contribute to the Diversity of the Student Body.

After *Grutter* and *Fisher II*, it is the law of the land that individualized and holistic review of university applications is an appropriately narrowly tailored mechanism for taking into account racial and ethnic origin in support of the compelling interest in enrolling a diverse student body. Individualized and holistic consideration of each applicant presents universities the opportunity to evaluate all of the characteristics that determine an applicant's expected contributions to campus diversity. In both ambition and operation, such individualized and holistic review adheres to the Supreme Court's directive that admissions processes "ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 309 (2013) (hereinafter *Fisher I*) (quoting *Grutter*, 539 U.S. at 337).

By design, the admissions programs of *Amici* are "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant." *Grutter*, 539 U.S. at 334. In an effort to ensure that all applicants are examined on their individual merits, *Amici* engage in holistic reviews that take into account a wide range of detail regarding each applicant. *Amici* obtain and review extensive information regarding the life experiences, accomplishments, talents, interests, and goals of each

applicant, to assess both the applicant's academic potential and the contribution that the applicant may make to the class as a whole. *See, e.g.*, *What Yale Looks For*, Yale College Undergraduate Admissions, https://admissions.yale.edu/what-yale-looks-for (last visited July 25, 2018) ("As we carefully and respectfully review every application, two questions guide our admissions team: 'Who is likely to make the most of Yale's resources?' and 'Who will contribute most significantly to the Yale community?'"). Such application processes should allow—indeed encourage—applicants to provide any information about themselves, including their background, that the applicant thinks is relevant.

Accordingly, *Amici* consider a wide range of race-neutral factors in seeking to compose broadly diverse and excellent student bodies. For example, *Amici* review applicants' socioeconomic background, parental education level, and whether languages other than English are spoken in the home. They consider the applicants' demonstrated leadership skills, their recommenders' assessment of their achievements and character, and all the other intangible characteristics that are crucial to ascertaining how an applicant will contribute to the university community. These admissions policies "weigh[] many other diversity factors besides race that can make a real and dispositive difference" for applicants of all races and ethnicities, "sufficiently tak[ing] into account, in practice as well as in theory, a wide variety of characteristics besides race and ethnicity that contribute to a diverse student body." *Grutter*, 539 U.S. at 338-39.

These admissions reviews also consider the racial and ethnic backgrounds of applicants as "one factor among many." *Grutter*, 539 U.S. at 340. Consistent with *Grutter* and *Fisher II*, *Amici*'s consideration of race and ethnicity does not "make[] race or ethnicity the defining feature of the application." *Grutter*, 539 U.S. at 309. No seats in

7

the class are reserved for applicants of any race or ethnic background, nor are applicants of any race or background limited to a certain number of places. Instead, *Amici* consider applicants' races and ethnicities with extraordinary care and only in the most limited fashion necessary to ensure a meaningful contribution to the diversity of their student bodies.

*Amici* take race into consideration because they understand that "the reality is that" "race [does] matter[]." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 787 (2007) (Kennedy, J., concurring in part and concurring in the judgment); *accord Grutter*, 539 U.S. at 332-33. To say that race continues to matter is to acknowledge forthrightly that for many reasons race continues to shape the backgrounds, perspectives, and experiences of many in our society, including *Amici*'s students. Unsurprisingly, race and ethnic background may significantly impact applicants' experiences, perspectives, and areas of accomplishment. Under the admissions policies of *Amici*, no applicant is excluded from discussing how their race or ethnicity has influenced their interests, goals, and experiences. The decision to invoke those identities as formative of a particular worldview is instead left to the applicants themselves, and *Amici* evaluate the salience of those experiences in conjunction with other formative factors, like socioeconomic status. Such a flexible system of individualized and holistic review enables *Amici* to identify those applicants who will contribute most significantly to *Amici*'s respective communities.

