## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:14-cv-14176-ADB |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | |
| Defendant. | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1 and the Court's orders, *see* Docs. 387, 407, Plaintiff Students for Fair Admissions ("SFFA") responds to the statement of material facts of Defendant President and Fellows of Harvard College ("Harvard"). Any alleged "undisputed facts" that are not disputed herein are assumed to be true solely for purposes of the pending motion for summary judgment. SFFA reserves all rights to contest any and all of Harvard's alleged "undisputed facts" should this case go forward following the Court's ruling on SFFA's motion for summary judgment.

## RESPONSES

### I.     Admission To Harvard

#### A.     Harvard's Competitive Admissions Pool

1.      More than 37,000 people applied to Harvard College for undergraduate admission to the Class of 2019. Declaration of Felicia H. Ellsworth in Support of Defendant's Motion for Summary Judgment ("Ellsworth Declaration"), Ex. 33 ¶ 29 (Card Report).

**Response:** Undisputed.

2.      2,003 applicants were offered admission to the Class of 2019. Ex. 33 ¶ 29 (Card Report).

**Response:** Undisputed.

3.      42,749 people applied for undergraduate admission to the Class of 2022. Ex. 82 (Harvard Gazette, *1,962 Admitted to Class of '22* (Mar. 28, 2018)).

**Response:** SFFA does not dispute that the cited article states that 42,749 people applied for undergraduate admission to the Class of 2022. Because there was no discovery into Harvard's 2018-2019 admissions cycle, SFFA lacks sufficient knowledge to verify these facts.

4.      1,962 applicants were offered admission to the Class of 2022. Ex. 82 (Harvard Gazette, *1,962 Admitted to Class of '22* (Mar. 28, 2018)).

**Response:** SFFA does not dispute that the cited article states that 1,962 applicants were offered admission to the Class of 2022. Because there was no discovery into Harvard's 2018-2019 admissions cycle, SFFA lacks sufficient knowledge to verify these facts.

5.      There were approximately 26,000 domestic applicants for admission to the Class of 2019. Ex. 33 ¶ 30 & Card Ex. 1 (Card Report).

**Response:** Undisputed.

6.      More than 8,000 domestic applicants to the Class of 2019 had perfect converted GPAs (according to Harvard's GPA index, which creates a standardized metric across high schools). Ex. 33 ¶ 31 & Card Ex. 2 (Card Report).

**Response:** Undisputed.

7.      Approximately 3,500 domestic applicants to the Class of 2019 had perfect SAT math scores; approximately 2,700 had perfect SAT verbal scores; and approximately 2,300 had perfect SAT writing scores. Ex. 33 ¶ 31 & Card Ex. 2 (Card Report).

**Response:** Undisputed.

8.     In total, more than 5,000 domestic applicants to the Class of 2019 had a perfect math or verbal SAT score. Ex. 33 ¶ 31 & Card Ex. 2 (Card Report).

**Response:** Undisputed.

9.     625 domestic applicants earned a perfect composite score on the ACT and 361 domestic applicants earned a perfect 2400 on the SAT. Ex. 33 at ¶ 31 & Card Ex. 2 (Card Report).

**Response:** Undisputed.

10.     Of the domestic applicants to the Class of 2019, approximately 15,000 had an average SAT Subject Test score at or above 700. Ex. 33 ¶ 31 & Card Ex. 2 (Card Report).

**Response:** Undisputed.

**B.     The Application Folder**

11.     Students may apply to Harvard through the Early Action program, which typically has a November 1 deadline, or Regular Decision, which typically has a January 1 deadline.  Ex. 75 (Application Timeline, Harvard College Admissions & Financial Aid).

**Response:** Undisputed.

12.     The process for considering applications does not meaningfully differ depending on whether the application is submitted in the Early Action or the Regular Decision round. Ex. 1 at 208:14-20 (McGrath 2015 Dep.); Ex. 33 ¶ 45 n.22 (Card Report).

**Response:** SFFA disputes Harvard's characterization of the cited testimony. SFFA admits that the procedural steps for considering applications is generally the same whether the student applies early action or regular decision. *See* SFFA Statement of Material Facts ("SMF") ¶ 58.

13.     Applicants may submit a Common Application, Universal College Application, or Coalition Application. These applications are accepted by more than 400 colleges and universities. Ex. 55 at HARV00001405 (Interviewer Handbook, 2014-2015); Ex 74 (Harvard College Admissions

& Financial Aid, Application Requirements).

**Response:** Undisputed.

14.    Harvard requires applicants to complete a short supplement to indicate their interest—and the strength of that interest—in a field of academic study, career, and particular extracurricular activities. Ex. 55 at HARV00001405 (Interviewer Handbook, 2014-2015).

**Response:** Undisputed.

15.    Applicants may submit scholarly work, recordings of music or dance performances, or artwork. Ex. 55 at HARV00001405 (Interviewer Handbook, 2014-2015); Ex. 1 at 95:14-23, 98:11-18, 181:17-182:2 (McGrath 2015 Dep.); Ex. 48 at HARV00005430 (Harvard 2015 Application Supplement).

**Response:** Undisputed.

16.    The Common Application, Universal College Application, and Coalition Application permit applicants to disclose their race or ethnic background in their application. Ex. 1 at 145:11-147:12 (McGrath 2015 Dep.); Ex 49 at HARV00003562 (The Common Application); Ex. 50 at HARV00003557 (Universal College Application); Ex. 95 (Coalition Application).

**Response:** Undisputed.

17.    Applicants may also include information about their race or ethnicity in other parts of their applications, such as the personal essay. Ex. 1 at 150:7-23 (McGrath 2015 Dep.).

**Response:** Undisputed.

18.    Harvard does not require applicants to disclose their race when applying, and approximately 10,000 domestic applicants to the Classes of 2014 to 2019 chose not to disclose their race. Ex. 1 at 145:11-147:12, 149:18-150:23, 152:19-153:2 (McGrath 2015 Dep.); Ex. 33 ¶¶ 7, 111 (Card Report).

**Response:** Undisputed but incomplete. Harvard may learn about the race or ethnicity in

other parts of the application, such as the applicant's name, birthplace of parents, personal essay, teacher recommendations, alumni interview reports, etc.  Ellsworth Ex. 1, McGrath 150:7-23; SFFA SMF ¶ 184.

19.     Harvard does not publish any guidelines regarding how applicants should disclose their race or ethnicity if they choose to do so. *See* Ex. 26 at 239:18-240:2 (Fitzsimmons Dep.); Ex. 1 at 145:11-147:12, 149:18-150:23, 152:19-153:2 (McGrath 2015 Dep.).

**Response:** Disputed. The evidence cited does not support the proposition that "Harvard does not publish any guidelines regarding how applicants should disclose their race or ethnicity if they choose to do so."

20.     Applicants may select more than one race or ethnicity in their application. Ex 49 at HARV00003562 (The Common Application); Ex. 50 at HARV00003557 (Universal College Application); Ex. 95 (Coalition Application).

**Response:** Undisputed.

21.     Most applicants are interviewed by a Harvard alumnus or alumnae, who then submits an interview report to the Admissions Office. Ex. 55 at HARV00001425-27 (Interviewer Handbook 2014-2015); Ex. 1 at 55:4-56:7 (McGrath 2015 Dep.).

**Response:** Undisputed.

22.     A complete application file or folder will typically include:

- the applicant's name, age, sex, address, citizenship, place of birth, and race (if the applicant chooses to disclose it);

- information about the applicant's family, including the educational attainment of the applicant's parents and siblings and the occupation of the applicant's parents;

- the applicant's scores on standardized tests, including the SAT or ACT, SAT Subject Tests, and AP Exams;

- the applicant's high school transcripts, as well as the applicant's reported grade point average;

- a document prepared by the applicant's high school that provides information about the high school, such as the number of students who go on to college, the courses available at the high school, the economic and demographic profile of the community served by the school, the percentage of students who receive free or reduced-price lunch, and other pertinent information;

- one or more essays written by the applicant;

- a letter from the applicant's high school guidance counselor;

- at least two letters of recommendation from high school teachers, and frequently additional letters of recommendation from teachers, mentors, supervisors, or others;

- in many cases, a detailed, multi-page evaluation from a Harvard alumni interviewer who has met with the applicant in person; and

- the applicant's answers to questions about his or her intended academic concentration, extracurricular and athletic participation, and expected post-college career.

Ex. 1 at 94:15-96:1, 126:11-127:21 (McGrath 2015 Dep.); Ex. 48 (Harvard 2015 Application Supplement); Ex. 50 (Universal College Application); Ex 49 (The Common Application); Ex. 55 at HARV00001429-38 (Interviewer Handbook 2014-15); Ex. 57 (Reading Procedures, Class of 2018); *see generally* Ex. 61 (redacted application files).

**Response:** Undisputed.

### C.   Admissions Office Review

23.    Most applicants are academically qualified to attend Harvard. Ex. 55 at HARV00001401 (Interviewer Handbook 2014-2015).

**Response:** Disputed. Harvard provides no statistical evidence or expert analysis to support this statement. SFFA disputes that most applicants are comparably academically qualified to attend Harvard. *See* Arcidiacono Dec., Ex. A ("Arcidiacono Rep.") 33, 36; Arcidiacono Dec., Ex. B ("Arcidiacono Rebuttal"), App. C, Table 4.1R; *see also* SFFA SMF ¶¶ 595-597.

24.     A significant portion of applicants present strong personal and extracurricular credentials. Ex. 55 at HARV00001401 (Interviewer Handbook 2014-2015).

**Response:** Disputed. SFFA disputes that a "significant proportion" of applicants present comparably strong extracurricular credentials. *See* Arcidiacono Rep. 36-37; Arcidiacono Rebuttal, App. C, Table 4.1R; SFFA SMF ¶ 600. SFFA disputes that Harvard is measuring "strong personal credentials" in a fair and nondiscriminatory manner. Arcidiacono Rep. 37-38; *see also* SFFA SMF ¶¶ 606-623.

25.     To select candidates for admission, Harvard takes an individualized approach to admissions that accounts for the whole person. Ex. 26 at 50:16-20, 51:24-52:20, 233:12-234:12 (Fitzsimmons Dep.); Ex. 52 (2012 Casebook); Ex 53 (2012 Casebook Discussion Guide); Ex. 55 at HARV00001400-02 (Interviewer Handbook 2014-2015).

**Response:** Disputed. Harvard's decisions are not "individualized" because Harvard awards large racial preferences to African-American and Hispanic applicants, *see* SFFA SMF ¶¶ 735-743; imposes penalties on Asian-American applicants, *see, e.g.,* SFFA SMF ¶¶ 664-677; and engages in racial balancing, SFFA SMF ¶¶ 230-264. Among other things, Harvard makes admissions decisions based on, among other things, ██████████████████████████████████ ██████████████ Connolly Ex. 16, McGrath 248:18-249:2; SFFA SMF ¶¶ 254-255.

26.     Each file is viewed "individually based on achievement and areas of excellence." Ex. 12 at 60:23-24 (Donahue Dep.); *see also* Ex. 16 at 172:22-173:8.

**Response:** Disputed. Applicants are not admitted to Harvard based solely on "achievement

and areas of excellence." SMF ¶¶ 152-153. Harvard awards large racial preferences to African-American and Hispanic applicants, *see* SFFA SMF ¶¶ 735-743; imposes penalties on Asian-American applicants, *see, e.g.,* SFFA SMF ¶¶ 664-677; and engages in racial balancing, SFFA SMF ¶¶ 230-264. Moreover a student's race or legacy status is not an "achievement" or "area of excellence." *Id*.; Connolly Ex. 6, Donahue 125:17-127:1.

27.     Harvard considers each applicant's academic, extracurricular, and other accomplishments within the context they were achieved, which includes socioeconomic circumstances, family background, parental education levels and occupation, high school quality and opportunities, geography, and much more. Ex. 26 at 55:14-21, 200:24-202:10, 233:23-234:12 (Fitzsimmons Dep.); Ex. 12 at 46:6-48:5 (Donahue Dep.); Ex. 1 at 231:9-233:15 (McGrath 2015 Dep.); *see also* Ex. 55 at HARV00001400-02 (Interviewer Handbook 2014-2015).

**Response**: Disputed. Harvard does not consider each applicant's academic, extracurricular, and other accomplishments "within the context they were achieved." Harvard awards large racial preferences to African-American and Hispanic applicants, *see* SFFA SMF ¶¶ 735-743; imposes penalties on Asian-American applicants, *see, e.g.,* SFFA SMF ¶¶ 664-677; and engages in racial balancing SFFA SMF ¶¶ 230-264. Moreover, Harvard provides almost no preference to certain disadvantaged applicants; African-Americans receive no added benefit from being disadvantaged. Arcidiacono Rep. 64; SFFA SMF ¶ 741-42.

28.     Harvard looks for "distinguishing excellences," which may be reflected in (among other things) ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ Ex. 55 at HARV00001400-02 (Interviewer Handbook 2014-2015); *see also* Ex. 26 at 261:19-262:14 (Fitzsimmons Dep.).

**Response:** Disputed. Harvard claims to look for such "distinguishing excellences" but

Harvard awards large racial preferences to African-American and Hispanic applicants, *see* SFFA SMF ¶¶ 735-743; imposes penalties on Asian-American applicants, *see, e.g.,* SFFA SMF ¶¶ 664-677; and engages in racial balancing, SFFA SMF ¶¶ 230-264. Harvard itself even identifies a student's race and legacy status as "distinguishing excellences." Ellsworth, Ex. 55 at HARV0001402.

29.     Harvard takes an expansive approach to distinguishing excellences, which "could be an excellence of any kind one could imagine." Ex. 26 at 261:21-22 (Fitzsimmons Dep.).

**Response:** Disputed**.** Harvard claims to look for such "distinguishing excellences" but Harvard awards large racial preferences to African-American and Hispanic applicants, *see* SFFA SMF ¶¶ 735-743; imposes penalties on Asian-American applicants, *see, e.g.,* SFFA SMF ¶¶ 664-677; and engages in racial balancing, SFFA SMF ¶¶ 230-264. Moreover, certain "distinguishing excellences" identified by Harvard (such as legacy status and race) are not "excellences" achieved by the student. Ellsworth, Ex. 55 at HARV0001402.

30.     New admissions officers participate in a rigorous training program that lasts for many months, which includes reading and discussing past files, having a second admissions officer read and evaluate the new admissions officer's first 50 to 100 application files, and additional monitoring for a year or more to ensure that the new admissions officer is properly evaluating files. Ex. 26 at 234:20-236:2 (Fitzsimmons Dep.).

**Response**: SFFA disputes the characterization of the training program as "rigorous." SFFA does not dispute that Harvard's training procedures includes having a second admissions officer's reading and evaluation of a new officer's first 50-100 files.

31.     Training for admissions officers emphasizes the need to take an individualized approach to evaluating applicants by considering all factors in the application and considering how the applicant will contribute to the overall class. Ex. 52 (2012 Casebook); Ex 53 (2012 Casebook Discussion Guide); Ex. 6 at 33:12-35:1; Ex. 26 at 234:15-236:2, 238:4-12, 238:23-239:17 (Fitzsimmons

Dep.).

    **Response**: Disputed. The evidence cited does not support the proposition that the training materials "emphasize the need to take an individualized approach to evaluating applicants by considering all factors in the application and considering how the applicant will contribute to the overall class." SFFA further disputes this statement because, among other reasons, admissions officers are instructed to ███████████████████████████████████████████ ████. SFFA SMF ¶¶ 200-206.

    32.    Guidelines for alumni interviewers emphasize the need to take an individualized approach to evaluating applicants by considering all factors in the application and considering how the applicant will contribute to the overall class. HARV00001400-02, HARV00001424-25 (Interviewer Handbook 2014-2015).

    **Response:** Disputed. The evidence cited does not support the statement that "[g]uidelines for alumni interviewers emphasize the need to take an individualized approach to evaluating applicants by considering all factors in the application and considering how the applicant will contribute to the overall class." Harvard's own materials also highlight an applicant's race or ethnicity and legacy status as worthy of special attention. Ellsworth, Ex. 55 at HARV0001402.

    33.    Harvard has a Standing Committee on Admissions and Financial Aid in Harvard College ("the Standing Committee"), which comprises College faculty members. Ex. 1 at 70:20-71:12 (McGrath 2015 Dep.); Ex. 94 (Standing Committees Listed Alphabetically, Harvard University Office of the Secretary).

    **Response:** Undisputed.

    34.    The Standing Committee's primary responsibility is the determination of admissions and financial aid policy and the representation of that policy to the faculty. *See* Ex. 1 at 70:20-72:17 (McGrath 2015 Dep.); Ex. 94 (Standing Committees Listed Alphabetically, Harvard University

Office of the Secretary).

     **Response:** Undisputed.

     35.    The Standing Committee meets twice per year. Ex. 1 at 72:4-17 (McGrath 2015 Dep.).

     **Response:** Undisputed.

     36.    Harvard organizes its review of application files into approximately 20 geographical regions referred to as "dockets." Ex. 6 at 42:18-23; Ex. 1 at 177:9-19 (McGrath 2015 Dep.); Ex. 55 at HARV00001407 (Interviewer Handbook 2014-2015); Ex. 26 at 231:14- 233:7 (Fitzsimmons Dep.); Ex. 51 at HARV0000371 (Reading Schedule).

     **Response:** Undisputed.

     37.    Each docket is intended to include a roughly similar number of applications.  Ex. 55 at HARV00001407 (Interviewer Handbook 2014-2015).

     **Response:** Undisputed.

     38.    A subcommittee of admissions officers is responsible for the initial evaluation of all candidates from a particular docket. Ex. 55 at HARV00001407-08 (Interviewer Handbook 2014-2015); Ex. 6 at 42:18-23.

     **Response:** Undisputed.

     39.    A subcommittee generally includes three to six area representatives and a docket chair, who is a senior admissions officer. Ex. 55 at HARV00001408 (Interviewer Handbook 2014-2015).

     **Response:** Undisputed.

     40.    Admissions officers are assigned to specific areas within their dockets, and they are frequently described as the "area representative," "area person," or "first reader." Ex. 55 at HARV00001408 (Interviewer Handbook 2014-2015).

**Response:** Undisputed.

41.     As applications are received, the area person reads all the application folders from high schools in his or her area. Ex. 55 at HARV00001408 (Interviewer Handbook 2014-15); Ex. 1 at 158:12-21, 172:11-173:9: (McGrath 2015 Dep.); Ex. 26 at 233:8-14 (Fitzsimmons Dep.).

**Response:** Undisputed.

42.     Admissions officers develop a deep understanding of the high schools in their assigned areas, which allows them to develop and apply specific knowledge about schools, courses, and teachers, regarding academic rigor, grading practices, and school recommendations. Ex. 26 at 231:16-234:12 (Fitzsimmons Dep.).

**Response:** Disputed. The evidence cited does not support the statement that admissions officers "develop a deep understanding of the high schools in their assigned areas, which allows them to develop and apply specific knowledge about schools, courses, and teachers, regarding academic rigor, grading practices, and school recommendations."

43.     After carefully reviewing all the material in the application folder, the first reader assigns academic, extracurricular, athletic, and personal ratings to the applicant. Ex. 57 at HARV00015414-15 (Reading Procedures, Class of 2018); Ex. 26 at 238:23-239:17 (Fitzsimmons Dep.); Ex. 1 at 158:12-159:5 (McGrath 2015 Dep.).

**Response:** SFFA disputes the characterization that every application is "carefully" reviewed. SFFA admits that the first reader assigns academic, extracurricular, athletic, and personal ratings to the applicant.

44.     The first reader also rates the strength of recommendations written by the high school guidance counselor and at least two teachers. Ex. 57 at HARV00015416 (Reading Procedures, Class of 2018); Ex. 26 at 239:7-9 (Fitzsimmons Dep.).

**Response:** Undisputed.

45.     The first reader also assigns an overall rating to each applicant. Ex. 57 at HARV00015414 (Reading Procedures, Class of 2018).

**Response:** Undisputed.

46.     The numerical ratings assigned to applicants generally range between 1 and 4 in all categories. Ex. 1 at 159:6-23 (McGrath 2015 Dep.).

**Response:** Undisputed.

47.     The numerical rating of 1 is the best rating that can be assigned. Ex. 1 at 159:24-160:12 (McGrath 2015 Dep.); *see also* Ex. 57 at HARV00015414-16 (Reading Procedures, Class of 2018).

