# EXHIBIT 1

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

STUDENTS FOR FAIR ADMISSIONS, INC,

      Plaintiff,

      v.

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE (HARVARD
CORPORATION),

      Defendant.

Civil Action No. 1:14-cv-14176-ADB

**AMICI CURIAE BRIEF OF
HARVARD-RADCLIFFE BLACK STUDENTS ASSOCIATION,
KUUMBA SINGERS OF HARVARD COLLEGE,
FUERZA LATINA OF HARVARD,
NATIVE AMERICANS AT HARVARD COLLEGE,
HARVARD-RADCLIFFE ASIAN AMERICAN ASSOCIATION,
HARVARD-RADCLIFFE ASIAN AMERICAN WOMEN'S ASSOCIATION,
HARVARD ASIAN AMERICAN BROTHERHOOD,
HARVARD VIETNAMESE ASSOCIATION,
HARVARD-RADCLIFFE CHINESE STUDENTS ASSOCIATION,
HARVARD KOREAN ASSOCIATION,
HARVARD JAPAN SOCIETY,
HARVARD SOUTH ASIAN ASSOCIATION,
HARVARD ISLAMIC SOCIETY,
TASK FORCE ON ASIAN AND PACIFIC AMERICAN
STUDIES AT HARVARD COLLEGE,
HARVARD PHILLIPS BROOKS HOUSE ASSOCIATION,
HARVARD MINORITY ASSOCIATION OF PRE-MEDICAL STUDENTS,
COALITION FOR A DIVERSE HARVARD,
FIRST GENERATION HARVARD ALUMNI,
NATIVE AMERICAN ALUMNI OF HARVARD UNIVERSITY,
HARVARD UNIVERSITY MUSLIM ALUMNI, AND
HARVARD LATINO ALUMNI ALLIANCE
IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ii

INTERESTS OF AMICI CURIAE...................................................................................................1

INTRODUCTION ...........................................................................................................................1

I.  Consideration of Race, as Part of Harvard's Holistic and Multi-Faceted Admissions Policy, Is Constitutional Under Long-Established Supreme Court Precedent and Essential to Foster a Diverse and Inclusive Learning Environment. ..................................4

    A.  Harvard's Race-Conscious Admissions Policy Is Permissible Under Well-Settled Supreme Court Precedent and Necessary to Promote Racial and Ethnic Diversity. .......................................................................................................4

    B.  Race Consciousness in Admissions Is Essential to Achieve the Benefits of Diversity Due to Discrimination in Standardized Testing.....................................8

    C.  The Need for Diversity and Inclusion Continues to Be a Pressing Issue at Harvard. ...................................................................................................... 15

II.  A Race-Conscious Admissions Policy That Fosters Diversity of Underrepresented Students Does Not Conflict with the Interests of Asian Americans. ............................... 20

    A.  Asian Americans Benefit from Race-Conscious Remedies. ............................... 21

    B.  Serious Flaws in SFFA's Statistical Analysis Undermine SFFA's Arguments to Eliminate Race-Conscious Admissions. ........................................ 23

    C.  SFFA's Requested Remedy—the Erasure of Race from Harvard's Admissions Process—Would Not Address the Alleged Discrimination Against Asian Americans. ...................................................................................................... 26

CONCLUSION............................................................................................................................ 29

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

## <u>CASES:</u>

*Fisher v. Univ. of Tex.*,
   570 U.S. 297 (2013)................................................................................................5-6

*Fisher v. Univ. of Tex.*,
   136 S. Ct. 2198 (2016).......................................................................................2, 4-5

*Gratz v. Bollinger*,
   539 U.S. 244 (2003)................................................................................................5

*Grutter v. Bollinger*,
   288 F.3d 732 (6th Cir. 2002) ..................................................................................9

*Grutter v. Bollinger*,
   539 U.S. 306 (2003)....................................................................................4, 5, 6, 29

*Guey Heung Lee v. Johnson*,
   404 U.S. 1215 (1971)............................................................................................21

*Regents of Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978)....................................................................................4, 5, 6, 29

## <u>OTHER AUTHORITIES</u>

ACT, *Condition of College & Career Readiness 2017*,
   http://www.act.org/condition2017 ......................................................................... 12

Herman Aguinis, et al., *Differential Prediction Generalization in College Admissions Testing*,
   108 J. OF EDUC. PSYCH. 1045 (2016) ................................................................... 14

Joan Biskupic, *Special Report: Behind U.S. Race Cases, a Little Known Recruiter*,
   REUTERS, Dec. 4, 2012, http://www.
   reuters.com/article/us-usa-court-casemaker-idUSBRE8B30V220121204.............................. 28

Gene D. Block, Office of the Chancellor, *The Impact of Proposition 209 and our Duty to Our Students*, Feb. 24, 2014, https://chancellor.ucla.edu/messages/the-impact-of-proposition-209-and-our-duty-to-our-students/ ...................................................................................... 8

Br. of Amici Curiae Members of Asian Ams. Advancing Justice, in Supp. of Resp'ts,
   *Fisher v. Univ. of Tex.*, No. 14-981, 2015 WL 7770251 (Nov. 2, 2015).................................. 23

**PAGE(S)**

Bethonie Butler, *'I, Too, Am Harvard': Black students show they belong*,
   WASH. POST, Mar. 5, 2014, https://www.washingtonpost.com/blogs/she-the-
   people/wp/2014/03/05/i-too-am-harvard-black-students-show-they-
   belong/?utm_term=.111eb82225d6 ........................................................................ 16

Paul L. Choi, Harvard Overseers Election Candidate Questionnaire Responses (Mar. 2017),
   https://www.diverseharvard.org/overseer-responses-2017 ...................................... 20

Kat Chow, *As Chinese Exclusion Act Turns 135, Experts Point to Parallels Today*, NPR,
   May 5, 2017, https://www.npr.org/sections/codeswitch/2017/05/05/527091890/
   the-135-year-bridge-between-the-chinese-exclusion-act-and-a-proposed-travel-ban ............. 22

Julie S. Chung and Alexander Z. Zhang, *Students for Fair Admissions and Harvard
   Both Got It Wrong*, HARV. CRIMSON, July 18, 2018,
   https://www.thecrimson.com/article/2018/7/18/chung-zhang-sffa-harvard-wrong/ ............... 16

*Consultation on the Validity of Testing in Education and Employment Before the
   U.S. Comm'n on Civil Rights* (June 16, 1989) ......................................................... 9

Crimson Editorial Bd., *Condemning Police Brutality at Harvard,* HARV. CRIMSON,
   Apr. 20, 2018, https://www.thecrimson.com/article/2018/
   4/20/editorial-police-brutality-at-harvard/ .............................................................. 18

Noah J. Delwiche, *Emailed Death Threat Investigation Remains Open*, HARV. CRIMSON,
   Apr. 6, 2015, https://www.thecrimson.com/
   article/2015/4/6/email-threats-investigation-ongoing/ ............................................... 18

Educ. Trust, *Overlooked & Underserved: Debunking the Asian "Model Minority" Myth in
   California Schools [Policy Brief]*, Educ. Trust West (Aug. 2010) ................................ 13

Roy O. Freedle, *Correcting the SAT's Ethnic and Social-Class Bias:
   A Method for Reestimating SAT Scores*, 73 HARV. EDUC. REV. 1 (2003) .............................. 12

Buck Gee and Denise Peck, *Asian Americans are the Least Likely Group in the U.S. to be
   Promoted to Management*, HARV. BUS. REV., May 31, 2018 ......................................... 21

Luke Charles Harris, *Rethinking the Terms of the Affirmative Action Debate Established
   in the Regents of the University of California v. Bakke Decision*,
   6 RES. IN POL. & SOC'Y 133 (1999) ....................................................................... 13

*Hidden Biases Continue to Produce Powerful Headwinds for College-Bound
   Blacks Aiming for Higher Scores on the SAT*,
   41 J. OF BLACKS IN HIGHER EDUC. 90 (2003) ......................................................... 11

**PAGE(S)**

Jasmine N. Hyppolite, *A Room Full of Mirrors: Harvard Without Affirmative Action*,
HARV. CRIMSON, July 9, 2013, https://www.thecrimson.com/article/
2018/7/9/hyppolite-harvard-without-affirmative-action/.......................................................... 19

William C. Kidder & Jay Rosner, *How the SAT Creates "Built-In-Headwinds":*
*An Educational and Legal Analysis of Disparate Impact*,
43 SANTA CLARA L. REV. 131 (2002).........................................................................9, 10-11, 12

Rakesh Kochhar & Anthony Cilluffo, *Income Inequality in the U.S. is Rising Most Rapidly*
*Among Asians*, Pew Research Center, July 12, 2018,
http://www.pewsocialtrends.org/2018/07/12/income-inequality-in-the-u-s-is-rising-most-
rapidly-among-asians................................................................................................................ 25

Joyce Kuo, *Excluded, Segregated and Forgotten: A Historical View of the Discrimination of*
*Chinese Americans in Public Schools*, 5 ASIAN AM. L.J. 181 (1998) ...................................... 21

