# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS
# BOSTON DIVISION

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC,<br><br>Plaintiff,<br><br>v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION),<br><br>Defendant. | Civil Action No. 1:14-cv-14176-ADB |

**AMICI CURIAE BRIEF OF
21 COLORFUL CRIMSON,
HARVARD BLACK ALUMNI SOCIETY,
ASSOCIATION OF BLACK HARVARD WOMEN,
COALITION FOR A DIVERSE HARVARD,
FIRST GENERATION HARVARD ALUMNI,
FUERZA LATINA OF HARVARD,
HARVARD ASIAN AMERICAN ALUMNI ALLIANCE,
HARVARD ASIAN AMERICAN BROTHERHOOD,
HARVARD ISLAMIC SOCIETY,
HARVARD JAPAN SOCIETY,
HARVARD KOREAN ASSOCIATION,
HARVARD LATINO ALUMNI ALLIANCE,
HARVARD MINORITY ASSOCIATION OF PRE-MEDICAL STUDENTS,
HARVARD PHILLIPS BROOKS HOUSE ASSOCIATION,
HARVARD SOUTH ASIAN ASSOCIATION,
HARVARD UNIVERSITY MUSLIM ALUMNI,
HARVARD VIETNAMESE ASSOCIATION,
HARVARD-RADCLIFFE ASIAN AMERICAN ASSOCIATION,
HARVARD-RADCLIFFE ASIAN AMERICAN WOMEN'S ASSOCIATION,
HARVARD-RADCLIFFE BLACK STUDENTS ASSOCIATION,
HARVARD-RADCLIFFE CHINESE STUDENTS ASSOCIATION,
KUUMBA SINGERS OF HARVARD COLLEGE,
NATIVE AMERICAN ALUMNI OF HARVARD UNIVERSITY,
NATIVE AMERICANS AT HARVARD COLLEGE, AND
TASK FORCE ON ASIAN AND PACIFIC AMERICAN STUDIES AT HARVARD
COLLEGE IN OPPOSITION TO SFFA'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ....................................................................... iii

INTERESTS OF AMICI CURIAE ............................................................. 1

INTRODUCTION ....................................................................................... 1

I.      SFFA's Remedy of Eliminating the Consideration of Race in Admissions Would Discriminate Against Asian Americans and Other Applicants of Color. ........................... 2

      A.      Erasing Race from College Applications is Impractical, and Harmful Both to the Admissions Process and to Many Applicants of Color ................................ 3

      B.      Censoring Race in College Applications Will Harm Some of the Asian American Applicants SFFA Claims to Represent .................................... 4

      C.      Requiring Harvard to Ignore Race Would Disproportionately Harm Black and Latinx Applicants ............................................................... 6

      D.      SFFA's Proposed Remedy of Eliminating Race Consciousness Is So Incongruous to its Claim of Discrimination that it Calls into Question the Validity of that Claim ........................................................... 7

      E.      Remedies for Discrimination Can and Should Be Race-Conscious .................... 10

II.     Harvard Legitimately Considers More Than Test Scores and Grades When Selecting Students ....................................................................................... 11

      A.      Test Scores Underpredict the Potential of Black, Latinx, and Other Applicants .................................................................................. 11

      B.      Grades, Extracurriculars, and Other Credentials are Not Objective Indicators of Merit ....................................................................... 13

      C.      Harvard Legitimately Considers More Than Academics and Extracurriculars ........................................................................... 23

      D.      Harvard Appropriately Values the Benefits of a Diverse Student Body ............. 26

III.    CONCLUSION ................................................................................ 29

## **TABLE OF AUTHORITIES**

**PAGE(S)**

### **CASES:**

*Assoc. Gen. Contractors of Mass., Inc. v. Altshuler*,
  490 F.2d 9, 16 (1st Cir. 1973) ................................................................................. 10

*Bos. Police Superior Officers Fed'n v. City of Boston*,
  147 F.3d 13, 20 (1st Cir. 1998) ............................................................................... 10

*Fisher v. Univ. of Tex.*,
  570 U.S. 297 (2013) ............................................................................................ 1, 11

*Fisher v. Univ. of Tex.*,
  136 S. Ct. 2198 (2016) .......................................................................................... 1, 9

*Green v. Cty. Sch. Bd. of New Kent*,
  391 U.S. 430 (1968) ................................................................................................ 10

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ..................................................................................... 1, 11, 26

*Local 28 of Sheet Metal Workers' Intern. Ass'n v. E.E.O.C.*,
  478 U.S. 421, 445 (1986) ........................................................................................ 10

*Morgan v. O'Bryant*,
  671 F.2d 23, 28 (1st Cir. 1982) ............................................................................... 10

*Regents of Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978) ........................................................................................... 1, 26

*Soc'y for Good Will to Retarded Children, Inc. v. Cuomo*,
  737 F.2d 1239, 1251 (2d Cir. 1984) .......................................................................... 8

*Sure-Tan, Inc. v. N.L.R.B.*,
  467 U.S. 883, 900 (1984) .......................................................................................... 8

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
  402 U.S. 1 (1971) .................................................................................................... 10

*United States v. Morrison*,
  449 U.S. 361, 363–64 (1981) ................................................................................. 7-8

*United States v. Stokes*,
  124 F.3d 39, 44 (1st Cir. 1997) ................................................................................. 7

**PAGE(S)**

*Wygant v. Jackson Bd. of Educ*.,
  476 U.S. 267, 277 (1986)...................................................................................... 10

**OTHER AUTHORITIES**

M. Aberg et al., Cardiovascular Fitness Is Associated with Cognition in Young Adulthood,
  PROCEEDINGS OF THE NAT'L ACADEMY OF SCI. (Nov. 30, 2009),
  http://www.pnas.org/content/106/49/20906. ........................................................... 19

R. Barros et al., *School Recess and Group Classroom Behavior*,
  123 PEDIATRICS 431-36 (2009), http://pediatrics.aappublications.org/content/123/2/431....... 18

W. Bowen et al., THE SHAPE OF THE RIVER (1998) ...................................................... 26

B. Brayboy et al., *K-12 Achievement for Indigenous Students*, 54:1 J. OF AM. INDIAN
  EDUC. (Spring 2015), https://www.jstor.org/stable/10.5749/jamerindieduc.54.1.
  0063?seq=1#page_scan_tab_contents ...................................................... 12, 14, 16-17

A. Carnevale et al., *Socioeconomic Status, Race/Ethnicity, and Selective College Admissions*,
  in AMERICA'S UNTAPPED RESOURCE: LOW-INCOME STUDENTS IN HIGHER EDUCATION
  (Richard D. Kahlenberg 2004), https://cew.georgetown.edu/socioeconomic-status-
  raceethnicity-and-selective-college-admissions/ .............................................. 19-20

D. Castelli et al., *Physical Fitness and Academic Achievement in Third- and Fifth-Grade
  Students*, 29 J. OF SPORT & EXERCISE PSYCHOL. 239-52 (2007),
  https://journals.humankinetics.com/doi/10.1123/jsep.29.2.239 ............................... 19

M. Chang et al., *The educational benefits of sustaining cross-racial interaction among
  undergraduates*, 77:3 THE J. OF HIGHER EDUC., 430-55 (2006) ............................... 27

R. Chetty et al., *Race and Economic Opportunity in the United States* (March 2018),
  http://www.equality-of-opportunity.org/assets/documents/race_paper.pdf. ................ 19

A. Chiang et al., *(Mis)Labeled: The Challenge of Academic Capital Formation for
  Hmong American High School Students in an Urban Setting*, 10 J. OF SE. ASIAN AM.
  EDUC. & ADVANCEMENT (2015)................................................................. 14, 21

COMPELLING INTEREST: EXAMINING THE EVIDENCE ON RACIAL DYNAMICS IN COLLEGES
  AND UNIVERSITIES (M. Chang, D. Witt, J. Jones, & K. Hakuta 2003) .................... 26

DIVERSITY CHALLENGED: EVIDENCE ON THE IMPACT OF AFFIRMATIVE ACTION
  (G. Orfield & M. Kurlaender 2001);................................................................. 26

A. Duckworth et al., *Grit: Perseverance and Passion for Long-Term Goals*, 92 J.
  OF PERSONALITY & SOC. PSYCHOL. 1087 (2007). .............................................. 25

**PAGE(S)**

Education Trust-West, *The Majority Report: Supporting the Educational Success of Latino Students in California* (Nov. 2017),
https://west.edtrust.org/resource/the-majority-report ............................................................. 17

R. Epstein, et al., *Girlhood Interrupted: The Erasure of Black Girls' Childhood*,
Ctr. On Poverty and Inequality at Georgetown Law Sch. (June 2017),
https://www.law.georgetown.edu/poverty-inequality-center/wp-content/uploads/sites/14/2017/08/girlhood-interrupted.pdf .................................................... 22

*Figure 3-3 Distribution of Total Population by Race: 1900 to 2000* in F. Hobbs et al., *Demographic Trends In the 20th Century: Census 2000 Special Reports* (Nov. 2002) .......... 12

D. Franklin et al., *News Analysis: Khurana's Welcome Email to Students is Normally Short and Sweet. Not This Year*, Harv. Crimson (Aug. 23, 2018),
https://www.thecrimson.com/article/2018/8/23/khurana-welcome-back-email ........................ 9

R. Freedle, *Correcting the SAT's Ethnic and Social-Class Bias: A Method for Reestimating SAT Scores*, 73 Harv. Educ. Rev. 1 (2003),
http://www.hepgjournals.org/doi/pdf/10.17763/haer.73.1.8465k88616hn4757?code=hepg-site ................................................................................................................... 12

W. Gilliam et al., *Do Early Educators' Implicit Biases Regarding Sex and Race Relate to Behavior Expectations and Recommendations of Preschool Expulsions and Suspensions?*, Yale Univ. Child Study Ctr. (Sept. 28, 2016),
https://medicine.yale.edu/childstudy/zigler/publications/Preschool%20Implicit%20Bias%20Policy%20Brief_final_9_26_276766_5379_v1.pdf .................................................. 20

