**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br>         Plaintiff, <br><br>     v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE, <br><br>         Defendant. | Civil Action No. 1:14-cv-14176-ADB |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

Adam K. Mortara
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
312.494.4400
adam.mortara@bartlit-beck.com

John M. Hughes
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
303.592.3100
john.hughes@bartlit-beck.com

Paul M. Sanford BBO #566318
BURNS & LEVINSON LLP
One Citizens Plaza, Suite 1100
Providence, RI 02903
617.345.3000
psanford@burnslev.com

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
703.243.9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com

Patrick Strawbridge BBO #678274
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
617.227.0548
patrick@consovoymccarthy.com

Michael H. Park
CONSOVOY MCCARTHY PARK PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
212.247.8006
park@consovoymccarthy.com

August 30, 2018

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................ii

ARGUMENT.........................................................................................................................1

I.     SFFA is entitled to summary judgment on Count I..................................................1

       A.     Harvard's attacks on Professor Arcidiacono's findings are baseless............1

       B.     Harvard unsuccessfully attempts to minimize SFFA's non-statistical
              evidence.......................................................................................................10

II.    SFFA is entitled to summary judgment on Count II...............................................15

III.   SFFA is entitled to summary judgment on Count III..............................................19

IV.    SFFA is entitled to summary judgment on Count V................................................21

CONCLUSION.....................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*Bazemore v. Friday*,
    478 U.S. 385 (1986) ..............................................................................................7

*Berger v. Iron Workers Reinforced Rodmen Local 201*,
    843 F.2d 1395 (D.C. Cir. 1988) ...........................................................................7

*Contractors Ass'n of E. Pennsylvania, Inc. v. City of Philadelphia*,
    6 F.3d 990 (3d Cir. 1993)......................................................................................7

*Diaz v. Jiten Hotel Management, Inc.*,
    762 F. Supp. 2d 319 (D. Mass. 2011) .................................................................14

*EEOC v. General Tel. Co. of Northwest*,
    885 F.2d 575 (9th Cir. 1989)................................................................................7

*Fisher v. University of Texas at Austin*,
    570 U.S. 297, 312 (2013). ...............................................................20, 22, 23

*Fisher v. University of Texas at Austin*,
    136 S. Ct. 2198 (2016).......................................................... 19, 20, 21, 23

*Fisher v. University of Texas at Austin*,
    758 F.3d 633 (5th Cir. 2014)...........................................................19, 20, 23

*Fountain v. City of Waycross, Ga.*,
    701 F. Supp. 1570 (S.D. Ga. 1988) ....................................................................15

*Grutter v. Bollinger*,
    539 U.S. 306 (2003)............................................................................................20

*Jay Edwards, Inc. v. New England Toyota Distrib., Inc.*,
    708 F.2d 814 (1st Cir. 1983)...............................................................................23

*Lomack v. City of Newark*,
    463 F.3d 303 (3d Cir. 2006) ...............................................................................19

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)............................................................................................14

*Miller v. Johnson*,
    515 U.S. 900 (1995)............................................................................................13

*Mullen v. Princess Anne Volunteer Fire Co., Inc.*,
    853 F.2d 1130 (4th Cir. 1988).............................................................................14

*Palmer v. Shultz,*
   815 F.2d 84 (D.C. Cir. 1987) ......................................................................................7

*Regents of the Univ. of Cal. v. Bakke,*
   438 U.S. 265 (1978) ................................................................................................19

*Schuette v. BAMN,*
   572 U.S. 291 (2014) ................................................................................................26

*Stuart v. Roache,*
   951 F.2d 446 (1st Cir. 1991) ...................................................................................15

*Thomas & Agnes Carvel Found. v. Carvel,*
   736 F. Supp. 2d 730 (S.D.N.Y. 2010)......................................................................23

*Thomas v. Eastman Kodak Co.,*
   183 F.3d 38 (1st. Cir. 1999) ....................................................................................14

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
   429 U.S. 252 (1977) ................................................................................................14

## OTHER AUTHORITIES

Brian Krauth, *Bounding a Linear Causal Effect Using Relative Correlation Restrictions,*
   5 J. Econ. Methods 117 (2016)...................................................................................6

Emily Oster, *Unobservable Selection and Coefficient Stability: Theory and Evidence,*
   J. Bus. & Econ. Stat. 1 (2016)...................................................................................6

Joseph G. Altonji, *et al., An Evaluation of Instrumental Variable Strategies for Estimating the Effects*
   *of Catholic Schooling,* 40 J. Hum. Resources, 791 (2005) ...........................................6

Joseph G. Altonji, *et. al., Selection on Observed and Unobserved Variables: Assessing the Effectiveness*
   *of Catholic Schools,* 131 J. Pol. Econ. 151 (2005)......................................................6

Thomas J. Espenshade, *et al., Admission Preferences for Minority Students, Athletes, and Legacies at*
   *Elite Universities,* 85 Soc. Sci. Q. 1422 (2004) .........................................................2

SFFA is entitled to summary judgment because no rational factfinder could conclude that Harvard complies with Title VI of the Civil Rights Act of 1964. Harvard discriminates against Asian-American applicants (Count I), engages in racial balancing (Count II), does not use race as a "plus" factor to achieve student body diversity (Count III), and has neither seriously considered race-neutral alternatives in good faith nor taken advantage of workable, nonracial policies that can achieve the educational benefits of diversity (Count V). Nothing in Harvard's Opposition alters this conclusion.

## ARGUMENT

**I.      SFFA is entitled to summary judgment on Count I.**

**A.      Harvard's attacks on Professor Arcidiacono's findings are baseless.**

Harvard argues that SFFA must prove there is a "gross" statistical disparity for Professor Arcidiacono's findings to be evidence of discrimination. Harvard Opp. to Mot. for S.J. ("Harvard Opp.") 5. But that standard would apply only if SFFA were relying solely on statistical evidence, SFFA Memo. in Supp. of Mot. for S.J. ("SFFA Memo") 6, which it is not, SFFA Opp. to Mot. for S.J. ("SFFA Opp.") 14. That said, SFFA has a winning case under any standard. *Id.*

**1.** Harvard chides SFFA for devoting "one paragraph" to describing Professor Arcidiacono's "regression analysis," Harvard Opp. 6, and claims that SFFA has "abandoned" it, *id.* at 18. Harvard wishes that were so—especially given the strength of Professor Arcidiacono's regression analysis—but the truth is that SFFA devotes significant attention to it. SFFA Statement of Undisputed Material Facts ("SMF") ¶¶ 648-677. There was no need to further describe the analysis since both experts "agree that multivariate regression analysis is the proper approach," Harvard Opp. 6, and Harvard only disputes Professor Arcidiacono's modeling choices, SFFA Memo 26; *see* Economists Amicus Br. in Supp. of SFFA ("Economists Br.") 34, Doc. 450. SFFA has naturally focused on the disputed issues.

**2.** Harvard briefly claims that Professor Arcidiacono erred by choosing to "pool admissions data across all six admissions cycles … rather than analyzing each cycle independently and computing

average effects across all cycles." Harvard Opp. 6. That is incorrect. SFFA Opp. 18-19; Economists Br. 3 n.2; *see also* Thomas J. Espenshade, *et al*., *Admission Preferences for Minority Students, Athletes, and Legacies at Elite Universities*, 85 Soc. Sci. Q. 1422, 1424 (2004). But the dispute is immaterial. Professor Arcidiacono found a statistically-significant penalty against Asian Americans who do not receive the ALDC preference under both approaches. SFFA Memo 32 n.6; Arcidiacono Dec., Ex. B ("Arcidiacono Rebuttal") 40, Table 4.2N.

