**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> Defendant. | Civil Action No. 1:14-cv-14176-ADB |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL
FACTS THAT DEFENDANT CONTENDS PRECLUDE SUMMARY JUDGMENT
FOR PLAINTIFF**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1 and the Court's orders, *see* Docs. 387, 407, Plaintiff Students for Fair Admissions ("SFFA") responds to Harvard's Statement of Material Facts that Preclude Summary Judgment. Any alleged "undisputed facts" that are not disputed herein are assumed to be true solely for purposes of the pending motion for summary judgment. SFFA reserves all rights to contest any and all of Harvard's alleged "undisputed facts" should this case go forward following the Court's ruling on SFFA's motion for summary judgment.

**I.      Harvard's Statement Of Material Facts That Preclude Summary Judgment For SFFA**

1.      Harvard incorporates by reference its Local Rule 56.1 Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment on All Remaining Counts. Dkt. 420.

**Response:** SFFA hereby incorporates its responses to Harvard's Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment.

2.      Most applicants to Harvard College are academically qualified to attend.  *See* Ellsworth Ex. 55 at HARV00001401; *see also* Ellsworth Ex. 1 at 277:11-12 (McGrath 2015 Dep.); Ellsworth Ex. 102 at 74:5-6 (Cheng Dep.).

**Response:** Disputed. Harvard provides no statistical evidence or expert analysis to support this statement. SFFA disputes that most applicants are comparably academically qualified to attend Harvard. *See* Arcidiacono Dec., Ex. A ("Arcidiacono Rep.") 33, 36; Arcidiacono Dec., Ex. B ("Arcidiacono Rebuttal"), App. C, Table 4.1R; *see also* SFFA Statement of Undisputed Material Facts ("SFFA SMF") ¶¶ 595-597.

3.      Admissions officers use the phrase "standard strong" to refer to applicants who are strong across the range of factors the Admissions Committee considers but are not distinguished in Harvard's competitive applicant pool. *See* Ellsworth Ex. 102 at 73:20-74:6 (Cheng Dep.); Connolly Ex. 25 at 229:10-15 (Weaver Dep.); *see also, e.g.*, Ellsworth Ex. 139; Ellsworth Ex. 136; Ellsworth Ex. 140.

**Response:** Disputed. The evidence cited does not support the proposition that admissions officers use the phrase "standard strong" to refer to applicants who are "strong across the range of factors the Admissions Committee considers."

4.      Harvard's admissions process is a comparative process; each year, all freshman applicants to Harvard College compete against the other applicants who have applied that year for the limited number of spots in Harvard's class. *See* Ellsworth Ex. 112 at 173:2-9 (Howrigan Dep.); Ellsworth Ex. 120 at 297:13-22 (Fitzsimmons Dep.); *see also, e.g.*, Ellsworth Ex. 132; Ellsworth Ex. 134; Ellsworth Ex. 135; Ellsworth Ex. 137.

**Response:** Disputed. All freshman applicants to Harvard College do not "compete against the other applicants" who have applied that year. Harvard engages in racial balancing, SFFA SMF ¶¶ 230-264, and makes admissions decisions based on, among other things, whether a "group" of

applicants "seems to be very underrepresented." Connolly Ex. 16, McGrath 248:18-249:2; SFFA SMF ¶¶ 254-255; *see also id.* ¶¶ 190-193. Recruited athletes, among others, also do not compete against all other applicants. Arcidiacono Rep. 21; Arcidiacono Rebuttal 3-4 n.1.

5.      The same individualized, whole person admissions process applies to every applicant to Harvard. *See* Ellsworth Ex. 102 at 187:10-12 (Cheng Dep.); Ellsworth Ex. 120 at 297:13-22 (Fitzsimmons Dep.); Ellsworth Ex. 1 at 231:14-232:3 (McGrath 2015 Dep.); Ellsworth Ex. 149 ¶¶ 6, 8 (Worth Decl.).

**Response:** Disputed. Harvard's decisions are not "individualized" because Harvard awards large racial preferences to African-American and Hispanic applicants, *see* SFFA SMF ¶¶ 735-743; imposes penalties on Asian-American applicants, *see, e.g.,* SFFA SMF ¶¶ 664-677; and engages in racial balancing, SFFA SMF ¶¶ 230-264. Harvard makes admissions decisions based on, among other things, whether a "group" of applicants "seems to be very underrepresented." Connolly Ex. 16, McGrath 248:18-249:2; SFFA SMF ¶¶ 254-255.

6.      Harvard recognizes that applicants' ability to contribute to the Harvard community and succeed at Harvard and beyond is not just a function of their prior academic, extracurricular, and athletic successes; it also reflects a broader range of personal characteristics, including citizenship attributes such as kindness and sensitivity; leadership attributes such as courage and independence; and the grit required to succeed in Harvard's competitive environment. *See* Ellsworth Ex. 149 ¶ 9 (Worth Decl.); Ellsworth Ex. 54 at HARV00001153-55 (Interviewer Handbook 2013-2014); Ellsworth Ex. 17 at 60:14-20 (Walsh Dep.). The personal rating assigned by admissions officers attempts to capture the strength of such characteristics in an applicant. *See* Ellsworth Ex. 149 ¶ 9 (Worth Decl.); Ellsworth Ex. 98 at 164:11-165:2 (McGrath 2015 Dep.); Ellsworth Ex. 25 at 359:16-360:9 (McGrath 2017 Dep.); Connolly Ex. 9 at 245:18-20, 248:6-25 (Fitzsimmons Dep.); Ellsworth Ex. 9 at 80:3-12 (Banks Dep.); Ellsworth Ex. 17 at 60:14-20 (Walsh Dep.); Ellsworth Ex. 115 at

121:2-6 (Bever Dep.).

