# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS
# BOSTON DIVISION

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:14-cv-14176-ADB |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## BRIEF OF *AMICI CURIAE* SOUTHEASTERN LEGAL FOUNDATION, THE CENTER FOR EQUAL OPPORTUNITY, AND REASON FOUNDATION IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Peter Antonelli, Esq.
Douglass C. Lawrence, Esq.
Curran Antonelli LLP
22 Boston Wharf Rd., 7th Floor
Boston, MA 02210
pantonelli@curranantonelli.com
dlawrence@curranantonelli.com

John J. Park, Jr. Esq.
Strickland Brockington Lewis LLP
1170 Peachtree St., Ste. 2200
Atlanta, GA 30309
jjp@sbllaw.net
(*pro hac vice* admission pending)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………..…………………………….……ii

STATEMENT OF INTEREST …………….….…...…………………………1

SUMMARY OF THE ARGUMENT ……………………………………....…3

ARGUMENT …………………………………………………………………....4

I.      The Harvard admissions process discriminates against Asian-American applicants and extends preferential treatment to African-American and Hispanic applicants……………..…………………………………………..5

        A.      Harvard penalizes Asian-American applicants………………………6

        B.      Harvard employs significant preferences in favor of African American and Hispanic applicants………………..………………………12

        C.      For the post-2016 admission cycles, Harvard set a floor for African-American admissions……………………………………………..14

II.     Harvard's plea for deference and its invocation of diversity as an explanation should be rigorously examined……………..……......................................15

III.    Harvard's admissions program is not narrowly tailored because it unduly harms Asian-American applicants…………………………………….…19

CONCLUSION...………………………………………….……………………..20

CERTIFICATE OF SERVICE..................................................................................22

# TABLE OF AUTHORITIES

## CASES

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ....................................15

*Adarand Constructors, Inc. v. Slater*, 528 U.S. 216 (2000) ....................................1

*City of Richmond v. J. A. Croson Co.*, 488 U.S. 469 (1989) ..................... 1, 4, 5, 17

*Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016) .................... passim

*Fisher v. University of Texas at Austin*, 570 U.S. 297 (2013) ................... 1, 4, 5, 15

*Fullilove v. Klutznick*, 448 U.S. 448 (1980) ..............................................................5

*Grutter v. Bollinger*, 539 U.S. 306 (2003) .................................................. 5, 15, 19

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) ...........................1

*Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993) ...............................................................1

*Northwest Austin Municipal Utility District No. One v. Holder*, 557 U.S. 193 (2009) ..................................................................................................1

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978) .....................................4, 17

*Shelby County v. Holder*, 570 U.S. 529 (2013) ........................................................1

*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986) .............................................4

## OTHER AUTHORITIES

Althea Nagai, *Too Many Asians: Affirmative Discrimination in Elite College Admissions* 13 (Center for Equal Opportunity 2018) ..........................................12

*Harvard Investigates Harvard*: *"Does the Admissions Process Disadvantage Asians?"* (Center for Equal Opportunity, 2018)........................................... passim

Richard Sander & Stuart Taylor Jr., Mismatch: How Affirmative Action Hurts Students It's Intended to Help, and Why Universities Won't Admit It (Basic Books 2012) ....................................................................................................18

## STATEMENT OF INTEREST[1]

Southeastern Legal Foundation (SLF), founded in 1976, is a national nonprofit, public interest law firm and policy center that advocates for constitutional individual liberties, limited government, and free enterprise in the courts of law and public opinion. SLF drafts legislative models, educates the public on key policy issues, and litigates regularly before the Supreme Court and federal courts, including such cases as *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016); *Fisher v. University of Texas at Austin*, 570 U.S. 297 (2013); *Shelby County v. Holder*, 570 U.S. 529 (2013); *Northwest Austin Municipal Utility District No. One v. Holder*, 557 U.S. 193 (2009); *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003); *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216 (2000); *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993); and *City of Richmond v. J. A. Croson Co.*, 488 U.S. 469 (1989).

