**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | Civil Action No. 1:14-cv-14176-ADB |
| v. | ) | |
| | ) | |
| PRESIDENT AND FELLOWS OF | ) | |
| HARVARD COLLEGE (HARVARD | ) | |
| CORPORATION), | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**POST-TRIAL AMICUS CURIAE BRIEF OF**
**THE ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND**
**AND OTHER ASIAN AMERICAN EDUCATION AND YOUTH-SERVING**
**ORGANIZATIONS AND HIGHER EDUCATION FACULTY IN SUPPORT OF**
**DEFENDANT**

**TABLE OF CONTENTS**

Page

INTERESTS OF AMICI CURIAE .......................................................................... 1

INTRODUCTION .................................................................................................. 2

ARGUMENT .......................................................................................................... 4

    A.    Asian Americans Benefit From Race-Conscious Admissions Programs. ............ 4

        1.   The Benefits of Diversity Accrue to All Students…………………………..5

        2.   There Is Substantial Diversity Within the Asian American Community…...6

        3.   Individualized Admissions Policies Prevent Asian Americans from Being Improperly Grouped Into A Single "Asian" Category……………………...8

    B.    SFFA's Arguments Do Not Advance the Goals of Asian Applicants. ............... 11

        1.   SFFA Conflates Negative Action and Race-Conscious Admissions Policies…………………………………………………………….12

        2.   SFFA's Arguments Treat Asian Americans as a Monolithic Group, Thereby Perpetuating the "Model Minority" Myth…………………………….13

        3.   SFFA's Requested Remedy—the Elimination of Race-Conscious Admissions—Will Mostly Benefit White Candidates, not Asian American Candidates……………………………………………………………15

    C.    SFFA and Its Amici Have Not Established Negative Action Against Asian Americans in Harvard's Admissions Process. .......................................... 17

        1.   SFFA's Theory of Implicit Bias Does Not Prove Intentional Discrimination…………………………………………………………...18

        2.   Standardized Test Score Data at Harvard Do Not Show Negative Action Against Asian Americans…………………………………………….21

        2.   SFFA's Assumed Bias in the Personal Score is Not Supported by the Data…………………………………………………………...24

CONCLUSION ....................................................................................................... 28

ADDENDUM ……………………………………………………………………... A1

i

# TABLE OF AUTHORITIES

Page

### Cases

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ................................................................. 18

*Fisher v. Univ. of Tex.*,
136 S. Ct. 2198 (2016) ............................................................ 2, 5

*Grutter v. Bollinger*,
539 U.S. 306 (2003) ............................................................ 2, 5, 17

*McGuire v. Reilly*,
386 F.3d 45 (1st Cir. 2004) ..................................................... 20

*Parents Involved in Community Schools v. Seattle School Dist.*,
No. 1, 551 U.S. 701 (2007) ....................................................... 5

*Regents of the University of California v. Bakke*,
438 U.S. 265 (1978) ................................................................. 2

*Smith v. University of Washington Law School*,
392 F.3d 367 (9th Cir. 2004) .................................................... 8

*Spath v. NCAA*,
728 F.2d 25, 28 (1st Cir. 1984) ................................................ 20

*Spencer v. Zant*,
715 F.2d 1562 (11th Cir. 1983) ................................................ 20

*Sylvia Dev. Corp. v. Calvert Cty.*,
48 F.3d 810, 819 (4th Cir. 1995) .............................................. 21

### Statutory Authorities

Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978 ..................................... 7

### Other Authorities

Sigal Alon & Marta Tienda, Diversity, *Opportunity, and the Shifting Meritocracy in Higher Education*, 72 Am. Soc. Rev. 487 (2007) ............................................................ 23

Ben Backes, *Do Affirmative Action Bans Lower Minority College Enrollment and Attainment? Evidence from Statewide Bans*, 47 J. Hum. Resources 435 (2012) ..................................... 16

Joan Biskupic, *Special Report: Behind U.S. Race Cases, a Little Known Recruiter*, REUTERS, Dec. 4, 2012, http://www. reuters.com/article/us-usa-court-casemaker-idUSBRE8B30V220121204 ................................................................................................. 4

William G. Bowen & Derek Bok, *The Shape of the River: Long-Term Consequences of Considering Race in College and University Admissions* 16 (2d ed. 2000) ........................ 22

Kat Chow, *'Model Minority' Myth Again Used As A Racial Wedge Between Asians And Blacks*, NPR, April 19, 2017, *available at* https://www.npr.org/sections/codeswitch/2017/04/19/524571669/model-minority-myth-again-used-as-a-racial-wedge-between-asians-and-blacks) ................................................................................................. 15

Department of Homeland Security, *Yearbook of Immigration Statistics: 2016* at 27-28, *available at* https://www.dhs.gov/sites/default/files/publications/2016%20Yearbook%20of%20Immigration%20Statistics.pdf ...................................................... 7

William T. Dickens & Thomas J. Kane, *Racial Test Score Differences as Evidence of Reverse Discrimination: Less Than Meets the Eye*, 38 Indus. Rel. 331 (1999).................... 22

Mark E. Engberg & Sylvia Hurtado, *Developing Pluralistic Skills and Dispositions in College: Examining Racial/Ethnic Group Differences*, 82 J. Higher Educ. 416 (2011) ........ 5

Thomas J. Espenshade, *Moving Beyond Affirmative Action, The New York Times* (Oct. 4, 2012), available at http://www.nytimes.com/2012/10/05/opinion/moving-beyond-affirmative-action.html ........................................................................................... 23

FairTest, National Center for Fair and Open testing, *"Optional List,"* (Current as of Summer 2018), *available at* http://www.fairtest.org/university/optional ........................................... 21

Claude S. Fischer et al., *Inequality by Design: Cracking the Bell Curve Myth* 46 (1996) ........ 22

Patricia Gurin et al., *Diversity and Higher Education: Theory and Impact on Educational Outcomes*, 72 Harv. Educ. Rev. 330 (2002)........................................................................... 5

Anemona Hartocollis, *He Took On the Voting Rights Act and Won. Now He's Taking On Harvard*, N. Y. Times, Nov. 19, 2017, available at https://www.nytimes.com/2017/11/19/us/affirmative-action-lawsuits.html ........................................................................................ 4

W.C. Hiss and V.W. Franks, *Defining Promise: Optional Standardized testing Policies in American College and University Admissions*, National Association for College Admissions Counseling (Feb. 5, 2014) ............................................................................... 22

iii

Scott Jaschik, *The Power of Race, Inside Higher Ed* (Nov. 3, 2009), available at
   https://www.insidehighered.com/news/2009/11/03/elite ...................................................... 23

Jerry Kang, *Negative Action Against Asian Americans: The Internal Instability of Dworkin's
   Defense of Affirmative Action*, 31 Harv. C.R.-C.L. L. Rev. 1 (1996) ................................... 12

William C. Kidder, *Misshaping the River: Proposition 209 and Lessons for the Fisher Case*,
   39 J.C. & U.L. 53 (2013)........................................................................................................ 22

William C. Kidder, *Negative Action Versus Affirmative Action: Asian Pacific Americans Are
   Still Caught in the Crossfire*, 11 Mich. J. Race & L. 605, at 605 n.2 (2006)........................ 12

William C. Kidder, *Situating Asian Pacific Americans in the Law School Affirmative Action
   Debate: Empirical Facts about Thernstrom's Rhetorical Acts,
   7 Asian Am. L.J. 29 (2000)*........................................................................................ 12, 13, 16

Iosk Kim and Wooksoo Kim, *Post-resettlement Challenges and Mental Health of Southeast
   Asian Refugees in the United States*, 10 Best Practices in Mental Health 63 (2014).............. 7

Jennifer L. Kobrin et al., *Historical View of Subgroup Performance Differences on the SAT
   Reasoning Test*, 19 (The College Board 2007), *available at* http://research.collegeboard.
   org/sites/default/files/ publications/2012/7/researchreport-2006-5-historical-view-
   subgroup-performance-sat.pdf .............................................................................................. 22

Rakesh Kochhar and Anthony Cilluffo, *Income Inequality in the U.S. Is Rising Most Rapidly
   Among Asians*, Pew Research Center: Social & Demographic Trends, *available at*
   http://www.pewsocialtrends.org/2018/07/12/income-inequality-in-the-u-s-is-rising-most-
   rapidly-among-asians/ ............................................................................................................. 9

Stacey Lee and Kevin Kumashiro, *A Report on the Status of Asian Americans and Pacific
   Islander in Education: Beyond the "Model Minority" Stereotype*, National Education
   Association, at xi (2005) ..................................................................................... 6, 7, 13, 14

