1                  UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5                     Plaintiff,          Civil Action
                                          No. 14-14176-ADB
6    v.
                                          October 16, 2018
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                     Pages 1 to 92

8
                     Defendants.
9    _____

10

11
                  TRANSCRIPT OF BENCH TRIAL - DAY 2
12         BEFORE THE HONORABLE ALLISON D. BURROUGHS
                  UNITED STATES DISTRICT COURT
13             JOHN J. MOAKLEY U.S. COURTHOUSE
                     ONE COURTHOUSE WAY
14                   BOSTON, MA  02210

15

16

17

18

19

20

21

22                    JOAN M. DALY, RMR, CRR
23                     Official Court Reporter
               John J. Moakley U.S. Courthouse
24             One Courthouse Way, Room 5507
                     Boston, MA  02210
25                  joanmdaly62@gmail.com

```
1    APPEARANCES:

2
     COUNSEL FOR THE PLAINTIFF:
3

4            ADAM K. MORTARA, ESQUIRE
             J. SCOTT McBRIDE, ESQUIRE
5            KRISTA J. PERRY, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
6            54 West Hubbard Street
             Suite 300
7            Chicago, Illinois 60654
             312.494.4400
8            adam.mortara@bartlit-beck.com
             scott.mcbride@bartlit-beck.com
9            krista.perry@bartlit-beck.com

10           JOHN M. HUGHES, ESQUIRE
             KATHERINE L.I. HACKER, ESQUIRE
11           MEG E. FASULO, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
12           1801 Wewatta Street
             Suite 1200
13           Denver, Colorado 80202
             303.592.3100
14           john.hughes@bartlit-beck.com
             meg.fasulo@bartlit-beck.com
15           kat.hacker@bartlit-beck.com

16           JOHN MICHAEL CONNOLLY, ESQUIRE
             THOMAS R. McCARTHY, ESQUIRE
17           WILLIAM S. CONSOVOY, ESQUIRE
             Consovoy McCarthy Park PLLC
18           3033 Wilson Boulevard
             Suite 700
19           Arlington, Virginia 22201
             703.243.9423
20           mike@consovoymccarthy.com
             tom@consovoymccarthy.com
21           will@consovoymccarthy.com

22           PATRICK STRAWBRIDGE, ESQUIRE
             Consovoy McCarthy Park PLLC
23           Ten Post Office Square
             8th Floor, South, PMB #706
24           Boston, Massachusetts 02109
             617.227.0548
25           patrick@consovoymccarthy.com
```

1    APPEARANCES (cont.):

2

3            MICHAEL H. PARK, ESQUIRE
             Consovoy McCarthy Park PLLC
             3 Columbus Circle
4            15th Floor
             New York, New York 10024
5            646.456.4432
             park@consovoymccarthy.com
6
             PAUL M. SANFORD ESQUIRE
7            BENJAMIN C. CALDWELL, ESQUIRE
             Burns & Levinson LLP
8            One Citizens Plaza
             Suite 110
9            Providence, Rhode Island 02903
             401.831.8330
10           psanford@burnslev.com
             bcaldwell@burnslev.com
11

12   COUNSEL FOR THE DEFENDANT:

13           WILLIAM F. LEE, ESQUIRE
             FELICIA H. ELLSWORTH, ESQUIRE
14           ANDREW S. DULBERG, ESQUIRE
             ELIZABETH C. MOONEY, ESQUIRE
15           SARAH R. FRAZIER, ESQUIRE
             Wilmer Cutler Pickering Hale and Dorr LLP
16           60 State Street
             Boston, Massachusetts 02109
17           617.526.6556
             william.lee@wilmerhale.com
18           felicia.ellsworth@wilmerhale.com
             andrew.dulberg@wilmerhale.com
19           elizabeth.mooney@wilmerhale.com
             sarah.frazier@wilmerhale.com
20

21

22

23

24

25

```
 1    APPEARANCES (cont.):

 2
            SETH P. WAXMAN, ESQUIRE
 3          DANIELLE CONLEY, ESQUIRE
            DANIEL WINIK, ESQUIRE
 4          BRITTANY AMADI, ESQUIRE
            PAUL R.Q. WOLFSON, ESQUIRE
 5          Wilmer Cutler Pickering Hale and Dorr LLP
            1875 Pennsylvania Ave, NW
 6          Washington, DC 20006
            202.663.6006
 7          seth.waxman@wilmerhale.com
            danielle.conley@wilmerhale.com
 8          daniel.winik@wilmerhale.com
            brittany.amadi@wilmerhale.com
 9          paul.wolfson@wilmerhale.com

10          DEBO P. ADEGBILE, ESQUIRE
            Wilmer Cutler Pickering Hale and Dorr LLP
11          7 World Trade Center
            250 Greenwich Street
12          New York, New York 10007
            212.295.6717
13          debo.adegbile@wilmerhale.com

14          ARA B. GERSHENGORN, ESQUIRE
            Harvard Office of the General Counsel
15          Smith Campus Center
            Suite 980
16          1350 Massachusetts Avenue
            Cambridge, Massachusetts 02138
17          617.495.8210
            ara_gershengorn@harvard.edu

18

19    COUNSEL FOR AMICI STUDENTS:

20          JON M. GREENBAUM, ESQUIRE
            BRENDA L. SHUM, ESQUIRE
21          GENEVIEVE BONADIES TORRES, ESQUIRE
            KRISTEN CLARKE, ESQUIRE
22          1500 K Street NW, Suite 900
            Washington, DC 20005
23          202.662.8315
            jgreenbaum@lawyerscommittee.org
24          bshum@lawyerscommittee.org
            gtorres@lawyerscommittee.org
25          kclarke@lawyerscommittee.org
```

```
 1    APPEARANCES (cont.):

 2
              LAWRENCE CULLEEN, ESQUIRE
 3            EMMA DINAN, ESQUIRE
              Arnold & Porter LLP
 4            555 Twelfth Street, NW
              Washington, DC 20004
 5            202.942.5477
              gina.dean@aporter.com
 6            emma.dinan@aporter.com

 7
      COUNSEL FOR AMICI ORGANIZATIONS:
 8
              JENNIFER A. HOLMES, ESQUIRE
 9            CARA McCLELLAN, ESQUIRE
              JIN HEE LEE, ESQUIRE
10            MICHAELE M. TURNAGE YOUNG, ESQUIRE
              RACHEL N. KLEINMAN, ESQUIRE
11            NAACP Legal Defense and Educational Fund, Inc.
              700 14th Street NW
12            Suite 600
              Washington, DC 20005
13            jholmes@naacpldf.org
              cmcclellan@naacpldf.org
14            jlee@naacpldf.org
              myoung@naacpldf.org
15            rkleinman@naacpldf.org

16            KENNETH N. THAYER, ESQUIRE
              KATE R. COOK, ESQUIRE
17            Sugarman Rogers
              101 Merrimac Street
18            Suite 900
              Boston, Massachusetts 02114
19            617.227.3030
              thayer@sugarmanrogers.com
20            cook@sugarmanrogers.com

21

22

23

24

25
```

<pre>
  1                      P R O C E E D I N G S
  2                 (The following proceedings were held in open
  3      court before the Honorable Allison D. Burroughs, United
  4      States District Judge, United States District Court, District
  5      of Massachusetts, at the John J. Moakley United States
  6      Courthouse, One Courthouse Way, Boston, Massachusetts, on
  7      October 16, 2018.)
  8                 THE CLERK:  All rise.  Court is in session.  Please
  9      be seated.
 10                 THE COURT:  Good morning, everyone.
 11                 MR. MORTARA:  Good morning, Your Honor.
 12                 THE COURT:  Is Dean Fitzsimmons here?
 13                 MR. MORTARA:  Your Honor, before we get started
 14      this morning, there is one housekeeping matter.
 15                 THE COURT:  Yes.
 16                 MS. HACKER:  We have the transcripts, Your Honor,
 17      for the majority of the witnesses that SFFA intends to call
 18      by deposition.  We have a binder of the eight witnesses.  If
 19      I could hand it up to Your Honor, there are a few remaining
 20      objections to testimony in these transcripts.  We anticipate
 21      we may read some of these depositions tomorrow, so we wanted
 22      to hand it up to Your Honor today in case you wanted to rule
 23      on those.
 24                 THE COURT:  Okay.
 25                 MS. ELLSWORTH:  Your Honor, just so we're aware,
</pre>

1    there are objections to at least three of the transcripts in

2    full on relevance grounds.  The other objections we can work

3    out whenever counsel tries to read it in.

4              THE COURT:  Three whole witnesses?

5              MS. ELLSWORTH:  The entire testimony of three

6    non-parties that was taken by subpoena.

7              THE COURT:  And when to you want to do that?

8              MS. ELLSWORTH:  Whenever they want to read them in,

9    I suppose.

10             MS. HACKER:  We can take those up as we get to

11   those witnesses in the order.  So that we can just start with

12   Dean Fitzsimmons this morning.

13             THE COURT:  That's fine.  You can pass that up.

14             You're still under oath.  Just a reminder.

15             THE WITNESS:  I'm sorry?

16             THE COURT:  Just a reminder that you're still under

17   oath.

18             THE WITNESS:  Okay.  Thank you.  Good.

19             MR. HUGHES:  Good morning, Your Honor.

20             THE COURT:  When you're ready, Mr. Hughes.

21             (WILLIAM FITZSIMMONS previously sworn by the Deputy

22   Clerk.)

23                     DIRECT EXAMINATION (resumed)

24   BY MR. HUGHES:

25   Q.  Good morning, Dean Fitzsimmons.

1    **A.**   Good morning.

2    **Q.**   I'd like to start by talking about what happens when

3    somebody applies to Harvard.  I understand that the

4    application comes in to the admissions office and is assigned

5    to a docket based on geography; is that correct?

6    **A.**   That's correct.

7    **Q.**   We talked about this a little yesterday.  Each docket has

8    a docket chair and then several other readers who are reading

9    applications on that docket, correct?

10   **A.**   Yes.  Correct.  Those other readers are advocates for

11   particular parts of the docket.

12   **Q.**   And a given reader might read applications on more than

13   one docket, correct?

14   **A.**   That's correct.

15   **Q.**   That includes even the docket chairs, right?

16   **A.**   That's correct.

17   **Q.**   And the dockets have -- do they have roughly the same

18   number of applicants from docket to docket, or does that

19   vary?

20   **A.**   It varies slightly, but that's true on the main.

21   **Q.**   Each application is read in full by at least one

22   admissions officer, correct?

23   **A.**   That's correct.

24   **Q.**   And the first admissions officer to read an application

25   is referred to, at least sometimes, as the first reader,

1  correct?

2  **A.**  Yes.  That first reader would be the advocate.

3  **Q.**  The first reader reads through the application, and part

4  of what that first reader does is assign some scores in

5  different categories, correct?

6  **A.**  Say that again.

7  **Q.**  The first reader gets the application and reads through

8  it, and part of the reader's first responsibility is to

9  assign an academic score, an extracurricular score, the

10  athletic score, a personal score, and a preliminary overall

11  rating, correct?

12  **A.**  Yes.  That would be one of the things that the reader

13  would do based on the evidence in the application.

14  **Q.**  And the reader also might write some comments in a couple

15  of comment fields on the summary sheet.  That's another thing

16  the reader could do, correct?

17  **A.**  That's correct.

18  **Q.**  And sometimes in the admissions office an application is

19  read in full again by another admissions officer, correct?

20  **A.**  That's correct.

21  **Q.**  Not all applications get that additional read, correct?

22  **A.**  That's correct.

23  **Q.**  Because some applications the first reader can see really

24  the applicant isn't going to make the cut, so those

25  applications don't frequently get that additional read,

1   correct?

2   **A.**   Not entirely.  Everyone is still in play.  In other

3   words, the first reader may make a decision not at that time

4   to pass the application on to a second or perhaps to a

5   faculty reader.  But all the applications are still very much

6   in play because there are lots of new pieces of information

7   coming in at all times.

8   **Q.**   Okay.  Focusing back on those categories where a numeric

9   score is awarded -- the academic, extracurricular, personal,

10  athletic, and preliminary overall score -- the readers score

11  those on a numeric scale from 1 being the best to 5 or 6

12  being the worst, correct?

13  **A.**   That's correct.

14           THE COURT:  Mr. Hughes, can you bend that

15  microphone a little closer to your mouth for me.

16           MR. HUGHES:  That better?

17           THE COURT:  Yes.

18  BY MR. HUGHES:

19  **Q.**   So 1 is the best score you can get, correct?

20  **A.**   That's correct.

21  **Q.**   5 or 6 is the worst?

22  **A.**   Usually 4.  A 5 might have another kind of indication;

23  for example, that a person has so many home responsibilities

24  and so many employment responsibilities that he or she is not

25  able to take part fully or at all in conventional

1    extracurricular activities, for example.

2    **Q.**   Thank you for that.

3         And generally speaking, a score of 1 in any of

4    these categories is relatively rare to the other scores,

5    correct?

6    **A.**   That's correct.

