```
 1                   UNITED STATES DISTRICT COURT

 2                    DISTRICT OF MASSACHUSETTS

 3   _____

 4   STUDENTS FOR FAIR ADMISSIONS, INC.,

 5                  Plaintiff,           Civil Action
                                         No. 14-14176-ADB
 6   v.
                                         October 18, 2018
 7   PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                    Pages 1 to 246

 8
                   Defendants.
 9   _____

10

11

12           TRANSCRIPT OF BENCH TRIAL - DAY 4
        BEFORE THE HONORABLE ALLISON D. BURROUGHS
13            UNITED STATES DISTRICT COURT
           JOHN J. MOAKLEY U.S. COURTHOUSE
14                ONE COURTHOUSE WAY
                  BOSTON, MA  02210

15

16

17

18

19

20

21

22               JOAN M. DALY, RMR, CRR
23               Official Court Reporter
            John J. Moakley U.S. Courthouse
24          One Courthouse Way, Room 5507
                 Boston, MA  02210
25               joanmdaly62@gmail.com
```

1    APPEARANCES:

2
     COUNSEL FOR THE PLAINTIFF:
3

4            ADAM K. MORTARA, ESQUIRE
             J. SCOTT McBRIDE, ESQUIRE
5            KRISTA J. PERRY, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
6            54 West Hubbard Street
             Suite 300
7            Chicago, Illinois 60654
             312.494.4400
8            adam.mortara@bartlit-beck.com
             scott.mcbride@bartlit-beck.com
9            krista.perry@bartlit-beck.com

10           JOHN M. HUGHES, ESQUIRE
             KATHERINE L.I. HACKER, ESQUIRE
11           MEG E. FASULO, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
12           1801 Wewatta Street
             Suite 1200
13           Denver, Colorado 80202
             303.592.3100
14           john.hughes@bartlit-beck.com
             kat.hacker@bartlit-beck.com
15           meg.fasulo@bartlit-beck.com

16           JOHN MICHAEL CONNOLLY, ESQUIRE
             THOMAS R. McCARTHY, ESQUIRE
17           WILLIAM S. CONSOVOY, ESQUIRE
             Consovoy McCarthy Park PLLC
18           3033 Wilson Boulevard
             Suite 700
19           Arlington, Virginia 22201
             703.243.9423
20           mike@consovoymccarthy.com
             tom@consovoymccarthy.com
21           will@consovoymccarthy.com

22

23

24

25

```
 1    APPEARANCES (cont.):

 2
              PATRICK STRAWBRIDGE, ESQUIRE
 3            Consovoy McCarthy Park PLLC
              Ten Post Office Square
 4            8th Floor, South, PMB #706
              Boston, Massachusetts 02109
 5            617.227.0548
              patrick@consovoymccarthy.com
 6
              MICHAEL H. PARK, ESQUIRE
 7            Consovoy McCarthy Park PLLC
              3 Columbus Circle
 8            15th Floor
              New York, New York 10024
 9            646.456.4432
              park@consovoymccarthy.com
10
              PAUL M. SANFORD ESQUIRE
11            BENJAMIN C. CALDWELL, ESQUIRE
              Burns & Levinson LLP
12            One Citizens Plaza
              Suite 110
13            Providence, Rhode Island 02903
              401.831.8330
14            psanford@burnslev.com
              bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17            WILLIAM F. LEE, ESQUIRE
              FELICIA H. ELLSWORTH, ESQUIRE
18            ANDREW S. DULBERG, ESQUIRE
              ELIZABETH C. MOONEY, ESQUIRE
19            SARAH R. FRAZIER, ESQUIRE
              DENISE W. TSAI, ESQUIRE
20            Wilmer Cutler Pickering Hale and Dorr LLP
              60 State Street
21            Boston, Massachusetts 02109
              617.526.6556
22            william.lee@wilmerhale.com
              felicia.ellsworth@wilmerhale.com
23            andrew.dulberg@wilmerhale.com
              elizabeth.mooney@wilmerhale.com
24            sarah.frazier@wilmerhale.com
              denise.tsai@wilmerhale.com
25
```

```
 1    APPEARANCES (cont.):

 2
              SETH P. WAXMAN, ESQUIRE
 3            DANIELLE CONLEY, ESQUIRE
              DANIEL WINIK, ESQUIRE
 4            BRITTANY AMADI, ESQUIRE
              PAUL R.Q. WOLFSON, ESQUIRE
 5            Wilmer Cutler Pickering Hale and Dorr LLP
              1875 Pennsylvania Ave, NW
 6            Washington, DC 20006
              202.663.6006
 7            seth.waxman@wilmerhale.com
              danielle.conley@wilmerhale.com
 8            daniel.winik@wilmerhale.com
              brittany.amadi@wilmerhale.com
 9            paul.wolfson@wilmerhale.com

10            DEBO P. ADEGBILE, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
11            7 World Trade Center
              250 Greenwich Street
12            New York, New York 10007
              212.295.6717
13            debo.adegbile@wilmerhale.com

14            ARA B. GERSHENGORN, ESQUIRE
              Harvard Office of the General Counsel
15            Smith Campus Center
              Suite 980
16            1350 Massachusetts Avenue
              Cambridge, Massachusetts 02138
17            617.495.8210
              ara_gershengorn@harvard.edu

18

19    COUNSEL FOR AMICI STUDENTS:

20            JON M. GREENBAUM, ESQUIRE
              BRENDA L. SHUM, ESQUIRE
21            GENEVIEVE BONADIES TORRES, ESQUIRE
              KRISTEN CLARKE, ESQUIRE
22            1500 K Street NW, Suite 900
              Washington, DC 20005
23            202.662.8315
              jgreenbaum@lawyerscommittee.org
24            bshum@lawyerscommittee.org
              gtorres@lawyerscommittee.org
25            kclarke@lawyerscommittee.org
```

```
 1    APPEARANCES (cont.):

 2
              LAWRENCE CULLEEN, ESQUIRE
 3            EMMA DINAN, ESQUIRE
              Arnold & Porter LLP
 4            555 Twelfth Street, NW
              Washington, DC 20004
 5            202.942.5477
              gina.dean@aporter.com
 6            emma.dinan@aporter.com

 7
      COUNSEL FOR AMICI ORGANIZATIONS:
 8
              JENNIFER A. HOLMES, ESQUIRE
 9            CARA McCLELLAN, ESQUIRE
              JIN HEE LEE, ESQUIRE
10            MICHAELE M. TURNAGE YOUNG, ESQUIRE
              RACHEL N. KLEINMAN, ESQUIRE
11            NAACP Legal Defense and Educational Fund, Inc.
              700 14th Street NW
12            Suite 600
              Washington, DC 20005
13            jholmes@naacpldf.org
              cmcclellan@naacpldf.org
14            jlee@naacpldf.org
              myoung@naacpldf.org
15            rkleinman@naacpldf.org

16            KENNETH N. THAYER, ESQUIRE
              KATE R. COOK, ESQUIRE
17            Sugarman Rogers
              101 Merrimac Street
18            Suite 900
              Boston, Massachusetts 02114
19            617.227.3030
              thayer@sugarmanrogers.com
20            cook@sugarmanrogers.com

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open
 3    court before the Honorable Allison D. Burroughs, United
 4    States District Judge, United States District Court, District
 5    of Massachusetts, at the John J. Moakley United States
 6    Courthouse, One Courthouse Way, Boston, Massachusetts, on
 7    October 18, 2018.)
 8              THE CLERK:  All rise.  Court is in session.  Please
 9    be seated.
10              THE COURT:  Couple things.  Ms. Hacker, thank you
11    for that, but I didn't get the email until this morning.
12    Some of it's done and some of it's not.  We'll have to pick
13    and choose as we go.
14              To make a long story short, I have a relative in
15    town just for the day.  I'd like to try to catch up with them
16    at lunch, so I'm hoping we can have our lunch break from
17    quarter of 1:00 to 1:30.  And then we'll go straight through
18    1:30 to 3:30.
19              So I don't know how long your cross is, but
20    whenever you want to take a break this morning, that's fine
21    because we'll take a later lunch and we won't have a break in
22    the afternoon, if that's all right with everyone.
23              You were standing up.  Did you have --
24              MS. HACKER:  We were just going to update you on
25    witness order, Your Honor.
```

```
 1              THE COURT:  Okay.
 2              MS. HACKER:  If it is helpful, we do have a thumb
 3  drive with the full transcripts for all those depositions, in
 4  case you want to see those for contexts.  It also has all of
 5  the exhibits referenced in those, if that would be helpful
 6  when you're ruling on this objection.
 7              THE COURT:  I'm happy to take it, but it's just as
 8  easy to work out of the notebook.  I just have a few
 9  questions along the way of things I can't sort out.
10              The first two that you said were Ortiz and Zuluaga.
11              MS. HACKER:  And Mr. Zuluaga.
12              THE COURT:  I have Ortiz done.  Do you want me to
13  go through those now?  Do you want me to wait?  What's your
14  preference?  I don't want to interrupt Mr. Lee.
15              MS. HACKER:  We're happy to start with Dean
16  Fitzsimmons this morning and then do the -- Miss Ortiz'
17  rulings right before we read her transcript.
18              THE COURT:  What is UMRP?
19              MS. HACKER:  Underrepresented minority group at
20  Harvard.
21              MS. ELLSWORTH:  Undergraduate minority recruitment
22  program.
23              THE COURT:  There's a couple others that I have
24  questions about.  It might be easier to do it when we get
25  there.  Most of those are done.  Then I -- I'm happy to hear
```

1    you on it, but I am inclined to exclude Zuluaga.  I don't

2    know what there is in there that is relevant and not opinion

3    and not very subjective.

4              MS. HACKER:  We would like to be heard about it,

5    Your Honor, if I may just very briefly.

6              THE COURT:  You want to do it now or after?

7              MS. HACKER:  Your Honor's preference.  We can get

8    started with Dean Fitzsimmons and do it this afternoon.

9              THE COURT:  I don't want to end up in a situation

10   where poor Dean Fitzsimmons has to come back for 10 minutes

11   tomorrow.  I'd rather -- if we're going to finish him today,

12   I'd like to finish him.  I don't want to use up his time such

13   that he ends up having to come back another day unless he

14   wants to.

15             MR. LEE:  Going to need more shirts.

16             THE WITNESS:  I got a shirt.

17             THE COURT:  When you're ready.

18             MR. LEE:  Thank you, Your Honor.

19             THE COURT:  One more reminder.  I'm sure you know

20   this by now, but you're still under oath.

21             THE WITNESS:  Yes, Your Honor.

22             (WILLIAM FITZSIMMONS previously sworn by the Deputy

23   Clerk.)

24                   CROSS-EXAMINATION (resumed)

25   BY MR. LEE:

1    **Q.**  Dean Fitzsimmons, when we suspended yesterday, we were

2    discussing the process by which the admissions office reviews

3    files and makes decisions.  Do you remember that?

4    **A.**  I do.

5    **Q.**  I'm going to put on the screen now DD 1.17.  It's Tab 2

6    of the notebook.  It's a demonstrative.  You can look at it

7    on the screen or the notebook, whatever is best for you.  And

8    I want to move to the next stage of the process.

9           After the initial review of the applications which

10   we discussed yesterday, what is the next step in the review

11   process?

12   **A.**  I believe we were talking about the subcommittee

13   meetings.

14   **Q.**  What are the subcommittee meetings?

15   **A.**  This is what we would call the first pass.  And there are

16   about 20 or so subcommittees just dividing pretty much evenly

17   the number of applications geographically.  It's meetings

18   that take place, five to seven people, three to five days to

19   do the initial review.

20   **Q.**  And what happens at the subcommittee meetings?

21   **A.**  Literally what happens is we go through each school

22   individually throughout the whole docket.  As we start at

23   each school, we take a look at all the people who applied

24   from the school, and then the advocate makes a decision at

25   that point about which ones he or she will present and put up

1    all the information on the screen.

2    **Q.**   Now, are all the applicants from that docket discussed at

3    the meetings?

4    **A.**   Not all will be discussed at the meetings.  Some, based

5    on at least the initial readings, may not go through a

6    discussion.  It's really the ones who at least at that point

7    appear to be legitimate contenders.

8    **Q.**   Can other admissions officers in the subcommittee

9    meetings ask to discuss candidates who advocates are not

10   proposing?

11   **A.**   Absolutely.  That's really the job of the chair, but it's

12   also the job of everybody else on that committee to provide a

13   check and a balance, in a sense, on really the advocate's

14   judgment.

15   **Q.**   Now, are you familiar with the concept of a docket

16   binder?

17   **A.**   I am.

18   **Q.**   What is a docket binder and what is its purpose at the

19   subcommittee meetings?

20   **A.**   The docket binder is a paper -- there are two of them,

21   actually.  It's a paper copy of literally all of the schools

22   and all of the applicants by school.  It supplements the

23   electronic system that we have.

24   **Q.**   We're not going to offer it into evidence, but I have

25   this large notebook from one docket.

1              MR. LEE:  May I approach the witness, Your Honor?

2              THE COURT:  Yes.

3    BY MR. LEE:

4    **Q.**  We're not going to offer it into evidence because of its

5    bulk.  Can you just tell Her Honor what is in the docket

6    binder?

7    **A.**  It really is as we go through this docket it gives you

8    information literally about every single candidate on the

9    docket.  For example, I can take a look at this particular

10   school and I can see the person's name.  I can see background

11   information.  I can see the profiles that we've talked about.

12   I can see the test scores and what the person intends to

13   major in.  All that sort of information.  It's about this

14   much of a page for that person.  And that's for every single

15   person from that docket.

16              So that's why it's very easy for the chair to say,

17   okay, well, there happen to be three people, as I'm looking

18   right here quickly at this docket, who applied from this

19   school.

20              But everyone is looking at those three cases, and

21   the area person may have chosen to present one of them.  But

22   as that presentation goes on, everyone else may be looking

23   also -- listening, of course, but also looking at the other

24   two to see whether or not perhaps they should have been

25   presented.

1   **Q.**   Now, when an application is, in fact, discussed, is there

2   information available to the subcommittee members in addition

3   to the docket binder?

4   **A.**   There's a great deal of information.  We literally

5   have -- of course it's all electronic.  We have every single

6   thing about the applicant available, at least what's come in

7   up to that point.

8   **Q.**   And I think you told Mr. Hughes that the information is

9   projected on a screen, correct?

10  **A.**   Yes.  So all that information you would see literally

11  starting with the common application all the way through the

12  short story that was presented.  There are some applications

13  that will have well over 100 pages.

14  **Q.**   What is the end product of the subcommittee meetings?

15  **A.**   The end product is to come up with what we call initial

16  recommendations.  This is way oversimplified, but let's

17  say -- remember we have to go out with about 2,000 admits.

18          So let's say, oversimplification, we'd ask the

19  subcommittee to come in with 100 recommended admits.  So

20  they'd come in with 100 recommended admits, we hope, after

21  the five days after going through this.

22          They would have gradations of admits, some that

23  looked stronger than others.  They might circle some of those

24  actions, saying that we need this whatever-it-was additional

25  information.

1          They might also have circles around the wait-list,

2     the rejects.  We also have holds.  We also have a thing

3     called financial aid holds so that we can get more

4     information to determine whether or not this person is, in

5     fact, let's say, very low income.

6     **Q.**  Are the decisions final decisions?

7     **A.**  Hardly.

8     **Q.**  Now, are there applicants who are not recommended for

9     tentative admission after the subcommittee meetings that, in

10    fact, are admitted at the end of the cycle?

11    **A.**  Oh, absolutely.  All the time.

12    **Q.**  Are there applicants who are actually recommended for

13    tentative admission who are ultimately not admitted to the

14    class?

15    **A.**  Also all the time.

16    **Q.**  Turn to DD 1.18 and let's talk about the next step in the

17    process.  Do you have DD 1.18 before you?

18    **A.**  Yes.  Is this the full committee meeting?

19    **Q.**  Yes.  Who from your office participates in the full

20    committee meetings?

21    **A.**  All 40 or so admission officers.

22    **Q.**  Does anyone from outside the office participate in the

23    full committee meetings?

24    **A.**  We invite our faculty committee to come in, and based on

25    their schedules, they sometimes are able to be with us as

1   well.

2   **Q.**   Have you heard of something called the faculty standing

3   committee?

4   **A.**   And that's the faculty standing committee I was referring

5   to.

6   **Q.**   The faculty standing committee is made up of tenured

7   members of the faculty?

8   **A.**   That's correct.

9   **Q.**   How long do these full committee meetings last?

10  **A.**   The full committee meetings for regular will go from

11  roughly, say, March 3 to maybe March 20.

12  **Q.**   Turn, if you would, to Tab 4 in your notebook.

13  **A.**   I have it.

14  **Q.**   Do you find DX41?

15  **A.**   I do.

16  **Q.**   What is it?

17  **A.**   It gives you a simplified view of our admissions

18  calendar.

19           MR. LEE:  Your Honor, we offer DX41.

20           THE COURT:  What tab is it at?

21           MR. LEE:  Tab 4, Your Honor.

22           MR. HUGHES:  No objection.

23           THE COURT:  It's admitted.

24           (Defendant Exhibit No. DX41 admitted.)

25  BY MR. LEE:

1   **Q.**   By way of example, for the year 2013 to 2014, when did

2   the full complete meetings take place?

3   **A.**   From the 3rd of March.  It looks like we had final review

4   on the 19th.

5   **Q.**   Had there been an early action admission cycle before the

6   full admission cycle?

7   **A.**   There had.

8   **Q.**   Is the review process for applications the same for early

9   applications as it is for the regular application cycle?

10  **A.**   Yes.

11  **Q.**   During 2013 to 2014, how many dockets were discussed at

12  each full committee meeting?

13  **A.**   In the full committee, it's typically about two in the

14  full committee, sometimes depending on whether you get ahead

15  of schedule or have a fire drill, for example, something of

16  that sort.  But pretty much stay on schedule.

17  **Q.**   Are all applicants recommended by the subcommittees or

18  the dockets discussed at the full committee meetings?

19  **A.**   Yes.  Almost always.

20          But let's say you had someone recommended in

21  subcommittee and then subsequent information comes in

22  indicating that that person wasn't as strong a candidate as

23  we thought, maybe bad midyear grades, perhaps an interview

24  that was below expectations.

25          So you don't necessarily -- we would talk about it,

1    but there would be an explanation for why this person who had

2    been tentatively recommended in subcommittee was not going to

3    be presented.  And then the committee could say, well,

4    usually what you'd do is they had a lot of promise.  You

5    might end up putting that person on the waiting list and

6    hoping things get better, let's say, with the grades.

7    **Q.**   Now, as is true at the subcommittee level, can applicants

8    not recommended by the dockets be discussed?

9    **A.**   Yes.

10   **Q.**   How long does the full committee, all 40 people plus

11   whoever is there from the faculty standing committee, how

12   long does that group of folks discuss any particular

13   candidate?

14   **A.**   It really varies a great deal.  If you had someone who

15   was unbelievably strong and you could see that from the

16   reader sheet and a quick perusal and the subcommittee members

17   as well as the chair and the advocate talk about it, now,

18   that could be a relatively short discussion.

19          There are others where you could have a

20   discussion -- I know the math doesn't quite work out, Your

21   Honor, for this, but it does -- you can have a discussion of

22   up to an hour.  There's no limit to go through the

23   complexities of the case.

24          And you could also -- perhaps if it took that long,

25   you might at the very end of the subcommittee process talk

1    about -- in the last three days be talking about that

2    candidate again maybe one or two more times.  Maybe not for

3    an hour.  But the idea is we want the full committee to get

4    to know all the cases in the world here that have a chance of

5    getting in.

6    **Q.**   Now, as is true at the subcommittee level, are the

7    applications themselves projected electronically on a screen?

8    **A.**   Yes.

9    **Q.**   Are the applications in full available electronically to

10   all the admissions committee members?

11   **A.**   Yes.

12   **Q.**   Does the full committee ever have information that the

13   first readers who we discussed yesterday did not?

14   **A.**   It happens all the time because so much late information

15   comes in because the senior year is a time for candidates

16   where lots of things are coming together.

17   **Q.**   And for some of these applications, they're filed in

18   November and the full committee's meeting five or six months

19   later?

20   **A.**   They can be totally different applications at that point.

21   **Q.**   Now, how does a full committee decide to admit, reject,

22   or wait-list an applicant?

23   **A.**   It really is a majority vote.  I've got a vote, as does

24   everyone else.

25   **Q.**   And you take those votes in the open meeting with 40

1    folks there?

2    **A.**   Yes.

3    **Q.**   Now, you mentioned earlier that you could only admit

4    about 2,000 applicants.  Do you recall that yesterday?

5    **A.**   I do.

6    **Q.**   When you get to the end of the full committee process,

7    are you often over 2,000 in number of tentative admits?

8    **A.**   Not often.  Always.

9    **Q.**   Do you have something called a lop process for when you

10   reach that point?

11   **A.**   We do.

12   **Q.**   What is the lop process?

13   **A.**   It's a process that sometimes takes us as long as three

14   days where we might have just, for example, 100 places left

15   in the class based on what we've done before.  And we might

16   have 300 people that we have been looking at actually over a

17   period of time.  And so it's getting to know, over a

18   three-day period, all of those people who have a real chance

19   of getting into the class and then voting and comparing each

20   one.

21   **Q.**   So when you said a little bit earlier that some

22   applicants could be discussed for a second or third time, is

23   this one of the occasions on which some applicants would be

24   discussed again?

25   **A.**   Yes.  And they could have been discussed two or three

1  times in subcommittee.  Yes, that's how it works.

2  **Q.**  I'm sorry.  Turn, if you would, to Tab 5.  Do you have

3  Tab 5 before you?

4  **A.**  I do.

5  **Q.**  What is Tab 5?

6  **A.**  This is a memo that I sent out on March 14, 2014, about

7  essentially the last three days, the so-called lop session

8  which you referred to.

9          MR. LEE:  Your Honor, we offer DX56.

10         MR. HUGHES:  No objection.

11         THE COURT:  Admitted.

12         (Defendant Exhibit No. DX56 admitted.)

13  BY MR. LEE:

14  **Q.**  Let me turn you in the document to the second to the last

15  paragraph.  Let me ask you first, are you the author of the

16  document?

17  **A.**  I am.

18  **Q.**  To whom did you send the document?

19  **A.**  To the whole staff.

20  **Q.**  And would you read for us the paragraph that begins,

21  "These are only guidelines."

22  **A.**  "These are only guidelines.  In the end it will be the

23  quality of the case that decides the issue, not whose case it

24  is or on which docket it resides.  There is a time and a

25  place for strong advocacy, but we must put this role aside

1  and think simply about getting the best class.  For the most

2  part, the class has been chosen and there is no reason to do

3  anything other than keep our perspective and sense of humor

4  as we make the final judgments."

5  **Q.**  Is that how you conduct this last stage of admissions

6  process?

7  **A.**  That's right.

8  **Q.**  Now, if we could go back to slide DD 1.19 in Tab 2.

9  What's the final step in the admissions process that we've

10 been discussing yesterday and today?

11 **A.**  Well, after we make -- get through that session, we make

12 our final decisions.  And then of course we then let the

13 financial aid office do what they do magically and come up

14 with financial aid awards and then send out the admission and

15 financial aid packet together.

16 **Q.**  And you then offer admission to approximately how many

17 people?

18 **A.**  About 2,000.

19 **Q.**  Now, to give some life to the process, I'm going to take

20 you through an actual application file so we can see how this

21 works.  Could you turn to Tab 6?

22        THE COURT:  Can I ask a question?  Of your

23 admissions, the 40 readers -- let's just take this year, if

24 you remember.  How many of those 40 were Asian?

25        THE WITNESS:  On the voting committee this year I

1  think around four or five, I would say.  On the staff, it's

2  more like eight or ten, I would say.

3        THE COURT:  Okay.

4        MR. LEE:  Your Honor, what we're going to do is I'm

5  going to offer DX293, which is at Tab 6.  It has personal

6  identifying information, obviously.  What I'm going to do is

7  take the dean through it and direct Your Honor's attention to

8  pages, ask him to describe what's there in general terms so

9  he's not revealing the information.  And we won't put the

10  information on the public screen, but it will be an

11  opportunity to walk through an actual file, if that's all

12  right with Your Honor.

13        THE COURT:  This appears to be the one that we

14  spent some time on yesterday.

15        MR. LEE:  Yes.  A little bit, yes.

16        THE COURT:  Does it make sense to put yesterday's

17  exhibit up on the screen so we can have some idea what we're

18  talking about?

19        MR. LEE:  That was just a demonstrative.  It had

20  the summary sheet on the left and the pullout on the right.

21        THE COURT:  Yes.

22        MR. LEE:  We can put it back up so people will know

23  what it is, and I'll offer the file.  Could someone remind me

24  what the demonstrative number is?  Here it is.  So this is a

25  file for DD 1.9, Your Honor.  On the left would be the

1    summary sheet from the actual file.  DX293 is the actual

2    file.

3              THE COURT:  Yes.

4              MR. LEE:  And we would offer DX293.

5              MR. HUGHES:  No objection, Your Honor.

6              THE COURT:  Admitted.

7              (Defendant Exhibit No. DX293 admitted.)

8    BY MR. LEE:

9    **Q.**  Now, Dean Fitzsimmons, I want to take you through the

10   file, as I said, to give some life to the process, but I'd

11   like to do it in a way where we're not revealing information

12   about this person individually so we can protect their

13   privacy.  Are you with me?

14   **A.**  I'm with you.

15   **Q.**  If you look at DX293, just first, look at the first three

16   pages.  Do you have those before you?

17   **A.**  I do.

18   **Q.**  What are those first three pages?

19   **A.**  The first page gives you lots of demographic information

20   and test scores and background information.  And then the

21   second and third pages are for comments by the readers.

22   **Q.**  What follows these summary sheets?

23   **A.**  What follows the summary sheets, the first sheets, so on

24   page 2, this is after the first two readers put their

25   profiles in.  They then talk about what they think some of

1    the strengths and possible weaknesses of the application are

2    and what some of the issues are, maybe some of the

3    highlights.

4    **Q.**   Turn, if you would, then, to the fourth page of the

5    exhibit.  Do you have that before you?

6    **A.**   Yes.

7    **Q.**   What begins at the fourth page?

8    **A.**   This is the common application that I mentioned

9    yesterday.

10   **Q.**   Again I want to protect the privacy of the individual.

11   In the common application, in general, what is the

12   information that the applicant is providing on the fourth and

13   following pages?

14   **A.**   It's all kinds of information about the family, the

15   background, to some extent the financial status.  All kinds

16   of things to really help to give a little bit of a sense of

17   who the actual person is.

18   **Q.**   Turn, if you would, to page 5, which has the numbers .005

19   in the bottom centered.  Do you see that?

20   **A.**   Yes.

21   **Q.**   Is this still part of the common application?

22   **A.**   Yes, it is.

23   **Q.**   What information is being provided by the applicant on

24   page 5?

25   **A.**   This is all about the family.  Families obviously are

1   very important in all kinds of ways for students.  It gives

2   you a sense of the -- among other things, the educational

3   background of the family, the profession the family might

4   have, and also information about siblings, which can

5   sometimes be sort of an interesting piece of a person's life.

6   **Q.**   One of the pieces of information you mentioned was

7   parental occupation, correct?

8   **A.**   That's correct.

9   **Q.**   Do you consider parental occupation in the admission

10  among many of these factors?

11  **A.**   We do because it can often give you at least a high

12  correlation with the student's life chances.

13  **Q.**   Can you give us an example where the parental occupation

14  would illuminate or educate your admissions decision?

15  **A.**   It really illuminates almost every case.  Let's say you

16  had somebody -- for example, in California we have a fair

17  number of migrant worker families who have kids in the pool

18  and who end up sending their kids to Harvard.  So that kind

19  of a piece of information would be very helpful.

20  **Q.**   Now, in your experience, is there a benefit to Harvard

21  student body in considering the backgrounds and parental

22  occupations in the admissions decisions?

23  **A.**   I think there's a huge benefit.  Because I think, again,

24  you bring with you to Harvard your life experience.  And your

25  life experience has been shaped often quite profoundly by

1    your parents and your family situation.  So you bring, in a

2    sense, a slice of that life with you.

3              For example, let's say you were the son or daughter

4    of a migrant worker.  It's one thing to talk about migrant

5    workers and immigration in the abstract, for example.  It's

6    another thing to live with someone for four years who has

7    lived that experience.

8    **Q.**  Now, turn if you would, to page 6 and 7 of the exhibit.

9    They have the numbers .006 and .007.  Do you see those?

10   **A.**  Yes.  I have it.

11   **Q.**  Are these still part of the common application?

12   **A.**  Yes.

13   **Q.**  Again without specifics, what information is the

14   applicant now providing?

15   **A.**  It's information about the high school, or lack

16   thereof -- because we have people who are homeschooled -- a

17   little bit about honors, future plans, which we know can

18   often be tentative, and also a little bit of a sense of what

19   the current year courses are.

20   **Q.**  Now, if you turn to pages 8 and 9 of this application --

21   **A.**  Yes.

22   **Q.**  -- what is on pages 8 and 9?

23   **A.**  0OO7 is really just about testing, whatever testing a

24   person wants to put in.

25   **Q.**  I put you on the wrong page.  Pages .008 and .009?

1    **A.**   008 and 9 are the opportunity for the student to tell us

2    about what he or she has done not just in school but out of

3    school.  And not just conventional extracurricular activities

4    but work experience:  babysitting, which I did myself because

5    I had too much younger siblings and had a neighborhood

6    babysitting system.  But whatever that person has done

7    outside of school is of interest to us in addition to what

8    that person might have done academically.

9    **Q.**   Did this applicant have actually a substantial number of

10   activities outside the classroom?

11   **A.**   Yes.

12   **Q.**   Now, turn to the final page of the common application.

13   Do you have that before you?

14   **A.**   0010.

15   **Q.**   Do you have that?

16   **A.**   I do.

17   **Q.**   What is that?

18   **A.**   This is the personal essay, and it also is an opportunity

19   for a person to give additional information.

20   **Q.**   And is the personal essay an important part of the file

21   when you're considering an admissions decision?

22   **A.**   It can be.  It's a real opportunity for the student to

23   help define who he or she is.

24   **Q.**   Turn to the page that at the bottom center says .12,

25   00.12.  Do you see that?

1     **A.**   On this page.

2     **Q.**   .0012 in the middle.

3     **A.**   0012 in the middle.  What am I missing here?  I'm sorry.

4     I'm talking about 0012.  Okay.  It's the Harvard College

5     member page.

6     **Q.**   What is the Harvard College member page?

7     **A.**   So under the common application, a college can ask

8     additional questions that we think might be helpful in

9     filling out the picture.

10    **Q.**   What does Harvard ask applicants to do to help fill out

11    the picture?

12    **A.**   We're actually really trying to get a little bit more of

13    a sense of how the person is thinking about college and what

14    we might look for in the application.

15            So for example, for many -- since as long as I've

16    really been in the office, we've encouraged people to send in

17    portfolios or any additional information they might want to

18    send.  This is a sign for us to look for it in the

19    electronics.

20            But we're also interested in what kind of thing

21    they want to do academically and also maybe how certain they

22    may be.  We're not looking for certainty necessarily because

23    one of the jokes in college admissions is the most popular

24    major is undecided.  But nevertheless, there are people who

25    might be, for example, among the best poets in the country or

1    the best mathematicians.  So we'd be interested in that.

2              And then we're trying to get a sense of how the

3    student is envisioning spending time in college.  So you can

4    look at the activities section.  Not surprisingly, just based

5    on the previous page, this woman wants to dance, is her

6    number one extracurricular.

7              But we're also concerned about, I guess, two things

8    under the context.  One is we're trying to check ourselves to

9    see whether or not sort of the way we try to reach out to

10   people is effective.  So we want to find out how this person

11   ended up in the Harvard applicant pool.

12             So you can see with her she was part of our email

13   and social media campaigns and our letter writing and mailing

14   campaign.  She also probably was contacted by one of our

15   student recruiters, it looked like, and maybe one of our

16   alums.  We're always glad to see -- we try to make sure we

17   understand, try to check ourselves to make sure that our

18   outreach is as good as can be.

19   **Q.**  One of the things you mentioned was intended

20   concentration or major.

21   **A.**  Yes.

22   **Q.**  Why do you ask for that information?

23   **A.**  Because it is important for us to see how well people are

24   thinking about their academic interests but also really to

25   take a look at the record they have compiled.

1          Let's say, for example, one of the things we're
2    always interested in doing is getting more humanists to come
3    to Harvard.  Unfortunately, if you look at the College Board
4    reports every year, there seems almost every year there are
5    fewer and fewer students who want to do anything like the
6    humanities in college.  And we think we've got a great
7    humanities program, and we teach over 80 languages.
8          So we really want to get these humanists to come
9    here.  If they have a track record of accomplishment in the
10   humanities, let's say they had taken Latin and Greek and they
11   were thinking of the classics, that's really a good thing
12   because we think it's really important for people with such
13   serious interests and track records they'll be great
14   educators, we hope.  Not just a fellow humanist but of our
15   engineers and our scientists so they'll have a human basis
16   for deciding how to use this powerful technology they're
17   studying.
18   **Q.**  Do you also consider information about the applicant's
19   intended career, tentative as it is?
20   **A.**  We do, tentative as it is.  But sometimes there are
21   people who make a very clear record of interest and
22   demonstrated accomplishment that would lead them to be very
23   successful in one kind of career or another.
24   **Q.**  Now, let's look at the additional information that's in
25   this file.  Turn, if you would, to the pages 00.17 to 00.20.

1    Do you have that?

2    **A.**   I have 17.

3    **Q.**   Yeah.  All I want you to do right now, I'm going to come

4    back to some of the specifics.

5              What is the document that begins at page 00.17?

6    **A.**   This is the secondary school report that usually is

7    filled out by the guidance counselor or the head of the

8    school or something of that sort.

