1        UNITED STATES DISTRICT COURT

2        DISTRICT OF MASSACHUSETTS

3  _____

4  STUDENTS FOR FAIR ADMISSIONS, INC.,

5              Plaintiff,          Civil Action
                                   No. 14-14176-ADB
6  v.
                                   November 1, 2018
7  PRESIDENT AND FELLOWS OF HARVARD
   COLLEGE, et al.,                Pages 1 to 261
8
              Defendants.
9  _____

10

11

12        TRANSCRIPT OF BENCH TRIAL - DAY 14
      BEFORE THE HONORABLE ALLISON D. BURROUGHS
13        UNITED STATES DISTRICT COURT
      JOHN J. MOAKLEY U.S. COURTHOUSE
14            ONE COURTHOUSE WAY
             BOSTON, MA  02210

15

16

17

18

19

20

21        JOAN M. DALY, RMR, CRR
      KELLY MORTELLITE, RMR, CRR
22        Official Court Reporter
      John J. Moakley U.S. Courthouse
23     One Courthouse Way, Room 5507
          Boston, MA  02210
24         joanmdaly62@gmail.com

25

```
 1     APPEARANCES:

 2
       COUNSEL FOR THE PLAINTIFF:
 3

 4              ADAM K. MORTARA, ESQUIRE
                J. SCOTT McBRIDE, ESQUIRE
 5              KRISTA J. PERRY, ESQUIRE
                Bartlit Beck Herman Palenchar & Scott
 6              54 West Hubbard Street
                Suite 300
 7              Chicago, Illinois 60654
                312.494.4400
 8              adam.mortara@bartlit-beck.com
                scott.mcbride@bartlit-beck.com
 9              krista.perry@bartlit-beck.com

10              JOHN M. HUGHES, ESQUIRE
                MEG E. FASULO, ESQUIRE
11              KATHERINE L.I. HACKER, ESQUIRE
                Bartlit Beck Herman Palenchar & Scott
12              1801 Wewatta Street
                Suite 1200
13              Denver, Colorado 80202
                303.592.3100
14              john.hughes@bartlit-beck.com
                meg.fasulo@bartlit-beck.com
15              kat.hacker@bartlit-beck.com

16              JOHN MICHAEL CONNOLLY, ESQUIRE
                THOMAS R. McCARTHY, ESQUIRE
17              WILLIAM S. CONSOVOY, ESQUIRE
                Consovoy McCarthy Park PLLC
18              3033 Wilson Boulevard
                Suite 700
19              Arlington, Virginia 22201
                703.243.9423
20              mike@consovoymccarthy.com
                tom@consovoymccarthy.com
21              will@consovoymccarthy.com

22

23

24

25
```

```
 1    APPEARANCES (cont.):

 2
              PATRICK STRAWBRIDGE, ESQUIRE
 3            Consovoy McCarthy Park PLLC
              Ten Post Office Square
 4            8th Floor, South, PMB #706
              Boston, Massachusetts 02109
 5            617.227.0548
              patrick@consovoymccarthy.com
 6
              MICHAEL H. PARK, ESQUIRE
 7            Consovoy McCarthy Park PLLC
              3 Columbus Circle
 8            15th Floor
              New York, New York 10024
 9            646.456.4432
              park@consovoymccarthy.com
10
              PAUL M. SANFORD ESQUIRE
11            BENJAMIN C. CALDWELL, ESQUIRE
              Burns & Levinson LLP
12            One Citizens Plaza
              Suite 110
13            Providence, Rhode Island 02903
              401.831.8330
14            psanford@burnslev.com
              bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17            WILLIAM F. LEE, ESQUIRE
              FELICIA H. ELLSWORTH, ESQUIRE
18            ANDREW S. DULBERG, ESQUIRE
              ELIZABETH C. MOONEY, ESQUIRE
19            SARAH R. FRAZIER, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
20            60 State Street
              Boston, Massachusetts 02109
21            617.526.6556
              william.lee@wilmerhale.com
22            felicia.ellsworth@wilmerhale.com
              andrew.dulberg@wilmerhale.com
23            elizabeth.mooney@wilmerhale.com
              sarah.frazier@wilmerhale.com
24

25
```

```
 1   APPEARANCES (cont.):

 2
           SETH P. WAXMAN, ESQUIRE
 3         DANIELLE CONLEY, ESQUIRE
           DANIEL WINIK, ESQUIRE
 4         BRITTANY AMADI, ESQUIRE
           PAUL R.Q. WOLFSON, ESQUIRE
 5         Wilmer Cutler Pickering Hale and Dorr LLP
           1875 Pennsylvania Ave, NW
 6         Washington, DC 20006
           202.663.6006
 7         seth.waxman@wilmerhale.com
           danielle.conley@wilmerhale.com
 8         daniel.winik@wilmerhale.com
           brittany.amadi@wilmerhale.com
 9         paul.wolfson@wilmerhale.com

10         DEBO P. ADEGBILE, ESQUIRE
           Wilmer Cutler Pickering Hale and Dorr LLP
11         7 World Trade Center
           250 Greenwich Street
12         New York, New York 10007
           212.295.6717
13         debo.adegbile@wilmerhale.com

14         ARA B. GERSHENGORN, ESQUIRE
           Harvard Office of the General Counsel
15         Smith Campus Center
           Suite 980
16         1350 Massachusetts Avenue
           Cambridge, Massachusetts 02138
17         617.495.8210
           ara_gershengorn@harvard.edu
18

19   COUNSEL FOR AMICI STUDENTS:

20         JON M. GREENBAUM, ESQUIRE
           BRENDA L. SHUM, ESQUIRE
21         GENEVIEVE BONADIES TORRES, ESQUIRE
           KRISTEN CLARKE, ESQUIRE
22         1500 K Street NW, Suite 900
           Washington, DC 20005
23         202.662.8315
           jgreenbaum@lawyerscommittee.org
24         bshum@lawyerscommittee.org
           gtorres@lawyerscommittee.org
25         kclarke@lawyerscommittee.org
```

```
1    APPEARANCES (cont.):

2
             LAWRENCE CULLEEN, ESQUIRE
3            EMMA DINAN, ESQUIRE
             Arnold & Porter LLP
4            555 Twelfth Street, NW
             Washington, DC 20004
5            202.942.5477
             gina.dean@aporter.com
6            emma.dinan@aporter.com

7
     COUNSEL FOR AMICI ORGANIZATIONS:
8
             JENNIFER A. HOLMES, ESQUIRE
9            CARA McCLELLAN, ESQUIRE
             JIN HEE LEE, ESQUIRE
10           MICHAELE M. TURNAGE YOUNG, ESQUIRE
             RACHEL N. KLEINMAN, ESQUIRE
11           NAACP Legal Defense and Educational Fund, Inc.
             700 14th Street NW
12           Suite 600
             Washington, DC 20005
13           jholmes@naacpldf.org
             cmcclellan@naacpldf.org
14           jlee@naacpldf.org
             mturnageyoung@naacpldf.org
15           rkleinman@naacpldf.org

16           KENNETH N. THAYER, ESQUIRE
             KATE R. COOK, ESQUIRE
17           Sugarman Rogers
             101 Merrimac Street
18           Suite 900
             Boston, Massachusetts 02114
19           617.227.3030
             thayer@sugarmanrogers.com
20           cook@sugarmanrogers.com

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1
2          (The following proceedings were held in open
3   court before the Honorable Allison D. Burroughs, United
4   States District Judge, United States District Court, District
5   of Massachusetts, at the John J. Moakley United States
6   Courthouse, One Courthouse Way, Boston, Massachusetts, on
7   November 1, 2018.)
8          THE COURT:  Good morning, everyone.  Give me one
9   second here.
10          All right.  Mr. Mortara, when you're ready.
11          MR. MORTARA:  Thank you, Your Honor.
12   EXAMINATION BY MR. MORTARA:   (Continued.)
13   **Q.**  Good morning, Professor Card.
14   **A.**  Good morning.
15   **Q.**  Do you remember we talked yesterday about this article,
16   "Our Referees and Editors in Economics Gender-Neutral"?  Do
17   you remember that?
18   **A.**  Yes.
19   **Q.**  Who is Stefano Della Vigna?
20   **A.**  He's my colleague.
21   **Q.**  Did you know that Stefano Della Vigna put this article on
22   his personal web page at U.C. Berkeley?
23   **A.**  I didn't know that until yesterday, yes.
24   **Q.**  You know it now?
25   **A.**  I do.

1   **Q.**  You used this slide in your direct examination.  It's DD

2   10.35, right?

3   **A.**  Yes.

4   **Q.**  Do you remember the conversation you had, actually two

5   separate conversations with the court, and the court was

6   asking about both the order and the magnitude of the effects

7   on this slide.  Do you remember that?

8   **A.**  Yes.

9   **Q.**  And do you remember at one point I stood up and I said I

10   really wanted to know about what would happen if you just

11   took your model and removed the personal rating.  Do you

12   remember I said that?

13   **A.**  Yes.

14   **Q.**  And Mr. Waxman said you were going to get to that.

15   Remember?

16   **A.**  Yes.

17   **Q.**  You actually mentioned it yesterday in your direct

18   testimony?

19   **A.**  Yes.

20   **Q.**  You did that calculation in your opening report, correct?

21   **A.**  Yes.

22   **Q.**  And you didn't show it, though, did you?

23   **A.**  Not that I recall.

24   **Q.**  If you would turn in your opening report, please, to page

25   72.  Are you there, sir?

1            And I have it on the screen.  This is a calculation

2      of your logit model of admissions removing the personal

3      rating, correct?

4      **A.**  Yes.

5      **Q.**  And it concludes --

6            THE COURT:  What page of his report?

7            MR. MORTARA:  Sorry, Your Honor.  It is 72 of the

8      opening report.  May I proceed, Your Honor?

9      **A.**  Yes.

10     **Q.**  And you see that the overall marginal effect you

11     calculated was minus .34 percent and it was statistically

12     significant, correct?

13     **A.**  Yes.

14     **Q.**  And for the record, for the year 2014, the effect was

15     minus .76, correct?

16     **A.**  Yes.

17     **Q.**  And the effect for 2015 was minus .37, correct?

18     **A.**  Yes, not statistically significant.

19     **Q.**  And the effect for 2016 is minus .45, correct?

20     **A.**  Yes, again, not statistically significant.

21     **Q.**  And the effect for 2017 is positive 0.05, correct?

22     **A.**  Yes.

23     **Q.**  And the effect for 2018 is minus .68, and that is

24     statistically significant on its own, correct?

25     **A.**  Yes, that's the only individual year that is, yes.

1    **Q.**   At the effect for 2019 is positive .14, correct?

2    **A.**   Yes.

3    **Q.**   Now, this is your model with all the ALDCs in it,

4    correct?

5    **A.**   Yes.   The model is slightly different in my rebuttal

6    report, but yes, this is my model.

7    **Q.**   We'll get to that in just a second.   But this is your

8    model with all the ALDCs in it, correct?

9    **A.**   Yes.

10   **Q.**   This is your model with intended career and staff

11   interview indicator, correct?

12   **A.**   Yes.

13   **Q.**   This is your model with parental occupation, correct?

14   **A.**   Yes.

15   **Q.**   This is a yearly model, not a pooled model, correct?

16   **A.**   Yes.

17   **Q.**   So if you do all of the things that you talked about,

18   your differences with Professor Arcidiacono, and you just

19   remove the personal rating, your preferred model shows a

20   statistically significant Asian penalty just like it does

21   right here in Exhibit 21 from your opening report, right?

22   **A.**   Yes, on average, although only one year is statistically

23   significant, yes.

24   **Q.**   You said you had a slightly updated model, correct?

25   **A.**   Yes.

1  **Q.**  But that's true of the slightly updated model, too, isn't

2  it?

3  **A.**  I believe so, yes.

4  **Q.**  I want to talk about your research for a little while.

5  The focus in your research is labor economics, correct?

6  **A.**  Yes.

7  **Q.**  And you frequently run regression models in your

8  research, correct?

9  **A.**  Yes.

10  **Q.**  And the type of model that you created for Harvard's

11  admissions model -- I think we've gone over this -- is called

12  a discrete choice model; is that right?

13  **A.**  Yes.

14  **Q.**  And you talked a few times about the number of variables

15  that you used in your yearly models, right?

16  **A.**  Yes.

17  **Q.**  And it's over 200 variables, isn't that correct?

18  **A.**  Yes.

19  **Q.**  How many papers have you published that involve discrete

20  choice models with over 200 variables?

21  **A.**  Off the top of my head, I don't know the answer to that.

22  **Q.**  Can you name one?

23  **A.**  Can I look at my CV for a second?

24  **Q.**  Sure.

25  **A.**  So none are coming to mind other than some current work

1    I'm working on, but yeah.

2    **Q.**   Okay.  I'm going to go through some of your papers, a

3    couple of the discrete model choice papers that you've done.

4    If those are ones that you think have over 200 variables,

5    please let me know, okay?

6    **A.**   Sure.

7    **Q.**   Now I want to go over an article that you wrote with

8    Professor Giuliano about peer effects.  It's in your binder

9    at C82.

10   **A.**   Yes.

11   **Q.**   And this is an article called "Peer Effects and Multiple

12   Equilibria in the Risky Behavior of Friends."  It's by David

13   Card and Laura Giuliano.  Who is Laura Giuliano?

14   **A.**   She's one of my former Ph.D. students who is now a

15   professor at the University of California Santa Cruz.

16   **Q.**   And what were you studying in this article with Laura

17   Giuliano?

18   **A.**   We're studying, looking at young people who are followed

19   over time in a dataset known as ed health.  We're studying

20   behavior of best friend pairs in the initiation of various

21   kinds of risky behaviors.

22   **Q.**   And did you run regression models in this article?

23   **A.**   A variety of different kinds of models, mostly what are

24   called probits and logits.

25   **Q.**   And logit models are the type you ran in this case,

1   right?

2   **A.**   Actually, nearly all the models in this paper are

3   probits.  There is a logit as a specification test.

4   **Q.**   And probit is another type of regression model, correct?

5   **A.**   Yes.

6   **Q.**   And I'm showing you Table 3 from page 1137, and that

7   includes some of the coefficients from the co-variants you

8   used in some of your regressions, correct?

9   **A.**   Yeah.  Excuse me.  My screen is so fuzzy.  I prefer to

10  look here.

11  **Q.**   It's no problem, Professor Card.  I think everyone

12  prefers to use paper.

13  **A.**   Yes.

14          THE COURT:  The old people do.  Right, Mr. Waxman?

15          MR. WAXMAN:  Even the no-so-old.

16          MR. MORTARA:  I have no quip.  I have no come back

17  to that.  There's nothing.

18          MR. WAXMAN:  I think Your Honor should be looking

19  at Mr. Lee.

20          MR. LEE:  That's okay.  I'll accept.

21          THE COURT:  He hasn't disparaged my age yet.

22  **Q.**   So while we're on this page, I want to ask you something.

23  You were here for Mr. Lee's cross of Professor Arcidiacono,

24  right?

25  **A.**   Yes.

1    **Q.**   And you heard him talk about a number of Professor

2    Arcidiacono's papers on affirmative action and other issues

3    that touch on race, correct?

4    **A.**   Yes.

5    **Q.**   And actually, in this paper, if you go back to the front,

6    you actually thanked Professor Arcidiacono in this paper,

7    didn't you?

8    **A.**   Yes, I did.

9    **Q.**   Now, if you go back to the page we were on, 1137, I just

10   want to ask you one quick question about something you

11   concluded at the lower right column at the bottom four and

12   five lines up.  Are you there?

13   **A.**   Yes.

14   **Q.**   It says, "Other factors that increase the likelihood of

15   initiating sexual activity include age, black race," it goes

16   on, "physical development and self-reported attitude toward

17   risk."  Do you see that?

18   **A.**   Yes.

19   **Q.**   That was a finding from the data that you made, correct?

20   **A.**   Yes.

21   **Q.**   You were in no way attempting to make any kind of

22   statement about causality between black race and the

23   likelihood to initiate sexual activity, were you?

24   **A.**   No.

25   **Q.**   Let's go back to the data.  If you just go to 1148, I

1   just have a very quick question here.

2   **A.**   Same paper?

3   **Q.**   Yes, same paper.  Sorry, Professor Card.  Are you there?

4   **A.**   Yes.

5   **Q.**   And you provide here in the back in the appendices all of

6   the coefficients from your models for this paper, correct?

7        You see in Table A3 you actually have the

8   coefficients for black race.  We just talked about that,

9   right?

10  **A.**   I believe so, but let me check the footnotes because

11  sometimes we don't report all the coefficients.

12  **Q.**   Well, I'll revise the question so we can move on.  You

13  report many, many of the coefficients here, don't you?

14  **A.**   Yes.

15  **Q.**   All right.  Let's look at another paper, if you would

16  turn to Tab C89.  And it's "What Works?  A Meta Analysis of

17  Recent Active Labor Market Program Evaluations."

18  **A.**   Yes.

19  **Q.**   Just a thumbnail, what's this paper about?

20  **A.**   Well, a meta analysis is a statistical analysis of

21  research papers.  So it tries to develop a model of the set

22  of results reported in different research papers, and these

23  research papers all concern active labor market programs

24  which are programs to try and help disadvantaged workers or

25  unemployed workers.

1   **Q.**  And if you go to page 914, you report some results of

2   some regression models, correct, in Table 5?

3   **A.**  Yes.

4   **Q.**  You report coefficients on the variables in your

5   regression models there, correct?

6   **A.**  Yes.

7   **Q.**  And then down in the notes, I've got it highlighted on

8   the screen, it says, "Models are linear regressions with the

9   effect size as a dependent variable.  Coefficients of

10  additional control variables are reported in Table 7."  Do

11  you see that?

12  **A.**  Yes.

13  **Q.**  And if you go to Table 7, which appears at page 917, you

14  report many, many more coefficients, correct?

15  **A.**  Yes.

16  **Q.**  I'd like to turn now to C101, Professor Card.

17  **A.**  Yes.

18  **Q.**  And that is an article called, "Does gifted education

19  work?  For which students?"  Again, by you and Professor

20  Giuliano, correct?

21  **A.**  Yes.

22  **Q.**  And this is an article that actually has a logistic

23  regression of a discrete choice model, right?

24  **A.**  Let me check.

25  **Q.**  I can guide you to Appendix Table 1 towards the back.

1    Please take your time.

2    **A.**   Appendix Table 1, yes.

3    **Q.**   Sadly, the a appendices tables are not page-numbered, so

4    you have to go through all the graphs, after page 36, all the

5    graphs and then you get to --

6    **A.**   Yes, I found it.

7    **Q.**   Now, my question is --

8             THE COURT:  Wait a second.  I haven't.

9             MR. MORTARA:  Sorry, Your Honor.

10            THE COURT:  Appendix Table 1.  Is that after

11   Figures 1 and 2?

12            MR. MORTARA:  Yes, it's after all the graphs.

13            THE COURT:  Appendix --

14            MR. MORTARA:  So Tables 1 through 7 and then

15   Appendix Table 1.  That was a lot of effort for not much.

16   This is an article that you have that actually uses a

17   logistic regression and discrete choice model, right?

18   **A.**   In this table it's using a conditional logit model, yes.

19   **Q.**   And you provided the coefficients, didn't you?

20   **A.**   Yes.

21   **Q.**   It's pretty standard in reporting on econometric models

22   in the literature to provide coefficients for your regression

23   models, correct?

24   **A.**   Yes.

25   **Q.**   And you said two days ago when you started your direct

1    testimony that you approached your work in this case, quote,

2    following basically the same procedure as you would in any

3    kind of research enterprise.  Do you remember that?

4    **A.**   I believe so, yes.

5    **Q.**   But in your research when you report on your regression

6    models you always report the coefficients of your model when

7    you publish them, isn't that right?

8    **A.**   So I'm not sure -- I would normally do so, but I wouldn't

9    necessarily always do that.

10   **Q.**   Well, we talked -- you talked about the award you got

11   from Econometrica in your direct testimony, right?

12   **A.**   Yes.

13   **Q.**   Can you name any paper you've ever published in

14   Econometrica when you did a regression model of your own work

15   and did not publish your coefficients?

16   **A.**   Most of the coefficients, yes.

17   **Q.**   And can you name any paper on your CV -- take your

18   time -- where you did a regression model in your own work and

19   didn't publish your coefficients?

20   **A.**   Not -- I can't think of any.

21   **Q.**   And one reason that economists, econometricians provide

22   the coefficients on their regressions in their published

23   articles and the reason the community insists they be

24   provided is so that others can critique the models, correct?

25   **A.**   Yes, I would agree with that.

1    **Q.**   And that's so others can look at it, look at the models

2    to see if there's odd findings or other issues that might

3    provide for new research or even criticisms of the models

4    that have been published, right?

5    **A.**   Right, although in the case of -- yes, but in the case of

6    choice models, discrete choice models, oftentimes people

7    will -- because the coefficients are difficult to interpret,

8    they'll oftentimes have additional analysis or even additions

9    to the table which show how those coefficients translate into

10   differences across groups.

11   **Q.**   And that's what you've done, right?

12   **A.**   I've certainly done that in some cases, yes.

13   **Q.**   Now, you know that your expert reports in this case have

14   been made public through briefing that happened over the

15   summer, right?

16   **A.**   Yes, I do.

17   **Q.**   But neither of your expert reports in this case provide

18   any coefficients from your models, correct?

19   **A.**   Well, they're available in the workpapers, yes.

20   **Q.**   You provided them to Students For Fair Admissions in the

21   form of program files that you could run in Stata to generate

22   your coefficients; is that right?

23   **A.**   Yes.

24   **Q.**   Would you recognize your coefficients if I showed them to

25   you?

1    **A.**  Well, yes.  They're all digits between zero and nine; but

2    other than that, I can't say for sure.

3    **Q.**  We'll get there in just a second.  In your direct

4    testimony you did not discuss or provide any information on

5    the coefficients from your admissions models, correct?

6    **A.**  No.

7    **Q.**  And just to be clear, you frequently analyze the

8    coefficients of your regression models in your own research;

9    when you're talking about your models, you talk about both

10   the average marginal effect or the effects on the

11   coefficients, right?

12   **A.**  Yes, sometimes.

13   **Q.**  Well, turn to C100.  We'll just quickly do an example.

14   **A.**  C100.

15   **Q.**  Sure.

16   **A.**  Okay.

17   **Q.**  This is a paper on the elimination of mandatory

18   retirement.  "Did the Elimination of Mandatory Retirement

19   Affect Faculty Retirement," with Orley Ashenfelter and David

20   Card, correct?

21   **A.**  Yes.

22   **Q.**  And Orale Ashenfelter was your Ph.D. advisor?

23   **A.**  Yes.

24   **Q.**  And just very briefly, what's this article about?

25   **A.**  I think that it's exactly about what the title says it's

1    about, studying the effect of eliminating mandatory

2    retirement.

3    **Q.**   And in this paper you used a logistic regression model

4    for the discrete choice of retirement -- funny that -- he

5    used the example of retirement in your own testimony.  If you

6    turn to 971, you can see some results of that.  Do you see

7    that?

8    **A.**   Yes.

9    **Q.**   And you showed all sorts of coefficients here in Table 4

10   on page 971, correct?

11   **A.**   Yes.  And I also show at the bottom of the table what

12   amount to the average marginal effects for reaching age 70

13   and 71, yes.

14   **Q.**   So in this published research article with Orley

15   Ashenfelter you disclosed your coefficients and the average

16   marginal effect, right?

17   **A.**   Yes.

18   **Q.**   And on the previous page, 970, I want to direct your

19   attention to the first full paragraph on the page that

20   begins, "The coefficients."  Do you see that?

21   **A.**   Yes.

22   **Q.**   And you make a remark, "The coefficients of the key

23   covariates show some interesting patterns."  Do you see that?

24   **A.**   Excuse me.

25   **Q.**   First full paragraph on the left side.  The coefficients

1    of the key covariates" --

2    **A.**   Yeah.

3    **Q.**   Then you go on to make several observations about the

4    coefficients showing some interesting patterns.  Do you see

5    that?

6    **A.**   Yes.

7    **Q.**   And in the next paragraph, you turn to the coefficients

8    of the individual faculty characteristics, and you make

9    several observations about those, correct?

10   **A.**   Yes.

11   **Q.**   But in your reports in this case you did not provide

12   coefficients anywhere or remark about any interesting

13   patterns, correct?

14   **A.**   Well, as I said, the coefficients were certainly

15   available in the workpapers.  And of course something like

16   the statistical significance of the average marginal effect

17   is exactly related to the statistical significance of the

18   coefficient.  So in terms of the issue of statistical

19   significance, it's really the same thing.

20   **Q.**   Can sometimes values for coefficients give you warning

21   signs that there's something wrong with your model; say if

22   it's statistically significant when you think it shouldn't

23   matter, like some of the hat size things you were talking

24   about?

25   **A.**   Well, that can happen.  Yes, that can happen; sometimes

1    it can happen by accident.  So for instance, one -- if five

2    times out of 100, if you estimate something that should be

3    zero, you'll get a significant result at the 5 percent level.

4    **Q.**  Can another warning sign in your coefficients when you

5    run a model be something that you would expect to be

6    associated with a strongly negative effect showing it being

7    associated with a strongly positive effect?

8    **A.**  Yes.  Actually, there's an example of that in actually

9    like some of Professor Arcidiacono's models where, because

10   there's academic index and SAT and so on, sometimes when you

11   look at the individual coefficients, SAT will seem to have a

12   negative effect, but that's because there's so many variables

13   representing different aspects of academic quality that one

14   has to interpret the whole batch of them carefully.

15   **Q.**  Yeah.  I think you actually mentioned this yesterday,

16   didn't you?  I think I caught this concept yesterday, similar

17   concept.

18          A lot of collinear variables means that you're

19   going to get a lot of noise in the coefficients but the

20   average marginal effect will still be fine?

21   **A.**  Well, what I said --

22   **Q.**  If I mischaracterized what you said, please tell me.

23   **A.**  Yeah, but that was in regards -- that's what I said, but

24   that was in regard to the average marginal effect for Asians,

25   not the average marginal effect, for instance, of SAT in that

1   model.

2   **Q.**   Yes.  And let's be clear.  The only average marginal

3   effects you calculated and showed in your direct testimony

4   was the average marginal effect of being Asian both in your

5   overall model and then in some modified models and subgroups,

6   correct?

7   **A.**   Correct.  But I mean, for instance in his appendix,

8   Professor Arcidiacono does not report all of his coefficients

9   either, so --

10   **Q.**   We'll get there.

11   **A.**   Okay.

12   **Q.**   Also we talked yesterday about the average marginal

13   effect of being African-American or Hispanic, right?

14   **A.**   Yes.

15   **Q.**   Now, I can put it on the screen if you need it or you can

16   look -- you have Professor Arcidiacono's reports right there.

17   Professor Arcidiacono reports hundreds and hundreds of

18   coefficients in the back of his expert reports, doesn't he?

19   **A.**   Let me just refresh my memory of what we're talking about

20   here.

21   **Q.**   You can look at the rebuttal report because it's got all

22   the latest models if you want and just turn to the back.

23          There's tables starting in the B.6.2R range and

24   going on for pages and pages with coefficients, right?

25   **A.**   Yes.  But, for example, as I recall, some of the

1  variables that are included in the model, the coefficients

2  are not reported here.

3  **Q.**  You didn't report any, correct?

4  **A.**  Not in my report, no.

5  **Q.**  And Professor Arcidiacono reported many; is that fair?

6  **A.**  Yes.

7  **Q.**  Now I want to talk to you about your use of parental

8  occupation in your model.  I think you listed the variables

9  in your model.  I just want to put on the screen a list.

10            Will you take me down for one second.

11            COURTROOM CLERK:  Sure.

12            MR. MORTARA:  Thank you.  I just want to -- I

13  probably ruined the screen now by taking myself down for a

14  second.  Okay.  You can put it back up.

15  **Q.**  Do you see the list of parental occupation variables on

16  the screen, other, homemaker, unemployed, skilled trades.  Do

17  you see that?

18  **A.**  I do.  I'm not sure what I'm looking at, though.

19  **Q.**  Well, just, do you remember the list of parental

20  occupations you used?

21  **A.**  It's a long list and -- could I check?

22  **Q.**  You can look at your reports, too, if you need to.  I

23  just want to know if this is the list.

24            MR. WAXMAN:  Your Honor, the witness has already

25  said he doesn't know what he's looking at.  So perhaps my

1   friend could either show him the paper or show him on the

2   screen what this is.

3           MR. MORTARA:  Your Honor, I'm happy to give it to

4   him.  It's a huge printout.  I'm just looking at the list of

5   variables.

6           THE COURT:  That's fine.  He is attempting to

7   refresh his recollection the way he's doing it.  If it does,

8   it does; and if it doesn't, you can show him something else.

9   **Q.**  I just want to know --

10  **A.**  So this is something that I -- it comes from my

11  workpapers?

12          MR. MORTARA:  Sure.  Your Honor, may I approach?

13          THE COURT:  Yes.

14  **Q.**  Professor Card, you remember me asking you if you

15  recognize the coefficients as you saw them, right?

16          What I've handed to you is a log file from Stata.

17  It's tabbed.  If you look at the tabs, the tabs have year

18  numbers on.  I really just do not want to spend that much

19  time on this, but I will put Defendant 685 up on the screen,

20  which has your average marginal effect and your 95 percent

21  confidence intervals.

22          And if you go through the years in the document I

23  handed you, and each tab tells you a year.  Blue tabs tell

24  you I think the year and the red tabs tell you the average

25  marginal effect.  You could maybe help yourself confirm that

1    what you're looking at is the log from your model.  But all I
2    want to ask you is the list of parental occupations.
3    **A.**   The thing is this is a very complicated thing to analyze.
4    I can't actually tell just in a few minutes whether this is
5    actually -- what data it's accessing, the sample sizes and
6    things like that.  I'm reluctant to make any conclusions
7    from --
8    **Q.**   My only --
9    **A.**   I have no idea where it came from.
10   **Q.**   My only question is what were the parental occupations in
11   your model.
12   **A.**   Oh, I can answer that.
13   **Q.**   Great.
14   **A.**   If we go to my direct report, my first report.
15   **Q.**   Take your time.  Tell me what page it's on.
16   **A.**   So a list would be in Appendix C of my main report, and I
17   would have --
18   **Q.**   Do you have the page number for me, sir?  I can put it up
19   on the screen for everybody.
20   **A.**   Yes.  Page 178 would be mothers' occupations.
21   **Q.**   No, sir.  These aren't the variables, are they?  Did you
22   have 24 variables?
23   **A.**   I believe that these are the set of occupations that I
24   use in my model, yes.
25   **Q.**   So you had 24 separate occupation variables?

1    **A.**   Well, there's variables for the mother and there's

2    variables for the father.

3    **Q.**   I understand.  So for each parent you had 24 separate

4    occupation variables.  Is that what you're saying?

5    **A.**   Well, of course there would be one omitted, but to the

6    best of my knowledge, that's correct, yes.

7    **Q.**   Okay.  If it turns out that that's not right, you can

8    come back and Mr. Waxman will lead you through it.

9           But putting aside the number of parental occupation

10   variables, these categories that you've got here, assuming

11   they are your variables, that's not what Harvard sees

12   necessarily on applications, is it?

13   **A.**   Well, so, of course students are applying through a

14   variety of mechanisms to Harvard, including the universal

15   application, the common application, and I think I mentioned

16   there's even some paper versions, and I believe there might

17   even be a Harvard application specifically.  So there's a

18   variety of mechanisms, and that information is then

19   translated into some kind of computerized database.

20   **Q.**   And then you pulled that information from the

21   computerized database, and you didn't use it directly.  You

22   converted it to a bunch of categories from a Bureau of Labor

23   Statistics database, right?

24   **A.**   I'm using a part of a BLS dataset, yes, that's correct,

25   yes.

1    **Q.**  I want to put on the screen some of your testimony with

2    Mr. Waxman.  And this is when you're talking about the

3    mothers' and fathers' occupations.  And you started to say,

4    "Variables representing the mothers' and fathers'

5    occupations," but then you said "Categorizations."  And what

6    you meant there was you didn't take the variables directly

7    out of Harvard's database and use them; you made your own

8    categories of these variables using the Bureau of Labor

9    Statistics categories and converted them yourself, like you

10   said you've done in other research from time to time, right?

11   **A.**  Yes, and almost inevitably when you use occupation data

12   you have to do this because of course there's many, many

13   codes.  Depending on the dataset there could be hundreds or

14   even thousands of occupation codes, yes.

15   **Q.**  And that's what you said yesterday?

16   **A.**  Yes.

17   **Q.**  And if you would turn to your rebuttal report now.

18   **A.**  Sure.

19   **Q.**  Because I think you showed a table of your conversions on

20   page 110 of your rebuttal report.

21   **A.**  Yes.

22   **Q.**  And this is a Table Exhibit 28.  It goes on to the next

23   page and it talks about how you took the codes that are on

24   the right and converted them to what's called a Card

25   category, right?

1    **A.**   Yes.  So exactly, yes.

2    **Q.**   And to be clear, these Card categories, those are named

3    after you, right?

4    **A.**   Yes.

5    **Q.**   And just to lighten the mood, you mentioned yesterday

6    that your name is also the name of a profession.  And I had

7    to look it up.  Do you want to tell everybody what it was?

8    Because I was a little surprised.

9    **A.**   It's something to do with wool.

10   **Q.**   Carding wool, huh?

11   **A.**   Yes.

12   **Q.**   I thought that was interesting.

13           Okay.  Back to the news.  Here we have your Card

14   categories -- nothing to do with wool -- and the categories

15   you created do not come directly from the Harvard database,

16   do they?

17   **A.**   No.  That's right.

18   **Q.**   And what you made is a virtual map.  You took the codes

19   you had from the database and you virtually mapped them to

20   create your Card category codes, right?

21   **A.**   Yes.  I largely followed the BLS hierarchy.  The Bureau

22   of Labor Statistics of course has developed many hierarchies

23   of occupations, so I followed that as closely as possible.

24   **Q.**   And BLS statistics are used by the Bureau of Labor

25   Statistics.  There's no evidence in this case that Harvard

1    uses BLS statistics for admissions, right; or have you seen

2    any?

3    **A.**   No, no.

4    **Q.**   So I want to just talk about --

5    **A.**   Excuse me.  I meant to say they're using the BLS

6    occupation -- the database has some categories and BLS

7    occupation codes.

8    **Q.**   They didn't do the Card, virtual thing with the Card

9    categories, did they?

10   **A.**   No, they didn't do that.

11   **Q.**   So let's talk about that.  On the right side of the

12   bottom of Number 5, you code everyone who is a business owner

13   or proprietor as self-employed, correct?

14   **A.**   Yes.

15   **Q.**   That means you code the owner of a small convenience

16   store the same way you would code one of the Koch brothers,

17   correct?

18   **A.**   Yes.

19   **Q.**   And do you think Harvard admissions officers would treat

20   those the same way?

21   **A.**   Well, they would have additional information about the --

22   so remember that the occupation -- I don't think they would.

23   The reason why is because, just like in my model, there's a

24   lot of other information.  There would be the education of

25   the parents, both parents.  There would be their occupation.

1    And so there would be what neighborhood they live in and so

2    on.  So there would be a way to contextualize that.

3    **Q.**   There would be a lot of differences that Harvard

4    admissions officers could use to draw the distinction I just

5    did, right?

6    **A.**   Yes, and my model would do some of that, yes.

7    **Q.**   Some of it?

8    **A.**   Yes.

9    **Q.**   But your Card categories don't draw that distinction,

