1           UNITED STATES DISTRICT COURT

2             DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5                    Plaintiff,        Civil Action
                                       No. 14-14176-ADB
6    v.
                                       February 13, 2019
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                  Pages 1 to 129
8
                    Defendants.
9    _____

10

11

12           TRANSCRIPT OF CLOSING ARGUMENTS
         BEFORE THE HONORABLE ALLISON D. BURROUGHS
13            UNITED STATES DISTRICT COURT
            JOHN J. MOAKLEY U.S. COURTHOUSE
14               ONE COURTHOUSE WAY
                 BOSTON, MA  02210
15

16

17

18

19

20

21

22           JOAN M. DALY, RMR, CRR
              Official Court Reporter
23       John J. Moakley U.S. Courthouse
          One Courthouse Way, Room 5507
24             Boston, MA  02210
              joanmdaly62@gmail.com
25

```
 1    APPEARANCES:

 2
      COUNSEL FOR THE PLAINTIFF:
 3

 4            ADAM K. MORTARA, ESQUIRE
              J. SCOTT McBRIDE, ESQUIRE
 5            KRISTA J. PERRY, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
 6            54 West Hubbard Street
              Suite 300
 7            Chicago, Illinois 60654
              312.494.4400
 8            adam.mortara@bartlit-beck.com
              scott.mcbride@bartlit-beck.com
 9            krista.perry@bartlit-beck.com

10            JOHN M. HUGHES, ESQUIRE
              MEG E. FASULO, ESQUIRE
11            Bartlit Beck Herman Palenchar & Scott
              1801 Wewatta Street
12            Suite 1200
              Denver, Colorado 80202
13            303.592.3100
              john.hughes@bartlit-beck.com
14            meg.fasulo@bartlit-beck.com

15            JOHN MICHAEL CONNOLLY, ESQUIRE
              THOMAS R. McCARTHY, ESQUIRE
16            WILLIAM S. CONSOVOY, ESQUIRE
              CAMERON T. NORRIS, ESQUIRE
17            Consovoy McCarthy Park PLLC
              3033 Wilson Boulevard
18            Suite 700
              Arlington, Virginia 22201
19            703.243.9423
              mike@consovoymccarthy.com
20            tom@consovoymccarthy.com
              will@consovoymccarthy.com
21

22

23

24

25
```

```
1    APPEARANCES (cont.):

2
          PATRICK STRAWBRIDGE, ESQUIRE
3         Consovoy McCarthy Park PLLC
          Ten Post Office Square
4         8th Floor, South, PMB #706
          Boston, Massachusetts 02109
5         617.227.0548
          patrick@consovoymccarthy.com
6
7    COUNSEL FOR THE DEFENDANT:

8         WILLIAM F. LEE, ESQUIRE
          FELICIA H. ELLSWORTH, ESQUIRE
9         ANDREW S. DULBERG, ESQUIRE
          ELIZABETH C. MOONEY, ESQUIRE
10        SARAH R. FRAZIER, ESQUIRE
          Wilmer Cutler Pickering Hale and Dorr LLP
11        60 State Street
          Boston, Massachusetts 02109
12        617.526.6556
          william.lee@wilmerhale.com
13        felicia.ellsworth@wilmerhale.com
          andrew.dulberg@wilmerhale.com
14        elizabeth.mooney@wilmerhale.com
          sarah.frazier@wilmerhale.com
15
          SETH P. WAXMAN, ESQUIRE
16        DANIELLE CONLEY, ESQUIRE
          DANIEL WINIK, ESQUIRE
17        Wilmer Cutler Pickering Hale and Dorr LLP
          1875 Pennsylvania Ave, NW
18        Washington, DC 20006
          202.663.6006
19        seth.waxman@wilmerhale.com
          danielle.conley@wilmerhale.com
20        daniel.winik@wilmerhale.com

21        DEBO P. ADEGBILE, ESQUIRE
          Wilmer Cutler Pickering Hale and Dorr LLP
22        7 World Trade Center
          250 Greenwich Street
23        New York, New York 10007
          212.295.6717
24        debo.adegbile@wilmerhale.com

25
```

```
 1    APPEARANCES (cont.):

 2
              ARA B. GERSHENGORN, ESQUIRE
 3            ROBERT IULIANO, ESQUIRE
              Harvard Office of the General Counsel
 4            Smith Campus Center, Suite 980
              1350 Massachusetts Avenue
 5            Cambridge, Massachusetts 02138
              617.495.8210
 6            ara_gershengorn@harvard.edu
              Robert_iuliano@harvard.edu
 7

 8    COUNSEL FOR AMICI STUDENTS:

 9            JON M. GREENBAUM, ESQUIRE
              BRENDA L. SHUM, ESQUIRE
10            GENEVIEVE BONADIES TORRES, ESQUIRE
              1500 K Street NW, Suite 900
11            Washington, DC 20005
              202.662.8315
12            jgreenbaum@lawyerscommittee.org
              bshum@lawyerscommittee.org
13            gtorres@lawyerscommittee.org

14            EMMA DINAN, ESQUIRE
              Arnold & Porter LLP
15            555 Twelfth Street, NW
              Washington, DC 20004
16            202.942.5477
              emma.dinan@aporter.com
17

18    COUNSEL FOR AMICI ORGANIZATIONS:

19            JENNIFER A. HOLMES, ESQUIRE
              CARA McCLELLAN, ESQUIRE
20            MICHAELE M. TURNAGE YOUNG, ESQUIRE
              RACHEL N. KLEINMAN, ESQUIRE
21            CATHERINE BULLOCK, ESQUIRE
              NAACP Legal Defense and Educational Fund, Inc.
22            700 14th Street NW, Suite 600
              Washington, DC 20005
23            jholmes@naacpldf.org
              cmcclellan@naacpldf.org
24            mturnageyoung@naacpldf.org
              rkleinman@naacpldf.org
25
```

1   APPEARANCES (cont.):

2

3           KATE R. COOK, ESQUIRE
            Sugarman Rogers
            101 Merrimac Street
4           Suite 900
            Boston, Massachusetts 02114
5           617.227.3030
            cook@sugarmanrogers.com
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          (The following proceedings were held in open court

3     before the Honorable Allison D. Burroughs, United States

4     District Judge, United States District Court, District of

5     Massachusetts, at the John J. Moakley United States

6     Courthouse, One Courthouse Way, Boston, Massachusetts, on

7     February 13, 2019.)

8               THE CLERK:  All rise.  Court is in session.  Please

9     be seated.  This is Civil Action 14-14176, Students for Fair

10    Admissions.

11              Will counsel identify yourselves for the record.

12              MR. MORTARA:  Your Honor, Adam Mortara for Students

13    for Fair Admissions.  With me are my colleagues Will

14    Consovoy, John Hughes, Meg Fasulo, Michael Connolly, Cameron

15    Norris, Patrick Strawbridge, *Thomas* McCarthy, Krista Perry,

16    and Scott McBride.  Excused absences for Ms. Hacker, who is

17    full-term now and cannot travel, and Mr. Michael Park who had

18    the great honor of appearing in front of the Senate Judiciary

19    Committee this morning in connection with his nomination to

20    the United States Court of Appeals for The Second Circuit.

21              MR. LEE:  Good afternoon, Your Honor.  Bill Lee

22    from Wilmer Hale for Harvard.  With me are my partners Seth

23    Waxman, Danielle Conley, Felicia Ellsworth, Debo Adegbile and

24    Daniel Winik.  And from Harvard, Bob Iuliano and Ara

25    Gershengorn.

```
1              MS. TORRES:  Good afternoon, Your Honor.  Genevieve
2    Bonadies --
3              THE COURT:  I knew you were here someplace.
4              MS. TORRES:  Genevieve Bonadies Torres representing
5    the student Amici in this case.  From the Lawyers Committee,
6    I'm joined by Brenda Shum and Jon Greenbaum.  And I am joined
7    by my colleagues at Asian Americans Advancing Justice, Nicole
8    Gon Ochi and Arnold & Porter -- somebody.  Thank you.
9              MS. HOLMES:  Good afternoon, Your Honor.  Jennifer
10   Holmes from the NAACP Legal Defense Fund here on behalf of
11   the Amici organizations.  I'm joined by our local counsel,
12   Kate Cook, and also my colleagues Michelle Turnage Young,
13   Rachel Kleinman, Cara McClellan, and Catherine Bullock.
14             THE COURT:  Excellent.  So each party has an hour.
15   The two Amici have 15 minutes.  I'm happy to do this however
16   you would like.
17             MR. MORTARA:  Your Honor, I'll be presenting in our
18   opening piece for Students for Fair Admissions.  We have one
19   small request changing up from the last closing.
20             We would like, with Your Honor's permission, to
21   have the plaintiff's traditional opportunity to have the last
22   word.  So if you wouldn't mind, we'd like our rebuttal piece
23   to go after the amicus parties.
24             THE COURT:  I'm fine with that.  Any objection from
25   Harvard?
```

```
1              MR. LEE:  Not from Harvard, Your Honor.

2              THE COURT:  How much time are you reserving,

3    Mr. Mortara?

4              MR. MORTARA:  15 minutes.

5              THE COURT:  Karen, you got that?  45 minutes for

6    him and then he can have his last 15.

7              Wasn't sure you were going to make it back,

8    Mr. Mortara.

9              MR. MORTARA:  Your Honor, I just couldn't quit this

10   case.

11             THE COURT:  The people that are standing in back,

12   you're welcome to stand.  But you have to have a wall because

13   you're blocking all those people that you're standing in

14   front of.  Or a floor, you can have a floor, too.

15             When you're ready.

16             MR. MORTARA:  You should have a binder, Your Honor,

17   that has all of my demonstratives that I'm going to show.  I

18   know you like to follow along in paper.

19             THE COURT:  Yes.  I appreciate that.  Thank you.

20             MR. MORTARA:  I'll try to tell you the tabs that

21   are numbered.  They're not all consecutive because they

22   correspond to some things I'm showing on the screen or in my

23   outline, but I'll direct you to the tabs as needed as we roll

24   through.  There's also some duplicates, but that's because

25   I'm rolling through.  So please don't be alarmed by
```

1      duplicates.  Luckily nothing fell out this time.

2                With your permission, Your Honor, I'll begin.

3                THE COURT:  Go.

4                MR. MORTARA:  Your Honor, in preparing your opinion

5      in this case, the Court will have the opportunity to explain

6      the undisputed facts, decide the disputed facts, and of

7      course apply the law to both.

8                Perhaps the most important undisputed fact is that

9      Asian-Americans received dramatically statistically

10     significantly lower personal ratings from Harvard, lower than

11     whites, lower than African-Americans, and lower than Hispanic

12     applicants.

13               And perhaps the most important question in the case

14     is, why is that happening?

15               It's no exaggeration to say that entire communities

16     of Americans, millions of them, await this Court's important

17     answer to that question.  And the case also turns on the

18     answer, as the Court knows.

19               If the Court finds that Harvard imposed a racial

20     penalty in the personal rating against Asian-Americans,

21     Harvard loses this case on Count I.

22               And Your Honor, as we did in the previous closing,

23     we're happy to rest on our papers on the other counts.

24     Should Your Honor have questions on those other counts,

25     Mr. Hughes is here to answer them, and we'll take up our time

```
1    to do so should we need to.
2              There's only two possible answers to that important
3    question, Your Honor.  Either Asian-Americans actually
4    deserve those lower personal ratings because, in fact, they
5    have less integrity, kindness, grit, and likability and all
6    the things that Harvard says it's looking for; they actually
7    have inferior personal qualities.  Or Harvard admissions
8    officers have fallen prey to human frailty and racial
9    stereotyping.
10             The Court can side with Harvard and write into law
11   that Asian-Americans are actually just one dimensional and
12   book smart.  Those are Harvard's terms.
13             Or the Court can find that through some mechanism,
14   whether it was inadequate supervision, inadequate training,
15   or inadequate written guidance, racial stereotyping crept
16   into Harvard's process.
17             As Mr. Hughes said the last time we were here, the
18   statistical battle in this case boils down to whether or not
19   you find race influences the personal rating.
20             If it does, even as just a tip, Professor Card
21   admitted it should be removed from the admissions model.
22   Your Honor knows the testimony.
23             Please excuse me while I relaunch my computer.
24             Your Honor knows the testimony.  He said it.  It's
25   behind Tab 1 in your binder.  It's inappropriate to include
```

```
 1          any variables that can themselves be affected by race.
 2                    And behind Tab 2, he said it again.  Even if the
 3          rating is influenced by race only in the form of a tip.
 4                    Those are clear admissions.
 5                    THE COURT:  Can I interrupt you for a second?
 6          Don't I have to find it was intentional for Count I?
 7                    MR. MORTARA:  Absolutely not, Your Honor.  Unless
 8          by "intentional" you mean animus.
 9                    THE COURT:  That or intentionality.  Or are you
10          relying on Teamsters?
11                    MR. MORTARA:  We are relying on pattern or
12          practice, absolutely.  Obviously it's an intentional
13          discrimination case.  You have to find intentional
14          discrimination.
15                    The First Circuit has been very clear that
16          intentional discrimination doesn't mean animus.  The Supreme
17          Court has been very clear about that in all of the equal
18          protection cases going back to the '90s that you do not need
19          to find animus to find intentional discrimination.
20          Intentional discrimination can come from racial stereotypes
21          or unthinking bias.  That's what the First Circuit said in
22          Thomas against Eastman Kodak.
23                    THE COURT:  Go ahead.
24                    MR. MORTARA:  In Professor Card's own model, when
25          the personal rating was removed, again as Your Honor knows,
```

1    he himself found in Harvard's admissions model a

2    statistically significant Asian penalty.

3            And you would expect then, since Professor Card

4    testified that if race influences the personal rating and if

5    it comes out of his model, it should come out of his model.

6    And if it does come out of his model, he himself found an

7    Asian penalty, that he would have told you, given you an

8    opinion, that race was not affecting the personal rating at

9    all.

10           But he did not.  He did not give you an expert

11   opinion as an economist crunching any numbers or present any

12   analysis that showed race wasn't influencing the personal

13   rating.  He instead chose to take Harvard's word for it.

14           Dean Fitzsimmons had a telephone call with him and

15   said we have never used race in the personal ratings, and

16   Professor Card accepted that representation.

17           The only model of the personal rating came from

18   Professor Arcidiacono, which showed significant effects of

19   race.  Negative on Asians, positive for African-Americans and

20   Hispanics.  That's behind Tab 4 in your binder.  You'll

21   remember this slide from Professor Arcidiacono, and in the

22   lower left pane of that slide you'll see the personal rating

23   model.  Negative penalty for Asians.  Large tips for

24   African-Americans and Hispanics.

25           Professor Card and Harvard, now through hundreds of

1    pages of posttrial briefing, have made no effort whatsoever

2    to explain the massive boost for African-Americans and

3    Hispanics found here and shown in the raw data.

4            Card never once talked about it, even though if

5    those tips are present, the personal rating will be just like

6    the overall rating and should be removed from the admissions

7    model, by his own testimony.

8            Harvard hasn't even tried to offer a rationale for

9    why African-Americans and Hispanics just have better personal

10   qualities than Asians or whites, why they would be more

11   likeable or have greater kindness, integrity, or grit.

12   Because they don't.  Because your skin color doesn't

13   determine your personal qualities.

14           In answering Professor Arcidiacono's model, Harvard

15   focused exclusively on the first third, the Asian penalty

16   that Professor Arcidiacono found.  But all the analysis

17   Professor Card did could not make it go away.

18           You'll remember, Your Honor, this demonstrative I

19   have created with Professor Card during the

20   cross-examination.  This is behind Tab 5 in your binder.  He

21   had shown the first four dots in his direct exam Professor

22   Arcidiacono's models of the personal rating, including model

23   5 which includes all the variables, the ratings variables,

24   context variables, interactions, demographics, academics.

25           And then he said, and I added some more variables

1    and I made the Asian penalty smaller.  And if I kept adding

2    variables, it might just go to the ceiling.

3           When I got to talk to him, we put in his results

4    and showed that even throwing in all the variables he could

5    at the personal rating model, he could not make the Asian

6    penalty go away.  Far from going to the ceiling, it's

7    plateauing at a statistically significant level.  He said his

8    own analysis showed a statistically significant Asian

9    penalty.  He didn't make it go away.

10          Harvard has some answers to this.  First, Harvard

11   repeats like a mantra the idea that because Asians outperform

12   white and other applicants on the extracurricular and

13   academic ratings, that must mean that Professor Arcidiacono

14   found a positive racial bias in those ratings.

15          And behind Tab 6 you have again Professor

16   Arcidiacono's models of the ratings, and I'll just blow up on

17   the screen the academic rating.  The point Harvard is making

18   here is because of this modest positive coefficient on

19   Asian-Americans, that must be mean that Professor Arcidiacono

20   should have been saying there's a positive bias in the

21   academic rating, as we have explained many many times.

22          There are observables in the data like SAT scores,

23   for example, important for the academic rating.  There's also

24   data about the applicant that Harvard has that don't go into

25   the model either because we don't have enough of it or

```
 1        because it's hard to program into the model.
 2                 One example of the former is the number of AP exams
 3        a student may have taken.  There's also evidence in the
 4        record that Asian applicants take more AP exams than white
 5        applicants to Harvard.
 6                 An example of the latter would be the type and
 7        quality of academic awards that an applicant got.  That's
 8        hard to code into the data.
 9                 The directionality you see here is consistent with
10        the idea that Asian-Americans are superior to white
11        applicants on the observable data like SATs, GPAs, the like.
12        And they're also superior on the unobservables like number of
13        AP scores, number of AP tests, and academic awards.
14                 It's when these arrows move in starkly opposite
15        directions that you know there's a problem like you see in
16        the lower left with the personal rating, arrows and the bars
17        moving in opposite directions.
18                 Now, Harvard likes to use jargon like
19        omitted-variable bias or other unobservables as some sort of
20        mystical explanation for why Asians are getting penalized on
21        the personal score that isn't itself race.
22                 I just gave you the example of the number of AP
23        scores and the academic awards.  What are Harvard's omitted
24        variables that will tell us Asian applicants really have less
25        integrity, grit, kindness or likability?  To even ask the
```

question proves that Harvard's invocation of terms like
omitted-variable bias and other unobservables just repackages
racial stereotypes and cloaks them in scientific sounding
phrases.

And to the surprise of no one, other than Harvard,
perhaps, the law is defendants cannot win discrimination
cases by saying it must be some other variable, without
telling us what that variable is, and providing evidence that
would support a race-neutral reason.