In *Amici*'s educational judgment, based on years of experience, individualized and holistic review provides the most effective path toward a diversity of backgrounds, perspectives, and interests that shape students' educational experiences and learning

8

during their time on campus. That review is intended to produce a student body that is talented and diverse in many ways, including in intellectual interests, goals, geographic origin, socioeconomic status, background and experience (including race and ethnicity), perspective, and areas of accomplishment.

### B. Facially Race-Neutral Approaches to Admissions Do Not Provide *Amici* with a Meaningful Alternative for Obtaining Diversity.

Race-neutral approaches to admissions decisions do not provide *Amici* with "workable means" to attain "the benefits of diversity" they seek. *Fisher II*, 136 S. Ct. at 2212. Universities are not obligated to adopt race-neutral or race-blind means if they determine that such means "may preclude the university from conducting the individualized assessments necessary to assemble a student body that is not just racially diverse, but diverse along all the qualities valued by the university." *Grutter*, 539 U.S. at 340. Such is the case here: were *Amici* to adopt exclusively race-neutral means, compelling evidence from institutions required to adopt race-neutral admissions policies shows that *Amici* would no longer be able to effectively pursue the attainment of the type of diversity that advances their educational missions. Though consideration of such factors as socioeconomic status is relevant to the attainment of a meaningfully diverse student body, exclusive reliance on such factors would fail to produce the *racial* and *ethnic* diversity needed to promote "enhanced classroom dialogue and the lessening of racial isolation and stereotypes," *Fisher I*, 570 U.S. at 308; *see also* Martha Minow, *After Brown: What Would Martin Luther King Say?*, 12 Lewis & Clark L. Rev. 599, 636 & n.192 (2008) (collecting studies showing that reliance on socioeconomic status as an admissions factor alone cannot produce racial diversity).

9

The struggles of other universities to enroll diverse student bodies exemplify why exclusively race-neutral admissions policies are unworkable as a means of advancing *Amici*'s compelling interest in diversity. For example, the University of California's most selective campuses have been unable to attain the type of student body diversity that enriches students' educational experiences since the University system was barred from considering race in university admissions after Proposition 209 was passed in 1997. As the President and the Chancellors of the University of California explained in an *amicus* brief filed in *Fisher II*, despite the implementation of numerous race-neutral approaches that aimed to boost minority representation, "the enrollment rates for underrepresented minorities still have not rebounded at UC's most selective campuses" since 1997, and "the overall enrollment figures at UC have not kept pace with the demographic changes in California." Br. of the President and the Chancellors of the Univ. of Cal. as *Amici Curiae* in Supp. of Resp's at 22, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) (No. 14-981), 2015 WL 6735847.

Predictably, at the University of California's most selective campuses the burdens of mandated race-blind admissions weigh most heavily on the shoulders of underrepresented minority students. A survey administered by the university showed that African-American and Latinx students at UC's most selective and least diverse campuses "report[ed] feeling that students of their race are not respected" at "substantially higher percentages" than at UC's most diverse campuses. *Id.* at 32; *see also* Adriane Kayoko Peralta, *A Market Analysis of Race-Conscious University Admissions for Students of Color*, 93 Denv. L. Rev. 173, 217 (2015) ("[T]he hidden costs of racial isolation … are greater in race-neutral settings because there are fewer students

10

of color. Considering all of these factors, a student of color has a better chance at thriving at a race-conscious college.").