**Response:** Undisputed.

48.     Admissions officers may add a plus or a minus to the numerical rating, and a plus is better than a minus (*i.e.*, a "2+" is better than a "2-"). Ex. 1 at 159:24-160:12 (McGrath 2015 Dep.).

**Response:** Undisputed, but incomplete. Readers are instructed to uses pluses and minuses only for ratings of "2" or "3." *See* Connolly Ex. 29, at HARV00001443.

49.     The academic rating summarizes the applicant's academic achievement and potential based on grades, testing results, letters of recommendation, academic prizes, and any submitted academic work. Ex. 1 at 161:12-162:1 (McGrath 2015 Dep.); Ex. 57 at HARV00015414-15 (Reading Procedures, Class of 2018).

**Response:** Undisputed.

50.     A "1" academic rating is characterized as "█████████████████████████████████████████████████████████████████████████████████████" Ex. 57 at HARV00015414 (Reading Procedures, Class of 2018); *see also* Ex. 1 at 168:17-169:3 (McGrath 2015 Dep.).

**Response:** Undisputed.

51.     In many circumstances, an applicant receiving a "1" academic rating has submitted academic work of some kind that is reviewed by a faculty member. *See* Ex. 1 at 168:17-169:3 (McGrath 2015 Dep.).

**Response:** Disputed. The evidence cited does not support the statement that in many circumstances an applicant receiving a "1" academic rating has "submitted academic work of some kind that is reviewed by a faculty member."

52.     An applicant receiving a "2+" academic rating is typically an applicant with perfect, or near-perfect, grades and testing, but no evidence of substantial scholarship or academic creativity. Ex. 1 at 168:8-169:3 (McGrath 2015 Dep.).

**Response:** Disputed. The evidence cited does not support the statement that an applicant receiving a "2+" typically has "no evidence of substantial scholarship or academic creativity."

53.     The extracurricular rating summarizes the strength of the applicant's involvement in activities during high school and potential to contribute outside the classroom at Harvard. Ex. 1 at 163:5-15 (McGrath 2015 Dep.); Ex. 57 at HARV00015415 (Reading Procedures, Class of 2018).

**Response:** Undisputed.

54.     A "1" extracurricular rating is characterized as " ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ " Ex. 57 at HARV00015415 (Reading Procedures, Class of 2018); *see also* Ex. 1 at 169:7-11, 170:7-16 (McGrath 2015 Dep.).

**Response:** Undisputed.

55.     An applicant who receives a "2" extracurricular rating is typically an applicant with significant school, and possibly regional accomplishments: for example, an applicant who was the student body president or captain of the debate team and the leader of multiple additional clubs. Ex. 57 at HARV00015415 (Reading Procedures, Class of 2018); Ex. 1 at 169:23-170:6 (McGrath 2015

Dep.).

  **Response:** Undisputed.

  56. An extracurricular rating of 5 is used to indicate that the applicant has family responsibilities at home or very limited resources that make it unlikely that the applicant could participate in extracurricular or other activities. Ex. 1 at 159:10-14 (McGrath 2015 Dep.); Ex. 57 at HARV00015415 (Reading Procedures, Class of 2018).

  **Response:** Undisputed.

  57. The athletic rating summarizes the strength of the applicant's potential contributions to athletics at Harvard, as well as the applicant's degree of participation in high school. Ex. 1 at 163:16-164:8 (McGrath 2015 Dep.); Ex. 57 at HARV00015415 (Reading Procedures, Class of 2018).

  **Response:** Undisputed.

  58. A "1" athletic rating is used to refer to an athlete recruited by a Harvard varsity team. Ex. 57 at HARV00015415 (Reading Procedures, Class of 2018); Ex. 1 at 163:18-164:3 (McGrath 2015 Dep.).

  **Response:** Undisputed.

  59. The personal rating summarizes the applicant's personal qualities based on all aspects of the application, including essays, letters of recommendation, the alumni interview report, personal and family hardship, and any other relevant information in the application. Ex. 1 at 164:11-165:2 (McGrath 2015 Dep.); Ex. 26 at 245:18-246:20 (Fitzsimmons Dep.).

  **Response:** Disputed. The cited evidence does not support the statement that the personal rating is "summarizes the applicant's personal qualities based on all aspects of the application, including … personal and family hardship." For example, there is statistical evidence that race affects the personal rating. *See* SFFA SMF ¶¶ 89-90, 216; Arcidiacono Rebuttal 22-27, Tables B.6.3R & B.6.7R; Arcidiacono Rep. 55-60 & Table 5.6.

60.     Many characteristics are valued in the assignment of the personal rating, and admissions officers may assign ratings based on their assessment of the applicant's humor, sensitivity, grit, leadership, integrity, helpfulness, courage, kindness and many other qualities. Ex. 1 at 164:11-165:2 (McGrath 2015 Dep.); Ex. 25 at 359:24-360:9 (McGrath 2017 Dep.); *see also* Ex. 55 at HARV00001401-1402 (Interviewer Handbook 2014-2015).

**Response:** SFFA disputes Harvard's characterization of the cited materials. SFFA admits that first readers determine the personal score by examining a variety of subjective factors, including those that are listed and others that are not. For example, there is statistical evidence that race affects the personal rating. *See* SFFA SMF ¶¶ 89-90, 216; Arcidiacono Rebuttal 22-27, Tables B.6.3R & B.6.7R; Arcidiacono Rep. 55-60 & Table 5.6.

61.     Admissions officers do not take race into account when assigning the personal rating. Ex. 1 at 165:3-18 (McGrath 2015 Dep.); Ex. 25 at 359:12-15 (McGrath 2017 Dep.); Ex. 17 at 60:14-61:11; Ex. 3 at 192:3-10; Ex. 6 at 72:10-21; Ex. 14 at 21:25-22:4; Ex. 9 at 80:13- 81:1.

**Response:** Disputed. At least one admissions officer (█████████████) takes race into account when calculating all four profile ratings (academic, extracurricular, athletic, and personal). Ex. 14, █████ 39:17-44:9; 50:2-52:7; *see* SFFA SMF ¶ 216. Further, there is evidence that race plays a substantial role in the formation of the personal rating, showing large bonuses for African-American applicants and a penalty for Asian-American applicants. Arcidiacono Rebuttal 22-27, Tables B.6.3R & B.6.7R; Arcidiacono Rep. 55-60 & Table 5.6.

62.     The ratings for recommendations, referred to as "school support" in the Admissions Office, characterize the strength of counselor and teacher recommendations. Ex. 57 at HARV00015416 (Reading Procedures, Class of 2018).

**Response:** Disputed. SFFA admits that Harvard instructs readers to assess the strength of the counselor and teacher recommendations, but the cited evidence does not support the statement

16

that they accurately do so.

63.     A "1" rating for school support signals "███████████████████████

███████████████████████" Ex. 57 at HARV00015416 (Reading Procedures, Class

of 2018).

**Response:** Undisputed.

64.     The overall rating summarizes the strength of the application taking all information

into account. Ex. 57 at HARV00015414 (Reading Procedures, Class of 2018); Ex. 26 at 249:6-25

(Fitzsimmons Dep.); Ex. 1 at 172:5-173:24 (McGrath 2015 Dep.).

**Response:** Disputed. SFFA admits that Harvard purports to summarize the strength of the

candidate in assigning an overall rating, but the cited evidence does not support the statement that

they accurately do so. Moreover, there is evidence that race heavily influences the overall rating. SFFA

SMF ¶¶ 624-628; Arcidiacono Rebuttal Tables 5.7R, B.6.4R, B.6.8R, B.6.9R, B.6.10R.

65.     The overall rating is "not a formula" and does not involve "adding up" other ratings.

Ex. 26 at 249:18-25 (Fitzsimmons Dep.).

**Response:** Undisputed.

66.     After close review of the application, the first reader may also write short prose

comments about the applicant. Ex. 57 at HARV00015414 (Reading Procedures, Class of 2018).

**Response:** Disputed. The cited evidence does not support the statement that all applications

receive a "close review."

67.     After the first reader's review is complete, the first reader may send the file to the

docket chair for further review. Ex. 1 at 173:18-21 (McGrath 2015 Dep.).

**Response:** Undisputed.

68.     If the file is passed on for further review, the chair will also read the file closely,

assigning ratings in the same categories as the first reader and adding additional written comments.

Ex. 1 at 173:21-24, 178:18-179:1 (McGrath 2015 Dep.).

**Response:** Disputed. The cited evidence does not support the statement that the chair reads every file "closely."

69.    The first reader and chair may assign different scores. Ex. 1 at 173:21-24, 178:18-179:1 (McGrath 2015 Dep.).

**Response:** Undisputed.

70.    The first reader's and the chair's scores as well as comments from any other readers are reflected on the application. Ex. 55 at HARV00001408 (Interviewer Handbook 2014-2015); Ex. 1 at 174:18-7 (McGrath 2015 Dep.); Ex. 61 (redacted application files)

**Response:** Undisputed.

71.    If the applicant has submitted material that Admissions Office staff believe would be best evaluated by a Harvard faculty member, such as an academic paper or a recording of a musical performance, the application may be sent to a faculty member (frequently but not always a member of the Standing Committee) for review and assessment. That faculty member's review (sometimes referred to as a "faculty read") is also included in the admissions folder. Ex. 1 at 75:20-78:3, 98:9-18, 170:7-16 (McGrath 2015 Dep.); Ex. 55 at HARV00001408 (Interviewer Handbook 2014-2015).

**Response:** Undisputed.

72.    The subcommittees then discuss applicants in meetings where the first reader summarizes for the subcommittee the strengths and weaknesses in each component of each candidate's application. Ex. 55 at HARV00001408 (Interviewer Handbook 2014-2015); Ex. 1 at 182:19-187:16 (McGrath 2015 Dep.).

**Response:** Undisputed.

73.    Subcommittee members discuss the case, and then decide as a group what recommendation to offer the full committee. Ex. 55 at HARV00001408 (Interviewer Handbook

2014-2015); Ex. 1 at 190:20-191:24 (McGrath 2015 Dep.).

**Response:** Undisputed but incomplete. Subcommittee members also discuss certain applications with Dean Fitzsimmons, who ██████████████████████████████████████ ████████████████████████████████. Ex. 9, Fitzsimmons 265:4-23. Dean Fitzsimmons' views receive substantial weight in admissions decisions. Ex. 151, HARV00066685; Connolly(2nd) Ex. 267, Donahue 243:23-246:8.

74.     The subcommittee examines each application several times to ensure that every application receives the same scrutiny, regardless of whether it was presented first or last. Ex. 55 at HARV00001408 (Interviewer Handbook 2014-2015).

**Response:** Disputed. The cited evidence does not support the statement that subcommittees examine "each application several times." ██████████████████████████████████████ ████████████████████████████████████████Applicants who do not receive a second evaluation or who are not competitive typically are not discussed by the subcommittee. Ex. 20, ██ 34:2-11, 38:3-6; Ex. 11, Howrigan 44:20-46:11.

75.     The subcommittee decides as a group whether to recommend to the full Admissions Committee that the applicant be admitted, and the degree of support expressed for candidates is also noted. Ex. 55 at HARV00001408 (Interviewer Handbook 2014-2015).

**Response:** Undisputed but incomplete. Subcommittee members' decisions are influenced by Dean Fitzsimmons, who ██████████████████████████████████████████ ████████ Ex. 9, Fitzsimmons 265:4-23; Ex. 151, HARV00066685; Connolly(2nd) Ex. 267, Donahue 243:23-246:8.

76.     After all subcommittees have decided which applications to recommend for admission, the full Admissions Committee, which includes approximately 40 members, meets to discuss and reach final decisions on applications. Ex. 1 at 190:11-19 (McGrath 2015 Dep.).

**Response:** Undisputed.

77.     The full committee includes all the admissions officers who read files, including Dean Fitzsimmons, Director McGrath, and the Director of Financial Aid. Ex. 12 at 227:24-228:15 (Donahue Dep.); Ex. 1 at 187:17-188:5 (McGrath 2015 Dep.).

**Response:** Undisputed.

78.     Members of the Standing Committee are invited to participate in all Admissions Office subcommittee meetings and all meetings of the full Admissions Committee when applicants are discussed. Ex. 1 at 74:14-75:14, 187:17-188:5 (McGrath 2015 Dep.).

**Response:** Undisputed.

79.     At the full Admissions Committee meeting, the area person who first read the application at issue presents the file, typically emphasizing the applicant's strengths. Ex. 1 at 193:16-194:3, 197:6-198:4 (McGrath 2015 Dep.).

 **Response:** Undisputed but incomplete. The full committee typically discusses only those applicants who are competitive. Applicants who receive low ratings and those who were not tentatively admitted by the subcommittees typically will not be discussed by the full committee. Ex. 6, Donahue 237:20-240:12; Ex. 16, McGrath 217:10-218:3.

80.     After the discussion is complete, the full committee decides whether to admit, reject, or waitlist the candidate. Ex. 1 at 193:16-194:5 (McGrath 2015 Dep.); Ex. 55 at HARV00001410 (Interviewer Handbook 2014-2015).

 **Response:** Undisputed.

81.     In both the subcommittee and full committee process, each admissions officer has an equal vote. Ex. 1 at 180:1-9, 193:16-194:5 (McGrath 2015 Dep.); Ex. 26 at 51:24-52:12 (Fitzsimmons Dep.).

 **Response:** SFFA disputes the characterization of the process. Although each admissions

20

officer has a vote, Dean Fitzsimmons' and Director McGrath's views receive "a lot of weight" in admissions decisions. Connolly(2nd) Ex. 267, Donahue 243:23-246:8; Ex. 151, HARV00066685.

## II.     Diversity And Harvard's Mission

82.     The Harvard College mission "is to educate the citizens and citizen-leaders for our society … through … the transformative power of a liberal arts and sciences education." Ex. 68 (*Mission Vision and History*, Harvard College, Harvard University).

**Response:** SFFA admits that the statement accurately quotes Harvard's mission statement, but disputes that its use of race is necessary to achieve its alleged mission. Kahlenberg Dec., Ex. A ("Kahlenberg Rep.") 5.

83.     Harvard believes that "[t]hrough a diverse living environment, where students live with people who are studying different topics, who come from different walks of life and have evolving identities, intellectual transformation is deepened and conditions for social transformation are created. From this we hope that students will begin to fashion their lives by gaining a sense of what they want to do with their gifts and talents, assessing their values and interests, and learning how they can best serve the world." Ex. 68 (*Mission Vision and History*, Harvard College, Harvard University).

**Response:** SFFA admits that the statement accurately quotes Harvard's mission statement, but disputes that its use of race is necessary to achieve its alleged goals.

84.     Harvard seeks to admit "students who are diverse on a variety of realms so that they play as important a part in educating one another through their experience together as we play in what we offer them within a classroom." Ex. 4 at 24:1-4 (Faust Dep.).

**Response:** Disputed. Harvard does not seek to admit students who are "diverse on a variety of realms" so that they "educat[e] one another through their experience together." Harvard awards large racial preferences to African-American and Hispanic applicants, *see* SFFA SMF ¶¶ 735-743;

imposes penalties on Asian-American applicants, *see, e.g.,* SFFA SMF ¶¶ 664-677, and engages in racial balancing, SFFA SMF ¶¶ 168-172, 230-264. Harvard also admits applicants based on factors that do not contribute to diversity and do nothing to help students "educat[e] one another," including giving preferences to, among others, the children of alumni, the children of donors or potential donors, and the children of staff and faculty. Ex. 190, HARV00097325-26; Ex. 83, HARV00015825-26; *see also* SFFA SMF ¶¶ 286-306.

85.     To achieve its educational mission, Harvard seeks to admit a class with diverse socioeconomic, geographic, and racial backgrounds; a broad range of academic, intellectual, and extracurricular interests and talents; and a variety of different life experiences that include overcoming hardship, engaging in public service, and much more. Ex. 8 at 71:18-22 (Khurana Dep.); Ex. 26 at 55:14-21, 200:24-201:22 (Fitzsimmons Dep.); Ex. 4 at 196:3-8 (Faust Dep.); Ex. 1 at 232:8-16 (McGrath 2015 Dep.); Ex. 55 at HARV00001401 (Interviewer Handbook 2014- 2015).

**Response:** Disputed. Harvard does not seek to "admit a class with diverse socioeconomic, geographic, and racial backgrounds; a broad range of academic, intellectual, and extracurricular interests and talents; and a variety of different life experiences that include overcoming hardship, engaging in public service, and much more." Harvard awards large racial preferences to African-American and Hispanic applicants, *see* SFFA SMF ¶¶ 735-743; imposes penalties on Asian-American applicants, *see, e.g.,* SFFA SMF ¶¶ 664-677; and engages in racial balancing, SFFA SMF ¶¶ 168-172, 230-264. Harvard admits applicants based on factors that do not promote these goals, including giving preferences to, among others, the children of alumni, the children of donors or potential donors, and the children of staff and faculty. Ex. 190, HARV00097325-26; Ex. 83, HARV00015825-26; *see also* SFFA SMF ¶¶ 286-306.

86.     In 1996, Harvard's then-President, Neil Rudenstine, wrote a report in which he explained the importance of diversity to Harvard's mission. Ex. 41 at HARV00030419,

HARV00030450 (Rudenstine Report).

**Response:** Undisputed.

87.     In 2015, Harvard College established a Committee to Study the Importance of Student Body Diversity, chaired by Dean Khurana. Ex. 45 at HARV00008048, HARV00008069 (Khurana Report); Ex. 8 at 163:19-164:10 (Khurana Dep.).

**Response:** Undisputed.

88.     The Committee examined how "diversity in the student body helps catalyze the intellectual, social, and personal transformations that are central to Harvard's liberal arts and science education." Ex. 45 at HARV00008049 (Khurana Report).

**Response:** SFFA does not dispute that report contains the quoted language, but the report and cited evidence is conclusory, created for litigation purposes, and a matter of opinion rather than fact. SFFA disputes that its use of race is necessary to achieve any of Harvard's alleged goals. SFFA SMF ¶¶ 851-882.

89.     The Committee "emphatically embrace[d] and reaffirm[ed] the University's long-held view that student body diversity—including racial diversity—is essential to our pedagogical objectives and institutional mission." Ex. 45 at HARV00008069 (Khurana Report).

**Response:** SFFA does not dispute that report contains the quoted language, but the report and cited evidence is conclusory, created for litigation purposes, and a matter of opinion rather than fact. SFFA disputes that its use of race is necessary to achieve any of Harvard's alleged goals. SFFA SMF ¶¶ 851-882.

90.     The Committee determined that diversity "enhances the education of all of our students, it prepares them to assume leadership roles in the increasingly pluralistic society into which they will graduate, and it is fundamental to the effective education of the men and women of Harvard College." Ex. 45 at HARV00008069 (Khurana Report).

**Response:** SFFA does not dispute that report contains the language, but the report and cited evidence is conclusory, created for litigation purposes, and a matter of opinion rather than fact. SFFA disputes that its use of race is necessary to achieve any of Harvard's alleged goals. SFFA SMF ¶¶ 851-882.

91.     The full Harvard Faculty of Arts and Sciences unanimously adopted the Committee's report. Ex. 71 (*Support for a Diverse Student Body*, Harvard Gazette (Feb. 16, 2016), https://news.harvard.edu/gazette/story/2016/02/support-for-a-diverse-student-body); Ex. 70 (*Faculty Unanimously Endorse Student Body Diversity*, Harvard Crimson (Feb. 3, 2016)).

**Response:** Undisputed.

92.     The Faculty of Arts and Sciences includes Harvard College, the Graduate School of Arts and Sciences, the School of Engineering and Applied Sciences, and the Division of Continuing Education. Ex. 78 (Harvard Faculty of Arts and Sciences, *What is FAS?*).

**Response:** Undisputed.

**III.     Variation In The Racial Composition Of The Admitted Class**

93.     Harvard does not seek to maintain any specified minimum or maximum percentage of any racial group. Ex. 7 at 78:14-24 (Smith 2017 Dep.); Ex. 26 at 335:20-336:15 (Fitzsimmons Dep.); Ex. 1 at 194:6-10 (McGrath 2015 Dep.).