Charles R. Lawrence III, *Two Views of the River: A Critique of the Liberal Defense of*
*Affirmative Action*, 101 COLUM. L. REV. 928 (2001) ............................................................. 13

Steven Lee, *Students Criticize Response to Emailed Death Threat*,
HARV. CRIMSON, Oct. 4, 2014,  https://www.thecrimson.com/article/
2014/10/8/discussion-criticize-response-threat/ ................................................................18-19

Richard O. Lempert et al., *Michigan's Minority Graduates in Practice:*
*The River Runs Through Law School*,
25 L. & SOC. INQUIRY 395 (2000)............................................................................................ 14

Letter from Harvard Black Law Students Ass'n to Harvard Univ. Cmty. & Broader Cambridge &
Boston Cmty., *Police Brutality at Harvard*, Apr. 13, 2018,
https://orgs.law.harvard.edu/blsa/media-gallery/police-brutality-at-harvard-april-13-2018/... 18

Adam Liptak, *Travel Ban Case Is Shadowed by One of Supreme Court's Darkest Moments*,
N.Y. TIMES, Apr. 16, 2018, https://www.nytimes.com/2018/04/16/us/politics/travel-ban-
japanese-internment-trump-supreme-court.html ...................................................................... 22

Goodwin Liu, *The Causation Fallacy: Bakke and the Basic Arithmetic of*
*Selective Admissions*, 100 MICH. L. REV. 1045 (2002) ........................................................... 26

James W. Loewen, *Here We Go Again: Tests for the Common Core May Be Unfair to*
*Some and Boring to All*, HISTORY NEWS NETWORK, Nov. 18, 2014 ..............................9-10, 11

Stephanie Mencimer, *Here's the Next Sleeper Challenge to Affirmative Action: The Guy Who*
*Engineered the Fisher Case in the Supreme Court Isn't Done Yet*,
MOTHER JONES, July 19, 2016, http://www.motherjones.com/politics/2016/07/
abigail-fisher-going-stay-mad................................................................................................... 28

**PAGE(S)**

Nat'l Comm'n on Asian Am. & Pacific Islander Research in Educ. & ETS,
*iCount: A Data Quality Movement for Asian Ams. and Pacific Islanders in
Higher Educ.* (2013) ............................................................................................... 13

National Public Radio, Robert Wood Johnson Foundation, and Harvard T.H. Chan School of
Public Health, *Discrimination in America:  Experiences and Views of Asian Americans*
(Nov. 2017), https://www.npr.org/assets/news/2017/12/
discriminationpoll-asian-americans.pdf ................................................................ 21-22

Press Release, *New Research Uncovers Hidden Bias in College Admissions Tests*, Indiana Univ.
Bloomington Newsroom (Jan. 25, 2016), http://archive.news.indiana.edu/releases/
iu/2016/01/bias-found-in-precollege-tests.shtml) .................................................. 14

*Prop. 209 Lands On UC*, L.A. TIMES, Apr. 1, 1998,
http://articles.latimes.com/1998/apr/01/local/me-34867 .......................................... 7

Ruben E. Reyes, Jr., *I Should Have Gone to Stanford*, HARV. CRIMSON, Oct. 16, 2017,
https://www.thecrimson.com/article/2017/10/16/reyes-latinx-longform/ ................................ 16

Sara Rimer & Karen W. Arenson, *Top Colleges Take More Blacks, but Which Ones?*,
N.Y. TIMES, June 24, 2004, https://www.nytimes.com/2004/06/24/us/top-colleges-
take-more-blacks-but-which-ones.html .................................................................. 28

Dennis Romero, *Racist, Anti-Asian Flier Rocks UCLA, USC Campuses*, LA WEEKLY,
Feb. 11, 2014, http://www.laweekly.com/news/racist-anti-asian-flier-rocks-ucla-usc-
campuses-4431258 ..................................................................................................... 22

Jay Rosner, *The SAT: Quantifying the Unfairness Behind the Bubbles*, in
SAT WARS: THE CASE FOR TEST-OPTIONAL COLLEGE ADMISSIONS
(Joseph A. Soares 2015) ...................................................................................... 10, 11

Maria Veronica Santelices & Mark Wilson, *Unfair Treatment? The Case of Freedle,
the SAT, and the Standardization Approach to Differential Item Functioning*,
80 HARV. EDUC. REV. 106 (2010) .......................................................................... 12

*SCOTUSblog on Camera: Edward Blum (Complete)*, SCOTUSblog,
http://www.scotusblog.com/media/scotusblog-on-camera-edward-blum-complete ........... 28-29

Statement of James W. Loewen, THE VALIDITY OF TESTING IN EDUCATION
AND EMPLOYMENT (Eileen Rudert, ed., 1993) ............................................... 9, 12, 15

Susan Sturm & Lani Guinier, *The Future of Affirmative Action: Reclaiming the
Innovative Ideal*, 84 CALIF. L. REV. 953 (1996) ...................................................... 13

Tumblr, *I Too Am Harvard*, http://itooamharvard.tumblr.com/ .................................................. 16

**PAGE(S)**

Kimberly West-Faulcon, *More Intelligent Design: Testing Measures of Merit*,
  13 U. PA. J. CONST. L. 1235 (2010-11) ............................................................ 13

David B. Wilkins & Bryon Fong, *Harvard Law School Report on the State of
  Black Alumni II: 2000-2016*,
  HLS Center on the Legal Profession Research Paper No. 2018-2 (August 1, 2017) .......... 14-15

David B. Wilkins & Elizabeth Chambliss, *Harvard Law School Report on the State of Black
  Alumni: 1896-2000*, Harvard Law School Program on the Legal Profession (2002)............... 14

Alia Wong, *'The Model Minority' at the Country's Top-Ranked Universities*,
  THE ATLANTIC, Sept. 24, 2015, https://www.theatlantic.com/
  education/archive/2015/09/university-california-top-rankings-asian-students/407080/ ..... 25-26

## INTERESTS OF AMICI CURIAE[1]

Amici Curiae are student and alumni organizations comprised of current and former Harvard students, who have an institutional interest in ensuring that Harvard College is an inclusive place of learning that provides students with the critically important benefits of diversity. As members of the Harvard student and alumni community, Amici Curiae have direct knowledge about the vital importance of maintaining considerations of race in Harvard's admissions process, and believe that their institutional knowledge, as well as the knowledge and experiences of their members, will contribute to this Court's understanding and assessment of the issues at the center of this important case. A description of each amicus curiae organization can be found in the Motion to Participate as Amici Curiae and is incorporated herein by reference.

## INTRODUCTION

Amici Curiae represent current and former Harvard students from myriad backgrounds, experiences, and racial and ethnic heritages. Despite their many differences, Amici Curiae stand unified in support of the continued consideration of race, as one of many factors, in Harvard's admissions process. Their unequivocal commitment in support of this consideration is based both on the significance that their members personally ascribe to their racial or ethnic identity and because they can attest personally to the devastating consequences that would result to the educational experience of all Harvard students if they were deprived of the benefits of learning from fellow students with diverse backgrounds and experiences.

Amici Curiae strongly condemn all forms of racial discrimination and urge the thorough investigation and redress of any credible allegations of racial discrimination in admissions

---

[1] Local counsel for Amici Curiae in this action, the law firm of Sugarman Rogers Barshak & Cohen, P.C. ("Sugarman Rogers"), also represents the defendant, President and Fellows of Harvard College ("Harvard"), in matters wholly unrelated to the legal and factual issues presented by this action. Neither Harvard nor its litigation counsel in this action have provided any financial support for the preparation of Amici Curiae's brief or authored this brief in whole or in part.

practices. However, Amici Curiae equally condemn the attempt to manufacture conflict between racial and ethnic groups in order to revive an unrelenting agenda to dismantle efforts to create a racially diverse and inclusive student body through college admissions. Race consciousness is not at odds with racial equality. Indeed, race consciousness is necessary to combat racial inequality given the history of discrimination and entrenched systemic prejudices—both explicit and implicit—against Black, Latinx,[2] Asian, and Native peoples.

This Court has significant grounds to be skeptical of the claims raised by Plaintiff Students for Fair Admissions ("SFFA"), which has demonstrated no sincere interest in advancing the rights of Asian Americans. Rather, this litigation is spearheaded by Edward Blum, a longtime crusader against civil rights and racial equality. Mr. Blum led the failed challenge against the University of Texas's race-conscious admissions policy, which the Supreme Court upheld in 2016 based on its well-established precedent that colleges and universities may pursue racial diversity as part of their educational mission. *Fisher v. Univ. of Tex.*, 136 S. Ct. 2198 (2016) ("*Fisher II*"). Having lost before the Supreme Court, Mr. Blum—under the guise of Plaintiff in this action—invokes the discredited and divisive strategy of attempting to pit historically marginalized groups against each other and demanding, to the detriment of all Harvard students, that the consideration of race be eliminated from Harvard's admissions process altogether. SFFA's attempt to use this new and divisive twist on old and rejected arguments plainly fails. Harvard's limited consideration of race, as part of its holistic admissions policy, is not only constitutional—it is an essential tool in advancing Harvard's educational mission.