P. Goff et al., *The Essence of Innocence: Consequences of Dehumanizing Black Children*, J. Of Personality & Soc. Psychol. (February 2014),
https://www.apa.org/pubs/journals/releases/psp-a0035663.pdf ............................................. 22

J. Grissom, *Physical Fitness and Academic Achievement*,
8:1 J. Of Exercise Physiology (Feb. 2005),
http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.510.725&rep=rep1&type=pdf..... 19

J. Heckman et al., *Hard Evidence on Soft Skills* (Aug. 1, 2013) 19 Labour Econ. 451),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3612993/.................................................... 26

S. Hughes et al., *Causation Fallacy 2.0: Revisiting the Myth and Math of Affirmative Action*,
30 Educ. Pol'y (2016). .......................................................................................................... 6

S. Hurtado, *The Next Generation of Diversity & Intergroup Relations Research*,
61 J. Soc. Issues 595, 602 (2005). ......................................................................................... 28

**PAGE(S)**

S. Jaschik, *An Admissions Reformer Takes Stock*, INSIDE HIGHER ED (May 22, 2017), https://www.insidehighered.com/admissions/article/2017/05/22/admissions-reformer-takes-stock-use-noncognitive-variables. ........................................................ 25

H. Jordan et al., *Teacher Effects on Longitudinal Student Achievement*, Dallas Pub. Schs (July 1997), https://www.dallasisd.org/cms/lib/TX01001475/Centricity/ Shared/evalacct/research/articles/Jordan-Teacher-Effects-on-Longitudinal-Student-Achievement-1997.pdf ........................................................ 15

W. Kidder et al., *How the SAT Creates "Built-In Headwinds": An Educational and Legal Analysis of Disparate Impact*, 43 SANTA CLARA L. REV. 131 (2002), https://digitalcommons.law.scu.edu/lawreview/vol43/iss1/3/. ................................ 13

M. Krupnick, *These Groups of Asian-Americans Rarely Attend College, But California Is Trying to Change That*, PBS NewsHour (May 21, 2015), https://www.pbs.org/newshour/education/these-groups-of-asian-americans-rarely-attend-college-but-california-is-trying-to-change-that ........................................ 5

M. Kurlaender et al., *Fifty Years After Brown: New Evidence Of The Impact Of School Racial Composition On Student Outcomes*, 6:1 INT'L J. OF EDUC. POLICY, RESEARCH & PRACTICE 51-78 (2005) ........................................ 27

M. Kurlaender et al., *Is diversity a compelling educational interest? Evidence from Louisville* in DIVERSITY CHALLENGED (G. Orfield 2001) ........................................ 27

M. Lagace, *Racial Diversity Pays Off*, Harv. Bus. Sch. Working Knowledge (June 2004) ......... 27

D. Lee et al., *Academic Needs and Family Factors in the Education of Southeast Asian American Students: Dismantling the Model Minority Myth*, 12:2 J. OF SE. ASIAN AM. EDUC. & ADVANCEMENT 1 (2017), https://docs.lib.purdue.edu/jsaaea/vol12/iss2/2.. ........................................ 18

LDF, *Locked Out of the Classroom: How Implicit Bias Contributes to Disparities in School Discipline* (2017) ........................................ 22

LDF & NWLC, *Unlocking Opportunity for African American Girls* (2014) ........................... 22

A. Lewis et al., DESPITE THE BEST INTENTIONS: HOW RACIAL INEQUALITY THRIVES IN GOOD SCHOOLS (2015) ........................................ 20, 21

J. Loewen, *Here We Go Again: Tests for the Common Core May Be Unfair to Some and Boring to All*, HISTORY NEWS NETWORK (Nov. 18, 2014), https://historynewsnetwork.org/blog/153543. ........................................ 12, 13

**PAGE(S)**

J. Logan, *Separate and Unequal: The Neighborhood Gap for Blacks, Hispanics and Asians in Metropolitan America*, Brown Univ. (July 2011), https://s4.ad.brown.edu/Projects/Diversity/Data/Report/report0727.pdf ................................. 19

K. Malott, *Being Mexican: Strengths and Challenges of Mexican-Origin Adolescents*, 8:12 J. OF SCH. COUNSELING (2010), https://files.eric.ed.gov/fulltext/EJ885087.pdf............. 21

P. Marthers, *Looking at Student "Grit and Resilience – from Recruitment to Retention* (June 16, 2017), https://www.academicimpressions.com/looking-at-student-grit-and-resilience-from-recruitment-to-retention/. .............................................................................. 25

M. Morris, PUSHOUT: THE CRIMINALIZATION OF BLACK GIRLS IN SCHOOLS (2015).................... 22

Nat'l Endowment for the Arts, *A Decade of Arts Engagement: Findings from the Survey of Public Participation in the Arts, 2002–2012* (Jan. 2015), https://www.arts.gov/sites/default/files/2012-sppa-feb2015.pdf............................................. 17

Nat'l Endowment for the Arts, *Arts Education in America: What the Declines Mean for Arts Participation* (Feb. 2011), https://www.arts.gov/sites/default/files/2008-SPPA-ArtsLearning.pdf........................................................................................................ 17

P. Ocen et al., BLACK GIRLS MATTER: PUSHED OUT, OVERPOLICED, AND UNDERPROTECTED (2015) ...................................................................................................... 22

S. Page, THE DIFFERENCE: HOW THE POWER OF DIVERSITY CREATES BETTER GROUPS, FIRMS, SCHOOLS, AND SOCIETIES (2008) ................................................................................ 27

J. Park, *The Misleading Lawsuit Accusing Harvard of Bias Against Asian Americans*, WASH. POST (Jan. 2, 2015), https://washingtonpost.com/opinions/the-misleading-lawsuit-accusing-harvard-of-bias-against-asian-americans/2015/01/02/cc7a7c52-91e5-11e4-ba53-a477d66580ed_story.html?noredirect=on&utm_term=.73840045bd2a.................................... 6

H. Peske et al., *Teaching Inequality: How Poor and Minority Students Are Shortchanged on Teacher Quality* (June 2006), https://1k9gl1yevnfp2lpq1dhrqe17-wpengine.netdna-ssl.com/wp-content/uploads/2013/10/TQReportJune2006.pdf .................................................. 15

K. Phillips, *How Diversity Makes Us Smarter*, 311:4 SCI. AM. (Oct. 2014). ............................... 27

R. Reyes, Jr., *I Should Have Gone to Stanford*, HARV. CRIMSON (Oct. 16, 2017), https://www.thecrimson.com/article/2017/10/16/reyes-latinx-longform/ ................................. 7

J. Rosner, *The SAT: Quantifying the Unfairness Behind the Bubbles*, in SAT WARS: THE CASE FOR TEST-OPTIONAL COLLEGE ADMISSIONS 134 (Joseph A. Soares 2015)............. 13

**PAGE(S)**

E. Sanchez Wilson, *Media Miss the Mark on Southeast Asian American Students and Impact of Affirmative Action*, Se. Asia Res. Action Ctr. (June 22, 2018), http://www.searac.org/our-voices/press-room/media-miss-the-mark-on-southeast-asian-american-students-and-impact-of-affirmative-action/. .................................... 5

W. Sanders & S. Horn, *Research Findings from the Tennessee Value-Added Assessment System (TVAAS) Database: Implications for Educational Evaluation and Research*, 12:3 J. OF PERSONNEL EVALUATION IN EDUC. (1998), https://www.sas.com/govedu/edu/ed_eval.pdf ........................................................ 14

W. Sanders & J. Rivers, *Cumulative and Residual Effects of Teachers on Future Student Academic Achievement,* Univ. of Tenn. Value Added Research & Assessment Ctr. (Nov. 1996), https://www.beteronderwijsnederland.nl/files/cumulative%20and%20residual%20effects%20of%20teachers.pdf ........................................ 15

M. Santelices et al., *Unfair Treatment? The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning*, 80 HARV. EDUC. REV. (2010), https://eric.ed.gov/?id=EJ930622 ................................................................. 12

R. Skiba, et al., *Are Black Kids Worse? Myths and Facts About Racial Differences In Behavior: A Summary of the Literature*, Ind. Univ. (March 2014), http://www.indiana.edu/~atlantic/wp-content/uploads/2014/03/African-American-Differential-Behavior_031214.pdf; 2013-14 CRDC First Look ......................................................................................... 22

K. Snellman et al., *Inequity Outside the Classroom: Growing Class Differences in Participation in Extracurricular Activities*, 40 VOICES IN URBAN EDUC. (2015), https://files.eric.ed.gov/fulltext/EJ1056739.pdf .................................................. 18, 25

B. Tatum, WHY ARE ALL THE BLACK KIDS SITTING TOGETHER IN THE CAFETERIA?: AND OTHER CONVERSATIONS ABOUT RACE (3d ed. 2017) ...................................................... 16

H. Tenenbaum et al., *Are Teachers' Expectations Different for Racial Minority Than for European American Students?: A Meta-Analysis*, 99:2 J. OF EDUC. PSYCHOL. (2007), http://psycnet.apa.org/record/2007-06672-003 .................................................. 20, 21

U.S. Comm'n on Civil Rights, *Public Education Funding Inequity in an Era of Increasing Concentration of Poverty and Resegregation* (Jan. 2018), https://www.usccr.gov/pubs/2018/2018-01-10-Education-Inequity.pdf ............................ 26-27

U.S. Dep't of Educ., *2015-2016 Civil Rights Data Collection: STEM Course Taking* (2018), https://www2.ed.gov/about/offices/list/ocr/docs/stem-course-taking.pdf. ........... 16, 17

**PAGE(S)**

U.S. Dep't of Educ. Office for Civil Rights, *2015-16 Civil Rights Data Collection: School Climate and Safety* 3 (June 7, 2016), https://www2.ed.gov/about/offices/list/ocr/docs/ school-climate-and-safety.pdf.................................................................................................. 23

U.S. Dep't of Educ., *2015-2016 Civil Rights Data Collection: School Climate and Safety* (2018) ................................................................................................................... 22

U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics, *The Condition of Education 2018* (May 2018), https://nces.ed.gov/pubsearch/pubsinfo.asp?pubid=2018144......................... 13-14