**3**. Harvard's attack on Professor Arcidiacono's exclusion of "special category" or "ALDC" applicants—*i.e.*, recruited athletes, children of faculty and staff, applicants who are on the Dean's List or Director's List, and legacies—is meritless. Harvard Opp. 7-10. To begin, Harvard mischaracterizes Professor Arcidiacono's model as including only a "limited subset of the applicant pool." *Id.* at 9. As Harvard knows, non-ALDC applicants make up approximately 95% of its applicant pool, and non-ALDC Asian Americans make up approximately 98% of the entire pool of Asian-American applicants. Arcidiacono Dec., Ex. A ("Arcidiacono Rep."), Table B.3.2

Moreover, Harvard's claim that excluding ALDC applicants "contradicts basic principles of statistical analysis" has it backwards. Harvard Opp. 7. Professor Arcidiacono was tasked with analyzing whether "Harvard has intentionally discriminated against Asian-American applicants for admission," SFFA Compl. ¶ 434, Doc. 1, and, if so, identifying where that discrimination occurs. From the start, then, and unlike Professor Card, Professor Arcidiacono analyzed two datasets, one of which (the baseline set) excluded ALDC applicants. He did this for two reasons. First, Harvard had previously blamed the ALDC preference for the disparate effect of its admissions policies on Asian Americans; second, it more easily allowed him to compare similarly situated applicants. Arcidiacono Rep. 2 & n.2. Harvard thus is wrong to claim that the way to deal with the differences between these sets of applicants "is to *control* for the attribute, allowing the regression to distinguish the effect of that attribute from the effects of other attributes." Harvard Opp. 8.

Exclusion is the appropriate course when the applicants, as here, are apples and oranges. SFFA Opp. 15; Economists Br. 16-18. Including ALDC applicants in the regression model would mask discrimination—which is why Professor Card is so determined to include them. SFFA Memo 26-27. Including recruited athletes, for example, would dilute the role of academics and extracurriculars in admissions decisions for non-ALDC applicants and, in turn, misleadingly minimize the discrimination non-ALDC Asian Americans face. SFFA Opp. 15. The same goes for the other applicants who are fortunate enough to have ALDC status. "Excluding these applicants allows for the effect of race to be tested on the bulk of the similarly situated applicant pool that did not fall into one of these categories." SMF ¶ 753 (citing Arcidiacono Rebuttal 3).[1]

Even if including ALDC applicants were appropriate, though, it would require interacting that status with *all* other variables (or, at a minimum, those that operate differently with ALDC status). Arcidiacono Rebuttal 4-5, 20-21. Moreover, the resulting penalty would need to be measured across non-ALDC applicants. Measuring across all applicants would not reveal whether there is a racial penalty within the non-ALDC group because of the masking effect. *Id.* at 19. Yet Professor Card interacts "ALDC attributes" only "with race," Harvard Opp. 9, and not, for example, with Harvard's ratings, which operate differently with ALDC status. Worse, Professor Card *never* measures the penalty against non-ALDC Asian Americans. This is likely because whether ALDC applicants are excluded from the model or properly controlled for, measuring the penalty against non-ALDC Asian Americans would reveal the same or similar results. *See, e.g.*, Arcidiacono Rebuttal, Table 7.2R.

---

[1] For these reasons, Harvard's "educational attainment" example backfires. Harvard Opp. 8. It is quite common to estimate separate models of earnings by educational attainment. See, for example, the classic article by Robert J. Willis & Sherwin Rosen, *Education and Self-Selection*, 87 J. Pol. Econ. S7, S7-S36 (1979). Splitting the estimation by education, in particular, is done when the researcher is interested in examining outcomes *within* a particular classification. *Id.* at S28-S29. A researcher investigating whether, for example, white high-school graduates are paid more than African-American high-school graduates would learn nothing by including college graduates in his regression model. Worse still, if it turned out that African Americans with college degrees are paid the same as white college graduates because the preference in the labor market for college graduates offsets or eliminates the racial discrimination, then including them in the model would only mask the discrimination that African-American high school graduates may be facing.

Harvard's only substantive response to Professor Arcidiacono's finding that it penalizes non-ALDC Asian Americans is to wonder aloud "why, if Harvard truly intended to discriminate against Asian-American applicants on the basis of their race, the supposed discrimination would affect only a subset of Asian-American applicants." Harvard Opp. 9-10. But anyone whose head is not buried in the sand can see the obvious: in limiting the number of Asian Americans it will admit, Harvard favors those who are star athletes, legacies, children of donors, and children of faculty and staff over those who are not. After all, it is not that Harvard seeks to admit *no* Asian Americans. Like President Lowell's response to the Jewish "problem," SMF ¶ 24, Harvard simply does not want *too many* Asian Americans on its campus. Harvard can call SFFA's claim "strange" and feign disbelief all it wants. Harvard Opp. 9-10. But Professor Card has conspicuously refused to dispute Professor Arcidiacono's findings.

**4.** Harvard's criticism of Professor Arcidiacono's exclusion of the personal rating for his model is equally weak. Harvard Opp. 10-18. Harvard claims that "disregard[ing] the personal rating ... does not reflect the actual admissions process and is fundamentally flawed and unreliable." *Id.* at 10. Professor Card agrees, however, that the personal rating *must be* excluded if it is affected by race. That is why he excluded the overall score from his own model. Ellsworth Ex. 33, ("Card Rep.") 10 ("Testimony in this case indicates that an applicant's race may have a direct effect on her overall rating, and it is a well-accepted statistical practice to exclude variables from a regression model that may themselves be directly influenced by the variable of interest (here, race)."); Economists Br. 3-4. Hence, Harvard's claim that including the personal score "is the only methodologically sound approach," Harvard Opp. 11, depends on an assumption that the score is not "influenced" by race. Yet Professor Card based that assumption entirely on a phone call with Dean Fitzsimmons. SFFA Memo 31. For Professor Card to accept the self-serving explanation of a lead fact witness—whose reputation is at stake—instead of verifying what he was told through statistical analysis is expert malpractice.

Instead of investigating this threshold issue, Harvard argues that SFFA lacks proof "that the personal rating is discriminatory." Harvard Opp. 11. But Harvard now concedes that there is an "association between Asian-American ethnicity" and having a lower score on the personal rating. *Id.* The task, therefore, was to probe the record to determine whether there might be a non-discriminatory explanation for the "correlation" or whether the "association results from discrimination on the basis of race." *Id.* Professor Arcidiacono marshaled significant support for his finding that discrimination is the most plausible explanation. SFFA Memo 28-32; SFFA Opp. 16-19.