  **Response:** Disputed. SFFA disputes Harvard's characterization of the cited materials. SFFA admits that first readers determine the personal score by examining a variety of subjective factors, including those that are listed and others that are not. For example, there is evidence that race affects the personal rating. *See* SFFA SMF ¶¶ 89-90, 216, 606-616; Arcidiacono Rebuttal 22-27, Tables B.6.3R & B.6.7R; Arcidiacono Rep. 55-60 & Table 5.6.

  7. The personal rating assigned by admissions officers reflects the wide range of information in the application—such as the applicant's personal essays, recommendations from teachers and guidance counselors, letters of support sent from outside recommenders, supplementary material submitted by the applicant, and reports from alumni or staff interviews (to the extent they have arrived before the rating is assigned)—that bears on whether the applicant will fulfill the ambitions Harvard has for all its applicants: to be the kinds of roommates, classmates, and teammates who will contribute to Harvard's educational environment for all its students and, once they graduate, to be citizen-leaders of our society. *See* Ellsworth Ex. 1 at 164:11-165:2 (McGrath 2015 Dep.); Ellsworth Ex. 26 at 245:18-246:20 (Fitzsimmons Dep.); Ellsworth Ex. 149 ¶¶ 8-9 (Worth Decl.).

  **Response:** Disputed. SFFA disputes Harvard's characterization of the cited materials. There is evidence the personal rating is affected by racial bias. *See* SFFA SMF ¶¶ 89-90, 216, 606-616; Arcidiacono Rebuttal 22-27, Tables B.6.3R & B.6.7R; Arcidiacono Rep. 55-60 & Table 5.6.

  8. Alumni interviewers have limited information about the applicants they interview. An alumni interviewer meets an applicant only once, for "no more than 60 minutes." *See* Ellsworth Ex. 54 at HARV00001172. Alumni interviewers "do not have access to applications." *See id.* at HARV00001175.

  **Response:** Disputed. The evidence cited does not support the proposition that alumni

interviewers "have limited information about the applicants they interview."

9.    An applicant's race is one of many factors that admissions officers consider in their whole-person review process but is not a determining factor in the admission decision. *See* Connolly Ex. 20 at 149:22-24 (Ray Dep.); Connolly Ex. 18 at 57:24-58:2 (Ortiz Dep.).

**Response:** Disputed. An applicant's race can be a "determining factor in the admission decision." Arcidiacono Rebuttal 70-71; *see also id.* 8, 46-47 & Table 5.1N.

10.    Harvard admissions officers have a nuanced understanding of many distinct identities within Asian-American communities and the ways in which those differences may enrich the diversity of Harvard's student body. *See, e.g.*, Ellsworth Ex. 127 at HARV00013394 (training presentation urging admissions officers to "be [wary] of aggregated data for Asian American student populations" and "[h]onor the nuance of both identity and context").

**Response:** Disputed. The evidence cited does not support the proposition that Harvard admissions officers have a "nuanced understanding of many distinct identities within Asian-American communities and the ways in which those differences may enrich the diversity of Harvard's student body." In addition, Harvard imposes penalties on Asian-American applicants. *See* SFFA SMF ¶¶ 664-677.

11.    Harvard admissions officers frequently regard the ethnicity of Asian-American applicants as a positive factor in the admissions process. Ellsworth Ex. 141 ("[Applicant] is a very deserving student from a first generation Vietnamese background who is valedictorian for this city-wide magnet school."); Ellsworth Ex. 131 (applicant of Nepali descent "[c]ertainly would bring a fascinating perspective to campus"); Ellsworth Ex. 142 ("Tug for BG [background] here, she writes well about the plight of exiled Tibetans and T2 [second teacher recommendation] lets us know that both of her parents were born in Tibetan refugee camps in India."); Ellsworth Ex. 130 ("B/G [background] of interest as he [applicant of Indian origin] would be someone who would add to the

mix at H"); Ellsworth Ex. 143 (comment that applicant was "involved in the Asian community as EIC [editor-in-chief] of local journal").

**Response:** Disputed. The evidence cited does not support the proposition that Harvard "frequently" regards the ethnicity of Asian-American applicants as a positive factor in the admissions process. Harvard receives tens of thousands of applications each year. For example, more than 37,000 people applied to Harvard College for undergraduate admission to the Class of 2019. Ellsworth Ex. 33, Card Rep. 12-13.

12.       Harvard has a limited number of beds available for first-year students, and it attempts to ensure that the number of matriculating students does not exceed the number of available beds. *See* Ellsworth Ex. 149 ¶ 17 (Worth Decl.); Ellsworth Ex. 47 at HARV00097321 (Smith Committee Report); Ellsworth Ex. 120 at 283:11-13, 285:8-10 (Fitzsimmons Dep.); Connolly Ex. 16 at 212:14-213:2 (McGrath 2015 Dep.).

**Response:** SFFA does not dispute that Harvard's class size is limited by the available student housing.

13.       Before the subcommittee process begins, senior admissions officers set a rough target number—which is flexible and subject to change—of admitted students for each docket based on the number of applicants and admits in the previous year and variations in application numbers. *See* Ellsworth Ex. 120 at 279:17-19, 279:22-282:6, 283:11-13, 285:8-10, 297:5-12 (Fitzsimmons Dep.); Connolly Ex. 16 at 212:14-213:2 (McGrath 2015 Dep.). Harvard does not use statistics shared at Association of Black Admissions and Financial Aid Officers of the Ivy League and Sister Schools' biannual Round Robin meetings to set admissions targets. *See* Ellsworth Ex. 149 ¶ 18 (Worth Decl.); Connolly Ex. 9 at 452:10-13 (Fitzsimmons Dep.); Ellsworth Ex. 105 at 156:20-157:6, 158:24-159:10 (Banks Dep.).