The Center for Equal Opportunity (CEO) is a research and educational organization formed pursuant to Section 501(c)(3) of the Internal Revenue Code and devoted to issues of race and ethnicity. Its fundamental vision is straightforward: America has always been a multiethnic and multiracial nation, and it is becoming even more so. This makes it imperative that our national

---

[1] All parties have consented to the filing of this brief.

1

policies do not divide our people according to skin color and national origin. Rather, these policies should emphasize and nurture the principles that unify us. *E pluribus unum* . . . out of many, one. CEO supports color-blind policies and seeks to block the expansion of racial preferences in all areas.

Reason Foundation (Reason) is a national, nonpartisan, and nonprofit public policy think tank, founded in 1978. Reason's mission is to advance a free society by applying and promoting libertarian principles and policies—including free markets, individual liberty, and the rule of law. Reason supports dynamic market- based public policies that allow and encourage individuals and voluntary institutions to flourish. Reason advances its mission by publishing *Reason* magazine, as well as commentary on its websites, and by issuing policy research reports. To further Reason's commitment to "Free Minds and Free Markets," Reason selectively participates as *amicus curiae* in cases raising significant constitutional issues.

*Amici* advocate for a color-blind interpretation of the Constitution and the preservation of the rights granted all citizens in the Equal Protection Clause. They also vigorously defend the right to educational opportunities regardless of race. This case is important because it threatens to erode the highest standards required to include race as a consideration in college admissions.

## SUMMARY OF THE ARGUMENT

There is overwhelming evidence that Harvard uses racial preferences against Asian-Americans as part of its admissions program. In addition to Dr. Arcidiacono's conclusions, a number of independently published studies show how Harvard penalizes Asian-Americans – this includes the findings of Dr. Althea Nagai, a research fellow at the Center for Equal Opportunity, whose published studies inform exactly how Harvard penalizes Asian-Americans. That evidence compels application of strict scrutiny to evaluate the constitutionality of Harvard's admissions program.

To satisfy strict scrutiny, Harvard must show that it is pursuing a constitutional goal in a narrowly tailored way. Consequently, an invocation of diversity must be justified in a particular way, not a general one. In particular, Harvard has to show that there are compelling educational benefits that follow from using racial preferences to limit the number of Asian-Americans admitted in the name of greater student body diversity. Further, these benefits must be capable of judicial evaluation and outweigh the obvious costs of discriminating against Asian-American applicants. Likewise, Harvard's claim of narrow tailoring, which is not entitled to judicial deference, cannot favor one minority over another. This Court should deny Harvard's motion because Harvard cannot

3

satisfy strict scrutiny since, among other factors, its admissions program favors African-American and Hispanic applicants while penalizing Asian-Americans.

## ARGUMENT

Before accepting Harvard's assertion that it uses race in a constitutionally acceptable way in its admissions process, this Court must look closely at how the Harvard program works in practice. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 313 (2013) (*Fisher I*). Harvard uses racial preferences against Asian-Americans, thereby requiring Harvard to identify a compelling interest that can justify treating Asian-Americans differently from other applicants and showing how its consideration of race is necessary to further that interest. *City of Richmond v. J. A. Croson Co*., 488 U.S. 469, 494 (1989) ("[T]he standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification."); *accord Wygant v. Jackson Bd. of Educ*., 476 U.S. 267, 273-74 (1986) (plurality op.).

Some 30 years ago, Justice Powell noted that Harvard's admissions program never used race as the decisive factor, but merely as one of the many "pertinent elements of diversity." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 316-17 (1978). Undoubtedly, he did not fathom that 30 years later the evidence would overwhelmingly show Harvard's penchant for stacking the decks against Asian-American applicants. Put simply, "[i]n every admission cycle, Asian-American

4

admit rates are below the average admit rate for the class and for all other racial groups." Decl. of Peter Arcidiacono, Expert Report 24, ECF No. 415-1; 25 Figure 1.1; *see also* Rebuttal Expert Report 15, ECF No. 415-2 ("The Asian-American admit rate was below the total admit rate *every year* from the Class of 2000 through the Class of 2019.")