Goodwin Liu, *The Causation Fallacy: Bakke and the Basic Arithmetic of Selective
   Admissions*, 100 Mich. L. Rev. 1045 (2002)........................................................................ 22

Stephanie Mencimer, *Meet the Brains Behind the Effort to Get the Supreme Court to Rethink
   Civil Rights*, Mother Jones, March/April 2016,
   https://www.motherjones.com/politics/2016/04/edward-blum-supreme-court-affirmative-
   action-civil-rights/ .................................................................................................................. 4

Samuel Museus and Peter Kiang, *Deconstructing the Model Minority Myth and How It
   Contributes to the Invisible Minority Reality in Higher Education Research*, 142 New
   Directions for Inst. Res. 5 (2009) .......................................................................................... 14

NYU CARE, *Asian Americans and the Benefits of Campus Diversity: What the Research Says* 1 (2012), *available at* http://care.gseis.ucla.edu/wp-content/uploads/2015/08/CARE-asian_am_ diversity_D4.pdf.................................................................................... 5

J. Owens and D.S. Massey, *Stereotype Threat and College Academic Performance: A Latent Variables Approach*, 40 Soc. Sci. Res. 150 (2011) ............................................................. 24

OiYan Poon et al., *A Critical Review of the Model Minority Myth in Selected Literature on Asian Americans and Pacific Islanders in Higher Education*, 86 Rev. of Educational Research 469 (2016).......................................................................................................... 6, 11

V. Purdie-Vaughns, *Social Identity Contingencies: How Diversity Cues Signal Threat or Safety for African Americans in Mainstream Institutions*, 94 J. Pers. Soc. Psychol. 615 (2008) ................................................................................................................................... 24

Jay Rosner, *Disparate Outcomes by Design: University Admissions Test*, 12 Berkeley La Raza L.J. 377 (2001) ....................................................................................................................... 23

Maria Veronica Santelices & Mark Wilson, *Unfair Treatment?: The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning*, 80 Harv. Educ. Rev. 106 (2010) ............................................................................................. 22

T. Schmader et al., *An Integrated Process Model of Stereotype Threat Effects on Performance*, 115 Psychol. Rev. 336 (2008) ............................................................................................... 24

Robert T. Teranishi et al *Heterogeneity among Asian Americans: Implications for Using Standardized Test Scores to Estimate Discriminatory College Admissions Practices*, CARE (Nov. 2015)................................................................................................................. 23

Robert T. Teranishi, *Asians in the Ivory Tower: Dilemmas of Racial Inequality in American Higher Education* 26 (2010) ........................................................................................... 6, 7

U.S. Census Bureau, *2016 American Community Survey 1-Year Estimates*, available at http://factfinder. census.gov/ ..................................................................................... 8

KaYing Yang, *Southeast Asian American Children: Not the "Model Minority*," 14 The Future of Children 127, 127 (2004) ................................................................... 8

## INTERESTS OF AMICI CURIAE

The Asian American Legal Defense and Education Fund ("AALDEF"), headquartered in New York City and founded in 1974, is a national organization that promotes the civil rights of Asian Americans. Through litigation, advocacy, education, and organizing, AALDEF protects the rights of Asian Americans and supports educational equity in higher education. AALDEF has an interest in this litigation because its work with community-based youth advocates across the country demonstrates that Asian American students benefit from individualized race-conscious admissions policies as well as from diverse educational settings. AALDEF opposes any cap, quota, or negative action against Asian Americans.

AALDEF is joined in this amicus brief by the following organizational entities and higher education faculty members, who are described in more detail in the Addendum: 18MillionRising.org (18MR.org), the Asian American Federation (AAF), the Asian American Psychological Association, Asian Americans United, the Asian Law Alliance, the Asian Pacific American Labor Alliance (APALA), AFL-CIO, the Asian Pacific American Network (APAN), the Asian Pacific American Women Lawyers Alliance (APAWLA), Asian Pacific Islander Americans for Civic Empowerment, Chinese for Affirmative Action, the Chinese Progressive Association, Coalition for Asian American Children & Families, GAPIMNY, the Japanese American Citizens League, LEAP (Leadership Education for Asian Pacifics), the National Coalition for Asian Pacific American Community Development (National CAPACD), the National Korean American Service & Education Consortium, the National Queer Asian Pacific Islander Alliance (NQAPIA), OCA - Asian Pacific American Advocates, Southeast Asia Resource Action Center (SEARAC), Vichet Chhuon, Ph.D., Gabriel J. Chin, J.D., LLM, Tarry Hum, MCP, Ph.D., Anil Kalhan, J.D., MPPM, Shirley Lung, J.D, Mari J. Matsuda, J.D.,

LLM, Kevin Nadal, Ph.D., Philip Tajitsu Nash, J.D., Cathy J. Schlund-Vials, Ph.D., John Kuo Wei Tchen, Ph.D., Margaret Y.K. Woo, J.D., LLM, and K. Wayne Yang, Ph.D.

## INTRODUCTION

AALDEF and its co-amici are committed to advancing the rights of Asian Americans across the country.  They therefore strongly support admissions policies like Harvard's, which benefit Asian American applicants and other applicants of color alike.  The Supreme Court has long held such policies to be constitutional.  *See, e.g.*, *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), *Grutter v Bollinger*, 539 U.S. 306 (2003) *Fisher v. Univ. of Tex.*, 136 S. Ct. 2198, 2207 (2016) ("Fisher II") ("the consideration of race, within the full context of the entire application, may be beneficial to any UT Austin applicant—including whites and Asian-Americans") (citing Brief for Asian American Legal Defense and Education Fund et al. as *Amici Curiae* at 12).  Moreover, individualized admissions policies that consider race as one factor among many are uniquely equipped to take into account the vast diversity within the Asian community, specifically the sharp differences in socioeconomic and education attainment among different ethnic subgroups.  Individualized consideration also prevents the perpetuation of the harmful "model minority" myth.

While SFFA professes to be bringing this lawsuit on behalf of Asian applicants, its trial evidence demonstrates otherwise.  SFFA presents Asian Americans as monolithic, ignoring the great diversity among Asian Americans and how individualized admissions review benefits Asian subgroups.  Further, SFFA relies on a narrow view of merit, which reinforces racial stereotypes.  Perhaps most revealing, SFFA failed to offer the testimony or application of a single Asian American applicant whom it claimed had been the victim of illegal discrimination.

2

Indeed, very little of SFFA's evidence at trial dealt with Harvard's treatment of Asian Americans, instead focusing on the so-called "tip" given to Black and Latino students. SFFA's attempt to equate benefits for Black and Latino students with discrimination against Asian Americans is wrong as a matter of law and reveals SFFA's true objective: not to vindicate Asian American rights, but to dismantle race-conscious admissions, regardless of the impact on Asian Americans or other communities of color.

AALDEF has not identified any direct or circumstantial evidence sufficient to prove that Harvard intentionally discriminates against Asian Americans, either in the summary judgment record or at trial. In fact, SFFA based its claim at trial on an entirely new theory, specifically that implicit bias infects Harvard's admission decisions. Yet even this late change in strategy fails to cure the deficiencies in SFFA's proof. Harvard's admissions policy is not legally infirm.

AALDEF believes that SFFA's broad-based attack will harm all minorities, including Asian Americans and especially those from ethnic subgroups struggling with low educational attainment and low socioeconomic status. AALDEF urges this Court to find in favor of Harvard on all counts.

## ARGUMENT

### A.    Asian Americans Benefit From Race-Conscious Admissions Programs.

Despite SFFA's claims to the contrary,[1] this case squarely implicates the future of admissions policies that take race into account. The avowed goal of SFFA's founder, Edward Blum, is to erase racial preferences from public life.[2] Mr. Blum pursued this goal in *Fisher* and *Fisher II* on behalf of white students and lost. Now, he and SFFA purport to advance the rights of Asian American students instead.[3] But SFFA's evidence at trial suggests Mr. Blum's agenda remains the same. Instead of focusing on Harvard's treatment of Asian applicants, SFFA repeatedly focuses on the "tips" received by Black and Latino students. *See*, *e.g.*, Tr. Day 9, at 77:07-14; 93:15-19; 113:13-17. Furthermore, SFFA continues to seek the abolition of race-conscious admissions,[4] despite the fact that this remedy provides the biggest boost to the admission rate of white students, not Asian Americans. *See* Tr. Day 1, 108:15-21.