7    **Q.**   And a score of 2 is a pretty good score that in any of

8    these categories indicates that a candidate is at least

9    somewhat competitive for admission to Harvard, correct?

10   **A.**   Certainly competitive.

11   **Q.**   Sometimes there are gradations in the scores.  You can

12   see a 2 plus which is better than a 2, right?

13   **A.**   That's correct.

14   **Q.**   A 2 minus is worse than a 2, correct?

15   **A.**   That's correct.

16   **Q.**   You can see that up and down the scale, right?

17   **A.**   Yes.

18   **Q.**   So Harvard's applicant pool is very strong academically.

19   Do you agree with that?

20   **A.**   Yes.

21   **Q.**   So these non-academic factors -- the extracurricular, the

22   personal score -- those can be important to admission to

23   Harvard, correct?

24   **A.**   That's correct.

25   **Q.**   I'd like to look at Plaintiff's Exhibit 1.  I'll pull

1    that up on the screen.  And this is the reading procedures

2    for the class of 2018.

3            MR. HUGHES:  And before I ask questions about the

4    document, I'd like to offer it into evidence.

5            MR. LEE:  No objection, Your Honor.

6            THE COURT:  Admitted.

7            (Plaintiff Exhibit No. 1 admitted.)

8            MR. HUGHES:  Thank you, Your Honor.

9    BY MR. HUGHES:

10   **Q.**  Dean Fitzsimmons, there's been a lot of discussion about

11   the personal score in this case, so I'd like to look at the

12   part of P1 that relates to that which I believe appears on

13   page 6.  I'll pull that up.

14           Actually I'm going to go back to page 5.  Can you

15   see that?

16   **A.**  Yes.

17   **Q.**  I've blown up the top of it.  This part of Plaintiff's

18   Exhibit 1, the reading guidance gives coding guidelines for

19   the summary sheets, correct?

20   **A.**  That's correct.

21   **Q.**  Plaintiff's Exhibit 1 is the reading guidance that is

22   supplied each year to Harvard admissions officers who are

23   reading and scoring applications, correct?

24   **A.**  Yes.

25   **Q.**  Admissions office document instructing the readers on how

1    to read and score, correct?

2    **A.**   That's correct.

3    **Q.**   And here we've got this part of the document that we're

4    looking at on page 5 is part of the document that relates to

5    the coding guidelines for the summary sheets, correct?

6    **A.**   That's correct.

7    **Q.**   And the summary sheet is the document where the scoring

8    that we talked about appears.  That's what the admissions

9    officer -- that's where the admissions officer records his or

10   her scores, correct?

11   **A.**   Yes.

12   **Q.**   So here is where Harvard is telling the admissions

13   officers how to score the various categories, correct?

14   **A.**   Yes.  In addition to, of course, the lengthy training

15   that takes place prior to looking at the document.

16   **Q.**   Lengthy training you're talking about is when somebody

17   first joins the admissions office, the first 50 or 100 files

18   that they read, somebody else is reading those over their

19   shoulder, so to speak?

20   **A.**   That's correct.

21   **Q.**   Let's talk about academic.  We've got at the bottom of

22   the page some instructions on how to score academics.  And

23   right there we see an academic -- what it takes to get an

24   academic 1, correct?

25   **A.**   Yes.  In a very general way.

1   **Q.**   Academic 1's are pretty rare, right?

2   **A.**   They are.

3   **Q.**   But here it's a determination by the admissions officer

4   that the person would likely -- would have a good chance to

5   graduate very near the top of the class at Harvard, summa,

6   right?

7   **A.**   That's correct.

8   **Q.**   If we go over to page 6 of Plaintiff's Exhibit 1, we've

9   got some more guidance on how to award these academic index

10   scores, correct?

11   **A.**   That's correct.

12   **Q.**   And for example, to get a 2, which is important to

13   admissions, there are specific guidance about the kind of SAT

14   or ACT score that the admissions officer should be looking

15   for in an applicant, correct?

16   **A.**   That's correct.   But it's a bit of an oversimplification

17   just to look at that.   Because what we're asking people to do

18   in addition to looking at these kinds of -- such as grades

19   and standardized tests, we're actually asking our readers to

20   go through everything on that application and to try also to

21   think about growth and the future potential.   Because in lots

22   of respects, we really are in the futures business.   We're

23   looking at people not simply by a rigid, formulaic kind of

24   thing such as a test score.

25   **Q.**   None of that is here in the guidance, correct?

1    **A.**   That's correct.  It would be part of the training and all

2    the extensive discussion we have in committee.

3    **Q.**   What we definitely have here in the guidance between a 2

4    and a 3 is an instruction to the reader to differentiate

5    between applicants based on grades and standardized test

6    scores, correct?

7    **A.**   Yes.  It would be a correlation but, again, not a

8    formula.

9    **Q.**   And the grades and the standardized test scores are

10   objective measures.  Right?

11   **A.**   We would not at all look at them as objective measures.

12   Just to give you an idea, so let's say we had one student who

13   had grown up in a very advantaged household and gone to

14   wonderful schools and had five or six years of very, very

15   expensive test prep and had enormous educational advantages.

16          And then let's take, on the other hand, someone who

17   grew up in an underresourced community in an underresourced

18   family, had not been able to attend rigorous schools that

19   would prepare a person for standardized tests, and did not

20   have the money to take advantage of any kind of lengthy and

21   expensive test prep.

22          So in those two circumstances, you -- again,

23   thinking creatively and thinking about people's actual

24   potential, you would take that kind of a thing and put it in

25   the back of your mind as you're trying to figure out what the

1    real future of that person is like.  Not one standardized

2    test score is certainly not equivalent to another

3    standardized test score taken over a very different lifetime

4    of experiences.

5    **Q.**   So is it the position of the Harvard admissions office

6    that you would discount the importance of a standardized test

7    score if you had evidence that a particular applicant had the

8    resources to go to significant test preparation courses?

9    **A.**   Not at all.  We're simply looking at the evidence sitting

10   in front of us.  And there are certainly people who have had

11   many advantages who are spectacular students and would do

12   great things with their lives.  So it's always trying to look

13   positively in every case and not ever look negatively.  And

14   that's the way the advocate system works.

15   **Q.**   I thought you just told me, Dean Fitzsimmons, that you

16   would look at test scores differently based on someone's

17   access to resources to take standardized test preparation

18   courses.  Is that your testimony?

19   **A.**   It would be certainly one of the factors that we would

20   look at, given the enormous amount of research out there that

21   indicates the effect of background and opportunity on

22   standardized testing.

23   **Q.**   And none of that guidance appears here in P1, correct?

24   **A.**   Not directly.

25   **Q.**   Now, let's move on to the personal score.  In P1, the

1    reader guide that your admissions officers get each year,

2    this is the sum total of the instructions in this document

3    that you give to your admissions officers about how to score

4    the personal score, correct?

5    **A.**   Yes.   In this document.

6    **Q.**   Are there any other documents where you instruct your

7    readers in the admissions office about how to award the

8    personal score?

9    **A.**   Of course the interviewer handbook, which you mentioned

10   yesterday.

11          But really what happens is through the lengthy

12   training process, and there would be many, many discussions,

13   working with actual case studies over a period of time,

14   talking with other -- say if you're a new admission officer,

15   talking with other more experienced admission officers about

16   what to look for.   So it's a very, very lengthy, you know --

17   and then continuing monitoring of exactly what happens when

18   you're looking at a personal rating.

19   **Q.**   Dean Fitzsimmons, I'd like to point out the interviewer

20   handbook which you mentioned in your answer.   This is

21   Plaintiff's Exhibit 88 that was admitted yesterday.   It's

22   page 10 of the interviewer handbook, page 12 of the exhibit.

23          Is this section that I have up here on the screen,

24   I think Mr. Lee might have shown it yesterday in opening, is

25   this the portion of the interviewer handbook that you had in

1    mind?

2    **A.**   Yes.  That's certainly part of it.

3    **Q.**   And this language in the interviewer handbook and what we

4    looked at in P1 is the sum and substance of the written

5    instructions to admissions officers relating to the personal

6    score, correct?

7    **A.**   Yes.

8    **Q.**   Now I want to talk about race in the admissions process.

9    Back to Plaintiff's Exhibit 1.

10                   And on the first page of Plaintiff's Exhibit 1,

11   there are instructions to admissions officers reading Harvard

12   applications about basically confirming the race or ethnicity

13   of applicants who have provided that information, correct?

14   **A.**   That's correct.

15   **Q.**   But there's nothing in Plaintiff's Exhibit 1 that

16   instructs admissions officers about how they are supposed to

17   use race in considering an application to Harvard, correct?

18   **A.**   Let me just -- can I look just for a second?

19   **Q.**   You absolutely may.  If you want to flip through the

20   document, it's P1, the very first one in the binder there in

21   front of you.

22   **A.**   Could you repeat the question again?

23   **Q.**   The question is, we've got instructions here on the first

24   page of confirming the race or ethnicity of a given

25   applicant, but there's nothing in P1 that instructs an

1  admissions officer how they are supposed to consider race in

2  considering an application to Harvard.

3  **A.**   That would be technically true, as I look at this.  Let

4  me just take another quick look here because we do change

5  these on occasion.  That looks correct to me.

6  **Q.**   And the same is true for the alumni interviewer handbook

7  that we just looked at, Plaintiff's Exhibit 88.  There's

8  nothing in there that instructs -- that provides instructions

9  about how race is supposed to be used in the review of an

10  applicant to Harvard, correct?

11  **A.**   That's correct.

12  **Q.**   As far as you know, there is no written guidance provided

13  to admissions officers that instructs admissions officers

14  about how they are supposed to take race into account in the

15  admissions process, correct?

16  **A.**   That's correct.  But of course there is an enormous

17  amount of other information that's provided.

18  **Q.**   And there's certainly no guidance, written guidance, on

19  whether race can be considered one way or the other in the

20  personal score, correct?

21  **A.**   In these two documents, that's correct.

22  **Q.**   And anywhere else in the Harvard admissions office there

23  is no written guidance on whether or not race can be used in

24  the personal score, correct?

25  **A.**   Right.  The guidance is really given in a wide variety of

1    other ways.

2    **Q.**   And in fact, you don't recall giving any particular

3    yearly instructions to the admissions office about how race

4    should be used, correct?

5    **A.**   No.  That isn't really the way it works.  So one of

6    the -- I've already talked about the process for training new

7    admission officers, and that is a process that takes place

8    over many weeks and really, you could argue, right through

9    the first year.

10          But one of the things that also happens is that in

11   our orientation every year, we will have presentations by

12   counsel, for example, and we'll have discussions about the

13   current situation regarding race.

14          And then in the reading process and certainly in

15   all the committee meetings that take place, both the

16   subcommittee and the full committee, there is certainly lots

17   of information back and forth from one admission officer to

18   another, from new admission officers to senior admission

19   officers and vice versa.

20   **Q.**   Dean Fitzsimmons, I'm going to put up page 236 of your

21   deposition on the screen.  Starting at line 22.  We asked

22   you, "Do you give any particular instruction every year to

23   the admissions office about how race should be used? "

24          Turn to page 237, you answered, "Not that I

25   recall."

1           Were you asked that question?  Did you give that

2    answer?

3    **A.**  Yes.  And I must have been thinking about the written

4    part, but I'm not sure what was in my mind at that point.

5           MR. LEE:  Can we in the interest of completeness

6    just have the next question and answer, which I think is

7    perfectly consistent with what he just testified?

8           MR. HUGHES:  I'm happy to read the whole page.

9           MR. LEE:  That's great.

10          MR. HUGHES:  Is there a specific -- I'll blow it

11   up.

12          MR. LEE:  I think the next question and answer.

13          MR. HUGHES:  I think the whole page is instructive.

14   BY MR. HUGHES:

15   **Q.**  "QUESTION:  Is there a specific training session that

16   everyone is required to attend on a regular basis that

17   reviews what is legally permissible with respect to the use

18   of race in the admissions process?

19          "ANSWER:  That really would be part of the

20   comprehensive training program.

21          "QUESTION:  Are you aware that it's specifically

22   included every year on the training program?

23          "ANSWER:  The intention of the training program is

24   to give a comprehensive overview of how to evaluate an

25   application.

1       "QUESTION:  Is it your understanding that that

2  includes specific training on how to race should be used?

3       "ANSWER:  If it isn't in writing, it could well

4  also be done in discussion.

5       "QUESTION:  Are you sure that it is?

6       "ANSWER:  I don't know for sure."

7       Were you asked those questions?  Did you give those

8  answers?

9  **A.**  I did.  I think what -- there in my mind, I think, was

10  there one huge specific session.

11       The fact is that this is built into our -- as I

12  said here really in the deposition, it's built into the

13  normal training program.  It really is part and parcel of

14  what we do, and it's a part of really every time we look at

15  an application.  For example, in a subcommittee or in a full

16  committee, there are always examples of how race might

17  factor, say, in that particular situation.

18  **Q.**  How does race factor into Harvard's admissions process?