9    **Q.**   Turn, if you would, to pages 25 -- 00.25 to 00.30.

10   **A.**   Okay.  I have it.

11   **Q.**   What do you find there?

12   **A.**   This is one of the teacher reports.  We require that

13   students send two recommendations from teachers.

14   **Q.**   Turn, if you would, to the pages .0031 to 32.  What do

15   you find?

16   **A.**   There we have the interview from the alumnus or alumnae.

17   **Q.**   Turn, if you would, back to the first page of this

18   applicant's file.

19   **A.**   Right to the reader sheet.

20   **Q.**   Right.  Now, did the first reader assign ratings that we

21   looked at briefly yesterday?

22   **A.**   Yes.

23   **Q.**   Was there a second reader?

24   **A.**   Yes, there was.  The chair of the docket.

25   **Q.**   Is there an academic rating?

1    **A.**   There is.

2    **Q.**   What was the academic rating assigned to this applicant

3    by the first reader?

4    **A.**   A 2+ academic.

5    **Q.**   What was the academic rating assigned by the docket

6    chair?

7    **A.**   A 2, which seems a little low to me.  But nevertheless,

8    there it is.

9    **Q.**   Now, you told me that page 6 provides information on the

10   applicant's educational background, correct?

11   **A.**   That's correct.

12   **Q.**   And page 7 provides information on the testing results?

13   **A.**   Yes.

14   **Q.**   Is that the only information that is considered in

15   setting the academic rating?

16   **A.**   Hardly, no.

17   **Q.**   Turn, if you would, to page 15 of the application file.

18   **A.**   I have it.

19   **Q.**   Do you have it before you?

20   **A.**   Yes.  15, right.

21   **Q.**   What is that?

22   **A.**   This is the writing supplement, again something we allow

23   people to do.

24   **Q.**   Now, looking at this writing supplement, is there

25   information in the writing supplement from the applicant that

1   would be considered in assigning the academic rating?

2   **A.**   Yes.

3   **Q.**   What?

4   **A.**   I think one the things that comes through, as I read

5   through here quickly, is a tremendous intellectual curiosity

6   and love of learning, which is a huge piece of being a really

7   great academician.  Without that, it doesn't work.

8   **Q.**   Was there a discussion in her written supplement about

9   her research in a laboratory?

10  **A.**   Yes.

11  **Q.**   Would that information be useful in setting the academic

12  rating?

13  **A.**   Yes, absolutely.  Very important.

14  **Q.**   Turn, if you would, to pages 17 to 20 of DX293.

15  **A.**   17 to 20?

16  **Q.**   Yes.

17  **A.**   Okay.

18  **Q.**   You told me that that's the school report?

19  **A.**   It is.

20  **Q.**   Is the school report used in assigning the academic

21  rating?

22  **A.**   Yes.

23  **Q.**   Why is it important?

24  **A.**   Really for some of the same reasons.  I think it's to try

25  to get a sense of, based on what was available at the school,

1   for example, academically, did this person take full

2   advantage of the academic opportunities at the school.

3          And the other part of it is -- I don't want to be

4   too simple-minded about it, but did this person do it

5   joyfully?  Did this person again have an excitement and a

6   love of learning and an intellectual curiosity?  Was this

7   person perhaps someone who might have inspired other students

8   to share that love of learning?

9   Q.  And what type of information did you get on those issues

10  from this file?

11  A.  Lots of things.  They talk about her being an

12  extraordinary young woman.  It talks all about the amazing

13  things she did to try to get into the ballet world at a

14  relatively older age.

15         It's really, in lots of respects, a love letter for

16  a person who has, to me, astonishing range of intellectual

17  and other interests and seems to be able to blend those

18  interests together, which is a really good sign, something

19  you'd want to look for.

20  Q.  Turn to the pages that have the Bates stamp number 0022

21  through 0023.  Do you have those?

22  A.  I do.

23  Q.  I forgot to ask you about these.  What are those?

24  A.  If it's 0022 and 23, it's the end of the secondary school

25  report.

1    **Q.**   Recommendation from the guidance counselor?

2    **A.**   From the guidance counselor, right.

3    **Q.**   Turn back to page 1.

4    **A.**   Yes.

5    **Q.**   What was the extracurricular rating for this applicant?

6    **A.**   It was a 1.

7    **Q.**   How unusual is it to have an extracurricular rating of 1?

8    **A.**   It's quite unusual.

9    **Q.**   Is the extracurricular rating of 1 or 2 or 3 or 4 done by

10   some formula?

11   **A.**   Not at all.

12   **Q.**   Is there information in this file that would tell you why

13   the readers gave her a extracurricular rating of 1?

14   **A.**   There is.

15   **Q.**   Turn, if you would, to page 8.  Do you have that?

16   **A.**   Page 8.

17   **Q.**   .0008?

18   **A.**   Yes, sir.

19   **Q.**   In general terms, what's listed on this page?

20   **A.**   In general terms, there's really a listing of the

21   activities.  And they're pretty impressive.  The listing

22   alone wouldn't -- that would suggest that you start to look

23   for the quality.

24   **Q.**   I'm going to ask you some specifics, but again trying to

25   protect the applicant's privacy.

1          Did this applicant have a research internship?

2     **A.**  Yes.

3     **Q.**  Did this applicant perform with a ballet company?

4     **A.**  Yes.

5     **Q.**  Did she also participate in student government?

6     **A.**  She did.

7     **Q.**  And did she also have a paid job?

8     **A.**  I'm sorry?

9     **Q.**  Did she also have a paid job?

10    **A.**  Yes.

11    **Q.**  Is there information on these pages about how many hours

12    she devoted to each of these activities?

13    **A.**  There is.

14    **Q.**  Now, is this the only information that you consider when

15    you set the extracurricular rating?

16    **A.**  No, not at all.

17    **Q.**  Turn to page 42.

18    **A.**  42.  Yes, I have it.

19    **Q.**  What is this?

20    **A.**  This is a rating from our own dance person, Jill Johnson.

21    **Q.**  She's a faculty member?

22    **A.**  She is.

23    **Q.**  And what is she rating?

24    **A.**  She's rating the dance and choreography, and she's

25    giving -- beyond the rating, she's giving sort of a

1    description of what it is perhaps we would expect this person

2    to do.

3            And that's a very good thing for us to understand

4    because it means in these activities which she could be

5    perhaps a star in, she'll meet others, she'll inspire others,

6    she'll educate others in these activities.

7    **Q.**  Turn back to the first page of the exhibit again to the

8    summary sheet.

9    **A.**  Yes.

10   **Q.**  Is there a personal rating?

11   **A.**  There is a personal rating.

12   **Q.**  Now, we looked at that briefly yesterday, correct?

13   **A.**  Yes.

14   **Q.**  What I'd like to do now is look at some of the

15   information that would have been used or was used in setting

16   the personal rating.  Are you with me?

17   **A.**  I'm with you.

18   **Q.**  Turn to page 10.

19   **A.**  Okay.  I have it.

20   **Q.**  What do you find at page 10?

21   **A.**  We have the essay and then we also have the additional

22   information.

23   **Q.**  And without disclosing details, what information is the

24   applicant providing to you that helps set the personal

25   rating?

1         MR. HUGHES:  Your Honor, I'm going to object to
2    this question.  He didn't actually award the personal ratings
3    on this application.  It's pure speculation on his part about
4    what the people who actually did consider in awarding those
5    awards.  He has no basis to testify what they considered when
6    awarding those awards.  He can talk about what's in the
7    application, but I don't see how he can possibly offer
8    reliable testimony on what went into the subjective
9    determination of awarding the personal scores on this
10   application.
11        THE COURT:  Well, I think he can say that -- he can
12   say whether or not the personal essays are considered in that
13   score.  And he can say generally what the two topics are that
14   she covers in these, right?
15        MR. HUGHES:  I think he can say what information is
16   contained in the application.  He can't get in the mind of
17   the people who awarded the personal score.  Certainly that
18   information was available to them, but he can't say that
19   whoever awarded these scores considered this essay or this
20   factor.
21        THE COURT:  No, but he can ask him whether or not
22   the essays are considered in the personal rating.  If he says
23   sometimes, he may not know whether it was in this case.  But
24   if he says it's the office policy that they always are, and
25   to discuss these two topics, that's fine.

1                    So why don't you lay the foundation.

2                    MR. LEE:  Sure.

3        BY MR. LEE:

4        **Q.**  First, Dean Fitzsimmons, was this student admitted to

5        Harvard?

6        **A.**  Yes.

7        **Q.**  Were you there when her file was reviewed and put on the

8        screen?

9        **A.**  I was.

10       **Q.**  Were you there when the summary sheet was put on the

11       screen?

12       **A.**  Yes.

13       **Q.**  Did you have access to every single piece of paper and

14       information we've just been discussing?

15       **A.**  Yes.

16       **Q.**  You had a chance to look at the personal rating that the

17       first reader had established, correct?

18       **A.**  I did.

19       **Q.**  Have you evaluated the personal rating -- withdrawn.

20                    Turn to page 10.  Do you have that before you?

21       **A.**  I do.

22       **Q.**  Is there any information on page 10 that was relevant to

23       you when you were evaluating the personal qualities of this

24       applicant?

25       **A.**  Very much so.

1    **Q.**  In general terms, without revealing her personal details,
2    could you tell us the type of information that's on page 10
3    that is useful in evaluating the personal characteristics of
4    a person?
5    **A.**  I would say first in terms of extracurricular interest.
6    The way she went about it was very unusual and the way she
7    described her experience with dance was quite unusual.
8           That was reflected in Jill Johnson's report.  Jill
9    Johnson is a very tough grader.  If you look carefully at
10   that piece, she actually rated her as a 2+ plus, which -- I'm
11   not sure I've ever seen Jill give a 1.
12          It's the combination of her heart and her soul and
13   her intellect that goes into her extracurricular passion.
14   It's dance for its own sake.
15          The other piece on the same page was really all
16   about her father's health challenges.  Without getting into
17   the details that could reveal -- that could broach
18   confidentiality, I found this to be incredibly moving.  And I
19   would have given her -- based on these two and all the rest
20   of the information in the application, I would have given her
21   a 1 personal.
22   **Q.**  Now, is the manner in which she responded to her father's
23   disability something you considered in evaluating her
24   personal qualities?
25   **A.**  Yes, very much so.

1   **Q.**   Is it something that you can reduce to a number?

2   **A.**   Not in a million years.

3   **Q.**   Turn, if you would, to pages 22 and 23, which we

4   discussed just a few minutes ago.

5   **A.**   Yes.

6   **Q.**   Does the secondary school report of this candidate

7   discuss her personal qualities?

8   **A.**   Yes.

9   **Q.**   And again without reviewing details, what does the school

10  say about the personal qualities of this young woman?

11  **A.**   Among other things, they talk about her as being an

12  extraordinary young woman and then give you loads of reasons

13  and examples of why they would make that claim.

14  **Q.**   Did they provide any information about how she interacts

15  with others in her community?

16  **A.**   Yes.  Very much so.

17  **Q.**   Would that be important to you in evaluating the personal

18  characteristics of a candidate?

19  **A.**   Absolutely.

20  **Q.**   I think you told us that she's described as an

21  extraordinary young woman, correct?

22  **A.**   That's correct.

23  **Q.**   Let me do this so that we're not revealing too much

24  information.  Is she also described as gracious, genuine, and

25  caring?

1    **A.**   Yes.

2    **Q.**   Is that information important to you in evaluating the

3    personal qualities of a candidate?

4    **A.**   Yes.

5    **Q.**   Now, if you turn to pages 26 and 27, do you have those

6    before you?

7    **A.**   I do.

8    **Q.**   I think you told me this is one of the teacher

9    recommendations?

10   **A.**   It is.

11   **Q.**   Turn, if you would, to page 27 to the paragraph that's at

12   the bottom of page 27 and carries over to the top of -- I'm

13   sorry.  At the bottom of page 26 and then carries over to the

14   top of 27.  Do you see that?

15   **A.**   I do.

16   **Q.**   And I think we can do this without revealing any

17   confidential information.  But if you look at the very last

18   sentence?

19   **A.**   Yes.

20   **Q.**   It begins, "As this illustrates the nature of all" --

21   redacted -- "activities."

22            Would you read the remainder of the sentence?

23   **A.**   Let's see.  You're starting where?

24   **Q.**   If you start at the top of page 27.

25   **A.**   Okay.  I'm sorry.

1    **Q.**  I want you to begin with "She is."

2    **A.**  "She is mature beyond her years.  She operates at an

3    exceptional level for a person of any age, and she does so in

4    a number of different fields all at the same time."

5    **Q.**  Was that information important to you in evaluating the

6    personal qualities of this candidate?

7    **A.**  Yes.

8    **Q.**  Staying on page 27, let's see what else her teacher says

9    about her.  Do you see the portion in the second page which

10   reads, "She is calm, kind, and quiet, thoughtful and focused,

11   never anxious but always working toward her goals."

12   **A.**  I see that.

13   **Q.**  Was that also important information to you?

14   **A.**  Very much so.

15   **Q.**  Turn to page 29 and 30.

16   **A.**  I have it.

17   **Q.**  Is this another teacher recommendation?

18   **A.**  It is.

19   **Q.**  We're not going to go through it, but it will be part of

20   the record for Her Honor.

21          But again, is there information on the personal

22   qualities of this individual that would have been relevant to

23   the personal rating but, more importantly, is relevant to

24   whether she's admitted or not?

25   **A.**  Absolutely.

1    **Q.**   Turn to pages 31 and 32.

2    **A.**   I have them.

3    **Q.**   I think you told me that's the alumni interview report?

4    **A.**   It is.

5    **Q.**   Now, was the alumni interview report available at the

6    time that the preliminary ratings were set?

7    **A.**   You know, I'm not sure.  Quite possibly not so because --

8    because California, I think I mentioned yesterday, four out

9    of the past seven years has been our biggest contributor of

10   students to Harvard.  There are lots of people applying.  So

11   our alumni interviewers often are -- they have a big backlog

12   and they'll get to the ones we need to get to.  It's quite

13   likely it wasn't there when --

14   **Q.**   If you turn to page 32 --

15   **A.**   Yes.

16   **Q.**   -- there is a portion of the interview form called

17   "Personal Qualities."  Do you see that?

18   **A.**   I do.

19   **Q.**   Now, to help complete the picture, do you recall

20   yesterday when I started your cross-examination we were

21   looking at the interview handbook?

22   **A.**   Yes.

23   **Q.**   And there was a section that described how interviewers

24   should evaluate personal qualities?

25   **A.**   Yes.

1  **Q.**  If I'm looking at the top of page 22, what is set forth

2  in general terms --

3  **A.**  You mean 32?

4  **Q.**  32, you're right.  I'm sorry.

5  **A.**  This gives you -- and I guess you could look under the

6  other topics as well.  For example, under academic, if you go

7  to 31, you can see some of the things even before they get

8  into their write-up that we hope that they will engage in.

9            And then we try to give them a little sense on the

10  extracurriculars.

11            The personal qualities, among other things, we'd

12  like them to give us information or at least their opinions

13  on openness to new ideas and new people, contribution to

14  college life.

15            And a very, very fundamental question that we've

16  talked about before, and with Mr. Hughes as well, is the

17  whole idea of what kind of a roommate will this person be.

18  That's the beginning of the places where people can really

19  make a difference to educating their fellow classmates.

20            And then of course we just ask them to give an

21  overall.  They can write as much as they want, by the way,

22  because the electronics now allow them to continue on, as

23  they say, for pages if they want to.

24  **Q.**  Now, under the comments this begins, "There is a special

25  maturity about the applicant," correct?

1    **A.**   That's correct.

2    **Q.**   Is that the kind of information that is important to you

3    in evaluating the personal characteristics and qualities of a

4    candidate?

5    **A.**   Yes.

6    **Q.**   Is it important to you in deciding whether to admit a

7    candidate or not?

8    **A.**   Absolutely.

9    **Q.**   Is it capable of quantification?

10   **A.**   No.  I'm not sure how you do it, but if you use all the

11   different sources and you begin to see how they all meld

12   together, you can get, I think, a good picture of that.

13   **Q.**   Now, you mentioned yesterday, but we didn't talk about it

14   much, that the admissions office also assigns a rating to the

15   guidance counselor recommendation?

16   **A.**   That's correct.

17   **Q.**   And to the teacher recommendations?

18   **A.**   That's correct.

19   **Q.**   And if you go back to page 1 --

20   **A.**   I have it.

21   **Q.**   -- of this exhibit?

22   **A.**   Yes.

23   **Q.**   Do you have those?

24   **A.**   I do.

25   **Q.**   Now, those are the numbers or the ratings that were

1    assigned by the reader to the guidance counselor

2    recommendation and the teacher recommendations?

3    **A.**   That's correct.

4    **Q.**   Now, let's turn to page 2 of the application file.

5    **A.**   Okay.

6    **Q.**   Now, what is at page 2?

7    **A.**   This again is a chance for the readers to put any notes

8    down that they think is worth perhaps mentioning in the

9    subcommittee and the full committee.  And also we ask them to

10   give a brief overview of what they think is actually going on

11   in the total file.

12   **Q.**   What did the first reader say about this candidate?

13   **A.**   I am not sure how X has managed to accomplish so much.  A

14   product of the blank public schools, she spent her early

15   education in a Spanish immersion program, so she's bilingual.

16   She auditioned for dance but soon discovered a love for

17   ballet and enrolled in the City Ballet of X and fought to

18   continue academics through school.

19         With the city ballet, she had lead paid roles such

20   as Aurora in Sleeping Beauty.  She's got a talent for science

21   and research supported by teachers at a local university.

22   For courses that her school did not offer, such as AP

23   chemistry, bio, and environmental studies, she studied the

24   material on her own.

25         It says she studied the material and took the exams

1    on her own, paying for them out of her babysitting money and

2    in the process earned a top grade, which is a 5, in those

3    tests.

4            The principal investigator in the lab where she

5    volunteers wrote that she has "shown a devotion, maturity,

6    and strong assistant in researches uncommon among peers her

7    age."  She sounds like she would be a fabulous admission to

8    Harvard.

9    **Q.**  Now, when you were telling Mr. Hughes that the admissions

10   process is not just any one factor but a collection of

11   information, is this the type of decision you were talking

12   about?

13           MR. HUGHES:  Your Honor, I'm going to object to the

14   leading.

15           THE COURT:  Rephrase the question.

16           MR. LEE:  I'll rephrase it.

17   BY MR. LEE:

18   **Q.**  Do you remember Mr. Hughes asking you about different

19   factors in the admissions process?

20   **A.**  I do.

21   **Q.**  And you responded about the different factors that were

22   considered?

23   **A.**  Yes.

24   **Q.**  Taking a look at this file, have we discussed the

25   different factors you had in mind when you were answering

1    Mr. Hughes?

2    **A.**   Yes.  I mean, this is a good example of what we do.

3    **Q.**   And she was admitted, correct?

4    **A.**   She was admitted.

5    **Q.**   Now, I'm going to come to another file in a few minutes,

6    but let me ask you a few questions about the use of race in

7    admissions.  You told Mr. Hughes that race can be considered

8    in the admissions process, correct?

9    **A.**   That's correct.

10   **Q.**   Can race be a tip for some applicants?

11   **A.**   It can be.

12   **Q.**   And you told us yesterday that can be a plus factor?

13   **A.**   It can be.

14   **Q.**   What does it mean for race to be a tip or a plus factor

15   in the admissions process?

16   **A.**   It simply means for people who are highly qualified and

17   who are, again, in that group of people who really have a

18   chance of getting in, it could be one factor that would lead

19   committee members to vote for that person just in terms of

20   whether or not that person might be a great educator of

21   others over the four years.

22   **Q.**   Are applicants of any race or ethnicity subjected to a

23   different admissions process?

24   **A.**   No.

25   **Q.**   In any of the ratings that we discussed, does indicating,

1   self-identifying yourself as a certain race automatically

2   result in a better rating?

3   **A.**   No.

4   **Q.**   Are there applicants of all races who are rejected

5   because they're just not academically qualified?

6   **A.**   That's correct.

7   **Q.**   For those applicants, is race a factor in those

8   decisions?

9   **A.**   No.

10  **Q.**   At what point in the process could race factor into the

11  decision?

12  **A.**   I think when you're in the situation of -- when you're

13  talking about candidates who are very competitive in the

14  subcommittee and then ultimately in the full committee,

15  that's when that kind of thing could come into play.  It's

16  one factor among many for people choosing to vote or not.

17  **Q.**   Is the fact that an applicant has self-identified their

18  race considered in assigning any of the four profile ratings?

19  **A.**   No.

20  **Q.**   Is it considered or can it be considered in assigning the

21  preliminary overall rating?

22  **A.**   It can be.

23  **Q.**   Must it be?

24  **A.**   Not necessarily.  Lots of people would be -- don't need

25  anything like that, that extra little tip to get in.  Many

1    people are -- again in the real world, you're talking about

2    people who are multidimensional across all these dimensions

3    that we've talked about.

4    **Q.**  Are there some applicants who will get in no matter what

5    their race or ethnicity is?

6    **A.**  Yes.  Quite a few.

7    **Q.**  How can race be considered in the preliminary overall

8    rating?

9    **A.**  If as the -- you're doing your preliminary overall

10   rating, if you think that this might be an additional little

11   element that might be helpful in terms of making a case that

12   this person, as I say, might be an unusual educator of

13   others, the person might decide to factor that into the

14   preliminary overall rating.

15   **Q.**  Is an applicant's race ever considered a negative factor?

16   **A.**  Never.

17   **Q.**  A negative tip?

18   **A.**  Never.

19   **Q.**  A negative, opposite of a plus, a negative?

20   **A.**  Never.

21   **Q.**  Turn, if you would, to Tab 7 in your notebook.

22   **A.**  Okay.

23   **Q.**  Do you find Exhibit 7 A-2 before you?

24   **A.**  I do.

25   **Q.**  Have you SA-2 before you?

1    **A.**  I do.

2    **Q.**  Have you seen it before?

3    **A.**  Yes.

4    **Q.**  Have you reviewed this file before?

5    **A.**  Yes.

6         MR. LEE:  Your Honor, we offer SA-2 which is one of

7    the exhibits from the amicus students.

8         MR. HUGHES:  No objection.

9         THE COURT:  Admitted.  Can I ask a question?  Are

10   we going to see any of the applications from the SFFA

11   representatives?

12        MR. LEE:  I don't think so.  Not a thing.

13        THE COURT:  Okay.

14        MR. LEE:  I think the only application files you're

15   going to see are from us.

16        THE COURT:  And you're not putting on any of the --

17        MR. LEE:  (Witness shakes head negatively.)

18        (Defendant Exhibit No. SA-2 admitted.)

19   BY MR. LEE:

20   **Q.**  Do you have SA-2 before you?

21   **A.**  I do.

22   **Q.**  Is this applicant a current student at Harvard?

23   **A.**  Yes.

24   **Q.**  Is this applicant one of the students who will testify at

25   this trial?

1    **A.**   Yes.

2    **Q.**   Turn, if you would, to page 4, which has the Bates stamp

3    number .004.

4    **A.**   Yes, I have it.

5    **Q.**   Is this the first page of the common application we've

6    discussed?

7    **A.**   Yes.

8    **Q.**   Does this applicant self-identify his race?

9    **A.**   Yes.

10   **Q.**   What does he say?

11   **A.**   He says Asian and then Vietnam.

12   **Q.**   So he has both identified himself as Asian and also as

13   Vietnamese, correct?

14   **A.**   Yes.

15   **Q.**   Now, for the first four days of this trial we've been

16   referring to Asian-Americans as a category.  Do you have that

17   in mind?

18   **A.**   I do.

19   **Q.**   In the admissions process, are there different groups and

20   subgroups and sub-subgroups within the category of

21   Asian-Americans?

22   **A.**   Very much so.

23   **Q.**   Are they different?

24   **A.**   Very much so.

25   **Q.**   Do you consider their differences?

1    **A.**   Yes.

2    **Q.**   Can you give us just an example of how they're different?

3    **A.**   There's a vast difference just within any country in Asia

4    in terms of socioeconomic advantage, for example.  The life

5    experiences of someone from Xinjiang province lives in a

6    rural area is vastly different from the experience someone

7    would have in Shanghai, for example.

8             There's astonishing diversity that you can get from

9    even one single country.

10            And in Vietnam, where I've actually been to

11   recruit, there is again a vast difference between what the

12   opportunities in life would be for someone from the rural

13   areas and someone in the cities.

14   **Q.**   The applicant here in the admitted student is named

15   Mr. Diep, correct?

16   **A.**   Yes.

17   **Q.**   And Mr. Diep has publicly disclosed portions of his file,

18   correct?

19   **A.**   He has.

20   **Q.**   I'm going to ask you some specifics that we can do on the

21   public record, thanks to him.  Turn, if you would, to page 5.

22   It has a Bates stamp number .0005.

23   **A.**   I'm sorry.  Page 5?

24   **Q.**   Yes.

25   **A.**   Okay.  I have it.

1   **Q.**  What does this page tell you about Mr. Diep's parents'

2   education?

3   **A.**  It tells you that they did not have college education,

4   but they did graduate from high school and secondary school,

5   which I think is a very good achievement.  And it also tells

6   you a lot about what they're doing for work now.

7   **Q.**  Would Mr. Diep be considered a first-generation Harvard

8   student?

9   **A.**  Yes.  As I was.

10  **Q.**  Turn, if you would, to page 6.  What was Mr. Diep's class

11  rank?

12  **A.**  Page 6.  I'm sorry.  He was number one in the class.  I

13  don't recall whether there was another person who shared that

14  rank, but he was number one.

15  **Q.**  What was his grade point average?

16  **A.**  4.325 out of 4.

17  **Q.**  Go to page 7.

18  **A.**  Okay.

19  **Q.**  What was Mr. Diep's SAT 1 score?

20  **A.**  The SAT 1 was a 650.

21  **Q.**  650 for critical reading?

22  **A.**  Yes.  I'm sorry.  Critical reading, which is the old

23  verbal if you're thinking of the way it used to be described.

24  710 in math and 710 in writing, and he had sort of mid

25  600-ish subject tests.

1    **Q.**   His total score on the SAT 1 was about 2090, correct?

2    **A.**   Sounds about right.

3    **Q.**   In the overall applicant pool at Harvard, where does a

4    2090 SAT 1 score fall?

5    **A.**   It would be kind of middling in the pool.  But I think

6    the way we would look at him is that here's a person who

7    until the fourth grade was in another country and English was

8    not his first language.  And he describes in the essay about

9    what he did to learn English.

10            Usually when a person has another language as a

11   first language or, as often is the case in many American

12   homes, usually over 20 percent of American homes have a

13   language other than English somewhere in the home.  You will

14   typically find a verbal or a critical reading score probably

15   is not going to reflect whatever his or her real verbal or

16   critical reading score would be.

17            If this person had had a different set of

18   opportunities to grow up with English and so forth, who

19   knows?  He may well have had an 800.

20   **Q.**   Was Mr. Diep academically qualified to be admitted to

21   Harvard?

22   **A.**   Perfectly qualified.

23   **Q.**   Turn, if you would, to page 10.

24   **A.**   Page 10.  Okay.

25   **Q.**   What did you find at page 10?

1    **A.**   His personal essay.

2    **Q.**   And what is the topic of Mr. Diep's personal essay?

3    **A.**   It's really all about his adjustment to the United States

4    and especially his language challenges, which is a problem --

5    we have loads of kids who arrive from other countries in our

6    pool and end up at Harvard.  His story is a familiar one.

7    **Q.**   Does he discuss the challenge with his classmates of

8    being Asian or Vietnamese?

9    **A.**   Very much so.

10   **Q.**   Turn, if you would, to page 26.  Let me ask you this:

11   You reviewed his file as part of the application process,

12   correct?

13   **A.**   Yes.

14   **Q.**   You were in the room when he was voted to be admitted,

15   correct?

16   **A.**   Yes.

17   **Q.**   Is this information that we're looking at now important

18   to you in evaluating the personal qualities of this

19   individual?

20   **A.**   Yeah.  Certainly I think for me and I think anyone who

21   would read it.

22   **Q.**   Turn, if you would, to page 26.

23   **A.**   Yes.

24   **Q.**   Is this the teacher evaluation?

25   **A.**   It is.

1    **Q.**   Now, since you've been doing most of the talking for

2    three days, I'll read this paragraph.   Do you see the second

3    paragraph that begins "As an immigrant?

4    **A.**   I do.

5    **Q.**   "As an immigrant, Thang has had to overcome some major

6    obstacles.   First, his father is still in Vietnam so Thang

7    has had to deal with the challenge of distance and separation

8    from him.   Second, Thang had had to deal with languages.   Due

9    to experiences when he was younger, Thang has had to overcome

10   a fear of public speaking.   As a child he was made fun of due

11   to his accent.   Once he entered high school, Thang challenged

12   himself to overcome this fear, and he has been successful in

13   this struggle.   Thang has developed strong voice and he

14   participates consistently with thoughtful comments and

15   questions."

16                Have I read that correctly?

17   **A.**   You have.

18   **Q.**   Was that information important to you when you were

19   evaluating the personal qualities of this individual?

20   **A.**   Absolutely.   How could your heart not go out for this

21   person?

22   **Q.**   Turn, if, would, to page 29.

23   **A.**   Yes.

24   **Q.**   What is at page 29?

25   **A.**   This is the alumnae/alumni interview.

1   **Q.**  And without going into the details, does the interviewer

2   note some of the same challenges and some of the same

3   successes?

4   **A.**  Yes.

5   **Q.**  And then let me ask you to look at another portion of

6   what the interviewer said.  There is a section called

7   "Supporting Comments on Personal Qualities Ratings."

8          Do you see that on page 30?

9   **A.**  I do.

10  **Q.**  And about halfway down there's a sentence that begins

11  "What was most striking."  Do you see that?

12  **A.**  Begins where they met?

13  **Q.**  No.  If you go down seven lines.

14  **A.**  Okay.

15  **Q.**  In the middle you'll see a sentence that begins "What

16  was."

17  **A.**  Yes.

18  **Q.**  All right.  Would you read that sentence for us.

19  **A.**  "What was most striking about Thang was his fun, casual

20  nature but impressive understated maturity."

21  **Q.**  Now, go back to the first page and let's look at the

22  ratings that the first reader assigned to this applicant.  Do

23  you have the first page before you?

24  **A.**  I do.

25  **Q.**  What was the preliminary overall rating assigned by the

1   first reader?

2   **A.**   It was a 2-.

3   **Q.**   What was of the initial academic rating?

4   **A.**   3+.

5   **Q.**   What was the initial extracurricular rating?

6   **A.**   2-.

7   **Q.**   What was the initial athletic rating?

8   **A.**   4.

9   **Q.**   And what was the initial personal rating?

10   **A.**   2-.

11   **Q.**   Now, the first reader also made some notes, correct?

12   **A.**   Yes.

13   **Q.**   And if you turn to the notes, do you see the notes from

14   the first reader?  Could you read to us the first two

15   sentences.

16   **A.**   It says, "Essay, immigrant Vietnamese identity" --

17   **Q.**   I'm sorry.  Wrong one.  The readers comments.

18   **A.**   Oh, yes.

19           Thang is an incredibly hardworking student and very

20   committed to pushing himself academically and personally.  He

21   has done a good deal to push his own boundaries and explore

22   new experiences.  Support expresses admiration for his

23   intellect, work ethic, and leadership on campus.  A very

24   involved first-generation student from a modest background,

25   one to compare with HFAI info --

1          Which is that's the Harvard financial aid

2     initiative, as we call it, to get the precise ranking.  In

3     other words, to get the information that might clarify that

4     he might be $65,000 and under family income so that the

5     family wouldn't have to pay anything, he wouldn't have any

6     loans to pay.  It would be obviously a full scholarship.

7     **Q.**  Did Mr. Diep's Asian and Vietnamese heritage factor --

8     strike that.

9          Did Mr. Diep's Vietnamese and Asian heritage

10    standing alone factor into any of the four profile ratings?

11    **A.**  No.  Not alone, no.

12    **Q.**  Did his story that resulted from his Asian and Vietnamese

13    heritage factor into the ratings?

14    **A.**  Yeah.  I think certainly into the overall rating.  To me

15    just reading it now, it's a very compelling story.

16    **Q.**  Did his application demonstrate to you that he would

17    contribute to the Harvard community?

18    **A.**  Very much so.

19    **Q.**  You told me that the Asian-American pool or the

20    Asian-American category actually has a lot of subgroups.

21          Are there groups within the Asian-American

22    community that actually receive tips in the admissions

23    process?

24    **A.**  I certainly think there are individuals.  For example,

25    Hmong applicants, there's actually quite a few from

1    Minnesota, for example.  A lot of the more recent immigrants

2    from Southeast Asia have come out of extremely impoverished

3    rural backgrounds, just as an example.

4            There's so much complexity and so much going on

5    that every application is a story in and of itself because

6    it's a person from what is always a complex country, and then

7    coming from a particular part of that country.

8    **Q.**   You told us Mr. Diep was Asian-Vietnamese, he was from a

9    modest socioeconomic background, and he was first generation,

10   correct?

11   **A.**   That's correct.

12   **Q.**   Did any one of those factors guarantee him admission to

13   the Harvard class?

14   **A.**   No, not at all.

15   **Q.**   What was it that led him to be admitted to the Harvard

16   class?

17   **A.**   It really was the combination of things.  And I think one

18   of our Asian-American graduates is a woman named Angela

19   Duckworth, and she's done quite a bit of research.  She's a

20   person at Penn who -- she's known as the grit lady, I guess.

21   She talks a lot about grit and hard work and how essentially

22   something I think a lot of us believe that about 99 percent

23   of success in life comes through hard work.