10   right?

11   **A.**   No, not in this case.

12   **Q.**   Let's just do one more with your Card categories.  Go to

13   number 6 on the next page.  You code --

14   **A.**   Yes.

15   **Q.**   -- everybody who is a policy-maker in government as a

16   business executive/management/administrator.  Do you see

17   that?

18   **A.**   This is category 7?

19   **Q.**   6.

20   **A.**   6.  Excuse me.

21   **Q.**   Do you see that?

22   **A.**   Yes.

23   **Q.**   And so if your father is the Secretary of Energy, and you

24   live in the suburbs of D.C., that's going to get you the same

25   code as someone whose dad is a regional sales manager for

1 Dunder Mifflin living down the street?

2 **A.** Yes.  Exactly the way the BLS would make them in their

3 hierarchy, yes.

4 **Q.** Do you think Harvard admissions officers would treat the

5 son of the Secretary of Energy the same way they would treat

6 the son of a regional sales manager for Dunder Mifflin when

7 they're looking at parental occupation and deciding how that

8 affects admissions prospects?

9 **A.** No.  But of course they would have other contextual

10 variables, some of which are included in my model as well.

11 **Q.** Now, yesterday -- and maybe the day before -- I can't

12 remember.  You talked very confidently about overfitting, and

13 you said that you had no concerns that your model was

14 overfit.  Do you remember that?

15 **A.** Yes.

16 **Q.** But overfitting and the concept of overfitting is not

17 discussed anywhere in your expert reports, is it?

18 **A.** I don't believe so, but I believe it came up in Professor

19 Arcidiacono's testimony.

20 **Q.** But it's not in your reports.  That's my only question.

21 **A.** I don't believe so, no.

22 **Q.** Overfitting is the production of an analysis that

23 corresponds too close or exactly to a particular set of data

24 and may therefore fail to fit additional data or predict

25 future observations reliably, correct?

1    **A.**   That sounds like one textbook definition.

2    **Q.**   An overfitted model is a statistical model that contains

3    more variables than can be justified by the number of events.

4    Would you agree with that?

5    **A.**   In part.

6    **Q.**   Well, we've just exhausted my knowledge of overfitting,

7    which comes from Wikipedia.  So I think we can move on a

8    little bit.  But I've got one test on the hat-size thing.

9         We talked a little bit yesterday about explanatory

10   power, and I don't know if you used the word junk or I used

11   the word junk to describe some models of the economy that can

12   have really high R-squareds but they're not really good

13   models.  Do you remember that discussion you and I -- that

14   sort of exchange we had when it was late in the day; both of

15   us were tired?

16   **A.**   I certainly do.

17   **Q.**   Okay.  I want to talk about maybe a related concept as it

18   pertains to the admissions model.  You have about 2,000

19   admits in one of your yearly models, 2,000 yes decisions; 1s

20   versus 0s?

21   **A.**   Around that, including nondomestic admits.  But for the

22   datasets we're looking at, it's more like 1750.

23   **Q.**   Great.  Let's do 1750.  And you talked a couple of times

24   about hat size and junk variables.  I want to give you a junk

25   variable and ask you if it would perfectly predict Harvard's

1   admissions process.

2           Social security number.  If you had the nine-digit

3   Social Security number for every student that got in and

4   coded that as a variable, yes or no, do you have this

5   nine-digit Social Security?  So you had 1750 admits and you

6   had 1750 variables.  And the variables were just -- you just

7   happened to know the Social Security numbers of the people

8   who got in.  Are you following me?  And it was, Do you have

9   this social security number?  That model, using only social

10  security numbers, would perfectly predict the Harvard

11  admissions process?

12  **A.**   I don't understand your hypothetical completely.

13  **Q.**   I'm going to work on it.

14  **A.**   Okay.

15  **Q.**   I'm not an economist, and I'm a worse teacher than -- I

16  teach law, and I don't think my students -- we could ask

17  Ms. Perry, but I don't think I'm the greatest teacher when I

18  teach law.

19           MR. WAXMAN:  Neither do I.

20           MR. MORTARA:  We could have a student-off between

21  me and Mr. Waxman and Professor Card.  And I'm not sure who

22  is going to win.  But if it's economics, I think Professor

23  Card would win.  Then we can bring Professor Arcidiacono's

24  students in and this can be like a brawl from Anchorman with

25  the news teams.

1          But back to serious stuff, Your Honor -- I know, I

2    get carried away.  Can we reduce the number of admits so we

3    can make the hypothetical a little less onerous.  So it's 100

4    admits.

5    **A.**  So if I could explain a little bit.  I'm having a problem

6    with like what -- if one is trying to model admissions, one

7    needs variables for both the people who are admitted and the

8    people who are not admitted.

9    **Q.**  This is kind of my point.  And I'm not trying to create a

10   good model.  I'm trying to create a really bad one that

11   perfectly predicts the process.  1750 people get in.

12   **A.**  Yes.

13   **Q.**  You run a regression model that happens to use 1750

14   variables that are, Do you have this social security number

15   for 1750 times, and each of the Social Security numbers

16   happens to be the social security number of the people that

17   got in.  You don't know anything else.  That model perfectly

18   predicts Harvard's admission process, right?

19   **A.**  Yes.  Yes, I understand.

20   **Q.**  It would also be completely junk, right?

21   **A.**  Well, it would be an example of in some sense a totally

22   circular model, yes.

23   **Q.**  In fact, it would be overfit.  It would be the definition

24   of overfit.  You have one observation for each variable?

25   **A.**  I can't -- I hesitate to say that -- there are some

1    circumstances where models would use -- there would be a set

2    of perfect predicts that would be perfectly okay.

3    **Q.**   I'm just talking about the hypothetical I've constructed

4    for you where we know -- we can all agree on one thing about

5    the Harvard admissions office.  They don't rely on Social

6    Security numbers.  And I constructed the model in order to

7    actually -- I used post hoc reasoning to construct the model.

8    That's an overfit model, isn't it?

9    **A.**   I think it could be described that way for some

10   circumstances but maybe not for others.  It would depend on

11   the setting.

12   **Q.**   And one indicator, one indicator that you should be

13   worried about an overfit model is when your number of

14   observations compared to your number of variables is pretty

15   small, right?  The hypothetical I've got is one to one.

16   That's a danger zone, right?

17   **A.**   No.  You've got 1756 variables but 25,000 people in the

18   admissions pool.

19   **Q.**   Okay.  You're saying that the number of observations

20   includes the number of rejects?

21   **A.**   Yes.  The model is fit on both the people who are

22   accepted and the people who are rejected.  So there's

23   really -- driving a model in any given year, for instance in

24   the Harvard admissions process, there could be 25,000

25   observation units.

1    **Q.**  And I want to be just completely clear.  You're saying

2    that -- withdrawn.

3              I said when you have a number of observations

4    that's low relative to or -- number of observations low

5    relative to number of variables, that's a danger sign for

6    overfit.  That's what I said, right?

7    **A.**  Yes.

8    **Q.**  And then you said, yeah, but in my admissions model, I've

9    got 25,000 observations, rejects and admits, and I think you

10   were essentially implying I've got 225 variables, so I'm not

11   worried about it, right?  I mean, I wasn't really asking you

12   about your model, but that's what you were trying to say.

13   **A.**  Yes.  I mean, in a pure accounting sense, whether one

14   would be worried or not would depend very much on the

15   context.

16   **Q.**  Sure.  But in terms of the sort of danger zone of

17   overfitness, in a logistic regression model, sort of a

18   discrete choice situation, it's your testimony that when

19   you're trying to compare the number of observations to the

20   number of variables, you look at all the observations, not

21   just the less frequent of the two events.  That's what you're

22   telling me?

23   **A.**  Not precisely, no.

24   **Q.**  In fact, when you're looking for the danger zone of an

25   overfitness in a logistic regression model where you've got

1    discrete choices, zero or one, the number of observations

2    that you look at to see if your model might be overfit is the

3    lower frequency event.

4            So for example, say you're doing a paper on the

5    likelihood of death after cesarean delivery and you have

6    500,000 observations but only 500 deaths.  You get worried

7    about overfittedness because you only have 500 deaths when

8    you have models trying to predict death versus life, right?

9    **A.**   Certainly.

10   **Q.**   In fact, you have a paper like that, don't you?

11   **A.**   I do, yes.

12   **Q.**   We're going to get to it in a little bit.  So you look at

13   the lower frequency event when you're talking about number of

14   observations versus variables, when you're thinking about

15   being concerned about overfitness.  That's what you did in

16   your paper on cesarean deliver, right?

17   **A.**   That's what I did in that context.  I'm hesitating to

18   draw a generalization.

19   **Q.**   Sure.  Let's just go through.  You have a few papers

20   where you discuss overfitting, right?

21   **A.**   I believe so, yes.

22   **Q.**   Well, we're just going to go through three of them.

23   **A.**   Okay.

24   **Q.**   If you go to C89, we're back to "What Works?"  Are you

25   there?

1   **A.**   Yes.

2   **Q.**   And I'm going to refer you to page 925.  At the very

3   bottom of the page, you'll see a sentence beginning, "A

4   concern."

5   **A.**   Yes.

6   **Q.**   And you say, "A concern with the specification in column

7   3 is that the average number of program estimates per country

8   is small.  Many countries only have two or three estimates,

9   leading to potential overfitting."  Do you see that?

10  **A.**   Yes.

11  **Q.**   That's referring to the number of observations you have

12  compared to the number of variables, and you're talking about

13  how for some of the countries you only have two or three

14  observations, right?

15  **A.**   Yes.  In this context we're including a variable that's

16  country-specific, GDP growth, and there's only two or three

17  observations per country, yes.

18  **Q.**   And your solution to that was to take the countries with

19  only a couple of estimates out of the model and re-estimate

20  the model with what you had left, increasing the ratio of

21  observations to variables -- if you just read on, goes to the

22  next page.  Right?

23  **A.**   Yes.

24  **Q.**   That was your solution, and then you compared that model

25  you did on a subgroup with the countries you had more data on

1    to the first model you measured, and you saw they were about

2    the same, resolving your concerns, right?

3    **A.**   Yes.

4    **Q.**   And that is a diagnostic technique for overfitting called

5    cross-validation, correct?

6    **A.**   No.

7    **Q.**   What's it called?

8    **A.**   I'm not sure this particular procedure has a name.  This

9    is a pretty standard thing where we look at a subgroup and

10   see if the model estimates are similar and if -- our main

11   concern is the coefficients on the top of this table.  And

12   we're trying to see if those coefficients are affected by how

13   we treat the other variables.  And so it would be kind of

14   similar in my report to, when I look at California and

15   applicants from California, female applicants, and say is the

16   average marginal effect for Asian ethnicity different for

17   those subgroups.  It's more like that, actually.

18   **Q.**   Except in this paper you compare coefficients and you

19   didn't do any comparison or any discussion of coefficients in

20   your expert reports, right?

21   **A.**   Well, in this paper, this is not a logit model, so these

22   are regression models, and these coefficients directly

23   translate into a effect of higher GNP growth on

24   effectiveness.

25   **Q.**   Let's get to a logit model then.  If you turn to Tab 88,

1    you'll find your cesarean delivery paper.

2    **A.**   Sure.  Okay.

3    **Q.**   This is the health effects of cesarean delivery for

4    low-risk first births by you and others.  I have I think

5    page-numbered this on the bottom right because it's like many

6    of the papers I got from you.  If you see at the bottom

7    right, there's page numbers, 1 of 86.  Do you see that?

8    **A.**   Yes.

9    **Q.**   This will help us get through here.  You had a concern

10   that one of your models in here was overfit as well, didn't

11   you?

12   **A.**   I don't remember the specific wording.

13   **Q.**   Turn to page 32.

14   **A.**   Okay.  Yes.

15   **Q.**   Excuse me.  Wrong document.  77.  Here we go.  Sorry,

16   sir.  Table 9.

17            MR. WAXMAN:  What page are we on?

18            MR. MORTARA:  77.

19            MR. WAXMAN:  The same document?

20            MR. MORTARA:  Yes.

21            THE WITNESS:  Page 77?

22            MR. MORTARA:  Correct.  It's Table 9.

23   **Q.**   While you're looking, in this paper you have a model of

24   the effects of hospital practices on neonatal and

25   post-neonatal mortality, right?

**A.**   In this table, that's true, but I don't see the
overfitting reference.

**Q.**   Just give me a second.

**A.**   Okay.

**Q.**   And in this table, Table 9, you present the coefficients
from your model in standard errors, correct?

**A.**   Yes.

**Q.**   And then down at the bottom you have a note.  Do you see
that?

**A.**   Yes.

**Q.**   And this is the discussion we were just having.  500,000
observations.  But I think in this model you only have about
600 deaths, right, something --

**A.**   Yes, around that, yes.

**Q.**   Very rare event, right?

**A.**   Yes, yes.

**Q.**   And so like admission to Harvard is pretty rare, but even
rarer, right?

**A.**   Yes.  But the predictions that are done and the risk of
overfitting has to do with how I classify these two groups.
I could explain in more detail if you'd like.

**Q.**   I only have a real simple question.

**A.**   Okay.

**Q.**   You had a huge number of observations, small number of
deaths, right?

**A.**   Yes.  But I just want to make clear the overfitting
doesn't have to do with like the coefficients in this model.
It has to do with how we choose the groups with low risk and
high risk of death.

**Q.**   Sure.

**A.**   Okay.

**Q.**   But the one thing you did to try to make sure you didn't
have a problem with overfitting was use 10-fold
cross-validation, correct?

**A.**   Well, we use -- yes, I used 10-fold cross-validation but
not for focusing on the coefficients but rather -- I'm going
to have to explain this in some detail.

      So we wanted to focus on high-risk and low-risk
babies, and there's a well-known concern when one uses -- we
don't have a natural indicator of risk, so we fit a logit
model for risk.  But if you use the same logit model to then
classify who is high risk and low risk and then fit a model
inside of each of those two populations, there's a problem
there.  A little bit like a circularity problem.

      And so what one does is use nine-tenths of the data
to predict risk and then, using that, classify each
individual.  It's rather complicated, and I don't want to
take too much of Your Honor's time.

**Q.**   That's okay.  Yesterday I got in trouble for asking
again.  I'm waiting.  I'm not going to ask.  But is that

1  sufficient?  Because I would like to move on.

2  **A.**  Yes, I just want to emphasize --

3  **Q.**  Go ahead.

4  **A.**  This is not anything to do with the kind of overfitting

5  issue in, say, what you were talking about before.

6  **Q.**  Yesterday you said -- I think it might have been two days

7  ago.  Hold on.  Trial Day 12.  I think it was two days ago.

8  I'm losing track of my days.  You said on the transcript at

9  158 that, "One of the problems with Professor Arcidiacono's

10  model is that he wasn't looking at the actual applicant

11  pool."  You said that, right?

12  **A.**  Right.

13  **Q.**  That's one of your criticisms?

14  **A.**  I can't remember the context.  Could I see the whole --

15  **Q.**  I'll take it off.  Is one of your criticisms of Professor

16  Arcidiacono that he didn't use the, quote, actual applicant

17  pool?

18  **A.**  Yes.  That's certainly a very important one of my

19  criticisms, that he's excluding the ALDC.

20  **Q.**  But you excluded a very large group of applicants from

21  your analysis, didn't you?

22  **A.**  Which group are you talking about?

23  **Q.**  You don't remember excluding a large group of applicants?

24  **A.**  Do you mean the foreign applicants?

25  **Q.**  Yes.  International citizens.  You excluded that group of

1   applicants from your model, correct?

2   **A.**   Yes, as did Professor Arcidiacono.

3   **Q.**   I'm just talking -- you tried to build the best model of

4   Harvard admissions as you can, right?

5   **A.**   Yes.

6   **Q.**   So let's just talk about your model.  You excluded

7   international citizens, non-U.S. citizens from your model,

8   correct?

9   **A.**   Roughly speaking, yes.

10  **Q.**   Even though many of those non-U.S. citizens actually go

11  to U.S. high schools and participate on the domestic dockets

12  and are discussed in subcommittee and full committee and get

13  profile ratings, right?

14  **A.**   My understanding is that they're on international

15  dockets.

16  **Q.**   Well, maybe I can refresh your memory.  There's

17  international dockets for people who live outside of the

18  United States?

19  **A.**   Yes.

20  **Q.**   Then there's foreign nationals who live in America who go

21  to U.S. high schools who are on the domestic dockets.  Does

22  that sound right?

23          If you don't know, you don't know, sir.  That's

24  fine.

25          MR. WAXMAN:  Your Honor, I want to object at this

point.  Both sides agreed at the outset, and it's reflected

in Professor Arcidiacono's original report, that the

comparisons would be -- because the allegation of

discrimination is against domestic applicants who are

Asian-American, that the models would look at domestic

applicants and not at foreign applicants.

THE COURT:  Well, okay.  Just now clarify this for

me.  So you're saying that they are excluding the

international docket, or they agreed to also exclude

foreign-born on the domestic docket?

MR. MORTARA:  It's both, Your Honor, but that's not

the -- not even the point of this at all.

THE COURT:  Now I want to understand it.

MR. MORTARA:  I can explain for our side.

THE COURT:  Okay.

MR. MORTARA:  Professor Arcidiacono did not use

people living in other countries, international citizens --

foreign nationals who live in other countries, and did not

use foreign nationals that go to U.S. high schools who

participate on the domestic dockets.  That's true.

Professor Card has offered a criticism that you

can't take information out of the model.  As you can I think

apprehend, I'm not talking about Professor Arcidiacono.  I'm

talking about what's good and bad to do.  And he also took a

bunch of information out of the model, and that's the point

1    of this cross, which I'm sure you already got.  This has

2    nothing to do with who did what and when and agreements.  It

3    has to do with crossing the witness about the approach.

4            THE COURT:  The cross-examination is perfectly

5    appropriate.  On a separate point, I now want to understand

6    whether we have excluded foreign-born -- if foreign-born

7    students who go to U.S. --

8            MR. MORTARA:  They're not U.S. citizens.

9            THE COURT:  So it has to -- the international

10   docket is defined by citizenship?

11           MR. MORTARA:  No.  So as far as I understand it,

12   and Mr. Waxman can correct me, there are international

13   dockets that are devoted to people who live outside of the

14   United States.  They were excluded.

15           THE COURT:  Yes.

16           MR. MORTARA:  There are also domestic dockets where

17   foreign nationals, i.e., a citizen of, say, El Salvador can

18   go to a U.S. high school and apply from his U.S. high school

19   with all the same information that you've seen a zillion

20   times, and they participate on the domestic docket, so for

21   instance if they're in Los Angeles, they're on the C docket

22   and they're discussed in subcommittee and full committee in

23   exactly the same way.  Neither expert used them.

24           THE COURT:  How are those people even extracted?

25           MR. MORTARA:  There's a citizenship code in the

1    database.

2            THE COURT:  Are we agreed that -- what did you say,

3    it was citizenship?

4            MR. MORTARA:  Yeah, it's based on citizenship.

5            MR. WAXMAN:  The parties agreed that we'd be

6    looking at the sets of applicants as to whom there's alleged

7    discrimination.  Dr. Arcidiacono ran his model in the way

8    that I believe Mr. Mortara has accurately represented, and

9    Dr. Card did the same thing.  So when the argument is that he

10   excluded people from the model, the model was the model of

11   the universe of applicants as to whom there is an allegation

12   of discrimination.

13           THE COURT:  Okay.  So he's not responsible, as it

14   turns out, for what is included in the model, but you are

15   free to cross-examine him on what the decision to leave those

16   people out did to the model.

17           MR. MORTARA:  Sure.  Thank you.  That's perfect.

18           THE COURT:  So then I'm perfect?  Can someone note

19   the date and time?

20           MR. MORTARA:  Your Honor, if you're going to

21   provide an opportunity for me to praise you on the record,

22   then I could go on.  I have a prepared speech that will last

23   15 and a half minutes.

24           MR. LEE:  If he does that, then we're definitely

25   not closing Monday.

1          MR. WAXMAN:  Your Honor, of course all of Your

2     Honor's rulings --

3          THE COURT:  I know --

4          MR. WAXMAN:  -- ruling on them are, quote, perfect

5     as Mr. Mortara says.  We can provide the court, in fact I can

6     provide the court now the citations to Professor Card's

7     report where he explains this.

8          MR. MORTARA:  Can he do that on redirect?

9          THE COURT:  I just want to understand.  I wanted to

10    make sure we were working off the same dataset, and I wanted

11    to know who was excluded.  But this area for

12    cross-examination is appropriate.  If he wants to look at

13    what the effect that agreement might have had on the

14    analysis, that's fine.

15         MR. MORTARA:  Sure.  I'm ready to keep going now.

16         THE COURT:  I'm sure you are.  Go ahead.

17    **Q.**  All right.  Now that we've got that out of the way,

18    Professor Card, we were talking about non-U.S. citizens who

19    apply to Harvard.  And the funny thing is you made this

20    comment on day one about how if you were applying to Harvard,

21    you wouldn't have gotten an academic 2 or something that

22    like.  Do you remember what you said about that?  Do you

23    remember that, this reference you made to yourself?  I

24    remember it.  Do you remember that?

25    **A.**  I said I wasn't sure I would get a 2 on anything, yes.

1    **Q.**  Yeah, and I thought to myself, I think, if Professor Card

2    had applied to Harvard, he wouldn't even be in the model,

3    would you?  And the reason is -- and I'm delighted to report

4    that you've rectified the situation, but I think when you

5    applied to college, were you only a citizen of Canada?

6    **A.**  Yes.

7    **Q.**  And now you're a dual citizen, right?

8    **A.**  Yes.

9    **Q.**  So you wouldn't have even been in the database because

10   you were a foreign national.  Great.

11         Now, do you know the percentage of applicants that

12   were excluded from your model that are foreign nationals; do

13   you know the percentage of overall applicants?  Is it bigger

14   or smaller than the ALDCs?

15   **A.**  The number of applicants excluded -- I'm just looking at

16   my report.  Could you give me a few seconds?

17   **Q.**  Sure.

18   **A.**  So for example, it's going to be something like 10,000

19   students per year in the more recent years, I think, around

20   that order of magnitude.

21   **Q.**  If you could turn in your binder to Tab P319, I've got

22   the numbers up there for you.

23         THE COURT:  What was the exhibit?

24         MR. MORTARA:  P319.  Then I'm going to move on,

25   Your Honor.

1    **Q.**  Do you see it's about 5,000 applications, 16.4 percent of

2    applications.  Do you see that?

3    **A.**  Yes.  I also see -- I think this is an extremely

4    important point, that's only 194 admits.  So it's a

5    relatively small number of admits, whereas the ALDCs of

6    course are almost 30 percent of the admits.

7    **Q.**  It's the same number of admits as Hispanic?

8    **A.**  Hispanic-American students -- Hispanic or other American

9    students.

10   **Q.**  Yeah, 195.  Do you see it on the thing right there?

11   **A.**  Yes.

12   **Q.**  Okay.  Let's now focus on ALDCs and talk about the

13   process that they participated in.  Staff interviews,

14   Professor Card.  Do you think staff interviews are given out

15   in the same process to ALDCs and non-ALDCs?

16   **A.**  Well, my understanding of staff interviews is that they

17   can be requested by a student; and if there's someone

18   available to do it, then it's a student-driven thing.

19   **Q.**  You think it's the same process, there's no special

20   treatment for ALDCs?

21   **A.**  I'm not sure what you mean by "special treatment."

22   **Q.**  Were you here for my cross-examination of Director

23   McGrath, sir?

24   **A.**  I was not, no.

25   **Q.**  So you don't know that Director McGrath testified that

1    there's a set-asides for interviews for the children of

2    donors, legacies and athletes?  You didn't know that?

3            MR. WAXMAN:  Objection.  That's mischaracterizing

4    the testimony.  Perhaps we could see what Director McGrath

5    said.

6            THE COURT:  You can either show him what Director

7    McGrath said, or you can rephrase the question.

8    Q.  Starting at the bottom of the screen, line 25, I'll just

9    read it, Professor Card.

10           "And some of the other ways you can get interviews

11   is if you're the child or relative of a donor, is that

12   right?"

13           "That may happen.

14           "It does happen.  And some of the other ways you

15   could get interviews are, for instance, you set aside a quota

16   of interviews for recruited athletes for each team."

17           Answer:  "We do interview a number of athletes for

18   each team, and we do have a target number for that."

19           Question:  "You have a set-aside number for

20   interview slots for recruited athletes?"

21           Answer:  "Yes.  We have a number, we agree, of not

22   doing more than, yes."

23           Do you see that?

24   A.  Yes.

25   Q.  Do you see all of that?  I read it to you.  That's what

1    Director McGrath said.  Then it goes on, "And you can even

2    get an interview outside of the September to November

3    timeframe that you tell the world on the website you can get

4    one in if you're in one of these special categories?"

5              Answer:  "Yes."

6              Do you see that?

7    **A.**  I see what you're saying.  I would really like to read

8    the whole thing to understand it better.

9    **Q.**  Great.  But here is now my question.

10   **A.**  Okay.

11   **Q.**  If ALDCs have special access to interviews, quotas for

12   athletes outside of the normal timeframe, that's not the same

13   process, is it?

14   **A.**  My understanding is that, first of all, the number of

15   students on the dean's list is quite small.  They're omitted.

16   So my understanding is that there could be a process that

17   gives interviews for recruited athletes.  That's a very small

18   number of students.  So I don't think that's necessarily

19   meaning that other students can't ask for an interview.  And

20   my understanding is if you ask for an interview and it's

21   possible to schedule one, they'll do one even by Skype.

22   **Q.**  First come/first served, but there are special privileges

23   for ALDCs, set-aside quotas and outside of the normal

24   timeframe?

25              MR. WAXMAN:  Objection.  That completely

1   mischaracterizes even the testimony that Mr. Mortara has --

2   there's nothing here about set-asides for ALDCs.

3               THE COURT:  Okay.  That's true.  Rephrase the

4   question.  And what's the exhibit number on the staff

5   interviews?

6               MR. MORTARA:  This is PD 38.3.  It's one of

7   Professor Arcidiacono's demonstratives.  Your Honor, it also

8   comes from admitted Plaintiff's Exhibit 619.  I'm about to

9   get into this, as I think you're anticipating, Your Honor.  I

10  will move on.

11  **Q.**  20 percent of ALDCs get staff interviews.  You saw that

12  Professor Arcidiacono presented that information, right?

13  **A.**  Yes.

14  **Q.**  You don't have any dispute with that, do you?

15  **A.**  I don't, but as I said, I think, in discussing these, I

16  have -- in my admissions models, I have separate controls for

17  ALDC as well as for staff interview, so they're kind of

18  separate factors in the model.

19  **Q.**  Feel free to explain as much as you need to.  That's not

20  really where I'm going, but we'll get there.  20 percent of

21  ALDCs get staff interviews, correct?

22  **A.**  That's what this says, yes.

23  **Q.**  And only 1.3 percent of non-ALDCs get the privilege of a

24  staff interview, correct?

25  **A.**  Well, I would hesitate to use "the privilege."  My

1   understanding is it's a student-driven process.

2   **Q.**  Well, the admission rate for people that get staff

3   interviews is pretty good, right?

4   **A.**  Well, of course, as you show here, for instance, many of

5   them are ALDCs, so they have high interview -- admission

6   rates.  And they may have other characteristics.  For

7   instance, my guess would be many of them are from

8   Massachusetts.  Many of them might be from nearby prep

9   schools.

10  **Q.**  Sure.  So the only point I'm trying to make is about 45

11  percent of the people who get interviews are ALDCs.  Do you

12  agree with that?  Just looking at the numbers.  Do you want

13  me to do it, 1366 divided by 3043, 44.9 percent.

14  **A.**  I'm actually not seeing where you get the 3043.

15  **Q.**  It's at the bottom.  I'll move my little window for you.

16  Do you see that, total applicants interviewed?

17  **A.**  Okay.  Thank you.  Yeah.

18  **Q.**  45 percent of the people who get interviews are ALDCs;

19  that's right, isn't it?

20  **A.**  Yes, so less than half.

21  **Q.**  And you think that happens because it's a student-driven

22  process, not because of any special treatment ALDCs are

23  getting; that's your testimony?

24  **A.**  Well, my understanding is other students are free to

25  apply and they try to accommodate them, yeah.

1   **Q.**  Do you understand that non-ALDCs can get interviews

2   outside of the September to November timeframe that's

3   advertised on Harvard's website?

4   **A.**  I'm not aware of the complete details of that, no.

5   **Q.**  So 45 percent of the interviews go to ALDCs.  And they're

6   only 5 percent of the applicant pool, right?

7   **A.**  Roughly, correct, yes.

8   **Q.**  Now, you mentioned yesterday a view of yours, that Asian

9   ALDCs receive lower personal scores than white ALDCs.  Do you

10  remember that?

11  **A.**  I wouldn't characterize it as a view.  It's an empirical

12  fact.

13  **Q.**  You didn't use a slide or exhibit or anything like that,

14  did you?

15  **A.**  No.

16  **Q.**  And those numbers aren't in your reports or in any

17  exhibit that you used, are they?

18  **A.**  No.

19  **Q.**  You did not show the court any analysis supporting your

20  view that you expressed to Mr. Waxman, did you?

21  **A.**  No.

22  **Q.**  Because there is no such analysis in your report, is

23  there?

24  **A.**  No.  We were responding -- I was trying to respond to a

25  question from the court, as I recall.  I believe she asked --

1    Your Honor asked that question more or less directly.

2    **Q.**  Fair enough.  Fair enough, Professor Card.

3             Now, did you happen to notice -- I'm going to put

4    up Plaintiff 619.  It's been previously admitted.  It's in

5    your binder, sir, if you want to look at it.

6             Did you happen to notice when you were reviewing

7    the data --

8    **A.**  Yeah, since this is so fuzzy I prefer to look at it.  So

9    where is it?

10   **Q.**  Sure.  It's in your binder.  It should be at P619.

11            THE COURT:  I don't actually have that one.

12            MR. WAXMAN:  I don't have it either.

13            MR. MORTARA:  I think he's got it.  I've got

14   copies.

15            THE WITNESS:  I don't believe I have it either.

16            MR. MORTARA:  I've got copies for everyone.  May I

17   approach everyone?

18            THE COURT:  Of course.

19   **Q.**  Plaintiff 619 is some more information about who gets

20   interviewed.  And you see that the rate of interviews for

21   Asian ALDCs is a little lower than whites.  That's the top

22   row.  Do you see all of that?

23   **A.**  Yes.

24   **Q.**  And you see the admission rates for ALDCs that get

25   interviewed is a whopping 80 percent, sometimes more than 80

1    percent across the board.  Do you see that?

2    **A.**  Yes.  Although I expect this is partially driven by the

3    preponderance of those students who might be athletes.

4    **Q.**  And athletes have a super-high admission rate, don't

5    they?

6    **A.**  Yes.  Of course, that's one of the reasons why I did that

7    analysis in my report of taking out the athletes, but yes.

8    **Q.**  And this is my question.  You talked with Mr. Waxman

9    yesterday about some review of the data in response to some

10   of the court's questions that wasn't in your report.  And you

11   didn't show any numbers, you didn't show any exhibits.

12          Did you happen to notice when you were reviewing

13   the data and coming to conclusions that are nowhere in your

14   reports or any slide or exhibit you used --

15          MR. WAXMAN:  Your Honor, hold on one second.  If

16   counsel wants to ask a question, of course, if it's proper,

17   we don't object.  This running commentary about his

18   impressions of what it is that is in his mind are

19   inappropriate as questions on cross-examination.

20          THE COURT:  I'm going to take that to be an

21   objection, and I'm going to sustain it.

22          MR. WAXMAN:  Yes.  I'm sorry.

23          THE COURT:  Skip the narrative.

24   **Q.**  Did you happen to notice in any analysis you did whether

25   Asians who got staff interviews got higher personal scores

1    than Asians who did not get staff interviews?

2    **A.**   No, I didn't look at that, I don't believe.

3    **Q.**   There is a staff interview personal rating, isn't there,

4    that's separate from the profile rating, correct?

5    **A.**   Yes.  I don't use that information, but I believe there

6    is such a variable.

7    **Q.**   You didn't use the staff interview profile -- you didn't

8    use the staff interview personal rating in your model, did

9    you?

10   **A.**   No, I didn't.

11   **Q.**   I didn't hear you do any analysis of how whites and

12   Asians are treated on those staff interview personal ratings,

13   did you?

14   **A.**   I don't -- no, correct.

15   **Q.**   Would you agree that applicants who get a staff interview

16   and a face-to-face meeting with an admissions officer are

17   less likely to face the risk of implicit bias and

18   stereotyping because they've had that opportunity for a

19   face-to-face meeting?

20   **A.**   I hesitate to say exactly because I'm not really an

21   expert on all the mechanisms of stereotyping biases.

22   **Q.**   I'm just asking you as a sort of fellow citizen, do you

23   think that bias goes down, including racial bias, when you

24   get a chance to meet somebody?

25   **A.**   You know, unfortunately that's not necessarily my

1    experience.

2    **Q.**   Do you agree that one racial stereotype about

3    Asian-Americans is that many of them are immigrants?

4    **A.**   Again, I don't really know.

5    **Q.**   Well, you study immigration, right?

6    **A.**   I do, yes.

7    **Q.**   And you know that Asians are the fastest-growing

8    immigrant group, don't you?

9    **A.**   In the United States, yes.

10   **Q.**   So would you agree that one stereotype that might be held

11   about Asian-Americans is that they're immigrants?

12   **A.**   Yes, you know, they also -- a large fraction live in

13   California, so that's another stereotype, I guess, if that's

14   what a stereotype is.

15   **Q.**   Do you think that the stereotype I'm asking about, the

16   stereotype of being an immigrant, would apply equally to

17   Asian-American legacy applicants to Harvard?

18   **A.**   I don't know.

19   **Q.**   Well, you probably agree the majority of Asian-American