Harvard didn't do that.  A case that says that,
Your Honor, is the *Palmer* case from the D.C. Circuit cited in
our briefs.

Where is the evidence that white applicants to
Harvard write essays that just make them seem more likeable
than Asian applicants?  Harvard cannot even start to answer
that question without invoking still more casual racist
stereotypes, adding to the list of loaded terms like
"one-dimensional" and "book smart" that we heard during the
trial.

The law and common sense tells us that skin color
has nothing to do with your personal qualities or likability.

Harvard's second answer to this is that, even
though Professor Arcidiacono's model 5, shown here on the
screen, includes all the ratings variables, Harvard now says
that because whites do slightly better on school support

1    ratings, that answers everything.

2              But it answers absolutely nothing, Your Honor.

3    Harvard's admissions officers themselves assigned the school

4    support ratings.  And there was unrebutted and undisputed

5    testimony from Professor Arcidiacono that he also found an

6    Asian penalty in those ratings.

7              Moreover, there was testimony, including from Dean

8    Fitzsimmons, that the personal rating is not only based on

9    school support or alumni interview ratings.  Harvard admits

10   extracurriculars and how a student performs in them weigh

11   into the personal rating.  And we know Asians massively

12   outperform white applicants on the extracurricular rating.

13             All Harvard did was cherry-pick one sliver of the

14   data, one spot where whites do slightly better, and then

15   tried to drive that through the entire explanation of the

16   observed Asian penalty.  But without an actual statistical

17   model, it proves nothing.  And the only regression analysis

18   we have is the one on the screen and the iterations Professor

19   Card did afterwards, all of which show a statistically

20   significant Asian penalty.

21             And as Professor Arcidiacono testified, and the

22   amicus brief at page 7 says, the relatively small white Asian

23   school support gap cannot explain the observed raw data

24   personal score gap that we see both in the raw data and in

25   the regression model.

1              And what about African-Americans and Hispanics?

2    Two-thirds of the pane you're looking at with these massive

3    boosts going in the opposite direction of the observables,

4    they do so much better on the personal rating than whites and

5    Asians.

6              Did Professor Card and Harvard show you how school

7    support or alumni interview ratings explained that?  No, they

8    didn't because they're not explaining the racial distribution

9    of the personal rating at all.  They're not giving you

10   evidence that race doesn't influence the personal rating.

11             Harvard wants you to believe that it's just a

12   coincidence that the racial pattern on the personal rating

13   looks just like the racial pattern on the overall rating,

14   which you'll see behind Tab 7.

15             Harvard wants you to think they admit using race in

16   the overall rating, admit giving a preference to

17   African-Americans and Hispanics in the overall rating.

18             There's undisputed testimony, unrebutted by

19   Harvard, unrebutted by Card, in this case that there's an

20   Asian penalty in the overall rating.  And they want you to

21   look at the same distribution in the personal rating and

22   believe them that race has never been used and race does not

23   influence the personal rating.

24             One thing Harvard is very good at is something that

25   some people call, colloquially, don't believe your lying

1    eyes, but we can also learn about in George Orwell's 1984.

2    Two plus two equals five.  Don't believe what you're seeing.

3    Don't believe what you're looking at, the same pattern

4    between overall and personal.  Believe us, trust us.  Race

5    has never been used in the personal rating.

6              And, Your Honor, that's before we get to all the

7    nonstatistical evidence on the personal rating where we see

8    more of this type of argument.

9              Some examples.  Christopher Luby.  We're supposed

10   to believe that Mr. Luby testified credibly at trial that he

11   never used race in the personal rating.  That's Harvard's

12   word from their posttrial brief, "credibly," even though he

13   said the opposite under oath at his deposition in the first

14   hour.  Then he sat there for hours answering additional

15   questions from my friend Mr. Connolly, didn't change his

16   testimony.

17             Then a month later he got the written transcript

18   and spent hours looking at that, reading what had been asked

19   and what he had answered, changing dozens of things,

20   substantive things about his testimony.  Didn't change it

21   then.

22             But then we're supposed to believe, you and I, that

23   after 40 hours spent with Harvard's counsel, he suddenly

24   discovered the truth about how he'd been doing his job all

25   along and that he'd never used race in the personal rating

1    ever.

2              Two plus two equals five, Your Honor.  Trust us.

3              We're supposed to believe that even though the

4    Department of Education's Office of Civil Rights found in a

5    report in 1990 that Harvard's admissions offices, at least

6    some of them, had been using race in the personal ratings, a

7    finding that has never once been disputed by Harvard in

8    hundreds of pages of posttrial briefings.  They've never once

9    even answered it or addressed it.

10             And then everyone from Mr. Lee to Director McGrath

11   to Dean Fitzsimmons came to court and told us nothing had

12   changed about Harvard's use of race since that finding.

13             And as you know, and behind Tab 8 you will find

14   Plaintiff's Exhibit 509, Harvard's own lawyers are writing

15   letters to the Department of Education, telling them those

16   earlier findings are still accurate today as late as 2012.

17             And no one remembers ever training or admonishing

18   anyone about not using race in the personal rating, even

19   after DOE made those findings.  Yet we are now supposed to

20   believe Harvard's made-for-litigation excuse that no one has

21   ever used race in the personal rating, despite the fact that

22   the United States Government found that they did.  And then

23   they told that same government nothing had changed as late as

24   2012.

25             Two plus two equals five, Your Honor.  Trust us.

1    It's never happened.

2              And what about what happened last summer?  We're

3    supposed to believe that Director McGrath was in Montana and

4    she didn't read the deluge of national press about this case

5    created by the summary judgment filings and the revelations

6    about the personal rating that were all over the press.

7              Mr. Hughes is from Montana.  His parents in

8    Whitefish had no trouble following the case.

9              We're supposed to believe that even though before

10   that summary judgment briefing the admissions office had

11   gotten together at a retreat and they decided to make no

12   changes to the personal rating guidance.

13             But somehow Harvard would have us believe that sua

14   sponte in August, after all that press, the admissions office

15   embarked on a process that ultimately added 872 percent more

16   words to the instructions on the personal rating than had

17   existed before.

18             That's depicted behind Tab 9, Your Honor.  You see

19   the class of 2022 reading procedures, Defendant's 744,

20   compared to the class of 2023, Plaintiff's 633.  This thing

21   had not changed in such a material way in decades.

22             Behind the next tab, Your Honor, 10, you'll see the

23   reading procedures guidance from the 1980s contained in the

24   OCR report compared to 2022 compared to what they did in

25   August.  And of course that had nothing to do with this case,

1    nothing to do with the revelations in the press, nothing to

2    do with this upcoming trial.  Nothing at all.  That's what

3    Harvard wants you to believe.  That's what they've said.

4              Now, we're told these massive revisions actually

5    changed nothing at all, and this is just a codification of

6    uniform historical practice that no one has ever deviated

7    from.  Right.  Because you don't change something for nearly

8    40 years in any appreciable way, and the system is working

9    perfectly, and no one uses race in the personal rating even

10   though the Department of Education found they did, but you

11   need to add 872.5 percent more words to make sure everything

12   stays the same.  And you have to add the first ever

13   injunction against using race in the personal rating

14   appearing in writing ever.

15             And of course the key language added that we all

16   know is designed to fight caricature and stereotypes of

17   Asians.

18             Appearing behind Tab 11, of course, at the top,

19   you'll see the reading procedures and the language that

20   you'll well remember was in red in one of the drafts, Your

21   Honor, compared to the OCR report which found, amongst other

22   things, that Harvard admissions officers had used

23   stereotypical language about Asian applicants.

24             We need to talk a little bit about how this came to

25   light, Your Honor.  First Director McGrath and Dean

1    Fitzsimmons testify inaccurately about whether there's
2    written guidance on the personal rating on race in this
3    court.  That's what happened.  The questions could not have
4    been clearer, and they got the answers dead wrong.
5           Remember my question.  Down to a sticky note on the
6    coffee pot, I asked Director McGrath, is it written anywhere
7    at the admissions office not to use race in the personal
8    operating?
9           She said, no, it's not.
10          We found out later when Director McGrath came back
11   that she had imposed an unverbalized qualification on my
12   question to be limited to the discovery period.
13          But putting aside Director McGrath's confusion
14   about my question, after that, Harvard knew, Harvard's
15   lawyers knew inside and outside, Your Honor, they knew those
16   answers were inaccurate.
17          And they did nothing to correct that false factual
18   testimony even though every rule in the book says that when
19   your witness in your case says something that is not true and
20   you know it's not true, whether or not the witness made a
21   mistake, you have a duty to tell the Court and to tell the
22   other side, but they didn't.
23          Then when the last admissions officer was on the
24   stand in a throwaway rehabilitation attempt of Tia Ray, we
25   find out about the new reading procedures.

1              Caught now with the McGrath and Fitzsimmons'

2     inaccurate testimony and the Court's immediate order to

3     produce the reading procedures, Harvard first assures me and

4     assures you that these new reading procedures actually help

5     Harvard's case.

6              Two plus two equals five, Your Honor.  Trust us.

7              These reading procedures, once we get them, end up

8     helping Harvard so much that by the time of closing Harvard

9     is telling the Court they're not admissible to support a

10    liability finding under Federal Rule of Evidence 407,

11    Subsequent Remedial Measures.

12             Just like I told you at my closing, Your Honor,

13    that argument has disappeared from the posttrial briefing

14    because it was waived when Harvard allowed the reading

15    procedures into evidence without objection.

16             I know you know this, Your Honor, but Rule 407 does

17    not exist because subsequent remedial measures are not

18    probative of liability.  They're extremely probative of

19    liability.  Rule 407 exists because of the public policy

20    matter.  We want cities to fill potholes after there are

21    accidents without fear that the filling of them will be used

22    in a very effective way to acknowledge they should have been

23    filled in the first place.

24             We want universities to fix broken admissions that

25    are broken down because of racial stereotyping and add new

1   instructions to people that read those applications without

2   fear that those new reading procedures won't be marched into

3   court to prove, because they do, that they knew there was a

4   problem.

5           But because of our hands were trapped in the cookie

6   jar over the earlier erroneous testimony, Harvard waived

7   Rule 407, and now we can see just about the most powerful

8   evidence you can imagine of a recognition of a problem by at

9   least some of Harvard's own rank and file admissions

10  personnel after everything came out in public over the

11  summer.  And a fundamental rewrite of the reading procedures

12  on the personal rating ensued.

13          But this is no big deal, Your Honor.  872 percent

14  more words, first ever injunction about race in the personal

15  rating, had hardly changed for decades, but we were supposed

16  to believe it just codifies uniform existing practice, Your

17  Honor.

18          Trust us.  Two plus two equals five.

19          There's also a little bit of legal two plus two

20  equals five going on, Your Honor, and you alluded to it

21  earlier in your question.  Harvard wants to tell you that we

22  have to prove evil racist intent in the hearts and minds of

23  admissions personnel in order to make out a case of

24  intentional discrimination.

25          I want to dispel that right here and right now with

1    binding First Circuit precedent behind Tab 12.  It's the

2    *Thomas vs Eastman Kodak* case from Judge Lynch.  The ultimate

3    question is whether the employee has been treated disparately

4    because of race.

5           This is so regardless of whether the employer

6    consciously intended to base the evaluations on race or

7    simply did so because of unthinking stereotypes or bias.  And

8    it goes on.

9           And what does this mean?  It means when Harvard's

10   admissions personnel come in here and tell you from the heart

11   that they're not discriminating while at the same time none

12   of them can explain why Asians are getting dramatically lower

13   personal ratings than whites, they may quite well have fallen

14   prey to racial stereotyping.  And it doesn't make them evil.

15   It makes them human.

16          What else does it mean, Your Honor?  It means if

17   you find in our favor on Count I, you do not need to find,

18   behind Tab 13, that the admissions officers came here and

19   lied and perjured themselves.  That is a straw man.  You

20   don't need to do that.  We don't have to look into the hearts

21   of these admissions officers to see exactly why they

22   systematically gave Asians lower personal ratings,

23   undisputedly penalized Asians on the overall rating, no

24   rebuttal from Card.  And undisputedly penalized Asians on the

25   school support ratings.  Again, no rebuttal.

1          The models produced by both experts tell us it's

2     happening, and that's sufficient to make out our prima facie

3     case of intentional discrimination by itself under the

4     pattern or practice method.

5          Behind Tab 14 is again Professor Card's own model

6     with the personal rating out and the statistically

7     significant Asian penalty.  Recall this model includes all

8     the things Harvard wants included except the personal rating.

9     ALDCs, intended careers, parental occupations, everything

10    that Professor Card wanted except that racially influenced

11    personal rating.

12         Under the pattern or practice method, we need to

13    show no more than this, this gross disparity to make out our

14    case.

15         Now, Your Honor, Harvard does like to make a little

16    bit of this gross disparity language that appears throughout

17    the cases, but the cases also make clear that it's synonymous

18    with the little asterisk at the bottom of the screen, a

19    statistical significance.  *Hazelwood* at Footnote 14 talks

20    about the difference being two or three standard deviations.

21    Two standard deviations means a p-value of less than 0.05,

22    which is what we call a statistical significance, and it is

23    right there in the asterisk.

24         The First Circuit said as much in *Jones against*

25    *City of Boston*, at Footnote 9.  That's a disparate impact

1    case.   The D.C. Circuit has said it multiple times, including

2    in *Segar* and *Palmer against Schultz*, cited in our briefs.

3            We, of course, had our own statistical analyses.

4    It wasn't just Harvard's that showed an Asian penalty.

5    Professor Arcidiacono's analysis showed an Asian penalty.

6    And you recall the robustness checks that he had on that

7    analysis.  And this one little change to Professor Card's,

8    removal, as he testified you should, of a rating that is

9    influenced by race gives what all the courts call prima facie

10   evidence of intentional discrimination, statistically

11   significant penalty.

12           Going to the law, Harvard now has two options.

13   They can dispute the analysis or provide a race-neutral

14   explanation.  But it's hard for Harvard to dispute the

15   analysis and model of their own expert coupled with the

16   single finding that race influenced the personal rating.

17   They can only try to convince you, no, no, no, ignore what's

18   going on with the African-Americans and Hispanics, look only

19   at the school support ratings, or whatever other excuse they

20   have.  Race isn't influencing the personal rating.  Put aside

21   what the United States Government said in the OCR report.

22           And Harvard has yet to come up with any

23   race-neutral explanation for the Asian penalty in the

24   personal rating.  I'll ask again for Harvard to be explicit.

25   Tell the whole world that Asian applicants to Harvard

1    actually deserved statistically significantly lower ratings

2    than whites, African-Americans, and Hispanics.  Say they

3    deserved it.

4            But you know what, Your Honor, that will just be

5    lawyer argument, even if they're willing to say it, because

6    no Harvard admissions officer was willing to come in here and

7    testify as to why this is happening.

8            In fact, the idea that Asians deserve lower

9    personal ratings will be news to every Harvard admissions

10   officer that testified, from Director McGrath to Charlene

11   Kim.  They universally said they wouldn't expect Asians to

12   have worse personal qualities.

13           Your Honor, there is some discussion about the

14   pattern or practice method and some discussion of waiver,

15   some confusion about this.  And Harvard seemed surprised to

16   see reference to this method of proof in our brief.

17           But behind Tab 15 you will find Harvard's summary

18   judgment brief, docket 418.  And over on page 36, which is

19   also behind that tab, Your Honor, at the top you'll see

20   Harvard knew exactly what was going on here.

21           Harvard told you that lacking direct support for an

22   intentional discrimination claim -- of course almost all

23   discrimination claims are circumstantial.  Rarely do you find

24   the smoking gun letter saying what we're really trying to do

25   is limit the number of non-ALDC Asians on campus.

1          SFFA can make a prima facie case based on

2     statistics only if it can show gross disparities of the kind

3     and degree sufficient to give rise to an inference that the

4     nonuniform individualized analyses reflects a pattern or

5     practice of discrimination.

6          Citing what?  A Third Circuit Title VII case on

7     pattern or practice.  Citing what else?  The *Hazelwood* case.

8     What's that?  A Title VII case on pattern and practice.

9          This is Harvard's summary judgment brief.  This is

10     no surprise to them.  We had told you, Your Honor, and them

11     in discovery motions way before that, including back in April

12     of 2017.  Behind Tab 18 you'll find one of our briefs, a

13     reply brief on a discovery dispute, where we said SFFA

14     alleges that Harvard engaged in a pattern or practice of

15     discrimination under Title VI.  Citing what?  The *Teamsters*

16     case, first case where the Supreme Court held private

17     plaintiffs could bring a pattern or practice method of proof

18     claim.

19          And then also *Indiana Harbor Belt Railroad*, which

20     is the Northern District of Indiana case, that holds that an

21     association like SFFA, like a union, can bring pattern or

22     practice method of proof to bear.

23          We did, Your Honor, refer to the *Arlington Heights*

24     framework and move on that basis an alternative legal theory

25     in our summary judgment motions.  It's true.  But one does

```
 1    not have to move on all the bases for relief in a summary
 2    judgment motion.
 3              And moreover, we did not have the cross-examination
 4    of Professor Card wherein he admitted that in all of his
 5    admissions models, including the very last one he did, if you
 6    pulled out the personal rating you got a statistically
 7    significant Asian penalty.
 8              We didn't waive pattern or practice method.
 9              But Harvard has still more arguments.  They're now
10    telling you the pattern or practice method of proof is either
11    not available in associational standing cases like this one
12    or not available under Title VI.  The problem with both those
13    arguments is there is actually zero authority for either of
14    them.
15              We cited the only case to address the question of
16    associational standing cases, *Indiana Harbor Belt Railroad*;
17    that's the Northern District of Indiana case.  No case holds
18    to the contrary.
19              And there's not a lot of case law on this, for
20    obvious reasons, Your Honor.  The very premise of an
21    associational standing case, as you've observed several times
22    in orders in this case, is that we are not bringing claims
23    one by one on behalf of individuals.  We're not deploying the
24    individual method of proof or the *McDonnell Douglas*
25    framework.  We're not doing that.  We're alleging systematic
```

1    discrimination.

2            The courts have held that individual plaintiffs

3    bringing a *McDonnell Douglas*-type claim cannot also resort to

4    the pattern or practice method.  That is true.  Those were

5    not the types of claims we were bringing.

6            And Harvard tried to tell you, in its opposition

7    brief at page 9, that the Second Circuit had held that

8    associations could not use pattern or practice proof in the

9    *Chin* case, which is behind Tab 20.