Nor would mechanistic admissions plans that rely solely on purportedly objective factors like college entrance test scores or GPA provide workable means of attaining a diverse student body. Such an approach would not just result in requiring the admission of far more students than *Amici* are able to serve, it would also be at odds with *Amici*'s educational missions. As the Supreme Court explained in *Grutter*, guaranteed admissions plans are not workable race-neutral alternatives for many universities because they "preclude the university from conducting the individualized assessments necessary to assemble a student body that is not just racially diverse, but diverse along all the qualities valued by the university." *Grutter*, 539 U.S. at 340. For *Amici*, the assumption embodied in mechanistic alternatives—*i.e.*, that numerical measures are the only or even the best gauge of an applicant's potential—is simply incorrect. An exclusive focus on quantifiable factors is entirely inconsistent with *Amici*'s evaluation of the qualifications of the whole applicant, as well as how the applicant would contribute to fulfilling the educational mission of the institution. Moreover, some have voiced concerns that standardized tests favor affluent students at the expense of students from disadvantaged backgrounds. No mechanical formula can capture the breadth of experiences, interests, and viewpoints that *Amici* seek in their applicants, and the imposition of such admission policies would be entirely inconsistent with *Amici*'s educational missions.

A "race-blind" version of holistic review would also defeat the purpose of a truly individualized assessment for many applicants. The central purpose of a holistic approach

to admissions is to understand each applicant as a multifaceted individual, with unique talents, experiences, and opinions to contribute to the diversity of the student body. It would be entirely antithetical to this approach to ignore a facet of an applicant's identity that may, to that individual, play an essential role in shaping his or her outlook and experience. A person's race often plays a role in shaping personal identity, *see Parents Involved*, 551 U.S. at 787 (Kennedy, J., concurring in part and concurring in the judgment), and a categorical bar on its consideration would severely hinder *Amici*'s ability to consider each individual applicant on his or her own terms. All applicants have the opportunity to have considered, as part of their application, any characteristics that they deem relevant. For many applicants, that includes race and ethnicity. For many, distinct personal experiences or characteristics ranging from disability, age, veteran's status, gender identity, first generation educated, immigrant status, or a wide range of other human distinctions may explain how the applicant can contribute to diversity and broaden the understanding and perspectives of fellow students. Moreover, the unique ways in which a person's race and ethnicity interact with other characteristics and experiences can make it impossible to consider these variables in isolation. Universities should not be ordered to blind themselves to race and ethnicity as they seek to gain insight into each applicant and to build a class that is more than the sum of its parts.

Reliance on race-neutral measures alone is an inadequate substitute for individualized, holistic review that takes account of race and ethnicity in the manner approved of by *Grutter*. *Amici* share the hope that someday "progress toward nondiscrimination and genuinely equal opportunity will make it safe to sunset affirmative action," *Grutter*, 539 U.S. at 346 (Ginsburg, J., concurring). But no race-neutral

alternative can presently replace race-conscious individualized and holistic review in effectuating *Amici*'s compelling interest in the educational benefits that follow from a diverse student body.

III. **It Would Be an Extraordinary Intrusion to Mandate the Use of One Particular Method of Selection Here or Prohibit All Consideration of Race in the Admissions Process.**

*Amici* require that students at their institutions be capable of excelling at demanding coursework, but their missions extend beyond that singular goal. They aim to develop active and engaged citizens equipped to address the problems of a rapidly evolving world—training future city, state, national, and international leaders in every field of endeavor, including the arts, humanities, government, science, and business.

To accomplish this, *Amici* must be able to compose a diverse student body. No Supreme Court decision prescribes that private institutions of higher education must employ any one particular set of criteria or method for admission, nor does any decision proscribe those institutions from considering race as one factor among many in seeking to obtain that diversity. Indeed, the Supreme Court has repeatedly held that a university is entitled to "considerable deference" in defining "intangible characteristics, like student body diversity, that are central to its identity and educational mission." *Fisher II*, 136 S. Ct. at 2214; *see also Fisher I*, 570 U.S. at 311 (acknowledging that "*Grutter* calls for deference to the University's conclusion, based on its experience and expertise, that a diverse student body would serve its educational goals." (internal quotation marks omitted)). This deference offers universities the flexibility to "provide that atmosphere which is most conducive to speculation, experiment, and creation," an issue that inevitably "leads to the question of who may be admitted to study." *Fisher I*, 570 U.S. at

13

308 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in the judgment) (internal quotation marks omitted) (alteration in original)).