**Response:** Disputed. Harvard engages in racial balancing and admits that it takes steps to ensure that there is not a "dramatic dropoff in some [racial] group" from the year before, and that each racial group is not "underrepresented" based on the prior year's admissions demographics. SMF ¶¶ 168-172, 230-264. It has also imposed a floor on the admission rare of African Americans in the classes of 2017, 2018, and 2019. SFFA SMF ¶¶ 717-722. Harvard also restricts the number of Asian Americans it admits. SMF ¶¶ 670-677.

94.     The proportion of students in Harvard's admitted class who are White varies from

year to year. Ex. 33 ¶¶ 193-194 & Card Ex. 31 (Card Report); Ex. 35 at 58 (Arcidiacono Rebuttal).

**Response:** Disputed. The cited evidence does not support the proposition that the proportion of students in Harvard's admitted class who are White materially varies from year to year.

95.     The proportion of students in Harvard's admitted class who are Asian American varies from year to year. Ex. 33 ¶¶ 193-194 & Card Ex. 32 (Card Report); Ex. 35 at 58 (Arcidiacono Rebuttal).

**Response:** Disputed. The cited evidence does not support the proposition that the proportion of students in Harvard's admitted class who are Asian American materially varies from year to year. SFFA disputes that the proportion of Asian-Americans students admitted has materially varied. SFFA SMF ¶¶ 699-701. Harvard has maintained a narrow range of admissions for Asian Americans for years, with the number increasing slightly only in response to this lawsuit. *See* SFFA SAF, *infra*, at ¶¶ 148-153. Moreover, Harvard engages in racial balancing. *See* SFFA SMF ¶¶ 168-172, 230-264.

96.     The proportion of students in Harvard's admitted class who are African American varies from year to year. Ex. 33 ¶¶ 193-194 & Card Ex. 33 (Card Report); Ex. 35 at 58 (Arcidiacono Rebuttal).

**Response:** Disputed. The cited evidence does not support the proposition that the proportion of students in Harvard's admitted class who are African American materially varies from year to year. Harvard has imposed a floor on the admission rate of African Americans in the classes of 2017, 2018, and 2019. SFFA SMF ¶¶ 717-722.  Moreover, Harvard engages in racial balancing. *See* SFFA SMF ¶¶ 168-172, 230-264.

97.     The proportion of students in Harvard's admitted class who are Hispanic or Other varies from year to year. Ex. 33 ¶¶ 193-194 & Card Ex. 34 (Card Report); Ex. 35 at 58 (Arcidiacono Rebuttal).

**Response:** Disputed. The cited evidence does not support the proposition that the proportion of students in Harvard's admitted class who are Hispanic or Other materially varies from year to year. Moreover, Harvard engages in racial balancing. *See* SFFA SMF ¶¶ 168-172, 230-264.

98.     In recent decades, Harvard has used three methodologies to report the race of applicants and students. Ex. 26 at 95:23-96:19 (Fitzsimmons Dep.).

**Response:** Undisputed.

99.     The federal government requires Harvard to use the Integrated Postsecondary Education Data System ("IPEDS") methodology for reporting to the federal government. Ex. 26 at 93:13-22 (Fitzsimmons Dep.); Ex. 23 at 37:15-17 (Driver-Linn Dep.); Ex. 58 at HARV00065450 (A Note on the Collection and Reporting of Data on Race and Ethnicity).

**Response:** Undisputed.

100.    IPEDS counts applicants who choose to identify their race in a single category: if the applicant selects only a single category, then he or she is counted in that category; if the applicant selects "Hispanic" and another category, then he or she is always counted as Hispanic no matter what other categories he or she selects; if the applicant selects multiple non-Hispanic categories, then he or she is counted as "multiracial." Ex. 5 at 135:2-19.

**Response:** Undisputed.

101.    Harvard has at various points used two other methods to report race, which it refers to as the "New Methodology" and the "Old Methodology." Ex. 26 at 96:9-19, 98:19-99:8 (Fitzsimmons Dep.); Ex. 59 at HARV00030509-30510.

**Response:** Undisputed but incomplete. The evidence indicates that both of these methods were used by the admissions office as recently as the last admissions cycle for which discovery was permitted. Ex. 47, HARV00004313.

102.    The Old Methodology counts applicants in a single category the applicant chooses to

identify on his or her application. Ex. 33 ¶ 188 (Card Report).

**Response:** Undisputed but incomplete. The Old Methodology also assigned applicants who identified as more than one race according to a specific hierarchy. Under that approach, for example, those who identified as African American and any other race were designated as African American. Arcidiacono Rep. Table A.6.

103.    The New Methodology counts applicants in as many categories as the applicant chooses to identify on his or her application. Ex. 5 at 134:22-24; Ex. 33 ¶ 188 (Card Report).

**Response:** Undisputed.

104.    Harvard implemented the IPEDS methodology for federal reporting in 2010, for the Class of 2014. Ex. 58 at HARV00065450 (A Note on the Collection and Reporting of Data on Race and Ethnicity); Ex. 27 at 243:3-14 (Arcidiacono Dep.).

**Response:** Undisputed.

105.    For the Classes of 2014, 2015, and 2016, the IPEDS admissions rate for African American applicants differed from the rate for all other applicants. Ex. 27 at 244:25-245:10 (Arcidiacono Dep.).

**Response:** Undisputed.

106.    In light of the three methods for reporting race and the six-year time period for which Harvard produced admissions data, there would have been 92 opportunities to identify a stretch of three years in which the admission rate for any particular racial group matched the admission rate for all other groups. Ex. 37 ¶ 161 (Card Rebuttal).

**Response:** Disputed. There are fewer than "92 opportunities" to identify a stretch of three years in which the admission rate for any particular racial group matched the admission rate for all other groups. Many of the "opportunities" are redundant because there are racial groups whose admission rate is reported identically across different reporting methods. *See* Connolly Ex. 26, Yong

135:8-136:2.

107.     SFFA's expert calculated a 0.2% chance that a single group's average admission rate would match that of other applicants. Assuming the chance is the same (0.2%) for each of the other racial groups, with 92 opportunities there would be a 17% chance of finding a three-year match of admissions rates for one racial group within the six-year period. 17% is much higher than the 5% threshold typically used by statisticians to reject the possibility that an event occurred by chance. Ex. 37 ¶ 161 (Card Rebuttal).

**Response:** Disputed. The probability of the admit rates for each of these three years being less than 0.00064 is "*less* than 0.2%." Arcidiacono Rep. 29; *id.* at App. B at 1; Connolly Ex. 3, Card 370:3-371:16. There are fewer than "92 opportunities" to find this pattern. Many of the "opportunities" are redundant because there are racial groups whose admission rate is reported identically across different reporting methods *See* Connolly Ex. 26, Yong 135:8-136:2. There thus is not a "17% chance of finding a three-year match of admissions rates" because Professor Card's inputs for calculating this probability are incorrect. *Id.*

108.     When Harvard publishes in the Harvard Gazette the racial composition of an admitted class, it uses the "New Methodology." Ex. 5 at 137:15-138:6; Ex. 26 at 100:23-101:9 (Fitzsimmons Dep.); Ex. 33 ¶ 190 (Card Report); Ex. 37 ¶ 153 (Card Rebuttal).

**Response:** Undisputed.

109.     From the Class of 2000 to the Class of 2017, the number of applicants to Harvard College increased from 18,183 to 35,023. Ex. 62 at HARV00032509-511.

**Response:** Undisputed.

110.     Asian-American applicants were 20.3% of the applicants to the Class of 2000 and 20.4% of the applicants to the Class of 2017. Ex. 62 at HARV00032509-511.

**Response:** Undisputed.

111.    African-American applicants were 5.3% of the applicants to the Class of 2000 and 9.8% of the applicants to the Class of 2017. Ex. 62 at HARV00032509-511.

**Response:** Undisputed.

112.    Hispanic applicants were 6.3% of the applicants to the Class of 2000 and 10% of the applicants to the Class of 2017. Ex. 62 at HARV00032509-511.

**Response:** Undisputed.

113.    The percentage of Asian-American students in the admitted class has grown by 29% in the last decade to nearly 23% of admitted students. *See* Ex. 82 (Harvard Gazette, *1,962 Admitted to Harvard College Class of '22* (Mar. 28, 2018)); Ex. 79 (Harvard Gazette, *Financial Aid Program Draws Record Number of Applicants* (Apr. 2, 2009)).

**Response:** Disputed. The evidence cited does not support the proposition that "the percentage of Asian-American students in the admitted class has grown by 29% in the last decade to nearly 23% of the admitted class" because the articles do not indicate which methodology was used to calculate these statistics. Because there was no discovery into Harvard's 2018-2019 admissions cycle, SFFA lacks sufficient knowledge to verify these facts. To the extent the facts in these articles are accurate, they show that most of the growth occurred *after* SFFA's lawsuit was filed. In March 2007, Harvard reported that 19.6% of the admitted class was Asian-American. Connolly(2nd) Ex. 268. In March 2014, before SFFA filed its lawsuit, Harvard reported that 19.7% of the admitted class was Asian-American. *See* Connolly(2nd) Ex. 269. Following the launch of SFFA's lawsuit in November 2014, the percentage of the admitted class that was Asian-American grew to 21.0% in 2015, *see* Connolly(2nd) Ex. 270; 22.1% in 2016, *see* Connolly(2nd) Ex. 271; 22.2% in 2017, *see* Connolly(2nd) Ex. 272; and 22.7% in 2018, *see* Ellsworth Ex. 82.

## IV.    Harvard's Consideration Of Race

114.    Harvard applicants may choose to disclose information about their race and ethnicity

in their application. Ex. 26 at 145:19-20 (Fitzsimmons Dep.).

**Response:** Undisputed.

115.    If an applicant chooses not to disclose his or her race, Harvard makes no attempt to determine his or her race. Ex. 26 at 240:3-11 (Fitzsimmons Dep.); Ex. 9 at 190:10-14.

**Response:** Disputed. At least one admissions officer has done independent investigation to identify the race of an applicant. Connolly Ex. 20, ███ 31:16-32:10.

116.    If an applicant chooses to disclose information about his or her race, Harvard does not attempt to verify the information disclosed by the applicant. Ex. 1 at 148:20-150:22 (McGrath 2015 Dep.); Ex. 6 at 114:9-115:18; Ex. 9 at 190:10-14.

**Response:** Disputed. At least one admissions officer has done independent investigation to identify the race of an applicant. Connolly Ex. 20, ███ 31:16-32:10.

117.    When disclosed by the applicant, race is considered as one factor among many in the admissions process. Ex. 26 at 336:12-15 (Fitzsimmons Dep.); Ex. 1 at 42:19-24 (McGrath 2015 Dep.); Ex. 13 at 83:12-84:2; Ex. 3 at 239:13-15; Ex. 14 at 54:11-23; Ex. 17 at 63:9-13; Ex. 18 at 207:21-23.

**Response:** Disputed. Harvard does not take race into account only when "disclosed by the applicant." Harvard will consider a student's race when the information is disclosed through materials over which the student has no control, such as teacher recommendations, guidance counselor recommendations, and alumni interviews. Connolly Ex. 16, McGrath Depo. 157:10-24. Harvard also does not consider race as "one factor among many." Harvard awards large racial preferences to African-American and Hispanic applicants, *see* SFFA SMF ¶¶ 735-743; imposes penalties on Asian-American applicants, *see, e.g.,* SFFA SMF ¶¶ 664-677; and engages in racial balancing, *see* SFFA SMF ¶¶ 168-172, 230-264.

118.    Admissions officers do not take race into account when assigning the four profile ratings—academic, extracurricular, athletic, and personal—or the ratings for school support. Ex. 1

at 165:3-18 (McGrath 2015 Dep.); Ex. 25 at 359:12-15 (McGrath 2017 Dep.); Ex. 17 at 60:14-61:11;

Ex. 3 at 192:3-10; Ex. 6 at 72:10-21; Ex. 14 at 21:25-22:4; Ex. 9 at 80:13-81:1; Ex. 13 at 23:12-17.

**Response:** Disputed. At least one admissions officer (█████████) takes race into

account when calculating all four profile ratings (academic, extracurricular, athletic, and personal).

Ex. 14, ████ 39:17-44:9; 50:2-52:7. Further, evidence shows that races plays a substantial role in the

formation of the personal rating, showing large bonuses for African-American applicants and a

penalty for Asian-American applicants. Arcidiacono Rebuttal 22-27, Tables B.6.3R & B.6.7R;

Arcidiacono Rep. 55-60 & Table 5.6; SFFA SMF ¶¶ 656-663.

119.   Admissions officers may take race into account in assigning the overall rating. Ex. 26

at 253:13-254:2 (Fitzsimmons Dep.); Ex. 3 at 194:14-24; Ex. 13 at 28:14-21; Ex. 16 at 33:19-34:13.

**Response:** Undisputed.

120.   To the extent race is taken into account in the overall rating assigned to an applicant,

it is taken into account only flexibly, not automatically or mechanically. Ex. 26 at 158:24-159:8,

251:11-21 (Fitzsimmons Dep.).

**Response:** Disputed. The evidence cited does not support the proposition that race is taken

into account in the overall rating "only flexibly, not automatically or mechanically." To the contrary,

Harvard awards large racial preferences in the overall rating to African-American and Hispanic

applicants, and imposes penalties in the overall rating to Asian-American applicants. Arcidiacono

Rebuttal Tables 5.7R, B.6.4R, B.6.8R, B.6.9R, B.6.10R; Arcidiacono Rep. 55-61; SFFA SMF ¶¶ 656-

663.

121.   To be admitted to Harvard, applicants must have multiple areas of strength in

addition to being academically qualified. Ex. 37 ¶ 136 (Card Rebuttal); Ex. 4 at 224:11-17, 225:3-5

(Faust Dep.); Ex. 26 at 132:5-8 (Fitzsimmons Dep.).

**Response:** Disputed. The evidence cited does not support the proposition that "[t]o be

admitted to Harvard, applicants must have multiple areas of strength in addition to being academically qualified." An individual's race is not an "area of strength," and the cited evidence in part relies upon the personal rating, which is affected by racial bias. Arcidiacono Rebuttal 22-27, Tables B.6.3R & B.6.7R; Arcidiacono Rep. 55-60 & Table 5.6; SFFA SMF ¶¶ 656-663.   Moreover, Harvard awards large racial preferences to African-American and Hispanic applicants, *see* SFFA SMF ¶¶ 735-743; imposes penalties on Asian-American applicants, *see, e.g.,* SFFA SMF ¶¶ 664-677; and engages in racial balancing, *see* SFFA SMF ¶¶ 168-172, 230-264.

122.    Race alone does not determine whether or not an applicant is admitted, and numerous other characteristics of applicants are much better predictors of Harvard's admissions decisions. Ex. 37 ¶¶ 137, 140 & Card Ex. 22 (Card Rebuttal); *see also* Ex. 33 ¶ 178 & Card Ex. 27 (Card Report).

**Response:** Disputed. "Race alone" can determine whether or not many applicants are admitted. Arcidiacono Rebuttal 70-71; *see also* 8, 46-47 & Table 5.1N. For many applicants, "numerous other characteristics" are not "better predictors of Harvard's admissions decisions" than the student's race. Arcidiacono Rebuttal 70-71; *see also* 8, 46-47 & Table 5.1N.

123.    The profile ratings used by the Harvard Admissions Office—academic, extracurricular, athletic, and personal—explain a much larger proportion of the variability in admission outcomes than race. Ex. 33 ¶ 178 & Card Ex. 27 (Card Report); *see also* Ex. 37 ¶¶ 65, 140 & Card Ex. 22 (Card Rebuttal).

**Response:** Disputed. For many applicants, Harvard's profile ratings—academic, extracurricular, athletic, and personal—do not "explain a much larger proportion of the variability in admission outcomes than race." Arcidiacono Rebuttal 70-71; *see also* 8, 46-47 & Table 5.1N. Moreover, at least one admissions officer (███████████) takes race into account when calculating all four profile ratings (academic, extracurricular, athletic, and personal). Ex. 14, ████

32

39:17-44:9; 50:2-52:7. Further, evidence shows that race plays a substantial role in the formation of the personal rating. Arcidiacono Rebuttal 22-27, Tables B.6.3R & B.6.7R; Arcidiacono Rep. 55-60 & Table 5.6; SFFA SMF ¶¶ 656-663.

124.     Factors such as College Board high school and neighborhood variables, parental occupation, and intended career explain more of the variability in admissions outcomes than race. Ex. 33 ¶ 178 & Card Ex. 27 (Card Report).

**Response:** Disputed. For many applicants, factors such as College Board high school and neighborhood variables, parental occupation, and intended career do not "explain more of the variability in admissions outcomes than race." Arcidiacono Rebuttal 70-71; *see also id.* 8, 46-47 & Table 5.1N.

125.     For the most competitive applicants, the marginal effect of race on an applicant's likelihood of admission is comparable to that of other factors, such as top academic, extracurricular, or personal ratings. Ex. 37 ¶¶ 140-145 & Ex. 23 (Card Rebuttal); Ex. 27 at 279:21-280:4 (Arcidiacono Dep.).

**Response:** SFFA does not dispute that Professor Card found that, for the most competitive applicants, the effect of being African American or Hispanic on an applicant's likelihood of admission is "comparable" to the effect of obtaining a 1 on the academic, extracurricular, or personal ratings instead of a 3 on these ratings. The comparator just proves how large Harvard's racial preferences are. Arcidiacono(2nd) Dec. ¶ 3.

## V.     Race-Neutral Alternatives

### A.     Current Race-Neutral Practices In Pursuit Of Diversity

126.     Harvard employs numerous race-neutral practices to pursue diversity. Ex. 47 at HARV00097313-97314 (Smith Committee Report).

**Response:** Disputed. The evidence cited does not support the statement that Harvard

employs "numerous" race-neutral practices to pursue diversity. Harvard is failing to employ many workable race-neutral solutions, and Harvard also is not fully utilizing the few practices (*e.g.*, recruiting) that it is using to increase overall diversity. SMF ¶¶ 895-900.

127.   Harvard seeks to identify strong applicants from modest economic backgrounds and encourage them to apply through, among other things, targeted mailings of materials about Harvard and its generous financial aid program. Ex. 47 at HARV00097313 (Smith Committee Report).

**Response:** Disputed. As of August 2017, Harvard does not send "targeted mailings of materials about Harvard and its generous financial aid program" to "strong applicants from modest economic backgrounds." Harvard creates its mailing lists based only on a student's race, location, test scores, and GPA. Ex. 113, HARV00023564; Ex. 58, HARV00007766; Ex. 26, Yong 262:5-276:1; Connolly(2nd) Ex. 273, Fitzsimmons 62:23-63:25; Ex. 9, Fitzsimmons 68:1-73:20. Harvard also could greatly improve its efforts to recruit applicants from modest economic backgrounds. SMF ¶¶ 897, 900. Harvard's financial aid program could also be more "generous." Harvard's endowment is $37.1 billion, and Harvard admits that there is no economic restraint on the number of students Harvard can admit through its financial aid initiative. SMF ¶ 896.

128.   Harvard representatives, including admissions officers, undergraduates, and alumni, conduct numerous recruitment events throughout the United States, including events targeting students who come from secondary schools and geographic areas that do not frequently send students to Harvard. Ex. 47 at HARV00097313 (Smith Committee Report).

**Response:** Undisputed but incomplete. Harvard could increase its recruiting efforts of students who come from secondary schools and geographic areas that do not frequently send students to Harvard. SMF ¶¶ 897, 900.

129.   Harvard seeks to admit and enroll students who are from the first generation in their families to attend a four-year college. Harvard's First Generation program encourages such students

to apply and matriculate. Ex. 47 at HARV00097313 (Smith Committee Report).

**Response: Disputed.** SFFA does not dispute the existence of the First Generation program, but first-generation status has very little, if any, positive effect on being admitted to Harvard. If African-American students were as underrepresented in Harvard's population as first-generation college students are, African-American students would constitute only 2.25% of the undergraduate student body. Arcidiacono Rebuttal Rep. B.7.2R; SMF ¶ 864; Kahlenberg Rep. 22, 35. Moreover, the statement relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

130.   Harvard's First Generation program includes electronic communications, promotional materials, and the ability to correspond directly with current first-generation students attending Harvard. Ex. 47 at HARV00097313 (Smith Committee Report).