Amici Curiae, therefore, support summary judgment in favor of Harvard's race-conscious admissions policy for two primary reasons:

---

[2] The gender-neutral term "Latinx" is used herein to refer collectively to Latinos, Latinas, and non-binary persons of Latin American background.

2

First, removing considerations of race from the admissions process would have devastating consequences on the admission of historically underrepresented and marginalized groups that could lead to further racial isolation, ignorance, or racial hostility on Harvard's campus, as well as significantly diminish the quality of the educational environment for all students. Amici Curiae's institutional knowledge of the experiences of racial isolation and, at times, even racial animus experienced by past and present Harvard students dictates that, rather than roll back Harvard's progress on diversity by eliminating considerations of race in admissions, Harvard should intensify its efforts to promote an inclusive and diverse student climate. Amici Curiae encourage the Court to carefully review all the declarations submitted in conjunction with this amicus brief, which contain vital information about the experiences of Harvard students that was impossible to include in its entirety within the pages of this brief.

Second, SFFA conflates the question of whether Harvard's race-conscious admissions process is permissible with the question of whether Asian American applicants are subject to bias in admissions. These two questions are not, as SFFA would have the court believe, inextricably linked. Amici Curiae are committed to eradicating racial discrimination at Harvard, whether in the admissions process or elsewhere. SFFA, however, has not shown—in satisfaction of its burden as Plaintiff in this action—that any such bias exists as a direct result of Harvard's efforts to create a diverse and inclusive student body through a race-conscious admissions process or that any such discrimination (if it exists) would be remedied by eliminating race-conscious admissions. The clear incongruity between SFFA's claim and the relief sought is demonstrated by the fact that eliminating considerations of race would primarily benefit white, not Asian American, students. This disconnect illuminates the true purpose of SFFA's lawsuit as merely the latest strategy in

Mr. Blum's ongoing crusade to undermine Supreme Court precedent and dismantle programs that promote diversity.

**I.      Consideration of Race, as Part of Harvard's Holistic and Multi-Faceted Admissions Policy, Is Constitutional Under Long-Established Supreme Court Precedent and Essential to Foster a Diverse and Inclusive Learning Environment.**

It is well-settled Supreme Court precedent that, as part of their educational mission to promote diversity and inclusion, colleges and universities may consider race as one of many factors in their admissions practices. As the declarations attached to this brief make abundantly clear, however, despite efforts to promote diversity, Harvard is still a racially isolating environment for many students of color. *See* Exs. 2-17 to Mot. to Participate as Amici Curiae. Harvard has yet to fully achieve the benefits of having a truly diverse student body and, thus, should continue to make all lawful efforts to increase campus diversity, including the use of a holistic, multifaceted race-conscious admissions process. This limited consideration of race is especially important given that test scores are not an accurate measure of merit due to the racial bias that pervades standardized testing instruments. SFFA's proposal to eliminate any consideration of race from the admissions process would set back Harvard's efforts to achieve the benefits of diversity and inflict additional damage on the students of color who attend Harvard.

**A.      Harvard's Race-Conscious Admissions Policy Is Permissible Under Well-Settled Supreme Court Precedent and Necessary to Promote Racial and Ethnic Diversity.**

The Supreme Court has for decades recognized that universities may consider race "to achieve that diversity which has the potential to enrich everyone's education." *Grutter v. Bollinger*, 539 U.S. 306 (2003); *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 311-13 (1978) (Powell, J.) (reasoning that universities have a unique academic freedom to create a diverse student body, including racial diversity). As recently as 2016, the Supreme Court reaffirmed the core

principle that a diverse student body yields numerous educational benefits for all students. *Fisher II*, 136 S. Ct. at 2208. The Court assumed "as given" its prior precedent on this point in *Fisher v. Univ. of Tex.*, 570 U.S. 297, 307 (2013) ("*Fisher I*") (citing *Grutter*, 539 U.S. 306; *Gratz v. Bollinger*, 539 U.S. 244 (2003); and *Bakke*, 438 U.S. 265).

 Harvard students from underrepresented backgrounds, who experience life on campus as outsiders every day, do not feel that Harvard has yet achieved the benefits that come from enrolling a truly diverse class. Particularly in moments of acute stress or controversy, students of color rely on each other and their affinity groups for support where the Harvard administration has fallen short. Moreover, there are continuing concerns as to whether student communities of color will be sufficiently large enough to wield some power and influence, such as hosting the Black Convocation to welcome new Black students to Harvard, Decl. of Aba Sam ("Sam Decl.") ¶ 5, preventing the closure of the Harvard University Native American Program, Decl. of Emily Van Dyke ("Van Dyke Decl.") ¶ 15, lobbying the administration for a comprehensive Ethnic Studies program and a multicultural center, Decl. of Margaret Chin ("Chin Decl.") ¶ 23, or becoming part of an active network of alumni of color, Decl. of Rashid Yasin ("Yasin Decl.") ¶ 3; Decl. of Daniel Lobo ("Lobo Decl.") ¶ 9; Decl. of Debra Sanchez Reed ¶¶ 7-8. It is also important for students of all backgrounds to interact with members of other races in significant enough numbers to dispel the myth that any racial group is a monolith. To eliminate race-conscious policies would have a deleterious effect on the student experience by reducing the number of students of color, dismantling their support systems, deepening their isolation, and preventing a richer educational experience for all students.

The consideration of race in Harvard's holistic admissions policy is sufficiently "narrowly tailored" to attain its educational goal of racial and ethnic diversity. "'To be narrowly tailored, a

race-conscious admissions program cannot use a quota system' but instead must 'remain flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application.'" *Fisher*, 570 U.S. at 309 (quoting *Grutter*, 539 U.S. at 334, 337). It must "consider all pertinent elements of diversity in light of the particular qualifications of each applicant,'" and implement "truly individualized consideration" that may use race in a "flexible, nonmechanical way." *Grutter*, 539 U.S. at 333 (quoting *Bakke*, 438 U.S. at 317). Harvard's admissions process does just that by considering applicants as a whole person, comparing their qualifications with those of all other applicants, and assessing them in the context of the opportunities and challenges they have faced. *See* Report of David Card, Ph.D, Ex. 33 to Decl. of Felicia H. Ellsworth in Supp. of Harvard's Mot. for Summ. J. ("Card Rep.") at 16, 19. Race is but one consideration among multiple variables that form part of this evaluation, including standardized test scores, an alumni interviewer evaluation, letters of recommendation, applicant essays, the academic strength of applicants' high schools, the economic and demographic profile of applicants' communities, parents' level of education, extracurricular activities, and optional submissions of scholarly work, artwork, or recordings of music or dance performances. *See* Harvard Stmt. of Material Facts ("Harvard's SMF") ¶¶ 15, 22.

These myriad race-neutral factors play the dominant role in a student's admission. Indeed, race has less of an effect on applicants' chances of admission than many other variables, such as teacher and guidance counselor recommendations, alumni interviews, the character of their high schools or neighborhoods, or their intended career or major. *See* Card Rep. at 82-83. Further, applicants for whom race appears to have had a larger positive effect on their likelihood of admission had the strongest applications—among the top ten percent of the applicant pool based on race-neutral factors. *Id.* at 84. Such highly qualified candidates are impressive across many

metrics, and it is impossible to conclude that race was the determinative factor in their admission. *Id.*

Yet, if Harvard eliminated the consideration of race, even while maintaining its existing race-neutral efforts to achieve diversity, the population of Black, Latinx, or "Other"[3] race students would dramatically decrease by nearly 50%. *See* Card Rep. at 103, 107-08 (demonstrating that relative to the Class of 2019, African American students would decrease from 14% to 6% and Hispanic or Other students would decrease from 14% to 9%). This outcome is neither unexpected or theoretical. Some of this can be explained by an overreliance on standardized test scores, which are infected by racial bias, as explained *infra* Section I.B. Schools that implement admissions policies that give too much weight to test scores and grades run the risk of systematically undervaluing the strengths and potential of many underrepresented applicants of color.