U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics, *Status and Trends in the Educ. of Racial and Ethnic Groups 2017* (July 2017), https://nces.ed.gov/pubs2017/2017051.pdf.................. 23

U.S. Dep't of Educ. Office for Civil Rights, *2013-2014 Civil Rights Data Collection: A First Look* (June 2016; Revised Oct. 2016), https://www2.ed.gov/about/offices/list/ocr/docs/2013-14-first-look.pdf. .................... 15-16, 22

U.S. Gov't Accountability Office, *K-12 Education: Discipline Disparities for Black Students, Boys, and Students with Disabilities* (March 2018) .................................................... 22

The Univ. of Chi. Consortium on Chi. Sch. Research, TEACHING ADOLESCENTS TO BECOME LEARNERS: THE ROLE OF NONCOGNITIVE FACTORS IN SHAPING SCHOOL PERFORMANCES: A CRITICAL LITERATURE REVIEW (June 2012).........................................24-25

A. Wells et al., *Research Fact Sheet: The Educational Benefits of Diverse Schools and Classrooms for All Students*, Am. Educ. Research Ass'n (2016), http://www.aera.net/Portals/38/docs/Annual_Meeting/2016%20Annual%20Meeting/ 2016%20Knowledge%20Forum/Wells.pdf. ........................................................................... 27

**INTERESTS OF AMICI CURIAE**[1]

Amici Curiae are 25 Harvard student and alumni organizations comprised of thousands of Asian American, Black, Latinx[2], Native American, and white Harvard students, alumni (including some who are parents of current Harvard students and prospective applicants), faculty, and alumni interviewers. Amici's alumni members have graduation years that span at least seven decades. Amici include many longstanding organizations, some of whom have served Harvard for more than a century. Amici offer the Court vast institutional knowledge pertinent to this case.

Amici wish to ensure that Harvard provides students with the critically important benefits of diversity and continues to consider race as one of many factors in its holistic admissions process. A description of Amici can be found in the Motion to Participate as Amici Curiae, ECF No. 455, and in the Motion of Additional Harvard Student and Alumni Organizations to Participate as Amici Curiae, filed concurrently herewith.

**INTRODUCTION**

Longstanding Supreme Court precedent allows the narrowly tailored use of race in college admissions in pursuit of the educational benefits of diversity.[3] And rightly so. Applicants' opportunities to amass credentials that make for a competitive college application are greatly affected by race. Given racial bias in standardized testing and endemic racial inequities in

---

[1] Local counsel for Amici Curiae in this action, the law firm of Sugarman Rogers Barshak & Cohen, P.C. ("Sugarman Rogers"), also represents the defendant, President and Fellows of Harvard College ("Harvard"), in matters wholly unrelated to the legal and factual issues presented by this action. Neither Harvard nor its litigation counsel in this action have provided any financial support for the preparation of Amici Curiae's brief or authored this brief in whole or in part.

[2] The gender-neutral term "Latinx" is used herein to refer collectively to Latinos, Latinas, and non-binary persons of Latin American background.

[3] *See, e.g.*, *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978); *Grutter v. Bollinger*, 539 U.S. 306 (2003); *Fisher v. Univ. of Texas* ("Fisher I"), 570 U.S. 297 (2013); *Fisher v. Univ. of Texas* ("Fisher II"), 136 S. Ct. 2198 (2016).

educational opportunities in primary and secondary school, Harvard must consider race if it is to assemble a diverse student body and achieve the educational benefits thereof.

Amici oppose Plaintiff Students for Fair Admissions' ("SFFA") attempt to upend this settled law and thereby prevent Harvard – and all colleges and universities – from considering race, as one of many factors, in admissions in order to assemble a diverse student body and obtain the educational benefits of diversity. Not only would SFFA's remedy – eliminating all signs of race from the admissions process – fail to redress the alleged discrimination, it would itself have an acute, foreseeable, and racially discriminatory disparate impact on applicants of color while giving an unjustified boost to white applicants.

Amici urge this Court to deny SFFA's motion for summary judgment[4] to make clear that, as the Supreme Court has repeatedly reaffirmed, universities may consider race, as one of numerous factors, in admissions, and Edward Blum and his latest litigation vehicle, SFFA, will not be rewarded for their efforts to sow racial division as part of Mr. Blum's unending crusade against civil rights and racial equality.

## I.    SFFA's Remedy of Eliminating the Consideration of Race in Admissions Would Discriminate Against Asian Americans and Other Applicants of Color.

Eliminating race-conscious admissions would disproportionately harm applicants of color, including some Asian Americans. While SFFA claims it seeks to end alleged bias in Harvard's admissions process, it advocates for an outcome that itself has discriminatory effects. Not only would a race-blind process force all applicants to erase their unique identities in the college admissions process, it would also impair the consideration of certain Asian American applicants and excessively burden Black and Latinx student admission. The Court should reject SFFA's

---

[4] As articulated in our prior brief, granting summary judgment in Harvard's favor is also warranted. Amicus Br. of 21 Harvard Student & Alumni Organizations ("Harvard Student & Alumni Orgs.' Br."), ECF No. 471.

requested remedy, which would not address its allegations of discrimination against Asian Americans but instead would primarily benefit white applicants.

### A. Erasing Race from College Applications is Impractical, and Harmful Both to the Admissions Process and to Many Applicants of Color.

SFFA seeks a "permanent injunction requiring Harvard to conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission." Compl., ECF No. 1 at 119. Such an injunction would radically transform Harvard's admissions process, preventing Harvard from conducting interviews; recruiting applicants in person; and viewing athletic, drama, music, dance, or other performances, either on video or in person. Moreover, applicants would be forced to suppress their identities when applying to college as they could no longer list awards, activities, or community service experiences that reveal their race or write their personal statements about experiences that touch on race. Recommenders could also no longer share in recommendation letters that the applicant overcame adversity as an immigrant or excelled despite encountering racism.

In short, applicants would no longer be able to present their authentic selves in their applications, deterring and disadvantaging applicants whose leadership and other experiences are inextricably intertwined with their racial and cultural heritage. *See* Parmley Decl., ECF No. 471-7 at ¶ 8; Ho Decl., ECF No. 471-4 at ¶ 7; Van Dyke Decl., ECF No. 471-14 at ¶ 16. Indeed, in its amicus brief in support of SFFA, the Asian American Legal Foundation and Asian American Coalition for Education concede the harm that can result from students feeling pressure to erase their racial identity. *See* AALF Br., ECF No. 467 at 18-19. And, as much as SFFA may want to erase race from college applications, attributes like a student's name, zip code, high school, and other traits may signal an applicant's race – especially for applicants attending highly segregated schools (e.g., the vast majority of Latinx and Black students, *see infra*, at 16) and applicants with

3

surnames that are easily identifiable as Latinx, Asian, or African. As an integral part of many people's identity, heritage, and life experience, race is nearly impossible to erase from a college application, and SFFA's proposed remedy of "colorblind" admissions is both damaging to students and impractical.

### B. Censoring Race in College Applications Will Harm Some of the Asian American Applicants SFFA Claims to Represent.

Race consciousness can and does benefit Asian American applicants. For example, Harvard admissions officers flag certain applications as "disadvantaged" based on factors that might indicate modest socioeconomic background, such as parents' educational attainment or occupation. Report of David Card, Ph.D., Ex. 33 to Decl. of Felicia H. Ellsworth in Supp. of Harv.'s Mot. for Summ. J. ("Card Rep.") at 36 n.56; Report of Peter Arcidiacono, Ph.D., Ex. A to Decl. of Peter Arcidiacono in Supp. of SFFA's Mot. for Summ. J., at 3 n.3. Within the category of disadvantaged applicants, Asian Americans receive the largest preference in admissions. They make up a larger share of disadvantaged applicants than do white applicants, and being Asian American within the disadvantaged category is correlated with a greater likelihood of admission (a pattern that is absent or only minimally present for Black or Latinx applicants, respectively). *See* Amicus Br. Of Economists Michael Keane et al., ECF No. 450, ("Keane Br.") at 14. Attention to the particular disadvantages faced by Asian Americans is important because this group has the highest intra-racial inequality. *See* Harvard Student & Alumni Orgs.' Br., ECF No. 471 at 25-26. As such, not all Asian American applicants would be affected equally by the elimination of race-conscious admissions. Students from certain Asian ethnic groups often face great adversity and have fewer educational opportunities before applying to college. *See id.* at 12-13, 25-26; *see also infra* at 13-14. Ending race-consciousness will eliminate Harvard's ability to reward the resilience

shown by Asian American applicants who have overcome hardships particular to their ethnic groups.

For example, as the Southeast Asia Resource Action Center has pointed out, Southeast Asian American students benefit from admissions policies that consider Southeast Asian American students' "resilience in overcoming racial, ethnic, and socioeconomic obstacles" to obtaining an education, including that such students often grow up in impoverished neighborhoods with under-resourced schools. E. Sanchez Wilson, *Media Miss the Mark on Southeast Asian American Students and Impact of Affirmative Action*, Se. Asia Res. Action Ctr. (June 22, 2018), http://www.searac.org/our-voices/press-room/media-miss-the-mark-on-southeast-asian-american-students-and-impact-of-affirmative-action/. Universities acknowledge this as well. As a California State University administrator noted, "We realized there needs to be some targeted support services for this population." M. Krupnick, *These Groups of Asian-Americans Rarely Attend College, But California Is Trying to Change That*, PBS NewsHour (May 21, 2015), https://www.pbs.org/newshour/education/these-groups-of-asian-americans-rarely-attend-college-but-california-is-trying-to-change-that. Indeed, "[a]bout half of the California State University's 23 campuses have participated in the system's Asian American and Pacific Islander Initiative, which runs college fairs and other events for underrepresented groups and translates Cal State materials into Hmong, Cambodian, Laotian, Marshallese, Samoan and other languages." *Id.*

Ending race-conscious admissions at Harvard will also have a chilling effect on similar policies at other selective schools, even if affirmative action remains constitutional, possibly due to concerns about litigation costs or negative press coverage. Even though the Court has already denied SFFA's claim seeking to overturn settled law allowing the narrowly tailored use of race in college admissions, *see* ECF No. 325, SFFA continues to advocate for this outcome. Some

colleges, however, depend on affirmative action as a tool to attract Asian Americans. *See, e.g.*, J. Park, *The Misleading Lawsuit Accusing Harvard of Bias Against Asian Americans*, WASH. POST. (Jan. 2, 2015) (describing her experience of being rejected from Harvard but receiving a full-tuition affirmative action-based scholarship to Vanderbilt), https://washingtonpost.com/opinions/the-misleading-lawsuit-accusing-harvard-of-bias-against-asian-americans/2015/01/02/cc7a7c52-91e5-11e4-ba53-a477d66580ed_story.html?noredirect=on&utm_term=.73840045bd2a. If Mr. Blum succeeds in forcing either Harvard or all colleges and universities to ignore race in admissions, top schools where Asian American enrollment lags behind Harvard's, such as Dartmouth (15%), Brown (15%), Vanderbilt (13%), Georgetown (9%), and Notre Dame (5%), may be unable or unwilling to consider race to increase their yield of Asian American students. Nat'l Ctr. for Educ. Stats., College Navigator, https://nces.ed.gov/collegenavigator/.