Harvard counters, incorrectly, that there is inconsistency between Professor Arcidiacono's finding, on the one hand, that the "*positive* association" between strong academic and extracurricular ratings and being Asian American is not due to discrimination but, on the other, that discrimination explains why "the personal rating was *negatively* associated with Asian-American ethnicity." Harvard Opp. 11-12. The academic and extracurricular ratings are "easily measured," Arcidiacono Rep. 37, and Professor Arcidiacono identified an objective, non-discriminatory explanation for why Asian Americans excel, SFFA Opp. 16-17. The same cannot be said of the personal score. The criteria is subjective and Professor Arcidiacono was unable to identify a non-discriminatory explanation for the disparity. *Id.* at 17-18; Arcidiacono Rebuttal, Table B6.11R.[2]

Next, Harvard wrongly argues that the discrepancy between the personal scores assigned to Asian Americans by alumni interviews and the Admissions Office is not discriminatory because the scores "reflect fundamentally different information and serve fundamentally different purposes." Harvard Opp. 13. Both scores are designed to assess the "personal qualities" of the applicant, SMF ¶ 93, and any informational differences cut against Harvard because only the alumni interviewers

---

[2] Harvard has surrendered the notion that it can rely on essays and other aspects of the applicant file that were withheld from SFFA in discovery. SFFA Memo 28-29. Harvard agrees that Professor Card has not (and cannot) rely on "evidence to which SFFA lacked access." Harvard Opp. 13 n.4.

actually meet the applicants. SFFA Memo 30; Economists Br. 7. Regardless, the pertinent issue is that Asian Americans perform roughly as well as white applicants on the alumni-interview personal score, yet fare much worse when scored by admissions officers. Arcidiacono Rebuttal, Table 5.6R. Harvard lacks a neutral explanation for why this kind of gross discrepancy would exist.

Harvard ultimately retreats to the argument upon which it asks this Court to rest its judgment: the association between being Asian American and a low personal score is caused by "statistically unobserved factors." Harvard Opp. 10; *see id.* at 16-17. But racial stereotyping is one such statistically unobserved factor, and Harvard has not produced any credible evidence of an alternative explanation. Economists Br. 7-13. That is because non-discriminatory unobserved factors tend to "move in the same direction as observed characteristics." SFFA Memo 30; Economists Br. 5-6. Harvard offers no evidence to refute this basic economic assumption. Harvard Opp. 16. For good reason. *See, e.g.*, Joseph G. Altonji, *et al.*, *An Evaluation of Instrumental Variable Strategies for Estimating the Effects of Catholic Schooling*, 40 J. Hum. Resources 791 (2005); Joseph G. Altonji, *et. al.*, *Selection on Observed and Unobserved Variables: Assessing the Effectiveness of Catholic Schools*, 131 J. Pol. Econ. 151 (2005); Emily Oster, *Unobservable Selection and Coefficient Stability: Theory and Evidence*, J. Bus. & Econ. Stat. 1 (2016); Brian Krauth, *Bounding a Linear Causal Effect Using Relative Correlation Restrictions*, 5 J. Econ. Methods 117 (2016).

Harvard responds that this "is *not* true in the context of this case" because while "Asian-American applicants were slightly stronger across academic measures," they were "slightly less strong than ... White applicants across a range of *observable* non-academic measures." Harvard Opp. 16-17. But Asian-American applicants are not "slightly stronger" than white applicants "across academic measures"—they are *much* stronger. Arcidiacono Rebuttal, Table B.4.1R; Ellsworth Ex. 37, ("Card Rebuttal") 16, Ex. 2. Furthermore, the "observable non-academic measures" upon which Harvard principally relies are the extracurricular, personal, and athletic ratings. Harvard Opp. 17. But Asian Americans outperform white applicants on the extracurricular rating, SFFA Memo 7, and the athletic

rating is essentially irrelevant for non-ALDC applicants, SMF ¶ 311. Harvard's argument thus boils down to an embarrassingly circular claim that the personal score is not biased against Asian-American applicants vis-à-vis white applicants because Asian-American applicants are "observed" to score lower on the personal score than white applicants.

It is thus incumbent on Harvard to explain what these "*unobservable* non-academic attributes" are that Asian Americans systematically lack. Harvard Opp. 17. As the Supreme Court has explained, "a regression analysis that includes less than 'all measurable variables' may serve to prove a plaintiff's case. A plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather, his or her burden is to prove discrimination by a preponderance of the evidence." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986). The defendant thus cannot undermine a plaintiff's expert regression analysis merely by identifying a missing variable. The defendant must explain why including the missing variable would have altered the analysis. *Id.* at 404 n.14; *Contractors Ass'n of E. Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990, 1007 (3d Cir. 1993); *EEOC v. General Tel. Co. of Northwest*, 885 F.2d 575, 579 (9th Cir. 1989); *Palmer v. Shultz*, 815 F.2d 84, 101 (D.C. Cir. 1987). Harvard has never explained what these "unobservable" factors are—let alone how they would have altered the analysis. All Harvard can say is that this "broader range of personal characteristics" is "difficult to quantify." Harvard Opp. 11-12. That is woefully insufficient under *Bazemore*. *See Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1416 (D.C. Cir. 1988) ("Mere conjecture or general assertions of inadequacies in the opponent's statistical case, without demonstrating their effect on the results, will not suffice.").

Harvard is rudderless. It concedes that the Admissions Office rates Asian Americans as lacking the personal qualities that make applicants "the kinds of roommates, classmates, and teammates that will contribute to Harvard's educational environment for all its students and, once they graduate, to be citizen-leaders of our society," Harvard Opp. 10-11, but it fails to offer a non-discriminatory explanation for why the Admissions Office consistently draws this conclusion. Yet Harvard has the

temerity to claim offense that SFFA would rebuke Professor Card for accepting that white applicants are more "multi-dimensional" than Asian-American applicants based on "unobserved" factors. *Id.* at 12-13. When an expert accepts that Asian Americans have less attractive personalities than all other applicants (despite uniform testimony to the contrary), and he attributes that disturbing phenomenon to "unobserved" traits as an article of faith, the only conclusion is that the expert believes that, as a group, Asian Americans lack the personal qualities that Harvard covets. SFFA Memo 28. That is confirmation bias, willful blindness to the far more plausible explanation, and racial stereotyping. *Id.* at 31-32. Because the personal rating is affected by race, Professor Arcidiacono was right to exclude it from his model.[3]

**5.** Finally, Harvard oddly criticizes SFFA's reliance on descriptive analysis. Harvard Opp. 15-18. Descriptive analysis is an accepted statistical tool that "involves straightforward assessments of the relevant data." Arcidiacono Rebuttal 12. That is why both OIR, SMF ¶¶ 212, 477, 498, 511, 562, and Professor Card likewise performed their own descriptive analysis, Card Rep. 12-15, 28-30.

Indeed, Harvard appears to be confused about the role of descriptive analysis. Contrary to Harvard's suggestion, descriptive and regression analyses are not an either/or proposition. Descriptive analysis provides an important starting point by orienting the data and identifying statistical disparities. The analysis, in other words, *describes* what is happening in admissions decisions by identifying the characteristics of who is being admitted and who is not. Here, the descriptive analysis revealed, *inter alia*, that Asian Americans have higher academic and extracurricular ratings than all other racial groups,

---

[3] Harvard criticizes SFFA's reliance on the Stuyvesant evidence and testimony as "cherry-picked" and nothing "more than anecdotal." Harvard Opp. 14. But it is Professor Card who is cherry-picking in his choice of high schools to highlight. Arcidiacono (3d) Dec. ¶¶ 5-6. In connection with his declaration, Professor Card *also* creates a new logistic regression model that actually confirms the existence of a racial penalty against Asian-American applicants. *Id.* at ¶¶ 8-9. His conclusions regarding Stuyvesant are flawed because his model is neither designed to nor capable of predicting admit rates for such small groups. *Id.* at ¶¶ 14-15. A proper regression analysis could confirm the suspicions of Stuyvesant's Director of College Counseling—who is aware of her students' backgrounds and qualifications, found the admissions data deeply troubling, and testified that she could not think of a non-discriminatory explanation for it. SFFA Memo 30; Arcidiacono (3d) Dec. ¶¶ 16 & Table 3.

but lower personal scores and lower admissions rates. SMF ¶¶ 594-616, 629-633. Professor Arcidiacono then turned to regression analysis to see whether these disparities are the product of discrimination or not. SMF ¶¶ 656-669. Calling the descriptive analysis "crude" misses the point. Harvard Opp. 16. Descriptive analysis does not "explain why" applicants have different outcomes; it proves that certain applicants—here, Asian Americans—do, in fact, have different outcomes.