**Response:** Disputed. The evidence cited does not support the proposition that the target

number is "flexible and subject to change." This number is a "hard target," meaning that the subcommittee cannot tentatively admit a number higher than the target number. Ex. 5, Cheng 150:1-152:3; Ex. 6, Donahue 250:3-251:12. The evidence cited does not support the proposition that "Harvard does not use statistics shared at Association of Black Admissions and Financial Aid Officers of the Ivy League and Sister Schools' biannual Round Robin meetings to set admissions targets." The declaration of Robin Worth is not credible evidence on this point because it lacks sufficient factual support for the Court to determine that its averments were based upon the personal knowledge of the declarant.

14.      "Yield" is the percentage of admitted students who choose to accept Harvard's offer of admission. *See* Connolly Ex. 16 at 211:19-21 (McGrath 2015 Dep.). Harvard estimates the yield based on a number of factors, including the previous year's yield. *See* Connolly Ex. 16 at 211:19-23 (McGrath 2015 Dep.); Ellsworth Ex. 26 at 281:18-21 (Fitzsimmons Dep.). Applicants with different characteristics have historically chosen to accept Harvard's offers of admission at different rates. *See, e.g.*, Ellsworth Ex. 120 at 338:2-6 (Fitzsimmons Dep.); Connolly Ex. 16 at 211:22-212:4, 213:12-20 (McGrath 2015 Dep.).

**Response:** Undisputed.

15.      The yield in a given year tends to be roughly similar to that of the previous year, but yields can vary by docket, overall, and from year to year; if the composition of the class of students that Harvard preliminarily intends to offer admission differs from previous years in a way that could affect the yield, senior admissions officers may need to adjust the estimated yield and the overall target number of admitted students. *See* Connolly Ex. 9 at 282:7-19, 339:3-17 (Fitzsimmons Dep.); Connolly Ex. 16 at 212:5-13 (McGrath 2015 Dep.).

**Response:** Disputed. The evidence cited does not support the proposition that "if the composition of the class of students that Harvard preliminarily intends to offer admission differs

7

from previous years in a way that could affect the yield, senior admissions officers may need to adjust the estimated yield and the overall target number of admitted students."

16.     Near the end of the regular decision process, the Dean and Director of Admissions confirm the final target number and determine whether any applicants must be "lopped" from the class of students that Harvard preliminarily intends to offer admission to reach that number.  *See* Ellsworth Ex. 120 at 317:22-318:9 (Fitzsimmons Dep.); Ellsworth Ex. 105 at 115:2-9 (Banks Dep.).

**Response:** Disputed. The evidence cited does not support the proposition that the Dean and Director of Admissions "confirm the final target number" near the end of the regular decision process.

17.     During the lop phase, admissions officers apply the same criteria employed throughout the admissions process by considering all information in an application file.  *See* Ellsworth Ex. 149 ¶¶ 19-20 (Worth Decl.); Ellsworth Ex. 99 at 249:1-12, 296:13-24 (Weaver 2017 Dep.); Ellsworth Ex. 105 at 98:9-99:13, 125:7-24 (Banks Dep.); Ellsworth Ex. 102 at 198:19-200:15 (Cheng Dep.); Ellsworth Ex. 113 at 94:4-17 (Walsh Dep.).

**Response:** Disputed. The full committee considers whether the student is ███████████ ██████████████████████████████████ when deciding whether to "lop" the student. Connolly Ex. 16, McGrath 199:10-16; *see also* SFFA SMF ¶¶ 258-260.

18.     Harvard neither seeks a minimum number nor a maximum number of students of any particular race or ethnicity, and there is never an expectation or understanding that certain racial groups needed to be lopped more than others in the lop phase.  *See* Ex. 98 at 196:5-6, 240:19-20, 252:4-10, (McGrath 2015 Dep.); Connolly Ex. 1 at 98:9-13 (Banks Dep.); Ellsworth Ex. 99 at 248:24-251:9 (Weaver 2017 Dep.); Ellsworth Ex. 113 at 94:4-17, 130:2-24 (Walsh Dep.); Connolly Ex. 9 at 329:19-330:5 (Fitzsimmons Dep.).

**Response:** Disputed. Harvard engages in racial balancing and admits that it takes steps to ensure that there is not a "dramatic dropoff in some [racial] group" from the year before, and that each racial group is not "underrepresented" based on the prior year's admissions demographics. SMF ¶¶ 168-172, 230-264. It has also imposed a floor on the admission rate of African Americans in the classes of 2017, 2018, and 2019. SMF ¶¶ 717-722. Harvard also restricts the number of Asian Americans it admits. SMF ¶¶ 670-677. The full committee considers whether the student is ███████ ████████████████████████████████████████████ when deciding whether to "lop" the student. Connolly Ex. 16, McGrath 199:10-16; *see also* SFFA SMF ¶¶ 258-260.

19.     Periodically during the admission process, Dean Fitzsimmons and Director McGrath receive documents that contain a snapshot of the group of students currently recommended for admission and the prior admitted class, listing the number of students by gender, geography, intended concentration, whether the student is a recruited athlete, whether the student's parent attended Harvard, whether Harvard waived the student's application fee, whether the student was flagged as socioeconomically "disadvantaged" by Harvard's admissions staff, whether the student applied for financial aid, and the student's citizenship, permanent residency, and race. *See* Connolly Exs. 43, 70; Ellsworth Ex. 120 at 101:18-102:4 (Fitzsimmons Dep.); Ellsworth Ex. 260 at 260:22-261:8 (Donahue Dep.); Ellsworth Ex. 112 at 20:9-14, 148:3-7 (Howrigan Dep.).

**Response:** Disputed. SFFA disputes that Dean Fitzsimmons and Director McGrath receive one-pagers only "periodically." *See* SMF ¶¶ 243-245.