**I. The Harvard admissions process discriminates against Asian-American applicants and extends preferential treatment to African-American and Hispanic applicants.**

Harvard's admissions program not only discriminates against Asian-Americans, it also gives preferences to African-American and Hispanic applicants. "Race may not be considered [by a university] unless the admissions process can withstand strict scrutiny." *Fisher v. Univ. of Tex. of Austin*, 136 S. Ct 2198, 2208 (2016) (*Fisher II*) (quoting *Fisher I*, 570 U.S. at 309). As a result, Harvard's racial classifications are constitutional "only if they are narrowly tailored to further compelling governmental interests." *Fisher I*, 570 U.S. at 309-10*; accord Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (Title VI). "[B]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate." *City of Richmond v. J. A.*

*Croson Co.*, 488 U.S. at 505 (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 533-35 (1980) (Stevens, J., dissenting)).

**A. Harvard penalizes Asian-American applicants.**

Harvard penalizes Asian-American applicants in two ways. First, there is a penalty for simply being Asian-American. Second, the personal ratings assigned to Asian-American applicants by Harvard's admissions office are inexplicably lower than those assigned to other races. Significantly, the magnitude of the penalty is understated.

In 2012 and 2013, Harvard's Office of Institutional Research (OIR) issued a report and a memorandum looking at the prospects of Asian-American applicants for admission. Harvard kept those materials confidential until the litigation began and now characterizes them as preliminary drafts that it never finalized. This is likely because, as Dr. Althea Nagai notes, the statistics in Harvard's OIR report and memo demonstrate that Harvard's process penalizes Asian applicants for simply being Asian. Althea Nagai, *Harvard Investigates Harvard*: *"Does the Admissions Process Disadvantage Asians?"* 16 (Center for Equal Opportunity, 2018) (*Harvard Investigates Harvard*).[2] More specifically, she explains "While it is true that OIR reached no final conclusions regarding bias against Asian applicants, the statistics themselves might be said to be the conclusion." *Id*. at 18.

---

[2] Available at www.ceousa.org.

For example, the OIR statistics show that when it used a logistic regression analysis to review admissions data for the classes of 2009 through 2016, it "found *only* one negative, statistically significant factor – being Asian." *Id*. at 14 and Table 1 (emphasis added). "All other things being equal, being white worked to an applicant's advantage (not to mention being African-American or Native American or, to a lesser extent, being Hispanic)." *Id*. at 16. That negative factor is independent of "other variables, including the personal ratings." *Id*. Thus, OIR's logistic regression analysis demonstrates the existence of a "clearly [] separate Asian effect – lower admissions rates for Asian applicants were not just because of lower personal ratings or less importance placed on high academic ratings." *Id*.

Consistent with Dr. Nagai's conclusions, Dr. Arcidiacono also highlights Harvard's penchant for penalizing Asian-American applicants. He observes that the academic performance and extracurricular activities of Asian-American applicants are significantly stronger than those presented by applicants of other racial groups. Rebuttal Expert Report 2, ECF No. 415-2, 41-42 and Table 5.1 (academic index); *id*. at 12-13. Indeed, if Harvard considered only academic credentials, Asian-Americans would make up 43% of the entering class. *Harvard Investigates Harvard* at 2, 6 and Figure 1; *see also* Expert Report 45-46, ECF No. 415-1.

The evidence only strengthens when one considers extracurricular activities and other, more subjective factors. This is because Asian-American applicants have higher extracurricular ratings and "are stronger than African-American and Hispanic applicants on all . . . dimensions except two: the athletic and personal ratings." Expert Report at 37;[3] *see also id*. at 47 and Table 5.4 (noting that applicants with higher academic indexes generally have higher extracurricular scores). Whereas, for school support measures like the ratings by the first and second teachers and counselors, the results for Asian-Americans lag behind those of comparable African-Americans and Hispanics. *Id*. at 48 and Table 5.5. As candidates become more competitive on other academic measures, "Asian-American applicants have similar probabilities of receiving a two to whites and Hispanics one decile below and to African-Americans two deciles below (across all three [school support] ratings)." *Id*.