SFFA's arguments incorrectly presume that race-conscious admissions programs like Harvard's only benefit Black and Latino applicants. To the contrary, students of all races including Asian Americans benefit from a diverse student body, which provides a range of cognitive and social benefits. Moreover, individualized admissions policies like Harvard's directly benefit Asian American applicants by taking into account the vast diversity within the

---

[1] *See* Transcript of Bench Trial ("Tr.") Day 1, at 11:11-13 (SFFA Opening by A. Mortara) ("[T]he future of affirmative action in college admissions is not on trial here this next couple of weeks.").

[2] *See* Joan Biskupic, *Special Report: Behind U.S. Race Cases, a Little Known Recruiter*, REUTERS, Dec. 4, 2012, http://www. reuters.com/article/us-usa-court-casemaker-idUSBRE8B30V220121204; Stephanie Mencimer, *Meet the Brains Behind the Effort to Get the Supreme Court§ to Rethink Civil Rights*, Mother Jones, March/April 2016, https://www.motherjones.com/politics/2016/04/edward-blum-supreme-court-affirmative-action-civil-rights/.

[3] *See* Anemona Hartocollis, *He Took On the Voting Rights Act and Won. Now He's Taking On Harvard*, N. Y. Times, Nov. 19, 2017, *available at* https://www.nytimes.com/2017/11/19/us/affirmative-action-lawsuits.html.

[4] SFFA's requested relief not only includes a permanent injunction against Harvard individually, but a broader declaratory judgment that any use of race in an educational setting is unconstitutional. *See* Compl. at 119.

Asian community.   Asian American subgroups differ significantly by ethnicity, language, socioeconomic status, immigrant status, and religion. Lumping all subgroups together as a single "Asian" monolith fails to capture the complex reality of their experiences.   Harvard's admissions process specifically recognizes these differences, treating Asian applicants as individuals.

### 1.      The Benefits of Diversity Accrue to All Students.

The benefits of student body diversity accrue to all students, including Asian Americans.   Studies have demonstrated that interactions with a diverse student body lead to higher levels of intellectual and civic engagement among Asian American college students.[5] These benefits continue as students graduate and enter an "increasingly diverse workforce." *See Grutter*, 539 U.S. at 330 (citation omitted).   Student diversity also has positive social effects on the campus as a whole.   *See Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 797-98 (2007) (Kennedy, J., concurring); *Grutter*, 539 U.S. at 328-29; *Bakke*, 438 U.S. at 312-13.   A diverse student body "promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races." *Fisher II*, 136 S. Ct. at 2210 (2016) (internal quotations omitted).   Asian Americans and other groups come to see each other more favorably, which leads to improved intergroup relations and reduced racial stereotyping.   *See Grutter*, 539 U.S. at 328-29.

---

[5] *See* NYU CARE, *Asian Americans and the Benefits of Campus Diversity: What the Research Says* 1 (2012), *available at* http://care.gseis.ucla.edu/wp-content/uploads/2015/08/CARE-asian_am_ diversity_D4.pdf; Patricia Gurin et al., *Diversity and Higher Education: Theory and Impact on Educational Outcomes*, 72 Harv. Educ. Rev. 330, 351-353, 354 tbl.3 (2002); Mark E. Engberg & Sylvia Hurtado, *Developing Pluralistic Skills and Dispositions in College: Examining Racial/Ethnic Group Differences*, 82 J. Higher Educ. 416, 434 (2011) (observing that while "the effects of intergroup learning on the pluralistic measure were significant for all other groups," Asian American students "seem to demonstrate the strongest benefit").

At trial, multiple students of color, including Asian Americans, testified that their interactions with Harvard classmates from different racial backgrounds were beneficial.[6] Students mentioned such positives as gaining new perspectives; learning critical and independent thinking; building a better understanding of intersectional issues like classism, sexism, and colorism; and creating cross-racial coalitions to fight for common causes. *See* Transcript of Bench Trial ("Tr.") Day 11, at 17:03-20; 153:06-25; 154:24-155:03.   Without Harvard's race-conscious admissions program, the number of students of color would drop, and these benefits of diversity would diminish.

### 2.      There Is Substantial Diversity Within the Asian American Community.

The term "Asian American" refers to a diverse population with over 50 ethnic subgroups, 100 languages, and a broad range of socio-historical, cultural, religious, and political experiences.[7]   Some Asian Americans are multi-generation Americans, some are from immigrant families, some are refugees, and some are the adopted children of non-Asian parents.   Students from these different subgroups face vastly differing socioeconomic and educational realities; while some achieve great academic and professional success, others struggle to obtain high school diplomas.[8]   It is impossible to generalize a single "typical" Asian experience.[9]

---

[6] Their vibrant testimony stands in stark contrast to SFFA's silence. SFFA failed to offer the testimony of any of its members or even of any student purportedly denied admission due to impermissible discrimination.  Moreover, SFFA failed to identify and offer any application files to buttress its claim.

[7] Stacey Lee and Kevin Kumashiro, *A Report on the Status of Asian Americans and Pacific Islander in Education: Beyond the "Model Minority" Stereotype*, National Education Association, at xi (2005).

[8] OiYan Poon et al., *A Critical Review of the Model Minority Myth in Selected Literature on Asian Americans and Pacific Islanders in Higher Education*, 86 Rev. of Educational Research 469, 472 (2016).

[9] Robert T. Teranishi, *Asians in the Ivory Tower: Dilemmas of Racial Inequality in American Higher Education* 26 (2010).

In particular, the different immigration histories of Asian American subgroups have shaped their socioeconomic experiences in the United States.  For example, many East Asian and South Asian immigrants from countries like India, Korea, China, and Taiwan traveled voluntarily to the United States as highly-educated professionals.[10]  Many spoke fluent English prior to their arrival, and were admitted under immigration policies giving employment preference to professionals who "hold[] advanced degrees" or have "exceptional ability."  *See, e.g.*, Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978.  These immigrants arrived with substantial social capital that "often correlated with educational and social mobility."[11]

By contrast, many Southeast Asian Americans arrived as refugees from Cambodia, Laos, Vietnam, and Myanmar.[12]  Most started their new lives in America with few material goods or local connections, and many were traumatized by war, their escape, or years in refugee camps.  Once here, they were forced to navigate unfamiliar social and education systems with limited English language skills.  Today, nearly three decades after Southeast Asian refugees began arriving in America, many continue to struggle with long-term poverty, literacy issues, and post-traumatic stress disorder.  For example, in 2016, 21.7 percent of

---

[10] Lee and Kumashiro, *Report, supra,* at 2.

[11] Teranishi, *Asians in the Ivory Tower*, *supra*, at 31. In 2016, the United States admitted 81,288 immigrants from Asia under the employment-based preference.  *See* Department of Homeland Security, *Yearbook of Immigration Statistics: 2016* at 27-28, *available at* https://www.dhs.gov/sites/default/files/publications/2016 %20Yearbook%20of%20Immigration%20Statistics.pdf.  Twenty five per-cent of the admittees were from India, 25% were from China, and 17% were from South Korea.  In contrast, only 1,261 individuals (1.55%) were admitted under the employment-based preference from Vietnam.

[12] Isok Kim and Wooksoo Kim, *Post-resettlement Challenges and Mental Health of Southeast Asian Refugees in the United States*, 10 Best Practices in Mental Health 63, 64 (2014).

Hmong, 16.1 percent of Cambodians, and 25.2 percent of refugees from Myanmar lived below the poverty line, as compared to 14.0 percent of all Americans.[13]

Southeast Asians also lag behind other Asian American subgroups in educational attainment.  In 2010, more than 30 percent of Hmong, Cambodian, Vietnamese, and Laotian individuals over the age of 25 did not have a high school diploma, as compared to 15 percent of all Asian Americans.[14]  These discrepancies are due to a variety of barriers facing Southeast Asian children, including poverty, limited English, feelings of alienation in the classroom, and persistent miscommunication between students, teachers, and parents.[15]  Even American-born Southeast Asian children can have limited English language skills when they first begin school, because English is not spoken at home.[16]  This can lead to later difficulties, especially on high-stakes testing like the SATs, which require a high level of English proficiency.[17]

### 3.   Individualized Admissions Policies Prevent Asian Americans from Being Improperly Grouped Into A Single "Asian" Category.

Narrowly-tailored, individualized admissions programs like Harvard's are uniquely equipped to take into account the vast diversity of the Asian American community.  *See, e.g., Smith v. University of Washington Law School*, 392 F.3d 367, 378 (9th Cir. 2004) (upholding admissions program that recognized "different cultures, back-grounds, and languages" of "applicants whose families or who themselves originated from the Philippines, Viet Nam,

---

[13] U.S. Census Bureau, *2016 American Community Survey 1-Year Estimates*, *available at* http://factfinder. census.gov/.

[14] ACS 1-Year Estimates, *supra*.