19  **A.**  For highly competitive applicants, it could be one factor

20  among many that might lead our 40-person admissions committee

21  to vote yes.

22       But race would never be seen in isolation, say

23  relative to the rest of the application.  It would be part of

24  it.  In some cases a person -- in many cases, in fact, would

25  have been admitted anyway without any consideration of race.

1          But it is again one part of a person's life, and

2   it's one part of a person's life that might lead that person

3   to be a great educator of others about how to be a good

4   citizen and citizen leader, not just at Harvard but later.

5   **Q.**   Is race part of your holistic admissions process or your

6   whole-person review?

7   **A.**   It is certainly one part of the whole-person review.

8   **Q.**   And you actually think it's impossible to abuse a

9   holistic admissions process like Harvard's, correct?

10  **A.**   To abuse?

11  **Q.**   Yes, sir.

12  **A.**   Could you repeat the question?

13  **Q.**   You actually think it's impossible to abuse a holistic

14  process like Harvard's, correct?

15  **A.**   I do.

16  **Q.**   In fact, you are not aware that the holistic admissions

17  process at Harvard was instituted, in part, because of

18  concerns about the number of Jewish students on Harvard's

19  campus, correct?

20  **A.**   That's certainly a part of history that I wasn't present

21  for.  I've certainly heard the charges.

22  **Q.**   I'm going to pull up page 408 of your deposition on the

23  screen, line 17.

24          "QUESTION:  Are you aware of the fact that the

25  holistic admissions process at Harvard was instituted in part

1    to concerns about the number of Jewish students on campus?

2         "ANSWER:  I'm not sure exactly what kind of

3    admissions process was being run at Harvard a hundred years

4    ago."

5         MR. LEE:  Your Honor, immediately preceding

6    questions and answers actually tell you what he was saying.

7         "Are you aware as to the origin of Harvard's

8    holistic admissions process?

9         "ANSWER:  I am aware of the holistic admissions

10   process of which I have been a part."

11        This is not proper impeachment.

12        MR. HUGHES:  It is exactly the question I asked him

13   on the stand.

14        THE COURT:  I'm not sure it's proper impeachment,

15   but I will sort out what is relevant and not relevant.  It's

16   more efficient to let him ask and answer the question than it

17   is to think about the objection.  So go ahead.

18        MR. HUGHES:  We're going to move on from this

19   issue.

20        THE COURT:  Perfect.

21        MR. HUGHES:  I understand Your Honor's views on

22   this subject.

23   BY MR. HUGHES:

24   Q.  Dean Fitzsimmons, let's get back to Harvard's use of race

25   in admissions today, okay?

1   **A.**   Sure.

2   **Q.**   Since you have been dean, the way Harvard uses race in

3   admissions has not changed, correct?

4   **A.**   That's correct.

5   **Q.**   In fact, you say the way Harvard uses race has not

6   changed since the filing of this lawsuit, correct?

7   **A.**   That's correct.

8   **Q.**   And in fact, you don't recall any specific discussion

9   about a staff member using race inappropriately, correct?

10  **A.**   That's correct.

11  **Q.**   And you don't recall any discussions with any staff

12  members about concerns that race was not being used

13  consistently with Harvard's guidelines, correct?

14  **A.**   That's correct.

15  **Q.**   And Harvard considers the race of an applicant even in

16  instances where the applicant does not indicate in their

17  application materials that race provided a particular

18  experience or influenced some part of their background,

19  correct?

20  **A.**   I'm not sure how that applies to a particular case.

21  Could you just repeat the question?  Maybe I don't quite

22  understand it.

23  **Q.**   Sure.  Harvard considers the race of an applicant even in

24  instances where the applicant does not indicate in their

25  application materials that race provided a particular

1    experience or influenced some part of their background?

2    **A.**   I'm still having trouble a little bit understanding the

3    thrust of the question.

4          But we certainly -- we are aware -- if people

5    choose to let us know through the common application, we

6    would know they are from a minority background.  Beyond that,

7    it really depends.  Each case really depends on how that

8    person's life has been lived.

9          But I think we're always -- because the nub of what

10   we do is literally 40 people looking at one person at a time

11   and looking to see all the different factors which would

12   include race in that person's life.  I hope I'm answering

13   your question.  I'm not sure I still understand it.

14   **Q.**   This was discussed last time you were under oath.  So if

15   an applicant provides their race or ethnicity in the common

16   application, Harvard will have that information, correct?

17   **A.**   That's correct.

18   **Q.**   Okay.  And then that applicant could choose to write

19   about in an essay or a teacher could write about in a

20   recommendation some experience in that applicant's life that

21   relates to or has to do with their race or ethnicity,

22   correct?

23   **A.**   That's true.  They could choose to do that.  The teachers

24   could choose to write about it.

25   **Q.**   But even in circumstances where you have the applicant's

1   racial or ethnic information but they don't write about

2   whether that's important to them and the teachers don't say

3   anything about them, you still consider the race of the

4   applicant in those situations as part of your whole-person

5   review process, correct?

6   **A.**  Yes.  We would still know about it, and it would still be

7   there.  Whether or not the race of the applicant would lead

8   someone to vote for that person really depends on all the

9   other factors.  Again, looking at people who are fully

10   competitive.

11   **Q.**  Let me just ask you, is Harvard's use of race as a factor

12   in the admissions process limited only to those applicants

13   who say in their application materials that race provided a

14   particular experience or influenced some part of their

15   background as they were growing up?

16   **A.**  If I understand your question, there's no requirement

17   that students would have to write about their background.

18   That still might mean that even if they didn't write about

19   their racial or cultural or ethnic background, that would

20   still be in the application.

21   **Q.**  And Harvard would still use race as a factor in the

22   admissions process for those applicants, correct?

23   **A.**  Again, race is never going to be used in isolation.  So

24   I'm not quite sure what the -- maybe I'm misunderstanding

25   where you're going with it.  We would know about it, but I am

 1    not sure exactly what you want me to answer, I guess.

 2    **Q.**   I'm just trying to see if we can get on the same page we

 3    were on in your deposition.  I've got page 86, line 6 through

 4    13 pulled up on the screen.

 5           "QUESTION:  Is Harvard's use of race as a factor in

 6    the admissions process limited only to those applicants who

 7    say in their application materials that race provided a

 8    particular experience or influenced some part of their

 9    background as they were growing up?

10           "ANSWER:  No."

11           That was your testimony at your deposition,

12    correct?

13    **A.**   Yes.  And I'm still having a little trouble trying to

14    think about it in juxtaposition of a single case.  We would

15    always know what the person's race was if the person wanted

16    to tell us about it.

17    **Q.**   You're not disagreeing with your testimony from your

18    deposition, correct?

19    **A.**   Could you just repeat again exactly what you're -- is

20    this the question --

21    **Q.**   I've already asked the question word for word, and you

22    can read it there.

23    **A.**   Right.

24    **Q.**   I'm just trying to see if we're on the same page that as

25    a general matter in the admissions process to Harvard you

1    consider the race of an applicant -- your consideration of

2    race of an applicant is not limited to applicants who write

3    about their race or ethnicity?

4    **A.**  Yes.  I think I answered that question.

5    **Q.**  That's exactly consistent with what we've got on the

6    screen, correct?

7    **A.**  Yes.

8    **Q.**  Now, why does Harvard consider race in its admissions

9    process?

10   **A.**  The major thing really is one of the best things about

11   going to any college, including Harvard -- and as you know,

12   Harvard is almost entirely residential -- is the opportunity

13   to learn from fellow classmates.  Mr. Lee talked in his

14   opening remarks about how critical that kind of piece of

15   education can be.

16            One of the things that was certainly a huge part of

17   my education was learning from roommates, learning from

18   people in dining halls, learning from people in

19   extracurricular activities, in smaller classes, literally

20   24 hours a day, about who they were, what their backgrounds

21   were.

22            I certainly think that in a country that is so

23   divided along racial and ethnic lines as ours is and with

24   demographics for the future that suggest an even more

25   critical role for race and ethnicity in the United States

1    that the opportunity for our undergraduates to learn from

2    people from every possible background, including racial and

3    ethnic backgrounds, is a critical part.  Not just of making a

4    difference to their own classmates during college, affecting

5    perhaps even how they would use the college experience.

6          Maybe they -- as a result of getting to know people

7    from different ethnic and racial backgrounds, they might

8    decide to take different courses from the ones they might

9    ordinarily have.  Or they might also go to lectures or take

10   part in activities of various kinds so that they would learn

11   a great deal more about what the country is really like.

12         That, in our view would make people much better

13   citizens and citizen leaders, again not just during Harvard

14   but we hope throughout the rest of their lives in a world

15   that race and ethnicity certainly seems to be, perhaps will

16   be even more important in the decades ahead as our students

17   live out their lives.

18   **Q.**   Thank you for that answer, Dean Fitzsimmons.

19         Just trying to get some shorthand, which I think

20   many people have used both in the context of this case and

21   outside the context much this case, one of the reasons

22   Harvard is considering race in its admissions process is to

23   achieve a racially diverse class, which you say results in

24   all of the benefits that you just testified to, correct?

25   **A.**   We do believe that diversity of all kinds is very

1  important in terms of what our students learn over the four

2  years and how they'll live their lives, we hope for the

3  public good.

4  **Q.**  Is there a way you can measure a particular level or

5  quantity of racially diversity that Harvard thinks is needed

6  to obtain all the benefits that you just described for us?

7  **A.**  No.  It's just like the admissions process.  There are no

8  formulas.  There are no sort of numerical guidelines that

9  would do justice to anything like that.  It just isn't that

10  simple.

11  **Q.**  If the racial diversity of Harvard's classes from year to

12  year bounced around significantly, you could still achieve

13  potentially the benefits of diversity that you just described

14  for us?

15  **A.**  Well, I think it depends a little bit on the degree.  If

16  you attended the Harvard I attended where there were

17  virtually no students of color -- and for that matter 4 to 1

18  male-female ratio -- it was a very, very different world.

19  And I know learned much, much less about what was going on in

20  the world than our undergraduates do today.

21         I just know from the fact because we do financial

22  aid and student employment as well as admissions, we have

23  lots of student recruiters, as you know.  So we know our

24  undergraduates well.  I would simply say my own life has been

25  enormously enriched by the opportunity to get to know our

1   students over the past four decades, including I noticed even

2   Jeannie Park, who is here with us today, was one of our key

3   student recruiters when she was an undergraduate.

4   **Q.**   I'd like to shift gears a little bit, Dean Fitzsimmons,

5   and talk about the importance of race in the admissions

6   process; in other words, how important race is to whether or

7   not a given applicant gets into Harvard.

8           And my question is, would you agree that race is a

9   determinative factor for about half of the African-Americans

10   admitted to Harvard and about a third of Hispanics in recent

11   admissions cycles?

12   **A.**   I'm not sure that I would use the word "determinative,"

13   again because it implies that race would be used in isolation

14   and separate from all the other factors that go into choosing

15   among very competitive applicants.

16           But certainly race was a help in terms of some

17   portion of the people, again when all other factors were

18   substantially equal.

19   **Q.**   I'd like to explore that with you now.  I'm going to put

20   on the screen Plaintiff's Exhibit 316.  I'm going to blow up

21   the top so you can see it before I ask questions.

22           MR. HUGHES:  I'd like to offer P316 into evidence.

23           MR. LEE:  No objection, Your Honor.

24           THE COURT:  It's admitted.

25           (Plaintiff Exhibit No. 316 admitted.)

1    BY MR. HUGHES:

2    **Q.**   Dean Fitzsimmons, you're familiar with Plaintiff's

3    Exhibit 316, correct?

4    **A.**   I am.

5    **Q.**   Plaintiff's Exhibit 316 is a report of a committee to

6    study race-neutral alternatives at Harvard, correct?

7    **A.**   That's correct.

8    **Q.**   And the committee consisted of you, Dean Smith --

9           Who is your boss, right?

10   **A.**   Yes.

11   **Q.**   -- and Dean Khurana, right?

12   **A.**   Yes.

13   **Q.**   Dean Khurana isn't part of the admissions process at

14   Harvard.  He does something else, right?

15   **A.**   He is a member of our committee, of our faculty committee

16   actually.

17   **Q.**   So that means he might read materials from a particular

18   applicant from time to time?

19   **A.**   That could happen.

20   **Q.**   Anything else?

21   **A.**   He could certainly attend meetings.

22   **Q.**   Committee meetings?

23   **A.**   No.  He's been very busy with his new duties, relatively

24   new duties and lots of things.

25   **Q.**   He's not significantly involved in the admissions

1    process?

2    **A.**   Not on a day-to-day basis.

3    **Q.**   Now, to be clear, this is Harvard's report, nothing to do

4    with Students For Fair Admission, correct?

5    **A.**   That's correct.

6    **Q.**   I want to turn to page 3.  Part of what you did, your

7    committee did here is you looked at some of the work that was

8    performed by some of the experts in this case, correct?

9    **A.**   That's correct.

10   **Q.**   Okay.  And one of the expert's work that you looked at

11   was Harvard's expert Dr. Card, correct?