24           And this is a person who has truly in every way, if

25   you go all the way through this application, has pushed the

1    boundaries to develop and really consolidate and coordinate

2    all the different opportunities that he's had to put together

3    I think an incredible application.

4    **Q.**  I don't think you know, but to keep the family happy, I

5    should tell you that Angela Duckworth is my first cousin.  I

6    don't think you knew that.

7    **A.**  I did not.

8    **Q.**  If I didn't say something, she'd never forgive me.

9          Let's go back to the overall Harvard admissions

10   process.  I think you described it as a whole-person process?

11   **A.**  Yes.

12   **Q.**  Has that process been in place since you joined the

13   office in 1972?

14   **A.**  It has, yes.

15   **Q.**  Turn, if you would, to Tab 8 in your notebook.

16   **A.**  Yes.

17   **Q.**  What do you find at Tab 8?

18   **A.**  This is the *Bakke* opinion.

19   **Q.**  Actually, Tab 8 is it the opinion or is it --

20   **A.**  I'm sorry.  Is it the friend of the Court brief?

21   **Q.**  Yes.

22   **A.**  Yes.

23   **Q.**  Have you seen it before?

24   **A.**  Yes.  Not for a while.

25   **Q.**  Turn, if you would, to page 47.

1    **A.**  All right.  I have it.

2    **Q.**  At page 47, do you see something called "Appendix" and

3    the title is "Harvard College Admissions Program"?

4    **A.**  I see it.

5              MR. LEE:  Your Honor, we would offer DX55.

6              MR. HUGHES:  No objection, Your Honor.

7              THE COURT:  Admitted.

8              (Defendant Exhibit No. DX55 admitted.)

9    BY MR. LEE:

10   **Q.**  I want to focus you on the appendix.  Do you see that?

11   **A.**  I do.

12   **Q.**  What does the appendix describe in general?

13   **A.**  It really talks about how our admission process had

14   worked for at least 30 years or so.

15   **Q.**  Dean Fitzsimmons, were you one of the people who helped

16   put the information together and draft this appendix?

17   **A.**  I was.  I had been in the office about five or six years.

18   It was a team effort, obviously, but lots of us contributed

19   to the information that was sent in.

20   **Q.**  And in fact, was this appendix attached to the *Bakke*

21   opinion itself?

22   **A.**  Yes.

23   **Q.**  Let's look a little bit about what the appendix to the

24   Supreme Court opinions said.  Turn, if you would, to the

25   middle of the first paragraph of the appendix.

1    **A.**   Uh-huh.

2    **Q.**   Do you see the sentence that begins "The belief"?

3    **A.**   Let's see.  The belief, yes.

4    **Q.**   Could you read that sentence for us, please.

5    **A.**   Yes.  "The belief has been that if scholarly excellence

6    were the sole or even predominant criterion, Harvard College

7    would lose a great deal of its vitality and intellectual

8    excellence and that the quality of the educational experience

9    offered to all students would suffer."

10   **Q.**   Was that true in 1977?

11   **A.**   Absolutely.

12   **Q.**   Is it still true today?

13   **A.**   It is.  Not just at Harvard but lots of places.

14   **Q.**   And has it been true consistently for the time that

15   you've been the dean?

16   **A.**   It has.

17   **Q.**   Turn, if you would, to page 48 of this appendix.

18   **A.**   Okay.

19   **Q.**   Do you see the sentence that begins "The belief"?

20   **A.**   I do.

21   **Q.**   Would you read that sentence for us?

22   **A.**   "The belief that diversity adds an essential ingredient

23   to the educational process has long been a tenet of Harvard

24   College admissions."

25   **Q.**   Was that true in 1977?

1    **A.**   Yes.

2    **Q.**   Is it true today?

3    **A.**   It is.

4    **Q.**   And has it been true consistently during your time as

5    dean?

6    **A.**   Yes.

7    **Q.**   Would you read the last sentence on that page?

8    **A.**   The last sentence begins, "The quality of the educational

9    experience of all the students in Harvard College depends in

10   part on these differences in the background and outlook that

11   students bring with them."

12   **Q.**   Was that true then?

13   **A.**   Yes.

14   **Q.**   Is it still true today?

15   **A.**   Yes.

16   **Q.**   And has it been true consistently?

17   **A.**   Yes.

18   **Q.**   How was race used in the Harvard admissions process at

19   the time that this appendix was submitted to the Supreme

20   Court?

21   **A.**   Very much the way we've described, as one factor among

22   many.

23   **Q.**   Did you tell the Supreme Court that in the appendix?

24   **A.**   We did.

25   **Q.**   Has the basic manner in which race is considered in the

1    Harvard admissions process changed?

2    **A.**  It has not.

3              MR. LEE:  Your Honor, I'm about to move to another

4    topic.  I can either go or break, whatever is best for you.

5              THE COURT:  As I say, I'm hoping to break for lunch

6    at about quarter of one.  I'm happy to take a morning break

7    any time that's a good stopping place for you.

8              MR. LEE:  This would be a good place, and then I

9    can finish up with the dean.

10             THE COURT:  15 minutes, does that work for

11   everyone?  Mr. Hughes, 15 minutes?

12             MR. HUGHES:  15 minutes is great, Your Honor.

13   Thank you.

14             THE COURT:  Five past, then.

15             MR. LEE:  Thank you, Your Honor.

16             (Court recessed at 10:48 a.m.)

17             THE COURT:  When you're ready.

18             MR. LEE:  Thank you, Your Honor.

19   BY MR. LEE:

20   **Q.**  Dean Fitzsimmons, I'd like to move to a different topic,

21   and that is recruiting.  Okay?

22   **A.**  Yes.

23   **Q.**  You discussed some of this with Mr. Hughes, so I'm just

24   going to try to fill in some spots.  Okay?

25   **A.**  Sure.

1   **Q.**  You testified earlier that Harvard has many more

2   applicants than it can admit, correct?

3   **A.**  That's correct.

4   **Q.**  If that's true, why do you so actively recruit?

5   **A.**  Because the reality is most of the best students in the

6   United States hardly have Harvard on their list.  Most of the

7   very good students in the United States, in fact, 80 percent

8   or so, will end up at a public college or university.

9          In fact, about 80 percent of students will end up

10  going to college within about 200 miles of their homes.  If

11  we hope to get some share of the top students in the country,

12  we need to be out there.  We need to be talking with them, to

13  their guidance counselors, and to their families.

14  **Q.**  All right.  Turn if you would to DD 1.20 in Tab 2.  It's

15  demonstrative Number 20.

16  **A.**  Tab 2, okay.  Yes.

17  **Q.**  What is summarized on this page?

18  **A.**  These are some of the ways we recruit.

19  **Q.**  Again, we've touched on some of these so I'm not going to

20  cover them all.  We've talked about the search lists?

21  **A.**  We have.

22  **Q.**  Can you remind us what joint travel is?

23  **A.**  Joint travel is the program where we go to 120 locations

24  every year in the U.S. with Georgetown, Penn, Duke, and

25  Stanford.

1           We do big evening meetings.  Sometimes there's 800

2   or 1,000 people, parents, students, and family members, and

3   so on.

4           Then in the morning we do a counselor breakfast.

5   You can have as many as 100 counselors at the breakfast, and

6   essentially presenting our institutions at least as a set of

7   possibilities.

8           It's a very important part of what we do.  And we

9   do these presentations and the large presentations in a

10  school auditorium, whatever.

11          Afterwards we talk with individual families after

12  those presentations.  And one of the things that -- it is

13  really important, I think, to make contact directly with

14  people on this because -- especially in terms of the

15  financial aid access ability.

16          I remember being in Texas a number of years ago,

17  actually as we were trying to come up with our first

18  iteration for our new financial aid program.  And a person --

19  it was in Austin, actually, in Texas, sort of said, gee,

20  Mr. Fitzsimmons, Harvard sounds great, and so on.  So do

21  these other colleges tonight.  Why should I send my daughter

22  up to the cold north with a bunch of Yankees -- and he was

23  kidding, I think; a bunch of communists -- when I could send

24  my daughter right here to UT Austin in the honors program

25  with music on Sixth Street and Hill Country to the west --

1    and here was the kicker -- for one-third of the cost?

2              So that was the time that we knew we really needed

3    that face-to-face joint travel, that we needed to make a

4    change.

5              So we ended up with the new financial aid program,

6    which means about for really a huge proportion of the United

7    States it's about the same or less expensive for close to

8    90 percent of American families to have their sons or

9    daughters to come to Harvard, even versus the public

10   university in state.  So the joint travel is really important

11   for us to get out there.

12   **Q.**   Now, why do you meet with the guidance counselors?

13   **A.**   Guidance counselors are really the ones who oftentimes

14   will encourage people to apply or not to apply to places,

15   especially out of state.

16   **Q.**   Now, there are a number of others listed here.  I just

17   want to ask you a couple of questions about each of them.

18              What is alumni outreach?

19   **A.**   This is where we ask our 10,000 alumnae/alumni not just

20   to interview but to go to college nights, visit high schools,

21   have events for local students to try to encourage them not

22   just to apply but then after admitted to come to Harvard.

23   **Q.**   Now, there is something called the undergraduate minority

24   recruitment program, UMRP.  It was mentioned earlier this

25   morning before you took the stand.

1          What is the undergraduate minority recruitment

2    program?

3    **A.**   The UMRP is our oldest recruitment program.  It was

4    started in the early '70s, really just after I came onto the

5    staff.  There are organizations for each -- components for

6    each of the minority groups.  So there's an Asian-American

7    organization, there's one for African-Americans, for Latin X,

8    and for Native Americans.

9    **Q.**   I think you may have mentioned this.  Is there a

10   recruitment program for Asian-Americans?

11   **A.**   Yes.

12   **Q.**   Her Honor asked you a question yesterday about the search

13   list that you purchased for Asian-Americans.  Is that used in

14   the portion of the UMRP that relates to Asian-Americans?

15   **A.**   Yes.  So not only will these students hear from us

16   perhaps 40 or 50 times electronically and otherwise, but the

17   students themselves will -- in the UMRP will use those lists

18   as a way to sort of go after them electronically, sometimes

19   telephone, all the ways to sort of connect them sort of

20   person-to-person, student-to-student.

21   **Q.**   Are the students in UMRP who are helping to recruit

22   Asian-American applicants, do they include Asian-American

23   students?

24   **A.**   Yes.

25   **Q.**   Now, I want to ask you about the Harvard financial aid

1    initiative which you've already mentioned.

2              Dean Fitzsimmons, do you know how much of the

3    incoming class at Harvard approximately receives financial

4    aid?

5    **A.**   About 55 percent right now.

6    **Q.**   How much of the incoming class has no parental

7    contribution to tuition --

8    **A.**   About 20 percent.

9    **Q.**   You need to let me finish.  She'll get mad at one of us.

10   **A.**   Sorry about that.

11   **Q.**   So the question is how much of the incoming class has no

12   parental contribution to tuition, room, or board?

13   **A.**   That's about 20 percent.

14             That's the group I mentioned, typically $65,000 and

15   under.  All of our financial aid students, including this

16   group, do not have to take out loans.  All they have to do is

17   work 10 or 12 hours a week.

18             And the other thing we do for that group under

19   65,000 is we give them for the first year what we call a

20   start-up grant.  So they're given a thousand dollars in

21   August, another thousand dollars in the end of January.  And

22   the idea there is they can use that to really purchase some

23   of the things that, frankly, most of the rest of their

24   classmates have been able to purchase through their families.

25   It's really in a sense to level the playing field right away.

1    **Q.**  For the portion of the class that is receiving some

2    financial aid, what is the average cost of attending Harvard?

3    **A.**  $12,000.  And so that's for the 55 percent of the

4    students who are on undergraduate financial aid.  Remember

5    also they do not have to take out loans.  Pretty much when

6    you think about it, we call it the 0 to 10 percent plan.  So

7    from say, for example, a $150,000-a-year family income, you

8    pay only $15,000 to send your son or daughter to Harvard.

9    **Q.**  Has the Harvard financial aid program, as you've outlined

10   it, helped Harvard recruit a more diverse and different class

11   of students?

12   **A.**  Very much so.  It's been 15 years and it's been

13   transformative.

14   **Q.**  The last one I want to ask you about is the

15   first-generation program.  Do you have that in front of you?

16   **A.**  I do.

17   **Q.**  What is the first-generation program?

18   **A.**  This is a program designed to help recruit those who

19   neither of their parents graduated from a four-year college

20   or university.

21   **Q.**  For the incoming class at Harvard, how many students are

22   first generation?

23   **A.**  This year about 17 percent of the admits, 16 percent of

24   the matrics.

25   **Q.**  I want to go to a slightly different but related topic.

1    You were asked by Mr. Hughes yesterday about the dean's

2    interest list.

3    **A.**  Yes.

4    **Q.**  I think you mentioned, too, that the list includes people

5    that you meet on your travel, correct?

6    **A.**  That would be true.

7    **Q.**  Who else is included on the dean's interest list?

8    **A.**  For example, if I hear about somebody who -- it may be

9    from any kind of a source, someone who is supposed to be a

10   really good applicant, I'll keep track of that.

11          I'll also keep track of if I hear about people who

12   with have performed unusual service for Harvard, whether it's

13   schools and scholarship committee service or Harvard Club --

14   schools and scholarship are the ones who help us recruit and

15   interview and so on -- Harvard Club activities.  But also

16   those who have helped raise money or give money to Harvard.

17   **Q.**  So let me ask you a few questions about the list.  In any

18   given year, how many names are on the list?

19   **A.**  I'm not exactly sure, but I'd say a couple of hundred.

20   **Q.**  Does everybody on the list get in?

21   **A.**  Hardly.

22   **Q.**  Does everybody on the list go through the same process

23   that we've gone through this morning and yesterday afternoon?

24   **A.**  Yes.

25   **Q.**  Now, you were asked some questions yesterday about some

1    exhibits that dealt with the children of donors.  Do you

2    recall that?

3    **A.**  I do.

4    **Q.**  For any given cycle, how much of the dean's list is

5    significant donors to Harvard?

6    **A.**  Significant might be 15 or 20 people, something lake

7    that.

8    **Q.**  15 or 20 people in total?

9    **A.**  Yeah.  You used the word "significant."  Yes.

10   **Q.**  Of those 15 to 20 people, do some people get in?

11   **A.**  Some get in.

12   **Q.**  Some not?

13   **A.**  Some not.  And again, one of the things I'll do, not just

14   with them but some of the others who'd been close to Harvard,

15   is I might try to give them some advance warning.  Or if I'm

16   really good and we hear that they might be applying, I

17   might -- if I find out enough about them, try to encourage

18   them not to apply, to be honest.

19   **Q.**  Do you recall the three exhibits that Mr. Hughes gave you

20   yesterday about applicants that were admitted?

21   **A.**  Yes.

22   **Q.**  One was a message from Dean Ellwood?

23   **A.**  Pardon?

24   **Q.**  One was a message from Dean Ellwood that mentioned --

25   **A.**  Yes, yes.

1  **Q.**  -- four candidates that he said were highly qualified?

2  **A.**  Yes.

3  **Q.**  Did they go through the same process as other candidates?

4  **A.**  Yes.

5  **Q.**  And just to be clear, for each one of the different

6  cycles we're talking about here, the significant donors might

7  be 15 to 20 people out of 40,000?

8  **A.**  Yes.

9  **Q.**  Has anybody ever suggested to you that considering donors

10  or whether folks have been donors has somehow disadvantaged

11  Asian-Americans?

12  **A.**  No.

13  **Q.**  Now, what is your purpose for keeping the dean's interest

14  list?

15  **A.**  I think like any of us, we're trying to, we hope, get the

16  best people from around the world that we can.  And we also

17  are really thinking about the long-term strength of Harvard,

18  both in terms of its ability to generate, for example,

19  cutting-edge research that might save lives or advance

20  knowledge in a variety of ways.

21  The other is really to make sure that the gates of

22  Harvard are open and remain open and we hope even wider for

23  people from modest economic backgrounds.  A huge part of my

24  life has been devoted to helping and to worry about making

25  sure there's enough financial aid for all the great students

1    who need it.

2    **Q.**  Let me go now to a different topic that Mr. Hughes I

3    think may have mentioned to you.  But if he didn't, I

4    apologize.

5         You're familiar with the concept of one-pagers?

6    **A.**  One?

7    **Q.**  One-pagers.

8    **A.**  Yes.

9    **Q.**  Turn, if you would, to Tab 10 in your notebook.

10   **A.**  Yes.

11   **Q.**  Do you find P163?

12   **A.**  Yes, I believe.  Yes.

13   **Q.**  Do you have that?

14   **A.**  Tab 10.  Yes, I do.

15   **Q.**  P163 is something you discussed with Mr. Hughes, and it

16   has several pages, correct?

17   **A.**  That's correct.

18   **Q.**  I want to be sure that the record is clear on what the

19   one-pager is.  Which page of this multipage exhibit is the

20   one-pager?

21   **A.**  It would be, I guess, in yours it would be 807, 16807.

22   **Q.**  00016807 is the one-pager, correct?

23   **A.**  That's the one-pager.

24   **Q.**  Now, I just want to ask you a couple questions.

25        Do you see the categories of information?  And

1    perhaps we could ask Mr. Lee to blow up as best he can the

2    categories on the left-hand side of the page.

3            Do you see those?

4    **A.**   I do.

5    **Q.**   On the one-pagers, what information are you receiving?

6    **A.**   This gives us a rough idea of what we've done so far in

7    the process.

8    **Q.**   It's broken down by category?

9    **A.**   It is.

10   **Q.**   And does that include gender?

11   **A.**   It does.

12   **Q.**   Geography?

13   **A.**   Yes.

14   **Q.**   Intended major career?

15   **A.**   It does.

16   **Q.**   If we can move a little further down, lineage?

17   **A.**   Yes.

18   **Q.**   Financial aid circumstances?

19   **A.**   Yes.

20   **Q.**   Athletes?

21   **A.**   Yes.

22   **Q.**   Disadvantaged staff fee waived?

23   **A.**   Correct.

24   **Q.**   Citizenship?

25   **A.**   Yes.

**Q.**   Race has three methodologies, correct?

**A.**   That's correct.

**Q.**   Could you explain to Her Honor why there are three
different methodologies listed?

**A.**   The first one is really just more historical, and we
certainly probably don't need it at this point.  But I think
probably some of the older staff members probably find it
useful as some sort of comparison.

          The two that really are more helpful are the new
methodology and then the IPEDS.

**Q.**   And what is IPEDS?

**A.**   This is the federal government Integrated Postsecondary
Educational Data System, as I understand it.

**Q.**   Now, do you receive the one-pagers?

**A.**   Yes.

**Q.**   And when do you receive them?

**A.**   At various points in the process.

**Q.**   What do you do with them?

**A.**   It gives me a good sense perhaps of -- the real point of
the exercise is to make certain we don't come in over 1,660
people because that's all the beds we have.  So it's a good
way for me to look at how the class is developing so that we
could know what total number we should probably be thinking
about this year.

          There are lots of factors.  We're trying to think

1  about the yield.  We even think about current news events,

2  the current state of the economy, almost anything else you

3  can imagine.  But this information is pretty helpful because

4  it has patterns that pertain from year to year.

5  **Q.**  Would you remind us what's yield?

6  **A.**  Yield would be the percentage of the students who we

7  admit who then decide to come to Harvard.  We admit about

8  2,000 people, and then about 1,660 will show up.

9  **Q.**  And does the yield, in your experience, differ by

10  category for the categories listed on the left-hand side of

11  this one-pager?

12  **A.**  Oh, absolutely.

13  **Q.**  And why is it important for you to have that yield

14  information by category?

15  **A.**  So for example, if you were admitting a lot of engineers

16  this year for whatever set of reasons.  And over the past 10

17  years there has been a huge increase in the number of

18  applications and admits from engineers and computer

19  scientists.  You would know that they're going to yield at a

20  much lower rate than the rest of the students typically.

21  Again, the competition to so many other great places that do

22  engineering and computer science.

23         So that would give you a confidence that you could

24  admit more total people because you know that a whole bunch

25  of those engineers and computer scientists will end up

1    happily ever after at MIT or Caltech or wherever.

2    **Q.**   Now, who gets the one-pagers in addition to you?

3    **A.**   I get it and Marlyn McGrath Lewis, the director of

4    admissions; and Sally Donahue, the director of financial aid.

5    Now Jay Kaufman, who is the new director.

6    **Q.**   Do you from time to time share information from the

7    one-pagers with the full committee?

8    **A.**   I will.

9    **Q.**   Do you share the full one-pager with the committees?

10   **A.**   No.

11   **Q.**   Is there a reason you share information orally but not by

12   giving them the one-pager?

13   **A.**   The reason really just goes back to that memo that you

14   had on here about the people in the last few days just

15   focusing on the actual quality of the cases.  Nothing to do

16   with numbers, nothing to do with dockets.  The whole idea is

17   that you want this to be as far as possible from anything

18   mechanistic or formulaic.

19   **Q.**   Do the yield rates at Harvard differ by race?

20   **A.**   The yield rates, yes.

21   **Q.**   Can you give Her Honor an example or two of how the yield

22   rates differ by race?

23   **A.**   Yes.  Just as an example, Asian-Americans yield at a very

24   high rate, really the highest rate of any of the ethnic

25   groups.

1          Latin X, or might say -- I'm not sure what they use

2     on this particular one.  I guess they say Hispanic-American.

3     That again for a whole bunch of different reasons, part of

4     them geography, those students would tend to yield at a lower

5     rate.

6     **Q.**  Now, of the three different categories of race, new

7     methodology, old methodology, IPEDS, which one do you

8     consider the most reliable?

9     **A.**  I would consider the new methodology the most reliable.

10    **Q.**  Because?

11    **A.**  Well, because it allows the student to -- when the

12    students fill out the common application, they can put down

13    the ethnicities with which they identify.  So it's really

14    from them and how they identify themselves.

15          It seems to us, too, just based on what we've seen

16    people do once they come to Harvard, for example, did they

17    end up being involved in ethnic organizations of various

18    kinds, of which there are many.  Oftentimes it will relate

19    back to what they said on their common app.

20    **Q.**  Now, does the one-pager include information about the

21    breakdown or the makeup of a past -- the past year's class?

22    **A.**  Yes.

23    **Q.**  And why is that information helpful to you in the

24    admissions process?

25    **A.**  It's really, I guess, just generally -- remember we've

1    already started the recruiting year for the next year, and

2    we'll be out on the road shortly doing joint travel.

3             One of the things we sort of say -- well, let's

4    say, for example, we were for whatever set of reasons, and it

5    happens, we're having a really bad year let's say in the

6    Mountain States, for example.  And there are some states --

7    remember we have no quotas of any kind.  Some years there are

8    some states where no one is admitted.

9             So it's good for the staff to have a sense of how

10   well or how badly we're doing as they go back out and to

11   think about whether or not there could be new recruiting

12   approaches.  It's a little bit of a report card to us, in a

13   sense of, maybe what's happened this year.

14            We don't have control over a lot of these things.

15   We know that there are different states, including New

16   England, where there are declines in the number of

17   18-year-olds very steadily.  There have been and there will

18   be going forward.

19   **Q.**  Do you use one-pagers to set a quota on the number of

20   minority applicants?

21   **A.**  No.

22   **Q.**  Do you use them to set a floor on the number of minority

23   applicants?

24   **A.**  No.

25   **Q.**  If a one-pager showed you that, to use your example, the

1    number of admitted engineers was significantly lower than a

2    prior year, would you make an effort to increase the number

3    of engineers admitted in that year?

4    **A.**   No, no.  It has nothing to do with that.  That will just

5    tell us we have a little more room or a little less room to

6    admit anybody the committee wants to do as they compare

7    people from around the world.

8    **Q.**   Would the same be true if you received a report that said

9    the number of African-Americans who were being admitted was

10   significantly lower than the prior year?

11   **A.**   Really the same thing would apply.

12   **Q.**   Do you make any effort to match the demographics of a

13   class for one year to the demographics of a class from

14   another year?

15   **A.**   Not at all.

16   **Q.**   Turn, if you would, to Tab 11 in your notebook.

17           THE COURT:  Can I just ask a question?  Is the

18   three methodologies on race and ethnicity, is the only

19   difference between those three where the information comes

20   from?

21           THE WITNESS:  No.  It's a little bit more

22   complicated.  The old methodology is was rather arcane.  Part

23   of it is the staff would take a look at what the student

24   maybe had said.  But also sometimes students even forget to

25   check it, but they may have, for example, when they took the

1   ACT and the SAT, they may have indicated an ethnicity there.

2   So there are ethnicities coming in from a variety of

3   different places.

4            That didn't seem to me to be as effective, say, as

5   what the common app does.  Looking just simply at the common

6   app, again you put down exactly what it is.  There are a fair

7   number of students in America who have not just two different

8   ethnicities, they might have three or for, which is often you

9   see more often than you would think.

10           On the other hand with IPEDS it's very different.

11  I'll give you an example.  So if you check they call it

12  Hispanic on IPEDS, then that's it.  You may have checked

13  other boxes or other ethnicities.  They don't get recorded.

14  If you check -- if you're not Hispanic but you check two or

15  more ethnicities, then you will be called two or more.

16           So what that means is, for example, the most

17  extreme example would be Native Americans.  Usually about 80

18  or 90 percent of Native Americans have at least one other

19  ethnicity.  Sometimes they would be Hispanic and Native

20  American.  That would not get counted -- they would not get

21  counted as Native American.  And if they were checked two or

22  more of the others, that would -- they would not.  So

23  essentially under IPEDS, Native Americans almost disappear

24  off the radar scope.

25           And in the real world, we know plenty of people who

1    have checked Native American and other things, which is often

2    the case, and then end up being the head of our Native

3    American recruiting organization or the head of the Native

4    American cultural activities.

5            So the IPEDS would not give you a very good sense

6    at all about what your real diversity was.  So that's why we

7    like the new methodology.

8            THE COURT:  On the new methodology, how do you

9    account for people that leave that section of the common app

10   blank?

11           THE WITNESS:  Blank.

12           THE COURT:  So those people aren't accounted for in

13   that section.

14           THE WITNESS:  That's correct.  They're just blank.

15   It's voluntary.

16   BY MR. LEE:

17   Q.   I think during the course of your examination by

18   Mr. Hughes, you mentioned from time to time people who were

19   not self-identified.  Do you remember that?

20   A.   That's correct.

21   Q.   Are those the people that Her Honor is referring to?

22   A.   That's correct.

23   Q.   Okay.  Now, turn, if you would, to Tab 11.  Do you have

24   DX97?

25   A.   I do.

**Q.**   What is it?

**A.**   This is a Harvard Gazette article announcing our new class of current freshmen.

**Q.**   For the class of 2022?

**A.**   That's correct.

**Q.**   Does it report the breakdown of the admitted class?

**A.**   It does.

**Q.**   Did admissions provide this information to the Gazette?

**A.**   Yes.

            MR. LEE:  Your Honor, we offer DX97.

            MR. HUGHES:  No objection.

            THE COURT:  Admitted.

            (Defendant Exhibit No. DX97 admitted.)

BY MR. LEE:

**Q.**   Turn, if you would, to page 3.

**A.**   Okay.  I have it.

**Q.**   What was the percentage of the admitted class for the class of 2022 that was African-American?

**A.**   African-American was 15.5 percent.

**Q.**   What was the percentage that was Asian-American?

**A.**   22.7.

**Q.**   What was the percentage that was Latino?

**A.**   12.2.

**Q.**   Do these numbers fluctuate from year to year?

**A.**   They do.

1    **Q.**  And have the numbers of Asian-Americans,

2    African-Americans, and Latinos fluctuated from year to year?

3    **A.**  They have.

4    **Q.**  But during the period of time that you've been the dean,

5    have the numbers and percentages for each of these three

6    categories increased?

7    **A.**  Increased, you say?

8    **Q.**  Yes.

9    **A.**  Generally, yes.  Not every year.

10   **Q.**  Over time, have they increased significantly?

11   **A.**  They have.  When I first started in admissions there were

12   almost no Asian-Americans.  We were only up to about

13   5 percent by the early '80s, and now it's 22.7 percent.

14   **Q.**  Now, let me go to a related but different question.

15           You discussed with Mr. Hughes, I think on the first

16   day of your examination, the importance of diversity and why

17   diversity was one of your goals.

18           Do you remember that?

19   **A.**  I do.

20   **Q.**  Now, you've been in admissions for 46 years, correct?

21   **A.**  Correct.

22   **Q.**  Have you been able to see the benefits of diversity in

23   the diverse classes you've admitted on the Harvard campus?

24   **A.**  It's a profoundly better place.  Just in terms of what

25   the students learn from each other, what the faculty and

1   those of us who work at Harvard learn from the astonishingly

2   diverse classes we have today.

3           Just think of examples, Paula Johnson, one of our

4   great African-American admits from not so long ago, became a

5   great doctor here in Boston, and she's now the president of

6   Wellesley College.  I've known her forever.

7           I think of Lisa Quiroz, who was one of our minority

8   recruiters as an undergraduate.  She died young,

9   unfortunately, last year in her 50's.  But she was the

10  Hispanic Woman of the Year not so long ago.

11          I think of Brenda Wallhood, who was one of our

12  great Native American recruiters, who has gone back and spent

13  her life in the Midwest working on Native American activities

14  and welfare.

15          I guess it's sort of like my daughter, but I was

16  the host family for a woman named Gia Chang, who was one of

17  the first three students admitted after the cultural

18  revolution from China.  She and her family spent -- her

19  father spent ten years out in the countryside at hard labor,

20  she spent three years in the countryside at hard labor, and

21  the rest of her family three to five years.

22          Getting to know these people and learning about who

23  they were and what they had experienced in their lives and

24  then being able to watch what they have done, it's changed my

25  life profoundly for the better.  And they've changed Harvard

 1   and their classmates profoundly for the better.

 2   **Q.**   Does diversity only benefit minority students?

 3   **A.**   It benefits everybody.  I think I'm not a minority

 4   student.  It certainly has changed my life.

 5   **Q.**   Let me talk about race-neutral alternatives very briefly.

 6   There are going to be some other witnesses who talk about it

 7   in a little bit more detail.

 8            But I want to ask you specifically, very quickly

 9   yesterday you had mentioned early action and then the

10   decision to reinstitute early action.

11            Do you remember that?

12   **A.**   I do.

13   **Q.**   Could you explain to Her Honor why you eliminated early

14   action, what you were hoping to achieve, and why you had to

15   say it was an experiment that didn't work?

16   **A.**   Well, what we hoped -- one of the problems we see in

17   America right now is there's so much pressure on students.

18            We, in fact, have a paper on our website called

19   "Time Out Or Burn Out For the Next Generation" in which we

20   try to encourage people to think about, for example, taking

21   gap years before coming to college and to Harvard.

22            And that pressure is on all kinds of students.  I

23   think one of the dilemmas with early admission is it puts

24   pressure, as part of the general pressure of growing up,

25   pressure across the board.  It puts -- I think sometimes

1    people in positions where they begin to make preliminary, I

2    think, decisions about where they want to go to college way

3    before they're ready to do it.  Because oftentimes in the

4    senior year, you learn a lot.

5            We've never had binding early decision because we

6    want people to have the whole year.  But we have also just

7    thought it kind of truncated -- the whole early process could

8    truncate the senior year, could make the whole senior year

9    less meaningful.

10           So we cannot talk to other colleges because of

11   antitrust issues, you know, if we decide to make any changes.

12           So we just jumped out there and did it on our own,

13   hoping that many of our competitors, frankly, would come with

14   us.  Princeton did and the University of Virginia did, but

15   none of our other -- UNC, but none of the others did.  That

16   was the backdrop.

17           The other thing is that we were very concerned that

18   because students from poor and modest economic backgrounds

19   often have way less access to college advising.  There are

20   plenty of high schools out there now where there are no

21   guidance counselors whatsoever.  In the average public high

22   school, it's about 500 to 1.  In some states the ratio is 8

23   or 900 to 1 counselee to counselor.

24           So in that world, we felt that people from the

25   other side of the tracks were probably less likely to be able

1    to get into early pools.  So it's a bunch of different

2    reasons that really kind of cross all the social classes.

3    **Q.**  And at the end when no -- when only Princeton and UVA

4    followed, did you make a decision as to what Harvard needed

5    to do?

6    **A.**  Yeah.  We started to worry because we did that.  Of

7    course one of the things we were concerned about is students

8    who come from less-resourced backgrounds.  Ironically, they

9    were frankly being recruited out of our -- into early

10   decision pools and early action pools at other places.

11           So we could begin to see a real problem, and we

12   were probably really going to start losing great kids across

13   the board if we didn't switch back.  So reluctantly we did

14   switch back.

15   **Q.**  And to be specific to this case, did you see that

16   minority students, highly qualified minority students, were

17   being recruited into the early action pools of other schools?

18   **A.**  Absolutely.  They're among the most avidly recruited,

19   once -- because we were on the sidelines on early.

20   **Q.**  Let's go to a different topic.  Turn, if you would, to

21   Tab 12 which is P555, the OCR statement of findings.

22   **A.**  Yes.

23   **Q.**  Mr. Hughes spent some time with you on this and read

24   certain portions to you.  Do you recall that?

25   **A.**  Yes.

1   **Q.**  So I'd like to just sort of fill in -- this is in

2   evidence, but I want to fill in some of the blanks left by

3   the portions read to you previously.

4               So let's look at the first page and the first

5   paragraph.

6   **A.**  Mm-hmm.

7   **Q.**  First let's talk about what the concern was that

8   intimated the OCR investigation.

9               Do you see four lines down -- well, we start three

10  lines down.

11              "As articulated in numerous media reports and

12  journal articles, the basic thrust of the concern has been

13  that despite superior academic credentials in terms of high

14  school performance and standardized test scores,

15  Asian-Americans have been admitted to selective schools at a

16  rate lower than white applicants and other minority group

17  applicants."

18              Have I read that correctly?

19  **A.**  You have.

20  **Q.**  And did you understand that that was the articulated

21  concern that led to the investigation?