20   legacy applicants to Harvard will not be immigrants, right?

21   Their parents are in the Harvard Club.

22   **A.**   I don't -- I can't agree with that necessarily because I

23   know more about Princeton where I used to teach, and there

24   were many -- and at Berkeley where I teach now, and there's

25   many alums who live in Asia and send their children -- for

1    instance, some of our major donors are from Hong Kong, and a

2    really important booster for our campus is that group.  So I

3    don't know whether you could really characterize it that way.

4    **Q.**  You think that the majority of Princeton alumni are not

5    United States citizens?

6    **A.**  No.

7    **Q.**  The vast majority of Princeton alumni are United States

8    citizens, right?

9    **A.**  I would assume so, yes.

10   **Q.**  Same with Harvard, right?

11   **A.**  I would assume so, yes.

12   **Q.**  And even the vast majority of Asian alumni of Harvard are

13   United States citizens.  You'd agree with that too, right?

14   **A.**  You know, I don't know about that.  I might be surprised.

15   **Q.**  I'll move on.

16        Two days ago -- I want to talk to you a little bit

17   more about stereotypes.  Two days ago you actually testified

18   that white applicants to Harvard were more multidimensional

19   than Asian-American applicants, didn't you?

20   **A.**  Yes.

21   **Q.**  You do realize that accusations of being one-dimensional

22   are an archaic racial stereotype about Asian-Americans, don't

23   you?

24   **A.**  No, I didn't know that.

25   **Q.**  Well, can you turn to Plaintiff's 555 in your binder.

It's the OCR statement of findings.

**A.** Yes.

**Q.** And if you turn to page 39, you briefly touched on this with Mr. Waxman yesterday, this document anyway.

THE COURT: I'm sorry. Where are you?

MR. MORTARA: Page 39 of the OCR.

THE COURT: 555.

MR. MORTARA: Plaintiff 555.

**A.** Yes.

**Q.** And you see that here in 1990, the Department of Education Office of Civil Rights is talking about stereotypes of Asian-Americans and including that they are one-dimensional. Do you see that?

**A.** Yes. So the sentence says stereotypically one-dimensional math/science type applicants. So this could be one of those -- I believe this is when Your Honor was speaking about the Oxford comma. So I'm not entirely sure whether they're one-dimensional math/science types or whether it's one-dimensional more generally.

**Q.** Understood, sir. You can actually see on this page, one of the things that's being discussed is how a lot of Asian-Americans are CJ-ers, which means they're interested in medicine as their career goal. Do you see that?

**A.** Yes.

**Q.** We'll talk about that in a second.

1          Now, you were not deploying that stereotype.

2    You're just telling us that that's just what you see in the

3    data, that Asians are less multidimensional than whites in

4    the Harvard applicant pool?

5    **A.**   Yes.   I was trying to define it precisely in terms of

6    these ratings in that analysis.

7    **Q.**   And you used this slide DD 10.9 to illustrate that point.

8    You talk about number of strengths.   Do you remember that?

9    You showed whites are better than Asians; they're more

10   multidimensional.   That's in the data; that's what you said,

11   right?

12   **A.**   Yes.

13   **Q.**   And I want to just look at what you said.   By the way,

14   this demonstrative that you created, DD 10.9, that includes

15   the personal rating, doesn't it?

16   **A.**   Yes.

17   **Q.**   I want to just take a look at what you said.   At the

18   top -- I've got your testimony.   I'm going to read it and

19   just make sure these are your views.

20          "And so when you put these three, four pieces

21   together, the multidimensional advantage coming for the white

22   students is coming because there's a higher academic strength

23   than the Asian students, there's a higher personal and higher

24   athletic strength in the white students, and that adds to a

25   multidimensional strength."   Right?

1    **A.**   Yes.  And the sentence continues on, "More balanced."

2    **Q.**   "The more balanced set of students," right?

3    **A.**   Yes.  By that I meant -- so what's important for

4    multidimensionality is not just the individual strengths but

5    also whether they're present together in a given student.

6    **Q.**   Let's go back to DD 10.9.  Who assigns the ratings you

7    were using to come to this conclusion about

8    multidimensionality?

9    **A.**   The admissions officers.

10   **Q.**   I want to make sure I get this right.  You have adopted a

11   conclusion that Asian-American applicants to Harvard are more

12   one-dimensional than whites, less multidimensional, right?

13   That's your conclusion?

14   **A.**   My conclusion is that based on these -- yes, my

15   conclusion is based on the presence of these four profile

16   ratings, which I believe are very, very important inputs to

17   the Harvard admissions process.

18   **Q.**   Will you acknowledge that one-dimensionality is an

19   archaic stereotype about Asian-Americans, that you just

20   happened to find data here supporting that it's true in this

21   instance?

22   **A.**   Well, it's your claim that that's an archaic stereotype.

23   I would hesitate to say that.

24   **Q.**   Fair enough.  It's my claim it's an archaic stereotype.

25   And this data confirms what I'm claiming is an archaic

1    stereotype about Asian-Americans?

2    **A.**   I disagree with that.

3    **Q.**   What does it confirm then?

4    **A.**   It confirms that -- if I look at these four dimensions of

5    ratings that are all very important in the Harvard process,

6    as I mentioned before, the academic dimension is the most

7    common, just distinguishing by that basis, it would be

8    impossible to choose a class, and moreover that's not what

9    Harvard wants to do.  So looking at these four dimensions,

10   Asian students have a slightly lower rate of having three or

11   more of those profile ratings above 2.

12   **Q.**   And the phrase you used in your testimony with Mr. Waxman

13   was that whites are more multidimensional, right?

14   **A.**   Yes, but I think the understanding was I was talking

15   about these profile ratings.

16   **Q.**   And the profile ratings are assigned by Harvard

17   admissions officers, correct?

18   **A.**   Yes.

19   **Q.**   So it's Harvard admissions officers determining that

20   whites are more multidimensional in the way that you're

21   showing here on the slide, right?

22   **A.**   In this way, yes.

23   **Q.**   Do you think it's possible that Harvard admissions

24   officers are deploying racial stereotyping when they create

25   the dataset that you conclude shows that Asians are more

1    one-dimensional than whites?  Is that possible?

2    **A.**   Well, based purely on statistical analysis, I can never

3    say that something is impossible.  And that's what I've done

4    in the case.  But I don't think it's that likely, no.

5    **Q.**   So that's a yes, it is possible?

6    **A.**   It is possible, yes.

7    **Q.**   I want to engage you with another hypothetical and ask if

8    your model was built to detect the use of other stereotypes.

9    Going back to P555, that page we were looking at, the part

10   that I didn't highlight, it was about how Asian-Americans

11   were CJ-ers.  Do you remember that?

12   **A.**   Yes.

13   **Q.**   And that's a stereotype about Asians that they want to be

14   doctors.  Are you familiar with that stereotype?

15   **A.**   To tell you the truth, I wasn't.  On our campus, that

16   doesn't -- I've never really heard that.

17   **Q.**   Never heard that one?  Huh.  Then if you go back to page

18   24 of that document.

19   **A.**   Yes.

20   **Q.**   There's another comment pulled from a Harvard admissions

21   officer of that era.  "He's quiet and, of course, wants to be

22   a doctor."  Do you see that on the screen?  This is from the

23   OCR findings.

24   **A.**   Yes.

25   **Q.**   So would you accept that at least the Department of

1  Education believed that there was a stereotype about Asians

2  that they wanted to be doctors?

3  **A.**  Yes.  But my understanding from reading their report was

4  that they ultimately concluded that that stereotyping bias

5  wasn't affecting the admissions of Asians and whites.

6  **Q.**  That was from two weeks ago.  Great.  I'm just asking if

7  it is a stereotype.

8          MR. WAXMAN:  I'm sorry.  Again, the commentary.

9  What was from two weeks ago?  And what does that have to do

10  with the question that this witness is being asked?

11          MR. MORTARA:  Your Honor, if I may?

12          THE COURT:  Hold on.  Let me reread it.  All right.

13  A marginal violation.

14          MR. MORTARA:  It's a yes or no question.

15          THE COURT:  "That was from two weeks ago, great."

16  Then you went back and asked the question, "I'm just asking

17  if that is a stereotype."  So the question is, is that a

18  stereotype.

19  **Q.**  Is it a stereotype of Asians that they want to be

20  doctors?

21          MR. WAXMAN:  Asked and answered, Your Honor.

22  **A.**  Yes.

23          THE COURT:  He can have the question.

24  **Q.**  That was a yes?

25  **A.**  As I said, I don't actually know the answer to that.

1    **Q.**  Well, you put up a slide yesterday, or the day before, DD

2    10.54, and you wanted to show the court something, and it

3    included that Asians are significantly more interested in a

4    medicine- or health-intended career than whites.  Do you see

5    that?

6    **A.**  Yes.

7    **Q.**  Could you engage me with a hypothetical, sir.  Imagine

8    that Harvard through racial stereotyping imposes a penalty on

9    Asians who want to do medicine by valuing their applications

10   less, so they impose a penalty on Asians who want to do

11   medicine, but they don't impose that that penalty on whites.

12   Do you have that hypothetical?

13   **A.**  Yes.

14   **Q.**  The way you would determine that in your statistical

15   model would be to interact medicine with race, right?

16   **A.**  I guess one might be able to do that.  I'm not aware that

17   the -- this is an empirical fact, not a stereotype that

18   Asian-American -- Asian applicants to Harvard are more likely

19   to say they want to take medicine or health as an intended

20   career.

21   **Q.**  And my hypothetical was Harvard punishes Asian students

22   through implicit or unconscious bias for conforming to a

23   racial stereotype, and that would show up; if you interacted

24   the variables of medicine and race, you would see a lower

25   coefficient or average marginal effect for Asians, a negative

1   one, and zeroes for other races?  If my hypothetical were

2   true.  I'm not saying you did that.

3   **A.**  I would have to see the entire specification to agree

4   that's a valid test of that, but I could see that that would

5   be a test.

6   **Q.**  And you didn't do it, did you?

7   **A.**  I didn't, no.

8   **Q.**  Just one more on this one issue.  Withdrawn.

9          One more on this issue.  You also showed something

10  about parental occupations varying by race.  Do you see that?

11  **A.**  Yes.

12  **Q.**  This is slide 49.  And you pointed out that

13  Asian-Americans have a larger percentage of moms that are in

14  the computer and mathematical fields.  Do you see that?

15  **A.**  Yes.

16  **Q.**  And it's the same issue with the intended career in

17  medicine.  If Harvard was imposing a penalty on Asians who

18  conformed to a stereotype, say having a mom or even dad that

19  was involved in the computer and mathematical profession, but

20  not on whites, the way you'd figure that out is by

21  interacting parental occupation with race.  And you did not

22  do that, correct?

23  **A.**  Well, I did not do that, correct.  But I would not

24  necessarily agree that such a specification would be

25  dispositive on that issue.

1  **Q.**  You know that there's been a great deal of debate about

2  where and how Harvard has been using race in its admissions

3  process, correct?

4  **A.**  Yes.

5  **Q.**  I want to focus first on the overall rating.  You've

6  heard during this trial that the overall rating is quite

7  important in the reading of Harvard applications, haven't

8  you?

9  **A.**  No, that would not be what I understood from them.

10  **Q.**  You don't believe that the overall rating is important?

11  **A.**  Well, my understanding was that it's a preliminary

12  assessment made by the first reader and that when a file gets

13  to later stages at the docket or subcommittee level and then

14  later to the committee level, just like the other ratings

15  variables, the ratings themselves don't necessarily have much

16  effect.  It's more the actual materials in the file.

17  **Q.**  So it's at least equally as important to, say, the

18  athletic rating or personal rating or extracurricular rating.

19  Would you at least agree with that?

20  **A.**  No, I don't agree with that.

21  **Q.**  Why not?

22  **A.**  Because I don't -- my understanding of the process is

23  that it's an assessment.  It's like -- for example, in my

24  hypothetical of retirement, it would be like asking someone's

25  supervisor if they think someone is likely to retire.

1    **Q.**  And what you mean by that is shown here on the screen

2    from Trial Day 5 from Ms. Bever's testimony.

3            Question:  "Can you please describe the preliminary

4    overall rating?"

5            Answer:  "I use the preliminary overall rating to

6    give my assessment of how strong I think that particular

7    applicant is" --

8    **A.**  I --

9    **Q.**  -- "in a whole, if one can, in a rating."  Do you see

10   that?  That's what you're trying to say, right?  That's

11   agreeing with you, isn't it?

12   **A.**  I guess so, yes.

13   **Q.**  The overall rating includes an analysis of every single

14   thing, as far as you know, in Harvard's holistic admissions

15   process, right?  You heard that testimony, too.  That's what

16   we just showed.  It's the whole, right?

17   **A.**  No.

18   **Q.**  It's intended to capture the whole?

19   **A.**  Yes, but it's made -- the overall rating is made by the

20   readers at a time when they may not have all the information

21   that ultimately will be available.

22   **Q.**  Let's ask a few questions.  The overall rating takes into

23   account the teacher recommendations, right?

24   **A.**  I believe so.

25   **Q.**  The overall rating takes into account the guidance

1    counselor recommendations, correct?

2    **A.**   It could.

3    **Q.**   The overall rating takes into account the essays that are

4    written, correct?

5    **A.**   I believe it would, yes.

6    **Q.**   The overall rating, if the alumni interview has taken

7    place, the overall rating will take into account the alumni

8    interview ratings, correct?

9    **A.**   Yes, I believe it -- it would try to take account of all

10   those factors --

11   **Q.**   The overall -- sorry.

12   **A.**   -- when the person is trying to make their assessment of

13   this candidate's overall strength.

14   **Q.**   The overall rating will take into account

15   extracurriculars, right?

16   **A.**   Yes, to the extent they have all the letters at the time

17   they do it.

18   **Q.**   The overall rating would take into account athletics,

19   correct?

20   **A.**   Yes, again, same caveat.

21   **Q.**   Subject to your caveat, it will take into account

22   academics, correct?

23   **A.**   Yes.

24   **Q.**   That includes SAT, GPA, those kind of things, correct?

25   **A.**   Right.  But remember, this is just one of the reader's

1   early assessments.

2   **Q.**   And it also takes into account all the observables we

3   talked about, say, for academics, like national awards and

4   how many AP classes you took or AP scores; it takes all of

5   that into account, right?

6   **A.**   Yes.   To the extent it's available at that time.   And

7   again, subject to the fact that this is just one reviewer and

8   in the ultimate admissions decision, there's 40 votes.

9   **Q.**   Yeah, but the personal rating is also the view of one

10   reviewer, right?

11   **A.**   Or the second, yes, agreed.

12   **Q.**   Same thing with the overall rating?

13   **A.**   Agreed.

14   **Q.**   Nothing different from the personal rating so far?

15   **A.**   Yes.

16   **Q.**   Great.   It could also take into account geography?

17   **A.**   Yes, I believe so.

18   **Q.**   And the quality of the high school?

19   **A.**   Yes, I believe so.

20   **Q.**   And socioeconomic status?

21   **A.**   Yes, I think so.

22   **Q.**   And so far we've gone through a big list of things that

23   the overall rating includes, and the personal rating takes

24   into account potentially all those, too, although I will

25   acknowledge your testimony that you think academics are less

1  important, right?

2          MR. WAXMAN:  Objection.  That mischaracterizes the

3  testimony.

4  **Q.**  Please answer whatever way you see fit.  The personal

5  rating takes into account all of these things as well,

6  correct?

7  **A.**  I think the personal rating would -- I'm having a hard

8  time remembering the full list of questions you've asked me.

9  **Q.**  I'll give you a big list.  And then --

10  **A.**  I think it would take into account all these guidance

11  counselor letters and so on, yes.

12  **Q.**  And extracurriculars, athletics, geography, quality of

13  the high school, socioeconomic status and even a little bit

14  of academics, right?

15  **A.**  I'm not entirely sure about athletics.

16  **Q.**  Okay.  With that caveat?

17  **A.**  For example, for example -- I'm just giving an example --

18  I'm not entirely sure I agree with that.

19  **Q.**  The overall rating also includes consideration of

20  Harvard's confessed use of race, correct?

21          MR. WAXMAN:  Objection.  Again, can we have

22  questions instead of freighted conclusions like "confessions

23  of the use of race."  Harvard proclaims that it takes race

24  into account in its admissions process and that that factor

25  is included in the preliminary overall rating and not the

1    other -- not the four profile ratings.

2              MR. MORTARA:  Your Honor --

3              THE COURT:  Overruled.

4              MR. MORTARA:  Thank you.  And I would ask that the

5    coaching stop, but here we go.

6              MR. WAXMAN:  This is not coaching.  This is

7    embedding in a question a freighted conclusion that Harvard

8    has, quote, confessed to something.  The rest of the question

9    is not objectionable.

10             MR. MORTARA:  I'll rephrase the question to resolve

11   the objection.

12             THE COURT:  The question -- if you want to give me

13   a big explanation about why the question is objectionable,

14   let's do it at sidebar.  If you just want to object, all you

15   have to do is stand up and object and give me either the rule

16   or two sentences -- two words on mischaracterizes, for

17   example.

18   Q.  All right.  The preliminary overall rating also includes

19   Harvard's admitted use of race.  You've heard a bunch of

20   Harvard witnesses testify and admit they use race in the

21   overall rating, correct?

22   A.  Yes.  My understanding is, of course, that race is not a

23   factor in many students' cases, but it could be -- for highly

24   competitive cases, it could be a factor, yes.

25   Q.  I want to talk about your work on the overall rating in

1  your reports.  Are you ready?

2  **A.**  Yes.

3  **Q.**  There isn't any work on the overall rating in your

4  reports, is there?

5  **A.**  There is no models of the overall rating, no.

6  **Q.**  You did no work on the overall rating in your reports,

7  did you?

8  **A.**  I believe the word would be mentioned in my reports.

9  **Q.**  But you did no analysis or work related to the overall

10  rating in your expert reports, correct?

11  **A.**  I did not report any analysis in my reports.

12  **Q.**  I'm only asking about things you've reported.

13  **A.**  Yes, yes.

14  **Q.**  And that's because you decided very early on that the

15  evidence suggested that the overall rating already included

16  some potential race-based tips so you did almost no careful

17  analysis of it, correct?

18  **A.**  Yes, that was true at the time of my deposition.  Since

19  then --

20         MR. MORTARA:  Your Honor, I'm going to ask him to

21  stop.  I only want disclosed opinions.  My question is very

22  clear.

23         THE COURT:  Well, you asked him -- you said you did

24  almost no careful analysis of it, correct, with no timeframe

25  on it, and he said, yes, that was true at the time of his

1  deposition.

2       MR. MORTARA:  That's the answer.  I didn't ask for

3  undisclosed expert opinion, Your Honor.

4       THE COURT:  Well, I don't think he was giving you

5  an undisclosed expert opinion.  I think he was trying to take

6  your question which did not have a timeframe and say this was

7  then and that was at a different time.  Either you can ask a

8  follow-up question or they can ask it when it's their turn.

9  Q.  Go ahead, sir.

10  A.  I'll stay with that answer if you want.

11  Q.  Tell me whatever it is that you wanted to tell me.

12  A.  I was going to say I've looked at the issue in much

13  greater detail since then.

14       MR. MORTARA:  Your Honor, could I have a sidebar?

15       THE COURT:  Yes.  Do you guys want a morning break,

16  or do you want to keep going until noon?  How about a

17  15-minute break so we can talk for five minutes and then you

18  can have a ten-minute break, so we'll be back at 11:25.

19       [Sidebar sealed and redacted.]

20       (Recess taken.)

21  BY MR. MORTARA:

22  Q.  Professor Card, you did not include the overall rating in

23  any of the admissions models in your expert reports, correct?

24  A.  Correct, yes.

25  Q.  And that's since your analysis seeks to isolate the

1    incremental effect of race on admissions decisions, it is

2    inappropriate to include any variables that themselves can be

3    affected by race, correct?

4    **A.**   Yes.

5    **Q.**   You agree that if one of Harvard's ratings, such as the

6    overall rating, may be influenced by an applicant's race,

7    then it should not be included in any model that is

8    attempting to estimate the effect of race, correct?

9    **A.**   Not precisely, no.

10   **Q.**   Could you turn to your first expert report.  At page 63,

11   sir.

12            (Pause.)

13   **Q.**   Are you there?

14   **A.**   Yes.

15   **Q.**   And over to the top of 64 in paragraph 132, it says, The

16   second row also relies on Professor Arcidiacono's model six

17   but removes the overall rating.  Do you see that?

18   **A.**   Yes.

19   **Q.**   Professor Arcidiacono's model six had included the

20   overall rating, correct?

21   **A.**   Yes.

22   **Q.**   And you say, comma, which should not be included in any

23   model that is attempting to estimate the effect of race

24   because, as discussed above, the overall rating may be

25   influenced by an applicant's race.  That's in your expert

1  report, right?

2  **A.**  It is, yes.  But the "as discussed above" is trying to

3  make the point that it's about, like, race per se has an

4  effect on the rating rather than race may be a contextual

5  factor.

6  **Q.**  "Per se," that's not a phrase that appears anywhere in

7  your expert reports in connection with this issue, is it?

8  **A.**  I don't actually know.

9  **Q.**  You think a rating cannot be used in your model even if

10  the influence of race in that rating may be just a positive

11  one, in other words, only a tip being given to

12  African-Americans, Hispanics, and other groups, right?

13  **A.**  Yes.  If it was a pure tip based on the race alone, yes,

14  I would say it should be excluded.  Yes, I agree.

15  **Q.**  And because you decided very early on that the evidence

16  suggested that the overall rating already included some

17  potential race-based tips, at the time of your deposition you

18  had done almost no careful analysis of it, correct?

19  **A.**  Yes.

20  **Q.**  So we've got may be influenced by race, can be affected

21  by race, and potential race-based tips in the overall rating,

22  correct?

23  **A.**  I don't quite understand the question.

24  **Q.**  The overall rating may be influenced by race, correct?

25  **A.**  Yes.

1    Q.   The overall rating can be affected by race, correct?

2    A.   Yes.

3    Q.   The overall rating contains some potential race-based

4    tips, correct?

5    A.   Yes.

6    Q.   And that corresponds -- I know you were here for Dean

7    Fitzsimmons' testimony -- to what Dean Fitzsimmons said on

8    page 50 of day 4, putting it on the screen at line 7.

9         "Q.   How could race be considered in the

10   preliminary overall rating?

11        "A.   If as the -- you're doing your preliminary

12   overall rating if you think that this might be an additional

13   little element that might be helpful in terms of making a

14   case that this person, as I say, might be an unusual educator

15   of others, the person might decide to factor that into the

16   preliminary overall rating."

17        Did you hear Dean Fitzsimmons give that testimony?

18   A.   I believe I did, yes.

19   Q.   In preparing your reports in this case, you relied on

20   Dean Fitzsimmons and a personal phone call you had with him

21   for your view that race was not influencing the personal

22   rating, correct?

23   A.   Among other materials, yes.

24   Q.   And as of your deposition, you did nothing to verify what

25   Dean Fitzsimmons told you, correct?

1   **A.**   Correct, yes.

2   **Q.**   Now, we showed earlier the results of your model from

3   Exhibit 21 of your opening report, if you remove the personal

4   rating.  And what you told me was, the overall average

5   marginal effect is statistically significant and negative.

6   Correct?

7   **A.**   Yes.

8   **Q.**   If the personal rating may be influenced by race, per se,

9   whatever way that you think it applies to the overall rating,

10   then removing it from your model results in the finding of a

11   statistically significant Asian penalty, correct?

12   **A.**   Yes, excluding it entirely, which I don't think it would

13   be the right thing to do, but, yes.

14   **Q.**   Now I want to talk about the modified ratings model you

15   showed yesterday.  This is your slide DD 10.83.  No

16   significant effect of Asian-American ethnicity using modified

17   ratings.  Do you see that?

18   **A.**   Yes.

19   **Q.**   And this is where you used Professor Arcidiacono's

20   ratings models for the personal extracurricular and academic

21   ratings to try to remove any effect of race from them, and

22   then you substituted those recalculated ratings for the real

23   ones in the database and ran your model again.  Do I have

24   that right?

25   **A.**   Yes.

1    **Q.**  And to be clear, you were no longer using the actual
2    ratings that Harvard reviewers assigned, you were using these
3    mapped or virtual ratings that you had computed using the
4    ratings models, right?
5    **A.**  Yes, that's what I've done here.  I have done it the
6    other way as well.
7    **Q.**  The regular way, which is your preferred model, right?
8    **A.**  No, I have done it the other way where I actually take
9    the actual rating and subtract off the effect of race.
10   **Q.**  Is that what this is?
11   **A.**  No.
12   **Q.**  What is this?
13   **A.**  This is using the predicted ratings, as you said,
14   precisely as you said.
15   **Q.**  I want to make sure I understand here.  You removed the
16   Asian effect from the ratings when you did this modified
17   ratings model, right?
18   **A.**  I removed the effects of race from all three of the
19   ratings, yes.
20   **Q.**  Okay.  Just want to make sure we have that.
21          I'm sorry, Professor Card, now I lost my train of
22   thought.  I'll get it back in just ten seconds.
23          You didn't use the ratings from Harvard's database,
24   you substituted modified ratings, correct?  In what's showing
25   on DD 10.83?

1  **A.**   Yes.   That would be a way to summarize it, yes.

2  **Q.**   All right.   Now you removed the effect of race that you

3  were talking about yesterday with Mr. Waxman on the three

4  profile ratings -- academic, extracurricular, and personal --

5  when you made these modified ratings, right?

6  **A.**   Yes.

7  **Q.**   And what that really means is so on academic, there was a

8  positive Asian coefficient, right, and you associated that

9  with unobservables like national awards and other things,

10  right?

11  **A.**   My belief is that's the correct interpretation of that.

12  Just as my interpretation of all the racial gaps is like

13  that.   But in this exercise I'm not making a stand on what

14  the source of this difference is.   I'm just subtracting it

15  off.

16  **Q.**   You were playing even-Stevens with all the three ratings,

17  right?   You just took out race in all of them.

18  **A.**   Yes.

19  **Q.**   And what that means is that because there was a positive

20  effect of being Asian on the academic rating which you

21  associated with unobservables, you would end up moving some

22  Asians from a 1 to 2 and some from a 2 to a 3.   That's what

23  it means to pull out a positive effect, right?

24  **A.**   Yes.

25  **Q.**   And same thing with extracurricular, although the effect

1   was smaller, some would go from a 1 to a 2 and some would go

2   from a 2 to a 3, right, for Asians?

3   **A.**   No, that's not correct.  The effect is bigger for

4   extracurricular.

5   **Q.**   Oh, okay.  There are still some that go from 1 to 2 and 2

6   to 3, right?

7   **A.**   Yes.

8   **Q.**   And then for personal, it kind of runs the other way.

9   Same Asians would go from 3 to 2s and some would go from 2 to

10  1s, right?

11  **A.**   Yes.

12  **Q.**   So you've reduced the Asian ratings on two of the ratings

13  and raised them on one, and then you recalculate -- you've

14  done it for everybody else, too, for whatever race effects

15  there are, whites, blacks, Hispanic and other, right?

16  **A.**   Yes.

17  **Q.**   Then you recalculated it, and these are were the results

18  that you got, right?

19  **A.**   Yes.

20  **Q.**   And I think you already said this, but in this instance,

21  you were assuming that the race effects seen in the academic

22  and extracurricular ratings were actually because of race,

23  because Professor Arcidiacono has concluded that the race

24  effects in the personal rating are because of race, right?

25  **A.**   I don't remember my precise wording.

1    **Q.**   Use your own words.

2    **A.**   Okay.  So what I was trying to do was if one was

3    concerned about the effect of race influencing each of these

4    three ratings for some reason other than unobservable

5    characteristics, so animus against Asians, for example, or

6    some kind of stereotyping bias, whatever that means, then I

7    tried to adjust all three on an equal basis from the model

8    that he had developed his model 5 in each case.

9    **Q.**   And just to be clear for the record, you don't actually

10   believe that the academic and extracurricular models have an

11   Asian boost that comes from race, just like you don't believe

12   that the personal rating has an Asian penalty, right?

13   **A.**   That's right.  I think that -- that's right, yes.

14   **Q.**   Now, you used Professor Arcidiacono's ratings models to

15   do this, right?

16   **A.**   Yes.

17   **Q.**   But you criticized Professor Arcidiacono's ratings models

18   for their low explanatory power, right?  That's what's shown

19   here on DD 10.61, particularly the personal rating and

20   extracurricular rating.  You spent some time yesterday

21   criticizing the low explanatory power of Professor

22   Arcidiacono's rating models, right?

23   **A.**   I pointed out that they have low explanatory power.  As I

24   said I think yesterday very clearly, simply having a low R

25   squared or pseudo R squared isn't necessarily the damaging

1    criticism.  What is important to realize, though, is when

2    there's a low R squared or pseudo R squared, there's an

3    enormous influence of unobserved factors, and that opens up

4    the door for potential omitted variable bias.

5    **Q.**   Okay.  So now we have your virtual rating on modified

6    rating analysis, it's a rating where Asians get lower

7    academic ratings than they should have because you took out

8    the unobservable effects, right?

9    **A.**   On the average across all the Asians there would be some

10   reduction in their academic scores, yes.

11   **Q.**   And that means that this modified model will potentially

12   explain some Asian rejections based on this modified lowering

13   of the academic rating, correct?

14   **A.**   Well, all three are done at once.

15   **Q.**   I'm going to go through all three.

16   **A.**   All right.

17   **Q.**   But that's correct, right, about the academic rating?

18   **A.**   So it's going to lower their ratings, and then the model

19   is going to be re-estimated to see how different candidates

20   compare against each other, yes.

21   **Q.**   And with the lower academic rating, it will explain Asian

22   rejections on the basis of that modified rating -- I'm going

23   to do all the ratings, all three of them.

24        THE COURT:  What's the slide number on this?  I

25   know it's ten --

1          MR. MORTARA:  This one, Your Honor, is DD 10.61.

2          Let me go back to the modified ratings analysis at

3     some point.

4     Q.  All right, so I'll ask my question again.  What it means

5     is your virtual ratings analysis model will potentially

6     explain Asian rejections based on an artificially lowered

7     academic rating, correct?

8     A.  No.

9     Q.  Well, what's wrong with what I said?

10    A.  Well, it's not artificially lower.  It's subtracting off

11    the component of that rating, precisely the component of that

12    rating, each of the ratings, that Professor Arcidiacono's

13    model explains as being unobservably different between

14    Asian-Americans and whites controlling for all the other

15    factors in his model.

16    Q.  And just to be clear, you don't think race is influencing

17    the academic or extracurricular ratings, right?

18    A.  I think the most likely -- correct.  My mostly likely

19    explanation is unobserved characteristics, yes.

20    Q.  But you substituted lower academic and extracurricular

21    ratings for Asians because of the unobservable

22    characteristics effect Professor Arcidiacono found, right?

23    In your modified reason analysis, that's what you did.

24    A.  Right.  So as I said -- correct.  His models find that,

25    for whatever reason, the raters, the readers of the file are

1    assigning a higher academic and extracurricular rating than

2    can be predicted by the observables, just as they find a

3    lower personal rating than can be explained by the

4    observables.  So I took all three at once, yes.

5    **Q.**   Thank you, Professor Card.  Sorry it took so long.

6              Professor Card, you did not address anywhere in

7    your expert reports or your deposition Professor

8    Arcidiacono's model of the teacher and guidance counselor

9    ratings, did you?

10   **A.**   I don't believe I have any written commentary on that,

11   but I certainly thought about them.

12   **Q.**   I'm only asking about what you've disclosed to us, okay.

13             But you were here when Professor Arcidiacono talked

14   about his findings that race influenced those ratings,

15   weren't you?

16   **A.**   I was here when he said something about that, yes.

17   **Q.**   Your modified rating analysis did not deploy the teacher

18   ratings, did it?  It didn't change them.  It used them as

19   they were in the database, did not remove any race effects

20   from the teacher ratings, correct?

21   **A.**   Correct.

22   **Q.**   And one other thing about your virtual rating analysis,

23   the overall rating, you did not use the overall rating in the

24   modified rating analysis, did you?

25   **A.**   No.

1   **Q.**  Now, you understand that Professor Arcidiacono has a

2   ratings model of the overall rating, correct?

3   **A.**  Yes.

4   **Q.**  You could have used Professor Arcidiacono's ratings model

5   of the overall rating to also modify it in your modified

6   rating model, correct?

7   **A.**  Yes, I could have.  And of course, we weren't using --

8   neither of us was using the overall rating in the model, so

9   that didn't seem to be a first order of concern.

10  **Q.**  I just want to get something straight.  The purpose of

11  the modified ratings analysis is to try to get out the

12  effects of race from Harvard's admissions process and see

13  what it looks like working from, in the first instance,

14  Professor Arcidiacono's models, right?  That's the purpose of

15  it.

16  **A.**  Working on the three profile ratings, yes.

17  **Q.**  But there's an effect of race in Harvard's admissions

18  process in the overall rating, correct?

19  **A.**  In his models there is, yes.

20  **Q.**  I mean, Harvard admits it uses race in the overall

21  rating, right?

22  **A.**  Yes.

23  **Q.**  And you did not take out the effect of race from the

24  overall rating and then use it in your modified ratings

25  analysis even though you could have, right?

1    **A.**  I didn't report that, but, actually, I did that exercise.

2    **Q.**  You didn't disclose it to us, did you?

3    **A.**  Well, I didn't because it's actually more favorable -- it

4    makes the Asian-American ethnicity effect even smaller,

5    closer to zero.

6              MR. MORTARA:  Your Honor, I move to strike the last

7    answer.