10           And it takes only a few minutes to look at the *Chin*

11   case to realize that that is a mischaracterization.  Over at

12   the very first paragraph, which is also in your binder, Your

13   Honor -- I'll just put it on the screen -- you will see, and

14   then in the pages that follow, the only claims that were

15   tried in that case were claims by 11 Asian-American

16   individuals.

17           There had been an association as part of the case

18   earlier, Your Honor.  They got the right to sue letter from

19   the EEOC.  But no associational standing claims were tried in

20   that case, none at all.  It was all individual evidence, Your

21   Honor.

22           Of course the Second held, as all circuits had,

23   that individual plaintiffs cannot bring pattern or practice

24   method cases.  That's not what we're doing.  This is an

25   associational standing case.

1           Your Honor, Harvard also says that you can't bring

2      pattern or practice under Title VI.  Precisely zero authority

3      supports that.

4           And behind Tab 22 -- this only came up in Harvard's

5      reply brief, Your Honor, you'll find some supplemental

6      authority, which is the Title VI legal manual from the United

7      States Department of Justice, which on the very first page

8      tells you in the table of contents that, yes, you can use the

9      pattern or practice method in a Title VI case.

10          And it goes on on pages 22 and 23, which you can

11     also find in there, to discuss the legal bases for that,

12     citing all sorts of Title VII cases.

13          And on page 23, Your Honor, you will find

14     supplemental authority, the *Melendres* versus the infamous

15     Sheriff Joe Arpaio case from the Ninth Circuit, which is a

16     Title VI case deploying the pattern or practice method of

17     proof.

18          And, Your Honor, lest you think this is newly

19     minted Justice Department guidance on Title VI, we actually

20     made some effort to try to track back how long the Justice

21     Department has been telling everyone that they think you can

22     bring pattern or practice claims and prove intentional

23     discrimination under Title VI.  It goes back at least as far,

24     potentially began at the time when Mr. Waxman was Solicitor

25     General of the United States in the Justice Department in the

1    Clinton administration.

2           We can bring a pattern or practice method.  And

3    that means statistics alone, contrary to what Harvard says,

4    can prove our case.  A regression analysis is what every

5    pattern or practice method says is sufficient to show

6    intentional discrimination, to get that statistical

7    significance mark.

8           But even if that weren't true, Your Honor, even if

9    we're under *Arlington Heights*, there's a mountain of

10   circumstantial evidence.  I've already touched on the Office

11   of Civil Rights findings that Harvard used stereotypes and

12   was using race in the personal rating.  The ultimate finding

13   there wasn't discrimination, but it didn't take long for it

14   to mature into a statistically significant Asian penalty.

15          I touched on Mr. Luby's frankly not at all credible

16   trial testimony and I talked about the new reading

17   procedures, such dynamite evidence of liability that

18   Rule 407, had Harvard been timely about it, would have kept

19   it out.

20          And, of course, there's the issue of Sparse

21   Country, Your Honor, and Dean Fitzsimmons's revealing and

22   frankly saddening testimony justifying why Asian students

23   living in New Orleans and Salt Lake City needed to get higher

24   PSAT scores to get a letter inviting them to Harvard.

25          Harvard points out in their brief it's not illegal

1    to discriminate on the basis of race in terms of who you

2    invite to apply.  We agree, that is not illegal.  What it is

3    probative of is Harvard didn't want any more Asians to apply.

4            What is more important is the direct evidence

5    behind Tab 25 that was right here in court when Dean

6    Fitzsimmons, in struggling to explain why this was going on,

7    over 20 pages of transcript finally says, well, there's some

8    people who might have only recently arrived in Sparse Country

9    and other people have been there forever.

10           We all know what was meant by that.  It's what

11   Dr. Chin called the stereotype of Asians as the perpetual

12   foreigner.  Mr. Hughes talked about it in his closing.

13           And what about what Dean Fitzsimmons did not do in

14   response to the findings of the Office of Institutional

15   Research?  Here we have perhaps the worst instances of two

16   plus two equals five in the case.

17           Harvard, its witnesses, and its lawyers have stood

18   here and told you the following incoherent concepts.  On the

19   one hand, everyone in admissions, including all the recent

20   college graduates they have, Miss Tia Ray, and Chris Luby,

21   they're perfectly trained on how to use race, even though

22   many of them couldn't remember that they'd ever been trained

23   on it.  Essentially, they don't get any written guidance,

24   they never make mistakes ever or succumb to racial

25   stereotyping in assigning the personal rating.  And, Your

1      Honor, to quote The Lego Movie, the first one, everything is

2      awesome.

3               But to use another literary reference, over at the

4      Office of Institutional Research, the Ph.D.'s who crunch

5      numbers for Harvard to submit to the United States

6      Government, they are the gang that couldn't shoot straight

7      because their work is so poor no one should believe it.

8               But in order to know they're the gang that couldn't

9      shoot straight, you have to first understand what they're

10     telling you.  And there we're treated to potentially the most

11     extreme two plus two equals five moment of the case, and

12     that's Plaintiff's Exhibit 26, Your Honor, behind Tab 26 in

13     your binder, the May 1 memo from OIR.  Not just Mark Hansen,

14     the junior staffer off on a lark --

15               THE COURT:  I don't have Tab 26.

16               MR. MORTARA:  It might be Tab 27, Your Honor.

17               THE COURT:  No.  27 is something different.

18               MR. MORTARA:  It might be Tab 28.  It might not be

19     there.

20               THE COURT:  It's not there.

21               MR. MORTARA:  As is usual, Your Honor.  Technical

22     details.

23               You know the document very well, Your Honor.  And

24     as you see, a memo from all of OIR, not just Mark Hansen, but

25     Dr. Driver-Linn herself at the head, and you know what it

1    told Dean Fitzsimmons:  They did a regression model, and he

2    looked at it.

3            Dean Fitzsimmons used to teach statistics.  He

4    loved talking about statistics, and he's conversant in modern

5    statistical methods like regression analyses.

6            And here's the table.  What did do we see in the

7    table?  What did it tell Dean Fitzsimmons?  If you have an

8    athletic rating of 1, you're a recruited athlete.  Harvard

9    wants you there.  You get a big tip.  I know that.  We intend

10   to recruit athletes.  We intend to given legacies a big tip.

11   It's a big part of this case.  We've heard a lot about it.

12   We intend to give African-Americans a big tip.  We intend to

13   give Hispanics a big tip.  We intend to give low-income

14   applicants a tip.

15           And this is empirical proof of that, said Dean

16   Fitzsimmons.  And then he got to the Asian penalty, minus

17   .37, p-value zero.  He says, I don't know what that means.

18           That's what we're being told, that he got to the

19   bottom, intent to help athletes, intent to help legacies,

20   intent to help African-Americans, intent to help Hispanics,

21   intent to help low-income folks, proves empirical proof.

22   What's that?  I don't know what that means.  Even though OIR

23   told him what it meant.  There are demographic groups that

24   have negative effects.

25           Your Honor, he understood what this meant.  There's

1    some dispute about the law here about cases like *Personal*

2    *Administrator Against Phoebe*, the idea that you can proceed

3    in the face of a known disparate impact and that doesn't mean

4    you're discriminating on the basis of race.

5                 Your Honor will recall that involved a preference

6    for veterans, which obviously falls unequally, at least at

7    the time, less so now, between men and women.  We could still

8    have that preference.  That's not discriminatory intent.

9    Absolutely true, Your Honor.

10                But that's not what this memo shows.  A regression

11   analysis of this type in every single pattern or practice

12   method case is considered proof not of a disparate impact but

13   of intentional discrimination.

14                And that's what Professor Fitzsimmons, former

15   teacher of statistics, got in a memo.  Not a memo saying

16   we've got disparate outcomes.  A memo saying we have an Asian

17   penalty, intentional discrimination, the same as if an owner

18   of a business got a memo from a manager, saying I think we're

19   invidiously discriminating against African-Americans, boss,

20   what do you think?

21                What did Dean Fitzsimmons think?  Not enough to

22   tell anybody about it or do anything else.

23                Your Honor, Harvard has its own accusations, to be

24   fair, of inconsistency on our part.  Even though Professor

25   Card found that Asian penalty in the personal rating once he

removed -- Asian penalty in the admission outcome once he
removed the personal rating, Harvard points out that Students
for Fair Admissions went one step further and proved that
that Asian admissions penalty is only affecting the
98 percent of Asian applicants that aren't ALDCs.  Your Honor
will recall that Professor Card's model includes all the
ALDCs, so that's kind of not an issue.

        But we went a step further and said, no, this is
really falling heavily on the 98 percent of applicants that
are not in those preferred groups.  Harvard calls it
incoherent that the 2 percent of Asian applicants who are
ALDCs are not treated on admissions outcomes statistically
significantly different from whites.

        That should be behind Tab 28, Your Honor.  And you
can see the admissions rates, they're slightly higher for
Asian-Americans.  And Dr. Card actually said if you add back
in the athletes and peel apart the ALDCs, Professor
Arcidiacono's model shows there may even be a tip for Asian
legacies over white legacies.

        But the absence of an Asian penalty for ALDCs or
even a preference for them is not inconsistent with a penalty
in the 98 percent of Asian applicants who don't fall into
those special categories.

        It's not incoherent.  It's, in fact, so coherent
legally there's an entire body of case law, typically in sex

discrimination, directed to this concept, saying plaintiffs
can prove illegal discrimination against a subgroup.

And it's not so coherent factually.  Your Honor,
it's happened before.  The law of the so-called sex-plus or
race-plus cases is absolutely clear.  You can't defend a
discrimination charge by pointing to another subgroup of the
protected class you didn't discriminate against.

Imagine a scenario where 98 percent of the women
who apply to a job have children and 2 percent don't.  The
employer discriminates against the 98 percent of the women
with children, for whatever reason, and does not discriminate
against the 2 percent that do not have children or maybe even
gives them a preference.

Why would they do that?  There could be many
different and equally awful reasons.  Maybe they think women
without children are more likely to participate in company
social activities, they'll fit in better, be more patriotic
towards the company.  Maybe they prefer having women in the
workplace who they perceive don't always talk about their
children.

Maybe they even prefer the 2 percent childless
women and hire as many as they can so that they can justify
to the EEOC or someone else who comes along and makes charges
of sex discrimination based on the raw numbers.  They want to
be able to say we don't discriminate; look at all these women

1    we hire.  Maybe when they get sued, they will say your sex

2    discrimination theory is incoherent.  We hired all these

3    childless women; we even gave them a preference.

4          Too bad for them and for Harvard.  The law is

5    crystal clear that this is unlawful discrimination, and

6    incoherency is not an excuse.  That's exactly what happened

7    here.  Just like an employee in my hypothetical, Harvard

8    imposes no admission penalty on Asian ALDCs but does impose

9    the penalty on those it deems less desirable, the non-ALDC

10   Asians.

11         This makes perfect sense.  This would be an easy

12   case if Harvard hadn't ever let in any Asian-American

13   applicant.  We would have won this on a Rule 12 summary

14   judgment.  It would be an easy case if they let in zero of

15   that 98 percent of Asian non-ALDCs.

16         Harvard is always going to admit some

17   Asian-American applicants.  We all know that.  And the fact

18   that in their virtual draft they prioritize the wealthy and

19   connected may be somewhat embarrassing to Harvard, but after

20   the evidence at trial, it's hardly surprising.  It makes

21   perfect sense.

22         Asian ALDCs are certainly less likely to be the

23   perpetual foreigner that Dean Fitzsimmons was alluding to.

24   They're the children of Harvard alumni, after all.  They have

25   something more, the Harvard DNA that Harvard likes so much.

1    It makes perfect sense.  Asian alumni of Harvard are

2    Harvard's donor and support base.  Why risk angering them and

3    losing those donations and support?

4          Makes perfect sense, Your Honor.  It's happened

5    before.  And I know you've expressed reticence, to put it

6    mildly, to invoke history here.  But I can point out that

7    several institutions of higher education in the last century

8    had the very same unlawful discriminatory policy that Harvard

9    today calls incoherent.  They had discriminated against Jews

10   who were not legacies while treating legacy Jewish applicants

11   more fairly.  They even enlisted the support of prominent

12   Jewish alumni to justify their schemes to keep the numbers of

13   undesirable Jewish students down.

14         And why did they do this?  Because of stereotypes

15   about those Jewish students, as among other things recent

16   emigrants or perpetual foreigners.  It's right in Jerome

17   Karabel's book at page 98.

18         You're right, Your Honor.  It's not terribly

19   relevant in the identity sense which institutions ran this

20   perfectly coherent if morally repugnant, sick system of

21   discrimination.  It's not terribly relevant that they

22   included Williams, Dartmouth, and Harvard.

23         But the history does tell us it's perfectly

24   coherent to prefer a subgroup of the unpreferred group to

25   cover one's tracks by allowing more of the desirable Asian or

1    Jewish applicant and less of the undesirables and to provide

2    a fig leaf of a justification to enroll the support of alumni

3    members of that unpreferred group.

4            It happened before, and it's happening again.  It's

5    about as far, sadly, from incoherent as one could imagine.

6            But Harvard tells you it's incoherent to accuse

7    someone that it and others have done before.  What scofflaw

8    employers of in violation of Title VII have done typically in

9    the sex discrimination context and which sadly and perversely

10   makes sense.

11           Two plus two equals five again.

12           Your Honor, I've reached the end of my initial time

13   with you.  I'm going to come back again and tell you that

14   Asian applicants didn't deserve lower personal ratings.  Will

15   Harvard explain to all of us why they did, or will they hide

16   behind omitted-variable bias and unidentified unobservables

17   without telling us on what omitted unobservable variable

18   Asians do so much worse than not just white applicants but

19   African-American and Hispanic applicants, too?

20           The school support ratings, they're in the model.

21   All the ratings are in the model.  Every variable Card could

22   find could not make the racial penalty on Asians go away.

23   Harvard never once has tried to explain what's going on in

24   the personal rating with African-Americans and Hispanics.  We

25   know what's going on.  It's a preference just like there's a

1    penalty for Asians.

2          The Court, however, does not have the luxury of

3    silence.  For it to rule in favor of Harvard on Count I, it

4    must explain why Asians deserved lower personal ratings.

5          It's now Harvard's turn, finally, here at the end

6    of all things, to tell us why.

7          THE COURT:  I have three questions for you.  I want

8    you to answer all three of them in less than two minutes.

9          MR. MORTARA:  I can do it.

10         THE COURT:  I'm going to give you all three of them

11   so you can allocate your time.

12         To find for you, which is largely a statistical

13   argument you're making, must I find Harvard's witnesses not

14   credible?

15         MR. MORTARA:  No.

16         THE COURT:  That's number one.

17         Number two, what am I to do with the fact that you

18   haven't shown me any students that you think should have

19   gotten in instead of the non-Asian students that did get in?

20         And number three, what are we doing with *Goodman*

21   and its requirement --

22         MR. MORTARA:  I am ready.  I have *Goodman* to put up

23   on the screen.  I'll take the last one first, Your Honor.

24         The language you talked about from *Goodman* is up on

25   the screen now, Your Honor.  It is very clear from the

1    context that racial animus is here being used just as

2    interchangeably with intentional discrimination.

3         But I don't even need to get there.  The Supreme

4    Court held in *Gratz*, they found a Title VI violation in *Gratz*

5    by the University of Michigan when there was absolutely no

6    animus whatsoever.  That's a Supreme Court decision.

7         Decisions both before and after *Goodman*, including

8    *Croson* and *Adarand* say in the equal protection context, your

9    motives don't matter.  You don't have to have animus to make

10    out an equal protection violation.

11         As you know, the Supreme Court's incorporated those

12    equal protection concepts into Title VI, and that includes

13    cases that postdate *Goodman*, like *Cooper*, cited in our brief.

14    No court has ever said that Title VI bizarrely sits out in

15    the family of Section 1981, 1983, Title VII, Title IX, and

16    the equal protection as the one anti-discrimination law we

17    have in this country where you have to prove evil racist

18    intent.

19         *Goodman* certainly does not say that.  If it did say

20    that, Your Honor, it's been overruled by subsequent Supreme

21    Court precedent.  *Gratz*, no one said -- no one said the

22    University of Michigan had invidious intent.  And there was a

23    Title VI violation found in that case.

24         Your Honor's first question was do you need to find

25    Harvard's witnesses were not credible or lied?

1          Absolutely not, Your Honor.  Obviously we believe

2     Mr. Luby wasn't credible on the use of race in the personal

3     rating.  But I understood your question to be more general.

4     Absolutely not.  *Thomas* against Eastman Kodak said that.

5          There was a premise in your first question saying

6     our evidence was largely statistical.  I have to quibble a

7     little bit with you there.  I really like those new reading

8     procedures, OIR, and I know there's pieces of evidence I

9     didn't talk about that Your Honor has indicated are not

10    terribly persuasive to you.  But we are not running away from

11    them.  There are some emails and some jokes, including some

12    jokes you didn't let us put into evidence, that I think

13    support our case.

14          The second question is escaping me.

15          THE COURT:  You haven't showed me any students --

16          MR. MORTARA:  Sorry, Your Honor.  Because you told

17    us we didn't have to.  The answer to that one is you told us

18    that we didn't need to bring individual students in here and

19    prove their claims.

20          The *Segar* case from the D.C. Circuit is really

21    great on this.  It's true that circumstantial evidence can

22    give life and meaning, to breathe life into the statistics.

23    That's true.  But there is absolutely no requirement to bring

24    it.

25          We also gave you some anecdotal evidence.  We

1    showed you that ice skater.  Remember the ice skater with the

2    low personal rating and everything else was out of sight

3    about that Asian applicant, yet that person did not get in.

4              We don't need to do it.  *Segar* says we don't need

5    to do it.  The very premise of associational standing cases

6    is we don't need to do it.

7              Thank you, Your Honor.

8              MR. LEE:  May I proceed, Your Honor?

9              THE COURT:  You may.

10             MR. LEE:  Good afternoon.  As we did in our closing

11   argument after trial, Mr. Waxman and I are going to split the

12   closing for the next hour.  After I offer an introduction,

13   Mr. Waxman will address the intentional discrimination claim

14   and the claim that Harvard does not use race as more than a

15   plus factor.

16             I will then address the claim of racial balancing

17   and the race-neutral alternatives.  Although SFFA hasn't

18   addressed those claims, they are important claims and they

19   were tried and litigated and we think they should be

20   addressed.