Admissions decisions are essentially educational judgments that are protected by the First Amendment and entitled to deference from the courts. "Academic freedom . . . long has been viewed as a special concern of the First Amendment," and "[t]he freedom of a university to make its own judgments as to education includes the selection of its student body." *Bakke*, 438 U.S. at 312 (opinion of Powell, J.). Exercise of this inherently academic judgment is a core element of "the expansive freedoms of speech and thought associated with the university environment." *Grutter*, 539 U.S. at 329. As a result, it should be the institutions themselves that evaluate how diversity should be defined within their academic communities. *Parents Involved*, 551 U.S. at 792 (Kennedy, J., concurring in part and concurring in the judgment) ("[P]recedent support[s] the proposition that First Amendment interests give universities particular latitude in defining diversity"). And once the educational institutions make that inherently academic determination, courts should heed "the importance of avoiding second-guessing of legitimate academic judgments." *Univ. of Pa. v. EEOC*, 493 U.S. 182, 199 (1990). To that end, this court should affirm the basic principle that educational institutions have the requisite expertise and the right to make the inherently academic judgments on how to set criteria for their student admissions and in particular, what kind, quality, or extent of diversity will best enhance the educational experience of students and allow those students to flourish. *See Grutter*, 539 U.S. at 328 ("The ... educational judgment that such diversity is essential to its educational mission ... [is a] complex educational judgment[] in an area that lies primarily within the expertise of the university."). It would be an

extraordinary infringement on universities' academic freedom to decree that institutions of higher education cannot consider race at all in seeking to obtain that diversity.

Of course, *Amici* acknowledge that there are clear boundaries regarding how goals of diversity may be *pursued*. A quota system, for example, "would amount to outright racial balancing, which is patently unconstitutional." *Fisher I*, 570 U.S. at 311 (quoting *Grutter*, 539 U.S. at 330). Likewise, an admissions program that treated race or ethnicity as "*automatically* ensur[ing] a specific and identifiable contribution to a university's diversity" would fall outside the scope of permissible consideration of race in university admissions. *Gratz v. Bollinger*, 539 U.S. 244, 271 (2003) (emphasis added). But neither of those concerns is triggered where admissions programs are specifically designed to advance the very types of diversity that institutions have determined most effectively contribute to students' educational experiences and that take race into account only as "one factor among many." *Grutter*, 539 U.S. at 340.

The admissions policies of *Amici* are reflective of an educational judgment that a student body that is diverse in perspectives, viewpoints, backgrounds, and experiences benefits students' educational experiences. The determination of what that diversity consists of is entitled to significant deference. These admissions policies, inspired by the Harvard Plan first extolled by Justice Powell in *Bakke* and adopted by the Court as constitutionally permissible in *Grutter*, are narrowly tailored to the compelling interest of enrolling a diverse student body. The Supreme Court has long held that independent universities like *Amici* are entitled to consider race and ethnicity as one factor among many in the admissions process; this Court should adhere to those rulings.

15

## CONCLUSION

The Court should affirm that institutions of higher education may employ holistic admissions programs that are not blind to race as set forth by the Supreme Court in *Grutter* and *Fisher II*.

Respectfully Submitted,

/s/ *Matthew S. Hellman*
MATTHEW S. HELLMAN
   (PRO HAC VICE PENDING)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
+1 202 639 6000 (telephone)
+1 202 639 6066 (facsimile)
Mhellman@jenner.com

/s/ *Seth B. Orkand*
SETH B. ORKAND (BBO NO. 669810)
DEMEO LLP
200 State Street
Boston, MA 02109
+1 617 263 2600 (telephone)
+1 617 263 2300 (facsimile)
sorkand@DemeoLLP.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via mail to those indicated as non-registered participants on July 30, 2018.

*/s/ Seth B. Orkand*
Seth B. Orkand