**Response:** Undisputed.

131.   Harvard's Undergraduate Minority Recruitment Program ("UMRP"), which originated in the early 1970s, attempts to encourage a racially diverse applicant pool. Ex. 47 at HARV00097313 (Smith Committee Report).

**Response:** Disputed. SFFA does not dispute the existence of the UMRP, but that program recruits some minorities (*e.g.*, African Americans and Hispanics) more aggressively than other minorities (*e.g.*, Asian Americans). Ex. 18, ███ 141:1-142:22; Ex. 1, Banks 18:11-19:11; *see* SMF ¶¶ 274-275. Moreover, the statement relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

132.   The UMRP sends targeted mailings to many potential applicants of different racial and ethnic backgrounds (including Asian-American, African-American, Hispanic, and Native American students), coordinates online communications, sends representatives to schools and events around the nation, and enlists current students to talk with prospective applicants. Ex. 47 at

HARV00097313 (Smith Committee Report); *see* Ex. 60 at HARV00036381 (UMRP Coordinator Manual); Ex. 9 at 16:22-17:16, 18:21-24.

**Response:** Undisputed but incomplete. Harvard's UMRP recruits some minorities (*e.g.*, African Americans and Hispanics) more aggressively than other minorities (*e.g.*, Asian Americans). Ex. 18, ███ 141:1-142:22; Ex. 1, Banks 18:11-19:11; *see* SMF ¶¶ 274-275. Moreover, the statement relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

133.    Harvard seeks in the admissions process to identify promising students from modest economic backgrounds, first-generation college students, and other students who would contribute to the diversity of the student body in many ways. Ex. 47 at HARV00097314 (Smith Committee Report).

**Response:** Disputed. SFFA admits that Harvard has a mechanism for identifying some of these types of students. But Harvard is not employing numerous workable strategies to identify and recruit additional students from "modest economic backgrounds, first generation college students, and other students would contribute to the diversity of the student body in many ways." *See* SFFA SMF ¶¶ 876-882; 895-99; Kahlenberg Rep. 23-25, 29-31, 39-42, 47-48; Kahlenberg Dec., Ex. B ("Kahlenberg Rebuttal") 33, Appendix A. Moreover, the statement relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

134.    The Admissions Office carefully reviews applications from such students to ensure that they are not disadvantaged in the application process because of their lack of resources and opportunities or their educational background, and to recognize the particular achievement of students who have excelled when coming from a modest background. Ex. 47 at HARV00097314 (Smith Committee Report). When reviewing applications, admissions officers flag applicants who appear to be socioeconomically disadvantaged or eligible for aid under the Harvard Financial Aid

Initiative. *E.g.*, Ex. 57 at HARV00015424 (Reading Procedures, Class of 2018); Ex. 18 at 84:14-24.

**Response:** Disputed. Certain students are "disadvantaged in the application process because of their lack of resources and opportunities or educational background," and SFFA admits that these students are flagged in the admissions database. But Harvard's admissions policies disproportionately favor wealthy and well-connected applicants, and Harvard is not employing numerous workable strategies to identify and recruit additional students from "modest economic backgrounds, first generation college students, and other students would contribute to the diversity of the student body in many ways." SMF ¶¶ 286-290, 291-304, 305-306, 858-863. Moreover, the statement relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

135.    Harvard offers an entirely need-based financial aid program—among the most generous in the country—designed to ensure that financial circumstances will not prevent any admitted student from matriculating. Ex. 47 at HARV00097314 (Smith Committee Report); *see also* Ex. 80 (*Fact Sheet*, Griffin Financial Aid Office, Harvard College).

**Response:** Disputed. Harvard's financial aid program could be more "generous." Harvard's endowment is $37.1 billion, and Harvard admits that there is no economic restraint on the number of students it can admit through its financial aid initiative. SMF ¶ 896. The statement that Harvard's financial aid program is "among the most generous in the country" relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

136.    Harvard expects no financial contribution from the parents of a student whose family earns less than $65,000 annually and has typical assets, and a contribution of 10% or less of family income from the parents of a student whose family earns between $65,000 and $150,000 annually and has typical assets. Ex. 47 at HARV00097315 (Smith Committee Report); *see also* Ex. 80 (*Fact Sheet*, Griffin Financial Aid Office, Harvard College).

**Response:** Undisputed.

137.    Harvard's policies are designed to ensure that students from all socioeconomic circumstances can attend Harvard, promoting both economic and racial diversity. Ex. 47 at HARV00097315 (Smith Committee Report).

**Response:** Disputed. Harvard's admissions policies award large racial preferences to African-American and Hispanic applicants, *see* SFFA SMF ¶¶ 735-743; impose penalties on Asian-American applicants, *see, e.g.,* SFFA SMF ¶¶ 664-677; and Harvard engages in racial balancing, *see* SFFA SMF ¶¶ 168-172, 230-264. Moreover, Harvard employs preferences that favor wealthy applicants (*e.g.,* legacies, faculty children, Z-list, the children of donors). SFFA SMF ¶¶ 286-290, 291-304, 305-306, 858-863. Harvard has 23 times as many high-income students as low-income students. Kahlenberg Rep. 20.

138.    55% of students at Harvard College receive need-based scholarship aid. Ex. 72 (*Harvard at a Glance*, Harvard University).

**Response:** Undisputed.

139.    Students who qualify for need-based scholarship aid pay an average of $12,000 to attend Harvard each year. Ex. 72 (*Harvard at a Glance*, Harvard University).

**Response:** Undisputed.

140.    Harvard publicizes its financial aid policies widely, prominently discussing them on its website and in promotional materials. Ex. 47 at HARV00097314 (Smith Committee Report).

**Response:** SFFA disputes Harvard's characterization of its efforts to publicize its financial aid policies. Moreover, the statement relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

141.    For example, Harvard provides a "Net Price Calculator" on its website that allows prospective applicants to estimate their likely cost of attending Harvard. Ex. 47 at HARV00097314 (Smith Committee Report); *see also* Ex. 81 (*Net Price Calculator*, Griffin Financial Aid Office, Harvard

College).

**Response:** Undisputed.

142.    Each year Harvard hosts admitted students for the Visitas program, which is designed to expose all admitted students to life at Harvard by enabling them to meet professors and students and explore Harvard's campus. Ex. 47 at HARV00097314 (Smith Committee Report).

**Response:** SFFA disputes Harvard's characterization of its Visitas program. Moreover, the statement relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

143.    Harvard provides need-based aid to help admitted students travel to Visitas. Ex. 47 at HARV00097314 (Smith Committee Report).

**Response:** SFFA does not dispute that Harvard offers aid to some students who attend Visitas, but disputes the statement to the extent it relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

144.    During Visitas, Harvard facilitates meetings between admitted students and current students of similar backgrounds. Ex. 47 at HARV00097314 (Smith Committee Report).

**Response:** Undisputed but incomplete. SFFA admits that Harvard takes efforts to house admitted students with current students of the same racial background. SFFA SMF ¶¶ 269, 272. The statement otherwise relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

### B.    Consideration of Alternative Practices

145.    In June 2014, Harvard convened a University-wide committee chaired by James Ryan, Dean of the Graduate School of Education, and charged with examining the importance of student-body diversity at the University and with evaluating whether the University could achieve the educational benefits of a diverse student body without considering applicants' race or ethnicity.

Ex. 47 at HARV00097311 (Smith Committee Report); Ex. 42 at HARV00072365- 368.

**Response:** Undisputed.

146.    After its initial meetings had taken place, the committee chaired by Dean Ryan paused its work in late 2014 when this litigation commenced. Ex. 47 at HARV00097311 (Smith Committee Report). Recognizing that this litigation would include extensive discovery in which experts would conduct in-depth empirical analyses of the College's admissions processes and proposed changes to it, Harvard decided to evaluate whether it could achieve the educational benefits of diversity in the College without considering race in admissions in a way that would be informed by those analyses. *Id.*

**Response:** Disputed. Harvard asserted privilege and opposed discovery into the reasons why the Ryan Committee ceased its work following the filing of this lawsuit. Nor did the Ryan Committee merely "pause" its work; the Committee was "disbanded" following the initiation of this lawsuit and Harvard has no plans to restart the committee. Ex. 23, Smith2 105:2-15, 171:7-172:17; *see* SMF ¶ 823. Ex. 159, HARV00072344; Ex. 158, HARV00072342. SFFA admits that the Smith Committee's review of race-neutral alternatives focused almost entirely on the expert analysis produced in this litigation. SMF ¶ 837. The statement otherwise relies upon evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

147.    In 2017, Harvard established a Committee to Study Race Neutral Alternatives in Harvard College Admissions. Ex. 47 at HARV00097310-97311 (Smith Committee Report). Michael Smith, the Edgerley Family Dean of the Faculty of Arts and Sciences, chaired the Committee. The Committee's other members were William Fitzsimmons, the Dean of Admissions and Financial Aid; and Rakesh Khurana, the Dean of Harvard College, Marvin Bower Professor of Leadership at Harvard Business School, and Faculty Dean of Cabot House. *Id.* at HARV00097328.

**Response:** Undisputed.

148.    Dean Smith is the Dean of the Faculty of Arts and Sciences, which is responsible for academics at Harvard College and supervises the Admissions Office. Ex. 47 at HARV00097312 (Smith Committee Report).

**Response:** Undisputed.

149.    Dean Khurana is the Dean of Harvard College and is responsible for issues of student life at the College. Ex. 47 at HARV00097312 (Smith Committee Report).

**Response:** Undisputed.

150.    Dean Fitzsimmons is responsible for the Admissions Office. Ex. 47 at HARV00097312 (Smith Committee Report).

**Response:** Undisputed.

151.    The Committee was charged with evaluating whether proposed race-neutral alternatives are available and workable for achieving the benefits that flow from student body diversity at Harvard College. Ex. 46 at HARV00072381 (Race Neutral Alternatives Committee Charge).

**Response:** SFFA does not dispute that this was the charge given to the Committee, but it disputes that the Committee was ever intended to engage in a serious or good-faith consideration of workable race-neutral alternatives. SMF ¶¶ 828-830, 837-843, 849-850. The Committee instead engaged in conclusory analysis created for litigation purposes.

152.    The Committee considered social-science and other literature on race-neutral means of pursuing diversity and collected information from several offices of Harvard College including the Office of Admissions and Financial Aid. Ex. 47 at HARV00097312 (Smith Committee Report).

**Response:** Disputed. SFFA admits that the Committee's report claims to have considered this information, but the report is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

153.   The Committee also considered materials produced in this litigation, including the complaint and expert reports submitted by both parties, which analyze the effects that abandoning consideration of race and certain other practices in admissions would have on the academic, demographic, and other characteristics of the Harvard College student body. Ex. 47 at HARV00097312 (Smith Committee Report).

**Response:** Disputed. SFFA admits that the Committee's report claims to have considered this information, but the report is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

154.   After meeting seven times over the course of nine months, and after considering voluminous materials and deliberating extensively, the Committee memorialized its conclusions in a report in April 2018. Ex. 47 at HARV00097310-97328 (Smith Committee Report).

**Response:** Disputed. The evidence cited does not support the proposition that the Smith Committee considered "voluminous materials and deliberat[ed] extensively." SFFA disputes the implication that the Smith Committee approached its review fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

155.   The Committee recommended that Harvard reexamine in five years whether it remains necessary to consider race in the admissions process to achieve the benefits of diversity. Ex. 47 at HARV00097328 (Smith Committee Report).

**Response:** Disputed. SFFA admits that the Committee's report contains this recommendation, but SFFA disputes that the Smith Committee approached its review fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

### 1.   Effect Of Eliminating Race-Conscious Admissions

156.   If Harvard stopped considering race in the admissions process, the proportion of

African-American and Hispanic students in the admitted class would decline dramatically, notwithstanding all the other efforts that Harvard takes to recruit a broadly diverse class. Ex. 47 at HARV00097317 (Smith Committee Report); *see* Ex. 33 ¶ 228 & Card Ex. 36 (Card Report) (relative to Class of 2019, African-American share of admitted class would decrease from 14% to 6%, and Hispanic share would decrease from 14% to 9%).

**Response:** Disputed. SFFA admits that if Harvard stopped considering race—and undertook no other race-neutral practices—the percentage of African-American and Hispanic students in the admitted class would decline. Kahlenberg Dec., Ex. C ("Kahlenberg Supp. Rep.") 1; SMF ¶ 884. If Harvard stopped considering race *and* implemented race-neutral alternatives its African-American admissions would remain strong and its Hispanic admissions would *increase*. SMF ¶¶ 884, 876, 880. SFFA disputes that Harvard has taken extensive efforts to recruit a broadly diverse class. SMF ¶¶ 897, 900.

157.   If Harvard stopped considering race in the admissions process, the proportion of White students in the admitted class would increase dramatically. Ex. 33 ¶ 228 & Card Ex. 36 (Card Report) (relative to Class of 2019, White share of admitted class would increase from 40% to 48%). The proportion of Asian-American students in the admitted class would increase slightly. Ex. 33 ¶ 228 & Card Ex. 36 (Card Report) (relative to Class of 2019, Asian-American share of admitted class would increase from 24% to 27%).

**Response:** Disputed. SFFA admits that if Harvard stopped considering race—and undertook no other race-neutral practices—the percentage of White students in the admitted class would increase. Kahlenberg Supp. Rep. 1; SMF ¶ 884. But if Harvard stopped considering race *and* implemented race-neutral alternatives its White admissions would *decrease*. SMF ¶¶ 884, 876, 880. SFFA disputes that the proportion of Asian-American students in the admitted class would increase only three percentage points if Harvard stopped considering race in admissions. SMF ¶ 876.

158.     Harvard does not have in mind a specific number of students of any given racial or ethnic background who must be on campus in order for Harvard's diversity-related educational objectives to be satisfied. Ex. 47 at HARV00097317 (Smith Committee Report); *see* Ex. 7 at 57:7-22 (Smith 2017 Dep.).

**Response:** Disputed. SFFA admits that Harvard's witnesses could not provide "any range or quantification" of what level of racial diversity is sufficient to achieve Harvard's educational goals. Ex. 9, Fitzsimmons 154:8-13; Ex. 13, Khurana 72:13-18. But Harvard has imposed a floor on the admission rate of African Americans in the classes of 2017, 2018, and 2019. SFFA SMF ¶¶ 717-722. And Harvard awards large racial preferences to African-American and Hispanic applicants, *see* SFFA SMF ¶¶ 735-743; imposes penalties on Asian-American applicants, *see, e.g.,* SFFA SMF ¶¶ 664-677; and engages in racial balancing, *see* SFFA SMF ¶¶ 168-172, 230-264.

159.     Harvard has concluded that the "significant decline in racial diversity that would flow from eliminating the consideration of race in the admissions process would prevent Harvard from achieving its diversity-related educational objectives" because "students in a significantly less diverse class will have diminished opportunities to engage with and learn from classmates who come from widely different backgrounds and circumstances … [which] would leave students ill prepared to contribute to and lead in our diverse and interconnected nation and world." Ex. 47 at HARV00097317 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee report contains this language. But the cited evidence is conclusory, created for litigation purposes, and a matter of opinion rather than fact. SFFA disputes that a decline in racial diversity will occur if Harvard stops considering race in the admissions process. SMF ¶¶ 876, 880. SFFA disputes that Harvard will be deprived of the educational benefits of diversity if it no longer considers race in the admissions process because, among other reasons, racial diversity will remain strong and socioeconomic diversity will increase. SMF ¶¶ 877-79,

881-82.

160.     Harvard has concluded that "a significant reduction in the number of African-American and Hispanic students on campus would inhibit the ability of Harvard's students and faculty to glean the benefits of a diverse student body and significantly undermine [Harvard's] educational mission and broader institutional objectives." Ex. 47 at HARV00097317 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee report contains this language. But the cited evidence is conclusory, created for litigation purposes, and a matter of opinion rather than fact. SFFA disputes that a "significant reduction in the number of African-American and Hispanic student on campus" will occur if Harvard stops considering race in the admissions process. SMF ¶¶ 876, 880. SFFA disputes that Harvard will be deprived of the educational benefits of diversity if it no longer considers race in the admissions process. SMF ¶¶ 877-79, 881-82.

161.     Harvard recognizes that there is much more work to do to ensure that it can become a truly inclusive community. Ex. 69 (Dean Rakesh Khurana, *Letter to Harvard College Students* (Nov. 19, 2015)).

**Response:** SFFA admits that the words in the cited letter were attributed to Dean Khurana.

162.     In 2015, for example, the Harvard College Working Group on Diversity and Inclusion produced a report outlining the challenges that Harvard continues to face in ensuring that all members of its community feel included and engaged. Ex. 44 at HARV00007944-7982.

**Response:** SFFA admits that the Working Group produced the cited report.

163.     Harvard expressed concern that "[t]he issues of diversity and inclusion that [it] faces today—including … ongoing feelings of isolation and alienation among racial minorities in [its] community—would only be exacerbated by a significant decline in African-American and Hispanic enrollment." Ex. 47 at HARV00097317 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee report contains this language. But the report is conclusory, created for litigation purposes, and a matter of opinion rather than fact. SFFA disputes that there will be "a significant decline in African-American and Hispanic enrollment" if Harvard ceases its use of race in the admissions process. SMF ¶¶ 876, 880.

### 2.  Potential Race-Neutral Alternatives

164.   Harvard has concluded that no combination of race-neutral practices would practicably allow it to achieve the educational benefits of a diverse student body without unacceptable cost to other important educational and institutional objectives. Ex. 47 at HARV00097318 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee reached this conclusion. But the report is conclusory, created for litigation purposes, and a matter of opinion rather than fact. SFFA disputes that Harvard could not "achieve the educational benefits of a diverse student body without unacceptable cost to other important educational and institutional objectives." SMF ¶¶ 876-82.

165.   Harvard considered practices set forth by SFFA and its expert, Richard Kahlenberg. Ex. 47 at HARV00097312 (Smith Committee Report). It also considered practices set forth in the relevant social science literature.  *Id.*

**Response:** SFFA admits that the Smith Committee's report discusses these practices. SFFA disputes that the Smith Committee gave serious, good-faith consideration to whether these practices were viable race-neutral alternatives fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

### a)  Potential New Practices

166.   Harvard considered the possibility of increased efforts to recruit a diverse class. Ex. 47 at HARV00097318 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee's report discussed the possibility of

increasing efforts to recruit a diverse class. SFFA disputes that the Smith Committee examined this practice fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

167.    Harvard already undertakes extensive efforts to recruit students who would contribute to the diversity of its class. Ex. 47 at HARV00097318-97319 (Smith Committee Report).

**Response:** Disputed. Harvard does not undertake "extensive" efforts to recruit students who would contribute to the diversity of its class. Kahlenberg Rep. 39-40. The statement that Harvard's outreach efforts "equal or exceed the efforts of its peer institutions" relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

168.    Harvard's outreach efforts equal or exceed the efforts of its peer institutions and include the assistance of more than 10,000 alumni located throughout the nation and around the world. Ex. 47 at HARV00097318 (Smith Committee Report).

**Response:** Disputed. The statement that Harvard's outreach efforts "equal or exceed the efforts of its peer institutions" relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

169.    Harvard has concluded that, "even if increased recruitment could double the number of socioeconomically disadvantaged students who apply to Harvard—an assumption [it regards] as extremely unrealistic—a race-neutral admissions process still could not achieve a student body comparable in diversity to current classes without unacceptably compromising other important institutional objectives." Ex. 47 at HARV00097318 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee report contains this language. SFFA disputes that the Smith Committee gave serious, good-faith consideration to whether these practices were viable race-neutral alternatives fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850. SFFA disputes that Harvard could

not increase the number of socioeconomically disadvantaged students who apply to Harvard. Kahlenberg Rep. 39-40. In addition, race-neutral alternatives exist that could "achieve a student body comparable in diversity to current classes without unacceptably compromising other important institutional objectives or that viable race-neutral alternatives do not exist." SMF ¶¶ 876-82.

170.    Harvard considered the possibility of increased financial aid. Ex. 47 at HARV00097319-97320 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee's report discusses the possibility of increasing financial aid. SFFA disputes that the Smith Committee examined this practice fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

171.    Harvard currently offers among the most generous financial aid of any higher education institution in America. Ex. 47 at HARV00097319 (Smith Committee Report).