The sharp decline in Black and Latinx student populations has become a reality at highly selective universities that have implemented colorblind admissions, such as the University of California at Berkeley, the University of California at Los Angeles, and the University of Michigan. *Id.* at 99. After Proposition 209 banned consideration of race in the University of California system in 1996, admission of Black and Latinx students at California schools dropped precipitously, especially at the most selective schools. *Prop. 209 Lands On UC*, L.A. TIMES, Apr. 1, 1998 (reporting that the number of Black and Latinx students admitted to UC Berkeley, as a part of the first freshman class since Proposition 209 went into effect, dropped by 66% and 53%, respectively, from the number of such students admitted the previous year), http://articles.latimes.com/1998/apr/01/local/me-34867. Almost two decades later, those student communities have not recovered. UCLA's Chancellor lamented that the school "continues to fall

---

[3] Due to their small numbers, Harvard's expert included students identifying as Native American and Hawaiian/Pacific Islander into the "Hispanic" racial category.  Card Rep. at 55.

far short of the diversity California's public colleges and universities enjoyed before" Proposition 209, leaving "many of our students of color [to] feel isolated, as strangers in their own house . . . [and] [o]thers [to] feel targeted, mocked or marginalized, rather than recognized and valued." Gene D. Block, Office of the Chancellor, *The Impact of Proposition 209 and our Duty to Our Students*, Feb. 24, 2014, https://chancellor.ucla.edu/messages/the-impact-of-proposition-209-and-our-duty-to-our-students/.

Harvard students of color know firsthand that their school still struggles with "issues of diversity and inclusion," including "ongoing feelings of isolation and alienation among racial minorities." Harvard's SMF ¶ 163. The significant decline in Black, Latinx, and possibly students from Asian subgroups[4] and Native students, that would result from an end to race-conscious admissions, would only exacerbate these issues. And all Harvard students would be deprived of the educational benefits of learning in a diverse environment that is crucial to succeeding in a multiracial workplace and society.

**B.** **Race Consciousness in Admissions Is Essential to Achieve the Benefits of Diversity Due to Discrimination in Standardized Testing.**

Harvard's ability to consider race, as one of many factors, in admissions is indispensable to its ability to achieve the benefits of diversity. This is especially true because the test scores—on which Harvard and other colleges and universities so heavily rely—are tainted by racial bias. Thus, short of eliminating standardized test scores altogether, it is crucial for Harvard to consider race, as one of many factors, as it works to identify talented and qualified students of color who may otherwise be undervalued based on test scores that do not accurately measure their capacity for success at Harvard and beyond.

---

[4] The Asian race category in Harvard's data is not disaggregated by specific ethnic groups.

SFFA's erroneous assumption that test scores are a valid and reliable[5] indicator of merit, despite evidence that tests like the SAT and ACT underpredict the potential of many talented and qualified students of color, is a fatal flaw in its challenge to Harvard's policy.[6] *See, e.g.*, Pl.'s Br. in Supp. of Summ. J. ("Pl.'s Br.") at 7 (quoting one of its experts referring to test scores as an objective measure of merit). Indeed, four Sixth Circuit judges recognized that standardized test scores are not objective measures of merit, stating "the record indicates that LSAT scores are neither race-neutral or gender-neutral criteria for admissions decisions." *Grutter v. Bollinger*, 288 F.3d 732, 771 (6th Cir. 2002) (Clay, J., concurring), *aff'd*, 539 U.S. 306.

Racial bias is built into the very fabric of standardized tests. Before an experimental test question is approved for use on a standardized test like the SAT, test manufacturers test the question for reliability. William C. Kidder & Jay Rosner, *How the SAT Creates "Built-In-Headwinds": An Educational and Legal Analysis of Disparate Impact*, 43 SANTA CLARA L. REV. 131, 146, 156 (2002). A test is reliable when its findings can be replicated: the results should be the same for an examinee taking the test multiple times under the same conditions. *See id.* at 156. Thus, a new question must generally produce the same findings as pre-existing questions. *See id.* Test manufacturers deem a question reliable when "high ability" examinees are more likely than "low ability" examinees to answer correctly. *Id.* at 157. But test manufacturers fail to use any independent measure of "ability." James W. Loewen, *Here We Go Again: Tests for the Common Core May Be Unfair to Some and Boring to All*, HISTORY NEWS NETWORK, Nov. 18, 2014,

---

[5] "'Valid' means that tests test what they claim to measure (i.e., content validity) and correlate strongly with performance in college (predictive validity)." *Consultation on the Validity of Testing in Education and Employment Before the U.S. Comm'n on Civil Rights* (June 16, 1989) (statement of James W. Loewen, Harvard-trained sociologist and author) in THE VALIDITY OF TESTING IN EDUCATION AND EMPLOYMENT, 42 (Eileen Rudert, ed., 1993). A measure is reliable if it produces consistent results (i.e., if multiple tests are given under the same conditions, the result should be the same).

[6] "One-third of the gender gap on the math exam, all of the gender gap on the verbal exam, and perhaps 40 percent of the black/white gap on the verbal exam, is due to test bias." Loewen statement to the U.S. Comm'n on Civil Rights, *supra* note 5, at 42.

9

https://historynewsnetwork.org/blog/153543. Instead, test manufacturers define "high ability" as an examinee who performed well on the overall test and will discard as "unreliable" questions on which high scorers do not outperform low scorers. *Id.*; Kidder, *supra*, at 157. If the test itself is biased and unfairly depresses the scores of some examinees, test makers' reliability check will reproduce that bias.

"Like most other 'standardized' tests given widely in the U.S., researchers originally validated the SAT on affluent white students." Loewen, *supra*. As a consequence, "[a]ffluent white students have always done better on [the SAT] than have African Americans, Hispanics, Native Americans, Filipino Americans, or working-class whites." *Id*. And because the "ability" of an examinee is measured by the yardstick of affluent white individuals' performance, experimental test questions are systematically discarded as "biased" when more Black or Latinx students answer correctly than white students, resulting in a scored test comprised entirely (or almost entirely) of questions that favor white students, sometimes by large margins. *Id.*; Kidder, *supra*, at 133-72.

> [I]f high-scoring test-takers—who are more likely to be white (and male, and wealthy)—tend to answer the question correctly in pretesting, it's a worthy SAT question; if not, it's thrown out. Race and ethnicity are not considered explicitly, but racially disparate scores drive question selection, which in turn reproduces racially disparate test results in an internally reinforcing cycle.

Jay Rosner, *The SAT: Quantifying the Unfairness Behind the Bubbles*, in SAT WARS: THE CASE FOR TEST-OPTIONAL COLLEGE ADMISSIONS 134 (Joseph A. Soares 2015) (internal citation omitted). This process is "used by psychometricians to construct admissions tests such as the SAT, ACT, GRE, LSAT, GMAT, MCAT, and many other bubble tests." *Id.*

An example of the bias produced by this process is an October 1998 administration of the SAT, on which white students outperformed Black and Chicano students on every single scored question. Kidder, *supra*, at 148. More than half of the questions had performance gaps so wide that the percentage of white students who answered correctly was at least 15 percentage points higher

than the percentage of Black students who answered correctly.[7] *Id.* at 148-50. If equally valid questions—but with a less racially disparate impact—were used, the Black-white score gap could be closed by 40%, while the Chicano-white score gap could be reduced by 25%. *Id.* at 172; *Hidden Biases Continue to Produce Powerful Headwinds for College-Bound Blacks Aiming for Higher Scores on the SAT*, 41 J. OF BLACKS IN HIGHER EDUC. 90, 92 (2003). Instead, "the process currently used to construct the SAT, LSAT, GRE, and similar tests unintentionally operates to select questions with larger racial and ethnic disparities (favoring Whites)." Kidder, *supra*, at 210. Research has found that "99% of SAT math questions chosen to appear on scored sections ha[d] to be answered correctly [in pre-testing] by . . . a higher percentage of whites than Mexican Americans[] and a higher percentage of whites than blacks, *simultaneously*." Rosner, *supra*, at 135. The process has "the ultimate effect of contributing to—even guaranteeing—the lower performance of African Americans and Chicanos on the SAT."[8] Kidder, *supra*, at 156.

In 2003, Roy Freedle, who served for 31 years as a cognitive psychologist for Educational Testing Services ("ETS"), the creator of the SAT, revealed that Black and Latinx students consistently outperformed white students on hard questions, while white students outperformed Black and Latinx students on easy questions, perhaps because the hard questions used vocabulary taught at school, while the easier questions used words learned at home that had varying colloquial meanings (with the test rewarding answers that matched the meaning most frequently used in

---

[7] Another purported quality control measure—differential item functioning ("DIF")—adds to the bias. Due to DIF, "whites may outscore blacks on items, but the items will still get dropped because whites don't outscore blacks by a great enough margin." Loewen, *supra*; *see also id.* ("Thus if 7% fewer African Americans typically get an item correct, compared to whites, and if 6% is the cutoff point that triggers DIF, then items on which blacks do 'only' 1% worse than whites will get flagged for scrutiny.").

[8] *See also* Kidder, *supra*, at 209 (noting that changes expected to be made to the SAT in 2005 would not solve this problem).