### C. Requiring Harvard to Ignore Race Would Disproportionately Harm Black and Latinx Applicants.

SFFA's remedy would also harm Black and Latinx applicants more than any other group, an outcome inconsistent with its claims. SFFA concedes that Harvard can legitimately pursue the goals of a diverse student body, Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 3, and admits that the admission of Black and Latinx students "could not explain the [alleged] disproportionately negative effect Harvard's admission system has on Asian Americans students," *id*. at 13. In fact, even if every Black or Latinx applicant were removed from Harvard's applicant pool, the admit rate for the remaining applicants (primarily Asian American or white) would increase by only one percentage point (from 5.84% to 6.84%). S. Hughes et al., *Causation Fallacy 2.0: Revisiting the Myth and Math of Affirmative Action*, 30 EDUC. POL'Y 63, 82 (2016).

Despite this, SFFA argues for a remedy that would devastate the admission of Black and Latinx applicants, groups that have a negligible effect on the admission rates for Asian Americans.

*Id.* Without race-conscious policies, the share of Black students in Harvard's admitted class would drop from 14% to 6% and the share of Latinx and "Other" underrepresented minority students would drop from 14% to 9%. Harvard's Mem. in Supp. of Mot. for Summ. J., ECF No. 418 at 28. Collectively, this amounts to a decline of around 220 students, approximately halving the number of Black and Latinx/Other students on campus. As discussed below, most of those spots would be filled by white students, not Asian American students. *See infra* at 8.

By pushing for a remedy that targets Black and Latinx students, SFFA perpetuates the false and divisive narrative that Black and Latinx students don't belong on Harvard's campus and are taking places that should have gone to other applicants. Yet, there is little factual support for this notion since, as SFFA admits, the admission of Black and Latinx students cannot account for the alleged disparities against Asian American applicants. *See* Pl.'s Br. at 13. Nevertheless, some members of Amici Organizations encounter this hurtful stereotype on campus when others assume that they are not qualified to be at Harvard solely because of their race. *See* Decl. of Aba Sam ("Sam Decl."), ECF No. 471-1 at ¶¶ 7-8; R. Reyes, Jr., *I Should Have Gone to Stanford*, HARV. CRIMSON (Oct. 16, 2017), https://www.thecrimson.com/article/2017/10/16/reyes-latinx-longform/ (recounting the painful experience of being mistaken for a day laborer on campus). If SFFA prevails on its claims, however, this harm would go beyond perpetuating stereotypes and also close Harvard's doors to many applicants of color.

### D. SFFA's Proposed Remedy of Eliminating Race Consciousness Is So Incongruous to its Claim of Discrimination that it Calls into Question the Validity of that Claim.

The incongruity between SFFA's claims and the relief it seeks casts doubt on the validity of those claims. It is hornbook law that "remedies ordinarily 'should be tailored to the injury suffered . . . and should not unnecessarily infringe on competing interests.'" *United States v. Stokes*, 124 F.3d 39, 44 (1st Cir. 1997) (quoting *United States v. Morrison*, 449 U.S. 361, 363–64

(1981)); *see also Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 900 (1984) (noting the "requirement that a proposed remedy be tailored to the unfair labor practice it is intended to redress"); *Soc'y for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1251 (2d Cir. 1984) (holding that "[i]njunctive relief should be narrowly tailored to fit specific legal violations adjudged" and collecting cases). Flouting this principle, SFFA argues that Harvard should be prohibited from considering race in admissions, an extreme request that contravenes Supreme Court precedent and bears little relationship to the harm alleged by SFFA.

Eliminating race from college applications will not remedy the alleged discrimination against the Asian American applicants whose interests SFFA claims to represent. SFFA claims that Asian American applicants are penalized because of their race as compared to white applicants, Pl.'s Br. 10, 12-13, but SFFA's proposed remedy—erasing race from college applications—would deepen this disparity by disproportionately benefitting white applicants and discriminating against some Asian American applicants. The share of white students in the admitted freshman class would increase from 40% to 48%, an addition of around 135 students. Card Rep. at 103. By comparison, the share of Asian American students would rise only modestly from 24% to 27% (around 50 students). *Id.* As a result, the gap between the white and Asian American shares of the admitted class would widen if race-conscious admissions were eliminated.

The boon to white applicants that would result from the elimination of race-conscious admissions is unsurprising given that many of Harvard's ostensibly race-neutral admissions practices benefit white and wealthy applicants. Approximately one-third of Harvard's admitted class are legacies, double legacies, recruited athletes, children of faculty and staff, or students on the dean's or director's interests lists. *See* Card Rep. at 111; Keane Br. at 17 n.12. While Harvard's general admission rate is 6%, the admission rates for these categories are exponentially higher:

recruited athletes (86%), legacy applicants (33.6%), the children of faculty or staff (46.7%) and students on dean and director's interest list (42.2%).[5] Rebuttal Report of Peter Arcidiacono, Ph.D., Ex. B to Decl. of Peter Arcidiacono in Supp. of SFFA's Mot. for Summ. J. at tbl. A.2R. And, as SFFA admits, admissions preferences for students in these categories "mostly benefit wealthy and white applicants." Pl.'s Opp'n to Harvard's Mot. for Summ. J., ECF No. 449 ("Pl.'s Opp'n") at 37.

Yet SFFA excludes these categories that operate primarily as preferences for white students from the statistical analysis it proffers in support of its claims of discrimination against Asian American applicants. *See* Harvard Student & Alumni Orgs.' Br., ECF No. 471 at 24 & n.14. By omitting data on applicants in these categories from its statistical model, SFFA simply assumes that the special consideration afforded these applicants is irrelevant to the alleged discrimination at the heart of their claim. SFFA declines to probe the potential effect of these categories on the admission of Asian Americans, preferring to train its sights only on race-conscious policies. By excluding data on other potential causal factors from its model, SFFA has placed its thumb on the scale to insulate policies that tend to benefit white applicants from scrutiny, while skewing its analysis against a policy that tends to benefit applicants of color. This distorted analysis exposes SFFA's true goal, which is not to identify the cause of alleged discrimination against Asian American applicants and remedy it, but to accomplish what Mr. Blum failed to do in *Fisher v. University of Texas*: dismantle race-conscious admissions.[6] Summary judgment cannot be granted

---

[5] Similarly, for an applicant with an academic rating of 2, the general admission rate is 7.87%, but if that applicant is a recruited athlete or other special category the admission rate jumps to 70.63% or 42.98%, respectively. Pl.'s Br. at 15.

[6] D. Franklin et al., *News Analysis: Khurana's Welcome Email to Students is Normally Short and Sweet. Not This Year*, HARV. CRIMSON (Aug. 23, 2018), https://www.thecrimson.com/article/2018/8/23/khurana-welcome-back-email/ (noting that, in an email to the Crimson, Mr. Blum admitted, "The motivation behind the lawsuit is to end racial classifications and preferences in university admissions.").

for SFFA on the basis of this flimsy analysis, which falls far short of proving that discrimination against Asian Americans exists—much less that it is caused by race-conscious admissions.

### E.  Remedies for Discrimination Can and Should Be Race-Conscious.

Even assuming arguendo that SFFA proves its claim of intentional discrimination, case law does not mandate the elimination of race from Harvard's admissions process. It is well settled that remedies for intentional racial discrimination may themselves be race-conscious. *See, e.g.*, *Green v. Cty. Sch. Bd. of New Kent*, 391 U.S. 430 (1968) (approving the use of race in assigning students to schools to remedy intentional discrimination); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971) (same); *Bos. Police Superior Officers Fed'n v. City of Boston*, 147 F.3d 13, 20 (1st Cir. 1998) (holding that the race-conscious promotion of a Black officer who scored one point lower on the police lieutenant's exam than three white applicants served "a proper remedial purpose" in light of the Boston Police Department's history of discrimination); *Morgan v. O'Bryant*, 671 F.2d 23, 28 (1st Cir. 1982) (collecting cases). "Once there has been a finding of intentional racial discrimination, race-conscious remedies are a constitutionally valid means of ameliorating the effects of such discrimination." *Morgan*, 671 F.2d at 28.[7] Particularly "where colorblind approaches would be inadequate"—or as in this case, harmful—"race-conscious remedies not only are permitted, they are said to be required." *Id.*

It is not racial blindness but "[i]ntentional, official recognition of race" that "has been found necessary to achieve fair and equal opportunity." *Assoc. Gen. Contractors of Mass., Inc. v. Altshuler*, 490 F.2d 9, 16 (1st Cir. 1973). If there is bias against Asian Americans in Harvard's

---

[7] *See also Local 28 of Sheet Metal Workers' Intern. Ass'n v. E.E.O.C.*, 478 U.S. 421, 445 (1986) (holding that "affirmative race-conscious relief as a remedy for past discrimination . . . may be appropriate where an employer or labor union has engaged in persistent or egregious discrimination, or where necessary to dissipate the lingering effects of pervasive discrimination."); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986) (holding that, pursuant to the goal of "eliminat[ing] every vestige of racial segregation and discrimination in [ ] schools," "race-conscious remedial action may be necessary.").

admissions process, it should be remedied by mindfulness and awareness of race to ensure that the distinct individual contributions of Asian American applicants and the range of diversity within this group are being properly considered. Were SFFA genuinely interested in advancing the interests of Asian American applicants, it would seek remedies that target the discrimination it alleges. Measures like implicit bias workshops and other enhanced training for admissions officers, hiring more Asian American admissions staff, independent oversight of Harvard's scoring system, required reporting, disaggregating its data collection on Asian American applicants, or analysis to ensure consistent scoring across applicants of different races would more directly address alleged bias against Asian Americans in the personal and overall ratings portions of the admissions process. An awareness of race is inherently part of such remedies. But SFFA ignores these potential remedies, insisting instead on the wholesale elimination of race-conscious admissions, a measure not required by case law that would largely benefit white applicants and harm all others.