Harvard nevertheless claims that Professor Arcidiacono has a "myopic focus on academic qualifications, to the exclusion of all else that matters in Harvard's admissions process." *Id.* That is wrong too. Professor Arcidiacono's descriptive analysis devotes attention to "non-academic considerations," Harvard Opp. 16, including extracurriculars, alumni interviews, and teacher and guidance counselor recommendations. SMF ¶¶ 598-605. He also devotes attention to describing the racial disparities in the personal score, SMF ¶¶ 606-616, as well as in the overall score, SMF ¶¶ 624-628, which, by definition, incorporates all of these non-academic factors. Professor Arcidiacono's descriptive analysis is robust.

Harvard's real complaint is not that Professor Arcidiacono focuses on academics too much—it is that he focuses on academics at all. According to Harvard, its "applicant pool is full of academically excellent candidates," Harvard Opp. 16, and thus, "it is unsurprising that applicants within a particular academic decile are admitted at different rates," *id.* at 18. But it is baseless to suggest that academic differences among applicants are unimportant. Harvard's academic indices are "highly correlated with admission," meaning that the higher the academic index, the greater the chance of admission. Arcidiacono Rep. 42-43 & Table 5.2. High academic indices also are "strongly associated with better overall ratings by both Harvard readers and by alumni interviewers." *Id.* at 50 & Table 5.7. The problem, then, is not Professor Arcidiacono's decision to compare applicants by academic decile. Harvard's problem is that the comparison reveals the grossly disproportionate effect of the admissions system on Asian-American applicants. SFFA Memo 9-10.

**B.      Harvard unsuccessfully attempts to minimize SFFA's non-statistical evidence.**

Harvard claims that "SFFA bases its claim of discrimination almost entirely on the statistical analysis." Harvard Opp. 5. That is incorrect. SFFA Memo 11-26; SFFA Opp. 8-13. Harvard's attack on this evidence fails at every turn.

**1.** Harvard's claim that SFFA mischaracterizes the OIR investigation is meritless. Harvard Opp. 19-23. First, OIR *did* conduct an "internal investigation into Harvard's treatment of Asian Americans." Harvard Opp. 19. The February 2013 Report examined whether Harvard's admissions process was "bias[ed] against Asians." SMF ¶ 399. The Admissions Part II Report was a second "iteration" into this investigation and contains more than a dozen pages analyzing the issue. SMF ¶¶ 432-465. And both the May 1, 2013 Memorandum and the May 30, 2013 Report examined whether Harvard's admissions process caused "a negative effect for Asian applicants." SMF ¶¶ 485, 492-512, 521-522. Harvard's anodyne description of the OIR Reports as "evaluating factors that play a role in Harvard College admission" is wishful thinking. Harvard Opp. 19. So too is Harvard's description of the OIR Reports as "preliminary" and "incomplete." *Id.*; *see* SFFA Memo. 18 n.4; SFFA Opp. 9-12.

Harvard also incorrectly claims that the OIR reports were not drafted "in response to a request from the Admissions Office" and were not prepared "in consultation with the Admissions Office." Harvard Opp. 19-20. OIR worked with Admissions to obtain all the "variables that are important in making admissions decisions" and to "gather all data that could be relevant to [its] analysis into whether Asians [were] disadvantaged in the admissions process." SMF ¶¶ 386-387. OIR met with Dean Fitzsimmons multiple times to present its findings. SMF ¶¶ 365, 426. And the May 1, 2013 memorandum was drafted at his request. SMF ¶ 493. Harvard's only evidence to the contrary is a new, self-serving declaration from Erin Driver-Linn that states, in conclusory fashion, that the Admissions Part II Report was "not created in response to a request from the Harvard College of Admissions." Ellsworth Ex. 150, ¶ 7. But Driver-Linn's newfound certainty contradicts her deposition testimony

where she claimed no knowledge of "who asked OIR to prepare this work product" or "why this document was created." Connolly (3d) Ex. 286, at 100, 103; *see id.* at 145:7-146:13 (Driver-Linn acknowledging that she could not say with certainty that "no person outside of OIR asked us to do this modeling work"). Regardless, the declaration's silence on who requested the *other* three OIR reports speaks volumes. *See* Ellsworth Ex. 150.

Second, Harvard is wrong that the OIR Reports "on their face acknowledge that any analysis would need much more information to approach a reliable understanding of Harvard's admissions process." Harvard Opp. 20. The referenced statements say nothing of the sort. Nor is there any contemporaneous evidence that OIR believed its analysis was flawed. SFFA Opp. 10. It is unthinkable that OIR would repeatedly circulate and present these reports to top Harvard officials over a multi-year period if OIR believed that it lacked enough information "about the admission process to render reliable conclusions." Harvard Opp. 20. To this day, Harvard can identify no statistical errors with *any* of OIR's reports. SMF ¶ 560.

Third, Harvard's defense of Dean Fitzsimmons' and Dean Khurana's response to the OIR reports is far-fetched. The Court need only read the OIR Reports to reject Harvard's contention that the reports contained "no adverse findings to bury." Harvard Opp. 22. The OIR Reports found, among other things, that the percentage of Asian Americans in the class would more than double if the Admissions Office considered only academic achievement, SMF ¶ 405, that white applicants fared significantly better than Asian-American applicants on the personal rating, SMF ¶¶ 439-440, and that being Asian American was negatively associated with the likelihood of admission to Harvard, SMF ¶ 504. And these are just a few of the reports' explosive conclusions. SMF ¶¶ 389-425, 432-65, 492-512, 518-24. It thus remains very "surprising"—if not stunning—that Harvard officials have so little memory of the reports. Harvard Opp. 22-23 n.9. Unlike the date a website was created or the number

of candidates that ran for a board seat, *id.*, comprehensive investigative reports detailing massive bias against Asian Americans are not something that would (or at least should) be easily forgotten.

Yet, through it all, Harvard stands by its story: Dean Fitzsimmons (who is no statistician) *instantly* saw the "evident limitations" of these voluminous reports and—*instantly*—concluded that no further investigation was needed without telling anyone what he was doing or why he was doing it. Harvard Opp. 22. Dean Khurana, too, used his "expertise in social science" to see instantly that these reports by OIR—the college's highly respected research body whose mission is to conduct this type of analysis—had not been done "appropriately." *Id.* These explanations do not merely lack credibility; they are farcical. SFFA Memo 16-20; SFFA Opp. 10-12.