20.     SFFA's standing members are not ready, willing, and able to transfer to Harvard. *See* Ellsworth Ex. 76 (Transferring to Harvard College); Ellsworth Ex. 11 at 70:5-8 (████ Dep.); Ellsworth Ex. 21 at 74:12-14, 81:25-82:4 ████ Dep.); Ellsworth Ex. 22 at 65:14-16, 73:22-23 (█ Dep.); Ellsworth Ex. 24 at 65:16-17, 66:2-15 (██ Dep.); Ellsworth Ex. 93 at SFFA- Harvard0001955; Ellsworth Ex. 15 at 37:25-38:3 (████ Dep.); Ellsworth Ex. 19 at 44:5-12 ██████ Dep.).

**Response:** Disputed. SFFA's standing members are ready, willing, and able to transfer to Harvard. *See* Connolly(2nd) Ex. 277, ██████ Dec. ¶ 6; Connolly Ex. 197, ██████ Dec. ¶ 6; Connolly(2nd) Ex. 275, ██████ 42:8-43:9; Connolly Ex. 199, ██████ Dec. ¶ 6; Connolly(2nd) Ex. 276, ██████ 51:17-53:10; Connolly(2nd) Ex. 278, ██████ Dec. ¶ 6; Connolly(2nd) Ex. 279, ██████ Dec. ¶ 6; Connolly(2nd) Ex. 280, ██ ¶ 6; Connolly(2nd) Ex. 281, ██████ Dec. ¶ 6; Connolly(2nd) Ex. 282, ██ Dec. ¶ 6; Connolly(2nd) Ex. 283, ██████ Dec. ¶ 6.

21.     SFFA's standing members have no ability to control SFFA. *See* Ellsworth Ex. 89 at SFFA-Harvard0000060 (Unanimous Written Consent); Ellsworth Ex. 24 at 40:5-41:17 (██ Dep.); Ellsworth Ex. 21 at 35:24-36:7, 108:7-109:16 (██ Dep.); Ellsworth Ex. 22 at 38:15-17, 63:5-15 (██ Dep.); Ellsworth Ex. 15 at 76:21-25, 80:4-81:12 (██ Dep.); Ellsworth Ex. 19 at 22:15-23:19, 75:10-77:3, 82:11-83:4 (██████ Dep.); Ellsworth Ex. 11 at 47:13-48:16, 55:3- 57:9, 111:4-13 (██ Dep.).

**Response:** Disputed. This is a statement of law rather than fact, and therefore no response is required. Nevertheless, the standing members play a role in selecting SFFA's leadership. The members directly elect one of SFFA's Board members. Connolly(2nd) Ex. 266 at SFFA-Harvard 0000052-53, Bylaws Amendments; Connolly(2nd) Ex. 264 at SFFA-Harvard 0000060, SFFA Bylaws. This position gives members "a direct voice in [SFFA's] decision-making, including the management and direction of ongoing litigation." Connolly(2nd) Ex. 266 at SFFA-Harvard 0000052, Bylaws Amendments. In addition, one of the standing members, ███████████████████. Connolly Ex. 194, ██████ Dec. ¶¶ 2, 6. SFFA's leadership also communicates with the standing members in this case and SFFA leadership seeks and receives their input about the case and other activities of the organization. *See, e.g.*, Connolly Ex. 197, ¶ 9; Connolly(2nd) Ex. 275, ██████ 69:22-70:12; Connolly(2nd) Ex. 279, ¶ 9. The standing members have the power to terminate their membership in SFFA, which would in effect terminate this litigation. Connolly(2nd) Ex. 264 at SFFA-Harvard 0000060, SFFA Bylaws.

10

22.      In 1988, the Department of Education's Office for Civil Rights ("OCR") conducted a compliance review of Harvard College's admissions policies. OCR "found no evidence of the existence or use of quotas, nor did [it] find that Asian Americans were treated differently than white applicants in the implementation of the admissions process." Connolly Ex. 116 at HARV00023643.

**Response:** SFFA admits that OCR reached this conclusion.

23.      Harvard's OIR conducts analysis and responds to hundreds of requests per year to support the work of various administrators, schools, and departments across Harvard University. *See* Connolly Ex. 2 at 219:11-220:2 (Bever Dep.); Ellsworth Ex. 150 ¶ 2 (Declaration of Erin Driver-Linn ("Driver-Linn Decl.")).

**Response:** SFFA disputes the implication that OIR "conducts analysis and responds to hundreds of requests" similar in scope to its work analyzing whether Harvard is biased against Asian-American applicants. OIR spent months researching these issues. *See* Connolly Ex. 10, Hansen 16:9-22.

24.      Staff within OIR conducted preliminary and limited analyses of Harvard's admissions process in 2013. *See, e.g.*, Connolly Ex. 134 at HARV00031718 ("The following analysis is preliminary and for discussion."); Connolly Ex. 145 at HARV00065741 (document marked "PRELIMINARY DRAFT"); Connolly Ex. 112 at HARV00023548-23549 (describing analysis as having "several limitations"); Ellsworth Ex. 23 at 195:21-196:10 (Driver-Linn Dep.) (OIR was "[r]educing what's a very complicated thing into … a quant model" and its analyses were "iterative, exploratory, preliminary, and limited"); Ellsworth Ex. 20 at 196:7-18 (Hansen Dep.) (OIR modeling "d[id] not take socioeconomic status into account" and "[t]here are other factors and data that are not reflected in these models").

**Response**: Disputed. The reports from the Office of Institutional Research were not "preliminary." These reports were distributed to high-level officials at Harvard at several different

points covering more than a year without any further revision. SMF ¶¶ 426, 533, 539. Harvard has made substantial changes to university policy on the basis of OIR reports that were marked "preliminary." SMF ¶¶ 383, 384. The OIR reports also were not "limited." OIR analyzed these issues extensively. *See* Connolly Exs. 112, 134, 145, 157. OIR's findings are consistent with Professor Arcidiacono's findings. Arcidiacono Rep. 9-10, 14.