In her article, Dr. Nagai demonstrates how OIR's statistics show the same thing. She notes, "Asians experienced the biggest impact when all nonacademic factors including race were added, resulting in an Asian admit percentage of 18%, down from the hypothetical 43%." *Harvard Investigates Harvard* at 11. More specifically, "[l]egacy plus athlete dropped them 12 percentage points;

---

[3] The athletic rating is "relatively unimportant." Expert Report 37, ECF No. 415-1; *see also id*. at 24 n.31.

extracurricular plus personal ratings 5 points. From there, Asians dropped a final 8 points and made up 18% of all admits." *Id*.

The differences reflecting the penalization of Asian-American applicants "stand out" most in the personal ratings that come from Harvard's admissions office and alumni. Expert Report 63, ECF No. 415-1. Even though Asian-American applicants have the highest academic indexes, they "have the lowest shares receiving a 2 or better on Harvard's personal rating of the four main racial groups." *Id*. at 49, 49 Table 5.6. For example, in the top decile, Asian-Americans get a 2 or better at half the rate that African-Americans in that decile get those scores; Asian-Americans also trail Hispanics by 12 percentage points, and whites by seven points. *Id*. at 49-50. That said, "the treatment of Asian Americans in the scoring of alumni personal rating is much different than Harvard's own scoring of Asian-American applicants on the personal rating." *Id*. at 50. Any racial disparity in the alumni personal rating for Asian-American applicants is "*less than half* of the disparity that exists in the Harvard personal rating." *Id*. (emphasis added). That "stark" difference "between the alumni personal ratings and the personal ratings assigned by Harvard's admissions office . . . is indicative of a penalty against Asian-American applicants in the scoring of the personal ratings." *Id*. Dr. Nagai concurs, pointing out that "the low personal ratings . . . best explain the drop in Asian admits." *Harvard Investigates Harvard*, at 9. Per

OIR's summary: "Personal rating is important in models of the admissions process and drive some of the demographic differences we see." *Id*.

The importance of personal ratings to the process can be seen in two ways. First, in OIR's logistic regression analysis of various factors pertinent to the admissions process, it found that a personal rating of a 1 or 2 was the second most important factors, behind an athletic rating of 1 and just ahead of legacy. *Id*. at 14 and Table 1. Second, as Dr. Arcidiacono finds, while 21.27% of white, 19.01% of African-American, and 18.68% of Hispanic applicants received a high personal rating of 1 or 2, only 17.64% of Asian applicants received the same. Rebuttal Expert Report 106, 106 Table 4.1R, ECF No. 415-2. Dr. Nagai explains, "These differences in percentages seem small, but for a study of 200,000 applicants a few percentage-point differences among applicants result in significant differences in the final racial composition of admits." *Harvard Investigates Harvard* at 9, n.14.

Taken as a whole, Harvard's process puts Asian-Americans at a statistically significant disadvantage vis-à-vis whites and, of course, also African-Americans and Hispanics. Dr. Arcidiacono explains that a male Asian-American applicant who is not disadvantaged with a 25% chance of admission would have a 36% chance of admission if he were white, a 77% chance if he were Hispanic and a 95% chance if he were African-American. Expert Report 3, 7, 65-66, 65 Table

7.1, ECF No. 415-1. Those changes in probability are both "large and statistically significant." *Id.* at 65. Even with the inclusion of the admissions criteria that penalize Asian-Americans – the personal and overall ratings – the substantial changes in probability persist; an Asian American male who is not disadvantaged with a 25% chance of admission would have a 32.5% chance admission if he were white, a 68.7% chance of admission if he were Hispanic, and a 90% chance of admission if he were African American. *Id.* at 66, 65 Table 7-1.

Dr. Arcidiacono further notes that "at least three reasons" explain why his estimates concerning the effect of the penalty on Asian-Americans and the preferences for African-Americans and Hispanics are underestimated. *Id.* at 77. First, Asian-Americans appear to be included in the percentage of applicants who do not report their race or ethnicity. "[S]tarting from the Class of 2010 admissions cycle, rises (falls) in the share missing are accompanied by falls (rises) in the share of both Asian-American and white applicants. A similar pattern is not seen for African-American or Hispanic applicants." *Id.* Second, given that Asian-Americans are "incredibly strong" on the observed factors, they are likely to be stronger on the unobserved elements as well. *Id.* Third, "the results also suggest bias in the other Harvard rankings measures that are more

11

subjective," including the way in which Asian-American application packages are held to a higher standard." *Id*. at 78 and Appendix C.