[15] KaYing Yang, *Southeast Asian American Children: Not the "Model Minority*,*"* 14 The Future of Children 127, 127 (2004)

[16] *Id.*

[17] *Id.*

8

Cambodia, Taiwan and the People's Republic of China").  Harvard's admissions process considers each applicant as a whole person, comparing their qualifications with those of all other applicants, and assessing them in the context of the opportunities and challenges they have faced.  *See* Tr. Day 3, at 150:09-12..  Race is one consideration among multiple variables, including standardized test scores, an alumni interviewer evaluation, letters of recommendation, applicant essays, intended concentration, the academic strength of applicants' high schools, the economic and demographic profile of applicants' communities, parents' level of education, extracurricular activities, and optional submissions of scholarly work, artwork, or recordings of music or dance performances. *See* Tr. Day 1, at 61:20-69:08; Tr. Day 2, at 22:09-23:10.

Individualized admissions programs like Harvard's prevent Asian Americans from being grouped into one monolithic "Asian" category, blurring the different socioeconomic realities that different ethnic subgroups face.  In fact, Harvard specifically considers these differences when examining Asian American applicants.  As Dean Fitzsimmons testified, low-income Asian applicants receive an admissions 'tip' designed to take into account the structural inequality they face.  *See* Tr. Day 3, at 185:19-25.  While all low-income applicants receive similar tips, the tip given to low-income Asian applicants is larger than almost any other ethnicity—10 percent of low-income Asian applicants are admitted, as opposed to 7 percent of non-low-income Asian applicants.  *Id.*  These numbers reflect the fact that income inequality among Asian Americans is greater than in any other racial group.[18]

---

[18] Rakesh Kochhar and Anthony Cilluffo, *Income Inequality in the U.S. Is Rising Most Rapidly Among Asians*, Pew Research Center: Social & Demographic Trends, *available at* http://www.pewsocialtrends.org/2018/07/12/income-inequality-in-the-u-s-is-rising-most-rapidly-among-asians/.

Other Amici, Students in Support of Harvard, provided testimony that illustrates just how Harvard's individualized admissions process takes into account the vast diversity within Asian community.  For example, Thang Diep, a Harvard senior who moved to America at age eight, explained that he structured his Harvard admissions essay around his Vietnamese identity, his struggles with English, and the racial slurs he endured growing up because of his accent.  *See* Tr. Day 11, at 140:19-141:18.  According to Mr. Diep, he chose to write about these experiences because his other personal achievements—like his high GPA and commitment to public service—could not be properly understood without reference to his ethnoracial identity.  *Id.* at 147:09-18.  Mr. Diep's admissions reviewers evidently agreed; his applicant file contained comments indicating that his Vietnamese identity and strong sense of self were seen as positives.  *Id.* at 147:19-148:03.

Sally Chen, a Harvard senior, also testified about how her Asian identity shaped her admissions package.  Like Mr. Diep, she chose to write her admissions essay about her identity, in particular her experience being a translator and advocate for her parents, who are both working class Chinese immigrants.  *Id.* at 200:01-14.  Although Ms. Chen had received advice from a high school guidance counsellor that Asian immigrant stories were "overdone," she chose to write about being the daughter of Chinese immigrants because "it was fundamental to explaining who I am."  *Id.* at 200:01-23; 201:03-10.  She too received comments in her application file which indicated that her ethnicity and experiences were seen as positives by her reviewers.  *Id.* at 202:05-203:01.

In addition to Mr. Diep and Ms. Chen, six other students and alumni of color testified about identity, race, ethnicity, and their admission to Harvard.  *Id.* at 08:01-194:25.  All six witnesses stated that they could not accurately describe their life story without reference to

10

race.  If Harvard adopts a race-blind admissions program, a fundamental part of the identity of applicants of color would be rendered superfluous.  As Sarah Cole explained, "[T]here is no part of my experience, no part of my journey, no part of my life that has been untouched by my race … To try not to see my race is to try not to see me." *Id.* at 83:23-84:05.

### B.    SFFA's Arguments Do Not Advance the Goals of Asian Applicants.

SFFA's arguments, and the evidence it chose to emphasize, suggest that its ultimate goal is not the protection of Asian American applicants, but the dismantling of race-conscious admissions.   First, SFFA conflates the question of whether Harvard's race-conscious admissions policy is permissible with the question of whether Asian American applicants face bias during the admissions process.   These two concepts—race-conscious policies versus negative action—are substantively distinct.   But rather than examine Harvard's treatment of Asian Americans for evidence of negative action, SFFA's arguments focus on the so-called "tip" given to Black and Latino students, conflating two very different issues.  Second, SFFA treats Asian Americans as a monolithic group, focusing on their perceived academic prowess and thereby buying into the harmful "model minority" stereotype that lumps Asian applicants into one stereotypical group.   The model minority stereotype not only erases significant differences between Asian American subgroups, but has long been used as a tool of racial wedge politics to punish other marginalized groups of color and undermine legitimate race-conscious admissions policies.[19]   Finally, SFFA's proposed remedy—the elimination of Harvard's race-conscious admissions process—would mostly benefit *white* students, not Asian American students. *See infra* at B.3.

---

[19] OiYan Poon et al., *A Critical Review of the Model Minority Myth*, *supra*, at 19.

### 1. SFFA Conflates Negative Action and Race-Conscious Admissions Policies.

Negative action and race-conscious admissions are two distinct concepts.[20] Discrimination against a particular group (negative action) is fundamentally different from a race-conscious admissions policy that recognizes the importance of diversity. Negative action occurs when a "minus factor" is applied to a candidate due to their race, a practice that is separate and apart for any "plus factor" given to candidates of color in a race-conscious admissions process.[21] Here, by focusing on the "tip" Harvard gives to some Black and Latino applicants, not Harvard's treatment of Asian Americans, SFFA conflates the question of whether Asian American applicants face negative action with the question of whether Harvard's race-conscious admissions policy as a whole is permissible. *See* Tr. Day 9, at 77:07-14; 93:15-19; 113:13-17. The two concepts are distinct. A tip to Black or Latino applicants is not a "minus factor" against Asian applicants. SFFA's conflation is particularly problematic because it uses the alleged discrimination against Asian American applicants as a tool to attack a policy that *benefits* both Asian Americans and other minorities.

SFFA's analytical error disregards leading scholarship by Asian American researchers, which emphasizes the importance of distinguishing between race-conscious admissions and negative action.[22] These publications in law, ethnic studies and sociology point out that there are two major problems with failing to distinguish race-conscious policies and negative action.

---

[20] *See* William C. Kidder, *Situating Asian Pacific Americans in the Law School Affirmative Action Debate: Empirical Facts about Thernstrom's Rhetorical Acts*, 7 Asian Am. L.J. 29, 33, 60 (2000); Jerry Kang, *Negative Action Against Asian Americans: The Internal Instability of Dworkin's Defense of Affirmative Action*, 31 Harv. C.R.-C.L. L. Rev. 1, 3-4 (1996).

[21] William C. Kidder, *Negative Action Versus Affirmative Action: Asian Pacific Americans Are Still Caught in the Crossfire*, 11 Mich. J. Race & L. 605, at 605 n.2 (2006).

[22] Kidder, *Situating Asian Pacific Americans*, *supra*, at 608.

First, the conflation creates the false impression that Asian Americans would be the beneficiaries of dismantling race-conscious admissions.  Second, it fails to confront the more logical focus of activism: ending negative action.[23]  As Asian American scholars point out, ending negative action itself would "yield a much higher payoff in terms of increasing educational opportunities" than focusing criticism on race-conscious policies.[24]  Here, SFFA attempts to distract the Court in the same manner by suggesting that ending race-conscious admissions at Harvard would end the alleged discrimination against Asian applicants.

### 2.  SFFA's Arguments Treat Asian Americans as a Monolithic Group, Thereby Perpetuating the "Model Minority" Myth.

The treatment of any racial population as monolithic is problematic and promotes racial stereotyping.  Here, SFFA adopts the "model minority" stereotype by focusing on Asian American applicants' perceived academic prowess over other minority groups.  *See* Tr. Day 5, at 165:16-18 ("Would you say that there are more Asian-American applicants with perfect or near-perfect SAT or ACT scores than there are African-Americans with those kind[s] of marks?").  The model minority myth is the notion that Asian Americans have achieved universal academic and professional success through hard work and adherence to Asian cultural norms.[25]  Although the model minority myth is often seen as harmless, or even positive, it has numerous negative effects for Asian Americans and other students of color.  For example, not only does the myth hide the diversity of the Asian American experience, but Asian American studies scholars have long noted that it has been used strategically by opponents of race-conscious policies "to support the notion of meritocracy" and promote the

---

[23] *Id.* at 616.