12   **A.**   That's correct.

13   **Q.**   And the other expert that you looks at was SFFA's expert

14   Mr. Kahlenberg, correct?

15   **A.**   That's correct.

16   **Q.**   And you knew who Mr. Kahlenberg was before this committee

17   was formed, right?

18   **A.**   That's correct.

19   **Q.**   In fact, you're familiar with a book that he edited,

20   called "Rewarding Strivers."  You put a blurb on the back of

21   that book, right?

22   **A.**   Yes.

23   **Q.**   I'd like to read that, what you said.

24            MR. LEE:  Your Honor, I'm not sure what we're

25   doing.  It's not a disclosed exhibit and surely not

1    impeachment.

2         MR. HUGHES:  I'm just going to ask him if he

3    agrees.  I'm not offering it into evidence.

4         MR. LEE:  There's a reason for the disclosures of

5    the exhibits.  But Your Honor can consider it.

6         THE COURT:  Do you want to take a minute to look at

7    it?

8         MR. HUGHES:  Do you want to look at it?

9         MR. LEE:  No.

10        THE COURT:  Why wasn't it disclosed?

11        MR. HUGHES:  The disclosure agreement relates to

12   exhibits that we're planning to offer into evidence.  I'm not

13   planning to offer it into evidence.  That's our agreement

14   with them.

15        MR. LEE:  Your Honor, I don't want to slow us down.

16   The agreement is you disclose anything other than that which

17   you're using for impeachment, so demonstratives are

18   disclosed, exhibits are disclosed.  There's nothing to

19   impeach here.

20        THE WITNESS:  I would --

21        THE COURT:  Hold on for a second.

22        You can read it to him and ask him if he agrees.

23   You're parsing a mighty fine line between what is shared and

24   was not.  So if there's things that you intend on using in

25   the days to come, why don't you show them to him before we

1    get going.

2              MR. HUGHES:  We will certainly abide by Your

3    Honor's instruction.  Thank you, Your Honor.

4    BY MR. HUGHES:

5    **Q.**  Dean Fitzsimmons, could you agree that The Century

6    Foundation continues its trailblazing mission to prevent the

7    tragic waste of human talent that threatens America's future.

8    "Rewarding Strivers" presents provocative research and

9    analysis that provides a blueprint for the way forward?

10   **A.**  Again, I would -- it would certainly have been better for

11   me to have seen the full context for me to look once again at

12   the book.  I'm not sure what the publication date was.  And

13   again, the context for that blurb that I wrote.  And also,

14   frankly, for me to see how well that report perhaps as how

15   good it looks today in terms of what we know about

16   admissions.

17   **Q.**  Thanks, Dean Fitzsimmons.  We can move on to page 8 of

18   your report by the race-neutral alternatives committee.  I've

19   got that blown up on the screen.  This is the section of the

20   report that talks about -- we've got it at the top here --

21   "What would happen if Harvard stopped considering race?"

22   Correct?

23   **A.**  That's correct.

24   **Q.**  And Harvard's report says, "The committee considered as

25   an initial matter the likely effect on Harvard's student body

1   if it were to stop considering race in its admissions process

2   while continuing to engage in the other practices in pursuit

3   of diversity described above.  As the expert report submitted

4   by one of Harvard's experts in the SFFA litigation, Professor

5   David Card, explains, the number of African-American and

6   Hispanic students on campus would decline dramatically,

7   notwithstanding all the other efforts that Harvard takes to

8   recruit a broadly diverse class.

9           "Specifically, Professor Card estimates that the

10   elimination of race in its race-conscious admissions program

11   would reduce the population of students who self-identify as

12   African-American, Hispanic, or other racial or ethnic

13   background by nearly 50 percent.  Relative to the admitted

14   class of 2019, for example, the proportion of

15   African-American students would be expected to drop from 14

16   to 6 percent and the proportion of Hispanic or other students

17   would be expected to drop from 14 to 9 percent.  This

18   decrease would produce a corresponding increase in students

19   of other races, primarily white students."

20           Do you see that?

21   **A.**   I do.

22   **Q.**   And what I just read is Harvard's position on what would

23   happen if Harvard stopped using race in its admissions

24   process, correct?

25   **A.**   That's correct.

1  **Q.**  Okay.  And I want to talk a little bit about -- we talked

2  before about whether or not race is determine -- a

3  determinative factor.

4  Do you remember we had that discussion?

5  **A.**  Yes.  A factor.

6  **Q.**  A factor.  But according to Harvard's own report here,

7  without race a large number of students would not be admitted

8  to Harvard, correct?

9  **A.**  That's correct.

10  **Q.**  And for those students, at least, race is a determinative

11  factor, correct?

12  **A.**  It certainly made a difference in whether or not they

13  were admitted, again all other things equal relative to lots

14  of other highly qualified candidates.

15  **Q.**  On average, Harvard admits about 2,000 students a year;

16  is that right?

17  **A.**  That's right, yep.

18  **Q.**  So if we're looking at Dr. Card's -- your report of

19  Dr. Card's analysis of 2019 in the actual admitted class,

20  that class had about 14 percent African-American admits,

21  correct?

22  **A.**  I think that's true, yes.

23  **Q.**  That would be about 280 students, correct?

24  **A.**  I'll trust your math.

25  **Q.**  And if that drops to 6 percent, that 280 drops to about

1    120, correct?

2    **A.**   Again, you were probably a math major.

3    **Q.**   No, sir.  We could do the same math for the drop for the

4    Hispanic students as well, correct?

5    **A.**   Correct.

6    **Q.**   The report here says that the decrease would produce a

7    corresponding increase of students from other races,

8    primarily white students, but other races would benefit as

9    well, correct?

10   **A.**   That would be true.

11   **Q.**   And what other race would benefit if Harvard stopped

12   considering the use of race in its admissions process?

13   **A.**   It doesn't say here, but I presume it would be

14   Asian-American and people from backgrounds who did not

15   declare, which is a reasonably large number, at least in

16   terms of the counting process.

17   **Q.**   Let's look at the part of Dr. Card's report that presents

18   the information about this 2019 deal, put that on the screen.

19           MR. LEE:  Does he have a copy of the report?

20           MR. HUGHES:  No, I don't think he does.  Bill, if

21   he has an issue, we can come back to it after a break.

22           MR. LEE:  Can he get a chance to get his report?

23           MR. HUGHES:  Sure.

24           MR. LEE:  Which report?

25           MR. HUGHES:  It's his first report.  It is page --

1          MR. LEE:  -- 108.

2          THE COURT:  Do you have it?

3          MR. LEE:  I don't have it.  Mr. Hughes has

4    represented that he has two questions.

5          My real concern is this was not disclosed for use

6    with this witness, again.  This is a document -- it's a

7    report by another expert.  It was not disclosed for use with

8    this witness.  That's the trouble.  That's really why we

9    don't have it here.

10          MR. HUGHES:  It was shown yesterday in opening

11    statements.

12          THE COURT:  Is the arrangement that you're going to

13    share all the exhibits that are to be used with a particular

14    witness before that witness takes the stand?

15          MR. HUGHES:  We have an arrangement to share

16    exhibits we intend to -- not admitted exhibits that we intend

17    to offer through a witness, which we've done, and

18    demonstrative.  All this is, this is not demonstrative, this

19    is their expert's report.  This is the table that provides

20    the precise data that we just looking at on page 8 of the

21    race-neutral alternatives report.

22          And all I want to do is he said he assumed that

23    Asian-Americans would benefit from getting rid of race.  I

24    just want to show him that's what Dr. Card said, and then

25    I'll move on.

 1           MR. LEE:  Your Honor, I have it.  If that's all he

 2      wants to do, in the interests of time.

 3           THE COURT:  We've already had a discussion that

 4      you'll be more careful about identifying what you're going to

 5      use with the witness.  Unless we run into some kind of

 6      roadblock on this, ask the questions you're going to ask.

 7      And if there's a problem, we'll circle back to it.

 8           MR. HUGHES:  Thank you, Your Honor.

 9      BY MR. HUGHES:

10      Q.  Dean Fitzsimmons, you see over here on the far left

11      hand --

12           [Alarm system goes off in Federal Courthouse.]

13           THE COURT:  They'll give us a voice in a minute

14      that will tell us what we're doing.  All right.  Karen is

15      telling us if the voice is not telling us to stay, we have to

16      go.  Murphy's law.

17           (Off the record.)

18           THE COURT:  Sorry about that, everyone.  It's

19      Murphy's law, right?  If it can go wrong, it will.  So we

20      will forego our usual morning break and we'll go straight

21      through until like 1:15 or 1:20 when you find a stopping

22      spot.  Okay?

23           MR. HUGHES:  Thank you, Your Honor.

24      BY MR. HUGHES:

25      Q.  Welcome back, Dean Fitzsimmons.

1    **A.**   Thank you very much.  And to you.

2    **Q.**   Just to reorient where we were, I'm going to go back few

3    questions just to remind you where we were.  We had been

4    looking at Plaintiff's Exhibit 316, which is Harvard's report

5    on the race neutral alternatives.

6              Do you recall our conversation about that exhibit?

7    **A.**   I do.

8    **Q.**   I want to orient up to the bottom where I've got

9    highlighted here.  In your report, you reference the work of

10   Dr. Card, correct?

11   **A.**   That's correct.

12   **Q.**   And he does a model about what the class of 2019 would

13   look like if Harvard stopped considering race, correct?

14   **A.**   That's correct.

15   **Q.**   And I now just want you to focus on these figures because

16   I'm going to show you Dr. Card's bar graph that relates to

17   these in a minute.

18             And according to his model, the number of

19   African-American students would have dropped from 14 percent

20   to 6 percent, Hispanics from 14 to 9 percent, correct?

21   **A.**   That's correct.

22   **Q.**   Okay.  So now we'll go to what I had on the screen when

23   the alarm went off.  Hopefully it won't cause it to go off

24   again.

25             And this is page 109 of Dr. Card's report.  And if

1    you see on the left-hand side, we've got a column that says

2    "Actual Admitted Class."

3              Do you see that?

4              MR. LEE:  I think that's page 108.

5              MR. HUGHES:  You're right, Mr. Lee.

6    BY MR. HUGHES:

7    **Q.**  Do you see on the left-hand column it's got the actual

8    admitted class?

9    **A.**  I see that.

10   **Q.**  And it's got the percentages of different ethnic or

11   racial groups, correct?

12   **A.**  That's correct.

13   **Q.**  And we've got the color blue for African-American.  That

14   goes from 14 to 6, just like in your report, correct?

15   **A.**  That's correct.

16   **Q.**  And for Hispanics, which Dr. Card used yellow, it goes

17   from 14 to 9, just like in your report, correct?

18   **A.**  Correct.

19   **Q.**  For red -- for Asian-Americans, if Harvard were to stop

20   considering race, the Asian admissions would actually go up

21   from 24 to 27 percent, correct?

22   **A.**  That's correct.

23   **Q.**  So I just want to make sure we can agree on a few basic

24   things.

25             THE COURT:  Can you put that back up for me?  Just

1  leave it up there for a second.  Keep going.

2           MR. HUGHES:  Absolutely.

3  BY MR. HUGHES:

4  **Q.**  Just a few basic things that are illustrated by both P316

5  and Dr. Card's bar graph here.

6           Asian-Americans, Dean Fitzsimmons, as a group do

7  not benefit from Harvard's use of race in terms of how many

8  Asian-Americans are admitted in a given class, correct?

9  **A.**  Just looking across, could you just go through the line

10  of reasoning?  So the 24 versus all the other reds across?

11  **Q.**  All the other reds have to do with models about

12  socioeconomic boosts that have nothing to do with my question

13  or what you're talking about in P316.

14  **A.**  Okay.

15  **Q.**  I'm just focused on the first two columns, which is

16  Column 1 is "Actual Admitted Class," Column 2 is removing

17  consideration of race.

18           You've already agreed that the numbers I've shown

19  you here for African-Americans and Hispanic applicants line

20  up with that paragraph I've showed you from your report,

21  correct?

22  **A.**  That's correct.

23  **Q.**  And we see that the Asian admissions go from 24 in the

24  actual class up to 27 when you remove race, correct?

25  **A.**  That's correct.

1  **Q.**  So my question is Asian-Americans, as a group, do not

2  benefit from Harvard's use of race in terms of how many

3  Asian-Americans are admitted in a given class, correct?

4  **A.**  Not in the number except that I think that the education

5  that the Asian-American students get as a result of being at

6  Harvard and being at a place that has great racial and ethnic

7  diversity is quite substantial.

8  **Q.**  I understand your testimony on that benefit, Dean

9  Fitzsimmons, but I'm focused on the number.  And on the

10  number, the number of Asian-Americans that are admitted to

11  Harvard, Asian-Americans do not benefit in terms of getting

12  into Harvard because of Harvard's consideration of race,

13  correct?

14  **A.**  Yes.  Except certainly there are certainly some

15  Asian-Americans who end up at Harvard themselves because

16  their background was a factor in their admissions in a

17  positive way.