22  **A.**  Yes, absolutely.

23  **Q.**  Turn to page 46, and let's look at the conclusion after

24  the investigation that you described to Mr. Hughes.

25  **A.**  I see it.

1    **Q.**  All right.  So at the end of the entire report, at the

2    end of the portions that Mr. Hughes read to you and some

3    other texts, would you read to us the conclusion of this

4    two-and-a-half-year investigation?

5    **A.**  Right at the end.  Okay.

6            "As a result of this compliance review, it is OCR's

7    overall conclusion that Harvard did not discriminate against

8    Asian-American applicants to its undergraduate program in

9    violation of Title VI of the Civil Rights Act of 1964 or its

10   implementing Regulation 34 C.F.R. Part 100."

11   **Q.**  Is the admissions process that OCR reviewed basically the

12   same admissions process as Harvard uses today?

13   **A.**  It is.

14   **Q.**  Let's talk about some of the similarities and some of the

15   other portions of the report.  Would you turn to page 0006 in

16   P555.

17   **A.**  Which tab are we here?

18   **Q.**  I'm sorry.  Same tab.  My apologies.  Same tab.  So we're

19   still at P555.

20   **A.**  Yep.

21   **Q.**  And page .0006.  Do you have that before you?

22            THE COURT:  They're not numbered like that.

23            THE WITNESS:  I think you mean page 6.

24   BY MR. LEE:

25   **Q.**  I'm sorry.  Page 6 at the top.  My fault.

1   **A.**   I got it.

2   **Q.**   I'm going to take you to the second full paragraph.   Do

3   you see the sentence that reads, "Applicants are?

4   **A.**   Applicants are.   Okay, yes.

5   **Q.**   Would you read that sentence for us, please.

6   **A.**   "Applicants are chosen on the strength of their

7   credentials, but once they are deemed academically

8   admissible, other strong qualities are added that would

9   potentially contribute to the educational experience at

10   Harvard for all students."

11   **Q.**   Was that true in 1990?

12   **A.**   Yes.

13   **Q.**   Is it true today?

14   **A.**   It is.

15   **Q.**   Was the docket system in place at the time OCR conducted

16   its investigation?

17   **A.**   Yes, it was.

18   **Q.**   Was the subcommittee process in place at that time?

19   **A.**   Yes.

20   **Q.**   Was the full committee process in place at that time?

21   **A.**   Yes.

22   **Q.**   Were the preliminary and profile ratings in place at that

23   time?

24   **A.**   Yes.

25   **Q.**   Turn, if you would, to page 6 and look at the final

1  paragraph.

2  **A.**  Page 6.  Okay, yes.  Do you want me to read it?

3  **Q.**  Yes.  I'd like you to read the sentence that begins -- do

4  you see the sentence that reads, "There are four major

5  criteria on which all candidates are recessed:  academic

6  achievement, extracurricular activities, athletics, and

7  personal qualities"?

8  **A.**  Yes.

9  **Q.**  "Criteria are described as standards against which all

10  applicants are measured."

11        Have I read that correctly?

12  **A.**  Yes, you have.

13  **Q.**  Would you read us the next sentence from OCR's findings?

14  **A.**  "In evaluating a candidate's accomplishments against the

15  criteria, Harvard judgments are primarily based on the set of

16  information listed below.  Some items listed are more or less

17  objective while others remain subjective in that they must be

18  measured through individual judgment or discretion.

19        "Examples of objective information are standardized

20  test scores, SATs, grade point average, GPA, and academic

21  distinctions such as National Merit Scholarship.  Subjective

22  items may include such information as teacher or counselor

23  recommendations, essays written by the applicant, and the

24  alumni interview."

25  **Q.**  Was that true in 1990?

1   **A.**   Yes.

2   **Q.**   Is it true today?

3   **A.**   Yes, it is.

4   **Q.**   Is it true with the two application files we reviewed

5   with Her Honor this morning?

6   **A.**   Yes.

7   **Q.**   Turn, if you would, to page 21.  I want to look at some

8   of the portions that Mr. Hughes didn't cover with you that

9   concern the personal rating.

10   **A.**   Okay.

11   **Q.**   Do you recall Mr. Hughes referred you to some statements

12   and asked you whether you condone stereotyping?

13   **A.**   That's correct.  Yeah, I remember.

14   **Q.**   And you said?

15   **A.**   No.

16   **Q.**   Let's see what it says about the personal ratings.  Are

17   you on page 21?

18   **A.**   I am.

19   **Q.**   Do you see the sentence that refers to the personal

20   ratings in OCR's finding that begins "With respect"?

21   **A.**   Yes.

22   **Q.**   Would you read that paragraph for us, please.

23   **A.**   "With respect to the personal qualities ratings, most

24   applicants in our sample, both Asian-American and white, were

25   given between 3- and 2+.  Overall in the classes of 1991 and

1   1992, from which our file samples were drawn, over 98 percent

2   of the applicants received some form of a 2 or 3.  However,

3   between the two groups, 20 percent of Asian-American

4   applicants and 25.5 percent of white applicants received a 2

5   rating in the personal category."

6   **Q.**  So to be clear, the second sentence is the sentence that

7   Mr. Hughes addressed with you, correct?

8   **A.**  Yes.

9   **Q.**  It's preceded by the first sentence that describes the

10  specific findings concerning the classes of 1991 and 1992,

11  correct?

12  **A.**  That's correct.

13  **Q.**  Now, I'm not going to go back to what I asked you about

14  yesterday when we first looked at OCR briefly.

15          Do you recall what OCR found as to whether these

16  few comments by interviewers before 1988, what effect they

17  had on the personal ratings?

18  **A.**  They said they did not have effects on the personal

19  rating.

20  **Q.**  So let's look at the next paragraph.  Do you have that

21  before you?

22  **A.**  I do.

23  **Q.**  Now, do you see the portion that reads, "According to the

24  admissions staff who were interviewed, the personal rating is

25  derived from a variety of elements in the applicant's file.

1    It may be based on the essay written by the applicant, the

2    comments of staff or alumni interviewers, teacher

3    recommendations, or any other information in the file which

4    indicates strength of character."

5            Do you see that?

6    **A.**   I do.

7    **Q.**   Was that true in 1990?

8    **A.**   Yes.

9    **Q.**   It is true today?

10   **A.**   It is.

11   **Q.**   Is it true in the two applications we looked at this

12   morning?

13   **A.**   Yes.

14   **Q.**   Look at the bottom paragraph.  Do you see the sentence

15   that begins "Of the 300 files examined?

16   **A.**   I do.

17   **Q.**   Would you read that sentence and the two sentences that

18   follow for the Court.

19   **A.**   Yes.  "Of the 300 files examined in this phase of the

20   file review, OCR found only one applicant who received a

21   personal rating poorer than 3- on the summary sheet.  The

22   applicant was an Asian-American who was admitted and who

23   ultimately came to Harvard.  The fact that the applicant was

24   admitted despite the low personal rating supported Harvard's

25   position that the readers and committees view the entire

1  application as a whole."

2  **Q.**  Is it still true that the whole person gets reviewed and

3  the decision is made no matter what the personal rating

4  happens to be?

5  **A.**  Yes.

6  **Q.**  I want to ask you a couple of questions about a paragraph

7  that Mr. Hughes drew your attention to.  It's at the bottom

8  of page 15.  Could you get to that page.

9  **A.**  Okay.  I have it.

10  **Q.**  Do you have it before you?

11  **A.**  I do.

12  **Q.**  And he asked you some questions about the sentence that

13  begins, "Other readers indicated that ethnicity was a factor

14  considered throughout the admissions process" -- "the entire

15  admissions process.  They stated that it could be reflected

16  in the four reader rating areas as well as in the POR during

17  the subcommittee and committee meeting discussions."

18           Have I read that correctly?

19  **A.**  Yes.

20  **Q.**  Now, my notes indicate that Mr. Hughes asked you some

21  questions about whether this applied to the personal rating.

22           Do you recall those questions from him?

23  **A.**  I do.

24  **Q.**  Is this portion of the OCR report limited to the personal

25  rating?

1    **A.**   No.  I'm having trouble following.  Where did you read

2    from the beginning?  Other readers?

3    **Q.**   Bottom of the page 15 where it says "Other readers

4    indicated."  It's on the screen now.

5    **A.**   I see.  And then went on to the next page.  Sorry.

6    **Q.**   Right.  Is this portion of the report we're referring to

7    just the personal rating or to all four ratings?

8    **A.**   Let me just read it again.  So what's your question

9    again?

10   **Q.**   I want to draw your attention to the portion that says

11   "They stated that it could be reflected in the four reader

12   rating areas.

13   **A.**   The personal rating, yes.

14   **Q.**   Are the four reader rating areas the profile ratings?

15   **A.**   Yes.  But ethnicity is only going to be considered in the

16   overall.

17   **Q.**   Great.

18   **A.**   If I get the thrust of the question.

19   **Q.**   Turn, if you would, to page 45 of this exhibit.

20   **A.**   45.  Okay.

21   **Q.**   There's a portion that Mr. Hughes covered with you that

22   concerns -- it starts, "Utilizing ten years of quantitative

23   data."  Do you see that?

24   **A.**   No.  But I'll get there.

25   **Q.**   Let us highlight for you.  It's in the last paragraph.

1    I'm not going to go over it in detail because you and

2    Mr. Hughes spent some time on it.

3    **A.**  Right at the bottom.

4    **Q.**  This is a person that refers to legacies and athletes,

5    correct?

6    **A.**  Yes.

7    **Q.**  Now, are you familiar with the acronym NLNA?

8    **A.**  I am.

9    **Q.**  What does NLNA mean?

10   **A.**  Non-legacy non-athlete.

11   **Q.**  After of the OCR investigation was concluded, did you

12   begin to track statistics on the NLNA pool?

13   **A.**  Yes.

14   **Q.**  Have you looked at those statistics periodically since

15   the OCR statement of findings in 1990?

16   **A.**  Yes.

17   **Q.**  Turn if you would, to Tab 13.

18   **A.**  I have it.

19   **Q.**  Do you find DX42?

20   **A.**  I do.

21   **Q.**  What is it?

22   **A.**  Let's see.  Just a little overall sense.  Across a number

23   of years of demographics of various kinds.  This particular

24   one is looking at ethnicity.

25          MR. LEE:  Your Honor, we offer DX42.

| | |
|---|---|
| 1 | MR. HUGHES:  No objection, Your Honor. |
| 2 | THE COURT:  Admitted. |
| 3 | (Defendant Exhibit No. DX42 admitted.) |
| 4 | BY MR. LEE: |
| 5 | **Q.**  Turn to pages 4 to 9. |
| 6 | **A.**  4 to 9, okay. |
| 7 | **Q.**  Tell me when you're there. |
| 8 | **A.**  I have page 4. |
| 9 | **Q.**  If you just flip through pages 4 to 9 -- |
| 10 | THE COURT:  Where are you getting the 4 from? |
| 11 | MR. LEE:  I'm sorry, Your Honor, .0004 at the |
| 12 | bottom center. |
| 13 | THE COURT:  All right. |
| 14 | **A.**  Yes.  I have it. |
| 15 | BY MR. LEE: |
| 16 | **Q.**  Do these pages show the applicants it admits overall and |
| 17 | also by NLNA? |
| 18 | **A.**  That's correct. |
| 19 | **Q.**  Let's look at page 4, and let's look at the class of |
| 20 | 2001, if we could. |
| 21 | **A.**  I'm sorry. |
| 22 | **Q.**  2001.  Do you see that? |
| 23 | **A.**  Class of 2001.  On page 4. |
| 24 | **Q.**  Yeah.  It's on the screen, if that's easier. |
| 25 | THE COURT:  Right in the middle. |

1          THE WITNESS:  Here it is.  Okay.  Yes.

2     BY MR. LEE:

3     **Q.**   And I'll ask Mr. Lee to highlight the NLNA admit rate for

4     Asian-American applicants to the class of 2001.  Do you see

5     that?

6     **A.**   I do.

7     **Q.**   What was that rate?

8     **A.**   That was 10.4 percent.

9     **Q.**   What was the admit rate for NLNA white applicants for

10    2001?

11    **A.**   10.3 percent.

12    **Q.**   Let's turn to page 6.  To make it easier, we'll put it up

13    on the screen.

14    **A.**   That would be great.

15    **Q.**   And let's look at the class of 2008.

16    **A.**   Okay.

17    **Q.**   What was the NLNA admit rate for Asian-Americans that

18    year?

19    **A.**   8.9 percent.

20    **Q.**   And what was the white NLNA admit rate for that year?

21    **A.**   8.8.

22    **Q.**   Turn, if you would, to page 7.  Again we'll put it on the

23    screen.  And I want to look at the class of 2011.

24    **A.**   Okay.

25    **Q.**   What was the NLNA admit late for Asian-Americans in 2011?

1    **A.**   8.1 percent.

2    **Q.**   For whites?

3    **A.**   Whites, 7 and a half.

4    **Q.**   Let's turn to the next page and look at the class of

5    2012.  Do you have it before you?

6    **A.**   I do.

7    **Q.**   What was the NLNA admit rate for Asian-Americans?

8    **A.**   7.2 percent.

9    **Q.**   And for whites?

10   **A.**   It looks like 7.1 percent.

11   **Q.**   Turn, if you would, to the next page and let's look at

12   the class of 2016.

13            What was the Asian-American NLNA admit rate for

14   that year?

15   **A.**   5.3.

16   **Q.**   And for whites?

17   **A.**   5.1.

18   **Q.**   All right.  Now, let's stay on that page and go to the

19   class of 2017.  What was the NLNA admit rate for

20   Asian-Americans that year?

21   **A.**   4.9 percent.

22   **Q.**   And for whites?

23   **A.**   4.5 percent.

24   **Q.**   Now, for each of the years we've looked at, the

25   Asian-American NLNA admit rate was higher than the white NLNA

1    admit rate, correct?

2    **A.**  That's correct.

3    **Q.**  Now, it's not exactly the same every single year,

4    correct?

5    **A.**  That's correct.

6    **Q.**  Have you received reports like this after you received

7    the OCR report in the 1990s?

8    **A.**  Yes.

9    **Q.**  Do you continue to receive them today?

10   **A.**  I do.

11   **Q.**  And do you review them?

12   **A.**  I do.

13   **Q.**  Now, has OCR looked into Harvard's admission process

14   after the 1990 compliance review?

15   **A.**  They did.

16   **Q.**  When?

17   **A.**  2001, again in 2012.

18   **Q.**  Let's take 2001.  What led to the 2001 inquiry?

19   **A.**  There was an individual complaint on the part of an

20   Asian-American applicant.

21   **Q.**  Did OCR investigate the claim?

22   **A.**  They did.

23   **Q.**  Was the claim one of discrimination?

24   **A.**  Yes.

25   **Q.**  Turn, if you would, to Tab 14.

1    **A.**   I'm sorry, Tab --

2    **Q.**   -- 14.

3    **A.**   We're getting there.

4    **Q.**   Tab 14.

5    **A.**   Tab 14, yes.

6    **Q.**   Do you find DX44?

7    **A.**   I do, yep.

8    **Q.**   What is it?

9    **A.**   It's a letter to President Summers from the Office For

10   Civil Rights.

11   **Q.**   And it's dated what?

12   **A.**   The date is we received December 14, 2001.

13           MR. LEE:  Your Honor, we offer DX44.

14           MR. HUGHES:  No objection, Your Honor.

15           THE COURT:  Admitted.

16           (Defendant Exhibit No. DX44 admitted.)

17   BY MR. LEE:

18   **Q.**   This is approximately ten years after the OCR concluded

19   its review, correct?

20   **A.**   That's correct.

21   **Q.**   OCR investigated, correct?

22   **A.**   They did.

23   **Q.**   And what was the conclusion?

24   **A.**   That we did not discriminate.

25   **Q.**   Now, let me talk a little bit more about the personal

1    rating.

2         Are you aware that SFFA claims that the personal

3    rating is being used to discriminate against Asian-Americans?

4    **A.**  I am aware.

5    **Q.**  Is that right?

6    **A.**  No.

7    **Q.**  When we looked at these summary sheets and you told me

8    about the first reader?

9    **A.**  Yes.

10   **Q.**  When someone is filling out the boxes for the four

11   profile ratings, is it the same person filling out the boxes?

12   **A.**  Yes.

13   **Q.**  And if it's the second reader, is it the same person

14   filling out the boxes?

15   **A.**  That's correct.

16   **Q.**  Dean Fitzsimmons, how many applications have you reviewed

17   in your time at the admissions office?

18   **A.**  I'm not sure I'd want to count them up, but it's a lot.

19   **Q.**  Is it in the thousands?

20   **A.**  Many, many, many thousands.

21   **Q.**  And for how many applications have you been a member of

22   the 40-person admissions committee?

23   **A.**  I've been there the whole time, sitting in those meetings

24   all but about a year and a half since 1972.

25   **Q.**  And you've attended virtually all the full committee

1    meetings?

2    **A.**   I have attended all of them.

3    **Q.**   In those meetings over that long period of time, have you

4    observed racial bias from any members of the committee?

5    **A.**   Never.

6    **Q.**   Have you observed racial bias by any members of the

7    committee in making decisions?

8    **A.**   Never.

9    **Q.**   Have you observed any bias or discrimination against

10   Asian-Americans?

11   **A.**   Never.

12   **Q.**   Based upon your experience in the committee, what are

13   your reasons for your view that Harvard is not using the

14   personal rating to discriminate?

15   **A.**   I think it's really, again, a process of having readers

16   look at the evidence in the application and really looking at

17   everything in that application, just the way we did as we

18   went through the process.

19         I think also there are so many checks and balances.

20   Again, you know, when you're filling out an application,

21   filling out a profile let's say at 9:00 at night, you know

22   that eventually that 40 people are going to be looking at

23   your work, you know.

24         So we're always vigilant.  Not just every time we

25   read an application but every time we go through applications

1    in committee.  So there are so many different checks and

2    balances on this.

3    Q.  And does the training which you've described provide you

4    some assurance as well?

5    A.  Yes.  The training is certainly -- especially for new

6    staff is very, very important.  It is a training period I

7    always say that isn't just simply a matter of months, but

8    it's really kind of a trial period.  I would say

9    realistically it takes you about three years before you get

10   fully up to speed.  And I think one of the things we --

11   because of the complexity of the job.  So we are really

12   always watching each other essentially, and especially some

13   of the newer members of the staff.

14           But we're also going through constant training

15   every year ourselves through our orientation sessions and

16   through various sessions throughout the year.

17   Q.  And we're going to have Director McGrath tell us about

18   that in more detail.

19           Let me ask you this:  Are you aware of the claim

20   that the personal ratings for Asian-American applicants are

21   on average lower than those for white applicants?

22   A.  I am.

23   Q.  And have you reviewed yourself data regarding the average

24   personal ratings for Asian-American applicants compared to

25   whites?

1    **A.**   I have.

2    **Q.**   And what does that data show?

3    **A.**   That there is a slight difference, that white applicants

4    have slightly stronger personal ratings than Asian-Americans.

5    Again on average.  But the range of course is, even you saw

6    in the OCR report, is quite strong.  So there are many, many

7    strong ratings obviously for Asian-Americans as well as

8    whites.

9    **Q.**   Now, you described it as a small or slight difference,

10   correct?

11   **A.**   I have.

12   **Q.**   Could you remind us what information, what external

13   information goes into those ratings?

14   **A.**   Well, you've had a little bit of a sense as you went

15   through this morning looking at the two applications.

16           And I think it's much easier to see it that way

17   because every single part of that application gives you yet

18   another set of insights into what this person may be like and

19   what may lead you to make a personal qualities rating of one

20   kind or another.

21   **Q.**   And for the information received from these external

22   sources, does Harvard and the admissions office take it as it

23   receives it from the schools, the recommenders, the teachers?

24   **A.**   We do.

25   **Q.**   Now, how many factors does Harvard use in considering an

1    applicant or applicants for the admissions process?

2    **A.**   As many as you can discern.  We went through -- we are a

3    little bit like umpires in baseball or the way a court of law

4    works; that is, we're looking at all the evidence.  And all

5    we can do is respond to what is in that application.  But

6    it's everything that we're looking at.

7    **Q.**   Let me return, to conclude, to the plaintiff's

8    allegations.

9            Dean Fitzsimmons, you've been the dean since 1986?

10   **A.**   That's correct.

11   **Q.**   You understand that SFFA has accused you of intentionally

12   discriminating against Asian-Americans.  Do you understand

13   that?

14   **A.**   I do.

15   **Q.**   Do you take it seriously?

16   **A.**   Absolutely.

17   **Q.**   Is it true?

18   **A.**   No.

19   **Q.**   And how do you know?

20   **A.**   Again, I think there are so many checks and balances that

21   are involved in the process, and there are so many of us

22   involved.  But for all the reasons I said before, I think

23   with all the training that we have in place, I think

24   everything -- we certainly do everything in our power, you

25   know, to treat every applicant completely and fairly.

1    **Q.**   Does the admissions office attempt to ensure that it

2    admits the same number of applicants from different racial

3    groups year after year after year?

4    **A.**   Not at all.

5    **Q.**   Do you attempt to ensure a consistent number of

6    matriculants by racial group year after year after year?

7    **A.**   No.

8    **Q.**   Have you ever used quotas?

9    **A.**   Never.

10   **Q.**   Have you ever used floors?

11   **A.**   Used --

12   **Q.**   -- floors?

13   **A.**   No.  No.

14   **Q.**   Dr. Arcidiacono, the plaintiff's expert, claims that for

15   the classes of 2017 to 2019 you purposefully admitted

16   African-American students at the same level as other domestic

17   applicants.

18            Are you aware of that accusation?

19   **A.**   I'm aware of the accusation.

20   **Q.**   Is it true?

21   **A.**   No, not at all.

22   **Q.**   How do you know?

23   **A.**   We don't even think in those terms.  I think that was the

24   first time I ever saw anybody suggest that somehow you would

25   sort of peg something to some other thing.  It just isn't the

1    way we work.

2    **Q.**   Dean Fitzsimmons, you entered Harvard College in 1963?

3    **A.**   That's correct.

4    **Q.**   What was the gender composition of your class?

5    **A.**   About 4 to 1.

6    **Q.**   4 men for every woman?

7    **A.**   (Witness nods in the affirmative.)

8    **Q.**   And what was the ethnic and racial makeup of your class,

9    in general?

10   **A.**   There were virtually no students of color.

11   **Q.**   Has the diversity both in terms of gender, race, and

12   ethnicity changed under your leadership since 1986?

13   **A.**   It has changed dramatically.  And again not just under my

14   leadership.  But this was a total institutional effort across

15   the board on the part of faculty, administrators, and

16   students and alumni.

17   **Q.**   Is Harvard a more diverse community today?

18   **A.**   Vastly more diverse.

19   **Q.**   In your view, is it a better community today?

20   **A.**   It's an infinitely better place.

21   **Q.**   Are you proud of your contribution to the diversity of

22   Harvard?

23   **A.**   I am proud that Harvard over time, with all the different

24   parts of Harvard, have really opened the gates of Harvard in

25   all kinds of ways to a much wider range of talent in the

1    United States and the world.

2            And people who will bring you excellences and life

3    experiences of all sorts, it is a vastly different

4    institution.  It's a work in progress.  We always feel we can

5    do better.  But we're working hard.  There's a lot of talent

6    out there in the country that needs to be encouraged through

7    all the means necessary to get them to all of the

8    institutions of higher education.

9    **Q.**   That includes Harvard but also many other colleges and

10   universities, correct?

11   **A.**   Absolutely.  And I think one of the big things is we're

12   so lucky, a lot of people around the world would say that

13   American colleges and universities are really the gold

14   standard now.  And I think one of the great things is you can

15   have choices.  You can decide to go to one of the great

16   public universities.  You could decide to go to one of the

17   great small colleges.  You could go to a place like ours.

18           I think one of the great things is that all these

19   places are vastly improved, say, compared to 1986 so that

20   it's a great time for people to be thinking about going on to

21   higher education.

22           And if we do that, I think we have a much better

23   chance of making sure that America continues to have a

24   leadership role in the world and the generations ahead.

25           MR. LEE:  Thank you, Dean Fitzsimmons.

```
 1              Nothing further, Your Honor.
 2              MR. HUGHES:  Your Honor, I will be brief, but I
 3    need a minute or two to set up, if that's okay.
 4              THE COURT:  You don't have to be brief, and you can
 5    take as much time as you need to set up, within reason.  So
 6    go ahead.
 7              MR. HUGHES:  I appreciate both of those comments.
 8              Your Honor?
 9              THE COURT:  Whenever you're ready.
10              MR. HUGHES:  Thank you, Your Honor.
11                        REDIRECT EXAMINATION
12    BY MR. HUGHES:
13    Q.  Good afternoon.
14    A.  Good afternoon, Mr. Hughes.
15    Q.  I hope to finish here before the lunch hour.  I want to
16    turn first to a subject that you talked with both me and
17    Mr. Lee about yesterday, and that was the information that
18    OIR provided to you in 2013.
19              You recall, I'm sure, our lengthy discussion about
20    that, right?
21    A.  I do.
22    Q.  And you talked with Mr. Lee yesterday about OIR and your
23    understanding of what was conveyed to you in 2013 by OIR,
24    correct?
25    A.  That's correct.
```

1    **Q.**   Okay.  I just want to make sure a few things are clear.

2              You are reasonably well informed with modern

3    statistical techniques, correct?

4    **A.**   I would say reasonably.

5    **Q.**   You'd say reasonably?

6    **A.**   (Witness nods in the affirmative.)

7    **Q.**   In fact, you previously taught statistics at the

8    introductory level, correct?

9    **A.**   Yes.  About a thousand years ago.

10   **Q.**   And you have been part of studies at Harvard using

11   logistic regression, correct?

12   **A.**   Yes.  Certainly they've been presented over the years by

13   such parts of Harvard as OIR.

14   **Q.**   And you are very familiar with the term "logistics

15   regression," correct?

16   **A.**   With the term, yes.

17   **Q.**   And focusing back on the information that you were

18   provided by OIR in 2013, you certainly understood the

19   information about Asians in the admissions process that OIR

20   provided to you, correct?

21   **A.**   Well, the thrust of it, yeah.  Remember I taught at Holy

22   Cross, statistics, in the '60s literally, and it was only

23   introductory.  I have a decent grasp of it; but beyond that,

24   no.

25   **Q.**   Dean Fitzsimmons, I'd like to put up page 431 of your

1   deposition on the screen.

2              MR. LEE:  Which page?

3              MR. HUGHES:  431.

4   BY MR. HUGHES:

5   Q.  You were asked, line 6:

6              "So did you ignore the information about being

7   Asian in the admissions process?

8              "ANSWER:  No.

9              "QUESTION:  What did you do with it?

10             "ANSWER:  We certainly understood it.  The

11  information was received."

12             Did you give that testimony?

13             MR. LEE:  I object, Your Honor.  This isn't

14  impeachment.

15             THE COURT:  I don't think it's strictly

16  inconsistent.  It's fine.

17             MR. HUGHES:  The question in court, to be clear,

18  was whether he certainly understood the information.

19             THE COURT:  He said that he understood it

20  generally, but I think the import of what he's saying is he

21  understood it but he's not an expert.

22  BY MR. HUGHES:

23  Q.  Let's move on.

24             You talked with Mr. Lee yesterday briefly about

25  Sparse Country, and the Court had a few questions that I hope

1    the two of us can clear up.  I want to go back to Plaintiff's

2    Exhibit 2.

3              MR. HUGHES:  I'm going to wait for Her Honor.

4              THE COURT:  I got it.

5    BY MR. HUGHES:

6    **Q.**  There was an exchange yesterday where Judge Burroughs

7    asked you about, you see there are high scorers men and high

8    scorers women.  Do you see that?

9    **A.**  I do.

10   **Q.**  I'm going to blow this up a little differently.  The

11   score ranges there are 1380 to 1600 for men, 1350 to 1600 for

12   women, correct?

13   **A.**  That's correct.

14   **Q.**  You and I reviewed this.  There's ethnicity and

15   geographic information in the column to the right of the

16   scores, correct?

17   **A.**  That's correct.

18   **Q.**  You and I reviewed that K is when the applicant doesn't

19   fill in their racial or ethnic information, O is other, W is

20   white, correct?

21   **A.**  Yes.  And then all.

22   **Q.**  And "all" means all the states, correct?

23   **A.**  I believe that's true.

24   **Q.**  And so the Asian applicants are not included in these

25   high scorers men and women.  They're actually included down

1   below in high scorers Asian men, high scorers Asian females,

2   correct?

3   **A.**  That's correct.

4   **Q.**  And we can see that's true because if you look over to

5   the column that I'm going to highlight, those are additional

6   applicants, correct?

7   **A.**  That's right.

8   **Q.**  And then the point that I was making I just want to make

9   sure is clear, with the lower PSAT range for Sparse Country,

10  that includes white applicants, other, and unknown but not

11  Asian applicants for the class years of 2017 and 2018,

12  correct?

13  **A.**  That's correct.

14  **Q.**  I want to look at one more exhibit related to this, and

15  that is P57.  I'll blow this up.  And that's an email from

16  Elizabeth Yong to you, January 29, 2014.  And before I ask

17  you questions, I'd like to offer it into evidence.

18              THE COURT:  Is it Tab 57?

19              MR. HUGHES:  I'm sorry, Your Honor.

20              THE COURT:  I got it.

21              MR. LEE:  No objection, Your Honor.

22              THE COURT:  Admitted.

23              (Plaintiff Exhibit No. 57 admitted.)

24  BY MR. HUGHES:

25  **Q.**  And I'd like to look at the next page.  The last document

1    we were looking at, P2 is for class years '17 and '18.  This

2    is for class year 2019, correct?

3  **A.**   Yes.

4  **Q.**   And here it's a little different.  For the high scorers

5    men and women, we've actually got -- it's just one group.

6    It's Asian, unknown, other, and white, correct?

7  **A.**   That's correct.

8  **Q.**   And we've got the same score range as before, correct?

9  **A.**   That is correct.

10  **Q.**   And just like before in Sparse Country with the lower

11    score range, you're inviting white applicants, other

12    applicants, and unknown applicants to apply with scores as

13    low as 1310 but Asian applicants are not included in that

14    category, correct?

15  **A.**   That appears to be correct.

16  **Q.**   And then I want to show you, and then we'll leave this

17    topic, Plaintiff's Exhibit 50, which Mr. Lee showed you and I

18    believe is already admitted into evidence.  If we look at the

19    fifth page of that.

20              THE COURT:  Not in your book, right?  In his book?

21              MR. HUGHES:  I think it was in my book.  It's not

22    in my book?  It's in Mr. Lee's book.

23              MR. LEE:  I can get it for you.  It's Tab 25 in our

24    notebook.

25              THE COURT:  Okay.  Got it.

BY MR. HUGHES:

**Q.**  The last two exhibits we looked at related to searches
for the classes of 2017, 2018, and 2019, correct?

**A.**  That's correct.

**Q.**  This relates to the search for the class of 2016,
correct?

**A.**  It appears to, yes.

**Q.**  We've still got the same -- this time we've got high
scorers at the top not differentiated by gender, correct?

**A.**  Yes.

**Q.**  And we've got the same Sparse Country score range and
ethnicities, correct?

**A.**  That's correct.

**Q.**  All right.  And then if we go down -- I think Mr. Lee
looked at this with you yesterday.  In 2016, there was
actually an Asian level 2 category that went down to 1300,
correct?

**A.**  That's correct.

**Q.**  And Harvard evidently made a decision to stop using that
category as of the class of 2017, '18, and ' 19 that we just
looked at, correct?

**A.**  Yeah.  I'm not sure who the Harvard was, to be honest.
Because Elizabeth Yong was in charge of our search, and we
obviously talked to Elizabeth.  But there are sometimes
complexities in ordering search materials from the ACT or the

1    SAT, but I don't remember being involved in that decision.

2    It's possible maybe I was.  It's also possible that

3    Elizabeth, who also didn't just order our search but she also

4    did our research, may for some reason have made the decision.

5    **Q.**   Okay.  But somebody made the decision?

6    **A.**   Precisely, right.

7    **Q.**   So as of 2017, the Asian level 2 no longer appears in

8    search, correct?

9    **A.**   That's what appears to be the case, yes.

10   **Q.**   Now, you talked about the docket.  You've got a big

11   docket there in front of you, right?

12   **A.**   Yes, I do.

13   **Q.**   Subcommittee process with Mr. Lee, correct?

14   **A.**   I did.

15   **Q.**   And you actually chair the P docket, correct?

16   **A.**   I do.  Currently and really for quite a few years.

17   **Q.**   Okay.  The dockets are a big, voluminous documents,

18   correct?

19   **A.**   They are.

20   **Q.**   So I'd like to look at Defendant's Exhibit 50 with you,

21   which is the docket.  It's a 1,500-page exhibit which I have

22   a printout of, but we're not going to look at more than a few

23   pages of the P, R, and S dockets.  Do you see that?

24   **A.**   I do.

25   **Q.**   If we just flip through --

1    **A.**   Is this somewhere in here?

2    **Q.**   It is not.  I've got it right there for you, if you want

3    the actual full paper binder.

4    **A.**   I might, but let's see what we can do to save time.

5    **Q.**   As you see on the screen, this is kind of what a docket

6    likes like, right?

7    **A.**   That's correct.

8    **Q.**   I'm looking at page 3.  And this is an entry for the P

9    docket for the Harvard College class of 2018, correct?

10             MR. LEE:  Your Honor, could we turn the gallery

11    screen off?  These are not redacted.

12             MR. HUGHES:  I'm sorry, Mr. Lee.  That's fine.

13             THE WITNESS:  I think especially because we're in

14    the local area.

15             THE COURT:  You turned mine off, too.

16             MR. HUGHES:  I took it down.  I think we're okay

17    now.