8              MR. WAXMAN:  It's totally responsive.

9              MR. MORTARA:  It's a yes or no question.

10             THE COURT:  No, it's not responsive.  The answer is

11   struck.

12             The question was:  You didn't disclose it to us,

13   did you?

14   **Q.**  Now, Professor Card, the admissions models you made are

15   discrete choice models as we've discussed, right?

16   **A.**  Yes.

17   **Q.**  And you teach discrete choice modeling at Berkeley,

18   right?

19   **A.**  Yes.

20   **Q.**  You teach discrete choice modeling in your labor

21   economics course, correct?

22   **A.**  Sometimes, yes.

23   **Q.**  And when you teach discrete choice modeling in your labor

24   economics course, you assign your students as recommended

25   reading works by Professor Michael Keane, correct?

1    **A.**   I don't actually remember but, perhaps, yes.

2    **Q.**   Let me see if I can refresh your memory.

3              MR. MORTARA:  May I approach, Your Honor?

4              THE COURT:  Sure.

5    **Q.**   What I've handed you, Professor Card, is a partial course

6    outline and reading list for Economics 250A.  This is the

7    course outline and reading list for your labor economics

8    course.

9    **A.**   Well, I haven't taught this particular course for several

10   years, but, yes.

11   **Q.**   And if you turn to the third page, you'll see there's a

12   lecture on structural modeling?

13   **A.**   Yes.

14   **Q.**   And there's two articles, including one that's

15   double-starred by Michael Keane, double-star indicating that

16   you recommend reading that, correct?

17   **A.**   Yes.

18   **Q.**   And Professor Keane is a recognized leader in the field

19   of discrete choice modeling, isn't he?

20   **A.**   I think that's fair to say, yes.

21   **Q.**   And in fact, in your handbook of labor economics that you

22   edit, the discrete choice modeling chapter is by Michael

23   Keane, correct?

24   **A.**   Yes, with a co-author, I believe.

25   **Q.**   It's co-authored by Michael Keane, correct?

**A.**  Yes.

**Q.**  And you heard Mr. Lee talk with Professor Arcidiacono about a group of economists who wrote a brief to this Court agreeing with you.  Do you remember that?

**A.**  Yes.

**Q.**  It was actually an exchange between Professor Arcidiacono and Mr. Lee, and Mr. Lee said something like Janet Yellen -- Dr. Card agrees with Janet Yellen, and I think Professor Arcidiacono said, I'd actually say it's more like she agrees with Professor Card.  Do you remember that?

**A.**  I remember some exchange.  I don't remember the precise words.

**Q.**  And Mr. Lee mentioned Janet Yellen, and you referred to two Nobel Prize winners, who are George Akerlof and Robert Solow, right?

**A.**  Yes.

**Q.**  Did you share the results of your model, including all the coefficients, with Janet Yellen?

**A.**  No.

**Q.**  Do you assign articles about discrete choice modeling written by Janet Yellen to your students?

**A.**  No, they're not on my -- no.

**Q.**  I didn't think so.

So now let's look at C70.  I'm going to hand that to you right now.  It's your binder.  You've got it in your

1    binder.  They've got it in their binder.  No one needs it to

2    be handed to them.

3             And this is a brief filed by economists, including

4    Michael Keane -- and that's the same Michael Keane whose

5    readings you assign when you teach discrete choice modeling

6    at Berkeley, correct?

7    **A.**  Yeah, one of his papers, yes.

8    **Q.**  And there's another gentleman here, named Fang Hanming,

9    Hanming Fang as he's also called, is a professor of economics

10   at the University of Pennsylvania, correct?

11   **A.**  I don't quite see where are we.

12   **Q.**  Second name on the screen, C 70 in your binder.

13   **A.**  I'm sorry, give me a second.

14   **Q.**  Sorry, take your time, sir.

15   **A.**  Okay.  I'm sorry.

16   **Q.**  Do you have it?  Just the front page.

17            I'm asking you about Fang Hanming, or Hanming Fang,

18   professor at University of Pennsylvania.  You know him, too,

19   right?

20   **A.**  I know of him.  I know of him a little bit.  I don't

21   think I've ever met him personally.

22   **Q.**  And he works on discrete choice modeling, too?

23   **A.**  He may have.  I think of him more as a theorist.

24   **Q.**  Well, let's stick with Professor Keane then.  Let's see

25   what these economists said about your work.  Just turn to

1    page 3.

2              Beginning is, Harvard's personal rating scores are

3    significantly biased against Asian-Americans.

4              Then it says, Dr. Arcidiacono persuasively shows

5    that Harvard's personal rating scores are biased against

6    Asian-Americans.

7              This is the brief by Michael Keane, who, when you

8    teach discrete choice modeling to your labor economics

9    course, you assign his articles.  That's what it says, right?

10   **A.**   He certainly signed the brief, and he certainly -- I've

11   used his papers in my class, apparently, yes.

12   **Q.**   And then, if you turn to the next page in the middle

13   paragraph, I'll read you another section.  "This issue is

14   critical.  The inclusion or exclusion of the personal rating

15   has the largest effect of any modeling decision on the

16   estimated degree of discrimination against Asian-American

17   applicants.  If the personal rating is biased, then all the

18   sensitivity analyses performed by Dr. Card to confirm there

19   is no evidence of discrimination are invalid, for they all

20   include the personal rating."

21             That's what Michael Keane -- that's what his brief

22   that he signed says, right?

23   **A.**   Yes.  I don't know how they would know that this has the

24   largest effect, because, like I showed in that analysis where

25   I go from my model to Professor Arcidiacono's model, there's

1    effects of excluding parental occupation and so on.  Those

2    set of variables that's -- I don't exactly know whether it

3    would be larger or smaller than the effect of removing the

4    personal rating.

5    **Q.**  Could you please turn to page 8?

6    **A.**  Yes.

7    **Q.**  And at the bottom, before the subheading 1, Professor

8    Keane's brief says, "Here it is unreasonable to infer that

9    missing data could be causing the racial disparities in

10   personal rating scores.  No plausible, nondiscriminatory

11   reason explains why Harvard rates Asian-American applicants

12   as less personally appealing than applicants in other racial

13   groups."  Do you see that?

14   **A.**  I do, yes.

15   **Q.**  Professor Keane, whose work you assign when you teach

16   discrete choice modeling in your labor economics class,

17   signed a brief that says that, correct?

18   **A.**  He did, but I certainly very strongly disagree with his

19   opinion.

20   **Q.**  Turn to page 12, over to 13.  There's a paragraph

21   bridging those two paragraphs that I want to talk about.

22          This is where Professor Keane and his colleagues

23   are talking about your comparison of Professor Arcidiacono's

24   findings on the academic and extracurricular ratings and his

25   findings on the personal rating.

1          It says at the top, "Dr. Card's claim of selective

2     reasoning is mistaken."

3          Do you see that?

4     **A.**  Excuse me.  I can't read the screen.

5     **Q.**  It's on page 16.  Go on the hard copy.

6     **A.**  16, I'm sorry.

7          MR. MORTARA:  I believe it's 16.

8          MR. WAXMAN:  I believe it's 12.

9          MR. MORTARA:  12, I'm sorry.

10         THE COURT:  16 of 24 at the top or 12 on the

11    bottom.

12         MR. MORTARA:  Thank you, Your Honor.

13    **Q.**  Do you see, "Dr. Card's claim of selective reasoning is

14    mistaken."  Have you found that?

15    **A.**  I see that statement, yes.

16    **Q.**  And then the paragraph that bridges the two pages is,

17    "This argument is premised on a false dichotomy.  It makes

18    sense to infer that missing data may explain the gap favoring

19    Asian-Americans in the academic and extracurricular rating

20    scores relative to their test scores because Asian-Americans

21    objectively outperform all other applicants in academic and

22    extracurricular measures.  It does not make sense to infer

23    that missing data explains away the much starker racial

24    disparity disfavoring Asian-Americans in the subjective

25    personal rating scores because no observable data justifies

1    that inference."

2          And I understand you disagree.  My question is, is

3    this what Professor Keane said?

4    **A.**   That's what he signed.  I believe it's a completely false

5    statement, but it's what he signed, yeah.

6    **Q.**   Have you talked to him about it?

7    **A.**   No.

8    **Q.**   Over here on page 15, Michael Keane also agrees with

9    Professor Arcidiacono and disagrees with you in the question

10   of interaction with disadvantaged status, right?

11   **A.**   That's what this heading says, yes.

12   **Q.**   And over on page 17, you can see a discussion of the ALDC

13   issue, right?  And it summarizes your arguments and concludes

14   that on the ALDC issue, Dr. Arcidiacono has the better

15   argument, right?  That's what professor Keane concluded.

16   **A.**   That's -- he writes that sentence, precisely, yes.

17   **Q.**   And then on the next page, I want to talk about one of

18   the results in that conclusion.

19          He talks about the staff interview issue you and I

20   had discussed earlier.  And he says, "The personalized

21   treatment afforded special category applicants provides a

22   logical reason to think that Asian-Americans in that group,

23   ALDCs, are less likely to suffer from stereotyping and

24   implicit bias than are other Asian-American applicants, and

25   provides a sound justification for excluding special category

1   applicants from the sample."

2            That's what Professor Keane said, right?

3   **A.**   That's what he said.  Of course, I -- as before, I

4   disagree strongly with this interpretation.

5   **Q.**   And you assign his articles in your labor economics

6   course when you're teaching discrete choice modeling,

7   correct?

8   **A.**   When I did, yes.

9   **Q.**   And the Harvard admissions models that you and Professor

10  Arcidiacono created are discrete choice models, correct?

11  **A.**   They are, yes.

12           MR. MORTARA:  I have no further questions, Your

13  Honor.

14           MR. WAXMAN:  My turn?

15           THE COURT:  Your turn.

16  RE-EXAMINATION BY MR. WAXMAN:

17  **Q.**   Good afternoon, Professor Card.

18  **A.**   Yes, thank you.

19  **Q.**   Was there a brief filed in this case supporting your

20  conclusions?

21  **A.**   There was, yes.

22  **Q.**   And how many economists signed that brief?

23  **A.**   I don't remember.

24  **Q.**   Does the number 16 sound about right?

25  **A.**   Yes.

1  **Q.**  And as we've heard from Mr. Mortara, that brief, the

2  signatures included Janet Yellen, correct?

3  **A.**  Yes.

4  **Q.**  Is she a respected economist in this country and in the

5  world?

6  **A.**  Yes.

7  **Q.**  And it is also signed by two Nobel Prize winners in

8  economics; is that correct?

9  **A.**  Yes.  George Akerlof and Bob Solow, both of whom have

10  made very important contributions in the areas of labor

11  economics.

12  **Q.**  I want to ask you a couple of questions following up on

13  Mr. Mortara's examination about the treatment of

14  international students, and I want to ask Mr. Lee to please

15  pull up page 21 of Dr. Arcidiacono's report.

16            And would you highlight the sentence that begins,

17  "I limited the focus."

18            Can you please read that sentence from Professor

19  Arcidiacono's report?

20  **A.**  Right.  "To start, I limited the focus to domestic,

21  non-transfer applications."  Do you want me to keep going?

22  **Q.**  Yes, please, the next sentence.

23  **A.**  "Harvard's internal tracking of applicant race treats

24  international applicants as their own category, so I likewise

25  excluded them from my analysis."

1    **Q.**  And now let me ask Mr. Lee to pull up page 13, footnote

2    eight of your report.

3              Would you please read the first sentence of that

4    footnote in your report?

5    **A.**  Yes.  "I follow Professor Arcidiacono by defining

6    domestic applicants as those who are U.S. citizens or

7    permanent residents and am limiting my analysis to domestic

8    applicants."

9              Could I just emphasize permanent residents is quite

10   important.

11   **Q.**  Okay.  Let me now ask you some questions about the

12   personal rating.  Mr. Mortara asked you about an analysis

13   that you -- that you, sorry, conducted in your opening report

14   in which you entirely threw out the personal rating, correct?

15   **A.**  Yes.

16   **Q.**  Now, you talked about this in your direct, but would you

17   remind Her Honor if the personal rating reflects some effect

18   of race, is throwing that rating out of the model the right

19   thing to do?

20   **A.**  No, not at all because, of course, there's lots of -- the

21   amount of variability in the personal rating that is driven

22   by race is quite small compared to the variability driven by

23   all the other factors.  And so, in my view, it would make

24   sense if one was concerned about these issues of racial

25   biases in the ratings to correct for the small components due

1    to race in each case, and then -- but try and retain as much

2    as possible the other information.

3    **Q.**  Mr. Lee, would you please pull up Professor Card's

4    opening report on page 71, paragraph 152.

5            And apologies for -- I believe you have your

6    reports there if you can't read this.

7            But am I right that you describe the analysis that

8    Mr. Mortara discussed with you as, quote, very conservative?

9    **A.**  Yes.

10   **Q.**  And why was it very conservative?

11   **A.**  Well, I think, as we just discussed, it's -- in my view,

12   this is a much too extreme idea of throwing out the entire

13   rating but -- so in that sense it's conservative, yes.

14   **Q.**  Now, Mr. Mortara asked you if you relied on a

15   conversation with Dean Fitzsimmons in determining that the

16   applicant's race is not directly considered in the personal

17   rating.  Do you remember that?

18   **A.**  Yes.

19   **Q.**  And you said, if my notes are correct, that you relied on

20   it among other materials, correct?

21   **A.**  Yes.

22   **Q.**  What else did you do to arrive at your conclusion that

23   the personal rating doesn't reflect the applicant's race?

24   **A.**  Well, I was able to review the testimony of -- and

25   depositions, excuse me, of quite a few other admissions

1    officers, including his own deposition, and there were some

2    additional materials, obviously, from Harvard.

3    **Q.**  Mr. Mortara also asked you some questions about your

4    modified ratings analysis, right?

5    **A.**  Yes.

6    **Q.**  And let's just be clear.  Do you think that race is

7    driving the correlations that Dr. Arcidiacono found for any

8    of the three profile ratings he modeled: academic,

9    extracurricular or personal?

10   **A.**  No.  I don't think -- I think the most likely

11   interpretation is not that at all, no.

12   **Q.**  So in your modified ratings analysis, are you making an

13   assumption contrary to that actual conclusion?  In other

14   words, now you're assuming, contrary to your conclusion, that

15   race actually does affect those ratings, whether by

16   stereotypical views about Asian-Americans and whites or

17   otherwise?

18   **A.**  Right.  So if you think that -- if -- contrary to my

19   view, if you think that race is driving these for some

20   stereotypical or animus basis of bias, then I think the right

21   thing to do is exactly what I did, which is to subtract off

22   that component from all three ratings, yes.

23   **Q.**  And remind us, again, what did you find when you used

24   those adjusted ratings in your model?

25   **A.**  What I found is that I get an estimated effects year by

1    year that are very similar to the estimates I got in my main

2    model, and the average marginal effect across all the years

3    is similar; and also, none of these are statistically

4    significant, so the substantive conclusions are not affected

5    by that.

6    **Q.**   Now, Mr. Mortara also showed you some numbers that showed

7    that ALDCs are more likely to receive staff interviews,

8    correct?

9    **A.**   Yes.

10   **Q.**   And I'm going to ask Mr. Lee to bring up the chart that

11   he showed, which I believe is Plaintiff Demonstrative 38,

12   slide 3.

13            Do you recognize this?

14   **A.**   Yes.

15   **Q.**   And let's look at the raw numbers.  Would you tell us how

16   many non-ALDC applicants received interviews?

17   **A.**   1,711.

18   **Q.**   1,711?

19   **A.**   Yes.

20   **Q.**   And how many ALDC applicants received interviews?

21   **A.**   1,366.

22   **Q.**   So I don't want to trust my ability to do math on the

23   fly, or even not on the fly.  Am I right that that means that

24   well over half the people who receive staff interviews are

25   not ALDCs?

1    **A.**   Yes.

2    **Q.**   Now, ALDCs are likelier to receive staff interviews than

3    non-ALDCs, right?

4    **A.**   Yes.

5    **Q.**   Is that a reason to throw out the staff indicator

6    variable?

7    **A.**   No, not in my view at all.  Because, again, the model

8    includes -- the model -- my admissions model includes

9    separate tips for each of the A and L and D and C, and then,

10   in addition, an indicator for whether one has an interview or

11   not.  So the variable for one having a staff interview or not

12   is an independent factor in the model and is -- because more

13   than half the people who get a staff interview are non-ALDCs,

14   is identifying differences across both ALDC and non-ALDC

15   students who get an interview.

16   **Q.**   So switching to a new topic, you testified that average

17   marginal effects or AMEs are more useful to refer to in this

18   case than coefficients, correct?

19   **A.**   I did, yes.

20   **Q.**   And would you remind us why?

21   **A.**   Yes.  Well, it has to do this with this S curve that

22   luckily is still sitting here.  I didn't realize it would be

23   so useful.  So it has to do with the fact that if one has --

24   as one has in the admissions setting such differences in the

25   underlying characteristics of students that two-thirds of

1    students are effectively out of the money completely, then

2    it's extremely important to think about the effects of

3    variables in a model which is a logistic type model as being

4    different for people who are in the bubble range.  And for

5    those people in the bubble range, as I tried to show in my

6    hypothetical and again mentioned in discussion of this issue,

7    for those people, any tip or benefit, like having a high

8    rating in some dimension or being from some sparse country or

9    having a particular other characteristic that's valued by the

10   admissions committee, that effect will be magnified in the

11   bubble range.  And so understanding the magnitudes of these

12   effects is quite important, and it particularly interacts

13   with multidimensionality issues.

14          So as I showed very simply, I think, or tried to

15   show very simply in one of my earliest slides, if one has a

16   student with only one strength, the value of that -- the

17   admission rate for students with one strength is only 2

18   percent.  So somebody who has got an academic 2 but nothing

19   else has only got a 2 or 3 percentage point probability of

20   admission.

21          Somebody who has two strengths goes up by to like a

22   14 percent probability.  So that second strength has a much

23   larger effect, independent of which one it is, when the first

24   one is already in play.  And again, when one goes to the

25   third, the same thing happens.  So if one has two strengths

1    and gets a third, then the probability goes up even more, and

2    that's exactly the kind of pattern that comes from these

3    models, and it's important in interpreting just about

4    everything in this case.

5            For example if one looks at so called tips for

6    African-Americans as a whole, African-Americans as a whole

7    have a tip that would be -- they're starting, in the absence

8    of that tip, at a base rate of admission of around 3 or so

9    percentage points, which is comparable to a student that has

10   one strength.

11           And just like in the case when I give a second

12   strength, the admission probability for the students with two

13   strengths goes up to 14 percent, just exactly like that.

14   When a student has one degree of strength and gets, say, a

15   tip for being African-American, it's as if we've given them a

16   second strength and their probability of admission rises

17   quite substantially.  It doesn't rise quite as much, it

18   doesn't rise all the way to 14 percent as these other

19   strengths but it rises.

20           So it's just fundamental to understanding the

21   admissions process and the way the characteristics interact

22   that one understands these average marginal effects.

23   Q.   If all that you knew or used was the coefficient, would

24   you be able to determine any of what you just explained?

25   A.   It's possible if somebody was an incredible expert in

1  understanding logit models and had great intuition, but in my

2  experience, no.

3  **Q.**  Now Mr. Mortara suggested that you were being misleading

4  by not reporting all of your coefficients.  Do you recall

5  that?

6  **A.**  He seemed to be suggesting that, I think.

7  **Q.**  Did you disclose to SFFA your dataset and code?

8  **A.**  Yes.

9  **Q.**  And that included every coefficient that arose from your

10  model, correct?

11  **A.**  They could construct every model that I estimated, yes.

12  **Q.**  Did you provide everything you would have provided to

13  your professional colleagues to assess your work?

14  **A.**  Yes.  In fact, what we do these days is we post an

15  appendix with all of the data and all of the programs, that's

16  standard protocol.

17  **Q.**  And SFFA could see all your coefficients by running that

18  code, correct?

19  **A.**  Yes.

20  **Q.**  Did you ever hear that SFFA was having difficulty in

21  doing so?

22  **A.**  No.

23  **Q.**  And now let me ask you, Mr. Mortara pointed out that Dr.

24  Arcidiacono reported a number of his coefficients in his

25  appendices, right?

1    **A.**   Yes.

2    **Q.**   Did he report all of them?

3    **A.**   No, not at all.

4    **Q.**   Do you recall any that he left off?

5    **A.**   Yes.  I specifically remember from his admissions models

6    that he leaves off the SAT variables, and some of those other

7    variables.  And some of those, as I mentioned before, have

8    this pattern that one might be a little surprised by it.

9    **Q.**   And in what respect?

10   **A.**   Well, certain of those models, the SAT variable itself

11   will have a negative effect.  It has a negative coefficient.

12   Excuse me.  Just looking at it in isolation.

13   **Q.**   Did it strike you as curious that Dr. Arcidiacono left

14   only those coefficients off the list?

15   **A.**   I wondered why, but --

16   **Q.**   Let me switch to another topic.

17              Mr. Mortara suggested that your coding of the

18   occupations was misleading or incorrect.  Do you recall that?

19   **A.**   Yes.

20   **Q.**   And I think you said your specialty was labor economics,

21   right?

22   **A.**   Yes.

23   **Q.**   Is this sort of thing, coding occupations, something that

24   you have expertise in?

25   **A.**   I have done it many, many times in many, many papers,

1    yes.

2    **Q.**   And did you do it in this case the same way that you

3    would do it in your academic work?

4    **A.**   Yes.  Normally I would try and follow as closely as

5    possible the BLS hierarchy so that's what we did, I did.

6    **Q.**   Another topic.  Do you recall Mr. Mortara's questioning

7    you about your decision to compare the sums of various

8    ratings for white and Asian-American applicants?

9    **A.**   Yes, I do.

10   **Q.**   Do you have Dr. Arcidiacono's rebuttal report there?  If

11   not, I'm sure we have --

12   **A.**   I do, yes.

13   **Q.**   Okay.  I want to ask Mr. Lee to pull up and for you to

14   look at Table 5.5R from Dr. Arcidiacono's rebuttal report.

15   And you can either see it on the screen or you can see it in

16   the report, but do you recognize this?

17   **A.**   Yes.

18   **Q.**   And does this show the proportion of applicants of

19   different races receiving teacher 1, teacher 2, and guidance

20   counselor ratings of 2 or better by academic index decile?

21   **A.**   Yes.

22   **Q.**   And, Mr. Lee, would you highlight the white and

23   Asian-American columns?  What does this show?

24   **A.**   Well, if one compares different levels of the academic

25   index, which is one of the ways -- seems to be largely

1    Professor Arcidiacono's preferred way of looking at academic

2    strength, you can see, for instance, among students in the

3    top decile, the academic index, so that would be the top 10

4    percent of applicants, that the whites in that category have

5    a higher probability of receiving a 2 on school support from

6    teacher 1 than Asian-Americans, so 50.17 versus 46.64.  For

7    teacher 2, same pattern, so 47.11 versus 43.10.  Same for the

8    guidance counselor rating, so 44.63 versus 38.34.  And the

9    same pattern one can see across each of the deciles I think,

10   or almost all of the deciles.

11   **Q.**   I would say -- is it true that white applicants on

12   average are stronger than Asian applicants on each individual

13   rating in all but a handful of the lowest deciles?

14   **A.**   Yes, I believe that's a fair characterization, yes.

15   **Q.**   All right.  Now stick with the same report.

16        Mr. Lee, can you pull up Dr. Arcidiacono's Table

17   5.6R from his report -- his rebuttal report.

18        And would you please highlight the alumni personal

19   rating?

20        Do you recognize this, Professor Card?

21   **A.**   Yes.  It's a very similar kind of exercise.

22   **Q.**   And again, I'm going to ask Mr. Lee to highlight the

23   white and Asian-American columns.

24        What does this show?

25   **A.**   So it's -- again, each row represents a different row of

1     the academic index decile, and so the bottom row is the top

2     decile.  And it shows in each in most of these rows, at least

3     just looking at it quickly and trying to remember what I knew

4     about this, one can see that whites have a higher probability

5     of getting an alumni personal rating of 2 or better in each

6     of the academic deciles.

7     **Q.**  In fact, it's true in every decile, except the lowest

8     decile, correct?

9     **A.**  Yes.  And of course, the lowest decile students are

10    largely out of the money.

11    **Q.**  Largely out of the money?

12    **A.**  I believe so, yes.

13    **Q.**  Very largely out of the money.

14          Mr. Lee, would you now display Dr. Arcidiacono's

15    rebuttal Table 5.7R, and would you highlight the alumni

16    overall rating table.

17          Do you recognize this?

18    **A.**  Yes.

19    **Q.**  And again, Mr. Lee, would you highlight the white and

20    Asian-American columns.

21          And what does this show?

22    **A.**  Well, it shows the same kind of pattern in most cases.

23    For example, at the top decile there's a small difference,

24    but when we go to the second decile, there's a bigger

25    difference, the third decile.  And so decile by decile, as

1 far as I can see, with the exception of the bottom decile,

2 whites are more likely to get a higher overall rating than

3 Asians, conditional on their academic index decile.

4 **Q.**  And just to be clear, were these all for Dr.

5 Arcidiacono's baseline dataset?

6 **A.**  I believe they are, yes.

7 **Q.**  So, in fact, this is showing -- this is even for the

8 dataset that excludes ALDCs, correct?

9 **A.**  Yes.

10 **Q.**  So were your results dependent in any way on the decision

11 to calculate the sums of the various ratings?

12 **A.**  No, not at all.

13 **Q.**  Now, do you recall Mr. Mortara asking you to agree that

14 your analysis can't completely rule out the possibility of

15 racial bias?

16 **A.**  Yes.

17 **Q.**  Can any statistical analysis of real world data as

18 opposed to a randomized experiment actually show or disprove

19 bias?

20 **A.**  No, never.

21 **Q.**  Have you seen anything in your entire analysis that

22 suggests racial bias against Asian-American applicants?

23 **A.**  No.

24          MR. WAXMAN:  No further questions.

25          MR. MORTARA:  Your Honor, I have about five to ten

1    minutes of recross if that's okay.

2              THE COURT:  Mr. Mortara, do you want those red

3    marks off the screen?

4              MR. MORTARA:  Is that the court technology?

5              THE COURT:  Do you want those gone.  You can go and

6    show him, Karen.

7              THE WITNESS:  My apologies.

8              If I touch this screen, it will --

9              THE COURT:  Yeah, you're trying to highlight

10   something on the screen, that's how you can do it.  I just

11   didn't want him to have to live with his highlighting marks.

12   I'm not criticizing you at all for putting them on there.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  Just giving you a clean slate to start

15   over again.

16             MR. MORTARA:  It's no problem.  Whenever you're

17   ready.

18             THE COURT:  Go ahead.

19   RE-EXAMINATION BY MR. MORTARA:

20   Q.  We meet again, Professor Card, very briefly for our last

21   time.

22             You talked with Mr. Waxman about how you relied on

23   depositions and other materials in addition to your phone

24   call with Dean Fitzsimmons for your conclusion that Harvard

25   didn't use race in the personal rating.  That just happened a

few minutes ago, you remember that, right?

**A.** Yes.

**Q.** One of the things you reviewed was the sworn testimony of someone called Christopher Looby, or Chris Looby.  Do you remember reading that deposition?

**A.** Yes, I do.

**Q.** And do you remember what Mr. Looby said about his use of race in the personal rating?

**A.** I do, but perhaps it would be useful to bring it up.

**Q.** You do remember?

**A.** I'm quite old, my memory isn't as good as it used to be.

**Q.** I'm going to refrain.

　　　　MR. MORTARA:  Your Honor, may I approach?

　　　　THE COURT:  Yes.

**Q.** I've got excerpts of the Looby deposition, and I'd like you to turn to what is marked page 51.

　　　　This is a deposition you read when you were preparing your expert reports, correct?

**A.** Yes.

**Q.** Question, line 12:  "Would you take a student's race into account when assessing his or her personal qualities?

　　　　"A.  Just like with the academic rating, it's one factor of many I consider."

　　　　That's what Mr. Looby said under oath in his deposition, correct?

1    **A.**   Yes.

2    **Q.**   And you reviewed that when you prepared your expert

3    reports, correct?

4    **A.**   Yes.

5    **Q.**   But you did not, in fact, mention that Mr. Looby had said

6    that anywhere in your expert reports, did you?

7    **A.**   I don't recall, but my interpretation is -- I certainly

8    was aware of it.

9    **Q.**   Okay.  Let's look at P 555 again.  That's the OCR

10   findings.  And on page 15 over to 16, is a highlighted

11   version on the screen that we've seen many times, and what it

12   says is that the Office of Civil Rights in the Department of

13   Education found in 1990 that Harvard's admissions officers,

14   some of them, were using race in the profile ratings,

15   correct?

16   **A.**   It could be reflected in the four ratings areas, yes.

17   **Q.**   And that's the profile ratings, correct?

18   **A.**   Yes.

19   **Q.**   You did not cite the Office of Civil Rights' findings in

20   your expert reports when you said race wasn't involved in the

21   personal rating based in part on the phone call, right?

22   **A.**   I didn't.  I had never seen that at the time I did my

23   reports.

24   **Q.**   You saw it here in court when Dean Fitzsimmons was

25   crossed for the first time, right?

1    **A.**   Sometime around then, yes.

2    **Q.**   And then the last document is P 509, also in your binder.

3    **A.**   P 509?

4    **Q.**   Yeah.  Take your time, sir.

5    **A.**   Okay, I found it.  I may have found it, yes.

6    **Q.**   It's a letter from Harvard's Office of the General

7    Counsel to the Office of Civil Rights.  And just at page 2,

8    there's a paragraph in the middle of the page, and I've got

9    some information highlighted that also came up during Dean

10   Fitzsimmons' cross.  This is a 2012 letter where Harvard

11   said, "The information that OCR gathered during the course of

12   that compliance review, and in subsequent cases, regarding

13   Harvard College's criteria for admission, its use of race as

14   a factor in admissions decisions, and its general policies

15   and procedures for selecting students for admission in its

16   undergraduate program is still accurate today."

17            You saw that during Dean Fitzsimmons' testimony,

18   correct?

19   **A.**   Yes.  I also saw the sentence above, "Nor did we find

20   that Asian-Americans were treated differently than white

21   applicants in the implementation of these processes."

22   **Q.**   You did not cite this letter with the OCR finding that

23   Harvard admissions officers used race in the profile ratings

24   in your expert reports, did you?

25   **A.**   No, I didn't.

1          MR. MORTARA:  No more questions.

2          MR. WAXMAN:  Just a few more before lunch.

3          THE COURT:  We really only allow two rounds each,

4     right?  We haven't had any re-redirect.

5               I will give you a very brief re-redirect, but he

6     will have his re-recross.

7          MR. MORTARA:  I will not take a re-recross, I'm

8     sure.

9          THE COURT:  I won't hold you to that.

10         MR. WAXMAN:  There won't be any material covered

11    other than a small subset of what my friend Mr. Mortara just

12    raised on cross-examination.

13    RE-EXAMINATION BY MR. WAXMAN:

14    **Q.**  With respect to the testimony of Christopher Looby, were

15    you here for Mr. Looby's testimony or did you review

16    Mr. Looby's testimony in this case?

17    **A.**  I did review it.  I wasn't here for it.

18    **Q.**  And do you recall him testifying about the way that he

19    used race in all of the profile ratings?

20    **A.**  Yes, I did.

21    **Q.**  And was that testimony here consistent with your

22    understanding of what he meant in his deposition, which you

23    reviewed prior to issuing your report, about how he uses race

24    in the evaluation of the various profile ratings?

25    **A.**  Yes.  My understanding is that exactly as he clarified in

1    his testimony, that he used race as a contextual factor to

2    evaluate, for example, opportunities for students and

3    segregation and other features that would be important

4    background factors, but not using race per se as a separate

5    factor.

6    **Q.**  And just referring briefly to the portion of the 1990 OCR

7    report that Mr. Mortara just directed you to, there was a

8    sentence in that report in which the OCR reflected that a

9    couple of the admissions officers indicated that they

10   considered race in all four of the profile ratings.  Did you

11   recall that sentence that Mr. Mortara reviewed with you?

12   **A.**  Yes.

13   **Q.**  And indeed, in that report, OCR observed through its

14   regression analysis that Asian-Americans were scoring lower,

15   I believe 20 percent lower, than white applicants on the

16   personal rating, correct?

17   **A.**  Yes.  It was a gap about like that, yes.

18   **Q.**  Did OCR infer racial bias from that difference?

19   **A.**  No.

20   **Q.**  Did they in fact conduct a full audit study in which they

21   read the admissions files, about 200 admissions files or

22   maybe it was 400, and 2,000 summary sheets in order to

23   actually investigate whether racial bias was infecting the

24   personal rating?

25                MR. MORTARA:  Your Honor, I object, leading.

1           MR. WAXMAN:  I'll rephrase.

2           THE COURT:  It's not leading; it's overruled.

3   **A.**   Yes, I'm -- I was aware that they had done a -- both a

4   careful side-by-side audit study of an equal number of white

5   and Asian application folders, equally split by whether they

6   were admitted or not, and tried to compare, and that was I

7   think the primary thing that they were using to conclude that

8   the two groups of students were treated -- evaluated fairly

9   or equally on the basis of, for instance, finding personal

10  qualities and not -- and also this extended sample that they

11  looked, yes.

12  **Q.**   And have you seen anything in your preparation for this

13  case or in the trial of this case indicating or suggesting in

14  any way the result either whether SFFA or Professor

15  Arcidiacono did such an audit analysis or the results of that

16  analysis?

17  **A.**   No.

18          MR. WAXMAN:  No further questions.

19          MR. MORTARA:  As promised, Your Honor.

20          THE COURT:  All right.  We will break for lunch.

21  Why don't we go back to the 45-minute lunch just to give

22  everyone a little break.  So 1:15.  You are excused.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  I know you're sad to be leaving us.

25          (Recess taken 12:29 p.m.)