21             Let me begin again by thanking the Court and the

22   courtroom staff for the time and careful attention you've

23   given to this case.  As the Court noted at the very end of

24   the trial, the issues raised in this case are incredibly

25   important, not only for the parties but also for the future

1          of higher education.  And of course those issues are

2          critically important to Harvard's health.

3                   And here with us in the courtroom today are the new

4          president of Harvard, Larry Bacow, Dean Fitzsimmons who you

5          know, and Director McGrath who you know.

6                   We have trials for a reason, Your Honor, as you

7          know.  And it's not a coincidence that Harvard asked for a

8          trial in this case.  We have trials because cases should be

9          decided on the facts and evidence elicited under oath, not by

10         unsupported accusation and vitriol directed at lawyers or

11         individuals.  We have trials because of facts and the truth

12         matter.

13                   Thirteen current and former Harvard employees and

14         administrators appeared in this courtroom and subjected

15         themselves to the crucible of cross-examination.  At the end,

16         we submit they left a singular and indelible impression.

17         They are good and dedicated people faced with the

18         exceptionally difficult task of selecting from an

19         extraordinary group of applicants in admitting a class of

20         students who are individually excellent and who collectively

21         form a diverse and robust community.

22                   They make those decisions, as Your Honor knows, as

23         a result of a long process involving many checks and

24         balances, and ultimately as a group of 40 after reviewing the

25         entire applicant's file and understanding the applicant

1    entirely.

2           The record of the trial that I was at is thousands

3    of pages and hundreds of exhibits.  But that collective

4    record demonstrates, we submit, that Harvard does not

5    discriminate against Asian-Americans or any other racial or

6    ethnic group; that Harvard does not consider race as more

7    than one among many factors in evaluating an applicant; that

8    Harvard does not and has not engaged in racial balancing; and

9    that it could not achieve its educational mission without

10   considering race as one of many factors in admissions

11   process.

12          Now, before we go into the claims in detail, I

13   would like to take a moment to discuss what is missing from

14   the record and answer Your Honor's third question to SFFA.

15          It is really remarkable.  The cases we have talked

16   to Your Honor about *Bakke*, *Grutter*, *Grace*, *Fisher*, *Fisher* 1,

17   *Fisher* 2.  They have those names because there was a

18   plaintiff.  There was an individual.  There was someone who

19   claimed to be discriminated against.

20          What you have is really remarkable.  No member of

21   SFFA testified.  Not a single one of its standing members

22   testified.  Not a single Asian-American applicant to Harvard

23   who was denied admission testified.  Not a single application

24   of any one of their standing members went into evidence.

25          And with the truly unexceptional -- truly

1    insignificant exception, and I'll explain why in a second, of

2    one file that its expert discussed, the plaintiff presented

3    nothing.  And when their expert presented that one file that

4    SFFA just referred Your Honor to, the expert conceded on

5    cross-examine that it did not prove discrimination.

6            Even after Your Honor in the middle of trial raised

7    the issue and invited the plaintiff to reconsider the absence

8    of any individuals who have been discriminated against, it

9    offered nothing.  In a case alleging widespread intentional

10   discrimination across multiple years, 160,000 applicants, the

11   plaintiff's failure to produce a single individual claiming

12   to have suffered as a result of that discrimination or a

13   single file reflecting a discriminatory outcome is truly

14   remarkable.

15           Now, there were fact witnesses who did testify, and

16   they showed just how and why Harvard's admissions system

17   works and why it complies with the law.  Just like the

18   testimony of the trial witnesses in *Grutter* described in the

19   *Grutter* opinion, those witnesses confirmed that Harvard

20   considers an applicant's race along with all other factors;

21   that Harvard does not seek to admit any particular number or

22   percentage of underrepresented minorities; and that the

23   extent to which race is considered in admissions, to quote

24   from the case, varies from one applicant to another.

25           Now, as a result of the absence of this proof, the

1   absence of any real-world proof that would bring to life

2   their allegations and accusations, their claim has become a

3   constantly moving target, which is why SFFA at the end of

4   their closing just now spent so much time trying to justify

5   their change in positions.

6           Let me give you two examples.  In opening

7   statement, the plaintiff claimed at the outset that Harvard,

8   Harvard's admissions office, bore intentional discriminatory

9   animus against some Asian-American applicants.

10          By closing, having failed to address any evidence

11  of animus, it retreated to the claim of, and I quote,

12  implicit or unconscious bias, and suggested it had crept into

13  the system.

14          Now, in the posttrial briefing and in the closing

15  today, recognizing that there was no proof of unconscious

16  bias from an expert or otherwise, the plaintiff argues that

17  because people in the United States stereotype

18  Asian-Americans, Harvard has a burden to show that it has

19  uniquely escaped the infiltration of that bias.

20          That's not the law, and Mr. Waxman will address it

21  specifically.

22          THE COURT:  Can I interrupt you?  You can put this

23  off to Mr. Waxman, if you want, later.

24          MR. WAXMAN:  Thank you, Your Honor.

25          MR. LEE:  It depends how difficult it is, Your

1    Honor.

2              THE COURT:  If one were to believe that there was

3    implicit bias or unconscious bias of some sort or another, is

4    there no remedy for that?

5              MR. LEE:  Your Honor, I don't think -- I have two

6    parts to that, and I think Mr. Waxman will address it

7    specifically.  Let me give you my answer and maybe his will

8    be better.

9              The first thing is on this record there's just no

10   proof.  And the concept of -- and I think Your Honor got this

11   even as it started to creep into the trial, precisely what

12   implicit or unconscious bias is.

13             It's not some easily defined concept.  The question

14   of whether things that might fall within someone's rubric of

15   unconscious or implicit bias might, might satisfy the intent

16   requirement is something that I don't think Your Honor needs

17   to decide.  It's something that can't be decided on this

18   record.  And the whole concept doesn't have sufficient

19   specificity to decide it in the abstract.

20             I think the important part here is to go to Your

21   Honor's first question to Mr. Mortara.  They do have to

22   proffer intentional discrimination.  That's the claim.  The

23   fact that the claim has evolved to where it is today says a

24   lot about the evidence at trial.

25             And it's not just, Your Honor, the claim that's

evolved.  It's the specifics of the claim.  Your Honor will
recall in opening, if I go to Slide 4 of our presentation,
the very first thing that SFFA said to the Court, to the
public, was that it was not alleging that Harvard
discriminates against Asian-American ALDC applicants.  Those
literally were the first words of the trial.

Why?  Because as we found out on cross-examination
of their expert, he was not claiming that Harvard
discriminates against Asian-Americans.  And I took him
through each category specifically.  It's on Slide 5.  He
agreed that Asian-Americans in those categories, if I move to
Slide 6, were actually admitted at higher rates than those --
than identical white applicants.  For legacy applicants, he
conceded on cross-examination the difference was
statistically significant.

It is very difficult to square that testimony or
that accusation of discrimination against some but not all
with an intentional discrimination case.

It's even harder, to go to Your Honor's question,
to square that with an unconscious bias or an implicit bias
case.  How does that work?  The plaintiff knows that, which
is why you heard what you heard in this closing.  What they
did is they have changed their theory 180 degrees.  They now
have claimed in their final filings that, oh, wait, actually
Harvard does discriminate against ALDCs, but they have a

1    problem.

2              First, it's just a 180-degree change in position.

3    The second is, if I take you to Slide 8, Professor

4    Arcidiacono testified that even taking into account any tip

5    given for being an ALDC applicant, Asian-Americans in these

6    categories are admitted at higher rates than white

7    applicants.  It is a concession that is inconsistent with the

8    intentional discrimination claim.

9              So, Your Honor, if I could, just on Slide 9s, let's

10   just compare what SFFA said when the trial started and what

11   it said last week.  When the trial started, Harvard did not

12   discriminate, according to them, against ALDCs.  They had to

13   say that because their expert actually conceded that ALDCs

14   were favored.  Asian-American ALDCs were favored.

15             Now, recognizing that that is a fatal flaw in their

16   argument, what do they say at the bottom?  Factually Harvard

17   does discriminate against ALDCs.

18             A 180-degree turn.  Recognizing that they have to

19   make these turns, change in theory, change in law, change in

20   facts, what did they do?  The same thing they did and I

21   mentioned to you at the closing three months ago, they

22   attacked the witnesses.  They attacked the lawyers.  They

23   attacked them in ways for which there's no justification.

24             So as we move into the specific claims, Your Honor,

25   let me start with important proof in the case that

1    Mr. Mortara didn't address, and that is Harvard's compelling

2    interest in achieving educational diversity and the benefits

3    of that diversity.  That's important because it is the

4    predicate for what Harvard's done.  It is a predicate for

5    what the Supreme Court has said.

6            So if I turn to Slide 10, the Supreme Court has

7    told us in *Fisher* 2 that once a university gives a reasoned,

8    principled explanation for its decision to pursue those

9    benefits, that decision on the compelling interest of

10   diversity gets some deference.

11           On this record, we submit that Harvard has supplied

12   a reasoned and principled explanation for its decision to

13   pursue the educational and community benefits of diversity.

14           Harvard's commitment to the benefits of diversity

15   and its articulation of those benefits, on Slide 11, can be

16   found in the mission of Harvard College.  It can be found on

17   Slide 12 in the report from President Rudenstine.  And most

18   recently, it can be found on Slide 13 in the report of Dean

19   Khurana's committee, adopted unanimously by the full faculty

20   of arts and sciences, concluding that that student-body

21   diversity, including racial diversity, is essential to

22   Harvard's pedagogical mission, pedagogical objectives, and

23   institutional mission.

24           Perhaps more importantly, Your Honor, this interest

25   in a diverse student body was reflected by the day devoted to

1    the testimony of the Harvard students themselves.  Your Honor

2    heard from several of those students.  You heard their own

3    stories and how they and their classmates have benefited from

4    living and learning from each other in a diverse community.

5           These students, these eight students who came to

6    testify and took the stand, are living proof that Harvard has

7    a compelling interest and we all have a compelling interest

8    in communities that are diverse and inclusive.

9           Let me now turn the podium over to Mr. Waxman to

10   turn to the intentional discrimination count.

11          MR. WAXMAN:  Good afternoon, Your Honor.  I'll

12   start first with the claim of intentional discrimination and

13   then cover the race is more than a plus factor count of the

14   complaint, which is not addressed in the closing argument but

15   is something that Your Honor needs to rule on.

16          THE COURT:  And I have some questions on that.  So

17   I would appreciate it.

18          MR. WAXMAN:  So the legal standard on intentional

19   discrimination, as Your Honor already adverted to, is pretty

20   straightforward.  It's the one that Your Honor stated in

21   denying summary judgment.  It's from *Goodman*, and it says

22   that to state a claim for intentional discrimination under

23   Title VI, the plaintiff, quote, must demonstrate that the

24   defendant discriminated on the basis of race, the

25   discrimination was intentional, and the discrimination was a

1    substantial or motivating factor for the defendant's actions.

2         There wasn't any dispute about that until SFFA

3    filed its first posttrial brief.  Before then, SFFA agreed

4    with the Court and with Harvard on two fundamental points:

5    number one, the plaintiff bears the burden to prove

6    intentional discrimination; and number two, the *Arlington*

7    *Heights* standard governs the inquiry.

8         Now, SFFA has now tried to change course on both

9    points.  Those new arguments are obviously inconsistent with

10   the Court's prior ruling, and they are incorrect.  But they

11   are also largely irrelevant, given the evidence adduced at

12   trial.

13        First, as to the burden.  SFFA's basic argument in

14   its posttrial briefs is that because Harvard considers race

15   in its admissions process, Harvard bears the burden to show

16   that its practices survive strict scrutiny.

17        But that argument doesn't distinguish between the

18   consideration of race in pursuit of diversity, which Harvard

19   does engage in, and the allegation in Count I that Harvard

20   discriminates intentionally against Asian-American applicants

21   relative to white applicants, which we vociferously dispute

22   and which would, in any event, have nothing to do with the

23   pursuit of diversity.

24        SFFA's claim in Count I depends on that second

25   disputed proposition, and SFFA bears the burden to prove it.

1    It can't evade its burden to prove intentional discrimination

2    against Asian-American applicants relative to white

3    applicants simply because it's undisputed that the admissions

4    process considers race as a plus factor in other ways.

5         This level of confusion in their part -- and maybe

6    it's just confusion -- was reiterated just now when my friend

7    cited the Supreme Court's decision in *Gratz* as evidence that

8    intentional discrimination doesn't require intentionality.

9         Let's be very clear.  *Gratz* was not a case about

10   intentional discrimination.  *Gratz* was a case in which the

11   University of Michigan undergraduate program was concededly

12   using race pursuant to a diversity rationale, and the Supreme

13   Court held that it failed strict scrutiny.  It had nothing to

14   do with any burden to prove intentional discrimination.

15        Now, second, as to *Teamsters*.  There are several

16   reasons why it's essentially irrelevant whether *Teamsters* or

17   *Arlington Heights* applies.  One is that no one disputes that

18   SFFA can seek to rely on aggregate statistical evidence as

19   part of its claim.  So the only serious question is whether

20   the Court should apply the *Teamsters* burden shifting

21   framework in evaluating that statistical evidence.

22        Even if that framework did apply, and even if

23   Dr. Arcidiacono's analysis were reliable and stark enough to

24   establish a prima facie case of intentional discrimination,

25   which as I'll explain it certainly is not, even in that

```
 1       event, Harvard's only burden in response would be one of
 2       production, to put in evidence a competing analysis that
 3       calls Dr. Arcidiacono's into question.  We've obviously done
 4       that.
 5               So at the end of the day under Teamsters or
 6       Arlington Heights, the Court still has to resolve the
 7       question whether Harvard intended to discriminate, and it
 8       still has to do that by considering all the evidence,
 9       nonstatistical and statistical.  And under either standard,
10       statistical evidence isn't enough unless it is far, far more
11       stark than anything here.
12               The Supreme Court cases that -- the Supreme Court
13       subsequent later cases and circuit court cases have talked
14       about without exception are Yick Wo and Gomillion, which are
15       cases in which the disparity was so incredible, they rezoned
16       the City of Tuskegee to exclude all black people and include
17       all white people, that the Court said in that rare instance
18       the proof of a statistical disparity can in and of itself be
19       evidence of intentional discrimination.
20               THE COURT:  What am I to do with the statistical
21       analysis that shows a penalty on the personal rating?  Or if
22       you're going to get to that, keep going.
23               MR. WAXMAN:  It would be a criminal default for me
24       not to get to it, given the emphasis.  I'm happy to answer
25       any questions.
```

1          THE COURT:  You can go in your orderly way.  They

2    have the no-victim problem, but you guys have the personal

3    rating.

4          MR. WAXMAN:  Absolutely.  What I want to say here

5    is that even if the Court were to credit Dr. Arcidiacono's

6    methodology and accept his model, that would not carry SFFA's

7    burden under Count I.

8          Now, let me start -- I'll talk about the

9    nonstatistical evidence and then I'll talk about the

10   statistical evidence.

11         SFFA has told this Court in its posttrial

12   briefings, and it said as much during the trial, that it

13   views its nonstatistical evidence of intentional

14   discrimination as "not particularly important."

15         That is an incredible concession.  SFFA received

16   more than 100,000 pages of documents.  It took dozens of

17   depositions of witnesses of its choice.  By its own

18   admission, it has little, if anything, to show for that.

19         What the evidence showed is that Harvard engages in

20   a dedicated effort to recruit students from all states,

21   across all socioeconomic strata, and of all races.  It showed

22   that Asian-Americans are one of the five demographic groups

23   targeted by the undergraduate minority recruitment program.

24   It showed an admissions process that is driven by open

25   discussion among 40 people, a process in which every

admissions officer has complete access to every application
file, a process in which the ratings that the initial readers
assign are not used to decide who gets in and who does not
but rather as an initial shorthand reflection of some of the
information that admissions officers consider in making their
decisions.

You heard live testimony from eight members of the
admissions office.  SFFA says that those witnesses can't be
believed, that there is no reason for Your Honor to believe
them.

Each described the same process.  They consistently
explained that they based their decisions on the full range
of information that is available to them.  They consistently
explained that everything in the application file matters,
with race as one of many factors that is considered.  And
they consistently explained that they have never seen any
evidence of bias or discrimination in the process.  That is
the nonstatistical record in this case, which is why SFFA
wishes that it were "not particularly important."

Now, SFFA keeps telling us that the law doesn't
require it to produce smoking-gun evidence.  That is true,
But it is equally true that the absence of any direct
evidence of discrimination is a powerful indication of the
absence of discrimination especially in a process that has so
many participants as Harvard's does.

1              It's not just that SFFA has failed to supply a

2      smoking gun.  They failed to provide evidence of a single

3      victim of discrimination.  They have failed to find a single

4      current or former employee who has witnessed even one

5      instance of discrimination.  In a case in which SFFA says

6      that scores of Asian-American applicants are denied admission

7      each year because of intentional discrimination, where is the

8      evidence?

9              Well, SFFA's expert, who said that he read 480

10     files and many more summary sheets, discussed, as we heard

11     again today, the figure skater, a single application that in

12     his view might suggest discrimination because a qualified

13     Asian-American candidate was denied admission.

14             As Your Honor knows, literally thousands of

15     students with perfect scores and/or perfect GPAs are denied

16     admission every year.  Applicants of all races with

17     compelling stories and competitive credentials are not

18     admitted.  Tellingly, SFFA asked no Harvard witness, not a

19     single one of them, about that rejected applicant or any

20     other.

21             So what does SFFA point to?  Pardon me.  I'm on

22     what I hope is the back end of the flu.

23             THE COURT:  Is it your Marco Rubio moment?

24             MR. WAXMAN:  Excuse me?

25             THE COURT:  Is it your Marco Rubio moment?

1          MR. WAXMAN:  So first of all, SFFA says that

2    Harvard discriminates in its recruiting practices against

3    Asian-Americans who live in what the admissions office calls

4    Sparse Country.

5          Here are the relevant facts.  For the classes of

6    2014 to 2016, Harvard sent recruiting letters to

7    Asian-American students across the country who scored lower

8    on the PSAT than the white students who received those

9    letters.  For the classes of 2017 through 2019, in most

10   states Harvard sent recruiting letters to Asian-American and

11   white students at identical thresholds.

12         In those three years, in the Sparse Country states,

13   Harvard sent recruiting letters to white students who

14   received lower PSAT scores than Asian-Americans, but at the

15   same time Harvard applied an identical cutoff on the ACT for

16   sending recruiting letters to Asian-American and white

17   students in Sparse Country.  And as Your Honor heard, the ACT

18   is by far the dominant test in those states.