**Response:** Disputed. The statement that Harvard "offers among the most generous financial aid of any higher education institution in America" relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact. Harvard's financial aid program also could be more "generous." Harvard's endowment is $37.1 billion, and Harvard admits that there is no economic restraint on the number of students it can admit through its financial aid initiative. SMF ¶ 896.

172.    Harvard's current financial aid program is already so generous that it makes Harvard more affordable, especially to low-income applicants, than many public institutions. Ex. 47 at HARV00097319 (Smith Committee Report).

**Response:** Disputed. The statement that Harvard's financial aid program is "so generous that it makes Harvard more affordable, especially to low-income applicants, than many public institutions" relies on evidence that is conclusory, created for litigation purposes, and a matter of

opinion rather than fact.  Harvard's financial aid program also could be more "generous."  Harvard's endowment is $37.1 billion, and Harvard admits that there is no economic restraint on the number of students it can admit through its financial aid initiative.  SMF ¶ 896.

173.     The most recent expansion of financial aid, in 2016, did not result in significant increases in the number of African-American or Hispanic applicants or admitted students.  Ex. 47 at HARV00097320 (Smith Committee Report); *see also* Ex. 33 ¶¶ 278-285 & Card Exs. 55- 59 (Card Report); Ex. 37 ¶ 199 (Card Rebuttal).

**Response:** Disputed.  There was no "expansion of financial aid" for the class of 2016.  For the class of 2016, Harvard's new policy had the effect of *reducing* the amount of money spent on financial aid.  For this class, Harvard coupled a small increase in the income cutoff for students requiring no parental contribution (from $60,000 to $65,000—less than 10%) with a "scaled back" financial aid commitment to families making between $150,000 and $180,000.  Kahlenberg Rebuttal 10; Kahlenberg Rep. 29-30; Connolly(2nd) Ex. 274, HARV00007805-7810.  In addition, increasing financial aid succeeds when done in *combination* with other strategies, such as increasing preferences for disadvantaged students.  Kahlenberg Rebuttal 10.

174.     Most African-American and Hispanic households are already eligible for zero parental contribution under Harvard's financial aid program.  Ex. 33 ¶ 280 (Card Report).

**Response:** Undisputed.

175.     There is nothing to suggest that members of any racial or ethnic group are choosing to attend other schools instead of Harvard on the basis of the need-based financial aid available at those institutions, and thus no reason to believe that further increases in financial aid will materially increase the diversity of Harvard's student body.  Ex. 47 at HARV00097319 (Smith Committee Report).

**Response:** Disputed.  There is "reason to believe that further increases in financial aid will

materially increase the diversity of Harvard's student body." Increasing financial aid would materially increase the diversity of Harvard's student body if combined with practices that cause more socioeconomically diverse students to be admitted to Harvard. Kahlenberg Rebuttal 10.

176.    Harvard could not significantly increase its financial aid budget without detracting from other commitments—to a four-year residential experience, cutting edge research facilities, faculty and staff, and operations—that are essential to maintaining Harvard as one of the world's leading institutions of higher learning. Ex. 47 at HARV00097320 (Smith Committee Report).

**Response**: Disputed. Harvard's endowment is $37.1 billion, and Harvard admits that there is no economic restraint on the number of students it can admit through its financial aid initiative. SMF ¶ 896. The statement also relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

177.    Harvard considered the possibility of incorporating geographic considerations more extensively in the admissions process. Ex. 47 at HARV00097320-97321 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee's report discusses the possibility of incorporating geographic considerations more extensively in the admissions process. SFFA disputes that the Smith Committee examined this practice fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

178.    Harvard determined that "the adoption of an admissions regime using rigid place-based preferences would greatly lessen Harvard's undergraduate student body of qualities that Harvard has long thought important," because it would compel Harvard "to deny admission to the second or third excellent applicant from one location simply because a formula points to an applicant in another place." Ex. 47 at HARV00097320 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee contains this language. SFFA disputes that Harvard could not achieve the educational benefits of a diverse student body by incorporating

geographic considerations more extensively. SMF ¶¶ 872, 876-882.

179.     Harvard considered the possibility of increasing the number of students admitted to transfer to Harvard after one or more years of undergraduate study at another institution.  Ex. 47 at HARV00097321-97322 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee's report discusses the possibility of increasing the number of students admitted to transfer to Harvard after one or more years of undergraduate study at another institution. SFFA disputes that the Smith Committee examined this practice fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

180.     Harvard concluded that increasing transfer admissions is unlikely to help Harvard achieve its diversity-related educational goals and would impair its pursuit of academic excellence. Ex. 47 at HARV00097322 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee contains language to this effect. SFFA disputes that Harvard could not increase the diversity of its student body by increasing its admission of community-college transfers. Kahlenberg Rebuttal 17-18.

181.     Harvard's class size is limited by the available student housing, because the residential system is an essential aspect of Harvard's undergraduate experience, 98% of students live on campus, and few students leave Harvard before graduation. Ex. 47 at HARV00097321 (Smith Committee Report).

**Response:** SFFA does not dispute that Harvard's class size is limited by the available student housing.

182.     Harvard concluded that building new housing would be infeasible at present.  Ex. 47 at HARV00097321-97322 (Smith Committee Report).

**Response**: SFFA admits that the Smith Committee contains language to this effect. SFFA

disputes that the Smith Committee examined this possibility fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

183.     Harvard found that "[t]here is no good reason to admit fewer freshmen for the purpose of reserving spots for transfer students" because there is no reason to believe that the transfer pool is stronger than the freshman pool of applicants, particularly when "Harvard already rejects thousands of incredibly talented students who could thrive at the College, including many racially diverse applicants." Ex. 47 at HARV00097321 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee contains this language. SFFA disputes that the Smith Committee examined this practice fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850. SFFA disputes that there is "no good reason" to admit more transfer students. Harvard could increase the diversity of its student body by increasing its admission of community-college transfers. Kahlenberg Rebuttal 17-18.

184.     The pool of transfer applicants to Harvard College is less racially diverse than the pool of freshman applicants, and transfer applicants have lower academic ratings (on average) than freshman applicants. Ex. 47 at HARV00097321 (Smith Committee Report); *see also* Ex. 33 ¶ 252 (Card Report).

**Response:** Disputed. The evidence cited does not support the statement that the pool of transfer applicants to Harvard College is "less racially diverse" than the pool of freshman applicants. Professor Card found that the pool of current transfer applicants is "not more diverse" than the regular applicant pool. The evidence cited also does not support the statement that the pool of community college applicants to Harvard is less racially diverse. *See* Kahlenberg Rebuttal 17-18.

185.     Harvard considered the possibility of affording even greater weight to the fact that an applicant comes from a modest socioeconomic background.  Ex. 47 at HARV00097322- 97324

(Smith Committee Report).

**Response:** SFFA admits that the Smith Committee's report discusses the possibility of affording greater weight to the fact that an applicant comes from a modest socioeconomic background. SFFA disputes that the Smith Committee examined this practice fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

186.    Harvard concluded that it cannot achieve both its diversity-related educational objectives and its other educational objectives by giving greater weight to the fact that an applicant comes from a modest socioeconomic background, even in combination with the elimination of practices alleged to reduce diversity. Ex. 47 at HARV00097323 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee reached this conclusion. SFFA disputes that the Smith Committee examined this practice fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850. SFFA disputes that Harvard "could not achieve both its diversity-related educational objectives and its other educational objectives by giving greater weight to the fact that an applicant comes from a modest socioeconomic background." SMF ¶¶ 866-882.

187.    If Harvard stopped considering race and eliminated practices alleged to inhibit the pursuit of diversity, it would need to award a boost to applicants from lower socioeconomic backgrounds that is larger than the boost given to candidates with the strongest academic, extracurricular, personal, and athletic ratings in order to admit a comparable proportion of African-American students to Harvard. Ex. 47 at HARV00097322-97323 (Smith Committee Report); Ex. 33 ¶¶ 232-243 (Card Report). A boost of that magnitude would lead to significant changes in the composition of the admitted class, including a reduction in academic and other forms of excellence. Ex. 47 at HARV00097323 (Smith Committee Report); Ex. 33 ¶¶ 232-243 (Card Report).

**Response:** Disputed. There are race-neutral alternatives that can create a "comparable" proportion of African-American students to Harvard without a boost to applicants from lower socioeconomic backgrounds that is "larger than the boost given to candidates with the strongest academic, extracurricular, personal, and athletic ratings." SFFA SMF ¶ 876; Kahlenberg Rebuttal 22, 29; Card Rebuttal 96-97.

188.    If Harvard gave sufficient weight to socioeconomic status to avoid significant changes in the proportion of African-American, Hispanic, and Other students, the proportion of admitted students with the best academic ratings (1 or 2) would drop from 76% to 66%.   Ex. 47 at HARV00097323 (Smith Committee Report); *see* Ex. 33 ¶¶ 240-241 & Card Exs. 36, 38 (Card Report).

**Response**: SFFA does not dispute that under Card Simulation 4x the "proportion of admitted students with the best academic ratings (1 or 2) would drop from 76% to 66%." SFFA disputes that such a decline makes Card Simulation 4x not a viable race-neutral alternative. *See* Kahlenberg Supp. Rep. at 2-3.

189.    If Harvard gave sufficient weight to socioeconomic status to avoid significant changes in the proportion of African-American, Hispanic, and Other students, the proportion of students with the highest extracurricular, personal, and athletic ratings would also decline.  Ex. 47 at HARV00097323 (Smith Committee Report); *see* Ex. 33 ¶¶ 240-241 & Card Exs. 36, 38 (Card Report).

**Response:** SFFA does not dispute that under Card Simulation 4x, the proportion of students with the highest extracurricular, personal, and athletic ratings would decline. SFFA disputes that such a drop makes Card Simulation 4x not a viable race-neutral alternative. *See* Kahlenberg Supplemental Report at 2-3.

190.    Harvard concluded that such a decline in academic and other qualities is incompatible with its educational mission. Ex. 47 at HARV00097323 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee reached this conclusion. SFFA disputes

that the Smith Committee examined this practice fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850. SFFA disputes that such a decline is "incompatible with [Harvard's] educational mission." SMF ¶¶ 866-882.

**b)      Eliminating Various Existing Practices**

191.    Harvard considered the possibility of eliminating Early Action. Ex. 47 at HARV00097324 (Smith Committee Report).

**Response**: SFFA admits that the Smith Committee's report discusses the possibility of eliminating Early Action. SFFA disputes that the Smith Committee examined this practice fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

192.    In 2006, Harvard announced that it would eliminate its Early Action program in the hope that doing so would encourage an even more racially diverse group of students to apply and matriculate. Ex. 47 at HARV00097314-97315 (Smith Committee Report); *see* Ex. 64 at HARV00030303-HARV00030332 (Memorandum to Members of the Corporation).

**Response:** SFFA admits that Harvard announced in 2006 that it would eliminate Early Action. SFFA disputes Harvard's characterizations of its reasons for doing so. The statement relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

193.    The Classes of 2012 through 2015 were admitted without an Early Action process. Ex. 47 at HARV00097314-97315 (Smith Committee Report); *see also* Ex. 73 (*Let the Admissions Begin*, Harvard Gazette (Dec. 15, 2011)).

**Response:** Undisputed.

194.    When Early Action was not offered, Harvard found that the share of self-identified African-American, Hispanic, and Other applicants to Harvard did not rise and that the yield rate for

African-American, Hispanic, and Other applicants declined, as many of the most promising African-American, Hispanic, and Other applicants opted to attend universities that continued to offer them early admission. Ex. 47 at HARV00097324 (Smith Committee Report); Ex. 64 at HARV00030303, 30306 (Memorandum to Members of the Corporation).

**Response:** Disputed. It is not clear that the changes to the Early Action program caused this decline. Kahlenberg Rebuttal 19-20.

195.    Harvard reinstated a non-binding Early Action program for the Class of 2016 admissions cycle and found that the yield rate for applicants of all racial groups increased. Ex. 47 at HARV00097324 (Smith Committee Report); Ex. 33 ¶¶ 291-292 (Card Report).

**Response:** Undisputed.

196.    There is no reason to believe that abolishing Early Action again would contribute to diversity on campus, let alone restore to a meaningful degree the diversity that would be lost by eliminating consideration of race, and the abolition of Early Action would damage Harvard's ability to compete effectively for top candidates, hindering its educational goals. Ex. 47 at HARV00097324 (Smith Committee Report).

**Response:** Disputed. SFFA disputes that the Smith Committee examined this practice fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850. There is "reason to believe that abolishing Early Action would contribute to diversity on campus." Wealthy applicants and white applicants disproportionally benefit from early action. Kahlenberg Rep. 42-44, 46; SMF ¶¶ 858-59. White students and legacy students are more likely to apply early than a typical student, and African-American students, Hispanic students, international students, those whose parents had no college degree, and those seeking a fee waiver are all more likely to apply regular admission than the typical student. Kahlenberg Rep. 44; Ex. 134, HARV00031696. Harvard could eliminate the admissions preferences it provides to Early Action

applicants. Arcidiacono Rep. 22; Kahlenberg Rebuttal 32. Harvard would not be damaged in its ability to compete for top candidates. Kahlenberg Rep. 44.

197.    Harvard considered the elimination of certain practices alleged by SFFA or others to inhibit diversity, including the practice of deferred admission, the consideration of whether an applicant's parents attended Harvard College or Radcliffe, the consideration of whether an applicant's parent is employed by Harvard, the consideration of whether the applicant is a recruited athlete, and the consideration of whether the applicant is on the Dean's or Director's interest list. Ex. 47 at HARV00097325-97326 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee's report discusses the possibility of eliminating these practices. SFFA disputes that the Smith Committee examined these practices fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

198.    If Harvard eliminated consideration of race in the admissions process, and also eliminated the practice of deferred admission, the consideration of whether an applicant's parents attended Harvard College or Radcliffe, the consideration of whether an applicant's parent is employed by Harvard, the consideration of whether the applicant is a recruited athlete, and the consideration of whether the applicant is on the Dean's or Director's interest list, the resulting class would have just half the number of students who identify as African-American, Hispanic, or Other. Ex. 47 at HARV00097325 (Smith Committee Report); Ex. 33 ¶¶ 229-231 & Card Ex. 35 (Card Report).

**Response:** Disputed. The cited evidence (from a simulation run by Professor Card) unnecessarily eliminates athlete preferences, fails to increase socioeconomic preferences, and fails to take into account additional race-neutral strategies. Kahlenberg Rebuttal 11-12.

199.    Harvard regards a significant decline in the number of students who identify as

African-American, Hispanic, or Other as inimical to its educational objectives. Ex. 47 at HARV00097325 (Smith Committee Report).

**Response:** SFFA does not dispute that the Smith Committee reached this conclusion. The Smith Committee did not, however, define what constitutes a "significant decline" that would be "inimical to Harvard's educational objectives." SFFA disputes that the Smith Committee's work was conducted fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

200.    Athletic excellence is one of many attributes that Harvard values in its students. Ex. 47 at HARV00097325 (Smith Committee Report).

**Response:** SFFA admits that Harvard values athletic excellence in some of its applicants. The statement otherwise relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

201.    Harvard's student-athletes are also among the most dedicated alumni and contribute in many ways to the University after they graduate, and athletic activities foster a sense of community on campus. Ex. 47 at HARV00097325 (Smith Committee Report).

**Response:** Disputed. The statements that Harvard's student-athletes are "among the most dedicated alumni" and that "athletic activities foster a sense of community on campus" rely on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

202.    Considering whether applicants have parents who attended Harvard College or Radcliffe cements strong bonds between the College and its alumni and encourages alumni to remain engaged with the University for the rest of their lives, including by volunteering as alumni interviewers. Ex. 47 at HARV00097325-97326 (Smith Committee Report).

**Response:** Disputed. The statement that giving preferences to legacy applicants "cements strong bonds between the College and its alumni and encourages alumni to remain engaged with the

University for the rest of their lives" relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact. SFFA also disputes this as a factual matter. Kahlenberg Rep. 32-33; Kahlenberg Rebuttal 12.

203.    Alumni provide financial support that is essential to Harvard's position as a leading institution of higher learning and helps make possible the financial aid polices that contribute to the diversity and excellence of the College's student body. Ex. 47 at HARV00097326 (Smith Committee Report); *see also* Ex. 96 (Simmons Declaration); Ex. 34 ¶ 55 (Simmons Report).

**Response:** Disputed. The statement that alumni financial support is "essential to Harvard's position as a leading institution of higher learning" relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact. SFFA disputes the implication that alumni will stop donating to Harvard if their children no longer receive admissions preferences. Kahlenberg Rep. 32-33; Kahlenberg Rebuttal 12.

204.    Considering whether an applicant's parent is a member of Harvard's faculty or staff aids in the retention of talent in the University workforce; eliminating that consideration would place Harvard at a significant competitive disadvantage in recruiting personnel. Ex. 47 at HARV00097326 (Smith Committee Report); *see also* Ex. 34 ¶ 56 (Simmons Report).

**Response:** Disputed. The statement that eliminating preferences to the children of Harvard faculty and would place Harvard at a "significant competitive disadvantage" relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact.  SFFA disputes the implication that staff and professors will decline to work for Harvard if their children no longer receive admissions preferences. Kahlenberg Rep. 32-33, 36; Kahlenberg Rebuttal 12.

205.    To the extent the Admissions Committee currently considers other aspects of service to Harvard, including whether an applicant's family has donated or has the capacity to donate to Harvard, it does so in a very small number of cases—far too small for the cessation of any such

practice to contribute meaningfully to campus diversity. Ex. 47 at HARV00097326 (Smith Committee Report).

**Response:** Disputed. The statement that Harvard gives admissions preferences only in a "very small number of cases—far too small for the cessation of any such practice to contribute meaningfully to campus diversity" relies on evidence that is conclusory, created for litigation purposes, and a matter of opinion rather than fact. Harvard does not award preferences to the children of donors or potential donors only in "very small number of cases." SMF ¶¶ 292; 294; Ex. 74, HARV00011624; Arcidiacono Dec. ¶ 15 & Table 3. Eliminating donor preferences could "contribute meaningfully to campus diversity" in combination with other race-neutral admissions policies. Kahlenberg Rep. 46; SMF ¶¶ 872, 876-882.

206.   Harvard considered the possibility of eliminating consideration of standardized test scores. Ex. 47 at HARV00097327 (Smith Committee Report).

**Response**: SFFA admits that the Smith Committee's report discusses the possibility of eliminating consideration of standardized test scores. SFFA disputes that the Smith Committee examined this practice fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

207.   Harvard has concluded that standardized tests are imperfect measures of academic excellence and aptitude but that—when considered in light of an applicant's background and ability to prepare—the tests provide useful information that the Admissions Office would lose if it excluded any consideration of them. Ex. 47 at HARV00097327 (Smith Committee Report).

**Response:** SFFA does not dispute that the Smith Committee reached this conclusion.  SFFA disputes that the Smith Committee examined this practice fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

208.   Although a correlation exists between standardized test scores and socioeconomic

background, Harvard has concluded that that correlation does not render standardized test scores irrelevant and provides no reason to prevent admissions officers from considering them while taking into account the applicant's resources. Ex. 47 at HARV00097327 (Smith Committee Report).

**Response:** SFFA does not dispute that the Smith Committee reached this conclusion. SFFA disputes that the Smith Committee examined this practice fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SMF ¶¶ 828-830, 837-843, 849-850.

209.    Mr. Kahlenberg proposed a set of admissions practices that in his view "would provide a viable path for Harvard." Ex. 36 at 34 (Kahlenberg Rebuttal).

**Response:** Undisputed.

210.    Mr. Kahlenberg's proposed set of practices would produce a class with 30% fewer African-American students than the admitted Class of 2019. Ex. 37 ¶ 193 & Card Ex. 26 (Card Rebuttal).

**Response:** Disputed. SFFA admits that Kahlenberg Simulations 6 and 7 produced "a class with 30% fewer African-American students than the admitted Class of 2019." *See* SFFA SMF ¶ 876. SFFA disputes that Mr. Kahlenberg's "proposed set of practices" (including taking measures not accounted for in the simulations) could not narrow or eliminate this decline. *See* Kahlenberg Rep. 14, 17-19, 39-53.