11

white, middle class homes like those of the test creators).[9] *See generally* Roy O. Freedle, *Correcting the SAT's Ethnic and Social-Class Bias: A Method for Reestimating SAT Scores*, 73 HARV. EDUC. REV. 1 (2003); *see also id*. at 28 (noting that there is "evidence for this bias pattern across a wide span of tests" and mentioning evidence of cultural bias on Advanced Placement exams, the GRE, and high school vocabulary exams). Because correct answers on easy questions—those infected with cultural bias—yielded the same amount of credit as correct answers to hard questions, test scores for Black students were artificially depressed by as much as 200 or 300 points. *Id*. at 12-13. Students of color "lose enough points on the easy items so that it is very difficult, in fact impossible, for them to regain sufficient ground when responding to the hard items to show their true ability." *Id*. at 20. A 2010 study replicated Freedle's findings, showing that the SAT "favors one ethnic group over another." Maria Veronica Santelices & Mark Wilson, *Unfair Treatment? The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning*, 80 HARV. EDUC. REV. 106, 126 (2010) (noting that the study's findings called into "question the validity of SAT verbal scores for African American examinees").

Test bias likely also artificially depresses the scores of other people of color, such as Native Americans and members of Asian American/Pacific Islander subgroups.[10] For example, according to the ACT's benchmarks of college readiness, 50% of white examinees who tested between 2013 and 2017 met three of four benchmarks of college readiness, while only 16% of American Indian and 23% of Pacific Islander examinees did the same. *See* ACT, *Condition of College & Career Readiness 2017*, http://www.act.org/condition2017. Similarly, in 2010, 48% of California's high

---

[9] Although "ETS researchers have proven that some groups use a word in one way while other groups use it in another," by 1989, "ETS ha[d] never dropped or included a single item as a result of this research" and "d[id] not use review panels to see if items might be unfairly unfamiliar to certain groups." Loewen Stmt. to the U.S. Comm'n on Civil Rights, *supra* note 5, at 43.

[10] Although Kidder and Rosner's study focused on Black and Latinx examinees, the authors suggested that, like Freedle's work, their finding also apply to other people of color. Kidder, *supra*, at 168-70.

school students who took the SAT scored 1500 or above (out of 2400), and they passed 58% of the AP exams they took. In contrast, in a California high school that was 44% Hmong, only 8% of students who took the SAT scored 1500 or above, and students there passed only 16% of the AP exams they took. At another California high school that was 40% Filipino, the comparable percentages were 13% and 22%, respectively. Nat'l Comm'n on Asian Am. & Pacific Islander Research in Educ. & ETS, *iCount: A Data Quality Movement for Asian Ams. and Pacific Islanders in Higher Educ.*, at 18-19, Table 4 (2013); *see also* Educ. Trust, *Overlooked & Underserved: Debunking the Asian "Model Minority" Myth in California Schools [Policy Brief]*, Educ. Trust West (Aug. 2010) (documenting test score gaps affecting Laotian, Cambodian, Guamanian/Chamorro, Samoan, and Filipino students).

In addition to the inherent racial biases in the tests themselves, standardized test scores are not valid measures of how well a student will perform in college.[11] "[N]either cumulative grade point averages nor national aptitude test scores have ever been shown to be anything more than rather crude instruments for predicting first year grade point averages in given academic settings; and after the first year their predictive value decreases sharply." Luke Charles Harris, *Rethinking the Terms of the Affirmative Action Debate Established in the Regents of the University of California v. Bakke Decision*, 6 RES. IN POL. & SOC'Y 133, 145 (1999). A 2016 analysis of data involving 475,000 examinees at 176 colleges across the country found that, at 62% of the colleges

---

[11] *See also* Kimberly West-Faulcon, *More Intelligent Design: Testing Measures of Merit*, 13 U. PA. J. CONST. L. 1235 (2010-11) (discussing the ramifications of social science research showing that standardized tests have racially skewed scores and do not accurately predict college performance); Charles R. Lawrence III, *Two Views of the River: A Critique of the Liberal Defense of Affirmative Action*, 101 COLUM. L. REV. 928, 945 (2001) ("An extensive body of research challenges the usefulness of standardized tests in predicting the performance of poor and minority students, and finds that the SAT does a better job predicting the socioeconomic status of the test taker's parents than predicting college performance."); Susan Sturm & Lani Guinier, *The Future of Affirmative Action: Reclaiming the Innovative Ideal*, 84 CALIF. L. REV. 953, 957, 968-80 (1996) (arguing that SAT and other standardized tests are racially biased and explaining that standardized test scores have limited predictive power with respect to students' future performance).

studied, there was a statistically significant difference in how well high school GPA and SAT scores predicted the first-year college grades of Black students as compared to how accurately high school GPA and SAT scores predicted the first-year college grades of their white classmates. Herman Aguinis, et al., *Differential Prediction Generalization in College Admissions Testing*, 108 J. OF EDUC. PSYCH. 1045, 1053 (2016). Similarly, at 41% of the colleges studied, there were statistically significant differences in how well high school GPA and SAT scores predicted the first-year college grades of Latinx students as compared to how well high school GPA and SAT scores predicted the first-year college grades of their white classmates. *Id.* While this study concerned the SAT, the study's author noted that the findings are applicable to other standardized tests as well. Press Release, *New Research Uncovers Hidden Bias in College Admissions Tests*, Indiana Univ. Bloomington Newsroom (Jan. 25, 2016), http://archive.news.indiana.edu/releases/iu/2016/01/bias-found-in-precollege-tests.shtml.

Test scores also do not accurately predict success after college. For example, a study of Black, Latinx, and Native American graduates from the University of Michigan's classes of 1970-96 found that, despite having lower standardized test scores, they were as successful as their white classmates in their professional life in terms of income, career satisfaction, and civic contributions. Richard O. Lempert et al., *Michigan's Minority Graduates in Practice: The River Runs Through Law School*, 25 L. & SOC. INQUIRY 395, 468-79, 485-90 (2000); *see also* David B. Wilkins & Elizabeth Chambliss, *Harvard Law School Report on the State of Black Alumni: 1896-2000*, Harvard Law School Program on the Legal Profession (2002); David B. Wilkins & Bryon Fong, *Harvard Law School Report on the State of Black Alumni II: 2000-2016*, HLS Center on the Legal Profession Research Paper No. 2018-2 (August 1, 2017) (noting that "the most comprehensive examination of the careers of the black graduates of any school ever assembled" shows that the

majority of Black Harvard Law School alumni surveyed have enjoyed considerable success even though, nationally, Black LSAT examinees have, on average, lower scores than white examinees).

The impact of racial bias in standardized testing on the ability of colleges and universities to assemble a class of racially diverse students is profound. Artificially depressed test scores hinder students' ability to procure offers of admission, scholarships, and other educational opportunities. Because standardized test scores have the patina of legitimacy, students of color themselves often do not realize that the tests are infected by racial bias, thus damaging their self-confidence if they receive a low score. As one professor noted, "[t]eaching experience has shown me that based upon their SAT and GRE scores, blacks think they have no chance at graduate school." Loewen Stmt. to U.S. Comm'n On Civil Rights, *supra*, at 41 n.2. "Conversely, advantaged whites showing only a modest ability to read, write, and think, test well, and win admission to prestigious schools and fine jobs." *Id.* "Unless counter-balanced by robust affirmative action programs, standardized tests block the dreams of many [people of color] . . . for equal access to education and employment." *Id.*

**C.     The Need for Diversity and Inclusion Continues to Be a Pressing Issue at Harvard.**

There is no question that Harvard needs student diversity to improve its school climate. Indeed, Harvard acknowledges that there is much work to do for its campus to become truly inclusive. Harvard's Br. in Supp. of Summ. J. at 28. Many Harvard students who come from historically underrepresented and/or disadvantaged communities continue to feel unwelcome in social and academic spaces on campus. The declarations provided by Amici Curiae, representing students and alumni from an array of backgrounds, include incredibly personal stories that paint a consistent picture of racial isolation for their members.

For example, many students in STEM classes have assumed that their Black classmates are not good at math and science and, thus, declined to collaborate with them. Sam Decl. ¶¶ 7-8. And Latinx students have, in a number of instances, been mistaken by students and staff as "laborers" as part of an overall assumption that they do not fit the mold of a Harvard student. *See* Ruben E. Reyes, Jr., *I Should Have Gone to Stanford*, HARV. CRIMSON, Oct. 16, 2017, https://www.thecrimson.com/article/2017/10/16/reyes-latinx-longform/. In some cases, the social isolation that students experience inhibits them from reaching their full academic potential. *See* Van Dyke Decl. ¶¶ 10-12 (discussing a gifted Harvard classmate from the Ojibwe Tribe, who began to struggle academically due to feelings of isolation and was tragically killed after returning to his reservation while on academic probation). Issues of diversity and inclusion are no less urgent for Asian, Asian American, and Pacific Islander students, who are too often treated as a monolithic entity, or stereotyped as model minorities with high test scores, but lacking the social skills necessary to take on leadership roles. *See* Decl. of Melissa Tran ("Tran Decl.") ¶ 5; Decl. of Jonathan Paek ¶ 10; Julie S. Chung and Alexander Z. Zhang, *Students for Fair Admissions and Harvard Both Got It Wrong*, HARV. CRIMSON, July 18, 2018, https://www.thecrimson.com/article/2018/7/18/chung-zhang-sffa-harvard-wrong/.