## II.   Harvard Legitimately Considers More Than Test Scores and Grades When Selecting Students.

As the Supreme Court has explained repeatedly, a university's decision that the pursuit of the educational benefits of student body diversity is "integral to its mission" is an educational judgment (made based on the university's experience and expertise) to which the courts defer. *Fisher I*, 133 S. Ct. at 2419 (citing *Grutter*, 539 U.S. at 328, 330). Because race affects access to educational opportunities in primary and secondary school, Harvard cannot assemble a racially diverse student body without considering how race has affected each applicant's ability to amass the educational credentials that make for a competitive application.

### A.   Test Scores Underpredict the Potential of Black, Latinx, and Other Applicants.

As explained in our first amicus brief, *see* ECF No. 471 at 8-15, SFFA fails to acknowledge that test scores are not objective measures of merit. *See* Pl.'s Opp'n at 17 (referring to these

credentials as "objective"). Rather, test scores are fundamentally infected with racial bias and thereby underpredict the potential of Black, Latinx, Native, and other applicants. *See* ECF No. 471 at 8-15; *see also* B. Brayboy et al., *K-12 Achievement for Indigenous Students*, 54:1 J. OF AM. INDIAN EDUC. 63, 69, 77 (Spring 2015), https://www.jstor.org/stable/10.5749/jamerindieduc.54.1. 0063?seq=1#page_scan_tab_contents (noting that standardized tests are biased against Native examinees). Both the SAT, created in 1926, and the ACT, created in 1959, were developed at a time when the population of the United States was 90% white. *See Figure 3-3 Distribution of Total Population by Race: 1900 to 2000* in F. Hobbs et al., *Demographic Trends In the 20th Century: Census 2000 Special Reports* 75 (Nov. 2002), https://www.census.gov/prod/2002pubs/censr-4.pdf. "Like most other 'standardized' tests given widely in the U.S., researchers originally validated the SAT on affluent white students." J. Loewen, *Here We Go Again: Tests for the Common Core May Be Unfair to Some and Boring to All*, HISTORY NEWS NETWORK (Nov. 18, 2014), https://historynewsnetwork.org/blog/153543. Rather than measuring what they claim to measure, standardized tests such as the SAT and ACT assess cultural literacy; that is, how familiar the examinee is with the colloquial language commonly used in white middle class homes like those of the test creators. *See generally* R. Freedle, *Correcting the SAT's Ethnic and Social-Class Bias: A Method for Reestimating SAT Scores*, 73 HARV. EDUC. REV. 1 (2003), http://www.hepgjournals.org/doi/pdf/10.17763/haer.73.1.8465k88616hn4757?code=hepg-site; M. Santelices et al., *Unfair Treatment? The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning*, 80 HARV. EDUC. REV. 106, 126 (2010), https://eric.ed.gov/?id=EJ930622 (noting that the study's findings called into "question the validity of SAT verbal scores for African American examinees").

These biases are replicated and entrenched over time as new questions are added to tests that were originally validated on white affluent students. Because test makers are interested in reliability—ensuring that new questions added to the test will produce findings consistent with the findings of existing questions—new questions must produce the same findings as old questions. W. Kidder et al., *How the SAT Creates "Built-In Headwinds": An Educational and Legal Analysis of Disparate Impact*, 43 SANTA CLARA L. REV. 131, 146, 156-57 (2002), https://digitalcommons.law.scu.edu/lawreview/vol43/iss1/3/. Thus, when examinees whose overall score on the test was low—perhaps because the examinee was unfamiliar with the semantics used in white homes—outscored high scorers on an experimental question, that question was thrown out as unreliable. *Id.*; Loewen, *supra*; J. Rosner, *The SAT: Quantifying the Unfairness Behind the Bubbles*, in SAT WARS: THE CASE FOR TEST-OPTIONAL COLLEGE ADMISSIONS 134 (Joseph A. Soares 2015) (internal citation omitted). The result is a test whose scored section is comprised entirely of questions that advantage white examinees. Kidder, *supra*, at 148. In this way, Black, Latinx, Native, and other examinees of color have been systematically disadvantaged by standardized tests.

### B.  Grades, Extracurriculars, and Other Credentials are Not Objective Indicators of Merit.

SFFA further errs by failing to recognize that opportunities to amass the other credentials that make up a competitive college application—such as grades, extracurricular activities, and artistic and athletic talents—are also affected by race. Black, Latinx, Native, and Pacific Islander students are three to six times more likely than white students to attend a high-poverty school.[8] U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics, *The Condition of Education 2018* 82 (May

---

[8] The National Center for Education Statistics defines a "high-poverty school" as one where 75% or more of the students are eligible for a free or reduced-price lunch.

2018), https://nces.ed.gov/pubsearch/pubsinfo.asp?pubid=2018144. Nearly half of Black and Latinx students, more than a third of Native students, and a quarter of Pacific Islander students attend high-poverty schools as compared to just eight percent of white students. *Id.* In addition, 26% of Hmong Americans, 20% of Cambodian Americans, 17% of Laotian Americans, and 15% of Vietnamese Americans live below the poverty line. U.S. Census Bureau, 2011-2015 American Community Survey Selected Population Tables on American Fact Finder, https://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t; A. Chiang et al., *(Mis)Labeled: The Challenge of Academic Capital Formation for Hmong American High School Students in an Urban Setting*, 10 J. OF SE. ASIAN AM. EDUC. & ADVANCEMENT 10, 25 (2015) (noting that many Hmong American students attend poorly performing schools in "low-income school districts"), https://docs.lib.purdue.edu/cgi/viewcontent.cgi?article=1118&context=jsaaea. "The college plans of low-income students and students of color are more likely to be influenced by their high school counselors; however, these students are least likely to have school counselors, more likely to have underprepared counselors, and most likely to have counselors who are forced to give up college counseling for other tasks." Brayboy, *supra*, at 72.

Moreover, although research has repeatedly shown "teacher effectiveness to be the most important factor in the academic growth of students," Black, Latinx, Native, Southeast Asian, and Pacific Islander students are less likely to have effective teachers. W. Sanders & S. Horn, *Research Findings from the Tennessee Value-Added Assessment System (TVAAS) Database: Implications for Educational Evaluation and Research*, 12:3 J. OF PERSONNEL EVALUATION IN EDUC. 247, 250 (1998), https://www.sas.com/govedu/edu/ed_eval.pdf (also noting at 254, "African American students and white students with the same level of prior achievement make comparable academic progress when they are assigned to teachers of comparable effectiveness"). The impact of effective

teaching is cumulative and additive such that a student repeatedly assigned to effective teachers will see far more academic gains than a student who did not have effective instruction as often. W. Sanders & J. Rivers, *Cumulative and Residual Effects of Teachers on Future Student Academic Achievement,* Univ. of Tenn. Value Added Research & Assessment Ctr. 1-14 (Nov. 1996), https://www.beteronderwijsnederland.nl/files/cumulative%20and%20residual%20effects%20of %20teachers.pdf; H. Jordan et al., *Teacher Effects on Longitudinal Student Achievement*, Dallas Pub. Schs. 3 (July 1997), https://www.dallasisd.org/cms/lib/TX01001475/Centricity/Shared/eval acct/research/articles/Jordan-Teacher-Effects-on-Longitudinal-Student-Achievement-1997.pdf. One study showed that fifth grade students who had effective teachers three years in a row scored 52-54 percentage points higher on a math proficiency exam than their classmates who had been assigned to ineffective teachers for the previous three years. Sanders & Rivers, *supra*, at 3 (both groups had the same level of prior academic achievement). The residual effects of an ineffective teacher are still detectable even after subsequent instruction by an effective teacher. Sanders & Rivers, *supra*, at 4. More experienced teachers and those who obtained a degree in the subject they teach are more effective. H. Peske et al., *Teaching Inequality: How Poor and Minority Students Are Shortchanged on Teacher Quality* 2 (June 2006), https://1k9gl1yevnfp2lpq1dhrqe17-wpengine.netdna-ssl.com/wp-content/uploads/2013/10/TQReportJune2006.pdf.

Black, Latinx, and Native students are twice as likely as white students to attend a school where more than 20% of the teachers are in their first year of teaching or where more than 20% of the teachers have not met state certification or licensing requirements. U.S. Dep't of Educ. Office for Civil Rights, *2013-2014 Civil Rights Data Collection: A First Look* 9 (June 2016; Revised Oct. 2016) ("2013-14 CRDC First Look"), https://www2.ed.gov/about/offices/list/ocr/docs/2013-14-first-look.pdf. More than a third of Native Hawaiian or other Pacific Islander students attend

schools where more than half of the teachers were absent for more than 10 days (just 12% of white students attended such schools). *Id.* at 9. In addition, 75% of Black K-12 students and nearly 80% of Latinx K-12 students attend racially segregated schools, which, like high-poverty schools, are "likely to have less-experienced teachers, high levels of teacher turnover, inadequate facilities, and fewer classroom resources." B. Tatum, WHY ARE ALL THE BLACK KIDS SITTING TOGETHER IN THE CAFETERIA?: AND OTHER CONVERSATIONS ABOUT RACE 7-8 (3d ed. 2017). "[S]tudents in high-minority schools are assigned to novice teachers at twice the rate as students in schools without many minority students," and students in "the highest-poverty schools are assigned to novice teachers almost twice as often as children in low-poverty schools." *Id.* at 2.