**2.** Harvard does not dispute that the phrase "standard strong" is used more often to describe Asian-American applicants; nor does Harvard dispute that Asian-American applicants are frequently called "busy and bright." SFFA Memo 20. Rather, Harvard argues that this is not evidence of racial discrimination because "'standard strong is not an epithet'" and because applicants of other races are sometimes referred to in these terms as well. Harvard Opp. 24-25. But Harvard misses the point. It is not that these are necessarily "racially coded" terms. *Id.* at 24. It is that universities, including Harvard, use them to describe a certain kind of applicant: someone who is "very well qualified academically and likely has a good deal of extracurricular involvement as well but isn't distinguished in Harvard's incredibly, incredibly competitive applicant pool." SMF ¶ 679. These labels are far too often applied to Asian Americans. SMF ¶¶ 683, 687; *see, e.g.*, SFFA Compl ¶ 280 ("When MIT's dean of admissions Marillee Jones was asked about Henry Park, who was rejected by Harvard, she said that 'it's possible that Henry Park looked like a thousand other Korean kids with the exact same profile of grades and activities and temperament. My guess is that he just wasn't involved or interesting enough to surface to the top.' To Ms. Jones, it made sense for universities to admit other students over 'yet another textureless math grind.'"). That Harvard disproportionately labels Asian-American applicants in this

dismissive way is evidence of "racial stereotyping" that is "at odds with equal protection mandates." *Miller v. Johnson*, 515 U.S. 900, 920 (1995).

**3.** Harvard offers no explanation for its refusal to investigate claims of discrimination against Asian Americans. SFFA Memo 21-22. Harvard shrugs off the need for further investigation because "such episodic complaints are hardly sufficient to warrant the kind of investigation SFFA seems to think was justified." Harvard Opp. 26. But Harvard is not so casual about claims of discrimination by other racial groups. SMF ¶¶ 345-346. Harvard is quick to respond then. Harvard's indifferent response to Asian Americans who complain about racial inequality is itself evidence of discrimination.

**4.** Harvard's refusal to defend the actions of President Faust and Director McGrath is most devastating of all. SFFA Memo 22-23. Harvard has had every chance to defend the actions of two of the most senior individuals at the university and explain why their behavior was appropriate. Instead, Harvard has demanded that these statements be concealed from the public and has claimed that these are "stray remarks" of rogue employees that should not be attributed to their employer. Harvard Opp. 26-27. But such remarks are admissible when, as here, "they plainly offer a window into the way the decisionmaker or decisionmakers think." *Diaz v. Jiten Hotel Management, Inc.*, 762 F. Supp. 2d 319, 337-38 (D. Mass. 2011). "Racial slurs represent the conscious evocation of those stereotypical assumptions that once laid claim to the sanction of our laws. Such language is symbolic of the very attitudes that the civil rights statutes are intended to eradicate." *Mullen v. Princess Anne Volunteer Fire Co., Inc.,* 853 F.2d 1130, 1133 (4th Cir. 1988). That Faust and McGrath countenanced slurs directed at Asian Americans should tell the Court everything it needs to know about their attitude.[4]

*      *      *

---

[4] Harvard argues that its sordid history of Jewish discrimination, SFFA Memo 23-26, is irrelevant because it was too long ago, Harvard Opp. 28. But it is impossible to ignore the similarities between the way Harvard treated Jews then and the way it treats Asian Americans now. SFFA Memo 25. That President Faust, an historian, and Dean Fitzsimmons refuse to acknowledge that this disgraceful chapter even occurred is all the more troubling. *Id.* at 25 n.5.

In a desperate attempt to avoid liability for discriminating against Asian-American applicants, Harvard pleads for the Court to overrule more than fifty years of civil-rights precedent. SFFA should not prevail, according to Harvard, unless it has smoking-gun evidence of a "conspiracy … among the many members of the Admissions Committee." Harvard Opp. 27. But the courts long ago came to understand that such "evidence is rarely found in today's sophisticated … world." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 58 n.12 (1st. Cir. 1999) (citation omitted). No court would ever hold a Title VII or a Title IX plaintiff to that standard. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, (1973). Nor would a court hold a civil-rights plaintiff to that standard in a racial-discrimination case under the Equal Protection Clause. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-65 (1977). That Harvard asks the Court to turn back the clock and impose rules of litigation from the Jim Crow era in order to stave off defeat should be shocking.

Harvard has done so because SFFA has mounted a case of racial discrimination so strong that summary judgment would be certain in any other civil-rights dispute. SFFA has shown Harvard discriminates in scoring applicants and, especially, in rating their personal qualities. SFFA has shown racial stereotyping infects Harvard's evaluation of Asian-American applicants. SFFA has shown gross statistical disparities in admissions decisions that even Harvard employees believe are the result of discrimination. SFFA has shown that Harvard buried internal reports detailing bias in its admissions system against Asian Americans and killed the investigation. SFFA has shown Harvard disregarded claims of discrimination against Asian Americans that would have been thoroughly vetted had they been made about other racial minorities. And SFFA has shown Harvard's leadership—including its President—has condoned the mocking of Asian-American applicants and the use of racial slurs to deride them. If SFFA cannot prevail based on this circumstantial record, then it is hard to see how any Title VI, Title IX, or other civil-rights plaintiff ever could.

II.    **SFFA is entitled to summary judgment on Count II.**

**A.** Harvard faults SFFA for not relying on expert testimony to support its racial balancing claim. Harvard Opp. 29-30. But expert statistical analysis is unnecessary because SFFA has direct evidence (*e.g.*, Director McGrath's testimony) and other circumstantial evidence (*e.g.*, consistent admission rates year over year). SFFA Opp. 20-21; *Stuart v. Roache*, 951 F.2d 446, 452 (1st Cir. 1991); *see, e.g., Fountain v. City of Waycross, Ga.*, 701 F. Supp. 1570, 1577 (S.D. Ga. 1988). Harvard also incorrectly claims that SFFA cannot prevail because there has been "variation in the racial composition of the class" over time. Harvard Opp. 29. SFFA is not required to show that Harvard racially balanced its class with surgical precision. SFFA Opp. 20. "Harvard's objective is to keep each racial group with a certain range year over year." *Id.* at 21 (citing SFFA Memo 31). The admissions statistics upon which SFFA relies clearly show this to be true. *Id.*

**B.** According to Harvard, Director McGrath's testimony is not evidence of racial balancing. Harvard Opp. 30. That is untenable. SFFA Memo 34-37; SFFA Opp. 19-21. Harvard has *no* response to McGrath's testimony on this matter. For example, she testified that Harvard "make[s] sure that [it is] not having a dramatic dropoff in some [racial] group" that was admitted "at a certain level ... last year." SMF ¶ 170. Harvard does not even try to explain how this is anything other than a confession to engaging in racial balancing. Instead, Harvard buries its head in the sand and ignores this damaging testimony from its Director of Admissions.

**C.** Harvard admits that it uses ████████████████████████████, and that ████████████████████████. Yet, in Harvard's view, "nothing about that fact suggests that applicants of the same race compete only against each other for admission, let alone that Harvard has some preconceived or desired racial balance." Harvard Opp. 31. That is incorrect. SFFA Memo 34-35. Beneath Harvard's flowery rhetoric is an uncomfortable truth: ████████████ ████████████████████████ are "competitive in Harvard's admissions pool," Harvard

Opp. 31, while ████████████████████████████ are not, SMF ¶ 190. This raises a

question Harvard cannot answer: what explanation could there be for the fact that ████████████

████████████████████████████████████████████████████████████████

████████████████████████ other than racial balancing?