25.     The 2013 admissions analysis entitled "Admissions Part II Subtitle" originated within OIR. *See, e.g.*, Ellsworth Ex. 150 ¶¶ 6-8 (Driver-Linn Decl.); Ellsworth Ex. 118 at 143:22-145:15 (Driver-Linn Dep.) ("no person outside of OIR" asked OIR to conduct this analysis).

**Response:** Disputed. The declaration of Erin Driver-Linn is not credible evidence on this point because it lacks sufficient factual support for the Court to determine that its averments were based upon the personal knowledge of the declarant. Driver-Linn's declaration conflicts with her deposition testimony, where—as Harvard's designated 30(b)(6) witness on matters related to OIR— she testified that she did not know "who asked OIR to prepare this work product." Connolly(3rd) Ex. 286, Driver-Linn 98:8-101:10.

26.     The OIR employees who worked on the 2013 analyses acknowledged that they did not know enough about the admissions process to render reliable conclusions. *See, e.g.*, Ellsworth Ex. 115 at 156:12-24 (Bever Dep.) ("[T]his does not reflect the process by which we do admissions … [b]ecause we review many factors, some of which can be data and some of which are not."); Ellsworth Ex. 116 at 116:20-117:4, 137:20-138:21, 195:23-196:18 (Hansen Dep.) (admissions process considers factors and data not reflected in the OIR models). The OIR admissions analyses were not prepared in consultation with the Admissions Office. *See, e.g.*, Ellsworth Ex. 115 at 134:19-138:17 (Bever Dep.) (OIR "oversimplified the [admissions] process"); Ellsworth Ex. 116 at 116:20-117:4, 137:20-138:21, 195:23-196:8 (Hansen Dep.) (admissions process considers factors and data not reflected in the OIR models).

**Response:** Disputed. The evidence cited does not support the proposition that "OIR employees who worked on the 2013 analyses acknowledged that they did not know enough about the admissions process to render reliable conclusions." OIR employees who worked on the analyses into Asian-American discrimination were not aware of any errors in their work. Connolly Ex. 7, Driver-Linn 125:23-126:7, 128:6-25, 129:11-14, 138:15-139:19, 294:22-296:11. No OIR employee raised any concerns at the time. Connolly Ex. 2, Bever 138:11-17; Ex. 7, Driver-Linn 199:18-200:25, 290:14-291:23, 296:24-297:15; Ex. 10, Hansen 164:23-165:5. The evidence cited does not support the proposition that the admissions analyses "were not prepared in consultation with the Admissions Office." OIR consulted and worked with the Admissions Office to prepare these reports. SMF ¶¶ 365, 386-387, 426, 493.

27.     OIR's 2013 analyses relating to the admissions process were not part of an internal investigation into allegations of discrimination against Asian-American applicants or any other topic and were not created in response to a request from Harvard's Office of the General Counsel. *See* Ellsworth Ex. 150 ¶¶ 8-9, 16-17, 23-24 (Driver-Linn Decl.); Ellsworth Ex. 23 at 165:9-16 (Driver-Linn Dep.) (OIR analysis not directed to "whether there was bias against Asians in college admissions at Harvard").

**Response:** Disputed. The evidence cited does not support the proposition that OIR's 2013 reports "were not part of an internal investigation into allegations of discrimination against Asian-American applicants or any other topic." The declaration of Erin Driver-Linn is not credible evidence on this point because it lacks sufficient factual support for the Court to determine that its averments were based upon the personal knowledge of the declarant. OIR was investigating whether Harvard's admissions process was "bias[ed] against Asians." Connolly Ex. 134, HARV00031724.

28.     OIR's 2013 analyses relating to the admissions process were not designed to evaluate whether Harvard was discriminating against Asian-American applicants or any other group and

reached no conclusion on that question. *See* Ellsworth Ex. 150 ¶¶ 10, 18, 25 (Driver- Linn Decl.); Ellsworth Ex. 23 at 165:9-16 (Driver-Linn) (OIR analysis not directed to "whether there was bias against Asians in college admissions at Harvard"); Ellsworth Ex. 116 at 193:24- 194:4 (Hansen Dep.) (former OIR employee answering "no" when asked whether "any of the work that [he] did while at OIR showed that Harvard College discriminates against Asian[] Americans"); *id.* at 137:20-138:21 (Hansen lacked "enough information" to assess whether there was evidence of discrimination).

**Response:** Disputed. One OIR report was expressly labeled as evaluating whether Harvard's admissions process was "bias[ed]" against Asian Americans, Ex. 134, HARV00031724, and another found that there is "a negative effect for Asian applicants," Ex. 156, HARV00069734. *See also* Ex. 10, Hansen 182:14-21. The declaration of Erin Driver-Linn is not credible evidence on this point because it lacks sufficient factual support for the Court to determine that its averments were based upon the personal knowledge of the declarant.

29.    OIR staff created four models that attempted to simulate how Harvard's admitted class might look under certain simplified admissions processes, such as an admissions process that considered only each applicant's Academic Index (an algebraic combination of the applicant's high-school GPA and standardized test scores) and the academic rating assigned by an admissions officer. *See* Connolly Ex. 145 at HARV00065750. The four models did not attempt to identify the particular effect of any one factor (including the effect of race) in Harvard's actual admissions process. They estimated the effects of simplified processes that differed from the process actually used. *See* Ellsworth Ex. 150 ¶ 12 (Driver-Linn Decl.); Ellsworth Ex. 115 at 134:19-138:17, 143:10-18, 156:12-24 (Bever Dep.).