Finally, Harvard caps the number of Asians that it will admit. Dr. Nagai reviewed data for the period from 1983 to 2016 and found that Asian-American enrollment at Harvard was some 4% in 1980 and rose to 21% by 1993, after which time it dropped before leveling off. Althea Nagai, *Too Many Asians: Affirmative Discrimination in Elite College Admissions* 13 (Center for Equal Opportunity 2018), (*Too Many Asians*). [4]   She concludes, "At Harvard, Asian-Americans as a percentage of all undergraduates sharply increased to 21%, then significantly dropped and has stayed at roughly 17%." *Id*. at 1. The effect on Asian-Americans alone requires that Harvard's program be subjected to strict scrutiny review.

## B. Harvard employs significant preferences in favor of African-American and Hispanic applicants.

In contrast to the cap on Asian admissions noted above, African-American and Hispanic applicants benefit substantially from Harvard's consideration of race, and only from that consideration. As Dr. Nagai notes, OIR created models showing the effect of the various factors that Harvard employs in deciding

---

[4] available at
http://ceousa.org/attachments/article/1209/AN.Too%20ManyAsianAms.Final.pdf

whether to admit applicants. If only academics were considered, the entering class would be 38% white, 43% Asian-American, 1% African-American, and 3% Hispanic. *Harvard Investigates Harvard* at 6, Figure 1.[5] If legacy and athletic admissions are considered in addition to academics, Harvard's entering class would be 48% white, 31% Asian, 2% African-American, and 3% Hispanic. *Id*. at 7, Figure 2.

The effect of adding both extracurricular activities and personal scores to the analysis would produce an entering class that is 51% white, 26% Asian-American, 2% African-American, and 4% Hispanic. *Id*. at 8, Figure 3. Low personal ratings for Asian-Americans "best explain the drop in Asian admits" from 31% to 26% *Id*. at 9. Because Asian-Americans scored the highest on extracurricular activities, the addition of that factor "alone should have boosted the number of Asian admits, not lowered them," but that boost was not enough to offset the low personal ratings given to Asian-American applicants. *Id*.

When race was included as a factor, the percentage of African-Americans and Hispanics increased, and the percentage of whites and Asian-Americans went down. In fact, African-American and Hispanic admissions increased "only" when race was included. *Id*. at 11. More specifically, the resulting class would be

---

[5] Dr. Nagai notes that those results "look[] a lot like Caltech, which has race-blind admissions. In the fall of 2016, Asians made up roughly 43% of Caltech undergraduates." *Harvard Investigates Harvard* at 7 (footnote omitted).

44% white, 18% Asian-American, 11% African-American, and 19% Hispanic. *Id*. at 10, Figure 4. Dr. Nagai points out, "OIR's predicted percentages in Model 4 [i.e., with race included] were within 1 percentage point of the actual composition of each racial and ethnic group of admits." *Id*.

### C. For the post-2016 admission cycles, Harvard set a floor for African-American admissions.

Dr. Arcidiacono observes that the admission rate for African-American applicants "is virtually always above the total admit rate." Expert Report 27, ECF No. 415-1. In the admissions cycles for 2017 through 2019, Harvard's admissions rates for African-American applicants were "almost exactly the same as the admit rates for all other domestic applicants." *Id*. That phenomenon stemmed from a change in the methodology for coding applicants who selected more than one race or ethnicity such that a student who selected more than one would not be coded as either; "a student who reported his or her race as both African-American and white would no longer be coded as 'African-American' (as Harvard previously had done)." *Id*. at 28. The effect was that, where for the 19 previous admissions cycles classes the lowest admission rate for African-American applicants was above 8%, the rate for single-race African-Americans in 2017-2019 was below 7%. *Id*.