[24] *Id.*

[25] Lee and Kumashiro, *Report, supra,* at xi.

idea that racial discrimination "does not impede the educational and occupational progress of racial/ethnic minorities."[26]   It is no coincidence that the myth first gained widespread popularity during the Civil Rights Era, when it was used as a tool to silence Black activists' claims of racial inequality.[27]

The model minority myth is based on three key misconceptions about the Asian experience: (1) all Asian Americans are the same; (2) Asian Americans do not face major challenges because of their race; and (3) Asian Americans do not require resources or support but can overcome discrimination solely based on their own efforts.[28]   These assumptions are demonstrably false.   As discussed above, Asian Americans are a diverse and complex group with vastly different levels of education and economic attainment.   Many face similar challenges to those facing Black and Latino students—discrimination, structural inequality, poverty, lack of access to education—and require support accordingly.   To pretend otherwise diverts attention from the real and pervasive racial inequalities facing the Asian American community.

SFFA's arguments contain all the hallmarks of the model minority myth.   SFFA focuses on Asian American applicants' supposedly universal academic success, failing to distinguish between the different levels of education attainment of different subgroups.   *See See* Tr. Day 5, at 164:22-165:06.   SFFA's proposed remedy—the abolishment of race-conscious admissions at Harvard—rests on the assumption that either Asian Americans do not

---

[26] Samuel Museus and Peter Kiang, *Deconstructing the Model Minority Myth and How It Contributes to the Invisible Minority Reality in Higher Education Research*, 142 New Directions for Inst. Res. 5, 6 (2009).

[27] Lee and Kumashiro, *Report, supra,* at xi.

[28] Museus and Kiang, *Deconstructing the Model Minority Myth, supra,* at 7-13.

face any challenges that allow them to benefit from race-conscious admissions, or do not require any resources or support to remedy the structural inequalities they face.

Finally, like so many other opponents of race-conscious admissions, there is substantial reason to believe that SSFA is employing the model minority myth as a racial wedge between Asian Americans and the Black and Latino communities.[29]   Indeed, SFFA spent much of its time at trial focusing on the "tips" that Black and Latino students receive in Harvard's admissions process.  *See* Tr. Day 9, at 77:07-14; 93:15-19; 113:13-17.  According to SFFA's expert, a tip for Black and Latino students is a "white penalty."  *Id.* at 177:16-17 ("A white penalty is the same thing as an African-American or Hispanic tip. They mean the same thing.").  This zero-sum game framing is a common tool of opponents of race-conscious admissions.  The Court should recognize SFFA's arguments for what they are: distortions of the Asian American experience designed to promote a specific agenda.

### 3.      SFFA's Requested Remedy—the Elimination of Race-Conscious Admissions—Will Mostly Benefit White Candidates, not Asian American Candidates.

There is a significant disconnect between SFFA's claims and its proposed remedy. Although purporting to address harm to Asian American applicants, SFFA's proposed remedy—the elimination of all race-conscious admissions—does not vindicate the rights of Asian American students.  First, as discussed above, negative action and race-conscious policies are distinct concepts.  Ending race-conscious admissions does not address negative action.  Furthermore, like other racial minorities, Asian American students benefit from individualized race-conscious admissions programs like Harvard's that allow admissions

---

[29] Kat Chow, *'Model Minority' Myth Again Used As A Racial Wedge Between Asians And Blacks*, NPR, April 19, 2017, *available at* https://www.npr.org/sections/codeswitch/2017/04/19/524571669/model-minority-myth-again-used-as-a-racial-wedge-between-asians-and-blacks.

officers to consider how race and ethnicity have shaped an applicant's experiences.  Second, eliminating race-conscious admissions policies primarily benefits *white* applicants, not Asian Americans.[30]  For example, after Proposition 209 put an end to race-conscious admissions in California in 1996, Asian American enrollment at UC Law Schools remained flat, while white enrollment rose significantly.[31]

The results would be the same here.  According to Harvard's expert, eliminating all considerations of race increases white students' share of the admitted class by 8 percentage points, from 40 percent to 48 percent.  *See* Tr. Day 1, 108:15-21.  By contrast, Asian American students' share increases by only 3 percentage points, from 24 to 27.  *Id.* at 109:02-03.  This has a minimal impact on the likelihood of admission for Asian applicants, raising the admissions rate less than one percentage point, from 5.1 percent to 5.8 percent.  *Id.* at 109:02-10.

Conversely, the number of Black and Latino students would, according to SFFA's own expert, fall precipitously, by over 1,000 students over four years of classes.  *See* Tr. Day 15, at 64:03-12.  Multiple students and alumni of color, Asian Americans included, testified that such a drop would dramatically reduce the quality of education at Harvard and student's general experience on campus.  *See, e.g.*, Tr. Day 11, at 154:18-22.  Moreover, testimony by student amici suggest that these projections likely underestimate the decline.  For example, Iztel Vasquez Rodriguez explained that if Harvard's admissions process was race-neutral, she would never have applied.  *Id.* at 16:21-17:02.  The number of acceptances by students of

---

[30] *See, e.g.*, Ben Backes, *Do Affirmative Action Bans Lower Minority College Enrollment and Attainment? Evidence from Statewide Bans*, 47 J. Hum. Resources 435, 448-50 (2012).

[31] Kidder, *Situating Asian Pacific Americans*, *supra*, at 40.

color would likely also drop.  As Sarah Cole explained, race-neutral admission "would be a signal to students of color that Harvard was disinterested in us." *Id.* at 83:17-84:07.

In summary, SFFA's proposed remedy does not align with its purported goals.

**C.    SFFA and Its Amici Have Not Established Negative Action Against Asian Americans in Harvard's Admissions Process.**

In its effort to obtain the educational benefits that result from student diversity, Harvard uses race within the context of "a highly individualized, holistic review" that gives "serious consideration to all the ways an applicant might contribute to a diverse educational environment."  *See Grutter*, 539 U.S. at 337.  Harvard undertakes its individualized holistic review by evaluating candidate information across six categories, including academic, extra-curricular, athletics, personal, strength of recommendations, and overall.  Harvard SMF at ¶¶ 43-45.  Harvard maintains that it considers race, if at all, when undertaking the "overall" review.

At trial, SFFA shifted the theory of its case to one centered on unconscious or implicit bias, an admission on SFFA's part that none of the evidence it previously briefed rose to the level of demonstrating consciously purposeful discrimination.  SFFA's claim that Harvard has intentionally discriminated against Asian American applicants is now predicated on two pieces of circumstantial evidence—the statistical analysis reported by its expert witness and an internal Harvard study conducted by the Office of Institutional Research ("OIR")—and two central arguments.  First, SFFA claims that standardized test scores are a determinative indicator of comparative merit.  Second, SFFA argues that Harvard takes negative action against Asian American applicants by intentionally awarding them lower scores on the personal category to limit the percentage of admitted Asian Americans.  SFFA's arguments are

flawed.  Both the statistical analysis completed by SFFA's expert and the OIR's analysis are incomplete and deficient in significant ways and therefore inadequate to support a compelling inference of intentional discrimination.  Moreover, standardized test score data are inherently unreliable as a measure of comparative merit and provide no evidence that Harvard has established a goal, target, or other quantitative objective for the admission of any particular group.  Finally, SFFA's argument regarding the personal category rests on unsupported assumptions and a mistaken view of the evidence.

### 1. SFFA's Theory of Implicit Bias Does Not Prove Intentional Discrimination.

Seemingly acknowledging that it has no direct evidence of negative action against Asian Americans in Harvard's admissions process, SFFA offered for the first time at trial its theory that Harvard discriminates against Asian Americans by acting with implicit or unconscious bias towards such candidates.  Regardless of the language SFFA uses to couch its claims against Harvard, SFFA, as a private party seeking judicial enforcement of Title VI's nondiscrimination protections, still must prove Harvard engaged in intentional discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001).  Suggesting intentional discrimination on the basis of implicit bias places greater weight on the remaining circumstantial evidence SFFA uses to create a compelling inference of intent.  Neither the statistical analysis conducted by SFFA's expert nor the OIR analysis demonstrate an intent to discriminate by Harvard.