18  **Q.**  But as a group, according to Dr. Card, actually more

19  Asian-Americans would be admitted if race weren't considered,

20  correct?

21  **A.**  That would be correct.

22  **Q.**  The other thing I wanted to focus on -- and this we can

23  go right back to your document -- the preference, the racial

24  tip that African-Americans receive is relatively stronger

25  than, more than the tip that Hispanic applicants receive.

1   Would you agree with that?

2   **A.**   I think I would just simply say again looking at

3   individual cases you can add these numbers up afterwards, but

4   again, the racial and ethnic background would be a factor in

5   those cases.

6   **Q.**   I'm trying to look at the math that you adopted in your

7   report, and I'll ask you the question.  According to the

8   numbers in your report, the falloff for African-Americans, 14

9   to 6, is greater than the falloff for Hispanics, 14 to 9, if

10  Harvard were to stop considering race, correct?

11  **A.**   I understand the numbers, yes.

12  **Q.**   The reverse is therefore true that as a group

13  African-Americans receive more of a benefit based on race in

14  the Harvard admissions process than Hispanics, correct?

15  **A.**   Yes.  There are more individuals who had benefited in

16  this individual review.

17  **Q.**   Now I want to shift gears a little bit, Dean Fitzsimmons,

18  and talk to you some more about the personal score.  Okay?

19  **A.**   Yes.

20  **Q.**   We can take this down.  Would you agree that Harvard

21  admissions officers do not take race into account when

22  assigning the personal rating?

23  **A.**   Yes, I do.

24  **Q.**   And what that means is that race is not involved in the

25  personal rating, correct?

1   **A.**   Not per se, correct.

2   **Q.**   And we've talked about guidance, written guidance.  Can

3   you think of anywhere where Harvard provides written guidance

4   telling its admissions officers not to use race or ethnicity

5   in awarding the personal score?

6   **A.**   I have not seen any written guidance, but it's certainly

7   well known on the staff and part of the training.

8   **Q.**   So I understand you say Harvard does not use race now

9   when awarding the personal score.

10          My question is, when did Harvard admissions

11  officers stop using race or ethnicity in awarding personal

12  scores?

13          MR. LEE:  I object to the predicate.  There's been

14  no demonstration of the predicate.

15          THE COURT:  That's sustained.

16          MR. HUGHES:  I'll rephrase.

17  BY MR. HUGHES:

18  **Q.**   Since you've been dean, have Harvard admissions officers

19  ever used race in awarding personal scores?

20  **A.**   Not to my knowledge.

21  **Q.**   Yesterday, you and I had a reasonably lengthy

22  conversation about the OCR statement of findings.

23          Do you recall that?

24  **A.**   Yes, I do.

25  **Q.**   We had a back-and-forth.  I just want to kind of refresh

1  everybody's memory where you described that process.

2          It was a lengthy investigation.  They set up shop

3  in your office.  They interviewed you and Director McGrath

4  and a number of other admissions officers in the course of

5  their investigation, correct?

6  **A.**  That's correct.

7  **Q.**  So -- and part of what the OCR did when it was conducting

8  this investigation was it got an understanding of how your

9  admissions process works, correct?

10  **A.**  I think it did.

11  **Q.**  And it did that in part based on the conversations with

12  you and other people in the admissions office, correct?

13  **A.**  In part, yes.  Correct.

14  **Q.**  I just want to look at parts of Plaintiff's Exhibit 555,

15  which has already been admitted into evidence, which is the

16  statement of findings from OCR.  Okay?

17  **A.**  Yes.

18  **Q.**  So I'm looking, Dean Fitzsimmons, at page 6 of

19  Plaintiff's Exhibit 555, the statement of findings.  And I'll

20  blow up this part of OCR's report.  Here OCR is reporting

21  what you and I have already discussed at length that there

22  are four major criteria on which all candidates are assessed:

23  academic achievement, extracurricular activities, athletics,

24  and personal qualities.

25          That's part of what OCR learned when it was

1   conducting this investigation, correct?

2   **A.**   That's correct.

3   **Q.**   OCR also as part of this investigation, since it had to

4   do with claims of racial discrimination, they investigated

5   how race was being used by the Harvard's admissions office in

6   the application process, correct?  That's part of what they

7   looked at?

8   **A.**   That's correct.

9   **Q.**   Now I want to show you the part of the OCR's statement of

10   findings that addresses that.  Okay?

11   **A.**   Sure.

12   **Q.**   Now what I've got on the screen is the bottom of page 15

13   and the top of page 16 of the report, which is P555.  And let

14   me read that into the record, dean Fitzsimmons, and I'll ask

15   you some questions.

16           This is OCR:  "We found that the readers had

17   several different views as to where and whether

18   Asian-American ethnicity was given positive weight or a tip

19   in the admissions process.  Some readers explained that when

20   ethnicity was deemed to be a significant factor in an

21   application, it was reflected in the POR" --

22           And I'll pause right there.

23           POR is preliminary overall rating, correct?

24   **A.**   Correct.

25   **Q.**   -- "it was reflected in the POR and during discussions at

1    subcommittee and committee meetings.

2            "Other readers indicated that ethnicity was a

3    factor considered throughout the entire admissions process.

4    They stated that it could be reflected in the four reader

5    rating areas, as well as in the POR and during the

6    subcommittee and committee meeting discussions.

7            "Still other readers stated that ethnicity was not

8    a factor at all unless the effect of that ethnicity on the

9    applicant was evident from the applicant's file.  They

10   indicated that ethnicity was only considered a plus when the

11   applicant wrote about or indicated the significance of his or

12   her heritage, or when there was some other indicia in the

13   file of the applicant's involvement with ethnic community

14   organizations or groups."

15           That's what OCR found, correct?

16   **A.**   That's one of their findings, yes.

17   **Q.**   And you told me yesterday that you and Director McGrath

18   and the other admissions officers that talked to OCR and

19   Mr. Hibino were honest and accurate when they described how

20   the process worked, correct?

21   **A.**   I certainly believe that they were honest and accurate in

22   terms of the information they received.

23   **Q.**   And so the date of this is 1990, correct?

24   **A.**   That's correct.

25   **Q.**   So at least in 1990, there was a group of Harvard

1    admissions officers that stated that race or ethnicity could

2    be reflected in the four reader rating areas, correct?

3    **A.**   Yes.  That's what it said.

4            But I think, again, let's give you an example.  So

5    let's say someone who was from, let's say, an

6    African-American background had experienced discrimination of

7    one sort or a set of hurdles for a variety of reasons due to

8    ethnicity in their home, in their high school, in their

9    community.  The fact that had overcome and surmounted those

10   kinds of obstacles could, in fact, have illuminated the

11   strength of the personal rating.

12           Now, that could happen to someone from any ethnic

13   background.  It depends, I think, on how you read that

14   question.  In other words, wasn't anyone from any ethnic

15   background or, say, gender or religion could be, let's say,

16   discriminated against.  And then due to their background --

17   and so that is -- and that might illuminate the strength of

18   their personal qualities.  So it really depends a little bit

19   on how you want to read that.

20   **Q.**   Let's break this down, Dean Fitzsimmons.  The four reader

21   rating areas that I've got highlighted here, one of those is

22   personal quality, correct?

23   **A.**   That's correct.

24   **Q.**   What you just testified to is that sometimes Harvard

25   admissions officers might consider the fact that somebody's

1   overcome discrimination as part of awarding their score,

2   correct?

3   **A.**   That's correct.  And it could be someone from any kind of

4   a background.  It doesn't have to be connected to race or

5   ethnicity.

6   **Q.**   We're talking about race.  And you're trying to interpret

7   the sentences I have highlighted here and suggest that what

8   that could really mean is that if the applicant provided

9   Harvard information about overcoming racial discrimination,

10  then that could play a role in the scores, correct?

11  **A.**   Yes.  Except what I'm trying to say, it depends on how

12  the phrase be reflected, could be read any number of ways.

13          But the rubric is that it per se would not affect

14  the personal rating.  It depends on the circumstance of the

15  individual.

16  **Q.**   What OCR found was that a group of readers indicated that

17  ethnicity was a factor considered throughout the entire

18  admissions process and could be reflected in the personal

19  score.  That's what they found, correct?

20  **A.**   Yes.  Just even on the first part of the sentence,

21  though, is that again the readings take place, the

22  subcommittee takes place, the full committee takes place.  So

23  race certainly could be discussed all the way along the line

24  and be a factor, let's say, in the final vote.

25          Even if you take the first part of that sentence,

1    you can see that the ethnicity can be a factor in individual

2    cases all the way down to the final committee vote.

3    **Q.**   And these readers told OCR that race could be reflected

4    in the four reader areas, which includes the personal score,

5    correct?

6    **A.**   Again, I've tried, I think, to explain how the

7    individual's background -- it could be religion, could be

8    gender, could be anything, could -- and overcoming obstacles

9    or prejudice or whatever it might be, that could illuminate

10   in that individual case the personal qualities rating.

11   **Q.**   The Harvard admissions office would only know the

12   information you just talked about if it was in the

13   applicant's file, correct?

14   **A.**   That would be correct, for individual circumstances.

15   **Q.**   Do you agree that OCR drew a distinction between readers

16   who consider ethnicity throughout the process and use it in

17   awarding the reader ratings; and other readers, still other

18   readers, stated that ethnicity was not a factor at all unless

19   the effect of that ethnicity on the applicant was evident

20   from the applicant's file?  Do you agree OCR is drawing the

21   distinction between those two types of readers?

22   **A.**   Again, I wasn't part of the conversations that the

23   readers at that time -- it was almost 30 years ago -- had

24   with the OCR people.  But I think, you know, depending on how

25   the discussion took place with those readers, I think you --

1    and depending on the context of the particular case, I could

2    see how you could interpret these things in a number of

3    different ways.

4    **Q.**   One way we can interpret what OCR found is that there

5    were a group of readers in Harvard's admissions office in

6    1990 who were using race and awarding personal scores.

7    That's one fair interpretation of this document, correct?

8    **A.**   It's possible.

9    **Q.**   And you agree it's possible that that's actually what was

10   happening in 1990, correct?

11   **A.**   Again depending on how you want to read that sentence.

12   **Q.**   I want to walk through a couple other parts of this that

13   relate to this issue.

14           Are you aware that in this document that OCR found

15   that Harvard did not provide its admissions officers

16   instructions on how much weight to give race or where to use

17   it in the process?

18   **A.**   Again, I think you're referring to written instructions.

19   And I certainly would argue, based on the extensive training

20   and the fact that this is monitored all the time, not just

21   for the first year of a staff member's time, but in a sense

22   one of the great checks and balances is we're all watching

23   each other, all 40 people.  When we look at those individuals

24   and all the information in the cases, everyone is always

25   vigilant to be certain that race and ethnicity is used in the

1    proper way.

2    **Q.**   OCR became familiar not only with your written

3    instructions but also -- let's take this down until I'm

4    ready.

5            OCR became familiar not only with your written

6    instructions but also with the process that you've had since

7    you've been dean where there's this training where somebody

8    is reading over your shoulder, so to speak, when you first

9    start in the admissions office, right?

10   **A.**   Yes.  In a sense, we're always reading over everyone

11   else's shoulders.  Because every time you put, as we do, all

12   that information up on the screen during the subcommittee and

13   the full committee, everyone is watching everybody else to be

14   sure that each applicant is being dealt with fairly.

15   **Q.**   And OCR knew all about that when it issued this report,

16   correct?

17   **A.**   You know, I don't know exactly what was in their minds,

18   but they certainly talked to ten admission officers, as you

19   know, and we talked about the 400 cases that they looked at,

20   and they had other information.

21   **Q.**   So now I want to look at what the OCR found about

22   training.  I'm focused here on the bottom.

23           "There are no formulas or specific criteria for

24   measuring or assessing ethnicity, nor are there instructions

25   for determining how much weight is given to ethnicity or

1    where the weight is to be applied in the admissions process."

2           That's what OCR found in 1990, correct?

3    **A.**   Yes.  And I think the fact that there was no formula, no

4    mechanical process that would in some rigid way do this, I

5    think is one of the strengths of the process.  Because each

6    individual is unique in the world, and how one's background

7    may affect one's life or one's life chances or life

8    experiences is unique to that individual.  So I think it is

9    important to have no formula or some mechanistic thing that

10   would do that.

11   **Q.**   Let's set aside formulas and mechanistic things.

12          Do you think it's important to have instructions

13   for determining how much weight to give to ethnicity or where

14   the weight should be applied in the admissions process?  Is

15   it important to have instructions on that?

16   **A.**   I agree not only instructions but, again, to have an

17   ongoing process that provides checks and balances not just

18   for new people but for everyone.

19   **Q.**   And right here we have OCR finding, based on their

20   lengthy investigation that we heard about yesterday, that

21   there aren't such instructions or at least there weren't in

22   1990, correct?

23   **A.**   If you mean a rigid set of formulaic instructions, that

24   would be correct.