18             THE WITNESS:  I think it would be very useful for

19    Your Honor to see it.

20    BY MR. HUGHES:

21    **Q.**   You can see it now on the screen, right?

22    **A.**   I can see it.

23    **Q.**   So here we have the P docket, correct?

24    **A.**   That's correct.

25    **Q.**   And this is for early action for the Harvard class of

1    2018, correct?

2    **A.**   That's true.

3    **Q.**   And I see some handwriting on the side.  Do you see

4    there's an S?  What does S stand for?

5    **A.**   This is my hideous handwriting.  I put "music" with an

6    exclamation mark because it seemed to be significant.  This

7    was the Harvard book winner and the person also plays the

8    saxophone.

9    **Q.**   For the P docket, you're the guy that's making the

10   handwritten notes?

11   **A.**   Yes.  Also remember there's another official docket, too,

12   number 2.  Somebody else will do that, but almost always it

13   will be my handwriting in the official number 1, it's called.

14   **Q.**   The letters to the side, does A stand for admit?

15   **A.**   Yes.

16   **Q.**   If you look above, I didn't have it highlighted, but what

17   does S stand for?

18   **A.**   That's defer.

19   **Q.**   That means you're going to defer them into the regular

20   action?

21   **A.**   That's correct.

22   **Q.**   I think we may look at a couple of other pages.  There's

23   a WL notation.  What does that stand for?

24   **A.**   Wait list.

25   **Q.**   And that means probably not getting admitted?

1      **A.**   No, not necessarily.  We've had years where we've

2      admitted over 200 off the wait list, the year we returned

3      from not having early action.  So it's not at all a dead

4      issue.

5      **Q.**   Okay.  But it's not as good as a deferral or an admitted,

6      generally speaking?

7      **A.**   A defer could end up admitted but they could also end up

8      rejected.  I would say on average "wait list" means you're

9      pretty close.

10     **Q.**   I want to just take a little side detour here.

11            You testified earlier that the stereotyping

12     comments we saw in the OCR report that Mr. Lee just reviewed

13     with you are abhorrent.

14            Do you agree with that?

15     **A.**   Yes.

16     **Q.**   I want to look at what those comments were just so we

17     have that stereotypical language was in mind.  So I'm going

18     to go back to Exhibit 555, page 24.  I'll read it in the

19     record.

20            So here on page 24 of the OCR report, "OCR's

21     concern for the potential stereotyping of Asian-American

22     applicants prompted a review of reader comments for negative

23     characterizations which could have an impact on the

24     admissions decision and ratings.

25            "On its face, reader comments revealed several

1    recurring characterizations attributed to Asian-American

2    applicants.  Quite often Asian-American applicants were

3    described as being quiet/shy, science/math oriented, and

4    hard-working.  For example, one reader's comment embraced all

5    of these in describing an Asian-American applicant when she

6    wrote, 'applicant seemed like a reserved, hard-working,

7    aspiring woman scientist/doctor.'

8              "While such descriptions may not seem damaging, OCR

9    was conscious that problem of model minority stereotypes

10   could negatively impact Asian-American applicants as a whole.

11   This concern was also raised when OCR's file review came upon

12   comments such as, 'He's quiet and, of course, wants to be a

13   doctor?'"

14             Do you see that text before you?

15   **A.**  I do.

16   **Q.**  Some of that stereotypical language associated with

17   Asian-Americans that you say you abhor are quiet/shy, hard

18   workers, reserved, hard-working, quiet.  Agree?

19   **A.**  Actually earlier today I actually talked about hard

20   working as perhaps one of the best descriptions you could

21   have for anyone.

22             I referenced one of our Asian-Americans alums,

23   Angela Duckworth, and her great book on grit and the

24   importance of hard work in terms of succeeding in any kind of

25   an endeavor.

1          So I would hardly say -- in my own mind at least

2     say that someone who's a hard worker that -- I would consider

3     it to be a huge compliment.  But that's just me.

4     **Q.**  These are the stereotypical language that you agreed

5     yesterday that you abhorred, correct?

6     **A.**  My statement was that I would abhor any stereotypical

7     comments.

8     **Q.**  Let's look at Plaintiff's D50, page 56.

9          THE COURT:  Are you going to move this into

10    evidence?

11         MR. HUGHES:  Sure.  I offer D50 into evidence.

12         MR. LEE:  Could we have a copy?

13         MR. HUGHES:  This was on Harvard's list of

14    documents.

15         MR. LEE:  What page?

16         MR. HUGHES:  Page 356.  I've also got it on the

17    screen.  I've also got a motion to move this into evidence.

18         MR. LEE:  There's no objection, Your Honor.

19         THE COURT:  Admitted.

20         (Defendant Exhibit No. D50 admitted.)

21    BY MR. HUGHES:

22    **Q.**  So this is docket P?

23    **A.**  Yes.

24    **Q.**  I want to look at the bottom that I've got highlighted.

25    This is an applicant that we've got -- what is the ethnicity

1    for this applicant?

2    **A.**   That would be Asian and then Chinese.

3    **Q.**   What is the course of action that's proposed as wait

4    list, correct?

5    **A.**   Yes.  At that time.

6    **Q.**   And this is your handwriting, correct?

7    **A.**   That's correct.

8    **Q.**   And you described the applicant.  There's only two

9    descriptive words, and they are "very quiet," correct?

10   **A.**   That's correct.

11   **Q.**   I've got one more.

12          MR. HUGHES:  Now, Mr. Lee, I'm on page 186.

13   BY MR. HUGHES:

14   **Q.**   Dean Fitzsimmons, can you see the page of the docket that

15   I've got up in front of you?

16   **A.**   I can, yes.

17   **Q.**   And again, this is your handwriting, correct?

18   **A.**   That's correct.

19   **Q.**   It's a P docket, correct?

20   **A.**   That is correct.

21   **Q.**   And what is the ethnicity of the applicant that I have

22   highlighted?

23   **A.**   That would be Asian and Chinese.

24   **Q.**   And the activity proposed in subcommittee is wait list,

25   correct?

1   **A.**  That's correct.

2   **Q.**  And you described that applicant as quiet and strong,

3   correct?

4   **A.**  I did.

5           MR. HUGHES:  No further questions.

6                    RECROSS-EXAMINATION

7   BY MR. LEE:

8   **Q.**  Dean Fitzsimmons, have you interviewed white candidates

9   who you described as quiet?

10  **A.**  I certainly have.

11  **Q.**  African-American candidates you described as quiet?

12  **A.**  Yes.

13  **Q.**  Hispanic candidates you've described as quiet?

14  **A.**  Yes.

15  **Q.**  Asian-Americans you've described as quiet?

16  **A.**  Yes.

17  **Q.**  Is that stereotyping by ethnicity?

18  **A.**  No.

19  **Q.**  Have you interviewed Asian-American candidates you

20  described as outgoing?

21  **A.**  Yes.

22  **Q.**  And the document that was just put in front of you is

23  1,592 pages, correct?

24  **A.**  That's correct.

25  **Q.**  It has handwritten notations by you on a variety of the

1    pages, correct?

2    **A.**   That's correct.

3    **Q.**   Now, when OCR was referring to stereotyping, it was

4    referring to phrases that were used to characterize someone's

5    ethnicity, correct?

6    **A.**   That's correct.

7    **Q.**   Is that what you were doing in these 1,592 pages?

8    **A.**   No.

9    **Q.**   Last couple of questions.  You were asked some more

10   questions about OIR.

11   **A.**   Yes.

12   **Q.**   I think you told us a lot of this started or part of it

13   started with the Unz article?

14   **A.**   Yes.

15   **Q.**   And as Mr. Hughes said, there was some controversy about

16   Asian-American admits, correct?

17   **A.**   That's correct.

18   **Q.**   Was there also controversy among the Harvard Jewish

19   community?

20   **A.**   Very much so.

21   **Q.**   Because?

22   **A.**   Because of the Unz article.

23   **Q.**   Right.  Now, at the end of this six months and all of the

24   different presentation memos you saw, you did see the model

25   you discussed with Her Honor, correct?

1    **A.**   Yes.

2    **Q.**   Did it tell you anything that was inconsistent with what

3    you had understood before the OCR investigation, after it,

4    right through the date you got those reports?

5    **A.**   No.   Perfectly consistent with everything we've known.

6              MR. LEE:   Thank you, Your Honor.

7              MR. HUGHES:   I have nothing further, Your Honor.

8              THE COURT:   Dean Fitzsimmons, you are excused.

9              THE WITNESS:   Thank you, Your Honor.

10             MR. MORTARA:   Your Honor, Adam Mortara.   Would you

11   remind me of the time you wanted to take lunch?

12             THE COURT:   I was planning on taking lunch from

13   quarter of 1:00 to 1:30.

14             MR. MORTARA:   I would suggest we do it right now

15   because I'm going to be right in the middle of my direct

16   examination of Christopher Looby.   I would be happy to do it

17   now.

18             THE COURT:   I need until 1:30 today.   Why don't we

19   do some of these deposition designations at sidebar before we

20   take a break.

21             (The following was held at sidebar.   Present are

22   Attorneys Katherine L.I. Hacker, Krista J. Perry, Meg E.

23   Fasulo, Denise W. Tsai, and Felicia H. Ellsworth.)

24             THE COURT:   Who do you want to start with?   Do you

25   want to start with Ortiz?

```
 1              MS. HACKER:  Sure.

 2              THE COURT:  I think the easiest way is page by

 3    page.

 4              MS. ELLSWORTH:  That's fine.

 5              MS. HACKER:  Yes.

 6              THE COURT:  The first one is on page 2.  That's

 7    overruled.

 8              MS. ELLSWORTH:  That's withdrawn.  Sorry about

 9    that.

10              THE COURT:  Page 3 is overruled.  This one is

11    harder to do.  Everything on page 6 comes in.  This one I had

12    to stop because I wasn't sure -- the top half of page 7 comes

13    in.  So page 7 comes in.  Now, on page 8, I couldn't really

14    understand this without an email.  I don't really know what

15    it is and all this talk about planning on using it next week.

16    Using it for what?  I'm just not sure what this is about.

17              MS. FASULO:  Your Honor, Meg Fasulo for SFFA.  This

18    is discussing an email chain between Ms. Ortiz and Ms. Bever

19    having to do with the distribution of SAT scores that

20    Ms. Ortiz was planning on using in a presentation to other

21    admission officers.

22              THE COURT:  Other admissions officers at Harvard?

23              MS. FASULO:  That's correct.

24              THE COURT:  That comes in.

25              MS. ELLSWORTH:  And I believe the exhibit came in.
```

1          MS. FASULO:  That's correct.  The exhibit was

2     unobjected to.

3          THE COURT:  Everything on page 8 comes in.  So then

4     on page 10, my highlighting at least starts right in the

5     middle of a question.  So I'm assuming that --

6          MS. FASULO:  That was a mistake.  The whole part

7     should be highlighted.

8          THE COURT:  You're objecting to the answer?  Start

9     on page 9.  Is that what's being objected to, that answer

10    that begins at line 18?

11         MS. ELLSWORTH:  The one that says, "Were I to

12    guess".

13         THE COURT:  That's sustained.  That question does

14    not come in.  The next question does come in, do you recall.

15    She says I don't recall.  That question and answer comes in.

16    And then the next question and answer, the objection is

17    sustained.

18         Page 11, that objection is sustained.  So on page

19    12, this kind of lost me again.  The answer comes in, I don't

20    recall.  The next question, the objection is sustained.  I

21    wasn't sure what you're objecting to.  The answer comes in,

22    but the question is out.

23         MS. ELLSWORTH:  I don't think the answer is the

24    next thing.  This is where it's confusing.  I'm not sure if

25    we objected to this or not.  I think it shouldn't come in

1    because it's speculation.

2         THE COURT:  What's in is "Would you have conveyed

3    this information?". That's a legitimate question.  She says

4    she doesn't know.

5         MS. ELLSWORTH:  It's the question that says what is

6    the type of context that an admissions officer should have

7    taken away --

8         THE COURT:  That's sustained.

9         MS. ELLSWORTH:  So the answer should not come in

10   either, right?

11        THE COURT:  Right.  The next objection that says it

12   was help for me.  That's overruled.  And then -- and that

13   last answer comes in which is on the bottom of page 12.

14        MS. ELLSWORTH:  Got it.

15        THE COURT:  The next one is -- do you want to talk

16   about Zuluaga here?  We can just do the objections here and

17   not hear the argument on who they want to keep out in their

18   entirety.

19        MS. HACKER:  I'm happy to do it all right now since

20   Your Honor has time before your lunch.

21        THE COURT:  Let met check my phone.  Okay.  There's

22   this one and another one.  One of them is from Stuyvesant and

23   the other is from Thomas Jefferson.  What I think on these, I

24   actually looked at Zuluaga and Pedrick.  My thinking on it

25   changed a little on it after I went back and did Pedrick.

1  Most of this stuff is not coming in through this witness,

2  right?  All the stuff about are Asians different, different

3  socioeconomic backgrounds, are they the same as each other,

4  that's just not coming in.

5          That being said, if you want to put in some

6  information about Thomas Jefferson, how many students they

7  have and what the gender is, what the ethnic breakdown is, I

8  can see letting that in if it's going to be linked up later.

9  It it's not going to be linked up, it's irrelevant.

10         MS. HACKER:  Whatever Harvard's position was going

11 into trial over the past few days, what we heard from Dean

12 Fitzsimmons is and this is a quote, "You know, the one thing

13 we do know, for example, and again speculation, and it's a

14 fact that the strength of the teacher recommendations and the

15 counselor recommendations for Whites is somewhat stronger

16 than those for Asian-Americans."

17         Dean Fitzsimmons is saying that the schools who

18 support these students do have a different belief, different

19 ratings for Whites versus Asians.  And what we're hearing

20 from these schools is directly relevant to contradict that

21 testimony.

22         THE COURT:  What I heard him say is that they're

23 looking at the evaluations and they're seeing that the

24 evaluations for White students are higher than for Asian

25 students.  So if you want to prove that up, you have to show

1    me some guidance counselor recommendations, not just this

2    like subjective kind of, oh, no, our recommendations would

3    never show anything like that.

4            MS. HACKER:  And we asked for those in discovery,

5    Your Honor, but we were denied --

6            THE COURT:  You were offered the opportunity to

7    come back and nobody ever did.  If you want to put this in

8    and then you have some other statistical breakdown later

9    about how kids from this high school are treated, that's one

10   thing.  But just this thing from the guidance counselor about

11   do we have too many Asians and are Asians different from each

12   other, it's not substantiated by anything.

13           MS. HACKER:  We will have data later that shows

14   there is no difference.  Whites are not better in school

15   support ratings than Asian-Americans.  This testimony

16   confirms that that is what these high school representatives

17   believe.  These were 30(b)(6) witnesses on behalf of these

18   high schools.

19           THE COURT:  It has to be an actual student.  It

20   can't be just general.  I don't even know which of these

21   people applied to Harvard.  And one of them says -- I think

22   one of them even equivocates -- I think the questions were

23   asked differently.  It's like are Asian students

24   well-rounded.  It was like more or less, basically, right?

25   It's like saying some are, some aren't which is probably

1    fair.  Some whites are -- the questions are asked

2    differently.  It doesn't link up to what Harvard is doing.

3            If you want to put in through these people the

4    demographic breakdown of the school, you can have that.  So

5    we can go through it and sort of -- but the rest of it just

6    doesn't come in.  So do you know the breakdown, how many

7    students, how many boys, how many girls, racial breakdown.

8    So that gets you to the top of page 2.

9            MS. ELLSWORTH:  I'm just getting the actual

10   subpoena served to Thomas Jefferson.  I think it's also

11   outside the scope of what they were to speak on.

12           THE COURT:  I didn't look at the scope.  My initial

13   take on this is it was coming out.  None of it was coming in.

14   I went back and looked at Pedrick, I thought if you're going

15   to link up those numbers later --

16           MS. ELLSWORTH:  This is the Thomas Jefferson

17   30(b)(6) notice.  Racial composition of applicants, admitted

18   persons, or enrollees to Harvard; Harvard's use of race in

19   the admissions process; communications to, from or copying

20   Harvard regarding the use of race in the admissions process;

21   alleged discrimination by Harvard against persons of Asian

22   descent from Thomas Jefferson High School for Science &

23   Technology in the college admissions process; and

24   communications concerning SFFA, the plaintiff, and its

25   representatives, including but not limited to Edward Blum or

1     the complaint or this action."

2             This is outside the scope.  I don't know that this

3     is actually competent evidence about the racial or ethnic

4     breakdown of Thomas Jefferson high school.  The witness

5     wasn't put forward on that.

6             MS. PERRY:  Krista Perry for SFFA, Your Honor.

7             THE COURT:  Hold on.  Let me just look at this.

8     She's right about the scope.  Let me what you say about that.

9             MS. PERRY:  I was just going to say that the

10    information about the schools themselves goes to the

11    foundation of the witness being a 30(b)(6) witness in the

12    first place.  To the extent they would have information about

13    discrimination against Asian-Americans to Harvard, it would

14    be through their experience with their students who apply.

15            THE COURT:  I think they are sort of foundational

16    questions on the 30(b)(6).

17            MS. ELLSWORTH:  We also requested documents which I

18    don't believe Thomas Jefferson agreed to provide.  Again the

19    documents are relating to enrollees to Harvard.  They just

20    didn't ask for this in the 30(b)(6) to get the breakdown.

21    I'm not sure these numbers are right.

22            THE COURT:  They're much vaguer here than they are

23    in Pedrick.

24            MS. HACKER:  To be clear, Your Honor, on the data,

25    there was some discussion going into these depositions of

1    whether or not the schools needed to produce the data because

2    it was data we already had from Harvard.  So there was an

3    agreement that the schools didn't need to produce the data

4    separately.

5            MS. ELLSWORTH:  The data from Harvard is the data

6    of whoever applied.  It's not the actual breakdown of Thomas

7    Jefferson.

8            THE COURT:  For example, does the information about

9    the school that Harvard would have on these two schools

10   include the ethnic breakdown of the schools?

11           MS. ELLSWORTH:  Not the school.  Just the

12   applicants to Harvard.

13           THE COURT:  Just the applicants?

14           MS. ELLSWORTH:  Right.

15           THE COURT:  I think this is so marginal.

16           MS. HACKER:  The last thing I'd say on that, Your

17   Honor, given the low bar relevance, we do not plan on

18   spending much time on this.  Mr. Zuluaga's transcript is 10

19   minutes and Ms. Pedrick's is 20.  Given the low bar

20   relevance, and this directly contradicts what we've heard

21   from Dean Fitzsimmons, we do think it should come in.

22           THE COURT:  I know you think it should come in.

23   That's why we're standing here.

24           MS. ELLSWORTH:  It's not the timing to which we

25   object.

```
1              THE COURT:  I didn't read anything except what's
2    objected to.  You didn't object to everything.
3              MS. ELLSWORTH:  We objected to it in its entirety.
4              THE COURT:  I didn't read the whole testimony.  Or
5    did I?  Let me see.
6              MS. ELLSWORTH:  The ones we didn't object to
7    related to actually topics of the 30(b)(6).  The suggestion
8    that Thomas Jefferson did not have enough black and Latino
9    students.  We think the entire designation and the entire
10   deposition is irrelevant.
11             THE COURT:  I'm going to exclude the testimony.
12   I'm going to exclude the witness.  What's next?
13             MS. HACKER:  Was that related to Mr. Zuluaga?
14             THE COURT:  Yes.  Zuluaga is all the way out.
15             MS. HACKER:  Casey Pedrick.
16             THE COURT:  I just want to look at the last pages.
17   This is -- what I was going to let in was, and we can discuss
18   this again in light of Zuluaga, everything on page 2,
19   everything on page 3, everything to "the most competitive
20   high school in the country."  I was going to let that in and
21   I was going to stop right there.  I was going to let in page
22   29 and stop at page 30.
23             MS. ELLSWORTH:  Your Honor, we have the same scope
24   objection.  The subpoena was identical in terms of didn't ask
25   for the admissions criterion or anything like that or
```

1    statistics related to applicants to Harvard.

2          THE COURT:  Once you're keeping out their

3    subjective impressions of the Asian population, the rest of

4    it just becomes sort of irrelevant.  If they were all

5    applying to Harvard and none of them are getting in, that

6    might be relevant.  But until you know who is applying and

7    who isn't and what percentage of them getting in, it's just

8    kind of floating out there.

9          MS. PERRY:  It seems to me just as an individual

10   student might be an instructive example, an individual

11   guidance counselor's impression and just as Dean

12   Fitzsimmons's general impressions of how the system works.

13   It's important to know whether the guidance counselor ratings

14   are objectively different or whether they're being scored

15   differently.

16         THE COURT:  I completely agree that that would be

17   admissible testimony.  So if you want to put it in, get a

18   guidance counselor on the stand and say this is the

19   application that I did for a White person and this is the

20   recommendation that I did for an Asian person, and I view

21   them to be equally strong, and they got different ratings,

22   that's a specific -- but this is like generally our Asian

23   students are great.  It doesn't get you to what Harvard --

24   You don't even know if all the Asian students she thinks are

25   great, you don't know if any of them applied to Harvard.

1    It's just not limited to their applicant pool in any way.

2          MS. PERRY:  Although she does describe her role as

3    a guidance counselor, and presumably she does know which set

4    of students does apply to Harvard.

5          THE COURT:  No recommendations were put in front of

6    her, at least from what I have in front of me.  So she could

7    look at them and say this is an Asian student that I thought

8    was fantastic and they didn't get in.  And this White student

9    that I thought was significantly less qualified did.  There's

10   no way to glean any of that from this.  So this one's out,

11   too.  Who's next?

12         MS. FASULO:  Grace Chang.

13         THE COURT:  Page 3, the objection is overruled.

14   Page 5, it's sustained.  Page 7, they're all sustained.  The

15   top one.  So page 8 is sustained.  The next ones are all

16   overruled on that page.  Overruled on page 9 and the top of

17   page 10.  On the bottom of page 10, so it's two questions and

18   two answers.  The first two answers and the first question

19   come in.  The last question, "Why did Dean Simmons ask you to

20   make that call?" is out.  Sustained on page 11.  Overruled on

21   page 12.

22         MS. ELLSWORTH:  Your Honor, just to be clear, the

23   top of page 11 comes out obviously.

24         THE COURT:  Yes.  The whole thing comes out.  Page

25   12, that top part is overruled.  The bottom part is

1    overruled.  Page 13, overruled.  Page 16, it's all overruled.

2    Page 17, it's all overruled.  Page 18 overruled.  So page 19

3    and 20 and 21, I was once again lost.  I can't see what we're

4    talking about.  It's a 50-page chart.

5              MS. ELLSWORTH:  If I may, Your Honor, a version of

6    the Dean's Interest List, one of which was just introduced

7    into evidence through Dean Fitzsimmons that the witness --

8              THE COURT:  Let's see.  Chance to review it.  Yes.

9    50-page chart.  She reviews the document.  So this is where

10   she says it's not familiar to her.  So I'm not really sure

11   what we're doing here.  You mark it.  She says she's reviewed

12   it.  Right?  You want that out where she says she's reviewed

13   it?

14             MS. ELLSWORTH:  What page are we on?

15             THE COURT:  19.

16             MS. FASULO:  On page 19 we have Exhibit 12 which is

17   actually an email that was sent from Ms. Chang.  And then on

18   page 20 starting at page 22, that's a separate exhibit which

19   is the Dean's List.

20             THE COURT:  But there's no question about

21   Exhibit 12.

22             MS. ELLSWORTH:  Let me just look for it, Your

23   Honor.

24             MS. FASULO:  We were just using Ms. Chang as a way

25   to bring Exhibit 12 into evidence.

1              MS. ELLSWORTH:  This is a document we've objected
2      to because it contains a lot of hearsay.
3              MS. FASULO:  Your Honor, this is not hearsay.  This
4      is an email that was written by Grace Chang about her
5      impressions and reactions to an alumni event.
6              THE COURT:  Do you have it?
7              MS. FASULO:  Yes, I can grab it.
8              THE COURT:  While she's getting that, so the next
9      one -- it's marked.  You ask her to look at it.  Her answer
10     is -- as far as I'm concerned she can look at it.  And then
11     she says -- It's not coming in through her, it's not familiar
12     to her.
13             MS. ELLSWORTH:  These are our counters.  That's why
14     it's not objected to.
15             THE COURT:  I see.  I guess I don't really get
16     this.  If I leave it in, the document's not coming in.  If I
17     leave it out, the document's not coming in.  Do you want to
18     just have her read that she's shown a document for
19     identification?
20             MS. HACKER:  And offer it into evidence, yes, Your
21     Honor.
22             THE COURT:  I'm not going to let it come into
23     evidence because she says it's not familiar to her.
24             MS. FASULO:  She was familiar enough with the
25     docket to be able to identify that it was a Dean's List.

1          THE COURT:  No.  "I'd like to mark it as an
2    exhibit.  It's a 50-page chart.  Witness reviews document."
3    Then what happens?  The next thing that I have is you
4    represent that the metadata indicates when it was created.
5    "Have you seen documents in this format before?  No.  This is
6    not familiar to you?  Correct.
7          MS. FASULO:  That's fine.
8          THE COURT:  So that one is out.  Let's just finish
9    the last one, and then we'll go back to the one we just
10   skipped.  "Document 16 is an email chain marked for
11   identification.  Have you reviewed it?  Yes."
12         MS. FASULO:  Again Your Honor, this is an email
13   that Grace Chang sent and received.  We're just using Grace
14   Chang as a way to get this email in.
15         THE COURT:  Are you objecting to that.
16         MS. ELLSWORTH:  We are objecting in part.  There's
17   a lot of hearsay at the bottom of it.
18         THE COURT:  Let me see 16 and 12.
19         MS. FASULO:  This is 16 and this is 12.  Oh, my
20   gosh.  I need better glasses.  What are you objecting to,
21   that this is hearsay?
22         MS. ELLSWORTH:  It's further down, Your Honor.
23   It's on the third page.  Somebody wrote on the message board
24   called College Confidential.  It's right there.  And there's
25   discussions back and forth.

1              MS. FASULO:  Your Honor, these are discussions

2    between Ms. Chang and an alumni interviewer in her role as an

3    alumni interviewer.  We're offering this -- that is not

4    hearsay.  We're just offering this statement that

5    Ms. Ellsworth has pointed out for its effect on Ms. Chang.

6              THE COURT:  I'll let this come in but not for the

7    truth, just that that's what they're responding to.

8              MS. FASULO:  Yes.

9              MS. ELLSWORTH:  Your Honor, I think the alumni

10   interviewer statements also come in not for the truth.

11             THE COURT:  Yes.  They'll come in for context on

12   what she's saying.  And then this is 12.

13             MS. FASULO:  Your Honor, this is an email.  The

14   lower email is sent from Grace Chang.  She's recounting an

15   event, an alumni event, and all of her impressions of what

16   happened.  And then you can see at the top she's forwarded it

17   to another admissions officer.

18             MS. ELLSWORTH:  And it's the bottom part, the long

19   part of the email where she recounts various statements from

20   people.  It could come in not for the truth.

21             THE COURT:  That can come in not for the truth.

22             MS. ELLSWORTH:  And then the top part, that's her

23   statement as an employee.  That's fine.

24             THE COURT:  That should get us through today.  I

25   have to go and meet my husband.  Who does that leave?

```
1              MS. HACKER:  It leaves us I believe with
2     Ms. Howrigan, Ms. Weaver and Mr. Walsh.
3              THE COURT:  Who does it leave?  Howrigan.
4              MS. HACKER:  Mr. Walsh, Ms. Weaver.
5              MS. FASULO:  And Ms. Lopez.
6              MS. ELLSWORTH:  Lopez is the only one remaining
7     that we have an objection in full to the witness.
8              THE COURT:  I did a bunch of them last night, then
9     got your email this morning and your email this morning and
10    tried to do a bunch more.  She's the one I haven't done.  So
11    I'll try and do it.
12             (End of sidebar.)
13             (Court recessed at 1:02 p.m.)
14                 ***  AFTERNOON SESSION  ***
15             MR. LEE:  Your Honor, Ms. Conley will be presenting
16    the witness for us.
17             THE COURT:  Whenever you're ready.
18             MR. MORTARA:  Your Honor, Students for Fair
19    Admissions calls Christopher Looby.
20             THE CLERK:  Can you please raise your right hand.
21             (CHRISTOPHER LOOBY duly sworn by the Deputy Clerk.)
22             THE CLERK:  Thank you.  You may be seated.  Can you
23    please state your name and spell your last name for the
24    record.
25             THE WITNESS:  Sure.  My first name is Christopher.
```

1    My last name is Looby.  It's L-O-O-B-Y.

2              MR. MORTARA:  Before we begin, Your Honor, I'm told

3    the gallery monitors are off.

4              THE COURT:  They're off because there's nothing on,

5    right?

6                        DIRECT EXAMINATION

7    BY MR. MORTARA:

8    Q.  Good afternoon, Mr. Looby.  I'm Adam Mortara.  Nice to

9    meet you.

10   A.  Nice to meet you.

11   Q.  Can you tell the Court about your educational background

12   after high school?

13   A.  Sure.  I went to Ithaca College where I graduated in

14   1996.  And then after that, I received my master's degree in

15   school counseling from Suffolk University.

16   Q.  I want to focus our time together, it will be brief, on

17   your work at the Harvard admissions office.  How long have

18   you been working there?

19   A.  I've been with the admissions office -- financial aid and

20   admissions for about ten years.

21   Q.  And when did you start working for the Harvard admissions

22   office exactly?

23   A.  Harvard admissions, about eight years ago.

24   Q.  What's your title today?

25   A.  I'm a senior admissions officer.

1    Q.   You've been reading applications in accordance with

2    Harvard's admissions procedures for about eight years; is

3    that right?

4    A.   That's correct.

5    Q.   And I understand you work on the N docket, which is

6    Connecticut, Rhode Island, and New York; is that right?

7    A.   That is correct, yes.

8    Q.   That's Upstate New York, not New York City; is that

9    correct?

10   A.   That's right.

11   Q.   And you also work on the D docket, which is Austin and

12   West Texas?

13   A.   Correct.

14   Q.   And in particular, in Texas you work on the city of

15   Austin.  You know those high schools pretty well?

16   A.   I do.

17   Q.   Like Westlake High School, for instance.  And you've done

18   that since about a year after you started at admissions

19   and -- financial aid and admissions?

20   A.   Yes.

21   Q.   Now, Mr. Looby, you can't recall any way in which Harvard

22   admits students changing over the eight years you've been

23   reading applications, can you?

24   A.   Can you repeat that, please?

25   Q.   You can't recall in any way by which the process by which

1  Harvard admits students has changed since you've been reading

2  applications, correct?

3  **A.**   That's correct.

4  **Q.**   And you personally have read applications the same way

5  for the eight years you've been doing it, right?

6  **A.**   That's correct.

7  **Q.**   When you were a new reader, when you first started doing

8  it, who read over your shoulder?  Who was your second reader?

9  **A.**   When I first started, the first 50 actual applications

10  that I read would be parsed out to higher-level admissions

11  folks.  So it would be a number of individuals, not one

12  specific person.

13  **Q.**   Did Rosemary Green read any of your applications?

14  **A.**   She was the chair of D docket, yes, she did.

15  **Q.**   Did Sally Harty read any of your applications?

16  **A.**   She did.  She was the chair of N docket.

17  **Q.**   The Rosemary Green was the chair of D docket and she read

18  some of your first 50, correct?

19  **A.**   I don't specifically again.  It was a number of people in

20  the office.

21  **Q.**   But Rosemary Green and Sally Harty would have had some

22  influence in you over how you read applications.  Is that

23  fair to say?

24  **A.**   That's fair, yes.

25  **Q.**   Now I'm going to put on the screen Plaintiff's

 1    Exhibit 71, which you also have in front of you, sir.  Unlike
 2    the last witness, I think we're only going to maybe discuss
 3    one document.  So that's all you're going to need.
 4            MR. MORTARA:  And I'm going to offer
 5    Plaintiff's 71.
 6            MS. CONLEY:  No objection, Your Honor.
 7            THE COURT:  Admitted.
 8            (Plaintiff Exhibit No. 71 admitted.)
 9    BY MR. MORTARA:
10    **Q.**  Mr. Looby, you see that these are the 2019 reading
11    procedures?
12            THE COURT:  Is this the same notebook?
13            MR. MORTARA:  It's the same as Plaintiff's
14    Exhibit 1, effectively.
15            THE COURT:  It's fine.  I just wanted to know if it
16    was in the book.  I'll just look on the screen.
17            MR. MORTARA:  We're not going to do all that much.
18    BY MR. MORTARA:
19    **Q.**  You were asked about this document in your deposition,
20    right?
21    **A.**  That's correct.
22    **Q.**  Now, this is the only document you recall that discusses
23    how you should consider race in the Harvard admissions
24    process, correct?
25    **A.**  That is not correct.

1    **Q.**  Mr. Looby, I'm going to hand you a copy of your

2    deposition.

3                MR. MORTARA:  May I approach, Your Honor?

4                THE COURT:  Of course.

5    BY MR. MORTARA:

6    **Q.**  Mr. Looby, to help you understand, I'm going to orient

7    you to your deposition by turning to page 27 first so you can

8    see what document is being discussed.

9                MR. MORTARA:  Your Honor, I'm not going to put this

10   on the screen just yet because this isn't the actual

11   impeachment.

12   BY MR. MORTARA:

13   **Q.**  It says Exhibit 1 marked.  Do you see that at line 16?

14   **A.**  Yes.

15   **Q.**  And then you see the next page 28 at lines 2 to 5 it

16   says:  Can you describe to me generally what that is, and

17   that's the reading procedures, class of '19.

18                Do you see that?

19   **A.**  I do see that, yes.

20   **Q.**  And then I want you to turn to page 46 of your

21   deposition, line 7.

22                At line 7 it says, "Do you recall ever reading a

23   document that outlines how you as an admissions officer

24   should use race in the admissions process?