```
1                    **** AFTERNOON SESSION ****

2            THE CLERK:  Court is in session.  Please be seated.

3            MR. McBRIDE:  Your Honor, before we get started

4    with the next witness.  We have some summary exhibits that we

5    want to put in evidence.  May I approach?

6            THE COURT:  Sure.

7            MR. McBRIDE:  This is summary exhibit, Plaintiff's

8    Exhibit 634, that we offer into evidence.

9            MR. LEE:  No objection, Your Honor.

10           THE COURT:  It's admitted.

11           (Plaintiff Exhibit No. 634 admitted.)

12           MR. LEE:  This is a summary exhibit.  It's designed

13   to answer some of the questions you asked President Simmons

14   two days ago.

15           MR. McBRIDE:  No objection.

16           (Defendant Exhibit No. 746 admitted.)

17           MR. MORTARA:  May I proceed, Your Honor?

18           THE COURT:  Of course.

19           MR. MORTARA:  Your Honor, the plaintiffs call

20   Marlyn McGrath.

21           THE COURT:  Director McGrath, we are going to

22   reswear you in.  I'm not sure if it's actually necessary,

23   but --

24           THE CLERK:  Can you raise your right hand, please.

25           (MARLYN McGRATH duly sworn by the Deputy Clerk.)
```

```
 1              THE CLERK:  Thank you.  You may be seated.
 2              THE COURT:  I'm sure you're delighted to be back.
 3              THE WITNESS:  I am delighted to be back.
 4              MR. MORTARA:  I handed up -- for once, Your Honor,
 5     you have the binder in advance.
 6              THE COURT:  Thank you, Mr. Mortara.  Give me one
 7     second.  I neglected to -- I need a little room.  Okay.  Go
 8     ahead.  I'm ready.
 9                              EXAMINATION
10     BY MR. MORTARA:
11     Q.  Nice to see you again, Director McGrath.
12     A.  Good to see you.
13     Q.  How are you today?
14     A.  Fine, thank you.
15     Q.  I'm putting on the screen and in your binder in front of
16     you on your left is Plaintiff's Exhibit 1, the reading
17     procedures for the class of 2018.
18              You're responsible for the content of the reading
19     procedures and a group of you develop and change it every
20     year, correct?
21     A.  Yes, that is correct.
22     Q.  Please go to the section on personal rating that is on
23     page 5.
24     A.  I just want to be certain I'm looking at the right thing.
25     This is P1 is the tab?
```

1    **Q.**  P1.

2    **A.**  This is not paginated, but I can count.

3    **Q.**  Just go until personal appears at the bottom.

4    **A.**  Yes.

5    **Q.**  It does not say anywhere in this document that race

6    should not be used in the personal rating, correct?

7    **A.**  I think that's correct.

8    **Q.**  I've got a broader question.

9           Does it say anywhere in the admissions office in

10   any written form, training material, memo, email, or any kind

11   of writing down to a Post-it on the coffee maker that race

12   should not be used in the personal rating?  Is it written

13   anywhere?

14   **A.**  For this document?

15   **Q.**  I'll read the question again.

16   **A.**  Yes.  Thank you.

17   **Q.**  It's a broader question.

18          Does it say anywhere in the admissions office in

19   any written form, training material, memo, email, or any kind

20   of writing, down to a Post-it on the coffee maker, that race

21   should not be used in the personal rating?  Is it written

22   anywhere?

23   **A.**  It has been written in more recent reading instructions.

24   **Q.**  Could you please turn to the binder on your right.  And

25   your trial testimony is there.  It's open to Tab 5 already.

1   And if you turn to page 231.

2   **A.**  Yes.

3   **Q.**  And this is when you and I were talking about things just

4   a couple of weeks ago on Friday, October 18, correct?

5   **A.**  Yes.

6   **Q.**  And I asked you, at line 15, 231:  "Now I've got a

7   broader question.  Does it say anywhere in the admissions

8   office in any written form, training material, memo, email,

9   or any kind of writing, down to a Post-it on the coffee

10  maker, that race should not be used in the personal rating?

11  Is it written anywhere?"

12          And you answered:  "In written form, no.  It is the

13  subject of a great deal of discussion and attention in our

14  training process."

15          Was that your sworn testimony?

16  **A.**  That was my sworn testimony.  And I had --

17  **Q.**  Go ahead.

18  **A.**  Sorry.  Go ahead.

19  **Q.**  I'm going to run through some basic facts and then I'm

20  going to give you an opportunity to fully explain in as much

21  detail as you like the discrepancy that we've just gone

22  through.

23          At least as of September 12, 2018, you have had

24  brand-new draft reading procedures that included an

25  instruction not to use race in the personal rating that you

1   had seen, correct?

2   **A.**   Yes.  We had in the 2018 September version, yes.

3   **Q.**   And at least as of September 19, 2018, your office issued

4   new reading procedures for the class of 2023 to all

5   admissions officers that included an instruction not to use

6   race in the personal rating, correct?

7   **A.**   Yes.

8   **Q.**   Then revised new reading procedures again issued on

9   October 5, 2018, that still included an instruction not to

10  use race in the personal rating, correct?

11  **A.**   Yes.

12  **Q.**   And on October 18, nearly two weeks after those last

13  procedures formally issued and nearly a month after the first

14  draft of the class of 2023 reading procedures, you told me

15  there was no written document at the admissions office that

16  said race should not be used in the personal rating.  That's

17  what you said, right?

18  **A.**   I said that because I had in mind the preparation

19  materials and what I had understood to be the focus of this

20  trial for the classes of 2014 to 2019.  I was not, in my

21  answer to you, referring to anything more current than that.

22  **Q.**   Is there anything else you'd like to tell us to explain

23  the discrepancy in the testimony that we've just gone

24  through?

25          MR. LEE:  Your Honor, I object to the form.

1    "Discrepancy" is his word, not hers.  It's argument.

2              THE COURT:  That's fair.  Why don't you just change

3    "discrepancy" to "difference."

4    BY MR. MORTARA:

5    **Q.**  Is there anything else you'd like to tell the Court to

6    explain the difference between your trial testimony on

7    October 18 and the way you answered the same question today?

8    **A.**  The reason I gave a different answer when we were here

9    before was that I had in mind those earlier reading

10   instructions, which I had understood -- which had been the

11   subject of my review and preparation for my testimony.

12   **Q.**  As far as you know, was Dean Fitzsimmons aware of the new

13   reading procedures when this trial began?

14   **A.**  As far as I know, he was aware that we were developing

15   new reading procedures.

16   **Q.**  Do you know if he was aware of the content of those new

17   reading procedures?

18   **A.**  I do not know.

19   **Q.**  Is the reason that you interpreted my question as being

20   limited in time in some way that Harvard's lawyers instructed

21   you to avoid bringing up the class of 2023 reading procedures

22   when you were here under oath the last time?

23   **A.**  No, I did not.

24             MR. LEE:  I'm going to let her answer the question,

25   but I don't want it to be a waiver of the attorney-client

1   privilege.

2           THE COURT:  All right.  So --

3           MR. MORTARA:  I think if she does answer, it is a

4   waiver, which is why --

5           MR. LEE:  Well, then I object.

6           THE COURT:  I think you've embedded the waiver in

7   your question.  So why don't you ask whether she got any such

8   instructions from the lawyers, any instructions --

9           MR. MORTARA:  Your Honor, I was going for the

10  objection and instruction not to answer.  If that's what I

11  get, that's what I want.

12          MR. LEE:  She answered the question.

13          THE COURT:  She did answer the question.

14          MR. MORTARA:  We can strike the answer.

15          THE COURT:  I'm not going to strike the answer.

16  She's answered the question and it doesn't implicate the

17  attorney-client privilege.  So forge forward.

18  BY MR. MORTARA:

19  Q.  Did you have any discussions with Harvard's lawyers about

20  the class of 2023 reading procedures when you were preparing

21  for this trial?

22  A.  No, not about those for this trial.

23  Q.  Did you have any discussions about the drafts when

24  preparing for this trial?

25  A.  Preparing for the trial?  Not previous to my prior

1   testimony.

2   **Q.**  I want to be clear now, the oath you've taken is to tell

3   the whole truth and nothing but the truth in response to my

4   questions.  Do you understand that?

5   **A.**  I do.

6   **Q.**  You cannot modify my questions in your head and answer

7   questions other than the one I'm asking.  Do you understand?

8           MR. LEE:  I object.  Your Honor, those were

9   instructions for you to give, not for him to give.

10          MR. MORTARA:  If they're wrong, Your Honor, then

11  I'm happy to be corrected.

12          THE COURT:  Well, you need to rephrase the

13  question.

14  BY MR. MORTARA:

15  **Q.**  Do you understand the nature of the oath that you took?

16  **A.**  Yes.

17  **Q.**  Now let's get into the substance.

18          You have in front of you a binder including

19  Defendant's Exhibit 744.  Would you please turn to it, D744.

20  Are you there?

21  **A.**  No.

22  **Q.**  You don't have the D744?  Can I assist maybe?  There's Ps

23  and Ds, director.

24  **A.**  This goes from 741 to 749.

25          THE COURT:  It's today's binder, second tab.

1            MR. MORTARA:  We have an extra, just in case.

2            THE COURT:  Just make sure she has the right binder

3     in front of her.

4            THE WITNESS:  Yes, I do.  I see it toward the

5     beginning.  They're not in order.  Yes.  Thank you.

6     BY MR. MORTARA:

7     **Q.**  These are the reading procedures for the class of 2022,

8     correct?

9     **A.**  Correct.

10    **Q.**  This class was selected in the spring of 2018, correct?

11    **A.**  Yes.

12    **Q.**  I want to start with this as the baseline.

13           MR. MORTARA:  I'm going to offer Defendant's 744 at

14    this time.

15           MR. LEE:  No objection.

16           THE COURT:  It's admitted.

17           (Defendant Exhibit No. 744 admitted.)

18    BY MR. MORTARA:

19    **Q.**  If you would, turn to the third page.  This one actually

20    has page numbers.  I'm going to refer you to the discussion

21    of the overall rating.

22           Do you see that?

23    **A.**  Yes.

24    **Q.**  There's no instruction about the use of race here, is

25    there?

1    **A.**   That's correct.

2    **Q.**   Please turn to the next page and take a look at the

3    personal rating.

4    **A.**   Yes.

5    **Q.**   The text is slightly different from the 2018 version we

6    were looking at, Plaintiff's Exhibit 1, correct?

7    **A.**   Yes.

8    **Q.**   There's no instruction about the use of race in the 2022

9    reading procedures, Defendant's Exhibit 744, is there?

10   **A.**   That's correct.

11   **Q.**   And just very briefly, Director McGrath, above we have

12   the athletic rating.

13   **A.**   Yes.

14   **Q.**   Remember you and I had that discussion about my daughter,

15   the figure skater?

16   **A.**   We did.

17   **Q.**   And you talked about some potential changes to the

18   athletic rating that were being discussed?

19   **A.**   Yes.

20   **Q.**   And you see Number 1 here that there's no change there.

21   It's still about Harvard sports and varsity athletics, right?

22   **A.**   Yes.

23   **Q.**   I want to go through now with you the process of revision

24   that led to the written changes to the reading procedures in

25   the class of 2023 version.

1          In the first week of June of this year, there was a

2     retreat of some kind where the admissions office got together

3     to discuss, amongst other things, suggestions for changing

4     the reading guidance; is that right?

5     **A.**   That's correct.

6     **Q.**   Amongst the things that were discussed actually was an

7     update about this case, right?

8     **A.**   I was not at that retreat.

9     **Q.**   Turn to Plaintiff's 696, please, in your binder.

10    **A.**   Yes.

11    **Q.**   This is an email dated June 12, 2018, from Christy

12    Mascolo to Jessica Bryan, subject line, "All staff retreat

13    followup."

14          Do you see that?

15    **A.**   Yes.

16          MR. MORTARA:  Your Honor, we offer Plaintiff's 696.

17          MR. LEE:  No objection, Your Honor.

18          THE COURT:  Admitted.

19          (Plaintiff Exhibit No. 696 admitted.)

20    BY MR. MORTARA:

21    **Q.**   Who is Jessica Bryan?

22    **A.**   She is my colleague who is a financial aid officer and

23    admissions officer.

24    **Q.**   And who is Tim?

25    **A.**   Tim I believe is Tim Smith, who was an admissions

1    officer.

2    **Q.**   And is it your understanding that they led the discussion

3    about the personal rating at the retreat?

4    **A.**   That is my understanding.

5    **Q.**   I want to focus in on the middle paragraph there.

6    There's a sentence, "I would suggest sending a draft to your

7    whole group so they can weigh in before producing a final

8    recommendation by July 9.  Then these will go to WRF, MEM,

9    and others, including OGC."

10              Do you see that?

11   **A.**   I do.

12   **Q.**   And Jessica and Tim led the discussion about the personal

13   qualities rating at the retreat, correct?

14   **A.**   Yes.

15   **Q.**   And then there's a discussion here indicating that draft

16   edits will go to WRF.  That's Dean Fitzsimmons, correct?

17   **A.**   Yes.

18   **Q.**   MEM, that is you, correct?

19   **A.**   Yes.

20   **Q.**   And others, including OGC, that's the office of general

21   counsel at Harvard, correct?

22   **A.**   Yes.

23   **Q.**   Do you remember hearing anything about the discussions

24   around the personal rating at this retreat?

25   **A.**   I do not remember hearing anything about it at the time.

1    **Q.**  All right.  Let's move forward in time.  Please turn to

2    Plaintiff's 705 in your binder.

3    **A.**  Yes.

4    **Q.**  This is an email from Christine Mascolo to Dean

5    Fitzsimmons and you, copy I believe your assistants.  The

6    subject line is "Potential changes to reading instructions."

7    It's dated July 23, 2018.

8              Do you see that?

9    **A.**  Yes.

10              MR. MORTARA:  We offer Plaintiff's 705.

11              MR. LEE:  No objection.

12              THE COURT:  Admitted.

13              (Plaintiff Exhibit No. 705 admitted.)

14   BY MR. MORTARA:

15   **Q.**  Director McGrath, you'll notice the attachments to the

16   email are in the tab right behind it.  They are 706, 707, and

17   708.

18              MR. MORTARA:  We will also offer those.

19              MR. LEE:  No objection.

20              THE COURT:  Those are admitted also.

21              (Plaintiff Exhibit Nos. 706, 707, and 708

22   admitted.)

23   BY MR. MORTARA:

24   **Q.**  The email says, "Hi, Fitz and Marlyn.  Attached you will

25   find suggested revisions to the reading instructions born out

1    of our retreat in early June.  These include the academic,

2    EC, and athletics section only.  There will be no suggested

3    changes for PQs and support at this time."

4              Do you see that?

5    **A.**   Yes.

6    **Q.**   Christine Mascolo was communicating to you that as of

7    July 23, 2018, there wasn't any plan to change the personal

8    rating or personal qualities section of the reading guidance?

9    **A.**   Yes, that's what this says.

10   **Q.**   And then the next sentence says, "My plan is to share

11   with both of you for any edits/thoughts you may have and then

12   to share with Ara, of course, as I do every year."

13             Do you see that?

14   **A.**   Yes.

15   **Q.**   Who is Ara?

16   **A.**   Ara is Ara Gershengorn, one of my attorneys.

17   **Q.**   Ara Gershengorn, she's in the office of general counsel,

18   correct?

19   **A.**   Yes.

20   **Q.**   Let's take a look at the drafts.  You see here there's a

21   markup of the academic rating, Plaintiff's 706?

22   **A.**   Yes.

23   **Q.**   And there's several changes here, including some

24   additional recommendations from the group discussion?

25   **A.**   Yes.

1    Q.  And on Plaintiff's 707, there's some changes to the EC

2    rating, relatively less comprehensive?

3    A.  Yup.

4    Q.  And then on 708 there's a few changes to the olympic

5    rating -- sorry -- the athletic rating.

6    A.  Yes.

7    Q.  And you see here, there is a change here sort of

8    responsive to the discussion you and I had about the figure

9    skating.  "Now you can get an athletic 1 if you have

10   recognition for individual athletic achievements,

11   championships at the national, world, or olympic level."

12   A.  Yes.

13   Q.  You didn't raise with me the fact that this change has

14   already been instituted last time, did you?

15   A.  I said it was a discussion, consideration of discussion.

16   How it's applied will remain to be seen.

17   Q.  I want to move forward now to August 13 and

18   Plaintiff's 755.

19   A.  Yes.

20   Q.  Plaintiff's 755 is an August 13, 2018, email from you to

21   Christine Mascolo, copy Dean Fitzsimmons.

22           Do you see that?

23   A.  Yes.

24           MR. MORTARA:  We'd offer Plaintiff's 755.

25           MR. LEE:  No objection, Your Honor.

1          THE COURT:  It's admitted.

2          (Plaintiff Exhibit No. 755 admitted.)

3     BY MR. MORTARA:

4     Q.  Here if you look in the middle of the page, there's a

5     part of an email from August 13, 2018, at 10:53 a.m.  And

6     Christine Mascolo had emailed your and said, "Just FYI, there

7     may be more updates to the reading instructions."  Then we

8     have a redaction.  "I will work with the group that

9     considered PQS during the retreat and make some

10    recommendations I will share with you both."

11         Do you see that?

12    A.  Yes.

13    Q.  On August 13, Christine Mascolo informed you that there

14    were going to be some proposed revisions to the personal

15    rating section of the reading guidance, correct?

16    A.  Yes.

17    Q.  And you responded, "Sounds just right to me.  Thank you.

18    And thanks for checking with" -- help me.

19    A.  Ara.

20    Q.  Ara.  Thank you.

21         And this email chain you can see is heavily

22    redacted.  Do you see that?

23    A.  I do.

24    Q.  It starts out with an exchange between Ms. Mascolo and

25    Ms. Gershengorn, correct?

1    **A.**   Yes.

2    **Q.**   Let's move forward in time to August 20, Plaintiff's 657.

3    **A.**   Yes.

4    **Q.**   Plaintiff's 657 is an email from Ms. Mascolo to Dean

5    Fitzsimmons and you.  It is dated August 20.

6             Do you see that?

7    **A.**   Yes.

8             MR. MORTARA:  We offer Plaintiff's 657.

9             MR. LEE:  I object.  This wasn't part of the

10   disclosure.  In fact, it was withdrawn.

11            MR. MORTARA:  I'm being told it is part of the

12   disclosure.

13            MR. LEE:  I don't think so.

14            THE COURT:  Hold on.

15            MR. LEE:  Your Honor, I'm pretty sure we have it

16   right that it was withdrawn.  But if what he wants to do is

17   offer it, in the interest of time, let's just go ahead.  No

18   objection.

19            THE COURT:  Just looking at it, it seems unlikely

20   he would have withdrew it, given the exercise here.

21            MR. MORTARA:  I'll offer it with its attachment,

22   Plaintiff's 658.

23            MR. LEE:  No objection.

24            (Plaintiff Exhibit Nos. 657 and 658 admitted.)

25   BY MR. MORTARA:

1    **Q.**  It's an email from Ms. Mascolo to you and Dean

2    Fitzsimmons.  It says, "Hi Fitz and Marlyn.  Attached you

3    will find updates to the reading instructions.  Thanks to Tim

4    and Jessica."

5            Do you see that?

6    **A.**  I do.

7    **Q.**  Tim and Jessica were the ones who worked on the personal

8    rating at the retreat, correct?

9    **A.**  Yes.

10   **Q.**  And the attachment, 658, is a draft for the personal

11   qualities.  Do you see that?

12   **A.**  Yes.

13   **Q.**  And there's some -- how would you characterize the number

14   of changes here?  Significant?  Moderate?

15   **A.**  Moderate.

16   **Q.**  So there's some moderate changes here, correct?

17   **A.**  Yes.

18   **Q.**  There's still no instructions on the use of race one way

19   or the other here in this draft, correct?

20   **A.**  Yes, that's correct.

21   **Q.**  Would you please turn to Plaintiff's Exhibit 767.

22   **A.**  Yes.

23   **Q.**  Plaintiff's Exhibit 767 is a September 7 email from you

24   to Ms. Mascolo and Dean Fitzsimmons.

25            Do you see that?

1    **A.**   I do.

2    **Q.**   The subject is "Privileged and confidential reading

3    instructions."

4             MR. MORTARA:  We offer Plaintiff's 767.

5             MR. LEE:  No objection.

6             THE COURT:  Objection?

7             MR. LEE:  No objection.  I'm sorry.

8             THE COURT:  It's admitted.

9             (Plaintiff Exhibit No. 767 admitted.)

10   BY MR. MORTARA:

11   **Q.**   Your response in here says, "Good to have."  Correct?

12   **A.**   Yes.

13   **Q.**   Please turn -- this is September 7.  Please turn to

14   Plaintiff's Exhibit 749.

15   **A.**   Yes.

16   **Q.**   And Plaintiff's Exhibit 749 appears to be a hard-copy

17   document.  There are the initials CJM and the date

18   September 11 in the upper right-hand corner.

19             Who is CJ -- CGM?

20   **A.**   That's Christine Mascolo.

21             MR. MORTARA:  We offer Plaintiff's 749.

22             MR. LEE:  No objection.

23             THE COURT:  Admitted.

24             (Plaintiff Exhibit No. 749 admitted.)

25   BY MR. MORTARA:

1    **Q.**  There are some handwritten edits in several areas of this

2    document.  I want to focus on why we're here.  If you go to

3    page 3, there's some highlighted language I'd like you to

4    take a look at surrounding the overall rating.  Let me know

5    when you're ready.

6    **A.**  Yes.  I'm ready.

7    **Q.**  In the first highlighting we see some changes in the

8    discussion of race, and it says, "However, readers should

9    have not be taking an applicant's race or ethnicity into

10   account in making any of the ratings other than the overall

11   rating, as discussed further below."

12           Do you see that?

13   **A.**  Yes.

14   **Q.**  That's a change, isn't it, an explicit written

15   instruction?

16   **A.**  Yes.

17   **Q.**  And the next highlighting says, "The consideration of

18   race or ethnicity may be considered only as one factor among

19   many."

20           Do you see that?

21   **A.**  Yes.

22   **Q.**  And it goes on and it says, "In addition, the

23   consideration of race or ethnicity should be in connection

24   with the application's discussion of the effect an

25   applicant's race or ethnicity has had on the applicant, not

1   simply the fact alone that an applicant has identified as a

2   member of a particular race or ethnicity."

3            Did I read that correctly?

4   **A.**  You did.  I see that here in this draft.

5   **Q.**  I want to now revisit a discussion we had the last time

6   you were here.

7            Remember we had a discussion about Harvard's use or

8   not use of religion in evaluating applicants?  Do you

9   remember that?

10  **A.**  I do.

11  **Q.**  And you said that while there's a box on the form on the

12  common application where someone can say "I am Roman

13  Catholic," Harvard doesn't look at that answer.

14           Do you remember that?

15  **A.**  I do.

16  **Q.**  But you did say Harvard would take into account religion

17  if an applicant mentioned that in their writing about

18  themselves in their essays, for example?

19  **A.**  That we might, yes.

20  **Q.**  And then you said that it wasn't a disadvantage to

21  Harvard to not be able to consider someone's self-proclaimed

22  religious identity unless they've written about it in one of

23  their essays, right?

24  **A.**  Would you mind repeating that?

25  **Q.**  You said you didn't consider it to be a disadvantage that

1   Harvard didn't get the information from the box on the common

2   application and they didn't consider -- you didn't consider

3   religion unless an applicant had written about it himself,

4   right?

5   **A.**   Yes.

6   **Q.**   That's exactly the instruction that's being given here in

7   the draft guidance we just read out.  "Consider race only if

8   the applicant discussed the effect of race or ethnicity on

9   the applicant and not when they just checked the box,"

10  correct?

11  **A.**   This is a draft.  That was an incorrect instruction.  It

12  does not reflect our practice.

13  **Q.**   This is what the instruction said, correct?

14  **A.**   That is what the instruction says in this draft, yes,

15  you're correct.

16  **Q.**   And please go to the personal rating.

17  **A.**   Yes.

18  **Q.**   And comparing this to the previous year's version, class

19  of 2022, would you characterize this as moderate or

20  significant changes?

21  **A.**   I would say moderate.

22  **Q.**   And there's including things like, "Think about what kind

23  of contribution would the person make to the dining hall

24  conversation."

25          That's new, isn't it?

1    **A.**   As a recommendation, it's new, yes.

2    **Q.**   And the last sentence says, "As noted above, though, an

3    applicant's race or ethnicity should not be considered in

4    assigning the personal rating."

5              Do you see that?

6    **A.**   Yes.

7    **Q.**   Now, this is the first time in any draft that you've seen

8    in chronological order that we have an express statement not

9    to use race in the personal rating; is that right?

10   **A.**   I think that's correct, yes.

11   **Q.**   And this would be the first time you've seen that written

12   down in your 30 years in the Harvard's admissions office,

13   correct?

14   **A.**   I can't say that I've never seen that sentence before

15   somewhere.

16   **Q.**   But as far as you can remember, this is the first time

17   you've seen an express written instruction not to use race in

18   the personal rating, correct?

19   **A.**   This is the first time I remember seeing it explicitly

20   written that way in the reading instructions.  Yes, that's

21   correct.

22   **Q.**   In any document?

23   **A.**   I can't say that honestly.

24   **Q.**   Do you remember any specific document saying it?

25   **A.**   No.

1    Q.  And this document is dated September 11, just about a

2    month before this trial, right?

3    A.  Yes.

4    Q.  Let's go forward to September 12, Plaintiff's 659.  Are

5    you there?

6    A.  Yes.

7    Q.  Plaintiff's 659 is an email from Ms. Mascolo to you, Dean

8    Fitzsimmons, and Ms. Gershengorn.  Subject line is "Reading

9    instructions."

10             And then it says, "Hi, everyone.  Input from all

11   previous drafts is captured in this document.  The only new

12   line everyone should look at is on page 5 in red."

13             And its attachment is Plaintiff's 660.  We would

14   offer them both.

15             MR. LEE:  No objection, Your Honor.

16             THE COURT:  They're admitted.

17             MR. MORTARA:  Thank you, Your Honor.  Sorry.

18             (Plaintiff Exhibit Nos. 659 and 660 admitted.)

19   BY MR. MORTARA:

20   Q.  You received this draft on September 12, 2018, correct?

21   A.  Yes.

22   Q.  Did you review it?

23   A.  I think I did not.

24   Q.  You did not review the draft?

25   A.  I may not have.  I was delegating until we had something

1    final.  I don't remember whether I did.  I think I may not

2    have.

3    Q.  Let's go look at the change that Ms. Mascolo was talking

4    about, over on page 5.  First let's go to page 3.  Sorry.

5           Let's just confirm the language we talked about

6    from the September 11 draft is still there.  "Don't take race

7    into account in any of the ratings other than the overall

8    rating, and only consider race when someone mentions it on

9    their application, not just because they self-identify."

10          Those two instructions we saw in the September 11

11   draft are still in there?

12   A.  In this draft they are still here, yes.

13   Q.  Now going to the red text Ms. Mascolo asked everyone to

14   read.

15          It says, and it's added to the previous version,

16   "It is important to keep in mind that characteristics not

17   always synonymous with extroversion are similarly valued.

18   Applicants who seem to be particularly reflective,

19   insightful, and/or dedicated should receive higher personal

20   ratings as well."

21          Do you see that?

22   A.  I do.

23   Q.  What's your definition of "extroverted"?

24   A.  I don't think I have a ready definition.  I think it's a

25   person who is -- there are lots of adjectives that you could

1    use in connection:  vivacious, outgoing.  Different people

2    would -- you asked me for mine.  Those are two.

3    **Q.**  Do you agree with me that some racial stereotypes that

4    are deployed against Asian-Americans is that they're quiet,

5    withdrawn, or one-dimensional?

6    **A.**  I think that's true, yes.

7    **Q.**  Do you think extroverted and quiet are the same thing or

8    perhaps more on opposite sides?

9    **A.**  I don't think they're the same thing, they're not exactly

10   opposites, but they're very different.

11   **Q.**  You're also using the word "reflective" here in

12   contradistinction to "extroverted."

13          Do you think "reflective" has a meaning closer to

14   "quiet" or "introverted"?

15   **A.**  I would not find it in contrast to extroversion.  It can

16   accompany an outgoing personality.  I think it's a different

17   aspect of personality, myself, my opinion.

18   **Q.**  Director McGrath, could a reasonable person looking at

19   this come to the view that this language was designed to make

20   sure that your admissions officers did not fall prey to

21   implicit bias or racial stereotyping about Asians?

22   **A.**  It's the kind of thing we always try to remind our staff

23   about when they're considering applications or people.  I

24   guess the most important thing I see about it is that it

25   captures a longstanding practice that was not included in

1    these terms in the reading instructions before this.

2    **Q.**   And it's in red here, the language Ms. Mascolo asked you

3    to look at, right?

4    **A.**   Yes.  Because it was an addition.

5    **Q.**   And my question, and I'll ask it again:  Could a

6    reasonable person looking at this believe that this

7    instruction was designed to help ensure that your admissions

8    officers did not fall prey to implicit bias or racial

9    stereotyping against Asians?

10            MR. LEE:  Objection, Your Honor.

11   **A.**   That would be a reasonable --

12            THE COURT:  Sustained.

13   BY MR. MORTARA:

14            MR. MORTARA:  I'll ask again in a different way.

15   BY MR. MORTARA:

16   **Q.**   Director McGrath, is it your view that this instruction

17   is designed to make sure that your admissions officers do not

18   fall prey to implicit bias or racial stereotyping about

19   Asians, in part?

20   **A.**   It would have that effect, and that would be desirable.

21   I don't think it's a new idea.  As I say, it memorializes a

22   long tradition of our office to work very hard to get beyond

23   stereotypes.

24   **Q.**   But this is the first time this kind of instruction has

25   ever appeared in writing anywhere, correct?

1    **A.**  I can't say ever anywhere, but it's the first time in

2    those words it appeared, to my knowledge, in the reading

3    instructions.

4    **Q.**  Just to be clear, to your knowledge, this is the first

5    time there's ever been any written guidance that's in red

6    here in the admissions office.  You can't remember any other

7    time?

8              MR. LEE:  I object.  Asked and answered.

9              THE COURT:  He can have the question.  It has been

10   asked and answered, but --

11   **A.**  I would add that you may have seen in previous exhibits

12   part of what we call the packet for new members of the staff,

13   the training packet.

14             One text that we use for discussion is an essay

15   written by a Professor Helen Vendler on the subject of

16   student's interests and the range of personalities that may

17   do well at Harvard.  It includes a number of these ideas and

18   is not unfamiliar to our committee.  I can't tell you --

19   because I don't think they she used exactly these words, but

20   it's not a new idea.

21   BY MR. MORTARA:

22   **Q.**  You subsequently thanked Ms. Mascolo for this draft,

23   correct?

24   **A.**  I did.

25   **Q.**  And that's Plaintiff's Exhibit 741, an email, September

 1     2, from you to Ms. Mascolo, Dean Fitzsimmons, and

 2     Ms. Gershengorn.

 3                MR. MORTARA:  We'd offer Plaintiff's 741.

 4                MR. LEE:  No objection.

 5                THE COURT:  Admitted.

 6                (Plaintiff Exhibit No. 741 admitted.)

 7     BY MR. MORTARA:

 8     **Q.**  You sent this from your iPhone, correct?  You said "Thank

 9     you"?

10     **A.**  Yes.

11     **Q.**  But you're not sure you reviewed the draft she sent or

12     the language in red; is that right?

13     **A.**  That's right.

14     **Q.**  Let's move forward to Plaintiff's 720 and 721.

15     **A.**  Yes.

16     **Q.**  Plaintiff's 720 is an email from Ms. Mascolo to an email

17     list, admfao_officers-list@lists.fas.harvard.edu.  Subject,

18     "Reading instructions."

19                Do you see that?

20     **A.**  I do.

21     **Q.**  Sent on September 19.  Who is on that email list?

22     **A.**  Admissions and financial aid officers.

23     **Q.**  Does it include you?

24     **A.**  It does.

25     **Q.**  Does it include Dean Fitzsimmons?

1    **A.**   It does.

2    **Q.**   Does it include Ms. Gershengorn?

3    **A.**   I don't think so.  That list does not.

4          MR. MORTARA:  We offer Plaintiff's Exhibit 720 and

5    its attachment, 721.

6          MR. LEE:  No objection.

7          THE COURT:  Admitted.

8          (Plaintiff Exhibit Nos. 720 and 721 admitted.)

9    BY MR. MORTARA:

10   **Q.**   The email says, "Hi, everyone.  Attached please find the

11   updated reading instructions for the year.  The middle of the

12   document is taken directly from the Ivy League annual memo

13   which will not come out for another week or so, so you can

14   skip pages 8 to 14."

15          After the parenthetical it says, "That said, please

16   make sure you read the rest of the document thoroughly as

17   there are several updates/additions.  Many thanks to all of

18   you who helped in the editing process."

19          Do you see that?

20   **A.**   Yes.

21   **Q.**   And Ms. Mascolo has bolded thoroughly, correct?

22   **A.**   Yes.

23   **Q.**   Did you read the document when it was sent on

24   September 19?

25   **A.**   I think I did not.

1    Q.   Let's take a look at the attachment.  Again starting with

2    the overall rating section that we've been through before, I

3    just want to point out to you on page 3 it has the same

4    language we've been through before.

5              Don't use race in the ratings other than the

6    overall rating and don't use race unless the applicant brings

7    it up on his application in discussing it.  Don't use race

8    just when the applicant self-identifies as a member of a

9    particular race or ethnicity.

10             Those are the instructions before and they're still

11   here in the September 19 version, correct?

12   A.   Yes.  In this draft, they are still here.

13   Q.   Just to be clear, Charlene Kim would have gotten this

14   email?

15   A.   Yes.

16   Q.   Erica Bever would have gotten this email?

17   A.   Yes.

18   Q.   Chris Looby would have gotten this email?

19   A.   Yes.

20   Q.   Roger Banks would have gotten this email?

21   A.   Yes.

22   Q.   Moving forward to the personal rating, this version also

23   has the language that was in red on the draft, correct?

24   A.   Yes.

25   Q.   The red language which in the previous draft said, "It is

1    important to keep in mind the characteristics not always

2    synonymous with extroversion are similarly valued.

3    Applicants who seem to be particularly reflective,

4    insightful, and/or dedicated should receive higher personal

5    ratings as well."

6    **A.**   Yes.

7    **Q.**   After the guidance was distributed on September 19, they

8    were released again on October 5 with a change, correct?

9    **A.**   Yes.

10   **Q.**   That's Plaintiff's 722.

11   **A.**   Yes.

12   **Q.**   Again an email from Ms. Mascolo to this list.  Same list

13   as before, correct?

14   **A.**   Yes.  Same list.

15   **Q.**   Dated October 5, 2018, 7:00 p.m.?

16           MR. MORTARA:  We offer Plaintiff's 722 and its

17   attachment, Plaintiff's 723.

18           MR. LEE:  No objection.

19           THE COURT:  Admitted.

20           (Plaintiff Exhibit Nos. 722 and 723 admitted.)

21   BY MR. MORTARA:

22   **Q.**   The text from Ms. Mascolo says, "Attached.  Please use

23   this version and disregard all previous versions," right?

24   **A.**   Yes.

25   **Q.**   This version was operative when you testified, talked to

1   me and we asked those questions that we went over at the

2   beginning, correct?

3   **A.**  It was operative for our current work, yes, that's

4   correct.

5   **Q.**  Let's talk about the big change that was made or a change

6   that was made, again in the overall section.

7          It says still "Readers should not take an

8   applicant's race or ethnicity into account in making any of

9   the ratings other than the overall rating."

10          But down below the instruction to only consider

11   race when an applicant brings it up as opposed to

12   self-identifying has disappeared, correct?

13   **A.**  That's correct.

14   **Q.**  And I've now got the earlier version on the top of the

15   screen with the restriction that we talked about.

16          Do you see that?

17   **A.**  I do.

18   **Q.**  And that restriction is a restriction to only consider

19   race when an applicant brings it up and talks about it and

20   not just when the applicant checks the box, correct?

21   **A.**  That was incorrect advice, and that's correct.

22   **Q.**  It's correct that the restriction was there on

23   September 19, September 12, and September 11, correct?

24   **A.**  Yes.

25   **Q.**  And the restriction is gone from the reading guidance

1    issued on October 5, correct?

2    **A.**  Yes.

3    **Q.**  Where did the idea come from to eliminate the restriction

4    we saw earlier?  Who suggested it?

5    **A.**  I don't know where the idea came from in the first place,

6    that proposal, which is now gone.

7          I have always regarded it as improper advice, not

8    reflecting our practice.  And I don't know at what point in

9    the process, we know the dates that it was between, it was

10   caught and eliminated.

11   **Q.**  Who suggested its elimination?

12   **A.**  I don't know.

13   **Q.**  Is it possible that the person who suggested its

14   elimination was a lawyer?

15          MR. LEE:  Your Honor, I object.  It's possible I'll

16   believe 7 foot 2 tomorrow, and it's not relevant.

17          THE COURT:  It is?

18          MR. LEE:  I won't be.

19          THE COURT:  The objection is sustained.  You can

20   withdraw the question.  In any event, she's not going to

21   answer it.

22   BY MR. MORTARA:

23   **Q.**  How did you find out that this language had been removed?

24   Who told you?

25   **A.**  I think I found out when I took up the looking at this

1    text and I noticed that it was gone, which is what was

2    appropriate.  I don't remember exactly.

3    **Q.**  So, Director McGrath, you just testified that you looked

4    at the text and noticed the restriction was gone.  That means

5    at some point you had noticed the restriction, correct?

6    **A.**  Yes.  I noticed the restriction at some point, but it may

7    not been very long before October because I actually don't

8    remember when.

9    **Q.**  Did you write anybody an email saying the restriction was

10   wrong?

11   **A.**  I don't think so.

12   **Q.**  Did you tell anybody the restriction was wrong?

13   **A.**  I don't remember because I don't remember what group

14   conversations I was in.

15   **Q.**  At some point you did read the restriction.  And as far

16   as you can remember, you didn't write anybody or tell anybody

17   you thought it was wrong, correct?

18   **A.**  I don't remember whether I did.  I think I may not have.

19   We had a system for reviewing this, and when it reached the

20   final stage, which I did see, I saw that it seemed to be

21   correct.

22   **Q.**  And then let's go back to P723.  Sorry.  If you go to

23   page 5 under the personal rating, it still has the red text,

24   correct, the October 5 version, It is important to keep in

25   mind that characteristics that are not always synonymous with

1    extroversion are similarly valid and so forth.  The red text

2    that's there in the October 5 version, correct?

3    **A.**  Let me just check where I am.  Yes.

4    **Q.**  I'm showing you now at the top of the screen the

5    October 5 version, and then on the bottom of the screen the

6    September 12 draft with the red text, just to confirm that.

7    **A.**  Yes.

8    **Q.**  Do you remember our discussion of the Office of Civil

9    Rights review from a few weeks ago?

10   **A.**  Yes.

11   **Q.**  You told me that after OCR came out with its findings --

12   withdrawn.

13          Do you remember our discussion of OCR's findings

14   that some of your readers were using race in assigning of the

15   profile ratings?  Do you remember that?

16   **A.**  Yes.

17   **Q.**  And do you remember that OCR said that your readers were

18   using race in different ways, including some using race in

19   the profile ratings?

20          Do you remember that?

21   **A.**  Yes.

22   **Q.**  And you said to me at the time you did not support

23   written guidance on this subject.  Do you remember that?

24   **A.**  That's right, yes.  I did say that.

25   **Q.**  In fact, you told me that you did not think even on

1    October 19, 2018, that the right remedy for inconsistent use
2    of race was more written guidance.  That's what you told me?
3    **A.**  Yes.
4    **Q.**  I want to just make this clear.
5           The OCR report came out in 1990, correct?
6    **A.**  Yes.
7    **Q.**  We looked at the reading guidance for the class of 2022,
8    which is 32 years later -- no, 28 years later because 2022
9    was selected this year, right?
10   **A.**  Right.
11   **Q.**  So 28 years later and there still wasn't any instruction
12   on how to use race.  OCR found there wasn't any written
13   instruction on how to use race, right?
14   **A.**  Right.
15   **Q.**  And here we are 28 years later and there still isn't any
16   written instruction in 2022 on how to use race, correct?
17   **A.**  Correct.
18   **Q.**  So we have 28 years in the admissions office having no
19   writing anywhere on how to use race in the reading guidance,
20   and then a few weeks ago it gets added for the first time,
21   correct?
22   **A.**  Yes.  We make changes every year, some large, some small
23   in our reading instructions.
24   **Q.**  My question is do you think it's a pretty big change to
25   depart from 28 years of no written guidance on a subject and

1    then all of a sudden do it?

2    **A.**   It memorializes our normal practice which has been pretty

3    much the same all of these years.  And to add it seemed to

4    members of my staff helpful.

5    **Q.**   Let's return to the discussion of the red text from the

6    draft from September 11 -- September 12.  Excuse me.  I want

7    to refer you to Plaintiff's Exhibit 656.  Going a little bit

8    back in time.

9    **A.**   Yes.  I'm there.

10   **Q.**   And Plaintiff's Exhibit 656 is an email from you to

11   Ms. Mascolo and Dean Fitzsimmons, dated August 13.

12          Do you see that?

13   **A.**   Yes.

14          MR. MORTARA:  We offer Plaintiff's 656.

15          MR. LEE:  No objection.

16          THE COURT:  Admitted.

17          (Plaintiff Exhibit No. 656 admitted.)

18   BY MR. MORTARA:

19   **Q.**   And down below is another email from you to Ms. Mascolo

20   and Dean Fitzsimmons.  And then further below there's a lot

21   of redactions.  So let's start with the August 13, 2018,

22   email from Ms. Mascolo.  That's the one we saw before.

23          "Just FYI, there may be more updates to the reading

24   instructions", right?  Do you remember that one?

25   **A.**   Yes.

Q.   Then you respond, "P.S. to my previous.  There may be
some helpful text in the handbooks for IVers/chairs.  Back
when Kevin Bolan did a thorough re-do, we tried to provide a
broad context for the PQ stuff.  Let me know if I can help.
Thanks, M."

            Do you see that?

A.   Yes.

Q.   Did Ms. Mascolo ask for your help?

A.   Yes.

Q.   And she responds, "This is great.  We'll take a look."

            And you just said, "I'm just hoping it's helpful,"
right?

A.   Yes.

Q.   And that refers to the alumni interviewer handbook.  I
think you looked at that with Mr. Lee the last time you were
here, right?

A.   Yes.

Q.   And you're suggesting that Ms. Mascolo look at the
interviewer handbook for guidance on what personal qualities
Harvard is looking for in applicants, correct?

A.   Yes.

Q.   Please turn to Defendant's Exhibit 5.

A.   Yes.

Q.   When you were here before, you explained that you used
the interviewer handbook in the training material for your

1    regular new staff when they arrived, correct?

2    **A.**  Yes.

3    **Q.**  And you told us that this includes factors that might be

4    used as tips in the admissions process, correct?

5    **A.**  Yes.

6    **Q.**  If you turn to the document page 10, there's some of

7    those categories here, students that might receive tips.

8                Do you see that?

9    **A.**  Yes.

10   **Q.**  And one of them is "unusually appealing personal

11   qualities."  Do you see that?

12   **A.**  Yes.

13   **Q.**  You discussed this section with Mr. Lee, remember?

14   **A.**  Yes.

15   **Q.**  And you see the mention here of "effervescence."  That's

16   a character trait usually considered to be synonymous with

17   "extroversion," isn't it?

18   **A.**  Yes.

19   **Q.**  There's no mention of reflective or insightful or

20   introversion, is there?

21   **A.**  Not in here at this place, no.

22   **Q.**  Dr. McGrath, we've looked at changes implemented in the

23   reading guidance over the summer with the particular focus on

24   the overall and personal ratings.

25                Do you agree that the idea to make changes to the

1  personal rating wasn't in the first draft distributed but

2  came sometime between mid July and mid August?

3  **A.**  Yes, that's when it was produced, this recommendation.

4  **Q.**  To the best of your knowledge, what was the most

5  important news event going on over the summer for the Harvard

6  admissions office?

7  **A.**  With respect to the preparation of this document, I would

8  say that it has to do with the retreat where everybody wanted

9  to have a go at giving people better training and advice.  I

10  think that was the event that kicked this off.

11  **Q.**  I think you might have misheard me or I misspoke.

12         For people working in the Harvard admissions

13  office, what was the most important national news going on

14  about how they did their jobs over the summer?

15         MR. LEE:  I object.  I don't know -- for 40 people?

16         THE COURT:  Right.  You can rephrase the question.

17  BY MR. MORTARA:

18  **Q.**  For you, what was the most important thing going on in

19  the national media as it pertained to your job as director of

20  admissions at Harvard?

21  **A.**  At what point?

22  **Q.**  Over the summer.

23  **A.**  I was in Montana.  The newspapers are terrible.

24  **Q.**  Mr. Hughes is from Montana.

25  **A.**  I learned that the other day and I wanted to take that up

1    with him.

2    Q.  Did you read the newspapers over the summer?

3    A.  I look at newspapers over the summer, but I wasn't really

4    following.

5    Q.  Did you read the news reports about this case over the

6    summer?

7    A.  Not much over the summer.  I don't remember reading any

8    over the summer.  There may have been some, but I don't think

9    I read them.

10   Q.  Are you aware that a lot of information about Harvard's

11   admissions process became public with filings over the

12   summer?

13   A.  I am.

14          MR. LEE:  Your Honor, I object.  This is a limited

15   recall to go to these events on the reading procedures.  Now

16   we're well beyond that.

17          THE COURT:  I know the question sounds broad, but I

18   think he's trying to figure out, and I think it's legitimate

19   to ask her whether these changes were a reaction to this

20   case.

21   BY MR. MORTARA:

22   Q.  I'm just asking if you were aware that there was a lot of

23   national media coverage about details of Harvard's admissions

24   process that became public because of this case.

25   A.  Yes, I'm aware of that.

1    **Q.**  Did you know that the expert reports from this case

2    became public over the summer?

3    **A.**  I wouldn't remember when they became public.

4    **Q.**  Did you learn over the summer that both experts had found

5    a gap between Asians and whites on the personal rating at --

6              MR. LEE:  Your Honor, I object.

7              THE COURT:  Sustained.

8    BY MR. MORTARA:

9    **Q.**  Director McGrath, I only have a few more questions.

10             Has the admissions office or anyone in the

11   admissions office conducted or received bias training?

12             MR. LEE:  Your Honor, I object.  This is a limited

13   recall.  There was a discovery period that went through

14   August of 2014.  This is well beyond the scope of the recall.

15             MR. MORTARA:  If I may respond?  Or if it's going

16   to be overruled, then I don't need to respond.

17             THE COURT:  You can ask if there's been any other

18   changes between 2014 and now on this topic.

19             MR. MORTARA:  That's kind of what I'm getting at.

20   We had a problem last time where my questions were being

21   interpreted in a timeframe that --

22             MR. LEE:  Your Honor --

23             MR. MORTARA:  Your Honor, this is exactly what

24   happened last time.  I want to find out what's happened.

25             THE COURT:  Do you guys want to discuss this at