19         That is their grand recruiting conspiracy.  There

20   was no evidence that the difference in the PSAT cutoff for

21   those three years was intentional, there was no evidence that

22   it was a result of unconscious bias, and there was no

23   evidence that it mattered.  Harvard does not provide an

24   admission tip to applicants who receive recruiting letters.

25         Now, next let me address the work of Harvard's

1    Office of Institutional Research.  SFFA says that OIR's work

2    provides key support for its intentional discrimination claim

3    and that Dean Fitzsimmons's reaction to OIR's work

4    establishes deliberate indifference to discrimination.  Those

5    assertions bear no relation to reality.

6            You'll recall that initially SFFA focused much of

7    its attention on a document prepared by Mark Hansen, who you

8    heard.  This is Plaintiff's Exhibit 9.  But at trial,

9    Mr. Hansen explained that the document comprised his working

10   notes, that he doubted he ever shared it with anyone,

11   including his boss, Ms. Driver-Linn, and certainly not Dean

12   Fitzsimmons, which is unsurprising because it's full of

13   errors.  The subtitle is "Subtitle."  The date is wrong by a

14   year.  Entire pages of these working notes, including notably

15   the conclusion page, are blank.

16           For her part, Ms. Driver-Linn testified she'd never

17   even seen Exhibit 9 before this litigation and certainly

18   didn't show it to Dean Fitzsimmons.

19           And yet, unconstrained by the record, in its

20   posttrial briefings SFFA continues to insist that Dean

21   Fitzsimmons saw this document.  In its finding of fact 118,

22   SFFA says, "OIR gave this report to Fitzsimmons."

23           In its response, SFFA doubles down, claiming in

24   Paragraphs 175 through 177 that "Fitzsimmons was shown

25   Exhibit 9 before this litigation, as were Driver-Linn and

Bever, and that it "provided Fitzsimmons with extensive statistical evidence that Harvard penalizes Asian-Americans."

Not only does SFFA have no evidence to support those assertions, the evidence at trial flatly contradicts them.  Now, OIR did show Dean Fitzsimmons the four models that so preoccupied us all at trial to simulate what the admitted class would look like under certain oversimplified admissions practices.

As Mr. Hansen explained those models, which were his very first effort ever at using statistical regression, were not meant to show the effect of any given factor in the admissions process.  They omitted far too many factors to do so.

And as Your Honor heard, the fact that the racial composition of the simulated class so closely matches that of the actual class signified nothing.  It's simply a function of the circularity of the model that Mr. Hansen used which used the racial composition of the actual class in order to predict the racial composition of the hypothetical class.

For his part, since this is all about Dean Fitzsimmons, Dean Fitzsimmons testified that his takeaway from this was simple.  The more factors you add to a model of the admissions process, the more closely you resemble reality.  He certainly did not view OIR's work as evidence of discrimination.

1          SFFA then invokes the memorandum that OIR sent Dean

2     Fitzsimmons about low-income applicants, claiming that the

3     dean did nothing in response.

4          Once again, that's not true.  In response to that

5     memorandum, the dean asked OIR to look into whether

6     low-income Asian-American applicants received a tip.  The

7     answer was, yes, a low-income tip as large or larger than the

8     one given to applicants of any other race.  The dean

9     explained to you under oath why he was reassured.

10          Your Honor, this is an intentional discrimination

11     case.  Why on God's green earth, in a system that intended to

12     discriminate against Asian-American applicants, would the

13     dean ask for, receive, and then be reassured by data that

14     showed him and he was told that Asian-American applicants

15     receive perhaps the most significant low-income tip of any

16     group?

17          In other words, the reason Dean Fitzsimmons didn't

18     sound the alarm in response to the documents, as SFFA says he

19     should have, is that he didn't understand the documents even

20     to show smoke, let alone a fire.

21          Now, in its posttrial brief the plaintiff has

22     offered an explanation for how to interpret the chart of

23     coefficients that are attached to the low-income memo.  On

24     their face, P28 offers no such explanation.  There is no

25     evidence from which the Court can infer that Dean Fitzsimmons

should have understood those charts as SFFA claims they were
meant to be understood.  Even Ms. Bever, who was the deputy
director of OIR and was involved in the creation of this
document, disagreed that SFFA's interpretation -- that is,
Dr. Arcidiacono's interpretation -- was the correct one.
That is on pages 234 to 236 of the transcript of October 18.

Even if SFFA were correct that Dean Fitzsimmons
should have done more in response to OIR's work, that would
get SFFA no closer to proving intentional discrimination.
Even if this Court were to import the deliberate indifferent
standard from Section 1983 cases into the Title VI context,
SFFA would still have to show that the dean actually knew
that the admissions office was actually discriminating but
chose to do nothing.

Now, we've seen on the chart the coefficient that
Mr. Mortara showed you with a negative 0.37 attached to
Asian.  He says that showed Dean Fitzsimmons, who apparently
taught introductory statistics in the 1960s, that this was
discrimination.  But Dean Fitzsimmons wouldn't have learned
much about statistics if he thought that that showed
discrimination.  It doesn't.  It shows a weak correlation
with between Asian-American ethnicity and outcomes in a very,
very incomplete model.  Just as, Your Honor, OCR found a
disparity between Asian-Americans and white applicants, and
yet doing the work of -- doing the heavy work of auditing the

```
 1    files found no evidence of discrimination.

 2              SFFA did not argue, nor could it, that the dean

 3    actually knew that the admissions office was actually

 4    discriminating.  Its theory, at most, is that OIR's work put

 5    Dean Fitzsimmons on notice of the possibility of

 6    discrimination.  Under the case law, a failure to investigate

 7    a possibility of discrimination, even if proven, which it was

 8    not, does not establish intentional discrimination.

 9              So now let me turn to another focus of what has

10    morphed into SFFA's case about intentional discrimination,

11    which is stereotypes.

12              SFFA says that Harvard, through no fault of the

13    good people in the admissions office, are engaging in anti

14    Asian-American stereotypes.  As Mr. Lee observed earlier,

15    this is the latest in SFFA's progression of theories of

16    discrimination in search of facts.  But here again, there is

17    just no evidence of stereotyping.  None apparently that SFFA

18    could find in the hundreds of application files and summary

19    sheets that were produced.

20              That's why SFFA spent so much time in its posttrial

21    findings about a handful of comments that the Office of Civil

22    Rights found in files that it reviewed in the late 1980s.

23    It's why its posttrial briefs cite a government report in

24    multiple law review articles for the proposition that

25    stereotyping occurs in the world.  That's why SFFA quotes at
```

1    length in its posttrial filings, and in the present tense,

2    from an article that Margaret Chin prepared 36 years ago,

3    without bothering to acknowledge Ms. Chin's testimony in this

4    very court about the immense strides that have been made

5    since then, not just generally but at Harvard in particular.

6         SFFA did all that because it has no actual evidence

7    of stereotyping in Harvard's admissions process.  It points

8    to a handful of comments in a single docket binder that

9    itself contains handwritten notes with respect to between

10   four and 5,000 applicants.  It deemed two of those notes

11   important enough to feature at trial.

12        In one comment, the applicant is noted as "very

13   quiet."  And in another comment, "quiet and strong."  Those

14   two applicants cherry-picked out of this binder happened to

15   be Asian-American.

16        What SFFA did not do was to ask Dean Fitzsimmons,

17   or for that matter, any of the other seven witnesses from the

18   admissions office, about other comments in the same docket

19   binder that describe white, African-American, and Hispanic

20   applicants as "shy," "understated," "quiet."  There is no

21   reason to believe that any of these notations are anything

22   other than accurate characterizations of the applicants.

23        I guess I'd better get going.

24        When OCR did its review, it noted that certain

25   comments that might be characterized as stereotypical had,

quote, actually originated from the interviews, teacher or counselor recommendations, or self-descriptions given by the applicant.  But when it went on to examine the files, it found no evidence of discrimination by stereotype.  Here SFFA hasn't even tried to tie any supposed stereotypical language to any adverse outcomes.

The charge that Harvard is engaged in racial stereotyping, a practice that Dean Fitzsimmons characterized as aberrant and deeply offensive, is utterly unsupported by the record.

Let me now turn to the statistical evidence.  And for the sake of relative simplicity, I'll focus on two issues, the descriptive statistics and the personal rating.

SFFA has given up lots of descriptive statistics showing differences in rating or admission outcomes by race, generally focusing on the academic index deciles, which just compare applicants with similar high school grades and SAT scores.

Those statistics don't try to analyze the effect of a given factor controlling for others.  That's what a regression does.

Because SFFA's statistics don't control for the many noneconomic factors that matter so much in the process, or even for the academic factors beyond high school scores, they tell you very little.  To a very significant degree, the

1    descriptive statistics just reflect Harvard's persistent and

2    wrong-headed view that the admissions process is all about

3    high school grades and test scores.

4            Let's turn now to the regression analysis.  The

5    main dispute having to do with the regression analysis, the

6    only one we really heard today, has to do with the personal

7    ratings.  You have heard sworn testimony in which admissions

8    officers sat in that witness chair and testified over and

9    over again that they do not consider race in assigning the

10   personal rating.

11           Here are just a few of the key pieces of testimony.

12   Their testimony was consistent and credible, and nothing in

13   the class of 2023 reading procedures is to the contrary.

14           Those procedures, as Director McGrath testified,

15   simply codify Harvard's consistent practice.  So the real

16   question in this case as to the personal rating, Your Honor,

17   is whether there is enough statistical evidence that race

18   is -- race per se is considered in the personal rating for

19   Your Honor to conclude that those admissions officers are all

20   either lying or mistaken.  The answer to that question is no,

21   and it is not close.

22           First, recall that OCR found a very similar

23   difference between the average personal rating of

24   Asian-American and white applicants.  OCR did not find,

25   nonetheless, on a further review of the files that race was

1    an element of the personal rating.  It told you -- it stated

2    in its report that it went and did the actual file review to

3    determine whether racial differences observed in the rating

4    factors could reflect racial bias.  It did the work that SFFA

5    either didn't do or didn't tell us about, and it issued a

6    report concluding that the answer was no.

7            SFFA is relying on Dr. Arcidiacono's regression

8    model of the personal rating.  But as Dr. Card explained,

9    there is a difference between correlation and causation.

10   Regression estimates can't measure causal effects unless the

11   model controls for all factors that are correlated with a

12   variable of interest and that affect the outcome.

13           A regression just spits out a number.  And if the

14   regression is missing information that could help explain the

15   outcome, then the number that the regression spits out simply

16   doesn't tell you whether that factor is actually causing the

17   estimated effect.  That's what Dr. Card showed you with his

18   whiteboard example about how age and salary affected a

19   worker's likelihood of retirement.

20           Now, SFFA, in its posttrial briefings, makes what

21   is really an astonishing assertion, which is the assertion

22   that if the effect that is estimated by a regression is

23   statistically significant, then it must be a genuine causal

24   effect.

25           I can't even begin to tell you how wrong that is.

```
 1        If a regression is missing relevant factors, it may estimate
 2        statistically significant effects that are not genuine causal
 3        effects.  Nobody versed in statistics could possibly agree.
 4        I am certain that if Dr. Arcidiacono were on that stand
 5        today, he'd tell you how wrong it is.
 6              So now back to the personal rating.  Everyone
 7        agrees that there are many, many factors that are not
 8        included in the model that affect the personal rating.
 9        Indeed, the factors in Dr. Arcidiacono's model explain only
10        29 percent of the variation in the personal rating.
11        71 percent of the information that goes into determining what
12        the personal rating would be is unobserved.  It is not
13        available in the data.
14              The question for Your Honor with respect to this
15        point is whether the negative effect that is estimated by
16        Dr. Arcidiacono's model can be attributed to those factors,
17        the 71 percent that is outside the record.
18              SFFA says no.  And the reason it gives is that
19        Asian-American applicants are supposedly stronger than white
20        applicants on the factors that are in the data that affect
21        the personal rating.  If that's true, SFFA says, it's fair to
22        assume that they are also stronger on factors outside the
23        data.  And if that's true, then the negative estimate that
24        Dr. Arcidiacono's model produced may not be attributable to
25        the 71 percent of factors that are outside the data.
```

1          The problem with this entire hypothesis of

2     Dr. Arcidiacono is that SFFA is wrong about the premise.  The

3     applications submitted by Asian-American applicants are not

4     stronger than those of white applicants on the factors in the

5     data that affect the personal rating.  As Dr. Card showed,

6     precisely the opposite is true.  White applicants on average

7     scored higher than Asian-American applicants on the school

8     support ratings.  The same was true for the alumni ratings.

9          And Dr. Card showed the very same thing for the

10    combination of all non-academic factors in the model.  And he

11    did it twice, both with a slide with the personal rating and

12    the ALDC characteristics included, and then with a slide with

13    those two things excluded.

14          The reason that Dr. Arcidiacono obtained a contrary

15    result was because he removed the ALDC applicants who are

16    mostly white and indeed are many of the very strongest white

17    applicants.  And by larding into his model academic data,

18    even though the personal rating reflects non-academic

19    factors, not academic factors, the Court -- in answer to

20    Mr. Mortara's rhetorical challenge here, the Court doesn't

21    have to find the reason, as if there is the reason, that

22    these Asian-American applicants in the database received

23    marginally lower personal ratings on average.  It just has to

24    find that SFFA has failed to prove that the cause of this

25    disparity was racial bias.  When one after another admissions

```
 1    officer testified that they don't consider race, and when, as
 2    Dr. Card explained, Dr. Arcidiacono's model of the personal
 3    rating didn't come close to proving a causal effect of race.
 4           Now, one last point on the personal rating.  SFFA
 5    keeps saying, as if repetition will make it true, that if the
 6    personal rating is somehow affected by race, that it has to
 7    be removed completely from the model.
 8           Dr. Card explained in detail why that isn't right.
 9    Even if the personal rating were affected to some degree by
10    race, it nonetheless captures a tremendous amount of
11    information that isn't affected by race and that is otherwise
12    unobservable, like applicant essays, for example, or
13    recommendation letters other than the two teacher letters and
14    the guidance counselor letters.
15           So even if a hypothetical situation in which a
16    portion of the personal rating could be fairly attributed to
17    racial bias, that is the marginal effect that Dr. Arcidiacono
18    found, the right thing wouldn't be to throw out the personal
19    rating entirely, it would be just to take out the part that
20    is supposedly affected by race.
21           And as you saw when Dr. Card adjusted the profile
22    ratings from that way, he found again no evidence of bias
23    against Asian-American applicants.  That is the analysis that
24    SFFA really doesn't want you to think about, which is why
25    they keep saying incorrectly that the only option is to take
```

1    the rating out.

2           Their exclusion of the personal rating is just

3    emblematic of the consistent difference between their

4    analysis and ours.  Harvard's analysis tries to model the

5    actual admissions process, and they don't.  Their preferred

6    model excludes the ALDCs, fully 30 percent of the admitted

7    students.  It ignores factors that demonstratively matter to

8    the admissions outcomes, like the staff interview, parental

9    occupation, intended career, and of course the vast

10   information that is reflected in the personal rating.

11          By contrast, Harvard's analysis includes the data

12   that SFFA wishes to ignore, although the admissions committee

13   considers.  It includes the applicants that SFFA wishes to

14   ignore, and its faithfulness to the process leads to a more

15   reliable measure of the effective race.  That analysis shows

16   that race has no effect on the admission of Asian-American

17   applicants relative to white applicants.

18          That was true, as Your Honor saw in Dr. Card's main

19   model, which I've just described.  It is true when you allow

20   the effects of the ALDC characteristics to vary by race and

21   vice versa, which SFFA insisted should be done.  Same

22   results.  It's true when you exclude recruited athletes,

23   which are -- SFFA said somehow their inclusion biases the

24   result because for athletes things like academics don't

25   matter that much.  He excluded the recruited athletes, same

```
 1    result.
 2             And it's true when you modify the profile ratings
 3    to remove the supposed effects of race, that is the marginal
 4    effects that Dr. Arcidiacono found when modeling the factors.
 5             So to sum up, even if in theory an intentional
 6    discrimination case could be based only on statistics, a
 7    circumstance that is reserved under governing case law not
 8    for any case in which some expert can come up with a
 9    statistically significant effect, but for exceptionally stark
10    cases like Yick Wo and Gomillion, the statistical evidence in
11    this case doesn't even establish a correlation between
12    Asian-American ethnicity and admissions outcomes, much less
13    that Harvard intentionally discriminates against
14    Asian-American applicants.
15             So in my remaining three to four minutes, I'll
16    address the more than a plus factor count.  Again let me
17    start by summarizing the law, which is largely undisputed, at
18    least in its broad outlines.  I've displayed the key points
19    on the slides here.
20             The Supreme Court has held that a university may
21    consider race only as a plus in a particular applicant's file
22    without insulating the individual from comparison with all
23    other candidates for available seats.  It's held that when
24    using race as a plus factor, a university's admissions
25    program must remain flexible enough to ensure that each
```

applicant is evaluated as an individual, not in a way that
makes the applicant's race or ethnicity the defining feature.

And the Court has forbidden, quote, mechanical
predetermined diversity bonuses based on race or ethnicity,
but conversely, it's made clear that race can make a
difference as to whether an application is accepted or
rejected.

The evidence in this case showed that Harvard's
consideration of race satisfies those requirements in every
respect.  Admissions officers took the stand one after
another, and they testified that they consider race as only
one among many other factors.  They don't award any fixed or
formulaic preferences, and they consider race in an
individualized way in the context of each applicant's life
story.

SFFA tries to support its contrary argument by
relying on statistical evidence.  But let's look at the full
story on those statistics, which are essentially undisputed.

First, the statistics show that knowing an
applicant's race tells you almost nothing about whether he or
she will be admitted.  I'm sure Your Honor -- well, I'm not
sure.  In light of Your Honor's recent labors, maybe you
don't remember the slide.

But then that takeaway is if you know the
applicant's race and nothing more, you can explain 2/10 of

1 percent of the probability that that person will be
admitted.  That is an incredible number, and it proves that
race is anything but the defining feature of the admissions
process.

Secondly, the statistics show that for highly
competitive applicants who would be on the bubble for
admission, no matter what their race, any number of factors,
including but by no means limited to race, have a meaningful
effect.

To understand why, recall again Dr. Card's
retirement example.  If you're 40, growing a year older isn't
going to significantly affect your likelihood of retirement.
If you are 78, the same is true, you're probably going to
retire anyway.  If you are 67 or 68 and right on the bubble
of retirement, then the additional year may mean a lot.  And
the same is true for admission to Harvard.