211.    Mr. Kahlenberg's proposed set of practices would reduce the proportion of admitted students with academic, personal, and extracurricular ratings of 1 or 2. Ex. 37 ¶ 193 & Card Ex. 26 (Card Rebuttal) (identifying reductions of 19% for top academic ratings, 13% for top extracurricular ratings, and 13% for top personal ratings).

**Response:** SFFA does not dispute that, under Kahlenberg Simulations 6 and 7, there would be a reduction in the proportion of admitted students with academic, personal, and extracurricular ratings of 1 or 2. SFFA disputes that Mr. Kahlenberg's "proposed set of practices" (including taking

measures not accounted for in the simulations) could not narrow or eliminate this reduction. Kahlenberg Rep. 14, 17-19, 39-53.

212.    In sum, Harvard has concluded that, at present, no available, workable race-neutral admissions practices could promote Harvard's diversity-related educational objectives as well as Harvard's current whole-person race-conscious admissions program while also maintaining the standards of excellence that Harvard seeks in its student body. Ex. 47 at HARV00097327 (Smith Committee Report).

**Response:** SFFA admits that the Smith Committee reached this conclusion. SFFA disputes that the Smith Committee examined these practices fairly, with an open mind, and without knowing the conclusions it would reach beforehand.  SMF ¶¶ 828-830, 837-843, 849-850. SFFA also disputes that there are no available, workable race-neutral admissions practices that could promote Harvard's diversity-related educational objectives and the standards of excellence it seeks as well as Harvard's current admissions process. SMF ¶¶ 866-882.

**VI.    Claim Of Discrimination Against Asian-American Applicants**

213.    Staff within Harvard's Office of Institutional Research ("OIR") conducted preliminary and limited analyses of Harvard's admissions process in 2013. Ex. 65 at HARV00031687, 31718 ("The following analysis is **preliminary** and for discussion."); Ex. 66 at HARV00065741 (presentation marked "PRELIMINARY DRAFT"); Ex. 67 at HARV00023548-23549 (describing modeling exercise as having "several limitations"); Ex. 23 at 195:21-196:10 (Driver-Linn Dep.) (OIR was "[r]educing what's a very complicated thing into … a quant model" and its analyses were "iterative, exploratory, preliminary, and limited"); Ex. 20 at 196:7- 18 (OIR modeling "d[id] not take socioeconomic status into account" and "[t]here are other factors and data that are not reflected in these models").

**Response:** Disputed. The reports from the Office of Institutional Research were not

"preliminary." These reports were distributed to high-level officials at Harvard at several different points covering more than a year without any further revision. SMF ¶¶ 426, 533, 539. Harvard has made substantial changes to university policy on the basis of OIR reports that were marked "preliminary." SMF ¶¶ 383, 384. The OIR reports also were not "limited." OIR analyzed these issues extensively. *See* Connolly Exs. 112, 134, 145, 157. OIR's findings are consistent with Professor Arcidiacono's findings. Arcidiacono Rep. 9-10, 14.

214.    The OIR analyses were not designed to evaluate whether Harvard was intentionally discriminating against Asian-American applicants and reached no such conclusion. *E.g.*, Ex. 20 at 193:24-194:4; Ex. 23 at 163:19-166:13 (Driver-Linn Dep.).

**Response:** Disputed. One OIR report was expressly labeled as evaluating whether Harvard's admissions process was "bias[ed]" against Asian Americans, Ex. 134, HARV00031724, and another found that there is "a negative effect for Asian applicants," Ex. 156, HARV00069734. *See also* Ex. 10, Hansen 182:14-21.

215.    The OIR analyses did not account for numerous factors relevant to the admissions process.  Ex. 65 at HARV00031722 ("There are a variety of factors that quantitative data is likely to miss or ratings do not capture.  We'd like to better understand: Exceptional talent (music, art, writing)[;] The role of context cases[;] The role of the personal statement/essay[;] Measures of socio-economic status (HFAI Flag, Low Income Flag)[.]"); Ex. 66 at HARV00065757 (noting that model does not account for "Children [of] faculty/staff," "Search for socioeconomic diversity," "High school quality/opportunities open to student," and "[Geographic] Dockets"); Ex. 67 at HARV00023549 ("This approach has several limitations; we picked a small set of variables that would factor in admissions decisions. The selection of a wider set of variables might result in a better fitting model, one that accounts for more of the variation in individual applicants and their potentially unique contributions to the entering class.").

**Response:** SFFA disputes the characterization of OIR's reports. SFFA does not dispute that OIR did not appear to include certain variables in its analyses, although at least one of OIR's memos specifically analyzed socioeconomic status. *See* Connolly Ex. 121, HARV00023548-50. SFFA disputes that the inclusion of any of these factors (to the extent they were not included) would have changed OIR's conclusions. Arcidiacono Rep. 9-10, 14.

216.     Harvard's expert, Dr. David Card, built a statistical model of the Harvard College admissions process based on data for domestic applicants to the Classes of 2014 through 2019 (approximately 150,000 applicants). Ex. 97 (Card Declaration); Ex. 33 ¶¶ 7, 128 (Card Report).

**Response:** Undisputed

217.     Dr. Card's model estimates the effects of several hundred applicant characteristics on the probability of an applicant's admission. *See* Ex. 33 ¶¶ 95-96 (Card Report).

**Response:** Disputed. The cited evidence does not support the statement that "Dr. Card's model estimates the effects of several hundred applicant characteristics on the probability of an applicant's admission."

218.     Dr. Card's model incorporated numerous factors that OIR was not able to analyze, such as information about socioeconomic factors and high-school context. Ex. 33 at 181-186 (Appendix E) (Card Report).

**Response:** Disputed. The cited evidence does not support the statement that OIR was "not able to analyze" numerous factors, and at least one of the memos specifically analyzed socioeconomic status. *See* Connolly Ex. 121, HARV00023548-50.

219.     Dr. Card found no statistically significant "negative effect of Asian-American ethnicity" on applicants' likelihood of admission. Ex. 33 ¶ 92 (Card Report); *see also id.* ¶¶ 128, 134-135, 141 & Card Exs. 17-19; Ex. 37 ¶ 103 (Card Rebuttal) ("I continue to find no evidence of bias against Asian-American applicants. The average effect of Asian-American ethnicity is statistically

insignificant, both overall and in each of the six years.").

    **Response:** SFFA does not dispute that Professor Card reached this conclusion. SFFA disputes that Professor Card used appropriate modelling to reach this conclusion; for example, he ignores racial interactions with disadvantaged status and incorrectly includes ALDC applicants ("Athlete, Lineage, Dean/director list, Children of faculty/staff"), the unreliable parental occupation variable, and the biased personal rating. SFFA SMF ¶¶ 750-790; Arcidiacono Rebuttal 39-44. There is a statistically significant negative effect of Asian-American ethnicity on applicants' likelihood of admissions. SMF ¶¶ 664-677. Professor Card did find evidence of discrimination when the personal rating was excluded. Card Rep. 71-72, Ex. 21. Minor corrections to Professor Card's model reveals penalties against Asian-American applicants in all six years. Arcidiacono Rebuttal 43.

    220.    Dr. Card found that the estimated effect of Asian-American ethnicity on applicants' likelihood of admission was positive (but not statistically significant) in three of the six years studied. Ex. 37 ¶ 103 (Card Rebuttal) ("The effect [of Asian-American ethnicity] is slightly positive in three of the six years and slightly negative in three, with an overall effect (-0.05 percentage points) that—as with the effects for each individual admission class—is statistically indistinguishable from zero.").

    **Response:** SFFA does not dispute that Professor Card reached this conclusion. SFFA disputes that Professor Card used appropriate modelling to reach this conclusion; for example, he ignores racial interactions with disadvantaged status and incorrectly includes ALDC applicants ("Athlete, Lineage, Dean/director list, Children of faculty/staff"), the unreliable parental occupation variable, and the biased personal rating. SFFA SMF ¶¶ 750-790; Arcidiacono Rebuttal 39-44. Minor corrections to Professor Card's model reveals penalties against Asian-American applicants in all six years. *Id.* at 43. Minor corrections to Professor Card's model also shows a statistically significant negative average marginal effect of being Asian American from the Class of 2014 through the Class of 2018 (the five years before SFFA filed its lawsuit). *Id.* at 43-44.

221.    Dr. Card found that, for female applicants, the estimated effect of Asian-American ethnicity on likelihood of admission was positive in four out of six years and positive overall, though the effect was not statistically significant either overall or in any individual year. Ex. 37 ¶ 117 & Card Ex. 19 (Card Rebuttal).

**Response:** SFFA does not dispute that Professor Card reached this conclusion. SFFA disputes that Professor Card used appropriate modelling to reach this conclusion; for example, he ignores racial interactions with disadvantaged status and incorrectly includes ALDC applicants ("Athlete, Lineage, Dean/director list, Children of faculty/staff"), the unreliable parental occupation variable, and the biased personal rating. SFFA SMF ¶¶ 750-790; Arcidiacono Rebuttal 39-44. With minor corrections, Professor Card's model shows a statistically significant penalty on Asian-American female applicants. *See* Arcidiacono Rebuttal Tables B.7.1R, B.7.2R.

222.    Dr. Card found that, for applicants from California dockets, the estimated effect of Asian-American ethnicity on likelihood of admission was positive in five out of the six years and positive overall, though the effect was not statistically significant either overall or in any individual year. Ex. 37 ¶ 117 & Card Ex. 20 (Card Rebuttal).

**Response:** SFFA does not dispute that Professor Card reached this conclusion. SFFA disputes that Professor Card used appropriate modelling to reach this conclusion; for example, he ignores racial interactions with disadvantaged status and incorrectly includes ALDC applicants ("Athlete, Lineage, Dean/director list, Children of faculty/staff"), the unreliable parental occupation variable, and the biased personal rating. SFFA SMF ¶¶ 750-790; Arcidiacono Rebuttal 39-44. In addition, Professor Card's yearly models have very large standard errors that increase when significantly less data are used in the analysis, making it impossible to rule out extremely large effects. Arcidiacono Rebuttal 44.

223.    Asian-American applicants who are either female or from California (or both)

comprised 64% of domestic Asian-American applicants for the Classes of 2014-2019. Ex. 37 ¶ 118 (Card Rebuttal).

**Response:** Undisputed.

224.    SFFA's expert, Dr. Peter Arcidiacono, also constructed a model attempting to estimate the effects of applicant characteristics on the probability of an applicant's admission. Ex. 35 at 1 (Arcidiacono Rebuttal).

**Response:** SFFA admits that Prof. Arcidiacono constructed a model in which he estimated the effects of applicant characteristics on the probability of an applicant's admission.

225.    Dr. Arcidiacono's analysis excludes from his preferred model of the admissions process several categories of applicants: recruited athletes, applicants with a parent who attended Harvard College or Radcliffe, applicants whose names appeared on a "Dean's interest" or "Director's interest" list, and children of Harvard faculty and staff. Ex. 35 at 69 (Arcidiacono Rebuttal); Ex. 37 ¶¶ 85-86 (Card Rebuttal). Dr. Card and Dr. Arcidiacono have referred to these applicants as "ALDC" applicants (Athletes, Lineage, Dean/Director List, Children of faculty and staff).  Ex. 37 ¶ 85 (Card Rebuttal); Ex. 27 at 116:11-13 (Arcidiacono Dep.).

**Response:** SFFA admits that Professor Arcidiacono excluded ALDC applicants from his preferred model and that he did so for proper reasons. Arcidiacono Rebuttal 3, 5-6, 19, 28, App. A at 3-4 n.1, Tables B.7.1R & B.7.2R; Arcidiacono Rep. 21-22.

226.    The Admissions Office considers in the admissions process whether an applicant is a recruited athlete, whether one of the applicants' parents attended Harvard College or Radcliffe, or whether one of the applicant's parents is a member of Harvard's faculty or staff. Ex. 55 at HARV00001402 (Interviewer Handbook 2014-2015); Ex. 1 at 97:16-23 (McGrath 2015 Dep.); Ex. 3 at 204:8-15.

**Response**: Undisputed.

227.    Dr. Arcidiacono conjectured that the Admissions Office evaluates ALDC applicants under "special admissions procedures." Ex. 35 at 69 (Arcidiacono Rebuttal).

**Response:** Disputed. Professor Arcidiacono did not "conjecture" that the Admissions Office evaluates ALDC applicants under "special admissions procedures." The Admissions Office evaluates ALDC applicants under "special admissions procedures" because they receive both procedural advantages, *see, e.g.*, SFFA SMF ¶¶ 195, 287, 298; Arcidiacono Rebuttal 34, and substantive advantages, *see* Arcidiacono Rebuttal 3, 5-6, 19, 28, App. A at 3-4 n.1, Tables B.7.1R & B.7.2R; Arcidiacono Rep. 21-22.

228.    There is no separate admissions process for recruited athletes, applicants one of whose parents attended Harvard College or Radcliffe, applicants who appear on the Dean's or Director's interest list, or applicants one of whose parents is a member of Harvard's faculty or staff. *See e.g.*, Ex. 77 (Frequently Asked Questions) (Question: "Is there a separate admissions process for prospective athletes?" Answer: "No. We encourage students with athletic talent to contact our Athletic Department for information about any of Harvard's 42 varsity athletic teams."); Ex. 63 at HARV00022645 (FW: Harvard Women's Ice Hockey) (email from women's hockey coach to admissions personnel regarding consideration of hockey recruits at "next week's admissions meeting" and noting that "there are many qualified applicants for next year's class" who are under consideration); Ex. 6 at 220:14-18 (Question:  "How are legacies treated differently in the admitting process than other applicants?" Answer: "They are not treated differently."); Ex. 3 at 203:19-204:4 (admissions officer "never experienced a time in which [she] was asked to give an applicant [on the Dean's interest list] different treatment" and her "experience in the admissions office was that all candidates were reviewed in the same form"); *id.* at 204:5-205:2 (if an applicant has a connection to Harvard faculty or staff "[i]t's one small factor among a list of many that are considered for a student's candidacy" and "a connection to staff or faculty alone would not be reason enough to grant a student

admission").

**Response:** SFFA does not dispute that ALDC applicants do not go through a "separate" admissions process—*e.g.*, that they are not reviewed in subcommittee meetings or in full committee meetings. Instead, applicants receive both procedural advantages, *see, e.g.*, SFFA SMF ¶¶ 195, 287, 298; Arcidiacono Rebuttal 34, and substantive advantages, *see* Arcidiacono Rebuttal 3, 5-6, 19, 28, App. A at 3-4 n.1, Tables B.7.1R & B.7.2R; Arcidiacono Rep. 21-22.

229.    The admission rate of domestic non-ALDC applicants to the Classes of 2014 to 2019 was 5.15% for Asian-American applicants and 4.91% for White applicants. Ex. 33 ¶ 71 & Card Ex. 7 (Card Report).

**Response:** Undisputed but immaterial, as these raw admit rates understate the penalties Asian Americans face because they do not take into account how strong the Asian-American applicant pool is relative to the other racial/ethnic groups. Arcidiacono Rep. 32.

230.    Dr. Arcidiacono also excluded the personal rating from his preferred model.  Ex. 27 at 157:22-158:10 (Arcidiacono Dep.); Ex. 35 at 25 (Arcidiacono Rebuttal).

**Response:** Undisputed.

231.    The personal rating takes into account numerous factors, many of which are not independently recorded in the admissions database.  Ex. 26 at 245:18-246:20 (Fitzsimmons Dep.); Ex. 1 at 164:11-165:2 (McGrath 2015 Dep.); Ex. 37 ¶ 40 (Card Rebuttal).  For example, the personal rating takes into account the applicant's essays, recommendation letters from at least two teachers, and a recommendation letter from the secondary school counselor; the essays and any recommendation letters beyond the required ones receive no numerical ratings in the database, and other recommendation letters receive only a unitary score that assesses the overall strength of the letter on all dimensions. Ex. 26 at 245:18-246:20 (Fitzsimmons Dep.); Ex. 1 at 164:11-165:2 (McGrath 2015 Dep.); Ex. 5 at 40:20-23; Ex. 37 ¶ 40 (Card Rebuttal).

**Response:** Disputed. Statistical evidence shows that race heavily affects the personal rating, which is recorded in the database. Arcidiacono Rebuttal 22-27, Tables B.6.3R & B.6.7R; Arcidiacono Rep. 55-60 & Table 5.6.

232.    When an applicant is strong in other respects, including academics and extracurricular activities, the applicant's personal qualities—as evidenced by teacher recommendations, the secondary school report, personal statement, and the alumni interview report—may distinguish an applicant's candidacy for admission. Ex. 55 at HARV00001401 (Interviewer Handbook 2014-2015); Ex. 26 at 164:11-165:2 (Fitzsimmons Dep.); Ex. 1 at 164:11-165:2 (McGrath 2015 Dep.).

**Response:** SFFA disputes the characterization of Harvard's admissions process. SFFA admits that the personal rating is a factor in determining whether a candidate will be admitted to Harvard but disputes the implication that race is not a factor in the personal ratings assigned by Harvard's admissions officers. Arcidiacono Rebuttal 22-27, Tables B.6.3R & B.6.7R; Arcidiacono Rep. 55-60 & Table 5.6.

233.    Dr. Arcidiacono's preferred model pooled admissions data across all six annual admissions cycles for which data were produced. Ex. 35 at 34-35 (Arcidiacono Rebuttal); Ex. 33 ¶¶ 102-104 (Card Report).

**Response:** SFFA disputes the characterization. Professor Arcidiacono's preferred model includes indicators for each application cycle (in addition to other yearly interactions) to take into account changes in the competitiveness of the pool across admissions cycles. Arcidiacono Rebuttal 69-70.

234.    The Harvard admissions process is a year-by-year process in which applicants to a particular year's class compete for spots in that class. Ex. 27 at 122:10-14 (Arcidiacono Dep.); Ex. 33 ¶¶ 102-103 (Card Report); Ex. 37 ¶ 80 (Card Rebuttal).

**Response:** Undisputed.

235.    Dr. Arcidiacono's preferred analysis excludes data reflecting the occupations of an applicant's parents. Ex. 35 at 31-33 (Arcidiacono Rebuttal); Ex. 27 at 190:15-18 (Arcidiacono Dep.).

**Response:** Undisputed. Professor Arcidiacono excluded these data from his preferred model for proper reasons, including because the "parental occupation" variable oscillates wildly from year-to-year and because there is no evidence that the Admissions Office considers parental occupation important aside from its value as a measure of socioeconomic status. Arcidiacono Rebuttal 6, 31-33. Professor Arcidiacono also included the "parental occupation" variable in his robustness analysis and found that his findings did not change. Arcidiacono Rebuttal 71-73; Table 8.2N.

236.    Harvard considers the occupations of an applicant's parents in the admissions process. Ex. 1 at 180:14-181:4 (McGrath 2015 Dep.); Ex. 9 at 184:18-185:6; Ex.12 at 47:15-16 (Donahue Dep.); Ex. 33 ¶ 86 (Card Report); Ex. 37 ¶¶ 62-65 (Card Rebuttal).

**Response:** SFFA admits that Harvard claims to consider parental occupation in its admissions process, but disputes the implication that this factor is given any particular significance in the admissions decision beyond socioeconomic status, which is already accounted for in Professor Arcidiacono's model. Arcidiacono Rebuttal Rep. 33.

237.    Dr. Arcidiacono omits from his analysis data reflecting an applicant's intended career. Ex. 33 ¶ 88 (Card Report).

**Response:** Disputed. Professor Arcidiacono included the "intended career" variable in his robustness analysis and found that his findings did not change. Arcidiacono Rebuttal 71-73, Table 8.2N. Professor Arcidiacono excluded these data from his preferred analysis for proper reasons, including because the "intended career" variable oscillates wildly from year-to-year, rendering the data unreliable and any results using it suspect. Arcidiacono Rebuttal 6, 62-63.

238.    Harvard considers an applicant's intended career in the application process.  Ex. 27 at 214:8-216:13 (Arcidiacono Dep.); Ex. 33 ¶ 88 (Card Report); Ex. 37 ¶¶ 72-73 (Card Rebuttal).

**Response:** SFFA admits that Harvard claims to consider intended career in its admissions process, but disputes the implication that this factor is given any particular significance in the admissions decision.