The testimonies provided in the accompanying declarations demonstrate that ensuring race consciousness in admissions is essential because the "Harvard administration has not done enough to foster inclusion," and the task often falls to students of color to support each other.[12] Decl. of

---

[12]For example, in 2014 when she was a sophomore at Harvard, Kimiko Matsuda-Lawrence, who is Black and Japanese, wrote and directed a play based on interviews with more than 40 Harvard students of color who expressed feelings of alienation because of false assumptions that they do not belong at Harvard. *See* Bethonie Butler, *'I, Too, Am Harvard': Black students show they belong*, WASH. POST, Mar. 5, 2014, https://www.washingtonpost.com/blogs/she-the-people/wp/2014/03/05/i-too-am-harvard-black-students-show-they-belong/?utm_term=.111eb82225d6. Matsuda-Lawrence's idea stemmed from discussion among members of Amicus Curiae Kuumba Singers of Harvard College, and the play was presented as part of Kuumba's annual Black Arts festival. *Id.* The interviews developed into a highly publicized campaign in which students of color asserted their right to be respected as members of the Harvard community. Tumblr, *I Too Am Harvard*, http://itooamharvard.tumblr.com/.

Catherine Ho ("Ho Decl.") ¶ 4; *see also* Decl. of Cecilia Nuñez ("Nuñez Decl.") ¶ 15; Lobo Decl. ¶ 6. Amici Curiae have often been compelled to compensate for the lack of sufficient support and inclusion for students of color at Harvard by providing their members with resources to navigate campus life and opportunities to build connections with others who share similar experiences. As a Board member from Fuerza Latina explained, members of Amici Curiae "come together to fight discrimination and hostility," but without a diverse campus "we wouldn't necessarily be able to advocate for ourselves" or "offer that same support." Nuñez Decl. ¶¶ 11-12. Among other things, Amici Curiae provide mentoring and networking opportunities for students who are the first in their family to attend college, Lobo Decl. ¶¶ 5, 9, community-building for students who experience racial isolation, Sam Decl. ¶¶ 5, 13-14, and increased cultural awareness for all students on campus, Ho Decl. ¶ 5. Due to insufficient equity and inclusion on campus, Amici Curiae have also engaged in advocacy to force Harvard to take action, such as a campaign led by TAPAS, Diverse Harvard, and other groups to secure a comprehensive Ethnic Studies program, which has not been established by Harvard despite decades of student advocacy, Chin Decl. ¶ 23, and another decades-long struggle involving numerous affinity groups representing people of color to have a multicultural center on campus, Sam Decl. ¶ 20 (describing how the lack of a designated space sends the message that the University does not value cultural diversity).

Repeated incidents of hostility on campus, including racial slurs and other forms of aggression, are additional evidence that Harvard has not achieved an inclusive climate. *See* Nuñez Decl. ¶ 10 (describing how she and other Latinx students depended on each other when they were called "wetbacks" while walking on campus together); Sam Decl. ¶ 12 (describing an incident when a member of BSA was harassed by a group of drunk people chanting racial slurs and confided in fellow BSA members); Tran Decl. ¶ 6 (describing perceptions of people from Southeast Asian

countries as "poorer, less intelligent, and even more barbaric than people from other Asian countries"). During the 2017-18 school year, the Cambridge Police Department ("CPD") violently attacked a Black Harvard College student. *See* Crimson Editorial Bd., *Condemning Police Brutality at Harvard,* HARV. CRIMSON, Apr. 20, 2018, https://www.thecrimson.com/article/2018/4/20/editorial-police-brutality-at-harvard/. BSA, whose members believe the student was treated more harshly due to his race, joined other student groups in releasing a statement that criticized the CPD for unnecessarily resorting to violence instead of providing the student with appropriate support. *See* Letter from Harvard Black Law Students Ass'n to Harvard Univ. Cmty. & Broader Cambridge & Boston Cmty., *Police Brutality at Harvard*, Apr. 13, 2018, https://orgs.law.harvard.edu/blsa/media-gallery/police-brutality-at-harvard-april-13-2018/; Sam Decl. ¶¶ 13-18. During the same school year, a campus organization distributed fake deportation notices in students' dorms for the well-intentioned purpose of raising awareness about unfair immigration policies without realizing the possibility that some students may actually be undocumented. *See* Nuñez Decl. ¶ 9.

Meanwhile, in October 2014, about 400 members of the Harvard community, most of them Asian American women students, received an email addressed to "slit-eyes," with the writer threatening to come to the Harvard campus the following day to "shoot all of you" and "kill you individually." Chin Decl. ¶ 35. The source of the death threats continued to contact Asian women students at Harvard throughout October, and in December 2014 a separate threatening email was sent to 80 Asian women students at Harvard. Noah J. Delwiche, *Emailed Death Threat Investigation Remains Open*, HARV. CRIMSON, Apr. 6, 2015, https://www.thecrimson.com/article/2015/4/6/email-threats-investigation-ongoing/; Steven Lee, *Students Criticize Response to*

*Emailed Death Threat*, HARV. CRIMSON, Oct. 4, 2014,   https://www.thecrimson.com/article/
2014/10/8/discussion-criticize-response-threat/.

      In addition, Amici Curiae have had to act in response to hostility toward students of color
fanned by this lawsuit and other attacks on race-conscious admissions. *See* Jasmine N. Hyppolite,
*A Room Full of Mirrors: Harvard Without Affirmative Action*, HARV. CRIMSON, July 9, 2013
(discussing the "emotional toll" of the case on students), https://www.thecrimson.com/article/
2018/7/9/hyppolite-harvard-without-affirmative-action/. In 2016, Harvard alumni formed Diverse
Harvard to campaign against a slate of candidates running for the Harvard Board of Overseers,
four of whom had written or testified extensively against affirmative action in lockstep with the
arguments that SFFA makes in this case. *See* Chin Decl. ¶ 44 ("It was clear that they were using
Asian Americans as a cover to attack the whole-person admissions process and establish a
complete bar against any consideration of race, so I joined with other alumni to form the Coalition
for a Diverse Harvard."). Amici Curiae often work in coalition with each other and are concerned
that this case could undermine their ability to collaborate with each other and receive the benefits
of a diversity student body. *See* Decl. of Jasmine Parmley  ¶ 5 ("[Edward Blum and SFFA's]
actions and words do not reflect how we feel, nor our lived experiences. . . . We are uncomfortable
with the way that Blum and SFFA could pit Asian Americans against Harvard and against other
people of color . . . ."); Ho Decl. ¶ 9, 12-13 (describing how AAWA would lose the richness of its
programming without being able to collaborate with other women of color to explore their
multifaceted identities).

      Embedding diversity and inclusion into the academic and social environment at Harvard
requires a selection process that recognizes the value of racial diversity, as part of a larger need to
address the challenges—and, at times, hostility—that students of color experience after their

admission to Harvard. As Paul L. Choi, who serves on Harvard's Board of Overseers, explains, "having a diverse environment [is] an integral part of the learning experience for students and an indispensable building block for making students feel welcome at Harvard." Paul L. Choi, Harvard Overseers Election Candidate Questionnaire Responses (Mar. 2017), https://www.diverseharvard.org/overseer-responses-2017. Race-, class-, and gender-conscious admissions permit consideration of how bias affects selection criteria and enables Harvard to admit a diverse and qualified group of students. Given these circumstances, eliminating any consideration of race from the admissions process would only cause additional damage.

## II.     A Race-Conscious Admissions Policy That Fosters Diversity of Underrepresented Students Does Not Conflict with the Interests of Asian Americans.

Like many racial, ethnic, and religious minorities, Asian Americans have historically faced discrimination and marginalization in this country, but they have also shared in its civil rights successes. Rather than driving discrimination against Asian Americans, race-conscious remedies have helped forge their path to equality. Indeed, SFFA fundamentally misconstrues the purpose of considering race, as one of many factors in admissions:  to achieve the benefits of a racially and ethnically diverse student body, which may not otherwise be possible due to substantial barriers to educational opportunities for certain talented students of color. Race consciousness in admissions, therefore, is meant to *further* racial equality, and any intentional discrimination against a particular racial group would be antithetical to that purpose.  That is why SFFA's extreme remedy—to end all consideration of race—is misplaced even if their allegations of discrimination against Asian Americans were true. This inherent disconnect between SFFA's claims and the requested remedy reveals the true reasons for this lawsuit.  SFFA is not trying to vindicate the rights of Asian Americans—who, like all Harvard students, would be harmed from the lack of diversity resulting from the elimination of race consciousness—but rather to advance the hidden agenda of Edward

Blum in his quest to prevent all colleges and universities from achieving racially diverse and inclusive educational environments.