In addition, "[c]lasses in high-poverty and high minority secondary schools are more likely to be taught by 'out-of-field teachers' – those without a major or minor in the subject they teach." *Id.* Indeed, "[n]early half of the math classes in both high-poverty high schools and high-minority high schools are taught by teachers who don't have a college major or minor in math or a math-related field, such as math education, physics, or engineering." *Id.* at 3 (also noting the same for 70% of math classes "[i]n high-poverty and high-minority middle schools."). Given this, the 75% of Black students and the nearly 80% of Latinx students who attend racially segregated schools and the third of Native American students, the quarter of Pacific Islander students, and the many Southeast Asian students who attend high-poverty schools are at a significant disadvantage.

High schools with high Black and Latinx enrollment are also less likely to offer advanced math and science courses such as Calculus or Physics as compared to other high schools. *See* U.S. Dep't of Educ., *2015-2016 Civil Rights Data Collection: STEM Course Taking* ("2015-16 CRDC: Stem") 5 (2018), https://www2.ed.gov/about/offices/list/ocr/docs/stem-course-taking.pdf. Similarly, "schools serving large numbers of Indigenous students offer few, if any, opportunities

for accelerated learning, including AP, honors, and international baccalaureate (IB) courses." Brayboy, *supra*, at 75. Even when Black, Latinx, or Native students attend schools that offer such courses, they are often less likely to be enrolled in those courses. *See* 2015-16 CRDC: Stem at 3, 7; *see also* Education Trust-West, *The Majority Report: Supporting the Educational Success of Latino Students in California* 3 (Nov. 2017), https://west.edtrust.org/resource/the-majority-report/ (finding that Latinx students "are often tracked away from college-preparatory coursework"); Brayboy, *supra*. For example, "Black students constituted 17 percent of the students in schools that offered Algebra I in Grade 8, and 11 percent of the students enrolled in Algebra I in Grade 8." 2015-16 CRDC: Stem at 3. "Latin[x] students comprised 25 percent of the students in schools that offered Algebra I in Grade 8, and 18 percent of the students enrolled in Algebra I in Grade 8." *Id*.

Black and Latinx students also have less access to arts instruction. Nat'l Endowment for the Arts, *A Decade of Arts Engagement: Findings from the Survey of Public Participation in the Arts, 2002–2012* 1, 66 (Jan. 2015), https://www.arts.gov/sites/default/files/2012-sppa-feb2015.pdf (finding that children of Black and Latinx parents were less likely to receive music and art instruction in school). Indeed, while 58% of white respondents ages 18-24 reported having received arts education in childhood, only 26% of Black respondents ages 18-24 and 28% of Latinx respondents ages 18-24 reported the same. Nat'l Endowment for the Arts, *Arts Education in America: What the Declines Mean for Arts Participation* 1, 16 (Feb. 2011), https://www.arts.gov/sites/default/files/2008-SPPA-ArtsLearning.pdf. Students who do not have equal access to dance, music, drama, and visual arts instruction do not have the same ability to develop their artistic credentials.

Black, Latinx, Native, Pacific Islander, and Southeast Asian K-12 students are also less likely to have access to extracurricular activities. "Even after controlling for family background

and cognitive ability, involvement in extracurricular activities predicts higher grades; higher college aspirations, enrollment, and completion; greater self-discipline, self-esteem, and resilience; lower risky behavior such as drug use, delinquency, and sexual activity; and lower truancy rates." K. Snellman et al., *Inequity Outside the Classroom: Growing Class Differences in Participation in Extracurricular Activities*, 40 VOICES IN URBAN EDUC. 11 (2015), https://files.eric.ed.gov/fulltext/EJ1056739.pdf. As noted above, Black, Latinx, Native, and Pacific Islander students are three to six times more likely than white students to attend a high-poverty school. Likewise, many Southeast Asian students (such as Cambodian, Hmong, Laotian, and Vietnamese students) are impoverished. D. Lee et al., *Academic Needs and Family Factors in the Education of Southeast Asian American Students: Dismantling the Model Minority Myth*, 12:2 J. OF SE. ASIAN AM. EDUC. & ADVANCEMENT 1, 8 (2017), https://docs.lib.purdue.edu/jsaaea/vol12/iss2/2. And high-poverty schools are less likely to offer extracurricular activities. Snellman et al., *supra*, at 13; *see* Lee et al., *supra*, at 8 (noting that many Southeast Asian students do not have access to after-school activities). "[T]he percentage of students receiving free or reduced-price lunch in the overall student body is negatively associated with the total number of extracurricular activities, sports teams, and service opportunities offered by the school." Snellman et al., *supra*, at 13. As one survey found, "61 percent of middle and high school students nationwide were charged a pay-to-play fee [(in which a student has to pay to participate in an extracurricular activity)]," *id.*, a fee that many families of color cannot afford.

Black and Latinx students are also significantly less likely to have recess, notwithstanding the documented benefits for students of having at least 15 minutes of recess each day. R. Barros et al., *School Recess and Group Classroom Behavior*, 123 PEDIATRICS 431-36 (2009), http://pediatrics.aappublications.org/content/123/2/431. Unequal access to recess and

extracurricular activities likely negatively affects Black and Latinx students' academic achievement since physical fitness is positively associated with learning outcomes. *See* J. Grissom, *Physical Fitness and Academic Achievement*, 8:1 J. OF EXERCISE PHYSIOLOGY (Feb. 2005), http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.510.725&rep=rep1&type=pdf; D. Castelli et al., *Physical Fitness and Academic Achievement in Third- and Fifth-Grade Students*, 29 J. OF SPORT & EXERCISE PSYCHOL. 239-52 (2007), https://journals.humankinetics.com/doi/10.11 23/jsep.29.2.239; M. Aberg et al., *Cardiovascular Fitness Is Associated with Cognition in Young Adulthood*, PROCEEDINGS OF THE NAT'L ACADEMY OF SCI. (Nov. 30, 2009), http://www.pnas.org/content/106/49/20906.

Even students from the most affluent Black and Latinx families do not have the same access to educational opportunities as white students. "The average affluent [B]lack or Hispanic household lives in a poorer neighborhood than the average lower-income white resident." J. Logan, *Separate and Unequal: The Neighborhood Gap for Blacks, Hispanics and Asians in Metropolitan America*, Brown Univ. 1 (July 2011), https://s4.ad.brown.edu/Projects/Diversity/Data/Report/repo rt0727.pdf; R. Chetty et al., *Race and Economic Opportunity in the United States: Executive Summary* 7 (March 2018), http://www.equality-of-opportunity.org/assets/documents/race_paper .pdf ("Less than 5% of [B]lack children currently grow up in areas with a poverty rate below 10% . . . In contrast, 63% of white children live in [such] areas."). "Neighborhood poverty is associated with inequalities in public schools, safety, environmental quality, and public health." Logan, *supra*, at 1. "Residential segregation is not benign." *Id*. at 17. "It means that whatever their personal circumstances [(i.e., even if they are affluent)], [B]lack and Hispanic families on average live at a disadvantage and raise their children in communities with fewer resources." *Id*.; A. Carnevale et al., *Socioeconomic Status, Race/Ethnicity, and Selective College Admissions*, in

AMERICA'S UNTAPPED RESOURCE: LOW-INCOME STUDENTS IN HIGHER EDUCATION 132 (Richard D. Kahlenberg 2004), https://cew.georgetown.edu/socioeconomic-status-raceethnicity-and-selective-college-admissions/ ("Our findings are analogous to many others showing that the inequality in educational opportunity among African Americans and Hispanics cannot be completely accounted for by socioeconomic status or by school variables.").

Even the small proportion of Black and Latinx K-12 students who attend integrated schools do not have equal access to educational opportunities. Although "students' engagement, motivation, and effort are roughly the same across racial groups (and on most dimensions, [B]lack students are more committed to education than whites)," the implicit bias of educators reduced educational opportunities for Black and Latinx students relative to their white classmates in a middle-class, integrated school. A. Lewis et al., DESPITE THE BEST INTENTIONS: HOW RACIAL INEQUALITY THRIVES IN GOOD SCHOOLS 166 (2015); W. Gilliam et al., *Do Early Educators' Implicit Biases Regarding Sex and Race Relate to Behavior Expectations and Recommendations of Preschool Expulsions and Suspensions?*, Yale Univ. Child Study Ctr. (Sept. 28, 2016), https://medicine.yale.edu/childstudy/zigler/publications/Preschool%20Implicit%20Bias%20Policy%20Brief_final_9_26_276766_5379_v1.pdf (showing that implicit biases against Black children began to cloud the judgment of their teachers as early as preschool). "Some kids (whites) are assumed to be less destructive, less in need of surveillance, and more in need of challenging curriculum, while others ([B]lacks and Latina/os) are more likely to face scrutiny, be punished for minor transgressions, and face a reality of dampened expectations." Lewis et al., *supra*, at 167-68; *see also* H. Tenenbaum et al., *Are Teachers' Expectations Different for Racial Minority Than for European American Students?: A Meta-Analysis*, 99:2 J. OF EDUC. PSYCHOL. 253-73 (2007), http://psycnet.apa.org/record/2007-06672-003 (finding that educators were less likely to believe

that students were academically capable and hardworking if those students were Black or Latinx than if they were white); K. Malott, *Being Mexican: Strengths and Challenges of Mexican-Origin Adolescents*, 8:12 J. OF SCH. COUNSELING 1-39 (2010), https://files.eric.ed.gov/fulltext/EJ885087 .pdf (finding that counselors had lower expectations that Mexican students would succeed in rigorous courses and selective colleges). With their judgment impaired by these implicit biases, educators obstructed Black, Latinx, and Southeast Asian students' access to college preparatory courses, disciplined them more frequently and harshly, and called on them in class less frequently. *See generally* Lewis et al., *supra*; *see* Tenenbaum et al., *supra* (finding that educators were less likely to offer encouragement and pose questions to Black and Latinx students than white students); A. Chiang et al., *supra*, at 10 ("Some researchers have found that Hmong American students have been tracked into lower level courses and were held to low expectations by their teachers").