 Harvard's only response—████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Harvard Opp. 31—is disingenuous, hypocritical, and

biased. Socioeconomic disadvantage has more than seven times the negative effect on standardized

test scores as race. Kahlenberg Dec., Ex. A ("Kahlenberg Rep.") 47 n.160. There are countless █████

████████████████ students who face that same obstacle. *See, e.g.,* SMF ¶ 690. Only racial balancing

could explain why Harvard deems certain disadvantaged students to be "uncompetitive" for admission

simply because they are not ████████████████████████.

 Moreover, Harvard provides no evidence that this is what actually motivated it to impose these

████████████. If "access to resources" mattered to Harvard, it would not give underrepresented

minorities a diminished preference for socioeconomic status. But that is precisely what Harvard does.

Kahlenberg Report 27-28. Indeed, Harvard gives no socioeconomic preference at all to disadvantaged

African-American applicants. *See id.* Harvard's attempt to mask its scheme of racial balancing by

portraying itself as merely being sensitive to societal inequality is offensive. Harvard ████████████

████████████████ because, as explained in the handbook Harvard gives to alumni interviewers, it

is a "critical opportunity to 'consciously shape the make-up of [its] student body.'" SMF ¶ 188. The

truth is no more complicated than that.

 **D.** Harvard's attempt to brush aside its use of racial targets is no stronger. Harvard Opp. 32.

Harvard implies that race is not a significant factor in this process, claiming that its "use of a target

number of *total number* of students *of all races*" is "unremarkable" given the limited number of "beds

available in each class." *Id.* Harvard is doubly wrong. First, Harvard *does* use race to predict its yield rate (*i.e.*, the percentage of students who will accept Harvard's offer of admission). SMF ¶¶ 230-235. Harvard does this because, as it acknowledges, the yield rate "may vary based on race" just as it may vary because of other factors. Harvard Opp. 32.

Second, Harvard's use of race in this process *is* "remarkable." *Id.* Harvard can use the yield rate by race to set admissions targets only if it assumes the racial composition of the admitted class will not change from the prior year. SFFA Memo 37-38. Harvard would face a student-housing crisis if the composition of the admitted class were to vary from "prior years in a way that could affect the estimated yield." Harvard Opp. 32. Harvard's assumption that the racial balance of its admitted class will remain stable supports SFFA's claim. Although Harvard hypothesizes that it would "adjust the overall target for the number of admitted students" if the composition of the likely admitted class varied from prior years, it has *never* missed these targets in a way that would "affect the estimated yield." *Id.*; *see* SFFA Memo 38 (citing SMF ¶ 232). It would be impossible to hit the targets every year if Harvard genuinely engaged in "whole person" review that treated each applicant as an individual. Only racial balancing can explain it.

**E.** Harvard's defense of the "lop" process may be its weakest of all. Harvard Opp. 32-33. Here too, Harvard tries to minimize SFFA's evidence by suggesting that the lop process "is an unremarkable feature of Harvard's admissions process" given the need to trim the tentatively admitted class to the number of available beds. *Id.* Of course that is unremarkable. The remarkable part—to which Harvard does not respond at all—is the significant role that race plays in this process. Harvard uses this "lop" process to ensure that it maintains its desired racial balance—*i.e.*, to ensure ██████████████ ████████████████████████████████████████████████████ ██ SFFA Memo 37. If Harvard had a non-inculpatory characterization of McGrath's testimony—

or, for that matter, Dean Fitzsimmons' request for his "ethnic stats" on the last day of full committee, SMF ¶¶ 259-260—it would have provided it.

**F.** Harvard defensively objects that its use of "one-pagers" does not reflect "an obsession with race or racial balancing." Harvard Opp. 34. But it shows precisely that. Harvard does not use one-pagers merely to note "trends" or to ensure the committee is not "overlooking strong candidates." *Id.* at 33. How could a one-pager identify "strong" candidates? A one-pager is a spreadsheet breaking down the tentatively admitted class by a limited set of categories, including race. SMF ¶¶ 120-123, 239-245. The one-pagers shed no light on individual applicants. They track whether certain categories of applicants are "surprisingly underrepresented," Harvard Opp. 33-34, and, specifically, whether certain races are underrepresented based on the prior year, SFFA Memo 37; SMF ¶ 121. Director McGrath's testimony is clear: if the one-pagers show that ███████████████████, the committee goes back to the drawing board. SMF ¶¶ 246-247, 249, 252-256. The parties thus agree that Harvard uses data comparing the racial breakdown of the tentatively admitted class to the prior year to make sure there are not a "surprisingly" fewer number of African Americans and Hispanics being admitted. Harvard just refuses to admit what the evidence shows—that this racial balancing.[5]

**G.** Last, Harvard devotes a single footnote to the powerful evidence that Harvard maintained a floor on the admission rate for single-race African Americans in the classes of 2017, 2018, and 2019. It is undisputed that the admission rate for single-race African Americans during this three-year period was virtually identical to the admission rate of all other domestic applicants. SFFA Mem. 38-39; SFFA Opp. 21-24. Given the infinitesimally small chance that this floor occurred by accident, *id.*, there is no

---

[5] Harvard claims that the Supreme Court allows it to use one-pagers in this way. Harvard Opp. 34. But *Grutter* allowed limited use of "daily reports" to monitor the law school's effort to achieve "critical mass"—not to reshape the admitted class. SFFA Opp. 19 n.8. Harvard has disclaimed critical mass, *infra* 19-21, and instead uses one-pagers to ensure that the racial breakdown approximates the prior year, SFFA Memo 36; SMF ¶¶ 246-247, 249, 252-256.

doubt that Harvard illegally "set target-quotas for the number" of African Americans to be admitted. *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 316 (1978) (opinion of Powell, J.). Harvard labels this argument as "bizarre," Harvard Opp. 34 n.11, because it has no answer to it, SFFA Opp. 21-24.

### III.   SFFA is entitled to summary judgment on Count III.

**A.** Harvard concedes that it does not use race to enroll a "critical mass" of underrepresented minority students. Harvard Opp. 35. That should be the end of the matter. SFFA Memo 39-40; SFFA Opp. 26. Contrary to Harvard's claim, critical mass is "a legal requirement." Harvard Opp. 35. It was the only basis for upholding the University of Michigan Law School's use of race as narrowly tailored. *Fisher v. University of Texas at Austin*, 758 F.3d 633, 643 (5th Cir. 2014) ("*Grutter* approved the University of Michigan Law School's goal of 'attaining a critical mass of under-represented minority students.'"), *aff'd*, *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016) ("*Fisher II*"); *Lomack v. City of Newark*, 463 F.3d 303, 310 (3d Cir. 2006) (same). There is no other goal that the Supreme Court has endorsed as narrowly tailored "to achieve student body diversity." *Grutter v. Bollinger*, 539 U.S. 306, 335 (2003).[6]

Harvard's reliance on *Fisher II* is misplaced. Harvard Opp. 35-36. There was no doubt that UT Austin relied on "critical mass" as its diversity goal. *Fisher*, 758 F.3d at 644 ("UT Austin had achieved sufficient diversity to attain the educational benefits of diversity, a critical mass, before it adopted a race-conscious admissions policy"); *id.* at 667 n.9 (Garza, J., dissenting) ("'[C]ritical mass' represents the goal the University purports to seek"); *Fisher v. University of Texas at Austin*, Brief for Respondent, No. 11-345 (filed Aug. 6, 2012), at 11 (UT's 2004 Proposal to reintroduce racial preferences "concluded that UT 'did not have a critical mass of minority students sufficient to provide an optimal