**Response:** Disputed. SFFA disputes the characterization of OIR's report. The evidence cited does not support the proposition that OIR "attempted to simulate" how Harvard's admitted class "might" look under "simplified" admissions processes.  OIR concluded that "once we account for

ratings and demographic factors, we can closely predict what the admitted class will look like." Ex. 134, HARV00031722. The declaration of Erin Driver-Linn is not credible evidence on this point because it lacks sufficient factual support for the Court to determine that its averments were based upon the personal knowledge of the declarant. OIR's findings are consistent with Professor Arcidiacono's findings. Arcidiacono Rep. 9-10, 14.

30.     OIR also created models that attempted to estimate the effects of various factors in Harvard's admissions process. *See, e.g.*, Connolly Ex. 145 at HARV00065748.  Those models did not allow reliable estimates of the effects of certain factors on admissions outcomes because they were basic and preliminary and did not include many of the dozens of factors that the Admissions Office considers when reviewing applications. Ellsworth Ex. 150 ¶¶ 13-14 (Driver-Linn Decl.); Ellsworth Ex. 33 ¶ 139 (Card Rep.). For example, the models did not account for socioeconomic factors, factors concerning each applicant's high school, geographic factors, or a range of other information that could play a role in the admissions process.  *See, e.g.*, Connolly Ex. 145 at HARV00065757; Connolly Ex. 134 at HARV00031718, 31722; Ellsworth Ex. 150 ¶ 14 (Driver-Linn Decl.).

**Response:** Disputed. SFFA disputes the characterization of OIR's report. The evidence cited does not support the proposition that OIR "attempted to estimate" the effects of various factors in Harvard's admissions process, or that the models "did not allow reliable estimates of the effects of certain factors on admissions outcomes." The declaration of Erin Driver-Linn is not credible evidence on these points because it lacks sufficient factual support for the Court to determine that its averments were based upon the personal knowledge of the declarant. OIR's findings are consistent with Professor Arcidiacono's findings. Arcidiacono Rep. 9-10, 14. OIR's models did "account for socioeconomic factors." *See* Connolly Ex. 112 at HARV00023547-23555.

31.     OIR employees acknowledged that their analyses were based on incomplete information. *See, e.g.*, Connolly Ex. 145 at HARV00065757 ("Other factors not used in models:

Children faculty/staff[,] Search for socioeconomic diversity[,] High school quality/opportunities open to student[,] Dockets."); Connolly Ex. 134 at HARV00031722 ("There are a variety of factors that quantitative data is likely to miss or ratings do not capture. We'd like to better understand: Exceptional talent (music, art writing)[;] The role of context cases[;] The role of the personal statement/essay[;] Measures of socio-economic status (HFAI Flag, Low Income Flag)."); Connolly Ex. 112 at HARV00023549 (describing "several limitations" of OIR's analysis); *id.* ("[W]e picked a small set of variables that would factor in admissions decisions. The selection of a wider set of variables might result in a better fitting model, one that accounts for more of the variation in individual applicants and their potentially unique contributions to the entering class."); *see also* Ellsworth Ex. 115 at 143:10-18 (Bever Dep.) (admissions modeling analysis "seems to inaccurately reflect[] the [admissions] process"); *id.* 134:19-138:17 (admissions modeling "oversimplified the [admissions] process"); *id.* 156:12-24 (admission modeling "does not reflect the process by which we do admissions … [b]ecause we review many factors, some of which can be data and some of which are not"); *id.* 276:5-16 ("This does not represent the Harvard admission process…. This is a model … of an admissions outcome using a limited data set.").

**Response:** Disputed. The evidence cited does not support the proposition that OIR was using "incomplete information." OIR's findings are consistent with Professor Arcidiacono's findings. Arcidiacono Rep. 9-10, 14.

32.    Harvard's expert, Dr. David Card, built a statistical model of the Harvard College admissions process based on data for domestic applicants to the Classes of 2014 through 2019 (approximately 150,000 applicants). *See* Ellsworth Ex. 33 ¶¶ 7, 128 (Card Report). Dr. Card's model estimates the effects of several hundred applicant characteristics on the probability of an applicant's admission. *See* Ellsworth Ex. 33 ¶¶ 95-96 (Card Report).

**Response**: Disputed. The cited evidence does not support the statement that "Dr. Card's

model estimates the effects of several hundred applicant characteristics on the probability of an applicant's admission."

33.     Dr. Card found no statistically significant negative effect of Asian-American ethnicity on applicants' likelihood of admission. *See* Ellsworth Ex. 33 ¶ 92 (Card Report); *see also id.* ¶¶ 128, 134-135, 141 & Card Exs. 17-19; Ellsworth Ex. 37 ¶ 103 (Card Rebuttal).

**Response**: Disputed. SFFA does not dispute that Professor Card reached this conclusion. SFFA disputes that Professor Card used appropriate modelling to reach this conclusion; for example, he ignores racial interactions with disadvantaged status and incorrectly includes ALDC applicants ("Athlete, Lineage, Dean/director list, Children of faculty/staff"), the unreliable parental occupation variable, and the biased personal rating. SFFA SMF ¶¶ 750-790; Arcidiacono Rebuttal 39-44. There is a statistically significant negative effect of Asian-American ethnicity on applicants' likelihood of admissions. SMF ¶¶ 664-677. Professor Card did find evidence of discrimination when the personal rating was excluded. Ellsworth Ex. 33, Card Rep. 71-72, Ex. 21. Minor corrections to Professor Card's model reveals penalties against Asian-American applicants in all six years. Arcidiacono Rebuttal 43.