More significantly, the difference between the admission rates for African-American and non-African-American applicants in 2017 and 2019 was less than

three thousandths of a percentage point. *Id*. and 28 Table 1.1. For 2018, it was less than seven-hundredths of a percentage point. *Id*. at 28-29 and 28 Table 1.1. He observes that these differences are "incredibly small," and the probability that such a result could have resulted from "mere happenstance" was vanishingly small. He concludes, "I can say with 99.8% confidence that Harvard has manipulated its admissions process to ensure that the African-American admissions rate tracks the overall admissions rate—it operates as a floor for African-American admit rates over at least those three admissions cycles." *Id*. at 29-30.

Such a floor, a quota by another name, must be subjected to strict scrutiny review. As the Court noted in *Grutter*, for race to be constitutionally considered, it must be used "in a flexible, nonmechanical way." 539 U.S. at 334. The statistics reflect an unconstitutional "manipulat[ion]" of the admissions process to favor African-American applicants. Expert Report 29, ECF No. 415-1

## II. Harvard's plea for deference and its invocation of diversity as an explanation should be rigorously examined.

Under strict scrutiny, a university must show "with clarity that its 'purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary . . . to the accomplishment of its purpose.'" *Fisher II*, 136 S. Ct. at 2208  (quoting *Fisher I*, 570 U.S. at 309).

15

*Amici* recognize that, in *Grutter v. Bollinger*, the Supreme Court "endorse[d] Justice Powell's view that student body diversity is a compelling . . . interest that can justify the use of race in university admissions." 539 U.S. at 325. They further recognize that a university's judgment that "diversity is essential to its educational mission" is entitled to deference. *Id*. at 328.

That said, just as strict scrutiny is not "strict in theory, but fatal in fact," *id*. at 326 (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995), deference to a university cannot shield a flawed admissions process from scrutiny. Rather, a university like Harvard must do more than simply claim that "student body diversity—including racial diversity—is essential to our pedagogical objectives and institutional mission." Def.'s Memo. in Opp. to Pl.s' Mot. for Summ. J. 36, ECF No. 435 (Def.'s. Memo). "[A]sserting an interest in the educational benefits of diversity writ large is insufficient. A university's goals cannot be elusory or amorphous—they must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them." *Fisher II*, 136 S. Ct. at 2211.[6]

---

[6]  Harvard says that a university does not have to seek to gain the benefits of diversity by pursuing a critical mass of underrepresented students. Def.'s Mem. 35, ECF No. 435. That said, a claim of critical mass is capable of judicial scrutiny in a way that a more generalized claim is not. In any event, Harvard does not claim to be pursuing critical mass.

"The Supreme Court has never sought to define diversity with much precision." *The Harvard Plan That Failed Asian Americans*, 131 Harv. L. Rev. 604, 609 (2017). Neither have the universities, which have ringed it with a protective layer of buzzwords. But, important questions remain: "How much diversity is sufficient? How big a role can race play in admissions? Is racial diversity equally important in engineering versus the liberal arts? What does student body diversity actually look like?" *Id*. Harvard does not attempt to answer these questions.

Moreover, the benefits of diversity at Harvard will be different from those at a public university like the University of Texas or a law school like the University of Michigan. Harvard must particularize the benefits of its pursuit of diversity and, thereby, distinguish itself from, among others, the University of Texas and the University of Michigan Law School. *Cf. Croson*, 488 U.S. at 505 (rejecting dissent's suggestion that "findings of discrimination may be 'shared' from jurisdiction to jurisdiction" as "unprecedented.").

The pursuit of diversity should also account for its potential costs and outweigh them. As Justice Powell observed, "[T]here are serious problems of justice connected with the idea of preference itself." *Bakke*, 438 U.S. at 298 (Powell, J.). The obvious racial preferences that Harvard employs entail personal unfairness and the rejection of better qualified students on inexplicable and soft

17

grounds. To the extent that the academic ratings of African-Americans (9.19%) and Hispanics (16.74%) trail those of whites (45.29%) and Asian-Americans (60.21%) by substantial margins, Harvard is setting those less qualified admissions up for failure. *See* Rebuttal Expert Report, ECF No. 415-2, Table 4.1R. That mismatch can foster a victim mindset and create pressure on grading and graduations. *See*, *e.g.*, Richard Sander & Stuart Taylor Jr., Mismatch: How Affirmative Action Hurts Students It's Intended to Help, and Why Universities Won't Admit It (Basic Books 2012). These and other costs should be weighed against the claimed benefits of diversity.