Statistical models were featured extensively throughout the trial as evidence illustrating the rates at which students are admitted to Harvard based on a variety of factors. Yet SFFA's expert excluded from his statistical model applicants who were recruited athletes,

children of Harvard College or Radcliffe alumni, children of Harvard faculty or staff members, and individuals on the Dean's or Director's interest lists (collectively, "ALDC applicants").  SFFA's expert claims to have done so because these applicants receive a "tip" based on their ALDC status.  This rationale is both unpersuasive and contradictory.  ALDC candidates make up a significant (nearly one-third) portion of a Harvard admitted class.  While they are identified as ALDC candidates throughout the admissions process, all ALDC applicants must participate in the same admissions process as all other domestic applicants. As SFFA's expert himself concedes, Tr. Day 10, 230:18-234:6, ALDC applicants are also not the only candidates that receive "tips," and he did not similarly remove such other applicants from his model, choosing instead to control for any "tipping" factors as Harvard's expert did with ALDC applicants.  Tr. Day 10, 230:18-20, 234:11-235:10, 243:13-244:24.

SFFA's expert's decision is even more troubling given that, as SFFA's expert himself admits, Asian American ALDC applicants are shown to be more likely to be admitted than their white ALDC counterparts.  Tr. Day 10, 120:23-121:3, 126:1-9, 190:1-5.  This is especially so for Asian American legacy applicants.  Tr. Day 12, 141:25-142:5.  These students represent the most highly competitive applications in the pool of applicants, and Asian Americans are shown to benefit more than any other group in this upper tier.  SFFA's expert's exclusion of ALDC applicants is relevant, as it conveniently serves to overestimate any negative effect on Asian American applicants and underestimate their performance overall in the admissions process.  Tr. Day 9, 238:4-7, 240:10-20.  It is reasonable for the Court to conclude that SFFA's expert excluded those categories to achieve the statistical results that would support SFFA's claim.

Statistical evidence of disparate outcomes alone generally cannot prove an intent to discriminate unless the demonstrated impact is so strong that the results of the analysis permit no other inference but that they are the product of a racially discriminatory intent or purpose. *Spencer v. Zant*, 715 F.2d 1562, 1581 (11th Cir. 1983)); *see also*, *e.g., McGuire v. Reilly*, 386 F.3d 45, 63 (1st Cir. 2004) ("[C]ourts have been loathe to infer intent from mere effect[.]"); *Spath v. NCAA*, 728 F.2d 25, 28 (1st Cir. 1984)  ("[G]enerally courts must look to evidence other than statistical impact to support a finding of discriminatory purpose.")  Viewed in even its most favorable light, the analysis conducted by SFFA's expert has not cleared this high bar. SFFA impliedly acknowledges that its statistical evidence is alone inadequate to demonstrate a Title VI violation, because it used much of its time at trial discussing the analysis conducted by the OIR, its findings, and Harvard's response to that analysis.  The OIR's study is not, however, sufficient to overcome the deficiency in Plaintiff's proof.

As witnesses explained during the trial, the analysis was generated by a team that had never before done a logistical regression project, Tr. Day 8, 52:5-17, and was based on limited data and variables, Tr. Day 3, 82:10-13.  Witnesses further acknowledged that the team had no experience working in admissions and lacked a sufficient understanding of how the admissions process works.  Tr. Day 5, 19:17-24; Day 8, 48:7-12, 54:24-55:1.  It is perhaps due to these circumstances that the OIR study excluded various factors critical to the admissions process.  Tr. Day 5, 22:6-23:7.  Instead, the OIR employed variables such as the Academic Index, which includes only board scores and GPA and is *not* considered in the admissions process.  Tr. Day 3, 176:2-8.

Additionally, the object of the analysis was not to evaluate any discriminatory practices based on race in Harvard's admission process, Tr. Day 5, 136:21-137:3, but rather to

assess Harvard's treatment of low income applicants, Tr. Day 5, 40:21-41:1.  That evaluation actually concluded that Asian American applicants *benefit* from Harvard's efforts to admit low income students, Tr. Day 3, 185:22-186:7.  This hardly qualifies as evidence of the type of "consistent pattern" of discrimination Title VI prohibits.  *Sylvia Dev. Corp. v. Calvert Cty*., 48 F.3d 810, 819 (4th Cir. 1995).  SFFA's thematic shift at trial failed to cure the inadequacy of its evidence and only serves to highlight the failure of SFFA to show intentional discrimination.

### 2.    Standardized Test Score Data at Harvard Do Not Show Negative Action Against Asian Americans.

SAT score statistics at Harvard do not demonstrate negative action against Asian Americans, contrary to the arguments made by SFFA and its Amici.  *See* Tr. Day 15, 12:4-13:12; AALF Br, at 14; *see also* NAS Br. at 7-9.  The differences in average standardized test scores between Asian Americans and other racial or ethnic groups reflect existing disparities among Harvard applicants.  These scores can also be boosted by costly test-preparation courses, further widening the gap between students with and without financial means.  Averaging SAT scores also obscures the wide distribution of scores among Asian American candidates, scores that are often tainted by what social scientists describe as "stereotype threats."  Notably, more than 1000 accredited colleges and universities do not require standardized test scores to admit students into their bachelor-degree programs or otherwise de-emphasize the use of standardized tests. [32]

---

[32] *See* FairTest, National Center for Fair and Open testing, "Optional List," (Current as of Summer 2018), *available at* http://www.fairtest.org/university/optional.  A four-year study of 33 private and public test-optional colleges and universities found that, of 123,000 students, 30 percent had been admitted without submitting test scores. The study concluded that there was no significant difference between nonsubmitters and submitters in graduation rates (0.6 percent lower for nonsubmitters) or cumulative G.P.A. (2.83 for nonsubmitters, 2.88 with test scores). Data also showed that nonsubmitters are more likely than submitters to be first-generation-to-college

Claims about differential standardized test scores by race are often highly misleading, if not demonstrably false.  Differences in average scores among racial or ethnic groups at institutions such as Harvard reflect the racial/ethnic test score disparities already present in the applicant pool, resulting from socioeconomic differences, educational practices, and other environmental factors.[33]  They are to be expected regardless of whether race neutral or race conscious criteria are used.[34]  Disparities in racial/ethnic SAT score averages on par with Harvard's individualized admissions pool are found nationwide,[35] including at other leading universities like UC Berkeley and UCLA that use race-neutral admissions.[36]

Significantly, SFFA's Amici rely heavily on discredited data to argue that standardized tests establish the comparative merit of Asian American applicants. *See, e.g.*, AALF Sum. J. Amicus Br. at 14.  Specifically, Amici cite statistics from a 2009 article by Thomas J. Espenshade.  *Id.*  In a subsequent interview however, Espenshade cast doubt on the usefulness of his data to establish that there was any bias towards Asian American students in

---

enrollees, underrepresented minorities, women, Pell Grant recipients and students with learning differences.  *See* W.C. Hiss and V.W. Franks, *Defining Promise: Optional Standardized testing Policies in American College and University Admissions*, National Association for College Admissions Counseling (Feb. 5, 2014).

[33] *See* Claude S. Fischer et al., *Inequality by Design: Cracking the Bell Curve Myth* 46 (1996); William G. Bowen & Derek Bok, *The Shape of the River: Long-Term Consequences of Considering Race in College and University Admissions* 16 (2d ed. 2000).

[34] *See, e.g.*, Maria Veronica Santelices & Mark Wilson, *Unfair Treatment?: The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning*, 80 Harv. Educ. Rev. 106 (2010); William T. Dickens & Thomas J. Kane, *Racial Test Score Differences as Evidence of Reverse Discrimination: Less Than Meets the Eye*, 38 Indus. Rel. 331 (1999).

[35] These disparities would exist even in the extreme (but counterfactual) case of a university admitting students in rank order based *solely* on their SAT scores.  *See* Goodwin Liu, *The Causation Fallacy: Bakke and the Basic Arithmetic of Selective Admissions*, 100 Mich. L. Rev. 1045, 1064 (2002).

[36] William C. Kidder, *Misshaping the River: Proposition 209 and Lessons for the Fisher Case* 39 J.C. & U.L. 53, 95 (2013).  The College Board, which created the SAT, has itself acknowledged this phenomenon.  *See* Jennifer L. Kobrin et al., *A Historical View of Subgroup Performance Differences on the SAT Reasoning Test* 19 (The College Board 2007), *available at* http://research.collegeboard.org/sites/default/files/publications/2012/7/researchreport-2006-5-historical-view-subgroup-performance-sat.pdf (finding that score gaps between different racial groups have "remained generally consistent" for 20 years).

admissions.[37]  In 2012, Espenshade wrote in an Op-Ed in The New York Times: "To be clear, I believe that race-conscious affirmative action is necessary, and often beneficial."[38]

Additionally, students can improve test scores by attending test-preparation courses. Such courses are, however, generally available only to those with financial means.  Score differences might therefore result from socioeconomic disparities.[39]  Amici's misleading arguments based on average SAT scores also fail to account for the bimodal distribution of SAT scores among Asian Americans.  Asian Americans have the widest distribution in standardized test scores and a higher standard deviation than whites.[40]  "Whites have a normal distribution that is consistent with how scores are distributed from the mean for other racial groups.  Asian Americans have a higher representation at the top scores, lower representation among middle-range scores, and higher representation among lower scores." *Id.* Thus, a comparison between the SAT scores of whites compared to Asian Americans does not fully convey the distribution of SAT scores across those populations.