25   **Q.**   Is that how you read the second part of this sentence, to

1    be referring to a rigid set of formulaic instructions?  Is

2    that how you're reading it, sir?

3    **A.**  I guess when I see formulas connected to instructions, it

4    leads me at least to think that there could be something

5    mechanistic or rigid or formulaic, which is not what we do.

6    **Q.**  Now, are you aware that at the time of this report that

7    OCR found that Asian-Americans were receiving lower personal

8    scores than white applicants?

9    **A.**  Again in general, I think there was a slight difference

10   between the personal ratings for Asian-Americans compared to

11   white students.

12   **Q.**  I've got page 21 of the OCR report up on the screen.  OCR

13   found, "With respect to the personal qualities ratings, most

14   applicants in our sample, both Asian-American and white, were

15   given between a three minus and a two plus.  Overall, in the

16   classes of 1991 and 1992, from which our file samples were

17   drawn, over 98 percent of the applications received some form

18   of a 2 or 3.  However, between the two groups, 20 percent of

19   Asian-American applicants and 25.5 percent of white

20   applicants received a 2 rating in the personal category."

21           Do you see that?

22   **A.**  I can see that.

23   **Q.**  And you were aware of that in 1990, correct?

24   **A.**  That's correct.

25   **Q.**  Did that give you any concern that there was such a stark

1  difference in personal quality ratings between Asian-American

2  applicants and white applicants in 1990?

3  **A.**   I think obviously any time you see anything about our

4  applicant pool, you want to make sure that everyone is being

5  treated fairly and evenly.  I think one of the things that

6  this shows is that there was an incredible range.  Obviously

7  there were many Asian-American applicants receiving very

8  strong personal ratings then and now.

9         Remembering of course that the ratings themselves

10  are just a beginning, you then have to go through the

11  process.  And that the ratings themselves are simply again

12  not for a group, but it's looking at each individual at a

13  time.

14         And when each time, say, a reader is going through

15  an application, it's a little bit like a legal process

16  certainly.  Or let's say if you're a baseball umpire or

17  something of that sort, what you're trying to do is look at

18  the evidence in front of you, evidence from outside sources,

19  you know, for example, from the teachers, from the counselor,

20  from all of the outside recommendations and all the other

21  outside information along with all the information provided

22  by the applicant.

23         And looking at that information on a case-by-case

24  basis, coming to some sort of a conclusion, again preliminary

25  conclusion, because a rating is only a preliminary step,

1     that's where you end up with these aggregate numbers.

2     **Q.**  Do you think the difference between the 20 percent of

3     Asian-Americans that were receiving a 2 and the 25.5 of white

4     applicants who were receiving a 2, do you think that's a

5     significant difference?

6     **A.**  It's a relatively small difference in the greater scheme

7     of things, keeping in mind that the personal rating is only

8     one of many, many factors that go into things, and that you

9     can certainly, if you took any other group, maybe let's say

10    Sparse Country people or students from my background,

11    first-generation students, you could find any number of

12    differences perhaps along any number of dimensions.

13          But as long as you get back to just keeping in mind

14    that any of these dimensions would only be one factor among

15    many as the committee looks at its applicants and then makes

16    its decisions.

17    **Q.**  You told me before that you never had to sit down with a

18    Harvard admissions officer and tell them they were using race

19    inappropriately in the Harvard admissions process.  You agree

20    with that, right?

21    **A.**  I cannot think of any instance where that's occurred.

22    **Q.**  And nothing in this report caused you to do that, right?

23    **A.**  No.  Simply looking, again, looking at the evidence in

24    front of us.

25    **Q.**  And the 25 to 20 percent, that wasn't a concern to you.

1  You thought that was okay that Asian-Americans were receiving

2  that level of difference in the personal score back in 1990,

3  correct?

4  **A.**   I think the big point was to ensure that we had a process

5  that looked at each individual; and took all the factors in

6  each individual's case into account; and have a process where

7  we ensured that it was really the evidence given by the

8  applicant him or herself as well as all the outside

9  information, which I won't detail just to save time.  We

10  wanted to make sure that process was well in place.

11  **Q.**   I want to look at a few additional things that OCR found,

12  Dean Fitzsimmons.  I've got page 24 in front of you.  Let me

13  read it and then I'll ask you some questions.

14  OCR says, "In addition to examining the ethnic

15  reader's comments, OCR's concerns for the potential

16  stereotyping of Asian-American applicants prompted a review

17  of reader comments for negative characterizations which could

18  have an impact on the admissions decision and ratings.

19  "On its face, reader comments revealed several

20  recurring characterizations attributed to Asian-American

21  applicants.  Quite often Asian-American applicants were

22  described as being quiet, shy, science/math oriented, and

23  hard workers.  For example, one reader's comment embraced all

24  of these in describing an Asian-American applicant when she

25  wrote:  'Applicant seems like a reserved, hard-working,

1    aspiring woman scientist/doctor.'

2           "While such descriptions may not seem damaging, OCR

3    was conscious that problems of model minority stereotypes

4    could negatively impact Asian-Americans applicants as a

5    whole.  This concern was also raised when OCR's file review

6    came upon comments such as, 'He's quiet and of course wants

7    to be a doctor'" --

8           Let me go to the next page.

9           -- "suggesting that most or all Asian-American

10   applicants want to be a doctor.  Or more pointedly,

11   applicant's scores and application seem so typical of other

12   Asian applications I've read:  Extraordinarily gifted in math

13   with the opposite extreme in English."

14           These were all findings by OCR, correct?

15   **A.**   That's correct.

16   **Q.**   Do any of the statements that your admissions officers

17   made that I've just read to you, do any of those concern you?

18   **A.**   Yes.  And I think one of the things we have made a point

19   of doing, certainly since receiving this report, is making

20   certain that staff members just simply do what we want them

21   to do.  And that is, go through the evidence contained in the

22   teacher reports, the counselor reports, and the outside

23   recommendations on which to base their ratings.

24           And I think one of the things to remember is that

25   the teacher recommendations and the counselor

1    recommendations, as you know, are certainly an important part

2    of the application.  And to the extent to which information

3    might be conveyed from those reports and the others, that

4    could affect how an individual reader may do the write-up.

5    **Q.**  But to be clear, you didn't sit down with any of your

6    admissions officers after this report came out and say stop

7    doing this, stop using race this way, stop making these

8    stereotypical comments.  You didn't do that, right?

9    **A.**  That's not right.  We took the report very, very

10   seriously, and we shared the report obviously with our staff

11   members and discussed the report in detail.  It was obviously

12   a very important report for the admissions committee members

13   and really for the general public to be aware of.

14           And it continues to be -- the OCR report continues

15   to be an important benchmark for us to make certain that we

16   do exactly what we said -- what the *Bakke* decision and what

17   was outlined here, and then what was outlined certainly in

18   any of the studies done.

19   **Q.**  I just want to make sure you're not changing what you've

20   told me before.

21           You never sat down with an admissions officer and

22   told them they were using race in the wrong way in your

23   process, correct?

24   **A.**  I'm not sure the image of, say, me or anyone else on the

25   staff sitting down with an individual admission officer --

1    for one thing, I'm not even sure who might have said these

2    kinds of things.

3            The point is that the entire staff, not just an

4    individual admission officer, the entire staff certainly

5    studied this report very, very carefully to make certain that

6    it did not engage in any racial stereotyping but rather

7    looked carefully at the evidence in each application.

8            But it's not simply talking with individuals.  It

9    was really talking with the entire admissions committee and

10   future admissions committees.

11   Q.  Dean Fitzsimmons, do you think that the stereotypical

12   comments which OCR quoted here are consistent with using race

13   with Harvard's guidelines?

14   A.  This is not -- I'm not quite sure what you mean by

15   consistent with guidelines.

16   Q.  Are these stereotypical comments that OCR found your

17   admissions officers made, are those comments consistent with

18   the way Harvard wants race used in its admissions process?

19   A.  We do not endorse, we abhor stereotypical comments.  This

20   is not part of our process.  This is not who I am, and it's

21   not who our admissions committee members are.

22   Q.  Dean Fitzsimmons, now I want to fast-forward to 2012.

23   We've looked at a number of things from 1990 that relate to

24   Harvard's use of race in its admissions process in this OCR

25   report, correct?

1    **A.**   That's correct.

2    **Q.**   We looked at the four categories of ratings; we looked at

3    these comments; we looked at the issue of instructions;

4    correct?

5    **A.**   That's correct.

6    **Q.**   And do you believe that OCR's 1990 description of how

7    Harvard uses race in its admissions process is still accurate

8    in more recent times, say like 2012?

9    **A.**   Again, I'm not exactly sure which aspect of the policy.

10   But in general terms, certainly the OCR report has been

11   important to us.

12   **Q.**   Do you think that a description of how Harvard uses race

13   in the -- do you think the description of how Harvard uses

14   race in the 1990 OCR report is still accurate?

15   **A.**   The general -- certainly the general description and the

16   outlining, yes.

17   **Q.**   Yesterday we looked at Plaintiff's Exhibit 509.  It's

18   already admitted.  I'll put it back on the screen.  Just to

19   remind you, I've got it on the screen, but Dean Fitzsimmons,

20   you're certainly welcome to look at it in the binder.

21        Again, this is the 2012 letter from Harvard office

22   of general counsel to OCR.  You recall talking about that

23   document with me yesterday?

24   **A.**   I do.

25   **Q.**   You were copied on it, and it's dated February of 2012,

1    correct?

2    **A.**   That's correct.

3    **Q.**   Turn to the second page of the document.  This is

4    Harvard's office of general counsel, and I'll just read this

5    and ask you some questions.

6         "In no way did Harvard subject" -- and then there's

7    a redacted name -- "to different treatment in the admissions

8    process on the basis of national origin as the complaint

9    alleges.  As you know, OCR has in the past conducted an

10   extensive compliance review of Harvard College admissions

11   process particularly with respect to Asian-American

12   applicants."

13        And then it references the compliance review that

14   we just looked at, correct?

15   **A.**   That's correct.

16   **Q.**   It goes on to say, "As OCR reported to Harvard at the end

17   of that review, we found no evidence of the existence or use

18   of quotas, nor did we find that Asian-Americans were treated

19   differently than white applicants in the implementation of

20   the admissions process."

21        That was the ultimate finding in the letter from

22   Mr. Hibino, correct?

23   **A.**   That's correct.

24   **Q.**   And then Harvard office of general counsel goes on to

25   say, "The information that OCR gathered during the course of

1    that compliance review and in subsequent cases regarding

2    Harvard College's criteria for admission, its use of race as

3    a factor in admissions decisions, and its general policies

4    and procedures for selecting students for admission to its

5    undergraduate program is still accurate today."

6            Do you see that?

7    **A.**  I do.

8    **Q.**  So do you agree that the way Harvard runs its admissions

9    process in terms of how Harvard uses race as a factor in

10   admissions is the same as it was in 1990 today?

11   **A.**  I do.

12   **Q.**  So does that -- would you then admit that based on what

13   OCR found in 1990 that it's at least possible that a group of

14   your admissions officers are using race in awarding the

15   personal score along the lines that OCR found in 1990?  Is

16   that possible today?

17   **A.**  I don't know.  I think -- I doubt it.  But what I would

18   say, though, is again the OCR report is certainly something

19   that our office is well aware of, continues to be well aware

20   of, as this sentence indicates.

21   **Q.**  All right.  I'm going to move on from OCR for now, Dean

22   Fitzsimmons.

23           Before this case, before this lawsuit, had the

24   admissions office ever conducted any empirical research into

25   whether Harvard admissions officers used race or ethnicity in

1    awarding personal scores?

2    **A.**   I'm not aware of any research that looked at that

3    specifically.   It's possible that there was some other sets

4    of things.   You'd have to show me.

5    **Q.**   Nothing comes to mind?

6    **A.**   No.

7    **Q.**   So you do recognize that as a result of this case the

8    experts have conducted some empirical research based on data

9    that was produced from your admissions office, correct?

10   **A.**   That's correct.

11   **Q.**   You understand the admissions office produced data for

12   six admission cycles, correct?

13   **A.**   That's correct.

14   **Q.**   And that data included data about students that were

15   admitted and students that were not admitted, correct?

16   **A.**   That's correct.

17   **Q.**   It had information like GPA and SAT scores and all of the

18   different ratings that we've talked about, correct?

19   **A.**   That's correct.

20   **Q.**   And it had information, to the extent it was provided, by

21   the applicants about race or ethnicity, correct?

22   **A.**   That's correct.

23   **Q.**   And in fact, I want to put Plaintiff's Exhibit 316 back

24   on the screen.   It's the race-neutral alternative report

25   that's already been admitted into evidence.   We'll put page 2

1    up on the screen.  Let me just read that to you, Dean

2    Fitzsimmons.  You're welcome to follow along on paper on the

3    screen.  It's page 2.

4         Harvard's report says, "In 2014, Harvard convened a

5    universitywide committee chaired by James Ryan, dean of the

6    graduate school of education.  That committee was charged

7    with examining the importance of student-body diversity at

8    the university and with evaluating whether the university

9    could achieve the educational benefits of a diverse student

10   body without considering the race or ethnicity of its

11   applicants.