25                "ANSWER:  This is the only document that I can

1    recall that discusses how we should consider race."

2              Was that your sworn testimony?

3    **A.**   That was, yes.

4    **Q.**   But the fact is there isn't actually any discussion in

5    this document about how you should use race in the admissions

6    process, is there?

7    **A.**   I see prompts that involve race in this, so I would

8    categorize that as instructions on how to use race.

9    **Q.**   Would you please turn to the previous page of your

10   deposition.

11             Do you see at line 5 it says, "Was there any

12   discussion in this document about how you should use race in

13   the admissions process?

14             "ANSWER:  Not that I recall, no."

15             Do you see that?

16   **A.**   I do.

17   **Q.**   That was your sworn testimony?

18   **A.**   It was.

19   **Q.**   Mr. Looby, there are no written training materials about

20   how to use race in Harvard's admissions process, are there?

21   **A.**   I believe there's much more than written instructions

22   with regards to using race in our process.

23   **Q.**   Please focus on my question.

24             There are no written training materials about how

25   to use race in Harvard's admissions process, correct?

1    **A.**  Again, I view this document as something that discusses

2    race and how to categorize that.  So I would say that that is

3    actually not a correct statement.

4    **Q.**  Take a look at the document.  Please tell me where on the

5    document it tells you how to use race, sir.

6    **A.**  In terms of coding the application.

7    **Q.**  I'm asking you how race affects whether somebody gets

8    admitted or not.  Did you not understand my question before?

9    Let me rephrase it.

10            Are there any written materials that tell Harvard

11   admissions officers, like you, how to use race insofar as it

12   affects somebody's admissions prospects?

13   **A.**  Well, there's far more than just race that affects

14   someone's chances of being admitted.

15            MR. MORTARA:  Your Honor, I move to strike the

16   answer as nonresponsive.

17            THE COURT:  I am not going to strike the answer.

18   The lawyers from Harvard are going to have a chance to go

19   back at you and clarify anything that you feel like it's not

20   clear.  So while it's his turn to ask you questions, you

21   should just listen to the question and answer to the best of

22   your ability the question that he's asking.

23   BY MR. MORTARA:

24   **Q.**  Insofar as it affects whether someone is admitted or not,

25   there are no written training materials telling admissions

1    officers how to use race in the process, correct?

2    **A.**   I'm not sure.

3    **Q.**   Is there any written guidance in Plaintiff's Exhibit 71

4    on how to use race as to whether someone is admitted or not

5    in Harvard's admission process?

6    **A.**   I think all of the information in this document is

7    related to who exactly has the potential to be admitted.

8    **Q.**   Mr. Looby, please focus on my question.  I'm only asking

9    about the use of race as it pertains to whether someone is

10   admitted or not.

11          Can you just tell me whether there's anything in

12   Plaintiff's Exhibit 71 that tells you how to use race in

13   making that decision?

14   **A.**   Again, I see this as all information tied to how we make

15   these decisions.

16   **Q.**   Mr. Looby, please identify where in Exhibit 71 it tells

17   you how to you use race to decide whether to admit somebody.

18          MS. CONLEY:  Objection.  Asked and answered.

19          THE COURT:  Well, it has been asked.  I don't think

20   it's exactly been answered.  I'll give him another shot at

21   it.

22   BY MR. MORTARA:

23   **Q.**   Just page through it as long as you need to, sir.  Find

24   where it tells you how you to use race in deciding whether to

25   admit somebody.

1    **A.**   Again, race is not something that is solely responsible

2    for admitting anyone.

3    **Q.**   I understand that, Mr. Looby.  My question is, is there

4    any written guidance given to Harvard admissions officers

5    instructing them how to use race in making their admissions

6    decisions?

7    **A.**   Again, I think this is a solid guideline that helps us

8    make these decisions.  I don't see anything specific that

9    points to this is how you should use it when admitting a

10   student.

11   **Q.**   Now let's break that down a little bit.

12            That means there's no written guidance on how to

13   use race in the ratings Harvard assigns, including the

14   overall rating, which appears at the top of page 5 of this

15   document.  No written guidance on how to use race in

16   assigning that rating, correct?

17   **A.**   We don't use -- that's correct.  I strike that.

18   **Q.**   No written guidance on how to use race in the academic

19   rating, correct?

20   **A.**   We don't use race when we're assigning academic.

21   **Q.**   Mr. Looby, does it say anything about using race one way

22   or the other on Plaintiff's Exhibit 71 when it's talking

23   about the academic rating?

24   **A.**   No, it does not.

25   **Q.**   No written guidance about whether to use race one way or

1    the other on the extracurricular rating, correct?

2    **A.**   That is correct.

3    **Q.**   No written guidance on whether to use race one way or the

4    other whether it comes to the athletic rating, correct?

5    **A.**   That is correct.

6    **Q.**   No written guidance when it comes to how to use race one

7    way or the other when it comes to the personal rating,

8    correct?

9    **A.**   That is correct.

10   **Q.**   And the same for school support.  No written guidance one

11   way or the other being on how to use race with the school

12   support, correct?

13   **A.**   That is correct.

14   **Q.**   Do you think one priority of your work in admissions is

15   to make sure that everyone is getting a fair shake?

16   **A.**   I do, yes.

17   **Q.**   And making sure that everyone is treated fairly requires

18   making sure as much as is possible that the reading guidance

19   and the written instructions you're given are applied in a

20   consistent way.  Is that fair?

21   **A.**   Absolutely, yes.

22   **Q.**   And that's why you have the reading procedures.  So if we

23   go back to academics, there's some guidance here to make sure

24   that the ratings are applied in a consistent way, right?

25   **A.**   That's correct.

1   **Q.**  Now, you've worked in a few other professional

2   environments, right?

3   **A.**  I have, yes.

4   **Q.**  You worked at ESPN?

5   **A.**  I did.

6   **Q.**  And you worked at Major League Baseball?

7   **A.**  I did.

8   **Q.**  Did you have training at those jobs?

9   **A.**  I did.

10  **Q.**  Do you remember some of your training from those jobs?

11  **A.**  Vaguely.

12  **Q.**  Do you remember some of the important topics that were

13  discussed in those trainings or in the written materials you

14  received?

15  **A.**  Vaguely.

16  **Q.**  You don't need to get into specifics, although we might

17  all want to know about what you get trained in when you work

18  at Major League Baseball, but do you remember what was

19  important to Major League Baseball with respect to your job

20  there?

21  **A.**  I do.

22  **Q.**  Was there written guidance on company procedures?

23  **A.**  Yes.

24  **Q.**  Now, when you started reading applications, did you think

25  it was strange that there was no written guidance on how to

1    use race in the consideration of whether to admit a Harvard

2    applicant?

3    **A.**  I did not.

4    **Q.**  I mean, you saw the written guidance here for academic.

5    We saw written guidance for extracurricular and for athletic.

6    You saw all those, right?

7    **A.**  I did.

8    **Q.**  You didn't think it was odd that there was no written

9    guidance on how to use race?

10   **A.**  Not at the time, no.

11   **Q.**  You understand race can be a sensitive issue in America,

12   right?

13   **A.**  I sure do, yes.

14   **Q.**  You understand that it's a sensitive issue when you're

15   dealing with college admissions, right?

16   **A.**  I do, yes.

17   **Q.**  And I don't know whether you do or not, but do you have

18   some idea that there's considerable legal boundaries on what

19   can be done with the use of race in college admissions?

20   **A.**  I do, yes.

21   **Q.**  Did you have those understandings when you started

22   reading applications?

23   **A.**  I believe I did, yes.

24   **Q.**  And you didn't think it was odd that there was nothing in

25   writing that was given to you about how to use race in

1    deciding whether to admit someone?

2    **A.**   I didn't think it was odd because, while it wasn't

3    written, it was certainly a topic that was discussed at great

4    length in person.

5    **Q.**   Mr. Looby, you've been reading applications for eight

6    years, right?

7    **A.**   That's right.

8    **Q.**   And in those eight years, you can't even remember anyone

9    ever teaching you how to use race in the admissions process

10   when you were making your admissions decisions; isn't that

11   right?

12   **A.**   That is not right.

13   **Q.**   Please turn to your deposition at page 46, sir.  At the

14   bottom at line 123 there's a question.  Do you see that?

15   **A.**   I do.

16   **Q.**   "Did anyone ever teach you how to use race in the

17   admissions process when you were making your admissions

18   decisions?

19            "ANSWER:  I don't recall."

20            Was that your sworn testimony a year ago?

21   **A.**   It was, yes.

22   **Q.**   Now, Mr. Looby, I want to stop here and talk about the

23   time that's passed since you gave your sworn deposition in

24   this case.

25   **A.**   Mm-hmm.

1   **Q.**   You gave your sworn deposition in, what, about June 2017?

2   **A.**   That's correct.

3   **Q.**   That was taken by my friend Mr. Connolly over here?

4   **A.**   Correct.

5   **Q.**   About a month later -- let's back up.  That was on page

6   46 and 47 of your deposition, right?

7   **A.**   Correct.

8   **Q.**   And how many pages of your deposition do you have in

9   front of you?  About 226 of your testimony?

10  **A.**   That's correct.

11  **Q.**   And how long did your deposition last, sir?

12  **A.**   Quite a long time.

13  **Q.**   So in the first 46 pages, you told my friend Mr. Connolly

14  that you couldn't remember anyone ever teaching you how to

15  use race in the admissions process, correct?

16  **A.**   That's what it says here.

17  **Q.**   And then you sat there for hours and gave more testimony,

18  correct?

19  **A.**   That's correct.

20  **Q.**   There were breaks, correct?

21  **A.**   That's correct.

22  **Q.**   You could have come back and told Mr. Connolly you'd

23  spoken in error and you'd remembered something, correct?

24  **A.**   That's correct.

25  **Q.**   And then you filled out what's called and errata sheet.

1    Do you know what that is, sir?

2    **A.**   I believe I do.

3    **Q.**   I'm going to hand you a copy.

4            MR. MORTARA:  Your Honor, may I approach?

5            THE COURT:  You may.

6    BY MR. MORTARA:

7    **Q.**   I'm going to put it up on the screen.  Is that your

8    signature on this errata sheet, which is August 9, 2017?

9    **A.**   Yes, it is.

10   **Q.**   And in fact, you made some changes to your deposition

11   testimony, didn't you?

12   **A.**   I did, yes.

13   **Q.**   So a month later, you carefully read your deposition and

14   you made changes where you even needed to clarify your

15   testimony, right?

16   **A.**   Correct.

17   **Q.**   And you did not clarify your testimony that you couldn't

18   remember anyone teaching you how to use race in Harvard's

19   admissions process, did you?

20   **A.**   I did not, no.

21   **Q.**   And here we are, it's about 14 months later, correct?

22   **A.**   Correct.

23   **Q.**   Did you reach out to Mr. Connolly or anybody and tell

24   them that you had new testimony or wanted to change your

25   testimony?  Did you do that?

1    **A.**  No, I did not.

2    **Q.**  Okay, Mr. Looby, let's get back on track.  I want to talk

3    to you about the dockets you read in and what you see when

4    you read applications.

5              Now, we pulled the numbers from the Austin docket,

6    but you're the one who really knows.  I'm just going to ask

7    you about your experience.  Okay?

8              Is the Austin docket quite racially diverse?

9    **A.**  Yes.

10   **Q.**  There are a lot of Asian-American applicants in the

11   Austin docket, aren't there?

12   **A.**  I believe there are.  I think there's a number of

13   different types of folks applying from that docket.

14   **Q.**  I'm going to go through -- fair number, there's a fair

15   number, sizeable percentage of Asian-American applicants in

16   the Austin docket, correct?

17   **A.**  Correct.

18   **Q.**  Would you agree with me it's about 30 percent?

19   **A.**  I don't know.

20   **Q.**  Does it sound good to say it's more than 10 percent?

21   **A.**  That's fair.

22   **Q.**  And there's a fair number of African-American applicants,

23   too, right?

24   **A.**  Yes.

25   **Q.**  And of course a large number of Hispanic applicants,

1  being Texas, correct?

2  **A.**  Yes.

3  **Q.**  And there's a lot of white applicants, too, actually.

4  It's kind of a mix, isn't it?

5  **A.**  It is, yes.

6  **Q.**  And how long have you been reading the Austin docket,

7  again?

8  **A.**  I believe seven years.

9  **Q.**  And you've reviewed a lot of applications from the Austin

10  docket from Asian-American students, correct?

11  **A.**  The Texas docket, yes, I have.

12  **Q.**  Hundreds?  Thousands?

13  **A.**  Probably thousands.

14  **Q.**  Thousands of applications from Asian-Americans?

15  **A.**  Over a thousand, I should say.

16  **Q.**  Over a thousand applications from Asian-American students

17  from the Austin docket.  Have you seen Asian-American

18  applications from the D docket, from Austin, where the

19  applicant has perfect or near-perfect SAT or ACT scores?

20  **A.**  I've seen a number of students in general that fit that

21  criteria.

22  **Q.**  From say Westwood High School.  Have you seen a lot of

23  Asian-American applicants with perfect or near-perfect ACT or

24  SAT scores?

25  **A.**  Again, I've seen a number of students that present those

1    credentials.

2    **Q.**   I'll get there.  I understand that not all the students

3    can be admitted.  I get where you're going.  I'm just asking

4    you have you seen a fair number of Asian-American

5    applications with near-perfect or perfect ACT and SAT scores?

6    **A.**   I believe I've seen quite a few, yes.

7    **Q.**   And sometimes those applicants get wait-listed or

8    rejected because they lack what you call distinguishing

9    excellence, right?

10   **A.**   Just like other applicants, yes.

11   **Q.**   Would you say in your experience on the D docket that

12   there are more Asian-American applications with near-perfect

13   or perfect SAT or ACT scores than there are white applicants

14   with those kind of marks?

15   **A.**   I can't say for certain, no.

16   **Q.**   Would you say that there are more Asian-American

17   applicants with perfect or near-perfect SAT or ACT scores

18   than there are African-Americans with those kind of marks?

19   **A.**   I couldn't say that as well.  I couldn't say that either.

20   **Q.**   I want to talk to you about something I saw in the reader

21   guidance, and it's over at page 12.  Are you there, sir?

22   **A.**   Yes.

23   **Q.**   It's something about prose comments.  It says, "When

24   making prose comments, first readers" --

25            That's you, right?

1    **A.**   That is, yes.

2    **Q.**   -- "should note the important academic and

3    extracurricular accomplishments that are particularly

4    pertinent to the case.  It is also helpful to reference

5    teacher reports or other items that may be crucial to our

6    evaluation.  In addition to numerical ratings, readers should

7    try to summarize the strengths and weaknesses of the folder

8    in brief paragraphs or comments.  Avoid slang and jargon and

9    remember," all caps, "your comments may be open to public

10   view at a later time."

11             Do you see that?

12   **A.**   I do, yes.

13   **Q.**   How do you take that instruction?  What do you think it

14   means?

15   **A.**   Just be careful with what you write.

16   **Q.**   Because somebody might look at it later, right?

17   **A.**   Someone may look at it later.

18   **Q.**   Now let's talk -- even though there aren't any written

19   instructions about how you use race, you usually discover the

20   race of a student from a data point or box on the

21   application, correct?

22   **A.**   If self-identified, yes.

23   **Q.**   And if race is provided to you on the application, that

24   means you will include it in your decision-making, correct?

25   **A.**   Just like with everything else in that application, it's

1    something we consider.

2    **Q.**   Now, you see applications where you know the student's

3    race, but the student's race wasn't discussed anywhere else

4    on the application, correct?

5    **A.**   That could be the case.

6    **Q.**   And in those situations, you take the student's race into

7    account when making your admission decision by what you call

8    thinking of the whole person, correct?

9    **A.**   We review the whole person, that's correct.

10   **Q.**   You would take the student's race into account even

11   though the only place the student put race on their

12   application was the box check on the common application,

13   correct?

14   **A.**   Again, we take everything that's included in the

15   application.  If that's included, it would be something that

16   we would consider, absolutely.

17   **Q.**   I want to make sure we got the record clear.  A student

18   applies to Harvard.  They check the box.  They say I am

19   Asian-American.  They don't write anything about their race

20   or ethnicity anywhere else on their application.

21          You, Christopher Looby, will take that into account

22   in making your admissions ratings and decisions, correct?

23   **A.**   Not specifically.  We take socioeconomic status, the

24   family's socioeconomic status into consideration.  We would

25   take the school support into consideration.  We would take

1   their extracurriculars into consideration.  I mean, it's one

2   of many factors that we would consider.

3   Q.  And you take their race into consideration as well,

4   correct?

5   A.  If provided, it might be something that we might

6   consider.

7   Q.  If provided by checking the box on the common

8   application, correct?

9   A.  It may be something that we consider.

10  Q.  Correct?  Yes?

11  A.  It may be something that we consider.

12  Q.  If a student checks the box on the common application and

13  indicates their race, you will take that into account no

14  matter what the rest of the application says, correct?

15          MS. CONLEY:  Your Honor, asked and answered.

16          THE COURT:  I'll let him have it.

17          MR. MORTARA:  Could you read it back, Ms. Daly.

18          (The reporter read back as requested.)

19          THE WITNESS:  That's not the case.

20  BY MR. MORTARA:

21  Q.  Tell me about all the times you have not taken race into

22  account when the student checked the box on the application.

23  A.  There may be other factors involved when deciding the

24  outcome of that particular application.

25  Q.  I thought you understood Harvard's admissions process to

1    be about the whole person; is that correct?

2    **A.**   That is.

3    **Q.**   And somebody's race is part of the whole person, correct?

4    **A.**   That's correct.

5    **Q.**   And you take that into account when somebody provides

6    that information, correct?

7    **A.**   It may not be a component that is what is driving us to

8    make a certain decision.

9    **Q.**   I'm not asking you why you make your decisions.  I'm

10   asking you what you take into account in making them.

11            You take an applicant's race into account when that

12   information is provided, correct?

13   **A.**   Again, we may.  We may.  It's not a yes-or-no answer.

14   **Q.**   Do you sometimes decide not to take an applicant's race

15   into account?

16   **A.**   No.  Sometimes it's not a factor that again is driving

17   the decision.  So it's not --

18   **Q.**   I'm not asking you about factors that drive the decision.

19   I'm asking you about things you think about or take into

20   account of.  You may take them into account and reject them.

21   You may take them into account and admit them.

22            Do you take applicant's race into account when they

23   provide it to Harvard?

24   **A.**   It depends on the individual.

25   **Q.**   Now, you told us a little while ago -- withdrawn.

1          You learned -- the first place you learned that
2     race was a factor for you to consider in admissions was
3     actually the first page of the reading guidance we're looking
4     at, Plaintiff's 71.  Isn't that correct?
5     **A.**  I don't recall if that's the first place that I learned
6     it.
7     **Q.**  Well, how did you learn that race is one of the many
8     factors you should use in the admissions process?
9     **A.**  It could have been a discussion prior to reading this
10    guideline.
11    **Q.**  Please turn to page 47 of your deposition, line 18.
12          "QUESTION:  Yes, but there's no discussion here
13    about how you should use race when reviewing an application.
14    So how did you learn that race is one of many factors that
15    you should use in the admissions process?
16          "ANSWER:  It's on the first page here.  It's one of
17    the components of the reading procedures."
18          Was that your sworn testimony?
19    **A.**  It was, yes.
20    **Q.**  14 months ago, correct?
21    **A.**  That's correct.
22    **Q.**  To Mr. Connolly, my friend?
23    **A.**  That's right.
24    **Q.**  And a month later you had an errata sheet and didn't
25    change that either.

1    **A.**   Correct.

2    **Q.**   And 14 months later we're here, correct?

3    **A.**   Correct.  If I could say one thing.  What you asked me

4    was what was the first thing that you learned about that.

5    I'm saying here that it was on the first page.  I didn't say

6    anywhere that it was the first thing that I learned about how

7    race should be used.

8    **Q.**   The record will be clear about what I asked, sir, so we

9    can go back and look at it.  If I confused you, then I'm

10   deeply sorry.

11           Now I want to talk about the eight years you've

12   been there reading applications.  You've been there for eight

13   years reading applications, and you have can't even remember

14   anyone teaching you to use race in the admissions process.

15   We talked about that, right?

16   **A.**   I don't view it that way.

17   **Q.**   You don't know if other admissions officers use race the

18   way you do, do you?

19   **A.**   I do know that others use race the way that I do.

20   **Q.**   Please turn to page 49 of your deposition, sir.

21           Line 6, "Do you know if this is how other

22   admissions officers use race in the admissions process?

23           "ANSWER:  I don't know."

24           That was your testimony 14 months ago to

25   Mr. Connolly, my friend, correct?

1    **A.**  That's correct.

2    **Q.**  And a month later you did an errata sheet, a sworn errata

3    sheet.  You didn't change this either, did you?

4    **A.**  No, I did not.

5    **Q.**  And 14 months go by and you don't tell anybody you're

6    going to change your testimony, do you?

7    **A.**  That's correct.

8    **Q.**  Now I need to stop again.  You spent 15 hours preparing

9    for your deposition with Harvard's lawyers; isn't that right?

10   **A.**  Approximately.

11   **Q.**  Do you want me to the refresh your recollection with your

12   deposition?  Please look at page 6, lines 21 to 23.  I'll

13   leave it off the screen.

14          You spent 15 hours with Harvard's lawyers getting

15   ready for your deposition 14 months ago, correct?

16   **A.**  Yeah.  Approximately.

17   **Q.**  And then you spent some hours reviewing your transcript

18   for the errata sheet we talked about several times.  How many

19   do you think that was?

20   **A.**  I don't know.

21   **Q.**  Two?

22   **A.**  Approximately.

23   **Q.**  Let's call that two.  How many days were you meeting with

24   Harvard's lawyers to get ready for your testimony in court

25   today?

1    **A.**   A number.

2    **Q.**   How many?

3    **A.**   Eight, ten.

4    **Q.**   Eight or ten days with Harvard's lawyers.  How many hours

5    a day?

6    **A.**   It's varied tremendously.  It hasn't been a consistent

7    number.

8    **Q.**   Let's go through as best as you can recollect, sir.  I

9    want to get for the record how many hours you spent with

10   Harvard's lawyers getting ready to testify here for about

11   30 minutes today.

12            How many hours on the first day?

13   **A.**   I don't recall.

14   **Q.**   You don't have any recollection of how many hours you

15   spent?  And who were the lawyers there?

16   **A.**   The lawyers were represented over at this table here.

17   **Q.**   Who are you identifying?

18   **A.**   Danielle, Denise.  I believe there were others back at

19   the law firm.

20   **Q.**   How many lawyers did you meet with on the first day when

21   you can't remember how long you met with them?

22   **A.**   I really don't recall.

23   **Q.**   Was it more than two or three?

24   **A.**   I believe so, yes.

25   **Q.**   So you met with more than two or three lawyers for some

1  undetermined number of hours on one day.  Same for the next

2  day.  Do you remember how many hours that was?

3  **A.**  I don't know.

4  **Q.**  Did you meet yesterday with lawyers?

5  **A.**  I did.

6  **Q.**  How many lawyers did you meet with yesterday?

7  **A.**  I believe three or four.

8  **Q.**  For how many hours yesterday did you meet with lawyers?

9  **A.**  About three, I believe.

10  **Q.**  Was that about the same amount of time you met with them

11  on the previous days?

12  **A.**  No.  I believe previous days was a bit longer.

13  **Q.**  So let's call it conservatively three hours a day for

14  conservatively eight days.  By my count, that's 24 hours.  So

15  you've now spent over 40 hours thinking about your testimony

16  in this case; is that right?

17  **A.**  Yes.  Well, I would say just thinking about this

18  testimony far more than 40 hours.

19  **Q.**  And you spent 39 hours with Harvard's lawyers, correct?

20  **A.**  Yep.

21  **Q.**  And you spent at least, probably more than 24 hours with

22  groups of Harvard's lawyers before you came in here and

23  changed about five or six different items in your deposition

24  testimony we've already been through.  Isn't that right?

25  **A.**  I don't believe I've changed on all of these answers.

1    **Q.**  Do you disagree that you answered things like "I don't

2    know" in your deposition and you're coming in here and you're

3    saying now you do know?

4    **A.**  I believe I did not know at that time, yes.

5    **Q.**  And between then and now, you spent 24 hours at least in

6    rooms with Harvard -- multiple lawyers from Harvard getting

7    ready to tell the truth under oath here, correct?

8    **A.**  I have told the truth in my deposition as well.

9    **Q.**  I want to talk to you about things related to the

10   personal rating, but first I want to talk about the other

11   ratings.

12        Do you see on Plaintiff's Exhibit 71 overall,

13   academic, extracurricular, athletic, personal?  Do you see

14   all that?  And then there's school support.  You know those

15   ratings?

16   **A.**  I do.

17   **Q.**  And you would give every student who had completed an

18   application a score in one of those six categories, correct?

19   **A.**  I would, yes.

20   **Q.**  And when we talked to you before under oath, you told us

21   that you didn't know any other document that would describe

22   how an admissions officer would score candidates in these

23   categories, did you?

24   **A.**  I believe I did.

25   **Q.**  The description in each of these categories aligns with

1    how you would rate an applicant, correct?

2    **A.**   Provides a solid framework, yes.

3    **Q.**   It aligns with how you would rate an applicant in each of

4    these categories, correct?

5    **A.**   It could.

6    **Q.**   You'd say generally speaking it does, right?

7    **A.**   It could.

8    **Q.**   Mr. Looby, please turn to your deposition, page 39.

9              "QUESTION:  And after reviewing these pages, does

10   the description in each of these categories align with how

11   you would rate an applicant for each of these categories?"

12             Then your lawyer objected.

13             "ANSWER:  Generally speaking, yes."

14             Did you see that?

15   **A.**   I do.

16   **Q.**   Did you read your deposition before you came here today,

17   sir?

18   **A.**   I did.

19   **Q.**   How may times?

20   **A.**   I believe I read it when I signed this piece of paper.

21   **Q.**   That was 14 months ago or about, right?

22   **A.**   Yes.

23   **Q.**   Did you read it in the last couple of weeks?

24   **A.**   I did, yes.

25   **Q.**   Did you discover that there were things that were wrong

1    in it?

2    **A.**  No.

3    **Q.**  Mr. Looby, now let's talk about the scores again, and I

4    want to ask you when you assign a score in any of these

5    categories, you take race into account, don't you?

6    **A.**  If we were to take race into account when rating any of

7    these, it may very well be the overall.

8    **Q.**  Please turn to your deposition, same page, 39, sir.

9            "QUESTION:  When you would score students in these

10   categories, would you take a student's race into account when

11   assigning him a score in any of these categories?"

12           And your lawyer objected.

13           "ANSWER:  It's one of my factors that I consider.

14           "QUESTION:  For every category?

15           "ANSWER:  I'm looking at the applicant as a whole.

16           Race is one of the factors you consider --

17   withdrawn.

18           That was your sworn testimony, sir, wasn't it?

19   **A.**  It was indeed, yes.

20   **Q.**  And race is one of the factors you consider when

21   assigning an applicant a score in any of the categories,

22   correct?

23   **A.**  That would be, again, the overall.

24   **Q.**  Sir, it doesn't say "overall" on your deposition, does

25   it?  It says any of these categories.  That's what it says,

1   right?

2   **A.**   It does not say that exactly.  It says when you would

3   score students in these categories.

4   **Q.**   Keep reading the question, sir.

5   **A.**   Would you take a student's race into account when

6   assigning him a score in any of these categories?

7   **Q.**   "ANSWER:  It's one of my factors that I consider."

8               When you were reading your deposition, did you

9   discover that you maybe testified in error and wanted to say

10  it was the overall score?

11  **A.**   No.  I answered the question as I heard it.  That's not

12  what I was trying to convey.

13  **Q.**   You misheard the question but then you read it and you

14  did the errata sheet.  You didn't clarify your answer to this

15  question, did you?

16  **A.**   I answered the question as I heard it.

17  **Q.**   Sir, when you did your errata sheet, you weren't

18  listening to the deposition on an audio tape, were you?

19  **A.**   No, I was not.

20  **Q.**   You were reading it just like we're reading it right here

21  in court.  And you didn't fix it, did you?

22  **A.**   I did not, no.

23  **Q.**   You didn't tell my friend Mr. Connolly that you were

24  going to change your testimony, did you, or that you misheard

25  the question, did you?

1    **A.**   I thought I understood the question.  What I was trying

2    to convey is that race is one factor of many when trying to

3    assess the applicant as a whole.  If you're trying to say

4    that I use race when assigning any of the four components of

5    the profile, that would not be accurate.

6    **Q.**   We'll come back to that, sir.

7            Now I want to talk about the personal rating.  And

8    what I'm hoping to do is not have to use your deposition

9    while I just ask you some simple questions that go into it.

10           MS. CONLEY:  Objection, Your Honor.  Argumentative.

11           THE COURT:  Ask a question.

12           MR. MORTARA:  Ms. Daly and I have organized a

13   procedure.  She's going to come over there by the flip chart,

14   and I'm going to draw on it a few things.  I'm going to take

15   my outline and your deposition, and I have Ms. Daly's

16   permission to ask questions from over there, if I have the

17   Court's.

18           THE COURT:  Is there a microphone over there or are

19   you going with him?

20           THE REPORTER:  I'm going with him because there's

21   no microphone there.

22   BY MR. MORTARA:

23   **Q.**   So let's talk about the personal rating, Mr. Looby.  Are

24   you ready?

25   **A.**   Yes.

1  **Q.**  I understand when you assign a personal rating, you're

2  looking at who that person is, correct?

3  **A.**  Correct.

4  **Q.**  So I'm going to make a title here, "Personal Rating."

5  And the first thing I'm going to write is who that person is.

6  And by that, you mean what a person brings to the community,

7  right?

8  **A.**  Could be.

9  **Q.**  Positive contributions that you're looking for include an

10  ability to work well with others and create meaningful

11  relationships with peers, right?

12  **A.**  Yes.

13  **Q.**  And I'm writing those on the flip chart.  I'll write

14  "meaningful relationships" and "work well with others."

15            And I'm running out of room.  Look at that.

16            You're looking for where others like to be around

17  him or her.  You'd say that?

18  **A.**  I would, yes.

19  **Q.**  Can we call that likability?

20  **A.**  Sure.

21  **Q.**  And you'd call that a positive personality, wouldn't you,

22  positive personality characteristics?

23  **A.**  All of those?

24  **Q.**  No.  Just generally.  You're looking for a positive

25  personality or like ability?

1    **A.**   Could be.

2    **Q.**   And I put that up there, too.

3              MR. MORTARA:  Ms. Daly, we can go back.

4    BY MR. MORTARA:

5    **Q.**   Is race a part of who someone is or who the that person

6    is?

7    **A.**   I don't think so necessarily, no.

8    **Q.**   Race is not a part about who someone is, huh?

9    **A.**   A person's race could inform us of characteristics that

10   tell us a bit about their personality.

11   **Q.**   And someone's race could also tell you something about

12   what they're going to bring to the Harvard community, right?

13   **A.**   Not necessarily.

14   **Q.**   It doesn't tell you what they might bring to the Harvard

15   community at all?  Why is Harvard using race in admissions

16   exactly?  I'll withdraw the question.

17             Why is Harvard using race in the college admissions

18   process?

19   **A.**   Could you repeat that, please?

20   **Q.**   Yeah.  Why is Harvard College using race as part of its

21   college admissions process?

22   **A.**   Again, I think it goes back to the whole-person review.

23   It allows us to get a good understanding of the applicant as

24   a whole.

25   **Q.**   And what is Harvard trying to get for itself from that?

1    Trying to make a good and diverse community maybe?

2    **A.**   Absolutely, yes.

3    **Q.**   So does somebody's race tell you a little bit about what

4    they're going to bring to the community?

5    **A.**   I think it depends on the individual.

6    **Q.**   But it can, right?

7    **A.**   It could.

8    **Q.**   And you take a student's race into account when assessing

9    his or her personal qualities as one factor to consider.

10   Isn't that right, Mr. Looby?

11   **A.**   That is not right.

12   **Q.**   Please turn to your deposition again, sir, at page 51.

13   We're going to go to line 12 this time.

14          "QUESTION:  Would you take a student's race into

15   account when assessing his or her personal qualities?

16          "Just like with the academic rating, it's one

17   factor of my consider."

18          That was your sworn testimony, right?

19   **A.**   Correct.

20   **Q.**   15 hours with Harvard's lawyers before you gave it,

21   right?

22   **A.**   Correct.

23   **Q.**   A month went by afterwards, you spent at least two hours

24   reading this, signed a sworn errata, didn't change it.

25   Right?

1    **A.**   That's correct.

2    **Q.**   Since then in getting ready for trial you spent at least

3    24 hours with three or four, maybe even five, Harvard lawyers

4    getting ready to come in here and testify when I asked you

5    questions, right?

6    **A.**   That's correct.

7              MR. MORTARA:  No more questions, Your Honor.

8              Your Honor, we're going to mark the demonstrative

9    Plaintiff's Demonstrative Exhibit 21.  We'll sticker it and

10   send you a picture.  It looks horrible.

11             THE COURT:  What did you say was the number?

12             MR. MORTARA:  Plaintiff's 21.

13             MS. CONLEY:  Your Honor, can we take that down?

14             THE COURT:  Sure.

15                         CROSS-EXAMINATION

16   BY MS. CONLEY:

17   **Q.**   Good afternoon, Mr. Looby.

18   **A.**   Good afternoon.

19   **Q.**   Mr. Looby, do you consider this a serious case?

20   **A.**   Very serious.

21   **Q.**   And do you consider these to be serious issues?

22   **A.**   Absolutely I do.

23   **Q.**   And you're taking your testimony today seriously,

24   correct?

25   **A.**   I sure am, yes.