```
 1   sidebar?
 2            MR. LEE:  I just don't want to say anything in
 3   front of the witness.  I'm happy to have him ask another
 4   question.
 5            MR. MORTARA:  I want to ask the question I asked.
 6            MR. LEE:  I'll object.
 7            MR. MORTARA:  I can ask it from 2014 forward.
 8            THE COURT:  Let me see the exact wording of the
 9   question.  Hold on.
10            MR. MORTARA:  Maybe we should sidebar this, if you
11   don't mind.
12            THE COURT:  Let me just look at the last question.
13   If you rephrase the question with the time period, that will
14   be fine.
15   BY MR. MORTARA:
16   Q.  Okay.  Director McGrath, has the admissions office or
17   anyone in the admissions office conducted or taken bias
18   training in the last year?
19            MR. LEE:  I object.
20            MR. MORTARA:  Could we have a sidebar, Your Honor?
21            THE COURT:  Are you objecting because it's beyond
22   the scope of her knowledge?
23            MR. LEE:  No.
24            THE COURT:  Then come to sidebar.
25            [Sidebar sealed and redacted.]
```

1          MR. MORTARA:  Your Honor, may I proceed?

2          THE COURT:  You may.

3     BY MR. MORTARA:

4     **Q.**  Director McGrath, has there been official admissions

5     office implicit bias training?

6     **A.**  Not formally.

7     **Q.**  Has there been informal admissions office implicit bias

8     training?

9     **A.**  Yes.

10    **Q.**  When did that happen for the first time?

11    **A.**  I can't tell you for the first time.  When I took this

12    job 30-something years ago, there was already much discussion

13    about the importance of not stereotyping candidates.  I think

14    we didn't have the language "implicit bias" in those days.

15    We certainly had the language for bias.  That's been, in my

16    whole experience, a subject of training and a subject of

17    staff discussion.

18          In addition, we have more recently, though we

19    haven't had formal instruction or seminars, we have sent

20    around as part of our continuing education program to staff

21    an article or two on this subject.  Professor Banaji in our

22    own faculty has written a good deal.  We have sent at least a

23    news article around about that.

24    **Q.**  About implicit bias?

25    **A.**  She works on that, yes.

1    **Q.**  And when were these documents and articles sent around to

2    the admissions office on implicit bias?

3    **A.**  Sometime within the past ten years.  Not very recently, I

4    think.

5              MR. MORTARA:  Thank you, Your Honor.  I have no

6    more questions.

7              MR. LEE:  Your Honor, could we have the flip chart?

8              THE COURT:  Yes.  That's fine.

9              MR. LEE:  Your Honor, may I proceed?

10             THE COURT:  You may.

11                              EXAMINATION

12   BY MR. LEE:

13   **Q.**  Director McGrath, good afternoon.

14   **A.**  Good afternoon.

15   **Q.**  Let me ask you a few questions and see if we can fill in

16   the blanks on some things that Mr. Mortara did not ask you

17   about.

18             Was there a specific period of time for which

19   Harvard had to produce documents in this case?

20   **A.**  Yes.

21   **Q.**  What was that period of time, as far as you know?

22   **A.**  Well, 2012 to 2014.  But for the classes of 2014 to 2019

23   were the --

24   **Q.**  Let's take both parts.

25             So the documents that were produced in this case

1    went from the period 2012 to the period 2014; is that right?

2    **A.**   Yes.

3    **Q.**   And the classes were the classes of what?

4    **A.**   2014 to 2019.

5    **Q.**   And for the class of 2019, when would the information

6    have been generated that would apply to that class?

7    **A.**   In the summer or the fall of 2015.

8    **Q.**   So the parties agreed that the relevant body of

9    information was six classes, 2014 to 2019, correct?

10   **A.**   Yes.

11   **Q.**   And the parties agreed that the relevant documents were

12   for the period 2012 to 2014, correct?

13   **A.**   Yes.

14   **Q.**   Now, Mr. Mortara has spent the afternoon asking you about

15   documents from 2018, correct?

16   **A.**   Yes.

17   **Q.**   Four years later, correct?

18   **A.**   Yes.

19   **Q.**   Now, during your direct testimony a couple of weeks

20   ago --

21          Do you remember that?

22   **A.**   I do.

23   **Q.**   -- 29 exhibits were admitted during your testimony.  Do

24   you recall that?

25   **A.**   Yes.

1    Q.   It's true, is it not, that every single one of those
2    exhibits was dated in the period 2012 to 2014, correct?
3    A.   Yes, I think so.
4    Q.   Now, as you told us, the discovery or the information
5    provided by the parties to each other ended with the class of
6    2019, correct?
7              MR. MORTARA:   Your Honor, this has been leading
8    from the start.
9              THE COURT:   I think he's just orienting her to the
10   next question.   Then you can watch the leading for me,
11   please.
12             MR. LEE:   Sure.
13   BY MR. LEE:
14   Q.   Is that right?
15   A.   Yes.
16   Q.   Did the Harvard admissions office go out of business
17   after the class of 2019?
18   A.   No.
19   Q.   How many classes have you admitted since that period of
20   time?
21   A.   Three.   Three classes.
22   Q.   And the class of 2023 would be the fourth, correct?
23   A.   That be would the fourth.
24   Q.   So let's talk about the reading procedures that
25   Mr. Mortara asked you about.   Would you remind us what are

1    the reading procedures?

2    **A.**   They are a guide to the coding used in the database and

3    on the materials in the folders, and they offer some

4    suggestions about reading and evaluating folders.

5    **Q.**   Do the admissions office officers receive guidance in

6    addition to the reading procedures?

7    **A.**   Yes.

8    **Q.**   And we discussed that the last time you were here,

9    correct?

10   **A.**   Yes, we did.

11   **Q.**   Now, how often does the admissions office update the

12   reading procedures?

13   **A.**   Annually.

14   **Q.**   Every year?

15   **A.**   Every year.

16   **Q.**   So Mr. Mortara asked you about one for the class of 2019

17   and then skipped ahead to the class of 2022.  Do you recall

18   that?

19   **A.**   Yes.

20   **Q.**   Were there revisions to the reading procedures in the

21   intervening period?

22   **A.**   Yes.  In each year.

23   **Q.**   In every year?

24   **A.**   Yes.

25   **Q.**   So let's take a look at some of those revisions after the

1    period of discovery in this case.  Turn, if you would, to

2    Tab 5 in your notebook.

3    **A.**  I have that.

4    **Q.**  Do you see DX743?

5    **A.**  Yes.

6    **Q.**  What are these?

7    **A.**  This is the reading procedures for the class of 2020.

8            MR. LEE:  Your Honor, we offer DX743.

9            MR. MORTARA:  No objection.

10           THE COURT:  Admitted.

11           (Defendant Exhibit No. DX743 admitted.)

12   BY MR. LEE:

13   **Q.**  Now, Mr. Mortara didn't show you these reading

14   procedures, did he?

15   **A.**  No.

16   **Q.**  Let's turn, if you would, to Tab 4 in your notebook.

17   **A.**  I that.

18   **Q.**  Do you see DX742?

19   **A.**  Yes.

20   **Q.**  What are they?

21   **A.**  Reading procedures for the class of 2021.

22           MR. LEE:  Your Honor, we offer DX742.

23           MR. MORTARA:  No objection.

24           THE COURT:  Admitted.

25           (Defendant Exhibit No. DX742 admitted.)

1    BY MR. LEE:

2    **Q.**   Now again, Mr. Mortara didn't show you the reading

3    procedures for the class of 2021, correct?

4    **A.**   Correct.

5    **Q.**   To be clear, they're after the discovery period in this

6    case, correct?

7    **A.**   Yes.

8    **Q.**   Now, did the admissions office make changes to the

9    reading procedures between the class of 2020 and the class of

10   2021?

11   **A.**   Yes.

12   **Q.**   Have you helped us prepare a redline that would

13   demonstrate the changes that were made from the class of 2020

14   to the class of 2021?

15   **A.**   I'm sorry.  What was the beginning of that question?

16   **Q.**   Have you helped us prepare a demonstrative redline to

17   show the changes between those two sets of reading

18   procedures?

19   **A.**   Yes.

20   **Q.**   Turn, if you would, to Tab 7 in your notebook.

21   **A.**   Yes.

22   **Q.**   Do you find DD 12?

23   **A.**   Yes.

24   **Q.**   What is it?

25   **A.**   This is reading procedures for the class of 2021 based

1    on -- original text is the reading procedures for the class

2    of 2020, and this includes the proposed changes for the next

3    set, the class of 2021.  You can see both versions here, two

4    colors.

5    **Q.**   There are a host of changes, but I want to explore a few

6    so we can fill in the period of time that was not addressed

7    by Mr. Mortara.

8              Turn, if you would to page 3.

9    **A.**   Yes.

10   **Q.**   And I'll put it on the screen.  It's DD 12.3 in the

11   bottom right-hand corner.  Do you see that?

12   **A.**   Yes.

13   **Q.**   Do you see the section "Coding Guidelines For Summary

14   Sheets"?

15   **A.**   Yes.

16   **Q.**   Were changes made in the coding guidelines for the

17   summary sheets between these two classes?

18   **A.**   Yes.

19   **Q.**   Turn to page 4, 12.4 in the bottom right-hand corner.

20   **A.**   Yes.

21   **Q.**   Do you see the section "Academic"?

22   **A.**   Yes.

23   **Q.**   And do you see the redlines or track changes indicating

24   changes?

25   **A.**   Yes.

1    **Q.**  Were changes made to the procedures for coding the

2    academic rating between class of 2020 and class of 2021?

3    **A.**  Yes.

4    **Q.**  Were changes also made to the coding of the

5    extracurricular rating, if I just move a little bit further

6    down the page?

7    **A.**  Yes.

8    **Q.**  If I turn you to the next page, were changes made to the

9    procedures for coding the athletic rating between the classes

10   of 2020 and 2021?

11   **A.**  Yes.

12   **Q.**  And if I take you done a little further, were changes

13   made to the procedures for ending coding for personal rating

14   between the classes of 2020 and 2021?

15   **A.**  Yes.

16   **Q.**  Now, were there other changes made to the reading

17   procedures as well between the class of 2020 and 2021?

18   **A.**  Yes.

19   **Q.**  You told us that changes are made on an annual basis?

20   **A.**  Yes.

21   **Q.**  If we just look at these changes that are indicated here,

22   for each of the different ratings and for other subjects, was

23   the magnitude of these changes unusual in your year-to-year

24   revisions?

25   **A.**  No.  We make a lot of changes every year.

1   **Q.**   Turn, if you would, to Tab 6.

2   **A.**   Yes.

3   **Q.**   Mr. Mortara discussed Tab 6 with you?

4   **A.**   Yes.

5   **Q.**   And what are these?

6   **A.**   Reading procedures for the class of 2022.

7   **Q.**   Now, so we're clear on the timing, when will the

8   admissions office begin reading files for the class of 2023?

9   **A.**   We have begun already.

10  **Q.**   And it's this fall?

11  **A.**   Yes.

12  **Q.**   Who was responsible for updating the reading procedures

13  for the class of 2023?

14  **A.**   My colleague Christine Mascolo.

15  **Q.**   Who is Ms. Mascolo?

16  **A.**   She is associate director of admissions, and she

17  oversees, among other things, the training program for new

18  staff.

19  **Q.**   Now, you mentioned a retreat in June.  Do you recall

20  that?

21  **A.**   I do.

22  **Q.**   Would you tell Her Honor what the retreat was about?

23  **A.**   The retreat had a number of topics.  It was about all

24  kinds of different things.  Procedures about interviewing,

25  alumni relations, how to think about academic assessments.

1    And in the back of many people's minds was translating some

2    of the discussion in various categories in a more explicit

3    way into the reading instructions.

4    **Q.**  Was the retreat caused by or the result of the fact that

5    SFFA sued us, sued Harvard?

6    **A.**  No.  We do retreats every year, have for a number of

7    years.

8    **Q.**  Right.  Was SFFA's lawsuit or any publicity about it the

9    reason there was a retreat?

10   **A.**  No.

11   **Q.**  Was anyone other than Ms. Mascolo involved in updating

12   the reading procedures for the class of 2023?

13   **A.**  She was the manager of the document, but a number of our

14   staff helped her with some of the proposed language.  We've

15   had some discussion about that today.

16   **Q.**  Now, turn, if you would, to Tab 1.  Do you have it before

17   you?

18   **A.**  I do.

19          MR. LEE:  And actually before we get to Tab 1, let

20   me ask Mr. Lee to bring up P720.

21   **Q.**  Do you recall Mr. Mortara discussing this with you?

22   **A.**  Yes.

23   **Q.**  And it has a date of September 19, 2018?

24   **A.**  Yes.

25   **Q.**  Do you see under "Attachments" it says, Reading

1    procedures 2018.19 draft, and then it goes on, correct?

2    **A.**  Yes.

3    **Q.**  Now, were these the final -- was this the final version

4    of the reading procedures for the class of 2023?

5    **A.**  No.

6    **Q.**  Now let's turn to Tab 1.  Do you find P633?

7    **A.**  Yes.

8    **Q.**  What is P633?

9    **A.**  I believe this is the final official text.

10   **Q.**  The final version of the reading procedures for the class

11   of 2023?

12   **A.**  I think so, yes.

13   **Q.**  When were they distributed to the admissions office?

14   **A.**  I think they were distributed to everybody on October 5.

15   **Q.**  About a week before this trial started?

16   **A.**  Yes.

17   **Q.**  Now turn, if you would, to the page that says

18   HARV 0097938.

19          Do you see the section that says "Overall"?

20   **A.**  Yes.

21   **Q.**  Let me draw your attention to the last paragraph of that

22   section.  Could you read those two sentences to us, please.

23   **A.**  "In assigning the overall rating, readers may consider

24   whether a student's background, including his or her race or

25   ethnicity, may contribute to the educational benefits of

1    diversity at Harvard College.  The consideration of race or

2    ethnicity may be considered only as one factor among many."

3    **Q.**  Is that paragraph consistent with how the Harvard

4    admissions office has considered race in the admissions

5    process?

6    **A.**  Yes.

7    **Q.**  For how long a period of time?

8    **A.**  For many years, certainly throughout my tenure.

9    **Q.**  And is it consistent with the description you provided to

10   Her Honor when you have testified a couple of weeks ago?

11   **A.**  Yes.

12   **Q.**  Turn, if you would, to page HARV 0097940.

13        Do you see the section titled "Personal"?

14   **A.**  Yes.

15   **Q.**  Were there updates to this section of the reading

16   procedures for the class of 2023?

17   **A.**  Yes.

18   **Q.**  Were there updates to other sections for the other

19   profile ratings also?

20   **A.**  Yes.

21   **Q.**  Let me direct your attention to the sentence at the end

22   of the first paragraph under personal.  It begins, "It is

23   important."

24        Do you see it?

25   **A.**  Yes.

1    **Q.**  Mr. Mortara asked you about this.  I want to go through

2    it a little bit more slowly.  Would you read the two

3    sentences to us, please.

4    **A.**  "It is important to keep in mind that characteristics not

5    always synonymous with extroversion are similarly valued.

6    Applicants who seem to be particularly reflective,

7    insightful, and/or dedicated should receive higher personal

8    ratings as well."

9    **Q.**  Does what you just read represent a change in Harvard's

10   admissions policy?

11   **A.**  Not -- no, it does not.

12   **Q.**  How long has it been Harvard's admissions policy?

13   **A.**  That has been our approach throughout my tenure also.

14   **Q.**  And is it consistent with your description of the policy

15   that you provided to Her Honor two weeks ago?

16   **A.**  Yes, it is.

17   **Q.**  Would you read the next sentence which begins "As noted

18   above."

19   **A.**  "As noted above, though, an applicant's race or ethnicity

20   should not be considered in assigning the personal rating."

21   **Q.**  And how does that compare to what you told Her Honor two

22   weeks ago about how race is considered in the admissions

23   office?

24   **A.**  That is the same message.

25   **Q.**  Now, Mr. Mortara asked you about the reading procedures

1    for the years 2013 to 2014.  It was DX5 in his notebook.  So

2    if I could ask you to switch notebooks for a second, go back

3    to his notebook and get DX5.  Do you have it?

4    **A.**  Yes, I do.

5    **Q.**  If we could have the cover, this is the interviewer

6    handbook for 2013 to 2014, correct?

7    **A.**  Yes.

8    **Q.**  Now, to be clear, this is one of the documents in the

9    period of time for discovery in this case, correct?

10    **A.**  Yes.

11    **Q.**  And when Mr. Mortara examined you a couple of weeks

12    allege, this is a document that he put in front of you,

13    correct?

14    **A.**  Yes.

15    **Q.**  He just asked you some questions about what this document

16    said about extroverts and introverts.  Do you remember?

17    **A.**  Yes.

18    **Q.**  Let's look at a portion that he didn't address.  If you

19    turn to the second page, do you see a section called "Valuing

20    the Creative and the Reflective"?

21    **A.**  Yes.

22    **Q.**  And this is a letter written -- or this is a piece

23    written by a woman named Helen Vendler?

24    **A.**  Yes.

25    **Q.**  Who was Helen Vendler?

**A.**   This is the piece I referred to earlier.  She is a

university professor, professor of English literature.  She

was a member of our admissions committee.  I think her tenure

on our committee ended in the year 2000, and I believe that's

when she wrote this essay at my request.

**Q.**   And this essay is the introduction to the interviewer

handbook for 2013 to 2014?

**A.**   Yes.

**Q.**   Turn, if you would, to the page that's page 3.

**A.**   Yes.

**Q.**   Now, you had mentioned to Mr. Mortara that the issue of

introverts and extroverts actually had been addressed in

written materials in admissions office previously, correct?

**A.**   Yes.

**Q.**   So let's look at a couple of the things that were said a

decade or so ago.  Go to the third paragraph on page 3.

**A.**   Yes.

**Q.**   Would you read the sentence that begins "The truth" and

continues down to "do we have room for."

**A.**   "The truth is that many future poets, novelists, and

screenwriters are not likely to be straight A students either

in high school or in college.  The arts through which they

will discover themselves prize creativity, originality, and

intensity above academic performance; they value

introspection above extroversion, insight above rote

1    learning.  Yet such unusual students may be in the long run

2    the graduates of whom we will be most proud."

3    **Q.**  And would you then read for me the very next sentence.

4    **A.**  "Do we have room for the reflective introvert as well as

5    for the future leader? "

6    **Q.**  When you told Mr. Mortara that Harvard had addressed the

7    question of introverts and extroverts years ago, was this one

8    of the things you had in mind?

9    **A.**  Yes, it is.

10   **Q.**  Let's see what else was said in this letter -- this

11   article.  Could you go down to the last paragraph on this

12   page.

13   **A.**  Yes.

14   **Q.**  Do you see the sentence that says, "Do we ask an

15   introverted student"?

16   **A.**  Yes.

17   **Q.**  Would you read that sentence for us.

18   **A.**  "Do we ask an introverted student which issues most

19   occupy his mind or suggest something, justice and injustice

20   in her high school, for her to discuss?"

21          Shall I continue?

22   **Q.**  No.  That's good.  Thank you.  Is this one of the

23   portions that you had in mind when you were answering

24   Mr. Mortara's questions?

25   **A.**  Yes.

1  **Q.**  Has Professor Vendler's article remained in the
2  interviewer handbook?
3  **A.**  Yes.
4  **Q.**  Right through today?
5  **A.**  Yes.
6  **Q.**  And would you remind us how many people get the
7  interviewer handbook with Professor Vendler's essay?
8  **A.**  Over 10,000 of our alumni.
9  **Q.**  Every year?
10  **A.**  Yes.  It's updated every year.
11  **Q.**  Now, Mr. Mortara asked you whether you had seen the class
12  of 2023 reading procedures before you testified a couple of
13  weeks ago.
14  **A.**  Yes.
15  **Q.**  And he showed you your testimony where you said that you
16  had not seen -- in answer to his specific question, you had
17  not seen them in written form, correct?
18  **A.**  Right.  Yes.
19  **Q.**  We've now seen the class of 2023 reading procedures.
20  Would you explain to us why you answered his question in the
21  manner that you did?
22  **A.**  When I testified before, I was referring to what I
23  thought was the period of time that was the principal focus
24  of this file and of the materials which I had reviewed in
25  preparation for my testimony.

1   **Q.**  And when you were pointing over to my hand scratchings on

2   the chart, you were referring to the period through 2014?

3   **A.**  Yes.

4   **Q.**  And the classes through 2019?

5   **A.**  Yes.

6   **Q.**  If you knew that his question was intended to come right

7   up through October the 15th or whatever day you were here,

8   would you have answered it differently?

9   **A.**  Yes.

10  **Q.**  Thank you.

11        MR. LEE:  Nothing further, Your Honor.

12        THE COURT:  Go.

13                        FURTHER EXAMINATION

14  BY MR. MORTARA:

15  **Q.**  You just looked at some pages from the alumni interviewer

16  handbook and an essay, correct?

17  **A.**  Yes.

18  **Q.**  And part of the essay had a question.  Do we ask the

19  introverted student about injustice in their high school, or

20  something to that effect, correct?

21  **A.**  Yes.

22  **Q.**  And that's talking about interviewing people, isn't it?

23  Did we ask questions?

24  **A.**  It's talking about interviewing people, and it's

25  talking -- yes.

1   **Q.**  Can you ask an introverted student who submits a paper

2   application and is not interviewed by anyone in your office

3   how they feel about injustice?

4   **A.**  Not necessarily.  But the interviewers who read this

5   essay in preparation for their interviewing of -- official

6   interviewing of our candidates that might be able to think

7   more deeply about the interview.

8   **Q.**  That's your alumni interviewers, correct?

9   **A.**  Correct.

10  **Q.**  Not your admissions officers who assign personal ratings

11  without interviewing many, many, many applicants, correct?

12  **A.**  Correct.

13  **Q.**  Thank you.

14                     FURTHER EXAMINATION

15  BY MR. LEE:

16  **Q.**  Director McGrath, do you consider yourself an introvert

17  or an extrovert?

18  **A.**  Good heavens.  You will have a better view than I will.

19            Probably an introvert.

20  **Q.**  Thank you.

21            MR. MORTARA:  Your Honor, could we have a

22  ten-minute break to confer?

23            THE COURT:  Yes.  Ten minute break.  We'll be back

24  at five of.

25            MR. LEE:  Your Honor, can the witness be excused?

```
 1              THE COURT:  I'm sorry.  You're excused, Director
 2    McGrath.
 3              (Court recessed at 2:44 p.m.)
 4              THE COURT:  Next witness, please.  Mr. Hughes,
 5    you're standing up.
 6              MR. HUGHES:  Your Honor, can we have a brief
 7    sidebar.
 8              THE COURT:  Yes.
 9              [Sidebar sealed and redacted.]
10              THE COURT:  Joan was just reminding me that the
11    sidebars have been sealed throughout as a matter of course
12    except for the parties.
13              Just so it is clear to everybody, I can't recollect
14    the number of the motion, but the agreed upon motion that
15    concerned judicial notice of historical documents is granted.
16              And Exhibits -- what's been marked for
17    identification as Exhibits 221, 512, and 513 are not
18    admitted.
19              MR. HUGHES:  Thank you, Your Honor.  Those are
20    P221, P512, and P513.
21              THE COURT:  Yes.  P221, P512, and P513.  And I have
22    under advisement the last two exhibits, and I'll give you the
23    ruling on that in the morning because I know you both have
24    submitted writings on that, and I haven't had a chance to
25    read them.
```

```
1              MR. HUGHES:  Thank you, Your Honor.  The plaintiffs
2     rest, and I'll turn it over to Mr. Lee.
3              MR. LEE:  Your Honor, Harvard calls Drew Faust.
4              THE CLERK:  Can you please raise your right hand.
5              (DREW FAUST duly sworn by the Deputy Clerk.)
6              THE CLERK:  Thank you.  You may be seated.
7              Can you please state your name and spell your last
8     name for the record.
9              THE WITNESS:  My name is Drew Faust, F-A-U-S-T.
10             THE COURT:  I see you leaning forward.  That whole
11    microphone can pull towards you if it's easier.
12             THE WITNESS:  Thank you.
13                             EXAMINATION
14    BY MR. LEE:
15    Q.   Good afternoon, President Faust.
16    A.   Good afternoon.
17    Q.   Would you introduce yourself to Her Honor?
18    A.   Your Honor, I am Drew Faust.
19             THE COURT:  Nice to meet you.
20             THE WITNESS:  Nice to meet you, too.
21    BY MR. LEE:
22    Q.   President Faust, by whom are you currently employed?
23    A.   I'm employed by Harvard University.
24    Q.   Were you the president of Harvard?
25    A.   Yes, I was.
```

1    **Q.**  Would you very briefly describe your educational

2    background for the Court.

3    **A.**  I grew up and attended elementary school in Virginia and

4    then graduated from Concord Academy here in Massachusetts

5    then got a bachelors degree from Bryn Mawr College then an MA

6    and Ph.D. from the University of Pennsylvania.

7    **Q.**  In what year did you receive your Ph.D.?

8    **A.**  1975.

9    **Q.**  What was the subject of your dissertation?

10   **A.**  Of my dissertation?

11   **Q.**  Yes.

12   **A.**  I was in a program in American civilization, and I wrote

13   a dissertation on the defense of slavery in the pre Civil War

14   South.

15   **Q.**  What did you do after earning your Ph.D.?

16   **A.**  I joined the Pennsylvania faculty.

17   **Q.**  And how long were you a member of the faculty at Penn?

18   **A.**  I was on the faculty there for 25 years.

19   **Q.**  What is the field in which your academic work has

20   concentrated?

21   **A.**  My academic work has been concentrated in the study of

22   the pre Civil War South and the Civil War.

23   **Q.**  Has your academic work educated your view of race in

24   America?

25   **A.**  It has.  Those are central issues to the work I have

1    undertaken.

2    **Q.**   Now I'm going to ask you to be immodest for a moment on

3    your own behalf.

4              Have you received any formal recognition for your

5    academic work in this field?

6    **A.**   I have.

7    **Q.**   Would you just give us a couple of examples?

8    **A.**   I recently was awarded the Kluge Prize in the study of

9    humanity by the Library of Congress.  My most recent book was

10   a finalist for the Pulitzer Prize and the National Book Award

11   and was named by The New York Times as one of the ten best

12   books of 2008.

13   **Q.**   What was the title of that book?

14   **A.**   That book was entitled "This Republic of Suffering: Death

15   and the American Civil War."

16   **Q.**   At some point did you leave the University of

17   Pennsylvania?

18   **A.**   I did.

19   **Q.**   Where did you go?

20   **A.**   I went to Harvard University.

21   **Q.**   In what capacity?

22   **A.**   I became the dean of the Radcliffe Institute For Advanced

23   Study.

24   **Q.**   And what is the Radcliffe Institute?

25   **A.**   The Radcliffe Institute is the unit of Harvard that was

created when Harvard and Radcliffe merged in 1999.  And what
had been Radcliffe College, a college for women, was
incorporated into the Harvard entity.  It was transformed at
that point into an institute for advanced study, and I was
the founding dean.

**Q.**  When did you begin serving as the president of Harvard
University?

**A.**  I began in that role in 2007, on July 1, 2007.

**Q.**  When did you complete your service as president?

**A.**  I completed my service as president on June 30 of this
year.

**Q.**  What is your current position at Harvard?

**A.**  I am the Lincoln professor of history.

**Q.**  What were your duties and responsibilities as president
of Harvard?

**A.**  I was responsible for everything at the university.

**Q.**  Were you involved in all the day-to-day decisions and
activities of the university?

**A.**  Yes.  I was ultimately responsibile.  But the day-to-day
decisions were not ones I engaged in universally across the
university.

**Q.**  Let me ask you some questions about the structure and
mission of Harvard University.

           As president of Harvard University, were you
ultimately responsible for the oversight of Harvard College?

1   **A.**   Yes, ultimately I was.

2   **Q.**   Was Harvard College the only academic institution you

3   oversaw as president?

4   **A.**   No, it was not.

5   **Q.**   Turn, if you would, in the notebook that we've put before

6   you to Tab 14.

7   **A.**   Yes.

8   **Q.**   Do you see DD 11.2?

9   **A.**   I do.

10  **Q.**   It's also on the screen in front of you, if that makes it

11  easier.  Can you tell us what this slide describes?

12  **A.**   This slide lists the various academic units that make up

13  Harvard University.

14  **Q.**   Would you just tell us what they are?

15  **A.**   They are Harvard College, Harvard Graduate School of Arts

16  and Sciences, Harvard John A. Paulson School of Engineering

17  and Applied Sciences, the Radcliffe Institute for Advanced

18  Study, Harvard Business School, Harvard Divinity School,

19  Harvard School of Dental Medicine, Harvard Graduate School of

20  Design, Harvard Graduate School of Education, Harvard Kennedy

21  School, Harvard Law School, Harvard Medical School, and

22  Harvard T.H. Chan School of Public Health.

23  **Q.**   On a day-to-day basis, who is responsible for overseeing

24  each of these schools?

25  **A.**   Each of these schools has a dean.

1   **Q.**   Excluding the schools within the faculty of arts and
2   sciences and the dental school, to whom did the deans report?
3   **A.**   The deans reported to me.
4   **Q.**   Who is responsible for the day-to-day operations of
5   Harvard College?
6   **A.**   The dean of Harvard College is Rakesh Khurana, and he has
7   that responsibility.
8   **Q.**   And during your time as president, to whom did Dean
9   Khurana report?
10  **A.**   Dean Khurana reported to the dean of the faculty of arts
11  and sciences, Mike Smith.
12  **Q.**   And to whom did Dean Smith report?
13  **A.**   Dean Smith reported to me.
14  **Q.**   And who was responsible for undergraduate admissions
15  during their tenure?
16  **A.**   Dean Fitzsimmons.
17  **Q.**   And to whom did he report?
18  **A.**   He reported to Mike Smith, the dean of the faculty of
19  arts and sciences.
20  **Q.**   Were you involved in the day-to-day work of the
21  admissions office of Harvard College?
22  **A.**   No, I was not.
23  **Q.**   Were you involved in the day-to-day work of the
24  admissions offices of any of the other units of Harvard
25  University?

1    **A.**   No, I was not.

2    **Q.**   Let's turn back to Harvard College.  Does Harvard College

3    have a mission statement?

4    **A.**   It does.

5    **Q.**   Turn, if you would, to Tab 1 in your binder.  Do you find

6    DX109?

7    **A.**   I do.

8    **Q.**   What is it?

9    **A.**   It's the mission, vision, and history of Harvard College.

10   **Q.**   And under the mission, would you read for us the first

11   two sentences of the mission of Harvard College?

12   **A.**   "The mission of Harvard College is to educate the

13   citizens and citizen-leaders for our society.  We do this

14   through our commitment to the transformative power of a

15   liberal arts and sciences education."

16   **Q.**   Was that the mission of Harvard College during your

17   tenure as president?

18   **A.**   It was.

19   **Q.**   Turn, if you would, to the second sentence of the next

20   paragraph.  And I'll ask Mr. Lee to highlight it.  Could you

21   read that sentence for us?

22   **A.**   "Through a diverse living environment, where students

23   live with people who are studying different topics, who come

24   from different walks of life and have evolving identities,

25   intellectual transformation is deepened and conditions for

1    social transformation are created."

2    **Q.**  Do you agree with that statement?

3    **A.**  I do.

4    **Q.**  While you were president, was diversity important to

5    fulfilling Harvard's mission?

6    **A.**  Diversity was a central element of fulfilling Harvard's

7    mission.

8    **Q.**  Why was it a central element of fulfilling Harvard's

9    mission?

10   **A.**  We are a residential college, at Harvard College, and

11   that means that we bring people together from a wide range of

12   places and backgrounds to educate one another as well as to

13   benefit from the formal education that they may receive from

14   our faculty and staff.  And so having people who are able to

15   educate one another about differences, bring different

16   elements to that community, is an essential part of the

17   experience of Harvard College.

18   **Q.**  What types of diversity are important to fulfilling

19   Harvard College's mission?

20   **A.**  There are a wide range of types of diversity that matter

21   to us.  We look for geographic diversity, diversity of

22   ethnicity, of race, of religion, of intellectual focus.  We

23   want students who will pursue different fields and have --

24   engaged with different questions intellectually before they

25   come.  We look for people with a variety of talents across a

1    spectrum of areas.

2    **Q.**   And racial diversity is one of the types of diversity

3    that you seek?

4    **A.**   Yes, it is.

5    **Q.**   Why is racial diversity important to achieving the

6    college's mission?

7    **A.**   Racial diversity is important because race is an element

8    in our society of importance, and it also can be a defining

9    element in how our students understand themselves and how

10   they understand the experiences of their lives and what they

11   bring to the Harvard College community.

12   **Q.**   During your 11 years as president, did the diversity of

13   the Harvard College class change?

14   **A.**   It did.

15   **Q.**   In what ways?

16   **A.**   It became more diverse in a variety of dimensions.

17   Socioeconomic diversity was a very important one because of

18   our expansions of financial aid, and that, in part, enabled a

19   more diverse class overall.

20   **Q.**   And did it change in terms of racial diversity?

21   **A.**   It did.

22   **Q.**   Geographic diversity?

23   **A.**   Yes, it did.

24   **Q.**   And in other ways?

25   **A.**   Yes, it did.

1   **Q.**  And as someone who was the president and who walked

2   across the campus on a daily basis for 11 years, did that

3   changed diversity change the campus and the community?

4   **A.**  It did.  It was a campus in which we saw students

5   bringing different elements of their own experiences to share

6   with their fellow students.

7             We saw, for example, in the arts, which was a real

8   interest and focus of mine, the kinds of diversity that

9   different ethnic and racial backgrounds enabled students to

10  represent through their artistic performances.  South Asian

11  dance or festival and so forth was just a symbol of the kind

12  of cultural differences that flourished on the campus as we

13  had more representation from more different groups,

14  geographic groups and ethnic groups and racial groups.

15  **Q.**  Is it your experience as an educator that students learn

16  from each other as well as from the faculty?

17  **A.**  Absolutely.  That's a fundamental assumption of our

18  educational model.

19  **Q.**  Is the diversity of the student body important to that

20  portion of the learning model?

21  **A.**  It absolutely is.

22  **Q.**  Now, has Harvard College ever evaluated the importance of

23  student body diversity?

24  **A.**  Yes, it has.

25  **Q.**  Has it made public its views on the importance of

1  diversity?

2  **A.**  Yes, it has.

3  **Q.**  And, in fact, has it shared its views on the importance

4  of diversity with the Supreme Court?

5  **A.**  Yes, it has.

6  **Q.**  When has it done so?

7  **A.**  It did so in 1977 in an amicus brief in the *Bakke* case.

8  It did so again in 2002 in an amicus brief submitted in the

9  *Grutter* case.  It did so again in the *Fisher* case.  There

10  have been a number of times that it has done this.  *Fisher*

11  one and two.

12  **Q.**  In addition to filing amicus briefs with the Supreme

13  Court, has Harvard made other formal statements on the

14  importance of diversity?

15  **A.**  It has.

16  **Q.**  Turn, if you would, to Tab 2 in your notebook.  Do you

17  find DX40?

18  **A.**  I do.

19  **Q.**  Tell us what it is.

20  **A.**  This is a president's report from President Neil

21  Rudenstine that is focused on the issue of the importance of

22  diversity to learning and education.

23          MR. LEE:  Your Honor, we offer DX40.

24          MR. HUGHES:  No objection.

25          THE COURT:  Admitted.