Here is the graph that Dr. Card used, showing that
there are basically no applicants who are assured of
admission to Harvard.  There are lots of applicants who
effectively have no chance.  There are about 25 percent who
are, as he called it, on the bubble.  That is, given the
constellation of the strengths in their application,
competitive enough that any one additional factor can push
them over the top, it's for those people that race can and
does have a meaningful effect and so can many other factors.

1          That's shown by the graphs on the next slide.  For

2    most applicants, race has no effect whatsoever on their

3    likelihood of admission.  It has a meaningful effect only for

4    candidates who would be competitive for admission no matter

5    what their race.  And for those candidates, the effect of

6    race isn't disproportionate to the effect of other factors

7    like academic excellence, extracurricular excellence, or

8    excellent personal qualities.

9          Every additional factor has a large effect for

10   highly competitive candidates.

11         Now, SFFA likes to emphasize that in the aggregate

12   the consideration of race significantly increases the number

13   of African-American and Hispanic students at Harvard.  That

14   is true.  That is a feature of the system, not a bug.  It's

15   not only permitted by the Supreme Court's jurisprudence, it's

16   expressly envisioned by it.

17         The Supreme Court recognized in *Fisher* 2 that race

18   can "make a difference to whether an application is accepted

19   or rejected."  It raised that the whole point of considering

20   race is to increase the admission of minority students who

21   otherwise "might not be represented in meaningful numbers."

22         Indeed, the Court in *Fisher* pointed favorably to

23   the fact that the consideration of race in that case caused a

24   54 percent increase in Hispanic candidates and 94 percent

25   increase in African-American candidates enrolled through the

1    University of Texas's holistic review program, an effect the
2    Court called "meaningful if still limited."
3            And in *Parents Involved*, a case that SFFA loves to
4    invoke, the Court pointed favorably to the fact that in
5    *Grutter*, consideration of race was necessary to achieve
6    diversity because doing so tripled minority enrollment.
7            I'm ready to turn the podium over to the marvelous
8    Mr. Lee.
9            MR. LEE:  Your Honor, let me turn to the claim that
10   Harvard engages in racial balancing.
11           Again, as Mr. Waxman did in each of the claims, let
12   us set out what the law is.  In Slide 48, we have what the
13   Supreme Court explained that a university is not permitted to
14   define diversity as some specified percentage of a particular
15   group merely because of the race or ethnic origin of the
16   group.  But the Court also explained that some attention to
17   numbers without more does not transform a flexible admissions
18   system into a rigid quota.  The evidence shows that Harvard
19   complies with just this longstanding precedent.
20           At Slide 49, each and every admissions officer who
21   testified consistently that there are no targets, there are
22   no quotas, on Slide 50.  There are no floors on Slide 51.
23   And Dean Fitzsimmons confirmed that for the entirety of the
24   time he's been there.
25           That testimony is also supported by the statistical

evidence, largely uncontested, which shows meaningful

year-to-year differences in the racial composition of

Harvard's admitted and matriculating classes.

The plaintiff, Your Honor, disputed none of this,

not today in closing, not in the first closing, and not

during the course of the trial.  To remind Your Honor, their

expert had an opinion on racial balancing in his report.  He

did not offer it.  He did not offer it at all, or any other

opinion.

So having no expert opinion, what does SFFA rely

upon?  It relies upon the recruitment letters for Sparse

Country, which Mr. Waxman has already addressed, and I'm not

going to reiterate the chronology of those letters.

And the one-pagers.  So let me talk really quickly

about the one-pagers.  At Slide 56, Your Honor, we have the

different categories that the one-pagers include.

There is, as Your Honor knows, much more

information than just race.  They include information on

gender, geography, intended major, legacy status, residency,

and financial aid.  They're used to keep a rough tab or rough

finger on how the composition of the tentatively admitted

class compares to that of prior classes across all of these

different dimensions.

Now, the plaintiff suggests that the fact that

these one-pagers were created as key milestones in the

1    admissions cycle is evidence that too much attention is being

2    paid to the numbers.  It is not.  It is not surprising that

3    the dean and director of admissions want to be aware if there

4    is a dramatic drop-off in the diversity of the class in any

5    dimension.

6            That's exactly the kind of attention to numbers the

7    Supreme Court expressly held does not transform a flexible

8    admissions system into a rigid quota.  And if Your Honor

9    considers the *Grutter* decision, you will see that the dean of

10   admissions was receiving daily one-pager reports during the

11   height of the admissions season in exactly the same way that

12   Harvard does.

13           As Your Honor has heard, the primary purpose of the

14   one-pagers is to ensure that Harvard, a residential college

15   with a fixed number of beds, does not admit more students

16   than it has room for.  The yield rate, the percentage of

17   admitted students who then decide to come to Harvard, varies

18   by categories, and the category is listed on the one-pagers.

19           If the tentatively admitted class has more students

20   than the prior year in a category with historically lower

21   yield rates, the dean knows there is room to admit a few more

22   students.

23           Conversely, if a tentatively admitted class has

24   more students in groups with historically higher yield rates,

25   the dean knows that fewer overall students can be admitted.

1           This has simply nothing to do with racial

2    balancing.  That's why the plaintiff's expert offered no

3    opinion on racial balancing.  That's why he didn't contest

4    Dr. Card's presentation on racial balancing.  The proportion

5    of African-American students, Hispanic-American students, and

6    Asian-American students, as you can see from Slide 57, has

7    steadily risen over several decades.  And those percentages

8    have varied significantly from year to year.  That is

9    anything other than racial balancing.

10           Now, the final claim concerns race-neutral

11   alternatives.  Again the law.  The Court has been clear that

12   universities need not, and I quote, "exhaust every

13   conceivable race-neutral alternative to a race-conscious

14   admissions process."

15           The burden on us in this circumstance is to show

16   that the race-neutral alternatives that are both available

17   and workable would not suffice to achieve the diversity and

18   the educational objectives of Harvard.

19           Critically, the Supreme Court has said, and we

20   quote it on Slide 59, that the university does not need,

21   cannot be forced to choose between maintaining its reputation

22   for academic excellence and fulfilling its equally important

23   commitment to provide educational opportunities for members

24   of all racial groups.

25           The evidence shows no combination of race-neutral

practices would allow Harvard to achieve a comparably diverse
class without compromising the academic excellence of the
class.

That is precisely what the Smith committee
examined.  They looked at the proposed alternatives more than
Mr. Kahlenberg suggested.  They looked at what happened when
these proposed alternatives were implemented.  They looked at
the history of alternatives like dispensing with early action
or increased financial aid and what happened.  They looked at
the literature and they evaluated the effect of those
alternatives:  an intellectual excellence at Harvard, the
broader excellence at Harvard in many dimensions, and the
diversity of the class.

What did the plaintiff offer in response?  Just
Mr. Kahlenberg.  Mr. Kahlenberg testified that the committee
considered the right race-neutral alternatives.  He testified
that the committee considered them according to the right
criteria.  In the end, he just disagrees with the judgment of
the committee.

Now, although he didn't do it, the plaintiff
attacks the process.  And I quote this because I think it's
unfair.  They describe the committee's work or composition as
almost comical.

You heard Dean Smith, Dean Khurana, Dean
Fitzsimmons, collectively a group of people with nearly five

1    decades of experience in university administration and

2    admissions.  We think that it's clear that they didn't

3    deserve the vitriolic attack that their work is almost

4    comical.

5         Compare that to Mr. Kahlenberg, who had never been

6    in university admissions, who had never implemented a

7    minority recruitment program, who had never implemented

8    financial aid program, who had never been retained by a

9    college or a university to consult on a race-neutral

10   alternative.

11        Mr. Kahlenberg, who was paid to consult on the

12   drafting of the complaint.  Mr. Kahlenberg, who the day after

13   the complaint was filed before there had been a single

14   document produced, a single deposition, a single expert

15   report, went on Fox News and pronounced judgment on Harvard,

16   a judgment that he stuck to.  And his judgment was that there

17   are race-neutral alternatives that wouldn't compromise the

18   academic integrity of Harvard and the diversity of Harvard.

19        Mr. Kahlenberg, as you now know, has vastly

20   different conceptions of what the academic excellence is that

21   is the core of Harvard's mission, and he has a radically

22   different view of what diversity is and should be at a

23   university.

24        On academic excellence, he had a very narrow set of

25   simulations based only upon test scores and GPAs.  And as

```
 1        Your Honor knows, those are not the drivers for the
 2     composition of the Harvard class.  The Harvard admissions
 3     officers consider much more.
 4              Dr. Card showed that if you took Mr. Kahlenberg's
 5     alternatives and other alternatives, you would significantly
 6     reduce the number of students on campus with academic ratings
 7     of 1 or 2.  You would significantly reduce the academic
 8     excellence of the class.
 9              Mr. Kahlenberg's definition of what is racially
10     diverse and what is acceptable as racial diversity was
11     equally off the mark.  Every one of his complicated
12     alternatives and some of his alternatives, as Your Honor
13     knows, are based upon assumptions that are just not --
14     they're just not based in reality -- show a drop in the
15     proportion of African-American students on campus from 14 to
16     10 percent.
17              Now, that's not a drop of 4 percent, as they
18     suggest to you in their filings.  That's a drop of
19     30 percent.  The plaintiff is confusing a drop, a percentage
20     drop with absolute percentage points.  A drop from 14 percent
21     to 10 percent of the African-Americans on campus would reduce
22     the number of African-Americans by 320.
23              How does Mr. Kahlenberg and SFFA address that?
24              MR. MORTARA:  Your Honor, we're five minutes over.
25     As long as I get them, I'm fine.
```

1          THE COURT:  You are over.

2          MR. LEE:  I'm close.  Can I have three minutes?

3          MR. MORTARA:  Can I have eight, Your Honor?

4          THE COURT:  Do you really need all eight?

5          MR. MORTARA:  I probably won't, Your Honor, but

6    this also happened in opening.  The Harvard rules for Harvard

7    and SFFA rules for SFFA gets a little tiresome.

8          THE COURT:  You can have eight.  I'm going to let

9    the Amici go before you go, though.

10          MR. LEE:  I'm not even going to dignify the

11   suggestion there have been different rules for Harvard and

12   for SFFA with a response.  It's not entitled to one.

13          How did they respond?  They say that a 30 percent

14   decrease in number of African-Americans is a slight decrease.

15   That's their response to you.  But the Smith committee told

16   you it's not slight.  More importantly, the students you saw

17   have told you that it's not slight.

18          So as we finish what we began in October, let me

19   suggest it would be useful to step back from all of the

20   detail, the statistical detail, the nonstatistical detail,

21   and look more broadly.  What do we see?

22          At Slide 62 on the screen, we can see what has

23   happened to the number of Asian-Americans at Harvard College

24   over time, from 3 percent in 1980 to the 20-some percent

25   where it is today.  These numbers have increased

1    substantially.  But at the same time, the number of

2    African-Americans and Hispanic students have increased as

3    well.

4              The plaintiffs nevertheless claim that

5    discrimination has affected hundreds of Asian-American

6    students over six years and 160,000 applications.  They

7    suggest to you that there have been hundreds of

8    Asian-American applicants that have been discriminated

9    against and disadvantaged.

10             And as Mr. Waxman and I have both pointed out

11   repeatedly, they have not identified one.  They have failed

12   to produce a single rejected applicant who claims

13   discrimination.  They have failed to produce a single file.

14             Now, Your Honor, Harvard, like many other

15   institutions of higher education, has recognized, as I said,

16   the compelling interest in creating communities through

17   diverse in many respects.  Those institutions -- not us

18   alone, but many other institutions of higher education have

19   invested enormous time, effort, and energy over many years in

20   recruiting and enrolling students from a wide variety of

21   racial, ethnic, socioeconomic, geographic, and other

22   backgrounds.

23             As President Simmons testified, and I quote on

24   Slide 65, how can we imagine a world in which we are not

25   creating leaders and citizens who have the capacity to

1    mediate differences?  I cannot imagine it.

2              And as President Faust testified, on Slide 66,

3    we've made progress, but there much to be done.

4              That is why the plaintiff's expert conceded, as

5    shown on Slide 67 that SFFA's analysis and his analysis is

6    one where there are winners -- whites and Asian-Americans --

7    and one where there are losers -- African-Americans and

8    Hispanics.

9              Buried in two footnotes in SFFA's briefing is the

10   evidence of SFFA's real ambition, to ask the Supreme Court to

11   change the law and forbid the consideration of race by

12   Harvard and other universities like it.

13             As the plaintiff's own slide show -- and I'm

14   putting now up on Slide 69 one of the slides from their own

15   expert's testimony -- at Harvard College, without any of the

16   ineffective race-neutral alternatives Mr. Kahlenberg

17   proposes, the elimination of race would result in a drastic

18   reduction of the number of African-American and Hispanic

19   students on campus.  That result would be wrong bigly; it

20   would be wrong morally.

21             Your Honor, the course the plaintiff urges you to

22   take is one that would undercut the considered judgment of

23   educators at Harvard and elsewhere that diversity enhances

24   the community and the learning that takes place in

25   classrooms, around the dining tables, and on playing fields.

1    It would leave generations of young Americans less equipped

2    to thrive in and to confront the challenges in an

3    increasingly complex world.  And it would send the message

4    and it would create the reality that American universities

5    are no longer the cradles of opportunity and its beacons of

6    social mobility.

7              Congress cannot have possibly intended that

8    Title VI, a statute enacted to expand opportunity, would be

9    used to contract the opportunity that's been made available

10   to so many people who have not historically had that

11   opportunity.

12             Thank you.

13             THE COURT:  Thank you.

14             Mr. Mortara, how many extra minutes do you get?

15             MR. MORTARA:  According to Mr. Hughes, it will be

16   ten.  I am certain I will not use it, but I won't be rushed.

17             THE COURT:  I'm going to give you some time to

18   figure out how to use your extra ten minutes and let the

19   Amici go next.

20             MR. MORTARA:  That's great.

21             MS. TORRES:  Your Honor, we have prepared slide

22   deck copies, if you would like one, as well as for the

23   parties.

24             And if I can quickly correct myself, I am joined by

25   Emma Dinan from Arnold & Porter and from MJ Rosner, one of

1    our co-counsel in the case.

2             Race-blind admissions is an act of erasure.  To try

3    to not see my race is to try to not see me.

4             It was on the witness stand right there that Sarah

5    Cole shared this sentiment, and Sarah was not alone.  Eight

6    Harvard students and alum testified at trial for student

7    Amici:  Thang, Sally, Itzel, and Sarah, along with

8    organizational Amici.

9             All eight shared their ethnicity with Harvard when

10   applying because all eight felt it was an integral aspect.

11   All eight testified that Harvard's racial diversity, a

12   product of its admissions process, positively shaped their

13   educational experience.  They engaged in cross-racial

14   conversations that were mind opening, met other students of

15   color who were their saving grace and learned lessons that

16   made them better physicians, teachers, policy makers, and

17   citizens.

18            SFFA did not challenge these facts.  And at points,

19   it outright agreed that race and racial diversity remains

20   vitally important in today's society.

21            Instead, the plaintiffs have engaged in their own

22   act of erasure.  They did not call a single student to

23   testify, and its experts did not consult a single student to

24   form their opinions.  The plaintiffs have tried to erase

25   countless student stories by placing undue emphasis on its

1    flawed statistical analysis and by ignoring the wealth of

2    evidence in the students' application files.  That evidence

3    is persuasive proof that Harvard's appreciation of race is

4    lawful and critical for cultivating citizen leaders.

5         As this Court knows, the plaintiffs tried to

6    achieve its singular goal of banning the consideration of

7    race by advancing two distinct legal theories, starting with

8    the claims against Harvard's policy promoting diversity.

9         The legal standard is straightforward.  Harvard

10   must show that it is both necessary and individualized.

11        Necessity is established by three undisputed facts.

12   The first, race provides critical context for accurately

13   assessing many applicants' strengths and contributions.  This

14   was true for Itzel, whose personal essay, entitled

15   "Different," told Harvard about how she initially felt like

16   an ethnic outsider because of her Latina heritage.  When she

17   used advanced vocabulary, she was made fun of for talking

18   white.  But she returned to her roots.  She ultimately

19   embraced her heritage because it made her stronger, more

20   empathetic, a more critical thinker.

21        She told Harvard that she discovered her life's

22   ambition to represent her heritage and that she would carry

23   that pride with her to college if admitted.

24        And the evidence shows that Harvard took note, not

25   of a single fact about Itzel but of a complex picture, of a

1    complex young woman who Harvard decided would be a good fit.

2              The plaintiffs don't say that that these strengths

3    should not be valued, but their requested remedy would compel

4    universities to blind themselves to any reference to race.

5    This would systematically undervalue the contributions like

6    Itzel.

7              The harm would cut just as deep for American

8    students like Thang.  Thang told Harvard that when he was

9    growing up, his Vietnamese identity felt lost in translation.

10   He told Harvard about his transformative growth, placing

11   pencils between his teeth to improve his pronunciation.  And

12   he told Harvard that he reconnected with his Vietnamese

13   identity because it showed he had a strong sense of self.

14   Erasing Thang's ethnicity from his application file would

15   undercount his strengths as well.

16             The plaintiff's own expert agreed.  Mr. Kahlenberg

17   conceded that admissions offices should be able to consider

18   whether an applicant has overcome racial discrimination.

19             Furthermore, the students show that even the

20   demographic check box can offer meaningful information.

21             Sarah wrote her essay on combatting gun violence in

22   Kansas City.  She committed herself to this cause after a

23   close acquaintance was killed.  And she presented the mayor

24   with six recommendations to end youth violence.  Sarah never

25   mentioned her race in her essay, but she did mark the box

that she was African-American.  This provides additional
context for Sarah's advocacy, and at trial Sarah agreed.

The second undisputed fact is that racial diversity
enriches the educational environment for all students.  Every
single student testified to this fact.  Thang explained that
his interactions with racially diverse students gave him a
tool set to think about cultural sensitivity which will make
him a better doctor.  And this diversity benefits nonminority
students, too.

Sarah told this court that she was repeatedly
thanked by classmates for her contributions, including when
she specifically framed them as a black woman.  Racial
diversity also matters for combatting racial hostility.

While Harvard has taken steps to better support
students of color, Itzel still felt stereotyped by classmates
who constantly questioned her:  Were you born here?  Are you
a citizen?

A staff member kicked Sally out of a student
lounge, presuming she was a trespassing tourist, making Sally
feel like a perpetual foreigner.