239.    Each of the methodological decisions made by Dr. Arcidiacono—including his choices to exclude ALDC applicants, pool data across admissions cycles, exclude the personal rating, exclude parental occupation data, and exclude intended career data—has the effect of increasing his estimated negative effect of Asian-American ethnicity on applicants' likelihood of admission. Ex. 37 ¶¶ 104-105 & Card Ex. 13 (Card Rebuttal); Ex. 27 at 114:8-116:7 (Arcidiacono Dep.).

**Response:** Disputed. Pooling data across admissions cycles does not necessarily result in higher estimates of the Asian penalty. Arcidiacono Rebuttal 40, Table 4.2N. SFFA disputes the implication that these methodological decisions were done to increase the negative effect of Asian-American ethnicity on applicants' likelihood of admission. *Id.* By contrast, Professor Card's methodological decisions all decrease the estimated negative effect of Asian-American ethnicity on applicants' likelihood of admission and appear to be intentionally included for that reason. Arcidiacono Rebuttal 2.

## VII.    Students For Fair Admissions And "Standing Members"

### A.    SFFA's Founding & Organizational Structure

240.    SFFA was incorporated in July 2014. Ex. 85 at SFFA-Harvard0000003 (Articles of Incorporation).

**Response:** Undisputed.

241.    SFFA's original Board of Directors consisted of Edward Blum, Abigail Fisher (the plaintiff in *Fisher v. University of Texas at Austin*), and Richard Fisher (Abigail Fisher's father). Ex. 2 at 102:6-16 (Blum Dep.); Ex. 86 at SFFA-Harvard0000105 (Organizational Action Taken by the Sole Incorporator of Students for Fair Admissions, Inc.).

**Response:** Undisputed.

242.    The original directors appointed themselves SFFA's President, Secretary, and Treasurer, respectively. Ex. 2 at 104:9-105:19 (Blum Dep.); Ex. 87 at SFFA-Harvard0000068 (Unanimous Written Consent).

**Response:** Undisputed.

243.    SFFA was created for the specific purpose of suing Harvard. Ex. 2 at 73:23-25, 166:13-25 (Blum Dep.).

**Response:** Disputed. The cited evidence does not support the proposition that "SFFA was created for the specific purpose of suing Harvard." SFFA was created for the purpose of "defend[ing] human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means." Connolly(2nd) Ex. 264 at SFFA-Harvard 0000059; Ellsworth Ex. 2, Blum 109:19-21.

244.    SFFA's Articles of Incorporation, dated July 29, 2014, provided that "[t]he Corporation shall have no members." Ex. 85 at SFFA-Harvard0000002 (Articles of Incorporation).

**Response:** Undisputed.

245.    SFFA's founding bylaws provided that "[t]he Corporation shall have no members." Ex. 87 at SFFA-Harvard0000068, SFFA-Harvard0000075 (Unanimous Written Consent).

**Response:** Undisputed but incomplete. The bylaws provided that "The Corporation shall have no members within the meaning of the [Virginia Nonstock Corporation] Act." Ellsworth Ex. 87 at SFFA-Harvard0000075.

246.    The founding bylaws provided for "affiliate members," but afforded such members no voting rights for directors, officers, or any other purpose. Ex. 87 at SFFA- Harvard0000075 (Unanimous Written Consent); Ex. 2 at 108:11-109:16 (Blum Dep.).

**Response:** SFFA admits that the bylaws said: "Affiliate members have no voting rights and

are not members within the meaning of the [Virginia Nonstock Corporation] Act." Ellsworth Ex. 87 at SFFA-Harvard0000075.

247.    On June 19, 2015, seven months after this lawsuit was filed, SFFA amended its bylaws. Ex. 89 at SFFA-Harvard 0000052–54 (Unanimous Written Consent).

**Response:** Undisputed.

248.    The amended bylaws added two directors, one appointed by the Board and one elected by a newly created class of "General Members." Ex. 89 at SFFA-Harvard0000060 (Unanimous Written Consent).

**Response:** Undisputed.

249.    Individuals identified by SFFA as "standing members" confirmed that they have not attended any SFFA meetings. *See* Ex. 24 at 40:14-41:17 ( Dep.); Ex. 21 at 35:24-36:7; 109:9-15 ( Dep.); Ex. 22 at 38:15-17  Dep.); Ex. 15 at 80:4-81:12  Dep.); Ex. 19 at 22:15-23:19 ( Dep.); Ex. 11 at 47:13-48:16 ( Dep.).

**Response:** Disputed. Standing members have met with SFFA's President and, in some cases, attended telephonic conference calls open to the entire membership. *See, e.g.,* Connolly Ex. 197, ¶ 9; Connolly(2nd) Ex. 275  80:4-17. Moreover . *See* Connolly Ex. 194,  Dec. ¶ 6.

250.    Individuals identified by SFFA as "standing members" were instructed by counsel not to answer whether they participated in any SFFA election. *See* Ex. 24 at 40:5-13  Dep.); Ex. 21 at 108:7-109:16  Dep.); Ex. 22 at 63:5-15 ( Dep.); Ex. 15 at 76:21-25 ( Dep.); Ex. 19 at 75:10-77:3, 82:11-83:4  Dep.); Ex. 11 at 55:3-57:9, 111:4-13  Dep.).

**Response:** Undisputed, but SFFA notes this instruction was consistent with the Court's order prohibiting such discovery on grounds of relevance. *See* Dkt. No. 152 (Transcript of 4/29/16 Hearing).

251.     Initial funding for SFFA was provided by the Project on Fair Representation ("POFR"), an organization for which Mr. Blum served as the Executive Director. Ex. 88 at SFFA-Harvard 0000044, 46 (Form 1023 (Application for Recognition of Exemption) on behalf of Students for Fair Admissions, Inc.).

**Response:** Undisputed.

252.     The amended bylaws authorized the Board to institute a one-time $10 dues requirement for new members. Ex. 89 at SFFA-Harvard0000059-60 (Unanimous Written Consent In Lieu of a Meeting of the Board of Directors of Students for Fair Admissions, Inc., Amendment of Bylaws); Ex. 90 at SFFA-Harvard0000122 (Annual Report of Students for Fair Admissions (SFFA)).

**Response:** Undisputed.

253.     SFFA reported $430 in "[m]embership dues" for 2015, and $300 in "[m]embership dues" for 2016. Ex. 91 at SFFA-Harvard0001973 (SFFA's 2015 IRS 990); Ex. 92 at 9 (SFFA's 2016 IRS 990).

**Response:** Undisputed.

254.     Approximately 99.6% of SFFA's 20,000 claimed members have never paid dues. *See* Ex. 2 at 325:21-326:4 (Blum Dep.); Ex. 91 at SFFA-Harvard0001973 (SFFA 2015 IRS 990) (43 members paid the $10 dues in 2015); Ex. 92 at 9 (SFFA 2016 IRS 990) (30 members paid the $10 dues in 2016).

**Response:** Disputed. As of April 30, 2017, 133 members had paid the $10 membership fee and SFFA had received 790 contributions from its individual members (including the required membership fee for every member who joined after July 30, 2015). Connolly (2nd) Ex. 262 at 9, 12, SFFA Rog Resp. (Aug. 4, 2017). SFFA has more than 20,000 members. *Id.* at 12. SFFA disputes any implication that these individuals are not actually members of SFFA. *Id.*

255.    SFFA reported $826,234 in "other contributions, gifts, grants, and similar amounts" for 2015, and $1,106,722 in such contributions for 2016. Ex. 91 at SFFA- Harvard0001973 (SFFA 2015 IRS 990); Ex. 92 at 9 (SFFA 2016 IRS 990).

**Response:** Undisputed.

256.    Approximately 99.9% of SFFA's 2015 and 2016 revenue came from sources other than membership dues. *See* Ex. 91 at SFFA-Harvard0001973 (SFFA 2015 IRS 990); Ex. 92 at 9 (SFFA 2016 IRS 990).

**Response:** Undisputed but incomplete. SFFA has also received revenue through individual contributions from its members. As of April 30, 2017, SFFA had received 790 contributions from its individual members Connolly (2nd) Ex. 262 at 9, SFFA Rog Resp. (Aug. 4, 2017).

257.    Mr. Blum is "the primary fund-raiser for SFFA" and he is solely responsible for SFFA's day-to-day operations. Ex. 10 at 149:2-5 (R. Fisher Dep.); Ex. 2 at 88:17-89:9 (Blum Dep.).

**Response:** Undisputed.

### B.    SFFA's Standing Members

258.    SFFA has identified only one "standing member" who was a member at the time the Complaint was filed: ▮▮▮▮▮▮. Dkt. 1 ¶¶ 15-23; Ex. 40 at 1 (Plaintiff's Supp. Response to Interrogatory No. 5); Ex. 11 at 195:11-201:2 (▮ Dep.).

**Response:** Disputed. ▮▮▮▮▮▮ "was a member at the time the Complaint was filed." *See* Ellsworth, Ex. 40 at 2.

259.    Harvard College admits transfer applicants only if they have completed at least one and not more than two years of undergraduate study. Ex. 76 (Transferring to Harvard College).

**Response:** Undisputed.

260.    ▮▮▮▮▮ is ineligible to transfer to Harvard College because ▮ has completed more than two years of undergraduate study. As of May 16, 2017, ▮▮▮▮▮ had "completed three full

years of study" at the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 11 at 70:5-8 (▮▮▮▮▮▮▮▮▮

**Response:** Undisputed.

261.    The deadline for transfer applications to Harvard College is March 1 and decisions are made by June 1. Ex. 76 (Transferring to Harvard College).

**Response:** Undisputed.

262.    ▮▮▮▮▮▮ has completed two years of undergraduate study and, therefore, can no longer apply to transfer to Harvard College. Ex. 21 at 74:12-14 (▮ Dep.) ▮▮▮▮ had finished freshman year a year ago, as of July 20, 2017); *id.* at 81:25-82:4 ▮▮▮▮ acknowledging that "the spring of [2018]" would be the latest ▮ could transfer).

**Response:** Undisputed.

263.    ▮▮▮▮▮ has completed two years of undergraduate study and, therefore, can no longer apply to transfer to Harvard College. Ex. 22 at 65:14-16 (▮ Dep.) ▮▮▮▮ had finished freshman year a year ago, as of July 24, 2017); *id.* at 73:22-23 (▮▮▮ acknowledging that "[i]f I were ineligible, I would not apply to transfer").

**Response:** Undisputed.

264.    ▮▮▮▮▮ has completed two years of undergraduate study and, therefore, can no longer apply to transfer to Harvard College. Ex. 24 at 65:16-17 (▮ Dep.) (▮▮▮▮ had finished freshman year a year ago, as of July 27, 2017); *id.* at 66:2-15 (▮▮▮ acknowledging that ▮ planned to return to ▮▮▮ for ▮ sophomore year and that "[i]f I'm no longer eligible for transfer admission, then I would not apply to transfer").

**Response:** Undisputed.

265.    ▮▮▮▮▮▮▮ has completed three years of undergraduate study and, therefore, can no longer apply to transfer to Harvard College. Ex. 93 at SFFA-Harvard0001955 (Declaration of ▮▮▮▮▮▮) (stating that ▮ had completed her freshman year two years ago, as of June 17,

2016).

    **Response:** Undisputed.

    266.    When asked whether ██ intended to apply to transfer to any other college or university ████████ testified that "I don't anticipate that at the moment, no." Ex. 15 at 37:25-38:3 (████ Dep.).

    **Response:** SFFA disputes the characterization of the testimony ████████ is able and ready to apply to transfer to Harvard were it to cease the use of race or ethnicity as an admissions preference and to cease its intentional discrimination against Asian Americans. Connolly Ex. 197, ¶ 6 ████ Dec.; Connolly(2nd) Ex. 275, ████ Dep. 42:8-43:9.

    267.    When asked under what circumstances ██ would be willing to consider transferring, ████████ testified that it was "highly speculative" as to whether ██ would apply to transfer. Ex. 19 at 44:5-12 (████ Dep.).

    **Response:** SFFA disputes the characterization of the testimony ████████ is able and ready to apply to transfer to Harvard were it to cease the use of race or ethnicity as an admissions preference and to cease its intentional discrimination. Connolly Ex. 199, ¶ 6 ████ Dec.; Ex. 276 ████ Depo. 51:17-53:10.

    268.    ████████ has not yet applied to Harvard and has no intention to do so until the admissions cycle of 2019-2020, if at all. Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

    **Response:** Undisputed.

    269.    SFFA has identified as a "standing member ████████ the parent of ████████ Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

    **Response:** Undisputed.

    270.    The only alleged basis ████████ standing is that ██ is the parent of ████████.

Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

**Response:** This is a statement of law rather than fact, and therefore no response is required. SFFA admits that ██████████████████████████.

271.   SFFA has identified as a "standing member" ████████████, the parent ████ and ████████████. Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

**Response:** Undisputed.

272.   The only alleged basis for ████████████ standing is that ██ is the parent of ████ and ████████████. Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

**Response:** This is a statement of law rather than fact, and therefore no response is required. SFFA admits that ████████████ is the parent of ████ and ████████████

273.   SFFA has identified as a "standing member" ████████, the parent of ████ and ████████. Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

**Response:** Undisputed.

274.   The only alleged basis for ████████ standing is that ██ is the parent of ████ and ████████. Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

**Response:** This is a statement of law rather than fact, and therefore no response is required. SFFA admits that ████████ is the parent of ████ and ████████.

275.   SFFA has identified as a "standing member" ████████████, the parent of ████ ████████ Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

**Response:** Undisputed.

276.   The only alleged basis for ████████████ standing is that ██ is the parent of ████ ████████ Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

**Response:** This is a statement of law rather than fact, and therefore no response is required. SFFA admits that ████████████ is the parent of ████████████.

277.    SFFA has identified as a "standing member" ███████, the parent of ████ and ████████████. Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

**Response:** Undisputed.

278.    The only alleged basis for ███████████ standing is that ██ is the parent of ████ and ████████████. Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

**Response:** This is a statement of law rather than fact, and therefore no response is required. SFFA admits that ███████████ is the parent of ██████ and ████████████.

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

1.      SFFA hereby incorporates its previously-filed Statement of Material Facts in Support of Motion for Summary Judgment into this Statement of Additional Facts in support of its Response to Defendant's Statement of Material Facts. *See* Doc. 414; *see also* Doc. 407 (ordering the parties to "limit repetition" and present the facts as "efficiently as possible").

## I.      Students for Fair Admissions

2.      SFFA is a voluntary membership association comprised of more than 21,000 people. Connolly (2nd) Ex. 262 at 10-12, SFFA Rog Resp. (Aug. 4, 2017).

3.      SFFA's members include applicants and prospective applicants to institutions of higher education, along with their parents, and other individuals who share SFFA's mission. Connolly(2nd) Ex. 262 at 10-12, SFFA Rog Resp. (Aug. 4, 2017); *id.*, Ex. 263 at SFFA-Harvard 000041, SFFA Application for Tax Exempt Status.

4.      SFFA's mission is "to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means." Connolly(2nd) Ex. 264 at SFFA-Harvard 0000059.

5.      A substantial part of SFFA's mission is to end race-based admissions policies at American universities. Connolly(2nd) Ex. 264 at SFFA-Harvard 0000059, SFFA Bylaws; 263 at SFFA-Harvard 000041, SFFA Application for Tax Exempt Status; Connolly(2nd) Ex. 262 at 10-12, SFFA Rog Resp. (Aug. 4, 2017); Connolly(2nd) Ex. 285, Blum 47:16-25; *Students for Fair Admissions, Inc. (SFFA) v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 261 F. Supp. 3d 99, 110-11 (D. Mass. 2017).

6.      In 2014, SFFA applied to be a 501(c)(3) nonprofit organization, describing itself as "a coalition of prospective applicants and applicants to higher education institutions who were denied admission to higher education institutions, their family members, and other individuals who support

the organization's purpose and mission of eliminating racial discrimination in higher education admissions." Connolly(2nd) Ex. 263 at SFFA-Harvard 000041, SFFA Application for Tax Exempt Status.

7.      The IRS approved SFFA as a 501(c)(3) nonprofit organization. Connolly(2nd) Ex. 265 at SFFA-Harvard 0000001, IRS Approval.

8.      SFFA's Board of Directors has five members. One of these members is elected directly by the members of SFFA. Connolly(2nd) Ex. 266 at SFFA-Harvard 0000052-53, Bylaws Amendments; Ex. 264 at SFFA-Harvard 0000060, SFFA Bylaws.

9.      SFFA offers membership to "any individual who seeks to support the purposes and mission of [SFFA], pays membership dues as may be prescribed by the Board of Directors, and meets any additional standards and procedures that may be prescribed from time to time by the Board of Directors." Ex. 264 at SFFA-Harvard 0000059-60, SFFA Bylaws.

10.      SFFA clearly communicates its mission, which has stayed consistent since its founding, to prospective members through its website and in its outreach efforts. Connolly(2nd) Ex. 262 at 10-11, SFFA Rog Resp. (Aug. 4, 2017); Connolly(2nd) Ex. 285, Blum 110:2-7; *SFFA*, 261 F. Supp. 3d at 110-11

11.      SFFA's members voluntarily join the organization by providing their name and contact information and paying a small fee. Connolly(2nd) Ex. 262 at 11-12, SFFA Rog Resp. (Aug. 4, 2017); Connolly(2nd) Ex. 266 at SFFA-Harvard 0000052-53, Bylaws Amendments; *SFFA*, 261 F. Supp. 3d at 110-11.

12.      The Bylaws lay out who qualifies as a member and what a member's role is and permit members to vote for one member of the Board of Directors, who participates in Board decisions, thereby granting members more direct access to SFFA's management. Ex. 264 at SFFA-Harvard 0000059-60, SFFA Bylaws; *SFFA*, 261 F. Supp. 3d at 110-11.

13.     SFFA members can voluntarily donate funds, in addition to the one-time, ten-dollar contribution (required since July 2015) as a way of influencing the organization. Connolly(2nd) Ex. 266 at SFFA-Harvard 0000052-53, Bylaws Amendments; *id.* Ex. 262 at 9, 12, SFFA Rog Resp. (Aug. 4, 2017); *SFFA*, 261 F. Supp. 3d at 110-11.

14.     As of April 30, 2017, 133 members had paid the $10 membership fee. Connolly (2nd) Ex. 262 at 12, SFFA Rog Resp. (Aug. 4, 2017).

15.     As of April 30, 2017, SFFA had received 790 contributions from its individual members (including the required membership fee for every member who joined after July 30, 2015). Connolly (2nd) Ex. 262 at 9, SFFA Rog Resp. (Aug. 4, 2017).

16.     SFFA communicates regularly with its members, including through email updates, letters, one-on-one communications, and members-only conference calls, about this litigation and other issues its members care about. Connolly (2nd) Ex. 262 at 13, SFFA Rog Resp. (Aug. 4, 2017).

17.     SFFA also holds conference calls to update members on its activities, including this litigation, and to solicit their input. On the calls, members can ask questions, provide guidance, and comment on SFFA's activities and priorities. Connolly (2nd) Ex. 262 at 13, SFFA Rog Resp. (Aug. 4, 2017); Ellsworth Ex. 90, SFFA-Harvard0000122.

18.     SFFA's leadership  also communicates with the standing members in this case and SFFA leadership seeks and receives their input about the case and other activities of the organization. *See, e.g.*, Connolly Ex. 197, ¶ 9; Connolly(2nd) Ex. 275, ███ 69:22-70:12; Connolly(2nd) Ex. 279, ¶ 9.

## II.    SFFA's Standing Members

### A.    SFFA's Members Denied Admission to the Harvard Class of 2018.

**1.**    ██████████

19.    ██████████ graduated ████████████████████ in ███████████. Connolly Ex. 256, ¶ 3.

20.    ██████████ is Asian American. *Id.* ¶ 2.

21.    In the fall of 2013 ██████████ applied for admission to Harvard College for the undergraduate class of 2018. In April 2014, ██ learned that Harvard College had denied ██ application for admission. *Id.* ¶ 4.

22.    ██████████ became a member of SFFA in November 2014 because ██ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 7.

23.    ██████████ did not pay a membership fee because no fee was required for membership when ██ joined SFFA. Nonetheless, his father ████████████████████) has contributed financially to SFFA. *Id.* ¶ 8.

24.    ██████████ agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum ██████████, and from SFFA's attorneys. They have answered ██ questions and afforded ██ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 9.