### A.     Asian Americans Benefit from Race-Conscious Remedies.

Asian Americans have a long and tragic history of racial discrimination in the United States. The first immigration law banning entry of an entire ethnic group to the United States targeted Chinese immigrants and was later extended to Japanese immigrants. *See* Joyce Kuo, *Excluded, Segregated and Forgotten: A Historical View of the Discrimination of Chinese Americans in Public Schools*, 5 ASIAN AM. L.J. 181, 187 (1998) (discussing the Chinese Exclusion Act of 1882). Other laws at the time prohibited Chinese immigrants from land ownership, voting, access to the courts, employment, interracial marriages, and naturalized citizenship. *Id*. at 188. Until the Supreme Court struck down the doctrine of "separate, but equal," Asian Americans were frequently forced to attend segregated public schools. *See Guey Heung Lee v. Johnson*, 404 U.S. 1215, 1215 (1971) ("Historically, California statutorily provided for the establishment of separate schools for children of Chinese ancestry."). "*Brown v. Board of Education* was not written for Blacks alone" but also to remedy this "classic case of *de jure* segregation . . ." *Id.* at 1215-16.

Vestiges of this history remain. Today, Asian Americans continue to face racial bias, and are often falsely stereotyped as timid, exotic, perpetual foreigners, or model minorities. These views translate into barriers in the workplace, where Asian Americans are the group least likely to be promoted to management even in industries where they are employed in high numbers, such as the tech industry. *See* Buck Gee and Denise Peck, *Asian Americans are the Least Likely Group in the U.S. to be Promoted to Management*, HARV. BUS. REV., May 31, 2018. In a 2017 survey, one-quarter of Asian Americans reported personally experiencing racial discrimination in applying for jobs, receiving equal pay or securing promotions, and renting or buying housing.  National Public

Radio, Robert Wood Johnson Foundation, and Harvard T.H. Chan School of Public Health, *Discrimination in America:  Experiences and Views of Asian Americans* (Nov. 2017) at 6, https://www.npr.org/assets/news/2017/12/discriminationpoll-asian-americans.pdf.   This same survey found that one-third of Asian Americans have encountered a racial slur or offensive comment about their race or ethnicity.  *Id.* at 8-9.

Additionally, some colleges have struggled with incidents of racist threats against Asian American students. *See* Dennis Romero, *Racist, Anti-Asian Flier Rocks UCLA, USC Campuses*, LA WEEKLY, Feb. 11, 2014 (describing obscene and threatening fliers sent to Asian American student groups at UCLA and USC in 2012 and 2014), http://www.laweekly.com/news/racist-anti-asian-flier-rocks-ucla-usc-campuses-4431258; *see also supra* Section I.C (discussing racist threats against Asian American female students at Harvard).  Recently, in the political realm, national leaders have evoked elements of the Chinese Exclusion Act and Japanese internment to support unjust immigration policies, recalling the historic hostility against Asian Americans during times of war. *See* Adam Liptak, *Travel Ban Case Is Shadowed by One of Supreme Court's Darkest Moments*, N.Y. TIMES, Apr. 16, 2018 (describing then-candidate Donald Trump speaking admiringly of President Roosevelt's approach to immigrants in the United States, which included authorizing Japanese internment camps), https://www.nytimes.com/2018/04/16/us/politics/travel-ban-japanese-internment-trump-supreme-court.html; Kat Chow, *As Chinese Exclusion Act Turns 135, Experts Point to Parallels Today*, NPR, May 5, 2017, https://www.npr.org/sections/codeswitch/2017/05/05/527091890/the-135-year-bridge-between-the-chinese-exclusion-act-and-a-proposed-travel-ban.   Amicus  Curiae  recognize  the commonalities of historical and present-day experiences of exclusion and prejudice shared by

multiple communities of color—although no group's experience is the same—and maintain a commitment to building solidarity with, and learning from, each other.

Just as Asian Americans shared in the benefits of *Brown*, so too have they benefitted from other civil rights advances, including race-conscious remedies. Affirmative action programs opened the doors of higher education to many Asian Americans in the 1960s and 1970s to increase their numbers in higher education. *See* Br. of Amici Curiae Members of Asian Ams. Advancing Justice, in Supp. of Resp'ts, *Fisher v. Univ. of Tex.*, No. 14-981, 2015 WL 7770251, at 8-10 (Nov. 2, 2015) ("AAJC *Fisher* Amicus Br."). In responses to the activism of students, Harvard began recognizing Asian Americans as a minority for purposes of admissions in 1976. Chin Decl. ¶ 16. Asian Americans continue to be included in race-conscious employment programs, such as public contracting, because they remain underrepresented in many fields. *See, e.g.*, AAJC *Fisher* Amicus Br. at 7. And there are wide disparities in the socioeconomic status and educational opportunities for various Asian American sub-groups. *See* Tran Decl. ¶ 5 (noting feelings of isolation among Southeast Asian students "due to expectations that [they] have had similar opportunities as other Asian students, when instead [they] come from a demographic with a distinctly lower educational and economic background"). Thus, Asian Americans also benefit from an admissions process that considers each person's specific circumstances and experiences that stem from their race. Finally, race-conscious policies that produce diverse educational environments benefit everyone by teaching cross-racial understanding, debunking stereotypes, and grooming students to create and support more equitable workplaces and communities.

### B. Serious Flaws in SFFA's Statistical Analysis Undermine SFFA's Arguments to Eliminate Race-Conscious Admissions.

In trying to eliminate all considerations of race in Harvard's admissions process, SFFA utilizes a statistical analysis that fundamentally misconstrues the holistic nature of that process by

placing too much emphasis on applicants' academic qualifications, rather than the non-academic qualifications that distinguish competitive candidates within a pool of Harvard applicants with exceptional academic credentials. Card Rep. at 12, 16, 28-31, 48, 65, 79; Rebuttal Report of David Card, Ph.D., Ex. 37 to Decl. of Felicia H. Ellsworth in Supp. of Harvard's Mot. for Summ. J ("Card Rebuttal") at 4, 10-15. SFFA's misplaced emphasis on the academic qualifications of competitive applicants, who are already in the upper margins of the pool, *see* Card Rep. at 6, is particularly egregious given the racial discrimination inherent in the standardized test scores that make up a large part of the academic criteria. *See supra* Section I.B.

Concerns that SFFA manipulated data to achieve its conclusions arise from questionable decisions made in its analysis. For example, SFFA compares applicants' data across all six years (rather than each year individually)[13] and omits applicants—such as athletes, legacies, children of faculty, children of large donors and others who are on the Dean's or Director's interest list—who receive special consideration, but nonetheless are still part of the admissions process.[14] In addition, SFFA ignores important control variables, such as parental occupation, intended career, and staff interview ratings,[15] and the analysis of the "personal rating" does not consider applicants' personal essays, which are a key component of that rating.[16]

Adjustments to SFFA's statistical analysis raise serious questions as to whether it has met its burden to prove that Harvard's consideration of race, as one of many factors, in its admissions process directly discriminates against Asian American applicants. Card Rep. at 46, 62-65, 79; Card

---

[13] Card Rep. at 51-54, 66; Card Rebuttal at 7, 39-40, 43-46.

[14] Card Rep. at 34-35, 57-58; Card Rebuttal at 18, 30, 46-52, 55. These applicants include recruited athletes, children of Harvard or Radcliffe alumni, individuals on special interest lists maintained by the Dean and Director of Admissions (which tend to include applicants related to donors), and children of Harvard faculty and staff.  Card Rep. at 34; Card Rebuttal at 46. Plaintiffs initially omitted Early Action candidates as well, but later included these applicants in their analysis. Card Rebuttal at 46 n.84.

[15] Card Rep. at 40-44, 48, 79; Card Rebuttal at 6-7, 18, 34-35, 40-43, 43, 55.

[16] Card Rep. at 70; Card Rebuttal at 5, 21-22.

Rebuttal at 53-55. Indeed, rather than finding statistically significant disparities against Asian Americans, Harvard's expert found that, in four of the six years examined, Asian American applicants had an *increased* likelihood of admission (though statistically insignificant) compared to white applicants.[17] Card Report at 67, 78-79. Moreover, being Asian American *increased* the likelihood of admission (though again statistically insignificant) for women and applicants from California, which are two large subgroups of Asian American applicants,[18] thus undermining SFFA's assertion of an "Asian penalty." Card Rep. at 75-78, 80; Card Rebuttal at 8, 53, 60-63.

An examination of the effect of an applicant's intended career, which SFFA omitted from its analysis, illustrates how certain factors (other than race) may influence the likelihood of admission. Harvard's statistical analysis, which included this factor, found that 30% of Asian American applicants—compared to 19% of white applicants—identified medicine or health as their intended career. This intended career has the lowest admission rate (5%) of all intended careers. Card Rep. at 44. Harvard's expert also found that intended career, as well as several other factors, have a greater impact than race on an applicant's admission to Harvard. Card Rep. at 83.