Even when white students hailed from families with less financial resources than their Black and Latinx classmates, "the symbolic capital of whiteness" relieved them from the hazards faced by their comparatively well-off Black and Latinx peers. Lewis et al., *supra*, at 167. For example, educators were receptive to requests from white parents that their child be placed in an advanced course or that their child be shown leniency after misbehavior, but unreceptive to the same requests from Black and Latinx parents. *See generally id*. As researchers explained

> The many daily moments when schools and school personnel, intentionally or inadvertently, reward such 'non-meritocratic' resources [("social networks, cultural knowledge, and even skin color")] through extra reminders to turn homework in, encouragement to try a higher-level class, a gentle reminder to have a hall pass next time, or lighter sanctions for rule breaking add up.

*Id*. at 168. Thus, "[s]chool practices systematically create institutional advantages for some groups (i.e., whites) and disadvantages for other groups (i.e., [B]lacks and Latina/os) by differentially responding to and rewarding parents' and students' social and cultural resources." *Id*. at 167.

21

Implicit biases also place Black, Latinx, Native, and Pacific Islander students—at integrated and segregated schools—at greater risk of losing instructional time to exclusionary discipline (e.g., suspensions, arrests, expulsions) than their white classmates.[9] For example, research shows that Black children are perceived as older than their actual age, less innocent, less childlike, more culpable for their actions, and more appropriate targets for police brutality than white children. P. Goff et al., *The Essence of Innocence: Consequences of Dehumanizing Black Children*, J. OF PERSONALITY & SOC. PSYCHOL. (February 2014), https://www.apa.org/pubs/jour nals/releases/psp-a0035663.pdf; R. Epstein, et al., *Girlhood Interrupted: The Erasure of Black Girls' Childhood*, Ctr. On Poverty and Inequality at Georgetown Law Sch. (June 2017), https://www.law.georgetown.edu/poverty-inequality-center/wp-content/uploads/sites/14/2017/08 /girlhood-interrupted.pdf.

Although Black students do not misbehave more than white students, Black students are nearly four times as likely as white students to be given an out-of-school suspension. R. Skiba, et al., *Are Black Kids Worse? Myths and Facts About Racial Differences In Behavior: A Summary of the Literature*, Ind. Univ. (March 2014), http://www.indiana.edu/~atlantic/wp-content/uploads/2014/03/African-American-Differential-Behavior_031214.pdf; 2013-14 CRDC First Look, *supra*, at 3. "American Indian or Alaska Native, Latino, Native Hawaiian or other Pacific Islander, and multiracial boys are also disproportionately suspended from school." 2013-14 CRDC First Look, *supra*, at 3.

---

[9] *See* U.S. Gov't Accountability Office, *K-12 Education: Discipline Disparities for Black Students, Boys, and Students with Disabilities* (March 2018); U.S. Dep't of Educ., *2015-2016 Civil Rights Data Collection: School Climate and Safety* 2-16 (2018); LDF, *Locked Out of the Classroom: How Implicit Bias Contributes to Disparities in School Discipline* at 4 (2017); M. Morris, PUSHOUT: THE CRIMINALIZATION OF BLACK GIRLS IN SCHOOLS (2015); LDF & NWLC, *Unlocking Opportunity for African American Girls* at 18, 20 (2014); P. Ocen et al., BLACK GIRLS MATTER: PUSHED OUT, OVERPOLICED, AND UNDERPROTECTED (2015).

As of the 2015-16 school year, "[B]lack students represented 15 percent of the total student enrollment, and 31 percent of students who were referred to law enforcement or arrested – a 16 percentage point disparity." U.S. Dep't of Educ. Office for Civil Rights, *2015-16 Civil Rights Data Collection: School Climate and Safety* 3 (June 7, 2016), https://www2.ed.gov/about/offices/list /ocr/docs/school-climate-and-safety.pdf. "Black male students represented 8 percent of enrolled students and accounted for 25 percent of students who received an out-of-school suspension." *Id*. at 13. "Black female students represented 8 percent of the student enrollment and accounted for 14 percent of students who received an out-of-school suspension." *Id*. Latino boys were also more likely than their white classmates to be given an out-of-school suspension. *Id*. In addition, Native students were twice as likely as white students to report being threatened or injured with a weapon at school. U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics, *Status and Trends in the Educ. of Racial and Ethnic Groups 2017* 72 (July 2017), https://nces.ed.gov/pubs2017/2017051.pdf.

SFFA widely misses the mark when it urges the Court to force Harvard to ignore race and rely solely on credentials that are skewed by entrenched racial disparities in educational opportunities. SFFA's proposed solution—erasing race from the admissions process altogether— is impossible, unethical, would wholly fail to remedy the harm that SFFA purports to redress, and would have an acute, foreseeable, racially discriminatory disparate impact on Black, Latinx, Native, Southeast Asian, Pacific Islander, and other applicants of color.

### C.  Harvard Legitimately Considers More Than Academics and Extracurriculars.

SFFA fails to recognize that Harvard's holistic, multifaceted admission process is not strictly based on academic credentials or a formulaic checklist that tallies up grades, test scores, and extracurricular activities. Harvard's admission of some students over others with higher test scores or GPAs is not in itself evidence of discrimination, but evidence that Harvard places emphasis on other applicant qualities, rather than solely academic metrics. Indeed, in a holistic

admissions context, admissions officers recognize that test scores and GPAs are but two imperfect measures of merit, and consider numerous other factors such as an applicant's resilience in overcoming adversity.

Although all students admitted to Harvard have superior academic credentials, academics are not usually the deciding factor in a student's admission. "Each admissions officer who reviews an application rates the applicant on four key dimensions: academic, extracurricular, athletic, and personal." Card Rep. at 25-26. "Only about 100 applicants per year receive an academic rating of 1," the most favorable score, "despite the large number of applicants with extraordinary GPA and SAT/ACT scores." *Id.* at 27-28. "[A]pplicants who are highly rated on non-academic dimensions are much scarcer than applicants with a high academic rating." While about 42 percent of applicants receive a 1 or 2 in academics, fewer than 25% receive a 1 or 2 in the extracurricular, athletic, or personal categories, and just 7% of applicants have a rating of 1 or 2 on at least three dimensions. Clearly, "high ratings on [a] non-academic dimension (and particularly on multiple non-academic dimensions) distinguish applicants in the pool much more effectively than a high academic rating." *Id.* at 29.

Harvard appropriately values and looks to qualities not measured by tests or GPAs that have been shown to predict success in college and the workplace. "There is a long list of factors—beyond content knowledge and academic skills—shown to have an impact on student performance." The Univ. of Chi. Consortium on Chi. Sch. Research, TEACHING ADOLESCENTS TO BECOME LEARNERS: THE ROLE OF NONCOGNITIVE FACTORS IN SHAPING SCHOOL PERFORMANCES: A CRITICAL LITERATURE REVIEW 4 (June 2012). These factors are referred to by economists as "noncognitive," because "they are not measured by commonly administered cognitive tests such as IQ tests or academic examinations." *Id.* Further, "[i]n a wide range of studies, many of these

noncognitive attributes are shown to have a direct positive relationship to students' concurrent school performance as well as future academic outcomes." *Id*. Certain "non-cognitive variables" have been particularly useful in predicting the success of students of color, including "self-concept, realistic self-appraisal, working the system (handling racism), long-term goals, leadership, having a support person and community, and nontraditional learning." S. Jaschik, *An Admissions Reformer Takes Stock*, INSIDE HIGHER ED (May 22, 2017), https://www.insidehighered.com/admi ssions/article/2017/05/22/admissions-reformer-takes-stock-use-noncognitive-variables.

Further, research demonstrates that traits such as the ability to persevere in the face of difficulty ("grit"), resilience, creativity, and persistence affect student achievement. P. Marthers, *Looking at Student "Grit and Resilience – from Recruitment to Retention* (June 16, 2017), https://www.academicimpressions.com/looking-at-student-grit-and-resilience-from-recruitment-to-retention/. For instance, grit has been found to demonstrate "incremental predictive validity of success measures over and beyond IQ and conscientiousness," suggesting that the "achievement of difficult goals entails not only talent but also the sustained and focused application of talent over time." A. Duckworth et al., *Grit: Perseverance and Passion for Long-Term Goals*, 92 J. OF PERSONALITY & SOC. PSYCHOL. 1087 (2007).

Studies reveal that high grit scores better predicted success than "other seemingly important characteristics such as SAT scores and college GPAs [that] turned out to be poor predictors of retention or . . . effectiveness." Snellman, *supra*, at 11. Contrary to what SFFA presumes, test scores do not accurately predict post-graduate success in terms of income, career satisfaction, and civic contributions. Research has revealed that "[a]chievement test scores are crude, low-dimensional summaries of high-dimensional vectors of traits that operate in conjunction with effort. It is unlikely that these summaries capture the precise combinations of

traits required for success in specific life tasks." J. Heckman et al., *Hard Evidence on Soft Skills* (Aug. 1, 2013) (unpublished manuscript, published in final edited form at 19 LABOUR ECON. 451), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3612993/.   In   sum,   contrary   to   SFFA's understanding of merit, it is well-established that "achievement tests do not adequately capture many skills that matter in life." *Id.*

### D.  Harvard Appropriately Values the Benefits of a Diverse Student Body.

As the Supreme Court has recognized, "the 'nation's future depends upon leaders trained through wide exposure' to the ideas and mores of students as diverse as this Nation of many peoples." *Bakke*, 438 U.S. at 313. The Court has further acknowledged that "numerous studies show that student body diversity promotes learning outcomes, and 'better prepares students for an increasingly diverse workforce and society, and better prepares them as professionals.'" *Grutter*, 539 U.S. at 330.[10] Indeed, as the Court recognized, "major American businesses have made clear that the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints." *Id.*

Research shows that student body diversity leads to "significant positive educational outcomes" for all students, such as improved critical thinking skills, enhanced problem-solving ability, higher graduation rates, more ambitious educational and career goals, higher earnings in the workforce, better health outcomes, increased student satisfaction and motivation, improved knowledge, and increased intellectual self-confidence. U.S. Comm'n on Civil Rights, *Public Education Funding Inequity in an Era of Increasing Concentration of Poverty and Resegregation*

---

[10] Citing Br. for Am. Educ. Research Ass'n et al. as Amici Curiae 3; W. Bowen et al., THE SHAPE OF THE RIVER (1998); DIVERSITY CHALLENGED: EVIDENCE ON THE IMPACT OF AFFIRMATIVE ACTION (G. Orfield & M. Kurlaender 2001); COMPELLING INTEREST: EXAMINING THE EVIDENCE ON RACIAL DYNAMICS IN COLLEGES AND UNIVERSITIES (M. Chang, D. Witt, J. Jones, & K. Hakuta 2003).