---

[6] Harvard incorrectly argues that SFFA did not make these allegations in its complaint. Harvard Opp. 35. SFFA alleged that "Harvard's use of racial preferences is not narrowly tailored because Harvard is not pursuing the critical-mass interest found permissible in *Grutter*." SFFA Compl. ¶ 427. SFFA also alleged that "Harvard is not complying with the requirement of narrow tailoring because it is not using race merely as a 'plus' factor in admissions decisions *in order to achieve student body diversity*." *Id.* ¶ 461 (emphasis added). Harvard obviously had "fair notice" of SFFA's allegation that Harvard is not using race in the manner permitted under *Grutter*. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana*, 786 F.3d 510, 517 (7th Cir. 2015).

educational experience in 1996.'"); *Fisher v. University of Texas at Austin*, Brief for Respondent, No. 14-981 (filed Oct. 26, 2015), at 42 ("UT had not reached a critical mass in 2004."). The Supreme Court thus was not rejecting the "notion that universities must define their objectives in terms of critical mass," Harvard Opp. 36, when it held that UT Austin was not required to "set forth more precisely the level of minority enrollment that would constitute a 'critical mass,' *Fisher II*, 136 S. Ct. at 2210. It was agreeing with the Fifth Circuit that "critical mass" cannot be reduced only to "an interest in enrolling a certain number of minority students." *Id.*

Harvard ties itself in knots trying to divorce the "critical mass" goal from "the educational benefits of diversity." Harvard Opp. 35. It is nonsensical to suggest that one school might pursue "critical mass," while a second might pursue "the educational benefits of diversity," and yet a third might seek "student body diversity." Enrolling a "critical mass" of underrepresented minority students is the means by which the university unlocks "the educational benefits that flow from a diverse student body." *Grutter*, 539 U.S. at 343.

Regardless, Harvard does not offer any alternative way of measuring whether or when it will have achieved student body diversity. SFFA Opp. 27-28. "[A]sserting an interest in the educational benefits of diversity writ large is insufficient. A university's goals cannot be elusory or amorphous—they must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them." *Fisher II*, 136 S. Ct. at 2211. Permitting the use of race without a measurable goal would amount to impermissible deference. SFFA Opp. 25, 37. Harvard thus needed to identify some other way of measuring its use of race. Yet all Harvard says is that "the educational benefits of diversity" are important to its mission. Harvard Opp. 36. Its use of race thus has no "logical end point," *Grutter*, 539 U.S. at 342, and its promise to reevaluate "the need to consider race" in five years, Harvard Opp. 38 n.15, is meaningless, SFFA Opp. 27 n.10

**B.** Harvard's system also is not narrowly tailored because race is far more than a "plus" factor for underrepresented minorities. SFFA Memo 40-41; SFFA Opp. 28-31; Arcidiacono (3d) Dec., Table 3. Harvard responds that race is not a "predominant factor" because it is "considered flexibly in the admissions process." Harvard Opp. 36-37. But the issue is not whether Harvard has set up a system that superficially mimics a process in which the applicant's race would appear to be "but a small part" of the admissions calculus. *Id.* at 37. It is whether, in practice, race plays an outsized role in admission decisions. SFFA Opp. 28-29. Reciting the mantra of "whole person" review will not suffice. Harvard Opp. 37. There is no "process-based" defense if it turns out that, for African Americans and Hispanics, race is more than a "plus" factor.

Harvard leans so heavily on its process because the evidence is stacked against it. Harvard's argument that other factors "explain more about admissions decisions than race" when it comes to African Americans and Hispanics, Harvard Opp. 38, is untrue, SFFA Memo 40-41. Harvard admits "that if race were not considered in the admissions process, the proportion of African-American and Hispanic students in the admitted class would drop significantly." Harvard Opp. 39 n.16. Harvard claims that any factor can have this effect in a competitive environment. But race is not just any factor. SFFA Opp. 29-30. Harvard equates being African American or Hispanic to earning "a top academic or extracurricular rating." Harvard Opp. 38-39. "[A] top academic or extracurricular rating" is exceedingly rare—few applicants achieve either distinction (let alone both). SFFA Opp. 30-31. Being African American or Hispanic is thus one of the most coveted attributes an applicant can have in Harvard's admissions process. In short, Harvard illegally treats the race of certain students as "the defining feature of his or her application." *Grutter*, 539 U.S. at 337.

## IV. SFFA is entitled to summary judgment on Count V.

**A.** Harvard argues that it "has for decades engaged in a variety of race-neutral *efforts* ... to achieve a class that is diverse along many dimensions, including race." Harvard Opp. 39-40 (emphasis

added). But Harvard was required to consider and take advantage of "alternatives" to classifying applicants by race. *Fisher v. University of Texas at Austin ("Fisher I")*, 570 U.S. 297, 312 (2013). "If a nonracial approach could promote the substantial interest about as well and at tolerable administrative expense," the Supreme Court has explained, "then the university may not consider race." *Id.* (citations and quotations omitted). The Court instructs universities to pursue race-neutral *alternatives*—and not just layer race-neutral efforts on top of racial preferences—because "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people." *Id.* at 309.

**B.** Harvard complains that it is "formalistic," Harvard Opp. 39, to require it to prove "before turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Fisher I*, 570 U.S. at 312. But Harvard should address its complaint about *Fisher I* to the Supreme Court. This Court may not second-guess the wisdom of a Supreme Court ruling. SFFA Opp. 26-27. Regardless, *Fisher II* made the point again: "Petitioner is correct that a university bears a heavy burden in showing that it had not obtained the educational benefits of diversity before it turned to a race-conscious plan." 136 S. Ct. at 2211. Unlike Harvard, the Supreme Court understands that racial preferences "are contrary to our traditions and hence constitutionally suspect." *Fisher I*, 570 U.S. at 309. Although "narrow tailoring does not require exhaustion of every *conceivable* race-neutral alternative," it does require exhaustion of those that are "workable." *Id.* at 312.

But the dispute is ultimately immaterial for summary-judgment purposes. Harvard does not deny *Grutter* required, at a minimum, "serious, good faith consideration" of race-neutral alternatives. 539 U.S. at 339; *see* Harvard Opp. 39-42. Yet Harvard did not consider race-neutral alternatives until 2017. SFFA Memo 42-43; SFFA Opp. 31. Harvard thumbed its nose at the Supreme Court until it was threatened with this suit nearly 15 years later. Harvard claims there is nothing the Court can do about it because SFFA seeks only forward-looking relief. Harvard Opp. 41. But SFFA is not seeking to impose independent liability on Harvard for its non-compliance with *Grutter* between 2003 and

2017. Rather, Harvard's brazen lawlessness is evidence that its more recent "consideration" of race-neutral alternatives was neither "serious" nor in "good faith." SFFA Opp. 31; *Jay Edwards, Inc. v. New England Toyota Distrib., Inc.*, 708 F.2d 814, 824 (1st Cir. 1983); *Thomas & Agnes Carvel Found. v. Carvel*, 736 F. Supp. 2d 730, 767 (S.D.N.Y. 2010).