34.     Dr. Arcidiacono also built a statistical model of the Harvard College admissions process. Despite having access to the same dataset that Dr. Card used, Dr. Arcidiacono excluded from his preferred model of the admissions process several categories of applicants: recruited athletes, applicants with a parent who attended Harvard College or Radcliffe, applicants whose names appeared on a "Dean's interest" or "Director's interest" list, and children of Harvard faculty and staff. *See* Ellsworth Ex. 35 at 69 (Arcidiacono Rebuttal); Ellsworth Ex. 37 ¶¶ 85-86 (Card Rebuttal). Dr. Card and Dr. Arcidiacono have referred to these applicants as "ALDC" applicants (Athletes, Lineage, Dean/Director List, Children of faculty and staff). *See* Ellsworth Ex. 37 ¶ 85 (Card Rebuttal); Ellsworth Ex. 27 at 116:11-13 (Arcidiacono Dep.).

**Response**: SFFA admits that Professor Arcidiacono excluded ALDC applicants from his preferred model and that he did so for proper reasons. Arcidiacono Rebuttal 3, 5-6, 19, 28, App. A at 3-4 n.1, Tables B.7.1R & B.7.2R; Arcidiacono Rep. 21-22.

35.     Both Dr. Card and Dr. Arcidiacono found that Asian-American ethnicity was positively associated with the likelihood of admission for applicants with a parent who attended Harvard College or Radcliffe. Dr. Card found that the estimated effect of Asian-American ethnicity among such applicants was +3.12 percentage points. *See* Ellsworth Ex. 37 ¶ 98 ("This means that among lineage applicants, Asian-American applicants are admitted at a rate that is roughly three percentage points higher than the rate at which the model would expect White applicants with identical characteristics to be admitted."). Dr. Arcidiacono agreed that "the estimated effect for Asian-American legacies is positive." *See* Ellsworth Ex. 27 at 110:10-111:8 (Arcidiacono Dep.); Ellsworth Ex. 35 at Table B.7.R2 (Arcidiacono Rebuttal).

**Response**: Disputed. SFFA does not dispute that Professor Card made this finding. But this finding is erroneous and unreliable because Professor Card made several fundamental errors in the modeling that yielded it. For example, Professor Card's model failed to include interactions between race and disadvantaged status and incorrectly included ALDC applicants ("Athlete, Lineage, Dean/director list, Children of faculty/staff"), the unreliable parental occupation variable, and the biased personal rating. SFFA SMF ¶¶ 750-790; Arcidiacono Rebuttal 39-44. SFFA disputes that Professor Arcidiacono found any statistically significant association between Asian-American ethnicity and the likelihood of admission for legacy applicants. Arcidiacono Rebuttal at Table B.7.R2. In any event, the number of Asian-American legacy applicants is a tiny subset of Asian-American applicants overall (only about 1% of the approximately 40,000 Asian-American applicants have legacy status). Arcidiacono Rep., Table B.3.2.

36.     Both Dr. Card and Dr. Arcidiacono found that Asian-American ethnicity was

positively associated with the likelihood of admission for applicants on the Dean's or Director's list and applicants who are children of Harvard faculty and staff. *See* Ellsworth Ex. 37 ¶ 98 (Card Rebuttal); Ellsworth Ex. 35 at Table B.7.R2 (Arcidiacono Rebuttal); Ellsworth Ex. 27 at 112:8-113:9.

**Response:** Disputed. SFFA does not dispute that Professor Card made this finding. But this finding is erroneous and unreliable because Professor Card made several fundamental errors in the modeling that yielded it. For example, Professor Card's model failed to include interactions between race and disadvantaged status and incorrectly included ALDC applicants ("Athlete, Lineage, Dean/director list, Children of faculty/staff"), the unreliable parental occupation variable, and the biased personal rating. SFFA SMF ¶¶ 750-790; Arcidiacono Rebuttal 39-44. SFFA disputes that Professor Arcidiacono found any statistically significant association between Asian-American ethnicity and the likelihood of admission for applicants on the Dean's or Director's list and applicants who are children of Harvard faculty and staff. Arcidiacono Rebuttal, Table B.7.R2. In any event, the number of Asian-American applicants who were on the Dean's or Director's list or were children of Harvard faculty or staff is a tiny subset of Asian-American applicants overall (less than 1% of the approximately 40,000 Asian-American applicants have this status). Arcidiacono Rep., Table B.3.2.

37.     Dr. Card concluded that Dr. Arcidiacono's exclusion of ALDC applicants from his preferred model "appears to be a form of data mining, a process whereby the researcher selectively chooses a subsample of the data to obtain a desired result." Ellsworth Ex. 37 ¶ 95.

**Response**: Disputed. SFFA does not dispute that Professor Card reached this conclusion. SFFA disputes the correctness of the conclusion. Professor Arcidiacono excluded ALDC applicants from his preferred model for proper reasons. Arcidiacono Rebuttal 3, 5-6, 19, 28, App. A at 3-4 n.1, Tables B.7.1R & B.7.2R; Arcidiacono Rep. 21-22. By contrast, Professor Card's methodological decisions all decrease the estimated negative effect of Asian-American ethnicity on applicants' likelihood of admission and appear to be intentionally included for that reason. Arcidiacono Rebuttal

2.

38.     In 2017, Harvard established a Committee to Study Race Neutral Alternatives in Harvard College Admissions. *See* Ellsworth Ex. 47 at HARV00097310-97311 (Smith Committee Report). Michael Smith, the Edgerley Family Dean of the Faculty of Arts and Sciences, chaired the Committee. *Id.* at HARV00097312. The Committee's other members were William Fitzsimmons, the Dean of Admissions and Financial Aid; and Rakesh Khurana, the Dean of Harvard College, Marvin Bower Professor of Leadership at Harvard Business School, and Faculty Dean of Cabot House. *Id.* at HARV00097328.

**Response**: Undisputed.

39.     The Committee was charged with evaluating whether proposed race-neutral alternatives are available and workable for achieving the benefits that flow from student body diversity at Harvard College. *See* Ellsworth Ex. 46 at HARV00072381 (Race Neutral Alternatives Committee Charge).