Just as important questions about diversity are unanswered, it is unclear how much of a "plus" race or ethnicity can be in an applicant's file. Here, Dr. Nagai shows that, when OIR added race and ethnicity as an admissions factor, African-Americans went from 2% of admissions to 11% of admissions, and Hispanics went from 4% to 10%. *Harvard Investigates Harvard*, 8-10 and Figures 3 and 4. In fact, "Hispanic and African American admits *only* increased in number when race was added as a factor. The other added factors hardly moved the numbers." *Id*. at 11 (emphasis added). OIR's logistic regression analysis also shows how important it was to be an African-American applicant; being an African-American is the fourth most important factor, just behind legacy. *Id*. at 14 and

Table 1; *see also id*. at 15 ("[B]eing African-American was worth almost as much as having a high personal rating or being a legacy.").

This Court should require Harvard to explain why diversity justifies a penalty for being Asian, both generally and with respect to the Admissions Office's subjective personal ratings, and why Hispanic and African-American admissions increase *only* when race is considered. Absent an explanation for those alarming facts, Harvard's plea for judicial deference should be rejected.

**III. Harvard's admissions program is not narrowly tailored because it unduly harms Asian-American applicants.**

"*Fisher I* clarified that no deference is owed when determining whether the use of race is narrowly tailored to achieve the university's permissible goals." *Fisher II*, 136 S. Ct. at 2208. Because preferences pose serious concerns about justice, the burden rests on the university to show that its program is narrowly tailored to achieve the identifiable and reviewable goals of diversity. "Narrow tailoring, therefore, requires that a race-conscious admissions program not unduly harm members of any racial group." *Grutter*, 539 U.S. at 341.

Plainly, Harvard's admissions regime harms Asian-American applicants, who are just as much of a racial or ethnic group as Hispanics. But, Harvard's program rewards Hispanic applicants for being Hispanic and penalizes Asian-Americans for being Asian. *Harvard Investigates Harvard* at 14, Table 1. It likewise rewards African-Americans for being African-American. *Id*. Given the

way in which Harvard's program rewards favored races and ethnicities and penalizes disfavored ones, it cannot be characterized as "narrowly tailored."

## CONCLUSION

Fifteen years ago, the Supreme Court held that "race-conscious admissions policies must be limited in time." *Grutter*, 539 U.S. at 342. Harvard's discriminatory admissions program has now been in place for 40 years. Even to the extent that racial distinctions may have been necessary to promote diversity, the law demands that Harvard decrease the usage of racial factors because it cannot satisfy its burden of showing that the use of such factors is narrowly tailored to meet a compelling interest. It has now been at least 40 years for Harvard's admissions program; it is time for Harvard to think about unwinding it. If Harvard will not do so, this Court should give it a push.

Respectfully submitted,

SOUTHEASTERN LEGAL
FOUNDATION, THE CENTER FOR
EQUAL OPPORTUNITY, AND
REASON FOUNDATION,

By their attorneys,

/s/ Douglass C. Lawrence
Peter Antonelli, BBO# 661526
pantonelli@curranantonelli.com
Douglass C. Lawrence, BBO# 657362
dlawrence@curranantonelli.com
Curran Antonelli, LLP
22 Boston Wharf Road
7th Floor
Boston, MA 02210
Telephone: (617) 207-8670
Facsimile: (857) 263-5215

John J. Park, Jr.
Strickland Brockington Lewis LLP
1170 Peachtree St., Ste. 2200
Atlanta, GA 30309
jjp@sbllaw.net
(*pro hac vice* admission pending)

21

## <u>CERTIFICATE OF SERVICE</u>

I, Douglass C. Lawrence, hereby certify that on this 30th day of August, 2018, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Douglass C. Lawrence<br>
Douglass C. Lawrence

22