Moreover, SAT scores are a poor proxy for the comparative merit of applicants because, inter alia, the SAT scores of minority students are tainted by what social scientists describe as "stereotype threats."  Stereotype threats are a phenomenon whereby individuals fear confirming negative stereotypes of their racial or ethnic group and said fear hurts their

---

[37]  Scott Jaschik, *The Power of Race*, Inside Higher Ed (Nov. 3, 2009), *available at* https://www.insidehighered.com/news/2009/11/03/elite (explaining that his data did not include "softer variables" such as recommendations, essays, and extracurricular activities that might help explain the disparity).

[38] Thomas J. Espenshade*, Moving Beyond Affirmative Action*, The New York Times (Oct. 4, 2012), *available at* http://www.nytimes.com/2012/10/05/opinion /moving-beyond-affirmative-action.html).

[39] *See* Jay Rosner, *Disparate Outcomes by Design: University Admissions Test*, 12 Berkeley La Raza L.J. 377, 383-84 (2001); Sigal Alon & Marta Tienda, *Diversity, Opportunity, and the Shifting Meritocracy in Higher Education*, 72 Am. Soc. Rev. 487, 490-91 (2007).

[40] *See* Robert T. Teranishi et al., *Heterogeneity among Asian Americans: Implications for Using Standardized Test Scores to Estimate Discriminatory College Admissions Practices*, CARE (Nov. 2015).

performance. *See* T. Schmader et al., *An Integrated Process Model of Stereotype Threat Effects on Performance*, 115 Psychol. Rev. 336, 336 (2008) ("[A] large body of work now testifies to the reliability and generalizability of stereotype threat effects on performance."). "[A]ctivating negative stereotypes about a social identity one possesses motivates individuals to try to combat that stereotype but that this creates some sort of extra situational burden that interferes with the ability to perform as well at a task as might otherwise be possible." *Id.* For example, when told questions are designed to test their intellectual ability, African American students perform worse than their white peers, but this gap diminishes when the students are told the same questions are non-diagnostic.[41] For this reason, SAT scores cannot be the whole story when evaluating potential students.[42] A college or university like Harvard seeking to admit students with the most potential must look beyond standardized test scores and consider the whole applicant, including whether other factors (e.g. race-based stereotyping) may have affected said scores.

### 3. SFFA's Assumed Bias in the Personal Score is Not Supported by the Data.

SFFA concludes that Harvard intentionally discriminates against Asian American applicants because Asian Americans receive the lowest score on average of any racial group in the personal category, despite higher than average scores in other areas evaluated in the admissions process (mainly, the academic score). SFFA Br. at 7-9. A key element of this

---

[41] *Id.* at 336-337.

[42] Stereotype threats also harm the performance of students once enrolled in college. *See* J. Owens and D.S. Massey, *Stereotype Threat and College Academic Performance: A Latent Variables Approach*, 40 Soc. Sci. Res. 150 (2011). Increased diversity minimizes the effect. Underrepresentation breeds stereotypes; however, when a group is sufficiently represented, the burden on each individual student is lessened, and stereotype threat has less of an effect. *See* V. Purdie-Vaughns et al., *Social Identity Contingencies: How Diversity Cues Signal Threat or Safety for African Americans in Mainstream Institutions*, 94 J. Pers. Soc. Psychol. 615 (2008).

argument is SFFA's contention that Harvard employs the qualitative elements of the personal category to effectuate a stereotypical view of Asian American applicants.   SFFA suggested throughout the trial that the personal category is a pretext for making judgments about a student's personality, and that Asian American students' lower than average scores in this category reveals that routine bias or stereotyping occurs when Harvard calculates personal scores for Asian Americans candidates.   Tr. Day 15, 45:10-17, 128:6-16.

SFFA bolsters this contention with the assumption that high scores in the academic and extra-curricular categories should predict similarly high scores in the personal category.   SFFA offers no support for this assumption and ignores the fact that the academic category also includes qualitative criteria.   For these reasons, SFFA's challenge based on the personal category is without merit and SFFA is not entitled to judgment as a matter of law.

SFFA's argument is flawed because the academic rating category includes a number of qualitative criteria such as criteria scored by Harvard admissions officers (the applicant's high school's characteristics, high school's curriculum, and academic prizes), Harvard faculty members (appraisals of the student's academic or written work), and the applicant's high school teachers and counselors who submit letters of recommendation.   Tr. Day 3, 220:13-221:11.   After considering the various criteria, the admission officer then assigns an overall numerical value to the category, an exercise that is based on judgment and not a formula.   Tr. Day 3, 232:17-20; Day 4, 186:12-16; Day 5, 51:14-52:2.   It is illogical and unreasonable to assume that if Harvard were engaged in negative action, it would by design use qualitative factors to disfavor Asian Americans in the personal category, but use qualitative factors to favor them in the academic category.

Furthermore, the personal category itself goes well beyond a mere personality test.  Tr. Day 3, 224:19-226:23; Day 4, 39:1-25; Day 5, 228:24-229:17; Day 8, 115:13-119:6.  In order to evaluate a student's potential contributions to the Harvard community and beyond both during enrolment and post-graduation, Harvard staff evaluate each individual applicant by identifying characteristics such as leadership, determination, and compassion, and collect information contained in teacher and guidance counselor recommendations, letters from other recommenders designated by the student, alumni interviews, and the student's personal statement.  Contrary to SFFA's arguments, this is not a "cold record" far removed from the person seeking admission.  In fact, Harvard's holistic approach and varied criteria helps paint a multi-dimensional picture of each student, as viewed through the eyes of those familiar with their achievements, neutral third-parties, and the students themselves.

SFFA makes much of the fact that, while the overall score is the only admissions numerical where race is explicitly identified as a relevant factor, Harvard admits that race may still influence the other score categories, including the personal score.  This practice, SFFA argues, disproportionately inflicts bias in the personal score and negatively affects the admissions rates of Asian American candidates.  Testimony at trial demonstrated, however, that Harvard does not act intentionally either to solicit or consider a candidate's race in isolation in assigning a personal score.  Instead, race comes up organically, as it is often a critical part of a candidate's lived experiences and therefore necessary to comprehensively evaluate the qualities exemplified by the student.  For example, an African American candidate's attendance at a historically segregated high school, for example, might be considered in the student's academic score, the same way a Vietnamese immigrant's personal statement would naturally cause that candidate's race to influence the personal score.  *See* Tr.

Day 11, 142:19-143:3, 196:10-197:1.  Elimination of these considerations would only serve to sanitize the relevant life experiences Harvard's holistic admissions process seek to identify and potentially harm the many Asian American candidates, particularly those from underrepresented subgroups, who benefit from the consideration of race.

AALDEF and its co-Amici are well aware and disturbed by the history of discriminatory admission policies, particularly at elite private universities, affecting Jews, African Americans, Asian Americans, women, and others.    Amici would never knowingly support exclusionary admissions policies against minority applicants, including Asian Americans.  The undersigned amici would vigorously oppose any cap, quota, bias, or other kind of negative action, formal or informal, affecting Asian Americans or any other group.[43] This record does not, however, support such an undisputed finding.  Nor does room for further consideration or refinement of Harvard's admissions policy mean it is legally infirm.    SFFA has wholly failed to meet its burden.

_____

[43] In Amici's original brief in this matter, we called upon Harvard to examine its admissions practices and identify areas where it could better prevent the influence of implicit biases in its admissions process.  Since that filing, Amici have come to learn that Harvard updated the reading instructions given to admissions and financial aid officers and its interviewer handbook.  These additions provide important reminders and guidelines aimed at reducing the impact of implicit bias.  Amici applaud Harvard's recent efforts and urge Harvard to continue taking immediate steps to lessen even the possibility that any of its admissions decisions, including the personal category rating, are affected by implicit biases of persons at Harvard or other outside influencers (such as teachers, coaches, counselors, or alumni interviewers).

## CONCLUSION

For the reasons stated above, AALDEF and its co-Amici maintain that the SFFA has failed to demonstrate that it is entitled to a verdict in its favor.  AALDEF and its co-Amici therefore urge this Court to find in favor of Harvard on all counts.