12        "That committee paused its work when Students for

13   Fair Admissions, Inc., SFFA, filed a lawsuit against Harvard

14   challenging Harvard College's consideration of race in

15   undergraduate admissions.  Recognizing that the litigation

16   would include an extensive discovery process in which experts

17   would conduct in-depth empirical analyses of the college

18   admissions process and proposed changes to it, Harvard

19   decided to evaluate whether it could achieve the educational

20   benefits of diversity without considering race in admissions

21   in the college in a way that would be informed by the

22   race-neutral alternatives proposed in the SFFA complaint and

23   the analysis of those and other alternatives anticipated to

24   be prepared by the parties' expert witnesses."

25        That's what your reports says, correct?

1    **A.**   That's correct.

2    **Q.**   I want to march through and unpack that a little bit.

3              What was the Ryan committee?

4    **A.**   The Ryan committee was chaired by Jim Ryan, who was the

5    dean of the graduate school of education at that time.  He is

6    now the president of the University of Virginia.  And he

7    convened this committee, as the statement indicates.

8    **Q.**   And it was convened in 2014?

9    **A.**   Right, that's correct.

10   **Q.**   How many people were on the Ryan committee?

11   **A.**   I'm not sure exactly.  I'm just trying to recollect.

12   Perhaps ten people, maybe more.  It was very brief.

13   **Q.**   You were one of the people?

14   **A.**   I was one of the people.  And obviously -- and a lot of

15   people on the committee, like me, have lots of other

16   conflicting meetings and so on.

17   **Q.**   So the record is clear, you were one of the people on the

18   Ryan committee, correct?

19   **A.**   I was, yes.

20   **Q.**   And what happened was after that committee kind of first

21   got started, but this lawsuit was filed in the fall of 2014,

22   so the work on the committee was stopped at that time,

23   correct?

24   **A.**   That's correct.

25   **Q.**   Was that your decision to stop that work?

1    **A.**  It was not my decision.

2    **Q.**  So the Ryan committee at that point was effectively

3    disbanded while Harvard waited for the empirical analysis to

4    be conducted by the parties' respective experts in this case,

5    correct?

6    **A.**  That's my understanding.

7    **Q.**  And then a new committee to study race-neutral

8    alternatives was formed after that, correct?

9    **A.**  That's correct.

10   **Q.**  The purpose, just so it's clear, the purpose of the Ryan

11   committee was to study race-neutral alternatives.  It really

12   didn't get off the ground.  We had the lawsuit, the work of

13   the experts, and then a new committee was formed that

14   included yourself, Dean Smith, and Dean Khurana, correct?

15   **A.**  That's correct.

16   **Q.**  So only three members on the new committee, correct?

17   **A.**  That's correct.

18   **Q.**  Did you make the decision about who to staff on the

19   committee that you participated in?

20   **A.**  I did not.

21   **Q.**  But what you definitely were anticipating was to look at

22   some of the empirical evidence that would be generated as a

23   result of the analysis done in this case about the admissions

24   data that you provided, correct?

25   **A.**  That would certainly be one of the things we would want

1    to look at.

2    **Q.**  Now I'd like to show you a page of Dr. Card's expert

3    report, his first report, which I think Mr. Lee has a copy

4    of.  I'll show you page 37.

5              MR. LEE:  I think the witness is looking for it in

6    the binder.

7              THE WITNESS:  What page?

8    BY MR. HUGHES:

9    **Q.**  It is not in your binder, Dean Fitzsimmons, but I

10   actually do have a paper copy which I'm happy to walk up to

11   you or we can look at it on the screen.  I defer to you, sir.

12   **A.**  The screen is fine for me.  I don't want to anticipate

13   another fire drill or something.

14   **Q.**  I've got it here if you want it.  Just let me know.

15   **A.**  Should I ask counsel --

16             MR. LEE:  Yeah.  If he could have a hard copy.

17   **A.**  -- maybe to see the whole context.  They would know

18   better than I.

19   BY MR. HUGHES:

20   **Q.**  Here you go, sir.  The only thing I'm going to ask you

21   about is what I have on the screen.  So what I've got on the

22   screen is page 36 of Dr. Card's report.  And we've got

23   Exhibit 8 to the report, and it's entitled, "White and

24   Asian-American Applicants Excel At Different Dimensions:

25   Percentage of Applicants With Ratings of 2 Or Better."

1          Do you see that on the screen in front of you, Dean

2    Fitzsimmons?

3    **A.**   I do.

4    **Q.**   So the only two ethnicities we've got on here are

5    Asian-American and white, correct?

6    **A.**   That would be correct.

7    **Q.**   And if we look at academic ratings, we see -- let me ask

8    you a new question just to orient you.

9          The red bars relate to Asian-American applicants,

10   correct?

11   **A.**   That's correct.

12   **Q.**   And the blue bars relate to white applicants, correct?

13   **A.**   That's correct.

14   **Q.**   And you reviewed Dr. Card's report as part of your duties

15   on the race-neutral alternative committee, right?

16   **A.**   Yes, that's correct.

17   **Q.**   And we've got -- along the left-hand side, we've got the

18   percentage of the applicant pool that gets these scores of 2

19   or better.  You see that over here, correct?

20   **A.**   I do.

21   **Q.**   Okay.  And then Dr. Card has helpfully provided the

22   aggregate number of students on each of the bars, correct?

23   **A.**   Yes.

24   **Q.**   And so what we've got for -- and again, this is Harvard's

25   expert, right?

1   **A.**   That's correct.

2   **Q.**   And so just we'll go through here.  On the academic

3   rating, it looks like almost 60 percent --

4         MR. LEE:  Your Honor, I am going to object now.

5   The tie to this is his review of the report for race-neutral

6   alternatives.  I don't think this has anything to do with

7   race-neutral alternatives.  And cross-examining this witness

8   on Dr. Card's report when Dr. Card is going to be here

9   doesn't seem to be either appropriate or a good use of our

10  time.

11        MR. HUGHES:  With respect, Your Honor, this is --

12  what I just showed him from his race-neutral alternative

13  report talked about anticipating empirical analysis of his

14  admissions process.  This is that empirical analysis.

15        He has been the dean of the admissions process for

16  32 years, and I think it's perfectly appropriate to confront

17  him and ask him questions with the basic pretty simple to

18  understand output of those empirical analysis to see if he

19  has helpful testimony or information to provide on those

20  subjects.

21        MR. LEE:  Your Honor, when he cross-examined on the

22  other chart, it dealt with the impact of the race-neutral

23  alternatives on different ethnicities.  I didn't object

24  because that was related to the report.

25        But Dr. Card's report runs hundreds of pages, much

1    of which has nothing to do with the RNAs, including this.   I

2    just think cross-examining a fact witness on the expert

3    report of an expert witness who's going to be here to

4    testify --

5              THE COURT:  I'm not sure where he's going with it.

6    If what he wants to ask is were you aware of these things and

7    did you take steps in response to it, that's fair game.

8    Right?  But to cross-examine on how he got to these numbers

9    and what they mean is not fair game.

10             MR. HUGHES:  I have absolutely no intention of

11   doing that, Your Honor.  I am going to ask him whether what

12   Dr. Card is showing here is consistent with what he knows,

13   given his long experience in the admissions process.  And I'm

14   going to ask him if he has explanations, for example, for the

15   difference in the personal score rating that Dr. Card is

16   showing here on his chart, based on his experience as the

17   dean of admissions office for 32 years.

18             I'm not going to ask him how he got to these

19   numbers or whether the numbers are right or whether

20   Dr. Card's opinions are valid.  I have no plan to get into

21   any of that.

22             I would actually be happy to skip this and move to

23   a different piece of empirical evidence that I'll put up

24   right now, which is Plaintiff's Exhibit 629.  And this is not

25   from an expert report.

1            MR. LEE:  I object.  There's no foundation for this

2       at all.  This witness has not seen this document before.

3       It's not been before him before.

4            Your Honor, if I could very briefly?

5            THE COURT:  Yes.

6            MR. LEE:  There are two things here.  The witness

7       has reviewed the Card reports for the purpose of the RNA

8       committee.  That doesn't mean that everything that's in those

9       reports that deal with a whole host of other issues would be

10      fair game for cross.

11           THE COURT:  That first question about whether the

12      report is consistent with what he knows based on his

13      experience, that is fair game, in my opinion.  However wrong

14      you think I have it, I think that question is a fair

15      question.  We'll see what his answer is.

16           I don't know how much further beyond that you go.

17      You can ask him what his familiarity is, but if there's no

18      foundation for asking him questions on 629 --

19           MR. HUGHES:  If I may be heard on this one.

20           THE COURT:  Yes.

21           MR. HUGHES:  629 is not part of the expert analysis

22      in the case.  What 629 is, is a summary-of-evidence exhibit

23      that summarizes the evidence produced by Dean Fitzsimmons'

24      admissions office, and it's an un-objected to exhibit in

25      terms of its admissibility.  It was used in opening

1    yesterday.

2              I plan to try to walk through with the witness the

3    basic structure of it.  But I think given the importance of

4    whether race is used in the personal score, given that Dean

5    Fitzsimmons has been the dean for 32 years and given that

6    this is an unobjected-to summary-of-evidence exhibit, based

7    on the data that they've produced, I'd like to see, and I

8    think it would be helpful to the Court, whether Dean

9    Fitzsimmons has any explanation for what we're seeing in

10   P629, which to me plainly shows --

11             MR. LEE:  Wait a minute.  Let's not talk in front

12   of the witness, which plainly shows to you --

13             THE COURT:  You make an excellent witness,

14   Mr. Hughes, but that's not your job here.

15             MR. LEE:  First, could we have this taken down?

16             THE COURT:  Take this down.  You can go back to the

17   other exhibit, and you can ask him if the information in that

18   exhibit is consistent with what he has observed, if you still

19   want to ask that question.  And then we'll see where he goes

20   and what the next question is.

21             MR. LEE:  And, Your Honor, this summary chart is

22   from -- this is from their expert, Dr. Arcidiacono.  His

23   report was not reviewed in connection with the RNA.

24             THE COURT:  When we get to that, he can ask him

25   about that exhibit.  And if he hasn't seen it and doesn't

1    have any basis for understanding the accuracy of it, then

2    he's not going to be asked questions about that.

3              MR. HUGHES:  On 629.

4              THE COURT:  On 629.

5              MR. HUGHES:  Understood, Your Honor.

6              THE WITNESS:  I'm sorry.  What's the question?

7    BY MR. HUGHES:

8    **Q.**  At least the fire alarm didn't go off.

9    **A.**  I'm ready.

10   **Q.**  So now I've got page 36 of Dr. Card's report.  And we had

11   kind of been walking through the basic structure of the bar

12   graph.  You recall our conversation there, sir?

13   **A.**  I do.  He's using Arcidiacono's data.  Is that the idea?

14   **Q.**  Yes.  Everybody but the athletes, but yes.

15   **A.**  Which, again, I think would be important.  In our world,

16   we look at everybody simultaneously together year by year.

17   But I'll leave that aside.

18              THE COURT:  Can I interrupt for one second?

19              What is this last category, three or more profile

20   ratings?  What is that category?

21              MR. HUGHES:  I have no intention of asking Dean

22   Fitzsimmons about that category because that has to do with

23   some analysis and calculation done by Dr. Card, which he can

24   probably explain better than I can.

25              THE COURT:  Okay.

1        THE WITNESS:  And better than I can.

2   BY MR. HUGHES:

3   **Q.**  We're on the same team on that one, Dean Fitzsimmons.

4        If we focus on the academic rating, we see that

5   Asian-Americans as a group, about 60 percent of the

6   Asian-Americans that apply to Harvard receive a 2 or higher

7   on the academic score, correct?

8   **A.**  That's correct.

9   **Q.**  And for a total number of almost 25,000, correct?

10  **A.**  That's correct.

11  **Q.**  And would you agree with me that on average in a given

12  admissions cycle, about twice the number of white applicants

13  apply to Harvard as Asian-American applicants?

14  **A.**  I would have to see the figures.  That sounds reasonable,

15  but I don't want to guess because I don't have the figures in

16  front of me.

17  **Q.**  And coming back to the chart here, the percentage of

18  white applicants that get a 2 or higher is less than

19  50 percent, correct?

20  **A.**  That's correct.

21  **Q.**  And about 3,700, 3,800 more white applicants than Asians,

22  correct?

23  **A.**  That sounds right.

24  **Q.**  And is the relative strength of the Asian-American

25  applicant pool in terms of academics consistent with -- does

1    that look right to you, based on your experience as the dean

2    of the Harvard admissions office?

3    **A.**   Yes.  And just to remind you, so these are ratings that

4    the admission officers themselves created based on the

5    evidence in the file.  And just reminding you that even in

6    the academic realm, we would argue that it's not objective in

7    any literal sense, that there's lots of things.