1    **Q.**   Now, Mr. Mortara walked you through various ratings that
2    an admissions officer assigns when evaluating an application
3    for admission and asked you if you consider assigning those
4    ratings.  Do you recall that?
5    **A.**   Yes.
6    **Q.**   Mr. Looby, do you consider race when assigning an
7    applicant a personal rating?
8    **A.**   No.
9    **Q.**   Do you consider race when assigning an applicant an
10   academic rating?
11   **A.**   No, I do not.
12   **Q.**   Do you consider race when assigning an applicant an
13   extracurricular rating?
14   **A.**   No, I do not.
15   **Q.**   Do you consider race when assigning an applicant an
16   athletic rating?
17   **A.**   No, I do not.
18   **Q.**   Do you recall when Mr. Mortara showed you your deposition
19   testimony regarding whether you take race into account when
20   assessing an applicant's personal qualities?
21   **A.**   I do, yes.
22   **Q.**   Let's take a quick look at that deposition testimony,
23   page 51, lines 12 through 17.  You were asked whether you
24   would take a student's race into account when assessing his
25   or her personal qualities.

1          And your answer was, "Just like with the academic

2     rating, it's one factor of many I consider."

3          Is that right?

4     **A.**  That's correct.

5     **Q.**  And you told Mr. Mortara that your testimony at your

6     deposition was -- you answered in a way that you understood

7     the question?

8          MR. MORTARA:  Your Honor, I object.  That wasn't

9     the question I was reading when he said that.  That was the

10    other question about all the ratings when he said he misheard

11    me about any of the factors.  Not even the same question.  I

12    object.

13         THE COURT:  I'm going to overrule it because "I

14    don't like it" is not the same thing as a legitimate

15    objection.  You have to give me a rule on an objection.

16    There's no rule that prohibits what she just did.  I will

17    listen to the evidence.  I got it.

18    BY MS. CONLEY:

19    **Q.**  What did you mean when you told Mr. Mortara that that's

20    how you understood the question?

21    **A.**  Again, what I was trying to convey is how I used race as

22    one factor of many within the application when assessing an

23    applicant's overall rating.

24    **Q.**  Stepping back for a minute, when you were deposed in this

25    case 14 months ago, was it your first deposition?

1    **A.**   Yes.

2    **Q.**   And were you nervous?

3    **A.**   Extremely nervous, yes.

4    **Q.**   Now, Mr. Looby, at the time that you were deposed

5    14 months ago, did you, as an admissions officer, consider

6    race when assigning an applicant a personal rating?

7    **A.**   No.

8    **Q.**   And sitting here today as an admissions officer, do you

9    consider race when assigning an applicant a personal rating?

10   **A.**   No.

11   **Q.**   Mr. Looby, what is the preliminary overall rating?

12   **A.**   The preliminary overall rating would be a rating that is

13   assigned by an admissions officer, and that would be an

14   indication of how that officer views the strength of that

15   particular application relative to the applicant pool.

16   **Q.**   And would you consider an applicant's race when assigning

17   an applicant a preliminary overall rating?

18   **A.**   We certainly could.

19   **Q.**   Under what circumstances might you consider an

20   applicant's race when assigning the POR or preliminary

21   overall rating?

22   **A.**   So at that point we'd be looking at, you know, many, many

23   very qualified applicants.  And it may be that for a

24   particular applicant it ultimately winds up being a tip that

25   pushes him or her into the admitted applicant pool.

1    **Q.**   Now, Mr. Mortara also showed you P71, which were the
2    reading procedures from the class of 2019.  Do you recall
3    that?
4    **A.**   I do, yes.
5    **Q.**   And he asked you whether there was any written guidance
6    with respect to the use of race in that particular document;
7    is that right?
8    **A.**   That's correct.
9    **Q.**   Mr. Looby, let me just back up and ask you, as an
10   admissions officer, have you received training on how to use
11   race in the admissions process?
12   **A.**   I absolutely have, yes.
13   **Q.**   And can you describe to Your Honor what training you've
14   received with respect to how to use race in the admissions
15   process?
16   **A.**   Sure.  So as mentioned earlier, when I first began
17   working as an admissions officer, I worked with a number of
18   colleagues also beginning.
19          And we would meet as a small committee and go over
20   the reading instructions.  We'd go over how to read a
21   particular file.  We would go over how the committee process
22   works.
23          And at that point, once the application is cleared,
24   they became actual applications.  We would then read those,
25   we would rate those, and they would be passed along randomly

1    to upper-level admissions folks who would then circle back

2    and talk to us about things we may have -- things we could

3    have added, different things we could have looked at, weighed

4    more heavily.

5            Outside of that, we've also received training

6    through some colleagues.  We have also been addressed by a

7    member of the office of general counsel to talk about issues

8    related to higher ed and race, and I've also attended

9    professional development seminars.

10           I think it's important to know, too, that I work

11   with a number of folks who have spent decades upon decades in

12   higher ed in admissions offices.  The person next to me in

13   the office has been doing this at Harvard for 40-plus years.

14   My N docket chair, Sally Harty, she's been doing this for

15   over 30 years.  And the docket chair, the D docket chair was

16   the longtime former admissions director at Brown.

17           So these are -- it's a constant education.  It

18   continues to be a constant education.

19   **Q.**  Mr. Looby, Mr. Mortara pointed you to one piece of your

20   deposition testimony about whether you recalled, whether you

21   were taught about the use of race.

22           Do you recall when he did that?

23   **A.**  I do.

24   **Q.**  Okay.  I want to take a look at a piece of your

25   deposition testimony that he didn't show you regarding this

1    same topic.  Can you take a look at page 48.

2              MR. MORTARA:  Objection, Your Honor.  She can ask a

3    question.  She can't lead the witness with his own

4    deposition.  She can ask a question.  There was no

5    completeness objection when I impeached him.  Just to be

6    clear, my objection is one cannot lead a witness with his own

7    deposition.

8              THE COURT:  Yes.  I understand.  I think she's just

9    trying to orient him.  Is this meant to be his direct and his

10   cross?  Is he on your list as well?  What are we doing here?

11             MR. MORTARA:  Your Honor, we have an agreement that

12   witnesses will only be called once, so she can go outside the

13   scope.

14             THE COURT:  So you're not making a scope objection.

15             MR. MORTARA:  No.

16             THE COURT:  I think she's just trying to orient

17   him.  But don't lead.

18             MR. MORTARA:  My objection is leading.

19             THE COURT:  Yes.

20   BY MS. CONLEY:

21   Q.  Do you recall testifying at your deposition other times

22   when -- excuse me.  Withdrawn.

23             Do you recall testifying at your deposition whether

24   you had ever learned about how to use race in the admissions

25   process?

1    **A.**  I do.

2    **Q.**  Do you recall Mr. Mortara showing you a piece of your

3    deposition with respect to whether you had ever learned about

4    the use of race in the admissions process?

5    **A.**  I do.

6    **Q.**  And did he show you all of your deposition testimony

7    related to that topic?

8    **A.**  I don't believe that he did.

9    **Q.**  Okay.  Can you turn to page 48 of your deposition

10   testimony.

11         MR. MORTARA:  Your Honor, objection sustained.

12   Leading.  If counsel obviously wanted to read more of the

13   deposition when I impeached him, the objection is

14   completeness.  Now this is leading with his former testimony.

15   I'm actually happy for the Court to take a look at it but not

16   during the exam, showing the guy his deposition and then

17   saying --

18         THE COURT:  You're trying to make the point that he

19   was testifying inconsistently --

20         MS. CONLEY:  Exactly.

21         THE COURT:  -- here with what he said in his

22   deposition.

23         So I think that entitles her to go back and show

24   portions of the deposition that were consistent in response

25   to your --

1          MR. MORTARA:  I understand your ruling, Your Honor.

2     However, what I would say is why not just ask the question

3     and get the answer.

4          THE COURT:  Hypothetically speaking, right?  We

5     have his answer here today.  You're saying his answer here

6     today is different than his answer yesterday.  She's trying

7     to show that the answer yesterday was also consistent with

8     what he said today.  That's fair game.

9          MR. MORTARA:  Again to be clear, I'm going to stand

10    up in a few seconds again and say the question isn't the

11    same.

12         THE COURT:  Okay.

13    BY MS. CONLEY:

14    **Q.**  Mr. Looby, can you turn to page 48 of your deposition

15    testimony.  At line 16 you were asked, "Can you recall from

16    your time at Harvard anyone ever telling you that race is one

17    factor among many that you should use in the admissions

18    process?"

19         And what was your answer?

20    **A.**  "I believe so."

21         MR. MORTARA:  Your Honor, and again my objection is

22    my question was about learning how to use race, and this was

23    about -- and I'll be argumentative for one moment longer,

24    Your Honor.

25         This is about Harvard's pablum about race being one

1    factor in admissions.  This is not the testimony about how he

2    learned how to use race, which is what I examined him about.

3              THE COURT:  Someone telling him that race is a

4    factor is part of telling him how to use race.

5              MR. MORTARA:  We'll respectfully disagree on that.

6              THE COURT:  Okay.  That's fine.

7    BY MS. CONLEY:

8    Q.   So, Mr. Looby, with respect to the training that you

9    received, that you were just discussing, did you specifically

10   receive feedback on how to evaluate applications?

11   A.   Yes.

12   Q.   And in the process of receiving that feedback on how to

13   evaluate applications, did you receive feedback on how to

14   consider race when evaluating applications?

15   A.   Yes.

16   Q.   Just stepping back for a minute, Mr. Looby, I just want

17   to talk to you a little bit about your background and how you

18   came to Harvard College.  You have mentioned that you

19   graduated from college in 1996, right?

20   A.   That's correct.

21   Q.   What did you do after you graduated?

22   A.   I worked at ESPN in Bristol, Connecticut.

23   Q.   After ESPN, what did you do next?

24   A.   I worked for Major League Baseball.

25   Q.   How long were you at Major League Baseball?

1    **A.**   I was at Major League Baseball for about eight years.

2    **Q.**   What did you do after you left Major League Baseball?

3    **A.**   I left Major League Baseball on a Friday and the

4    following Monday was employed by Boston Public Schools as a

5    paraprofessional.

6    **Q.**   What led to your decision to leave Major League Baseball

7    and join Boston Public Schools?

8    **A.**   So there were a number of factors involved.  I felt as

9    though my career in the professional sports entertainment

10   industry, I felt as though the time had come for me to pursue

11   other endeavors.

12           I think a big factor was my now wife.  She and I

13   had been dating for two years.  She was living here in Boston

14   and I was working in Manhattan.  So I had talked to a number

15   of people.  I have talked to family members, you know, began

16   to start considering education.

17           And then I had a powerful event happen where -- you

18   know, go back years earlier.  I was a tennis instructor at a

19   summer club and became close with a number of the students I

20   was teaching, family members, and so on.  There was one

21   family in particular where I was drawn to them because the

22   two boys reminded me a lot of my brother and myself.

23           So fast-forward again.  Now my time is at Major

24   League Baseball, and I receive a call from my mother who is a

25   teacher in my hometown.  And she said that the younger son

1    had been tragically killed in a car accident, which certainly

2    shook me.  So I went home and I went to the wake.  And it was

3    at the wake that I learned he was in line to become the

4    captain of my high school tennis team, which I also was.  His

5    first job was my first job at a local tennis club.  And I

6    also learned that, you know, I had a profound impact on this

7    young man.

8              And for me to hear that, you know, thinking back to

9    when I was a college kid teaching tennis and just enjoying

10   the summer, I didn't think I was having an impact on anyone's

11   life.  And I felt as though maybe my calling was to work in

12   an industry helping others.  And I felt like education was

13   the right path.

14   **Q.**  And so you mentioned you started with Boston Public

15   Schools as paraprofessional?

16   **A.**  That's correct.

17   **Q.**  What is a paraprofessional?

18   **A.**  I was hired to work as a one-to-one aide with a student

19   in one of the Boston Public Schools.

20   **Q.**  When you were working with this particular student, what

21   sort of services were you providing?

22   **A.**  This student was involved in a gang-related incident and

23   was left paralyzed on one side of his body, so he was not

24   able to write.  So I was essentially his scribe.  I went to

25   all of his classes with him.  I would help him with his

1   homework.  I would call him at night and help him with his

2   homework, help him take his exams, and so on.

3   **Q.**  And were you doing anything else at the time that you

4   were working with the Boston Public Schools system?

5   **A.**  I was enrolled in Suffolk University's school counseling

6   graduate program.

7   **Q.**  And what type of coursework were you taking in that

8   counseling program?

9   **A.**  Primarily psychology courses along with adolescent

10   development courses.

11   **Q.**  At some point you left Boston Public Schools?

12   **A.**  I did, yes.

13   **Q.**  What did you do next?

14   **A.**  I was hired by Harvard to work in the financial aid

15   office.

16   **Q.**  And when was that?

17   **A.**  That was 2008, the summer of 2008, I believe.

18   **Q.**  And, Mr. Looby, what led you to join the Harvard

19   admissions office?

20   **A.**  Again, there were a number of things in play there.  I

21   felt as though having just moved to Boston and working in a

22   completely new industry, finances were certainly tough.  I

23   also, more importantly, felt as though this could lead to a

24   career that directly tied into my college counseling or my

25   school counseling coursework.  So I felt as though the move

1    made sense on a number of levels.

2    **Q.**   And do you like what you do in the admissions office at

3    Harvard?

4    **A.**   Very much so, I do.

5    **Q.**   What do you like about it?

6    **A.**   I feel like I make an impact or I help make an impact on

7    people's lives.  You know, our students, I feel as though it

8    extends beyond just the individuals.  I feel as though -- you

9    know, in many cases I hear how it impacts direct family

10   members.  And on a larger scale, I've heard how a student

11   being accepted to Harvard College, it impacts a community.

12            I've got great stories that I enjoy telling people,

13   you know.  Certainly my time at Major League Baseball I could

14   sit down and tell you stories about conversations I've had

15   with Hall of Famers, you know, like just amazing people.

16            But nothing, nothing comes close to calling a

17   student and telling him or her that not only are they -- have

18   they been accepted to Harvard College but perhaps they're not

19   paying anything for their freshman year because of their

20   financial situation.

21   **Q.**   Earlier you mentioned that you've worked as an admissions

22   officer for about eight years.  Is that right?

23   **A.**   That's correct, yes.

24   **Q.**   And in those eight years, approximately how many

25   subcommittee meetings did you attend?

1     **A.**   Probably close to 100.

2     **Q.**   And in that same eight-year period, how many full

3     committee meetings did you attend?

4     **A.**   Probably close to 50.

5     **Q.**   And in that time period, how many times have you seen an

6     admissions officer show bias against an applicant because of

7     the applicant's race?

8     **A.**   Never.

9     **Q.**   Mr. Looby, when you're determining whether to admit an

10    applicant, is race ever used as a negative factor?

11    **A.**   No.

12    **Q.**   And in your eight years in the admissions office, have

13    you ever seen any of your colleagues treat an applicant's

14    race as a negative factor?

15    **A.**   No.

16    **Q.**   Mr. Looby, have you ever been instructed to admit a

17    target number of any particular racial or ethnic group in the

18    admissions process?

19    **A.**   Absolutely not.  We don't work with targets.

20    **Q.**   And, Mr. Looby, have you ever discriminated against an

21    applicant because of his or her race?

22    **A.**   Certainly not, no.

23            MS. CONLEY:  No further questions.

24            THE COURT:  Redirect?

25            MR. MORTARA:  No redirect, Your Honor.

```
 1                    THE COURT:  You're excused, Mr. Looby.

 2               Your next witness?

 3                    MR. McBRIDE:  Your Honor, Scott McBride for

 4     Students for Fair Admissions.  Our next witness is Erica

 5     Bever.  May we have a moment to set up?

 6                    THE COURT:  Yes, of course.

 7                    MR. McBRIDE:  Your Honor, I have a binder of

 8     exhibits that I can hand up to you and opposing counsel and

 9     for the witness.

10                    THE CLERK:  Can you please stand and raise your

11     right hand.

12               (ERICA BEVER duly sworn by the Deputy Clerk.)

13                    THE CLERK:  Can you please state your name and

14     spell your last name for the record.

15                    THE WITNESS:  It's Erica Bever.  B as in boy, E, V

16     as in Victor, E-R.

17                    MR. McBRIDE:  Your Honor, may I approach the

18     witness?

19                    THE COURT:  Yes, of course.

20                    MR. McBRIDE:  Your Honor, we have a number of

21     exhibits for which there are no objections.  In the interest

22     of efficiency, if I can just go through and read them and get

23     confirmation from counsel and get them admitted into evidence

24     to streamline the examination, if that's acceptable to you.

25                    THE COURT:  It's fine with me if it's fine with
```

1    them.

2              MS. ELLSWORTH:  Your Honor, I'd prefer to do them

3    when they come up.  I don't know if they're all going to come

4    up in the examination or not.

5                        DIRECT EXAMINATION

6    BY MR. McBRIDE:

7    **Q.**  Good afternoon, Ms. Bever.  How are you?

8    **A.**  I'm fine, thank you.

9    **Q.**  I'm Scott.  I'd like you to look at first Plaintiff's

10   Exhibit 43, if you could, please.  Let me know when you've

11   found it.

12   **A.**  I'm there.

13   **Q.**  Is Plaintiff's Exhibit 43 an August 28, 2014, email with

14   attachments from you to Lucerito Ortiz?

15   **A.**  It is.

16             MR. McBRIDE:  I'd like to admit this into evidence.

17             MS. ELLSWORTH:  No objection.

18             THE COURT:  Admitted.

19             (Plaintiff Exhibit No. 43 admitted.)

20   BY MR. MORTARA:

21   **Q.**  Could you turn to Plaintiff's Exhibit 44, please.

22   Plaintiff's Exhibit 44, this is an August 2, 2014, email with

23   attachments, from you to Lucerito Ortiz as well?

24             MR. McBRIDE:  Your Honor, I'd like to move

25   Plaintiff's 44 into evidence.

```
 1              MS. ELLSWORTH:  No objection.

 2              THE COURT:  Admitted.

 3              (Plaintiff Exhibit No. 44 admitted.)

 4   BY MR. MORTARA:

 5   Q.  Thank you.  That was just a little bit of housekeeping,

 6   Ms. Bever.

 7              Where do you work currently?

 8   A.  I currently work in the Harvard College office of

 9   admissions and financial aid.

10   Q.  What's your position there?

11   A.  I'm the director of research for admissions and financial

12   aid and a senior admissions officer.

13   Q.  You've been working there for how long in the admissions

14   office?

15   A.  I've been there for about four years.

16   Q.  Prior to going there four years ago, where did you work?

17   A.  I worked in the Harvard University office of

18   institutional research.

19   Q.  OIR?

20   A.  Correct.

21   Q.  When did you start in OIR?

22   A.  In July of 2007.

23   Q.  And if you had been working in the admissions office for

24   about four years, is it correct that you left OIR sometime in

25   the summer of 2014?
```

1    **A.**   That's correct.

2    **Q.**   Which means you spent seven years in OIR?

3    **A.**   Yes.

4    **Q.**   How many admission cycles, then, have you done since you

5    joined the office?

6    **A.**   I'm about to begin my fourth.

7    **Q.**   Begin your fourth.  So you've completed three admission

8    cycles?

9    **A.**   Yes.

10   **Q.**   I noticed that your counsel had identified a number of

11   application files as exhibits to your examination today.  So

12   I wanted to talk to you first briefly about your experience

13   as an admissions officer over the last four years.

14           Is it correct that as a new admissions officer one

15   of the ways you are trained is that you have someone who is

16   rereading the first 50 to 100 files that you are reading as

17   part of your work?

18   **A.**   Yes.  During my initial period there were -- the first 50

19   of my applications were reread by a second reader.  But of

20   course, all the applications I pass to a chair of any

21   subcommittee I served on were also read by that chair and

22   provided feedback that way.

23   **Q.**   Who provided you the second reading on the first 50 files

24   that were part of your training?

25   **A.**   I believe it was various colleagues who are senior on the

1    admissions committee in tenure to me.

2    **Q.**  Do you remember anyone specifically?

3    **A.**  It certainly would have been people like Grace Chang.  It

4    could have been other colleagues who'd been on the committee

5    longer.

6    **Q.**  In a given admissions cycle, about how many admission

7    applications or application files do you read?

8    **A.**  Currently I read about 500 a year.

9    **Q.**  Has that been true for the first three years or the first

10   three cycles that you did?

11   **A.**  In my first year on the admissions committee, I served on

12   two subcommittees, and I read over a thousand that year and

13   after that have read about 500.

14   **Q.**  Why the reduction in the number?

15   **A.**  To balance out my own workload.

16   **Q.**  And when you go into the subcommittee and the committee

17   stages, which we've heard about from other witnesses, about

18   how many files do you then have to review and examine as part

19   of that work?

20   **A.**  Generally we review all of them in preparation for

21   subcommittee.  Sometimes that's a cursory glance to see what

22   new information has come in.  Sometimes it's a more thorough

23   reread to prep for presentation in subcommittee.

24   **Q.**  When you're in subcommittee and committee, do you review

25   the application files of other examiner or other readers who

1   are bringing those files to subcommittee?

2   **A.**   Yes.

3   **Q.**   So about how many files -- other than the 1,000 or 500

4   that are part of your group of files, how many of those other

5   files do you then read and review for the subcommittee and

6   the committee process each year?

7   **A.**   Well, again, I couldn't really estimate how many are

8   discussed in subcommittee and full committee.  But every one

9   that's presented.  We're essentially seeing the full file as

10  we are reviewing them.

11  **Q.**   Now, we've heard there are a number of different ratings

12  that admissions officers like you assign when reviewing an

13  application.  You're familiar with those ratings?

14  **A.**   I am.

15  **Q.**   So for example, the profile ratings, as I understand it,

16  are the academic, the extracurricular, the athletic, the

17  overall, and a personal rating, right?

18  **A.**   Yes.

19  **Q.**   And you as the reader, you assign those scores in the

20  applicant's files?

21  **A.**   I assign the first reader ratings, yes.

22  **Q.**   And if a second reader reads the file, the ratings are

23  made by that second reader?

24  **A.**   That's correct.

25  **Q.**   And it's true the personal rating is the rating by which

1    you assess an applicant's personal qualities and character?

2    **A.**  Yes.

3    **Q.**  There are also some school support ratings, as I

4    understand it, from teachers and guidance counselors?

5    **A.**  Correct.

6    **Q.**  And you as the reader, you also assign those teacher and

7    counselor ratings to the applicant's files?

8    **A.**  Yes.  I read their letters and I assign a rating based on

9    the review given in those letters.

10   **Q.**  So it's correct, then, that the teacher and guidance

11   counselor, the so-called school support ratings, you assign

12   those based on your reading of the text of the teacher

13   recommendation and the counselor letter?

14   **A.**  Yes.  And the forms that they submit that go along with

15   those letters.

16   **Q.**  I'm sorry.  What?

17   **A.**  There are forms that come with their letters that often

18   provide some rating information as well from the teachers and

19   guidance counselors.

20   **Q.**  And you rely on that from the teachers in forming the

21   rating that you give in the school support measures?

22   **A.**  Exactly.

23   **Q.**  Did you receive any instruction about whether or not race

24   should ever be incorporated into the personal score when you

25   were trained as an admissions officer?

1   **A.**   No, I didn't receive specific instruction about putting

2   race into the personal rating.

3   **Q.**   Did you receive any instruction about whether or not race

4   should ever be incorporated into the personal score when you

5   were trained as an admissions officer?

6   **A.**   No.  There was a lot of feedback about how the personal

7   rating should be used but not specifically about race per se.

8   **Q.**   However, you do look at race as one of many factors in

9   evaluating an application, right?

10  **A.**   That is correct.

11  **Q.**   And as part of your process, what you say is that if a

12  student indicates race somewhere on the application, you

13  would note that as you would note their birthday, gender,

14  where they're from, what their high school is, and what the

15  grades are, right?

16  **A.**   Certainly I would know all that information as I was

17  evaluating their application.

18  **Q.**   And you would note that along with race?

19  **A.**   I would make note of it, yes.

20  **Q.**   And you can't ever recall factoring in a student's race

21  when you assign them an overall rating, right?

22  **A.**   The overall rating, as I see it, is the strength of the

23  application has a whole.  Certainly if their race played a

24  role in how strong I viewed that application, then the

25  overall rating might reflect something about their race in

1    the strength of their case.

2            MR. McBRIDE:  Your Honor, may I approach?

3            THE COURT:  Sure.

4    BY MR. McBRIDE:

5    **Q.**  Ms. Bever, I'm going to hand you a copy of your

6    deposition.  Do you remember your deposition on -- I believe

7    it was in July 13 of 2017.

8    **A.**  I do.

9    **Q.**  And do you remember before you began the deposition you

10   raised your right hand, like you did here, and swore to tell

11   the truth?

12   **A.**  I did.

13   **Q.**  And you gave truthful testimony at your deposition?

14   **A.**  Yes.

15   **Q.**  Could you please turn to page 301.  I put that up on the

16   screen.  I'd like to look at lines 22 to 25.

17           Do you recall at your July 13, 2017, deposition you

18   were asked the question:

19           "Do you -- can you recall ever factoring in a

20   student's race when you assigned them an overall rating?

21           "ANSWER:  I cannot."

22           Do you recall being asked that question and giving

23   that answer?

24   **A.**  Yes.

25   **Q.**  You also, you can't say how race would weigh on your

```
1    ultimate decision as to whether or not to recommend

2    admission, right?

3    A.   Again, race might play a role in how strongly I feel the

4    applicant will compare to others in the application pool.

5    Q.   Well, how would it weigh on your ultimate decision as to

6    whether or not to recommend admission?

7    A.   I cannot say per se how it would impact my decision.

8    Race plays a role among many factors in how strongly I might

9    view a case, a particular applicant's case.

10   Q.   Do you think race is more or less relevant than the

11   applicant's birthday?

12   A.   It's just different.

13   Q.   Can you say whether it's more or less relevant than the

14   applicant's birthday?

15   A.   Race is one of many factors.  Perhaps their birthday

16   played a role in their case, and that would be important for

17   a particular applicant.  Race can play a different role in a

18   different applicant's case.

19   Q.   Could you turn to page 303, please?

20   A.   300 and what?

21   Q.   303.  And look at lines 9 through 12.  Do you recall at

22   your deposition being asked --

23            MS. ELLSWORTH:  Your Honor, I object.  This is not

24   impeachment.

25            MR. McBRIDE:  Your Honor, I asked the question and
```

1    she did not say I don't know because it might be important.

2           THE COURT:  I don't think it's directly

3    contradicting, but I don't see any harm in the question

4    either.

5    BY MR. McBRIDE:

6    **Q.**  Were you asked the question, "Do you think it's more or

7    less relevant than the birthday?"

8           Ms. Ellsworth objected.

9           "ANSWER:  I don't know."

10          Were you asked that question and did you give that

11   answer?

12   **A.**  Yes.

13   **Q.**  You don't believe you've ever counted a student's race as

14   a negative in their application, do you?

15   **A.**  No, I do not.

16   **Q.**  But you don't know whether you ever counted race as

17   positive in their application, do you?

18   **A.**  I can recall cases where a student's race played a role

19   in how I viewed their application and how strongly I viewed

20   their application.

21   **Q.**  Have you ever counted race as a positive?

22   **A.**  Again, it's one factor among many.  I don't think of it

23   that way.

24   **Q.**  Could you please turn to 302 for me of your deposition,

25   looking at lines 21 to 24.

1      "QUESTION:  Have you ever counted it as a positive?

2      "ANSWER:  I do not know."

3          Were you asked that question and did you give that

4   answer in your sworn testimony?

5          MS. ELLSWORTH:  Your Honor, I'll lodge the same

6   objection.  I don't think this is proper impeachment.

7          THE COURT:  I understand the objection.  In front

8   of a jury, I may make a different ruling.  But I'm making the

9   decisions, and I don't see any harm to the question.  I heard

10  the first question and I see the question in the deposition.

11  I don't think they're strictly contradictory, but they are

12  different, and I'll let him have it.

13         MS. ELLSWORTH:  Thank you, Your Honor.

14         MR. McBRIDE:  Thank you, Your Honor.

15  BY MR. McBRIDE:

16  Q.  Is it possible for you to say whether in all your time

17  reading files race has ever made a difference in whether

18  someone got admitted or not?

19  A.  I couldn't say.

20  Q.  I'm sorry?

21  A.  I couldn't say.

22  Q.  I want to turn to your time at the office of

23  institutional research, OIR, if I could, please.  And I want

24  to look at Plaintiff's Exhibit 465.

25         MR. McBRIDE:  Your Honor, I offer Plaintiff's

1    Exhibit 465 into evidence.

2                MS. ELLSWORTH:  No objection.

3                THE COURT:  Admitted.

4                (Plaintiff Exhibit No. 465 admitted.)

5    BY MR. McBRIDE:

6    **Q.**  You see at the top this is the website for OIR.  Do you

7    recognize that?

8    **A.**  Yes.

9    **Q.**  And you see at the top the objectives of OIR is to offer

10   accurate, timely, and digestible research, tailored to

11   diverse audiences, with the goal of promoting informed

12   decision-making and furthering the core missions of the

13   university."

14   **A.**  Yes.

15   **Q.**  That's the standard you followed when you worked at OIR?

16   **A.**  I believe this is the same objective statement we had

17   when I was in the office.

18   **Q.**  And is that the standard that you followed at OIR to

19   offer accurate, timely, and digestible research?

20   **A.**  Yes.

21   **Q.**  And you tried to do a good job, the best job you were

22   able to do when you were at OIR?

23   **A.**  I did.

24   **Q.**  And it was your practice to prepare complete assessments

25   on questions that you looked into, right?

1    **A.**   Most often.

2    **Q.**   Did you ever not try to do that?

3    **A.**   Occasionally we had meetings that were preliminary in

4    nature, and we would try and ask for more information in the

5    middle of a process or project.

6    **Q.**   Was it your habit when you worked at OIR to prepare

7    incomplete assessments on the questions you were asked to

8    look into?

9    **A.**   Again, projects took many months, sometimes years.  So we

10   would have checked in periodically.

11   **Q.**   Could you please turn to page 131 of your deposition,

12   lines 12 to 16.

13           "QUESTION:  Did you -- was it your habit when you

14   worked at OIR to prepare incomplete assessments on questions

15   you were asked to look into?"

16           There was an objection.

17           "ANSWER:  No."

18           Were you asked that question and did you give that

19   answer at your deposition?

20   **A.**   Yes.

21   **Q.**   It was your practice to provide reliable work product to

22   your Harvard decision-makers, right?

23   **A.**   Yes.

24   **Q.**   So I want to look at some of the work from when you were

25   at OIR.  Turn to Plaintiff's Exhibit 12, which I believe is

1    already in evidence, Your Honor.

2              This is an OIR report from February of 2013; is

3    that right?

4    **A.**  It is a presentation that appears to be from

5    February 2013.

6    **Q.**  And if you turn to the third page, you see that one of

7    the questions in this presentation was under the heading

8    "Access" on a page titled "Recent Admissions and Financial

9    Aid Questions Raised Was 'Does the Admissions Process

10   Disadvantage Asians?'"

11             Do you see that?

12   **A.**  I do.

13   **Q.**  I don't want to go through this whole deck, but I would

14   like to orient you.  If you could, turn to Slide 31.  You see

15   it's a section on evaluating factors that play a role in

16   Harvard College admission?

17   **A.**  I see that.

18   **Q.**  It goes on for about six or seven slides through to

19   around -- I think this section ends on Slide 38.  Do you see

20   that?

21   **A.**  Yes.

22   **Q.**  And Slide 32 has, as you see on the screen under the

23   methods, it has the goal, the strategy, and the notes.  Do

24   you see that?

25   **A.**  Yes.

1    **Q.**  And in summary, what's being described here is creating

2    some logistic regression models that OIR had created?

3    **A.**  Yes, I believe so.

4    **Q.**  And at the bottom, it does note here in the notes

5    section, "The following analysis is preliminary and for

6    discussion."  Do you see that?

7    **A.**  I do.

8    **Q.**  And this caveat, that was something that was applied to

9    reports that you would do at OIR generally, wasn't it?

10   **A.**  Again, there were things that were preliminary and often

11   for discussion, yes.

12   **Q.**  And it was something that was applied to reports that you

13   would do at OIR generally, right?

14   **A.**  Again, I think we tried to apply that label when things

15   were preliminary and for discussion.

16   **Q.**  I'd like to turn to your deposition again, if you would,

17   please.  If you could go to page 114.  I'll just read this

18   one.

19             On page 114 at around line 17, it says, "Okay.  The

20   next bullet point says, 'The following analysis is

21   preliminary and for discussion.'  Did I read that correctly?

22             "You did," is the answer.

23             "QUESTION:  Is that -- do you remember -- do you

24   remember that -- do you remember that caveat being applied to

25   reports that you would do at OIR generally?"

1          Next page.

2          "ANSWER:  Yes."

3          Were you asked that question and did you give that

4    answer?

5    **A.**  Yes.

6    **Q.**  You included that caveat because almost everything you

7    did at OIR was up for discussion and review, right?

8    **A.**  Many things, yes.

9    **Q.**  Almost everything was, right?

10   **A.**  Certainly everything was up for discussion, yes.

11   **Q.**  And review?

12   **A.**  Yes.

13   **Q.**  So over the next few slides here in Plaintiff's

14   Exhibit 12, you agree this is presenting the results of the

15   modeling of Harvard's admissions process that was done?

16   **A.**  I agree that it's presenting models of the admission

17   rate.

18   **Q.**  And you see on Slide 35 it has some showing of how

19   projected admit rates in the model would change as you add

20   more factors.  Do you agree?

21   **A.**  Yes.  For the few factors that was included in this

22   model.

23   **Q.**  And to be clear, your only memory of this section of

24   slides is of Mark Hansen sitting in your office and showing

25   you these slides?