```
 1                     (Defendant Exhibit No. DX40 admitted.)

 2     BY MR. LEE:

 3     Q.   Who is Neil Rudenstine?

 4     A.   Neil Rudenstine is one of my predecessors as president of

 5     Harvard.  He served from 1991 to 2001.

 6     Q.   Was he the president at the time this report was issued?

 7     A.   Yes, he was.

 8     Q.   Turn, if you would, to the page that says DX040.004 at

 9     the bottom.  And I'm going to focus you on the first full

10     paragraph of this page.

11               Do you see it?

12     A.   I do.

13     Q.   Would you read to us the first sentence of that page.

14     A.   Beginning "In the pages?

15     Q.   Yes, please.

16     A.   "In the pages that follow, I discuss the emergence of

17     student diversity as an important idea in American higher

18     education, especially as it relates to learning that takes

19     place beyond the classroom and the formal curriculum."

20     Q.   Would you go to the last sentence of that paragraph and

21     read it for us, please.

22     A.   "Finally, I indicate why the goal of diversity remains so

23     important to the actual quality and breadth of education for

24     all our students, and why our existing policies continue to

25     offer the most effective and promising pathway to the
```

1    future."

2    **Q.**   Do these statements fairly summarize president

3    Rudenstine's report?

4    **A.**   They do.

5    **Q.**   Turn, if you would, to Tab 3 in your binder.  Do you find

6    DX14?

7    **A.**   I do.

8    **Q.**   What is DX14?

9    **A.**   This is a report that was issued by a committee in the

10   faculty of arts and sciences, chaired by Rakesh Khurana, to

11   study the importance of student body diversity.  It was

12   submitted to the faculty of arts and sciences for discussion

13   and consideration.

14   **Q.**   What is the date of the report?

15   **A.**   It's 2015.

16   **Q.**   Was the report provided to you?

17   **A.**   It was.

18   **Q.**   And who participated in addition to Dean Khurana in the

19   creation of the report?

20   **A.**   There was a committee of FAS faculty listed at the end of

21   the report.

22   **Q.**   When you say "FAS," do you mean --

23   **A.**   Faculty of arts and sciences, yes.

24   **Q.**   Now, did the committee reach any conclusions?

25   **A.**   The committee did.

1  **Q.**  Let me draw your attention to page 22.  Do you have that?

2  **A.**  I do.

3  **Q.**  Do you see the concluding paragraph?

4  **A.**  I do.

5  **Q.**  Would you read that to us, please.

6  **A.**  "We emphatically embrace and reaffirm the university's

7  long-held view that student body diversity, including racial

8  diversity, is essential to our pedagogical objectives and

9  institutional mission.  It enhances the education of all of

10  our students.  It prepares them to assume leadership roles in

11  the increasingly pluralistic society into which they will

12  graduate.  And it is fundamental to the effective education

13  of the men and women of Harvard College."

14  **Q.**  Do you agree with that statement?

15  **A.**  I do.

16  **Q.**  And did you agree with that statement as president of

17  Harvard University?

18  **A.**  I did.

19  **Q.**  Now, what was done with the report?

20  **A.**  The report was submitted by the committee to the faculty

21  as a whole and was discussed in two faculty meetings and then

22  voted on.

23  **Q.**  And was it approved?

24  **A.**  It was approved unanimously.

25  **Q.**  Now, we've discussed President Rudenstine's report in

1    1996 and Dean Khurana's report in 2015.  Are these the only

2    statements Harvard has made about the importance of

3    diversity?

4    **A.**   Harvard has made, many, many statements about the

5    importance of diversity in presidential speeches, decanal

6    speeches.  And other predecessors, President Derek Bok

7    published a book called "The Shape of the River," which is

8    a -- together with Bill Bowen; they were coauthors.  And

9    that's a major statement and analysis about the importance of

10   diversity.  So there are many places in which these

11   statements have been made.

12   **Q.**   And have you yourself made statements publicly about the

13   importance of diversity?

14   **A.**   I have.

15   **Q.**   And generally in what context?

16   **A.**   The context perhaps would be a talk at commencement which

17   I gave every year, I think.  Many of these were focused on

18   diversity.  I always gave a talk on the first day of classes

19   in morning prayers, and a number of those were focused on

20   diversity.  There were occasions in the course of the year

21   when I would emphasize diversity in either a formal or

22   informal talk, but it was a constant theme.

23   **Q.**   While you were the president, did Harvard College take

24   steps to ensure that it had a diverse student body?

25   **A.**   It did.

1   **Q.**  And what mechanism did it use to ensure it had a diverse

2   student body?

3   **A.**  Well, there were many mechanisms in the admissions

4   process, the kind of outreach, recruitment, identification of

5   talented students.  That was a very important dimension of

6   the admissions process.

7          But we also changed our financial aid policy as a

8   way of making Harvard more affordable and accessible to a

9   diverse number of students, a diverse population of

10  prospective students.

11  **Q.**  I'd like to ask you a little bit more about the

12  developments in the financial aid program.

13          Before you became the president, did Harvard take

14  any steps to expand financial aid?

15  **A.**  This has been a theme at Harvard for quite some time,

16  actually.  Right after World War II, the then president James

17  Conant created a national scholar system because he

18  recognized that it was important that Harvard reach out

19  beyond its usual population and bring in a more economically

20  diverse body of students.

21          But in more recent times -- and we've had over the

22  years a need-blind admissions policy of financial aid.

23          But in 2004, we made significant advances before my

24  presidency with the introduction of a Harvard financial aid

25  program that we now call HFAI for the lowest income group and

1    then expanded on that in 2007 when I became president.

2    **Q.**  When the program was expanded when you became president

3    in 2007, what were the elements of the program?

4    **A.**  The elements of the program were, first of all, we had no

5    loans.  There were to be no loans for families that made

6    below a certain income.  And we've tweaked it a little bit

7    since then.  I'll describe it as it currently is formulated.

8             Families below $65,000 a year in income paid no

9    parental contribution.  For families up to about $150,000,

10   the rubric was that the family would pay no more than

11   10 percent of income for tuition and room and board.

12            And then we have financial aid going up further in

13   the income level, dependent on family need and family

14   resources.  So students well into the middle class could have

15   assistance from Harvard financial aid to make education

16   affordable.

17   **Q.**  So to give us just an idea of the magnitude of the

18   financial aid program, let me ask you this:  Before your

19   presidency, how much was Harvard spending annually, each

20   year, on financial aid for the college?

21   **A.**  At the beginning of my presidency it was about

22   $90 million a year in the college.

23   **Q.**  At the end of your presidency this June, how much was

24   Harvard spending on financial aid at the college?

25   **A.**  It's close to 200 million.

1    **Q.**   Why did you expand financial aid so substantially during

2    your presidency?

3    **A.**   It seemed to me and to others in leadership roles and

4    throughout the university that this was an absolutely

5    essential act in order to be able to commit ourselves to our

6    fundamental purposes, those being attracting people of talent

7    regardless of their financial circumstances, attracting

8    people across a wide range of origins and identities and

9    ethnicities and races, making sure that people understood

10   they should not see financial impediments to being able to be

11   part of this community and to bring their extraordinary

12   talents to it.

13   **Q.**   Now, your decision to expand the financial aid program

14   came about close to the time of the recession, correct?

15   **A.**   It did.

16   **Q.**   Did the financial crisis have any impact on the Harvard

17   College financial aid program?

18   **A.**   The program was announced in December 2007, and then of

19   course the following fall, by September of 2008, we faced

20   really serious financial headwinds and began looking at

21   budgets and cutting expenditures in a variety of areas.

22          But we determined we were not going to do that in

23   the financial aid program.  In fact, we increased our

24   financial aid commitments because there were so many families

25   that found themselves more needy because of the circumstances

1    of the recession.

2    **Q.**   Was pressure brought to bear on you to actually reduce

3    the financial aid program because of that recession?

4    **A.**   Yes, there was.

5    **Q.**   What did you decide?

6    **A.**   I decided that we should not do that.  We should maintain

7    our commitment to the financial aid program.

8    **Q.**   And under Harvard's current financial aid program, what

9    percentage of undergraduates have zero parental contribution

10   and zero loans?

11   **A.**   It's about 20 percent.

12   **Q.**   Approximately what percentage of the class receives

13   financial aid?

14   **A.**   It varies a bit from year to year, but between 55 and

15   60 percent receive financial aid.

16   **Q.**   For those undergraduates receiving financial aid of some

17   kind, what is the average cost of attending Harvard on an

18   annual basis?

19   **A.**   It's about $12,000.  That's tuition and room and board, I

20   think is important to explain.

21   **Q.**   So it's tuition, room, and board and on average $12,000?

22   **A.**   Total cost.

23   **Q.**   What percentage of the incoming class are

24   first-generation college graduates?

25   **A.**   That's about 17 percent now.

1    **Q.**   Now, we've talked about the changes in the expansion of

2    the financial aid program, correct?

3    **A.**   We have.

4    **Q.**   In addition to yourself, was there a person or persons at

5    Harvard who were the real drivers of the expansion of the

6    financial aid program?

7    **A.**   The longtime champion of this commitment and the person

8    who really devised the various methods and worked with

9    administration in Mass. Hall, the president's office, to

10   advance this was Dean Fitzsimmons.

11   **Q.**   Over many years?

12   **A.**   Over many, many years.  This has been a passion for him,

13   the openness and access question.

14   **Q.**   Has Harvard made progress achieving all of its

15   diversity-related goals?

16   **A.**   We've made progress, but there is still work to be done.

17   **Q.**   Let's talk about some of the progress that's been made.

18           Today, what is the approximate gender composition

19   of the Harvard class?

20   **A.**   It's close to 50-50.

21   **Q.**   What is the approximate racial composition of Harvard's

22   class?

23   **A.**   That again is close to 50-50, 50-50 white and nonwhite.

24   **Q.**   Has the Asian-American share of the admitted class

25   changed over time?

1    **A.**   It has.

2    **Q.**   How has it changed?

3    **A.**   Well, if we go back to 1980, I believe that the

4    percentage of the class was around 3 percent.  In 2010 it was

5    around 18 percent.  It's currently in 2008 about 23 percent.

6    So we can see significant change both in the shorter term and

7    in the longer term.

8    **Q.**   Now, we just focused on students, correct?

9    **A.**   Yep.

10   **Q.**   Let me turn to faculty.

11            Has the diversity of the Harvard faculty changed

12   over time?

13   **A.**   It has.

14   **Q.**   Has the racial diversity of the Harvard faculty changed

15   over time?

16   **A.**   It has.

17   **Q.**   And specifically has the number of Asian-American faculty

18   on the faculty of arts and sciences changed over time?

19   **A.**   It has.

20   **Q.**   How much approximately?

21   **A.**   I believe that the tenured faculty, Asian-American

22   faculty, has increased by about 50 percent over the past

23   decade.

24   **Q.**   And do you know how much the faculty at large has

25   increased?

1   **A.**   That number is not right on the tip of my tongue.

2   **Q.**   The tenured faculty has about a 50 percent increase?

3   **A.**   Yes, it has.

4   **Q.**   We've heard during the course of the trial about the

5   concept of diversity and inclusion.  You're familiar with

6   both terms?

7   **A.**   I am.

8   **Q.**   What is the difference between the two?

9   **A.**   Diversity is about presence, who's present, what is the

10   demographic makeup of a group of a campus, of a community.

11           Inclusion is about the experience of those

12   individuals within that community.

13   **Q.**   Can Harvard achieve the benefits of diversity without

14   inclusion?

15   **A.**   Inclusion is a critical element of fully benefiting from

16   diversity, yes.

17   **Q.**   During your tenure as president, did students express

18   concerns to you about the inclusiveness of the Harvard

19   community?

20   **A.**   Yes, they did.

21   **Q.**   And did you respond to those concerns?

22   **A.**   I did.

23   **Q.**   Did you meet with them?

24   **A.**   I did.

25   **Q.**   Now, has Harvard taken systematic or more formal actions

1   to promote inclusion?

2   **A.**   Yes, it has.

3   **Q.**   Turn, if you would, to Tab 14 in your notebook, and I'm

4   going to put on the screen DD 11.3.  Do you see that?

5   **A.**   I do.

6   **Q.**   And you see we've listed a number of the different

7   committees and working groups during your tenure as president

8   of the university, correct?

9   **A.**   Yes.

10  **Q.**   Let's start with the first one, the college working group

11  on diversity and inclusion.  Who convened that working group?

12  **A.**   That group was convened in the college and chaired by

13  Professor Jonathan Walton.

14  **Q.**   Who is Professor Jonathan Walton?

15  **A.**   Professor Jonathan Walton is the Pusey Minister in

16  Memorial Church and the Plummer Professor of Christian

17  Morals.

18  **Q.**   What did his working group do?

19  **A.**   That working group looked at a number of quite specific

20  concerns of undergraduates that had been some of them under

21  discussion, some of them talked about for some time, but they

22  looked at them comprehensively and made some direct

23  recommendations for direct interventions.

24  **Q.**   Turn, if you would, to Tab 4 in your notebook.  Do you

25  have DX13?

1   **A.**   I do.

2   **Q.**   What is it?

3   **A.**   That is the report of the working group.

4          MR. LEE:  Your Honor, I think it may already be in

5   evidence.  It is in evidence.

6   BY MR. LEE:

7   **Q.**   President Faust, what recommendations did this report

8   contain?

9   **A.**   This report contained a number of recommendations in

10  different areas.  It recommended, for example, that we

11  provide spring break meals for students who were unable to

12  travel home and that we keep the dining halls open during

13  spring break.  It also recommended that we pay more attention

14  to mental health services for students.

15          Other recommendations about the curriculum, noting

16  that for students who came from less advantaged backgrounds,

17  perhaps they'd come from someplace that had no lab science,

18  and we needed to take action to make sure that laboratory

19  sciences, the way concentrations, majors were structured at

20  Harvard, they would be open to students who had not had that

21  kind of experience in high school.

22          It also had some administrative recommendations

23  about training of staff and faculty and asked that we look at

24  some of the different groups of individuals who were assigned

25  roles relating to diversity and what those roles entail.

1    And then it also asked that this college work be

2    supplemented by a look at the university more broadly and the

3    context within which the college sat on these issues.

4    **Q.**  Turn, if you would, to Tab 5 in your notebook.  Do you

5    have DX100?

6    **A.**  I do.

7    **Q.**  What is it?

8    **A.**  This is a charge that I issued to a subsequent task force

9    on inclusion and belonging that was at the universitywide

10   level.

11        MR. LEE:  Your Honor, we offer DX100.

12        MR. HUGHES:  No objection.

13        THE COURT:  Admitted.

14        (Defendant Exhibit No. DX100 admitted.)

15   BY MR. LEE:

16   **Q.**  How did this task force differ from Professor Walton's

17   working group.

18   **A.**  This group was meant to look at the questions on

19   universitywide basis, so the members of this group came from

20   all over the university.  It also was asked to look at

21   questions relating to staff and faculty and students so that

22   all of those groups were participating as representatives or

23   as examples of the experience of their groups.

24        It also asked that we address some of the questions

25   of universitywide structures, policies, and administrative

1    realities and ask how those could be more supportive of the

2    mission of inclusion and belonging.

3    **Q.** What was the result of the task force work?

4    **A.** The task force issued a report in the spring of this

5    year.

6    **Q.** Turn, if you would, to Tab 6 in your notebook.  Do you

7    find DX740?

8    **A.** I do.

9    **Q.** What is it?

10   **A.** This is the report that was issued by that task force.

11               MR. LEE:  Your Honor, we offer DX740.

12               MR. HUGHES:  No objection.

13               THE COURT:  Admitted.

14               (Defendant Exhibit No. DX740 admitted.)

15   BY MR. LEE:

16   **Q.** Did you receive this report?

17   **A.** I did.

18   **Q.** Did you respond to the report?

19   **A.** I did.

20   **Q.** Turn, if you would, to Tab 7 in your binder.

21   **A.** Yes.

22   **Q.** Do you find DX83?

23   **A.** I do.

24   **Q.** What is DX83?

25   **A.** This is my response to the community and to the task

1   force recommendations.

2              MR. LEE:  Your Honor, we offer DX83.

3              MR. HUGHES:  No objection.

4              THE COURT:  Admitted.

5              (Defendant Exhibit No. DX83 admitted.)

6   BY MR. LEE:

7   **Q.**  Can you summarize your response to the task force

8   recommendations?

9   **A.**  This response came in March of this year, and I had only

10  a few months left in my presidency at that point.  So I

11  wanted to respond in a way that would make some -- take some

12  initial actions in response to things that could be acted

13  upon right away but also set up some momentum for moving

14  forward in a general sense on the more long-range issues.

15             I did that, of course, in close consultation with

16  my successor.  I didn't want to do anything that would be at

17  cross-purposes with his intentions.  But we agreed that if we

18  could get some momentum going, then he would be able to pick

19  up this issue as he settled into his new role.

20             So one of the things this did was to bring someone

21  into the president's office, John Wilson, who is here today,

22  to be kind of the point person for the pursuing of the

23  recommendations that I was unable to meet right away.

24             But right away we instituted some changes in

25  symbols and the alma mater.  I committed presidential

1    resources to create faculty recruitment.  We also committed

2    resources to support innovative ideas in bringing teaching

3    and learning across the campus into a place where it could

4    take account of the findings of the task force.

5            And the task force had also recommended to faculty

6    committees to inquire into academic dimensions of inclusion

7    and belonging, and I appointed the chairs of those committees

8    to get them underway.

9    **Q.**  So he doesn't feel left out, who is your successor as the

10   president?

11   **A.**  My successor is Lawrence Bacow.

12   **Q.**  You mentioned John Wilson as the person that you put in

13   place to spearhead or lead some of these efforts.  Who is

14   Dr. Wilson?

15   **A.**  Dr. Wilson is a graduate of our school of education.  He

16   served as a member of the board of overseers, one of the

17   governing boards.  He's taking a leave of that at this time

18   to serve in the president's office.  He's the former

19   president of Morehouse College, and he's also someone who has

20   worked on diversity issues throughout his career, including

21   early in his career at MIT with Lawrence Bacow.

22   **Q.**  What did you ask Dr. Wilson to do other than to come to

23   court today?  What did you ask him to do?

24   **A.**  That was his idea coming to court.

25            I asked him to take up the agenda that the task

1    force report had put forth and pursue how to implement the

2    parts of it that seemed worthy of implementation immediately,

3    to figure out -- some of the things that the task force

4    recommended were things like strategic planning and setting

5    up structures to enable the schools to look in a longer view

6    at their goals for inclusion and belonging.  So this required

7    organizational skill and organizational interventions that

8    Dr. Wilson has committed himself to.

9           Another issue was that I felt as president -- and

10   the task force believed this, too -- there needed to be a

11   function in the central administration, a point person in the

12   central administration looking at these issues on a permanent

13   basis.

14          But how to structure that role, what that job

15   should be, that's something that Dr. Wilson is also thinking

16   about during his time in the interim role in this position.

17   **Q.**  Has Harvard finished implementing the recommendations of

18   the task force?

19   **A.**  I would not expect it has.  I'm not president anymore,

20   but I would think a lot of these are very long term in their

21   demands.

22   **Q.**  Let me turn to a different topic.

23          Have you heard of the concept of race-neutral

24   alternatives?

25   **A.**  I have.

1    **Q.**  Has Harvard ever considered race-neutral alternatives

2    through a committee?

3    **A.**  Yes, it has.

4    **Q.**  When did Harvard first consider race-neutral alternatives

5    through a committee?

6    **A.**  That would be the Ryan committee, I believe, that was

7    formed in the spring of 2014.

8    **Q.**  And I'm going to bring up DD 11.3 again just so we can

9    orient ourselves.  This is the committee labeled the Ryan

10   committee.

11   **A.**  Mm-hmm.

12   **Q.**  Before we come back to the Ryan committee, let me ask you

13   this:  Before the formation of the Ryan committee, had

14   Harvard shared its views on race-neutral alternatives with

15   the United States Supreme Court?

16   **A.**  Yes, it had.

17   **Q.**  Turn, if you would, in your notebook to Tab 8.

18   **A.**  Tab 8?

19   **Q.**  Tab 8.  Do you have that before you?

20   **A.**  I do.

21   **Q.**  Do you find DX55?

22   **A.**  I do.

23   **Q.**  What is it?

24   **A.**  This is an amicus brief of Harvard University and other

25   universities in the case of California versus Allan *Bakke*.

1    **Q.**  Turn if you would to the page at the bottom which says

2    DX055.020.

3    **A.**  Mm-hmm.

4    **Q.**  Do you see the last paragraph?

5    **A.**  I do.

6    **Q.**  Would you read the first sentence to us.

7    **A.**  "The educational goals discussed above cannot be realized

8    by any racially neutral procedure known to us."

9    **Q.**  This is a statement made by Harvard and other

10   universities in 1977 or so, correct?

11   **A.**  It is.

12   **Q.**  Turn, if you would, to Tab 9 in your binder.  Do you find

13   DX53?

14   **A.**  I do.

15   **Q.**  What is it?

16   **A.**  It's an amicus brief of Harvard University and other

17   universities in the case of *Grutter v. Bollinger*.

18              MR. LEE:  Your Honor, we offer DX53.

19              MR. HUGHES:  No objection.

20              THE COURT:  Admitted.

21          (Defendant Exhibit No. DX53 admitted.)

22   BY MR. LEE:

23   **Q.**  Turn, if you would, to the page at the bottom that says

24   .0029.  And I'm going to draw your attention to the first

25   paragraph.  Do you have that before you?

1  **A.**  I do.

2  **Q.**  And could you read for us the third and fourth sentences

3  of that first paragraph.

4  **A.**  Beginning with "But the decisive fact"?

5  **Q.**  Yes.

6  **A.**  "But the decisive fact is that all of the suggested

7  race-neutral factors and many more besides already enter into

8  admissions decisions."

9  **Q.**  And the next sentence.

10  **A.**  "Consideration of those factors alone does not achieve

11  the distinctly racial diversity that amici seek in their

12  student bodies."

13  **Q.**  Had Harvard considered race-neutral alternatives before

14  the filing of this brief?

15  **A.**  Yes, it had.

16  **Q.**  What had it concluded about the viability of race-neutral

17  alternatives?

18  **A.**  It concluded that it could not, using only those

19  race-neutral alternatives, accomplish the diversity, racial

20  diversity in its student body that it saw as essential to its

21  educational mission.

22  **Q.**  Turn, if you would, to Tab 10 in your binder.  Do you

23  find DX26?

24  **A.**  I do.

25  **Q.**  What is this?

1    **A.**   This is an amicus brief of Harvard and other universities

2    in the case of *Fisher versus the University of Texas*.

3              MR. LEE:  Your Honor, we offer DX26.

4              MR. HUGHES:  No objection.

5              THE COURT:  Admitted.

6              (Defendant Exhibit No. DX26 admitted.)

7    BY MR. LEE:

8    **Q.**   Now turn, if you would, to the page at the bottom .0023.

9    **A.**   Mm-hmm.

10   **Q.**   In the last paragraph, do you see the sentence which

11   begins "Amici also engage"?

12   **A.**   I do.

13   **Q.**   I'm not going to have you read the sentence because it's

14   now in evidence, but let me just ask you this:  Do those

15   sentences accurately describe Harvard's experience with

16   race-neutral alternatives at the time this brief was filed?

17   **A.**   They do.

18   **Q.**   And do each of the amicus briefs we've just looked at

19   accurately characterize or summarize Harvard's experience

20   with race-neutral alternatives at the time?

21   **A.**   They do.

22   **Q.**   Now, you mentioned the Ryan committee earlier.

23              Who chaired that committee?

24   **A.**   That committee was chaired by Jim Ryan, who was then the

25   dean of the school of education at Harvard.

1    **Q.**  And he is today --

2    **A.**  -- the president of the University of Virginia.

3    **Q.**  Did you play any role in convening Dean Ryan's committee?

4    **A.**  I did.

5    **Q.**  What was your role?

6    **A.**  I invited the various individuals to serve on that

7    committee.

8    **Q.**  Did you consult with anybody in convening the committee?

9    **A.**  I did.

10   **Q.**  Who?

11   **A.**  I consulted with a wide range of individuals about who

12   would be appropriate and a good member of the committee.

13   **Q.**  And did you consult with Dean Ryan himself?

14   **A.**  I did.

15   **Q.**  Turn, if you would, to Tab 11 in your binder.  Do you

16   find DX12?

17   **A.**  I do.

18   **Q.**  What is it?

19   **A.**  This is a letter to one of the members, prospective

20   members of that committee from me, inviting that individual

21   to serve.

22   **Q.**  Does it include your charge to the committee?

23   **A.**  It does.

24            MR. LEE:  Your Honor, we offer DX12.

25            MR. HUGHES:  No objection.

1          THE COURT:  Admitted.

2          (Defendant Exhibit No. DX12 admitted.)

3     BY MR. LEE:

4     Q.  What did you ask the committee to do?

5     A.  I asked the committee to focus on two issues.  One is the

6     value of diversity, to assess the value of diversity as part

7     of the educational experience.

8          And the second charge was to explore the viability

9     of race-neutral alternatives in achieving that diversity.

10    Q.  Did the Ryan committee complete its work?

11    A.  No, it did not.

12    Q.  Why not?

13    A.  We ended the Ryan committee when the SFFA lawsuit was

14    begun.

15    Q.  Why?

16    A.  We felt that in the course of accumulating information

17    and evidence and analysis for this lawsuit there would be a

18    number of very helpful elements that would enable us to study

19    race-neutral alternatives very effectively.  And so we wanted

20    to postpone our consideration of that question until that

21    data was on hand.

22    Q.  Now, you told us that the Ryan committee was asked to

23    address two questions, correct?

24    A.  Yes.

25    Q.  Has Harvard College now addressed both of those

1   questions?

2   **A.**   Yes.  The first question, the question of the value of

3   diversity, is the one that was addressed by the Khurana

4   committee that we discussed a few minutes ago.

5          And the second question, the race-neutral

6   alternatives question, was taken up once again when the data

7   for this case became available.  And it was taken up in the

8   spring of 2017 by another committee.

9   **Q.**   Did you play any role in convening that committee?

10  **A.**   I did.

11  **Q.**   What was your role?

12  **A.**   I discussed with Dean Michael Smith of the faculty of

13  arts and sciences the creation of that committee.

14  **Q.**   Did you ask him to chair the committee?

15  **A.**   I did.

16  **Q.**   Did you discuss with Dean Smith the other members of the

17  committee?

18  **A.**   We discussed how to structure the committee, yes.

19  **Q.**   Why did you ask Dean Smith to chair the committee?

20  **A.**   Well, a couple of things.  One is that the lawsuit

21  focused on the college rather than the university as a whole.

22  So the Ryan committee had a wide representation from the

23  whole university, but it was clear that we needed to look at

24  this question very explicitly within the structure of the

25  college.

1          And so Dean Smith, as the long-serving dean and

2    academic leader of the faculty of arts and sciences, seemed a

3    very good choice to undertake the task at hand.  He had been

4    responsible as the dean of FAS for the admissions office

5    which operates beneath him for ten years at that point, was

6    very experienced in these matters.

7    **Q.**   Who else was on the committee?

8    **A.**   The other two members of the committee were the dean of

9    the college, Rakesh Khurana, and the dean of admissions,

10   William Fitzsimmons.

11   **Q.**   In your view, were they the right people for the task?

12   **A.**   They were.  Dean Khurana deals with issues in the college

13   every day.  He's also a Ph.D. in sociology who has very

14   sophisticated abilities in statistical analysis, social

15   science data.  So we knew that the accumulation of all the

16   data that had occurred as a result of work on the case would

17   be something that he would be very adept at dealing with.

18          And Dean Fitzsimmons has been involved in these

19   questions for 40 years as dean of admissions at Harvard.  And

20   so it seemed there could be few people imaginable who would

21   be better suited to look at admissions questions.

22          I also thought, and Dean Smith agreed, that one of

23   the big issues was how do you implement policies, how do you

24   operationalize them.  And these were all people who were very

25   familiar with questions like how does the financial aid

1    policy work, or how would you undertake some of the measures

2    that have been advanced as possible race-neutral

3    alternatives.  They would understand how they would operate

4    within the system.

5                And so it seems that they were really well suited

6    to assess that because of their administrative experience as

7    well as their scholarly experience.

8    **Q.**   Now, SFFA has suggested that the committee for some

9    reason had too few members.  Do you agree?

10   **A.**   I think a committee should have the number of members it

11   needs to do the work that it's assigned to do, and I felt

12   that this committee was well suited to undertake that work.

13   **Q.**   Did Dean Smith's committee generate a report?

14   **A.**   It did.

15   **Q.**   Was it submitted to you?

16   **A.**   It was.

17   **Q.**   Did you review it?

18   **A.**   I did.

19   **Q.**   What conclusions did the committee reach?

20   **A.**   The committee looked very carefully at the variety of

21   suggested race-neutral alternatives and analyzed why they

22   would not be effective in establishing the kind of student

23   body diversity that we believed essential to our educational

24   mission without sacrificing some of the other essential parts

25   of our educational commitments.

1  **Q.**  Did the committee make any recommendation for future

2  work?

3  **A.**  It did.  It said we should look at these questions again

4  in five years.

5  **Q.**  Did you agree?

6  **A.**  I will certainly agree, yes.

7  **Q.**  Now, President Faust, I want to ask you a few questions

8  about issues that have come up during the course of the

9  litigation.

10          At the pretrial conference, there was a suggestion

11  that you denied the fact that Harvard discriminated against

12  Jewish applicants in the 1920's.  Is that true?

13  **A.**  No.

14  **Q.**  Have you ever denied that?

15  **A.**  I have never denied that.

16  **Q.**  Was it a proud chapter in Harvard's history?

17  **A.**  It was not a proud chapter in Harvard's history.

18  **Q.**  And have you taken steps during your tenure to ensure it

19  would not happen again?

20  **A.**  I feel that my tenure has been committed in considerable

21  part to expanding openness, access to Harvard, to making sure

22  that every individual who can thrive in our community has the

23  opportunity to apply and be included, welcomed, and to

24  flourish in our community.  There's no place for

25  discrimination of any kind at Harvard.

1   **Q.**   Now, President Faust, how long have you known Dean

2   Fitzsimmons?

3   **A.**   I'm not sure exactly when I met him, but it was soon

4   after I arrived at Radcliffe as the dean because our

5   geographic location -- the Radcliffe Institute was very

6   closely located to the admissions office.

7   **Q.**   And how long have you known Director McGrath?

8   **A.**   I met her soon after that, I think, as well.  So the very

9   early aughts, 2003, 2004, something like that.

10   **Q.**   So for each of them, you've known them for more than

11   15 years?

12   **A.**   Yes.

13   **Q.**   I'll represent to you that SFFA has suggested that both

14   or either has been less than truthful in this case.

15         Do you have an opinion on their truthfulness and

16   honesty?

17         MR. HUGHES:  Your Honor, I object.  I don't think

18   her opinion on this is relevant to what's happened here at

19   trial.  It's vouching character testimony.  It's completely

20   improper.

21         MR. LEE:  It's actually admissible under Rule 608.

22         THE COURT:  Give me a minute.

23         Admissible.  Evidence of truthful character

24   admissible once a witness' character for truthfulness has

25   been attacked.

1          So that certainly gets us to Director McGrath.  I'm

2    not sure it covers Dean Fitzsimmons at this point.

3          MR. HUGHES:  That's just what I was about to say.

4          MR. LEE:  If that's, in fact, the representation,

5    I'll limit myself to Director McGrath.

6          MR. HUGHES:  I'm not going to limit what I'm going

7    to say in closing by any means.  I want to make sure that the

8    question isn't connected to what's happened here at trial,

9    which she can't possibly know about.

10          MR. LEE:  I'm not going to ask anything about what

11    occurred during the trial.  I have represented to her,

12    because she was sequestered, that this has occurred.  I am

13    now asking her for opinion independent of that under 608.

14          THE COURT:  If you're not going to limit your

15    closing, then I'll let him have the question for Dean

16    Fitzsimmons as well.

17          MR. HUGHES:  I'm definitely not limiting my

18    closing.  So we should let him have the question.

19          THE COURT:  Okay.

20    BY MR. LEE:

21    **Q.**  So, President Faust, let me start again.

22          I'll represent to you that SFFA has attacked Dean

23    Fitzsimmons and Director McGrath and their honesty.  Do you

24    have that in mind?

25    **A.**  I do.

1    **Q.**  I know you haven't been here.  Do you have an opinion

2    about the honesty and the credibility of these two folks who

3    you've known for 15 years?

4    **A.**  I regard both of them as people with the very highest

5    integrity.

6    **Q.**  And honesty?

7    **A.**  And honesty, yes.

8    **Q.**  During the 15 years that you've known them, have you ever

9    heard anyone challenge their honesty and integrity other than

10   SFFA?

11   **A.**  No, I have not.

12   **Q.**  And what is your reaction to SFFA's suggestion during

13   this trial that these folks lack integrity and honesty?

14   **A.**  I find it not credible.  They are people who believe in

15   values above all.

16   **Q.**  And is that what you've seen during your 15 years?

17   **A.**  It is.

18   **Q.**  Now, you also are aware of the allegations that were made

19   against Harvard in this case?

20   **A.**  Yes, I am.

21   **Q.**  And you know that SFFA claims that Harvard intentionally

22   discriminates against Asian-Americans?

23   **A.**  I know that.

24   **Q.**  As the president, what is your reaction to those

25   assertions?

1    **A.**  Those assertions seem to me completely at odds with the

2    history of Harvard over recent decades as it has opened up

3    its doors more widely, has searched avidly to include people

4    from every background and every group, and has committed

5    itself to the notion of a community that is strengthened and

6    indeed dependent on its openness to people of all races and

7    backgrounds.

8             That has been a driving force in the identity of

9    Harvard College and Harvard University, and we would not

10   undermine that by discriminating.  It's totally at odds with

11   who we are, what we believe, and what we think makes us

12   strong.

13            MR. LEE:  Thank you, President Faust.

14            Nothing further, Your Honor.

15            MR. HUGHES:  Your Honor, may I approach the

16   witness?

17            THE COURT:  Yes.

18                              EXAMINATION

19   BY MR. HUGHES:

20   **Q.**  Good afternoon, President Faust.

21   **A.**  Good afternoon.

22   **Q.**  You've won the prize for being the last witness in the

23   case.

24            My name is John Hughes.  I'm a lawyer for SFFA.

25   I'm just going to ask you a few questions.

1        The first is I'd like to ask you if you agree with

2   the following statement:  Do you agree that race is a factor

3   that has an impact on the formation of a personality of a

4   human being, could have an influence on a set of perspectives

5   that an individual may have?  It is one of many

6   characteristics of an individual that contribute to the

7   person who is presented to us in an admissions folder at

8   Harvard.

9        Do you agree with that?

10  **A.**  I do.

11  **Q.**  Now, you talked with Mr. Lee about some historical events

12  in Harvard's past and Harvard's treatment of Jewish