Cecelia Nunez shared about how a classmate called
her and her friends a bunch of wetbacks.  The number of
minority students matters in these moments.  Cecelia shared
that they could laugh off the racial slur because they were a
large group of students, but she acknowledged that they had

1    likely felt threatened had their numbers been lower.

2            The plaintiffs have suggested that these benefits

3    could be achieved without considering race, but they are

4    wrong because of the third undisputed fact.

5            Eliminating the consideration of race would sharply

6    reduce the number of black, Hispanic, and other minority

7    students on campus.  Harvard's expert estimated that their

8    numbers would be cut in half, and the plaintiff's expert said

9    that their numbers would be cut by roughly 1,000 students on

10   campus.

11           All students would lose out from this decline.  As

12   Sarah shared, there would be less learning because black and

13   Latinx students offer perspectives that make classes so much

14   richer.  And Itzel explained that students of color are

15   driving many of the positive changes on Harvard's campus.

16           SFFA's expert, Mr. Kahlenberg, tries to erase these

17   harms by saying Harvard could achieve comparable benefits by

18   using race-neutral alternatives.  But his alternatives do not

19   make up for the losses.

20           All of them reduce the share of black students.

21   This reduction would undoubtedly harm Harvard's

22   African-American students.  Sarah needed a sufficient number

23   of same-race peers to lean on when Harvard's newspaper

24   published a racially bigoted article suggesting that

25   admitting black students to Harvard was like teaching a blind

person to be a pilot.  This is a group that is already highly
marginalized on Harvard's campus.  But this decline also
hurts every student.

Thang testified that the decline in black students
would hurt his education dramatically because it's their
advocacy that taught him how to build coalitions and how to
better address the health needs of people of color, including
his own Vietnamese community.

Another shortcoming, socioeconomic status cannot
serve as a proxy for race.  As Itzel testified, ethnoracial
diversity is more visibly salient.  When she entered a
classroom, she took note mentally of the number of nonwhite
students, and she intentionally sought out spaces with more
students of color because there she could finally breathe.

Kahlenberg himself admits that the most efficient
method for cultivating racial diversity is considering race,
not socioeconomic status.

Another major pitfall.  It threatens to reduce the
diversity within each racial group.  Asian-Americans vary
widely in their immigration histories, educational
opportunities, and countless other characteristics.  As Thang
testified, Southeast Asian representation is lacking at
Harvard with fewer underrepresented Vietnamese students.
This often makes him feel erased.  Thang explained
race-conscious admissions allows Harvard to take his

1    Vietnamese immigration history into account.

2         As a final problem, it's likely that the decline

3    would be even greater than estimated.  Several students said

4    that if Harvard stopped considering race, minority students

5    would be less likely to apply and less likely to accept.

6         Taken together, these facts demonstrate racial

7    considerations are necessary.  The remaining question is

8    whether Harvard's manner of considering it is individualized.

9         This question should also be resolved in their

10   favor based on three facts:  Admitted black and Hispanic

11   students are eminently qualified regardless of race; Harvard

12   considers all pertinent elements of diversity; and Harvard

13   flexibly applies its positive appreciation of race across

14   students of all backgrounds.  It does not award predetermined

15   points, and it is never a negative factor.

16        The plaintiffs say that race is the predominant

17   factor in admitting black and Hispanic students.  The claim

18   is false, and Sarah's file shows why.

19        Harvard's readers made no comment about Sarah's

20   race.  They do comment extensively on Sarah's extraordinary

21   achievements.  And I've just pulled out a few highlights.

22   They praised Sarah's stellar academics and wide-ranging

23   extracurriculars.  She earned straight As and A pluses in

24   high school while holding down a part-time job.  The comment

25   about her character attributes are all backed up by glowing

1    recommendations.

2          And notably for this case, Harvard's readers

3    underlined that she exhibited leadership of a subtler,

4    quieter type, proof that "quiet" can be a positive term.  The

5    comments also show Harvard's valuing a full range of

6    diversity attributes, noting Sarah's socioeconomic status,

7    her geographic ties, and even her parents' occupations, a

8    sign that Harvard does consider this information.  And

9    Dr. Card's model is stronger for considering it, too.

10          Izel's application reflects a similar pattern.  It

11   is full of detailed commentary about the full spectrum of her

12   strengths.  For Itzel, Harvard's readers did make two

13   references to her ethnicity, noting that she was connected to

14   her heritage after a period of disconnect, see PE.

15   Presumably PE is her personal essay entitled "Different."

16   This shows when Harvard's considering ethnicity, they're

17   viewing it in context.

18          To be clear, race may have played a limited role in

19   Itzel and Sarah's admission, but the plaintiff's argument

20   that race is the predominant factor is not only incorrect, it

21   unfairly erases the great weight of their accomplishments.

22          Just as importantly, there is nothing wrong with

23   considering race in a limited, reasonable way.  Harvard is

24   admitting minority students who are making concrete

25   contributions to its educational goals based in part on their

1    race.   Itzel vowed in her application to carry her Latina

2    pride to college, and she made good on this promise.   She led

3    a coalition of students who established an ethnic studies

4    track at Harvard.

5            The recommendation letter from Sarah's school

6    counselor, including her response in a prior survey saying

7    that her greatest contribution in high school was loosening

8    the strong hold of stereotypes by providing her classmates

9    with an example of a working-class black woman who strives

10   for academic excellence.

11           Sarah continued to challenge stereotypes at

12   Harvard.   She co-authored a diversity report.   She served as

13   president of the Black Students Association.   And when the

14   campus was shaken by the deaths of Michael Brown, Eric

15   Garner, and the slew of police shootings that followed, Sarah

16   led the rest of the campus in finding a path for her to mourn

17   and make meaning of the fact that black lives matter and how

18   to be better allies.

19           It's clear on this record that Harvard's process is

20   both necessary and highly individualized.

21           Turning briefly to the plaintiff's second legal

22   theory of intentional discrimination, the students offer

23   three observations.

24           First, the plaintiffs cannot evade the burden of

25   proving intent, and strict scrutiny does not apply.

Harvard's counsel covered this.  So I'm going to move on to
the second observation.

The application files of the Asian-American student
Amici corroborate the testimony of Harvard's witnesses.  If
Asian-American ethnicity is taken into account, it's always
seen in a positive light.

The reviewer who noted Thang's Vietnamese identity
and use of pencils used to improve his English also favorably
praised him for pushing himself academically and personally.

For Sally, the only reference to her Chinese
heritage were positive, and they were always tied to context.

The plaintiffs cannot erase entirely the
significance of these examples.

A third observation:  The plaintiff's method of
proof overlooks the importance of non-academic factors.  The
plaintiff's arguments about the personal score are not
persuasive because they overemphasize academic metrics.
Their expert throws out the personal score based on two
flawed analyses.

First, he points to differences in the personal
score when students are arranged by academic index, a score
based entirely on standardized test scores and grades.  While
there may be racial variants, this does not show racial bias.
It simply demonstrates that the academic index is not
strongly related to the personal score.  And those applicants

with midrange scores are more than academically qualified.

Take our students.  Among the four, Thang had the lowest academic index at 220, probably because of his lower-end SAT score.  According to the plaintiff's table, this places him in the 5th decile.  The plaintiffs have derisively referred to this as a middle-of-the-pack score.

But Thang was more than academically qualified.  He had straight As in high school, graduated first in his prestigious magnet program, and was a national AP scholar with distinction.  That's what qualifies as underqualified in the SFFA model.

His academic index also says nothing about the attributes relevant to the personal score, such as reaction to setbacks and concern for others.  Here, Thang excelled. He overcame language barriers, and his school recommendations stressed that he was an unusually caring individual with an infectiously happy personality.

There's also nothing suspicious about variation by race.  The academic index is highly driven by standardized test scores which track privilege more than talent.  Test scores are racially skewed in large part because of racial variation in wealth, which impacts who has access to expensive test-prep programs.

Grades and coursework can also be racially skewed. Several student Amici testified that teachers were less

likely to identify black and Latino students for gifted coursework.

Dr. Arcidiacono also justifies throwing out his personal score based on his regression analysis.  But his method selectively ignores some racial associations but not others.  All three of the rating regressions showed associations with race.  All three had no explanatory power.  They should be treated consistently.

Dr. Card did this.  He adjusted his model for the racial associations across all three of the ratings, and he found no sign of discrimination.

Harvard's admissions system is not perfect.  To be clear, Asian-Americans overcome setbacks, display courage, and make great leaders.  But because of biases in the K-12 system, such attributes may show up in students' application files at varying rates.

Teachers and counselors may offer effusive praise of Asian-American students, but that praise may focus more on their academic strengths and less on their reaction to setbacks.

Think of Sally Chen.  Her college counselor told her not to write about her family's Asian immigrant story because it was overdone.  Fortunately, Sally did not heed this advice.  She wrote about it, received a high personal score, and got in.  But imagine if the counselor had

convinced Sally.  And these are the very same counselors who
are writing recommendation letters for students.

Instead of perpetuating inequalities,
race-conscious admissions is one of the most important tools
for counterbalancing such biases.  Harvard should continue to
refine its system to promote greater equity.  It should
continue to train its staff to be more sensitive to the
challenges of all minority students.  And it should and
legally may use race-conscious admissions as one of these
tools.

In sum, the plaintiffs cannot erase student stories
from the record, and it should not be permitted to erase the
appreciation of race in admissions.

The students trust that this Court's holistic
review of the evidence, much like Harvard's holistic
race-conscious process will honor their stories and preserve
diversity on Harvard's campus to cultivate the citizen
leaders that we need to lead in this stunningly diverse
world.

Thank you.

MS. HOLMES:  Good afternoon, Your Honor, counsel.
I represent 25 Harvard student and alumni organizations as
Amici.  These organizations represent thousands of
Asian-Americans, black, white, Latinx, and native students
and alumni who support Harvard's ongoing consideration of

1    race as one of many factors in its holistic admissions

2    system.

3            Your Honor heard from a few of these members who

4    testified during trial, as well as from witnesses from the

5    student Amici.

6            By contrast, as has been pointed out, no student

7    testified in support of SFFA's claims.  The Court has our

8    proposed findings of fact and conclusions of law, but I would

9    like to highlight three crucial points in a case that has

10   become largely dominated by the battles of statistics.

11           First is to give a concrete picture of what is

12   meant by the educational benefits of diversity.  In other

13   words, what would be lost should Harvard no longer be able to

14   cultivate this diversity.

15           The second is to expose the fallacy of race-neutral

16   alternatives.  They have been studied, attempted, and

17   simulated.  And the evidence in the record shows that there

18   are no workable alternatives through which Harvard can

19   generate sufficient educational benefits of diversity

20   compared to the limited consideration of race in admissions.

21           And finally, SFFA's push for a race-blind

22   admissions system disproportionately harms applicants and

23   students of color, including Asian-Americans.

24           One goal of the organizations I represent is to

25   make concrete what a diverse student body looks like.  And

I'm focusing here on racial and ethnic diversity, although it is true that other types of diversity are also important and Harvard does consider those other types of diversity.

Our witnesses demonstrated how learning in a racially diverse student environment shaped their educational experiences.  Their firsthand experience offers real-world examples of the concepts described by Dr. Ruth Simmons, an educator with decades of experience in college pedagogy and administration, that, in her words, encountering difference deepens student's learning, influences their academic and career paths, and breaks down stereotypes to prepare them for a future in a pluralistic and diverse society.

To highlight a few examples from the record, a racially diverse student body enhances academic study.  You heard this from Thang Diep, who recalled hearing from a black student in his public health class which helped open his eyes to how medical studies can be racially biased and forming his plans to be a pediatrician.

Or take Cecelia Nunez, whose experience before Harvard was primarily with her own Mexican-American community but came to Harvard and discovered other Latinx students from a range of ethnic backgrounds and was inspired to focus on Latin-American studies to explore the full breadth of this diaspora.

Harvard as an institution also depends on a diverse

1    student body to become a school that is more responsive to

2    the needs of its students.  For example, Harvard

3    administrators reached out to Sarah Cole, the president of

4    the Black Students Association, during a period of police

5    shootings of unarmed black men for help in communicating with

6    the student body about this sensitive issue.

7         Diversity on campus also fosters feelings of

8    representation, recognition, and solidarity.  Madison Trice

9    spent years being the only black student in her high school

10   honors courses but was elated to arrive at Harvard and be

11   welcomed into an organization that celebrates black women and

12   all their multidimensional identities.

13        Diversity allows for coalition building and coming

14   together to tackle difficult topics.  A group of

15   Asian-American students at Harvard started a coalition of

16   multiple student groups of color to push the Harvard

17   admiration to establish an ethnic studies track and an ethnic

18   studies program, efforts that continue today.

19        And diversity promotes moments of interpersonal

20   revelation.  Through late-night conversations with her black

21   roommate after an incident of police brutality against a

22   black student took place just steps from campus, Catherine Ho

23   learned about the emotional total that the episode had taken

24   on the black student community.

25        This is precisely what the Supreme Court meant when

1    it says, in *Bakke*, "The atmosphere of speculation,
2    experiment, and creation so essential to the quality of
3    higher education is widely believed to be promoted by a
4    diverse student body."  Justice Powell continued, "It is not
5    too much to say that the nation's future depends upon leaders
6    trained through wide exposure to the ideas and mores of
7    students as diverse as this nation of many peoples."
8           Without a diverse student body, the conversations,
9    educational epiphanies, moments of solidarity, challenges to
10   prior assumptions, or feelings of finally belonging cannot
11   happen.  These educational experiences cannot be taught in
12   the classroom.  Indeed, much of the work of translating
13   diversity into these benefits is shouldered by our client
14   organizations which bring people together across racial lines
15   for socializing, educational events, dialogue, and activism.
16          Even though they can't be quantified, the evidence
17   showed that these benefits are more than abstract concepts
18   and have real, lasting effects on students' educational
19   experiences and future potential.  And we should tread very
20   carefully when we consider dismantling an admissions system
21   that has made them possible.
22          Turning to race-neutral alternatives, I will start
23   by pointing out that on the stand Mr. Kahlenberg agreed to
24   the eminently simple concept that the best and most efficient
25   method of promoting racial diversity in a student body is to

consider race in admissions.  The evidence in the record
takes this further, demonstrating that it is a fallacy that
race-neutral alternatives are enough to produce a
sufficiently diverse class to foster the educational benefits
of diversity.

First, Harvard already employs numerous
race-neutral alternatives, such as an immense and targeted
recruitment apparatus, one of the most generous financial aid
programs in the country, strong consideration of low-income
and disadvantaged status in admissions, and extensive
resources put towards convincing admitted students to
matriculate.

Even if these practices remained in place,
according to Dr. Arcidiacono, if Harvard eliminated the
consideration of race in admissions, the number of black and
Latinx admitted students would fall by nearly 1,100 across
all four years.  That is roughly half.

Mr. Kahlenberg agreed that this is unacceptable,
but his own proposals of race-neutral alternatives do not
fare much better.  In each of his four main simulations, the
share of admitted black students would drop by nearly
one-third.  And we must remember that this is the percentage
of admitted students, so the actual share of black student
enrollment would be even lower, in the single-digit
percentages, especially given that black students yield at a

1    lower rate.

2           As Mr. Lee mentioned, SFFA repeatedly characterizes

3    this reduction as slight.  And shockingly, SFFA touts this

4    marginalization of Harvard's black student community as an

5    increase in diversity, claiming that there will be increases

6    to the Latinx or Asian-Americans share of admits.  Our

7    clients would support this increase but not at the cost of

8    losing one-third of their black classmates.

9           In SFFA's view, apparently, diversity means that

10   people of color are fungible.  You don't need a robust mix of

11   people from different backgrounds.  You don't care about

12   diversity within each racial group, and you can squeeze out

13   one-third of the black community and pat yourself on the back

14   for increasing diversity.

15          Thankfully, under *Fisher*, Harvard and not SFFA has

16   a First Amendment right to define its educational mission and

17   pursue the type of robust diversity that supports that

18   vision.

19          But SFFA's ultimate failure here is that it does

20   not go past the numbers to consider the effect on actual

21   students.  SFFA and Mr. Kahlenberg offer no evidence about

22   how the loss of one-third of admitted black students would

23   affect the educational benefits of diversity at Harvard.

24          Mr. Kahlenberg did not speak to any students,

25   faculty, or educational experts about this.  And SFFA

1    presented no evidence on this issue.  In its brief, SFFA

2    simply scoffed at the idea that there could be a negative

3    effect, calling it "not credible."

4            But the unrebutted evidence at trial shows

5    otherwise.  Amici witnesses described their participation in

6    or their engagement with the black student community and the

7    detrimental effects a significant reduction in this community

8    would have on their Harvard experience.

9            These effects include fewer opportunities for

10   meaningful interactions that break down stereotypes, more

11   isolation of black students, and feelings of tokenism in the

12   classroom, a potential increase in racial hostility, less

13   diversity within the black student community because a

14   smaller community will likely not reflect the full range of

15   black experiences, fewer black students to help recruit and

16   welcome prospective students, and less capacity of cultural

17   organizations to promote dialogue and education that helps

18   expose students to people of different backgrounds and issues

19   faced by different communities.

20           On this last point, many black student

21   organizations such as our clients, the Black Students

22   Association and the Kuumba singers, for example, are some of

23   the more established organizations on campus with decades of

24   leadership at Harvard.  They have served as models and paved

25   the way for a proliferation of cultural organizations.  For

1    these organizations to lose membership and capacity would

2    have effects that reach beyond the black community, but it

3    would affect this entire network and also affect Harvard's

4    relationship with its students of color.

5            Harvard still has progress to make to become a more

6    inclusive place.  There are still classes and spaces that

7    feel overwhelmingly white.  Harvard still lacks an ethnic

8    studies program.  There are still incidents of racial

9    hostility, and many complained about the school's inadequate

10   response to an incident of police brutality.

11           A significant reduction in the black student

12   community is antithetical to making progress on these issues.

13           And thus, Your Honor should reject SFFA's claims

14   that it has identified a race-neutral solution that works

15   about as well as the consideration of race in admissions

16   because there is no evidence that these alternatives can

17   foster diversity sufficient to reach -- sufficient to reap

18   its educational benefits.

19           Finally, at every step of this case, SFFA has

20   pursued its claims in ways that disadvantage students of

21   color.  First, SFFA's intentional discrimination claim relies

22   heavily on comparing applicants on academic measures of

23   grades and test scores.  But Harvard has never claimed that

24   these are the most important metrics in its admissions

25   determinations, especially when distinguishing between highly

1    competitive applicants.