### B.    SFFA's Members Denied Admission to the Harvard Class of 2019.

**1.**    ██████████

25.    ██████████ graduated from ████████████████ in ███████████, ██████████ in 2015. Connolly Ex. 258, ¶ 3.

26.    ██████████ is Asian American. *Id.* ¶ 2.

27.     In the fall of 2014, ████████████ applied for admission to Harvard College for the undergraduate class of 2019. In April 2015, ██ learned that Harvard College had placed ██ on the waiting list, so ██ decided to attend another college. *Id.* ¶ 4.

28.     ████████████ became a member of SFFA in June 2015 because ██ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 7.

29.     ████████████ did not pay a membership fee because no fee was required for membership when ██ joined SFFA. *Id.* ¶ 8.

30.     ████████████ agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. They have answered ██ questions and afforded ██ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 9.

### C.     SFFA's Members Denied Admission to the Harvard Class of 2020.

#### 1.     ████████████

31.     ████████████ graduated from ████████████ in ████████████. Connolly Ex. 254, ¶ 3.

32.     ████████████ is Asian American. *Id.* ¶ 2.

33.     In the fall of 2015, ████████████ applied for admission to Harvard College for the undergraduate class of 2020. In April 2016, ██ learned that Harvard College had denied ██ application for admission. *Id.* ¶ 4.

34.     ████████████ became a member of SFFA in April 2016 because ██ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 7.

35.  ███████████ paid the membership fee when █ joined SFFA in April 2016. *Id.* ¶ 8.

36.  ███████████ agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. They have answered █ questions and afforded █ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 9.

**2.**  ██████

37.  ███████ graduated from ███████████████ in ███████████. Connolly Ex. 255, ¶ 3.

38.  ██████ is Asian American. *Id.* ¶ 2.

39.  In the fall of 2015 ███████ applied for admission to Harvard College for the undergraduate class of 2020. In April 2016 █ learned that Harvard College had denied █ application for admission. *Id.* ¶ 4.

40.  ██████ became a member of SFFA in May 2016 because █ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 7.

41.  ██████ paid the membership fee when █ joined SFFA in April 2016. *Id.* ¶ 8.

42.  ██████ agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. They have answered █ questions and afforded █ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 9.

**3.**  ██████

43.  ██████ graduated from ███████████ in █████████ Connolly Ex. 195, ¶ 3.

44. ██████ is Asian American. *Id.* ¶ 2.

45. In the fall of 2015, ██████ applied for admission to Harvard College for the undergraduate class of 2020. In April 2016, █ learned that Harvard College had placed ██ on the waiting list, and in May 2016, █ learned that Harvard College had denied ██ application for admission. *Id.* ¶ 4.

46. ██████ became a member of SFFA in June 2016 because █ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 7.

47. ██████ paid the membership fee when █ joined SFFA in June 2016. *Id.* ¶ 8.

48. ██████ agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. They have answered █ questions and afforded ██ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 9.

**D.    SFFA's Members Denied Admission to the Harvard Class of 2021.**

**1.    ██████**

49. ██████ graduated from ████████████ in ████████████ in 2017. Connolly(2nd) Ex. 277, ¶ 3.

50. ██████ is Asian American. *Id.* ¶ 2.

51. In December 2016, ██████ applied for admission to Harvard College for the undergraduate class of 2021. In March 2017, ██ learned that Harvard College had denied ██ application for admission. *Id.* ¶ 4.

52. ██████ is currently a student at ████████████ where █ recently completed her first year of studies. *Id.* ¶ 5.

53. ███████ is able and ready to apply to transfer to Harvard were it to cease the use of race or ethnicity as an admissions preference and to cease its intentional discrimination against Asian Americans. *Id.* ¶ 6.

54. ███████ became a member of SFFA in June 2018 because ██ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 7.

55. ███████ paid the membership fee when ██ joined SFFA in June 2018. *Id.* ¶ 8.

56. ███████ agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. Mr. Blum and SFFA's attorneys have answered ██ questions and afforded ██ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 9.

**2.** ███████

57. ███████ graduated from █████████████ in █████████ in 2017. Connolly Ex. 197, ¶ 3.

58. ███████ is Asian American. *Id.* ¶ 2.

59. In the fall of 2016, ███████ applied for admission to Harvard College for the undergraduate class of 2021. In March 2017, ██ learned that Harvard College had denied ██ application for admission. *Id.* ¶ 4.

60. ███████ is currently a student at ████████. *Id.* ¶ 5.

61. ███████ is able and ready to apply to transfer to Harvard were it to cease the use of race or ethnicity as an admissions preference and to cease its intentional discrimination against Asian Americans. *Id.* ¶ 6; Connolly(2nd) Ex. 275, ██ 42:8-43:9.

62. In ██ deposition, ███████ confirmed that everything in ██ declaration is true and accurate. Connolly(2nd) Ex. 275, ██ 40:25-41:2.

63.     In ▮ deposition ▮▮▮▮ confirmed that ▮ remains ready and able to apply to Harvard if Harvard stops discriminating on the basis of race: "if Harvard were to stop using its use of race and ethnicity in admissions, I would think my chances of being admitted had risen enough, because of that change, that I would apply again for transfer to see if I could get in under the new system." Connolly(2nd) Ex. 275, ▮▮▮ 42:22-43:2.

64.     In ▮ deposition, ▮▮▮▮ reiterated ▮ intentions: "Q. But under the current system you have no intent to apply to transfer; is that correct? A. That's correct. Q. Is it just if Harvard were to cease the use of race as an admissions process, then you would intend to apply to transfer to Harvard? A. Yes." Connolly(2nd) Ex. 275, ▮▮▮ 43:3-9.

65.     ▮▮▮▮ became a member of SFFA in November 2014 because ▮ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. Connolly Ex. 197, ¶ 7.

66.     ▮▮▮▮ did not pay a membership fee because no fee was required for membership when ▮ joined. *Id.* ¶ 8.

67.     ▮▮▮▮ agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. Mr. Blum and SFFA's attorneys have answered ▮ questions and afforded ▮ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 9.

68.     For example ▮▮▮▮ testified that "I've been very curious about this, asked a lot of questions, and they've answered them thoroughly. And having input and direction, I have suggested things to them about, like, possible arguments to make in the lawsuit or—I've actually had more input—I've given them more input about future lawsuits to bring." Connolly(2nd) Ex. 275, ▮▮▮ 69:22-70:12.

**3.** ██████████████

69.     ████████████ graduated from ███████████ in █████████ in 2017. Connolly Ex. 199, ¶ 3.

70.     ███████████ is Asian American. *Id.* ¶ 2.

71.     In the fall of 2016, ███████████ applied for admission to Harvard College for the undergraduate class of 2021. In March 2017, ██ learned that Harvard College had denied ██ application for admission. *Id.* ¶ 4.

72.     ████████████ is currently a student at ██████████████ *Id.* ¶ 5.

73.     ███████████ is able and ready to apply to transfer to Harvard were it to cease the use of race or ethnicity as an admissions preference and to cease its intentional discrimination against Asian Americans. *Id.* ¶ 6; Connolly(2nd) Ex. 276, ████████ 51:17-53:10.

74.     In ██ deposition, ███████████ confirmed that everything in his declaration is true and accurate. Connolly(2nd) Ex. 276, █████████ 50:10-51:20.

75.     In ██ deposition, he made clear that he remains ready and able to apply to Harvard if Harvard stops discriminating on the basis of race: "Q. If Harvard does cease the use of race or ethnicity as an admissions preference, would you plan to apply to transfer? .... A. As the document says, I'm able and ready to apply to transfer, were it to cease the use of race." Connolly(2nd) Ex. 276, █████████ 52:15-21.

76.     █████████████ became a member of SFFA in April 2017 because ██ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. Connolly Ex.199, ¶ 7.

77.     ███████████ paid the membership fee when ██ joined SFFA in April 2017. *Id.* ¶ 8.

78.     █████████████ agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. Mr.

Blum and SFFA's attorneys have answered ▮ questions and afforded ▮ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 9.

**E.    SFFA's Members Denied Admission to the Harvard Class of 2022.**

**1.    ▮▮▮**

79.    ▮▮▮ graduated from ▮▮▮ in ▮▮▮. Connolly(2nd) Ex. 278, ¶ 3.

80.    ▮▮▮ is Asian American. *Id.* ¶ 2.

81.    In the fall of 2017, ▮▮▮ applied for admission to Harvard College for the undergraduate class of 2022. In March 2018, ▮ learned that Harvard College had denied ▮ application for admission. *Id.* ¶ 4.

82.    ▮▮▮ is able and ready to apply to transfer to Harvard were it to cease the use of race or ethnicity as an admissions preference and to cease its intentional discrimination against Asian Americans. *Id.* ¶ 6.

83.    ▮▮▮ became a member of SFFA in June 2018 because ▮ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 7.

84.    ▮▮▮ paid the membership fee ▮ he joined SFFA in June 2018. *Id.* ¶ 8.

85.    ▮▮▮ agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. Mr. Blum and SFFA's attorneys have answered ▮ questions and afforded ▮ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 9.

**2.** ▮▮▮▮▮

86.     ▮▮▮▮▮ graduated from ▮▮▮▮▮ of ▮▮▮▮▮ Connolly(2nd) Ex. 279, ¶ 3.

87.     ▮▮▮▮▮ is Asian American. *Id.* ¶ 2.

88.     In the fall of 2017, ▮▮▮▮▮ applied for admission to Harvard College for the undergraduate class of 2022. In March 2018 ▮▮▮▮▮ was informed that Harvard College had denied ▮ application for admission. *Id.* ¶ 4.

89.     ▮▮▮▮▮ is able and ready to apply to transfer to Harvard were it to cease the use of race or ethnicity as an admissions preference and to cease its intentional discrimination against Asian Americans. *Id.* ¶ 6.

90.     ▮▮▮▮▮ became a member of SFFA in April 2018 because ▮ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 7.

91.     ▮▮▮▮▮ paid the membership fee ▮▮▮ he joined SFFA in April 2018. *Id.* ¶ 8.

92.     ▮▮▮▮▮ agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. Mr. Blum and SFFA's attorneys have answered ▮ questions and afforded ▮ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 9.

**3.** ▮▮▮▮▮

93.     ▮▮▮▮▮ graduated from ▮▮▮▮▮ in ▮▮▮▮▮. Connolly(2nd) Ex. 280, ¶ 3.

94.     ▮▮▮▮▮ is Asian American. *Id.* ¶ 2.

95.     In the fall of 2017 ▮▮▮▮▮ applied for admission to Harvard College for the undergraduate class of 2022. In March 2018 ▮▮▮▮▮ was informed that Harvard College had placed

████ on the waiting list. In June 2018, ████ learned that Harvard College had denied ████ application for admission. *Id.* ¶ 4.

96.     ████████ is able and ready to apply to transfer to Harvard were it to cease the use of race or ethnicity as an admissions preference and to cease its intentional discrimination against Asian Americans. *Id.* ¶ 6.

97.     ████████ became a member of SFFA in June 2018 because ██ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 7.

98.     ████████ paid the membership fee when ██ joined SFFA in April 2018. *Id.* ¶ 8.

99.     ████████ agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. Mr. Blum and SFFA's attorneys have answered ███ questions and afforded ███ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 9.

**4.**     ████████

100.     ████████ graduated 
in June 2018. Connolly(2nd) Ex. 281, ¶ 3.

101.     ████████ is Asian American. *Id.* ¶ 2.

102.     In the fall of 2017 ████████ applied for admission to Harvard College for the undergraduate class of 2022. In March 2018 ████ was informed that Harvard College had placed ████ on the waiting list. In May 2018, ██ learned that Harvard College had denied her application for admission. *Id.* ¶ 4.

103.     ████████ is able and ready to apply to transfer to Harvard were it to cease the use of race or ethnicity as an admissions preference and to cease its intentional discrimination against Asian Americans. *Id.* ¶ 6.

104.     ████      became a member of SFFA in June 2018 because ██ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 7.

105.     ████      paid the membership fee when ██ joined SFFA in June 2018. *Id.* ¶ 8.

106.     ████      agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. Mr. Blum and SFFA's attorneys have answered ██ questions and afforded ██ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 9.

**5.**    ████

107.     ████      graduated ████████████████ in ████████ in June 2018. Connolly(2nd) Ex. 282, ¶ 3.

108.     ████      is Asian American. *Id.* ¶ 2.

109.     In the fall of 2017 ████ applied for admission to Harvard College for the undergraduate class of 2022. In March 2018 ████ was informed that Harvard College had denied ██ application for admission. *Id.* ¶ 4.

110.     ████      is able and ready to apply to transfer to Harvard were it to cease the use of race or ethnicity as an admissions preference and to cease its intentional discrimination against Asian Americans. *Id.* ¶ 6.

111.     ████      became a member of SFFA in June 2018 because ██ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 7.

112.     ████      paid the membership fee when ██ joined SFFA in June 2018. *Id.* ¶ 8.

113.     ████      agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. Mr. Blum and

SFFA's attorneys have answered ███ questions and afforded ███ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 9.

**6.** ███████

114. ███████ graduated from the ███████████████

Connolly(2nd) Ex. 283, ¶ 3.

115. ███████ is Asian American. *Id.* ¶ 2.

116. In the fall of 2017 ███████ applied for admission to Harvard College for the undergraduate class of 2022. In March 2018, █ learned that Harvard College had denied █ application for admission. *Id.* ¶ 4.

117. ███████ is able and ready to apply to transfer to Harvard were it to cease the use of race or ethnicity as an admissions preference and to cease its intentional discrimination against Asian Americans. *Id.* ¶ 6.

118. ███████ became a member of SFFA in June 2018 because █ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 7.

119. ███████ paid the membership fee when █ joined SFFA in June 2018. *Id.* ¶ 8.

120. ███████ agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. Mr. Blum and SFFA's attorneys have answered ███ questions and afforded ███ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 9.

**F.   SFFA's Members Who Are Parents of Rejected and Future Applicants to Harvard**

**1.** ███████

121. ███████ is a first-generation immigrant who resides in ███████

Connolly Ex. 198, ¶ 2.

122. ██████████████ has two children, ████ and ████ *Id.*

123. ██████ graduated from ████████████ in ████████ in May 2017. ████ applied for admission to Harvard College, which denied ██ admission despite ██ outstanding qualifications. *Id.* ¶ 3.

124. ██████ is a rising ninth grader and has expressed interest in applying for admission to Harvard College. *Id.* ¶ 4.

125. ████████████ became a member of SFFA in April 2017 because ██ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 5.

126. ████████████ paid the membership fee when ██ joined SFFA in April 2017. *Id.* ¶ 6.

127. ████████████ agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. Mr. Blum and SFFA's attorneys have answered ██ questions and afforded ██ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 7.

   **2.** ████████

128. ██████ is a first-generation immigrant who resides in ████████████. Connolly Ex. 259, ¶ 2.

129. ██████ has two children, ████ and ████. *Id.*

130. ██████ graduated from ████████████ in ████████████ in 2016. ████ applied for admission to Harvard College, which placed ██ on the waitlist despite ██ outstanding qualifications. *Id.* ¶ 3.

131. ██████ is a rising senior at ████████████ and plans to apply for admission to Harvard College in the fall of 2018. *Id.* ¶ 4.

132.  ███████ became a member of SFFA in June 2016 because ██ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 5.

133.  ███████ paid the membership fee when ██ joined SFFA in April 2016. *Id.* ¶ 6.

134.  ███████ agreed to participate in SFFA's lawsuit against Harvard and has received updates about the status of the case from Edward Blum and from SFFA's attorneys. Mr. Blum and SFFA's attorneys have answered ██ questions and afforded ███ the opportunity to have input and direction on SFFA's case. *Id.* ¶ 7.

**3.**   ███████████

135.  ███████████ resides in ███████████. Connolly Ex. 260, ¶ 2.

136.  ███████████ has three ███████████, and ████. All three of ████████ are adopted children of Chinese national origin who became United States citizens upon adoption and entry into the United States. *Id.* ¶ 2.

137.  ████ graduated ███████████ in ███████████, in 2015. ██ applied for admission to Harvard College, which placed ███ on the waitlist despite ██ outstanding qualifications. *Id.* ¶ 3.

138.  ███████████ became a member of SFFA in June 2015 because ███ supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 5.

139.  ███████████ did not pay the membership fee when ███ joined SFFA in June 2015. *Id.* ¶ 6.

140.  ███████████ and ████ agreed to participate in SFFA's lawsuit against Harvard and have received updates about the status of the case from Edward Blum and from SFFA's attorneys.

Mr. Blum and SFFA's attorneys have answered their questions and afforded them the opportunity to have input and direction on SFFA's case. *Id.* ¶ 7.

**4.** ██████████████████████

141.  ██████████████████ is a first-generation immigrant who resides in ████████ ██████ Connolly Ex. 194, ¶ 2.

142.  ██████ has three ████████████ is his middle ███ *Id.*

143.  ██████ graduated from ████████████████ in ████████████, in 2014. ██ applied for admission to Harvard College, from which ██ was rejected despite ██ outstanding qualifications. *Id.* ¶ 3.

144.  ██████ became a member of SFFA ████████████ because he supports its mission and believes that Harvard College and many other colleges and universities wrongly discriminate against Asian-American applicants for admission. *Id.* ¶ 4.

145.  ██████ did not pay a membership fee because no fee was required for membership when ██ joined SFFA. Nonetheless, ██ has contributed financially to SFFA because ██ supports its mission. *Id.* ¶ 5.

146.  ████████████████████████████████████████████████████████ ██████████████████████████████████. *Id.* ¶ 6.

147.  ████████████████████████████████████████████████████████ ██████ have been in contact with Mr. Blum and SFFA's attorneys. ██ also communicates with ██ about the case. *Id.* ¶ 7.

## III.   Additional Facts

148.  In March 2007, Harvard reported that 19.6% of the admitted class for the Class of 2011 was Asian-American. Connolly(2nd) Ex. 268.

149.    In March 2014, before SFFA filed its lawsuit, Harvard reported that 19.7% of the admitted class for the Class of 2018 was Asian-American. *See* Connolly(2nd) Ex. 269.

150.    In April 2015, after SFFA filed its lawsuit, Harvard reported that 21.0% of the admitted class for the Class of 2019 was Asian-American. Connolly(2nd) Ex. 270.

151.    In April 2016, after SFFA filed its lawsuit, Harvard reported that 22.1% of the admitted class for the Class of 2020 was Asian-American. Connolly(2nd) Ex. 271.

152.    In March 2017, after SFFA filed its lawsuit, Harvard reported that 22.2% of the admitted class for the Class of 2021 was Asian-American. Connolly(2nd) Ex. 272.

153.    In March 2018, after SFFA filed its lawsuit, Harvard reported that 22.7% of the admitted class for the Class of 2022 was Asian-American. Ellsworth Ex. 82.

154.    The Office of Institutional Research used a pooled model when analyzing the effects of Harvard's admissions process. *See, e.g.,* Connolly Ex. 112 at HARV00023550.


Dated: July 30, 2018                                      Respectfully submitted,


                                                         */s/ William S. Consovoy*

Adam K. Mortara                                          William S. Consovoy
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP                Thomas R. McCarthy
54 West Hubbard Street, Suite 300                        J. Michael Connolly
Chicago, IL 60654                                        CONSOVOY MCCARTHY PARK PLLC
312.494.4400                                             3033 Wilson Boulevard, Suite 700
adam.mortara@bartlit-beck.com                            Arlington, Virginia 22201
                                                         703.243.9423
John M. Hughes                                           will@consovoymccarthy.com
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP                tom@consovoymccarthy.com
1801 Wewatta Street, Suite 1200                          mike@consovoymccarthy.com
Denver, CO 80202
303.592.3100                                             Patrick Strawbridge BBO #678274
john.hughes@bartlit-beck.com                             CONSOVOY MCCARTHY PARK PLLC
                                                         Ten Post Office Square
Paul M. Sanford BBO #566318                              8th Floor South PMB #706
BURNS & LEVINSON LLP                                     Boston, MA 02109
One Citizens Plaza, Suite 1100                           617.227.0548

Providence, RI 02903
617.345.3000
psanford@burnslev.com

patrick@consovoymccarthy.com

Michael H. Park
Consovoy McCarthy Park PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
212.247.8006
park@consovoymccarthy.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ William S. Consovoy
William S. Consovoy