Of additional concern is the possible variation of admission rates among specific Asian American subgroups, which may differ from the admission rates for Asian Americans as a whole. Asian Americans have the most intra-group economic inequality, and viewing them as a single entity masks significant disparities among subgroups. Rakesh Kochhar & Anthony Cilluffo, *Income Inequality in the U.S. is Rising Most Rapidly Among Asians*, Pew Research Center, July 12, 2018, http://www.pewsocialtrends.org/2018/07/12/income-inequality-in-the-u-s-is-rising-most-rapidly-among-asians/; *see also* Alia Wong, *'The Model Minority' at the Country's Top-Ranked*

---

[17] SFFA's discrimination claim focuses on comparisons between Asian American and white student applicants. SFFA has conceded that any positive effect of race on the admission of Black and Latinx applicants would not cause the alleged negative effect of race on Asian American applicants. *See* Pl.'s Br. at 13.

[18] One-half of Asian American applicants are female, and 30% are from California. Card Rep. at 80.

*Universities*, THE ATLANTIC, Sept. 24, 2015 (discussing very low rates for Laotian, Hmong, and Cambodian American students in attaining higher education), https://www.theatlantic.com/education/archive/2015/09/university-california-top-rankings-asian-students/407080/.     SFFA's overreliance on academic achievement (defined in large part by standardized test scores) in its statistical analysis, coupled with the wide variation of test scores among Asian American subgroups discussed above, *see supra* Section I.B, provide additional grounds to question its conclusions, which are centered on a false view of "Asian Americans" as a monolithic group of people.  *See* Decl. of Fatima Shahbaz ¶ 13 ("[To] reduce Asian Americans to their test scores is, quite frankly, offensive because it supports the notion that Asian Americans are just a summation of their test scores, instead of real individuals with personal struggles and triumphs that have shaped their lives.").

Of course, as Harvard's expert opined, statistical analyses have limitations in examining subjective factors that are difficult to reduce to quantifiable variables, such as an applicant's personal essay that makes up a significant portion of the personal rating. *See* Card Rep at 32-33, 70. However, it is SFFA's burden to prove its claims, and it has chosen to do so with statistical analyses that, when scrutinized, are vulnerable to several important criticisms.

**C.      SFFA's Requested Remedy—the Erasure of Race from Harvard's Admissions Process—Would Not Address the Alleged Discrimination Against Asian Americans.**

Because far fewer Black, Latinx, and Native American students apply to elite colleges and universities, as compared to white applicants, the decrease in their admissions due to the elimination of race considerations would not greatly benefit Asian American student applicants. *See* Goodwin Liu, *The Causation Fallacy: Bakke and the Basic Arithmetic of Selective Admissions*, 100 MICH. L. REV. 1045, 1046 (2002). In fact, according to Harvard's expert, eliminating all

considerations of race would increase the Asian American share of the admitted class by 3 percentage points—from 24% to 27%—while at the same time increasing the share of white students by almost triple that amount—8% percentage points, from 40% to 48%. Card Rep. at 103. SFFA concedes that, according to its own statistical analysis, any advantage to Black and Latinx applicants due to their race does not account for the alleged negative effect of Harvard's admission system on Asian American applicants. *See* Pl.'s Br. at 13.

If there is discrimination against Asian American applicants in the personal category rating—whether due to implicit or other bias by Harvard or some other outside entity, such as teachers, guidance counselors, or alumni interviewers—Harvard must take immediate action to eliminate and/or counter this bias. But "we must be careful not to conflate society's tendency to view the [Asian American/Pacific Islander] experience as a monolithic one with any effects of race-conscious admissions." Ho Decl. ¶ 11. The solution to the question of bias is "not to erase all applicants' identities by eliminating race consciousness." Yasin Decl. ¶ 5. Instead, Harvard can better ensure that implicit bias does not infect decisionmaking by providing implicit bias training to everyone involved in the admissions process (with a focus on understanding both the shared experiences of Asian Americans and the varied experiences of people from different Asian American subgroups), hiring additional Asian American admissions officers, and recruiting additional Asian American alumni interviewers. Harvard should also reconsider its approach of grouping all Asian American and Pacific Islander applicants together as a single ethnic demographic in the admissions process, which cloaks the myriad distinct identities under that

banner and may also disadvantage members of certain subgroups. These recommendations apply equally to eliminate and/or counter biases against all other communities of color.[19]

SFFA's true motivations are laid bare by the fact that, instead of advancing remedies that would actually help Asian Americans, it instead seeks a remedy that would dramatically improve the rate of admission of white student applicants. Card Rep. at 103 (noting that elimination of race would cause the white share of admitted class would increase from 40% to 48%). SFFA's transparent display of false concern for the real interests of Asian Americans is unsurprising given that Edward Blum is the engine behind this litigation. Indeed, Mr. Blum has long been a foe of civil rights on a mission to put an end to "race-based laws and policies." Joan Biskupic, *Special Report: Behind U.S. Race Cases, a Little Known Recruiter*, REUTERS, Dec. 4, 2012, http://www.reuters.com/article/us-usa-court-casemaker-idUSBRE8B30V220121204. In this quest, he has brought multiple lawsuits to make college admissions less diverse and inclusive, including *Fisher* and a pending case brought by SFFA against the University of North Carolina ("UNC"). Stephanie Mencimer, *Here's the Next Sleeper Challenge to Affirmative Action: The Guy Who Engineered the Fisher Case in the Supreme Court Isn't Done Yet*, MOTHER JONES, July 19, 2016, http://www.motherjones.com/politics/2016/07/abigail-fisher-going-stay-mad.

Mr. Blum has no history of advocacy for the Asian American community and has made clear that the genesis of this lawsuit was his failure to prevail in the *Fisher* litigation. *See SCOTUSblog on Camera: Edward Blum (Complete)*, SCOTUSblog, http://www.scotusblog.com/media/scotusblog-on-camera-edward-blum-complete (presenting a video of Edward Blum

---

[19] For example, the category of "Black" applicants can include both recent African or West Indian immigrants and African Americans who are the descendants of people who toiled under slavery and whose families have lived in the United States for generations through the Jim Crow era and Civil Rights Movement. Both bring distinct experiences and identities to Harvard's campus. *See* Sara Rimer & Karen W. Arenson, *Top Colleges Take More Blacks, but Which Ones?*, N.Y. TIMES, June 24, 2004, https://www.nytimes.com/2004/06/24/us/top-colleges-take-more-blacks-but-which-ones.html.

describing his plan to sue Harvard and UNC). Tellingly, the founders of SFFA include Mr. Blum, Abigail Fisher, and her father. Harvard's SMF ¶ 241. Mr. Blum has readily admitted that the goal of suing Harvard and UNC "is to eliminate the use of race or ethnicity in applying. So, I needed plaintiffs. I needed Asian plaintiffs." SCOTUSblog, *supra*. Thus, SFFA cannot credibly assert that it is seeking redress for the benefit of Asian American applicants by pursuing this case. Rather, this litigation is a naked and cynical attempt to once again challenge well-settled law and make spurious and controversial claims of discrimination for the sole purpose of preventing Harvard and other colleges and universities from creating a diverse learning environment for their students.

## CONCLUSION

The pressing need for diversity and equity on Harvard's campus requires race-conscious admissions to help foster an inclusive environment that facilitates meaningful exchanges between students of all backgrounds. "[N]othing less than the 'nation's future depends upon leaders trained through wide exposure to the ideas and mores of students as diverse as this Nation of many peoples.'" *Grutter*, 539 U.S. at 324 (quoting *Bakke*, 438 U.S. at 313). As members of the Harvard student and alumni community, Amici Curiae urge this Court to follow clear precedent and reject Plaintiff's dubious challenge to Harvard's narrowly-tailored efforts to foster diversity and inclusion by considering race, as one of many factors, in its admissions decisions.

Dated: July 30, 2018

Respectfully submitted,

/s/ Jin Hee Lee
Sherrilyn Ifill*
Janai Nelson*
Samuel Spital*
Jin Hee Lee*
Rachel Kleinman*
Cara McClellan*
NAACP Legal Defense &
    Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY  10006
(212) 965-2200

Michaele N. Turnage Young*
Jennifer A. Holmes*
NAACP Legal Defense &
    Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300

/s/ Kenneth N. Thayer
Kenneth N. Thayer, BBO #61029
thayer@sugarmanrogers.com
Kate R. Cook, BBO #650698
cook@sugarmanrogers.com
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street (9th floor)
Boston, MA 02114-4737
(617) 227-3030

*Counsel for Amici Curiae Harvard-Radcliffe
Black Students Association, Kuumba Singers
of Harvard College, Fuerza Latina of
Harvard, Native Americans at Harvard
College, Harvard-Radcliffe Asian American
Association, Harvard-Radcliffe Asian
American Women's Association, Harvard
Asian American Brotherhood, Harvard
Vietnamese Association, Harvard-Radcliffe
Chinese Students Association, Harvard
Korean Association, Harvard Japan Society,*

30

*Harvard South Asian Association, Harvard Islamic Society, Task Force on Asian and Pacific American Studies at Harvard College, Harvard Phillips Brooks House Association, Harvard Minority Association of Pre-Medical Students, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Native American Alumni of Harvard University, Harvard University Muslim Alumni, and Harvard Latino Alumni Alliance*

*\*Pro Hac Vice Admission Pending*