5 (Jan. 2018), https://www.usccr.gov/pubs/2018/2018-01-10-Education-Inequity.pdf; A. Wells et

al., *Research Fact Sheet: The Educational Benefits of Diverse Schools and Classrooms for All

Students*, Am. Educ. Research Ass'n 2 (2016), http://www.aera.net/Portals/38/docs/Annual_Meet

ing/2016%20Annual%20Meeting/2016%20Knowledge%20Forum/Wells.pdf.[11]

Those working in racially diverse groups "anticipate differences of opinion and

perspective," leading them to better prepare to make their case, anticipate alternative viewpoints

and new information, and expect to work harder to reach consensus than if they were with others

like themselves who they assumed shared their presumptions. K. Phillips, *How Diversity Makes

Us Smarter*, 311:4 Sci. Am. (Oct. 2014). *See also* M. Lagace, *Racial Diversity Pays Off*, Harv.

Bus. Sch. Working Knowledge (June 2004); S. Page, The Difference: How the Power of

Diversity Creates Better Groups, Firms, Schools, & Societies (2008). "Diversity jolts us

into cognitive action in ways that homogeneity simply does not." Phillips, *supra*.

The research also suggests that college students who have positive experiences with

classmates from different racial backgrounds become more open-minded and are more engaged in

classroom conversations. *Id*. Moreover, "racially diverse educational settings can reduce prejudice

by promoting greater contact between students of different races—both informally and in

classroom settings—and by encouraging relationships and friendships across group lines." *Id*.

Amici attest to these benefits. *See* Ex. 4, Trice Decl. ¶¶ 7-9; Ex. 2, Prasad Decl. ¶¶ 5-7, 10-13; Ex.

1, Mathew Decl. ¶¶ 4-8, 10-11; Paek Decl., ECF No. 471-3 at ¶¶ 5-6; Ho Decl., ECF No. 471-4 at

¶¶ 8-9, 12-13; Choi Decl., ECF No. 471-5 at ¶¶ 4, 10; Tran Decl., ECF No. 471-6 at ¶ 9; Parmley

---

[11] *See also* M. Chang et al., *The educational benefits of sustaining cross-racial interaction among undergraduates*, 77:3 The J. Of Higher Educ., 430-55 (2006); M. Kurlaender et al., *Is diversity a compelling educational interest? Evidence from Louisville* in Diversity Challenged 111-41 (G. Orfield 2001); M. Kurlaender et al., *Fifty Years After Brown: New Evidence Of The Impact Of School Racial Composition On Student Outcomes*, 6:1 Int'l J. of Educ. Policy, Research & Practice 51-78 (2005); M. Kurlaender et al., *Measuring school racial composition and student outcomes in a multiracial society*, 113:2 Am. J. of Educ. 213-42 (2007); S. Page, The Difference: How The Power Of Diversity Creates Better Groups, Firms, Schools, And Societies (2008).

Decl., ECF No. 471-7 at ¶ 9; Shahbaz Decl., ECF No. 471-8 at ¶¶ 7-8; Omer Decl., ECF No. 471-9 at ¶ 6; Ke Decl., ECF No. 471-10 at ¶¶ 8-9; Abdelwahab Decl., ECF No. 471-11 at ¶¶ 6-7; Chin Decl., ECF No. 471-12 at ¶¶ 16, 19, 26, 39-43; Lobo Decl., ECF No. 471-13 at ¶ 10; Yasin Decl., ECF No. 471-15 at ¶¶ 7, 11; Sanchez Reed Decl., ECF No. 471-16 at ¶ 8; Ex. 3, Price Decl. ¶ 5.

Indeed, a longitudinal study of 10 public universities showed that "students who report meaningful and positive interactions with diverse peers tend to score higher . . . on cultural awareness, interest in social issues, self-efficacy for social change, belief in the importance of creating greater social awareness, perspective-taking skills, the development of a pluralistic orientation, interest in poverty issues, concern for the public good, and support for race-based initiatives." S. Hurtado, *The Next Generation of Diversity & Intergroup Relations Research*, 61 J. SOC. ISSUES 595, 602 (2005). "[S]ubstantial interaction with diverse peers" gives students many opportunities to practice conflict resolution skills and increase their civic engagement. *Id*. at 603 (noting that such students were more likely to vote in federal and state elections). In addition, "[s]tudents who participated in extracurricular diversity activities tended to express self-confidence in leadership skills, cultural awareness, self-efficacy for social change, have higher interests in social issues, valued creating social awareness, and supported institutional diversity initiatives." *Id*. at 605. "Frequency of interaction with diverse peers on campus provides students with more experience to become accustomed to social difference, hone intergroup skills, and prepare them for diverse workplaces." *Id*. at 606.

Importantly, the benefits of student body diversity cannot be achieved without "having sufficient numbers of diverse peers not only on a campus but also in majors, in classrooms, and in a variety of out of classroom contacts." Hurtado, *supra*, at 606. Accordingly, Harvard must be

allowed to consider race, as one of numerous factors, in admissions so that it can assemble a diverse student body.

## CONCLUSION

The internal inconsistencies and flawed analysis at the heart of SFFA's arguments preclude a ruling for summary judgment in its favor. Not only does SFFA's skewed model fail to prove its claim of discrimination, but it cannot link any alleged discrimination to Harvard's use of race-conscious policies. On this unreliable foundation, SFFA then argues for a broad remedy that does virtually nothing to address alleged discrimination against Asian Americans while resulting in an acute, foreseeable, racially discriminatory disparate impact on Southeast Asian, Pacific Islander, Black, Latinx, Native, and other applicants of color. Such a record is fatal to SFFA's claims. As members of the Harvard student and alumni community, Amici Curiae urge this Court to follow clear precedent, deny SFFA's motion for summary judgment, and grant Harvard's.

Dated: Aug. 30, 2018

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Jin Hee Lee
Sherrilyn Ifill*
Janai Nelson*
Samuel Spital*
Jin Hee Lee*
Rachel Kleinman*
Cara McClellan*
Earl Kirkland*
NAACP Legal Defense &
    Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY  10006
(212) 965-2200

Michaele N. Turnage Young*
Jennifer A. Holmes*
NAACP Legal Defense &
    Educational Fund, Inc.

</div>

29

700 14th Street NW, Suite 600
Washington, DC 20005
(202) 682-1300

/s/ Kenneth N. Thayer
Kenneth N. Thayer, BBO #61029
thayer@sugarmanrogers.com
Kate R. Cook, BBO #650698
cook@sugarmanrogers.com
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street (9th floor)
Boston, MA 02114-4737
(617) 227-3030

*Counsel for Amici Curiae Coalition for A Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina Of Harvard, Harvard-Radcliffe Asian American Association, Harvard Asian American Brotherhood, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre-Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard-Radcliffe Asian American Women's Association, Harvard-Radcliffe Black Students Association, Harvard-Radcliffe Chinese Students Association, Kuumba Singers Of Harvard College, Native American Alumni Of Harvard University, Native Americans At Harvard College, and Task Force On Asian And Pacific American Studies At Harvard College, and Proposed Amici Curiae 21 Colorful Crimson, Harvard Black Alumni Society, Association of Black Harvard Women, and Harvard Asian American Alumni Alliance*

*Admitted Pro Hac Vice

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of August, 2018, a copy of the above and foregoing AMICI CURIAE BRIEF OF 21 COLORFUL CRIMSON, HARVARD BLACK ALUMNI SOCIETY, ASSOCIATION FOR BLACK HARVARD WOMEN, COALITION FOR A DIVERSE HARVARD, FIRST GENERATION HARVARD ALUMNI, FUERZA LATINA OF HARVARD, HARVARD ASIAN AMERICAN ALUMNI ALLIANCE, HARVARD ASIAN AMERICAN BROTHERHOOD, HARVARD ISLAMIC SOCIETY, HARVARD JAPAN SOCIETY, HARVARD KOREAN ASSOCIATION, HARVARD LATINO ALUMNI ALLIANCE, HARVARD MINORITY ASSOCIATION OF PRE-MEDICAL STUDENTS, HARVARD PHILLIPS BROOKS HOUSE ASSOCIATION, HARVARD SOUTH ASIAN ASSOCIATION, HARVARD UNIVERSITY MUSLIM ALUMNI, HARVARD VIETNAMESE ASSOCIATION, HARVARD-RADCLIFFE ASIAN AMERICAN ASSOCIATION, HARVARD-RADCLIFFE ASIAN AMERICAN WOMEN'S ASSOCIATION, HARVARD-RADCLIFFE BLACK STUDENTS ASSOCIATION, HARVARD-RADCLIFFE CHINESE STUDENTS ASSOCIATION, KUUMBA SINGERS OF HARVARD COLLEGE, NATIVE AMERICAN ALUMNI OF HARVARD UNIVERSITY, NATIVE AMERICANS AT HARVARD COLLEGE, AND TASK FORCE ON ASIAN AND PACIFIC AMERICAN STUDIES AT HARVARD COLLEGE IN OPPOSITION TO SFFA'S MOTION FOR SUMMARY JUDGMENT was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

<div align="right">

/s/ Kenneth N. Thayer
Kenneth N. Thayer
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street (9th floor)

</div>

Boston, MA  02114-4737
(617) 227-3030