**C.** Harvard's defense of how it considered race-neutral alternatives after *Fisher I* and *Fisher II* is meritless. Pointing to the Ryan Committee, Harvard argues that it undertook serious consideration of race-neutral alternatives beginning in May 2014. Harvard Opp. 41-42. But that meager effort was not a response to *Fisher I*—an opinion that the Supreme Court issued nearly a year before the Ryan Committee was formed. Harvard created the Ryan Committee because the Harvard Not Fair website was launched in April 2014 and Harvard was gearing up for litigation. SFFA Memo 42-43; *see* SMF ¶¶ 813-816. Moreover, the Ryan Committee met only three times, produced no work product, and reached no conclusions. SFFA Memo 43-44.

Harvard claims the Ryan Committee "paused its work after SFFA filed this lawsuit" because the "litigation would produce information and analysis that would inform the evaluation of many of the questions that the Committee was considering." Harvard Opp. 42. But the Ryan Committee was not "paused"—it was disbanded. SMF ¶¶ 822-825. Harvard's explanation also is nonsensical. The Ryan Committee could have considered "the specific race-neutral alternatives advanced by SFFA." Harvard Opp. 42-43. The only plausible inference for creating a new committee is that Harvard was deeply concerned about the conclusions that the Ryan Committee would reach. SMF ¶¶ 817-818. Putting this sensitive matter in the safe hands of Fitzsimmons, Smith, and Khurana—all of whom had testified that they could envision no scenario in which Harvard would cease using race—made it a sure thing. SFFA Memo 43; SMF ¶¶ 827-830.

The idea that the Smith Committee neutrally considered whether Harvard should abandon the use of race is risible. SFFA Memo 42-44. It is not just that the Smith Committee had three members—

the three members are key figures in Harvard's alleged wrongdoing. It is not just that the Smith Committee failed to hear testimony or conduct interviews—the committee skimmed a few articles and then rubberstamped Harvard's expert report. And it is not just that counsel was at the table—the Smith Committee's work was outsourced to its litigation team and then shielded from discovery by privilege. Harvard's consideration of race-neutral alternatives, in short, did not need to "resemble a legislative hearing." Harvard Opp. 43. It just needed to be a more serious effort than the preordained charade it clearly was.

The truth is that Harvard has *never* seriously considered race-neutral alternatives because it does not believe that there can be a "whole person" review without considering the applicant's race. That is why Director McGrath testified that the admission staff has never even discussed race-neutral alternatives and she did not have a "hunch" if they could succeed. SMF ¶ 807. That is why Dean Smith could think of no "circumstance in which Harvard would not want to use race as a factor in the holistic admissions process." SMF ¶ 828. And that is why President Faust testified it "would be impossible" to evaluate applicants without using race. SMF ¶ 167. It would have been better (or at least more honest) if Harvard had just registered its disagreement with the Supreme Court's determination that, at some point, "the use of racial preferences will no longer be necessary to further the interest" in diversity. *Grutter*, 539 U.S. at 343.

**D.** Harvard's reasons for why no race-neutral policies could achieve diversity are meritless. Harvard Opp. 43-45. Harvard claims that SFFA "barely discusses any actual race-neutral alternatives." Harvard Opp. 39. But SFFA identified multiple race-neutral policies (at least two from Mr. Kahlenberg and at least one from Professor Card) that would allow Harvard to achieve its diversity interest without engaging in the divisive practice of classifying applicants by race. SMF ¶¶ 866-882; *see* SFFA Memo. 43-44; SFFA Opp. 32-37. Harvard ignores them.

Harvard argues that underrepresented minority enrollment would drop by approximately 50% in the absence of racial preferences. Harvard Opp. 43-44. But that argument depends on Harvard refusing to substitute *any* race-neutral alternatives—such as socioeconomic preferences—for racial preferences. Harvard knows that race-neutral alternatives would maintain or increase its overall underrepresented minority enrollment. SFFA Opp. 32-33.

Harvard hypocritically counters that deploying socioeconomic preferences would jeopardize academic selectively. Harvard Opp. 44. The Court should be skeptical of this newfound concern given Harvard's claim elsewhere that it "does not seek simply to admit the applicants with the highest grades or standardized test scores." Harvard Opp. 11. Unless Harvard is referring to ALDC applicants when it professes to seek out students with "a broader range of personal characteristics," *id.*, socioeconomic diversity would advance its stated mission to bring more disadvantaged students into its community, SFFA Opp. 33-37. Anyway, employing race-neutral alternatives would not impair Harvard's "pursuit of academic excellence." Harvard Opp. 44. Harvard's academic profile and selectivity would remain virtually unchanged. SFFA Opp. 33-34.[7] The only thing that a nonracial approach would jeopardize is a divisive practice that Title VI "barely—and only provisionally—permits." *Schuette v. BAMN*, 572 U.S. 291, 317 (2014) (Scalia, J., concurring). But being forced "out of the racial-preferences business altogether," *id.*, is of course what Harvard fears most, SFFA Memo 45.

## CONCLUSION

SFFA respectfully requests that the Court grant it summary judgment on all counts.

---

[7] Harvard argues that increasing financial aid would do nothing to increase racial diversity. Harvard Opp. 45. That is incorrect, but, more importantly, it is immaterial for summary judgment purposes. SFFA Opp. 36-37. Harvard also claims that SFFA ignores "many other race-neutral alternatives considered by the [Smith] Committee." Harvard Opp. 45. That is likewise untrue. Kahlenberg Rep. 6 & n.12 (partnerships with schools); *id.* at 36-39 (geographic diversity); *id.* at 39-41 (recruitment); *id.* at *id.* at 41-42 (transfers); *id.* at 42-44 (early action); *id.* at 46 (recruited athletes).

Dated: August 30, 2018                                    Respectfully submitted,

                                                         /s/ William S. Consovoy
Adam K. Mortara                                          William S. Consovoy
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP                Thomas R. McCarthy
54 West Hubbard Street, Suite 300                        J. Michael Connolly
Chicago, IL 60654                                        CONSOVOY MCCARTHY PARK PLLC
312.494.4400                                             3033 Wilson Boulevard, Suite 700
adam.mortara@bartlit-beck.com                            Arlington, Virginia 22201
                                                         703.243.9423
John M. Hughes                                           will@consovoymccarthy.com
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP                tom@consovoymccarthy.com
1801 Wewatta Street, Suite 1200                          mike@consovoymccarthy.com
Denver, CO 80202
303.592.3100                                             Patrick Strawbridge BBO #678274
john.hughes@bartlit-beck.com                             CONSOVOY MCCARTHY PARK PLLC
                                                         Ten Post Office Square
                                                         8th Floor South PMB #706
Paul M. Sanford BBO #566318                              Boston, MA 02109
BURNS & LEVINSON LLP                                     617.227.0548
One Citizens Plaza, Suite 1100                           patrick@consovoymccarthy.com
Providence, RI 02903
617.345.3000
psanford@burnslev.com                                    Michael H. Park
                                                         CONSOVOY MCCARTHY PARK PLLC
                                                         745 Fifth Avenue, Suite 500
                                                         New York, NY 10151
                                                         212.247.8006
                                                         park@consovoymccarthy.com

*Attorneys for Plaintiff Students for Fair Admissions, Inc.*


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing.

                              /s/ William S. Consovoy
                              William S. Consovoy