**Response**: Disputed. SFFA does not dispute that this was the charge given to the Committee, but it disputes that the Committee ever intended to engage in a serious or good-faith consideration of workable race-neutral alternatives. SFFA SMF ¶¶ 828-830, 837-843, 849-850. The Committee instead engaged in conclusory analysis created for litigation purposes.

40.     To that end, the Committee considered social-science and other literature on race-neutral means of pursuing diversity and collected information from several offices of Harvard College including the Office of Admissions and Financial Aid. *See* Ellsworth Ex. 47 at HARV00097312 (Smith Committee Report). It also considered materials produced in this litigation, including the complaint and expert reports submitted by both parties, which analyze the effects that abandoning consideration of race and certain other practices in admissions would have on the academic, demographic, and other characteristics of the Harvard College student body. *See* Ellsworth

Ex. 47 at HARV00097312 (Smith Committee Report).

**Response**: Disputed. SFFA admits that the Committee's report claims to have considered this information, but the report is conclusory, created for litigation purposes, and a matter of opinion rather than fact.

41.     After meeting seven times over the course of nine months, considering voluminous materials, and deliberating extensively, the Committee memorialized its conclusions in a report in April 2018. *See* Ellsworth Ex. 47 at HARV00097310-97328 (Smith Committee Report).

**Response**: Disputed. The evidence cited does not support the proposition that the Smith Committee considered "voluminous materials and deliberat[ed] extensively." SFFA disputes the implication that the Smith Committee approached its review fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SFFA SMF ¶¶ 828-830, 837-843, 849-850.

42.     Dean Smith requested that a first draft of the report, based on the Committee's discussions, be prepared by counsel. *See* Ellsworth Ex. 123 at 65:21-67:10, 69:2-19 (Smith 2018 Dep.).

**Response:** Disputed. SFFA does not dispute that the first draft of the report was prepared by counsel. SFFA disputes that the report was "based on the Committee's discussions." The Smith Committee did not approach its review fairly, with an open mind, and without knowing the conclusions it would reach beforehand. SFFA SMF ¶¶ 828-830, 837-843, 849-850.

43.     The Committee received the first draft of the report in March 2018 and held meetings to discuss and revise the report, both with and without counsel present. *See* Ellsworth Ex. 123 at 38:9-15, 67:18-23, 72:4-73:8, 74:6-15, 82:23-84:11, 164:17-165:3; (Smith 2018 Dep.); Ellsworth Ex. 155 at HARV00097513 (Mar. 23, 2018 Agenda); Ellsworth Ex. 155 at HARV00097307 (Apr. 6, 2018 Agenda).

**Response:** Disputed. The evidence cited does not support the proposition that the Committee "received the first draft of the report in March 2018" and held "meetings" to discuss and

revise the report, both with and without counsel present.

44.     After the March 23, 2018 meeting, Dean Khurana revised the draft based on the Committee's discussion. *See* Ellsworth Ex. 123 at 85:19-86:2, 166:16-22 (Smith 2018 Dep.). After Dean Khurana edited the draft, he circulated it to Dean Smith and Dean Fitzsimmons who made further edits. *See id.* at 166:23-167:6.

**Response:** Disputed. SFFA does not dispute that Dean Khurana, Dean Smith, and Dean Fitzsimmons edited the draft. The bulk of the drafting, however, was done by Harvard counsel. Connolly Ex. 23, Smith2 68:16-70:22, 189:23-190:4.

45.     The Committee's drafting process was typical for a Harvard Faculty of Arts and Sciences Committee, with a first draft being prepared by individuals assisting the Committee, and subsequent drafts being both directly edited by Committee members and revised by individuals assisting the Committee based on the Committee's feedback. *See* Ellsworth Ex. 123 at 64:5-65:16, 190:5-191:6 (Smith 2018 Dep.). Each member of the Committee carefully reviewed several drafts of the report and fully endorsed the final draft. *Id.* at 75:19-77:16.

**Response:** Disputed. The evidence cited does not support the proposition that the Committee's drafting process was "typical for a Harvard Faculty of Arts and Sciences Committee." The Smith Committee differed sharply from other Harvard committees. SFFA SMF ¶¶ 849-850. The evidence cited does not support the proposition that "[e]ach member of the Committee carefully reviewed several drafts of the report."

Dated: August 30, 2018                             Respectfully submitted,

                                                   /s/ William S. Consovoy
Adam K. Mortara                                    William S. Consovoy
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP          Thomas R. McCarthy
54 West Hubbard Street, Suite 300                  J. Michael Connolly
Chicago, IL 60654                                  CONSOVOY MCCARTHY PARK PLLC
312.494.4400                                       3033 Wilson Boulevard, Suite 700
adam.mortara@bartlit-beck.com                      Arlington, Virginia 22201
                                                   703.243.9423
John M. Hughes                                     will@consovoymccarthy.com
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP          tom@consovoymccarthy.com
1801 Wewatta Street, Suite 1200                    mike@consovoymccarthy.com
Denver, CO 80202
303.592.3100                                       Patrick Strawbridge BBO #678274
john.hughes@bartlit-beck.com                       CONSOVOY MCCARTHY PARK PLLC
                                                   Ten Post Office Square
Paul M. Sanford BBO #566318                        8th Floor South PMB #706
BURNS & LEVINSON LLP                               Boston, MA 02109
One Citizens Plaza, Suite 1100                     617.227.0548
Providence, RI 02903                               patrick@consovoymccarthy.com
617.345.3000
psanford@burnslev.com                              Michael H. Park
                                                   CONSOVOY MCCARTHY PARK PLLC
                                                   745   Fifth   Avenue,   Suite   500
                                                   New York, NY 10151
                                                   212.247.8006
                                                   park@consovoymccarthy.com


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ William S. Consovoy
William S. Consovoy