Dated: January 9, 2019

Respectfully submitted,

*/s/ Madeleine K. Rodriguez*_____
Dean Richlin, BBO #419200
Hemmie Chang, BBO#544249
Sarah Burg, BBO#683245
Madeleine K. Rodriguez, BBO #684394
Rachel Hutchinson, BBO#696739
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
Tel: 617- 832-1000
Fax: 617-832-7000
drichlin@foleyhoag.com
hchang@foleyhoag.com
sburg@foleyhoag.com
mrodriguez@foleyhoag.com
rhutchinson@folehoag.com

Kenneth Kimerling, *pro hac vice*
admission pending
Asian American Legal Defense and
Education Fund
99 Hudson Street, 12th Floor
New York, NY  10013-2815
Tel: (212) 966-5932
kkimerling@aaldef.org

*Attorneys for Asian American Legal
Defense and Education Fund, et al.*

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Madeleine K. Rodriguez*

## ADDENDUM – LIST OF *AMICI CURIAE*

<u>Organizational Entities</u>

**18MillionRising.org (18MR.org)** brings many disparate Asian American communities together online and offline to reimagine Asian American identity with nuance, specificity, and power. It is using this Asian American identity as the foundation to build a more just and creative world where Asian American experiences are affirmed, their leadership is valued, and all of them have the opportunity to thrive.

The **Asian American Federation (AAF)** is a pan-Asian nonprofit leadership organization that represents and supports a network of nearly 70 Asian American community service organizations in New York City that work in health and human services, education, economic development, civic participation, and social justice. AAF's mission is to raise the influence and well-being of the pan-Asian American community through research, policy advocacy, public awareness, and organizational development.

The **Asian American Psychological Association** aims to promote the mental health and wellbeing of Asian Americans and Pacific Islanders across the United States.

Founded in 1985, the mission of **Asian Americans United** is to build leadership in Asian American communities to build neighborhoods and unite against oppression. AAU has worked in Philadelphia's Asian American communities and in broader multiracial coalitions around quality education, youth leadership, anti-Asian violence, immigrant rights, and folk arts and cultural maintenance.

The **Asian Law Alliance** is a non-profit law office founded in 1977 by law students from Santa Clara University School of Law. ALA's mission is to provide equal access to the justice system to Asian and Pacific Islanders and low income residents of Santa Clara County, California. ALA provides legal services in the areas of public benefits, civil rights, domestic violence, landlord and tenant law and immigration law.

Founded in 1992, the **Asian Pacific American Labor Alliance (APALA), AFL-CIO,** is the first and only national organization of Asian American and Pacific Islander (AAPI) workers, most of whom are union members, and its allies advancing worker, immigrant and civil rights.

The **Asian Pacific American Network (APAN)** is dedicated to addressing the concerns and issues of the Asian Pacific Islander Desi American (APIDA) faculty, staff, and students in higher education. APAN's purpose is to provide community, professional development, networking, and affirmation of identity for APIDA higher education/student affairs professionals. APAN represents APIDA issues and advocates for programs, services, research, and actions within the leadership of the Coalition for Multicultural Affairs (CMA) and the American College Personnel Association (ACPA).

The **Asian Pacific American Women Lawyers Alliance (APAWLA)** is an organization that promotes inclusion, empowerment and advancement of Asian Pacific American women in the legal profession. APAWLA is devoted to advocating, educating, mentoring, networking, and developing leadership within the profession and larger community. APAWLA members work in solo practices, law firms, state and federal courts; as prosecutors, defenders and civil practitioners; and in non-profits and government agencies; and, inspired by the great movement for Civil Rights, APAWLA shares a common goal of gender and racial equality.

**Asian Pacific Islander Americans for Civic Empowerment** envisions a just, inclusive, and progressive Washington State with racial, political, and economic equity for all people, including AAPIs. APACE expands democracy by identifying and removing barriers that prevent AAPIs from full civic engagement. It creates pathways that educate and mobilize our diverse communities to take civic action across Washington State.

**Chinese for Affirmative Action** is a community-based civil rights organization in San Francisco. The mission of the organization is to protect the political and civil rights of Chinese Americans and to advance multi-racial democracy in the United States.

Founded in 1972, the **Chinese Progressive Association** educates, organizes and empowers the low income and working class immigrant Chinese community in San Francisco to build collective power with other oppressed communities to demand better living and working conditions and justice for all people.

**Coalition for Asian American Children & Families** is the nation's only pan-Asian children's advocacy organization. CACF improves the health and well-being of Asian Pacific American children, youth, and families in New York City by providing programs and policy campaigns that challenge stereotypes of the "Asian model minority"; speaking out on behalf of families in-need, especially immigrants struggling with poverty and limited English skills; and advocating for better policies, funding, and access to services at the city and state level.

**GAPIMNY** is an all-volunteer, membership-based community organization that empowers queer and transgender Asian Pacific Islander people in the greater New York metropolitan area. GAPIMNY is committed to advancing racial justice and LGBTQ rights for intersectionally marginalized communities, and supports affirmative action as a policy that equalizes opportunity.

The **Japanese American Citizens League**, founded in 1929, is a national organization whose ongoing mission is to secure and maintain the civil rights of Japanese Americans and all others who are victimized by injustice and bigotry. The leaders and members of the JACL also work to promote cultural, educational and social values and preserve the heritage and legacy of the Japanese American community.

A2

**LEAP (Leadership Education for Asian Pacifics)** is a national, nonprofit organization, with a mission to achieve full participation and equality for Asian and Pacific Islanders (APIs) through leadership, empowerment, and policy.

The **National Coalition for Asian Pacific American Community Development (National CAPACD – pronounced "capacity")** is a coalition of more than 100 local organizations that advocate for and organize in low-income AAPI communities to further the economic and social empowerment of low income AAPIs and equitable development of AAPI neighborhoods. It strengthens and mobilizes its members to build power nationally and further its vision of economic and social justice for all.

The **National Korean American Service & Education Consortium's** mission is to organize Korean and Asian Americans to achieve social, racial and economic justice. Founded in 1994 by local community-based organizations, NAKASEC's affiliates are the Korean Resource Center (southern California), HANA Center (greater Chicago) and NAKASEC VA (northern Virginia).

The **National Queer Asian Pacific Islander Alliance (NQAPIA)** is a federation of lesbian, gay, bisexual, and transgender (LGBT) Asian American, South Asian, Southeast Asian, and Pacific Islander (AAPI) organizations. It seeks to build the organizational capacity of local LGBT AAPI groups, develop leadership, promote visibility, educate its community, enhance grassroots organizing, expand collaborations, and challenge anti-LGBTQ bias and racism.

**OCA - Asian Pacific American Advocates** is a national Asian American and Pacific Islander civil rights organization dedicated to advancing the economic, political, and social well-being of AAPIs. Through its chapters, OCA works to ensure that minority and low-income students have equal and equitable access to educational opportunities and experiences.

**Southeast Asia Resource Action Center (SEARAC)** is the only national civil rights organization devoted to empowering and uplifting the Southeast Asian American community. It represents the largest community of refugees ever to be resettled to America from the countries of Cambodia, Laos, and Vietnam, and works mindfully in solidarity with other communities of color and social justice movements.

Individuals
(Titles and institutional affiliations provided for identification purposes only)

**Vichet Chhuon**
Associate Professor of Culture & Teaching
Faculty, Asian American Studies Program
University of Minnesota-Twin Cities

A3

**Gabriel J. Chin**
Edward L. Barrett Jr. Chair and Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

**Tarry Hum, MCP, PhD**
Professor and Chair, Department of Urban Studies
Queens College CUNY

**Anil Kalhan**
Professor of Law
Drexel University Thomas R. Kline School of Law

**Shirley Lung**
Professor of Law
City University of New York School of Law

**Mari J. Matsuda**
Professor of Law
William S. Richardson School of Law
University of Hawai'i at Manoa

**Kevin Nadal, PhD**
Professor
City University of New York

**Philip Tajitsu Nash**
Lecturer, Asian American Studies Program and Latin American Studies Center
University of Maryland at College Park

**Cathy J. Schlund-Vials**
Associate Dean for Humanities & Diversity, Equity, and Inclusion
College of Liberal Arts and Sciences
Professor of English and Asian/Asian American Studies
University of Connecticut

**John Kuo Wei Tchen**
Inaugural Clement A. Price Chair of Public History and Humanities
Rutgers University - Newark

**Margaret Y.K. Woo**
Associate Dean for Research & Interdisciplinary Education
Northeastern University School of Law

A4

**K. Wayne Yang**
Provost, John Muir College
Associate Professor, Ethnic Studies
University of California, San Diego