8              And so the judgment made by individual admission

9    officers looking at individual cases, that it was their

10   judgment that produced this kind of difference.  It looks

11   like a reasonable difference though.

12   **Q.**   And some of the things that go into the academic score,

13   one of the things is standardized test scores, correct?

14   **A.**   That would be part of it certainly.

15   **Q.**   And based on your experience in the admissions office,

16   would you agree that Asian-Americans as a group outperform

17   white applicants to Harvard on standardized test scores?

18   **A.**   Standardized tests are higher for Asian-Americans.

19   **Q.**   Grade point average, that's another component, one

20   component of the academic score, correct?

21   **A.**   That's correct.

22   **Q.**   Would you agree that Asian-Americans as a group tend to

23   get higher grade point averages than white applicants?

24   **A.**   Yes.

25   **Q.**   So there's a number of things that go into the academic

1     score, I think is what you're trying to tell me, correct?

2     **A.** I am.  Including things such as faculty readings and all

3     kinds of things.

4     **Q.** Are the teacher and guidance counselor ratings another

5     thing that your admissions officers consider when determining

6     the academic score?

7     **A.** Very much so.

8     **Q.** And so would you agree that based on the data that we

9     have here in front of you that Asian-Americans as a group get

10     better support from their teacher recommendations and

11     guidance counselors?

12     **A.** Again, that's one of the factors that go to the rating.

13     As the admission officers compile the ratings for an

14     individual, they're taking all those factors into account,

15     including the teacher recommendations.

16     **Q.** Yeah.  I'm just trying to go through each of the factors

17     with you, sir.

18     **A.** Right.

19     **Q.** So the question is, would you agree that based on what we

20     see here in Dr. Card's analysis that Asian-Americans as a

21     group are getting better teacher recommendations, more

22     support from guidance counselors?

23            MR. LEE:  I object.

24            THE COURT:  Sustained.

25     BY MR. HUGHES:

1  **Q.**  Do you think that Asian-Americans as a group are more

2  competitive in terms of the high school curriculum they take,

3  based on your experience in the Harvard admissions office?

4  **A.**  I don't have data on that, and it doesn't demonstrate

5  here.  Could be.

6  **Q.**  Do you think that Asian-Americans as a group, based on

7  your experience in the Harvard admissions office, take more

8  advanced placement exams than white applicants?

9  **A.**  I don't have data on that.  It could be.

10  **Q.**  Let's move on to the extracurricular bar graphs here.  We

11  see that the Asian-American applicants are slightly stronger

12  in terms of the percentage of the applicant pool that gets a

13  2 or better than white applicants, correct?

14  **A.**  Yes.  Again, that are rendered by the admission officers.

15  **Q.**  And that's based on the information that the applicants

16  are provided about their participation in various

17  extracurricular activities.  That's one data point for your

18  admissions officers, correct?

19  **A.**  Yes.

20  **Q.**  And also get information probably from teachers and

21  guidance counselors and so forth, correct?

22  **A.**  Yes.  As you know, everything in the application would be

23  looked at to help compile the extracurricular rating.

24  **Q.**  And your admissions officers aren't using race when

25  they're awarding extracurricular or academic scores, right?

1   **A.**   That's correct.

2   **Q.**   Now, when we move on -- they're just looking at the data,

3   the information that's provided in the application, correct?

4   **A.**   Just looking at the evidence.

5   **Q.**   And then if we move on to personal rating, there we see

6   that this relationship shifts where the white applicants to

7   Harvard are more likely to receive a personal rating of 2 or

8   greater than Asian-American applicants, correct?

9   **A.**   That's correct.

10   **Q.**   And based on your experience as the dean of Harvard

11   admissions office, you don't think that Asian-Americans have

12   fewer attractive personal qualities than whites or any other

13   group, right?

14   **A.**   I would certainly agree with that.

15   **Q.**   And so based on your experience as the dean of the

16   Harvard admissions office, do you have any explanation for

17   why whites are more likely, according to Dr. Card, to get a

18   personal score rating of 2 or greater than Asian-American

19   applicants?

20   **A.**   Well, as I said in my deposition, there's no way when

21   you're looking at the whole person to know for certain, you

22   know, to come up with a definitive answer.

23           But you know, the one thing we do know, for

24   example -- and again speculation, but it's a fact that the

25   strength of the teacher recommendations and the counselor

1    recommendations for whites is somewhat stronger than those

2    for Asian-Americans.  That could be one factor.  But again

3    when an admission officer is going through an application,

4    they're looking at everything.

5    **Q.**  How do you know that the strength of teacher

6    recommendations is somewhat stronger for Asian-American

7    applicants than white applicants?

8    **A.**  We simply know that because it's our office and we're in

9    the business and there's evidence of it.

10   **Q.**  We're done with that.

11           MR. LEE:  For clarity of the record, could I have

12   the question back?

13           MR. HUGHES:  I had it flipped.

14           MR. LEE:  You had it flipped.  You had it stronger

15   for Asian-Americans than for whites as opposed to the

16   reverse.

17           MR. HUGHES:  I don't even remember what the

18   question was.  I'm prepared to move on unless you want me to

19   try to reconstruct my question.

20           MR. LEE:  I said it on the record.  I think that's

21   what was intended, and the answer is clear.

22           THE COURT:  He did.  He got it backwards, but I

23   actually got it right in my notes.

24           THE WITNESS:  The strength of the recommendation

25   for whites are stronger than for Asian-Americans.

1    BY MR. HUGHES:

2    **Q.**  Harvard computes for each of its applicants, at least for

3    as many as it can, an academic index score, correct?

4    **A.**  That's correct.

5    **Q.**  And is part of the reason that Harvard computes that

6    academic index score is it gets reported out to the Ivy

7    League, right?

8    **A.**  Yes, to the Ivy League.

9    **Q.**  I don't think we need to get into the precise contours of

10   the equation, but the academic index, the score, is based on

11   a combination of standardized test scores and grade point

12   average; is that right?

13   **A.**  That's correct.

14   **Q.**  And the highest score you can get on an academic index is

15   a 240, correct?

16   **A.**  That's correct.

17   **Q.**  Perfect score?

18   **A.**  Perfect everything.

19   **Q.**  So that would mean 800 on your SATs, both of them, and

20   really good grades?

21   **A.**  That's correct.

22   **Q.**  And I think the lowest you can get is 60, right?

23   **A.**  Never seen one, but I'll take your word for it.

24   **Q.**  And do you have any reason -- can you give us any reason

25   why applicants to Harvard with comparable academic index

1    ratings --

2              You understand that concept?

3    **A.**   Yes.

4    **Q.**   Let's say you had 10,000 applicants to Harvard, and they

5    all had comparable academic index rating.

6    **A.**   Okay.

7    **Q.**   Do you have that you in mind?  And let's say we divvy

8    them up by race, ethnicity, so we've got white,

9    Asian-American, African-American, Hispanic.

10             Do you have that in mind?

11   **A.**   I do.  Do you have an exhibit?

12   **Q.**   I do have an exhibit that shows that, that I would very

13   much like to show you, which is P629, which I'll put on the

14   screen and we'll see how we do.

15             MR. HUGHES:  But this is the subject of our prior

16   conversation with Your Honor.

17             MR. LEE:  If he wants to put it on the screen and

18   ask the witness if he's ever seen it before.

19             THE COURT:  That's fine.

20   BY MR. HUGHES:

21   **Q.**   So, Dean Fitzsimmons, I've got on the screen P629.  Do

22   you have that in front of you on the screen?

23   **A.**   I have.  But I haven't seen it before.

24   **Q.**   Just let me ask you.  You were here during Mr. Mortara's

25   opening statement, right?

1    **A.**   I was.

2    **Q.**   Do you remember seeing this during Mr. Mortara's opening

3    statement?

4    **A.**   Ever so briefly, and I was in the very back.

5              MR. HUGHES:  Ruling?

6              THE COURT:  You can't ask him to interpret this

7    exhibit.  But if these numbers mean something to him and they

8    happen to be displayed to him on this exhibit, that's fine.

9    But if the numbers don't mean anything to him, I'm not going

10   to ask him to sit up there and try to do an analysis.

11             MR. HUGHES:  Let me try to baby step it.

12             THE COURT:  Okay.

13   BY MR. HUGHES:

14   **Q.**   You see at the very top, I'll just highlight this row,

15   Dean Fitzsimmons, we've got academic index range between 236

16   and 240.

17             Do you see that?

18   **A.**   I do.  Again, I have never worked with this data in such

19   a way before, so it's a bit unfamiliar.

20             THE COURT:  Let me just ask you, have you ever

21   broken down the academic index range by ethnicity?

22             THE WITNESS:  Have I?

23             THE COURT:  Or have you looked at data that breaks

24   down the academic index range by ethnicity, either yourself

25   or compiled by someone else?

1          THE WITNESS:  I have not.

2          THE COURT:  That closes that avenue for you.

3     BY MR. HUGHES:

4     **Q.**  Do you have any explanation, Dean Fitzsimmons, for why

5     applicants with comparable academic index scores receive

6     significantly different personal scores based on ethnicity?

7     Do you have any explanation for why that is a result from the

8     process in your admissions office?

9     **A.**  I don't want to be repetitive, but I would simply just go

10    back to the idea that we do look at everything, when

11    everybody individual has a personal rating compiled and

12    recorded.

13          The one thing that, you know, I can say is that the

14    strength of the support from the teachers and the counselors

15    is less strong for Asian-Americans than for whites.  Just

16    again looking at those reports, which are important.  Beyond

17    that, we're simply looking at everything else as well.

18    **Q.**  The strength of the teacher-supported recommendations for

19    Asian-American applicants is stronger than it is for Hispanic

20    and African-American applicants, correct?

21    **A.**  I am not sure of that.

22    **Q.**  You don't know the answer to that one way or the other?

23    **A.**  I don't.

24          MR. HUGHES:  Your Honor, I'm at a perfect breaking

25    point, and it's almost 1:15.

```
 1              THE COURT:  That's fine.  It's exactly 1:15.  We
 2     will resume tomorrow at 10:00 unless anyone feels they want
 3     to make up some of the time we lost today, in which case I'm
 4     happy to start at 9:30.
 5              MR. HUGHES:  Mr. Lee, I defer to you and Dean
 6     Fitzsimmons.
 7              THE COURT:  Tomorrow I can sit until 3:30.  So
 8     10:00 to 3:30 seems like a perfectly reasonable day to me,
 9     but if you -- if people feel like we're getting behind, I'm
10     happy to start at 9:30.
11              When we're thinking about that, we had an hour for
12     lunch yesterday.  Do you all want to keep going with an hour?
13     Do you want do shorten it up?
14              MR. LEE:  I think two things.  Our view, I think it
15     would be great if we could start at 9:30 tomorrow so we can
16     get the dean on and off and get to some other witnesses.  I
17     think for us, if it's all right to the Court and everybody
18     else, 45 minutes for lunch probably does it.
19              MR. HUGHES:  I'm perfectly happy to start at 9:30,
20     and as short of a lunch break as we can take for our team is
21     fine.  45 minutes seems reasonable.
22              THE COURT:  We'll start at 9:30 tomorrow, and we'll
23     take a 45-minute break, and that will at least get us part
24     way made up for the time we lost today.
25              I think you all know you have three weeks, and I
```

1    start another trial after that.  So we'll use these three

2    weeks any way you want.  However long you want to sit,

3    however long you want lunches to be, just let me know.  To

4    the extent that I can be here, I'll be here.  We're trying to

5    move some of these late-afternoon things to even later so we

6    can make up some of that time at the end of the day, too.

7         MR. HUGHES:  I can tell you in terms of the

8    duration of the presentation of evidence from our side's

9    perspective, once we finish with Dean Fitzsimmons, the pace

10   will pick up considerably in terms of how long we're spending

11   with Harvard's witnesses.  Of course the experts will be a

12   little bit of a different story.

13        THE COURT:  I'm not trying to rush you at all.  I

14   just want to make sure we get everything done in the time

15   that we need to get it done.  I notice everybody always

16   stands up and says I'm going to be brief.  I'm really not

17   trying to rush anybody.  But I to want to make sure that we

18   get as much time in as we need in the next three weeks,

19   because that's really kind of what we have.

20        I'll see you at 9:30 tomorrow morning.  We'll take

21   a 45-minute lunch break.

22        MR. LEE:  Thank you, Your Honor.

23        (Court recessed at 1:18 p.m.)

24

25

1              - - - - - - - - - - -

2                     CERTIFICATION

3

4          I certify that the foregoing is a correct

5     transcript of the record of proceedings in the above-entitled

6     matter to the best of my skill and ability.

7

8

9

10    /s/ Joan M. Daly              October 16, 2018

11    _____       _____

12    Joan M. Daly, RMR, CRR        Date
      Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF WITNESSES

2    WITNESS                                            PAGE

3
     WILLIAM FITZSIMMONS
4
         Direct Examination (Resumed) by Mr. Hughes.........    7
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

E X H I B I T S

2

3

Plaintiff Exhibit                                    Received

4

1              ....................................      12

5

316            ....................................      32

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25