1    **A.**   I remember a couple of these slides from a meeting with
2    Mark Hansen.  This is not one of the slides I recall.
3    **Q.**   And you have no recollection of any critique you had of
4    the slides that Mark showed you?
5    **A.**   That is correct.
6    **Q.**   And you don't have a memory of any concerns you had about
7    mistakes in the slides?
8    **A.**   That is correct.
9    **Q.**   But Mark Hansen, he worked for you at OIR at that time,
10   right?
11   **A.**   He did.
12   **Q.**   And in your experience, he did quality work?
13   **A.**   He did.
14   **Q.**   And you were responsible for his performance evaluations,
15   right?
16   **A.**   I was.
17   **Q.**   And you don't remember ever giving him a negative
18   performance evaluation?
19   **A.**   That's true.
20   **Q.**   But you do remember giving him positive performance
21   evaluations when he worked for you?
22   **A.**   Yes.
23   **Q.**   And you thought highly enough of Mr. Hansen's work in
24   Plaintiff's Exhibit 12 to pass it along to others?
25   **A.**   That may be the case, yes.

1    Q.  I'd like to look at some of the times that you passed

2    Mr. Hansen's work along to others while you were at OIR.  If

3    you could, turn to Plaintiff's Exhibit 15.

4            MR. McBRIDE:  I'd like to move Plaintiff's

5    Exhibit 15 into evidence.

6            MS. ELLSWORTH:  No objection.

7            THE COURT:  Admitted.

8            (Plaintiff Exhibit No. 15 admitted.)

9    BY MR. McBRIDE:

10   Q.  So Plaintiff's Exhibit 15, this is an email from you to

11   Mark Hansen and Erin Driver-Linn on February 20, 2013; is

12   that right?

13   A.  That's correct.

14   Q.  I understand she's Ms. Driver-Linn, not Dr. Driver-Linn.

15   Is that correct?

16   A.  I always referred to her as Erin.

17   Q.  Okay.  I won't do that.  Ms. Driver-Linn, was she your

18   boss at this time?

19   A.  She was.

20   Q.  And Mark, as we already established, he worked for you or

21   Mr. Hansen worked for you?

22   A.  Yes.

23   Q.  If you look at the first two sentences, you say, "Hi,

24   Mark and Erin.  Attached is my shot at pulling together much

25   of the work related to admissions.  Since I'm still not sure

1  what Fitz and Sally have seen, I'd welcome your thoughts on

2  what we should add (especially related to the Unz article)."

3  　　　　　Do you see that?

4  **A.**  I do.

5  **Q.**  "Fitz," is that the shorthand you'd use for Dean

6  Fitzsimmons?

7  **A.**  Yes.

8  **Q.**  And who is Sally?

9  **A.**  In this case I'm probably referring to Sally Donahue who

10  was our director of financial aid.

11  **Q.**  It mentions the Unz article.  During your time at OIR,

12  you were familiar with that article?

13  **A.**  A little bit.

14  **Q.**  And you recall it came up in late fall, early winter of

15  2012-2013?

16  **A.**  I believe that's correct.

17  **Q.**  And you understand you were out of the office on leave

18  for part of that, for maternity leave?

19  **A.**  That's correct.

20  **Q.**  But you were aware that the Unz article made assertions

21  about the way Harvard treated Asian-Americans in the

22  admissions process?

23  **A.**  Yes.

24  **Q.**  And specifically that it alleged Harvard discriminated

25  against Asian-Americans in the admissions process?

1    **A.**   Yes.

2    **Q.**   And you recall that when David Brooks wrote about that in

3    the New York Times, it caused a bit of a stir at Harvard

4    among the decision-makers above you?

5    **A.**   I was on leave during that period.  I wasn't really aware

6    of what discussions were happening during that time.

7    **Q.**   Now, if you see here, there are a series of attachments.

8    I think there are two attachments here in Excel and a

9    PowerPoint?

10   **A.**   Yes.

11   **Q.**   I notice that in each of them they have a name.  For

12   example, admissions_20120220_EB.pptx.

13          Do you see that?

14   **A.**   Yes.

15   **Q.**   And does this reflect a naming convention you used for

16   documents that you prepared?

17   **A.**   Yes.  It's how we dealt with version control.

18   **Q.**   By version control, then you include this reverse date

19   notation?

20   **A.**   Correct.

21   **Q.**   And you would also include your initials, EB?

22   **A.**   Yes.

23   **Q.**   And that would reflect that you had had a hand in

24   preparing or editing that version of the document?

25   **A.**   Either I created it or edited it.

1    **Q.**  And would you agree that this date here appears to be --

2    the thing I always do, which is for the first two months of a

3    year I use the wrong year when I label a document.

4              So this from 2013 is actually from 220 -- 2013

5    where it says 2012?

6    **A.**  That's possible, but I don't recall.

7    **Q.**  And if you look at the document that's attached, we page

8    forward, here's the Excel sheet for the first few pages.  And

9    then it begins here on what is it about the ninth page of the

10   document, even though it says Slide 1.

11             Do you see we're starting a PowerPoint?

12   **A.**  Yes.

13   **Q.**  And take a moment, but would you agree that this is a

14   version, close version of the PowerPoint that we had just

15   looked at at Plaintiff's Exhibit 12?

16   **A.**  It appears to be a version.  I don't recall everything

17   that was in that document.

18   **Q.**  You have both exhibits there.  So please take your time.

19   I would like to make sure that we're clear for the record

20   that what you are forwarding to your boss, Erin Driver-Linn,

21   is a version of the PowerPoint we just looked at at

22   Plaintiff's Exhibit 12.

23   **A.**  We can agree to that.

24   **Q.**  Specifically if you look at the third slide here in this

25   Plaintiff's Exhibit 15, you'll note that it is, in fact,

1    asking not exactly the same but a very similar question as

2    what we saw in the previous one.  I think the last one said

3    does it disadvantage Asians.  Here the question is, is there

4    bias against Asians in college admissions?

5              Do you see that?

6    **A.**  I see that.

7    **Q.**  And then if you look on, you'll see starting at around

8    Slide 30 and 31, we have the same series of seven or eight

9    slides that we saw earlier in Plaintiff's Exhibit 12

10   reflecting a logistic regression model?

11   **A.**  Yes.

12   **Q.**  And what you were pulling together for your boss relating

13   to admissions was the OIR PowerPoint that include Mark

14   Hansen's slides with the logistic regression modeling the

15   effect of certain factors on admit rates at Harvard, right?

16   **A.**  Yes.  I was pulling together a number of slides that

17   included Mark's analysis.

18   **Q.**  The same slide deck basically as P12?

19   **A.**  This one appears a little bit rougher.  There are notes

20   on it.

21   **Q.**  I understand that other than what's written in the email,

22   you say that you don't actually have a recollection of the

23   discussions that the email refers to.  Is that right?

24   **A.**  That's correct.

25   **Q.**  But we can agree that at least with respect to what you

1    wrote in your email to Ms. Driver-Linn, you did not criticize

2    the work of Mark Hansen that you pulled together for her.  Is

3    that right?

4    **A.**   This email does not include any criticism.  That's

5    correct.

6    **Q.**   You did not tell her, for example, in this email that the

7    work Mark had done in those slides was somehow unreliable or

8    incomplete?

9    **A.**   That's correct.

10   **Q.**   I'm sorry.  Did I interrupt you?  I apologize.

11   **A.**   I was just saying the email does not say that.

12   **Q.**   And you did not tell her in your email that this

13   reflected anything other than the complete and reliable work

14   that you normally did when you were at OIR, did you?

15   **A.**   All it says is that I pulled together much of our work.

16   It doesn't even say it's complete.

17   **Q.**   And it definitely doesn't say it's incomplete or

18   unreliable or don't rely on this, right?

19   **A.**   That's correct.  It does not say that.

20   **Q.**   So I'd like to move forward in time.  If you could look

21   at Plaintiff's Exhibit 25 for me, please.

22            MR. McBRIDE:  I'd like to offer Plaintiff's

23   Exhibit 25 into evidence.

24            MS. ELLSWORTH:  No objection.

25            THE COURT:  Admitted.

1      (Plaintiff Exhibit No. 25 admitted.)

2  BY MR. McBRIDE:

3  **Q.**  So Plaintiff's Exhibit 25, is this an April 30 email from

4  you, again to Ms. Driver-Linn, copying Mark Hansen?

5  **A.**  It is.

6  **Q.**  And again, this is another instance where you have sent

7  around OIR analysis that relates to race and admissions,

8  right?

9  **A.**  I believe this memo was intended to address the issue of

10  economics, socioeconomic status in admissions.

11  **Q.**  We'll take a look at what you've got here in this email

12  in a second.

13      What you wrote is, "Hi, Erin.  Mark and I have

14  updated the memo and exhibits based on your comments,

15  including adding the new exhibit.  Please let us know if you

16  would suggest additional changes."

17      Do you see that?

18  **A.**  I do.

19  **Q.**  Again, all the files here have your naming convention

20  with EB in your name?

21  **A.**  The first file does.  The second does not.

22  **Q.**  Correct.  I see that.  So the analysis memo, that has

23  your initials in the file name?

24  **A.**  Yes.

25  **Q.**  Now, if we go to the next page, this is the first page of

1    the memo that you referenced.  And this is a draft memo from

2    you, Ms. Driver-Linn, and Mr. Hansen to Dean Fitzsimmons,

3    right?

4    **A.**   That's what it appears, yes.

5    **Q.**   And it has as the subject line, "Harvard College

6    admissions and low-income students."

7          Do you see that?

8    **A.**   Yes.

9    **Q.**   I don't want to go through this in excruciating detail.

10   We've seen versions of this previously.

11         But would you agree that this memo reflects the

12   results of some logistic regressions that OIR ran for Dean

13   Fitzsimmons relating to admissions and low-income status?

14   **A.**   Yes, that's correct.

15   **Q.**   And if you look on the last -- I'm sorry -- on the next

16   page, which is the third page of the document altogether, I

17   just want to look at the bottom paragraph there.

18         You wrote in this memo that you were sending to

19   your boss at this time, this draft, "To get a sense of the

20   size of the admissions advantage conferred to low-income

21   applicants relative to other groups of applicants, the

22   so-called thumb on the scale, we include low-income status in

23   a second logistic regression model.  The table below is

24   sorted based on the effect size of each of the variables

25   included in the model.  The variables with the largest

1    effects on the probability of admission are athletic rating,

2    personal rating, and legacy status.  Compared to athletes and

3    legacies, the size of the advantage for low-income students

4    is relatively small."

5            Do you see that?

6    **A.**  I do.

7    **Q.**  And the table with the results that the memo is

8    describing here, those are on the next page; is that right?

9    **A.**  Yes.

10   **Q.**  And on the next page this table is a table titled

11   "Logistic Regression Predicting Admission."

12           Do you see that?

13   **A.**  I do.

14   **Q.**  And it's a table with variables along the left,

15   coefficient estimates in the middle, and P values on the

16   right?

17   **A.**  Yes.

18   **Q.**  And the coefficient, that reflects the probability of a

19   particular outcome, right?

20   **A.**  It reflects the correlation between that variable and the

21   outcome of interest.

22   **Q.**  And by "correlation," you mean how it affects the

23   probability of that outcome occurring?

24   **A.**  Yes.

25   **Q.**  And a positive -- and the outcome here is probability of

1    admission, to be complete?

2    **A.**   I believe so, yes.

3    **Q.**   And a positive coefficient means there is a positive

4    relationship between that variable and admissions outcomes?

5    **A.**   Yes.

6    **Q.**   In other words, "positive" means makes it more likely

7    you'll be admitted --

8    **A.**   Yes.

9    **Q.**   -- according to the model?

10   **A.**   According to this model with a limited set of variables,

11   yes.

12   **Q.**   And a negative coefficient means there is a negative

13   relationship between that variable and the possibility of

14   admissions, right?

15   **A.**   Between that particular variable, yes.

16   **Q.**   And if you go down the chart, we see what the memo is

17   describing, that the biggest effect is athletic rating 1

18   because it has the highest positive coefficient?

19   **A.**   Yes.  The biggest effect in this model.

20   **Q.**   And the next biggest effect shown in this model is

21   personal rating of 1 or 2?

22   **A.**   Yes.

23   **Q.**   And then legacy?

24   **A.**   Yes.

25   **Q.**   And so on.  And if you go down the columns, what we see

1    here is that near the very bottom we see Asian, and Asian has

2    a negative coefficient, right?

3    **A.**   It does.

4    **Q.**   And the negative coefficient here means that the model

5    says that being an Asian-American applicant has a negative

6    effect on your probability of admission, according to this

7    model?

8    **A.**   According to this model with limited set of variables, it

9    says that being Asian in this model is negatively correlated

10   with the admission rate.

11   **Q.**   And P value, that represents statistical significance,

12   right?

13   **A.**   It does.

14   **Q.**   The P value of zero, that means it is statistically

15   significant?

16   **A.**   That's correct.

17   **Q.**   And we see that for everything all the way down through

18   Asian until the very last two variables, all of those values

19   the model finds to be statistically significant?

20   **A.**   Yes.

21   **Q.**   Now, in fairness to you, I'm going to turn back to the

22   previous page.  Because you do in this draft memo that you're

23   sending to your boss, Ms. Driver-Linn, you reflect on some

24   limitations that the model has.

25            And you state, "This approach has several

1    limitations.  We picked a small set of variables that would

2    factor in admissions decisions.  The selection of a wider set

3    of variables might result in a better fitting model, one that

4    accounts for more of the variation in individual applicants

5    and their potentially unique contributions to the entering

6    class.  For example, the model does not capture exceptional

7    talent in art or music explicitly, although ratings may

8    capture some aspects of these attributes.  In addition, our

9    model is limited to main effects, not examining interactions

10   between variables.  Our analysis should not be considered

11   exhaustive."

12           Do you see that?

13   **A.**   I do.

14   **Q.**   However, you'll note that if you continue down, the next

15   thing you say is, "In spite of these limitations, the

16   logistic regression model results are consistent with the

17   descriptive analysis described above and shown in Exhibits 1

18   and 2," right?

19   **A.**   Yes.

20   **Q.**   To be fair, you understood that there was more data on

21   additional variables available in Harvard's database, right?

22   **A.**   I think I was aware that there was more data available,

23   yes.  But I had no understanding of the admissions process at

24   the time.

25   **Q.**   I apologize.  You were in OIR at that time.  You hadn't

1    yet become a reader?

2    **A.**   That's correct.

3    **Q.**   But you understood you could go to Elizabeth Yong, who

4    managed the database, and you could secure more data on more

5    variable if you wanted it, right?

6    **A.**   I don't specifically recall that, but that may be the

7    case.

8    **Q.**   And generally when you had wanted to get more data on a

9    process, you went to Elizabeth Yong to get it, correct?

10   **A.**   I think that's correct, yes.

11   **Q.**   You could also have expanded the model to include

12   interaction between variables, as you noted here, right?

13   **A.**   Yes.

14   **Q.**   Like interacting race and disadvantaged status?

15   **A.**   Yes.

16   **Q.**   You don't remember anyone at the time of this memo

17   raising concerns about the way a logistic regression was

18   being used here, do you?

19   **A.**   I don't recall any discussions about that memo.

20   **Q.**   Which means you don't -- no one raised any concerns about

21   the use of a regression, that you recall?

22   **A.**   I don't recall any discussions about this memo.

23   **Q.**   And you don't recall anyone critiquing the analysis that

24   was employed here generally?

25   **A.**   Yes.  I don't recall discussing it.

1    **Q.**  But ultimately you did finalize this memo and you sent it

2    on to Dean Fitzsimmons, right?

3    **A.**  I believe we sent a version, yes.

4    **Q.**  Hopefully a final version?

5    **A.**  I think it was final.

6    **Q.**  But first before we do that, I wanted to look at just one

7    more draft of this memo here.

8              MR. McBRIDE:  I'm going to put Plaintiff's

9    Exhibit 23 up on the screen and offer it into evidence.

10             MS. ELLSWORTH:  No objection.

11             THE COURT:  It's admitted.

12             (Plaintiff Exhibit No. 23 admitted.)

13   BY MR. McBRIDE:

14   **Q.**  If you take a look at what is in your binder, it's

15   Plaintiff's Exhibit 23 as well as here on the screen.  I just

16   want to establish first this is a markup redline draft of the

17   same memo we looked at before.

18   **A.**  Yeah.  It appears to have track changes.

19   **Q.**  I'll represent to you that the metadata for this shows

20   that it's titled "analysis memo_20130426_EB."

21             If you would accept that representation, you'd

22   agree that this is from April 26 of 2013?

23   **A.**  Yes.

24   **Q.**  And that would be a few days before the April 30 memo we

25   just saw?

1    **A.**   Yes.

2    **Q.**   I want to focus on the last page of this memo.  If you

3    look at the last page, first just confirm that this earlier

4    memo here, it has the same chart of coefficients, albeit at

5    the very end of the memo?

6    **A.**   I think it does, yeah.

7    **Q.**   And if we look up at the top, there's a final paragraph

8    here.  I just want to highlight some of the text here while

9    we read it.

10           So what you write here in this draft from before

11   April 30, the April 26 draft, it says, "While we find that

12   low-income students clearly receive a tip in the admissions

13   process, our model also shows that the tip for legacy

14   athletes, etc., is larger.

15           "On the flip side, we see a negative effect of

16   being Asian.  These realities have also received intense

17   scrutiny from critics like Bowen or more recently Unz, as we

18   have discussed at length.  To draw attention to the positive

19   benefit that low-income students receive may also draw

20   attention to the more controversial findings around Asians or

21   the expected results around legacies and athletes."

22           Do you see how you wrote that in that draft?

23   **A.**   I see that that's written here.  I don't recall writing

24   it.

25   **Q.**   I want to look at the final version of the memo that you

1    then sent to Dean Fitzsimmons.  So if you could, turn to

2    Plaintiff's Exhibit 26.  I believe 26 is in evidence.

3            So this is an email from you to Dean Fitzsimmons on

4    May 1, the day after the first memo draft that we looked at.

5    Is that true?

6    **A.**  Yes.

7    **Q.**  And you copy his assistant as well as Ms. Driver-Linn and

8    Mr. Hansen?

9    **A.**  Yes.

10   **Q.**  And you say, "Dear Fitz.  Attached is a memo describing

11   our recent analysis of low-income admissions.  In the memo we

12   describe our approach and results.  At your suggestion, we

13   reviewed a small sample of literature to put this in context

14   and realized our approach was consistent with what others

15   have done.  We'd appreciate any comments or suggestions you

16   have."

17           Do you see how you wrote that?

18   **A.**  Yes.

19   **Q.**  And if you take a look, you would agree that if we page

20   through the rest of the memo that it is very similar to both

21   of the drafts that we saw before, more closely related to the

22   April 30 draft obviously.  Would you agree?

23   **A.**  Yes.

24   **Q.**  And it has the same chart of coefficients for Dean

25   Fitzsimmons that we saw before?

1    **A.**   Yes.

2    **Q.**   And other than the email that sent this memo, you don't

3    recall discussing the memo or its findings with Dean

4    Fitzsimmons, do you?

5    **A.**   That's correct, I do not.

6    **Q.**   You don't remember any discussions with Dean Fitzsimmons

7    about the findings in the memo about the effect of being

8    Asian-American, right?

9    **A.**   I don't recall discussing this memo with Dean

10   Fitzsimmons.

11   **Q.**   And you say that you actually don't remember much about

12   the specific analysis that was done in this memo; is that

13   right?

14   **A.**   I don't really remember the analysis of this work, but

15   I'd be happy to comment on it today.

16   **Q.**   I'm sure your lawyers will be happy to ask you.

17            But I'm going to ask you instead that you don't

18   remember the analysis about the extent to which the

19   admissions process fell negatively on Asian-Americans, right?

20   **A.**   I don't remember any discussion about this analysis.

21   **Q.**   This wasn't the last time, though, that you were sending

22   Dean Fitzsimmons OIR analysis on race, low income, and

23   admissions probabilities, though, was it?

24   **A.**   I don't recall.

25   **Q.**   Would you turn to Plaintiff's Exhibit 29.

```
 1              MR. McBRIDE:  Your Honor, if I may just check in.
 2   I can't remember how long you said we were going, if we were
 3   going until 4:00 or 3:30.
 4              THE COURT:  I have another hearing at 3:30.
 5              MR. McBRIDE:  This is a new document.  I don't know
 6   if you'd -- --
 7              THE COURT:  I'd like us to use the time.
 8              MR. McBRIDE:  I'll keep going.
 9   BY MR. McBRIDE:
10   Q.  Plaintiff's Exhibit 29 is in evidence.  This is an email
11   that you sent to Dean Fitzsimmons on Monday, June 3?
12   A.  Yes.
13   Q.  And this is about a month after the low-income admissions
14   and admissions memo we just saw?
15   A.  Yes.
16   Q.  And what you say -- you say, "Hi, Fitz.  This note is a
17   follow-up from our last conversation on income and admissions
18   with Jeff Neal.  We've put together several exhibits that
19   examine the interaction between race and low-income status."
20              Do you see that?
21   A.  I do.
22   Q.  And you don't recall what the last conversation is that
23   this is referring to?
24   A.  I don't.
25   Q.  And it notes an attachment here at the bottom, an
```

1    attachment in the form of a download file titled

2    "Demographics & Income_20130603."

3             Do you see that?

4    **A.**   I do.

5    **Q.**   I want to look at the attachment which you'll find just

6    before this at Plaintiff's Exhibit 28, if you would, please.

7    And that is, I believe, in evidence.

8             Do you see Exhibit 28?

9    **A.**   Yes.  I am at 28.

10   **Q.**   And if you will page through this for me, please, you'll

11   see that around Slides 7 and 8, what you've provided to Dean

12   Fitzsimmons are additional tables of results from logistic

13   regression models that you did on modeling the predicted

14   probability of admissions, in this case for the classes of

15   2009 to 2016.

16            Do you see that?

17   **A.**   I do.

18   **Q.**   And if we can look at both of those, both Slide 7, there

19   we see again the coefficient for Asian is negative,

20   reflecting a negative correlation to the probability of

21   admission?

22   **A.**   The coefficient for Asian is negative.  The coefficient

23   for being Asian and low income is positive.

24   **Q.**   The way you work with those, as you know, is that if you

25   want to find out what that means for the overall coefficient

1   for a low-income Asian applicant is you add those two

2   together?

3   **A.**   That's correct.

4   **Q.**   So if you were to do that in this instance, what you

5   would find -- Asian and low income, that's an interaction

6   term, to be correct?

7   **A.**   Yes.

8   **Q.**   And what you do is if you want to ask the question, What

9   is the coefficient for a low-income Asian applicant? is that

10  you take .282 positive and you add it to the overall

11  coefficient for Asian of negative .429, right?

12  **A.**   And then you add the coefficient for it being low income,

13  which is .899.

14  **Q.**   Your testimony is that in order to determine what a

15  low-income Asian applicant is that you add all three

16  variables?

17  **A.**   I think that's correct.  I'd have to check.

18  **Q.**   I agree that I think you should go back and check that.

19          For now, we'll leave that for the experts to

20  resolve later --

21  **A.**   Okay.

22  **Q.**   -- since you're not sure.

23          But we can agree on one thing, that this purely

24  Asian coefficient here is negative .429?

25  **A.**   Yes.

1   **Q.**   And it's more negative than what we saw before?

2   **A.**   Controlling for a few other things, yes.

3   **Q.**   Yes.  So adding more controls has made this Asian

4   coefficient more negative?

5   **A.**   In this particular model.

6   **Q.**   In this particular model, right.

7            And regardless of our disagreement or uncertainty

8   about how exactly you put these numbers together to get to a

9   low-income Asian applicant, you'd agree this number here

10  reflects now a non low-income Asian applicant?

11  **A.**   Relative to whatever the omitted group is, yes.

12  **Q.**   And for a non-low-income Asian applicant, this model is

13  showing an even more negative correlation with admission?

14  **A.**   In this particular model, yes.

15  **Q.**   And you'd agree that when we look at the number of Asians

16  who are not in the low-income category, it's over 80 percent

17  of the applicants, right?

18  **A.**   Over 80 percent of Asian applicants?  I'd have to check.

19  **Q.**   We'll go back because I believe you helpfully provided us

20  some information in this draft.  This is back on Slide 4.

21           This is a slide which I've conveniently blocked the

22  title so you can't see it.  "Percent of Applicants With

23  Incomes Less Than 60,000 by Race/Ethnicity."

24           Do you see that?

25  **A.**   Yes.

1    **Q.**   What it shows here is that for the Asian-American

2    applicants it is 18 percent, right?

3    **A.**   Yes.

4    **Q.**   And so that means that 82 percent of Asian-American

5    applicants are in the non-low-income category associated with

6    the negative .4-something coefficient in the model?

7    **A.**   During this time period, yes.

8    **Q.**   And if we look on page 8, just to wrap things up, here

9    you have what you've done on this page 8 is you've actually

10   done additional interactions not just between Asian and low

11   income, but you've interacted all races and ethnicities with

12   low income and now provided resulting coefficients?

13   **A.**   Yes.

14   **Q.**   And in fact, what you find here is that for

15   non-low-income Asians, this model shows a negative

16   correlation with admissions in a coefficient of the form

17   negative .418.

18          Do you see that.

19   **A.**   Yes.

20   **Q.**   And you say that you don't recall why you would be

21   sending this to Dean Fitzsimmons at the time?

22   **A.**   I don't recall having a conversation in between sending

23   the initial memo and sending this document.

24   **Q.**   And you don't recall any discussions about the

25   information in this chart in June of 2013 or at any point

1    thereafter, right?

2    **A.**  I do not.

3    **Q.**  But as was your practice when at OIR, you would only have

4    sent him analysis that you believed to be accurate and

5    reliable, right?

6    **A.**  Yes.

7    **Q.**  I want to move forward now from June of 2013 to October

8    of 2013.  I'm going to move to a new exhibit.  This is

9    Plaintiff's Exhibit 35.

10            MR. McBRIDE:  And I'd like to move that into

11    evidence, please.

12            MS. ELLSWORTH:  I'm sorry.  Mr. Lee was distracting

13    me.  No objection.

14            THE COURT:  Admitted.

15            (Plaintiff Exhibit No. 35 admitted.)

16            THE COURT:  She threw you right under the bus.  Not

17    even a moment of hesitation.

18            MR. LEE:  I'm not saying anything any longer.

19            MS. ELLSWORTH:  It's not going to be the last time.

20    BY MR. McBRIDE:

21    **Q.**  Ms. Bever, Plaintiff's Exhibit 35 is an email from

22    Monday, October 7, from you to Ms. Driver-Linn?

23    **A.**  Yes.

24    **Q.**  And you're attaching something that is also, on the

25    subject line, called "Admissions Simulation 20130114_MH"?

1   **A.**   Yes.

2   **Q.**   What you say in your email is, "Hi, Erin.  So Mark did

3   quite a bit of work, and his slides attached here essentially

4   answer the questions posed.  Although we could do a bit more

5   using socioeconomic status and ZIP Code, which were mentioned

6   of interest, I won't have time to get to that before

7   tomorrow.  So we might just bring these slides."

8        Do you see that?

9   **A.**   I do.

10  **Q.**   The MH and Mark, that both refers to Mark Hansen here?

11  **A.**   I assume so, yes.

12  **Q.**   When you say the work, you're referring to the attachment

13  with his initials in it?

14  **A.**   I imagine so.

15  **Q.**   And if you look at the attachment, we'll see again there

16  are some very familiar slides here, some of the slides we've

17  seen going all the way back to February 2013?

18  **A.**   Yes.  This seems to be a draft.

19  **Q.**   You agree this is another draft of the logistic

20  regression model that we first began our discussion with in

21  the February 2013 time period?

22  **A.**   Yes.

23  **Q.**   Your email doesn't offer any criticism of the quite a bit

24  of work that Mark did, does it?

25  **A.**   It does not.

1   **Q.**  Your email doesn't say that Mark's answer to the

2   questions posed are somehow flawed or unreliable, does it?

3   **A.**  It doesn't, but it says we could do some more.

4   **Q.**  It says you could do more, but it doesn't say what you've

5   done is flawed or unreliable, does it?

6   **A.**  No.

7   **Q.**  In fact, you're saying we might just bring these slides,

8   right?

9   **A.**  Yes.

10  **Q.**  You don't bring slides to someone else out of OIR unless

11  they are reliable and digestible and accurate, right?

12  **A.**  That would be true, although we bring preliminary work to

13  discuss with someone to get their feedback and thoughts.

14  **Q.**  Of course.  As you said, all OIR work is preliminary and

15  up for discussion, right?

16  **A.**  Yes.

17  **Q.**  And on your website, I'm assuming that you are accounting

18  for that when you say we provide accurate, reliable, and

19  digestible research, right?

20  **A.**  Yes.

21  **Q.**  Now, you say that you don't remember where you were

22  bringing these slides to or who you were meeting with,

23  though, do you?

24  **A.**  I don't.

25  **Q.**  Look at Plaintiff's Exhibit 36, if you would, please.

1          MR. McBRIDE:  Offer that into evidence.

2          MS. ELLSWORTH:  No objection.

3          THE COURT:  Admitted.

4          (Plaintiff Exhibit No. 36 admitted.)

5     BY MR. McBRIDE:

6     **Q.**  Plaintiff's Exhibit 36 is a meeting invite out of

7     Microsoft Outlook, for Tuesday, October 8.  Do you see that?

8     **A.**  Yes.

9     **Q.**  That's the next day.  That's the tomorrow from your

10    email, so to speak?

11    **A.**  Yes.

12    **Q.**  And it is a meeting organized by Robert Iuliano.  That's

13    the general counsel of Harvard?

14    **A.**  Yes.

15    **Q.**  And you were one of the required attendees at this

16    meeting?

17    **A.**  I think that's the default in Outlook, but yes.

18    **Q.**  And the subject of the meeting was *Fisher v. University*

19    *of Texas*, Discussion Number 2.  Do you see that?

20    **A.**  Yes.

21    **Q.**  And you're familiar with the *Fisher* decision?

22    **A.**  Yes.

23    **Q.**  You know that was an important Supreme Court decision on

24    affirmative action in this general time period?

25    **A.**  Yes.

1    **Q.**  And the other people you see here who were required

2    attendees, what departments do they represent?

3    **A.**  The admissions office, institutional research, financial

4    aid, our office of general counsel, Harvard College IR.

5    **Q.**  So you have people from the OGC, OIR, admissions,

6    financial aid, and Harvard IR meeting to talk about

7    affirmative action on the day after you forwarded around

8    slides that you say essentially answered some kind of

9    questions posed.  Is that right?

10   **A.**  I don't know what we discussed at this meeting.  I don't

11   remember it.

12   **Q.**  And isn't it possible that the event that you refer in

13   your meeting to happening tomorrow was the *Fisher* meeting?

14   **A.**  It could have been.

15   **Q.**  And isn't it possible that the questions essentially

16   answered by Mark Hansen's admissions models were questions

17   about the effect of Harvard's use of race in admissions?

18   **A.**  I don't think that's what necessarily that analysis

19   answers, but it could have been something we might have

20   wanted to discuss at this meeting.

21   **Q.**  And isn't it possible that in your October 7 email to

22   your boss you were proposing bringing the slides modeling the

23   effect of race in Harvard's admissions process to the *Fisher*

24   meeting the next day?

25   **A.**  It is possible that's what that email was suggesting,

1    that I would bring those slides.

2            MR. McBRIDE:  Your Honor, we're ready to move on to

3    a new document, a new exhibit, and I've hit 3:30 pretty

4    closely.

5            THE COURT:  Yes, you have.

6            We can recess for the day.  We can start tomorrow

7    at 9:30, if you want, or we can go back to 10:00.  I think I

8    can go to 4:00 tomorrow, right, Karen?

9            THE CLERK:  Yes.

10           THE COURT:  I'm happy to go to 4:00 unless any of

11   you people have to travel, in which case I'm willing to

12   recess whatever works for you all.

13           MR. MORTARA:  Depending on how long they're going

14   to be, I think we can get all four of our witnesses on and

15   off tomorrow, if we start at 9:30 and go to 4:00.

16           THE COURT:  That's a long day, but if that schedule

17   works for everyone, I'm happy to do it.  Any objections?

18           MR. LEE:  No.

19           MR. MORTARA:  No.

20           THE COURT:  So we'll see everyone tomorrow at 9:30

21   tomorrow.

22               (Court recessed at 3:32 p.m.)

23

24

25

```
1                   - - - - - - - - - - -

2                      CERTIFICATION

3

4          I certify that the foregoing is a correct

5     transcript of the record of proceedings in the above-entitled

6     matter to the best of my skill and ability.

7

8

9

10    /s/ Joan M. Daly              October 18, 2018

11    _____      _____

12    Joan M. Daly, RMR, CRR        Date
      Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          INDEX OF WITNESSES

2    WITNESS                                                  PAGE

3

     WILLIAM FITZSIMMONS
4
        Cross-Examination (Resumed) by Mr. Lee..............   8
5       Redirect Examination by Mr. Hughes.................  115
        Recross-Examination by Mr. Lee....................  129
6

7    CHRISTOPHER LOOBY

8       Direct Examination by Mr. Mortara..................  148
        Cross-Examination by Ms. Conley....................  183
9

10   ERICA BEVER

11      Direct Examination by Mr. McBride..................  199

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          E X H I B I T S

2
        Defendant Exhibit                      Received
3
            SA-2        .....................      51
4
            DX41        .....................      14
5
            DX42        .....................     102
6
            DX44        .....................     106
7
            D50         .....................     127
8
            DX55        .....................      63
9
            DX56        .....................      19
10
            DX97        .....................      86
11
            DX293       .....................      22
12

13

14      Plaintiff Exhibit                       Received

15           15         .....................     216

16           23         .....................     229

17           25         .....................     222

18           35         .....................     238

19           36         .....................     241

20           43         .....................     199

21           44         .....................     200

22           57         .....................     119

23           71         .....................     151

24          465         .....................     210

25
```