13  applicants to Harvard in the 1920's, right?

14  **A.**  Yes.

15  **Q.**  And you recall that you were asked some questions about

16  that when we took your deposition in this case?

17  **A.**  Yes.

18  **Q.**  And do you recall your deposition was on March 10, 2017?

19  **A.**  I recall it was in 2017.

20  **Q.**  It's sitting right there.  I'll just refresh your memory

21  it was in March of 2017.

22  **A.**  Okay.

23  **Q.**  So as of the date of your deposition, did you know

24  whether Harvard had ever acknowledged that its holistic

25  admissions process was used to discriminate against Jewish

1    applicants in the early 20th century?

2    **A.**   I recall that I was asked that question, and I wasn't

3    sure what was meant by "acknowledge."  I wasn't sure whether

4    you meant a formal public statement, so I wasn't sure how

5    exactly to answer.  I certainly knew that Harvard had

6    discriminated against Jews.

7    **Q.**   You recall your answer to that question at the deposition

8    was that you didn't know?

9    **A.**   I can't remember exactly the words.  I said I didn't

10   recall, perhaps.  I'm not sure what I said.  And it was in

11   response to the question had I -- had Harvard acknowledged.

12   **Q.**   Let me ask you a different question.

13            As of the date of your deposition, were you

14   generally aware that the holistic admissions process was used

15   for a time in the 20th century to discriminate against Jewish

16   applicants?

17   **A.**   I was aware that there were procedures in effect during

18   the presidency of President Lowell, but I'm not sure that we

19   could call those the holistic admissions process as we

20   currently understand it.

21   **Q.**   Let me direct you -- you've got your deposition there --

22   **A.**   I do.

23   **Q.**   -- on the table in front of you.  Let me direct you to

24   page 30 of your deposition.  I'm going to put it up on the

25   screen.  Do you see line 15, President Faust?

1    **A.**   I do.

2    **Q.**   "QUESTION:  Are you -- are you generally aware that the

3    holistic admissions process was used for a time in the 20th

4    century to discriminate against Jewish applicants?"

5              And there was an exchange between counsel, then:

6              "QUESTION:  Do you know whether that's true?"

7    **A.**   I see that.

8    **Q.**   And then on the next page:

9              "ANSWER:  I'm a historian.  I would not rely on the

10   interpretation of a single historian unchallenged.  I have

11   not done that historical work myself, and therefore I would

12   not presume to make judgment about its accuracy."

13             Was that your sworn testimony?

14             MR. LEE:  Your Honor, in fairness, he needs to read

15   the question at line 13 and 14, the question and answer that

16   precedes it, actually beginning at line 10.  Because

17   otherwise you don't know who the single historian is on the

18   next page.

19             MR. HUGHES:  I'm happy to do that since it

20   clarifies.  Where did you want me to go, Mr. Lee?

21             MR. LEE:  I think if you started, Mr. Hughes, at

22   page 30, line 10, "Are you familiar with."

23   BY MR. HUGHES:

24   **Q.**   So we asked you:  "Are you familiar with the work of

25   Jerome Karabel?"

 1              And you answered "Yes."

 2              And then we asked:  "Are you familiar with his book

 3      "The Chosen"?

 4              You said:  "I am.  I have not read it.  I know of

 5      it."

 6              And then we asked you:  "Are you -- are you

 7      generally aware that the holistic admissions process was used

 8      for a time in the 20th century rich to discriminate against

 9      Jewish applicants?  Do you know whether that's true?"

10              And then you answered, "I'm a historian.  I would

11      not rely on the interpretation of a single historian

12      unchallenged.  I have not done that historical work myself,

13      and therefore I would not presume to make judgment about its

14      accuracy."

15              That was your sworn testimony, correct?

16      **A.**  Yes, it was.

17      **Q.**  And do you know -- or at the time of your deposition, did

18      you know whether prior Harvard presidents had acknowledged

19      that the use of a holistic admissions process was

20      inappropriate with respect to Jewish applicants during the

21      20th century?

22      **A.**  I'm sorry.  Your question is?

23      **Q.**  At the time of your deposition, did you know whether

24      prior Harvard presidents had acknowledged that the use of a

25      holistic admissions process was inappropriate with respect to

1   Jewish applicants during the 20th century?

2   **A.**  I knew and my predecessors as presidents knew.  And Neil

3   Rudenstine in that very document that we were talking about a

4   moment ago talked about discrimination against Jews.

5        What I was trying to say here is I did not know the

6   nature of the admissions process as you described it as

7   holistic.

8        It was a characterization that you have given it.

9   I don't know exactly how that admissions process worked.  Was

10  it the holistic admissions process that you equate with the

11  one today?  I was very uncomfortable with the way you -- not

12  you -- but your predecessors were asking me to describe this

13  process.  And I felt it was not adequately complicated in its

14  approach to historical materials.

15  **Q.**  Are you aware that Harvard adopted its holistic

16  admissions policy in the 1920s, in part, to limit the number

17  of Jewish students on its campus?  Are you aware of that?

18        MR. LEE:  We are way beyond the couple of questions

19  and way beyond the judicial notice.

20        MR. HUGHES:  It's the last question.  And we asked

21  Dean Khurana this exact question.

22        THE COURT:  That's fine.  He can have it.

23  BY MR. HUGHES:

24  **Q.**  I'll ask it again because of all the interruptions.

25  **A.**  I lost track.

1   **Q.**  Are you aware that Harvard adopted its holistic

2   admissions process in the 1920s in part to limit the number

3   of Jewish students at Harvard?

4   **A.**  Harvard adopted an admissions process in the 1920s to

5   limit the number of Jewish students.  How to characterize

6   that precisely and to make an equation between that process

7   and the one that has been in effect in recent years is not

8   something that I am comfortable assenting to.

9        I would never doubt -- I would not ever want to

10  express a doubt that there had been discrimination against

11  Jews in the 1920s.  That is clear.  But the particulars of

12  how that admissions process worked are not known to me, and I

13  don't think I could say that they are equivalent to what we

14  today call the holistic admissions process.

15  **Q.**  All right.  Let's shift gears to a new topic.

16       Would you agree that implicit bias is a concept

17  that has been studied extensively by individuals on Harvard's

18  campus and other campuses and it's an important consideration

19  to take into account when one makes judgments?

20  **A.**  Yes.

21  **Q.**  Would you agree that the research on implicit bias shows

22  that everybody has some implicit bias?

23  **A.**  Yes.

24  **Q.**  And do you believe that the institution of Harvard has a

25  responsibility to ensure that bias is not leaking into its

1    admissions decision-making process in any form?

2    **A.**   I believe that Harvard should do its utmost to address

3    questions of bias, yes.

4    **Q.**   Last topic.

5           At a certain point during your presidency, Harvard

6    decided to bring back the early-action program to its

7    admissions process, right?

8    **A.**   That's correct.

9    **Q.**   And that happened in 2011, correct?

10   **A.**   That's correct.

11   **Q.**   And the decision to bring back early action in admissions

12   was a sufficiently important decision that the board had to

13   weigh in, right?

14   **A.**   That's correct.

15   **Q.**   Can you describe just a little bit the relationship of

16   the board to the college at a very high level?

17   **A.**   Harvard actually has two governing boards, the board of

18   overseers and the Harvard Corporation, and they jointly

19   oversee the university.  It's generally seen that the group

20   with the more direct fiduciary engagement is the corporation,

21   and they have the final say on anything in which they would

22   choose to be engaged.

23          But in most instances there's quite a respectful

24   division between management and governance.  And so a lot

25   takes place through consultation and advice and consent

1    rather than direct exertion of control by that governing

2    board.

3              Is that what you wanted to know?

4    **Q.**  It does.  I'm just trying to get to the point that the

5    corporation board had to approve -- did approve the return --

6    bringing back early action.  Is that right?

7    **A.**  It did.  It's unclear whether they would have had to, but

8    I felt it was important that they be on board because this

9    was a significant decision.  And so I wanted their

10   concurrence in it.

11   **Q.**  And you sought their concurrence on important issues, not

12   everyday issues?

13   **A.**  Yes.  Exactly.

14   **Q.**  So now I want to show you a document that's Plaintiff's

15   Exhibit P62.  It should be in that binder right there.  I'm

16   going to put it up on the screen.  And you see this is a

17   memorandum to the members of the corporation from you and

18   Mike Smith, correct?

19   **A.**  Yes.

20   **Q.**  And it concerns the proposed changes in admissions

21   policy, right?

22   **A.**  It does.

23   **Q.**  And it's from February 2, 2011, correct?

24   **A.**  Mm-hmm.

25   **Q.**  You're familiar with this document, right?

1    **A.**  I am.

2            MR. HUGHES:  I move the admission, if we haven't

3    already, of P62.

4            MR. LEE:  No objection.

5            THE COURT:  It's admitted.

6            (Plaintiff Exhibit No. P62 admitted.)

7    BY MR. HUGHES:

8    **Q.**  You actually presented this memo to the board during a

9    meeting with them, right?

10   **A.**  Yes.

11   **Q.**  And you would have reviewed P62 before you did that

12   presentation, correct?

13   **A.**  Yes, I would have.

14   **Q.**  And the idea of the memo is it basically captures the

15   reasons why you and Dean Smith were recommending that Harvard

16   reinstate early action, correct?

17   **A.**  That's correct.

18   **Q.**  And you know, you're familiar with the Harvard Office of

19   Institutional Research, correct?

20   **A.**  I am.

21   **Q.**  Sometimes referred to as OIR, right?

22   **A.**  Yes.

23   **Q.**  Okay.  And OIR is an office within the provost's office

24   that does data analytics on whatever dimension of Harvard

25   that Harvard needs data analytics on, right?

1    **A.**   That's correct.

2    **Q.**   Did you work with OIR a fair amount when you were

3    president?

4    **A.**   I did.

5    **Q.**   And you came to rely on their work?

6    **A.**   I did.

7    **Q.**   And that was a serious office with serious people that

8    did reliable work?

9    **A.**   Yes, it was.

10   **Q.**   Okay.  And some of the pages that are in P62 are pages

11   that were prepared by OIR; is that right?

12   **A.**   Yes, it is.

13   **Q.**   I'd like to just turn and show a few of those to you.

14   I'm going to go to page 10 on the screen.  You're welcome to

15   follow along with me on paper.

16           This would be one of the pages prepared by OIR,

17   correct?

18   **A.**   The screen is sort of blurry, so I'm going to --

19   **Q.**   Look at the papers.  You're not the first witness to make

20   that comment.

21   **A.**   I was thinking it was my eyes.

22   **Q.**   It's not your glasses.

23   **A.**   Good.

24   **Q.**   What you've got there on the paper, page 10 is one of the

25   pages or slides prepared by OIR, correct?

1    **A.**   Yes.

2    **Q.**   And you see up at the right-hand corner it says

3    "Preliminary Draft"?

4    **A.**   Yes.

5    **Q.**   And then on the next page the same thing, page 11 we've

6    got another OIR slide, correct?

7    **A.**   Yes.

8    **Q.**   It says "Preliminary Draft"?

9    **A.**   Mm-hmm.

10   **Q.**   Is that right?

11   **A.**   It does.

12   **Q.**   Then if we turn to page 15 of this presentation to the

13   board to bring back early action, again we have some analysis

14   from OIR, correct?

15   **A.**   Wait a minute.  Yes.

16   **Q.**   Again it says "Preliminary Draft," correct?

17   **A.**   It does.

18   **Q.**   And if we go to page 20, again we've got another OIR

19   slide, correct?

20   **A.**   I've got all kinds of things in the middle here.  Yes.

21   **Q.**   It says "Preliminary Draft"?

22   **A.**   Mm-hmm.

23   **Q.**   Is that a yes?

24   **A.**   Yes.

25   **Q.**   Same thing with page 21, correct?

1   **A.**   Yes.

2   **Q.**   Same thing with page 22, analysis from OIR with the

3   "Preliminary Draft" in the upper right, correct?

4   **A.**   Yes.

5   **Q.**   Same thing with the next page, more analysis from OIR,

6   also says "Preliminary Draft," correct?

7   **A.**   Yes.

8   **Q.**   And same thing again with the next page, more analysis

9   from OIR.  Also says "Preliminary Draft," correct?

10   **A.**   Yes.

11   **Q.**   And when you sent these slides from OIR to the board with

12   the designation of "Preliminary Draft," you weren't sending

13   unreliable or incomplete analysis to Harvard's board, were

14   you?

15   **A.**   Were these sent to the board in this form?

16   **Q.**   This is your memo, ma'am.  P62, this is your document.

17   This is the memorandum that I believe you told us you sent to

18   the board.

19   **A.**   It would surprise me that we were sending preliminary

20   drafts to the board.  Often materials were circulated within

21   the administrative units beforehand, and they were usually

22   formalized before they went to the board.  So I'm a little

23   puzzled why we would have sent preliminary material to the

24   board.

25   **Q.**   Let me direct you -- I'm going to direct you to part of

1    your deposition, just to see if we can refresh your

2    recollection.  If you can, look to page 148 of your

3    deposition.  Actually if you start at page 147, and you see

4    here we're talking about Exhibit 4 in your deposition?

5    **A.**   Yes.

6    **Q.**   And you see on the screen Exhibit 4 to your deposition is

7    the same document I'm showing you, Plaintiff's Exhibit 62.

8    **A.**   Okay.

9    **Q.**   Do you see that?

10   **A.**   Mm-hmm.

11   **Q.**   And then if you look at page, at the bottom of page 148,

12   line 22.  Kind of read from the bottom of page 148 over to

13   149, line 1 actually, the top of 149, line 1.  And I'll ask

14   you a question.

15   **A.**   Yes.

16   **Q.**   So now that you've looked at your testimony, do you agree

17   you presented the information contained in P62 to the board?

18   **A.**   I don't know if I did or not.  In my deposition we didn't

19   focus on the preliminary -- whatever it says, preliminary

20   report part of it, which puzzles me.

21          So I would expect that we presented some version of

22   this to the board, but we're not usually in the habit of

23   presenting preliminary drafts to the board.  During the

24   deposition we didn't talk about that.  And perhaps I didn't

25   notice that it said "Preliminary Draft."

1            You've made such an emphasis on it here that now

2    I'm thinking did we give this to the board in preliminary

3    form.

4    **Q.**  Maybe I went too far.  But you agreed in your deposition

5    that you did provide the information contained in P62 to the

6    board, correct?

7    **A.**  We gave information about statistics related to early

8    action to the board, yes.

9    **Q.**  Is there anything that you can see just from the face of

10   this document that would lead you to believe it wasn't the

11   final document?

12   **A.**  Well, that it says "Preliminary Draft."

13           MR. HUGHES:  Thank you, President Faust.

14           No further questions.

15           MR. LEE:  Nothing further, Your Honor.

16           THE COURT:  You're excused.  Thank you.

17           THE WITNESS:  Thank you.

18           THE COURT:  We have left the deposition testimony?

19           MR. LEE:  That's it.

20           THE COURT:  I'm game for forging through today and

21   we can get to closings tomorrow.

22           MR. LEE:  It's very short.  Ms. Ellsworth is going

23   to be the examiner.  I'm going to be the witness.

24           MS. ELLSWORTH:  Harvard calls the former associate

25   director of admissions Grace Cheng.  And her name and address

1    is actually in the record.

2                (GRACE CHENG, deposition read in court)

3                          EXAMINATION

4    BY MS. ELLSWORTH:

5    **Q.**   Ms. Cheng, how does an applicant's GPA play a role in

6    Harvard's admissions process?

7    **A.**   It is just one piece of data that is available.

8    **Q.**   Okay.  Now, let me ask the question replacing GPA with

9    race.  What's your answer on that?

10   **A.**   I would give the same answer.

11   **Q.**   Did you use the numbers of minorities from prior years

12   classes as targets from an admissions cycle?

13   **A.**   No.

14   **Q.**   Within the Z docket, we talked earlier about targets, how

15   you received a number of applicants to recommend which you

16   were to bring to the full committee meeting; is that right?

17   **A.**   Yes.  A recommended preliminary target.

18   **Q.**   And did you account for diversity by ethnicity or gender

19   or otherwise in arrival at that target number?

20   **A.**   No.

21   **Q.**   So your subcommittee was not focused on the number of men

22   and women, African-Americans, Asian-Americans, and others by

23   number in reaching the target in your subcommittee?

24   **A.**   Correct.

25   **Q.**   Okay.  So then let's go forward to the full committee.  I

1    guess each subcommittee then brings a recommended number of
2    applications.  How then is the class shaped by gender,
3    ethnicity, and otherwise?
4    **A.**  So once the committee enters full committee, as I
5    mentioned before, the targets become irrelevant and area
6    people advocate for individual cases to be admitted in the
7    full committee process without keeping track of specific
8    categories like you mentioned.
9             At the end of the full committee process, we then
10   are told the total number of still preliminary admitted
11   students.  We are told whether we need to pull out a certain
12   number according to the procedures we talked about earlier.
13   **Q.**  Okay.  So then at what point did Dean Fitzsimmons
14   communicate to the full committee that numbers by groups
15   needed to be adjusted?
16   **A.**  So approximately three days before the end of the full
17   committee process, the full committee would be notified how
18   many students needed to come out of the class.  They would
19   come out of each docket.
20   **Q.**  So the first time the full committee saw numbers by
21   subgroups such as ethnicity and gender was three days before
22   the end of the process?
23   **A.**  No.  To clarify, we never saw numbers by those
24   categories.  We only saw numbers by docket.
25   **Q.**  Okay.  At that point, is the full committee aware of the

1  subcategories of numbers?

2  **A.**  No.

3  **Q.**  So what guidance are the subcommittees given in terms of

4  how to narrow their pool?

5  **A.**  They are just given number of applicants that they need

6  to identify to pull out of the class.

7  **Q.**  And this is the lop process?

8  **A.**  Correct.

9  **Q.**  Were you ever given guidance in terms of a group being

10 too underrepresented?

11 **A.**  Not that I remember.

12 **Q.**  Did you know the numbers by race of the preliminarily

13 admitted class before the lopping process began?

14 **A.**  No.

15 **Q.**  Do you know if that information was tracked during the

16 admissions process?

17 **A.**  I don't know.

18 **Q.**  After that process, what was the committee's information

19 about groups by race of the prospectively admitted class at

20 that point?

21 **A.**  From what I remember, we were never told the breakdown.

22 **Q.**  So when did you learn the breakdown of an admitted class

23 by race?

24 **A.**  Usually in the press release to the public once the class

25 was admitted.

1    **Q.**  So is it your testimony that from the beginning of the

2    process until the press release, the full committee did not

3    have in front of it the numbers of the prospectively admitted

4    class by race?

5    **A.**  From what I recall, yes.

6    **Q.**  Okay.  The lopping process, just to finish that subject,

7    who made the final decisions about who was lopped?  Was that

8    also a full committee vote for each prospectively or

9    preliminarily admitted applicant or was the process different

10   for the lopping?

11   **A.**  The process was not different.  It came down to the full

12   committee vote.

13   **Q.**  So for each person on the lop list, there was a full

14   committee vote?

15   **A.**  Yes.

16              (End of GRACE CHENG deposition reading.)

17              MS. ELLSWORTH:  Harvard calls former admissions

18   officer Caroline Weaver.

19              (CAROLINE WEAVER, deposition read in court)

20                           EXAMINATION

21   BY MS. ELLSWORTH:

22   **Q.**  And you worked at the admissions office at Harvard from

23   approximately August of 2013 to August 2015; is that

24   accurate?

25   **A.**  I believe so, yes.

1  Q.  So you worked there during two admission cycles, correct?

2  A.  Correct.

3  Q.  And that would be for the class of 2018 and the class of

4  2019, correct?

5  A.  Correct.

6  Q.  Were there guidelines circulated to you as to what -- as

7  to how to score within these four subcategories that we just

8  mentioned?

9  A.  Admissions officers receive training on how to read and

10  review an application file.

11  Q.  Which included how to properly score each subcategory

12  that we just mentioned?

13  A.  The scoring was included in the training, yes.

14  Q.  And you had that training at the beginning of your time

15  at the Harvard admissions office?

16  A.  There was a -- an official training that we went through.

17  However, we were constantly receiving feedback.

18  Q.  Going back to the personal score, what goes into that

19  score?

20  A.  Personal qualities would be decided based on many

21  different things that were covered in the application.

22  Q.  Such as what?

23  A.  A student teacher's recommendations could play a role.

24  Q.  Would you agree that an applicant's race can sometimes

25  factor into the personal score?

1    **A.**   No.

2    **Q.**   Why not?

3    **A.**   An individual's personal qualities are separate from the

4    race.

5    **Q.**   Have you seen -- have you seen applicants with legacy

6    status get in who, in your opinion, would not have been

7    admitted if not for their legacy status?

8    **A.**   Legacy status would not be a reason why a student was

9    either admitted or not admitted.

10   **Q.**   And you have no personal knowledge what, if any,

11   different treatment the list of applicants on the list for

12   Dean Fitzsimmons, which you just mentioned, had compared to

13   the other applicants.  You don't know one way or the other,

14   correct?

15   **A.**   My experience in the admissions office was that all

16   candidates were reviewed in the same form.

17   **Q.**   If an applicant has a familial or personal connection to

18   a Harvard employee, is that fact considered as part of the

19   admissions process?

20   **A.**   There is a place on the student's application where they

21   can check whether or not they're related to a faculty or

22   staff member at Harvard.

23   **Q.**   How is -- how significant is that factor considered?

24   **A.**   It is one small factor among a list of many that are

25   considered for the student's candidacy.

1    **Q.**   Do you recall an instance of where an applicant who has a

2    familial or personal connection to a Harvard employee,

3    whether that fact increased his or her chances of getting

4    into Harvard based on that?

5    **A.**   Again, it's one very small component, and it would depend

6    entirely on the individual applicant.  But that -- a

7    connection to staff or faculty alone would not be reason

8    enough to grant a student admission.

9    **Q.**   You mentioned that if an applicant noted his or her race

10   in an application, that would be noted on the applicant's

11   folder, correct?

12   **A.**   The student could elect to share their race or ethnicity

13   with the admissions department by checking a box on their

14   application.

15   **Q.**   Right.  When you receive the folder as a first reader,

16   where is that noted on within the application folder?

17   **A.**   It would be one of many pieces of information captured on

18   the summary sheet.

19   **Q.**   What does the term "standard strong" mean within the

20   admissions office?

21   **A.**   "Standard strong" would be a term used to describe an

22   applicant who is very well qualified academically and likely

23   has a good deal of extracurricular involvement as well but

24   isn't distinguished in Harvard's incredibly, incredibly

25   competitive applicant pool.

**Q.** Based on your experience has an admissions officer over two years, was it your impression that the term "standard strong" or "SS" was used disproportionately to Asian applicants, to describe Asian applicants?

**A.** I don't have that impression.

**Q.** In comparing applicants at the subcommittee meeting stage, how was race used to justify full committee consideration for one candidate over another?

**A.** Race wouldn't have been a reason to justify full committee consideration.

**Q.** Was it used as a reason to influence full committee consideration?

**A.** Race was just one factor of many factors that were considered in an applicant's folder. It was very individual and depended completely on the applicant.

**Q.** During the subcommittee review process, to what extent are the admissions officers aware of the racial diversity in percentages of the prior year's class?

**A.** I can't speak for other admissions officers. In my experience, no one told me the breakdown of the previous class. That information was public. I could look it up if I had wanted to. It's published every year at the end of the process.

**Q.** In your experience, do the subcommittees that you were a part of, did they try to ensure that the racial diversity of

1    the present year's class that was up for consideration was

2    reflective of the racial diversity in the prior year's class?

3    **A.**   When I was there, diversity was something that was

4    important to the university.  However, there was no effort

5    made to make sure that one particular year's diversity

6    reflected that of a previous year's.

7    **Q.**   For an applicant to be considered by the full committee,

8    does the subcommittee need to have a majority vote on that

9    applicant?

10   **A.**   A majority of subcommittee members would have to vote

11   that they would like to admit that individual student for the

12   student to then progress to full committee.  That's usually

13   the process when I was there.

14   **Q.**   After making decisions at the subcommittee level, did any

15   of the subcommittees you participated in ever go back and

16   reevaluate cases?

17   **A.**   Yes.

18   **Q.**   How often is that process triggered by a certain racial

19   group being underrepresented?

20   **A.**   That wouldn't have been the reason we would have reviewed

21   cases.

22   **Q.**   In your experience?

23   **A.**   In my experience, we did not go back and review an

24   application in subcommittee again because of your proposed

25   racial imbalance.  Yes.

1  **Q.**   In the full committee setting, how often is there

2  discussion about a particular racial group being

3  underrepresented compared to last year's class?

4  **A.**   I don't remember that being a focus of the full committee

5  process at all.

6  **Q.**   Based on your experiences as an admissions officer, how

7  could the admissions process be manipulated if someone wanted

8  to achieve a certain percentage of Asian admittees in a given

9  year?

10  **A.**   Based on my experience, I can't think of a way in which

11  the process could be manipulated.

12  **Q.**   What about through the lop list that we discussed

13  earlier?

14  **A.**   A lop list is not intended nor can I think of a way in

15  which it would be designed to manipulate the admissions

16  process.

17  **Q.**   Well, if students were listed by their ethnicity on a lop

18  list, couldn't that be used as a way potentially to lop

19  students off of a certain ethnicity?

20  **A.**   You're proposing that it's possible.  I'm telling you

21  that in my experience in the two years that I was working,

22  that's not how the lop list was used.

23  **Q.**   Understood.  But it's possible that it would be could be

24  used that way, correct?

25  **A.**   I don't think it's possible because individuals who were

1    submitted on a lop list were not necessarily lopped.  And the

2    entire full committee then reviewed the individual

3    application before a student was voted to stay in the class

4    or remove from the class.

5    **Q.**  But the individuals on the lop list, their ethnicity is

6    tracked on that list, correct?

7    **A.**  You showed me a document that was collected from Harvard.

8    That was not a document that I was familiar with.

9    **Q.**  You'd agree that those documents, you're referring to the

10   lop list exhibits that were previously marked, correct?

11   **A.**  Yes.

12   **Q.**  You'd agree that both those documents had the

13   abbreviation ETH on them, correct?

14   **A.**  They had that as a column header.

15   **Q.**  Do you agree that the bar is set higher for Asian

16   students as opposed to students from other races at Harvard?

17   **A.**  I personally do not agree with that.

18   **Q.**  Why do you think Asian-Americans are admitted at a lower

19   rate than other applicants at Harvard College?

20   **A.**  I don't know that they are admitted at a lower rate.

21   **Q.**  Do you agree that during your time at Harvard admissions,

22   the admission rate for Asian-Americans and whites were lower

23   than the admission rates for Hispanic and African-American

24   students?

25   **A.**  I don't know the numbers.

1   **Q.**   Do you think the way race is used in Harvard's admissions

2   process is inappropriate?

3   **A.**   No, I do not think it's inappropriate.  It's a small

4   factor that's considered for some applicants depending on the

5   student's individual application.

6                (End of CAROLINE WEAVER deposition reading.)

7                MS. ELLSWORTH:  Harvard calls former admissions

8   officer Brock Walsh.

9                THE COURT:  Hold on.  Let me just get caught up

10  here.

11                MS. ELLSWORTH:  Brock Walsh.

12                (BROCK WALSH, deposition read in court)

13                            EXAMINATION

14  BY MS. ELLSWORTH:

15  **Q.**   Could you please state your name and business address?

16  **A.**   Brock Walsh.  And my business address is 740 21st Street,

17  Santa Monica, California.

18  **Q.**   And what were you ultimately trying to decide when

19  assigning a personal rating?

20  **A.**   Whether the student would contribute to the class,

21  classroom, roommate group, to the class as a whole.  Their

22  human qualities.

23  **Q.**   When making that determination, would you take the

24  student's race into account?

25  **A.**   No.

1   **Q.**   Would you ever take a student's race into account when

2   deciding whether the student should be lopped?

3   **A.**   No.

4   **Q.**   Why not?

5   **A.**   The deliberations of the lop discussion were no different

6   from any other discussion.  We discussed the whole candidate

7   no matter -- no one matter is more important than the other.

8   We tell their story.  You advocate for them as best you can

9   as their area admissions person, and then you put it to a

10  vote.

11  **Q.**   Why was knowing a student's race helpful for you in

12  deciding whether he or she should be admitted to Harvard?

13  **A.**   It's one part of their story that they choose to share.

14  I honor their application and all the care they put into it.

15  And anything they decide to include I honor by taking all

16  that information in and doing my best to understand them as

17  fully as possible and render my best decision.

18              (End of BROCK WALSH deposition reading.)

19              MR. LEE:  Your Honor, Harvard rests.

20              THE COURT:  So we have concluded the evidentiary

21  portion of the case.  We'll go to closing arguments tomorrow.

22              Does 9:30 make sense for everybody?

23              MR. LEE:  That would be great.

24              THE COURT:  Any representatives from the amici

25  here?

 1          AMICI REPRESENTATIVE:  Yes, Your Honor.

 2          THE COURT:  You all can close orally if you want.

 3     We will go SFFA, Harvard.

 4          I think you're going to reserve some rebuttal time?

 5          MR. HUGHES:  We've agreed we'll get 90 minutes.

 6     We'll split ours up.  I'm going to talk for about a minute --

 7     no.  It will it be 60 or 70 minutes, and then we'll have the

 8     remainder as rebuttal.

 9          THE COURT:  So close, close, rebuttal, and then the

10     two Amici groups can have their 15 minutes to close as well.

11     Okay?

12          AMICI REPRESENTATIVE:  Thank you, Your Honor.

13          MS. ELLSWORTH:  Your Honor, I've discussed with

14     counsel for SFFA coming up with a schedule for the posttrial

15     briefing and an argument date.  We've conferred with

16     Ms. Folan, and we'll ask for some dates potentially in

17     February for argument and back out the schedule from there.

18          So we'll submit it in writing after the closings,

19     if that's all right with you.

20          THE COURT:  Yes.  How are you planning on doing the

21     findings of fact and conclusions of law?  One and then the

22     other or both at the same time?

23          MS. ELLSWORTH:  What we had been discussing was

24     simultaneous submissions.  Two rounds, but simultaneous for

25     each of them.

```
 1              MR. HUGHES:  This isn't my area.  I'm going to
 2     trust that Ms. Ellsworth --
 3              THE COURT:  You're thinking about February for
 4     closing arguments?
 5              MS. ELLSWORTH:  That was the thinking based on some
 6     scheduling constraints on both ends.
 7              MR. WAXMAN:  Including your end.
 8              THE COURT:  All right.  Let me think about that.
 9     We have a trial that's scheduled for 14 weeks beginning at
10     the end of January.  And we will either take a day off from
11     that, depending on how it's going, or sit for a half day on
12     that and then have you do the closings in the afternoon.
13              I would like to take a separate day for this, but I
14     need to see where they are because I am very tightly
15     controlling their time.
16              MR. WAXMAN:  14 weeks?  How tight is that?
17              THE COURT:  14 weeks, not including jury selection,
18     which they claim to need all of.  I'm concerned about a jury.
19     If we take two weeks off in there, I'm trying to have it be
20     the two school vacation weeks in hopes that that increases
21     the jury pool.
22              I'm not sure -- we'll pick a day and then we'll
23     pick the time of day as we get closer to and I can figure out
24     what's going on in that case.  14 weeks does seem adequate
25     for almost anything.  So that's fine.  So we'll do that.
```

1          Will you all just be mindful tomorrow, I've had

2     some concerns expressed -- I guess it can be hard for the

3     audience to hear what you all are saying, particularly when

4     you're facing me.  So if those closing could be mindful of

5     their volume in getting the microphone closer to their mouth,

6     I think the viewing audience would appreciate that.

7               All right.  Anything else for today?

8               MR. HUGHES:  Thank you, Your Honor.

9               MR. LEE:  Thank you, Your Honor.

10              THE COURT:  We'll see you tomorrow.

11              (Court recessed at 4:30 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      - - - - - - - - - - -

2                          CERTIFICATION

3

4           I certify that the foregoing is a correct

5    transcript of the record of proceedings in the above-entitled

6    matter to the best of my skill and ability.

7

8

9

10   /s/ Joan M. Daly                  November 1, 2018

11   _____              _____

12   Joan M. Daly, RMR, CRR            Date
     Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF WITNESSES

2     WITNESS                                           PAGE

3     DAVID CARD (continued)

4
          Examination By Mr. Mortara ........................   6
5         Re-Examination By Mr. Waxman ......................  98
          Re-Examination By Mr. Mortara ..................... 113
6         Re-Examination By Mr. Waxman ...................... 117

7
      MARLYN MCGRATH
8
          Examination By Mr. Mortara......................... 121
9         Examination By Mr. Lee............................. 165
          Further Examination By Mr. Mortara................ 182
10        Further Examination By Mr. Lee.................... 183

11
      DREW FAUST
12
          Examination By Mr. Lee............................ 185
13        Examination By Mr. Hughes......................... 227

14

15    GRACE CHENG, DEPOSITION READ IN COURT

16        Examination ...................................... 242

17
      CAROLINE WEAVER, DEPOSITION READ IN COURT
18
          Examination ...................................... 245
19

20    BROCK WALSH, DEPOSITION READ IN COURT

21        Examination ...................................... 253

22

23

24

25

E X H I B I T S

1

2

Defendant Exhibit                                    Received

3
        DX12      ...................................   219
4
        DX26      ...................................   217
5
        DX40      ...................................   196
6
        DX53      ...................................   215
7
        DX83      ...................................   211
8
        DX100     ...................................   209
9
        634       ...................................   120
10
        DX740     ...................................   210
11
        DX742     ...................................   169
12
        DX743     ...................................   169
13
        744       ...................................   128
14

15

16

17   Plaintiff Exhibit                                   Received

18      P62       ...................................   236

19      634       ...................................   120

20      656       ...................................   157

21      657       ...................................   136

22      658       ...................................   136

23      659       ...................................   143

24      660       ...................................   143

25      696       ...................................   130
                  ...................................   132

705 ....................................

706 .................................... 132

707 .................................... 132

708 .................................... 132

720 .................................... 149

721 .................................... 149

722 .................................... 151

723 .................................... 151

741 .................................... 148

749 .................................... 138

755 .................................... 135

767 .................................... 138