2         One reason is because Harvard recognizes the

3    realities of our K-12 educational system in which black and

4    Latinx students disproportionately face barriers to

5    educational opportunity that may limit the degree to which

6    grades and test scores reflect their full academic potential.

7         And yet, SFFA overemphasizes grades and test scores

8    in its analysis, constantly comparing applicants by academic

9    index, even though Harvard does not even consider the

10   academic index in its admissions.

11        You've heard from student witnesses of many races,

12   and they are all highly qualified with stellar academic and

13   non-academic credentials.  Hearing their pre-Harvard

14   accomplishments, scores, and resumes, it is clear that to the

15   extent that race was considered this their admission, it was

16   simply a plus factor that helped add context to their

17   stories, the cherry on top of a great application.

18        But SFFA's focus on academic measures devalues the

19   non-academic strengths of those applications, which are can

20   sometimes be the credentials that allow black and Latinx

21   applicants to show their full potential.

22        Second, race-conscious admissions allow Harvard to

23   consider the full lived experiences of applicants of color,

24   whose experiences may often be illuminated by their racial or

25   ethnic identity.  If Harvard no longer considered race in

admissions, it could signal to these applicants that the
school doesn't value these experiences or might not even
consider compelling stories of adversity or identity or
immigrant background that are inextricably tied to race.

This would hurt Asian-American applicants just as
much as other applicants of color.

Finally, under all the expert analysis in this
case, Dr. Card, Dr. Arcidiacono, and Mr. Kahlenberg, if you
remove the consideration of race, almost any way you slice
the data, the groups that suffer in the admissions process
are primarily black and Latinx applicants.

SFFA's claim is premised on alleged discrimination
against Asian-American applicants compared to white
applicants.  And yet white applicants do not bear the brunt
of the burdens of their proposed alternatives or remedies.
Indeed, in some of the analyses, white applicants are the
primary beneficiaries.

It is hard to believe that SFFA has pursued this
case in order to turn away the wolf of racial bias when
SFFA's claims, analyses, and remedies seem so slanted against
students and applicants of color.

On a final note, since its inception, my
organization, the NAACP legal defense fund, as well as the 25
organizations we represent, has been committed to racial
equality.  We unequivocally denounce discrimination against

1    any group.  We are also well aware of the burden that civil

2    rights plaintiffs shoulder in bringing intentional

3    discrimination cases under Title VI.

4            SFFA bears that burden in this case, but it has

5    attempted to evade its obligation by twisting the law to

6    argue that the burden should shift onto Harvard to disprove

7    discrimination simply because Harvard has a race-conscious

8    admissions policy, even though that policy has been approved

9    by Supreme Court precedent.

10           SFFA's legal gymnastics are revealing because this

11   case is not really about intentional discrimination.  It is

12   an attack on Harvard's ability to provide a racially

13   inclusive and diverse educational environment from which all

14   students benefit.  The subtext of SFFA's argument is that any

15   race-conscious admissions policy is tantamount to

16   discrimination.  But that premise is not borne out by the

17   evidence in this case and conflicts with Supreme Court

18   precedent.

19           And it is deeply ironic that under the guise of

20   Title VI of the Civil Rights Act of 1964, SFFA would attempt

21   to ban a civil rights policy that is intended to advance

22   equity in higher education, without which Harvard would be a

23   of whiter, more closed institution.

24           Thank you.

25           MR. MORTARA:  Your Honor, subject to the computer,

1   I'm ready to go.

2             Ms. Daly, are you?

3             Your Honor, while the screen is adjusting, I think

4   you've learned a little bit about me personally in the course

5   of this case.  I hadn't told you yet that my wife, Mary

6   Swietnicki, and I have ten nieces and nephews.  Four of them

7   are Chinese-Americans.  My daughter has four Chinese-American

8   cousins.  Mary's brother married a Chinese-American woman.

9             And I'm here to tell you I'm part of the community

10  of Americans waiting to hear why it is that Asian-Americans

11  got not marginally lower personal ratings, statistically

12  significantly lower personal ratings than white applicants.

13  It is undisputed in this case, and we still haven't been told

14  why.

15            I get it, Your Honor, from listening to Mr. Waxman

16  in particular, I have failed my own family because we are the

17  gang that can't shoot straight.  We allegedly have told you

18  all sorts of inconsistent things.

19            But if you remember Tab 12 of your binder and the

20  *Thomas* case, it is not inconsistent to talk about intentional

21  discrimination.  I will say it again.  Harvard intentionally

22  discriminated in this case.  It's not inconsistent to follow

23  that up with statements that it could have happened because

24  of implicit bias, and it could have happened because of

25  racial stereotyping.

1              None of those things are inconsistent with one
2     another.  The *Thomas* versus Eastman Kodak case says they are
3     all the same.  And I'll say it all again.  Harvard
4     intentionally discriminated in this case against
5     Asian-American applicants.

6              And right behind that, Your Honor, you know you
7     don't have to find that Harvard's witnesses were liars and
8     perjurers, even when they said they never used race in the
9     personal rating.

10             That's what *Thomas* is all about.  Cognitive biases
11    that cause people to do things that they come in here and
12    they can't even explain.

13             None of them could explain why Asians were getting
14    lower personal ratings, but they are.  How is it happening?
15    Why is it happening?  We still haven't heard.

16             What we have heard is a lot of confusion and more
17    two plus two equals five about the law.  I heard Mr. Waxman
18    say that *Gratz* is not an intentional discrimination case.

19             Let's check.  Here's the Supreme Court decision in
20    *Gratz*, and I just am going to go to the very beginning of
21    Chief Justice Rehnquist's majority opinion.  This is a case
22    about alleged violations of the equal protection clause and
23    what Title VI of the Civil Rights Act of 1964.

24             And what's the conclusion?  The program in the
25    University of Michigan *Gratz* case violated these

1    constitutional and statutory provisions.

2            The last I checked, Title VI only bans intentional

3    discrimination.  *Gratz* absolutely is an intentional

4    discrimination case.  All we heard just now was another

5    episode of two plus two equals five.  And Harvard is even

6    move confused about other areas of discrimination law.

7            If you took seriously everything they were saying,

8    they'd be overturning about 40 years of discrimination case

9    law or trying to make Title VI different from Title VII in

10   some way nobody could possibly explain.  They're right next

11   to each other, in the same act and are modeled after one

12   another.

13           First, we somehow need to show you direct evidence

14   of discrimination?  Not according to the Third Circuit in

15   *Aman v Cort Furniture*.  Let's take a look at that.  This is

16   *Aman v Cort Furniture Rental* from the Third Circuit.  And

17   what did they say on the subject where we were criticized for

18   no direct evidence.

19           Here's what they said:  "As one court has

20   recognized, defendants of even minimal sophistication will

21   neither admit discriminatory animus or leave a paper trail

22   demonstrating it."

23           I think we can all agree Harvard and its admission

24   personnel are more than minimal sophistication.  We need to

25   have anecdotal evidence?  Really?  What did the D.C. Circuit

1    say about that in the *Segar* case.  This is the *Segar* case
2    from the D.C. Circuit.
3            And over in that case, around about Headnote 36,
4    statistics of course are not irrefutable, citing *Teamsters*,
5    but when a plaintiff's statistical methodology focus on the
6    right things, the appropriate labor pool, and generates
7    evidence of discrimination at a statistically significant
8    level, no sound policy reason exists for subjecting the
9    plaintiff to the additional requirement of either providing
10   anecdotal evidence or showing further gross disparities.
11   Such a rule would reflect little more than a superstitious
12   hostility to statistical proof, a preference for the
13   intuitionistic and individualistic over the scientific and
14   systematic.
15           We are rolling back the decades in employment
16   discrimination law every time Harvard stands up, or we're
17   just deciding that Title VI is somehow different.  Courts
18   cite Title VII cases and Title VI cases interchangeably every
19   single week in this country.
20           Now, Your Honor, I did say something -- I did say
21   we didn't think much of the anecdotes because Harvard's
22   cherry-picked set of applications that they gave us --
23   remember, we picked applications from behind the veil of
24   ignorance as to what they said.  They had all the
25   applications when they picked them.

1              The anecdotes don't mean of because we didn't get a

2       statistically relevant sample of applications.  And I did say

3       that.  We don't think much of the anecdotal evidence, and

4       that includes the ice skater, Your Honor, to be candid.  I

5       never once said, we never once said our nonstatistical

6       evidence doesn't amount to much.

7              Your Honor, maybe we've got disagreements between

8       the Court and SFFA.  We certainly have them with our friends

9       from Harvard.  But we produced a mountain of nonstatistical

10      evidence.  OIR, the new reading procedures, the emails, Utah,

11      etc., the stereotypical notes on the dockets.  It's different

12      to call an Asian-American applicant quiet than to call a

13      Hispanic applicant quiet.  One is a racial stereotype, one

14      isn't.  What OCR found.

15             Your Honor, we are constantly being told that we

16      should have dragged Students for Fair Admissions standing

17      members in here and put them on the stand.  I know no one

18      from Harvard or its legal team would have done the kinds of

19      things that Ms. Fisher experienced for her being a plaintiff

20      in a case like this.

21             But I think you can understand -- I think everyone

22      here can understand what people online -- what the online

23      community has done and the way things have gotten in our

24      country and what would have happened to these young people.

25             We all know -- none of us in here would have done

```
 1          it, but somebody would have done something horrible to one of

 2          our students if they'd stood there and done that.  And we

 3          didn't have to, and we didn't.  Nothing in the law says we

 4          had to bring our kids in here to suffer the slings and arrows

 5          rather than the adulation that is poured on others who

 6          support Harvard.

 7                    And we're very proud of the students who testified

 8          as well.

 9                    There's room for disagreement about these deep,

10          deep questions.  But I think we can put aside the idea that

11          legally or for any other reason we needed to have our members

12          testify.

13                    I want to move on to the Office of Institutional

14          Research because I just heard that Plaintiff's Exhibit 28,

15          the so-called follow-up analysis, put Dean Fitzsimmons at

16          ease.

17                    Let's take a look at that.  Here's the follow-up

18          analysis.  We did not see the coefficients on the screen,

19          Your Honor.  Follow-up analysis tells you basically the same

20          story, intent to help athletes, intent to help

21          African-Americans.  I won't do the whole staccato

22          presentation again.

23                    There's the thing allegedly put Dean Fitzsimmons at

24          ease.  Oh, we gave a plus to low-income Asians.

25                    Right down below is a massive minus for
```

1    non-low-income Asians.  82 percent of the Asian applicants to

2    Harvard are not low income.  And this is not a statistically

3    significant finding of a correlation, not at all.

4    Statistical significance in a regression model equals intent.

5    Wrong again, Harvard.

6            Let's take a look at *Fudge v Providence Fire* from

7    the First Circuit.  "When statistical tests sufficiently

8    diminish chance as a likely explanation, it can then be

9    presumed that an apparently substantial difference in pass

10   rates here is attributable to discriminatory bias."

11           Regressions show intent.  Not just disparate

12   impact.  Dean Fitzsimmons knew that.  He saw those

13   coefficients.  He wasn't put at ease by a plus for low-income

14   Asians.  Standing right next to it is an even bigger, even

15   bigger minus for non-low-income Asians.  Instead of being

16   minus .037 now, it's minus .46789, even bigger.

17           Your Honor, I'm going to wrap up, not even taking

18   close to my time, but I am going to talk a little bit about

19   the personal rating.

20           I cannot make Harvard answer our questions.  But

21   you have not heard any answer to the racial pattern in the

22   personal rating.  Will someone please tell us why

23   African-Americans and Hispanics get these huge boosts in the

24   personal rating?  It's undisputed they do better than

25   everyone else, whites and Asians.  No one has ever adequately

explained that to you.  You weren't shown school support ratings or non-academic ratings or anything else explaining the racial pattern in the personal rating.  You were given, at best, a partial explanation for the differences between Asians and whites.  But it's incomplete, for the reasons I gave.

Professor Arcidiacono's model showed you all the ratings variables going into his model of the personal rating.  And it's true, Your Honor, a little bit, that the academic ratings don't matter as much for the personal rating.  That's all taken into account in the model.  Let me take you back there.

You see the model that just includes academic variables, model 2?  It's not very good.  R-squared value, a pseudo R-squared value of .2, it's considered the gold standard.  That's the McFadden paper I discussed with Professor Card.

Once you get above .2, that's a good fit.  The first model with just the academic variables isn't a great fit.  The model takes into account the relatively weak correlation, if there still is one, the relatively weak correlation between academics and the personal rating.  And it rolls it all in.

So by the time you get to model 5, you've got whatever contribution academics makes, small though it may

1      be, and all the contributions of school support, alumni

2      interview, and everything else that Mr. Waxman called

3      non-academic, none of which explained the rank hierarchy

4      we've shown you time and time again.

5              They have never bothered to tell you why it is

6      African-Americans do better than Hispanics, do better than

7      whites, do better than Asians.  Not once.  There is no

8      explanation other than what Mr. Luby said the first time when

9      he told the truth, Harvard uses race in the personal rating.

10             And if so, I don't know what else we need to do

11     other than keep putting up Professor Card's own testimony

12     about how he treated the overall rating.

13             And now we're given the story that the personal

14     rating has all this good, extra data in it, and why would we

15     get it out of the model.  The overall rating has all sorts of

16     good, extra data in it.  It's the admissions officers

17     assessment of the ultimate likelihood that the candidate will

18     be admitted taken into account every single thing in the

19     application.

20             Nevertheless, because Harvard told Professor Card

21     that they were using preferences in the overall rating as

22     opposed to what they hid from him about the personal rating,

23     Card pulled it out of his model.  There's no rationale for

24     not doing the same thing to the personal rating that he did

25     to the overall rating.  I've shown it dozens of times.

1          So now what do we get?  We get the virtual rating

2     model.  This is a model no one believes is accurate.  You

3     have to give Asians artificially low academic ratings and

4     artificially low extracurricular ratings while boosting the

5     ratings of other groups like African-Americans and Hispanics,

6     giving everybody false ratings.

7          At the same time, you don't bother to racially

8     correct the overall rating where there's an undisputed Asian

9     penalty, and you don't bother to racially correct the school

10    support ratings where there's an undisputed racial penalty.

11         The virtual rating model is junk.  Dr. Card had it

12    right when he talked the first time about the overall rating

13    and why he took it out.  And by implication, if you find race

14    influences the personal rating, it's got to come out.

15         I want to close on what we heard from Harvard.

16    Instead of omitted-variable bias, it's now missing relevant

17    factors.

18         Your Honor, the law in discrimination cases is that

19    a defendant cannot look at a statistical analysis like

20    Dr. Card's own analysis without the personal rating or like

21    Professor Arcidiacono's models of the personal rating, and

22    say that doesn't prove anything, it must be some other

23    variable.

24         And don't just take my word for it, like Mr. Waxman

25    standing up here and telling you *Gratz* is not an intentional

discrimination case.  Let's look at the *Palmer* case from the

D.C. Circuit.  We'll go there together.

This is *Palmer v Schultz* from the D.C. Circuit.  As

I said, decades of discrimination law.  It's discussing the

*Bazemore* case from the Supreme Court, a pattern or practice

case involving race discrimination.

*Bazemore* instructs lower courts to be cautious

about dismissing plaintiff's statistical studies as not

probative simply because Harvard offers some

nondiscriminatory explanation for the disparity shown.

Implicit in the *Bazemore* holding is the principle

that a mere conjecture or assertion on Harvard's part that

some missing factor would explain the existing disparities

between Asians and white applicants generally cannot defeat

the inference of discrimination created by plaintiff

statistics.

To be sure, as the Supreme Court acknowledged in

*Bazemore*, there may be a few instances in which the relevance

of a factor to the selection process is so obvious that the

defendants merely pointing to its omission can defeat the

inference of discrimination created by plaintiff statistics.

The logic of *Bazemore*, however, dictates that in

most cases what a defendant cannot rebut statistical evidence

by mere conjectures or assertions without introducing

evidence to support the contentions that the missing factor

```
 1      can explain the disparities as a product of a legitimate,
 2      nondiscriminatory selection criterion without introducing
 3      evidence that Asian essays are worse than whites, without
 4      introducing evidence that something in these recommendation
 5      letters tells Harvard that Asian applicants are less
 6      likeable, kind, have less integrity, less grit, or just have
 7      inferior personal qualities.
 8              I asked a question.  We are asking a question.  Why
 9      did Harvard give Asian applicants lower personal ratings?  We
10      have not yet received an answer other than answers that
11      decades of discrimination case law say are not good enough.
12              Your Honor, I have to address the ALDC point.
13      We're all big fans of PowerPoint in here, but one thing you
14      can do with PowerPoint is you can cut off statements and
15      conceal the full context, and that's exactly what happened
16      with the ALDC issue from our findings of fact.
17              As Your Honor knows, we don't allege that the ALDC
18      Asians suffer a discriminatory admissions outcome penalty.
19      Everyone agrees they suffered some kind of personal rating
20      penalty, which we say just proves our point about stereotypes
21      being applied.
22              And then later on when they get into full committee
23      or subcommittee, wherever it is, somebody says let's pull
24      that candidate up, he's one of us, he's one of ours, he's or
25      she's got that Harvard DNA.
```

1          Mr. Lee put on the screen -- I can't remember if it

2     was Mr. Lee or Mr. Waxman -- Harvard does discriminate

3     against Asian ALDCs, pulled completely out of context from

4     Paragraph 274 of our brief where we acknowledge that there is

5     no admissions penalty outcome on Asian ALDCs, but there is a

6     penalty on the personal rating.

7          It's right here.  If you take a look, Harvard does

8     not appear to impose an admissions penalty on Asian-American

9     ALDCs.

10          We are not the gang that cannot shoot straight.  We

11     have not been inconsistent.  And I hope we have not failed

12     and I have not failed my nieces and nephews.

13          Thank you, Your Honor.

14          THE COURT:  All right.  Thank you all again.  As

15     usual, the arguments were of the highest caliber and

16     edifying.  Thank you.  We'll get to work on this.  Thanks,

17     everyone.

18          (Court recessed at 4:32 p.m.)

19

20

21

22

23

24

25

```
 1                  - - - - - - - - - - -

 2                      CERTIFICATION

 3

 4        I certify that the foregoing is a correct

 5  transcript of the record of proceedings in the above-entitled

 6  matter to the best of my skill and ability.

 7

 8

 9

10  /s/ Joan M. Daly                February 14, 2019

11  _____            _____

12  Joan M. Daly, RMR, CRR          Date
    Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```